

# TEXAS LAW & PSYCHIATRY, P.L.L.C.

VICTOR R. SCARANO, M.D., J.D.
DIRECTOR, FORENSIC PSYCHIATRY SERVICES

713.667.6903
FAX 713.667.6904
vscarano@txlap.com

October 6, 2011

The Honorable John Ellisor
122nd Judicial District Court
Galveston County Justice Center
600 – 59th Street, Suite 3305
Galveston, Texas 77551

     Re:   The State of Texas v. Travis James Mullis
             Cause No.: 08CR0333

Dear Judge Ellisor:

Enclosed please find my report regarding Travis James Mullis.

It is my opinion following this forensic psychiatric examination/evaluation and review of the records cited in my report that Mr. Mullis possesses sufficient present ability to knowingly, intelligently, and voluntarily waive his rights to post-conviction habeas review.

Sincerely,

Victor R. Scarano, M.D., J.D.

Encl.

cc.   Donna Cameron
       Brad Levenson

# STATEMENT OF UNDERSTANDING
## FORENSIC PSYCHIATRIC EXAMINATION/EVALUATION

I, the undersigned,

_Travis_          _James_          _Mullis_

**(PRINT)**          **FIRST**          **MIDDLE**          **LAST**

understand that I am seeing:

**Victor R. Scarano, M.D., J.D.**
Director, Forensic Psychiatry Services
Texas Law & Psychiatry, P.L.L.C.
P.O. Box 25371
Houston, Texas 77265

a physician, whose services have been retained by someone other than myself to perform a psychiatric examination/evaluation.

The purpose of my psychiatric examination/evaluation is legal or administrative, not treatment or treatment-related diagnosis. This means, in part, that the physician is not *my doctor*. In other words, I do not have a *doctor-patient* relationship with the physician, and this psychiatric examination/evaluation does not create one.

I understand that the things I discuss with the physician are not confidential in the same way that a *doctor-patient* examination/evaluation might be confidential. For example, the physician may write a report for a court, an attorney, or other person, organization or insurance company entitled to information about my psychiatric examination/evaluation. The physician may also be asked to testify in court or at a deposition about the things I discuss during the psychiatric examination/evaluation. Nevertheless, I understand that I should cooperate with the interview as best I can, and be honest and straightforward in my answers. Also, I understand that the physician's report and/or testimony may either be helpful to or against my interests in this matter. Finally, unless compelled to do so by a court of law, I may refuse to cooperate with this interview.

I understand that I may ask questions of the physician at any time during the psychiatric examination evaluation. However, questions after the psychiatric examination/evaluation should be referred to those individuals or organizations who requested this psychiatric examination/evaluation, or to my attorney.

A copy of this *Statement of Understanding* has been given to me to keep.

_____          9/23/11
Signature of EVALUEE                              Date

_R. Lemin_____          9/23/2011
Signature of WITNESS                              Date

Victor R. Scarano, M.D., J.D.
Revised 08/2006
Forensic.C-Statement of Understanding.doc

# COMPETENCY TO WAIVE FURTHER LEGAL CHALLENGES TO HIS CONVICTION AND SENTENCE OF DEATH
# MENTAL ILLNESS/MENTAL RETARDATION

Travis James Mullis
DOB: ███████
SSN: ███████
CAUSE No.: 08CR0333
DATE: October 6, 2011

Prepared by:

Victor R. Scarano, M.D., J.D.
Director, Forensic Psychiatry Services
Texas Law & Psychiatry, P.L.L.C.
P.O. Box 25371
Houston, Texas 77265

## TABLE OF CONTENTS

I.   IDENTIFYING INFORMATION ........................................................................... 1

II.   PRESENTING PROBLEMS .............................................................................. 2

    A.   INTERVIEW ................................................................................................ 2
    B.   DECISION TO WAIVE FURTHER LEGAL CHALLENGES TO HIS CONVICTION AND
        SENTENCE OF DEATH ............................................................................... 5
    C.   FAMILY, SOCIAL, EDUCATIONAL HISTORY ................................................ 7
    D.   PAST PSYCHIATRIC HISTORY ................................................................... 8
    E.   MEDICATIONS ........................................................................................ 9

III.   MENTAL STATUS EXAMINATION ................................................................... 9

    A.   APPEARANCE AND BEHAVIOR .................................................................. 9
        1. Dress .............................................................................................. 9
        2. Posture ........................................................................................... 9
        3. Facial Expression ............................................................................. 9
        4. Motor Activity .................................................................................. 9
        5. Physical Characteristics .................................................................... 9
        6. Specific Mannerisms ........................................................................ 9
        7. Reactions to Interviewer ................................................................... 9
    B.   NATURE OF SPEECH ............................................................................... 9
    C.   MOOD AND AFFECT ............................................................................... 10
    D.   THOUGHT PROCESS .............................................................................. 10
    E.   THOUGHT CONTENT .............................................................................. 10
    F.   NATURE OF PERCEPTION ....................................................................... 10
    G.   INSIGHT AND JUDGMENT ....................................................................... 10

IV.   COGNITIVE FUNCTION ............................................................................... 10

    A.   ORIENTATION ....................................................................................... 10
    B.   FUND OF INFORMATION ......................................................................... 10
    C.   ATTENTION/DIGIT SPAN ......................................................................... 11
    D.   CONCENTRATION/ARITHMETIC ............................................................... 11
    E.   MEMORY .............................................................................................. 11
    F.   JUDGMENT: COMPREHENSION ............................................................... 11
    G.   PERCEPTION and COORDINATION ........................................................... 12
    H.   ABSTRACT REASONING .......................................................................... 12
    I.   MINI MENTAL EXAMINATION ................................................................... 12
    J.   TRAILS-A and TRAILS-B ......................................................................... 12
    K.   SIMILARITIES ....................................................................................... 13
    L.   REY FIFTEEN ITEM MEMORY TEST .......................................................... 13
    M.   COMPLICATED HAND MOVEMENT TEST ................................................... 13
    N.   THE CENTER for EPIDEMIOLOGIC STUDIES DEPRESSION SCALE (CES-D) ............ 13

V.   RECORD REVIEW ...................................................................................... 13

    A.   RECORDS FROM TDCJ– MEDICAL RECORDS ............................................ 13
    B.   RECORDS FROM TDCJ – CLASSIFICATION FILE ......................................... 15
    C.   HEARING ON PRO SE MOTION – 05/20/11 ................................................ 16
    D.   VIDEO INTERVIEW – 09/21/11 ................................................................. 16
    E.   *EX PARTE BILLY GEORGE REEDY* ........................................................ 17
    F.   *REES V. PEYTON* ............................................................................... 17
    G.   *RUMBAUGH V. PROCUNIER* ................................................................ 17

VI.   DISCUSSION ............................................................................................. 19

VII.   DIAGNOSES .............................................................................................. 19

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page ii

**VIII. PSYCHOLOGICAL ISSUES: COMPETENCY TO WAIVE POST-CONVICTION HABEAS REVIEW** ............................................................................................. **20**

**IX.   PSYCHOLOGICAL ISSUES: MENTAL ILLNESS/MENTAL RETARDATION** ......... **20**

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 1

# I.   IDENTIFYING INFORMATION

Travis James Mullis is a 25-year-old, Caucasian male who was convicted of capital murder and sentenced to death in March 2011.  Mr. Mullis has been at the TDCJ Polunsky Unit since the end of May 2011.  Mr. Mullis has now notified the trial court that he would like to waive all further legal challenges to his conviction and sentence of death, and have the court assign a date for his execution.

Mr. Mullis is represented by Mr. Brad Levenson, Director, Office of Capital Writs.  Ms. Donna Cameron, First Assistant District Attorney, Galveston County District Attorney's Office, represents the State of Texas.  Judge John Ellisor, 212th Judicial District Court, Galveston County, Texas, on September 15, 2011, appointed Victor R. Scarano, M.D., J.D., to perform a forensic psychiatric examination/evaluation to address:

1. Whether Mr. Mullis is competent to waive further legal challenges to his conviction and sentence of death;
2. Whether Mr. Mullis is suffering from a mental disease or defect;
3. If Mr. Mullis is suffering from a mental disease or defect, does the mental disease or defect prevent him from understanding his legal position and the options available to him;
4. If Mr. Mullis does understand his legal position and the options available to him, does the mental disease or defect nevertheless prevent him from making a knowing, intelligent, and voluntary choice among his options.

Mr. Mullis was interviewed by Dr. Scarano on Friday, September 23, 2011, at the Galveston County Jail, Galveston, Texas.  Dr. Scarano was escorted to Mr. Mullis's jail pod by Deputy Sheriff Lemire.

The following records, reports, and court cases were obtained and reviewed:

1. A letter from Judge John Ellisor, 122nd Judicial District Court, Galveston County, Texas, to Victor R. Scarano, M.D., J.D., dated 09/15/11.
2. An Order Appointing Expert to Examine Petitioner for Competency to Waive Post-Conviction Habeas Review from Judge John Ellisor, 212th Judicial District Court, Galveston County, Texas, dated 09/15/11.
3. Materials from the Texas Department of Corrections:
   a. Medical Records.
   b. Classification File.
4. Transcript of the Hearing on Pro Se Motion, 05/20/11.
5. Video Interview of Mr. Mullis by Chris Paschenko, reporter for the Galveston County Daily News, 09/21/11.
6. Review of Texas Court of Criminal Appeals cases provided by Mr. Brad Levenson:
   a. *Ex Parte Juan Jose Reynoso*, 228 S.W.3d 163 (Tex.Crim.App. 2007).
   b. *Ex Parte Juan Jose Reynoso*, 257 S.W.3d 715 (Tex.Crim.App. 2008).

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 2

       c. *Ex Parte Billy George Reedy*, 282 S.W.3d 492 (Tex.Crim.App. 2009).
       d. *Rees v. Peyton*, 384 U.S. 312 (1966).
   7. *Rumbaugh v. Procunier*, 753 F.2d 395, (5th Cir. 1985).

Tests given during the forensic psychiatric examination/evaluation process consisted of:

1. Mental Status Examination.
2. Mini Mental Examination.
3. Trails A and Trails B.
4. Similarities.
5. Rey Fifteen Item Memory Test.
6. Complicated (Luria) Hand Movement Test.
7. Center for Epidemiologic Studies Depression Scale (CES-D).

At the onset of the interview it was explained to Mr. Mullis that the purpose of this forensic psychiatric examination/evaluation is to address Mr. Mullis's competency to waive further post-conviction challenges to his conviction and sentence of death, with the result that the trial court will set a date certain for his execution.  It was further explained to Mr. Mullis that as a result of this forensic psychiatric examination/ evaluation a report would be generated and sent to Judge John Ellisor; Mr. Mullis's attorney, Mr. Brad Levenson; and the State's attorney, Ms. Donna Cameron, First Assistant Criminal District Attorney for Galveston County.  It was explained to Mr. Mullis that Judge Ellisor appointed Dr. Scarano to perform a forensic psychiatric examination/ evaluation.  It was explained to Mr. Mullis that the information contained in the report could become public through the trial process and is, therefore, not confidential.  It was explained to Mr. Mullis that the results of this forensic psychiatric examination/ evaluation could serve Mr. Mullis's legal interests, but could just as well work against those interests.  Mr. Mullis was also informed that a doctor/patient relationship was not formed through this process of a forensic psychiatric examination/evaluation and that Dr. Scarano would not be providing treatment for Mr. Mullis.

Mr. Mullis, having been informed of the purpose and nature of this forensic psychiatric examination/evaluation, agreed to proceed with the interview and testing, and signed the Statement of Understanding.  Deputy Sheriff Lemire witnessed Dr. Scarano's explanation of the procedure to Mr. Mullis and Mr. Mullis's signing the Statement of Understanding.

## II.   PRESENTING PROBLEMS

### A. INTERVIEW

Travis James Mullis is a 25-year-old, Caucasian male who was convicted of capital murder and sentenced to death in March 2011.  Mr. Mullis has been at the TDCJ Polunsky Unit since the end of May 2011.  Mr. Mullis has now notified the

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 3

trial court that he would like to waive all further legal challenges to his conviction and sentence of death, and have the court assign a date for his execution. Mr. Mullis was asked to go over the legal time line between the commission of the criminal act and his present plan to waive further legal challenges to his conviction and death sentence.

Mr. Mullis stated that the murder occurred on 01/29/08. He stated that he was arrested in Philadelphia, Pennsylvania, and brought to Galveston County. Mr. Mullis stated that he was convicted of capital murder and sentenced to death on 03/11/11.

On 05/20/11, Mr. Mullis stated that he was in Judge Ellisor's court initially for a hearing on a Motion for a New Trial, but it turned into a hearing on his motion to proceed *pro se*. Mr. Mullis stated that Judge Ellisor questioned him about his decision and whether he understood the implications of proceeding *pro se*. After the court finished questioning him, Mr. Mullis stated that Judge Ellisor granted his motion, following which he told Judge Ellisor that he wanted to waive his direct appeal and the Motion for a New Trial.

Mr. Mullis stated that Brad Levenson was the attorney appointed to represent him in the other legal challenge, i.e., Writ of Habeas Corpus. Mr. Mullis stated that Mr. Levenson was appointed to represent him on 03/23/11 by Judge Ellisor.

A few days after the 05/20/11 hearing, Mr. Mullis stated that he was transferred to the Polunsky Unit. Mr. Mullis stated that he has remained there until he was returned to the Galveston County Jail earlier this week for a psychiatric evaluation to determine whether he is competent to waive further legal challenges to his conviction and death sentence, and then to participate in a hearing before the court on that matter.

Mr. Mullis was asked to go over a 24 hour day at the Polunsky Unit starting with the morning. Mr. Mullis stated that breakfast usually comes around 3:30 to 4:30 AM. After breakfast if he is not on the roster for the 1st recreation period, Mr. Mullis stated that he would go back to sleep until 8:00 to 9:00 AM.

Mr. Mullis was asked what the recreation period entails. Mr. Mullis stated that the inmates are allowed a 2 hour recreation period, which allows them to be out of their cells and either in an outdoor or indoor hall. Mr. Mullis stated that not everyone takes their recreation time. According to Mr. Mullis, there are 10 recreation halls and though the inmates are in his separate recreation halls, they can talk to one another through the bars.

Mr. Mullis stated that the first recreation period starts at about 6:00 to 6:30 AM. When asked what he does, if he goes to the first recreation period, Mr. Mullis

stated that he would get out of recreation sometime between 8:30 to 9:00 AM, return to his cell, and take a bird bath.

When asked what he meant by a "bird bath," Mr. Mullis stated that he washes off in the sink in his cell after getting back from his recreation period. Mr. Mullis stated that he then cleans up his cell and listens to the radio or the television. When asked if he has television in his cell, Mr. Mullis stated that he has a radio and the radio can be jerry-rigged to bring in the audio portion of television stations.

When asked what happens next, Mr. Mullis stated that lunch usually comes around noon. After lunch, Mr. Mullis stated that he may take a nap. In the afternoon, Mr. Mullis stated that he reads or listens to the news. When asked what kind of books he reads, Mr. Mullis stated that he reads both fiction and non-fiction books. Mr. Mullis stated that he just finished a 900 page book about J. Edgar Hoover. Also, he said that he recently read a book on the history of Microsoft up to 1995. Mr. Mullis stated that he likes computer stuff a lot.

Mr. Mullis was asked about jerry rigging his radio to bring in television stations. Mr. Mullis stated that he had one of the other inmates jerry rig his radio, because he didn't have all the details on how to do it. When asked how, being in a separate cell, he was able to get his radio to another inmate to jerry-rig it for him, Mr. Mullis stated that the inmates throw out a line to another cell, attach the item to the line, and the other inmate hauls it in.

Mr. Mullis described making a speaker. According to Mr. Mullis, when a radio breaks down, the inmate strips out all the wires. The wires are then formed into a coil and sandwiched between two magnates, which becomes the core of the speaker. Mr. Mullis stated that the core is used to build a speaker using some cardboard and other items.

When asked about dinner, Mr. Mullis stated that dinner comes at about 6:30 to 7:30 PM. When asked about showers, Mr. Mullis stated that showers occur in shifts throughout the day. Mr. Mullis stated that the inmates are allowed 40 minutes for a shower.

When asked when lights are out at night, Mr. Mullis stated that lights go out starting at 9:00 PM and depending on what is going on it can be later. At night, Mr. Mullis stated that he reads, listens to the news on the radio and television stations. Mr. Mullis stated that he likes to listen to the Dave Letterman show and the Craig Ferguson show is on from midnight to 1:00 AM, after which he goes to sleep.

When asked if he receives any letters, Mr. Mullis stated that his brother and the younger of his two sisters write to him. Mr. Mullis stated that his mother wrote to

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 5

him for the first time in a year.  He stated that he also gets letters from a friend in Houston.

## B. DECISION TO WAIVE FURTHER LEGAL CHALLENGES TO HIS CONVICTION AND SENTENCE OF DEATH

Mr. Mullis was asked to talk about his decision to waive further legal challenges by starting when he was arrested in Philadelphia.  Mr. Mullis stated that he figured he was going to get the death penalty when he was arrested and returned to Galveston.

Mr. Mullis stated that his attorneys had him evaluated by a couple of mental health specialists, i.e., psychiatrist and psychologist.  Mr. Mullis stated that the attorney came to see him after they received the psychiatric report outlining his childhood issues and the sexual abuse he endured.  Mr. Mullis stated that his attorneys wanted his permission to go to the district attorney asking him to drop the death penalty in return for life in prison without the possibility of parole if Mr. Mullis would plead guilty to the capital murder charge.  Mr. Mullis stated that after an hour of so arguing that he did not want to enter a guilty plea, he gave in and told the attorneys to go ahead and talk to the district attorney.  Mr. Mullis stated that he told the attorneys that the district attorney wouldn't go for it.  Mr. Mullis stated that his attorney came back and told him that the district attorney said, "No."

Mr. Mullis stated that, at the time, he felt he would be fine with whatever fate the jury decided for him.  Mr. Mullis stated that he was found guilty of capital murder and was sentenced to death.  Mr. Mullis stated that he went to the law library and did the best he could to educate himself on the appeals process, as he had already decided that he did not want to fight the conviction and the sentence.

Mr. Mullis stated that Mr. Wayne Hill was appointed his direct appeal attorney and he advised Mr. Hill that he wanted to waive his appeals, which resulted in the 05/20/11 hearing before Judge Ellisor.

Mr. Mullis stated that Mr. Brad Levenson was appointed his Writ attorney in late March 2011.  When he was first asked about having an attorney to proceed with a writ of habeas corpus, Mr. Mullis stated that he didn't know what that meant so he said, "Yes," in order to give him some time to research what the Writ thing was all about.

When asked what happens if the court grants his motion to waive further legal challenges to his conviction and sentence, Mr. Mullis stated that the judge will set a date certain for his execution.

When asked what happens at his execution, Mr. Mullis went over the chemicals that would be introduced into his body through an intravenous line.  Mr. Mullis

stated that previously the first chemical used to be sodium pentothal, but that has been replaced with phenobarbital.  Once asleep, Mr. Mullis stated that the next chemical that is introduced intravenously is pancuronium bromide, which is a muscle relaxant.  Mr. Mullis stated that the third chemical that is introduced through the intravenous line is potassium chloride, which is used to stop the heart.

When asked what happens when his heart stops, Mr. Mullis stated that when the heart stops he would be dead.  When asked what he understands by "being dead," Mr. Mullis stated that the soul separates from the body.  When asked what happens to the separated soul, Mr. Mullis stated that it either goes to Heaven or to Hell.  When asked where his soul will go, Mr. Mullis stated that, as strange as it might seem to others, he believes that his soul will go to Heaven.  When asked why he believes his soul will go to Heaven, Mr. Mullis stated that he has repented for what he has done, that he believes that God can forgive anything and has forgiven him, and that he has forgiven himself.  Mr. Mullis stated that he has made peace with the terrible crime he had committed and is ready to accept the punishment given to him by the jury.

When asked if he grew up in a family that had a religious affiliation.  Mr. Mullis stated that he grew up as a Roman Catholic, but considers himself to have a much broader religious belief.  When asked what he meant, Mr. Mullis stated that he has read the Bible cover to cover, the Koran cover to cover, and read about other religious beliefs, i.e., Judaism, Buddhism.  When asked about the Buddhist belief that a soul continues to return to life on Earth through many lifetimes, Mr. Mullis stated that he can see that it is a possibility.  Mr. Mullis stated that his adoptive mother has been involved in "*past life transgression*" a type of hypnosis, where one experiences what they did and where there were in a past life, as a way of helping with problems in this life.

When asked why he believes that waiving further legal challenges to his conviction and sentence is a proper choice, Mr. Mullis stated that the punishment fits the crime.  Mr. Mullis stated that he took a life and there is no question of his guilt.

Mr. Mullis stated further that he did not believe it would be fair to the victim, to the families, to go through years and years of fighting, when he believes that he received a just punishment, has made his peace with God and himself, and is prepared to go through with his execution, which the jury had decided was appropriate punishment for his crime.

When asked if there was any pressure brought to bear on him to waive his right to challenge the conviction and sentence, Mr. Mullis stated that it is just the opposite, i.e., others are trying to pressure him to not waive his right to challenge.  Mr. Mullis stated that several of the inmates on death row tried to get him to

change his mind, but when he explained his reasons and thought process they came around to his way of thinking and understood his point of view.
Mr. Mullis stated that he has been thinking about this for the past 3 years and decided early on that whatever the jury was going to give him he was going to accept.

Mr. Mullis was asked if the thought of life in prison without the possibility of parole was a motivating factor in his decision to waive his right to challenge the conviction and sentence, Mr. Mullis stated that it was not. Mr. Mullis added that he does not believe an appeal would ever work, because of the nature of the crime he committed and the fact that there is no doubt of his guilt. Mr. Mullis stated that if it ever came about that his sentence was changed to life in prison without the possibility of parole, he would be sent to a general population prison. Mr. Mullis stated that, as a child rapist and murderer, he would be at the bottom of the food chain in prison and there would be inmates there that would want to kill him.

When asked if the thoughts of being killed in prison had prompted him in any way with forging ahead with his execution, Mr. Mullis stated that it did not, because it is really not relevant to his decision making process.

## C. FAMILY, SOCIAL, EDUCATIONAL HISTORY

Mr. Mullis stated that he was born in Charlotte, North Carolina, and raised in a town just outside of Baltimore, Maryland. Mr. Mullis stated that he never met his birth father and his birth mother died when he was 9 months old.

Mr. Mullis stated that he was adopted and that his adoptive father was a half-brother of his birth mother. Mr. Mullis stated that his adoptive father and his birth mother both had the same mother. Mr. Mullis stated that his adoptive parents lived in the Baltimore area.

Mr. Mullis stated that he was the youngest of 4 children. Mr. Mullis stated that he has an older brother and sister who are about 18 years older than him, and an older sister who is 9 years older than him.

When asked about physical or sexual abuse as a child, Mr. Mullis stated that his adoptive father sexually abused him starting when he was 3 years old to the age of 6 years old. Mr. Mullis stated that his adoptive father reported his sexual assault to Mr. Mullis's therapist and then turned himself into the police. Mr. Mullis stated that his adoptive father did not spend much time in prison. When asked about his adoptive mother's response, Mr. Mullis stated that his adoptive mother had a feeling something was going on, but didn't check it out. Mr. Mullis stated that his adoptive mother was a nurse and worked the night shift, which was the time the sexual abuse took place.

When asked about school, Mr. Mullis stated that he dropped out of school in the 11th grade on his birthday, because he was then 18 years old. Mr. Mullis stated that his adoptive mother told him that he had 3 choices, i.e., finish school, get a job, or get out of the house. Mr. Mullis stated that he contacted a friend in Texas and decided to get out of the house and go to Texas.

Mr. Mullis stated that his adoptive mother bought him a plane ticket and he flew to Houston, Texas, in 2004.

## D. PAST PSYCHIATRIC HISTORY

Mr. Mullis stated that it was thought that he had ADHD as a child and he was given the medication, Ritalin®. When he was 12 going on 13 years of age, Mr. Mullis stated that he was diagnosed with bipolar disorder. The doctors were of the opinion that the earlier diagnosis of ADHD was wrong and that he was exhibiting symptoms of bipolar disorder.

When asked what his symptoms of bipolar disorder were, Mr. Mullis stated that he would be calm one day and then become violent, destroying things the next day. When asked how many days the calm days and the violent days would alternate, Mr. Mullis stated that he cycled rapidly from day to day.

When asked if he was prescribed medication for his bipolar disorder, Mr. Mullis stated that some of the medications were Depakote®, Risperdal®, and Wellbutrin®. When asked how long he took these medications, Mr. Mullis stated that he quit taking any medications when he was 18 years old and went to Texas.

Mr. Mullis stated that he was given some medication while he was incarcerated in the Galveston County Jail, but since they didn't seem to be of any help he quit taking them. Mr. Mullis stated that he has not taken any medications since July 2010.

When asked if he had ever suffered a head injury with a period of unconsciousness, Mr. Mullis stated that in 2004 shortly after he arrived in Texas his jaw was broken and he was knocked out for a few seconds. Mr. Mullis stated that he was seen at the Memorial Hermann Hospital and told he had a broken jaw.

Mr. Mullis stated that the doctors were manipulating his jaw, which was painful, and he asked them to stop and to give him something for pain before they proceeded. Mr. Mullis stated that he got into an argument with the doctors and decided to leave. Mr. Mullis stated that he lived on ice cream and apple sauce for a couple of months after which his jaw healed and he went back to eating regular food.

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 9

### E. MEDICATIONS

Mr. Mullis stated that he has not taken any psychotropic medications since July 2010.

## III.   MENTAL STATUS EXAMINATION

### A.   APPEARANCE AND BEHAVIOR

1. Dress

   Mr. Mullis was dressed in jail garb.  He wore glasses.  He was neat, clean, and well groomed.

2. Posture

   Mr. Mullis was relaxed throughout the interview and during the testing portion of the evaluation.  Rapport was readily established and conversation flowed without strain or tension.

3. Facial Expression

   Mr. Mullis's facial expressions were normal and appropriate with the subjects being discussed.

4. Motor Activity

   Mr. Mullis exhibited normal motor activity.  He was neither restless nor immobile.

5. Physical Characteristics

   Mr. Mullis was a medium built man.  His weight was proportionate to his height.

6. Specific Mannerisms

   Mr. Mullis did not exhibit any tics, abnormal movements, stereotypies, or bizarre posturing.

7. Reactions to Interviewer

   Mr. Mullis was cooperative during the interview.  His eye contact was good.  He answered questions readily and easily.

### B. NATURE OF SPEECH

Mr. Mullis's speech exhibited normal rate, volume, and tone.  He was quite articulate and his grammar was good.

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 10

### C. MOOD AND AFFECT

Mr. Mullis stated that he was in a good mood.  His affect was congruent with his mood.

### D. THOUGHT PROCESS

Mr. Mullis's thought processes were logical and goal directed.  He did not exhibit circumstantiality, tangentiality, derailment, looseness of associations, or flight of ideas.

### E. THOUGHT CONTENT

Mr. Mullis denied current suicidal and homicidal ideation.  He did not express any grandiose or delusional thoughts.

### F. NATURE OF PERCEPTION

Mr. Mullis denied having auditory or visual hallucinations.  He denied paranoid thoughts.

### G. INSIGHT AND JUDGMENT

Mr. Mullis exhibited reasonably good insight and judgment.

## IV.  COGNITIVE FUNCTION

### A. ORIENTATION

Mr. Mullis was oriented to time, person, place, and situation (Mr. Mullis understood that he was undergoing a psychiatric evaluation in relation to his intention to waive further legal challenges to his conviction and death sentence).

### B. FUND OF INFORMATION

The individual's fund of information is often a good indication of his/her general level of intelligence and is useful because of its relative insensitivity to the effects of any but the most severe forms of psychopathology.  It is, therefore, particularly helpful in determining the "premorbid" level of intellectual functioning when there is impairment in other functions.  Mr. Mullis was asked a series of 26 questions, some easy and some hard.  The average for Mr. Mullis's age group is to correctly answer 10 to 15 of the 26 questions.  Mr. Mullis answered 19 of the 26 questions correctly, placing him in the above average (16 to 21 correct answers) IQ category on this test

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 11

## C. ATTENTION/DIGIT SPAN

This is not a test of memory, although individuals can improve their performance by rehearsing the digits and so introduce a memory factor. Poor performance is not, therefore, necessarily due to memory loss. Average performance requires an ability to Attend to the digits while excluding interfering thoughts, feelings, etc. Selective attention to the digits can be automatic and effortless or may involve deliberate effort as when the individual rehearses, groups the digits, etc. Anxiety and other interfering affects lower the score. Degree of impairment can be best judged against the Information Test used as a Base Line. Someone of average ability on Information should be average on digits. A below average score would suggest some impairment. Severe loss is suggestive of organic impairment, psychosis, or severe anxiety. Mr. Mullis was verbally given a list of digits to repeat. The first part of the test required Mr. Mullis to repeat the digits in the order they were given. In the second part of the test he was to repeat the digits backward. An average score in Mr. Mullis's age group is to repeat 7 digits forward and 5 digits backward. Mr. Mullis was able to repeat 8 digits forward and 6 digits backward, placing him in the above average category on this test.

## D. CONCENTRATION/ARITHMETIC

Adequate performance requires storing all the information in the question, selecting out what is relevant for the problem, and then completing the operations while not forgetting the problem. Adequate performance requires both effortless and deliberate concentration. If both Digits and Arithmetic are low one would suspect defective attention. A drop in Arithmetic compared to Digits suggests impaired concentration. A severe deficit may indicate a presence of organic impairment. Failing easy items and passing more difficult ones may suggest psychosis. Mr. Mullis was given a series of 6 arithmetic problems. Mr. Mullis answered 5 of the 6 problems correctly, placing him in the above average (5 to 6 correct answers) category on this test.

## E. MEMORY

In this test, a story with a number of facts was read to Mr. Mullis. At the completion of the story he was to recall as many of the facts as possible. The maximum score on this test is 20. The average score in Mr. Mullis's age group is 10 segments recalled. Mr. Mullis was able to recall 12 segments, placing him in the above average category on this test.

## F. JUDGMENT: COMPREHENSION

This test is to determine the extent to which an individual has been able to acquire an understanding of common modes of behavior in society, and an understanding of common social mores and conventions. The extent to which an

individual can perform well in this area may be an index of the extent to which he/she can be a socially conforming individual who responds in terms of good judgment.  In this test, Mr. Mullis was given a series of 10 questions, each worth 2 points.  Mr. Mullis scored 18 out of a possible 20 points, placing him in the superior (17 to 20) category on this test.

## G. PERCEPTION and COORDINATION

This is a brief examination of the individual's perceptual and visual motor functioning, which is most vulnerable to the effects of organic impairment.  The individual is to read the instructions for him/herself and then perform the tasks.  A performance is considered "normal" when there is an accurate copying of the six drawings and correct performance of all three instructions.  Mr. Mullis correctly copied 3 of the 6 designs.

On the opposite page, Mr. Mullis was asked to draw a cube, and to draw a clock face, insert the numbers, and set the hands of the clock at 5:20.  Mr. Mullis drew a cube, as directed.  Mr. Mullis drew a clock face, placed the hour numbers in their correct position, and set the hands at 5:20, as directed.

## H. ABSTRACT REASONING

The individual's capacity to reason abstractly is a particularly important aspect of the individual's intellectual functioning because of its vulnerability to the effects of organic disturbances and because of its impairment in certain psychotic states, particularly schizophrenia.  The capacity for abstraction can be tested through the use of proverbs.  Mr. Mullis was given several proverbs to interpret.  Mr. Mullis scored in the average category in interpreting proverbs.

## I. MINI MENTAL EXAMINATION

This is a short examination focusing on orientation, attention, registration, recall, and language.  Mr. Mullis scored 30 out of a possible 30 points on this examination.

## J. TRAILS-A and TRAILS-B

Trails A:
In this test, Mr. Mullis was asked to connect a series of numbers in sequence from 1 to 25.  Mr. Mullis performed the test without error in 30 seconds.  The average time to perform this test is 30 to 45 seconds.

Trails B
This is a little harder test where Mr. Mullis is required to connect in sequence both numbers and letters, starting at the number 1, connecting it to letter A, then

to number 2, to letter B, to 3, to C, to 4, to D and so on.  Mr. Mullis performed this test without error in 52 seconds.  The average time to perform this test is up to 210 seconds.

### K. SIMILARITIES

Mr. Mullis was asked to provide a similarity for 20-paired dissimilar objects.  Mr. Mullis scored 20 out of a possible 20 points on this test.

### L. REY FIFTEEN ITEM MEMORY TEST

Mr. Mullis was told that he was to perform a memory test.  Though the test has fifteen items there are only 3 easy sequences to recall.  Individuals who are attempting to exaggerate memory deficiencies or problems will tend to do poorly on this test.  Mr. Mullis recalled 15 of the 15 items on this test, indicating that he was not attempting to feign memory deficits.

### M. COMPLICATED HAND MOVEMENT TEST

Mr. Mullis was asked to watch closely as Dr. Scarano performed a complicated hand movement test and then to perform the movements.  Mr. Mullis was able to perform the hand movements correctly after 1 demonstration.

### N. THE CENTER for EPIDEMIOLOGIC STUDIES DEPRESSION SCALE (CES-D)

This is a self-report depression scale responding to a list of 20 questions in regards to how Mr. Mullis felt or behaved during the past week.  Mr. Mullis scored a 2, indicating the absence of a clinical depression.

## V.   RECORD REVIEW

### A. RECORDS FROM TDCJ– MEDICAL RECORDS

1. An Initial Mental Health Screening Interview was completed on 05/23/11.  Mr. Mullis reported that he had had psychological problems in the past and received counseling at Sheppard Pratt Hospital in Baltimore, Maryland, between the ages of 12 to 17.  Mr. Mullis reported that he was prescribed the medication Wellbutrin® by a psychiatrist, which he took between the ages of 13 to 17.

   Mr. Mullis reported that he experienced suicidal thoughts when he was 12 years of age and was admitted to Sheppard Pratt Hospital on 4 occasions during a 30 day time frame.  Mr. Mullis reported making one suicidal attempt by overdosing on vitamins.

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 14

When asked about head injuries, Mr. Mullis reported that at the age of 11 he suffered a concussion when while playing hockey.

Mr. Mullis denied ever having auditory or visual hallucinations.  Mr. Mullis denied the belief that he had any special gifts or super powers that others do not have.

When asked about prior drug abuse, Mr. Mullis reported abusing alcohol, marijuana, ecstasy, and Xanax® between the ages of 17 to 21.

When asked if he ever suffered abuse as a child, Mr. Mullis reported that he was sexually abused.

At the time of the screening interview, Mr. Mullis was noted to be cooperative with clear, spontaneous speech.  He was noted to be alert and oriented to time, place, and person.  His thought processes were reported as logical and goal oriented.

2. A Correctional Managed Care Mental Health Services Outpatient Intake Chain Screen was completed on 05/23/11.  Mr. Mullis's behavior and mood were reported as *within normal limits* (WNL).  His hygiene was reported as *good*; clothing was *clean and appropriate.*   It was noted that psychometric testing was not clinically indicated.

A Mental Status Examination noted the following:
Appearance: WNL.
Orientation: X4[1].
Behavior: Cooperative.
Speech: Clear.
Thought Process: Intact; free of hallucinations or delusions.
Thought Content: WNL.
Perception: WNL.
Memory: Intact.
Intelligence: Average.
Mood: Euthymic[2].
Affect: Congruent[3].
Suicidal/Homicidal Ideations: Denied.
Impulse Control: Good.
Insight and Judgment: Fair to good.

---

[1] Oriented to time, place, person, and situation.
[2] Euthymic is considered to be normal mood.
[3] Mood is what the patient describes and affect is what is observed.  Congruent mood means that the observed affect is consistent with what the patient is describing as his mood.

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 15

A Provisional Diagnostic Impression noted on Axis I was 71.09[4].  In regards to Plan and Follow-up it is noted: *no further intervention at this time*.

A Suicide Risk Assessment was completed on 05/23/11.  The risk assessment  reported, as follows: *In my opinion, this offender is at low imminent risk for potentially lethal suicide attempt*.

3. A Texas Uniform Health Status Update was completed on 05/23/11.  Mr. Mullis was found to have no current or chronic health problems, and no special needs.

4. A Physical Examination report was completed on 05/24/11.  Under the section entitled, Chief Complaint, Mr. Mullis reported that he uses an albuterol inhaler for asthma.

Past medical history indicated that Mr. Mullis had his large intestine removed during infancy due to necrotizing enterocolitis.  Mr. Mullis reported that he has a history of asthma and the last time he used inhalers was 3 years ago.  Mr. Mullis reported that he had been diagnosed with ADHD[5], reactive attachment disorder, and PTSD[6].  Physical examination report noted no abnormal findings.

Mr. Mullis was given a prescription for Proventil Inhaler with the following directions: 2 puffs 4 times daily, as needed.

5. TDCJ Health Summary for Classification forms were completed on 06/03/11 and 09/20/11.  Both forms are identical with no changes indicating *No Restriction*.

## B.    RECORDS FROM TDCJ – CLASSIFICATION FILE

The records indicate that Mr. Mullis arrived at the Polunsky Unit on 05/23/11 and remained there until he was transported to the Galveston County Jail on 09/20/11 for a hearing on his Motion to Waive Post-Conviction Habeas Corpus Review.

The disciplinary history records indicate no disciplinary actions taken against Mr. Mullis for infractions of prison rules.  The weekly Administrative Segregation Level Review indicated no restrictions.

---

[4] The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR) 2000, page 743.
V71.09: No Diagnosis or Condition on Axis I.  When no Axis I diagnosis or condition is present, this should be indicated.
[5] ADHD – attention deficit hyperactivity disorder.
[6] PTSD – post traumatic stress disorder.

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 16

There are a number of documents regarding scheduled visits with his attorneys. Mr. Mullis completed a visitor's list naming individuals that should be allowed to visit him at the prison.

## C. HEARING ON PRO SE MOTION – 05/20/11

The hearing was initially set for the Motion for New Trial. Mr. Mullis, however, had decided that he wanted to remove his direct appeal attorney, Mr. Wayne Hill, and proceed *pro se*. Due to the importance of such a decision and to determine whether Mr. Mullis appreciated and understood the consequence of his decision and whether he exhibited the mental capacity to make the decision to represent himself, *pro se*, the court carefully questioned Mr. Mullis to determine whether he understood and appreciated what he was requesting.

The transcript revealed Mr. Mullis to be an articulate and knowledgeable young man who had spent time in legal research in order to learn the differences between a direct appeal and a Writ of habeas corpus. Despite being admonished by the court that self-representation was not a good idea, Mr. Mullis persisted in his request.

The court granted Mr. Mullis's request to proceed *pro se*; however, Mr. Mullis continued, at the time of the *pro se* hearing to be represented by Mr. Brad Levenson as his writ attorney.

## D. VIDEO INTERVIEW – 09/21/11

Reporter Chris Paschenko, Galveston County Daily News, conducted an interview with Mr. Mullis at the Galveston County jail.

During the interview, Mr. Mullis exhibited clear, rational, and goal directed thought processes. There was no evidence of disorganization, hallucinations, and psychotic or delusional content in Mr. Mullis's responses to Mr. Paschenko.

Mr. Mullis commented on the fact that he would be representing himself, that he won't continue any appeals, and that he will let his habeas corpus rights expire on 12/23/11. Mr. Mullis went over with Mr. Paschenko the evolving timeline, noting that the Texas Court of Criminal Appeals will review his trial transcript for constitutional errors. Once that is over, Mr. Mullis stated that the judge will set the date of execution, which would be no earlier than 90 days after the appeals process is completed.

When asked about the death sentence, Mr. Mullis stated that the punishment is justified for the crime he committed and that he has accepted the sentence the jury gave him.

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 17

### E. *EX PARTE BILLY GEORGE REEDY*[7]

Though this case involves a waiver of post-conviction remedies, it differs from Mr. Mullis's case in that the inmate in *Reedy* pled guilty to a capital murder charge as part of a plea bargain, but he did not proceed through a full jury trial. The Court was concerned when a defendant waives his rights to post-conviction as part of a plea bargain, since, not going through a full jury trial, *he could not know whether he would desire or have reason or ground for seeking a new trial*[8].

Nevertheless, this case in regards to Mr. Mullis is instructive as to the principle: (1) the post-conviction inmate can waive his right to mount challenges to his conviction and sentence, *so long as* (2) *the waiver is made voluntarily, knowingly, and intelligently*[9].

### F. *REES V. PEYTON*[10]

A death row inmate through his attorney filed a writ of habeas corpus in the U.S. District Court, Eastern District of Virginia. A month after the petition had been filed *Rees* directed his attorney to withdraw it and forgo any further legal proceedings. *Rees'* attorney had him evaluated by a psychiatrist who concluded that *Rees* was incompetent. *Rees* would not cooperate with the State's psychiatrist who expressed doubts that *Rees* was insane. The Court held that U.S. District Court is to hold proceeding to determine Rees' competence, i.e., *whether he has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or, on the other hand, whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises*[11].

In Rees, the U.S. Supreme Court outlines the necessity for a psychiatric evaluation of death row inmates who wish to waive their post-conviction rights to legally challenge their conviction and death sentence, since it must be known whether the desire to waive those rights is made rationally and with appreciation as to the consequences.

### G. *RUMBAUGH V. PROCUNIER*[12]

Charles Rumbaugh was convicted of capital murder and sentenced to death in Texas on 04/04/75. Mr. Rumbaugh's conviction was reversed by the Texas Court of Criminal Appeals. He was retried and again convicted of capital murder and sentenced to death. After the 2nd conviction was reaffirmed, Mr. Rumbaugh

---

[7] 282 S.W. 3d 492 (Tex.Crim.App. 2009).
[8] 282 S.W. 3d 492, 496; citing Smith v. State, 440 S.W.2d 843 (Tex.Crim.App. 1969).
[9] 282 S.W.3d 492, 494-495.
[10] 384 U.S. 312 (1966).
[11] 384 U.S. 312, 384.
[12] 753 F.2d 395 (5th Cir. 1985)

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 18

directed his attorney to take no further steps to challenge his conviction and sentence.

Mr. Rumbaugh underwent psychiatric evaluations.  The court weighing all the evidence concluded that Rumbaugh was mentally competent to forego further judicial proceedings.  The Court cited the Supreme Courts standard[13] to be used in deciding whether a person is mentally competent to waive further challenges to the conviction and sentence.  The Court enunciated the test, as follows:

> The test is whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.  The test requires the answer to three questions:
>
> 1.  Is the person suffering from a mental disease or defect?
> 2.  If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
> 3.  If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

The decision tree can then be constructed, as follows:

Is the person suffering from a mental disease or defect?

**NO**
No further inquiry.

**YES**
If so, does the mental disease or defect prevent him from understanding his legal position and the options available to him?

**YES**
Person is Incompetent

**NO**
If not, does the mental disease of defect, nevertheless prevent him from making a rational choice among his options?

**YES**
Person is incompetent

**NO**
Person is competent.

---

[13] *Rees v. Peyton*, 384 U.S. 312 (1966).

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 19

## VI.   DISCUSSION

Travis James Mullis is a 25-year-old, Caucasian male who was convicted of capital murder and sentenced to death in March 2011.  Mr. Mullis has been at the TDCJ Polunsky Unit since the end of May 2011.  Mr. Mullis has now notified the trial court that he would like to waive all further legal challenges to his conviction and sentence of death, and have the court assign a date for his execution.

The following records demonstrate that Mr. Mullis is knowingly, intelligently, and voluntarily waiving his rights to post-conviction habeas review:

1. Mr. Mullis's testimony in the 122nd Judicial District Court for the 05/20/11 *pro se* hearing.
2. Mr. Mullis's 09/21/11 interview with the Galveston County Daily News reporter, Mr. Chris Paschenko,
3. Mr. Mullis's TDCJ medical records from 05/23/11 through 09/20/11,
4. Mr. Mullis's 09/23/11 forensic psychiatric examination/evaluation.

This forensic psychiatric evaluation/examination and testing indicates that Mr. Mullis is above average in intelligence despite not graduating from high school.  Mr. Mullis has spent time educating himself regarding the criminal justice system as it pertains to him and his situation, i.e., his conviction and death sentence.  In addition, Mr. Mullis has educated himself on the methodology that will be used to cause his death.  Mr. Mullis was able to explain what "death" meant, i.e., his life as Travis James Mullis will end, his body and soul will separate, and his soul will go to Heaven, as he believes God has forgiven him.  Mr. Mullis stated that he has come to terms with what he has done, that he has accepted the sentence of death, and he is ready for the sentence to be carried out.

Mr. Mullis was able to articulate what post-conviction challenges he could make in regards to his conviction and sentence and has decided to forego further challenges and ask the court to set a date for his execution.

No one, according to Mr. Mullis, has influenced him in making his decision.  Though he mentioned, during my interview with him, the fact that a child molester and murderer would be a target for being killed in a general population situation in prison, Mr. Mullis stated that it was not a factor in his decision to waive further challenges to his conviction and sentence.

## VII.   DIAGNOSES

**AXIS I:**   No current Axis I diagnosis.
**AXIS II:**   Features of Borderline Personality Disorder.
**AXIS III**:   Cerebral concussion at age 11.

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 20

**AXIS IV:** No current psychosocial and/or environmental issues.  Mr. Mullis claims and this forensic psychiatric examination/evaluation supports his claim that he has come to terms with the crime he committed, has accepted his death sentence and is prepared for the punishment he will receive for his crime, and has made peace with his Maker and himself in accordance with his religious beliefs.

**AXIS V:** Global Assessment of Functioning Scale – 75.

## VIII.  PSYCHOLOGICAL ISSUES: Competency to Waive Post-Conviction Habeas Review

It is my opinion following this forensic psychiatric examination/evaluation and review of the above cited records that Mr. Mullis possesses sufficient present ability to knowingly, intelligently, and voluntarily waive his rights to post-conviction habeas review.

## IX.  PSYCHOLOGICAL ISSUES: Mental Illness/Mental Retardation

During the interview, Mr. Mullis provided a past history of ADHD and bipolar disorder.  According to Mr. Mullis, when he was 12 going on 13 years of age, he was told that the diagnosis of ADHD was wrong and that he actually was suffering from bipolar disorder.

Mr. Mullis's TDCJ medical records were reviewed from the time of his initial screening on 05/23/11 to his transfer back to the Galveston County Jail on 09/20/11.  Mr. Mullis reported that, between the ages of 12 to 17, he received mental health services at the Sheppard Pratt Hospital in Baltimore for ADHD, PTSD, and Bipolar disorder.  Also noted in the TDCJ medical records was Mr. Mullis's report that between the ages of 17 to 21, he used the following drugs on an experimental or a regular basis, i.e., alcohol, marijuana, ecstasy, and Xanax®.

When asked what his symptoms of bipolar disorder were, Mr. Mullis stated that he would be calm one day and then become violent, destroying things the next day.  When asked how many days the calm days and the violent days would alternate, Mr. Mullis stated that he cycled rapidly from day to day[14].

Mr. Mullis stated that he was prescribed medications, at that time, i.e., Depakote®, Risperdal®, and Wellbutrin®, which are the types of medications used to treat bipolar disorder.  Mr. Mullis stopped taking medications and from the age of 18 to the present, Mr. Mullis has not been on any psychotropic medications except for a short time during his incarceration in the Galveston County Jail during the pending criminal trial.  Mr. Mullis stated that the medications did not do much for him and, in fact, caused unacceptable side effects.

---

[14] See page 8 of this report.

Forensic Psychiatric Examination/Evaluation
Travis James Mullis
October 6, 2011
Page 21

Mr. Mullis's description of his symptoms does not fit either bipolar disorder or cyclothymic disorder[15]. Bipolar Disorder is categorized as either Bipolar I associated with manic episodes, and Bipolar II associated with hypomanic episodes. In Bipolar I the manic episodes last 1 week and in Bipolar II the hypomanic episodes last at least 4 days. Mr. Mullis described his mood changes occurring from day to day, which description does not meet the initial threshold time requirement for manic episodes in Bipolar I or hypomanic episodes in Bipolar II. Violent, destructive behavior is not usually seen in cyclothymic disorder.

Borderline Personality Disorder (BPD) is associated with marked shifts in mood that can occur quickly with one day and certainly from day to day. Individuals diagnosed as adults with BPD almost always report that they experienced significant abuse as a child, i.e., physical, sexual, emotional. A history of early childhood psychological trauma (beginning under the age of 6) is almost always a differentiating factor between BPD patients and other personality disorder patients. Thus, the history of childhood trauma is a very common feature in patients with BPD.

Individuals with BPD have a need to have other people with and around them, but their fear of abandonment prompts them to continually test the other person's commitment to them. Individuals with BPD display impulsivity and have significant problems in controlling their behavior, which often result in destructive behavior.

Mr. Mullis has described problems in controlling his anger. He described his mood cycles as calm one day with violent, destructive behaviors the next day.

Though a more complete and in-depth history is needed to make a firm diagnosis of borderline personality disorder, BPD appears to have a better potential for explaining Mr. Mullis's emotional and psychological makeup than bipolar disorder.

The TDCJ medical records note that between the dates of 05/23/11 through 09/20/11, Mr. Mullis did not exhibit any symptoms or signs of a mental disease or defect, received no psychotropic medications, did well on the mini-mental status examinations, and received no diagnosis on Axis I.

Mr. Mullis is not mentally retarded and does not require commitment to a facility for the mentally retarded.

Respectfully submitted,

Victor R. Scarano, M.D., J.D.

---

[15] Cyclothymic Disorder: a chronic fluctuating mood disturbance involving numerous episodes of hypomanic symptoms and numerous periods of depressive symptoms.