## DECLARATION OF DR. RICHARD BROKAW
## PURSUANT TO 28 U.S.C. § 1746

1.  My name is Richard Brokaw. I am a licensed and certified psychologist with a doctorate from Penn State. I currently work both at Cape and Mariner Middle Schools in Milton, Delaware. I have over 16 years of experience working as a school psychologist. In addition to my work in schools, I saw clients in a private practice at Bay Counseling Services from the mid to late 1990's. Travis Mullis was one of my clients at Bay Counseling. I last saw Travis in the summer of 1998, when he was 12 years old.

2.  I began treating Travis when he was ten or eleven years old. We met for fifty minutes a session, once a week, for around a year. While most of the time I met with Travis one-on-one, I consulted with his adoptive mother, or occasionally his (adoptive maternal) grandmother, for five or ten minutes before my sessions with Travis. During these consultations, I got the sense that Travis' mother felt completely overwhelmed by her son and his behavior problems. Her attitude was, "I didn't sign up for this." She had adopted Travis with her exhusband who was biologically related to Travis. With her exhusband out of her picture, her connection with Travis was tenuous. I felt that she was burnt out. When she was confronted with specific issues such as Travis' shoplifting habits, she tended to minimize them. She lacked the resources to respond adequately and productively to his problem behaviors. Travis' grandmother was not capable of compensating for Anne's exhaustion. Travis and his grandmother did not have a positive relationship. She seemed to irritate Travis.

3.  Children need structure. Children need to know what is expected of them and what they can expect from others. They need routines and predictable patterns in their days to feel safe and secure. When children do not have the structure they need from trusted caretakers, they do not

have the emotional maturity to ask for it. Instead, they do their best to impose their own structure. Travis let me know, early on in our therapy sessions, that his life was chaotic and he felt insecure. He did this in a very memorable way by trying to impose structure in our therapy sessions. In our first meeting, Travis marched in, pointed at me and said "you listen to me, I've been through this therapy before, I know what's going on, just so we are clear, I'm running the show here." I kept my amusement to myself at the time, but it was funny to see such a scrawny child trying to lay down the law like that. I asked if he was finished, then I told him to sit down. I told him it was my office and I had rules he needed to abide by. Travis clearly appreciated my response and reacted positively to the limits I established. He clearly needed structure and responded well to it.

4. Travis had serious control issues, resulting from the chaotic environment in which he was raised. He craved structure and I provided that for him. In order to give our sessions structure, we'd play board games, such as Homes and Places, to provide an element of predictability to our time together. Travis responded well to games for that reason. They organized our time and were for the most part predictable; they made him feel secure. In the space around the pattern of his turn and my turn, he was more comfortable talking about what was going on in his life.

5. Travis had a significant history of loss, including the loss of his biological mother and his adoptive father. His adoptive father was sent to prison when Travis was a child for repeatedly sexually assaulting him. Travis had Attention Deficit Hyperactivity Disorder and was taking medication at the time. His mood and energy level were highly variable, ranging from active, energetic and euphoric to lethargic and depressed. Travis had difficulty making friends and I recall him sharing with me his impression that a lot of people hated him. He told me kids his own age didn't like him and one of our goals was to try to increase his peer relationships.

6. Unlike adults, children grieve in a circular fashion. Their feelings and attempts to

cope occur in cycles. In contrast, adults grieve in a linear fashion. A well adjusted adult will come to terms with a loss over time and will increasingly feel a lightening of the weight of the loss. There may be some dips in feelings of the loss after, for example, the anniversary of the loss. However, the pain generally lessens over time. The way in which children cope is more complicated. The pain from a loss might lessen over time, but will then feel fresh and overwhelming again years later. Given this, the ways in which Travis' losses continued to impact him are not only unsurprising, but predictable.

7. Travis had a habit of hoarding. This behavior was consistent with the abuse and trauma he experienced as a child and was an attempt to gain control over his basic needs. He was insecure and felt he could be on his own at any time. In order to prepare to take care of himself, Travis held on to things for what he feared might be his solitary future. This is also consistent with the abandonment and neglect to which he was subject in his formative years. I also recall Travis occasionally being extremely vulgar and oversexualized. This was also not surprising given his history.

8. In therapy we often worked on his issues with his dad, curbing his use of vulgarity, acting appropriately in the real world, and making friends. I took Travis fishing or to the library as a reward for good behavior and to provide him with an opportunity to use the skills we were developing in the real world.

9. Whenever I got to close to a real issue in therapy, Travis would find a way to change the subject or would even bolt out of the room. He had a clear pattern of trying to escape when something was uncomfortable.

10. Travis was hesitant to discuss the abuse by his adoptive father. I did not press him on the topic, as I attempted to let things come out as naturally as possible. When his father's name

was even mentioned, Travis expressed extreme anger and resentment. I recall at least two occasions where Travis shared with me that he received a card from his father and ripped it up in anger, but kept the money to buy himself something. That was typical Travis, trying to gain control over a situation which was completely beyond his power to control.

11. Travis spent a significant amount of time with his cousins, the Barrys. He was quite fond of his Uncle Steve and often expressed positive feelings towards him. I understand that Uncle Steve disassociated himself completely from Travis after the incidents with his daughters. While understandable on Uncle Steve's part, this must have been devastating for Travis, who looked up to the man immensely. Steve was Travis' best approximation for a father figure in those years.

12. Travis clearly also saw me as a father figure. He would not want our therapy sessions to end and would act up when our time was nearly over for that very reason. A number of times, he expressed his hope that I would marry his mother and become his father. I recall when my twins were born in April of 1998, Travis was jealous of them.

13. When we first discussed terminating therapy, which occurred because Travis' mother felt he had sufficiently integrated the issue of his abuse, Travis became extremely agitated. Eventually he masked his agitation with bravado, stating "well that will only give me more time to do what I want to do." This was typical Travis. He suffered such extreme loss in his life that whenever he sensed an impending "abandonment," he attempted to take control by appearing as if this was something he wanted all along.

14. At the conclusion of my sessions with Travis, I let his adoptive mom know she should bring him back anytime. I also stressed that he would surely need further treatment in the future because of what he had been through. I would have advised her to remain alert for warning signs and told her not to ignore problem behaviors.

15.     I only recently learned that Travis went to trial on a murder he committed in 2008. If anyone working on Travis' legal defense had come to speak to me before now, I would have told them all of the information above. I would have been willing to testify at Travis' trial.

I hearby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

 

Richard Brokaw, Ph.D.