DECLARATION OF WENDY MYERS
PURSUANT TO 28 U.S.C. § 1746

I, Wendy Myers, hereby depose as swear as follows:

1. My name is Wendy Myers. In the early 2000's, my name was Wendy Redick. I was a Licensed Clinical Social Worker and the Director of the Transitional Youth Program at Stone Bridge Transitional Care Home. Stone Bridge houses children and adolescents, from age 12 to 18, in need of short-term therapeutic residential placement. From July of 2000, until January of 2001, Travis Mullis was one of the clients there under my care.

2. Travis was placed at Stone Bridge following an incident where he molested his cousin. The very first thing I would do when I heard of such a young man engaging in this kind of behavior is to look at what he was exposed to before this incident. Upon his admission, Travis was diagnosed with Bipolar Disorder, Chronic Type Post Traumatic Stress Disorder (PTSD), and had a Global Assessment of Functioning (GAF) score of 40. While most people have a basic understanding of Bipolar Disorder and PTSD, I would point out that a GAF score of 40 is low. The GAF scale is 1-100 and a score of 40 notes impairments or serious impairments in a number of possible areas. In comparison, a score of 50 notes serious symptoms. The designation "impairments" is more severe than "serious symptoms." In plain language, this means Travis had impairments or major impairments in reality testing, communication, family relations, judgement, thinking or mood. By way of comparison, if an adult had a score of 40, he or she would be unable to hold a job or function in a workplace.

3. Travis was clearly disturbed. However, he was respectful to staff. I believed him to be lower risk than our other clients. For that reason, I placed him with an intern for therapy rather than with a licensed social worker. Only around ten percent of our clients saw interns instead of more

experienced therapists, so it wasn't as though seeing an intern was the norm.

4. Travis was a child who was all mouth and that was it. He tried to take a stance but all he could do was bark– he had no bite. He tried to make an impression that he was more than what he was in order to fit in with his peers, but he wasn't able to impress them. He was one of the few white students in placement. It was also certainly rare to have students from more middle class backgrounds. He was the white kid from the suburbs trying to put on a front for a bunch of city kids. On top of that, Travis was the runt of the group. He was physically very small compared with his peers. He tried extremely hard to fit in and get the acceptance of everyone. Travis had an easier time with staff members. The expectations of staff were more clear and Travis was compliant and respectful.

5. There were times when Travis was not doing well and he would be sent to what we called the "rubber room." It was a seclusion room that students were sent to when they were escalating in order to calm them down in a place where nothing was present that they could use to hurt themselves. Being in this quiet environment seemed to help Travis.

6. Travis' family was not involved in his treatment while he was at Stone Bridge. I do not know if there were involved after he left Stone Bridge or not. However, I would have remembered if his family had been a part of his treatment.

7. I have no recollection of any sexual misconduct between Travis and the other patients at Stone Bridge. Maryland law requires reporting of child sexual abuse. Had such an incident happened, it would have been reported.

8. Until very recently, no one working on Travis' case came to talk to me about Travis. No one working for Travis' defense spoke with me before his trial. If they had, I would have told them all of the information above. I would have testified at Travis' trial if I had been subpoenaed to do so.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

*Wendy Myers, LCSW-C*
Wendy Myers