DECLARATION OF RICHARD G. DUDLEY, JR., M.D.
PURSUANT TO 28 U.S.C. § 1746

I, Richard G. Dudley, Jr., M.D., hereby depose and swear as follows:

1.  My name is Richard Dudley. I am a physician, who is licensed to practice medicine in the State of New York and is board certified in psychiatry by the American Board of Psychiatry and Neurology. I have a private practice in New York City, which has been about equally divided between a clinical practice and a forensic practice, and I have also taught at both a medical school and a law school in New York City. I was retained to work on the Travis Mullis case in Texas and I testified at his penalty phase in 2011.

2.  It is my memory that I was retained to work on Travis' case shortly before his trial. I was in the midst of preparing to testify in another capital case with the same attorney, Mr. Bourque, when he asked me to work on this case. I first saw Travis in December 2010, and was testifying in the penalty phase by March 2011. Therefore I had much less time to work on this case compared to comparable cases.

3  It is also my memory that I had much less preparation time with the attorneys than I am used to having in comparable cases; I was told little-to-nothing about their overall theory or strategy for mitigation and really didn't know much about the penalty phase; and I don't believe that they really spent enough time with me to adequately understand my findings and my opinions (see below).

4.  It was my understanding at the time of trial that the referral question was whether or not Travis suffered from any major psychiatric disorder(s) and/or whether or not there were other mental health issues that could be considered for possible presentation as mitigation should his trial reach a penalty phase. At some point it became clear that there was no plan to discuss or present his mental state at the time of the crime (even as part of mitigation); I do not remember

having much if any discussion with the attorneys about my findings and opinions about his mental state at the time of the crime. Even after the district attorney questioned me about what Travis had told me about the crime during his cross examination, without allowing for any testimony about his mental state at the time of the crime, I still was not asked about his mental state at the time of the crime during re-direct. Although I suspected that the defense didn't have much of an idea about what I might say if asked about Travis' mental state at the time of the crime, given that we hadn't fully discussed this, I was still surprised that I was not asked about this in any way during re-direct, especially given the cross examination. Additionally, upon my recent review of the closing arguments, I see that essentially, this allowed the DA to argue un-rebutted that Travis was simply upset at the time of the crime. If I had been asked about Travis' state of mind at the time of the offense, I would have testified that he was suffering from major psychiatric illnesses that seriously impaired his ability to function.

5. Based on my psychiatric evaluation of Travis, it was my opinion that, at the time of the crime, he had suffered from and continued to suffer from multiple major psychiatric disorders. More specifically:

   a. As a child he suffered from Attention Deficit-Hyperactivity Disorder, most likely caused by a combination of genetic vulnerability and damage to him while inutero.

   b. During his early childhood years he didn't have the type of parenting that would foster the development of a healthy bond between him and a caregiver (in part due to his extended hospitalizations, but mostly due to parental neglect and abandonment), resulting in Reactive Attachment Disorder.

   c. During his early childhood years he was also repeatedly sexually abused by his adoptive father, resulting in an Anxiety Disorder with symptoms of Posttraumatic

        Stress Disorder, and a lack of sexual boundaries and sexual confusion, including confusion and often considerable distress about sexual identity and pedophilic urges.

d.    The above noted traumas that he endured, in the absence of adequate parental nurture and support, also influenced the development of his personality, resulting in a Personality Disorder, Mixed Type, with Narcissistic and Borderline features.

e.    In addition, he suffered from a rapid cycling Bipolar Disorder, the onset of which was quite early; the underlying mechanism for this disorder is biochemical; and the etiology of this disorder is believed to be genetic transmission.

6.    Although I believe the attorneys knew that it was my opinion that Travis suffered from the above noted major psychiatric disorders, I believe that as a result of the very minimal preparation time, they did not have a full understanding of the impact of each of these disorders on Travis' ability to function. They also lacked a full understanding of how these disorders interacted with each other. More specifically, for example, many of these disorders have overlapping symptoms (such as hyper-reactivity and/or impulsivity) that cause certain of the disorders to potentiate others. The symptoms of many of these disorders can also be exacerbated by particular psychosocial stressors, and then in turn, the enhanced symptomatology exacerbates some of the other disorders or makes them more difficult to manage. Similarly, for example, the cycling mood states that are part of the Bipolar Disorder impact in various ways on Travis' ability to manage the other difficulties, and such cycling mood states can also exacerbate the mood instability and dysregulation that is part of some of the other disorders.

7.    This more in depth understanding of the impact of Travis' psychiatric disorders and how they interact with each other would have been helpful for several reasons. Specifically:

a. It is really the impact of mental illness on a person's ability to function that makes the illnesses potentially mitigating

b. An understanding of Travis' mental state at the time of the crime requires this understanding of how these psychiatric disorders were exacerbated by the psychosocial stressors he was experiencing at the time, and then how these disorders interacted with and potentiated each other, resulting in the mix of behaviors that were a part of the crime.

c. Understanding the unique confluence of psychosocial stressors and the interaction of his psychiatric disorders places his mental state at the time of the crime in sharp contrast to likely mental states while incarcerated, thereby impacting one's understanding of his "future dangerousness."

d. An understanding of the impact of these disorders on Travis' ability to function, both individually and as they interact with each other, is required to understand many of the behaviors he exhibited during the course of his life that could have been otherwise easily misunderstood and/or attributed to other causes.

8. Some of the records provided to me initially also help one understand the various behaviors that Travis evidenced over the course of his life. In other words, the impact of Travis' psychiatric disorders, both individually and collectively, is very well documented in these records; this confirms the nature of his psychiatric difficulties and their chronic course; and it also helps efforts to differentiate behaviors that were/are a product of his psychiatric difficulties from behaviors that might be due to other causes. Such an understanding would have allowed the defense attorneys to challenge the prosecution's efforts to characterize Travis as simply manipulative, one who is just faking suicide, a victimizer, etc., and replace those characterizations

with a more informed understanding of his behavior and the cause(s) of his behavior.

9. I have also recently been provided additional information about the severe sexual dysfunction in Travis' birth family, including that his mother was sexually abusing her children, that his father and step-brother were raping his step-sister and that his grandmother had sexually abused family members as well. Had I known this at the time of the trial, I could have further testified about the increased risk factors regarding the impact of such exposure at a young age and the genetic implications of these factors. These risk factors are further enhanced by additional information that I did not know about at the time of the trial regarding the true nature of the severity of the sexual abuse that Travis was subject to at the hands of his adoptive father. Gary Mullis' counseling records establish that he initially lied about the frequency and severity of the abuse. I have only recently learned that he later admitted that the abuse occurred about 12 times (rather than 6) and that he masturbated himself to ejaculation while performing fellatio on Travis. Other records indicate the likelihood that Travis was also anally raped by his father. This additional information would have allowed me to testify to the severe psychiatric implications that this abuse had on Travis' mental development.

10. I was also not asked about "future dangerousness," including even with regard to how available psychiatric treatment might impact on future dangerousness. In that regard, it is my opinion that psychopharmacologic treatment of Travis' Bipolar Disorder, which is readily available in prison, could have brought the symptoms of his Bipolar Disorder under control. Given the dramatic impact that his Bipolar Disorder had on his ability to function, both individually and in connection with his other disorders, such control of his Bipolar Disorder would have had a significant positive impact on his ability to function. More specifically, for example, he would no longer be plagued by the extremely difficult to manage rapid cycling of his mood,

with depression and suicidal impulses at one end, and hyper-irritability and reckless impulsivity at the other. The mood instability and dysregulation associated with some of his other disorders would no longer be made worse by the cycling of his Bipolar Disorder. Increased stability of his mood would make him much more able to cope with some of his other difficulties, especially, for example, such increased stability would leave him more able to resist the pedophilic urges that he was so very conflicted about and ashamed of. Such dramatic improvement in Travis' ability to function, coupled with the fact that the psychosocial stressors to which he is most vulnerable are less likely to be present in prison, coupled with the stability and predictability of prison life versus Travis' life on the street, make the possibility of future dangerousness argued by the prosecution quite remote.

11. I have also been asked to comment on the so called "hit list" that Travis wrote on the wall of his cell along with information about rival gangs. I have no memory of being told about the "hit list" and/or being questioned about it during the trial. If I had been told about it and asked to comment on it, I would have asked to meet with Travis again (even on the eve of my testimony) to explore this issue with him. Based on my review of the trial transcript, it appears that the prosecution presented this "hit list" as further evidence of how dangerous Travis is and will continue to be. I would have wanted to meet with Travis about this because I suspect that there are other, much more likely explanations for the "hit list." For example, given Travis' Bipolar Disorder, the behavior is much more likely part of a manic episode or a suicidal element of a depressive episode than evidence suggesting that he will be a danger to others.

12. I have also recently been provided information about Travis' sexual relationships with older men, which it appears the prosecution characterized as evidence of how manipulative Travis is and how he has always used others. I was not provided this information by trial counsel.

It is most certainly my opinion that those relationships were much more complicated than that.

    a.    First of all, it is not at all uncommon for a late adolescent or young adult male, who was sexually abused by a paternal figure as a child, to end up repeatedly becoming sexually involved with older men.

    b.    When the young man was also neglected, abandoned or otherwise developed attachment issues during childhood years, this need to find a "father" is even more intense, as is the sense that the relationship/intimacy with that "father" can/should be expressed sexually.

    c.    These above noted elements of Travis' history are much more the driving force behind his relationships with older men than anything else.

    d.    Additionally, as a result of the above noted combination of psychiatric difficulties that Travis suffered from, his capacity to care for himself was extremely impaired; the fact that these older men took Travis in and cared for him met his needs, but also obviously met their needs. In that regard, it is more accurate to see this aspect of these relationships as one of mutual exploitation.

    e.    As further noted above, a lack of sexual boundaries and sexual identity confusion are also products of the difficulties that Travis endured along with his other various psychiatric difficulties. As a result, he doesn't really know if he is bisexual or not, and at times he hasn't even been sure to what extent his relationships with these older men were even primarily sexual.

    f.    In addition, it is also important to note that hyper and reckless sexuality is symptomatic of the more manic phases of Travis' Bipolar Disorder, so while in a manic state, his sexual behavior is much more out of his control and difficult to

manage.

g. Finally, Travis has considerable confusion and shame about virtually all of his sexual urges and behaviors. This is quite consistent with the above noted assertion/opinion that his sexual behavior is the product of a variety of forces that Travis does not fully understand and has little to no ability to manage.

13. I have also recently been provided with new information gathered from Travis' adoptive mother. Specifically, that she has now reported that when Travis was a child he did tell her that he was being sexually abused by her husband, Travis' adoptive father, but she didn't believe him, and she also reported that Travis called her for help on the night of the crime and she described and confirmed Travis' report to me about their interaction on the phone that night. Additionally, I have received new information that when Travis told his counselor about the abuse, she informed Anne Mullis, who responded with anger towards Travis.

14. It has been well established that a parent's refusal to believe a child's report of being sexually abused and associated refusal to help/protect the child dramatically magnifies the damaging impact of the sexual abuse on the child's development. Given the history of Travis' relationship with his adoptive mother that he reported to me, I was surprised when he told me that he called her on the night of the crime (as he was deteriorating and did not know what to do/prior to the crime itself). When he talked to me about this it was clear that her lack of responsiveness to him that night was clearly devastating to him and clearly contributed to his continued deterioration; however now, knowing that she did not believe his childhood report to her of being sexually abused, I understand even more why he was so devastated by this repeat/re-enactment of his childhood experiences with lack of help from or protection by her. Had I known this at the time of the trial, this information would have further allowed me to explain Travis' mental state the

night of the crime.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Date: July 21, 2013　　　　　　　　　　　　s/ Dr. Richard D. Dudley, Jr., M.D.
　　　　　　　　　　　　　　　　　　　　　　Dr. Richard G. Dudley, Jr., M.D.