## DECLARATION OF DR. MATTHEW MENDEL
## PURSUANT TO 28 U.S.C. § 1746

I, Matthew Mendel, Ph.D., hereby depose and swear as follows:

1. My name is Matthew Mendel. I am a psychologist licensed in North Carolina. I was retained by the defense to work on the Travis Mullis case in Texas. I was asked to review records and conduct a psychological assessment of Mr. Mullis. I was not provided with a comprehensive life history mitigation report. I met with Travis several times in the county prison in Galveston, Texas and I testified at his trial in 2011.

2. I have recently been contacted by Travis' federal attorneys from Philadelphia. They have provided me with additional information of which I was not aware at the time of the trial or at the time of my testimony. Some of this information is critical to fully understanding the severe effects that Petitioner's upbringing, loss, abandonment, neglect and sexual abuse had on his mental state and his development.

3. For example, I have recently been provided with a declaration signed by Travis' adoptive mother. In that declaration, she indicates that Travis had told her that her husband Gary Mullis was sexually abusing Travis. This was prior to the time that Gary Mullis admitted the abuse. Ms. Mullis indicates that she did not believe Travis and did not do anything about it. Records from Gary Mullis' counseling, that I have only been provided recently, also indicate that he "hinted" to his wife about the abuse and she did nothing. Additionally, I have recently been provided with a declaration from Sally Ann Jennings, who was Travis' childhood therapist. She indicates that Anne was furious with Travis when Ms. Jennings first told her that Travis had told Ms. Jennings about the abuse.

4. If I had known about this at the time of the trial, I would have presented very strong opinions to the jury about the huge effect this had on Travis. First, presumably if she had

believed Travis in the first place, this would have lessened the duration of the abuse (and perhaps its severity, as it appears that it escalated over time). We know that duration and severity are both negative factors in future outcome for victims. Additionally, this certainly played a role in Travis' relationship with his mother and his anger at and mistrust of her. Essentially, he turned to her for help and protection and she did not provide it. During the penalty phase, I spoke extensively in my testimony about his mother as one of the individuals who abandoned him. I recall that the prosecution attacked this notion. I have recently been provided additional evidence regarding Travis' relationship with his mother, declarations of Travis' therapist, Sally Ann Jennings, and his psychologist, Richard Brokaw. These declarations, in addition to the acknowledgments from Anne herself, provide a great deal of crucial additional information on this point and further evidence for Travis' sense of Anne Mullis as an untrustworthy, unsupportive individual. The failure to protect Travis by his mother had a profound negative impact on his overall mental development.

5. Neither during preparation with the lawyers or while on the witness stand was I asked about Travis' state of mind on the night of the crime. If I had been asked about the circumstances of the crime, I would have certainly been able to speak about how the facts of the crime were consistent with his impulsivity and cognitive defects. Second, I could have testified that his reasoning and decision-making abilities are weak and flawed, i.e., his idea that he would never abandon Alijah and that killing him was somehow less egregious than abandoning him. I spoke about that latter issue some in my report and in my testimony, but my focus was on how terrible the prospect and issue of abandonment was for him, rather than on the underlying flaw in cognitive abilities. Had I been asked, I could have testified that the act was likely an impulsive, unplanned act, consistent with his characteristic impulsivity. Additionally, the new records

provided regarding Gary Mullis' counseling are also informative. Gary Mullis admitted in those records that he would masturbate himself to ejaculation while performing fellatio on Travis. Thus, Travis was raised from a very early age, by Gary, with the notion that sexual acts are things that adults do to infants/toddlers/children. (We know the abuse began at least by age 4, but it may have begun by the age of 11 months or soon thereafter, particularly in light of the fact that Gary lied about the duration of the abuse initially.) Thus, sexual activity with Alijah would not have seemed as unfathomable to Travis as it does to most of us.

6. I have also recently been given information that soon after Travis moved to Texas at the age of 18, he was sexually involved with several significantly older men, at least one of whom was a known sex offender. I do not recall if I discussed this during my meetings with Travis, but I know that I was not asked about it during my testimony. Had I been asked, I could have testified that a young boy who was sexually abused as a child is at great risk of victimization by older men. I also could have testified to the following:

a) Travis' hypersexuality: Sex is the way he knows to connect with other people; it's the "skill" he has, and the way that he will naturally think of in order to make money, and to support himself.

b) Promiscuity is a very common outcome of sexual abuse. For Travis, with the sexual abuse beginning so young and lasting so long, he'd be even more at risk of that outcome. He was more profoundly sexualized than are most victims, and that was expressed in sexual offenses on his part – throughout his adolescence, with his cousin, and then at Sheppard Pratt – and later in his sexual relationships with significantly older men.

c) His experiences with these older men probably reinforced his world view of people using sex, wanting sex from others in a manipulative fashion, being able to use sex

manipulatively or to gain things he wants, and so forth. Sex was a commodity, while at the same time being his only way of connecting to others.

7. I have also recently been provided with information that there was sexual abuse in Travis' biological family, involving his mother, his father, his older brother and his maternal grandmother. I do not recall being aware of this history at the time of the trial. This evidence would have added to my understanding of Travis, and particularly to the huge range of risk factors he faced. Essentially, a genetic basis of aggression, violence, and abuse would have been added to the risk factors I focused upon: abandonment, sexual abuse, and early childhood lack of attachment.

8. I have also recently been provided with records indicating that Travis was likely anally raped by Gary Mullis. The records show that Travis was treated for anal fissures and for rectal bleeding when he was at the Brook Lane placement. I have also recently been provided, for the first time, records of Gary Mullis' counseling after being arrested for sexually abusing Travis. Those records show that Gary Mullis previously lied about the extent and frequency of the sexual abuse. He had previously only admitted to abusing Travis about 5 or 6 times. These records indicate that he admitted the abuse occurred 12 times. (It remains quite probable that even this represents an understatement regarding the extent, frequency and duration of the abuse.) I had not previously been provided with those records or the Brook Lane records. This information of physical injuries consistent with anal rape and evidence that Gary Mullis previously lied about the extent of the abuse, lead me to believe that the sexual abuse was far worse than I had thought at the time of my testimony.

9. The fact that Travis was likely anally raped by this father would have been tremendously important to know about. My previous knowledge of the sexual abuse was that it

was limited to – at its most extreme – fellatio. The presence of anal fissures make it quite likely that it included anal rape. This is a more severe (and more physically painful act) especially for an infant/toddler/young child. It is much more traumatic and likely to be experienced as far more invasive, painful, and abusive. I also think it could have been very relevant in testimony. Simply put, I think it likely would have had a much more powerful impact on the jury to hear from me that Travis' adoptive father, Gary Mullis, anally raped him, probably repeatedly, from infancy or toddler years until about age 6. That, I think, would have come across, as much more enormous and egregious and harmful, than does oral sex.

10. The Gary Mullis treatment records are also enormously important for other reasons. Not only do they corroborate the sexual abuse, and confirm that the severity, frequency and duration were significantly greater than previously acknowledged, they also show very clearly how strong an emotional bond there was between Gary and Travis. Gary loved Travis. He speaks in almost every session about his concern for Travis' well-being, about missing him, and about his guilt and remorse for his treatment of Travis and its impact on Travis. This is so different than anyone else's regard for and relationship with Travis. These treatment notes corroborate what I said about the twin impacts of the sexual abuse and then the consequent loss of the one figure with whom Travis was positively bonded. If I had access to those notes prior to my testimony, they would have strengthened my testimony about the centrality and tragedy of this loss.

11. In addition to that, I have also recently been provided evidence of other significant losses in Travis' life. I testified regarding the loss of his birth mother and his adoptive father, but now have substantially more evidence of loss – of Travis' uncle, Steven Barry, of his grandfather, and of Richard Brokaw, a treating psychologist. If I had this evidence

at the time of the trial, my testimony regarding the effects of multiple loss on Travis' mental development would have been far stronger.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Date: July 18, 2013

Dr. Matthew Mendel