# Psychological Report of Trauma and Its Impact: Travis Mullis

## Part I.
### Introduction

I am a licensed clinical psychologist and forensic consultant in the effects of trauma. As my C.V. indicates, I have experience working on death penalty cases as expert witness in the assessment of childhood trauma and its impact. For the past fifteen years, I have been involved in the study and treatment of complex adaptations to physical and sexual abuse in both the civilian and the military population. For the past twelve years, I worked for the Department of Veteran Affairs (VA) Medical Center in Durham, North Carolina where I treated veterans who have experienced combat, sexual abuse in childhood, and rape in the military. At the Durham VA Medical Center, in addition to working with female veterans with PTSD, I developed and directed the Male Military Sexual Trauma Program. This program is one of the few comprehensive outpatient programs in the nation devoted to understanding and treating the effects of childhood sexual abuse and military rape on males. I have been asked to present on physical and sexual trauma nationally, and provide consultation across the country within the VA system on the particular effects of sexual abuse on males. I am an active member in good standing of the International Society For Traumatic Stress Studies, where I have presented papers and chaired symposia on the effects of traumatic experiences on children's development and subsequent adult behavior. I have extensive experience teaching and supervising post-doctoral fellows and psychology residents in the assessment and treatment of traumatic sequelae.

### Rationale for Evaluation of Trauma in this case

I was asked by Mr. Mullis's attorneys to evaluate his history of trauma. I was asked to assess and evaluate the impact of previously documented traumatic events that were brought forth in the penalty phase of his trial and to assess for possible other traumatic events throughout his life. In particular, I was asked to evaluate the imprint of these traumatic experiences on his adult behavior and to evaluate and offer a trauma-informed perspective on Mr. Mullis's behavior and state of mind. Evaluation and testimony by Drs. Dudley and Mendel presented in the trial and penalty phases offered competent evaluation of Mr. Mullis's developmental history and some of the impacts of his traumatic life experiences. These results will not be reprised in this report, but should be considered relevant background to the information presented here. Instead, this evaluation and report aims to fill in possible overlooked traumatic events and specific trauma-related impacts on Mr. Mullis's behavior.

1

### Method & Sources

In addition to the documents reviewed below, an extended face-to-face assessment was conducted with Mr. Mullis over the course of two days. I met with Mr. Mullis for approximately 14 hours June 24-25, 2013 on the Polunsky Unit in Polk County, TX. We met face-to-face in a small interview room with a table between us. Mr. Mullis was in leg chains. We were observed by a prison guard behind sound-proof glass throughout the assessment.

Documentation from the following sources was reviewed prior to the assessment with Mr. Mullis:

- Transcript of Trial
- Transcript of Penalty Phase
- Letters written by TJM (05-10-11, 10-11-11, 8-20-12, 9-13-12)
- Jefferson School ( 7 Volumes)
- Hartford County Public School & Edgewood High School
- Plumtree Family Health
- Shepard Pratt Medical Records
- Pediatric Partners
- Bay Area Counseling
- Experts
- Miscellaneous
- Galveston Co Jail Records
- Hartford County Sherriff transcripts
- Interviews with: Candy Rhinhart, Francis Barry, Michele Duarte, Caren Kohnberger
- Galveston Police telephone record excerpt of call to Anne Mullis Jan 29,
- Brooklane records. Summary
- Declarations: Anne Mullis, Sally Ann Jennings, Rebecca Pate, Dr. Katz and Richard Bokaw
- Treatment records of Gary Mullis

## Part II. Additional Sources of Trauma not Explicated at Trial

**Contribution of Maternal Neglect to Posttraumatic Adjustment**

2

**Maternal Denial of Disclosure of Sexual Abuse:** Travis's anger at his mother and the absence of feelings of loyalty or protectiveness towards her, despite what he is facing legally is, in my opinion, quite unusual and indicative of another layer of his traumatic past that has not been well explicated. While it is not helpful or even possible to impugn Anne Mullis's intentions in raising Travis, it is also not helpful to overlook her contribution to the intensity of impact Travis's early traumas had on him.

Research on child resiliency to abuse and maltreatment cite the primacy of the non-abusive caretaker's initial response to disclosure and subsequent attunement to the child's individual needs throughout his or her integration of the traumatic experience. Research indicates that maternal denial of a child's disclosure of abuse is particularly damaging and rivals the negative effects of the abuse itself. Denial, minimization or blame appear to predict the worst outcomes in children after disclosure. While there is no "perfect" parent or caretaker and while children respond positively to a fairly wide range of caretaker styles after maltreatment, there are some responses and behaviors that are clearly more detrimental than others, no matter the caretaker's intentions.

Prior to the revelation of the sexual abuse, records indicate that Travis's mother sought treatment for him at age 3 due to difficulties bonding. It is likely that Travis was already being sexually abused by Gary Mullis before and during this period, despite his statement that it didn't begin until Travis was 4 or 5. Gary Mullis's treatment records show that he initially lied and downplayed the frequency and severity as well the duration of the abuse. He abused Travis more times than he initially admitted, and he did such things as masturbate himself to orgasm, which he also failed to disclose to DSS or Travis's therapist. Travis himself stated that his own experience struggling with these kinds of sexual urges informs his belief that his father's sexual abuse started earlier than he admitted. He said, "it's not a problem that just comes and then goes. It's with you always." From infancy to 3 or 4 years of age, children are incapable of distinguishing mental boundaries the way an older child can, thus Travis would have thought his mother was aware of the abuse, even if, in fact, she wasn't. He would have expected her to interact with him about it, to stop his father or intervene in some way. This perception that his mother knew, but did nothing to stop the sexual abuse would have constituted, for the very young Travis, a psychologically catastrophic failure of protection-- especially when laid on top of the physiologic remnants of neglect in his earliest infancy prior to his adoption. So, it is very likely that the early difficulties Ann and Travis had bonding were, in part, because of his distress over the sexual abuse, the (often unintended) implicit message to the child, if he is in therapy, that there is something wrong with *him,* when, in fact, there was something wrong happening *to him* not only by his father, but by her in her failure to protect him. Thus, the real source of Travis's distress in his earliest experiences of therapy was altogether overlooked.

3

Unfortunately, such invalidation continued. When Travis did tell his mother about the sexual abuse more directly prior to his father's admissions, Anne Mullis did not believe Travis. His therapist observed that she was "very protective" of Gary Mullis and became angry with Travis instead. Her initial denial of this disclosure was a crucial aspect of the traumatizing impact of Gary Mullis's sexual abuse.

While she eventually responded to the information that her husband was sexually abusing their son by dissolving the marriage and returning Travis to therapy, it may have been too late to regain his trust.

Further, it did not seem to change a fundamental emotional disconnection Anne appeared to have from Travis. His therapist observed that Anne was closed to her education and guidance about the impact of the sexual abuse on Travis's behaviors. Travis described clear mis-attunement between his needs and her response to the abuse. For several years, and because she became the sole caretaker, Travis was often sent to live at the Barry household while she worked. While this may have been necessary, it was not an emotionally viable proposition for Travis, whose trust in his mother's protection and care was already in jeopardy because of his pre-adoption neglect as well as the sexual abuse. When she did have Travis at home, Travis recalled that she spent all of her time in her own room on her computer, and was emotionally detached from him. When they interacted, it was around household functions such as doing errands, going out to get groceries, etc. While Travis's need for her emotional and physical presence was, no doubt, a catch-22 for Anne Mullis, who now had to rely on her brother and mother to take care of Travis while she worked because she no longer had a husband to do it, it was experienced by Travis as a continuation of the same relationship of perceived abandonment by his mother, only now he no longer had his father with whom he had some semblance of an emotional connection. In Travis's words, his mother was "dutiful to a point, but only about some things. She wouldn't go emotionally beyond what she was "supposed to do." This seems to be reflected in his childhood therapist's observations of Anne Mullis. She stated that Anne "went through the motions" of getting Travis into treatment, but was not engaged and pulled him out of treatment prematurely, at critical time in his processing of the sexual abuse. (*declaration*, Sally Ann Jennings)

### Maternal and Grandmother's Use of Physical Punishment

Perhaps one of the more pernicious disruptions that occurred for Travis in his relationship with his mother and his grandmother was their use of regular physical punishment when he had done something wrong. It is difficult to determine whether this crossed the line into what might be considered physical abuse, since males tend to minimize the degree to which they are willing to admit being physically dominated or rendered helpless, especially by women. Travis, particularly, needed to present himself as invulnerable with respect to

4

his mother and gave minimal detail about her beatings. Nevertheless, Travis reported that his mother hit him "pretty regularly," and when I clarified what that meant, he indicated that she hit him for something he had done wrong almost every day starting around age 4 or 5, and that the hitting continuing through the time when he entered the Jefferson School. She hit him with wooden spoons and kitchen utensils she kept in a canister on the stove. He reported that she hit him on his behind and that one time her wooden spoon broke while hitting him. He described the beatings as definitely very painful and something he wanted to avoid. When asked if he tried to escape them or run away from beatings, he said, "I knew I couldn't get away from her. Why run away and make her even more angry? That might make it worse." Similarly, his grandmother, who was in daily charge of him after school for many years, used to beat him with her hand, with kitchen utensils and would also put cayenne pepper in his mouth when he cursed.

He recalled that his mother's frequent spankings and his grandmother's cayenne punishment facilitated more feelings of anger and alienation from his mother and from all of his caretakers. He said he coped with the feelings of helplessness and the physical and emotional pain that his mother and grandmother inflicted by learning to numb himself. He recalled that he would tell himself that, in fact, he was in control because he had gotten to do what he wanted anyway, that his mother was not the one in control and that the pain of the beatings would stop soon.

Travis reported that the last time his mother attempted to punish him came soon after he returned from the Jefferson school. He recalled that she got upset with him about something and attempted to restrain him in a chair by pinning his hands down by his sides. He said he was big enough by that time to break loose of her hold. After she realized his strength, she never hit him again after that.

**Maternal Emotional Mis-attunement & Exacerbation of The Impact Of Sexual Abuse:** Once his mother accepted the fact of his father's sexual abuse, Travis perceived an intensification in her scrutiny of his behavior that he found intrusive. After his father admitted to the abuse, he recalled endless questioning, interviews and attention paid to what happened to him. He expressed regret and remorse that his own child victims (e.g., Cecilia Duarte) may have had to endure similar experiences after his abuse of them.

As mentioned above, Travis perceived Anne Mullis's absence from his early daily caretaking as an abandonment, especially since his father was likely already abusing him during this time. His mother's sudden appearance in his life after the abuse therefore felt "smothering" to Travis. He recalled feeling like everything happened fast after his father's admission of guilt--too fast for him to process emotionally. In representing his state of mind at the time, he

5

stated what he would have wanted to say at the time to his mother: "Wait a minute, you're telling me it's wrong (the sexual abuse), but it doesn't feel like its wrong, so back off and let me deal with it. First you're not there, and then you're there too much."

As well, his mother's failure to make a true connection to his vulnerability or his confused and confusing emotions was only exacerbated by her insistence that he be in psychological treatment for the abuse. While this may have been dutiful and responsible, it had myriad of negative consequences for Travis. The description and responses to the aftermath of disclosure suggests that Travis was traumatized almost as much by the intended "help" he received as by the actual abuse from his father.

First, because of the kind of therapy it appears he was offered (individual child therapy rather than parent-child therapy), it meant that Anne Mullis was not present to witness, validate and understand the complexity of his feelings either towards his father or towards her. Her absence in this critical aspect of his recovery from the sexual abuse compounded their already problematic attachment. Instead of repairing the damage, it further objectified Travis in her eyes. He said, "my mom only saw me as a bunch of problems and diagnoses. Whenever I did something, she'd say, "you're doing this or that because you were sexually abused, or you're just saying that because of the bipolar disorder, or your ADHD makes you do this or that." This dynamic continued throughout his adolescence and adulthood.

Her attention to the abuse after-the fact also gave him the impression that she was only interested in his victimhood. This can be particularly invalidating for male children, since having the helplessness of sexual abuse made "public," so-to-speak, typically heightens feelings of vulnerability and stigma. For a male, (child or adult), being rendered helpless in any way is interpreted as a sign of "weakness." No matter that Travis was a child sexually abused by a trusted adult, the gender norms available to him and to his mother in processing the impact of his sexual abuse failed to account for the overwhelming importance of the damage the abuse and his mother's (if inadvertent) subsequent response did to his gender identity development. It is not surprising, then, that battles for control ensued in their relationship, particularly when he reached adolescence. He remarked, our relationship was "based on who was going to be in charge, who was going to be in control," since feelings of control were one of the only ways Travis knew to prove the manhood he felt was taken from him by the sexual abuse and by his mother's subsequent responses.

Despite not liking the kind of attention his revelation of the sexual abuse produced, it nevertheless got his mother's attention, something Travis wanted and badly needed at every stage of his development. A careful reading of treatment notes where Ann is present indicate her difficulties being emotionally attuned and appropriately responsive to Travis's communications

6

and feelings. Therapist notes characterized her as often missing cues, and being surprised or bewildered at the strength of Travis's tears or reactions after many attempts to get her attention before this occurred. When a parent is emotionally disconnected or mis-attuned, children often have to resort to increasingly "loud" behaviors before being "heard."

His mother's mis-attunement and emotional abandonment of Travis can be seen in three examples at critical junctures or crisis points in his adult life. In the first, Travis called his mother after learning that Caren was pregnant to share his excitement that he was going to be a father. Instead of responding with any validation of his happiness, Travis recalled his mother asking why he had called in the middle of the night, she had to work the next day, and couldn't he have waited until the morning to tell her this? Perhaps the most disturbing indication of abandonment was his mothers response to the call from the Galveston police the night of the crime in 2008 in which, according to the report, she said "she wished he would commit suicide and he should pay for what he's done to her grandson."

At a more critical moment, Travis reported calling his mother from Texas the night of the crime to tell her he felt he was in danger of offending with one of the Duarte kids. He recalled that she was put off, once again, by his middle-of-the-night call disrupting her sleep, and that she asked him, "what am I supposed to do about this from so far away?" Travis hung up the phone with an increased sense of desperation and the certainty that there was no one who could help him. Her denial and minimization of his current desperate state served as a re-enactment of her denial when he disclosed his father's sexual abuse, thus re-triggering the network of emotions associated with his childhood sexual abuse. Travis was completely unaware of being triggered and flooded with past memories and associations, and was unprepared to cope with such an overwhelming flood of stress on top of his current and immediate challenge of managing his urges.

**Caretaker Neglect: Sexual Reactivity among children in household, absence of physical contact:** Another overlooked phenomenon contributing to a turning point in Travis's behavior was the absence of parental or caretaker oversight in his uncle's household and a great deal of what can be termed "sexually reactive" behavior among all of the children in that household. Travis described that between the ages of 5 or 6 and 13, he and the Barry children were relatively unsupervised. He recalled coming back to the Barry household after school where his grandmother looked after the kids while Mr. and Mrs. Barry were at work. He said his grandmother was usually in the kitchen and "never knew where we (the kids) were at." Travis, Michael, Michelle and Suzie played sexualized games together: "shanks" which entailed pulling the pants of the other children down, and "doctor" which typically happened between just two children at a time. Travis stated that he and his cousins all participated

7

willingly in these games and that they did not necessarily see them as bad or wrong. He stated their sexualized behaviors escalated gradually to the point where he recalled his first true sexual arousal in an encounter with Michael, who was just one year younger than him, involving "69" and "humping" each other. He saw this as exploratory and described Michael as initiating these behaviors as much as he did. He reported similar activities with Stephanie, but less so, and then with Suzie. In retrospect, he wondered if Suzie's accommodating responses to his initiation of sexual activity with her were a result of her brother or sister already having had this kind of contact with her.

He revealed that he had a very difficult time understanding that what he had done to Suzie was wrong, in part because he knew that all of the Barry children were doing sexual things with each other and that because none of them had indicated dislike or objected to the "games," he had misunderstood particularly Suzie's accommodation as consent.

When asked why he didn't tell Mrs. or Mr. Barry or his mother about the sexual activity among all the kids, especially after being caught engaging in sexual activity with Suzie, he stated he knew would never have been believed. He stated, "I was the scapegoat, no one was going to listen to me." Travis had already experienced his mother's denial and disbelief when he tried to tell her about his father's sexual abuse, so he had experiential knowledge of the likelihood of this occurring again. In addition, he was aware of the implicit "expectation" that because he was a victim of sexual abuse, he would have been at risk for such behaviors. The self-fulfilling nature of this identity within the family as a potential perpetrator cannot be underestimated in Travis's difficulties breaking the patterns of his own sexually inappropriate behaviors in adolescence and adulthood.

Further, the prohibition and stigma of homosexuality in the culture strongly prevents boys from reporting on any kind of sexualized activity with each other. So, even if Travis considered telling about the sexually reactive behaviors among all of the Barry children, shame and confusion would still have made it very unlikely that he would have told any adults about the sexual activity between he and Michael. Similar realistic fears of stigmatization prevented him from revealing these encounters with Michael to any of his therapists.

Thus, his earliest sexual experiences were an intensely confusing mix of arousal and likely intrusive memory from childhood sexual abuse with his father that functioned as an overwhelming trigger to his father's past abuse. His subsequent perpetration with Suzie and the uncanny re-enactment of his father's story, suggest how this activity with Michael may have been an extremely activating trigger to his earlier trauma. Yet, the swift and terrifying consequences of his abuse of Suzie left the trigger hidden and un-addressed. Subsequent to his abuse of Suzie, Travis was completely ostracized from

8

cousins he considered siblings and from an uncle who functioned as the only father figure to which he had access. Finding himself the target of his family's anger and bearing the secret of his confusing sexual encounters with Michael, Travis thought about killing himself for the first time and was psychiatrically hospitalized.

## Part III. Additional Trauma-Relevant Information Not Presented at Trial

### A Neurobiological Perspective on Repeated Abuse In Childhood

Another area of importance in understanding the impact of traumatic experiences is how it affects the child's brain and body. Studies of children and adult survivors increasingly show that the neurobiology of prolonged states of terror and helplessness is specific and produces a myriad of psychological outcomes and diagnoses including diagnoses of mood dysregulation (Major Depression, etc.), chronic fear reactions (e.g., panic, PTSD, agoraphobia) and pervasive dysregulation of the emotional system (Borderline Personality Disorder, etc.). More importantly, understanding the neurobiological underpinnings of traumatic experience cuts across diagnoses and helps explain emotions, cognitive states and behaviors that are common to children who experience infantile abuse as well as male survivors of sexual abuse..

1. Healthy child development depends on a number of interconnected biologic and psychological processes, the bases of which are formed in a secure parental attachment. The past two decades have seen a remarkable acceleration in our understanding of the neurobiology of the developing brain and its impact upon child and adult behavior. We are increasingly able to understand the biological bases of psychological phenomena.

2. The brain of a developing child is an extremely plastic organ that is shaped in many important ways by the environment in which it grows. For example, there is mounting evidence that the millions of face-to-face interactions between a child and his or her caretakers - the smiles and verbal exchanges, the caring touches, the teaching and the gentle admonitions - are responsible for the growth of neural networks in critical areas of the frontal lobes of the brain. The neural circuitry in the frontal lobes is what gives us our capacity to inhibit our impulses, modulate our emotions, reflect on our own thoughts and feelings, and therefore to temper them.

3. A child who grows up in a family that provides him with a healthy environment, in which he has frequent interactions with his caretakers - smiles, touches, verbal exchanges - will develop increasingly dense neural circuitry in his frontal lobes, and will become aware of his emotions and impulses, learn to contain them, and eventually to verbalize them. This developmental process is at the core of what we call "socialization."

4. Children are inherently adaptive and that these adaptations tend to highlight resilience. They can find what they need most to survive and grow even when conditions are not optimal. There are limits, however, to resiliency. Travis's childhood was catastrophic because he was subjected to levels of trauma and abuse and neglect that would have overwhelmed any adult, never mind a child without the brain and behavioral capacities of an adult.

5. The earlier in life trauma begins and the longer it lasts, the more severe the psychological and behavioral impacts are likely to be. When the perpetrators are part of the child's caregiving and attachment system, the severity and complexity of symptoms are also typically increased. Travis's neglect and maltreatment began prior to his birth and his first months of life were fraught with physical pain, the absence a source of attachment and this continued well into his first year of life.

6. From a neurobiological perspective, the early neglect and subsequent sexual abuse and physical punishment used by his caretakers evoked extremely intense emotions and impulses, while the absence of attachment to his adoptive mother deprived him of the needed relational context and socialization that would facilitate the neural development he needed to contain and modulate these impulses.

**Unique Impacts of Sexual Abuse on Males**

**Concerns over Masculinity and Sexual Orientation:** While boys and men who experience sexual abuse are negatively impacted in ways very similar to females, there are concerns and reactions that are unique to males. Most of these impacts link to the larger process of masculine gender socialization. It is still the case that we tend to view male-to-male sexual abuse as some expression of homosexual sex. So, whereas females who experience sexual abuse rarely question their sexual orientation, males who are sexually abused (even by females) almost always struggle with the fear and shame of being stigmatized as homosexual, whether they are or not.

10

The assumption that being sexually abused by another male makes them "gay," is linked to other aspects of masculine socialization. In most cultures, including our own, "real men" are supposed to be physically strong, fearless, in control and dominant over others. The implicit rules in the code of masculinity dictate that boys and men do not feel fear, and learn not to express emotions (except anger) or feel empathy too deeply. Feelings of empathy, shame, fear, sadness, etc. are typically associated with sterotypes of the female gender. While gender prototypes allows for some variation, they are not highly flexible. When a male is subjected, then, to sexual abuse, which involves being physically overcome or manipulated, victimized or terrorized by another person, he is thrown into feeling and behavioral states that the code of masculinity cannot accommodate. His only options are to consider what was done to him as something to do with being "gay" and his reactions to it as associated with female vulnerability.

Most boys and men who are sexually abused are then forced to make sense of their masculinity within definitions and options limited by our cultural stereotypes. They find themselves confused by feelings of fear, shame and inadequacy. This confusion may get expressed through avoidance of sexual contact, contact with males even while being fearful or disgusted by this, or by a stalling-out of appropriate sexual development. Travis's adolescent sexual development bears the negative imprint of all of these: he failed to move into adult sexuality and largely avoided sexual contact, except with a few males or younger females, in part due to an inability to understand or come to terms with the impact of his earlier sexual abuse.

Another possible response that many males make to the confusion they feel over their masculinity is to adopt "hypermasculine" behaviors. They may try to prove their heterosexuality through promiscuity and multiple sexual encounters with women. Around age 18, when he moved to Texas, Travis entered a period where he was, in part, driven to sexual activity with as many women as he could find. His hypersexuality has typically been understood within the framework of sexual deviance, however, it is not at all unusual for men who have been sexually abused to show patterns of sexual dysregulation over their lifetime from homosexual to heterosexual contact and avoidance or delay in sexual development to hypersexuality.

**Fear of Re-victimization by Rape:** Another unique impact that played a large part in Travis's adult behavior and was a direct result of his childhood history of sexual abuse was his omnipresent fear of being anally raped. Despite Travis's inability to recall if his father anally raped him, there are a number of concerning indicators that this may have occurred, including physical ones. Travis had a history of late potty training, as well as GI bleeding and anal fissures. These problems were not necessarily associated with any complications related to his NEC condition at birth, and were more likely associated with infection or physical trauma to that area of his body (see

11

*declaration,* Dr. M. Katz). Further, Travis's very specific fear of anal rape and the lengths to which he goes to avoid anal contact, even while engaging in other sexual contact with men is also an indication of this being a trauma-related fear. While he does not let this fear be known to others or even himself, it continues to function as a significant source of anxiety. Avoidance of anal penetration and the terror of this occurring out of his control has influenced many of Travis's past and current decisions. When assessing what he labeled his "survival fears" that emerged when he moved to Texas, it became clear that Travis was driven to find a domestic situation in which he felt he could predict his hardships and get his material needs met so as to avoid the unpredictability of living on the streets or doing something like dealing drugs where violence and the potential loss of control over his physical safety was more likely.  His associations to the kinds of trouble that might befall him in these situations always circled back to his fear of being raped and his belief that it would be extraordinarily painful.  While his decision to live with and prostitute himself to a convicted sexual predator (discussed in detail below) was dangerous and had the potential for the kind of rape he so feared, it is quite common for survivors of sexual abuse to be numbed to the dangers that most closely approximate the actual conditions of their past abuse.

In Travis's case, his re-enactment of his father's abuse with a man in his 50's did not elicit the kind of "alarm" it should have precisely because he had learned to accommodate these conditions in childhood, whereas the fear engendered from past abuse was more readily apparent when he contemplated the unknown.

This fear of being raped is currently present for Travis and plays a role in his decisions about his legal case. His terror of being in general population and his decisions to waive his appeals is informed by his fear that he will no longer be physically isolated. He fears and assumes both because of his crime, but also because of the intrusive content of his past sexual abuse, that one of the ways in which he will be "punished" by other prisoners will be brutal and painful anal rape.

**Other Imprints of CSA on Adult Behavior: Complex Posttraumatic Symptoms, Triggering and the Intrusion of Traumatic Content**

Trauma memories, associations and emotions can be understood as "psychological shrapnel" that is embedded in victims' memories and psychobiological and behavioral systems.  For many adults who have been through childhood sexual abuse, long after the abuse has ceased, remnants of that experience lie in wait to be re-detonated in the emotions and behaviors of the adult survivor.

If the traumatic experiences take place before or during the development of language as Travis's did, the adult may then only "remember" the traumatic

events themselves in non-narrative form (e.g., as a sensation in the body, as a repetitive behavior that evokes the same emotions or outcomes as the traumatic events, etc.). This is similar to the way in which a piece of shrapnel— inert in and of itself-- remains hidden in the body of a combat veteran, but signifies past danger--and when probed, may result in vivid recollections or emotion from the dangerous time.

The intractability and self-defeating nature of some of Travis's behaviors and reactions also signal their ties to trauma. Often, when behaviors are impervious to logic, intervention and attempts at change, they are tied to a deeper logic of survival specific to traumatic situations forgotten by the survivor.

**Traumatic Intrusions in the Form of Fear-Based Behaviors**

**Hypervigilance** (behavioral, cognitive): Closely related to the need for control are the many forms of hypervigilance that Travis demonstrates. While he has long been recognized as having deficits in attention and has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), this diagnosis fails to recognize the fear at the basis of his inattentive behaviors. Unlike ADD distractibility, post-traumatic hypervigilance describes a set of beliefs and concomitant behaviors that reflect an overwhelming concern with danger, safety and impending threat. Travis's hypervigilant symptoms are extreme.

**Visual Scanning:** Perhaps the most striking example of his hypervigilance could be seen in his constant visual scanning throughout two days of assessment. Every movement of the guards behind the window prompted a disruption in the flow of his thought and attention. The scanning ranged from cutting his eyes towards the guards every few seconds to complete visual fixation on them for a matter of 20 or 30 seconds. Travis was completely unaware of this behavior, the beliefs that drove it, or its function. Once prompted, however, he was able to narrate the danger and fear-based beliefs behind this visual scanning (e.g., "what dangerous event is happening in the prison right now that would prompt their movement? what rank is that guard? What harm can he or she cause me? How will I respond when they try to hurt me or take something from me? What will they do to me?" etc.). He was completely unable to inhibit the visual scanning, though, even when re-assured that we were safe, we were not being over-heard and that he would have plenty of warning time before the guards could get into the interview room to mount any needed safety defense.

**Auditory Hyperarousal:** Travis reported extreme sensitivity to sounds and noises in his environments throughout his life with the purpose of parsing, once again, the potential for danger that such information held. He gave the example of involuntarily jumping up to look out the door of his cell whenever he heard anyone pass by. This behavior is accompanied by the belief that he is more likely to be ready to defend himself if he anticipates danger early by responding to low-level noises that could signal danger.

**Suspiciousness and Mistrust:** Many psychological assessments have noted Travis's tendency to seem over-intellectualized, absent of emotion, "manipulative" or withholding of information in conversations. This has led to a view of Travis as someone who appears to be calculating and who lies. While the result may be accurately labeled as such, the hypervigilance that drives this behavior has gone un-noticed. Travis is constantly "scanning" the verbal content of interpersonal interactions for the ways in which the other person will "gain advantage" over him and render him either mentally vulnerable or physically exploitable by causing him to enter a state of emotional arousal where he loses physical control. For example, Travis warned me that he often instantly and quickly thinks through the consequences of everything he says, maintaining a vigilance for his own speech. He also has a long-standing habit of interrupting and talking-over others. He did this repeatedly throughout the interview. Again, this behavior has been over-attributed to ADD, when in fact, it often reflects a distant trauma cognitive adaptation or imprint. When Travis interrupted, his intention was often to control the direction of the conversation away from topics that would lead him into strong negative emotion—most often embarrassment, fear or anger. These feelings, in their most basic form, re-trigger helplessness and associations to very early victimization. Such verbal control tactics and mistrust would occur if he perceived that he had gotten an answer "wrong," for example, or if he anticipated that I was asking him to talk about memories that he habitually numbed.

Travis's assumption that human interactions are always and inflexibly skewed towards taking control of another is a distant imprint of the betrayal encoded when a child is abused by a caretaker, in particular. In caretaker sexual abuse, what appear to be benign communications are often attempts on the part of the perpetrator to render the child susceptible to the perpetrator's wishes. With children, this is accomplished very often through kindness, reason, play, "negotiation" etc. rather than through frank cruelty. Thus, the child learns that these normal communication strategies signal danger. When normal communications are tainted in this way, the abused child, and subsequently the adult, is left with an intractable reaction of mistrust and suspiciousness elicited by the very communication strategies meant, in normal relationships, to build trust.

**Intrusions of Trauma in the Form of Re-enactments of the Trauma Story**

**Prostitution & Sexual Exploitation by Older Men:** Travis's young adult sexual activity and relationships bear the imprint of his early sexual abuse and offer a glimpse of the impact of these experiences many years later on his level of fear and demoralization. When Travis moved to Texas, at the age of 18 without a job or source of support, he repeatedly described being in "survival mode." This state of being was marked by constant fear of being homeless, and the necessity of making money on the streets in ways that would lead to physical

14

pain, attack or rape. In order to avoid this, he engaged in series of sexual relationships with older men. In exchange for food, shelter, material possessions and enough money to keep a cell phone on, Travis engaged in sexual favors with much older men to whom he felt no sexual attraction. He believed himself to be "in control" of these relationships because he did not become emotionally involved and told himself that he was free to leave them at any time. Most importantly, Travis told himself that he was in control and "safe" because he insisted he set the terms of sexual contact to avoid anal penetration.

One relationship was particularly complicated and problematic for Travis. When he only 18 years old, he was invited to live with a man in his 50's who had federal charges as a sexual predator and who was on probation for these charges. In exchange for a place to live, food, a cell phone, Travis agreed to provide chauffeur services due to his impaired eyesight, and to perform sexual favors for this man. Over time, Travis had to fend off the older man's escalating sexual demands. He described the pressure he was under to perform anal sex on him and that this pressure never ceased. Eventually, Travis described allowing him to stick his penis in between Travis's "butt cheeks" in order to simulate anal sex. He also described the necessity of emotionally numbing himself in order to get through the daily routine of this man returning home from work and expecting sex. Travis described feeling dread as this part of the day approached and wishing he would "just hurry up and get it over with." Travis felt he owed this man these sexual favors because of the material support he provided. He considered this a fair exchange, despite the re-triggering and attempts at mastering his own traumatic past that this entailed and the psychological toll this took on him.

When it comes to adult women survivors of CSA, we readily recognize the mark of earlier traumas in such complex relationships, but we tend to but tend to overlook the trauma imprint in men when they engage in similar relationships.

**Conflicts in Building Intimacy with Women:** Another area in which Travis's past history of trauma becomes apparent in the circumstances leading up to his crime and which appears to have been unexplained is the impact of his failing relationship with Caren Kohnberger. Travis explained that the news that Caren was pregnant elicited a feeling of hope and purpose in him that he would be able to repair a failing relationship with her. He was please to think that he would be a father and would have the opportunity to "do it differently" than his own father. He described accompanying Caren to her OB appointments, and being present in the surgery while she had a C-section and feelings of happiness upon holding his infant son, Alijah, for the first time. He was motivated to stay at the hospital to take care of Caren and the baby while they both recovered from the birth. He continued in this frame of mind and behavior for a period of time after they returned home. However, his past traumas (both his pre-

15

adoption infantile neglect and the problems with his adoptive mother) became increasingly intrusive as the weeks at home with Caren and Alijah passed.

Travis's anger at the mother of his son, Caren, was apparent throughout the assessment and had a quality similar to his feelings about his mother. Upon further assessment, it became clear that the arrival of an infant as well as his relationship to Caren triggered Travis's associations to his mother's role in his own sexual abuse. Not only did he describe Caren's physical characteristics as being similar to his mother, he noted that her tendency to spend much of her time emotionally "checked out" was triggering to him. He described Caren as having an alcohol problem and that she was either drinking, drunk or recovering from drinking most days. She also spent most of her time on the computer. Both of these activities left her emotionally disengaged, which reminded Travis of his own mother. Reminiscent of his childhood with his mother, he fell into a familiar childhood behavior of spending hours on the computer, himself, while she spent hours on hers.

While this way of relating was tolerable prior to the arrival of their infant son, Alijah, it became intolerable for Travis after his birth. He described himself as being solely responsible, most days and nights, for feeding, changing and responding to his infant son's needs. At first, he was dutiful and able to attribute the situation to Caren's prolonged recovery from her C-section, but when it continued for several weeks, and when Caren sat at her computer rather than answering the baby's cries or need for changing or feeding, he became increasingly distressed.

While many new fathers who participate in the care of a baby feel overwhelmed, the triggered associations to his own pre-adoption maternal neglect as well as the emotional mis-attunement of Caren created an level of emotional distress that Travis was wholly unaware of, and that went far beyond normal. Travis was clearly unable to distinguish his own needs and somatic memories of his own dependence from those of his infant son. This was readily apparent when he described his growing sense of desperation and alarm at Caren's unresponsiveness to the baby. He said, "Caren was turning out to be just like my mother--checked out. I was afraid my son was going to grow up with a mother just like mine." Discussing this period of time after the birth of Alijah and the state of his relationship with Caren was clearly difficult for Travis. He became agitated and increasingly hypervigilant during this portion of the assessment and the conversation was disrupted several times by his need to watch the guards and speculate on their potential danger to him in the moment.

Several times Travis coped with his distress by leaving the house, thinking that he would not return. One time out of anger and the desire to get Caren to appreciate the importance of his role in caring for the baby, he removed most of their possessions from the household, sold them and planned to use the

16

money to leave her. However, he was checked by his sense of obligation to his son. He stated, "what kind of father would I have been if I burned off like that?" When Travis returned after his longest period of time away, he was confronted by an "intervention" by Michelle Duarte, her husband, two neighbors and Caren. They told him he was no longer allowed to just leave for days and that if he did, the male neighbor would find him and beat him up. Travis felt out-numbered and misunderstood, since Caren's dysfunction, her drinking and neglect of the baby was never mentioned as part of the reason he was escaping. The role of his own past traumas in driving his behavior was completely unrecognized both by Travis and everyone else in the situation. This scene re-enacted the past experience of being confronted by Mrs. Barry for having abused Susie, especially since only his behavior was being addressed and punished.

### Intrusions in the form of Self-Hatred, Suicidality & His Response to the Current Legal Context

Travis has waived his appeals twice since the sentencing phase of his trial. He has a long history of suicidality going back to early adolescence. Despite the fact that he has not actually attempted suicide, he was and continues to be plagued with thoughts of wanting to die and impulsive thoughts of killing himself. He was clear, during this assessment, that his feelings of self-hatred and contemplating the loss of control over his safety in the prison environment led him to becoming suicidal. He revealed that while being held in the county jail, he planned to hang himself. He explained that he was--and still is-- terrified of being beat up and raped in prison.

While it is not unusual, in my experience, for men to speak about their ambivalence about being in the general prison population after having been on death row for a long period of time, the men who have a history of sexual abuse most often describe that they would rather be put to death than endure rape in prison. They rightly imagine this experience to be a repeat of their childhood sexual victimization and worse, which causes them to waive their appeals. During our assessment, Travis was clear that he thought of the death penalty as a way to commit suicide, and preferable because it was a way to "someone else to do it for me." He explained that he changed his mind in August of 2012 partly as a result of surprising emotional support for the inherent value of his life offered him through several pen pals.

Travis's history of trauma gets re-enacted in a number of ways as he engages in the legal process. He is well aware of the hatred towards him that his crime elicits in others. This response confirms his self-hatred, demoralization and feelings of worthlessness. Despite lifelong displays of intermittent grandiosity, self-interest, or self-preservation, Travis believes he deserves to die. This belief predates his crimes and has long been linked to the confusion and pain

17

associated with his earliest traumas, the negative impacts of which he has never been able to repair.

In addition, the constant uncertainty and loss of control over his security, safety and connection to a caring person that define his legal course re-enact many periods of his life both during the period of time when his father was sexually abusing him, and subsequent to this when his attachment difficulties with his mother were at their most severe in his adolescence. These current day experiences elicit intense urges to "escape" through suicide. He often thinks about his options for how he can accomplish this and thinks the death penalty is the most viable method.

**Insufficient Treatment for PTSD**

Travis was in therapy at the time his adoptive father, Gary Mullis, disclosed his sexual abuse of Travis. He continued in therapy, presumably to help him process the effects of the sexual abuse. He was not given a diagnosis at this time, but soon thereafter, at the age of 7, Travis was given a diagnosis of ADHD. The psychological report by Dr. N. Williams noted that Travis's mood was "very anxious" and that projective tests indicate his preoccupation and worries about his father's sexual abuse and its consequences. It would have been appropriate to consider a diagnosis of pediatric PTSD, however, there is no indication that this diagnosis was assessed or ruled out.

It is notable that Travis was given a diagnosis of Posttraumatic Stress Disorder starting at the age of 13 while at Sheppard Pratt Hospital, and yet I can find no PTSD-specific treatment anywhere in his extensive mental health record.

Throughout his teens, indications of PTSD symptoms continue to appear in treatment notes, but after his first act of sexual offending, it is clear that PTSD was never a primary target of treatment. For example, in several records, particularly at Stonebridge House and the Jefferson School, Travis complained of "flashbacks" and nightmares about his father's sexual abuse. As well, his hypervigilance (a symptom in the hyperarousal cluster of PTSD symptoms), is extreme and appears to have been an active symptom since childhood. Records indicate that he received medication management, but the class of medications he was given are not typical for the treatment of pediatric or adolescent PTSD.

The diagnosis of PTSD in children was recognized in the literature on traumatic stress as early as 1985 (Eth & Pynoos, 1985) and a growing understanding of the underlying neurobiology and the behavioral and interpersonal developmental impairment associated with pediatric and adolescent PTSD symptoms was well-established by 1995 (Terr, 1990, Amaya-Jackson, et al., 1995). Treatment Guidelines for best practices in the treatment of pediatric and adolescent PTSD were recognized in 2000 (Cohen, Berliner & March, 2000). Therefore, the

absence of specific treatment targeting the cognitive, biologic and behavioral manifestations of this history in the form of PTSD symptoms is puzzling and concerning.

It appears that Travis's other psychiatric diagnoses were targeted for medication treatment instead (e.g., ADHD, ODD, Bipolar II) and that group and milieu therapy was offered to target behaviors associated with these disorders. Despite its ubiquitous use in juvenile justice programs, the evidence base for general behavioral group therapies for kids with homogeneous problem behaviors is equivocal at best, and can at times, exacerbate problem behaviors and symptoms of other diagnoses. These groups often function to "teach" kids more problem behaviors. Travis himself described this phenomenon at Stonebridge and Jefferson School. He suggested that he left these programs having been exposed to and influenced by kids with worse behaviors than he had before he entered. Treatment plans in these programs call for monthly individual therapy, which would have been an insufficient dose/frequency had they been conducting PTSD-specific treatment.

In sum, it is notable that Travis was given a diagnosis of chronic PTSD at the age of 13, but there is no evidence of actual treatment for this psychiatric disorder, despite the growing understanding in 1990's and 2000 that this was a treatable psychiatric disorder in children and adolescents, that treatment guidelines for best practices were available and that PTSD- specific treatment was not only warranted, but could have been successful.

## Part V. Conclusions

1. While prior assessments of Mr. Mullis's history have identified a history of multiple developmentally significant traumatic experiences, there are other experiences that were not considered part of his maltreatment, but which are known to have significant implications on the severity of maltreatment and on a child's poor recovery from maltreatment and abuse.

2. As described above, the following constitute experiences that exacerbated the impact of Travis's documented maltreatment and abuse and were an integral part of what made his pre-adoptive neglect and paternal sexual abuse traumatic experiences from which he could not recover.

   a. Maternal denial of disclosure
   b. Subsequent and continued emotional mis-attunement and emotional distance
   c. The over use of physical punishment and the absence of physical touch and warmth
   d. Sexual reactivity among the children whom he considered his siblings

   The contribution of these additional experiences should not be minimized, since their imprint played an ongoing role in his behavior leading up to the crime, and continue to play a pervasive role in his current adjustment to his legal situation.

3. Further, the unique contribution of male sexual abuse was not fully explicated when Travis's adult behavior was described. While any sexual abuse of a child has the potential for complications and damage, emerging research of the sexual abuse of males suggests that these experiences are often significantly more complicated and damaging, and their course of recovery less certain than for females. Continued cultural ignorance of the phenomenon and damaging gender stereotypes often result in misunderstanding the symptoms and behaviors of males who experience sexual abuse.

4. In conjunction with the contribution of gender to his sexual abuse, there are several complex posttraumatic symptoms related to his entire history of abuse which continue to significantly affect Travis's adult behavior. The following symptoms are notably severe:

   a. Generalized Survival Fears
   b. Fear of rape
   c. Hypervigilance (both cognitive and behavioral)
   d. Intrusive "memories" of his childhood maltreatment in the form of fears, somatic drives, emotions, and re-enactments

5. The mechanisms by which past traumas make an appearance in adult behavior are rarely recognized either by the adult survivor or those who interact with him or her. These complex posttraumatic symptoms drive much of Travis's behavior and they became increasingly acute prior to his crime.

6. The trajectory of Travis's life and his crime is, unfortunately, one possible outcome when children endure the kinds of very early and severe trauma Travis suffered. His humanity can and should be seen in his vulnerability to these worst outcomes, since they tell the story of the original pains and damage he experienced at the hands of the adults who were responsible for caring for him, and from whose betrayal he was unable to recover.

*Victoria Reynolds*
Victoria Reynolds, Ph.D.
July 17, 2013