**UNITED STATES DISTRICT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **TRAVIS JAMES MULLIS,** | : | |
| Petitioner, | : | |
| | : | No. 3:13-cv-121 |
| **v.** | : | **THIS IS A CAPITAL CASE** |
| | : | |
| **WILLIAM STEPHENS,** | : | |
| **Director, Texas Department of Criminal Justice, Correctional Institutions Division,** | : | |
| | : | |
| Respondent. | : | |

**PETITIONER'S MOTION TO STAY AND**
**ABEY THE FEDERAL HABEAS PROCEEDING**

SHAWN NOLAN
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West—The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
215-928-0520
Shawn_Nolan@fd.org

November 20, 2014

# TABLE OF CONTENTS

I. Petitioner Never Received State Habeas Review Because of His State Habeas Counsel's Ineffectiveness ........................................................................................... 1

    A.    Counsel Performs a Cursory Initial Investigation ............................................. 2

    B.    Counsel Does Nothing To Protect Mullis's Interests Before, During, or After the Competency Hearing ................................................................................. 3

    C.    The Court Decides Not To Remove Counsel and Defers Any Decision on Waiver ....... 9

    D.    Counsel Prevents Mullis from Filing a Timely Habeas Petition by Miscalculating the Deadline To File ................................................................ 18

II. The District Court Should Stay Proceedings So That Mullis Can Exhaust His Claims in State Court ........................................................................................... 26

    A.    Petitioner Has Good Cause for Failing to Exhaust Because of the Inadequate Assistance of His State Habeas Counsel ................................................... 28

    B.    Permitting Petitioner To Return to State Court Is Not Plainly Meritless ...................... 31

            1.    Texas's Relaxed Approach to Untimely Applications Under Article 11.071, Section 4A .................................................................................. 31

            2.    The Unsettled State of Texas's Rule for Abuse of the Writ ................................ 36

            3.    Invalidity of Mullis's Earlier Waiver ................................................................. 37

            4.    If the Court Harbors Any Doubt About These Novel State Law Matters, a Stay Is Warranted ............................................................................... 39

    C.    Mr. Mullis Has Not Engaged in Intentionally Dilatory Tactics ..................................... 40

    D.    Principles of Federalism Favor Allowing the State Court the Opportunity To Consider Petitioner's Unexhausted Claim ................................................... 41

Conclusion ........................................................................................................................ 44

# TABLE OF AUTHORITIES

## Federal Cases

*Alvarez v. Thaler*, No. 4:09–CV–3040 (S.D. Tex. June 6, 2013) ................................. 28

*Appel v. Horn*, 250 F.3d 203 (3rd Cir. 2001) ......................................................... 9

*Barbee v. Thaler*, No. 4:09-cv-00074 (N.D. Tex. May 18, 2011) ............................... 27

*Blake v. Baker*, 745 F.3d 977 (9th Cir. 2014) ........................................... 28, 29, 30

*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990) ............................................... 9

*Broxton v. Thaler*, No. 4:11-cv-00315 (S.D. Tex. Feb. 23, 2011) .............................. 27

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014) .............................................. 30

*Clements v. Maloney*, 485 F.3d 158 (1st Cir. 2007) ............................................. 28

*Duncan v. Walker*, 533 U.S. 167 (2001) .......................................................... 41

*Gonzales v. Thaler*, No. 5:10-cv-00165 (W.D. Tex. Jan. 31, 2011) ............................ 27

*Harris v. Reed*, 489 U.S. 255 (1989) .............................................................. 42

*Haynes v. Quarterman*, 526 F.3d 189 (5th Cir. 2008) ........................................... 31

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014) ...................................................... 21

*Hunter v. Thaler*, No. 4:10-cv-00778 (S.D. Tex. June 6, 2011) ................................ 27

*Jackson v. Roe*, 425 F.3d 654 (9th Cir. 2005) ................................................... 28

*Jalowiec v. Bradshaw*, 657 F.3d 293 (6th Cir. 2011) ........................................... 28

*Martinez v. Ryan*, 132 S.Ct. 1309 (2012) .................................................... 29, 30

*Neathery v. Stephens*, 746 F.3d 227 (5th Cir. 2014) ............................................ 27

*Neville v. Dretke*, 423 F.3d 474 (5th Cir. 2005) ...................................... 28, 31, 37

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005) ....................................................... 29

*Panetti v. Thaler*, No. 1:09-cv-00774 (W.D. Tex. July 1, 2010) ............................... 27

*Rayford v. Stephens*, 552 F. App'x 367 (5th Cir. Jan. 21, 2014) .............................. 27

*Raymond v. Weber*, 552 F.3d 680 (8th Cir. 2009) ................................................ 9

*Rhines v. Weber*, 544 U.S. 269 (2005) ...................................................... passim

*Rose v. Lundy*, 455 U.S. 509 (1982) ............................................................. 29

*Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007) .............................................. 28

*Shuffield v. Thaler*, No. 08-cv-00180 (E.D. Tex. Aug. 26, 2010) .............................. 27

*Sloan v. Delo*, 54 F.3d 1371 (8th Cir. 1995) .................................................... 40

*Sparks v. Stephens*, No. 3:12-CV-469-N, 2014 WL 113583 (N.D. Tex. Jan. 13, 2014) ....... 27, 29

*Sturgis v. Goldsmith*, 796 F.2d 1103 (9th Cir. 1986) ............................................ 9

*Trevino v. Stephens*, 740 F.3d 378 (5th Cir. 2014) ............................................. 27

*Trevino v. Thaler*, 133 S. Ct. 1911 (2013) ...................................................... 28

*United States v. Barfield*, 969 F.2d 1554 (4th Cir. 1992) ....................................... 9

*United States v. Collins*, 430 F.3d 1260 (10th Cir. 2005) ....................................... 9

*United States v. Klat*, 156 F.3d 1258 (D.C. Cir. 1998) .......................................... 9

*Wardrip v. Stephens*, No. 7:01-CV-247-G-BF, 2014 U.S. Dist. LEXIS 55471 (N.D. Tex., Apr. 22, 2014) .................................................................................. 27, 29, 30

*Wilder v. Cockrell*, 274 F.3d 255 (5th Cir. 2001) ............................................... 39

*Williams v. Thaler*, 602 F.3d 291 (5th Cir. 2010) ............................................... 26

*Woods v. Kemna*, 13 F.3d 1244 (8th Cir. 1994) ................................................. 40

*Wooten v. Kirkland*, 540 F.3d 1019 (9th Cir. 2008) ............................................ 28

## State Cases

*Ex parte Austin*, WR-59,527-01 (Tex. Crim. App. July 6, 2004) ................................. 35

*Ex parte Bigby*, WR-34,970-02, 2008 WL 5245356 (Tex. Crim. App. Dec. 17, 2008) ............... 33

*Ex parte Brown*, WR-68,876-01, 2008 WL 152724 (Tex. Crim. App. Jan. 16, 2008) ................ 33

*Ex parte Buck*, 418 S.W.3d 98 (Tex. Crim. App. Nov. 20, 2013) ................................ 37

*Ex parte Carter*, WR-70,722-01, 2009 WL 190161 (Tex. Crim. App. Jan. 28, 2009) ............... 33

*Ex parte Castillo*, WR-70,510-01 (Tex. Crim. App. April 22, 2009) ............................ 34

*Ex parte Cortez*, WR-78,666-01, 2013 WL 458197 (Tex. Crim. App. Feb. 6, 2013) ................ 33

*Ex parte Diaz*, No. WR-55850-02, 2013 WL 542971 (Tex. Crim. App. Sept. 23, 2013) ............ 37

*Ex parte Evans*, 964 S.W.2d 643 (Tex. Crim. App. 1998) ...................................... 41

*Ex parte Gobert*, WR-77,090-01, 2012 WL 479689 (Tex. Crim. App. Feb. 15, 2012) ............. 33

*Ex parte Gongora*, WR-60115-02, 2006 WL 173106 (Tex. Crim. App. Jan. 25, 2006).. 22, 33, 35

*Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002) ...................................... 36

*Ex parte Kerr*, 64 S.W.3d 414 (Tex. Crim. App. 2002) ........................................ 31

*Ex parte Luna*, WR-70,511-01 (Tex. Crim. App. Oct. 1, 2008) ................................. 34

*Ex parte Matamoros*, No. WR-50791-02, 2011 WL 6241295 (Tex. Crim. App. Dec. 14, 2011) 41

*Ex parte McCarthy*, No. WR-50,360-04, 2013 WL 3283148 (Tex. Crim. App. June 24, 2013) .....
.................................................................................. 36, 37

*Ex parte McPherson*, 32 S.W.3d 860 (Tex. Crim. App. 2000) ................................... 41

*Ex parte Medina*, 361 S.W.3d 633 (Tex. Crim. App. 2011) ...................... 33, 34, 35, 41

*Ex parte Medrano*, WR-78,123-01, 2012 WL 5452694 (Tex. Crim. App. Nov. 7, 2012) ..... 34, 35

*Ex parte Moreno*, 245 S.W.3d 419 (Tex. Crim. App. 2008) ..................................... 41

*Ex parte Mullis*, No. WR-76,632-01 (Tex. Crim. App. Sept. 12, 2012) ...................... 20, 23

*Ex parte Murphy*, WR-70,832-01 (Tex. Crim. App. Mar. 25, 2009) ............................. 33

*Ex parte Neal*, WR-70,512-01 (Tex. Crim. App. Oct. 1, 2008) ................................. 34

*Ex parte Ramirez*, AP-75,167 (Tex. Crim. App. July 7, 2008) ................................. 34

*Ex parte Reedy*, 282 S.W.3d 492 (Tex. Crim. App. 2009) ................................... 38, 39

*Ex parte Reynoso*, 228 S.W.3d 163 (Tex. Crim. App. 2007), *vacated*, 257 S.W.3d 163 (2008) .....
.................................................................................. 17, 32

*Ex parte Reynoso*, 257 S.W.3d 715 (Tex. Crim. App. 2008) ............................... passim

*Ex parte Segundo*, WR-70,963-01, 2009 WL 190162 (Tex. Crim. App. Jan. 28, 2009) ............ 33

*Ex parte Tabler*, WR-72,350-01 (Tex. Crim. App. Sept. 16, 2009) ............................. 35

*Ex parte Young*, WR-70,513-01 (Tex. Crim. App. Oct. 1, 2008) ............................... 34

## Statutes

Tex. Code Crim. Proc. art. 11.071 § 2 ........................................................ 1

Tex. Code Crim. Proc. art. 11.071 § 3(a) .................................................... 14

Tex. Code Crim. Proc. art. 11.071 § 4(a) ................................................ 18, 43

Tex. Code Crim. Proc. art. 11.071 § 4(b) .................................................... 24

Tex. Code Crim. Proc. art. 11.071 § 4(d) ................................................ 22, 43

Tex. Code Crim. Proc. art. 11.071 § 4A ..................................................... 32

Tex. Code Crim. Proc. art. 37.071(h) ..................................................... 1, 19

## Rules

Tex. Disciplinary R. Prof'l Conduct 1.02 ................................................. 13, 14

iv

Tex. R. App. P. 38...................................................................................................... 23
Tex. R. App. P. 38.6............................................................................................. 19, 21
Tex. R. App. P. 71.1..................................................................................................... 19
Tex. R. App. P. 71.3..................................................................................................... 19

**Other Authorities**

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty
    Cases Guideline 10 *Investigation* (2003)................................................................. 14
Brief for Respondent, *Trevino v. Thaler*, No. 11-10189 (U.S. Jan. 14, 2013)...................... 36, 41
Director's Supp. Br. Respecting the Pet. for Reh'g En Banc, *Ibarra v. Thaler*, No. 11-70031 (5th
    Cir. June 4, 2013)..................................................................................................... 42

Petitioner Travis James Mullis, pursuant to the procedure approved in *Rhines v. Weber*, 544 U.S. 269 (2005), requests that the Court stay and hold in abeyance his federal habeas proceedings to permit him to present his unexhausted claims to the state courts.  In support of this request, Mr. Mullis sets forth the following:

## I.     Petitioner Never Received State Habeas Review Because of His State Habeas Counsel's Ineffectiveness

On March 23, 2011, Brad Levenson and the Office of Capital Writs ("OCW" or "Counsel") were appointed to represent Travis James Mullis in his state habeas corpus proceedings pursuant to § 2 of Texas's capital habeas statute.  Tex. Code Crim. Proc. art. 11.071 § 2.  On September 12, 2012, the Court of Criminal Appeals concluded that Mullis had waived his right to file a habeas application.    What happened between those dates is the principal subject of this motion, because it explains why Mr. Mullis was unable to exhaust his claims in state court.[1]

State habeas counsel for Mr. Mullis failed to represent their client's interests before, during, and after the crucial competency hearing that determined whether Mullis was eligible to waive his habeas application.  The court never granted Mullis permission to proceed pro se and never granted Mullis's motion to remove counsel.  As a result, Counsel remained Mullis's attorneys from the start of their appointment at least until the Court of Criminal Appeals ruled that Mullis had waived his application by failing to file one.  Counsel simply abandoned any

---

[1] Petitioner does not concede that *all* claims raised in his Federal Habeas Corpus Petition are unexhausted. For example, Petitioner may have exhausted some claims via the Texas Court of Criminal Appeals' ruling finding no fundamental error on automatic review of his conviction and sentence.  *See* Tex. Code Crim. Proc. Art. 37.071(h).   Additionally, Claim XVI of Petitioner's Federal Habeas Corpus Petition was presented to, and subsequently denied by the Court of Criminal Appeals in his November 30, 2012 Motion for Leave to File Petition for Original Writ of Habeas Corpus.

investigation on their client's behalf.  And Mullis's change-of-heart might have permitted timely filing of a habeas application, but for counsel's mistaken understanding of the deadline for filing. It was those failures, not Mullis's, that led to his failure to exhaust his claims.  Petitioner now moves to stay his federal proceedings in order to return to state court to have his first opportunity to present and exhaust his claims of constitutional error.

### A.    Counsel Performs a Cursory Initial Investigation

To understand how cursory and incomplete Counsel's investigation was, this Court does not need to look any further than Counsel's own representations about what they did and did not do in the first six months they had the case.  The first six months matter because Counsel ceased investigating entirely after September 2011, when Counsel filed a motion to waive Mr. Mullis's habeas application.  *See* Mot. to Appoint Counsel & Establish a New Habeas Corpus Application Due Date Under Article 11.071 Section 4A at 12,  attached as Exhibit 1 ("4A Motion") (OCW did not "fully" investigate "[b]ecause" Mullis waived).  But even prior to filing Mr. Mullis's motion to waive, Counsel had done little to develop the case.  As Counsel reported to the state habeas court at its October 11, 2011 hearing on Mr. Mullis's motion to waive his habeas proceedings, "[w]hat we have done so far is we have *started* the investigative process." Transcript of Hearing on Motion to Waive Post-Conviction Hearing Review, 10/11/11 at 7, attached as Exhibit 2 ("10/11/11 transcript") (emphasis added); *see also* 4A Motion at 13 ("Substantial Investigation has yet to be done in this case.").  In fact, OCW was already winding down its investigation before the hearing on Mr. Mullis's motion to waive.  At the hearing, Mr. Levenson stated that OCW had "suspended" an important investigative trip "when it looked like Mr. Mullis was going to affirmatively waive." 10/11/11 transcript at 8.    These remarks—

showing that counsel was already treating Mr. Mullis's waiver and competency to do so as a forgone conclusion—foreshadow the inadequate representation that would come next.

While OCW had all of the files from Mullis's trial counsel, OCW took only "initial steps" to review those records.  4A Motion at 12. They had not conducted more than merely preliminary interviews with Mr. Mullis's family, let alone spoken with any of Mr. Mullis's "extended relatives, friends . . . former employers, and other witnesses who may have insight into Mullis's life history and background."  OCW acknowledged that doing this work would take "many months" to complete.  True, Counsel did not have the reporter's record—the official trial record—at the time, and true, that record was important to OCW's evaluation of which claims Mullis might develop.  But Counsel still fail to explain why they had not used the many months they had—from the time of their appointment in March until the October competency hearing— to perform any investigation on Mr. Mullis's behalf.

**B.      Counsel Does Nothing To Protect Mullis's Interests Before, During, or After the Competency Hearing**

Counsel's inadequate representation continued with Counsel's performance before, during, and after the competency hearing.  Counsel's complete failure to advocate on Mr. Mullis's behalf resulted in a competency determination by a court-appointed psychiatrist, Dr. Victor Scarano, made without the benefit of Mr. Mullis's long and highly relevant history of severe mental illness.  Dr. Scarano never received documentation that Mr. Mullis had been diagnosed multiple times with Bipolar Disorder, or that he had been placed in a psychiatric hospital three times in the course of a month for suicidal ideation, or that doctors had diagnosed him with severe, recurrent depression and Post-Traumatic Stress Disorder.  Unaware of this

crucial information, Dr. Scarano produced a report wholly inconsistent with Mr. Mullis's mental health history.

On September 15, 2011, while investigation into Mullis's case had just begun, Counsel acquiesced in Mullis's demand to file a motion to "waive post-conviction habeas review" application.  *See* Pet'r's Mot. to Waive Post Conviction Habeas Review, attached as Exhibit 3 ("Motion to Waive").  In that motion, Counsel requested appointment of a mental health expert to evaluate whether Mullis was competent to waive and a subsequent hearing on the requested waiver.  Counsel also stated that Mullis sought to remove OCW as his attorneys.  That same day, the court appointed Dr. Victor Scarano to examine Mullis "for the purpose of determining whether [he] has sufficient present ability to consult with his attorney . . . and whether [he] has a rational as well as factual understanding of the proceedings against him to knowingly and intelligently waive his post-conviction habeas review." *See* Order Appointing Expert to Examine Petitioner for Competency to Waive Post-Conviction Habeas Review, attached as Exhibit 4.

At that moment, Counsel knew of Mr. Mullis's well-documented lifelong history of mental illness.  Counsel possessed hundreds of pages of childhood medical records, substantiating Mullis's repeated diagnoses for mental disorders.[2]  Those records show, for example, that Mullis carried a diagnosis for Attention Deficit Hyperactivity Disorder and Separation Anxiety from the age of seven.  They show that, at age thirteen, Mullis was placed in a psychiatric hospital three times in the course of a month for suicidal ideation and that doctors

---

[2] "At the time Mullis was granted pro se status on his post-conviction habeas proceedings, the OCW had collected the files of Mullis's trial counsel, as well as the files from the expert witnesses who testified at Mullis's trial (although there may still be other experts consulted by trial counsel who did not testify that the OCW has not yet contacted.)."  4A Motion at 12.

4

diagnosed him with severe, recurrent depression and Post-Traumatic Stress Disorder. They show that Mullis was repeatedly diagnosed with Bipolar Disorder and received spotty treatment for all these disorders.

Counsel also knew there was information in trial counsel's file that, if investigated, could open promising avenues for challenging the competency finding. For example, Counsel had files and notes for psychiatrist Dr. Richard Dudley and psychologist Dr. Matthew Mendel who had each testified at Mullis's trial regarding Mr. Mullis's mental health disorders. Even though habeas counsel did not yet have the reporter's record of the trial, trial counsel's files and notes contained significant leads. Yet counsel failed to contact or follow up in any way with those experts.[3]

Even though Counsel had access to these records and knew that the court-appointed psychiatrist was willing to review records from the parties, counsel did not provide any of these records to Dr. Scarano. The State did not hesitate in giving Dr. Scarano material it thought might influence his evaluation. For example, the State gave Dr. Scarano a news report in which Mullis had spoken to the press about his case. On October 5, the State also submitted medical records from jail and prison authorities. Counsel was notified of the State providing Dr. Scarano this material and yet provided no records of Mr. Mullis. *See* Competency Report by Dr. Vincent R. Scarano, attached as Exhibit 5 ("Scarano Report"). Rather, Dr. Scarano's report reflects that state habeas counsel provided him with only four Texas Court of Criminal Appeals opinions. As

---

[3] To the extent that Counsel lacked a detailed knowledge of Mr. Mullis's history of mental illness because of inadequate time to review records collected, reasonable counsel would have alerted the Court to this concern and requested additional time to review these record and develop these details.

a result, Dr. Scarano necessarily lacked highly relevant documentary evidence that would affect his competency finding.

When OCW received Dr. Scarano's report on October 6, they should have noticed numerous red flags. The most striking of these was the stark contrast between Mr. Mullis's extensively documented, deeply troubled mental health history reflected in trial counsel's records and Dr. Scarano's conclusions.  Moreover, Dr. Scarano concluded that Mr. Mullis had no Axis I mental disorders in spite of Mullis's own explanation of his childhood diagnoses for ADHD and bipolar disorder.  Dr. Scarano based his evaluation in part on a brief assessment of Mullis in which Mullis gave an incomplete history of his diagnoses and treatments.  In short, Dr. Scarano was the first and only mental health professional in 25 years to evaluate Mr. Mullis and conclude that he did not suffer from severe mental disorders.

Raising these issues would have raised grave doubts about Mullis's competency.  We know, for example, that had counsel sought the consultation of trial experts Dr. Dudley and Dr. Mendel, they would have learned that those experts' professional opinions would have contradicted Dr. Scarano's.  As Dr. Dudley said in an affidavit:

> If an attorney had contacted me and let me know Mullis was considering having the attorney removed so he could represent himself, and abandoning his appeal, I would have told the attorney . . . that Mullis's bipolar disorder and history of suicidal thoughts and gestures suggest a substantial risk that Mullis could be attempting to abandon his appeals in order to hasten his own execution.  This would be a type of suicide.

Affidavit of Richard Dudley, 11/14/2012, attached as Exhibit 6.   Based on OCW's own motion to file an untimely habeas application, we also know that a psychiatrist confronted with a full account of Mr. Mullis's medical records would have found severe mental impairments:

> Mr. Mullis, in my professional opinion has manifested symptoms of significant psychiatric illness throughout his lifetime. He has been diagnosed by qualified physicians with several disabling conditions and many have attempted a variety of treatment modalities. It remains unclear if there is a single unifying diagnosis underlying his mood volatility, depressive periods, impulsivity, sexual aberrations, lack of empathy, and general instability. Without a reasonable doubt many of his behaviors and thought processes can be attributed to a disorder of personality.  He was subjected, it appears, to a highly traumatic sequence of violations early in life and clearly manifests. Many persons presenting with a history such as his accumulate numerous Axis I psychiatric disorder diagnoses as they pass through childhood, adolescence, and adulthood.  Bipolar Disorder, ADHD, Impulse Control Disorder, Major Depression, Substance Abuse Disorders, Paraphilias, Post Traumatic Stress Disorder, and others are commonly "collected" during the development and maturation of these individuals.

Report of Psychiatric Examination by Dr. Michael Fuller at 11, attached as Exhibit 7.

Upon receiving Dr. Scarano's report, OCW should have also noticed a number of other issues. Dr. Scarano dismissed life imprisonment as a motivating factor for Mullis's decision to waive in spite of his statement acknowledging "that, as a child rapist and murderer, he would be at the bottom of the food chain in prison and there would be inmates that would want to kill him."  Scarano Report at 7.   Dr. Scarano also apparently based his evaluation on medical records from jails and prisons that he had only received on October 5, the day before he issued the report. Dr. Scarano supplemented his testimony, too, with his interpretation of judicial precedents on the legal question of competency, which, typically would be the exclusive province of the court.  *See* Scarano Report at 17-18.   Each of these premises contributed to Dr. Scarano's finding, and each was subject to vigorous attack.

In addition, Dr. Scarano's report contained important but underdeveloped details counsel could have used to both give context to and challenge Mr. Mullis's waiver.  Take for example the report's conclusion that Mullis had features of Borderline Personality Disorder.  As Dr. Scarano recounted, features of that mental disorder include "fear of abandonment" and the need

"to continually test the . . . commitment" of those around the individual with Borderline Personality Disorder.  Scarano Report at 21.  Individuals with Borderline Personality Disorder are also marked by "impulsivity"—calm one day, destructive the next.  *Id*.  A reasonable lawyer would find this characterization highly relevant and insightful regarding the issue of Mr. Mullis's waiver: was Mullis "test[ing] the commitment" of his lawyers by threatening waiver of his legal rights and removal of counsel?  Mullis's impulsive behavior, motivated by a need to test those around him, made him incapable of consulting effectively with his counsel and undermined the "voluntariness" of his waiver. Counsel must have seen these red flags and these opportunities to challenge the validity of the competency evaluation, and yet Counsel did nothing to challenge Dr. Scarano's competency finding at the October 11 hearing.

Reasonable counsel would have seized any of these numerous options for attacking Dr. Scarano's competency determination.  For example, Mullis's lawyers could have introduced evidence on Mullis's extensive history of mental illness, alerting the Court to the striking discrepancies between this history and Dr Scarano's report.  They could have requested that Dr. Scarano prepare a new report based on a reading of all the relevant records in Counsel's possession.  They could have hired a different expert to help interpret Dr. Scarano's findings or alternatively challenge those findings on the basis of a larger set of records.  Or Counsel could have simply submitted the report to rigorous adversarial testing by requesting Dr. Scarano appear and examining him.

But Counsel did nothing.  Instead, at the October 11 hearing, Mr. Levenson attested that he had read the report "thoroughly" and had no objection to the report "as a whole" and "certainly ha[d] no problems putting it into evidence." 10/11/11 transcript at 7.  (Perhaps anticipating Counsel's ready surrender to the competency finding, the October 11 hearing did not

offer a ready forum for testing Dr. Scarano's evaluation.  Dr. Scarano had not even been called to appear before the court to testify regarding his findings.)

No reasonable attorney would succumb so readily to a finding of competency, and especially no attorney aware of his client's lengthy history of mental illness.  The law says as much: competency hearings are crucial stages at which counsel needs to be present.[4]  When counsel abandon their role as advocates for their client's interests, they are as good as no counsel at all.  Thus, when Levenson represented to the court that he had no objection to the court's admission of Dr. Scarano's report, in reality he failed to provide any representation at all.   By failing to document their client's history of mental illness, conducting *no* investigation into obvious leads to challenge Dr. Scarano's evaluation, and performing no adversarial testing at the competency hearing, Counsel had abdicated their client's sole defense.[5]  Counsel abdicated their duties not only to Mr. Mullis, but also to the Court.  Counsel's failure to alert the Court, or any of the parties, to Mr. Mullis's documented and highly relevant history of psychological problems, and its striking inconsistencies with Dr. Scarano's report, constituted a breakdown in the adversarial process and rendered the result unreliable.[6]

## C.      The Court Decides Not To Remove Counsel and Defers Any Decision on Waiver

---

[4] *See, e.g.*, *Raymond v. Weber*, 552 F.3d 680, 684 (8th Cir. 2009) (agreeing with other circuits that competency hearing is critical stage of criminal prosecution); *United States v. Collins*, 430 F.3d 1260, 1264 (10th Cir. 2005); *Appel v. Horn,* 250 F.3d 203, 215 (3rd Cir. 2001); *United States v. Klat,* 156 F.3d 1258, 1262 (D.C. Cir. 1998); *United States v. Barfield,* 969 F.2d 1554, 1556 (4th Cir. 1992); *Sturgis v. Goldsmith,* 796 F.2d 1103, 1108–09 (9th Cir. 1986).  This Fifth Circuit appears to have never addressed this issue.

[5] *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) (where challenging own client's competency and raising insanity defense is client's "sole hope," an attorney aware of his client's history of mental problems and institutionalizations, could have no reasonable strategy for failing to investigate).

[6] *See Burdine*, 262 F.3d at 349.

9

Despite their total abdication of their adversarial role at the hearing, Counsel did accomplish at least one thing at the hearing: they persuaded the court that they should not be removed as counsel on Mr. Mullis's case.  First, Counsel pointed out that their investigation was still in its very early stages.  Thus, OCW could not yet advise Mr. Mullis of what potential claims might be raised on his behalf.  10/11/11 transcript at 9.  Specifically, Mr. Levenson pointed out that the trial transcript was not yet available. *Id.*  Review of the trial transcript would be of great importance in determining what claims may exist and how OCW would "put the trial in context." *Id.*  If permitted to remain on the case, OCW could more fully investigate, identify, and develop potential claims, allowing Mr. Mullis to make a more informed decision about his waiver. *Id.* at 10.

Second, Mr. Levenson expressed practical and legal concerns that the court should not permit waiver too soon.  Based on his experience, Levenson suspected that Mr. Mullis might later change his mind regarding his decision to waive post-conviction proceedings, just like other capital litigants who later regretted their decisions to waive. *Id.*  Levenson also argued that permitting Mullis to waive at that point was legally premature because waiver could not be enforced until after the deadline to file a habeas application had passed:

> [T]he main point is that Mr. Mullis can't really waive his habeas until the time it's due and that would be another reason to for keeping us on the case during this time.  He's going to be sitting either here or at Polunsky and we certainly have the time and energy and the desire to work on Mr. Mullis's case on his behalf.

10/11/11 transcript at 17.  *See also* Motion to Waive, n.2 (citing *Ex parte Reynoso,* 257 S.W.3d 715, 720 n.2 (Tex. Crim. App. 2008) (waiver of habeas review not truly effective until after filing deadline has passed)).  Thus, Levenson requested that the court allow OCW to remain as

counsel on the case and defer any decision regarding Mullis's request to waive and remove counsel until after OCW was able to investigate Mullis's case:

> I would actually ask you to look beyond [Dr. Scarano's] report and to look at the age of Mr. Mullis and where we are in our investigation at this point and to perhaps kick this can down the road a little bit farther so we can have more time to work on Mr. Mullis's case and he can make a more informed decision about what this office can do for him.  I just don't think he can make that decision right now.

*Id*. at 11.  The State did not object to such an arrangement.  *Id*.

The court shared Levenson's concerns and stressed to Mullis the importance of allowing OCW to continue to investigate and develop his application, lest he later change his mind and find himself without adequate time to complete an application for writ of habeas corpus.   *Id*. at 19.  The court made clear to all parties that OCW's removal as counsel would be inconsistent with their continued involvement and would require OCW to stop investigating on Mr. Mullis's behalf.

> And if you waive this, they stop doing that.  That's the point.  Waive means to give up. . . . That they would stop the whole process of working on your behalf, trying to find something that might change the ultimate outcome.

*Id*. at 15.

At the conclusion of the October 11 hearing, the court had three discrete decisions to make on the motion before it: (1) Was Mullis competent to waive? If so, (2) would the court grant the waiver at this juncture? (3) Would the court remove OCW as counsel?  The next day, the court entered an order (titled simply "Order") seeming to adopt exactly Counsel's position at the hearing.

Though the court clearly found Mr. Mullis competent for the purpose of waiving his rights to post-conviction habeas review, the court deferred any decision regarding the waiver itself and allowed OCW to remain on the case as counsel for Mr. Mullis. The relevant portion of the order states:

> Mr. Mullis is permitted to act *pro se* regarding any decisions concerning waiver and/or filing a post-conviction writ of habeas corpus. The Office of Capital Writs may continue to investigate and prosecute a post-conviction writ of habeas corpus on behalf of Mr. Mullis until the deadline for filing, but must not file the writ if Mr. Mullis persists in electing to waive filing.

October 12, 2011 Order, attached as Exhibit 8.

It is difficult to imagine how Counsel thought this language granted Mr. Mullis's request for waiver or removed them from the case, but apparently that is how counsel read it. The court did not use the sort of language—terms like "grant," "deny," and "remove"—that would effect such a definitive conclusion, and the court used mandatory language sparingly: Mullis was *permitted* and OCW *may*. The only phrase that mandated anything implied that the court did not remove Counsel and did not grant waiver. By permitting Counsel to act and "continue to investigate . . . *on behalf of* Mr. Mullis" the court plainly envisioned a continuing attorney-client relationship. Indeed, the court had previously admonished all parties that OCW's removal from the case would require a termination of OCW's investigation on Mr. Mullis's behalf. *See* 10/11/11 transcript at 15 ("[To waive means] they would stop the whole process of working on your behalf."). By allowing OCW to continue investigating, the order necessarily did not remove OCW as counsel. The phrase "*persists in electing to waive* filing" suggests the waiver process was ongoing or unresolved and had not yet been decided. In light of the previous day's hearing, the message was clear: the court's order did not grant waiver and did not remove OCW

from the case.  Rather, the court denied Mr. Mullis's request to do so, and allowed OCW to remain as counsel.

Legal ethicist Robert Schuwerk, co-author of the Handbook of Texas Lawyer and Judicial Ethics, longtime member of the committee on Texas Disciplinary Rules of Professional Conduct ("TDRPC"), and Professor Emeritus at the University of Houston Law Center shares this view.  Declaration of Robert P. Schuwerk at ¶ 6, attached as Exhibit 9 ("Schuwerk Declaration").  Although the court found Mr. Mullis was "permitted to act *pro se* regarding any decisions concerning waiver and/or filing a post-conviction writ of habeas corpus," this language was not inconsistent with OCW's continued representation of Mr. Mullis.  Under TDRPC 1.02(a)(1), a lawyer is obligated to defer to a client concerning the "objectives and general methods of representation." TDRPC Rule 1.02(a)(1); *see also* Schuwerk Declaration at ¶ 8. Therefore, even absent the court's order, this rule would dictate that the decision whether to file a habeas corpus application was ultimately up to Mr. Mullis, not OCW.  *Id.*  "[T]his was not a substantially greater limitation on the OCW's freedom of action than would ordinarily govern a lawyer." *Id.*  Essentially, the court was merely restating a right Mr. Mullis, and all clients, always have.

Following the court's order, OCW continued to hold itself out as counsel for Mullis, further supporting the conclusion that they had not been removed from the case.  For example, on February 14, 2012, OCW filed a motion for extension of time to file a habeas petition on Mr. Mullis's behalf.  *See* Unopposed Motion for an Extension of Time to File Initial State Habeas Application, Feb. 14, 2012, attached as Exhibit 10.  In the motion, OCW described itself as "counsel for Mr. Mullis."  This conduct further supported Professor Schuwerk's conclusion that OCW remained counsel for Mr. Mullis following the Court's October 12, 2011 order.  Schuwerk

Declaration at ¶ 10.  It also appears the State "recognized that the OCW remained as counsel for Mr. Mullis." *Id.*  Anytime the State communicated with the court or Mr. Mullis regarding the case, it served a copy of the letter or pleading on the OCW as well as on Mr. Mullis.  *See, e.g.*, State's Motion for Trial Court to Notify the Court of Criminal Appeals of the Lack of Filing of Habeas Writ, Pursuant to Art. 11.071, June 27, 2012, at 5, attached as Exhibit 11 (Certificate of Service reads "The undersigned attorney for the State certifies that a copy of the above motion was mailed to Brad Levenson, habeas counsel.").

Because the trial court did not remove OCW from the case, it remained counsel for Mr. Mullis at least until the final date to file a timely application for writ of habeas corpus. Schuwerk Declaration at ¶ 12.  And because OCW remained as counsel for Mr. Mullis, their statutory and ethical duties to investigate on Mr. Mullis's behalf still applied.  TDRPC 1.02, cmt. 6 ("Unless the representation is terminated as provided in Rule 1.15, a lawyer should carry through to conclusion all matters undertaken for a client.").  Article 11.071 § 3(a) requires counsel to "investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus." Tex. Code Crim. Proc. art. 11.071 § 3(a).  Additionally, the ABA guidelines mandate that "[a]t every stage of the proceedings counsel has a duty to investigate the case thoroughly." ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES Guideline 10.7 *Investigation* (2003) (hereinafter "ABA GUIDELINES"); *see also id.* Guideline 10.15.1(e)(4) (requiring post-conviction counsel to "continue an aggressive investigation of the case").

If nothing else, OCW should be held to the obligations they led both the court and Mr. Mullis to believe they would perform if they remained counsel.  According to Professor

14

Schuwerk, Counsel's colloquy with the court regarding the activities OCW believed needed to be done in order to advise Mr. Mullis concerning his habeas application created the expectation, on the part of both Mr. Mullis and the court, that OCW would:

> "(i) review the trial transcript once it was generated; (ii) follow up with any promising information that transcript revealed; (iii) complete other aspects of its investigation alluded to in the October 11 hearing that were not directly dependent on that transcript; (iv) develop an overall strategy, if not an actual completed draft, of what it viewed as the optimal approach to any habeas petition it might file on his behalf, and (v) complete all of that work sufficiently before the deadline for waiving the filing of the writ to permit them to consult with Mr. Mullis about it beforehand."

Schuwerk Declaration at ¶ 7.

Despite these well-established duties and the October 12 order's express language permitting OCW "to continue to investigate and prosecute a post-conviction writ of habeas corpus on behalf of Mr. Mullis until the deadline for filing," Counsel promptly abandoned any investigation into Mullis's case following the hearing.

A comparison of Counsel's own representations at the October 11, 2011 hearing, and its 4A Motion filed on November 20, 2012 reveals the lack of any substantial investigation after the October, 2011 hearing. At the time of the competency hearing, OCW had collected trial counsel's files, had spoken to one of trial counsel, and had spoken to the defense experts from trial and had received their reports. 10/11/11 transcript at 8. OCW had also interviewed Mr. Mullis's mother, and two half-siblings. *Id.* By Counsel's own admission, the investigation was still in its early stages. Counsel explained to the court: "What we have done so far is we have *started* the investigative process . . . . It takes about a year and a half . . . . we've had about six months." *Id.* (emphasis added).

Tellingly, OCW's investigation had already begun to stop before it had even gotten started. At the October 11 hearing, OCW admitted that it had cancelled an investigative trip to interview Mr. Mullis's family even before the competency hearing. "And we actually had a visit planned to go to North Carolina. We suspended it when it looked like Mr. Mullis was going to affirmatively waive." *Id.* at 8.

More than twelve months later, Counsel explained that it had gotten no farther in its investigation. In the 4A Motion, Counsel put it bluntly: "Because Mullis waived his post-conviction habeas litigation, the OCW has not fully investigated or prepared an application on his behalf." 4A Motion at 12. Elsewhere, OCW stated, "substantial investigation ha[d] yet to be done in this case." *Id.* at 13. Just as before, OCW had collected the files of trial counsel and expert witnesses, but had taken only "initial steps to review those records." 4A Motion at 12. The Reporter's Record became available on October 27, 2011, shortly after the trial Court's October 12 order. Although Mr. Levenson had stressed to the Court the importance of the trial transcript in determining what issues should be pursued, *see* 10/11/11 transcript at 9, OCW did not even review the transcript upon receiving it, *see* 4A Motion at 12-13. In fact, twelve months later, after the deadline to file Mr. Mullis's state habeas application had passed, OCW still had not reviewed the trial transcript. 4A Motion at 12-13. Counsel's account of the investigation completed makes no mention of additional records being collected in that span of time. *Id.*

With regards to witnesses, again, Counsel had still only spoken to Mr. Mullis's mother and two half siblings. *Id.* at 13. However, "extensive interviews" with these witnesses "still ha[d] not been undertaken" and no additional witnesses had been interviewed. *Id.* In short, despite remaining as counsel for Mr. Mullis, and holding themselves out as such, OCW abandoned all investigation on his behalf.

16

Had Counsel been forthright, and disclosed to the convicting court that they did not intend to continue to investigate Mr. Mullis's case, the court could have removed OCW and appointed new counsel. Instead, OCW holding itself out as counsel gave the false appearance that Mr. Mullis was receiving the benefit of representation, preventing any corrective action by the court.

In *Ex parte Reynoso*, the Court of Criminal Appeals laid out the only two appropriate courses of action for counsel to take when confronted with a client who seeks to waive post-conviction review and remove appointed counsel. 257 S.W.3d 715, 720 n.2 (Tex. Crim. App. 2008).[7] Article 11.071, § 3(a) requires counsel to "investigate the case to the best of his ability despite the defendant's wishes." *Id*. "Thus, counsel faced with an uncooperative client should either (1) move to withdraw from the case, or (2) diligently pursue the investigation despite his client's protests." *Id*.[8] Despite these two mutually exclusive and exhaustive options, counsel did neither. Instead OCW held itself out as counsel for Mr. Mullis while performing none of the duties required of counsel. Independent of Counsel's other failures detailed in this motion, OCW's abandonment of the investigation alone constitutes good cause for the failure to present Mr. Mullis in state court.

---

[7] With this statement, the Court of Criminal Appeals also overruled its prior statement to the contrary:

> Our statement in *Ex parte Reynoso,* 228 S.W.3d 163, 165 [(Tex. Crim. App. 2007)], that "any attorney would be reasonable in declining to work on a habeas application under the circumstances [of this case]" may have painted with too broad a brush given the statutory duty of Article 11.071 § 3(a) that appointed counsel "shall investigate" the case before and after the appellate record is filed.

*Ex parte Reynoso*, 257 S.W.3d 715, 720 n.2 (Tex. Crim. App. 2008).

[8] There is little doubt state habeas counsel was familiar with *Reynoso*, as counsel cited this very footnote in both Petitioner's Motion to Waive Post-Conviction Habeas Review and the 4A Motion. Motion to Waive at 3; 4A Motion at 12.

**D.**     **Counsel Prevents Mullis from Filing a Timely Habeas Petition by Miscalculating the Deadline To File**

Confusion about Mullis's deadline for filing his habeas application further frustrated Mullis's ability to reconsider his desire to waive his claims.  Section 4 of Article 11.071 states that an application for a writ of habeas corpus:

> must be filed in the convicting court not later than the 180th day after the date the convicting court appoints counsel under Section 2 or not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later.

Tex. Code Crim. Proc.art. 11.071 § 4(a).  Yet Mullis's counsel repeatedly flubbed the deadline, depriving Mullis of his ability to file a timely habeas application or to waive that right knowingly.   These repeated failures cost Mullis at least 42 and up to 135 days, a period during which Mullis had a crucial change of heart.  Had Counsel made a reasonable attempt to calculate the date, Mullis's renewed desire to exercise his rights would have occurred with over a month remaining to file a habeas application and he would have been able to file a timely petition or otherwise knowingly waive his petition based on a fixed deadline.

Mullis's counsel repeatedly failed to calculate the deadline to file and did so based on unreasonable assumptions and a faulty understanding of the law.  First, Counsel strung along a series of pointless extensions of a yet-undetermined time to file.   These extensions were premised on the incorrect notion that the event triggering Mullis's habeas deadline was Counsel's appointment, not the filing of the State's brief on direct appeal.

A basic understanding of the direct appeal process in capital cases reveals that this could not be so.   Under the death penalty statute, Article 37.071 of the Texas Code of Criminal Procedure, the Court of Criminal Appeals had to conduct an "automatic review" of the conviction and sentence, irrespective of Mullis's May 20, 2011 "waiver" of his direct appeal.

18

Tex. Code Crim. Proc. art. 37.071(h).  Therefore, even though Mullis forfeited his ability to present arguments on appeal, that waiver did not alter the fact that the Court of Criminal Appeals must review the case.  That meant that the State could still file a brief notwithstanding Mullis's waiver of his direct appeal.  And the State's brief was due at its earliest 60 days from the submission of the appellate record,[9] which had not been filed as of the time Counsel sought his first extension on October 4.[10]  Since the habeas deadline is 45 days after the deadline for the State's brief, that event could not have occurred until 105 days from the date the record became complete, which had not even happened.  Counsel should have known, then, that their appointment date, March 23, 2011, could not be the trigger.

But even if Counsel had been reasonable in thinking that the appointment was the correct trigger, Counsel acted unreasonably on that knowledge by waiting until *after* the deadline had passed to seek an extension.  If appointment was actually the trigger (which it was not in Mullis's case), the 180-day deadline would have fallen on September 19, 2011—or "roughly" September 19th by Levenson's estimation.  10/11/11 transcript at 16.  But Counsel did not seek an extension of the (non-existent) deadline until October 4, and the court did not grant the extension until October 11.  *See* Petitioner's Motion for Extension of Time to File Initial State Habeas Application, attached as Exhibit 12.

---

[9] Texas Rule of Appellate Procedure 71.1 makes direct appeal of a death penalty judgment appealable directly to the Court of Criminal Appeals.  Tex. R. App. P. 71.1.  Briefing must still conform to ordinary filing timelines under Texas Rule of Appellate Procedure 38.6.  Tex. R. App. P. 71.3.  Rule 38 dictates that, unless otherwise ordered, an appellant must file a brief within 30 days after the later of (1) the date the clerk's record was filed, or (2) the date the reporter's record was filed.  The appellee's brief must be filed within 30 days after the date the appellant's brief was filed.

[10] The record—the so-called "reporter's record"—was not filed with the Court of Criminal Appeals until October 27.

The risks OCW took in failing to ascertain and extend Mullis's timeline appear especially unreasonable in light of Counsel's argument at the October 11 hearing. There, Counsel explained the paramount importance of getting a fixed deadline to file. Under Texas law, Mullis's waiver could not take effect until the date for filing a habeas application had passed. *See supra* Part I.C. The court seemed to adopt this position in its order. *See* 10/12/11 order (treating decision on waiver and filing as interchangeable). The Court of Criminal Appeals later took this position, too: "But despite the desire he expressed early in the process, applicant could have changed his mind and filed an application up to and including the date it was due." *Ex parte Mullis*, No. WR-76,632-01, at *2 (Tex. Crim. App. Sept. 12, 2012) (per curiam) (unpublished), attached as Exhibit 13. Therefore, Mullis required a "date certain" in order to "really waive his habeas." 10/11/11 transcript at 17.

The court granted the ninety-day extension, placing the deadline at December 19, 2011. But December 19 came and went without Counsel seeking an extension on the deadline or admitting that its prior motion for the deadline was erroneous. In fact, Counsel waited two months before deciding to correct their previous made-up deadline. Unfortunately for Mullis, when Counsel finally did act, they again sought to impose an imaginary deadline based on unreasonable assumptions.

In their February 14, 2012 motion for extension, Counsel concluded Mullis required a 90-day extension from what they now believed was the correct due date, February 21. Counsel based this supposed deadline on the idea that the triggering event, the date the State's original brief was supposedly due, had passed on January 7. *See* 2/14/12 Motion for Extension of Time.

Case 3:13-cv-00121   Document 31   Filed on 11/20/14 in TXSD   Page 26 of 51

Counsel did not support this date with any evidence.  January 7, 2012 was a Saturday, and thus could *under no circumstances* have been the deadline for the State's original brief.[11]

In truth, up to that point, no event that could have plausibly triggered the Article 11.071 § 4 deadline had occurred: the State had filed nothing in the direct appeal and the appeal was still under review by the Court of Criminal Appeals.  Yet the court, acquiescing in Counsel's incorrect assumptions, assigned Mullis a deadline of May 21.  On April 25, Levenson reiterated this arbitrary and incorrect deadline to his client, "Remember, your deadline to file the petition is May 21."[12]

Counsel's failures were simply unreasonable.  *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."). And given the doubtful assumptions Counsel used, it is not surprising that the courts and the parties were reluctant to enforce their made-up deadlines.  December 19 came and went, and the court took no action.  May 21 came and went, and the court took no action.  The State also was willing to condone Mullis filing a habeas application after May 21.  According to the State's own motion, on June 5, the State spoke with Levenson to determine whether Mullis wished to file a habeas application.  Finally, over a month past the deadline, the State moved for the court to notify the Court of Criminal Appeals of the

---

[11]Based on Texas Rule of Appellate Procedure 38, the state's deadline might have been December 26 or January 14, but certainly not January 7.  That is because the State's 30 days to file either begun on November 26, when Mullis's motion was due, or on December 13, when the Court notified the parties that it had not received an appellate brief from Mullis.

[12] At the very least, Counsel should have realized that he had miscalculated the date on February 17 when the Court of Criminal Appeals informed OCW that Mullis's direct appeal was "set for submis[sion]" without oral argument on March 7, 2012.

21

lack of a habeas application.  *See* Order Notifying Court of Criminal Appeals of Lack of Filing of Writ, June 27, 2012, attached as Exhibit 14.    But even so, Judge Ellisor's order never specified a time to file. *Id*.  This laxity reflects the fact that May 21 was a "deadline" in name only.

This laxity not only deprived Mullis of the certainty he needed to effectuate his waiver; it also independently violated the court's obligations under the state capital habeas statute.  Article 11.071 § 4(d) states:

> If the convicting court . . . determines that after the filing [deadline] no application has been filed, the convicting court *immediately, but in any event within 10 days*, shall send to the court of criminal appeals and to the attorney representing the state:
>
> > (1) . . . a statement of the convicting court that no application has been filed within the time periods required . . . and
> > (2) Any order the judge of the convicting court determines should be attached . . . .

Tex. Code Crim. Proc. art. 11.071 § 4(d) (emphasis added).  The court should have notified the Court of Criminal Appeals by May 31 (and, for that matter, by December 29) that no application had been filed.  By waiting until late June to notify the Court of Criminal Appeals, the court violated its obligation under Article 11.071.  *See Ex parte Gongora*, WR-60115-02, 2006 WL 173106 (Tex. Crim. App. Jan. 25, 2006) (finding "good cause" for 4A motion where court failed to notify CCA pursuant to § 4(d)).  This violation further added to the confusion regarding Mr. Mullis's deadline.

When the case finally arrived before the Court of Criminal Appeals, Texas's highest criminal court was likewise flummoxed by the deadline issue.  In its September 9, 2012 order, the Court of Criminal Appeals offered a peculiar open-ended interpretation of the deadline for filing that Mullis had apparently surpassed: "*Under the best possible scenario*, applicant's

application would have been due to be filed in the trial court on or before July 2, 2012." CCA 9/12/12 Order at 2. Generally speaking, the idea of a deadline is that there can only be one time to file; if there are many scenarios that can produce different times in which to file, there is no deadline. The uncertainty in the Court of Criminal Appeals's statement is understandable, however; the language of the statute did not address what Mullis's deadline to file his habeas application was. The event that should have triggered the application deadline under the statute was the filing of the State's original brief on direct appeal, and that event never took place.

The Court's order plausibly could be read as creating an unprecedented exception to the statutory rule. But to the extent the court did create an exception, it did not explain its reasoning. Perhaps the rule would go as follows: where there is no state brief on direct appeal, the triggering event is the date the direct appeal becomes final following automatic review of the conviction. *See Ex parte Mullis*, No. WR-76,632-01, at *2 n.2 (emphasizing finality of direct appeal). Therefore, since the mandate issued on the appeal on May 21, 2012, Mullis's deadline was July 5, 2012, a mere three days after the July 2 date the Court of Criminal Appeals may have mistakenly used. Alternatively, the Court could have interpreted the triggering event as February 17, 2012, the date the State sent a letter to the court declaring an intent not to file a brief in the direct appeal. Combining the 45-day period with a 90-day extension, Mullis's deadline was Sunday, July 1, 2012, which would have been moved to Monday, July 2, 2012. This interpretation is doubtful because the Court of Criminal Appeals did not mention this February 17 order or the 90-day extension in its discussion of Mullis's case.[13] If either of these is indeed

---

[13] The court also implicitly discarded a handful of other potential events that could have triggered the habeas deadline. For example, the trigger could have been March 7, 2012, the day counsel was advised that the court would take the direct appeal under submission. Or it could have been December 26, 2011, the day the state's direct appeal brief would have been due had Mullis filed a timely appellate brief. *See* Tex. R. App. P. 38 (appellee

the correct interpretation of Article 11.071's filing requirements, no one ever told Mullis, and the Court of Criminal Appeals only hinted at that rule after the fact.

Had Counsel calculated the time to file according to the Court of Criminal Appeals's eventual ruling, they would have determined that Mullis had at least until July 2, 2012 to file and possibly until October 3, 2012.  Mullis would have been entitled to 45 days from the May 21 mandate plus an additional 90-day extension, which could only run from "the filing date applicable to the defendant under [§ 4(a)]."[14]  Tex. Code Crim. Proc. art. 11.071 § 4(b); *Ex parte Reynoso*, 257 S.W.3d 715, 722 n.4 (Tex. Crim. App. 2008) (so long as motion for 90-day extension was timely filed, counsel's error regarding due date is "not material" because the "plain language" of § 4(b) requires the extension to run from the filing date applicable).  Instead of May 21, Mullis would have had until October 3, 2012 to file.  Counsel never sought to correct his incorrect advice to Mullis regarding the filing deadline or his incorrect information to the court.

These mistakes by Counsel and the state courts had devastating consequences for Mullis's ability to present his claims.  The error was not small: it cost Mullis at least 42 and up to 135 days, a period during which Mullis had a crucial change of heart.  By mid-August, Mullis had notified Counsel of his desire to "pick up" his habeas application.  Had Counsel taken the time to calculate the date, Mullis's renewed desire to exercise his rights would have occurred

---

has thirty days from date appellant brief is filed).  Or it could have been January 14, 2012, the day the state's direct appeal brief would have been due if the state's clock ran from the notice that no appellant brief had been filed on December 13, 2011.

[14] Note that the Court of Criminal Appeals made no mention of, and did not apply, this already-granted extension in determining Mullis's time to file.  Had it done so, it would have recognized that its September 12, 2012 order was premature since Mullis had until October 3 to file in the convicting court.

with over a month remaining to file a habeas application.  In other words, Mullis's decision to resume his state habeas proceedings and file a petition would have been timely but for his Counsel's inability to calculate his habeas deadline.

Even if the deadline were July 2—which would have had to be based on pure speculation since the Court of Criminal Appeals had yet to determine how to calculate the deadline in this unprecedented situation—Counsel's failure to calculate the deadline, combined with their failure to investigate, paralyzed Mullis.  Mullis could not know when his waiver would become effective and he could not know what sorts of claims he was giving up.  In this scenario, even if Mullis wanted to waive, his counsel's errors ensured that that waiver could not be accomplished knowingly.

As a result of Counsel's deficient investigation, their capitulation at the competency hearing, their effective abandonment of his client, and their failure to calculate the correct deadline, Mullis was unable to investigate, develop, and raise his claims in state court.  There are several claims that reasonably effective post-conviction counsel would have developed and presented in a state habeas corpus application.  A non-exhaustive list follows:

- The State knowingly presented false allegations of extraneous offenses by Mr. Mullis as a juvenile, in violation of the Eighth and Fourteenth Amendments.  Trial counsel was ineffective for failing to rebut these allegations and make appropriate objections. (appellate counsel was ineffective for failing to raise this record-based claim) (Claim I of Petition)
- Mr. Mullis was denied his Sixth Amendment right to the effective assistance of counsel at capital sentencing, because trial counsel failed to investigate, develop, and present compelling mitigating evidence. (Claim II of Petition)
- The State denied Mr. Mullis his constitutional rights to due process and a fair trial by withholding evidence.  Trial counsel was ineffective for failing to request this evidence. (Claim III of Petition)
- The trial court erred in failing to instruct Mr. Mullis's capital sentencing jury that mitigating circumstances do not need to be proven beyond a reasonable doubt, violating his Eighth and Fourteenth Amendment Rights.  Trial Counsel was ineffective for failing

to move for a proper instruction or object to the instruction as given. (Appellate counsel was ineffective for failing to raise this issue.) (Claim VI of Petition)

- Trial counsel was ineffective for failing to investigate, develop, and present evidence of Mr. Mullis's mental state to rebut the State's evidence of intent and to challenge the admission of Mr. Mullis's statement. (Claim XII of Petition)
- Appellate counsel was ineffective for failing to litigate Mr. Mullis's appeal and for enabling Mr. Mullis's waiver of counsel on direct appeal.  The trial court erred in permitting the waiver. (Claim XVI of Petition)

Additionally, effective post-conviction counsel would have developed and presented the remaining claims contained in Mullis's Petition for Writ of Habeas Corpus (Docket Entry 13, July 19, 2013) and Supplement to Petition for Writ of Habeas Corpus (Docket Entry 28, September 12, 2014).

## II.  The District Court Should Stay Proceedings So That Mullis Can Exhaust His Claims in State Court

A stay is an appropriate way to permit a petitioner to exhaust his unexhausted claims in state court, and should be granted when the district court finds three grounds satisfied: (1) there was good cause for the failure to exhaust the claims; (2) the claims are not plainly meritless; and (3) there is no indication that the failure was for purposes of delay. *Williams v. Thaler*, 602 F.3d 291, 309 (5th Cir. 2010) (citing *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005)).  Mr. Mullis satisfies all these prerequisites for a stay.

First, good cause exists for Mullis's unexhausted claim, because Mullis received ineffective assistance from his post-conviction counsel.  Second, in light of the Texas Court of Criminal Appeals' liberal approach to granting untimely habeas applications, Mullis's presentation of his unexhausted claims to the state court will not be plainly meritless.  Third, Mullis has moved to have his unexhausted claims heard in state court just after completing his investigation and filing of an Amended Petition in this Court and before this Court has had an opportunity to pass on the merits of Mullis's petition.  Finally, Mullis's request for a stay serves

a broader federalism purpose by permitting the state courts to have the first opportunity to rule on Mullis's claims before a federal court rules.

Mullis's request is supported by the routine practice of federal courts in Texas as well. Texas federal courts have granted *Rhines* stays in numerous cases.[15]   The Fifth Circuit has authorized the *Rhines* stay as a mechanism for habeas petitioners to return to state court to exhaust unexhausted claims on account of allegations of state habeas counsel's ineffectiveness. In *Trevino v. Stephens*, 740 F.3d 378 (5th Cir. 2014), the Court stated:

> In light of the Supreme Court's decision in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), we remand to the district court for full reconsideration of the Petitioner's ineffective assistance of counsel claim in accordance with both *Trevino* and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). If the Petitioner requests it, the district court may in its discretion stay the federal proceeding and permit the Petitioner to present his claim in state court.

*Id.*; *accord Neathery v. Stephens*, 746 F.3d 227, 229 (5th Cir. 2014); *Rayford v. Stephens*, 552 F. App'x 367 (5th Cir. Jan. 21, 2014).   A number of district courts have acted in their discretion by granting *Rhines* stays.   *See, e.g.*, *Wardrip v. Stephens*, No. 7:01-CV-247-G-BF, 2014 U.S. Dist. LEXIS 55471 (N.D. Tex., Apr. 22, 2014) (granting stay after *Trevino* for CCA to have the first opportunity to consider whether state habeas counsel's ineffectiveness justified review of unexhausted claim); *Sparks v. Stephens*, No. 3:12-CV-469-N, 2014 WL 113583 (N.D. Tex. Jan.

---

[15] *See, e.g.*, Order, *Hunter v. Thaler*, No. 4:10-cv-00778 (S.D. Tex. June 6, 2011); Order Granting Motion for Stay and Abeyance, *Barbee v. Thaler*, No. 4:09-cv-00074 (N.D. Tex. May 18, 2011); Order Granting Petitioner's Motion To Stay and Abate Habeas Proceedings, *Broxton v. Thaler*, No. 4:11-cv-00315 (S.D. Tex. Feb. 23, 2011); Order Granting Stay, *Gonzales v. Thaler*, No. 5:10-cv-00165 (W.D. Tex. Jan. 31, 2011); Order Granting Motion to Stay Federal Proceedings, *Shuffield v. Thaler*, No. 08-cv-00180 (E.D. Tex. Aug. 26, 2010); Order, *Panetti v. Thaler*, No. 1:09-cv-00774 (W.D. Tex. July 1, 2010).

13, 2014) (same); *Alvarez v. Thaler,* No. 4:09–CV–3040 (S.D. Tex. June 6, 2013) (granting stay after *Martinez*).  And the State of Texas has itself endorsed this approach.  *See Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013) ("Texas submits that its courts should be permitted, in the first instance, to decide the merits of Trevino's ineffective-assistance-of-trial-counsel claim.").  This Court should likewise grant a stay in Mr. Mullis's case.

### A.    Petitioner Has Good Cause for Failing to Exhaust Because of the Inadequate Assistance of His State Habeas Counsel

Good cause is an equitable standard, not a technical requirement.  *Ruiz v. Quarterman*, 504 F.3d 523, 529 n.17 (5th Cir. 2007).  The standard for "good cause" under *Rhines* is a lower standard than is required to show cause to excuse procedural default.  *Id.*  Summarizing the scant guidance the Supreme Court and lower courts have provided,[16] one court of appeals has said that good cause merely "turns on whether the petitioner can set forth a reasonable excuse, supported by sufficient evidence." *Blake v. Baker*, 745 F.3d 977, 982 (9th Cir. 2014); *accord Ruiz*, 504 F.3d at 529 n.17.

In his concurring opinion in *Rhines*, Justice Stevens explained that "'good cause' . . . is not intended to impose the sort of strict and inflexible requirement that would 'trap the unwary pro se prisoner.'"  *Rhines*, 544 U.S. at 279 (Stevens, J., concurring) (quoting *Rose v. Lundy*, 455

---

[16] Neither the Supreme Court nor the Fifth Circuit has defined "good cause." *See Rhines*, 544 U.S. at 275-78; *Neville v. Dretke*, 423 F.3d 474, 479-80 (5th Cir. 2005).  Courts have infrequently applied the "good cause" standard. *See, e.g., Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011) (good cause where petitioner's "failure to timely assert certain bases for his *Brady* claim [were] shown to be attributable to the prosecution's wrongful withholding of information"); *Wooten v. Kirkland*, 540 F.3d 1019, 1024 (9th Cir. 2008) (no abuse of discretion for finding no good cause when a petitioner had the mistaken "'impression' that a claim had been included in an appellate brief."); *Clements v. Maloney*, 485 F.3d 158, 170 (1st Cir. 2007) (no abuse of discretion for finding no good cause when failure to exhaust resulted from counsel's "reasonable strategy" not to present certain claims); *Jackson v. Roe*, 425 F.3d 654, 661-62 (9th Cir. 2005) ("extraordinary circumstances" standard does not comport with the "good cause" standard).

U.S. 509 (1982)).   The Supreme Court later provided one key example: "[a] petitioner's *reasonable* confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court."   *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005) (emphasis added).

Courts have held that a state habeas counsel's bad conduct provides a reasonable excuse for Petitioner's failure to exhaust.   In a case of first impression, the Ninth Circuit held that ineffective assistance of counsel by post-conviction counsel supplies good cause for a *Rhines* stay.   *Blake*, 745 F.3d at 983.   District courts in this circuit have reached the same conclusion. *See, e.g.*, *Sparks*, 2014 WL 113583, at *3 (granting a stay and stating that "[i]f the ineffective assistance of state habeas counsel qualifies as cause under *Martinez* [*v. Ryan*, 132 S.Ct. 1309 (2012)], it may well constitute cause under *Rhines* as well."); *Wardrip*, 2014 U.S. Dist. LEXIS 55471, at *7.

In *Blake* and *Sparks*, the Supreme Court's recent expansion of the cause standard in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), had special relevance for finding good cause under *Rhines*.   First, the courts recognized that the *Rhines* "good cause" standard is no more demanding than the cause standard for excusing procedural default.   *See Blake*, 745 F.3d at 984 & n.7 ("The Supreme Court's statement in *Pace* . . . suggests that [the good cause] standard is . . . lesser than the cause standard . . . applied in *Martinez*."); *Sparks*, 2014 WL 113583, at *3. Second, those courts noted the Supreme Court's recent decision in *Martinez*, which held that ineffective assistance by state post-conviction counsel "at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."   132 S. Ct. at 1315.   Third, it followed from these premises that ineffective assistance of habeas counsel could be "good cause" under *Rhines* and further that "good cause under *Rhines*,

when based on IAC, cannot be any more demanding than a showing of cause under *Martinez* to excuse state procedural default." *Blake*, 745 F.3d at 983-84.

To be clear, in order to show good cause under *Rhines* Petitioner does not need to show that his state habeas counsel's conduct rose to the level of deficient performance defined in *Martinez* or *Strickland v. Washington*, 104 S.Ct. 2052, (1984). *Compare Ruiz*, 504 F.3d at 529 n.17; *Blake* 745 F.3d at 984 & n.7 *with Canales v. Stephens*, 765 F.3d 551, 567-68 (5th Cir. 2014) (holding that cause to excuse a procedural default requires proof that habeas counsel at initial-review collateral proceeding was deficient as defined in *Strickland v. Washington*, and that the underlying ineffective-assistance-of-trial-counsel claim has "some merit" (citing *Martinez,* 132 S. Ct. at 1318)). Good cause requires the lower showing of "sufficient evidence" of a "reasonable excuse." As the district court in *Wardrip* summarized, "it is not necessary to determine whether this [*Martinez*] exception applies before granting a stay for exhaustion. . . . That decision should be left to the state court, and its outcome could determine whether there is any available procedure under state law for presenting this sort of claim to the state court." *Wardrip*, 2014 U.S. Dist. LEXIS 55471, at *7.

The proceedings below more than demonstrate a reasonable excuse for Mullis's failure to exhaust his claims. Counsel failed to subject a questionable finding of competency to meaningful adversarial testing, even though disproving competency represented the sole defense that counsel could make on their client's behalf. Counsel abandoned any investigation of Mullis's claims based on an unreasonable belief that Mullis was granted the ability to proceed pro se. Counsel failed to advise Mullis of the proper date for filing his habeas petition based on an unreasonable failure to understand the law, which caused Mullis's eventual decision to resume habeas review to fall out of time. If even "reasonable confusion about whether a state

filing would be timely will ordinarily constitute 'good cause'" for a stay, *Pace*, 544 U.S. at 416, then *unreasonable* confusion about the time to file a state deadline undoubtedly will constitute good cause for a stay.  These faults are not Mullis's, and they should not prevent Mullis from receiving one fair shot to present his claims on state post-conviction review.

### B.    Permitting Petitioner To Return to State Court Is Not Plainly Meritless

The Fifth Circuit has held that a case is "plainly meritless" under *Rhines*'s second requirement if the petitioner were "now procedurally barred from raising those claims in state court."  *Neville*, 423 F.3d at 480.  *Accord Haynes v. Quarterman*, 526 F.3d 189, 197 (5th Cir. 2008) (Petitioner "has no meritorious argument that the Texas Court of Criminal appeals would allow him to file a successive application for post-conviction relief even if the district judge granted a stay and abeyance"); *Williams*, 602 F.3d at 309, *cert. denied*, 131 S.Ct. 506 (2010).  Mr. Mullis does not ask this court to grant a futile stay.  If this court permits Mullis to return to state court to exhaust his claims, Mullis would have a strong likelihood that the state courts will hear his claims for the first time.

### 1.    Texas's Relaxed Approach to Untimely Applications Under Article 11.071, Section 4A

Texas's capital habeas statute is "built upon the premise that a death row inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute."  *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002).  When an applicant's counsel makes mistakes that are not attributable to the applicant, the Court of Criminal Appeals has given the applicant the chance to have a single "bite

at the apple" by finding "good cause" under Section 4A of the statute. [17]   Since Mullis has never

filed a habeas application under Article 11.071 and his failure to file was on account of his

counsel's numerous mistakes, Mullis is entitled to file an original habeas application.

The Texas Court of Criminal Appeals has interpreted "good cause" leniently and

typically granted petitioners the opportunity to file otherwise untimely applications under 4A

when counsel has made some mistake.  The case of Juan Reynoso is instructive.  In that case, the

applicant waffled in his decision to waive, repeatedly invoking waiver and removing counsel and

then seeking to revoke waiver and have counsel reappointed.  *Ex parte Reynoso*, 257 S.W.3d

715, 716 (Tex. Crim. App. 2008).   Reynoso eventually permitted his counsel to file an

application on his behalf, but the application was ruled untimely.  *Id.*   Initially, "[g]iven the

timing and applicant's repeated claims that he did not want to pursue his appeals, [the Court]

held that, although his application was filed during an interval in which he chose to pursue his

appeals, applicant could not show good cause for the untimely filing." *Id.* (citing *Ex parte*

*Reynoso,* 228 S.W.3d 163 (Tex. Crim. App. 2007)).   But the Court of Criminal Appeals

reconsidered its decision, vacating its earlier finding of no good cause.  *Id.* at 717.  The Court

determined there was "good cause" where Reynoso's "tardiness in filing was due to [counsel's]

mistaken, but not totally implausible, interpretation of the law," notwithstanding Reynoso's own

---

[17] Section 4A provides:

> On command of the court of criminal appeals, a counsel who files an untimely application or fails to file an application before the filing date applicable under Section 4(a) or (b) shall show cause as to why the application was untimely filed or not filed before the filing date. . . . At the conclusion of the counsel's presentation to the court of criminal appeals, the court may . . . appoint new counsel to represent the applicant and establish a new filing date for the application, which may be not more than 270 days after the date the court appoints new counsel.

Tex. Code Crim. Proc. art. 11.071 § 4A.

waffling on his decision to waive.  *Id.* at 723.  Therefore, technical mistakes of law can provide "good cause" even where the applicant's conduct partially contributes to the untimely filing.

Time and again, the Court has found "good cause" for technical errors, honest mistakes, and sundry equitable reasons.  *See, e.g.*, *Ex parte Bigby*, WR-34,970-02, 2008 WL 5245356 (Tex. Crim. App. Dec. 17, 2008) (good cause found for "a simple miscalculation of the dates"); *Ex parte Murphy*, WR-70,832-01 (Tex. Crim. App. Mar. 25, 2009) (good cause found where motion for extension of time filed after deadline due to counsel's misreading of statute).  The Court has found good cause where "the State fail[ed] to challenge [counsel's honest] mistake." *Ex parte Brown*, WR-68,876-01, 2008 WL 152724 (Tex. Crim. App. Jan. 16, 2008).  The Court has also found good cause when the applicant's counsel has "intentional[ly] refus[ed] to plead specific facts that might support habeas-corpus relief."  *Ex parte Medina*, 361 S.W.3d 633, 642 (Tex. Crim. App. 2011).

It has found good cause where counsel missed *two* habeas applications and stated that he was hospitalized for a mere four days over two months before the application was due.  *Ex parte Segundo*, WR-70,963-01, 2009 WL 190162 (Tex. Crim. App. Jan. 28, 2009); *Ex parte Carter*, WR-70,722-01, 2009 WL 190161 (Tex. Crim. App. Jan. 28, 2009).  It has found good cause for unstated reasons in a case where the application was filed over six months late.  *Ex parte Gongora*, WR-60115-02, 2006 WL 173106 (Tex. Crim. App. Jan. 25, 2006).  It has found good cause where counsel had not even moved to show good cause and the circumstances causing the untimely filing were "primarily" beyond counsel's control.  *Ex parte Gobert*, WR-77,090-01, 2012 WL 479689 (Tex. Crim. App. Feb. 15, 2012); *see also Ex parte Cortez*, WR-78,666-01, 2013 WL 458197 (Tex. Crim. App. Feb. 6, 2013) (waiving requirement of showing of good cause and addresses merits of application signed on due date but not field until five days later).

33

The Court is so committed to the principle that an applicant have one full and fair opportunity to present his claims that it has ensured even applicants who fail to show good cause can receive the benefit of a 4A remedy—i.e., appointment of new counsel and the opportunity to file a new application. *See Ex parte Medrano*, WR-78,123-01, 2012 WL 5452694 (Tex. Crim. App. Nov. 7, 2012) (good cause not found where original counsel's filing was four years overdue, but still appointing new counsel to prepare a new application); *see also Ex parte Castillo*, WR-70,510-01 (Tex. Crim. App. April 22, 2009) (after determining original counsel had failed to show good cause for failing to file timely application, Court appointed new counsel and granted 270 days to file application); *Ex parte Luna*, WR-70,511-01 (Tex. Crim. App. Oct. 1, 2008) (same); *Ex parte Neal*, WR-70,512-01 (Tex. Crim. App. Oct. 1, 2008); *Ex parte Young*, WR-70,513-01 (Tex. Crim. App. Oct. 1, 2008) (same); *Ex parte Ramirez*, AP-75,167 (Tex. Crim. App. July 7, 2008) (appointing new counsel and granting 270 days to file petition after original counsel failed to timely file application and "ha[d] not even attempted to show good cause.").[18]

In sum, the court has construed "good cause" broadly in order to ensure that an applicant receives one bite at the apple. *See Medina*, 361 S.W.3d at 642. In fact, Mr. Mullis would be

---

[18] The Court has also found good cause in *Ex parte Norman*, WR-74,743-01, 2010 WL 4978807 (Tex. Crim. App. Dec. 8, 2010) (application considered timely after counsel for applicant filed application in wrong county, which then forwarded application to correct county after deadline.); *Ex parte Rubio*, WR-65,784-02 (Tex. Crim. App. Sept. 11, 2013) (good cause found in light of difficulty obtaining timely rulings from trial court, and upon applicant's third request, counsel failed to show good cause, but Court still granted additional 30 days to file application.); *Ex parte Smith*, WR-70,593-01 (Tex. Crim. App. Oct. 1, 2008) (good cause found where originally appointed counsel withdrew due to health condition and subsequent counsel diligently pursued case); *Ex parte Blanton*, WR-61,443-01 (Tex. Crim. App., June 22, 2005) (good cause found for reasons not stated); *Ex parte Ramirez*, WR-71,401-01 (Tex. Crim. App. Feb. 11, 2009) (good cause found where originally appointed counsel was removed for failing to file timely application, and subsequent counsel had difficulty obtaining full record); *Ex parte Brewer*, WR-46,587-02, (Tex. Crim. App. Jan. 20, 2012) (good cause found where filing deadline was unclear due to complicated history of case).

only the third applicant to be denied the opportunity to file an initial application in the 15 years since Section 4A was amended to allow untimely applications upon a showing of good cause. *See Ex parte Tabler*, WR-72,350-01 (Tex. Crim. App. Sept. 16, 2009); *Ex parte Austin*, WR-59,527-01 (Tex. Crim. App. July 6, 2004).

If these mistakes can move the Court of Criminal Appeals to find good cause, then Counsel's unreasonable errors certainly will.   To begin, *Reynoso* will control the Court's analysis.   As in that case, Mullis's state habeas counsel labored under a mistaken understanding of the time to file, which fact alone should warrant 4A relief.  *See Reynoso*, 257 S.W.3d at 723. Moreover, Mullis's claim is even stronger than Reynoso's. Counsel's actions, unlike Reynoso's counsel, were downright "implausible."  *See id.*   Counsel's conduct more closely resembles the attorney's in *Medina*, since Counsel's failures resulted from their "intentional refusal" to act on behalf of their client.  *See Medina*, 361 S.W.3d at 642.  And these failures were interlaced with the convicting court's own failure to perform its statutory duty under Section 4(d) of Article 11.071. *See Gongora*, 2006 WL 173106, at *1.  These mistakes individually and taken together made Mullis's "waffling" irrelevant for the good cause determination, and make it likely that the Court of Criminal Appeals will find good cause under 4A.  *See Reynoso*, 257 S.W.3d at 723.

Moreover, the Court of Criminal Appeals has never heard these grounds for good cause before.  Prior counsel filed a 4A motion, but the Court's denial of Counsel's flawed 4A motion provides no model for our claim, and should not bar Mullis from now receiving the benefit of the 4A remedy.  *Cf. Medrano*, 2012 WL 5452694, at *1-*2 (granting 4A remedy in spite of finding no good cause in first state habeas counsel's 4A motion).  That 4A motion was fatally flawed because Counsel faced an unavoidable conflict. In order to assert the strongest grounds for their client, they had to describe their own ineffectiveness and mistakes.  But Counsel was unwilling,

or unable due to the conflict, to admit that they still represented Mullis until Mullis's waiver-by-default in September 2012; that they had failed to investigate their client's claims; that they had abdicated responsibility for testing their client's competency; and that they had failed to reasonably calculate a deadline for filing the habeas application. Instead, Counsel advanced a single unpersuasive theory: it was all their client's fault for deceiving Counsel and the court as to the real status of his mental health.

### 2.    The Unsettled State of Texas's Rule for Abuse of the Writ

Even if the Court of Criminal Appeals considered Mullis's brief as a successive habeas application subject to Article 11.071 § 5—despite the fact that Mr. Mullis has never filed an initial application—his application would still not be meritless. As the State predicted in its *Trevino* briefing, a majority of the Court of Criminal Appeals has expressed a willingness to revisit its procedural bar rules in light of *Trevino*. *See* Brief for Respondent at 58-59, *Trevino v. Thaler*, No. 11-10189 (U.S. Jan. 14, 2013). Within a month of the *Trevino* decision, four of the Court's nine judges indicated that in light of that decision, they want to reconsider Texas's rule for procedural bar. In *Ex parte McCarthy*, No. WR-50,360-04, 2013 WL 3283148 (Tex. Crim. App. June 24, 2013), half of the eight voting judges expressed a willingness to reconsider that interpretation in an "appropriate" case. In her dissenting opinion, Judge Alcala, joined by Judge Johnson, advocated reconsideration of *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002), which held that ineffective assistance of habeas counsel did not provide a gateway to hearing a procedurally barred ineffective assistance claim in a successive petition. *See id.* at *5-*11 (Alcala, J., dissenting, joined by Johnson, J.). In addition, Judge Price authored a concurring opinion, joined by Judge Meyers, stating that "principles of federalism would justify this Court in taking a second look at the construction it gave Article 11.0171 . . . in *Ex parte Graves*." *Id.* at

*1 (Price, J. concurring, joined by Meyers, J.). *Ex parte McCarthy* is not the only case in which members of the court have expressed their desire to reconsider the state procedural bars. *See Ex parte Buck*, 418 S.W.3d 98 (Tex. Crim. App. Nov. 20, 2013) (Alcala, J., dissenting, joined by Price and Johnson, JJ.).

What is more, a fifth judge appears to have joined the bandwagon. In *Ex parte Diaz*, No. WR-55850-02, 2013 WL 542971 (Tex. Crim. App. Sept. 23, 2013), Judge Cochran joined Judge Alcala's concurring opinion reaching the merits of a defaulted ineffective assistance claim despite the existence of a procedural bar. *Id.* at *1-*3. Judge Cochran expressed no reservation in joining Judge Alcala's statement that she "adhere[s] to the general position [she] took in *McCarthy*"—i.e., that the court should reconsider its procedural bar in light of *Trevino*. *Id.* at n.1.

In sum, a majority of the Court of Criminal Appeals has indicated a desire to reconsider the state's procedural bar rules in light of *Trevino*. Consequently, the court should not assume that Petitioner's case is futile, just because, prior to *Trevino*, Texas generally prohibited the filing of successive habeas applications. *Cf. Neville*, 423 F.3d at 480 (finding no abuse of discretion in denial of "plainly meritless" stay, where petitioner's claim was procedurally defaulted and there was no indication of a change in procedural default doctrine). There is strong evidence, as the State presciently recognized, that the state court will open its door to Mullis's claim even if it is treated as successive.

### 3.  Invalidity of Mullis's Earlier Waiver

Moreover, there is a strong likelihood the state court will find Mr. Mullis's purported waiver invalid and hear his claims. Under well-established law, Mr. Mullis's purported waiver

of habeas review will not be enforced should he be permitted to return to state court.  *See Ex parte Reedy*, 282 S.W.3d 492 (Tex. Crim. App. 2009).

In *Reedy*, the habeas applicant had pled guilty and waived his right to state habeas review in exchange for a life sentence in a capital case.  *Id.* at 494.  He thereafter filed a state habeas corpus application notwithstanding his waiver.  The trial court recommended dismissal of the habeas application pursuant to the terms of Reedy's plea agreement.

The CCA first determined that an express waiver of the right to post-conviction habeas corpus relief may be enforceable only when it is "knowingly and intelligently executed." *Id.* at 495-96.  The Court continued that in order to "knowingly and intelligent" waive his right to a post-conviction writ, an applicant must be "in a position to know the nature of the claims he could have brought on [habeas review] but for his waiver.  *Id.* at 498.  Knowing and intelligent waiver is only possible where an applicant knows or should have known "the particulars of" the claims at the time of the waiver:

> Obviously, many constitutional claims that might be brought by an applicant in a post-conviction application for writ of habeas corpus will be claims that he could have anticipated at the time of his waiver—claims based upon purported defects that are known (or that could have been known with due diligence and the assistance of counsel) to the applicant—at the time of his waiver. . . .  He knows (or should know) the particulars of what he is foregoing and therefore does so knowingly and intelligently.

*Id.*  However, an applicant cannot have made a knowing and intelligent waiver of claims that "were not within the applicant's knowledge or comprehension . . . at the time he agreed to waive the right to pursue an application for writ of habeas corpus." *Id.*

> Claims such as actual innocence based on newly available evidence, the suppression of material, exculpatory evidence by the State, and ineffective assistance of counsel will often (although not always) meet this description. Often an applicant cannot be expected to have known about the existence of the facts

38

> that support such claims at the time of his waiver. When it comes to claims of this type, the applicant's waiver of habeas relief cannot be knowing and intelligent, and cannot, therefore, be enforceable.

*Id.*

Under this standard, Mr. Mullis's purported waiver of claims in habeas cannot be enforceable. State habeas counsel abandoned Mr. Mullis and failed to investigate and develop his case, despite clear statutory and ethical duties requiring them to do so. Without the assistance of state habeas counsel, Mr. Mullis "could not reasonably have known about" any claims relying on extra-record evidence. For example, the facts underlying claims such as Mr. Mullis's claim of ineffective assistance of trial counsel for failure to investigate develop, and present mitigating evidence, among others, "did not exist or were not within [his] knowledge or comprehension" when Mr. Mullis initially indicated his desire to waive his state habeas proceedings. Later, when the deadline to file a state habeas application passed, such facts were still not known to Mr. Mullis, as OCW still had not investigated Mr. Mullis's case or advised him of what claims could potentially be brought on his behalf. Thus, pursuant to its own jurisprudence, the state court will likely find that Mr. Mullis did not waive his right to state habeas review, and that the claims may be presented in an initial habeas application.

### 4. If the Court Harbors Any Doubt About These Novel State Law Matters, a Stay Is Warranted

Even if there is some doubt about whether the state courts would entertain the merits of the claims not previously presented in a state habeas application, unless it is "entirely clear" that the state court will apply a procedural bar, "the State should be allowed to make the procedural, vel non, determination." *Wilder v. Cockrell*, 274 F.3d 255, 262 (5th Cir. 2001) (holding that a claim not previously raised in state court should not be treated as procedurally defaulted because it was not "entirely clear" that Texas' subsequent-application bar would prohibit consideration of

the claim, and ordering dismissal without prejudice of federal habeas petition to allow the state court to make that determination.).  *Accord Sloan v. Delo*, 54 F.3d 1371, 1381 (8th Cir. 1995) ("If a federal court is unsure whether a claim would be rejected by the state courts, the habeas proceedings should be dismissed without prejudice or stayed while the claim is fairly presented to them."); *Woods v. Kemna*, 13 F.3d 1244, 1245-46 (8th Cir. 1994) (dismissing possibly defaulted claim on non-exhaustive grounds so state court can "definitely answer the question" of whether state remedy still available).

### C.   Mr. Mullis Has Not Engaged in Intentionally Dilatory Tactics

Mr. Mullis's failure to exhaust his claims in state court was not for the purposes of delay. Rather, as discussed above, the failure to exhaust these claims was the result of state post-conviction counsel's abandonment of any investigation on Mr. Mullis's behalf.

Moreover, Mr. Mullis's request to return to state court is not brought for the purpose of delay.  Mr. Mullis brings this motion only shortly after undersigned counsel completed their investigation and filed the Supplement to Petition for Writ of Habeas Corpus.  Mr. Mullis could not have plead what facts and claims state post-conviction counsel would have developed in the course of a thorough investigation without having completed such an investigation themselves. Similarly, the determination whether the unexhausted claims are meritorious would be premature before allowing Mr. Mullis to thoroughly investigate, develop and present these factual bases to this court.

Any remaining concerns the Court may have about delay can be accounted for by "plac[ing] reasonable time limits on a petitioner's trip to state court and back." *Rhines*, 544 U.S. at 278.  For this reason, Mr. Mullis proposes that he be required to file his state habeas

application no later than thirty days from the date of the order granting this motion to stay and abey federal habeas proceedings, and that he be required to return to this Court within thirty days of the final disposition of his state application.

### D.   Principles of Federalism Favor Allowing the State Court the Opportunity To Consider Petitioner's Unexhausted Claim

Principles of comity and federalism animate the doctrine of exhaustion and the *Rhines* stay rule.  *See Rhines*, 544 U.S. at 273-74; *Duncan v. Walker*, 533 U.S. 167, 178-79 (2001). These principles compel a stay here, because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation."  *Rhines*, 544 U.S. at 274 (citation and internal quotation marks omitted).

The Solicitor General of Texas, representing the State, has forcefully argued that, as a consequence of the holding in *Trevino*, "state courts should have the opportunity to adjudicate defaulted claims on the merits."  Brief for Respondent at 58, *Trevino v. Thaler*, No. 11-10189 (Jan. 14, 2013).  In its briefing before the Supreme Court, the State implored that "equity demands at a minimum that the [Court of Criminal Appeals] have an opportunity to reevaluate its procedural ruling and adjudicate the claim on the merits."  *Id.* at 59.  The reasons were twofold.  First, "Texas courts . . . have a proven track record of hearing once-defaulted claims on the merits under appropriate circumstances." *Id.* (citing *Medina*, 361 S.W.3d at 642–43; *Ex parte McPherson*, 32 S.W.3d 860, 861 (Tex. Crim. App. 2000); *Ex parte Evans*, 964 S.W.2d 643, 647 (Tex. Crim. App. 1998); *Ex parte Matamoros*, No. WR-50791-02, 2011 WL 6241295 (Tex. Crim. App. Dec. 14, 2011) (per curiam); *Ex parte Moreno*, 245 S.W.3d 419, 420 (Tex. Crim. App. 2008)).  Second, returning these defaulted claims to state court mollifies the "strong

medicine of granting habeas review on long-defaulted claims." *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 282 (1989) (Kennedy, J., dissenting).[19]

The same holds true here of Mullis's unexhausted claims. Denying Mullis the opportunity to return to state court affects not just Mullis's opportunity to litigate his claims, it undermines the State's important interest in giving Mullis a forum to have his first full and fair adjudication of his claims. Just as in *Trevino*, the State was deprived of the opportunity to adjudicate an applicant's claim as a result of state habeas counsel's conduct. And, faced with that deprivation, state courts deserve the first opportunity to provide that opportunity.

For the State, then, satisfying these federalism concerns far outweighs whatever delay this stay would cause in the federal proceedings. The State advocated returning defaulted claims to state court without regard to the delay to federal proceedings. That is, between de novo federal review of an unexhausted claim and the certain risk of delay, the State has concluded that "exhaustion plainly is the lesser of two evils." Director's Supp. Br. Respecting the Pet. for Reh'g En Banc at 5, *Ibarra v. Thaler*, No. 11-70031 (5th Cir. June 4, 2013).

Favoring comity (and exhaustion) makes especially good sense here where the crucial question is so entwined with state law. To resolve whether Mullis may adjudicate his claims, a court must determine whether *state* habeas counsel, appointed under *state* law and bound by special *state* obligations to investigate and prepare a habeas application, performed so deficiently that he had "good cause" under *state* law for the failure to file a petition. Incidental to resolution of that question are many other state-law matters: the proper calculation of the deadline provided

---

[19] The State has stuck to this litigating position even after *Trevino* was decided. *See* Director's Supp. Br. Respecting the Pet. for Reh'g En Banc at 4, *Ibarra v. Thaler*, No. 11-70031 (5th Cir. June 4, 2013).

by Section 4 of Article 11.071 under novel circumstances; the confusing effect of the convicting court's failure to inform the Court of Criminal Appeals of the lack of an application in the time required by Section 4 of Article 11.071; and the status of OCW as counsel under Texas law and rules of professional conduct.  While this court is competent to answer these questions, out of respect for the state courts, they are questions which the state courts ought to answer first.

Federalism concerns also favor a generous approach to the determination of what is "plainly meritless."  By the State's reasoning, the mere hypothetical possibility of a change in the state court's approach to procedural default rules can provide cause for a stay.  By comparison, Mullis's chance of presenting and adjudicating his claims in state court is far from hypothetical. His return to state court will not depend on a sea change in doctrine, but on a routine interpretation of "good cause" for the failure to file a timely habeas application.

For these reasons, the court should be attentive to the significant federalism concerns at issue in this request for a stay, and per the State's own advice, give respect to the state courts by granting Mullis his first opportunity to litigate his habeas application in state court.

**CONCLUSION**

WHEREFORE, Mr. Mullis respectfully requests this Court enter an order staying his federal habeas corpus proceeding and holding it in abeyance to permit him to file an application for writ of habeas corpus in state court, requiring that he file his application in the state courts no later than thirty (30) days from the date of the order granting the stay, and requiring that he return to this Court within thirty (30) days of the final disposition of his state application. To the extent this Court considers it helpful in making its determination, Mr. Mullis further requests oral hearing on this motion.

Respectfully submitted,

  /s Shawn Nolan  

SHAWN NOLAN
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia, PA 19016
215-928-0520
Shawn_Nolan@fd.org

Dated: November 20, 2014

44

## CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with counsel for Respondent, Assistant Attorney General Matthew Ottoway, who has indicated that his office opposes this motion.


\_\_/s Shawn Nolan\_\_

Shawn Nolan


Dated: November 20, 2014

## CERTIFICATE OF SERVICE

I, Shawn Nolan, hereby certify that on this 20th day of November, 2014 I served the foregoing on the following person by ECF Filing:

> Greg Abbott, Esquire
> Attorney General of Texas
> Matthew Ottoway
> Assistant Attorney General
> Southern District of Texas
> P.O. Box 12548, Capitol Station
> Austin, TX 78711

  _/s Shawn Nolan_
Shawn Nolan