UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

_____
                                                    :
TRAVIS JAMES MULLIS,                 :
                                                    :        No. 3:13-cv-121
                        Petitioner,          :
                                                    :
            v.                                     :
                                                    :        **This is a Capital Case**
LORIE DAVIS,                                  :
Director, Texas Department of        :
Criminal Justice, Correctional         :
Institutions Division                        :
                                                    :
                        Respondent.        :
_____

**CONSOLIDATED PETITION FOR WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY
PURSUANT TO 28 U.S.C. § 2254 *et seq.***

SHAWN NOLAN
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia, PA 19016
215-928-0520
Shawn_Nolan@fd.org

July 19, 2017

## PRELIMINARY STATEMENT

Petitioner files this Consolidated Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. §2254, in accord with this Court's Orders of April 4, 2017 and June 2, 2017.  This Consolidated Petition combines Petitioner's Initial Petition for Writ of Habeas Corpus (Doc. No. 10) (hereinafter "Initial Petition") filed on July 19, 2013 and Supplement to Petition for Writ of Habeas Corpus (Doc. No. 28) (hereinafter "Supplement") filed on September 12, 2014. This Petition does not raise new factual allegations or legal grounds for relief that were not already raised in these previous two filings.  However, this Consolidated Petition does consolidate and supplement the legal analysis pertaining to the claims already pled, as Petitioner's Initial Petition and Supplement anticipated the subsequent filing of a Memorandum of Law.  *See* Initial Petition at i, 188; Supplement at 24.

Cites to the exhibits in this Consolidated Petition correspond with the attached Appendix as well as the Appendices filed shortly after the Initial Petition (Exhibits 1-39)[1] and with the Supplement (Exhibits 40-59).

Petitioner Travis James Mullis will be referred to by name or as "Petitioner." Notes of testimony of state court proceedings in the Reporter's Record will be cited as [Volume number] RR [page number].  Pleadings and orders that are part of the Clerk's Record in the 122nd District Court of Galveston County will be referred

---

[1] Pursuant to this Court's order of July 23, 2013 (Doc. No. 14), exhibits 28 through 39 were filed under seal.

i

to as named in the record, with reference to CR, followed by page number, when available.

None of the orders or opinions from the state courts in this case are published.  The opinion of the Court of Criminal Appeals denying appellate relief is *Mullis v. State*, No. AP-76,525, 2012 WL 1438685 (Tex. Crim. App. Apr. 25, 2012).   The order of the Court of Criminal Appeals denying habeas relief is *Ex Parte Travis James Mullis*, No. WR-76, 632-01 (Tex. Crim. App. Sept. 12, 2012). The order of the Court of Criminal Appeals denying the motion to appoint counsel and establish a new habeas corpus date is *Ex parte Mullis*, No. WR-76, 632-01, Order (Tex. Crim. App. Dec. 12, 2012).  The Court of Criminal Appeals denied the motion for original writ and application to reinstate appellate rights without written order or opinion on January 16, 2013.

All other citations are either self-explanatory or will be explained.   All emphasis in this Consolidated Petition is supplied unless otherwise indicated; parallel citations are omitted.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. i

STATEMENT OF THE CASE AND ........................................................1

PROCEDURAL HISTORY....................................................................1

PRELIMINARY STATEMENT ON EXHAUSTION AND LACK OF
      PROCEDURAL BAR ................................................................17

THIS COURT SHOULD HOLD AN EVIDENTIARY HEARING......................19

CLAIMS FOR RELIEF ........................................................................21

I.     IN SUPPORT OF A DEATH SENTENCE, THE STATE KNOWINGLY
      PRESENTED FALSE ALLEGATIONS OF EXTRANEOUS OFFENSES
      BY PETITIONER AS A JUVENILE, IN VIOLATION OF THE EIGHTH
      AND FOURTEENTH AMENDMENTS; DEFENSE COUNSEL WAS
      INEFFECTIVE FOR FAILING TO REBUT THESE AND OTHER
      ALLEGATIONS THAT PETITIONER WAS A FUTURE DANGER AND
      MAKE APPROPRIATE OBJECTIONS; APPELLATE COUNSEL WAS
      INEFFECTIVE FOR FAILING TO RAISE THIS RECORD-BASED
      CLAIM...................................................................................21

     A.    The Allegations and Argument Presented at Trial..............................22

     B.    Available, Unpresented Information in the Records..........................28

     C.    The State's Knowing Presentation of False Evidence and Failure to
          Correct that Testimony Violated Due Process ...................................29

     D.    Defense Counsel's Concession and Failure to Rebut the False
          Evidence and Counter Other Evidence of Future Dangerousness Were
          Ineffective...........................................................................33

     E.    The False Evidence Undermines the Reliability of the Death Sentence
          ...........................................................................................42

II.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO
      THE EFFECTIVE ASSISTANCE OF COUNSEL AT CAPITAL
      SENTENCING, BECAUSE COUNSEL FAILED TO INVESTIGATE,
      DEVELOP, AND PRESENT COMPELLING MITIGATING EVIDENCE.
      ...........................................................................................43

iii

A.    The Legal Standard for Ineffective Assistance of Counsel at Penalty43

B.    Counsel's Investigation and Presentation of Mitigating Evidence
      Were Deficient. ....................................................................................45

C.    Trial counsel failed to ask the expert witnesses that testified to opine
      about Petitioner's state of mind on the day of the killing.  For these
      reasons, the jury did not hear all of the compelling mitigating
      evidence outlined below.  Counsel's performance was unreasonable.
      Counsel was also deficient for failing to conduct brain imaging,
      despite information from their consulting neuropsychologist that such
      testing would likely result in helpful mitigation. Compelling
      Mitigating Evidence That Could Have Been Presented......................55

      1.    Mother's Disbelief of Travis' Disclosure of Sexual Abuse. ....56

      2.    The Sexual Abuse Was Far Worse than the Jury Heard...........60

      3.    Sexual Dysfunction in Travis' Birth Family. ...........................64

      4.    Petitioner's Childhood and Adolescent Mental Health
            Treatment. ................................................................................70

      5.    Petitioner was Victimized by Older Men .................................91

      6.    Petitioner's Mental State on the Day of the Killing .................96

      7.    Petitioner Exhibited Remorse. .................................................99

      8.    Petitioner Suffers From Brain Damage. .................................101

D.    Counsel's Failures Prejudiced Petitioner ..........................................103

III.    THE STATE DENIED PETITIONER HIS CONSTITUTIONAL RIGHTS
        TO DUE PROCESS AND A FAIR TRIAL BY WITHHOLDING
        EVIDENCE; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO
        REQUEST THIS EVIDENCE. ...................................................................108

        A.    The State Suppressed Material Exculpatory Evidence, in Violation of
              the Fifth, Sixth and Fourteenth Amendments. ...................................109

        B.    In the Alternative, Counsel was Ineffective for Failing to Seek and
              Obtain the Exculpatory Evidence.......................................................112

IV.    THE EXCUSAL OF ONE HUNDRED VENIREPERSONS BY
       AGREEMENT BETWEEN THE PARTIES, WITHOUT INDIVIDUAL

iv

VOIR DIRE, DENIED PETITIONER HIS RIGHT TO AN IMPARTIAL CAPITAL SENTENCING JURY, PROTECTED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS; THE TRIAL COURT ERRED IN PERMITTING THIS PRACTICE; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THIS PRACTICE; THE STATUTE PERMITTING EXCUSALS UPON AGREEMENT IS UNCONSTITUTIONAL; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM...................................................112

    A.    The Legal Standards...........................................................113

    B.    The Jury Selection Procedures in This Case Failed to Protect Petitioner's Constitutional Rights. .....................................116

V.    IMPROPER VICTIM IMPACT EVIDENCE AND ARGUMENT WAS INTRODUCED AT PENALTY PHASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.  THE PROSECUTOR COMMITTED MISCONDUCT AND TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN LITIGATING THIS ISSUE. ..................................................................................130

    A.    Improper Victim Impact Evidence and Argument............................133

    B.    Trial Court Error and Prosecutorial Misconduct................................137

    C.    Ineffective Assistance of Counsel .......................................138

VI.    THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT MITIGATING CIRCUMSTANCES DO NOT NEED TO BE PROVEN BEYOND A REASONABLE DOUBT, VIOLATING PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR A PROPER INSTRUCTION OR OBJECT TO THE INSTRUCTION AS GIVEN; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE. ..........................................................140

VII.    THE STATE REPEATEDLY ENGAGED IN PROSECUTORIAL MISCONDUCT BY PRESENTING INFLAMMATORY AND IMPROPER EVIDENCE AND ARGUMENT AT PENALTY PHASE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.  THE TRIAL COURT ERRED BY ADMITTING THIS EVIDENCE, AND TRIAL AND APPELLATE

COUNSEL WERE INEFFECTIVE IN FAILING TO PROPERLY
LITIGATE THIS ISSUE. ...........................................................................145

    A.    The State Presented Improper and Irrelevant Argument in Penalty
Phase Closing For the Sole Purpose of Inflaming the Passion of the
Jury. ...................................................................................................146

    B.    The State Presented Prejudicial Testimony About Tonya Dean's
Emotional Reaction to Discovering Semen on the Victim's Oral
Swab. .................................................................................................151

VIII.  PETITIONER WAS TRIED AND SENTENCED TO DEATH UNDER AN
UNCONSTITUTIONAL STATUTORY SCHEME; THE TRIAL COURT
ERRED IN DENYING THE DEFENSE MOTION TO DECLARE TEXAS
CODE CRIM. PROC. 37.071 UNCONSTITUTIONAL; APPELLATE
COUNSEL WAS INEFFECTIVE FOR FAILURE TO RAISE THIS
CLAIM...................................................................................................154

    A.    Legal Standards ................................................................................156

    B.    The Presentation of Evidence of "Extraneous" Conduct Violates the
Fifth, Sixth, Eighth and Fourteenth Amendments. ...........................158

    C.    Special Issue One Lacks the Guided Discretion Required by the
Eighth and Fourteenth Amendments, Because the Terms of the
Question Are Vague and Undefined, the Use of "Probability"
Undermines the State's Burden of Proof, and the Question Fails to
Genuinely Narrow the Class of Defendants Eligible for the Death
Penalty. ..............................................................................................161

        1.    A "Probability" of Future Criminal Acts of Violence Is
Unconstitutionally Vague. ....................................................162

        2.    The Term "Continuing Threat to Society" is Unconstitutionally
Vague. ...................................................................................164

    D.    The Statute Requires An Unconstitutional Instruction that Ten or
More Jurors Must Agree on a Life Sentence, Whereas the Jury Must
Unanimously Decide on a Death Sentence. ......................................165

IX.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR
CHANGE OF VENUE OR VENIRE DESPITE THE FACT THAT THE
COMMUNITY AND THE JURY POOL HAD BEEN SATURATED WITH
HIGHLY PREJUDICIAL PUBLICITY.  AS A RESULT, PETITIONER

WAS DENIED HIS RIGHTS TO AN IMPARTIAL JURY AND DUE
PROCESS. .................................................................................................168

X.      THE VOIR DIRE FAILED TO INQUIRE ABOUT JURORS' ABILITY TO
        CONSIDER INDIVIDUAL MITIGATING CIRCUMSTANCES AND
        CONSIDER A SENTENCE OF LIFE IN THIS CASE, VIOLATING
        PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND
        FOURTEENTH AMENDMENTS; THE TRIAL COURT ERRED IN
        DENYING THE DEFENSE MOTION FOR FULL, FAIR AND
        CONSTITUTIONAL VOIR DIRE; TRIAL COUNSEL WERE
        INEFFECTIVE FOR FAILING TO ENSURE ADEQUATE VOIR DIRE;
        APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILURE TO
        RAISE THIS CLAIM. ................................................................................175

        A.      The Trial Court Refused to Question Potential Jurors About Whether
                They Could Consider the Defendant's Life, Background, and
                Character as Mitigation. ....................................................................176

        B.      Given the Facts of this Case, Voir Dire Should Have Included an
                Inquiry into Whether Jurors Could Consider a Life Sentence for
                Someone Who Killed an Infant. ..........................................................179

XI.     IMPROPER VICTIM IMPACT EVIDENCE AND ARGUMENT WAS
        PRESENTED TO THE JURY AT GUILT/INNOCENCE PHASE OF
        TRIAL IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE
        SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.  TRIAL AND
        APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO
        PROPERLY LITIGATE THIS ISSUE. ....................................................182

        A.      Improper Argument and Evidence. ....................................................184

        B.      Trial Court Error. ...............................................................................186

        C.      Ineffective Assistance of Counsel. ....................................................188

XII.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
        INVESTIGATE, DEVELOP AND PRESENT EVIDENCE OF
        PETITIONER'S MENTAL STATE TO REBUT THE STATE'S
        EVIDENCE OF INTENT AND TO CHALLENGE THE ADMISSION OF
        PETITIONER'S STATEMENT. ...............................................................189

A.    Trial Counsel Failed to Investigate, Develop and Present Evidence of Petitioner's Mental State at the Time of the Crime to Rebut the State's Evidence of Intent. ...........................................................................189

B.    Trial Counsel Failed to Present Evidence of Petitioner's Mental Illness to Challenge the Admission of Petitioner's Statement..........194

XIII. PETITIONER WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BY THE PROSECUTION'S PRESENTATION OF IMPROPER AND INFLAMMATORY EVIDENCE, THE TRIAL COURT'S ERRONEOUS EVIDENTIARY RULINGS AND BY TRIAL COUNSEL'S INEFFECTIVE FAILURES TO OBJECT TO THE ADMISSION OF CERTAIN IMPROPER EVIDENCE; DIRECT APPEAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO RAISE THIS CLAIM. ....................195

A.    The Uncharged Bad Act Evidence. ...................................................196

B.    Admission of Irrelevant and Prejudicial Evidence. ..........................198

C.    Bad Character Evidence. ..................................................................200

D.    The Trial Court Erred and Abused its Discretion in Admitting Cumulative, Irrelevant, and Inflammatory Autopsy Photographs. ...201

E.    Trial and Appellate Counsel were Ineffective. .................................204

XIV. THE TRIAL COURT ERRED BY ADMITTING PETITIONER'S CUSTODIAL STATEMENTS WITHOUT PRETRIAL NOTICE AND IN VIOLATION OF PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY LITIGATE THIS ISSUE AND FOR FAILING TO OBJECT TO AND/OR COUNTER LAW ENFORCEMENT TESTIMONY REGARDING PETITIONER'S PURPORTED LACK OF REMORSE. ................................................................................................205

A.    Trial Court Error for Admitting Petitioner's Custodial Statements Despite Lack of Pretrial Notice.......................................................209

B.    Trial Counsel Were Ineffective for Failing to Seek Suppression of Petitioner's Inculpatory Custodial Statements on Fifth and Fourteenth Amendment Grounds. .....................................................210

C.    Counsel's Ineffectiveness for Failing to Object to Irrelevant Lack of Remorse Testimony...........................................................................211

XV.   PETITIONER'S RIGHT TO SILENCE WAS VIOLATED WHEN THE PROSECUTOR COMMENTED ON PETITIONER'S SILENCE DURING THE PENALTY PHASE...............................................................................214

XVI.  APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO LITIGATE PETITIONER'S APPEAL AND FOR ENABLING PETITIONER'S WAIVER OF COUNSEL ON DIRECT APPEAL; THE TRIAL COURT'S FAILURE TO HOLD A COMPETENCY HEARING VIOLATED PETIONER'S RIGHT TO DUE PROCESS; AND THE COURT OF CRIMINAL APPEALS ERRED IN DENYING PETITIONER'S EFFORTS TO RESTORE HIS APPELLATE RIGHTS, IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS................................................................218

      A.    The Legal Standard. ........................................................................219

      B.    The Court Violated Petitioner's Right to Due Process by Failing to Hold a Competency Hearing and Erred in Accepting the Waiver....221

      C.    Petitioner Was Not Competent and His Waiver Was Not Knowing and Voluntary; Counsel Ineffectively Failed to Investigate Petitioner's Competence and the Validity of His Waiver. ...................................221

      D.    The Decisions of the Court of Criminal Appeals Reinstatement......225

XVII. PETITIONER'S CONVICTION AND SENTENCE ARE UNCONSTITUTIONAL DUE TO THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S INADEQUATE REPRESENTATION, THE STATE'S MISCONDUCT AND THE COURT ERRORS DESCRIBED ABOVE.....................................................................................225

REQUEST FOR RELIEF .....................................................................................226

## STATEMENT OF THE CASE AND
## PROCEDURAL HISTORY

Petitioner Travis James Mullis – "T.J." to those who know him – was born in 1986.  His biological mother and his father were both sexual predators who preyed on their own children.  His father left when he was a newborn, and his mother died of complications of obesity when he was ten months old.   By the time Travis was *three years old*, he was already being treated for severe psychological and emotional problems.  At six years old, he disclosed in therapy that his adoptive father had been sexually abusing him for years.

Travis spent his childhood and teen years in and out of mental health treatment centers and under the intermittent care of his adoptive mother.  When he was 18, off his medication and in an ever-worsening mental condition, she kicked Travis out of the house.  She bought him a one-way ticket to Texas so that Travis could move in with a woman he had met in an internet chat room.  Without access to mental health treatment or medication, Travis lived in and around Houston for a couple of years, staying with anyone who would take him in.

When Travis was 21, his girlfriend gave birth to a son, Alijah.  Three months later, on January 29, 2008, Travis sexually molested Alijah and then, consumed by shame and madness, killed him.  Travis later turned himself in to the police and confessed to the killing.

1

At a trial beset by constitutional errors, Travis was convicted of murder and sentenced to death.  Despite his severe mental illness, and as a result of ineffective lawyering and court error, the state courts accepted his waivers of counsel for appellate and habeas review.  As a result, the State of Texas now seeks to execute Petitioner without any court having reviewed the compelling constitutional errors described below.

Mr. Mullis was charged with capital murder and related counts and was arrested on February 1, 2008, in Philadelphia, Pennsylvania, after voluntarily turning himself in at Philadelphia Police Department headquarters.  Petitioner, through counsel Daniel Stevenson, Esq., a public defender in Philadelphia, voluntarily waived extradition.  On February 6, 2008, after his extradition to Galveston County, Petitioner was found indigent and Robert Loper, Esq., was appointed to represent him.  *See* CR 26.  After the State filed a Notice of Seeking the Death Penalty in August 2008, *see* CR 33, the court appointed Gerald Bourque, Esq., to serve as counsel with Mr. Loper.  CR 36.

In a jury trial in the 122nd District Court, Galveston County ("trial court"), Petitioner was convicted of capital murder on March 11, 2011, and sentenced to death on March 21, 2011.  *See* CR 780 (conviction), 820 (sentence).  Petitioner is presently incarcerated at the Polunsky Unit, Texas Department of Criminal Justice.

2

On the day the jury returned the sentencing verdict, Petitioner signed a
Notice of Appeal, which was filed on his behalf.  *See* CR 836.  Two days later, on
March 23, 2011, the trial court found Petitioner indigent and appointed Wayne
Hill, Esq., to represent Mr. Mullis on appeal, and Brad Levenson of the Office of
Capital Writs ("OCW") to represent Mr. Mullis in his state habeas proceedings.
*See* CR 842-43.

On April 19, 2011, Mr. Hill filed a Motion for New Trial with the trial court.
The Motion was three pages long and raised eleven issues.  The Motion was
accompanied by an affidavit from Petitioner, affirming the allegations in the
motion, and an affidavit from Mr. Bourque, regarding the claim of juror
misconduct.  The appeal was assigned to the Court of Criminal Appeals.  *See* CR
891.  The trial court set a hearing date for May 20, 2011.

At this early stage, the appeal rapidly changed course.  On May 3, 2011, Mr.
Hill filed with the trial court a Waiver of Appearance at the Motion for New Trial,
accompanied by an affidavit from Mr. Mullis regarding his waiver of presence.
*See* CR 884.

Mr. Hill described his involvement in the case in a sworn affidavit:

1.      On March 23, 2011, I was assigned as counsel for Mr. Mullis
on direct appeal to the Texas Court of Criminal Appeals.

2.      On March 23, 2011, I spoke with trial counsel concerning the
facts and circumstances of the case.  I was informed that mitigating
evidence had been presented on behalf of Mr. Mullis. I also discussed

3

possible appellate issues in the case, including the issue of potential juror misconduct involving premature deliberations, outside of the courtroom, and potentially without all jurors present.  As I recall, the report was that this happened during the defense presentation of evidence.  I also had subsequent conversations with trial counsel concerning the juror issue.

3.      On March 25, 2011, I went to the Galveston County District Clerk's office and conducted a preliminary review of court documents related to the case.  I then proceeded to the Galveston County Jail to meet Mr. Mullis and review the circumstances of his case with him. I also explained the direct appeal process to him.  I also informed Mr. Mullis that Brad Levenson with the Office of Capital Writs in Austin would be representing him on his habeas petition.  During our March 25th meeting, Mr. Mullis expressed his desire to move from the "FSP" (Full Suicide Prevention) Unit.  I contacted Kathy White - Head of Nursing at the Galveston County Jail to assist Mr. Mullis in his effort to move to a different housing unit within the Galveston County Jail.  I later learned from Mr. Mullis that he was transferred as he had requested.

* * *

5.      Under Texas Rule of Appellate Procedure 21.4, I had only thirty days from the date of Mullis's sentencing on March 21, 2011, to file the motion for a new trial.  This motion, and the anticipated hearing thereon, would have allowed the Texas Court of Criminal Appeals to consider the evidence from the motion for new trial on direct appeal.  On April 19, 2011, I reviewed the motion for new trial with Mr. Mullis and obtained his notarized signature on it.  I then filed the motion for new trial and "presented" it to Judge Ellisor as required by the Texas Rules of Appellate Procedure….

6.      On April 25, 2011, I spoke with Mr. Levenson concerning issues surrounding the client's decision to waive certain post-conviction remedies.  On May 3, 2011, I had a lengthy meeting with Mr. Mullis at the Galveston County Jail during which we discussed numerous topics and issues relating to his trial and pursuing his direct appeal to the Texas Court of Criminal Appeals.  Mr. Mullis executed the Defendant's Waiver of Appearance at Motion for New Trial which

4

is attached hereto as "Attachment 2." I had a subsequent conversation with Mr. Levenson on May 16, 2011.

7.      During the course of my representation of Mr. Mullis, I met with him 6-7 times. I do not recall the precise date that Mr. Mullis first raised the issue of not wanting to pursue his direct appeal, but he did mention it at least during our April 25th meeting, if not sooner. When the topic was discussed, I likely told him it would be a "stupid thing to do" (or words to that effect) because an appeal is automatic in a death penalty case. When Mr. Mullis reiterated his desire to make decisions consistent with not seeking appellate review, he asked me to notify the Court he wanted neither an attorney nor an appeal.

8.      Based on a request made by Mr. Mullis, I prepared a document entitled Waiver of Rights and Invocation of Defendant's Right to Proceed Pro-Se ("Attachment 3") which Mullis signed. I filed this document in Court on May 20, 2011.

Affidavit of Wayne Hill, Nov. 19, 2012.[2]

As described by Mr. Hill in his affidavit, at the motion for new trial hearing on May 20, 2011, he filed a Waiver of Rights and Invocation of Defendant's Right to Proceed *Pro Se*, written by Mr. Hill and signed by Petitioner. *See* CR 903. The Waiver stated that the defendant wished to "abandon his direct appeal to the Texas Court of Criminal Appeals. Mr. Hill has explained to Defendant that the Texas Court of Criminal Appeals will review the case for constitutional error, notwithstanding Defendant's desire to waive his direct appeal. Mr. Hill has

_____

[2] This sworn and notarized affidavit was filed with a Motion for Leave to File Petition for Original Writ of Habeas Corpus with the Court of Criminal Appeals on Nov. 30, 2012, by Brian W. Stull, Esq., acting *pro bono* on behalf of Mr. Mullis.

advised against this course of action."  CR 904.  The Waiver also invoked

Petitioner's right to self-representation.  CR 904.

The May 20, 2011 hearing, originally scheduled as a hearing on the motion

for new trial, instead addressed the waiver motion.  Petitioner was present at the

hearing, and the court conducted a colloquy.  In the colloquy, the court ascertained

that Petitioner was a high school dropout who had not completed a GED, that he

had lived in "some type of home for a number of years until . . . age 17," and he

had never lived independently.  34 RR 8-9.  Petitioner stated that he wanted to "go

pro se" and had no intention of filing a brief.  *Id.* at 7.  He understood that the

Court of Criminal Appeals would review for fundamental error.  *Id.*  The

prosecutor noted, there was a "psychiatric history" and asked the judge to inquire

on that topic.  *Id.* at 14.  Petitioner then described that he had stopped taking his

psychiatric medications when he moved to Texas at the age of 17 or 18, *id.* at 15,

and that he was not presently taking any psychiatric medications, due to the

unpleasant side effects of the medications prescribed at the Galveston County Jail.

*Id.* at 16.  Although Mr. Hill, who addressed the court, stated that Petitioner was

proceeding against his advice, he also stated his belief that Petitioner was

"competent."  Counsel did not tell the court that Petitioner had only recently, and

at counsel's request, been removed from the jail's suicide prevention unit.  *Id.* at

18.

Based on its belief that Petitioner was proceeding "freely" and "voluntarily," the trial court permitted Petitioner to waive his right to counsel and his right to a hearing on the pending motion for new trial.  34 RR 20, 24-25.  The court relieved Mr. Hill of his appointment.  *Id.*  Neither the court nor counsel had ever requested an evaluation of Petitioner's competence to raise his right to counsel on appeal.

On July 5, 2011, the Clerk's Record was filed.  The Clerk's Record contains the indictment, motions and pleadings filed with the court, the court's docket sheet, the court's charge, the jury's verdict, and the notice of appeal.  *See* Tex. R. App. P. 34.5.[3]

On September 14, 2011, Petitioner signed an affidavit, prepared by OCW counsel, stating that he had declined all legal representation, including for his state habeas proceedings.  The following day, Levenson filed the affidavit with the trial court, accompanied by a Motion to Waive Post-Conviction Habeas Review and a request for a court-ordered mental health evaluation.  The Motion argued that a decision on the waiver was "imminently necessary based upon the due date of Mr. Mullis's application for writ of habeas corpus," which counsel estimated to be December 23, 2011.  Motion to Waive Post-Conviction Habeas Review at 3.

---

[3] The Clerk's Record is only part of the appellate record; the other part of the appellate record is the Reporter's Record, which consists of transcripts of all proceedings and exhibits. *See* Tex. R. App. P. Rule 34.6.  Under the rules, an appellant's brief on direct appeal is due 30 days after the filing of the clerk's record or the reporter's record, whichever is later.  *See* Tex. R. App. P. 38.6(a).

7

Counsel noted that consistent with *Ex Parte Reynoso*, 257 S.W. 3d 715, 720 n.2 (Tex. Crim. App. 2008), a waiver of post-conviction habeas review is not effective until after the state habeas deadline has passed.  *See id.*

On September 15, the day the Motion to Waive was filed, the trial court issued an order appointing a psychiatrist, Dr. Victor Scarano, to evaluate Petitioner's competency.  Dr. Scarano was provided: Petitioner's medical and classification records from TDCJ; the transcript of the May 20, 2011, hearing on the waiver of appellate counsel; a video interview of Petitioner by the Galveston Daily News on Sept. 21, 2011; and a "review of Texas Court of Criminal Appeals cases provided by Mr. Brad Levenson" regarding waivers.  Dr. Scarano's evaluation was conducted on September 23, and he wrote and submitted to the court a report dated October 6, 2011, opining that Petitioner was competent to waive post-conviction habeas review.  *See* Report of Dr. Scarano.

On October 4, 2011, Mr. Levenson filed a Motion for Extension of Time to File Initial State Habeas Application.  The Motion stated that in the unusual procedural posture of a direct appeal waiver, the state habeas deadline was "uncertain," but might have already passed on Sept. 19, 2011, and that counsel was therefore requesting a statutory 90-day extension under Article 11.071 to Dec. 19, 2011.

On October 11, 2011, the trial court held a hearing on the motion to waive

post-conviction habeas review.  *See* 35 RR.  At the hearing, OCW counsel praised

Dr. Scarano's work and stated that he did not object to admission of Dr. Scarano's

report into evidence.  Counsel stated that there had been "some back and forth" in

Petitioner's decision to waive state post-conviction.  35 RR at 7-8.  Counsel also

explained that he had "strenuously objected" to the waiver, and that counsel "had

some opportunity to review his case but certainly not enough time."  *Id.*  Counsel

had "started the investigative process" but had not interviewed witnesses or jurors,

had not conducted any out-of-state investigation, and had not reviewed the

transcript because it was not yet available.  *Id.* at 8-9.  Because the transcript and

exhibits were not available, counsel "c[ould]n't really put the whole trial into

context and come up with a determination of what issues should be raised."  *Id.* at

9.  Counsel had begun, but had not completed, review of trial counsel's file and the

District Attorney's file.  *Id.*  Counsel concluded by asking the court to "perhaps

kick this can down the road a little bit farther so we can have more time to work on

Mr. Mullis' case and he can make an even more informed decision about what this

office can do for him."  *Id.* at 11.  The State did not object to counsel's request for

more time to review the transcript and the District Attorney's files.  *Id.* at 11, 18.

The court conducted a brief colloquy of Petitioner, consisting of less than

three transcript pages, asking Petitioner why he wanted to waive, and asking

whether he had considered the possibility that he would change his mind "as [he] mature[s] and get[s] older." 35 RR 13-15. The court granted the extension through December 19. The court stated,

> I would urge you that the wise thing to do would allow the office of capital writs to continue working on this through that time. If you ultimately waive, fine. At least they won't be behind the game if you change your mind in the next three months.

*Id.* at 18-19. The court then took the matter under advisement. On the following day, the court issued an order finding Petitioner "competent to knowingly, intelligently and voluntarily waive his rights to post-conviction habeas review." Order, Oct. 12, 2011. The Order continued,

> Mr. Mullis is permitted to act *pro se* regarding any decisions regarding waiver and/or filing a writ of habeas. The Office of Capital Writs may continue to investigate and prosecute a post-conviction writ of habeas corpus on behalf of Mr. Mullis until the deadline for filing, but must not file the writ if Mr. Mullis persists in electing to waive filing.

*Id.*

On October 27, 2011, a little over two weeks after the court accepted Petitioner's waiver, the Reporter's Record was filed, making the transcripts and exhibits available for the first time.[4]

---

[4] Presumably, the filing of the Reporter's Record also triggered the filing date for the appellant's brief on direct appeal, which would be thirty days later, under Tex. R. Crim. Pro. 38.6(a).

On December 13, 2011, the Court of Criminal Appeals sent Petitioner, to his prison address, a notice of failure to file an appellate brief in his direct appeal. The notice stated:

> The appellant has failed to file a brief, in the above referenced case, which was due May 31, 2012.[5]  In order to avoid the issuance of a show cause order, counsel must immediately file the brief along with a motion for extension of time with this Court.

Despite the reference to "counsel," the notice was not copied to Mr. Hill or OCW counsel. On February 15, 2012, the District Attorney sent a letter to the Court of Criminal Appeals, stating, "the State does not intend to file a brief in the direct appeal proceeding. The State respectfully requests that this Court review the case for fundamental error."

Along with the confusing notice from the Court of Criminal Appeals, confusion over the state post-conviction deadline persisted. On February 14, 2012, OCW counsel filed an unopposed Motion for Extension of Time requesting an additional 90 days to file the post-conviction application. The motion reasoned that counsel's prior calculation of the habeas deadline was incorrect–the presumed habeas deadline that counsel presented in September as the "imminent necessity" requiring a ruling on Petitioner's waiver– and that the habeas application was not

---

[5] The origin of the May 31, 2012, date is unclear.  Under Tex. R. App. Pro. 38.6(a), it is unclear how the brief could have been due on May 31, 2012.  In addition, if the brief was due May 31, 2012, it is unclear why a letter was sent on December 13, 2011, regarding failure to file a brief.

due in December 2011, as previously thought, but in February 2012. The court granted the motion in a February 17, 2012, order, stating that the initial state habeas application would be due on May 21, 2012.

On April 25, 2012, the Court of Criminal Appeals affirmed the conviction and sentence in the direct appeal in an unpublished three-paragraph opinion. The opinion stated the court had, "in the interest of justice, reviewed the entire record. Having found no unassigned fundamental error, we affirm the trial court's judgment." *Mullis v. State*, No. AP-76,525 (Tex. Crim. App. Apr. 25, 2012).

On June 27, 2012, the State moved the trial court to notify the Court of Criminal Appeals of the lack of filing an initial state habeas application, and for the court to forward the record to the Court of Criminal Appeals. The trial court issued an Order Notifying Court of Criminal Appeals of Lack of Filing of Writ that day.

On August 20, 2012, Petitioner sent letters to OCW counsel, the trial court, and the District Attorney requesting that his direct appeal and state habeas proceedings be reinstated and that the trial court appoint counsel. The letter stated that new evidence is available, that Petitioner would not have waived had it been available previously, and that the prior waiver was based on "misleading and incomplete defendant pro se information." Mr. Hill attested that he had received a

phone call from the clerk of court requesting that he take up the appeal, but that he

had declined to do so:

> On August 22, 2012, Janice with the Galveston County District
> Clerk's office contacted my office and left a message that Mr. Mullis
> desired to reinstate his appeal.  I returned Janice's call that same date
> and declined to undertake representation due to other pending
> professional commitments.

Affidavit of Wayne Hill, Nov. 19, 2012.

On September 12, 2012, the Court of Criminal Appeals issued an order in

the state habeas case, stating, *inter alia*:

> But despite the desire [to waive] he expressed early in the process,
> applicant could have changed his mind and filed an application up to
> and including the date it was due. Under the best possible scenario,
> applicant's application would have been due to be filed in the trial
> court on or before July 2, 2012.

> The due date has now passed, and no writ application was filed in the
> trial court.  Further, the record reflects that applicant continued to
> maintain his desire to waive habeas review until at least mid-August.
> Therefore, applicant's failure to timely file an application constitutes a
> waiver of all grounds for relief that were available to him before the
> last date on which his application could have been timely filed.  Art.
> 11.071, § 4(e).

> On August 22, the trial judge received a letter from applicant in which
> applicant requested that his appeals be reinstated because "new
> evidence has surfaced."  On August 28, this Court received a similar
> letter.  Although applicant is not currently entitled to appointed
> counsel or to file an untimely writ application, should he or *pro bono*
> counsel working on his behalf file an untimely writ application or a
> motion for a new filing date under Article 11.071 § 4A, then the filer
> will have to show good cause as to why an application was not filed
> on or before the statutorily applicable due date.

13

*Ex Parte Travis James Mullis*, No. WR-76, 632-01 (Tex. Crim. App. Sept. 12, 2012).  The court also noted that the appeal had become final when the Court of Criminal Appeals issued the mandate in the direct appeal case on May 21, 2012.

After the September 12 order, OCW counsel, acting *pro bono*, retained a psychiatrist to evaluate Petitioner's competency to waive his state habeas proceedings.  Dr. Michael Fuller evaluated Petitioner in November 2012, reviewed relevant materials including the transcripts of expert testimony at the penalty phase of trial, and authored a report opining that Petitioner had not been competent to waive his rights in October 2011 due to mental illness, depression, suicidal ideation, and fear of violence in prison outside the locked-down death row unit.

Based largely on Dr. Fuller's report, on November 20, 2011, OCW counsel filed a Motion to Appoint Counsel and Establish a New Habeas Corpus Application Due Date Under Article 11.071, Section 4A.  The Motion argued that Petitioner's mental impairments constitute good cause for the failure to file a state habeas application.  The Motion requested the statutory 270 days to file a habeas application, explaining that OCW counsel had not yet reviewed the trial record, and that "substantial investigation has [sic] yet to be done."  Motion at 13.  Dr. Fuller's report was attached in support.

On November 30, 2012, *pro bono* counsel Brian Stull filed a Motion for Leave to File Petition for Original Writ of Habeas Corpus, accompanied by a

14

pleading captioned as: Application for Writ of Habeas Corpus Under Art. V, Sec. 5 of the Texas Constitution, or, in the alternative, Late Motion for Rehearing of This Court's Decision on Direct Appeal, and for Related Relief.  This Application requested *vacatur* of the April 25, 2012, Court of Criminal Appeals order affirming Petitioner's conviction and sentence on direct appeal, and reinstatement of the right to direct appeal.  The Application argued that appellate counsel was ineffective for proceeding with the waiver hearing without any review of the record or any familiarity with Petitioner's mental health problems, and that the waiver violated Petitioner's right to a meaningful direct appeal under the U.S. Constitution and state law.  The Application also argued that the erroneous and confusing procedures of the Court of Criminal Appeals unlawfully deprived Petitioner of a direct appeal.  Affidavits of Attorney Wayne Hill; trial mental health experts Dr. Matthew Mendel, Dr. Richard Dudley, and Dr. Jolie Brams; and legal experts Professor Eric Freedman and Attorney William Harris were attached in support.

The Court of Criminal Appeals denied the OCW Motion in a four-page unpublished order.  *Ex parte Mullis*, No. WR-76, 632-01, Order (Tex. Crim. App. Dec. 12, 2012).  The court held, "neither counsel's motion nor Fuller's report show that applicant was incompetent on August 22, 2012, when he tried to reinstate his appeals or on September 13, 2012, when he again re-urged his desire to waive

15

review of his conviction . . . counsel has failed to establish good cause for failing to file a habeas application on or before the statutorily applicable due date."

On January 16, 2013, the Court of Criminal Appeals denied without written order or opinion the Motion for Leave to File Petition for Original Writ of Habeas Corpus and accompanying Application to reinstate appellate rights.

On April 16, 2013, undersigned counsel filed a Motion for Appointment of Counsel, requesting to be appointed to represent Petitioner in these habeas corpus proceedings. On April 17, 2013, this Court appointed undersigned counsel to represent Mr. Mullis throughout all available post-conviction processes, and granted Petitioner leave to proceed *in forma pauperis*.

On July 19, 2013, undersigned counsel filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. No. 10) and Appendix (Doc. No. 15). With permission of this Court, a Supplement to this Petition with accompanying Appendix was filed on September 12, 2014. Doc. No. 28.

On July 28, 2015, this Court stayed Petitioner's federal habeas corpus case to allow Petitioner to exhaust remedies in state court. Doc. No. 47. This Court later lifted the stay and reopened this case. Doc. No. 59. Following a number of pro se filings and in response to this Court's Order of December 6, 2016 (Doc. No. 83), Petitioner filed an Advisory to the Court stating that a stay of federal proceedings to exhaust in state court was no longer necessary. Doc. No. 86.

16

Subsequently, the parties filed a Joint Motion for Scheduling Order (Doc. No. 88), which this court granted on April 4, 2017 (Doc. No. 89). Pursuant to that Order, Petitioner's Consolidated Petition was due June 5, 2017. Petitioner filed an unopposed request for thirty day extension of the dates set forth in this Court's scheduling order, which was granted by this Court on June 2, 2017 (Doc. No. 91). Petitioner filed an additional request for a two week extension of these deadlines, which was granted on July 11, 2017. Pursuant to that Order, Petitioner files this Consolidated Petition on July 19, 2017.

## PRELIMINARY STATEMENT ON
## EXHAUSTION AND LACK OF PROCEDURAL BAR

Due to the procedural history in this case, the State may raise defenses of exhaustion and procedural bars in its answer. Petitioner shall present facts and law addressing any such defenses in his Traverse and/or response. Preliminarily, Petitioner proffers that none of the facts and claims presented in this Petition are procedurally barred because: (a) any state court procedural rulings in this case are not "independent" and "adequate" state grounds to bar federal review; (b) Petitioner can establish "cause" and "prejudice" to overcome any procedural bar; and/or (c) Petitioner can establish a "fundamental miscarriage of justice" to overcome any procedural bar.

We note, *inter alia*, that post-conviction counsel's failure to investigate and present claims for relief to the Court of Criminal Appeals, counsel's rush to secure

a waiver of Petitioner's state habeas rights months before any deadline was imminent, and counsel's failure to ensure that Petitioner's waiver was knowing, intelligent and voluntary amounted to ineffective assistance of counsel that overcomes any procedural bars.  In addition, the denial by the Court of Criminal Appeals of post-conviction counsel's 2012 motion to establish a new habeas deadline is an inadequate state ground.  The Court of Criminal Appeals has granted such relief in similar cases, and therefore denial of that motion was not based on a firmly established and consistently followed state procedural rule.

Appellate counsel's failure to raise the available record-based claims for relief and failure to secure Petitioner's appellate rights were ineffective.  *See* Claim XVI.  Appellate counsel permitted and enabled Petitioner to waive his appellate rights months before the record was complete, just weeks after counsel's appointment.  Petitioner's waiver was not knowing, intelligent and voluntary, due to his mental illness and due to counsel's failures.  Counsel made no effort to develop any claims except for interviewing a number of jurors regarding an issue of juror misconduct which had come up during trial.  In addition, the denial of direct appeal rights through the erroneous and confusing procedures followed by the Court of Criminal Appeals was a "cause" for any default that was external to Petitioner.  The errors and confusion in the Court of Criminal Appeals also establish that the state ground was inadequate to preclude federal review.

Finally, the denial by the Court of Criminal Appeals of pro bono counsel's application to reinstate the direct appeal is an inadequate state ground. As described in the state court application, the Court of Criminal Appeals had reinstated direct appeals in a number of similar cases, and therefore there was no firmly established and consistently followed rule to deny reinstatement.

Because the facts alleged herein would entitle Petitioner to relief, this Court should grant a hearing.

## THIS COURT SHOULD HOLD AN EVIDENTIARY HEARING

As a general rule, an evidentiary hearing is appropriate when the facts alleged in the habeas petition, if true, would entitle the petitioner to relief, and there is a material dispute about those facts. *See Townsend v. Sain*, 372 U.S. 293, 312-19 (1963). When evaluating a habeas petitioner's proffer, a court accepts as true his factual allegations, and views his factual assertions in the light most favorable to him. *Id*. at 312. Evidentiary "hearings are particularly important in capital cases ..., where the 'irremediable' penalty demands factfinding at a 'heightened standard of reliability.'" *Parkus v. Delo*, 33 F.3d 933, 939 n.6 (8th Cir. 1994) (quoting *Ford v. Wainwright*, 477 U.S. 399 (1986)); *cf. Banks v. Dretke*, 540 U.S. 668, 675 (2004) ("through discovery and an evidentiary hearing ... in a federal habeas corpus proceeding ... long-suppressed evidence came to light" and death sentence was vacated).

19

To the extent this Court believes that any of Petitioner's claims may be procedurally defaulted, this Court should grant a hearing because Petitioner can show cause and prejudice and/or a fundamental miscarriage of justice to overcome any default.  *See, e.g., Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980) (application of cause and prejudice may require district court fact finding); *Schlup v. Delo*, 513 U.S. 298 (1995) (remanding to district court to determine whether to hold hearing on fundamental miscarriage of justice); *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) (ineffective assistance of state post-conviction counsel can establish cause).  Finally, in unusual procedural circumstances like these that resulted in a "procedural morass," and the absence of a record, discovery and an evidentiary hearing are particularly necessary.  *See, e.g., Wellons v. Hall*, 558 U.S. 220, 221, 226 (2010) (per curiam) (discovery and a hearing are "especially" important "in a case in which petitioner's allegations and the unusual facts raise a serious question about the fairness of a capital trial").

## CLAIMS FOR RELIEF

**I.    IN SUPPORT OF A DEATH SENTENCE, THE STATE KNOWINGLY PRESENTED FALSE ALLEGATIONS OF EXTRANEOUS OFFENSES BY PETITIONER AS A JUVENILE, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS; DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO REBUT THESE AND OTHER ALLEGATIONS THAT PETITIONER WAS A FUTURE DANGER AND MAKE APPROPRIATE OBJECTIONS; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS RECORD-BASED CLAIM.**

At the penalty phase, the State presented testimony and argument that Petitioner sexually "groomed and molest[ed]" other juveniles during his residential treatment, although records in possession of the State refuted these allegations. The State also exaggerated the scope of the alleged misconduct, describing it as "four, five, maybe eight" individuals as opposed to the three individuals mentioned in the records, and repeatedly emphasized that the alleged sexual contact was homosexual, in violation of the Fourteenth Amendment and a ruling by the trial court prior to trial.  The prosecution also argued that Petitioner assaulted a staff person by kicking her.  However, this incident was significantly less egregious than portrayed.

The State's knowing use of false and misleading testimony, and its exaggeration of the factual basis for the testimony, violated Petitioner's Eighth Amendment right to reliable capital sentencing and Fourteenth Amendment right to due process.

21

Defense counsel was ineffective for conceding some of the conduct alleged by the State, failing to challenge the admissibility of this evidence and argument for lack of notice, and failing to rebut the factual bases of the allegations with information in defense exhibits and information available through investigation. Defense counsel was also ineffective for failing to counter the State's assertion that the graffiti drawing incident showed Petitioner was a future danger and for failing to present evidence of Mr. Mullis' positive adjustment in jail while awaiting trial. Appellate counsel was ineffective for failing to raise a record-based claim challenging the State's extraneous offense allegations with the contrary information in the defense exhibits.  Petitioner's sentence must be vacated.

### A.    The Allegations and Argument Presented at Trial

Petitioner lived in several residential treatment centers during his teenage years.  In his records from Sheppard Pratt/Jefferson School, the treatment center and school where he was placed for two and a half years, multiple notations appear in late March and early April 2002 that Petitioner made an admission of sexual misconduct with three boys at a prior placement, Stone Bridge Respite Program. Travis Mullis was 13-14 years old when he was at Stone Bridge.  *See* 58 RR Def. Exh. 45-142, -143, -144.  The Sheppard Pratt/Jefferson School records also include a report of an incident with a female staffer, Dee Dietz, whom Mr. Mullis allegedly kicked in 2002, when he was 15.

22

The State cross-examined three defense witnesses about the alleged sexual incidents, eliciting testimony harmful to the defense. During cross examination of Gina Vitale, the mitigation specialist, the prosecution asked:

> Q.      There's a note in 2002 about Travis stated that there was two of the three additional victims are in attendance at the Jefferson School in some program reportedly in the Howell House and the other one's enrolled in the day school. Travis stated he victimized the three males while he was in the Stone Bridge respite program and while all three of the boys were his roommates. And he related that he began grooming each of these victims by being nice to them and allowing them to play with his toys, repeatedly asking them to play sexual games. Then he reported that he performed fellatio on all the boys on approximately eight or nine occasions. Do you recall that entry?
>
> A.      Yes, I actually believe that's in our binder.

30 RR 206. Although Ms. Vitale correctly remembered that the allegations were reflected in defense exhibit 45, the Jefferson School records, at tabs 142, 143, and 144, she failed to testify, and defense counsel failed to elicit from her on redirect, that later entries in the records show that investigation showed the incidents were unsubstantiated or ruled out.

The State used the same allegations to question defense experts Dr. Mendel and Dr. Dudley. During Dr. Mendel's testimony, the State used the evidence to elicit an answer that Petitioner is manipulative:

23

Q.     And you know from the records in Sheppard Pratt[6] he manipulated – as he calls it, groomed – three or four male victims while he was undergoing treatment for sexual abuse of Susan Barry?

A.     He definitely has the capacity to manipulate, yes.

Q.     Right. And he does manipulate on a regular basis. Okay.

31 RR 208.  During Dr. Dudley's testimony, the State used the allegations again,

eliciting damaging testimony that the other male patients had been "victimized" by

Petitioner, and that Petitioner "violates" and "uses" other people:

Q.     He's a victimizer in the fact that he violates other people and uses them sometimes for his purpose?

A.     I guess he certainly used other people really to help support himself, to take care of himself; so, I think that's certainly for his purpose.

Q.     Well, whenever he victimized other patients at Sheppard Pratt, male patients, he wasn't trying to support himself. He victimized them, right?

A.     I think that more goes to the earlier question about his sexual behavior.

Q.     Well, isn't that – I'm sorry if I don't put everything in your category but whenever you make someone a victim, is it a proper English to call them that you have victimized them?

A.     Its [sic] important to say they've been victimized. I don't think it's proper to say he's a victimizer.

32 RR 135-36.

---

[6] Sheppard Pratt is an umbrella mental health organization that includes, among other units, the Jefferson School.

24

The State also argued to the jury in closing that these incidents showed that Petitioner "sees people as something to be used for his own needs, for his own gratification, without caring about the consequences and without accepting any responsibility." 33 RR 22. The State compared the residential treatment setting to a prison setting, arguing:

> So, in terms of thinking about the future dangerousness of the Defendant, think about what we know about Sheppard Pratt. Sheppard Pratt was a structured lockdown facility much like a jail would be, only it was very therapeutic trying to meet his needs…. He grooms and sexually molests other residents. So that's what he's like in a controlled setting.

*Id.* The State also argued that the incidents undermine the "volumes and volumes of records" presented by the defense in mitigation, as well as the defense argument that Petitioner did well in structured settings:

> Now, while he was locked up at Sheppard Pratt – I think the Defense said, well, he was comfortable there. Oh yeah, I'm comfortable at Sheppard Pratt. I've been there three years. Let me see, I've victimized four, five, maybe eight guys. Good deal. I'm thinking: All right, I'm doing okay.

33 RR 54. Here, the State argued that Petitioner had "victimized" four to eight people, as opposed to the three individuals mentioned in the records. *See* Def. Exh. 45-142, -143, -144, -150, -153 (all consistently referring to three boys).

The State also used these allegations as a means to emphasize repeatedly to the jury allegations of homosexual conduct by Petitioner, in violation of a previous

ruling that the State could not use homosexuality as an extraneous bad act.  22 RR

32-33.  Each time the State referred to the allegations, the State used the word

"male" to emphasize that the alleged conduct was homosexual.  *See, e.g.*, 30 RR

206, 31 RR 208, 32 RR 135, 33 RR 54-55.

The State's presentation of this information to the jury as a basis for an

extraneous offense or as a basis for a sentence of death violated due process.  *See,*

*e.g., Lawrence v. Texas*, 558 U.S. 539 (2003) (Texas statute criminalizing

homosexual sodomy violates the Fourteenth Amendment's guarantee of due

process).  It also violated a prior ruling by the trial court that the prosecution could

not present evidence of homosexual behavior in support of extraneous offenses.

*See* 22 CR 32-33; Order on Defendant's Motion to Disqualify the Galveston

County District Attorney's Office and Motion for Sanctions (Mar. 3, 2011).[7]

In addition to the State's evidence and argument, defense counsel conceded

in closing that Petitioner "had sex with other juveniles at Sheppard Pratt."  33 RR

41.  Thus, the jury heard from the prosecutor, defense expert witnesses, and

defense counsel that Petitioner had molested other boys while in juvenile

placement.

The State presented Mr. Donald Bilnoski, an employee of the TDCJ-CID

Classification and Records Department, who testified that, if Mr. Mullis were

---

[7] This Order is sealed.

sentenced to life without parole, he would be classified as a G-3 prisoner.  Mr.
Bilnoski explained the conditions of confinement such prisoners face.  Utilizing
this testimony, the State argued that Jefferson School was similar to the prison and
Mr. Mullis would act out in prison as he did at Jefferson School.

The State also argued in closing that Petitioner had assaulted his
grandmother Francis Barry, *id*. at 21, and that he had assaulted a residential
counselor, Dee Dietz, at the Jefferson School.  *Id.* at 22.  The defense did not
contest these allegations of extraneous offenses.

Finally, the State presented testimony from Kenneth Dunn and Royce
Eugene McQuaig, two Galveston County deputy sheriffs, about graffiti – including
drawings, gang symbols and a "hit list"– found on the walls and door of
Petitioner's cell. 29 RR 13-27; 29 RR 55-56.  Over a dozen photographs of this
graffiti were admitted into evidence and published to the jury.  *Id.* at 16 (State's
Exhibit Nos. 171-185 admitted and published to jury).  While the jury viewed these
photographs, Kenneth Dunn used a laser pointer to highlight "white supremacist
gang graffiti" on the back of Petitioner's cell door, as well as "black gang graffiti,"
Nazi and other "white power gang graffiti," and various initials on the "hit list."
*Id.* at 15-27.  Counsel did not present evidence to counter this, leaving the door
open for the State to argue in closing that this graffiti was further evidence
Petitioner was a future danger, even when incarcerated.  33 RR 23 ("What do we  .

27

. .know about the Defendant as far as when he's in the jail . . . he's creating a hit list of all the people that have tried to reach out to him."); 33 RR 56 ("That's what went through his mind, here's the people I hate.").

### B.    Available, Unpresented Information in the Records.

Although the Jefferson School records, Defense Exhibit 45, contain statements that Petitioner self-reported sexual contact with three boys at Stone Bridge, the records also contain information directly refuting those allegations. The jury never heard any of this information.

The day after Petitioner's "disclosure" of the sexual encounters, the treating psychiatrist, Dr. Khan, wrote in regard to the self-report, "Not sure about the truthfulness of these disclosures."  Def. Exh. 45-143.  More importantly, the matter was referred to Washington County Child Protective Services for an investigation, *see* Def. Exh. 45-143, -151, -153, and the investigation concluded that the allegations were ruled out or unsubstantiated.[8]  On August 15, 2002, the records reflect that restrictions on Travis were lifted "due to the lack of results in a CPS investigation."  Def. Exh. 45-183.

Washington County Child Protective Services, the agency to which the matter was referred, has informed undersigned counsel that it has no records of any

---

[8] *See* Code of Maryland Regulations (COMAR) 07.02.07.12, Disposition of Investigation of Suspected Child Abuse.

28

investigation into Travis Mullis. This shows that the investigation ruled out any misconduct, because the agency keeps records unless the investigation rules out the allegations and finds they are unsubstantiated, in which case records must be destroyed within 120 days. *See* Letter from Washington County Department of Social Services (July 19, 2013) (Exh. 3); COMAR 07.02.07.11, Disposition of Investigation of Suspected Child Abuse and Neglect (stating that agency "shall make a finding that alleged child abuse or neglect is indicated, unsubstantiated, or ruled out."); COMAR 07.02.07.17, Expunging Local Department Abuse and Neglect Investigation Records (stating that records of an investigation that is "unsubstantiated" shall be expunged within five years of receiving the report, and records of an investigation that is "ruled out" shall be expunged within 120 days of receiving the report).

With regard to the State's argument that Petitioner assaulted his grandmother Francis Barry, Ms. Barry unequivocally denied in a pre-trial interview conducted by the State that Petitioner ever assaulted her. An audio recording of this interview was provided to defense counsel before trial.

C.    **The State's Knowing Presentation of False Evidence and Failure to Correct that Testimony Violated Due Process**

Due process is violated when the prosecution presents evidence known to be false, and when the prosecution, "although not soliciting false evidence, allows it

to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959);

*Alcorta v. Texas*, 355 U.S. 28 (1957).  Indeed, there is a duty upon the State to

correct false evidence even if not solicited by the state.  *Napue*, 360 U.S. at 269.

This duty extends to circumstances when the sate allows the jury to be presented

with a materially false impression.  *See Alcorta*, 355 U.S. at 31; *see also Davis v.

State*, 831 S.W.2d 426, 439 (Tex. App. 1992) (holding that district attorney's

questioning that knowingly created false impression that witness volunteered to

correct her testimony was a violation of due process).  Relief is warranted "if there

is any reasonable likelihood the false testimony could have affected the judgment

of the jury."  *United States v. Bagley*, 473 U.S. 667, 678-79 & n.9 (1985) (noting

that this standard can also be described as requiring the prosecution to prove

beyond a reasonable doubt that the error was harmless); *accord Kirkpatrick v.

Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

A due process violation under *Napue* requires that (1) the testimony was

false or highly misleading; (2) the State knew or should have known the testimony

was false or highly misleading; and (3) the testimony was material.  *Napue*, 360

U.S. at 269-72.

The State here repeatedly elicited and failed to correct testimony that

Petitioner had sexually "victimized" other boys while in juvenile residential

treatment, despite information in the records that the treating psychiatrist doubted

30

the truthfulness of the self-report, and that the Child Protective Services investigation found that such conduct was not substantiated.  At no point did the State seek to correct the false and misleading impression that these offenses had indeed occurred.  To the contrary, the State emphasized the testimony in its closing argument, arguing that the sexual offenses support a finding that Petitioner posed a "continuing threat to society" pursuant to the first special issue, and that the offenses rebut the mitigating evidence of sexual abuse and mental illness presented by the defense.

Additionally, the prosecution argued that Petitioner had violently assaulted Dee Dietz, a counselor at Jefferson, even though interviews of her or other employees would have shown the incident to be extremely minor.

The materiality standard applied to the use of false or misleading evidence by the State is less onerous than the materiality standard under *Brady v. Maryland*, 373 U.S. 83 (1963).  *Kirkpatrick*, 992 F.2d at 497.  False or misleading testimony is material if there is any reasonable likelihood the false testimony could have affected the judgment of the jury." *Bagley*, 473 U.S. at 678.

Here, under either materiality standard, there is a strong likelihood that the false and misleading testimony presented by the State affected the jury's penalty phase verdict, as it was directly relevant to the first special issue considered by the jury in deciding whether Mr. Mullis would be sentenced to death—whether he

31

"would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. art. 37.071.

The State also misleadingly compared the conditions at the Jefferson school to the conditions of confinement Mr. Mullis would be subject to if he were sentenced to life in prison, and argued that his previous misbehavior was predictive of how he would act in prison.

> So, in terms of thinking about the future dangerousness of the Defendant, think about what we know about Sheppard Pratt. Sheppard Pratt was a structured lockdown facility much like a jail would be, only it was very therapeutic trying to meet his needs…. He grooms and sexually molests other residents.  So that's what he's like in a controlled setting.

33 RR 22.  Because there is also a reasonable likelihood that this testimony and argument could have affected the jury's decision, Petitioner has shown a due process violation under *Napue* and *Bagley*.

**D.   Defense Counsel's Concession and Failure to Rebut the False Evidence and Counter Other Evidence of Future Dangerousness Were Ineffective.**

Defense counsel knew the State intended to rely on these allegations.  *See* 22 RR 11 (at previous hearing, the State explained intent to use sexual offense reports from the residential treatment records at the penalty phase).[9]  Despite this knowledge, counsel ineffectively failed to prepare to rebut the evidence with information in their own files, described *supra*; failed to explain to defense expert witnesses the legal significance of extraneous offenses and the available information factually rebutting the allegations; failed to investigate the allegations factually; and failed to present that information to the jury.  Counsel's representation was ineffective.

Defense counsel has a duty to prepare to rebut potential aggravating evidence, and in particular to review records that counsel knows the prosecution will use at the penalty phase.  *Rompilla v. Beard*, 545 U.S. 374, 389-90 (2005) ("Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction. . ."); *see also The American Bar*

_____

[9] By pointing out the verbal representations the State made at the March 3, 2011 hearing, we do not concede that the prosecution complied with Texas requirements for notice of extraneous offenses.  To the contrary, the trial court ruled that the State had not complied with the notice requirements.  22 RR 32.

*Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, 2003,* Guideline 10.11(stating defense counsel's duty "to ascertain the aggravating and rebuttal evidence the prosecution intends to use, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted, or undercut."); The State Bar of Texas Guidelines and Standards for Texas Capital Counsel (2006) ("Texas Guidelines"), Guideline 11.7 (A) (stating defense counsel's "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.").

Here, defense counsel was on notice that the State intended to use the Sheppard Pratt/Jefferson School records, which were actually a defense exhibit. However, defense counsel unreasonably failed to use available information in those records directly rebutting the prosecution's claims, or to investigate the allegations. Counsel did not explain to Ms. Vitale, Dr. Mendel or Dr. Dudley the legal significance of the sexual offense allegations, did not direct them to records in the file showing that the allegations were disbelieved and unsubstantiated, did not seek social services records which would have confirmed that the allegations were ruled out or unsubstantiated, and to the contrary, conceded the allegations in closing argument.

With regard to Petitioner's alleged assault of his grandmother, counsel failed to adequately investigate and rebut that incident with Francis Barry's police interview.  With regard to the allegation of a physical assault on staff member Dee Dietz, counsel also failed to investigate that incident and did not interview Ms. Dietz, which would have established that the incident was very minor.  Counsel's representation fell short of prevailing professional norms.

Moreover, counsel failed to object to the admission of this testimony on due process grounds, where the trial court had ruled before the penalty phase began that the State could not present evidence of homosexual conduct as an extraneous bad act.  At that *in camera* hearing, the trial court stated, "Now, if during the trial it begins to come up, approach the Bench immediately.  We'll have an outside of the presence of the jury hearing as to what it's about."  22 RR 32-33.  Despite this directive from the trial court, counsel failed to object when the State referred repeatedly to Petitioner's sexual victimization of "males."

Finally, counsel failed to investigate, uncover and present testimony from a corrections expert and available Galveston County deputy sheriffs who had substantial interactions with Petitioner while incarcerated.  These witnesses could have rebutted the State's case regarding future dangerousness and provided testimony that Petitioner was unlikely to commit acts of violence if sentenced to

life in prison, based, in part, on Petitioner's positive adjustment experience in jail while awaiting trial.

At least four Galveston County deputy sheriffs who had substantial interactions with Mr. Mullis from the time of his arrest until the time of his trial and an expert in prison security and classification matters were available to provide compelling evidence that Mr. Mullis did not present a future danger to anyone in prison, contrary to the State's argument. *See* Declaration of Ruben Ornelas (Exh. 40); Declaration of Richard Styner (Exh. 41); Declaration of Michael Bradford (Exh. 44); Declaration of Robert Lundy (Exh. 42); and Declaration of Frank G. AuBuchon (Exh. 43).  No corrections expert was presented by the defense at Petitioner's trial, and the deputy sheriffs attest they were never previously contacted by anyone working on behalf of the defense but would have been willing to testify at Mr. Mullis' trial if asked to do so.  Ornelas Dec. at ¶ 5; Styner Dec. at ¶ 7; Bradford Dec. at ¶ 9; Lundy Dec. at ¶ 8.

Specifically, deputy sheriff Ruben Ornelas attests:

I can't say Travis was ever any trouble for me.  When I asked him to do something, he would do it.  If I told him to be quiet, he would be. . . . I was more strict with the inmates than other deputies. However, I was consistent and they knew what to expect from me.  I would write up inmates that no one had written up before.  Still, I don't think I ever wrote Travis up.  He knew what I expected from him, so he did that.  He was respectful to me.

Ornelas Dec. at ¶¶ 2-3 (Exh. 40).

36

Likewise, deputy sheriff Richard Styner states that he spend quite a bit of time talking with Mr. Mullis over the course of two years, and Mr. Mullis never rushed the door, threatened him, or came across as intimidating or violent.  Styner Dec. at ¶ 2 (Exh. 41).  In fact, it was quite the opposite.  Mr. Mullis taught him to understand the sign language inmates used, thereby enabling him to understand what was going on around him and keep himself out of harm's way. *Id*. at ¶ 3.

Similarly, deputy sheriff Michael Bradford recalls interacting with Travis on a daily basis and describes him as "respectful" to him and other deputies, "not at all threatening or aggressive" and "an overall good guy."  Bradford Dec. at ¶¶ 1-2 (Exh. 44).  Bradford characterized Travis as "more like an assistant deputy than an inmate," explaining that Travis "wanted the jail to be safe for everyone, and he contributed to making it safe."  *Id.* at ¶ 4.  According to Bradford, "compared to other inmates, Travis' behavior was real good."  When they spoke, Travis would discuss personal things, including his own sexual abuse and the guilt he harbored about his crime.  *Id.* at ¶ 6.

Finally, deputy sheriff Robert Lundy, who had interacted with Travis on a daily basis since 2008, avers as follows:

> . . . [Travis] was a damn near perfect inmate.  Anytime I asked him to do something, he would do it.  I never had any trouble with him. Other than his crime, Travis was the model inmate. . . . he did what I asked and was cooperative.  He would even anticipate what I needed him to do and prepare to do it.

Lundy Dec. at ¶¶ 1-3 (Exh. 42).  From what Lundy observed, Travis "wasn't a threat in jail." *Id.* at ¶ 7.  Lundy explained:

> The prospect of Travis threatening other inmates is laughable.  Other guys would threaten him, but he never threatened or was a threat to anyone else in the jail. . . . I did not see Travis get into anything with other inmates. . . . He got along fine with the other inmates from what I saw.

*Id.* at ¶¶ 4-5.

Regarding the graffiti incident the State presented at trial, all four deputy sheriffs state they did not take this incident seriously and would not characterize it as threatening, but rather as an attention-seeking act of boredom.  Ornelas Dec. at 4 (Exh. 40); Styner Dec. at ¶ 4 (Exh. 41); Bradford Dec. at ¶ 8 (Exh. 44); Lundy Dec. at ¶ 7 (Exh. 42).  Corrections expert Frank AuBuchon interprets it similarly. *See* Declaration of Frank G. AuBuchon at ¶¶ 7-8 (Exh. 43).

At Petitioner's trial, the State referenced the testimony of TDCJ classification and records department employee Mr. Bilnoski, made analogies between Jefferson School and a prison, and suggested that Mr. Mullis' behavior at Jefferson was indicative of how he would behave in prison.  The defense could have countered this testimony and argument through the presentation of their own prison expert.   Because they failed to do so, the State's testimony and argument on this issue went unrebutted.

If called to testify, corrections expert Frank AuBuchon would have testified that Mr. Bilnoski's account of the conditions of confinement Mr. Mullis would be subjected to if sentenced to life without parole was not wholly accurate.  Mr. Bilnoski overstated the leniency Mr. Mullis would be afforded.  *See* AuBuchon Dec. at ¶¶ 9-11 (Exh. 43).  Mr. AuBuchon would have testified as to the difference between the conditions and security measures at Jefferson School and those in prison (particularly for a G-3 prisoner), countering the State's misleading argument that Petitioner's alleged misbehavior at Jefferson forecast how he would behave in prison.  *Id.* at ¶¶ 3-6.

There is a reasonable probability that counsel's deficient representation had an effect on the sentencing outcome.  Had counsel taken the steps described above, counsel could have factually rebutted the allegations of sexual misconduct at Stone Bridge with information in the Sheppard Pratt/Jefferson records, with testimony of Petitioner's therapist at Stone Bridge, and with social services records establishing that the investigation into that report was ruled out or unsubstantiated.  As Michael Smith, a social worker who treated Mr. Mullis at Stone Bridge Respite, states:

> I never heard anything about him being involved sexually with any of his roommates.  If anyone at Stone Bridge had been aware of any incidents of sexual abuse, they would have been required to report such an incident pursuant to Maryland's mandatory reporting law.

Michael Smith Declaration, ¶ 4 (Exh. 4).

39

Had counsel interviewed Ms. Dietz, or other Jefferson School employees, the defense could have presented testimony that the incident was distorted by the prosecution and in reality "was not a big deal." Maldina Dietz Declaration p. 2 (Exh. 5). She did not feel threatened by Mr. Mullis, was not in any way injured and did not report the incident to law enforcement. *Id.* In comparison to an incident with another student, after which she did press charges, she "never considered pressing charges against Travis." *Id.*

Had counsel investigated and presented Galveston County prison employees to establish Petitioner's positive adjustment to jail while awaiting trial and show the insignificance of the graffiti incident, this would have blunted the State's argument that Petitioner was a future danger, even when incarcerated. Had counsel retained and presented a corrections expert to explain that the secure conditions Petitioner would face if sentenced to life were very different from the conditions at Jefferson School, they could have countered the State's misleading suggestion that Petitioner's purported misconduct at Jefferson school was predictive of how he would behave in prison. If the jury heard this evidence, there is a reasonable probability it would have reached a different verdict, at least as to the first special issue.

As set forth herein, the prosecution used the alleged misconduct in the Jefferson records to argue for a finding of future dangerousness under the first

40

special issue, and to rebut the defense mitigation case under the second special issue.  The State's argument that the alleged sexual misconduct and "assault" on a staff member showed future dangerousness was particularly strong, because the State was able to argue that Petitioner had previously offended or threatened to offend while "locked up," and therefore he would continue to offend while imprisoned in the Texas Department of Criminal Justice.  *See* 33 RR 22, 54-56 ("Even while locked up, he continued to offend.  Even while being treated for the sexual crimes he committed and for the mental issues, he continued to offend."); 33 RR 23 ("What do we know about the Defendant as far as when he's in jail . . . he's creating a hit list. . . .").  The State was also able to argue effectively against the defense case in mitigation, which presented Petitioner's troubled family history, sexual abuse, and mental illness.  On the basis of the alleged offenses, the State argued that Petitioner manipulatively took advantage of people who were trying to help him. Had reasonable counsel prevented that argument, or presented evidence and argument to show the allegations were unsubstantiated, the jury would likely have come to a different conclusion either as to the question of future danger or as to the weighing of mitigation.

Appellate counsel who permitted Petitioner to waive his right to counsel on appeal before the record was prepared, failed to review the record and discover that the trial exhibits themselves refuted the allegations of sexual offenses in the

41

juvenile treatment centers, that the discovery refuted the allegation of an assault on Travis' grandmother, and that trial counsel had failed to object to the admission of testimony the trial court had expressly barred.  Had counsel reviewed the record, counsel could have informed Petitioner that this claim was available and raised this claim on appeal.  Because appellate counsel has a duty to review the record, and because there was a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

### E.   The False Evidence Undermines the Reliability of the Death Sentence

The Eighth and Fourteenth Amendments require heightened reliability in capital sentencing.  *See*, *e.g.*, *Gardner v. Florida*, 430 U.S. 349 (1977); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).  The admission of this false and misleading testimony and argument created an unconstitutional risk that the jury decided a sentence of death based on unreliable evidence.  The admission of this testimony and argument, which was used to rebut the defense case in mitigation, also precluded the jury from considering and giving full effect to all relevant mitigating evidence.  *See*, *e.g.*, *Penry v. Johnson*, 532 U.S. 782, 797 (2001).  The jury's consideration of this evidence also violates due process.  *Townsend v. Burke*, 334 U.S. 736 (1948) (sentencing on the basis of materially untrue assumptions about criminal record violates due process.).

42

## II.   PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT CAPITAL SENTENCING, BECAUSE COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT COMPELLING MITIGATING EVIDENCE.

Trial counsel were ineffective in failing to investigate and present mitigating evidence to the jury.  Counsel failed to conduct a complete and comprehensive life history mitigation investigation, failed to prepare a social history report, relied solely on expert witnesses who had never treated Petitioner and on records to portray his life after the age of nine months, and failed to present to the jury a cohesive narrative of Petitioner's lifetime of abuse, abandonment and despair.  As a result, the jury heard content, but not context, and gaping holes were left in the picture presented to the jury.  Counsel's failures enabled the prosecution to trivialize and appear to rebut what should have been powerful mitigating evidence. If the jury had heard the true mitigation case that was available, there is a reasonable probability that at least one juror would have voted for a life sentence. Petitioner is entitled to a new penalty phase.

### A.   The Legal Standard for Ineffective Assistance of Counsel at Penalty

The Sixth Amendment right to effective assistance of counsel is violated when counsel's representation is deficient, in that it falls below "an objective standard of reasonableness," and when the defendant is prejudiced, meaning that

43

confidence is undermined in the outcome of the proceeding. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

At capital sentencing, counsel must present an accurate picture to humanize their client. Counsel's duty is to present to the jury details of the defendant's life story, and show the jury the nature and extent of the abuse and impairments he has suffered, to allow the jury to meaningfully appraise his moral culpability. At the core of the Supreme Court's jurisprudence is the recognition that counsel has a Sixth Amendment duty to conduct a thorough investigation of the defendant's background and to identify all reasonably available mitigating evidence. *See Sears v. Upton*, 561 U.S. 945 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins*, 539 U.S. 510; *Williams v. Taylor*, 529 U.S. 362 (2000). "In assessing the reasonableness of an attorney's investigation," the Court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. The reasonableness of counsel's representation is measured against prevailing professional norms. And, as the Fifth Circuit has emphasized, the duty to humanize one's client is even more important when the facts of the offense are particularly brutal. *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001).

44

To show prejudice, the "undermines confidence" standard requires only "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This standard is not a stringent one, and can be shown by less than a preponderance of the evidence. In considering prejudice and weighing unpresented mitigation evidence, a post-conviction court must evaluate the totality of the evidence–both that adduced at trial, and the evidence adduced in the habeas proceedings.

As discussed below and as Petitioner will show at an evidentiary hearing, trial counsel's investigation and presentation of mitigating evidence did not meet prevailing professional norms, and confidence in the outcome is undermined.

### B. Counsel's Investigation and Presentation of Mitigating Evidence Were Deficient.

Trial counsel must present an accurate, detailed picture to humanize their client. *Walbey v. Quarterman*, 309 F. App'x 795, 803 (5th Cir. 2009). Counsel's duty is to present to the jury the nature and extent of the abuse and impairments the accused has suffered to allow the jury to meaningfully appraise his moral culpability.

The Supreme Court has clearly established that counsel in a capital case must conduct a thorough investigation of the defendant's background and identify all reasonably available mitigating evidence. *See Sears*, *Porter*, *Rompilla*, *Wiggins*, *Williams*, *supra*.

45

The Fifth Circuit and others have held that controlling Supreme Court precedent required habeas relief in similar capital cases. *See Adams v. Quarterman*, 324 F. App'x 340 (5th Cir. Apr. 22, 2009); *Walbey*, 309 F. App'x 795; *see also Williams v. Allen*, 542 F.3d 1326, 1329-30 (11th Cir. 2008); *Gray v. Branker*, 529 F.3d 220, 225-26 (4th Cir. 2008). Applying clearly established federal law, these cases collectively hold that trial counsel in a capital case must make an "informed decision"[10] about mitigation strategy, and must present "the details,"[11] "the full picture,"[12] the "entire,"[13] "cohesive,"[14] and "complete"[15] story, not a "scattered"[16] narrative that is "[in]accurate"[17] or "misleading,"[18] but "the strongest mitigation case possible."[19]

In *Walbey*, for example, trial counsel presented the petitioner's grandmother and two psychologists, but failed to speak to a number of potential witnesses who had first-hand knowledge of his troubled childhood, failed to correct the grandmother's misleading testimony painting a too-rosy picture of Walbey's past, and failed to rehabilitate misleading cross-examination about whether Walbey fit

---

[10] *Adams*, 324 F. App'x at 349.
[11] *Walbey*, 309 F. App'x at 803.
[12] *Gray*, 529 F.3d at 238.
[13] *Id.* at 237.
[14] *Id.* at 235.
[15] *Walbey*, 309 F. App'x at 802; *Williams*, 542 F.3d at 1340.
[16] *Gray*, 529 F.3d at 233 n.2.
[17] *Walbey*, 309 F. App'x at 802.
[18] *Williams*, 542 F.3d at 1340.
[19] *Id.* at 1340.

46

the criteria for antisocial personality disorder.  309 F. App'x. at 796-97.  The court

of appeals, citing case law "that firmly establishes a duty to investigate the

background and character of a capital defendant, along with his family and social

circumstances and mental health history," held that counsel's investigation, and

hence his performance, was deficient because it was "severely limited."  *Id*. at 800-

01; *see also Adams*, 342 F. App'x at 347-49; *accord Lewis v. Dretke*, 355 F.3d

364, 367-68 (5th Cir. 2003) (accepting testimony of petitioner's sisters that trial

counsel never interviewed them, and finding counsel ineffective in capital

sentencing for failing to investigate and present evidence of petitioner's abusive

childhood).

Here, trial counsel failed to conduct a thorough investigation of Petitioner's

background, and as a result could not show the jury "a true picture of [Mr. Mullis']

tortured childhood" and young adult life.  *Lewis*, 355 F.3d at 368.  Trial counsel's

deficient performance resulted in part from their unreasonable caseloads.  Mr.

Mullis' attorneys at trial both had far too many active capital cases leading up to

the trial and, as a result, could not devote sufficient time to Mr. Mullis' case.  *See* 6

RR 5 (defense counsel Bourque: "the problem in this district is that there are only

27 death certified lawyers.  All of us are working…. I have 11 and an additional

two I'm doing appeals on.  I know what Mr. Loper has almost that many, if not

more."

47

Trial counsel's investigation was "severely limited," *Walbey*, 309 F. App'x at 801, and focused narrowly on three themes: (1) Petitioner's birth mother's neglect and health problems during his gestation and infancy, and his resulting neonatal health problems; (2) his adoptive father's sexual abuse of him from ages three to six; and (3) his resulting attachment difficulties and mental health treatment and diagnoses. The focus on these three themes, and counsel's reliance on experts and records to tell the story, left the mitigation presentation bereft of the full story of Travis Mullis' childhood and young adulthood. Trial counsel attempted to avoid the facts of the crime itself, and thus the jury also did not have a picture of the human being who committed this disturbing crime, or of his mental state at the time.

Counsel presented as witnesses a pediatric endocrinologist, a psychiatrist, a psychologist, a mitigation specialist, four people who knew Travis when he lived with his birth mother (two half-siblings, an aunt and a neighbor)[20] and a mentor who knew Travis at twelve years old through a year-long mentoring program.

The four civilian witnesses who testified about Travis' life as an infant were Michael Nicholson, his half-brother; Kendra Witherspoon, his half-sister; Denise Devlin, his maternal aunt; and Me'chelle Black, a family neighbor. All of these

---

[20] Petitioner's birth mother died when he was nine months old. He was taken out of state by his adoptive parents at one year old, and had no further contact with these family members until trial.

witnesses knew Petitioner only when he was an infant, and at the time of trial they had not seen him since he was approximately ten months old.  However, even the testimony that was elicited did not accurately relate the true situation in which Petitioner lived at that time or the extent of the abuse that members of the household endured.

Michael Nicholson testified that he had only recently learned where Travis was and that he would be willing to have a relationship with him if he was sentenced to life in prison, but was not asked to accurately describe the household. He testified that Petitioner's father, Bobby Ray Wallace treated the family "just fine."  32 RR 161.  That was certainly not true, as Petitioner's half-sister Kendra testified that Wallace repeatedly sexually abused her.

Denise Devlin testified that if Travis were sentenced to life, "we can come and see him."  32 RR 189.  She did not describe the out-of-control household in which Petitioner lived as an infant.  Me'chelle Black testified that she was a neighbor and remembered Petitioner as an infant.  She also did not describe the extent of the abuse in the household.  Nor did Kendra Witherspoon, Petitioner's step-sister.  Kendra testified that Travis' father forced her to perform oral sex on him, and that her brother Michael and her grandmother physically abused her. However, the jury was not presented with the complete picture of the abusive

household as described below.  Counsel's failure to present that to the jury was unreasonable.

The only other civilian witness to testify, William Kelly, was a mentor of sorts starting when Travis was twelve years old.  He testified that his role was to be a "trusted friend," not to be a counselor or advisor but simply "somebody a child could come and talk to if they wanted to."  32 RR 16.  He met with Petitioner on a regular basis for a year or so.  It is not clear, however, what the purpose of his testimony was.  He did not offer any real mitigating evidence to the jury.  Indeed, his testimony was more harmful than helpful.  *See, e.g.,* 32 RR 21 (testimony that Petitioner had falsely told Kelly that he had thrown a puppy out a second-story window).

Travis' adoptive mother, whom the defense team never interviewed face-to-face and who never understood what could be presented in mitigation, did not testify.  Anne Mullis Dec., ¶ 19. ("I never spoke with lawyers working on T.J.'s case.  At the time I remember thinking there wasn't anything I could do or say that might help T.J.").  Neither did counsel present testimony from any of the psychologists, psychiatrists or therapists who treated Travis throughout his childhood.

Counsel failed to present any witnesses, including Petitioner's adoptive mother, Petitioner's adoptive mother's boyfriend who was involved in his therapy,

50

or any of his teachers or the therapists or doctors who treated him, to testify regarding his life after he was placed in the custody of his adoptive parents when he was just ten months old.  Counsel did present records regarding that time period through the testimony of the mitigation specialist, but no witnesses who actually interacted with Travis described his life or treatment for the jury.

Habeas counsel have interviewed Anne Mullis, Travis' mother; Sally Ann Jennings, the therapist to whom he first disclosed his father's sexual abuse; Dr. Richard Brokaw, a psychologist from Bay Counseling Service, who treated Travis when he was about 10-12 years old; Dr. Terry Pritt, a psychiatrist who treated Travis at Sheppard Pratt; Rebecca Pate, a friend and girlfriend when Travis was a teenager; Terri Cook, a social worker who provided individual and family counseling to Travis at the Jefferson School; Anne Jenkins (formerly Anne Lawrence), Travis' group therapist at Jefferson School; Teria Pittman, Travis' residential counselor at Jefferson School; Kim Mirch, Travis' residential counsel and teacher at Jefferson School; Sarah Oswald, a registered nurse who assessed Travis when he was admitted to the hospital in a suicidal state; and a number of other people who knew Travis as a child and teenager.  They have all stated that they would have provided the same information to the defense team to which they now attest, and would have testified at trial about their personal knowledge of Travis and his mental health treatment.  *See, e.g.,* Declarations of Richard Brokaw

(Exh. 6), Sallyann Jennings (Exh. 7), Michael Smith (Exh. 4), Terry Pritt (Exh. 8),
Wendy Myers (Exh. 9), Rebecca Pate (Exh. 10); Hazel T. Cook (Exh. 46), Anne
Jenkins (Exh. 47), Teria Pittman (Exh. 48), Kim Mirch (Exh. 49), Sarah Oswald
(Exyh. 45), Michael Bruzzdzinski (Exh. 50), Beverly Hibschman (Exh. 50), and
Maldina Dietz (Exh. 5).

Counsel's failure to secure a comprehensive social history report from a
mitigation specialist also constituted deficient performance.  Social histories are
standard practice in capital cases, and give experts, and juries, the tools to
contextualize a defendant's life experiences.  *See*, *e.g.*, ABA Guidelines 4.1,
commentary (requiring mitigation specialist to "compile[] a comprehensive and
well documented psycho-social history of the client based on an exhaustive
investigation.").  The social history prepared by Petitioner's habeas counsel
explains Mr. Mullis' dysfunctional biological family, neonatal health problems,
adoption and relationship with his adoptive mother, sexual abuse, early childhood
mental health problems, experiences in the juvenile justice system, psychiatric
treatment, transitions from treatment, and adjustment to incarcerated life.  *See*
Declaration of Jessica Johnson (Exh. 57).  This report distills information from
Petitioner's treatment records and affidavits from treating mental health
professionals, family members, teachers and friends into a comprehensive and

understandable mitigation story. *Id.* All of this information was available to trial counsel.

Counsel was also deficient for failing to collect critical, readily available records. As the Supreme Court explained in *Rompilla*:

> With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay, and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim.

*Id.* at 385-86 (footnote omitted).

Here, counsel did not collect records from Travis' psychiatric placement at Stone Bridge/Brook Lane as a young teenager; Travis' juvenile probation records from Maryland; records of Gary Mullis' counseling for committing sexual abuse of Travis; and social services records showing that allegations that Travis sexually

abused other boys during his juvenile placements were unfounded.[21]  Counsel's

failure to secure these records was deficient.

Moreover, because trial counsel did not secure a comprehensive social

history, collect critically important records, or secure testimony or affidavits form

important civilian witnesses, counsel was unable to present the expert witnesses

with the necessary tools for them to conduct a complete assessment.[22]  The experts

at trial did not know:

- Gary Mullis' sexual abuse of Petitioner was far worse than the jury heard;

- Travis first told his mother about the sexual abuse and she did not believe him and ignored hints from her husband and sister in law about it as well; then when the abuse was revealed in therapy, she became irate with Travis;

- Travis expressed remorse to his Philadelphia attorney shortly after his arrest and to prison guards prior to trial;

---

[21] *See also* Claim I regarding the State's misconduct in presenting that evidence, and trial counsel's related ineffectiveness.

[22] Dr. Dudley, a psychiatrist, was additionally handicapped because he was only retained shortly before the trial and did not have sufficient time to completely evaluate Petitioner.  He has indicated that he was preparing to testify for defense counsel Bourque in another capital case in December of 2010, when he was asked to work on Petitioner's case.  He states that he had much less time to work on this case compared to other such cases.  Dr. Dudley also notes that he did not have sufficient preparation time with the attorneys before testifying: "I had much less preparation time with the attorneys than I'm used to having in comparable cases; I was told little-to-nothing about their overall theory or strategy for mitigation and really didn't know much about the penalty phase; and I don't believe that they really spent enough time with me to adequately understand my findings and my opinions."  Dudley Declaration (7/21/13) at ¶ 3 (Exh. 13).

- the extent of the sexual abuse and inappropriate sexual conduct in Travis' birth family; and

- Travis was exploited for sexual favors by multiple older men when he was a homeless teenager.

Counsel was deficient in failing to provide this information to the experts.

A comprehensive social history report and/or testimony from a mitigation specialist, combined with testimony from treating mental health professionals, would have brought to life the records presented to the jury, and put Petitioner's life history, including the crime he committed and a number of allegations of future dangerousness presented by the State, into a sympathetic, understandable context for the jury tasked with deciding his fate.  Without this testimony, the jury was left without the evidence necessary to contextualize Petitioner's life experiences or digest the voluminous mental health records existing in this case.

> **C.     Trial counsel failed to ask the expert witnesses that testified to opine about Petitioner's state of mind on the day of the killing. For these reasons, the jury did not hear all of the compelling mitigating evidence outlined below.  Counsel's performance was unreasonable. Counsel was also deficient for failing to conduct brain imaging, despite information from their consulting neuropsychologist that such testing would likely result in helpful mitigation. Compelling Mitigating Evidence That Could Have Been Presented**

Because of counsel's deficient performance, the jury never heard the compelling mitigation case proffered to this Court, including the full extent of the sexual abuse in Travis' birth home during his infancy; his life with his adoptive

parents, Gary and Anne Mullis; the full extent and impact of Gary Mullis' sexual abuse; firsthand accounts of his years of mental health treatment as a child and teenager; or the story of Travis' sexual exploitation by older men.  Petitioner was prejudiced.  Had the jury heard the mitigating evidence that has now been developed, there is a reasonable probability that the jury would not have reached the same verdict.  Indeed, the law is clear that Petitioner need only establish that there is a "reasonable probability that at least *one juror* would have struck a different balance."  *Wiggins*, 539 U.S. at 537.

### 1.    Mother's Disbelief of Travis' Disclosure of Sexual Abuse.

As noted above, counsel unreasonably failed to develop and present the testimony of Petitioner's adoptive mother.  In a recent declaration, Anne Mullis has indicated that Petitioner told her that Gary Mullis was sexually abusing him, and she did nothing about it:

> TJ had tried to tell me what was happening before.  He said to me, "Daddy is kissing my pee pee."  Unfortunately, I did not believe him until some time later when Gary admitted it.  After that I was kicking myself for not having done something about it when TJ first told me. I have always felt bad about that.

Anne Mullis Declaration at ¶ 6 (Exh. 11).  Gary Mullis' treatment records also indicate that Gary "hinted" to his wife about the abuse, but she did nothing.  *See* Johns Hopkins Treatment Records - Gary Mullis at 7, 352 (Exh. 14).

Sallyann Jennings, who was Petitioner's counselor when he was a child, was also not presented to the jury. It was during her sessions with Petitioner that he first told her of the abuse by Gary Mullis, which was after Petitioner had told his mother. His mother also pushed back when told about it by the therapist.

> When Travis first told me that his father had been "playing with my wee wee" or something to that effect in the bath, Anne was furious with Travis. She asked him why he would say such a thing. She was very protective of her husband after the accusations. It wasn't until after Gary admitted to some of the abuse that she accepted it and realized she was wrong for not believing Travis.

Sallyann Jennings Declaration at ¶ 4 (Exh. 7).

Candy Reinhardt, who was married to Anne's brother Steve Barry, provides additional insight into Anne's relationship with Travis. Trial counsel did not speak to her and thus she was not able to share those insights at Petitioner's trial. Declaration of Candy Reinhardt at ¶ 10 (Exh. 56). Ms. Reinhardt helped Anne care for Travis. During this time, she recalls Travis telling her Gary was touching him in the bath. When she realized the seriousness of what Travis was saying, she told her husband and Anne what Travis had said, but they did not believe her. *Id.* at ¶ 4. According to Ms. Reinhardt, even after Gary confessed to having abused Travis, Anne remained in denial. Ms. Reinhardt recalls that "[i]t took a while before she believed TJ." *Id.*

57

Ms. Reinhardt states that Travis "seemed fine until everything happened with Gary." *Id.* at ¶ 3. Then, things changed drastically. During the year Travis lived with Anne, following his discharge from Jefferson, Travis decompensated.

> Trash was piled up feet high in the basement. There were holes in the walls. TJ had spilled paint and covered it with newspapers. One corner of the basement TJ had used as a restroom.

*Id.* at ¶ 9. Ms. Reinhardt reports "Anne wrote TJ off after she bought him the ticket to Texas. She had adopted him but when he turned 18, she was done." *Id.* at ¶ 8. In response to Anne's treatment of Travis, Ms. Reinhardt states: "It's got to be a sad thing to know no one cares about you." *Id.*

This information has now been provided to Dr. Dudley and Dr. Mendel. If it had been provided to the experts at the time of the trial, the jury would have heard compelling testimony regarding the devastating effect that this had on Petitioner's mental state.

> As Dr. Dudley explained:

> It has been well established that a parent's refusal to believe a child's report of being sexually abused and associated refusal to help/protect the child dramatically magnifies the damaging impact of the sexual abuse on the child's development. Given the history of Travis' relationship with his adoptive mother that he reported to me, I was surprised when he told me that he called her on the night of the crime (as he was deteriorating and did not know what to do/prior to the crime itself). When he talked to me about this it was clear that her lack of responsiveness to him that night was clearly devastating to him and clearly contributed to his continued deterioration; however now, knowing that she did not believe his childhood report to her of being sexually abused, I understand even more why he was so

58

devastated by this repeat/re-enactment of his childhood experiences with lack of help from or protection by her.  Had I known this at the time of the trial, this information would have further allowed me to explain Travis' mental state the night of the crime.

Richard Dudley Declaration (7/21/13) at ¶ 14 (Exh. 13).

Dr. Mendel declares:

If I had known about this at the time of the trial, I would have presented very strong opinions to the jury about the huge effect this had on Travis.  First, presumably if she had believed Travis in the first place, this deal of crucial additional information on this point and further evidence for Travis' sense of Anne Mullis as an untrustworthy, unsupportive individual.  The failure to protect Travis by his mother had a profound negative impact on his overall mental would have lessened the duration of the abuse (and perhaps its severity, as it appears that it escalated over time).  We know that duration and severity are both negative factors in future outcome for victims.  Additionally, this certainly played a role in Travis' relationship with his mother and his anger at and mistrust of her.  Essentially, he turned to her for help and protection and she did not provide it.  During the penalty phase, I spoke extensively in my testimony about his mother as one of the individuals who abandoned him.  I recall that the prosecution attacked this notion.  I have recently been provided additional evidence regarding Travis' relationship with his mother, declarations of Travis' therapist, Sally Ann Jennings, and his psychologist, Richard Brokaw.  These declarations, in addition to the acknowledgments from Anne herself, provide a great development.

Mendel Declaration (7/18/13) at ¶ 4 (Exh. 16).

Dr. Reynolds, who is an expert in trauma resulting from child sexual abuse, has also opined on this topic.  Initially, she describes how children like Petitioner, who are sexually abused, assume that the non-abusing parent knows about the

59

abuse.  The fact that his mother did nothing to stop it had a profound effect on

Petitioner's developing mental state:

> From infancy to 3 or 4 years of age, children are incapable of
> distinguishing mental boundaries the way an older child can, thus
> Travis would have thought his mother was aware of the abuse, even if,
> in fact, she wasn't.  He would have expected her to interact with him
> about it, to stop his father or to intervene in some way.  This
> perception that his mother knew, but did nothing to stop the sexual
> abuse would have constituted, for the very young Travis, a
> psychologically catastrophic failure of protection – especially when
> laid on top of the physiologic remnants of neglect in his earliest
> infancy prior to his adoption.

Reynolds Report at 3 (Exh. 17).

Dr. Reynolds also discussed the impact of Petitioner directly telling his

mother about the abuse:

> Unfortunately, such invalidation continued.  When Travis did tell his
> mother about the sexual abuse more directly, prior to the father's
> admissions, Anne Mullis did not believe Travis and became angry
> with him.  Her initial denial of this disclosure was a crucial aspect of
> the traumatizing impact of Gary Mullis' sexual abuse.

*Id.* at 4.  The jury never heard this compelling mitigating evidence.

## 2.     The Sexual Abuse Was Far Worse than the Jury Heard.

Counsel presented evidence through the testimony of the mitigation

specialist that Travis was sexually abused by his adoptive father, Gary Mullis.

Expert testimony was also presented through Dr. Mendel and Dr. Dudley to

discuss the significance of that abuse.  However, available records obtained

recently show that the sexual abuse by Gary Mullis was far worse and more brutal

60

than the evidence presented to the jury.  Because counsel failed to obtain critical, readily available records in this regard, the jury did not hear the true nature of the repeated sexual abuse which Travis suffered.

The jury was told that Gary Mullis sexually assaulted his son approximately six times.  *See*, *e.g.*, 31 RR 122-24 (Dr. Mendel's testimony that the records describe 6-7 incidents).  They were also told that the extent of the sexual abuse was that Gary would take Travis' penis into his mouth.  The jury was not told that Gary Mullis later, in treatment, admitted to at least 12 incidents of abuse, double the number presented at trial, and that he admitted to masturbating himself to orgasm while performing oral sex on Travis.  *See* Johns Hopkins Treatment Records - Gary Mullis at 6, 351 (Exh. 14).  Further, medical information in other records, including the recently uncovered Stone Bridge/Brook Lane records, creates a strong suspicion that Travis was anally raped or experienced some sort of anal penetration as a young child.

Undersigned counsel has recently obtained previously available records from Brook Lane treatment center, where Petitioner was treated on an inpatient basis as a child.  Those records indicate that Petitioner was treated for anal fissures and rectal bleeding.  *See* Brook Lane Records at 30 (Exh. 18).   These records have now been provided to Dr. Dudley, Dr. Mendel, Dr. Katz and Dr. Reynolds.  These

61

experts have opined that these physical manifestations are consistent with Petitioner having been anally raped or penetrated by Gary Mullis.

Other records that counsel did obtain also support this conclusion and should have prompted further investigation by counsel. For instance, the Petition for a Child in Need completed upon Travis' report of the sexual abuse, when he was six years old, describes evidence consistent with anal rape and inconsistent with Gary Mullis' report that the abuse was only oral sex: "Travis also spoke of his bottom hurting him, to the point where it was hard for him to sit down at school. He would have 'gooey gunk' put on his bottom by his parents." Harford County Petition for Child in Need of Assistance at 2 (Exh. 19). Counsel failed to follow up on this red flag and failed to present this to the jury. Travis' medical records also indicate that he was late to potty training, consistent with a history of sexual abuse.

Dr. Katz has reviewed some of these records recently. He states that "[a]nal fissures are generally indicative of anus manipulation; they are a reflection of trauma to that area of the body." Katz Declaration at ¶ 6 (Exh. 20). He also states that records showing that Petitioner was not potty trained until age four "may have been another indicator of sexual abuse." *Id.* at ¶ 7. Counsel presented Dr. Katz to the jury, but unreasonably failed to provide him with this information and failed to inquire in this area: "Mr. Bourque never asked me to opine about Travis' history of

62

anal fissures, rectal bleeding or late potty training.  Had he inquired, I would have told him what I stated above." *Id.* at ¶ 8.

Dr. Dudley, Dr. Mendel and Dr. Reynolds have similar opinions.  Dr. Mendel states as follows:

> The fact that Travis was likely anally raped by this father would have been tremendously important to know about.  My previous knowledge of the sexual abuse was that it was limited to - at its most extreme - fellatio.  The presence of anal fissures make it quite likely that it included anal rape.  This is a more severe (and more physically painful act) especially for an infant/toddler/young child.  It is much more traumatic and likely to be experienced as far more invasive, painful, and abusive.  I also think it could have been very relevant in testimony.  Simply put, I think it likely would have had a much more powerful impact on the jury to hear from me that Travis' adoptive father, Gary Mullis, anally raped him, probably repeatedly, from infancy or toddler years until about age 6.  That, I think, would have come across, as much more enormous and egregious and harmful, than does oral sex.

Mendel Declaration (7/18/13) at ¶ 9 (Exh. 16).  *See also* Dudley Declaration (7/21/13) at ¶ 9 (Exh. 13) ("This additional information would have allowed me to testify to the severe psychiatric implications that this abuse had on Travis' mental development.").

Dr. Reynolds has detailed the severe impact that such sexual abuse had on Petitioner's development.

> Another unique impact that played a large part in Travis' adult behavior and was a direct result of his childhood history of sexual abuse was his omnipresent fear of being anally raped. Despite Travis's inability to recall if his father anally raped him, there are a number of concerning indicators that this may have occurred,

63

including physical ones. Travis had a history of late potty training, as well as GI bleeding and anal fissures. These problems were not necessarily associated with any complications related to his NEC condition at birth, and were more likely associated with infection or physical trauma to that area of his body (see declaration, Dr. M. Katz). Further, Travis's very specific fear of anal rape and the lengths to which he goes to avoid anal contact, even while engaging in other sexual contact with men is also an indication of this being a trauma-related fear. While he does not let this fear be known to others or even himself, it continues to function as a significant source of anxiety. Avoidance of anal penetration and the terror of this occurring out of his control has influenced many of Travis's past and current decisions.

Dr. Reynolds Report at 11-12 (Exh. 17). *See also id.* at 12-14 (describing posttraumatic symptoms and fear-based behaviors as a result of the sexual abuse perpetrated on Petitioner as a child).

Because of counsel's deficient performance, the jury did not hear the horrific extent of the sexual abuse perpetrated on Petitioner by his adoptive father. Nor did the jury hear expert testimony regarding the devastating effect being anally raped by his father had on Petitioner's mental development.

### 3. Sexual Dysfunction in Travis' Birth Family.

As noted above, counsel presented four witnesses who discussed the household in which Petitioner lived until he was about nine months old. One of those witnesses, Kendra, Petitioner's step-sister, testified that she was sexually abused by Petitioner's father. However, because of counsel's deficient performance, the presentation to the jury did not even scratch the surface of the

sexual dysfunction that was rampant in that home while Petitioner lived there.  For example, Travis' father abused not only Kendra, but also Michelle and when this was revealed to Travis' mother, she was critical of Michelle, not Travis' father.  In addition, Travis' birth mother herself sexually abused two of her own children, Petitioner's brother Michael and sister Kendra.  *See* Declaration of Kendra Witherspoon at 11 (Exh. 52); Declaration of Joanne Wallace at ¶ 7 (Exh. 53); Declaration of Lori Russell at ¶16 (Exh. 54); and Declaration of Margaret Wallace at ¶ 5 (Exh. 55).  The mental health experts were not provided with this crucial evidence.  Undersigned counsel have recently uncovered this previously available evidence, as set forth below, and have provided it to the mental health experts.

Although Petitioner's half-sister Kendra Witherspoon testified at trial, she did not reveal all that she knew because she was not asked to do so.  She testified that her father Bobby Wallace (also Petitioner's biological father) did inappropriate things to her, but she did not explain what those things were. 32 RR 213-214; Witherspoon Dec. at ¶ 2 (Exh. 52).   She testified that her grandmother was mean to her, but she did not explain the abusive things her grandmother did that made her feel that way.  32 RR 217-218; Witherspoon Dec. at ¶ 5.  In addition, Ms. Witherspoon was not asked, nor did she mention, anything about her mother's inappropriate sexual interactions with her, her mother's emotionally abusive treatment of her sister Michelle, her suspicions that her father was also abusing

65

Travis when he was an infant, or the impact that this abusive environment had on her throughout her life.

Ms. Witherspoon describes her father Bobby as a "scum ball" who sexually abused her when she was only eight and nine years of age. He would take her to his bedroom or to the bathroom and kiss her on the lips, fondle her, and force her to give him oral sex. *Id.* at ¶ 2. While her mother was often present in the home when this abuse occurred, she was afraid to tell her, having learned from her sister Michelle's experience this would only lead to more abuse. According to Kendra, when Michelle told their mother that Bobby raped her, her mother called Michelle "a slut" and said she "wanted it." *Id.* at ¶ 3. Hearing this, Kendra explained: "I knew there was no point in telling mom what Bobby did to me." *Id.*

Ms. Witherspoon further recounts her suspicion that Bobby abused TJ as well, when he was just an infant:

> [O]n two occasions, I was playing and Bobby picked TJ up and took him into my mom's bedroom. They were in there for up to half-an-hour. I was scared and concerned about what was happening. I knew what happened when Bobby took me in there. I was just a kid and scared of Bobby myself, so I couldn't go in there or stop him.

*Id.* at ¶ 4.

Ms. Witherspoon explains that her mother was sexually abusive to her and her brother Michael, and that Michael was also sexually inappropriate with her. She recalls her mother asking her to touch her breasts and vagina. *Id.* at ¶ 6. She

66

also recalls learning her brother Michael was sexually involved with her mother. According to Ms. Witherspoon, this made sense given they slept in the same bed together and seemed close in a "romantic way." *Id.* at ¶ 7. Finally, she avers that Michael would watch her take a shower, come in her room when she was changing her clothes, and look at her in a sexual way. *Id.* at ¶ 9.

Ms. Witherspoon recalls her grandmother being extremely insulting, degrading, and verbally and emotionally abusive to both her and her mother. She would make fun of her mother for being on welfare and call her a "fat lazy slob" and "trash." *Id*. at ¶ 5. She would tell Kendra she was dirty, her hair smelled, and she had a bad mom. *Id.*

Ms. Witherspoon explains how this sordid environment impacted her. She describes herself as thinking no one cared about her and as "full of hate" as a young person. She states that she currently "struggles with depression and anxiety," to the point that she tried to kill herself multiple times. She currently takes medication, which has afforded her some stability. *Id.* at ¶ 10.

Joanne Wallace (Bobby Wallace's first wife), Lori Russell and Margaret Wallace (Petitioner's half sisters) could have provided additional compelling testimony about the depth and extent of abuse, dysfunction and mental health problems in Petitioner's biological family.

67

Joanne explains that Bobby, Travis' biological father, did not have a great upbringing.  His father died young and his mother despised him, seemingly blaming him for his father's death.  Joanne Wallace Dec. at ¶ 2 (Exh. 53).  During her marriage to Bobby, she recounts that he was in and out of prison, ran off with other women (even having a baby with someone in Louisiana), and was physically abusive to her.  *Id.* at ¶¶ 3-4, ¶ 6.  Joanne was left to fend for herself.  Struggling to pay the rent and buy food, she eventually moved in with her mother.  *Id.* at ¶ 3.  Joanne and Bobby's two youngest children were taken away from them and eventually put up for adoption.  *Id.* at ¶ 4.  In 1985, Joanne and Bobby divorced and Bobby took up with the next door neighbor, Sheila (Travis' mother and, incidentally, Joanne's friend).  *Id.* at ¶ 5.

According to Lori Russell, her father Bobby was not a good person.   Russell Dec. at ¶ 2 (Exh. 54).  He drank all the time and she suspected he used drugs.  *Id.* at ¶ 8.  He was in and out of prison and ran off various times, leaving his family behind.  *Id.* at ¶ 9.  He sexually abused her as a child, sneaking into her bedroom at night to touch her privates and to force her to touch him and give him blow jobs.  *Id.* at ¶ 5.  When she told her mother, she did not believe her.  *Id.*  Bobby also had sex with Lori's sister Joanne, in exchange for money Joanne used to buy drugs.  *Id.* at ¶ 6.

Ms. Russell recounts her father beat her mother all the time, and she heard that her mother's second child, Bobby Ray Junior, died soon after birth as a result of these beatings. Her mother, who she heard was raped at around 14 years of age and never the same after that, fell into a deeper depression after Bobby Ray Junior died. She rarely got out of bed and was unable to care for Lori or her four other children. *Id.* at ¶ 3. According to Ms. Russell, the family did not have any money and she and her siblings rarely had enough to eat. *Id.* at ¶ 10. Her two youngest siblings, Mary and Josh, were removed from the family at a young age, and Lori herself was in and out of foster care. *Id.* at ¶¶ 4-5.

Margaret Wallace, Petitioner's other half sister, reports that she too grew up in and out of foster and group homes. Margaret Wallace Dec. at ¶ 2 (Exh. 55). She recounts the effects of this dysfunctional family environment on her and her siblings. At the age of 15 or 16, she was diagnosed with bipolar disorder and has been on and off medication ever since. She experiences mood swings, from debilitating depression to extreme mania, but medication helps her manage her symptoms. *Id.* at ¶ 3. Her brother Joshua, who was adopted when he was young, currently suffers from ADHD. *Id.* at ¶ 4.

Anne Mullis has also explained that Gary Mullis' own history of child sexual abuse was at the hands of his mother, Gladys Mullis. *See* Anne Mullis Declaration at ¶ 3 (Exh. 11). Gladys was Travis' biological grandmother. He was

69

sent to live with her at the age of nine months, after his birth mother died and before the adoption went through.  Thus, Travis had both environmental and biological exposure to sexual abuse through his mother's household (where his mother and father both abused children) and his grandmother.  Again, the jury heard none of this.

> Dr. Mendel states:
>
> I do not recall being aware of this history at the time of the trial.  This evidence would have added to my understanding of Travis, and particularly to the huge range of risk factors he faced.  Essentially, a genetic basis of aggression, violence, and abuse would have been added to the risk factors I focused upon: abandonment, sexual abuse, and early childhood lack of attachment.

Mendel Declaration (7/18/13) at ¶ 7 (Exh. 16).

Dr. Dudley has also had the opportunity to consider this evidence for the first time and concurs that evidence of sexual abuse in the biological home would have increased his understanding of the severe risk factors to which Petitioner was subject.  *See* Dudley Declaration (7/21/13) at ¶ 9 (Exh. 13).

### 4.    Petitioner's Childhood and Adolescent Mental Health Treatment.

Due to failure to investigate, the defense did not present witnesses who knew Travis when he was a child and teenager.  Thus, the jury never heard first-hand accounts of how vulnerable and immature Travis was during those years; how he had tremendous difficulty making friends or maintaining stable relationships; or

that his mood instability improved when he was on medications and receiving treatment. The jury also never heard from staff at Stone Bridge that they had no knowledge of Travis' alleged sexual misconduct while at that facility when he was 13. Nor are there any records indicating that such an incident occurred. To the contrary, staff remember that he was a "runt," smaller and less physically mature than his peers, and from a different background, as most of the other children were African-American kids from urban areas. *See* Michael Smith Declaration at ¶¶ 3-4 (Exh. 4); Wendy Myers Declaration at ¶¶ 3, 7 (Exh. 9).

As noted elsewhere, Sallyann Jennings was Travis' counselor for a number of years, including during the time that the sexual abuse by his father came to light. She would have been a compelling mitigation witness to present to the jury. She could have testified about his therapy, the interaction with his parents, the reaction to the revelations of sexual abuse and other dynamics in Travis' childhood. For example, she could have presented a first-hand account of her interactions with Anne Mullis:

> I began working with Travis when he was four years old. I immediately noted that his parents, Anne and Gary, had issues. For instance, Anne introduced Travis as her adopted son. Presenting him that way stressed the importance of his "otherness" in the family unit. Anne was very critical of Travis and everything that he did. On the other hand, she had nieces and a nephew that were biologically related to her. They seemed more important to her. She saw Travis as someone who was just giving her grief.

Sallyann Jennings Declaration at ¶ 2 (Exh. 7).

She also could have testified about Travis' interactions with his cousins and

how Anne removed Travis from treatment at a critical time:

> After Anne and Gary separated, Anne reported that Travis was
> playing sexual games with his cousins.  I forget what happened
> exactly, but it was relatively minor acting out compared to the offense
> he was sent to The Jefferson School for as an adolescent.  Anyway,
> Anne was livid about it.  She accused me of failing to treat him.  I
> recall her angrily firing me after one incident.  I always felt like I was
> on eggshells with her.
>
> * * *
>
> Anne didn't seem to hear anything I said to her about Travis'
> treatment.  I tried to explain to Anne what was happening when Travis
> acted out sexually but she did not seem to understand.  She went
> through the motions of trying to get him some help, but she wasn't
> engaging in the process. When Anne discontinued treatment with me
> for Travis, it was a crucial time for him to be in treatment.  Travis
> needed to continue to have a space to process the sexual abuse.  I told
> her that he didn't need to be in treatment with me, but he needed to be
> in treatment.

*Id.* at ¶¶ 5, 7.  Instead of the rote entry of records that trial counsel proffered to the

jury, this witness could have described the mitigating aspects of Travis' life in a

compelling manner.  Moreover, the theme of institutional failure, which trial

counsel failed to recognize, investigate or present, could have been explained

through Ms. Jennings' testimony.

Richard Brokaw, a psychologist, treated Travis when he was ten or eleven

years old for about a year.  He was never contacted by the defense.  Had he been

asked to testify, he could have explained his interactions with Travis during that time. He, too, could have explained his interactions with Anne Mullis and Travis' grandmother:

> During these consultations, I got the sense that Travis' mother felt completely overwhelmed by her son and his behavior problems. Her attitude was, "I didn't sign up for this." She had adopted Travis with her ex-husband who was biologically related to Travis. With her ex-husband out of her picture, her connection with Travis was tenuous. I felt that she was burnt out. When she was confronted with specific issues such as Travis' shoplifting habits, she tended to minimize them. She lacked the resources to respond adequately and productively to his problem behaviors. Travis' grandmother was not capable of compensating for Anne's exhaustion. Travis and his grandmother did not have a positive relationship. She seemed to irritate Travis.

Richard Brokaw Declaation at ¶ 2 (Exh. 6).

Dr. Brokaw also could have described for the jury Travis' positive response to structure:

> Travis let me know, early on in our therapy sessions, that his life was chaotic and he felt insecure. He did this in a very memorable way by trying to impose structure in our therapy sessions. In our first meeting, Travis marched in, pointed at me and said "you listen to me, I've been through this therapy before, I know what's going on, just so we are clear, I'm running the show here." I kept my amusement to myself at the time, but it was funny to see such a scrawny child trying to lay down the law like that. I asked if he was finished, then I told him to sit down. I told him it was my office and I had rules he needed to abide by. Travis clearly appreciated my response and reacted positively to the limits I established. He clearly needed structure and responded well to it.

*Id.* at ¶ 3.

Additionally, Dr. Brokaw could have described Travis' difficulties for the jury. For example, he could have explained Travis' history of loss and how he attempted to deal with that in therapy. He also could have testified: "Travis had difficulty making friends and I recall him sharing with me his impression that a lot of people hated him. He told me kids his own age didn't like him and one of our goals was to try to increase his peer relationships." *Id.* at ¶ 5. Simply, he could have presented a sympathetic picture of Travis as a child, one that the jury never heard.

Counsel also failed to present any of the mental health professionals who treated Travis at any of the inpatient placements. Testimony from these witnesses would have humanized Petitioner, painting a compelling and sympathetic picture of a severely mentally ill young man, who was self-conscious, overly sensitive to rejection, struggled to fit in, and frequently expressed guilt surrounding his own abuse and remorse for his own misdeeds. These witnesses would have explained, first hand, the familial difficulties and institutional failures he experienced throughout his childhood. This would have given the jury a compelling basis to reject the State's characterization of Petitioner as a self-centered, manipulative person who lacked a conscience and was provided every opportunity to thrive, but failed to do so.

74

One of these treating professionals was Hazel "Terri" Cook, a Licensed Clinical Social Worker and Travis' individual and family therapist at Jefferson School for a two and a half year period. Ms. Cook was available and willing to testify at trial. Cook Dec. at ¶ 15 (Exh. 46).

Ms. Cook explained Travis' severe mental health and resulting social and interpersonal problems:

> TJ was a withdrawn, shy, and very depressed young man. He was emotional, impulsive, and easily overwhelmed. He had multiple mental illnesses including depression, anxiety, and PTSD. He had flashbacks of his father sexually abusing him. He took medication for depression and anxiety. In my experience, patients with symptoms as severe as his have the best prognosis when they remain on medications for the long term.
>
> * * *
>
> TJ was bullied by his peers. He was not an aggressive kid; he wasn't violent. TJ wanted friends desperately. He wanted people to like him. He tried hard to fit in. He would try to act cool, but he never really succeeded. . . . He had a poor sense of self and poor self-esteem.

*Id.* at ¶¶ 3, 5.

Ms. Cook explains that Travis, unlike other students, did not need to be restrained frequently. She recounts that when he was having flashbacks or other problems, or simply "to get recentered," Travis voluntarily secluded himself in the "quiet room." She described the quiet room as a ten by ten foot room with mats on the floor, a steel door and a small window where students could go voluntarily

75

or at the direction of staff.  She recounts that Travis voluntarily used the quiet room "a lot."  *Id.* at ¶ 4.

Ms. Cook recalls that Travis experienced much angst and guilt in response to his father's efforts to reconnect with him after getting out of jail.  She described Travis' response to his father's letters and calls as "emotionally catastrophic."  *Id.* at ¶ 7.  Ms. Cook also recalls how Travis' mother was "very upset and sad about the choices Travis had made" and how Travis inadvertently pushed her away due to his overwhelming fear that she would abandon him as others had in his life.  *Id.* at ¶ 8.  According to Ms. Cook, Travis was making progress in therapy and was "able to express genuine guilt and remorse" for his offenses against his cousin.  *Id.* at ¶ 13. Such testimony would have countered the State's portrayal of him as remorseless and indifferent to anyone but himself.  *See e.g.*, 33 RR 58 ("He doesn't have a life compass. He doesn't have a conscience. He doesn't know right from wrong. He knows it's all about me.  He sees people as things to be used, not as people to be used, as objects to be used.").

Ms. Cook recalls multiple times where Travis "stormed out of family therapy . . . because he was stressed and needed to do something quick to stop the emotional pain he was experiencing."  *Id.* at ¶ 9.  Ms. Cook explained that this was Travis' default reaction when he was emotionally overwhelmed:

> When something was too much for him to handle emotionally, he would leave without thinking.  He didn't make a connection between

cause and effect, between him taking off and his mother being hurt. At these times, when he was overwhelmed and stressed, he wasn't thinking.  He needed the emotional pain to stop, and he'd stop it without thought of consequences.

*Id.*

Ms. Cook also recounts how, despite constant supervision, "a lot of sexual acting out happened" at Jefferson.  *Id.* at ¶ 12.  This did not surprise Ms. Cook, who stated that "[b]eing over-sexualized like this is commonplace with victims of sexual abuse."  *Id.*  Such testimony would have put Petitioner's alleged sexual misconduct while in placement – to the extent it was even substantiated – into this appropriate context.

Another person who worked extensively with Travis was Anne Jenkins (formerly Anne Lawerence), a Licensed Clinical Social Worker and group therapist at Jefferson School.  Ms. Jenkins worked with Travis from the day he was admitted to the day he was discharged.  She described Travis and his experience at Jefferson School as follows:

Most, if not all of the boys in the program were severely damaged and traumatized.  Amongst this traumatized group, *Travis stood out as one of the most emotionally damaged.*  He definitely suffered a significant amount of trauma in his life.

Travis was socially awkward.  He did not fit in well with the other members of the group and his peer group did not respond well to him either.  Travis was not an overtly aggressive individual while at Jefferson School.  In the facility, we were authorized to physically restrain clients and some clients were "frequent fliers" when it came to being restrained.  Travis was not one of these frequent fliers.  In

fact, if anything, he was more likely to be victimized, rather than be
the aggressor.  As I said, he was not well liked or received by his
peers.  He was frequently the victim of bullying, and frequently was
an antagonizer of his peers.

Anne Jenkins Dec. at ¶¶ 6-7 (Exh. 47).

Calling into question whether Mr. Mullis' purported acts of sexual

aggression while at Jefferson School actually happened, or at the very least putting

them into context, Ms. Jenkins explained:

Sexual contact, consensual or otherwise, occasionally occurred at the
facility.  Sexually abused individuals often become sexually
provocative and act out sexually.  When a group of sexual offenders
are housed together, it only increases the risk of this occurring.  While
the boys at Jefferson were constantly monitored, staff members
worked hard to be vigilant, however, at times, incidents like this
occurred.  These incidents were always documented by the staff
members in incident reports and then were reported to CPS for them
to take further action if they determined that was necessary.

*Id.* at ¶ 5.

Ms. Jenkins characterized the overall experience for sex offenders at

Jefferson School (who were kept segregated from the rest of the facility) as

"stigmatizing at times."  *Id.* at ¶ 2. She went on to describe Travis' discharge from

Jefferson as less than ideal:

I cannot recall exactly why, but Travis' discharge did not sit right with
me.  He had only reached the second (Silver) of four levels, while it
was preferred that clients had reached the third (gold) level.

*Id.* at ¶ 8.

Kim Mirch, one of Travis' residential counselors and assistant teachers at

Jefferson School, was also available to the defense at the time of Petitioner's trial.

Ms. Mirch describes Travis and his experience as follows:

> Travis was a smart kid.  He was impulsive, but I don't remember him
> having a lot of problems.  Travis did well in a structured environment.
> He was controllable and participated in the activities I planned for
> students. . . .Travis was one who would follow directions.  I did not
> have trouble predicting his behavior.  Travis was trusted enough to be
> allowed certain privileges. . . . In the classroom . . . he was the type of
> student you would give an assignment to and he would just do it.  He
> didn't need much supervision.

Mirch Dec. at ¶ 4 (Exh. 49).

Ms. Mirch described how Travis responded well to rules and expectations,

and when he was anxious or thinking of offending or hurting himself he would

reach out for help.  He would come to her to talk it out, ask for a community

service assignment to keep himself busy, or walk himself over to the quiet room

where he could feel safe.  *Id.* at ¶¶ 5-6.

Ms. Mirch described Travis' fear of being hurt by others:

> The way Travis interacted with Anne [his adoptive mother whom she
> refers to as his "aunt"] was distant. Travis stuck by himself with his
> peers too.  He wasn't one of the crowd and he didn't get close to
> anyone in particular.  As a defense mechanism, it makes sense that
> Travis would stay distant thinking that if he wasn't close with anyone,
> they couldn't hurt him.

*Id.* at ¶ 7.

Sharing Ms. Jenkins' sentiment, Ms. Mirch expressed her frustration at

Jefferson School's lack of an aftercare program, which she thought set Travis and

79

other students up for failure.   She described this flaw as "not making any sense"

and said it upset her.  According to Ms. Mirch:

> Travis should not have been put back into the community and left
> alone.  We tried to teach him better coping skills, but in the end we
> just let him walk out the door and say "see you."

*Id.* at ¶ 11.

Teria Pittman, a residential counsel at Jefferson School who worked with

Travis, was another compelling witness the defense failed to interview.  She avers

as follows:

> Compared to other students in the two residential sex offender houses
> at Jefferson School, Travis did not stand out in my mind as a problem
> student.  Unlike other kids, I do not recall him needing to be taken
> down or physically removed to the quiet room on a regular basis. . . .
> He was not violent to other kids or to property.
>
> Travis was an introverted, shy kid, who seemed to keep to himself
> quite a bit.  He seemed rather isolated from the other students.  Travis
> never seemed to fit in with his peers, although he tried hard to be a
> part of the group.  He seemed to prefer interacting with staff, as
> opposed to other students his age.  I think it was a trust issue, he
> seemed to feel safer when he was around staff.
>
>         * * *
>
> I recall at least two students whose parents were very involved in
> therapy sessions.  Travis was not one of these students.  I do not recall
> Travis' mother was particularly involved in his treatment.  I do not
> recall interacting with her much.

Pittman Dec. at ¶¶ 2-3, 5 (Exh. 48).

Michael Bruzdzinski, Anne's boyfriend who attended family therapy

sessions at Jefferson and had extensive contact with Travis after his discharge from

Jefferson, was also available to testify, but was never called. Bruzdzinski Dec. at ¶ 14 (Exh. 50). Mr. Bruzdzinski describes Travis as lacking coping mechanisms, being unable to stop and think before he acted, and not understanding the consequences of his actions. *Id.* at ¶¶ 2, 4. He recounts numerous examples of this, including Travis getting upset and punching holes in his bedroom wall and destroying his Walkman. *Id.* at ¶¶ 5-6.

He also recalls Travis having serious issues with self-esteem, trust, rejection and abandonment. According to Mr. Bruzdzinski, Travis never got past the fact that he abused his cousin, and always felt like people were judging him even if they were unaware of his history. *Id.* at ¶ 7. He recounts how Travis blamed himself for his parent's divorce and was hurt by his Uncle John having completely written him off. *Id.* at ¶ 9. He explains that Travis operated from the premise that people were lying to him and would only end up hurting him in the end. *Id.* at ¶ 10. According to Bruzdzinski, Travis understood "no" to mean you are against me and don't love me. *Id.* at ¶ 4. Overall, Mr. Bruzdzinski recalls that Travis' problems "kept him from rational behavior." *Id.* at ¶ 12.

Based upon what he observed, Mr. Bruzdzinski felt that Travis was not ready to be discharged from Jefferson School, which happened "very suddenly." *Id.* at ¶ 3. He recounts that this transition was rough for Travis, as well as for Anne. There appeared to be no resources available to help Travis adjust, and his

81

probation officer at the time "had marginal contact with Travis" and "did not provide support." *Id.* at ¶¶ 3, 8. Anne was in a constant state of despair, "crying about everything" and expressing that she felt like a failure. *Id.* at ¶ 3. In the meantime, Travis was deteriorating considerably, to the point that right before he moved to Texas, "he was living in a world of make believe." *Id.* at ¶ 8. Mr. Bruzdzinski recalls Travis becoming increasingly hostile and paranoid, saying people were after him and threatening to kill him. Mr. Bruzdzinski characterized the situation as "really bad" towards the end of Travis' time in Maryland. *Id.* When Bruzdzinski heard Travis was married and his wife was pregnant, he recalls thinking how ill-equipped Travis was to care for a child. He recalls Anne definitely stating she did not have any plans to visit Travis or the baby. *Id.* at ¶ 11.

Sarah Oswald, an RN who assessed Travis when he was brought into Hartford Memorial Hospital in March of 2000 and ultimately transferred to Sheppard Pratt for one of his numerous inpatient stays, was also available and willing to testify at Petitioner's trial. Oswald Dec. at ¶ 5 (Exh. 45). According to Ms. Oswald, upon admission to the emergency room, Travis was agitated and his speech was pressured and fast. She concluded, as did an evaluator from the Mobile Crisis Unit, that Travis had "a clear suicidal intent with a plan." *Id.* at ¶¶ 2, 4. She assessed Travis to be at the highest triage priority level of 1, meaning that he required immediate life-saving intervention. She also determined that he

82

had a Global Assessment of Functioning (GAF) score of 20-30, which she described as "very low" and indicating "serious impairment in communication and judgment" and "an inability to function in almost all areas." *Id.* at ¶ 3. Due to his condition and concerns for his safety, Travis received a course of treatment prescribed for patients with a "serious risk of suicide" and was transferred to Sheppard Pratt for inpatient psychiatric care. *Id.* at ¶ 2. According to Ms. Oswald, Petitioner's mother was not supportive, getting upset when she was told she had to stay with her son while the ambulance transported him from the hospital to the inpatient facility. *Id.* at ¶ 4.

Records of Petitioner's stay at Hartford Memorial Hospital were also available to corroborate Ms. Oswald's testimony, but counsel never obtained them. *See* Hartford Memorial Hospital Records (Exh. 59).

Travis' second-grade teacher Beverly Hibschman, was also available to explain her experiences with Travis and his mother at Abington Elementary School. She describes Travis as a sweet and energetic kid, who frequently left his seat unexcused, spoke out of turn, and did not complete his classroom work. According to Ms. Hibschman, Travis did not do well in school because of his short attention span and inability to focus. Suspecting he had ADHD, she documented her observations, completed the required paperwork and referred him for special treatment. Hibschman Dec. at ¶ 2 (Exh. 51). Ms. Hibschman recalls that Travis'

83

mother worked long hours and struggled with finances and everything else involved with being a single parent. *Id.* at ¶ 4.

Wendy Myers, a clinical social worker at the Stone Bridge Transitional Care House, was never contacted by the defense. *See* Wendy Myers Declaration at ¶ 7 (Exh. 9). From July of 2000 until January of 2001, Travis was under her care at the facility. *Id.* at ¶ 1. She could have presented a sympathetic picture of Travis as a child:

> Travis was clearly disturbed. However, he was respectful to staff. I believed him to be lower risk than our other clients. For that reason, I placed him with an intern for therapy rather than with a licensed social worker. Only around ten percent of our clients saw interns instead of more experienced therapists, so it wasn't as though seeing an intern was the norm.
>
> Travis was a child who was all mouth and that was it. He tried to take a stance but all he could do was bark– he had no bite. He tried to make an impression that he was more than what he was in order to fit in with his peers, but he wasn't able to impress them. He was one of the few white students in placement. It was also certainly rare to have students from more middle class backgrounds. He was the white kid from the suburbs trying to put on a front for a bunch of city kids. On top of that, Travis was the runt of the group. He was physically very small compared with his peers. He tried extremely hard to fit in and get the acceptance of everyone. Travis had an easier time with staff members. The expectations of staff were more clear and Travis was compliant and respectful.

*Id.* at ¶¶ 3-4. *See also* Michael Smith Declaration at ¶ 3 (Exh. 4) ("He was a sweet kid and a small runt of a boy. He sought out the attention and approval of staff and his peers alike. He tried hard to fit in with his peers, but he did not.").

84

This evidence would have offered compelling mitigation.  It would have rebutted the State's assertions and arguments that Travis was an abuser of other patients in this placement.  That was simply not the case and the jury should have been so informed.

Similarly, Dr. Terry Pritt, a psychiatrist, could have testified regarding his treatment of Travis at the Sheppard Pratt Hospital when Travis was thirteen years old.  He, too, was never contacted by the defense.  He would have testified that Travis "exhibited extreme mood lability, impulsivity, and impaired insight and judgment.  Travis suffered from intrusive thoughts, flashbacks, and nightmares about his abuse and panic attacks."  Dr. Terry Pritt Declaration at ¶ 3 (Exh. 8).  He also could have testified that he was the treating physician who diagnosed Travis with "Post Traumatic Stress Disorder, Chronic; Bipolar II Disorder, Hypomanic, Provisional; and Attention Deficit Hyperactivity Disorder, Combined Type" and that he prescribed "Seroquel, Adderall and Depakote."  *Id.* at ¶ 4.  He would have testified, "These medications were intended, in combination with talk therapy, to stabilize his mood, increase his level of concentration and help to create the non-existent stimulus barrier that caused him to act before he thought things through."  *Id.*  Again, such testimony, as opposed to trial counsel's rote admission of records, would have put a human face on the severe psychiatric difficulties and treatments that Travis Mullis endured.  Dr. Pritt also could have stressed for the jury the

importance of treatment with medication for someone like Travis. "Notably,

Travis reported not taking his Seroquil prior to the incident that led to his final

admission to Sheppard Pratt." *Id.* at ¶ 5.

Additionally, Dr. Pritt could have explained to the jury the institutional

failures involved in Travis' release from inpatient treatment:

> Once Travis was released from any residential treatment care facility,
> it goes without saying that he would require intensive outpatient
> therapy and services, to ensure he continued to take his medication
> and received the psychiatric assistance he required.
>
> ***
>
> The transition process from residential treatment to outpatient services
> is vital to a patient's long term success and should never be rushed.
> This would be antithetical to underlying philosophy of residential
> treatment.

*Id.* at ¶¶ 6, 7. This testimony would have been highly mitigating.

Because of counsel's failures, the jury also did not hear any evidence about

Travis' life after he was released from inpatient treatment. Indeed, his mother

describes being very surprised that he was released without notice to her:

> TJ's release from The Jefferson School was abrupt. All of a sudden,
> they told me that he had completed the program. I thought he had at
> least another year there. It was a scramble to get him enrolled in the
> public school because he was released right at the beginning of the
> school year.
>
> TJ was put in regular full time classes without treatment. I
> complained to the school but they said there was nothing they could
> do. They refused to put him into special education classes and did not
> even develop an individual education plan for him. It was a disaster.
> I thought they were just trying to get rid of him. It ultimately worked.
> He was truant often and eventually stopped going to school.

86

Anne Mullis Declaration at ¶¶ 13-14 (Exh. 11).  This was a difficult time for Travis, whose mental illnesses were cycling out of control leading up to his move to Texas.  "TJ was at home with me for around a year before he moved to Texas. His mental illness was out of control and he would not take his medication."  *Id.* at ¶ 15. Yet the jury heard nothing about it.

Travis was on probation at that time.  His mother thought that probation could help ensure structure in Travis' life, but that was not the case.

> He was supposed to be on probation at that time too.  He wasn't doing what he was supposed to in terms of that as far as I could tell, but his probation officer never did anything about it.  I was hoping the probation would give TJ some of that structure that he needed.

*Id.* at ¶ 14.  Travis' probation officer was supposed to assure that he complied with the terms of probation, including attending outpatient treatment, regularly attending school and complying with medication.  Juvenile records (that were not obtained by trial counsel) show periods of lapse in probationary supervision.  *See* Maryland Department of Juvenile Services Records (Exh. 61).  This institutional failure was not presented to the jury.[23]

---

[23] School records from that time show that Travis was failing ten out of his eleven classes. His year to date attendance record indicated he has missed 68 days and been present for 39.  Nevertheless, his probation officer reported Travis "is doing well on supervision.  He is improving in school as far as attendance and grades...there are no behavioral issues."  (Exh. 61 at 27)

Rebecca Pate dated Travis during this tumultuous time.  Defense counsel never contacted her.  She knew that Travis was bipolar and she could have described for the jury the severe symptoms of his mental illness:

> TJ got upset and agitated very suddenly.  Frustration came over his face.  He'd pace back and forth, go up and down the stairs and pull on his hair.  His face turned red.  That's when it all happened.  When I say, that's when it all happened, I mean that's when the craziness of Travis came out.  He'd start screaming, punching the walls and throwing things.  He wouldn't throw things at me or at anyone, he'd throw things at the walls or out of the way.  He'd leave holes in the wall where he punched them, he'd rip doors out of their doorframes.  He'd kick or punch any inanimate object in his way.  He even peed on the floor, inside of the house, when he was mad. He destroyed his bedroom on Raccoon Court. When I first started dating him, he had a room upstairs in the house.  He ruined it.  He moved down into the basement of the house and did the same thing to that room.  He ripped down the curtains.  He ripped up the carpet.  He'd get mad and throw his computer.  He wrote all over his dresser and he tore it apart.  One minute he was fine, the next minute he was out of control.

Rebecca Pate Declaration at ¶ 2 (Exh. 10).

She also could have described the flashbacks that Travis had as a result of the sexual abuse he suffered as a child.  *Id.* at ¶ 5.  She also could have explained to the jury the good side of Travis: "There were times with TJ that were good and times that were bad.  Sometimes he was a good boyfriend and was there for me when I needed him.  He could be sweet to me, caring, loving and lovable.  TJ wasn't a bad person.  It was just that he had two sides."  *Id.* at ¶ 8.  This testimony would have presented the humanity of the person that is Travis rather than the "monster" portrayed by the state.

88

Additionally, because counsel failed to conduct adequate investigation into Petitioner's life after his adoption, several instances of loss of male figures in his life were not presented to the experts or the jury. Dr. Dudley and Dr. Mendel each testified regarding the mental health significance of some of the losses suffered in Petitioner's early childhood. However, they were unaware of several others.

At a very early age Travis lost contact with his adoptive paternal grandfather. Gary Mullis' father would often care for Travis as a young child. After Gary Mullis confessed to sexually abusing Travis, his grandfather stopped seeing Travis, too. As Anne Mullis describes:

> I kicked Gary out of the house after this all came out and we eventually divorced. It was tough for TJ because he had been close with Gary, but I had no choice. Gary's father also cut TJ out of the picture after the abuse came out. It was a shame, because all of the male figures in TJ's life then were gone.

Anne Mullis Declaration at ¶ 7 (Exh. 11).

Had counsel reasonably interviewed Anne Mullis, they would also have learned that Travis became very close to his uncle, Steven Barry, after Gary Mullis' arrest. Travis lost this father figure, too, after he was charged with molesting Mr. Barry's daughter:

> When TJ was about thirteen, he was accused of molesting his cousin. Her father Steven is my brother. He and TJ had grown close since everything had happened with Gary. Steven tried to help be a male role model for TJ. After the abuse allegation of Steven's daughter, he cut TJ out of all of their lives completely.

*Id.* at ¶ 11.[24]

Another significant loss in Travis' life that was not explored at the time of trial was the loss of therapists and mental health professionals who treated him.  It is noted above that treatment with Sallyann Jennings was discontinued abruptly by Travis' mother after Travis acted out sexually.  Additionally, Travis experienced significant loss when his treatment with psychologist Richard Brokaw was discontinued:

> Travis clearly also saw me as a father figure.  He would not want our therapy sessions to end and would act up when our time was nearly over for that very reason.  A number of times, he expressed his hope that I would marry his mother and become his father.  I recall when my twins were born in April of 1998, Travis was jealous of them.

> When we first discussed terminating therapy, which occurred because Travis' mother felt he had sufficiently integrated the issue of his abuse, Travis became extremely agitated.  Eventually he masked his agitation with bravado, stating "well that will only give me more time to do what I want to do."  This was typical Travis.  He suffered such extreme loss in his life that whenever he sensed an impending "abandonment," he attempted to take control by appearing as if this was something he wanted all along.

---

[24] Richard Brokaw, who treated Travis for some time, also recalls his close relationship with Uncle Steve:

> Travis spent a significant amount of time with his cousins, the Barrys.  He was quite fond of his Uncle Steve and often expressed positive feelings towards him. I understand that Uncle Steve disassociated himself completely from Travis after the incidents with his daughters.  While understandable on Uncle Steve's part, this must have been devastating for Travis, who looked up to the man immensely. Steve was Travis' best approximation for a father figure in those years.

Richard Brokaw Declaration at ¶ 11 (Exh. 6).

Richard Brokaw Declaration at ¶¶ 12, 13 (Exh. 6).  These losses were significant and would have further bolstered the testimony of Dr. Dudley and Dr. Mendel. *See, e.g.,* Mendel Declaration (7/18/13) at ¶ 11 (Exh. 16) ("I testified regarding the loss of his birth mother and his adoptive father, but now have substantially more evidence of loss - of Travis' uncle, Steven Barry, of his grandfather, and of Richard Brokaw, a treating psychologist.  If I had this evidence at the time of the trial, my testimony regarding the effects of multiple loss on Travis' mental development would have been far stronger.").

Counsel conducted almost no investigation into Travis' life after he was ten months old and went to live with the Mullis family.  This failure was woefully deficient and severely prejudiced Petitioner.  The jury heard no evidence from anyone who knew Travis during this most important time in his life.

### 5.   Petitioner was Victimized by Older Men

When Petitioner first arrived in Texas, he was eighteen years old with no means of support and practically homeless.  Not long after he arrived, a number of older men began to groom him for sex, men who would provide for him in return for sexual favors.  The men were the age of his adoptive father.  Such behavior is entirely consistent with and, in fact, is corroborative of the severe sexual abuse to which Petitioner was subject.  Yet the jury never heard this.  Instead, the jury heard how the prosecution characterized these "relationships" as indicative of Petitioner's manipulation of others.  Had counsel developed and presented this

91

evidence through the mental health experts, the jury would have heard the true import of this part of Petitioner's life.  Counsel unreasonably failed to develop and present this evidence and failed to request that the mental health experts consider this evidence.

Dr. Reynolds describes Petitioner's activities in this regard and explains the significance:

> Travis' young adult sexual activity and relationships bear the imprint of his early sexual abuse and offer a glimpse of the impact of these experiences many years later on his level of fear and demoralization. When Travis moved to Texas, at the age of 18 without a job or source of support, he repeatedly described being in "survival mode."  This state of being was marked by constant fear of being homeless, and the necessity of making money on the streets in ways that would lead to physical pain, attack or rape. In order to avoid this, he engaged in series of sexual relationships with older men. In exchange for food, shelter, material possessions and enough money to keep a cell phone on, Travis engaged in sexual favors with much older men to whom he felt no sexual attraction. He believed himself to be "in control" of these relationships because he did not become emotionally involved and told himself that he was free to leave them at any time.  Most importantly, Travis told himself that he was in control and "safe" because he insisted he set the terms of sexual contact to avoid anal penetration.

> One relationship was particularly complicated and problematic for Travis. When he only 18 years old, he was invited to live with a man in his 50's who had federal charges as a sexual predator and who was on probation for these charges. In exchange for a place to live, food, a cell phone, Travis agreed to provide chauffeur services due to his impaired eyesight, and to perform sexual favors for this man. Over time, Travis had to fend off the older man's escalating sexual demands. He described the pressure he was under to perform anal sex on him and that this pressure never ceased. Eventually, Travis described allowing him to stick his penis in between Travis "butt cheeks" in order to simulate anal sex. He also described the necessity

of emotionally numbing himself in order to get through the daily routine of this man returning home from work and expecting sex.

Travis described feeling dread as this part of the day approached and wishing he would "just hurry up and get it over with." Travis felt he owed this man these sexual favors because of the material support he provided. He considered this a fair exchange, despite the re-triggering and attempts at mastering his own traumatic past that this entailed and the psychological toll this took on him.

When it comes to adult women survivors of CSA, we readily recognize the mark of earlier traumas in such complex relationships, but we tend to but tend to overlook the trauma imprint in men when they engage in similar relationships.

Dr. Reynolds Report at 14-15 (Exh. 17).

Dr. Mendel has also been asked to consider this evidence for the first time.

He notes numerous relevant points in relation to these relationships that he could

have explained to the jury:

I have also recently been given information that soon after Travis moved to Texas at the age of 18, he was sexually involved with several significantly older men, at least one of whom was a known sex offender. I do not recall if I discussed this during my meetings with Travis, but I know that I was not asked about it during my testimony. Had I been asked, I could have testified that a young boy who was sexually abused as a child is at great risk of victimization by older men. I also could have testified to the following:

a)     Travis' hypersexuality:  Sex is the way he knows to connect with other people; it's the "skill" he has, and the way that he will naturally think of in order to make money, and to support himself.

b)     Promiscuity is a very common outcome of sexual abuse.  For Travis, with the sexual abuse beginning so young and lasting so long, he'd be even more at risk of that outcome.  He was more profoundly sexualized than are most victims, and that was expressed in sexual offenses on his part - throughout his adolescence, with his cousin, and then at Sheppard Pratt - and later in his sexual relationships with significantly older men.

c)      His experiences with these older men probably reinforced his world view of people using sex, wanting sex from others in a manipulative fashion, being able to use sex manipulatively or to gain things he wants, and so forth.  Sex was a commodity, while at the same time being his only way of connecting to others.

Mendel Declaration (7/18/13) at ¶ 6 (Exh. 16).

Dr. Dudley also has strong opinions in this regard that could have been presented to the jury.

I have also recently been provided information about Travis' sexual relationships with older men, which it appears the prosecution characterized as evidence of how manipulative Travis is and how he has always used others.  I was not provided this information by trial counsel.  It is most certainly my opinion that those relationships were much more complicated than that.

First of all, it is not at all uncommon for a late adolescent or young adult male, who was sexually abused by a paternal figure as a child, to end up repeatedly becoming sexually involved with older men.

When the young man was also neglected, abandoned or otherwise developed  attachment issues during childhood years, this need to find a "father" is even more intense, as is the sense that the relationship/intimacy with that "father" can/should be expressed sexually.

These above noted elements of Travis' history are much more the driving force behind his relationships with older men than anything else.

Additionally, as a result of the above noted combination of psychiatric difficulties that Travis suffered from, his capacity to care for himself was extremely impaired; the fact that these older men took Travis in and cared for him met his needs, but also obviously met their needs; and so in that regard, it is more accurate to see this aspect of these relationships as one of mutual exploitation.

94

As further noted above, a lack of sexual boundaries and sexual identity confusion are also products of the difficulties that Travis endured along with his other various psychiatric difficulties.  As a result, he doesn't really know if he is bi-sexual or not, and at times he hasn't even been sure to what extent his relationships with these older men were even primarily sexual.

In addition, it is also important to note that hyper and reckless sexuality is symptomatic of the more manic phases of Travis' Bipolar Disorder, so while manic his sexual behavior is much more out of his control and difficult to manage.

Finally, Travis has considerable confusion and shame about virtually all of his sexual urges and behaviors.  This is quite consistent with the above noted assertion/opinion that his sexual behavior is the product of a variety of forces that Travis does not fully understand and has little to no ability to manage.

Dudley Declaration (7/21/13) at ¶ 12 (Exh. 13).

Undersigned counsel has obtained evidence from the district attorney showing that the prosecution knew that two of these men, B.W. and N.D., were sex offenders.  *See* B.W. File, N.D. File (Exh. 38 & 39) (names redacted and filed under seal pursuant to Court order of 7/23/13 (Doc. No. 14)). [25]  Of the places Travis stayed during his three years in Texas, he stayed with B.W. the longest. B.W. was born in 1949, just three years older than Gary Mullis, and 37 years older that Travis.  When Travis was eighteen years old and met B.W., he was fifty-five. He was 5'11" and 235 pounds, and had prior convictions for sexual assault on a

---

[25] It is unclear whether these files were turned over to trial counsel.  To the extent that they were, counsel was further ineffective for failing to present this evidence to the experts and to the jury.  To the extent they were not turned over, the failure to do so violated due process and the requirements of *Brady v. Maryland*.  But even if the State withheld this evidence, reasonable trial counsel should have found it.  B.W. was on the State's witness list prior to trial, and is listed in the Texas public sex offender registry.

14-year-old boy, and possession of child pornography.  In exchange for a place to live and a car to drive, B.W. expected sexual favors from Travis.  Travis did not ever live with N.D., but conducted an extensive correspondence with him while he was incarcerated pretrial.  N.D. was born in 1947, and thus was thirty-nine years older than Travis and five years older than Gary Mullis.  N.D. has a 1989 conviction for indecent sexual conduct with a child, a 14-year-old male, and a 1999 conviction for indecency with a child, a fifteen-year-old male.  As noted above, evidence that Petitioner was being victimized by these older sexual predators would have been highly mitigating.

Petitioner did not "manipulate" these older men.  He was victimized by them.  This behavior, as the mental health experts have established, is entirely consistent with Petitioner's history of lifelong sexual abuse.  Had counsel developed this evidence and presented it to the experts, this compelling mitigation could have been presented to the jury.

### 6. Petitioner's Mental State on the Day of the Killing

On the day of the killing, Petitioner was suffering from multiple mental illnesses that impaired his ability to function.  Counsel unreasonably failed to present evidence to the jury regarding the Petitioner's mental state at the time of the crime.  Such evidence is highly mitigating.

Dr. Dudley states that although he had opinions about it based on his evaluation of Petitioner, he was not asked to discuss Petitioner's mental state at the time of the crime:

> At some point it became clear that there was no plan to discuss or present his mental state at the time of the crime (even as part of mitigation); I do not remember having much if any discussion with the attorneys about my findings and opinions about his mental state at the time of the crime; and even after the DA questioned me about what Mr. Mullis had told me about the crime during his cross examination, without allowing for any testimony about his mental state at the time of the crime, I still wasn't asked about his mental state at the time of the crime during re-direct.

Dudley Declaration (7/21/13) at ¶ 4 (Exh. 13).

Had Dr. Dudley been asked his opinion in this regard, the jury would have heard compelling mitigating evidence.  "If I had been asked about Mr. Mullis' state of mind at the time of the offense, I would have testified that he was suffering from major psychiatric illnesses that seriously impaired his ability to function."  *Id.* at ¶ 4.  He also notes that an "understanding of Travis's mental state at the time of the crime requires this understanding of how these psychiatric disorders were exacerbated by the psychosocial stressors he was experiencing at the time, and then how these disorders interacted with and potentiated each other, resulting in the mix of behaviors that were a part of the crime."  *Id.* at ¶ 7.

Dr. Mendel also was not asked his opinion about Travis' mental state at the time of the crime.  He, too, could have offered compelling mitigating testimony in this regard:

> If I had been asked about the circumstances of the crime, I would have
> certainly been able to speak about how the facts of the crime were
> consistent with his impulsivity and cognitive defects.  Second, I could
> have testified that his reasoning and decision-making abilities are
> weak and flawed, i.e., his idea that he would never abandon Alijah
> and that killing him was somehow less egregious than abandoning
> him.

Mendel Declaration (7/18/13) at ¶ 5 (Exh. 16).  *See also id.* ("Had I been asked, I

could have testified that the act was likely an impulsive, unplanned act, consistent

with his characteristic impulsivity.").

Dr. Victoria Reynolds has also opined on Petitioner's state of mind on the

night of the killing.  She has evaluated this in terms of Petitioner's relationship

with his mother:

> At a more critical moment, Travis reported calling his mother from
> Texas the night of the crime to tell her he felt he was in danger of
> offending with one of the Duarte kids. He recalled that she was put
> off, once again, by his middle-of-the-night call disrupting her sleep,
> and that she asked him, "what am I supposed to do about this from so
> far away?" Travis hung up the phone with an increased sense of
> desperation and the certainty that there was no one who could help
> him. Her denial and minimization of his current desperate state served
> as a re-enactment of her denial when he disclosed his father's sexual
> abuse, thus re-triggering the network of emotions associated with his
> childhood sexual abuse.  Travis was completely unaware of being
> triggered and flooded with past memories and associations, and was
> unprepared to cope with such an overwhelming flood of stress on top
> of his current and immediate challenge of managing his urges.

Reynolds Report at 7 (Exh. 17).

Instead of this compelling mitigation, the jury was led to believe that Travis'

mental state had nothing to do with the crime and that he was just acting out of

anger.  Indeed, the prosecutor repeatedly questioned Dr. Dudley and Dr. Mendel in

this regard.  *See* 32 RR 134-35 (Dudley); 31 RR 217-18 (Mendel).   Counsel

unreasonably failed to follow up on this misperception during redirect examination

of either of these witnesses.  Counsel was ineffective for failing to present this

compelling mitigation to the jury.

### 7.    Petitioner Exhibited Remorse.

Throughout the trial and the penalty phase, the prosecution repeatedly

argued to the jury that Petitioner was not remorseful for killing his son.  Because

counsel was ineffective, the jury did not hear compelling available evidence of

remorse.  Petitioner was prejudiced by this deficiency.

Lack of remorse was a big theme for the prosecution.  For example, in his

penalty phase closing argument, the prosecutor repeatedly discussed lack of

remorse:  "He doesn't have a conscience.  It's what we called cold-blooded Killer."

33 RR 58.  "He has no remorse.  He's not upset about this.  And let's just look and,

you know – remorse, to me, is my God, what have I done?  How could I have done

this?  Do you see one – anybody, anywhere, any place where that's what he said?

No."  33 RR 59.  *See also* 33 RR 60, 62, 71.

This could have been easily rebutted had trial counsel simply returned the

phone calls of, or otherwise contacted, the Philadelphia lawyer who represented

Petitioner during the extradition proceedings.  Daniel Stevenson, a public defender,

was appointed to represent Petitioner.  He describes Petitioner's demeanor when he

met with him:

> Prior to the extradition hearing in court, I met with Mr. Mullis in the cell room at the Criminal Justice Center in Philadelphia.  Mr. Mullis was crying when I walked in to meet with him.  He kept saying over and over again how sorry he was that he had killed his baby.  He was incredibly remorseful.  He did not want to fight extradition.  He just wanted to get back to Texas and face his punishment.  I explained the process and told him how it would work if he wanted to fight it.  He just kept crying and said he wanted to just agree to go back.

Stevenson Declaration at ¶ 2 (Exh. 22).[26]

Counsel could also have rebutted this purported lack of remorse by investigating and presenting Galveston County prison employees who interacted with Travis following his arrest.  Deputy sheriffs Richard Styner and Michael Bradford both recount Travis expressing feelings of guilt and remorse about his crime.  Styner Dec. at ¶ 6 (Exh. 41); Bradford Dec. at ¶ 6 (Exh. 44).

This evidence would have also been helpful to the experts.  Dr. Dudley was cross-examined regarding remorse.  The prosecutor asked Dr. Dudley if Petitioner "shows a lack of remorse."  32 RR 128.  Dr. Dudley answered that he would not agree that Petitioner shows a lack of remorse, but he had nothing to back that up. Had he been provided with Mr. Stevenson's observations of Petitioner soon after turning himself in, and of Deputy sheriffs Styner's and Bradford's observations, he could have explained this to the jury.  Dr. Mendel also testified to his belief that

---

[26] Counsel was also put on notice that this helpful evidence was available, as it was included in a news article about Petitioner's extradition hearing.  *See Police: Mullis Showing Remorse; Slain Baby's Dad to Return to Texas as Early as Tuesday*, Houston Chronicle (February 4, 2008 (Exh. 21).  In this article, which was part of trial counsel's file, Mr. Stevenson is quoted as saying Petitioner was "crying when I spoke to him," he was "remorseful" and "seemed ready to get back to Texas."

Petitioner expressed remorse.  He too, could have used this evidence to bolster that testimony.

Taking together the mitigating evidence proffered here with the defense case in mitigation at trial, and reweighing it against the prosecution's case in aggravation, prejudice is shown.  The mitigating evidence outlined above presents a complete picture of Travis' life, his vulnerabilities, and his impairments, and places the crime in context.  Had a reasonable jury heard all of this mitigating evidence, there is a reasonable likelihood of a different outcome.

Prejudice is also shown because the unpresented evidence would have explained and rebutted a number of problems that plagued the defense case, including the image of Travis as a "manipulator" and "con man," as opposed to a victim and young man desperately seeking adult approval and a male role model, and the State's argument that Travis never displayed remorse, whereas witnesses close in time to his confession observed intense remorse.  In addition, the mitigation that counsel failed to present, in combination with the rebuttal of the State's future dangerousness evidence discussed in Claim I, together show prejudice.

### 8.    Petitioner Suffers From Brain Damage.

As noted above, counsel unreasonably failed to develop and present evidence of Petitioner's brain damage through neuroimaging.  An adequate

investigation by trial counsel would have yielded brain imaging indicating the presence and extent of Petitioner's brain damage.

Dr. Antoinette McGarrahan, a neuropsychologist, evaluated Petitioner at defense counsel's request prior to trial. Although the testing conducted by Dr. McGarrahan did not reflect brain damage, Petitioner exhibited significant problems with impulsivity in both his clinical history and his evaluation: "it was my opinion at that time and remains my opinion based on his clinical history, records, and my interview that Mr. Mullis has exhibited significant behavioral signs that could be suggestive of deficits in executive functioning." Dr. Antoinette McGarrahan Declaration at ¶ 3 (Exh. 23). Dr. McGarrahan informed counsel that imaging was warranted:

> I consulted with the defense team about my findings and informed them that I believed that Mr. Mullis was severely emotionally disturbed. He had a horrific childhood history, wrought with rejection, abandonment, and attachment issues. The defense team asked me about the possibility of brain imaging. Consistent with my practice, I informed trial counsel that certain types of imaging, specifically PET (Positron Emission Tomography) and/or SPECT (Single Photon Emission Computed Tomography), are highly sensitive measures that might reflect abnormalities in brain functioning that the paper-and-pencil tests did not.

*Id.* at ¶ 4.

Despite the advice of Dr. McGarrahan, and several red flags in the records strongly indicating the presence of brain damage, counsel failed to pursue imaging.

As a result, the jury never heard compelling evidence of Petitioner's brain damage.[27]

### D.    Counsel's Failures Prejudiced Petitioner

The mitigating evidence outlined above and contained in the social history prepared by Jessica Johnson presents a complete picture of Petitioner's life, his vulnerabilities, and his impairments, and places the crime in context.  Had a jury heard all of this mitigating evidence, there is a reasonable probability that at least one juror would have voted for life.  *See Wiggins*, 539 U.S. at 537.

The Supreme Court has made clear that the presentation of mitigating evidence at trial does not preclude a finding of prejudice under *Strickland*.  *Sears*, 561 at 954 ("We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented.") (citation omitted); *see also Williams*, 529 U.S. at 369, 396.

In *Walbey*, the Fifth Circuit noted:

> *Williams* …. stands for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation is presented and even if there is psychiatric testimony.  The fact that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing is also clear from the test that *Williams* establishes.  There, the Court held that it is an unreasonable application of Supreme Court precedents for a state court not to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and

---

[27] Undersigned counsel filed a motion with this Court on September 9, 2013 requesting permission to transport Mr. Mullis to an appropriate medical facility to conduct brain image testing.  This Court denied this motion without prejudice on June 24, 2014 (Doc. No. 26) and Petitioner intends to renew this motion after the briefing is completed.

the evidence adduced in the habeas proceeding." This standard
clearly contemplates that even when some mitigating evidence is
presented at trial, prejudice is still possible if that evidence is
substantially incomplete.

*Walbey*, 309 F. App'x at 802.

The Supreme Court has recognized that in capital sentencing, where the goal of defense counsel is to humanize their client, details matter. For example, the Supreme Court has held that counsel's deficient investigation prejudiced a capital defendant because the information that was not presented was compelling— specifically the "graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 398. The inquiry turns on "the nature and the extent" of the evidence. *Wiggins,* 539 U.S. at 535, 537 (had jury heard "nature and the extent" of abuse Wiggins suffered and details of his "excruciating life history," "there is a reasonable probability that at least one juror would have struck a different balance").

Details likewise mattered in *Lewis*, 355 F.3d 364, where petitioner alleged trial counsel was ineffective for failing to conduct a thorough investigation into his background, including the abuse he suffered as a child. The district court denied relief, noting that trial counsel put on evidence of child abuse through the testimony of petitioner's grandmother. *Id.* at 368. The Fifth Circuit reversed, finding the grandmother's "conclusional testimony contained none of the details

104

provided by Lewis's siblings at the habeas hearing, which could have been truly beneficial." *Id.* Her "skeletal testimony" failed to give "a true picture of the tortured childhood experienced by Lewis." *Id.*; *see also Walbey*, 309 F. App'x at 803 (finding testimony on abuse presented at trial was "general and conclusional" and could not "be expected to have communicated to a jury the bloodcurdling facts of his upbringing"); *Foust v. Hook*, 655 F.3d 524, 539 (6th Cir. 2011) (unpresented evidence "paints an altogether different picture of [the petitioner's] childhood"); *Johnson v. Mitchell*, 585 F.3d 923, 943 (6th Cir. 2009) (prejudice established because new evidence "differ[ed] in a substantial way 'in strength and subject matter' from the evidence actually presented at sentencing"); *Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008) (state court rejection of claim unreasonable because trial counsel's investigation "only scratched the surface of [petitioner's] horrific childhood"); *Williams*, 542 F.3d at 1342 (evidence counsel failed to uncover "paints a vastly different picture of [petitioner's] background than that created by [his mother's] abbreviated testimony"); *Gray*, 529 F.3d at 235-38 (prejudice found where counsel failed to provide the "full" and "cohesive" picture).

Due to counsel's failure to investigate, the jury did not hear about: the full extent of the sexual abuse in Travis' birth home during his infancy; his life with his adoptive parents, Gary and Anne Mullis, and the full extent and impact of Gary Mullis' sexual abuse; firsthand accounts of his years of mental health treatment as

a child and teenager; or the story of Travis' exploitation by older, "father figure" men – not coincidentally sexual offenders – when he was homeless.

A comprehensive social history report and/or testimony from a mitigation specialist, combined with testimony from lay witnesses and treating mental health professionals would have brought to life the records presented to the jury, and put Petitioner's life history, including the crime he committed and a number of allegations of future dangerousness presented by the State, into a sympathetic, understandable context for the jury tasked with deciding his fate. Without this testimony, the jury was left without the evidence necessary to contextualize Petitioner's life experiences or digest the voluminous mental health records existing in this case.

The evidence of Mr. Mullis's background proffered above differs substantially in both 'strength and subject matter' from the incomplete, often cursory evidence presented by trial counsel. *Johnson*, 585 F.3d at 943.

Much of the evidence set forth above addressed topics about which the jury never heard. For example, the jury never heard Mr. Mullis's sexual exploitation by older "father figure" men decades his senior when he was homeless. Likewise, they jury never heard evidence regarding Mr. Mullis's mental state on the day of the crime. Mr. Mullis's psychiatric disorders and history of trauma were exacerbated by psychosocial stressors, seriously impairing his ability to function.

Such testimony contrasts sharply with the State's argument at trial that Mr. Mullis was simply acting out of anger.   *See* 32 RR 134-35; 31 RR 217-18.

The evidence contains powerful details that would have conveyed to the jury the full extent and severity of the abuse suffered by Mr. Mullis.  Although the jury learned Mr. Mullis was sexually abused by his adoptive father, a thorough investigation by trial counsel would have showed that the abuse was in fact far worse and more brutal.  Likewise, jurors never learned that when Mr. Mullis's adoptive mother first learned of the sexual abuse, she failed to protect Mr. Mullis did nothing to stop the abuse.  The jury never learned the profound psychological impact this failure had on Travis.

Petitioner was further prejudiced by trial counsel's failure to call any fact witnesses to discuss Mr. Mullis's life after the age of months.  At trial, the State argued that Mr. Mullis was a remorseless manipulator who preyed on and sexually abused the other students while at his treatment centers.  Trial counsel's failure to present any witnesses who knew Mr. Mullis during this time allowed that inaccurate portrayal to go unrebutted.  Available records and testimony from any number of available witnesses could have showed the jury that Mr. Mullis was not a predator.  Rather, he was a severely emotionally damaged child who was rejected by his peers and was often the victim of bullying.[28]

---

[28] Such evidence was relevant to the mitigation" special issue" and also would have rebutted the State's argument in support of the "future dangerousness" issue. *See* Claim I, *supra*.

Ultimately, counsel failed to present a cohesive and coherent outline of Petitioner's life, which was destroyed by horrific sexual and physical abuse, abandonment, neglect, loss and severe mental illness.  Had the jury heard Travis' true life story, there is more than a reasonable probability that at least one juror would have voted for life.

At the very least, the Court should hold an evidentiary hearing at which the proffered evidence can be presented.

## III. THE STATE DENIED PETITIONER HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY WITHHOLDING EVIDENCE; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO REQUEST THIS EVIDENCE.

Due process requires a prosecutor to disclose evidence favorable to the accused.  *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Bagley*, 473 U.S. 667 (1985). In this case, the State's failure to disclose material exculpatory and impeachment evidence violated Petitioner's right to a fair trial and sentencing.

A prosecutor's failure to disclose *Brady* material requires a new trial where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  In proving materiality, the question is "not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The prosecution has a clear obligation to turn over exculpatory evidence to the defense. "[A] rule ... declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004). In *Banks*, the Supreme Court squarely rejected the State's argument that the defendant should have more diligently sought evidence that a key witness was a paid informant. However, in the alternative, to the extent counsel had an obligation to uncover the *Brady* evidence, trial counsel were ineffective for failing to request and obtain this evidence.

### A.     The State Suppressed Material Exculpatory Evidence, in Violation of the Fifth, Sixth and Fourteenth Amendments.

The State violated Petitioner's rights to due process and a fair trial by suppressing exculpatory evidence supporting a defense to capital murder and mitigating evidence. Pretrial, the defense moved for production of all exculpatory evidence. *See* Motion to Reveal the Deal, CR 70 (requesting, *inter alia*, disclosure of "the existence and substance of any agreements between any co-defendant, co-conspirator, or any other person in this case and any officer or agent of the Federal or State Government"), *granted by* Order, CR 73; Defendant's Motion Pursuant to *Brady* for Production of Exculpatory Evidence, CR 74 (requesting, *inter alia*, production of "evidence within [the State's] actual or constructive possession which is, or may hereafter be, of an exculpatory nature"). There is a reasonable probability that, had this evidence been disclosed to the defense, the outcome of

the guilt-innocence trial and/or the penalty phase would have been different. Petitioner's conviction and sentence must be vacated.

The State failed to disclose, prior to trial, exculpatory and impeachment evidence of consideration received by key prosecution witness Carolyn Entriken in return for her cooperation, and by failing to correct false and misleading testimony. The State also continues to withhold a large volume of information in its file as "work product," and Petitioner believes those portions of the file may contain exculpatory information.

Carolyn Entriken testified for the prosecution at both the guilt-innocence and the penalty phases of trial. Ms. Entriken, Caren Kohberger's mother, and the grandmother of the victim, was a key prosecution witness.[29] The prosecution suppressed material impeachment information regarding Ms. Entriken's testimony, including information that she testified in exchange for dropping the charges against her daughter. Caren had been charged in Brazoria County with child endangerment for permitting Petitioner to take Alijah with him, when she was aware that he was extremely upset, he had just attempted to molest a child, and he was having flashbacks to his childhood sexual abuse. *See State v. Caren Kohberger*, Complaint, Feb. 1, 2008, Cause No. F016385 (Brazoria County) (Exh. 24).

---

[29] Caren Kohberger did not testify at trial or sentencing.

Ms. Entriken testified at trial that the child endangerment charges against Caren were "still pending." 24 RR 130. That was technically accurate on the dates of Entriken's testimony, March 8 and March 14, 2011. However, charges against Caren were dropped within days after Petitioner's sentencing: on March 28, 2011, the District Attorney of Brazoria County moved to dismiss the charges against Caren, citing as reason for the motion, "Travis Mullis tried for Capital Murder in Galveston County in death of baby and received death penalty." *State v. Caren Kohberger*, Cause No. F016385, Motion to Dismiss (Brazoria County Justice Court, Mar. 28, 2011) (Exh. 25). This stated reason was inaposite, because the basis for the charges was Caren's responsibility in permitting Petitioner to take the baby when she knew Petitioner was in a very unstable state of mind. Thus, Petitioner's conviction did not undermine the factual basis for the charges against Caren. The timing of the motion to dismiss charges, the fact that the State elicited testimony from Ms. Entriken to assure the jury that charges were "pending" against Caren, and the stated reason in the motion to dismiss, support the inference that Ms. Entriken expected a benefit from the State for her testimony against Petitioner.

Had the defense been able to show that Ms. Entriken was receiving consideration in exchange for her testimony, in the form of a promise that charges would be dropped against her daughter Caren, the jury would likely have viewed Ms. Entriken's testimony in a different light. Petitioner meets the materiality

111

standard under *Brady*, because her testimony at both stages of the trial was devastating.  *See* Claims V and XI.

The State is also maintaining three bankers boxes of "work product" that federal habeas counsel was not permitted to review during open file review.  The boxes are labeled "AA‒Investigator," "BB‒Voir Dire Work Product," and "CC‒Work Product."  Petitioner requests an order permitting his counsel to review those boxes, or an order for *in camera* review of those boxes, to determine whether they contain any exculpatory or impeachment evidence that the State is constitutionally obligated to disclose.

### B.    In the Alternative, Counsel was Ineffective for Failing to Seek and Obtain the Exculpatory Evidence.

In the alternative, assuming without conceding that defense counsel had an obligation to seek the exculpatory evidence, trial counsel was ineffective for failing to request and obtain this evidence.  Because there is a reasonable probability the evidence would have affected the outcome of trial or sentencing, as described above, Petitioner was prejudiced by counsel's deficient representation.  To the extent that any portion of this claim could have been raised as a record-based claim on appeal, appellate counsel was ineffective for failing to do so.

### IV.    THE EXCUSAL OF ONE HUNDRED VENIREPERSONS BY AGREEMENT BETWEEN THE PARTIES, WITHOUT INDIVIDUAL VOIR DIRE, DENIED PETITIONER HIS RIGHT TO AN IMPARTIAL CAPITAL SENTENCING JURY, PROTECTED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS; THE TRIAL COURT ERRED IN PERMITTING THIS PRACTICE; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO

**THIS PRACTICE; THE STATUTE PERMITTING EXCUSALS UPON AGREEMENT IS UNCONSTITUTIONAL; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM.**

During jury selection in this case, one hundred venirepersons were excused from jury service by "agreement" between the parties, on the basis of their answers on a written juror questionnaire alone, without individual voir dire.

Petitioner is entitled to a new capital sentencing hearing because the trial court deprived him of his right to individual voir dire and improperly excused jurors in violation of his constitutional rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Trial counsel was ineffective for failing to ensure an adequate voir dire protecting Petitioner's right to an unbiased and impartial jury. The statute permitting excusals based on agreements between the parties is unconstitutional as applied in this case. Appellate counsel was ineffective for failing to raise these meritorious claims in post-sentence motions and on appeal.

### A.     The Legal Standards.

The Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury. Part of the guaranty of this right "is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 730 (1992). The right to an impartial jury is violated when a jury is empaneled that is "uncommonly willing to condemn a man to die." *Witherspoon v. Illinois*, 391

113

U.S. 510, 521 (1968). The jury is improperly empaneled when one or more jurors are excluded merely because of their general moral or philosophical reservations about the death penalty. *Id.* at 522. If even a single juror is improperly excluded under *Witherspoon*, "any subsequently imposed death penalty cannot stand." *Davis v. Georgia*, 429 U.S. 122, 122 (1976) (per curiam).

"The State may bar from jury service [only] those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." *Adams v. Texas*, 448 U.S. 38, 51 (1980). To exclude a juror because of his or her beliefs about the death penalty, the State must prove that "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Uttecht v. Brown*, 551 U.S. 1, 7 (2007) (quoting *Adams*, 448 U.S. at 45). The mere acknowledgment of scruples against the death penalty does not satisfy this test. Even plainly expressed opposition to (or discomfort with) the imposition of a death sentence is not enough to disqualify a person from serving as a capital juror, for one "who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." *Witherspoon*, 391 U.S. at 519.

The burden of proving partiality rests on the party seeking to excuse the venireperson for cause. *Wainwright v. Witt*, 469 U.S. 412, 423 (1985). The touchstone of partiality is a demeanor assessment in open court. No written,

multiple-choice questionnaire can substitute for individual examination when the inquiry is into state of mind.  It violates the Sixth Amendment for a court to exclude jurors for their views on the death penalty on the basis of a written questionnaire alone, without conducting individual voir dire.  Mechanically culling venirepersons for expressions about the death penalty—without establishing that the views underlying those expressions make the venirepersons partial—creates a jury "uncommonly willing to condemn a man to die" and violates the right to an impartial jury.  *Witherspoon*, 391 U.S. at 521.  "The question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireman's state of mind . . . based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province."  *Witt*, 469 U.S. at 428.   Moreover, because jurors are vested with greater discretion in capital cases, the examination of prospective jurors must be more careful than in non-capital cases.  *See, e.g. Turner v. Murray*, 476 U.S. 28, 35-36 (1986).

**B.    The Jury Selection Procedures in This Case Failed to Protect Petitioner's Constitutional Rights.**

In this case, the parties agreed–without input from the trial court–to excuse one hundred venirepersons on the basis of their questionnaires alone.[30]  There was no opportunity for counsel or the trial court to assess the venirepersons' demeanor or credibility before they were disqualified.  At least fifteen of those prospective jurors who were "excused by agreement" were clearly not challengeable for cause based on their answers to the questionnaire.[31]  As a result, the State was not held to its burden under *Witt* to prove partiality.  The trial court erred in permitting dozens of jurors to be excused without individual voir dire.

---

[30] Initially, a list of more than 400 venirepersons was compiled.  *See* Venireperson List (Exh. 28 & 29).  On the first day of jury selection, the court charged the array and then heard and decided upon any requests for exemption from service.  12 RR 4-67.  During this process, counsel for the State and the defense agreed on the record to excuse a number of jurors.  *Id.* Afterward, the court set up appointment times (for individual questioning) for the jurors who were not exempt or excused.  *Id.* at 67-89.  Over a period of a week, and through a combination of individual voir dire and further "excusals by agreement," trial counsel processed all of the jurors on the list up through the last alternate chosen (Gary Ford, Ven. #584); by that time, the first 141 jurors on the original list had been gone through: 100 were excused by agreement without questioning, and 41 were subjected to voir dire.

The prospective jurors excused by agreement at some point during jury selection were (in order by venire number): Ven. #10; Ven. # 16; Ven. #24; Ven. #34; Ven. #36; Ven. #39; Ven. # 40; Ven. #41; Ven. #55; Ven. #62; Ven. #64; Ven. #70; Ven. #71; Ven. #83; Ven. #87; Ven. # 88; Ven. #90; Ven. #93; Ven. #99; Ven. #100; Ven. #101; Ven. #104; Ven. #114; Ven. #125; Ven. #142; Ven. #153; Ven. #154; Ven. #156; Ven. #175; Ven. #177; Ven. #202; Ven. #203; Ven. #205; Ven. #208; Ven. 211; Ven. #217; Ven. #220; Ven. #230; Ven. #236; Ven. #241; Ven. #248; Ven. #270; Ven. #274; Ven. #275; Ven. #277; Ven. #294; Ven. #300; Ven. #301; Ven. #304; Ven. #305; Ven. # 306; Ven. #314; Ven. #316; Ven. #318; Ven. #320; Ven. #321; Ven. #322; Ven. #329; Ven. #332; Ven. #344; Ven. #363; Ven. #367; Ven. #371; Ven. #378; Ven. #387; Ven. #396; Ven. #409; Ven. #416; Ven. 417; Ven. #421; Ven. #422; Ven. #427; Ven. #438; Ven. #439; Ven. #445; Ven. # 450; Ven. #452; Ven. #461; Ven. #478; Ven. # 479; Ven. #482; Ven. #492; Ven. #500; Ven. #503; Ven. # 520; Ven. #522; Ven. #531; Ven. #533; Ven. #540; Ven. #547; Ven. #548; Ven. #550; Ven. #556; Ven. #559; Ven. #560; Ven. #561; Ven. #568; Ven. #570; Ven. #573; Ven. # 576.

Texas law permits excusals by consent between the parties.  *See* Tex. Code Crim. Proc. Art. 35.05.  That statute is unconstitutional as applied in this case.  The large number of jurors excused by consent deprived Petitioner of a meaningful opportunity to assess the demeanor, credibility, and partiality of the venire, and resulted in the excusal of numerous jurors who expressed general moral or philosophical reservations about the death penalty, but who were not demonstrably "partial" under *Witt*.

---

Trial counsel and the State "agreed to excuse' four jurors *in the midst of voir dire questioning*.  Ven. #61 (14 RR. 70); Ven. #74 (14 RR. 86); Ven. #331 (17 RR. 84); Ven. #467 (19 RR. 79).  These four jurors were not challenged for cause, nor did either party use a peremptory challenge, but the jurors were dismissed after a few minutes of individualized voir dire.  In fact, in the cases of Ven. #61 and Ven. #467, there was nothing on their questionnaires *or* during their truncated voir dire that constituted cause for removal.

Petitioner obtained access to juror questionnaires from the State.  Eight of those have been filed under seal. (Exhs. 30-37).  To the extent the State or Court would like to see additional questionnaires, Petitioner will provide them upon request.

[31] Prospective jurors Ven. #55; Ven. #62; Ven. #114; Ven. #175; Ven. #177; Ven. #202; Ven. #321; Ven. #322; Ven. #363; Ven. #409; Ven. #427; Ven. #503; Ven. #533; Ven. 560; Ven. #568; Ven. #576.  In addition, a number of other jurors who were excused by agreement were not *clearly* challengeable for cause, nor exempt from service for any other reason, based solely on their answers to the questionnaire, and therefore should not have been excused without first attempting to rehabilitate, or at least clarify, their written answers.  *See, e.g.*, Ven. #329 Questionnaire, nos. 17, 18; *see also* Exemption from Jury Service for Certain Persons with Legal Custody of a Child, ch. 599, (H.B. 319) § 62.106(a)(2) (2009) (Under Texas law at the time, "[a] person qualified to serve as a petit juror *may* establish an exemption from jury service if the person . . . has legal custody of a child younger than 15 years of age and the person's service on the jury requires leaving the child without adequate supervision"; Ven. #329 had three children, including two under the age of 15, but in his questionnaire, he said he would not be distracted by concern for them during a lengthy trial and did not try to claim an exemption.).

117

In the thirteen-page form that prospective jurors were required to fill out prior to being tested for qualification[32] and prior to being subjected to individual voir dire, twenty-eight questions mentioned the death penalty explicitly.  *See* Blank Juror Questionnaire (questions 34, 35, 50, 72, 73, 75.1-75.16, 77-78 part 6) (Exh. 27).  However, the wording of the questions and the overlong nature of the questionnaire as a whole[33] did almost nothing to help the attorneys determine whether an individual juror's beliefs about the death penalty would "prevent or

---

[32] *See* Tx. Code Crim. Proc. art. 35.10, 35.12 (the court "tests the jurors' qualifications" by identifying and excluding those jurors who are not qualified voters in the county or who are under indictment for or convicted of any theft or felony).

[33] Some of the prospective jurors who did make it to individual questioning on voir dire stated that they were confused by the complicated language and repetitive nature of the questions, particularly questions 75.1 through 75.16.  In that section, the questionnaire listed statements about the death penalty and required prospective jurors to choose "Agree" or "Disagree."  Some of the statements were compound sentences, making it unclear precisely what the juror "agreed" or "disagreed" with, much less what they would do if they were faced with the decision of sentencing someone to death.

For example, question 75.1 read, "I think the death penalty is necessary, but I wish it were not."  When a prospective juror chose "Disagree," it was impossible to know from the form alone which half of the statement the juror took issue with: did he think the death penalty *was* necessary but did *not* wish it wasn't, or did he *not* think the death penalty was necessary at all?  Similarly, question 75.5 read, "I do not believe in the death penalty, but I believe it is necessary."  If a prospective juror chose "Diagree," did they *not* believe in the death penalty, or did they *not* believe it was necessary?  There was no way the attorneys or the court could have known the answers to these questions without testing the jurors in open court.  *See* 18 RR. 15-16 (Prospective juror no. 383: "[T]hat was one thing I was confused about, the agree and disagree questions on the questionnaire.  I had a lot of trouble with your questions because they weren't cut-and-dried.  It was like they put two answers to the same question.  And I couldn't figure out if I agreed or disagreed.").

However, regardless of whether jurors answered "Agree" or "Disagree" on either question 75.1 or 75.5, their answers could not have been the basis for exclusion from voir dire under *Witherspoon*: neither question addressed whether the jurors' opinions would "prevent or substantially impair the performance of [their] duties . . . in accordance with [their] instructions and . . . oath.'" *Uttecht*, 551 U.S. at 7 (quoting *Adams*, 448 U.S. at 45).

118

substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Uttecht*, 551 U.S. at 7.  To the contrary, the sum of most of the jurors' answers to the questionnaires established that they were willing to consider meaningfully the death penalty versus life in prison without parole based on the facts of each specific case; therefore, such jurors−those whose answers did *not* show that they would be impaired in the performance of their duties−should have been subjected to individual voir dire as required by *Witherspoon* and its progeny.  Yet, 100 of the first 156 prospective jurors were excused on the basis of their questionnaires, without ever having been questioned in open court.

Perhaps the most egregious example of how the "excuse by agreement" practice improperly excluded jurors without subjecting them to individualized voir dire was how the attorneys treated jurors based on their answers to question number 73.  The question asked prospective jurors to assume they were on a jury to determine punishment for a defendant who had already been convicted of capital murder, for whom the law would allow the jury to choose sentences of "death, life imprisonment, or some other penalty;"[34] within those parameters, the jurors were to choose one of five possible responses:

---

[34] This phrase in question number 73 makes any response chosen by a prospective juror even more unclear and misleading.  In Texas, the only two possible punishments for a defendant convicted of capital murder are a death sentence or life without parole.  Tex. Code Crim. Proc. art. 37.071.  Telling a juror to pretend he is able to choose death, life, *or some other punishment*

119

1.   I cannot vote to assess the death penalty under any circumstances.

2.   I am opposed to the death penalty but could vote to assess it in a proper case.

3.   My decision on whether to assess the death penalty would depend upon the facts and circumstances of a particular case.

4.   I would usually vote for the death penalty in a case where the law allows me to do so.

5.   I would vote to assess the death penalty in every case that I could.

*See* Blank Juror Questionnaire (Exh. 27).  Responses 1 and 5 are the only responses that would "prevent or substantially impair" a juror's ability to follow the law on a capital jury.[35]  Even a juror who chose numbers 1 or 5, however, could still be questioned about that answer, particularly if the rest of his answers were inconsistent with his choice for question 73; however, questioning for anyone who chose 1 or 5 was *never* done in this case.

The other responses to question 73 (2, 3, and 4) do not show that the juror is partial under the *Witherspoon* standard.  Thus, there was no basis to excuse for cause any juror who chose 2, 3, or 4; these jurors should have proceeded to

_____

means that the juror looks at responses 1 through 5 with the mistaken understanding that a capital murderer could one day get out of prison unless they, the jury, choose death.

[35] Number 1 is clearly responsive to the ultimate *Witherspoon* question.  Number 5, however, leaves more room for differences of opinion: it is possible that a juror could read "in every case that I could" to *only* include those cases in which he properly followed the law in order to arrive at a sentence of death.  This possibility is another way in which the questionnaire was too confusing to be properly determinative in a *Witherspoon* analysis.

individual voir dire.[36]  However, the attorneys agreed to excuse *all prospective jurors who chose anything other than response 3*.  Of the 47 venirepersons excluded on the basis of question 73 alone, 16 venirepersons could not have been properly challenged for cause, nor were they exempt from service on any other ground, based on the answers to the questionnaire alone; these 16 individuals chose, in response to question 73, the following  answers: four persons chose 2;[37] nine chose 4;[38] two chose 5;[39] and one chose both 4 and 5.[40]

Other questions used to excuse jurors by agreement were also improperly applied.  Question 75.4, for example, instructed the prospective jurors to "agree" or "disagree" with the following statement: "The death penalty has never been effective in preventing crime."  Neither answer establishes whether his views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Uttecht*, 551 U.S. at 7 (quoting *Adams*, 448 U.S. at 45).  Yet the parties placed great emphasis on question 75.4: they agreed to excuse 46 out of the 53 prospective jurors who answered, "Agree,"

---

[36] Unless there were some other proper reason for excluding them that was clear from the questionnaire, such as a health problem that would detract from their ability to concentrate on the trial.  Tex. Code Crim. Proc. art. 35.16(a)(5); *see, e.g.*, Prospective juror Gonzales (Ven. #153) (vision problems; on medication that may interfere with her ability to concentrate).

[37] Prospective jurors Ven. #16; Ven. #104; Ven. #378; Ven. #550.

[38] Prospective jurors Ven. #55; Ven. #62;  Ven. #100; Underwood (Ven. #101); Ven. #205; Ven. #211; Ven. #344; Ven. #396; Ven. #520.

[39] Prospective jurors Ven. #39 and Ven. #177.

[40] Prospective juror Ven. #305.

121

so that only 7 of the 41 people questioned on voir dire "agreed" with question 75.4.

Stated differently: while 37.5% (53 out of 141) of all the venirepersons chose

"Agree," only 17.1% (7 out of 41) of the jurors who were subjected to voir dire

chose "Agree."  Of those 46 venirepersons who were excused by agreement

because they answered "Agree," 6 were not challengeable for cause, or exempt

from service on any other ground, on the basis of their answers to the questionnaire

alone.[41]

Similarly, question 75.9 instructed the venirepersons to "agree" or

"disagree" with the statement: "Life imprisonment is more effective than the death

penalty."  Again, this statement yields little information relevant to a *Witherspoon*

analysis; it is by no means clear what "effective" means in question 75.9, and it is

equally unclear that someone who "agreed" would thus be incapable of performing

his duties as a capital juror, per *Uttecht*.  551 U.S. at 7 (quoting *Adams*, 448 U.S. at

45).  Trial counsel and the State, however, agreed to excuse nearly all of the people

who "agreed" with question 75.9.   Out of the 141 people who filled out the

questionnaire, 30 chose "Agree" (27.0%); out of the 41 people who were subjected

to individualized voir dire, only 2 of them chose "Agree" (4.9%).  In both

questions 75.4 and 75.9, then, the parties excluded prospective jurors on the basis

of questions that did not indicate whether a juror could be empaneled under the

*Witherspoon* standard.

---

[41] Ven. #114; Ven. #202; Ven. #322; Ven. #427; Ven. #503; Ven. #568.

Though many of the one hundred jurors who were excused by agreement should have been subjected to voir dire, one juror stands out as having been improperly excluded on the basis of her answers to the questionnaire standing alone: Venireperson #321.[42]  All of #321's answers to the twenty-eight questions that asked about the death penalty placed her well within the bounds of *Witherspoon* and its progeny.  For example, for question 75.7, which posited, "I do not believe in the death penalty under any circumstances," Cole responded, "Disagree," showing that she was open to the idea of sentencing a capital murder defendant to death in an appropriate case.  *See* Ven. #321 Questionnaire at no. 75.7.  Similarly, in response to question 75. 2, which stated, "Any person, man or woman, young or old, who commits capital murder should pay with his own life," #321 answered, "Disagree," indicating her willingness to sentence a capital murder defendant to life without parole in an appropriate case.  *See* Ven. #321 Questionnaire at no. 75.2.  *See also* nos. 34, 35, 72, 73, 75.2, 75.6, 75.7, 75.14.  In addition, the remaining questions on the form−used to determine #321's basic life story and any other basis for impairment or bias−gave no indication that she was unfit or impartial.  *See* Ven. #321 Questionnaire at nos. 23, 42 (no health problems that would distract her during trial); 25-31, 36-37, 39 (no prior experience with the

---

[42] #321 was given a time-slot for individualized voir dire.  12 RR. 69.  However, six days into the process and before her time-slot arrived, the parties announced on the record that they had agreed to excuse #321 from voir dire, and the judge canceled her time-slot and removed her from the prospective jurors list.  17 RR. 52.

criminal justice system); 40-43 (no bias against psychiatrists or psychologists); 64-68, 70, 71 (no bias for or against persons working in law enforcement or criminal law); 80(a) (general willingness to serve if chosen).  Given all of this, trial counsel should not have agreed to excuse #321 without subjecting her to individualized, face-to-face voir dire questioning–but that is precisely what counsel did.

In contrast, Venireperson #553 was not only called for individualized questioning on the basis of her questionnaire answers, 12 RR. 70, but also ultimately seated as Juror #12.  19 RR 177. #553's answers when she was questioned in open court demonstrate the importance of the in-person, individualized "voir dire culminating in a finding by the trial judge concerning the venireman's state of mind." *Witt*, 469 U.S. at 428.  Despite the fact that some of her written answers seemed to establish her partiality under *Witherspoon*, the State and defense counsel questioned her on voir dire and determined that she was confused when she completed the form, but was capable of acting in accordance with a capital juror's instructions and oath.

Venirepersons #553 and #321, in some ways, had very similar questionnaires: #553 gave exactly the same answers as #321 on twenty of the twenty-eight questions that directly referred to the death penalty.[43]  In addition, like

---

[43]*Compare* #553 and #321 Questionnaires at nos. 34, 50, 73, 75.1, 75.1, 75.4, 75.6-75.11, 75.13, 75.15, 75.16, 78 parts 2 through 6.  In addition, for question 78 part 1, #553 said, "In certain circumstances [the death penalty] is beneficial to society." Ven. #553 Questionnaire. #321 answered the same question, "Punishment should fit the crime."  Ven. #321 Questionnaire.

#321, #553's questionnaire showed little in her personal or professional life that would point toward bias or unfitness for service; the most it revealed was that she worked as a deputy court clerk in a nearby town's police station. *See* Ven. #553 Questionnaire at nos. 9, 12.  On the remaining seven death penalty questions, however, #553 gave at least one answer that appeared to establish her partiality under the *Witherspoon* standard–and yet she was not only chosen for individualized voir dire but also *ultimately seated on the trial jury*, while #321 was never questioned.  The chart below illustrates the fact that #321 gave answers on her questionnaire that aligned almost perfectly with the answers that the State and defense counsel were most interested in seeing; #553, on the other hand, not only gave some answers that raise questions about partiality, but also diverged from the parties' most sought-for responses:

| Questionnaire Question | Most Common Answers (by jurors selected for voir dire) | Answers by Venire #553 (also Juror #12) | Answers by Venire #321 (Not subjected to voir dire) |
|---|---|---|---|
| 35. Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict, which would result in the execution of another human being? | NO | YES[44] | NO |
| 72. CHOOSE ONE:<br><br>1. I am opposed to capital punishment in all cases, …<br>2. I am opposed to capital punishment except in a few cases where it may be appropriate.<br>3. I am neither generally opposed to not generally in favor of capital punishment.<br>4. I am in favor of capital punishment except in a few cases where it may not be appropriate.<br><br>5. I am strongly in favor of | Responses in order from most chosen to least:[45]<br><br>4 (most common)<br><br>3<br><br>5<br><br>2<br><br>3 & 4<br><br>1 (least common) | 2 | 4 |

44 However, #553 did an about-face on voir dire:

Q. [Quoting question 35]

A. I believe I put 'No.'

Q. You checked 'Yes.' That's why I'm asking because the rest of your questionnaire didn't seem to fit that answer … So, I just want to make sure. You say, 'Oh, well, now, that what you're talking about.' So, you meant to say 'No' on that. So, you don't have any religious, moral or personal beliefs that I can't do this?

A. No.

19 RR 133-34. This exchange demonstrates individual voir dire can show that a juror whose written answers seem to establish partiality under *Witherspoon* can still be an impartial juror. In a death penalty case, impartiality must be determined through individualized questioning, so that demeanor and credibility can be assessed by the court. *See Irvin*, 366 U.S. at 724.

45 This question, much like questions 75.4 and 75.9, was disproportionately used to exclude jurors who chose response 2. The parties questioned only 8.0% of the jurors who chose 2 (2 out of 25)—as compared to 37.5% of those who chose 3 (12 out of 32); 45.5% of those who chose 4 (20 out of 44); and 18.5% of those who chose 5 (5 out of 27). Importantly, 3 of the 23 jurors who chose number 2 were not challengeable for cause, nor exempt from service for any other reason, solely on the basis of their answers to the questionnaire. *See* Ven. #202 Questionnaire; Ven. # 568 Questionnaire.

| Questionnaire Question | Most Common Answers (by jurors selected for voir dire) | Answers by Venire #553 (also Juror #12) | | Answers by Venire #321 (Not subjected to voir dire) |
|---|---|---|---|---|
| capital punishment as an appropriate penalty. | | | | |
| 75.3. The death penalty is wrong, but it is necessary in our imperfect civilization. | Disagree | Agree[46] | | Disagree |
| 75.5. I do not believe in the death penalty, but I believe it is necessary. | Disagree | Agree[47] | | Disagree |
| 75.12. I do not believe in the death penalty, but I do not believe it should be abolished. | Disagree | Agree[48] | | Disagree |
| 75.14. The State cannot teach the sacredness of human life by destroying life. | Disagree | **Agree** | | Disagree |
| 77. I believe the death penalty in Texas is used: <br> a) Too often <br> b) An appropriate amount of time <br> c) Not often enough | b) | b) | | c) |

Venireperson # 321 said *nothing* in her questionnaire that made her

challengeable for cause, much less anything that was specifically at odds with her

duty as a capital juror, as defined by *Witherspoon*–and yet trial counsel agreed to

excuse her without ever questioning her in court.  In contrast, on the basis of her

---

46 On voir dire, #553 indicated she did not think the death penalty was wrong at all:

Q. First of all, can you kind of tell us in your own words, what's your opinion about the death penalty?

A. I believe it serves a purpose. There are some instances where it would be very applicable depending on the crime.

Q. Okay. Do you think it's a proper type of punishment for certain types of –

A. For certain crimes, yes.

Q. Okay. Has there ever been a period of time in your life where you opposed the death penalty? Said, 'I don't believe in it. I don't think we ought to do it?'

A. Not that I can think of, no.

47 #553 was confused in filling out her form on multiple questions, number 75.5 included. On voir dire, when asked, "Do you believe in the death penalty?" #553 responded, "Yes, I do believe in the death penalty." In reply to the follow-up, "Do you think sometimes it's necessary?" #553 said, "Yes." 19 RR 144; *see also* note 20

48 *See* notes 20, 21.

answers to questions 35 and 75.14 alone,[49] #553 *may* have been challengeable for cause–but the trial attorneys did not agree to excuse her; instead, they called her in for individualized voir dire and felt that she rehabilitated her original answers well enough to be seated on the jury.  14 RR 128-77.  Thus, it is clear that the questionnaire was not a valid way to determine whether a prospective juror could have properly empaneled under *Witherspoon*; that determination can only be made during individualized, in-person voir dire.

Excusing venireperson #321 by agreement without questioning her in open court was error.  Petitioner was harmed by her exclusion because he was not allowed the opportunity to determine if #321–who was before #553 on the venire list–could have been an impartial juror.

Because of venireperson #321's improper exclusion, as well as the improper exclusion of nearly one hundred other jurors, Petitioner's "subsequently imposed death penalty cannot stand."  *Davis*, 429 U.S. at 122.

Trial counsel was deficient for failing to object to this procedure as a violation of *Witherspoon* and its progeny.  Because the improper disqualification of even a single venireperson is reversible error, *see Gray*, 481 U.S. at 668, Petitioner was prejudiced.

---

[49] Interestingly, Ven. #50 and Ven. #431 also chose "Agree" in response to the statement in question 75.14: "The State cannot teach the sacredness of human life by destroying it."  Ven. #50 Questionnaire and #431 Questionnaire at no. 75.14.  Both were called for questioning and ultimately empaneled.  14 RR. 59 (#50, as Juror #4); 19 RR. 49 (#431, as Juror #11).

Appellate counsel, who permitted Petitioner to waive his right to counsel on appeal before the record was prepared, ineffectively failed to review the record. Had counsel reviewed the record, counsel could have informed Petitioner that this claim was available and raised this claim on appeal.  Because appellate counsel has a duty to review the record, and because there would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.  *See Riley v. State*, 889 S.W.2d 290 (Tex. Crim. App. 1993), *rehearing denied* (Feb. 9, 1994), *rehearing denied* (Dec. 21, 1994) (reversing capital conviction and sentence on the basis of improperly sustained challenge for cause to venireperson who consistently and unequivocally stated that she could answer statutory punishment issues affirmatively if proven beyond a reasonable doubt, despite conscientious objections to death penalty).

## V.   IMPROPER VICTIM IMPACT EVIDENCE AND ARGUMENT WAS INTRODUCED AT PENALTY PHASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. THE PROSECUTOR COMMITTED MISCONDUCT AND TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN LITIGATING THIS ISSUE.

The State presented unduly prejudicial evidence and argument, beyond the permissible limits of victim impact evidence, at the penalty phase.  This improper evidence and argument described: a memorial at the site of the killing created in Elijah's memory, with accompanying photographs; a memorial services held in his memory, with an accompanying pamphlet; the impact of this murder on everyone involved, including the witnesses, police, prosecutors, and even the jury; and the impact of an extraneous offense committed by Petitioner on the victim of that offense and her family.  The prosecutor's closing argument improperly compared the worth of Petitioner to that of the victim and other members of the community, including other sexual abuse survivors and Petitioner's mother.  Ultimately, the prosecutor asked the jury to impose a death sentence for all his prior bad acts and for "every victim in his life."  33 RR 26.  The jury's consideration of this improper evidence and argument violated Petitioner's Eighth and Fourteenth Amendment rights to a fair and reliable sentencing proceeding.

While *Payne v. Tennessee*, 501 U.S. 808 (1991), held that victim impact evidence at the penalty phase is not per se unconstitutional, the Court cautioned that such evidence should provide only a "quick glimpse" of the victim's life.  *Id.*

at 822. The Court recognized that due process prohibits evidence which "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825. As Justice O'Connor noted:

> We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, the Eighth Amendment erects no per se bar. If, in a particular case, a witness' testimony or prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.

*Id.* at 831 (O'Connor concurring) (internal citations omitted). Thus, *Payne* permits limited victim impact evidence in order to prevent the victim from being "faceless," while at the same time avoiding unfair prejudice to the defendant.

Following *Payne*, Texas state law limits the admission of victim impact evidence to that which shows the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to defense mitigating evidence. *See Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998). However, the court in *Mosley* made it clear that such evidence is irrelevant to any future dangerous determination and becomes overly prejudicial when it is too extensive and/or seeks to compare the worth of the victim to the defendant or other members of society. *Id.* Moreover, under Texas law, as under federal law*,* testimony concerning the impact of extraneous offenses committed by the defendant is not permitted. *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997); *Payne*, 501 U.S. at 827.

Trial counsel filed and argued various pretrial motions seeking to completely exclude and/or limit the victim impact testimony admitted at the penalty phase of trial. *See* Defendant's Motion Regarding Victim Character/Impact Testimony After *Mosley v. State,* CR 204; Motion to Preclude State from Offering Victim Impact Testimony and Order, CR 209; Motion in Limine, CR 279; 11 RR 14-18. These motions specifically sought to exclude testimony that went beyond the limits set forth in *Payne* and *Mosley* and testimony related to the impact of any extraneous offenses committed by Petitioner. These motions also requested a limiting instruction regarding the proper use of any victim impact evidence that was admitted. The court denied Petitioner's motions,[50] but ordered the State to provide defense counsel with "a general outline of the subject matter to be inquired into" with Ms. Entriken and stated that it would consider the admissibility of this testimony at the time it was offered. *See* 11 RR 15-16. There is no indication that this notice was ever provided, and Ms. Entriken's testimony was admitted in full at the penalty phase of trial without objection from counsel. No limiting instruction was requested at the close of evidence, and none was presented to the jury.

---

[50] It is not clear whether the Court ruled on one of Petitioner's motions, entitled *Petitioner's Motion in Limine (Victim Impact Type Evidence).* To the extent the court did not rule on this motion, counsel were ineffective for waiving this issue.

The court's rulings with regard to the admissibility of this victim impact evidence were erroneous, resulting in a violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

Given the court's ruling that the admissibility of this evidence would be determined during the course of trial, defense counsel's failure to object to the admission of any improper victim impact evidence and argument was deficient performance that rendered Petitioner's trial fundamentally unfair.  Counsel was also deficient for failing to renew their pretrial request for a limiting instruction regarding the jury's proper use of this evidence.  To the extent counsel did not seek a ruling from the court on all pretrial motions filed with regard to this evidence and to the extent counsel did not obtain a written proffer as to the evidence the State intended to elicit from Ms. Entriken, counsel was also deficient.  Petitioner was prejudiced as a result of counsel's failures.

### A.    Improper Victim Impact Evidence and Argument.

Carolyn Entriken was the sole victim impact witness at the penalty phase. She began by describing her grandson's death as "horrifying" and the manner in which he was killed as "egregious[ ] and cruel."  22 RR 23.

Ms. Entriken went on to describe a memorial that someone put up in memory of her grandson and several visits she made to that memorial.  *Id.* at 24. Utilizing State's Exhibit 170, a photograph of the memorial admitted without any objection from defense counsel, Ms. Entriken described it as consisting of two

crosses surrounded by stuffed animals and beads from many parades held at that location.   She described how the memorial seemed to have survived Hurricane Ike and that when she visited the site she left a tile with the letter "A" on it at the location.   *Id.* at 26.

Ms. Entriken further testified about a memorial ceremony she helped plan for baby Alijah.  She explained that it was a very small service in a very big sanctuary, for which she enlarged a couple pictures of Alijah and put them on pallets.  She explained that she was still in shock and the service was very hard to get through.  *Id.* at 27.

She went on to describe how the family suffered additional sadness because Alijah's body was not released to them until sometime in late May and as a result they were unable to bury him until June 4, 2008.  *Id.*  She described the ceremony that accompanied the burial in Connecticut and, with the consent of defense counsel, a pamphlet handed out at the memorial service was admitted into evidence.  *Id.* at 28.  She characterized the service as "extremely difficult" and explained that it was "really wrenching" to see the little white casket, which was positioned right in front of them.  *Id.* at 29.

Ms. Entriken went on to describe the impact of the murder of not only herself, but on her daughter, the Zaros and everyone else involved in the case.  She explained how she was denied the opportunity to be a grandparent and to see her daughter become a parent.  *Id.* at 30, 32.   She described how she didn't get the

134

chance to see her grandson smiling, laughing, and giggling.  *Id.* at 30.  She testified

about the difficulty she and her daughter have any time they have to pass the baby

section at the grocery store.  She testified they were "all depressed" and felt "a

betrayal beyond belief."  *Id.* at 31-32.  Regarding the Zaros, she testified: "I can't

even imagine what those poor people went through when they found Alijah.  . . .

I'm sure that their lives will never be the same the rest of their life."  *Id.* at 32.  She

testified she felt bad for the jury who had to endure all this "evil" and that her heart

went out to the investigators, the prosecutors, the medical examiners and anybody

who had to be a part of this case.  She described how she didn't think anyone

would ever forget this case and expressed the hope that they never had to see "this

kind of evil again."  *Id.* at 33.

The prosecutor's closing argument created even more prejudice, making

improper statements as to the worth and morality of Petitioner as compared to baby

Alijah, other sex offenders, and his mother.  The prosecutor repeatedly referred to

Petitioner as a "monster" and "evil," which sharply contrasted with his description

of the Alijah as "helpless" and "a beautiful baby."  33 RR 20, 21, 26.

The prosecutor repeatedly and improperly compared Petitioner's worth and

morality to that of other abuse survivors, including the decedent in this case:

> How many people in our society have perfect childhoods?  How many
> people are out there that have suffered abuse, physical abuse,
> emotional abuse, whether or not it's Kendra Witherspoon or
> somebody that you knew, someone that you grew up with, a family
> member?

*Id*. at 25.  The State reiterated this same point, arguing:

> Travis Mullis is a sexual abuse survivor.  His sister from the same
> mother, a sexual abuse survivor.  Most sexual abuse survivors are not
> re-offenders.  Travis Mullis not only is a re-offender, he also killed his
> son. . . . [The only] abuse survivor that didn't survive is Alijah Mullis.
> He was not a survivor.  He was sexually abused but he was not a
> survivor.

*Id.* at  65-66.

The prosecutor also improperly compared Petitioner's worth and morality to

that of his biological mother Sheila Wallace.   In defending Ms. Wallace, he

argued:

> Sheila Wallace knew she wasn't going to live the night, she gave
> Travis to Ms. Devlin . . . to take home. . . . she delivered him to
> someone who cared.  And for that, we would be so lucky if Travis
> Mullis had what Shelia Wallace had.  Take care of Alijah.  Take care
> of him.  I can't take care of him.  Hand him over to somebody else as
> opposed to use him for his physical pleasure and then kill him.

*Id.* at 64.

Finally, the prosecutor made the improper argument that "[t]he Defendant

deserves the death penalty for everything he's done, for every victim in his life."

*Id.* at 26.  This argument clearly informed the jury that they should consider

victims other than the family of Alijah Mullis, whose murder was the subject of

Petitioner's penalty phase.  The prosecutor made that even clearer in his rebuttal

closing argument when he described the impact of Petitioner's actions on a young

girl who testified that Petitioner attempted to sexually assault her:

136

And did you see Cecelia when she took that stand?  Can you envision her on the stand, this big lock of bangs?  I don't know if you noticed. She's sitting there and the lock of bangs was covering this eye and she could see Travis and she moved her hair over to block that view to see this view.  You could tell by Cecelia that she felt she was in the presence of evil even though she's in a courtroom well lit, bailiffs, jury, you could tell she felt the threat and that's the kind of threat that he is.

33 RR 68.

The jury had heard inflammatory testimony from Cecelia and other victims, but that testimony was admissible only on the issue of future dangerousness – not for victim impact.  The psychological effect that Petitioner's uncharged acts may have had on Cecelia is not a proper basis for a death sentence.  Nonetheless, one of the last things the prosecutor said to the jury before it was sent to decide Petitioner's sentence was that Cecelia "felt she was in the presence of evil" and "felt the threat" from being in Petitioner's presence.  *Id.*  These improper arguments were highly prejudicial and interjected an impermissible factor into the jury's thinking and deliberation.

## B.  Trial Court Error and Prosecutorial Misconduct

Prior to trial, defense counsel moved to limit the amount and scope of the victim impact evidence and argument the State should be allowed to admit at the penalty phase of trial and requested a limiting instruction regarding the proper use of this evidence.  The trial court erred in denying these motions and refusing to give a limiting instruction .  Ms. Entriken was permitted to testify well beyond the

137

proper limits of victim impact testimony.  Moreover, the penalty phase instructions were completely void of any explanation as to how the jury was supposed to factor in Ms. Entriken's overly extensive and sympathetic victim impact testimony into their determinations of the first and second special issues.

The prosecution committed misconduct by eliciting this improper victim impact testimony and making improper comments in closing argument.  By diverting the jury's attention toward concern for the decedent's family and anyone involved in the case, and arguing Petitioner's purported moral worthlessness compared to that of others in society, this evidence and argument impaired the jury's ability to make a reasoned determination of Petitioner's moral culpability and to give full effect to mitigating evidence, in violation of the Sixth, Eighth, and Fourteenth Amendments.

The prosecutor clearly exceeded the bounds of *Payne* when he argued that Petitioner should be sentenced to death for all the victims of his non-capital offenses, including Cecelia.  This implicates the equal protection and due process clauses of the Fourteenth Amendment and the Eighth Amendment's prohibition on arbitrarily or capriciously-imposed death sentences.  *See Kennedy v. Louisiana*, 554 U.S. 407 (2008).

### C.    Ineffective Assistance of Counsel

Although the trial court denied Petitioner's pretrial motions with regard to the State's anticipated victim impact presentation, the court ruled that the

138

prosecution was to provide the defense with a general outline of the points to be addressed with Ms. Entriken.   Although it is not clear whether this proffer was actually given, defense counsel was ineffective for either failing to ensure it was delivered or for receiving the proffer and not objecting to the irrelevant and inflammatory aspects of her testimony.  During trial, defense counsel did not object to, or request a curative instruction in response to, any of the improper testimony or prosecutorial arguments set forth above.  Nor did counsel object to the admission, and circulation to the jury, of photographs of a memorial created on the decedent's behalf or a pamphlet from his memorial service.  These extraneous items had no relevance or bearing upon a proper victim impact presentation and served merely to inflame the passions of the jury.  Counsel also failed to renew their pretrial request for a limiting instruction regarding the use of Ms. Entriken's victim impact testimony, explaining that the law required that such evidence is *not* to be considered when determining the future dangerousness issue.

Trial counsel had no reasonable basis for failing to properly object and litigate this meritorious claim – particularly where counsel had identified the potential prejudice before the trial even began, as evident from their pretrial motions.

Counsel's failures prejudiced Petitioner.  Counsel's failure to object to the prosecutor's comment that the jury should impose death for all of Petitioner's victims left the jury to assume that it could consider the impact of Petitioner's

139

alleged misconduct towards Cecelia and Antonio Duarte, Susan Barry, Dee Dietz, and any purported victims at Jefferson School and Brooklane/Stone Bridge when it was deciding whether Petitioner would live or die.  Had defense counsel objected to this impropriety, as well as all of the other improprieties set forth above, and renewed their request for a limited instruction with regard to the use of victim impact evidence, there is a reasonable probability that at least one juror would not have voted for a sentence of death.

Appellate counsel, who permitted Petitioner to waive his right to counsel on appeal before the record was prepared, failed to review the record.  Had counsel reviewed the record, counsel could have informed Petitioner that this claim was available and raised this claim on appeal.  Because appellate counsel has a duty to review the record, and because there would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

**VI.  THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT MITIGATING CIRCUMSTANCES DO NOT NEED TO BE PROVEN BEYOND A REASONABLE DOUBT, VIOLATING PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR A PROPER INSTRUCTION OR OBJECT TO THE INSTRUCTION AS GIVEN; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE.**

The Eighth and Fourteenth Amendments require that a capital sentencing jury be able to consider and give effect to mitigating evidence in order to reach an individualized sentence:

> Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense.  Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a reasoned moral response to the defendant's background, character, and crime.

*Penry v. Lynaugh*, 492 U.S. 302, 327-328 (1989); *see also*, *e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 285 (2004); *Penry v. Johnson*, 532 U.S. 782, 797 (2001).  This principle was violated in this case when the trial court instructed the jury that the burden of proof for the special issues was beyond a reasonable doubt.  The jury was not instructed that mitigating circumstances need not be proven beyond a reasonable doubt.  Thus, any reasonable juror would assume that the only burden of proof described in the instructions applied to all the issues to be determined at the penalty phase.  This violated Petitioner's Eighth and Fourteenth Amendment rights to individualized, reliable capital sentencing.

Under Art. 37.071, a capital defendant may be sentenced to death only if the jury unanimously[51] answers the first special issue (future danger) "yes," and the second special issue (weighing mitigation) "no."  The first special issue is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," Art. 37.071 Sec.

---

[51] The constitutionality of the unanimity requirement juxtaposed by the ten votes requirement is discussed in Claim VIII.

2(b)(1).  The statute requires that the prosecution prove beyond a reasonable doubt each issue submitted under the first question.  The second special issue is: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."  Art. 37.071 Sec. 2(e)(1).  The statute does not specify a burden of proof for mitigating circumstances.

Here, the trial court instructed the jury more than once that the burden of proof for the first special issue was beyond a reasonable doubt:

> The prosecution has the burden of proving that the answer to Special Issue Number 1 should be "Yes," and it must do by proving a "yes" answer to Special Issue Number 1 beyond a reasonable doubt, and if it fails to do so, you must answer Special Issue Number 1 "No."

Charge of the Court on Punishment, CR 820.  The court also instructed the jury that extraneous crimes or bad acts, other than the conviction in this case, "cannot [be] consider[ed] for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other acts, if they were committed."  CR 823.  The court also described the answers to both Special Issues as a "finding," further emphasizing the similarity of the jury's tasks on both issues.  *Id.*

The jury received a written copy of the charge with the verdict sheet attached.  The verdict sheet stated, as to the first Special Issue, "Do you find from

142

evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?" CR 825.   The verdict sheet stated, as to the second Special Issue, "Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?"  CR 826.  The verdict sheet was structured identically with respect to the Special Issues.  CR 825-26.  Of course, the jury had also been instructed at the guilt-innocence phase of trial that its findings had to be made beyond a reasonable doubt.  *See* Charge of the Court, CR 772-80 (using the phrase "beyond a reasonable doubt" ten times).

Given the charge of the court and the verdict sheet as a whole, a reasonable juror would believe that all findings, including findings of mitigating circumstances, were required to be made beyond a reasonable doubt.  This unconstitutionally limited the jury's ability to consider and give effect to mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990); *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Tennard v. Dretke*, 542 U.S. 274, 285 (2004).  "The Constitution *requires* States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall."

143

*McKoy*, 494 U.S. at 442.  A jury must be allowed to consider any *relevant* mitigation evidence.  *Tennard*, 542 U.S. at 284.  Here, jurors were forced to ignore relevant mitigating evidence that they felt was not proven—or capable of being proven—beyond a reasonable doubt.  That is, they could not "consider" all relevant mitigating evidence as *Lockett* and its progeny require.

Trial counsel failed to move for a proper jury charge and verdict sheet, and failed to object to the court's charge and verdict sheet.  In this case, counsel followed a strategy of challenging unconstitutional aspects of the Texas death penalty statute, *see* Claim VIII, and counsel raised a similar issue in a Motion to Hold Unconstitutional Tex. Code Crim. Proc. Art. 37.071 Sec. 2(e) and (f) – Failure to Require Mitigation be Considered, CR 425.  Thus, counsel could have had no reasonable strategy for failing to raise this meritorious constitutional issue.  Because the jury charge and verdict sheet resulted in an unconstitutional death sentence, Petitioner was prejudiced by counsel's deficient representation.

Appellate counsel, who permitted Petitioner to waive his right to counsel on appeal before the record was prepared, ineffectively failed to review the record.  Had counsel reviewed the record, counsel could have informed Petitioner that this claim was available and raised this claim on appeal.  Because appellate counsel has a duty to review the record, and because there would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

144

## VII.   THE STATE REPEATEDLY ENGAGED IN PROSECUTORIAL MISCONDUCT BY PRESENTING INFLAMMATORY AND IMPROPER EVIDENCE AND ARGUMENT AT PENALTY PHASE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.   THE TRIAL COURT ERRED BY ADMITTING THIS EVIDENCE, AND TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO PROPERLY LITIGATE THIS ISSUE.

The prosecution engaged in misconduct throughout penalty phase of Petitioner's trial.  The prosecution made improper inflammatory argument, improperly attacked defense counsel, and presented prejudicial, irrelevant testimony.  This misconduct infected Petitioner's penalty phase with unfairness.  Defense counsel failed to object to this prosecutorial misconduct.  Accordingly, Petitioner was denied his rights to due process and effective assistance of counsel.

The prosecution's duty in a criminal prosecution "is not that it shall win a case, but that justice shall be done."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  As part of this duty, a prosecutor is required to avoid improper argument to the jury.  Because of the prosecutor's prominent courtroom role as the State's representative, jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight ... when they should properly carry none."  *Id*.  "The Government's representative may prosecute with earnestness and vigor– indeed he should do so.  But while he may strike hard blows, he is not at liberty to strike foul ones."  *United States v. Diaz Carreon*, 915 F.2d 951, 956 (5th Cir. 1990) (quotation omitted).  When a

prosecutor's argument infects the trial with unfairness, due process is violated. *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989).

Even where individual remarks by themselves do not create a due process violation, their cumulative effect may do so. *Berger*, 295 U.S. at 89 (misconduct was not "slight or confined to a single instance, but ... was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential"); *see also Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (new trial granted based on cumulative effect of prosecutor's improper remarks in closing argument, including vouching for the credibility of a witness and disparaging the defense violated due process where the only curative instruction was the standard instruction that counsel's arguments are not evidence); *Davis v. Zant*, 36 F.3d 1538, 1550 (11th Cir. 1994) (prosecutor's conduct as a whole violated due process); *Lesko v. Lehman*, 925 F.2d 1527, 1546 (3d. Cir. 1991) (same).

### A. The State Presented Improper and Irrelevant Argument in Penalty Phase Closing For the Sole Purpose of Inflaming the Passion of the Jury.

The principle of due process requires fundamental fairness by the State in all of its dealings with those accused of crimes. The prosecutor's role is especially important in death penalty cases because the prosecutor is a determining force in the decision of whether a human being lives or dies.  As the Fifth Circuit stated:

Because death is so fundamentally different from other kinds of punishment, the Constitution requires, by means of procedural safeguards and judicial vigilance, assurance that the imposition of death is not the product of arbitrariness or caprice. At a sentencing hearing in a capital case, the jury's role is to focus on the aggravating and mitigating circumstances of the crime. In reviewing such a proceeding, we inquire whether the jury was motivated by subjective rather than objective factors in reaching its decision. If the prosecutor's arguments make a rational assessment by the jury unlikely, or the prosecutor engages in "persistent or pronounced misconduct," then the sentencing hearing is fundamentally unfair.

*Kirkpatrick v. Blackburn*, 777 F.2d 272, 288 (5th Cir. 1985) (internal citations omitted). *See also Lesko*, 925 F.2d at 1541 ("The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system," so a capital "prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices.").

At several points during the penalty phase closing in Petitioner's case, the prosecutor made improper arguments for the sole purpose of inflaming the passions of the jury, thereby violating his special capital case duties and impairing the jury's objectivity.  First, throughout the closing argument at the penalty phase, the prosecution improperly and unfairly attacked Petitioner – repeatedly referring to him as "evil," and "a monster."  The prosecution argued "that evil does exist, that the monster is sitting right here in this courtroom and his name is Travis Mullis."  33 RR 20.  *See also id*. at 21 ("And what do we know about all the efforts that went into trying to fix the monster?"); *id*. at 23 ("There is nothing you can do about the evil he is."); *id*. at 26 ("The Defendant deserves the death penalty... for a

147

beautiful baby that was helpless as the hands of a monster."); *id.* at 68 ("You could tell by Cecilia that she felt she was in the presence of evil...").  The prosecution also referred to petitioner as a "cold-blooded killer."  *See id.* at 58 ("He doesn't have a conscience. It's what we call a cold-blooded killer.").

The prosecutor's repeated use of these derogatory terms in reference to Petitioner was improper and inflammatory.  *See Ponce v. State*, 299 S.W.3d 167, 175 (Tex. App. 2009) ("It is improper to refer to a defendant by a derogatory term designed to subject him to personal abuse," yet the *single* use of term "monster" did not prejudice defendant).  When considered in combination with the prosecutor's other misconduct and the lack of a contemporaneous corrective instruction, Petitioner was denied a fair and impartial sentencing hearing.  *See United States v Francis*, 170 F3d 546, 549 (6th Cir. 1999) (prosecutor's calling defendant "a liar" and "con man" was reversible error in absence of curative instructions); *United States v. Blakey*, 14 F.3d 1557, 1559-62 (11th Cir. 1994) (prosecutor's impugning of defendant's character and statements that defendant is a "professional criminal" were reversible error because misstatements were repeated, curative instructions were poor and evidence of defendant's guilt was not overwhelming.).

Second, the prosecution improperly attacked defense counsel several times during the penalty phase.  In commenting on defense counsel's efforts to show that Petitioner would not commit acts of violence in the future (Special Issue Number

148

1), the prosecution suggested to the jury that defense counsel was attempting to mislead them. *Id*. at 53 ("Something's wrong here.  Somebody's trying to lead somebody down somewhere."); *see also id*. at 62 ("And the biggest manipulation, the biggest con he hopes to pull off is to con you into believing he's not a continuing threat.").  Later, without any evidentiary basis, the prosecution suggested to the jury that Petitioner's lack of violent incidents in jail while awaiting trial was solely the result of collusion between Petitioner and defense counsel. *Id*. at 57 ("If I start acting out too much, it's probably a bad thing, probably not going to be to my benefit.  I suggest defense counsel probably told him that.").

The prosecutor's reference to evidence not in the record and repeated personal attacks on opposing counsel were patently improper.  *See United States v. Morris*, 568 F.2d 396 (5th Cir.1978) ("prosecutor may not directly refer to or even allude to evidence that was not adduced at trial"); *Murrah*, 888 F.2d at 27 (prosecutor may not challenge the integrity and ethical standards of defense counsel unless the prosecutor has certain proof of an offense and the matter is relevant to the case being tried).  In combination with the prosecutor's other misconduct, and in light of the lack of any contemporaneous curative instruction, Petitioner was denied a fundamentally fair sentencing hearing.  *See Murrah,* 888 F.2d at 27-28 (prosecutor's repeated references to evidence not in record and attacks on integrity of defense counsel were reversible error because curative

149

instructions were insufficient and government evidence was open to varying inferences); *United States v. Friedman*, 909 F.2d 705, 709-10 (2d. Cir. 1990) (prosecutor's statements that defense counsel would "make any argument he can to get that guy off" and "for high fees" was reversible error because curative instructions were insufficient and evidence of defendant's guilt was not overwhelming); *United States v. Rodriques*, 159 F3d 439, 451 (9th Cir. 1998) (prosecutor's attack on defense counsel was reversible error because it was not mitigated by curative instructions and seriously impaired jury's ability to render fair verdict).

The prosecution also improperly argued that Petitioner's uncle – Steven Barry – feared Petitioner, in part because "he knows Travis Mullis assaulted his own grandmother." *Id*. at 21.  The prosecutor knew or should have known that Petitioner's grandmother told law enforcement no such assault had ever happened. *See* Claim I.

Moreover, the prosecution presented irrelevant and inadmissible victim impact evidence and argument. *See* Claim V.  The prosecution also improperly argued that Petitioner should be sentenced to death for extraneous, non-capital offenses. *Id*.  The State also argued for death based upon prior alleged misconduct that it knew or should have known was unfounded. *See* Claim I.

In deciding Petitioner's sentence, the jury considered whether Petitioner "would commit criminal acts of violence that would constitute a continuing threat

150

to society." Charge of the Court on Punishment, 4 CR 820. The prosecution urged the jury to interpret "society" as including both prison and the free world, rather than just prison, even though Petitioner could be sentenced to only death or life in prison without parole, and therefore could never again be in the free world. 33 RR 20; *id*. at 53. The State's argument to the jury as to how "society" should be interpreted created a "risk of wholly arbitrary and capricious action" by the sentencing jury. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).

The arguments and evidence set forth above were improper and highly inflammatory, and not relevant to either issue of the penalty phase. The admission of this improper evidence and argument violated Petitioner's constitutional rights to counsel, to remain silent, and to not be subject to arbitrary, capricious and cruel and unusual punishment. This repeated and pervasive prosecutorial misconduct so infected the penalty phase with unfairness that Petitioner's rights to due process were abrogated.

**B.    The State Presented Prejudicial Testimony About Tonya Dean's Emotional Reaction to Discovering Semen on the Victim's Oral Swab.**

During the penalty phase of Petitioner's trial, the State presented the testimony of Tonya Dean, a forensic scientist at the Texas Department of Public Safety Regional Crime Lab in Houston. 29 RR 160. Ms. Dean testified that her duties in this case included the testing of any DNA she could extract from the evidence obtained from the crime scene. *Id.* at 165-66. She sought to compare the

biological evidence from the crime scene with the DNA samples collected on oral swabs from the victim Alijah Mullis, the victim's mother, and Petitioner. *Id.* at 166-67.

During her direct examination, Ms. Dean testified that she found two or more DNA profiles on Alijah's oral swab. *Id.* at 172. After ruling out crime lab contamination as the source of the mixed DNA on Alijah's swab, Ms. Dean spoke with a police detective and decided to check for semen. *Id.* at 172-75. The results were positive for the presence of semen, and Ms. Dean observed sperm cells when looking at the oral swabs under a microscope. *Id.* at 172-77. At trial, Ms. Dean opined that the presence of numerous sperm tails in the sample indicated that the seminal fluid was deposited around the time of death. *Id.* at 177.

Ms. Dean testified that, after confirming semen on the baby's oral swabs, she had to stop working on the case that day because her emotional reaction was so strong. She told the jury,

> One thing that we're taught in our training is that we're going to deal with cases that are difficult and that are hard to deal with. And it is our responsibility as scientists to approach these cases scientifically and unemotionally. And when I was able to confirm semen on the baby's oral swabs, I felt I could no longer do that.
>
> I remember it very vividly. It was a Friday. It was right about lunch time. I had finished up all of my testing and I knew at that point it was best for the case to put it away and to not deal with it the rest of that day and to find some paperwork to do, spend the weekend at home with my family, get my mind right, get refocused, come back in unobjectively as a good scientist and begin my analysis again on Monday.

*Id.* Based on her tests conducted later, Ms. Dean concluded that the oral swabs contained a mixture of Alijah's DNA and Petitioner's DNA, *id.* at 185, and she concluded that Petitioner had ejaculated inside Alijah's mouth at or near the time of death. *Id.* at 199.

Ms. Dean's testimony about her emotional reaction upon finding evidence of semen in the victim's oral swab was improper, inflammatory, and inadmissible. Ms. Dean's only role as the State's expert witness was to provide testimony about the physical evidence she examined and any conclusions she could draw from that evidence, based on her training and experience as a forensic scientist. The testimony about her emotional reaction had no place within Texas' capital sentencing scheme. The jury's consideration of that evidence violated Petitioner's due process rights and the heightened procedural safeguards required by the Eighth Amendment. *See*, *e.g.*, *Ake v. Oklahoma*, 470 U.S. 68 (1985); *Beck v. Alabama*, 447 U.S. 625 (1980); *Gardner v. Florida*, 430 U.S. 349 (1977). This created an impermissible risk of an arbitrary and capricious sentence.

### C.    Prior Counsel Failed to Object to The Improper Testimony and Argument in Violation of Petitioner's Right to Effective Assistance of Counsel.

Trial counsel were ineffective for failing to object to this testimony and argument and for failing to request a mistrial or, at the very least, a curative instruction. Trial counsel had no reasonable basis for failing to properly object to this prejudicial testimony and argument. This inflammatory testimony and

argument was far outside the bounds of what Texas law and the United States Constitution permit the State to present in a capital trial. Petitioner was prejudiced by counsel's failures because of the inflammatory and prejudicial nature of the testimony and argument. If counsel had objected, there is a reasonable probability that the trial court would have stricken the prejudicial testimony and argument and would have at the very least, issued a curative instruction. There is a reasonable probability that the sentencing verdict would have been different had the jury not considered this improper evidence and argument.

Appellate counsel, who permitted Petitioner to waive his right to counsel on appeal before the record was prepared, ineffectively failed to review the record. Had counsel reviewed the record, counsel could have informed Petitioner that this claim was available and raised this claim on appeal. Because appellate counsel has a duty to review the record, and because there would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

## VIII. PETITIONER WAS TRIED AND SENTENCED TO DEATH UNDER AN UNCONSTITUTIONAL STATUTORY SCHEME; THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION TO DECLARE TEXAS CODE CRIM. PROC. 37.071 UNCONSTITUTIONAL; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILURE TO RAISE THIS CLAIM.

In pretrial motions, defense counsel challenged the constitutionality of Texas Code Crim. Proc. Art. 37.071, the capital sentencing statute, on several grounds. The trial court erred in denying these motions. The capital sentencing scheme, on

154

its face and as applied to Petitioner, violates the Fifth, Sixth, Eighth and Fourteenth Amendments in multiple ways. These issues were preserved in the record. Appellate counsel was ineffective for failure to review the record and raise these preserved issues on appeal.

The capital sentencing statute sets forth two "special issues" for the jury to decide. The first special issue is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071 § 2(b)(1). If the jury finds unanimously that the State has proven this question, the jury then must consider a second question, "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." Art. 37.071 § 2(e)(1). The jury is instructed that it may consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's character or background or the circumstances of the offense, when deciding both of the special issues. Art. 37.071 § 2(d)(1) & 2(e)(1). If the jury finds that the state has proven the first special issue, and that the answer to the second special issue is no, the defendant is sentenced to death.

While the Supreme Court has long held that the Eighth and Fourteenth Amendments impose heightened procedural safeguards in capital cases, and bar arbitrariness and unreliability in capital sentencing schemes, the proceedings in this case were starkly at odds with those safeguards.

### A.    Legal Standards

When the Supreme Court reinstated the death penalty in *Gregg v. Georgia*, 428 U.S. 153 (1976), it did so only after it was satisfied that Georgia's death penalty statute would "not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S. at 188.  Otherwise put, a death penalty statute would run afoul of the Constitution if it lacked a "meaningful basis for  distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* (quoting *Furman v. Georgia*, 408 U.S. at 313 (White, J., concurring)).

The *Gregg* Court noted that, for a death statute to be constitutional, the sentencing body's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."   *Id.* at 189.  To do so, the sentencing jury must be "apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of  the information." *Id.* at 195.

Only four years after *Gregg*, the Supreme Court invalidated part of Georgia's death penalty statute based on that standard because Georgia's

156

"outrageously or wantonly vile, horrible or inhuman" aggravating circumstance,

as interpreted by Georgia's courts, was so "broad and vague" as to run afoul of

the Eighth and Fourteenth Amendments. *Godfrey v. Georgia*, 446 U.S. 420,

424 (1980). Discussing *Furman* and *Gregg*, the *Godfrey* Court reiterated:

> [I]f a State wishes to authorize capital punishment it has a
> constitutional responsibility to tailor and apply its law in a manner
> that avoids the arbitrary and capricious infliction of the death
> penalty. Part of a State's responsibility in this regard is to define the
> crimes for which death may be the sentence in a way that obviates
> standardless [sentencing] discretion. It must channel the sentencer's
> discretion by clear and objective standards that provide specific and
> detailed guidance, and that make rationally reviewable the process
> for imposing a sentence of death.

*Godfrey*, 446 U.S. at 428 (internal quotations and citations omitted). Noting that

a "person of ordinary sensibility could fairly characterize almost every murder

as 'outrageously or wantonly vile, horrible and inhuman,'" the Court concluded

that Godfrey was sentenced to death based on "the uncontrolled discretion of a

basically uninstructed jury." *Id.* at 429. It reversed the death sentence. *Id.* at

433.

A jury's discretion is not properly channeled in a capital case if the jury

charge is unclear because its terms are vague. *See Maynard v. Cartwright*, 486

U.S. 356 (1988). If a "provision fails adequately to inform juries what they

must find to impose the death penalty and as a result leaves them and appellate

courts with . . . open-ended discretion," the provision runs afoul of the Eighth

and Fourteenth Amendments. *Id.* at 361-62.

The Supreme Court has repeatedly affirmed that basic tenet.  *See Maynard*, 486 U.S. at 363 ("The construction or application of an aggravating circumstance is  unconstitutionally broad or vague if it does not channel or limit the sentencer's discretion in  imposing the death penalty"); *see also Zant v. Stephens*, 462 U.S. 862, 877 (1983); *Lewis v. Jeffers*, 497 U.S. 764, 776 (1990); *Richmond v. Lewis*, 506 U.S. 40, 46 (1992); *Clemons v. Mississippi*, 494  U.S. 738, 756 (1990).

The Court has also long held that a sentence of death cannot stand if an ambiguous jury instruction fails to allow a jury to properly consider mitigating evidence  that might call for a sentence other than death.  *See Mills v. Maryland*, 486 U.S. 367, 375-78 (1988).  Where a jury charge is unclear, the inquiry is "what a reasonable juror could have understood the charge as meaning." *Francis v. Franklin*, 471 U.S. 307, 315-16 (1985) (citing *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979)).  "[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett v. Ohio*,  438 U.S. 586, 605 (1978); *see also Andres v. United States*, 333 U.S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper  meaning . . . . is probable.  In death cases doubts such as those presented here should be resolved in favor of the accused.").

    **B.**    **The Presentation of Evidence of "Extraneous" Conduct Violates the Fifth, Sixth, Eighth and Fourteenth Amendments.**

Under Art. 37.07 and Art. 37.071, the State is permitted wide latitude to introduce evidence of "extraneous" offenses during the penalty phase. The State may introduce "any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." Art. 37.07 §3 (a)(1), including "an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence," Art. 37.07 § 3(g). Normal evidentiary rules are relaxed during the penalty phase, so that the State may introduce "any evidence the court deems relevant to sentence." Art. 37.071 §2 (a)(1). The "extraneous" evidence may be considered by the jury in deciding both of the special issues.

The presentation of extraneous conduct to support a finding of the first special issue violates the Fifth Amendment's presumption of innocence, the Sixth Amendment's jury trial guarantee, and creates a risk of arbitrary and unreliable capital sentencing in violation of the Eighth and Fourteenth Amendments. The Supreme Court has held that death-eligibility factors are the functional equivalent of elements of a greater offense, and must be found by the jury beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). This sentencing scheme, however, permits the prosecution to offer evidence of unadjudicated offenses and charges that did not lead to a conviction, and does not require the jury

159

to find beyond a reasonable doubt that the defendant is guilty of those offenses before the jury may consider them in deciding the special issues.  Instead, the jury must decide the first special issue, a broad question about "continuing threat to society," beyond a reasonable doubt; the jury may also consider the extraneous offenses in considering the second special issue.  This collective consideration of unadjudicated offenses and charges that have not led to a conviction invites arbitrariness into the capital sentencing decision, because there are no procedural safeguards attached to the extraneous offenses.[52]

In *McMillian v. Pennsylvania*, 477 U.S. 79 (1986), the Court held that, in certain situations, a sentencing fact found during a punishment phase of a criminal trial could be a "tail which wags the dog of the substantive offense" in the sense that the finding of a pivotal sentencing fact can drastically increase criminal punishment. *Id*. at 87-88 (holding that it may be necessary to require the finding of the fact beyond a reasonable doubt to satisfy due process.)

This issue was raised by the defense pretrial.  *See* Motion to Preclude the Offer of Evidence of Extraneous Offenses, CR 261; Motion to Preclude the Death Penalty as a Sentencing Option and Declare Article 37.071 Unconstitutional, CR 310; Motion to Declare Article 37.071 § 2(a) of the Texas Code of Criminal Procedure Unconstitutional on its Face, CR 322; Motion to Declare Article 37.071

---

[52] Petitioner's case, of course, shows precisely those dangers.  As described in Claim I, Petitioner's sentencing jury considered evidence of unadjudicated extraneous conduct that was unsubstantiated.

§ 2(b)(1) of the Texas Code of Criminal Procedure Unconstitutional on its Face,
CR 337; Motion to Find that Tex. Code Crim. Proc. Art. 37.071 Sec. 2(b)(1) is
Unconstitutional, CR 412.  The trial court erred in denying the motions.  Appellate
counsel was ineffective for failing to review the record and raise this meritorious,
preserved issue.

> **C.     Special Issue One Lacks the Guided Discretion Required by the
> Eighth and Fourteenth Amendments, Because the Terms of the
> Question Are Vague and Undefined, the Use of "Probability"
> Undermines the State's Burden of Proof, and the Question Fails
> to Genuinely Narrow the Class of Defendants Eligible for the
> Death Penalty.**

The first special issue is unconstitutionally vague, and fails to provide the
constitutionally-required guided discretion to the sentencing jury.  Neither the
statute nor the required jury charge define the terms "probability," "criminal acts of
violence," or "continuing threat to society."[53]  Moreover, the use of "probability"
in an issue that the jury is instructed to determine beyond a reasonable doubt
undermines the State's burden of proof.

---

[53] As an example of the vagueness of the term, the Texas Court of Criminal Appeals has
held both that "society" means prison society to which any life- or death-sentenced prisoner
would be confined, *and*, conversely, that it includes society at large.  *See, e.g.*, *Berry v. State*,
233 S.W. 3d 847 (Tex. Crim. App. 2007) (vacating death sentence for lack of sufficient evidence
of future dangerousness where defendant is dangerous only toward her own children, and it is
"very unlikely" she will have more children while sentenced to life imprisonment); *cf. Martinez
v. State*, 327 S.W. 3d 727, 735 (Tex. Crim. App. 2010) (future dangerousness special issue is
construed as whether a defendant would be a threat "whether in or out of prison").  To the extent
the Texas Court of Criminal Appeals follows the *Martinez* approach, including society at large in
the future danger assessment, that injects unconstitutional arbitrariness into capital sentencing,
because juries, who believe that they are deciding between a sentence of life without parole and
death, are invited to consider the possibility of the defendant being release back into society.

This issue was raised by the defense pretrial.  *See* Motion to Hold that Tex. Code Crim. Proc. Art. 37.071 is Unconstitutional, CR 287; Motion to Declare Article 37.071 § 2(b)(1) of the Texas Code of Criminal Procedure Unconstitutional on its Face, CR 337; Motion to Find that Tex. Code Crim. Proc. Art. 37.071 Sec. 2(b)(1) is Unconstitutional, CR 412.  The trial court erred in denying these motions.  Appellate counsel was ineffective for failing to review the record and raise this meritorious, preserved issue.

The special issue, as interpreted by the state courts, also fails to genuinely narrow the class of defendants eligible for the death penalty, and thus violates the Eighth Amendment.  Capital sentencing schemes must be tailored to minimize the arbitrary and capricious imposition of the death sentence.  Texas courts have held that the circumstances of the crime itself can be sufficient to meet the State's burden under the first special issue.[54]  *See, e.g., Fuller v. State*, 253 S.W. 3d 220, 231-32 (Tex. Crim. App. 2008).  Thus, since any defendant who reaches the penalty phase of trial has necessarily been convicted of capital murder, the special issue performs no narrowing function.  Trial counsel was ineffective for failing to challenge this aspect of the statute.

### 1.     A "Probability" of Future Criminal Acts of Violence Is Unconstitutionally Vague.

Petitioner's case provides a clear example of why the use of the term

---

[54] In fact, the State argued in closing, "The crime itself, that tells you, doesn't it, that this guy's a continuing threat to society."  33 RR 57.

"probability" is unconstitutionally vague. The State argued in closing, "The crime itself, that tells you, doesn't it, that this guy's a continuing threat to society." 33 RR 57. Rather than considering the specific threat that Petitioner posed or the likelihood that he would again offend, the prosecution asked the jury to look to the past crime committed to determine whether or not there was a continuing threat to society.

As many judges and commentators have noted, "a probability is simply a chance— however small or large—as measured and defined in mathematical or statistical terms." *See Jurek v. State*, 522 S.W.2d 934, 948 (Tex. Crim. App. 1975) (Roberts, J., dissenting). As another dissenting judge stated in that case,

> What did the Legislature mean when it provided that a man's life or death shall rest upon whether there exists a "probability" that he will perform certain acts in the future? Did it mean, as the words read, is there A probability, some probability, any probability? We may say there is a twenty percent probability that it will rain tomorrow, or a ten or five percent probability. Though this be a small probability, yet it is some probability, A probability, and no one would say it is no probability or not a probability. . . . The statute does not require a particular degree of probability but only directs that Some probability need be found. The absence of a specification as to what degree of probability is required is itself a vagueness inherent in the term as used in this issue. Our common sense understanding of the term leaves the statute too vague to pass constitutional muster.

*Jurek*, 522 S.W.2d at 945 (Odom, J., dissenting).

Notwithstanding the scientific and obviously plain meaning of "probability," the Texas courts have for decades held that "probability" in special issue number one means "[l]ikelihood," or "true, real, or likely to occur." *See*,

163

*e.g.*, *Granviel v. State*, 552 S.W.2d 107, 117 n.6 (Tex. Crim. App. 1976); *see also*

*Renteria v. State*, 206 S.W.3d 689, 706 (Tex. Ct. App. 2006) ("This Court has

repeatedly held that the trial court need not define this term because the jury is

presumed to understand it without further instruction."). Yet juries in general are

not—and Mr. Mullis' jury in particular was not—instructed of that definition.

A probability—any probability— does not meaningfully narrow the class

of offenders sentenced to death. *Maynard*, 486 U.S. at 362-63.   As set forth

below, whether under a *de novo* standard of review or through the lens of section

2254(d), relief is warranted in this case.

### 2.   The Term "Continuing Threat to Society" is Unconstitutionally Vague.

Special issue one also asks the jury to determine whether a defendant would

be a "continuing threat to society."  The vagueness of this term turns on the term

"society."  The Texas Court of Criminal Appeals has held that "society" means

both the prison society to which any life- or death-sentenced prisoner would be

confined, *and* society at large.   *See*, *e.g.*, *Berry v. State*, 233 S.W.3d 847 (Tex.

Crim. App. 2007) (vacating death sentence for lack of sufficient evidence of

future dangerousness where defendant is dangerous only toward her own children,

and it is "very unlikely" she will have more children while sentenced to life

imprisonment); *cf. Martinez v. State*, 327 S.W. 3d 727, 735 (Tex. Crim. App.

2010) (future dangerousness special issue is construed as whether a defendant

would be a threat "whether in or out of prison").  That approach alone injects

unconstitutional arbitrariness into capital sentencing, because whether a defendant is sentenced to death or life without parole, the defendant will never be released back into society and cannot therefore be a continuing threat to the society at large.

Here the jury was invited to assess Petitioner's risk to an unconstitutionally vague definition of society, being inside and outside of prison. The instructions asked jurors to consider whether "the Defendant would commit criminal acts of violence that would constitute a continuing threat to society." CR 820.  In closing remarks the prosecutor told the jury, "Is society just prison society?  It's not defined that way in the charge.  Society means all of society." 33 RR 20.  The prosecution later noted in closing arguments, "Is penitentiary a part of society?  You bet it is."  33 RR 53.  The over-inclusive and vague definition of the word society accepted by Texas courts invited arbitrariness to the Petitioner's capital sentencing.

**D.    The Statute Requires An Unconstitutional Instruction that Ten or More Jurors Must Agree on a Life Sentence, Whereas the Jury Must Unanimously Decide on a Death Sentence.**

The sentencing statute requires the jury to be instructed:  (1) that the prosecution must prove the first special issue beyond a reasonable doubt; (2) the jury shall return a verdict of "yes" or "no" on the first special issue; (3) the jury may not return a "yes" verdict unless it is unanimous, and it may not return a "no"

verdict unless 10 or more jurors agree.  *See* Tex. Code Crim. Proc. Art. 37.071 Sec. 2(c)&(d).

The instructions on the second special issue, the mitigation question, requires the jury to be instructed:  (1) the jury shall return an answer of "yes" or "no"; (2) the jury may not return a "no" unless it is unanimous, and may not return a "yes" unless at least ten jurors agree.  Tex. Code Crim. Proc. Art. 37.071 Sec. 2(e)(2).

The statute expressly bars the jury from being instructed that if the jury is unable to reach a unanimous or at-least-ten verdict on either of the special issues, the trial court is required to sentence the defendant to life in prison.  Tex. Code Crim. Proc. Art. 37.071 Sec. 2(a) (barring instruction on the effect of a failure to agree); Sec. 2(g) (life sentence required if jury is unable to agree).

The statute and the confusing instructions create a farcical scenario in which the opposite of "unanimous" is "ten people agree."  Clearly, deliberations in a jury room on a death sentence could reach multiple outcomes that fall into neither category: a vote of 9-3, 8-4, 7-5, and so on.  However, juries are given no instruction on how to proceed when that scenario plays out.  The statute and instructions create an unconstitutional risk of arbitrary and unreliable capital sentencing in violation of the Eighth Amendment.  They also create an unconstitutional risk of jury coercion, wherein the jurors perceive that they must reach a certain result.  *See Jenkins v. United States*, 380 U.S. 445, 446 (1965).  The

166

instructions are also inconsistent with *Wiggins*, which held that a death sentence cannot stand if a single juror strikes a different balance in weighing the mitigating circumstances. *Wiggins*, 529 U.S. at 537.

This portion of the jury instruction, which suggests that it requires the agreement of 10 out of 12 jurors to find "no" on the first special issue and to find "yes" on special issue two, unconstitutionally diminished each juror's individual sense of responsibility in the sentencing process in violation of the Eighth Amendment. *See Lockett*, 428 U.S. at 605. The plain language of the statute creates the impression that one juror's dissent from the remaining members of the jury, without the agreement of at least one other juror, would be insufficient to make a difference in the determination of either of these special issues or the ultimate sentence the jury imposes. For this reason, this instruction is also a violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Moreover, by actively misleading potential holdout jurors to believe their individual votes will not change the outcome, the jury instruction injects arbitrariness and unfairness into the penalty phase, in violation of Petitioner's due process rights.

This issue was raised by the defense pretrial. *See* Motion to Declare the "10-12 Rule" Unconstitutional, CR 441. The trial court erred in denying the motion. To the extent that each of these constitutional arguments was not sufficiently raised by trial counsel, counsel's performance was deficient and Petitioner was prejudiced.

Appellate counsel, who permitted Petitioner to waive his right to counsel on appeal before the record was prepared, ineffectively failed to review the record. Had counsel reviewed the record, counsel could have informed Petitioner that this claim was available and raised this claim on appeal.  Because appellate counsel has a duty to review the record, and because there would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

## IX.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR CHANGE OF VENUE OR VENIRE DESPITE THE FACT THAT THE COMMUNITY AND THE JURY POOL HAD BEEN SATURATED WITH HIGHLY PREJUDICIAL PUBLICITY.  AS A RESULT, PETITIONER WAS DENIED HIS RIGHTS TO AN IMPARTIAL JURY AND DUE PROCESS.

Due process requires that a criminal defendant receive a trial by an impartial jury free from outside influences.  *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966). Where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.  *Id.*

Trial counsel was deficient for failing to move for a change of venue despite overwhelming negative press and a constitutionally infirm jury pool. Had trial counsel moved for a change of venue or venire, it is reasonably likely that the court would have granted the requested relief for the reasons discussed below.

Under Texas law, a motion for change of venue may be granted if the defendant establishes that "there exists in the county where the prosecution is

commenced so great a prejudice against him that he cannot obtain a fair and impartial trial."  Texas Code of Criminal Procedure Section 31.03(a).  To justify a change of venue, a defendant must show that the publicity was pervasive, prejudicial, and inflammatory.  The following factors are relevant to the question of venue in Texas: (1) the nature of the pretrial publicity; (2) the connection of government officials with the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury panel was to be drawn; and (6) any factors likely to affect the candor and veracity of the prospective jurors during voir dire.  *Ryser v. State*, 453 S.W.3d 17, 33 (Tex. App. 2014).

The discovery of the body of a three-month-old baby would be newsworthy in any community, but the discovery of Alijah Mullis in Galveston in January 2008 occasioned even more news coverage than might be expected.[55]  At the time, there

---

[55] The Houston Chronicle published 23 articles discussing this case between the offense and the start of trial: "Another grim discovery in Galveston; Woman says dead baby is hers; Police search for 21-year-old man after couple find boy along seawall," Jan. 30, 2008; "Infant's death is ruled a homicide; Hunt continues for man police say may be father," Jan. 31, 2008; "Father of slain baby sought in 2nd case,"  Feb. 1, 2008; "Father admits he killed baby boy, police say; Mullis, 21, says he stomped on infant's head," Feb. 2, 2008; "Police: Man says he killed baby boy; Mullis, 21, surrenders in Philadelphia," Feb. 2, 2008; "Mom recalls baby's 'gorgeous smile'; Service comes day after father admits to slaying,"  Feb. 3, 2008; "Police: Mullis showing remorse; Officials say slain baby's dad likely will not fight extradition," Feb. 4, 2008; "A public appeal for 'Beloved Doe'; 5 years after he was found, police hope new details will reveal identity," Feb. 5, 2008; "Mullis expected to be returned to Texas tonight; Officials say the Alvin man who admits killing son is eager to return," Feb. 5, 2008; "Slain baby's father flown to Houston," Feb. 6, 2008; "Slain infant's mother accused of endangerment; Authorities say she handed baby to 'unstable' father," Feb. 8, 2008; "Slain infant's mom arrested in New York; She is being held in a prison hospital, awaiting extradition to Texas," Feb. 13, 2008; "Mullis submits to a DNA test," Feb. 16, 2008;  "Saving kids with a surge," Feb. 20, 2008; "Death penalty sought in baby's killing; Father is accused of stomping on his 3-month-old son,"

were two other high-profile, gruesome crimes involving babies in Galveston.  In

the first case, the badly beaten body of a two-year-old girl was found in Galveston

Bay in July 2007; the child was known as Baby Grace until the remains were

identified in November of that year.  In the second case, the father of a two-month-

old was charged with microwaving his baby in a Galveston motel room in May

2007.  Thus, press coverage of Alijah Mullis' death was expressly linked to the

other recent cases of violence against babies.[56]

---

Aug. 13, 2008; "Defendant seeks halt to fight against death penalty; Lawyers asked to stop opposing constitutionality," Jan. 4, 2011.

The Galveston Daily News published 26 stories discussing this case between the offense and the start of trial: "Mother says dead infant is hers," Jan. 29, 2008; "Dead boy's dad charged in unrelated case," Jan. 31, 2008; "Dead baby's father turns himself in," Feb. 1, 2008; "Web site could be infant's memorial," Feb. 1, 2008; "Mullis awaiting arraignment in Philadelphia," Feb. 2, 2008; Letter, "Child's violent death was inexcusable," Feb. 3, 2008; "Mullis arraigned in Philadelphia," Feb. 3, 2008; "Affidavit: Crying baby stomped to death," Feb. 4, 2008; "Investigators unable to interview Mullis," Feb. 5, 2008; "Man held in baby's death kept isolated," Feb. 6, 2008; Letter, Feb. 7, 2008; "Warrant issued for dead infant's mother," Feb. 7, 2008; "Search for mom of dead baby continues," Feb. 8, 2008; "Detectives sift feelings to solve case," Mar. 8, 2008; "Dead infant's mother extradited, posts bond," Mar. 8, 2008; "Prosecutors seek death for accused child killer," Aug. 12, 2008; "Prosecutors to seek death penalty in two cases," Aug. 13, 2008; "Angel tree at DA's office honors homicide victims," Dec. 3, 2008; "2008 in review: Pre-Ike news 'grisly to goofy,'" Dec. 30, 2008; "Defendant wants death penalty as option," Jan. 1, 2011; "Defendant wants death penalty as option" (video), Jan. 1, 2011; "'I kept stomping his head,'" Jan. 18, 2011; "Judge watches video recounting baby's death," Jan. 19, 2011; "Judge rejects death penalty challenges," Jan. 20, 2011; "Accused child-killer's statements admissible," Jan. 25, 2011; "Juror selection in capital murder case delayed," Feb. 3, 2011.

[56] *See*, *e.g.*, "Another grim discovery in Galveston," The Houston Chronicle, Jan. 30, 2008; "Isle DA expects 'Grace' backlash'; Prosecutor won't seek death for girl's mother and stepfather," The Houston Chronicle, Apr. 17, 2008; "Pasadena Siblings Found Dead; A terrible trend of death and abuse; Several cases tie parents to crimes, so what's going on?," The Houston Chronicle, June 22, 2008; 'Little girl died, and few knew about it till now; Boyfriend of child's mother goes on trial today," The Houston Chronicle, July 15, 2008; "Violence in 2008; The loss of officers, children and a beloved deer over the last 12 months dominated a period that left behind tears, questions and a sense of bewilderment; Emotions Tested in a Year of Crime," The Houston Chronicle, Dec. 31, 2008.

The link to the Baby Grace case, also a homicide, was particularly prejudicial, because the Galveston District Attorney decided not to seek the death penalty in that case, thus increasing political pressure on the District Attorney to seek death in this case. *See* "Isle DA expects 'Grace' backlash; Prosecutor won't seek death for girl's mother and stepfather," The Houston Chronicle, April 17, 2008 (describing District Attorney's fear of political fallout for failing to seek death penalty in Baby Grace case; refusing to comment on plans for Mullis case); "Death penalty sought in baby's killing; Father is accused of stomping on his 3-month-old son," The Houston Chronicle, Aug. 13, 2008 ("District Attorney Kurt Sistrunk released a five-page explanation of why he decided to seek the death penalty for Mullis…. Sistrunk was severely criticized in April for not seeking the death penalty for the mother and stepfather of 2-year-old Riley Ann Sawyers, initially known as Baby Grace. The two were accused of beating Riley to death and storing her body for as long as two months before dumping it in West Galveston Bay."). Thus, the Mullis case was described by the media as an opportunity denied in the Baby Grace case for the community to express outrage over the horrific killings of babies by seeking the death penalty.

The press coverage also focused on two particularly prejudicial aspects of the story. First, the press covered Petitioner's statement to police. *See*, *e.g.*, "Police: Man says he killed baby boy; Mullis, 21, surrenders in Philadelphia," The Houston Chronicle, Feb. 2, 2008. Media coverage of a confession is particularly

171

prejudicial. *Parker v. Randolph*, 442 U.S. 62, 72 (1979) ("[T]he defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him."). Second, when Petitioner and his counsel disagreed over the filing of motions challenging the constitutionality of the capital sentencing statute, the news media reported the story as if Petitioner, whose trial had not yet begun, was seeking the death penalty. *See, e.g.*, "Defendant wants Death Penalty as an Option," Galveston Daily News, Jan. 11, 2011 (also posted on Galvestondailynews.com website as a video interview). Additionally, Petitioner's case received extensive coverage from television news outlets.

During jury selection many prospective jurors stated they had heard about the case in the media. Other prospective jurors stated they were familiar with the Baby Grace case from the media. Three members of Petitioner's jury stated they were familiar with the Baby Grace case. *See* 18 RR 185 (Juror Stacy Holly, saying about that case, "it was in the news every day for a month"); 19 RR 134 (Juror Patricia Proehl); 20 RR 85-87 (Juror Gary Ford).

Trial counsel was clearly aware of the media coverage of the case, because they asked their mitigation specialist to collect media coverage of the case and filed a motion to restrict media access to the trial. Defendant's Motion for a Restrictive Order Regulating News Accounts, Comments and Editorials Concerning Certain Circumstances of the Case, March 8, 2010, CR 300. In that motion, the defense argued:

> This case involves circumstances which may cause it to receive the
> concentrated attention of the news media and thereby to receive great
> notoriety and publicity, especially in the local community of
> Galveston County, Texas, where the offense allegedly took place.
> Unless some procedural rules and guidelines are immediately
> propounded by the court to the news media of Galveston County,
> Texas, it can be expected that the community will be exposed to
> massive dosages of pre-trial and trial publicity and reports concerning
> the facts of the case and Defendant's implication therein.

*Id.* The trial court issued a detailed, four-page Media Plan prior to the
commencement of trial to ensure the media would not disrupt proceedings in the
courtroom. *See* Media Plan, CR 723-26. Yet, despite recognizing the clear risk of
prejudicial publicity, counsel never filed a motion for a change of venue/venire, or
introduced into evidence all of the articles or other media attention for the trial
court's review and consideration.

No reasonable trial strategy could have guided trial counsel's decision not to
move for a change of venue or venire. Counsel moved for cause excusals[57] or to
exercise peremptory strikes[58] against venirepersons who described exposure to
media reports of this case. Thus, it was counsel's strategy to attempt to select
jurors who had less knowledge of the case from the media. However, as described

---

[57] A number of venirepersons stated they had been exposed to media reports about the
case, and the defense moved for a cause excusal, or the defense and prosecution jointly agreed on
a cause excusal. *See* 13 RR 12-36; 13 RR 105-166; 14 RR 86-112; 16 RR 90-95; 17 RR 44-51;
17 RR 65-84; 18 RR 8-13.

[58] The defense exercised peremptory strikes against two jurors who stated exposure to
media reports about the crime. *See* 15 RR 51-90; 17 RR 7-43.

above, counsel did not seek to exclude jurors who had followed the Baby Grace case.

Trial counsel's failure to move for a change of venue, in a capital case, where the court was sympathetic to the inflammatory and prejudicial nature of the swirling media, fell below the standard of representation required by the Sixth Amendment.  *See Strickland v. Washington,* 466 U.S. 668, 687 (1984).  The omission by trial counsel affected the fundamental fairness of the proceeding, and this Court should focus upon the structural nature of the error.  *See Weaver v. Massachusetts*, No. 16-240, 2017 WL 2674153, at *7 (U.S. June 22, 2017) ("[W]hen a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on the fundamental fairness of the proceeding.").

Even if this Court determines trial counsel's error to be less than structural in nature, Mr. Mullis can establish prejudice under *Strickland* – but for trial counsel's error, Mr. Mullis would most likely have been afforded a trial in an impartial jurisdiction as demanded by the Due Process Clause of the Fourteenth Amendment.  If Petitioner's jury had not been exposed to prejudicial pretrial publicity, including assertions that Petitioner wanted the death penalty, there is a reasonable probability that Petitioner would have been found not guilty or that at least one juror would have voted for life.

**X.    THE VOIR DIRE FAILED TO INQUIRE ABOUT JURORS'
ABILITY TO CONSIDER INDIVIDUAL MITIGATING
CIRCUMSTANCES AND CONSIDER A SENTENCE OF LIFE IN
THIS CASE, VIOLATING PETITIONER'S RIGHTS UNDER THE
SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS; THE
TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION
FOR FULL, FAIR AND CONSTITUTIONAL VOIR DIRE; TRIAL
COUNSEL WERE INEFFECTIVE FOR FAILING TO ENSURE
ADEQUATE VOIR DIRE; APPELLATE COUNSEL WAS
INEFFECTIVE FOR FAILURE TO RAISE THIS CLAIM.**

The Sixth and Fourteenth Amendments to the United States Constitution "ensure the impartiality of any jury that will undertake capital sentencing." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Id.* at 729. In capital cases, the Supreme Court has "not hesitated . . . to find that certain inquiries must be made [during voir dire] to effectuate constitutional protections." *Id.* at 730; *Mu'Min v. Virginia*, 500 U.S. 415 (1991). In this case, despite Petitioner's pre-trial request, potential jurors were not asked whether they could consider mitigating evidence of Petitioner's background and character that was unrelated to the crime, such as evidence of abuse and mental health impairments. In addition, potential jurors were not asked during voir dire whether they would automatically impose a death sentence in a case involving the killing of an infant who was just three months old. There is an impermissible risk that jurors were empaneled who were unable to fairly consider mitigating evidence and fairly consider a life sentence in this case.

175

### A. The Trial Court Refused to Question Potential Jurors About Whether They Could Consider the Defendant's Life, Background, and Character as Mitigation.

The Texas capital sentencing statute requires jurors to consider the defendant's life history two times during its penalty deliberations.  First, while considering the first Special Issue regarding future dangerousness, the jury must "consider all evidence admitted at the guilt or innocence stage and the punishment stage, *including evidence of the defendant's background or character* or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."  Tex. Code. Crim. Proc. Art 37.071, § 2(d).  If the jury answers the first Special Issue in the affirmative, the jury then must answer this:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, *the defendant's character and background*, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

*Id.* § 2(e)(1).

"[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence."  *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).

The court can only determine whether each juror is willing to consider evidence of the defendant's background unrelated to the crime by inquiring about this issue during voir dire.  A juror who is unwilling to consider this type of

176

evidence is unqualified to serve because his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

Because a defendant is entitled under *Morgan* to conduct voir dire sufficient to identify jurors who cannot follow the statutory instruction to consider the defendant's character and background, a defendant must be permitted, upon request, to tell the jurors that life history evidence need not relate to the crime and to ask the jurors whether they could consider that type of evidence as mitigation. This type of questioning is entirely appropriate. *See, e.g., Ex parte Smith*, 132 S.W.3d 407, 420-21 (Tex. Crim. App. 2004) (prosecutor explained during voir dire that evidence of retardation, drug or alcohol problems, or childhood abuse might be presented as mitigation); *Goff v. State*, 931 S.W.2d 537, 546-47 (Tex. Cr. App. 1996) (jurors were asked if they could consider religious conversion, the age of the offender, history of drug abuse, and evidence of mental illness or mental retardation during capital sentencing).[59]

---

[59] In federal capital cases, where the sentencing statute requires the jury to consider "factors in the defendant's background, record, or character," 18 USC § 3592(a)(8), juries are routinely asked questions about their ability to follow the statute. *See, e.g.*, *United States v. Whitten*, 610 F.3d 168, 183-84, 186 (2d Cir. 2010) (jurors asked if they would "be willing to consider evidence about the convicted individual's character and background"); *United States v. Sampson*, 486 F.3d 13, 40 (1st Cir. 2007) (juror questioned about ability to balance mitigating evidence of defendant's "severe emotional disturbance"); *United States v. Hall*, 152 F.3d 381, 408, 412 (5th Cir. 1998) (jurors were asked whether they "could consider the fact that a defendant grew up in a dysfunctional, abusive family as a mitigating factor"); *United States v. Chandler*, 996 F.2d 1073, 1103 (11th Cir. 1993) (defense permitted to question juror about her ability to consider mitigating factor of defendant's youth).

Defense counsel filed a motion asking the court to alert potential jurors that mitigating factors may include information about the life, background, or character of the defendant and requesting permission to inquire whether potential jurors could consider that type of evidence during sentencing. Defendant's Memorandum of Law in Support of a Full, Fair and Constitutional Voir Dire, CR 861. The trial court denied the motion. As a result, defense counsel was unable to ascertain whether the jurors could consider life history evidence as mitigation, even if it did not relate to the crime.

Petitioner was prejudiced because the focus of his mitigation case was his life history, including his neonatal health problems, childhood sexual abuse, and his mental health problems. There is an impermissible risk that jurors were empaneled who were unwilling to consider this type of life history mitigation. This is particularly so given the prosecutor's standard voir dire which suggested that it was the jurors' option not to find this evidence mitigating. The prosecutor asked almost every single prospective and seated juror some rendition of the following:

> Additionally, let's say there's evidence during the trial, a person has some mental disability; a slow learner, special ed. Student, Attention Deficit Disorder. May have some type of mental illness. Depression, Post Traumatic Stress Syndrome, anything like that. Juror No. 1 may say, I think that mitigates towards a life sentence. He sounds to me like he was kind of messed up or whatever. Juror No. 2 may say, Wait a second. I know people at work, the neighborhood, church, you know, even in our family who have mental issues or whatever. They don't go out and commit criminal acts of violence. That didn't cause them to do that. So, what's the deal here that would cause him to do

that? They don't think it's mitigating just because he may be a slow
learner or have Attention Deficit Disorder or any type of diagnosis
with mental illness.

13 RR 53 54.  Defense counsel ineffectively failed to follow up and simply ask

each juror if they were capable of finding mitigation.  Petitioner's constitutional

rights were violated.

Appellate counsel, who permitted Petitioner to waive his right to counsel on

appeal before the record was prepared, ineffectively failed to review the record and

discover this meritorious issue.  Had counsel reviewed the record, counsel could

have informed Petitioner that this claim was available, and could have raised this

claim on appeal.  Because appellate counsel has a duty to review the record, and

because there would have been a reasonable probability of reversal on appeal,

appellate counsel was ineffective.

### B.  Given the Facts of this Case, Voir Dire Should Have Included an Inquiry into Whether Jurors Could Consider a Life Sentence for Someone Who Killed an Infant.

During voir dire in this case, potential jurors were told that the defendant

was charged with the murder of a child under the age of six.  They were not told,

however, that the victim in this case was only three months old.  The potential

jurors were never asked if they could consider a life sentence for a defendant who

was found guilty of killing a three-month old infant.

A bias for death in cases involving the murder of infants was likely common

in the venire.  Prospective jurors are often particularly outraged by the murders of

179

children and may be prone to impose the death penalty in such cases.[60]  It is only

logical that this bias would be even stronger when the victim is a three-month old

infant.  *Morgan* requires that this bias be explored during voir dire.  *Cf. People v.

Valdez*, 281 P.3d 924, 998-99 (Cal. 2012) ("the age of a minor victim is an

important circumstance on which the parties should be allowed to question

prospective capital jurors"); *State v. Jackson*, 836 N.E.2d 1173 (Ohio 2005)

(reversing a death sentence for failure to allow voir dire regarding a three-year-old

murder victim's age).  A juror who would automatically impose the death penalty

or who could not consider mitigation where the crime was the murder of an infant

should not have been qualified to sit in this case, but the court refused to undertake

the questioning needed to identify such jurors.  There is an impermissible risk that

jurors were empaneled who were unable to consider a life sentence given the very

young age of the victim in this case.

Trial counsel were ineffective for failing to question potential jurors about

their ability to consider a life sentence and to consider mitigation where the victim

was a three-month old infant.  Counsel did not even raise this issue in their pre-trial

motion for a full, constitutional voir dire.  Trial counsel's strategy was to question

the potential jurors about all possible biases against their client.  They had no

---

[60] A study of actual capital jurors revealed that "the child victim had a pronounced effect"
on capital jurors.  "This strong reaction in cases in which the victim is a child is unsurprising, as
the child victim touches practically every rational and emotional chord calling for the severest
punishment possible . . . ."  Scott E. Sundby, *The Capital Jury and Empathy: The Problem of
Worthy and Unworthy Victims*, 88 Cornell L. Rev. 343, 346 (2003).

reasonable basis for failing to include this obvious bias in their line of questioning. If counsel had asked the venire about their biases where the victim was a very young infant, there is a reasonable probability that at least one juror would have admitted he or she was unable to consider a life sentence or unable to consider mitigation in those circumstances.  Jurors with that bias were unqualified to serve. It is likely that such jurors were empaneled.  Petitioner's Sixth and Eighth Amendment rights were violated.

The trial court also erred in failing to ensure that the voir dire was adequate to protect Petitioner's constitutional right to a jury that could consider a life sentence in this case.

Appellate counsel , who permitted Petitioner to waive his right to counsel on appeal before the record was prepared, ineffectively failed to review the record. Had counsel reviewed the record, counsel could have informed Petitioner that this claim was available and raised this claim on appeal.  Because appellate counsel has a duty to review the record, and because there would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

XI. **IMPROPER VICTIM IMPACT EVIDENCE AND ARGUMENT WAS PRESENTED TO THE JURY AT GUILT/INNOCENCE PHASE OF TRIAL IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE IN FAILING TO PROPERLY LITIGATE THIS ISSUE.**

The law is clear that victim impact evidence is limited to the issue of punishment, not guilt or innocence. By definition, victim impact evidence relates to a sentencing proceeding. *Payne v. Tennessee*, 501 U.S. 808, 821 (1991) ("Congress and most of the States have, in recent years, enacted legislation to enable the sentencing authority to consider information about the harm caused by the defendant."). *See also Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (such evidence does not make more or less probable any fact that is of consequence during the guilt/innocence phase of the trial). Victim impact evidence is inadmissible as proof of guilt.

Improper victim impact evidence and argument permeated the guilt phase of Petitioner's trial, making an appearance in opening argument, during the prosecution's case in chief and during closing argument. This victim impact evidence and argument was completely irrelevant to anything at issue in the guilt/innocence phase of trial, should not have been admitted under the Texas Rules of Evidence, and should have been objected to by the defense. Even if this evidence and argument was arguably relevant, which it was not, it inflamed the passions of the jury and was "so unduly prejudicial that it rendered Petitioner's trial fundamentally unfair." *Payne*, 501 U.S. at 824.

182

Trial counsel filed and argued various pretrial motions seeking to exclude and/or limit the victim impact testimony admitted at the penalty phase and to completely exclude the presentation of victim impact evidence at the guilt phase of trial. *See* Defendant's Motion Regarding Victim Character/Impact Testimony After Mosley v. State, CR 204; Motion Preclude State from Offering Victim Impact Testimony and Order, CR 209; Motion in Limine, CR 279; 11 RR 14-18. These motions were denied,[61] but the court ordered the state to provide defense counsel with "a general outline of the subject matter to be inquired into" with Ms. Entriken and stated that it would consider the admissibility of this testimony at the time it was offered. *See* 11 RR 15-16. There is no indication in the record that this notice was ever provided and the testimony of the decedent's grandmother was admitted at the guilt phase of trial without objection from counsel.

The court's rulings with regard to the admissibility of this victim impact evidence were erroneous, resulting in a violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights. Given the court's ruling that admissibility of this evidence would be determined during the course of trial, defense counsel's failure to object to the admission of this irrelevant and overly prejudicial evidence and argument was deficient performance that rendered Petitioner's trial fundamentally unfair.

---

[61] It is not clear from the record whether the court ruled on one of Petitioner's motions, entitled Petitioner's Motion in Limine (Victim Impact Type Evidence). To the extent the court did not rule on this motion, counsel was ineffective for waiving this issue.

### A.   Improper Argument and Evidence.

In opening argument, the prosecutor told the jury that they would hear a "chilling" and "traumatizing" 911 call from Mr. Jesse Zaro, wherein he promised the jury they would "hear a grown man crying, so upset. . . . [saying] I can't believe it.  Who would do this to a baby."  23 RR 17.  Then he told the jury they would hear from Carolyn Entriken, the decedent's grandmother, who would tell the jury that this was her first grandchild, that she came down to Texas to help plan a memorial, and ended up taking her daughter to New York where she was hospitalized for depression.  *Id.* at 25-26.

During its case in chief, the prosecution delivered on its promise.  Mr. Zaro testified that "it hurts my heart to talk about this. . . . I looked down and something hit my heart.  It was like all the wind just left me.  God, it's a horror.  It was a horror. . . ."  *Id.* at 51.  Then the state presented the testimony of Carolyn Entriken.  Ms. Entriken described the birth of her grandson.  She explained how her eldest daughter Courtney was present for the birth and how she was on the phone with her daughter Caren soon thereafter.  She described that experience:

> I remember talking to Caren on the phone.  And he must have been in the room with her.  He was crying like a baby would.  And I was very emotional now that he was here.  And I said, "Oh, my grandson's crying."  I mean, it was a – it was a good thing.  It was a good thing to hear.

24 RR 98.

Not drawing any objection from defense counsel, the prosecutor elicited further irrelevant testimony, asking Ms. Entriken to describe baby Alijah, to which she responded:

> The time that I spent with him, other than crying because he needed a bottle, which would be – you know, you would expect, he seemed to be a *very calm baby*. I know all babies are beautiful. *He was an extraordinary beautiful baby to me. He had steel blue eyes, cute little reddish hair. He was very precious.*

*Id.* at 105. The prosecutor repeated this description in a follow up question: "And you said that he kind of had – you know, he has blue eyes and he had a little red hair, did you say?" *Id*. at 106. Without objection from counsel, the witness affirmed her earlier description. *Id.* The prosecutor went on to ask, "Did he look like anybody in your family or who did you think he looked like?" *Id.* Defense counsel finally objected on relevance grounds, but the objection was overruled and the witness answered: "I certainly saw similarities with my daughter." *Id.* at 107.

Ms. Entriken was then asked to identify pictures that were taken during her visit with Alijah at one month of age. She identified three photographs: one of her daughter Caren and the baby, a second of herself and the baby, and a third of her husband, herself and the baby on the beach. *Id.* at 113; State's Exh. 100, 152, 153. Defense counsel affirmatively stated that he had no objection to the admission of these photographs and they were promptly published to the jury for their review. *Id.*

Ms. Entriken also testified that she learned about her grandchild's death when she received a call from her daughter Courtney.  She described how she and her daughter scrambled to get a flight to Houston, but upon arriving there were never afforded the opportunity to see Alijah at the funeral home of the morgue.  *Id.* at 118-19.  She explained how she helped to plan a memorial service for Alijah, which was held a few days after she arrived in Houston.  *Id.* at 120.  She complained that his body was not even released to her and her family until May of 2008, at which time he was buried in Greenwich, Connecticut.  *Id.* at 119.

She described her daughter as being "pretty numb" and having "emotional issues" and "periods of depression."  *Id.* at 119.  She explained that she brought her daughter Caren back to Maryland with her, where she was placed in Bellevue Hospital, which Ms. Entriken described as a "psychiatric hospital."  *Id.* at 122.

In closing argument the prosecutor, while displaying a picture of the decedent to the jury, stated:

> So, on January 29th 2008, this was Baby Alijah.  That was what Baby Alijah looked like.  A beautiful blond-haired, blue-eyed, 3-month old child that had everything in the world to live for, who know what Alijah Mullis could accomplish in this world if given the chance.

27 RR 15.

## B.    Trial Court Error.

None of the testimony or argument set forth above was relevant to any issue in the guilt phase of trial and even so, any probative value it could have had was substantially outweighed by the danger or unfair prejudice.  Despite this, the trial

186

court denied Petitioner's pretrial motions to exclude it.  When the introduction of

such irrelevant evidence renders the proceedings unfair to the defendant, it also

violates the Due Process Clause of the Fourteenth Amendment.  *See Humphries v.*

*Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005) ("it is evident that both *Darden v.*

*Wainwright*, 477 U.S. 168 (1986) and [*Donnelly v.] DeChristoforo*, [416 U.S. 637

(1974)] apply to cases in which the defendant or petitioner alleges that the

admission of victim impact evidence or prosecutorial comment victim-impact

evidence violated his rights under the Due Process Clause of the Fourteenth

Amendment.").

  Moreover, when the probative value of such evidence, though relevant, is

greatly outweighed by the prejudice to the accused from its admission, principles

of fundamental fairness and due process of law are implicated.  *See Lesko v.*

*Owens*, 881 F.2d 44, 52 (3d. Cir. 1989); *see also Osbourne v. Wainwright*, 720

F.2d 1237, 1239 (11th Cir. 1983) (per curiam) (error in balancing must be of "such

magnitude" as to deny fundamental fairness); *United States ex rel. Palmer v.*

*DeRobertis*, 738 F.2d 168, 171 (7th Cir. 1984) (when probative value of evidence

is "greatly outweighed" by the prejudice to the accused, then use of such evidence

may "rise to the posture of the denial of fundamental due process").

  Because the victim impact evidence and argument admitted at guilt phase of

Petitioner's trial was not probative for any relevant consideration, was highly

inflammatory and prejudicial, and was quite extensive, its admission violated

Petitioner's due process rights.

### C.    Ineffective Assistance of Counsel.

But for counsel's single objection to the prosecutor's question of Ms.

Entriken regarding who the victim resembled, none of the improper victim impact

evidence and argument set forth above drew an objection, or a request for a

mistrial, from defense counsel.  Prior to trial, counsel sought to exclude the

admission of all victim impact testimony and argument at the guilt phase of trial,

arguing it was irrelevant to any issue before the jury and overly prejudicial to

Petitioner.  To the extent counsel did not obtain a ruling on each of these pretrial

motions, counsel was ineffective.  In the ruling it did issue, the court made it clear

that it would consider the admissibility of this victim impact type evidence as it

was being elicited.  Given this limited ruling, counsel's failure to object to this

improper evidence was particularly egregious.  Counsel's failure constitutes

deficient performance under *Strickland*.

There could have been no strategic reason for counsel's failure, particularly

given their attempt to preclude this evidence prior to trial and given the limited

nature of the court's ruling.  This evidence had no place in the guilt/innocence

phase to trial and its admission could not have benefitted Petitioner in any way.

This evidence inflamed the passions of the jury and created undue prejudice

against Petitioner.  There is a reasonable probability that counsel's deficient

performance had an effect on the outcome of the trial. The admission of this evidence so infected the trial with unfairness that Petitioner was deprived of his rights to due process and a fair trial.

Appellate counsel, who permitted Petitioner to waive his right to counsel on appeal before the record was prepared, ineffectively failed to review the record and discover this meritorious issue.  Had counsel reviewed the record, counsel could have raised this claim on appeal, and could have informed Petitioner that this claim was available.  Because appellate counsel has a duty to review the record, and because there would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

## XII.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT EVIDENCE OF PETITIONER'S MENTAL STATE TO REBUT THE STATE'S EVIDENCE OF INTENT AND TO CHALLENGE THE ADMISSION OF PETITIONER'S STATEMENT.

### A.   Trial Counsel Failed to Investigate, Develop and Present Evidence of Petitioner's Mental State at the Time of the Crime to Rebut the State's Evidence of Intent.

Counsel has a duty to investigate potential mental health defenses.  *See*, *e.g.*, *Seidel v. Merkle*, 146 F.3d 750, 756 (9th Cir. 1998) (counsel's failure to investigate mental health defense to murder objectively unreasonable); *United States v. Kauffman*, 109 F.3d 186, 191 (3d. Cir. 1997) (counsel ineffective for failing to investigate insanity defense); *Maddox v. Lord*, 818 F.2d 1058, 1061 (2d Cir. 1987) (counsel was objectively unreasonable for failing to investigate psychiatric

evidence establishing "extreme emotional disturbance" defense that reduces charge

from murder to manslaughter.); *see also* ABA Guidelines at 956, commentary on

Guideline 4.1 ("Evidence concerning the defendant's mental status is relevant to

numerous issues that arise at various junctures during the proceedings, including

competency to stand trial, sanity at the time of the offense, [and] capacity to intend

or premeditate death…")

Despite this well-established duty, trial counsel failed to investigate, develop

and present evidence of Petitioner's mental state at the time of the crime that

would have rebutted the state's evidence of intent and shown that Petitioner was

severely mentally ill and unable to formulate the intent to kill.

Under Texas law, evidence of a defendant's mental state or mental illness

may be offered to rebut the State's evidence of intent.  *See Ruffin v. State*, 270

S.W.3d 586, 587-88 (Tex. Crim. App. 2008) (holding that both lay and expert

testimony that directly rebuts mens rea is relevant and admissible unless barred by

a specific evidentiary rule); *see also Jackson v. State*, 160 S.W.3d 568, 573 (Tex.

Crim. App. 2005)("The diminished capacity doctrine... is simply a failure-of-proof

defense in which the defendant claims the State failed to prove that the defendant

had the required state of mind at the time of the offense."); *see also Smith v. State*,

314 S.W.3d 576 (Tex. Crim. App. 2010).

On the day of the killing, Petitioner was suffering from multiple mental

illnesses and psychosocial stressors that severely impaired his ability to function,

and, in turn, left him unable to formulate the intent to kill.  However, despite numerous red flags and extensive evidence of Petitioner's mental illness, trial counsel unreasonably failed to present evidence to the jury regarding Petitioner's mental state at the time of the crime.

Although trial counsel retained and presented the testimony of several mental health experts in the penalty phase of Petitioner's trial, counsel failed to ask any mental health experts to evaluate Petitioner's mental state at the time of the crime.  Counsel's representation was deficient, as they were aware of substantial information that would have led a reasonable lawyer to investigate further in this area.

Dr. Dudley, the psychiatrist presented by the defense in the penalty phase, states that although he had opinions about Petitioner's mental state at the time of the crime, "[a]t some point it became clear that there was no plan to discuss or present his mental state at the time of the crime (even as part of mitigation); I do not remember having much if any discussion with the attorneys about my findings and opinions about his mental state at the time of the crime."  Dudley Declaration (7/21/13) at ¶ 4 (Exh. 13).

Had Dr. Dudley been asked his opinion in this regard, the jury would have heard evidence rebutting the State's case regarding intent:

> If I had been asked about Travis' state of mind at the time of the
> offense, I would have testified that he was suffering from major
> psychiatric illnesses that seriously impaired his ability to function.

* * *

>An understanding of Travis' mental state at the time of the crime
>requires an understanding of how these psychiatric disorders were
>exacerbated by the psychosocial stressors he was experiencing at the
>time, and then how these disorders interacted with and potentiated
>each other, resulting in the mix of behaviors that were a part of the
>crime.

Dudley Declaration (7/21/13) at ¶ 4, 7 (Exh. 13).

Dr. Mendel, the psychologist presented by the defense in the penalty phase,

also was not asked his opinion about Petitioner's mental state at the time of the

crime.  He, too, could have offered compelling evidence rebutting the State's

assertion that Petitioner had specific intent to kill:

>If I had been asked about the circumstances of the crime, I would have
>certainly been able to speak about how the facts of the crime were
>consistent with his impulsivity and cognitive defects.  Second, I could
>have testified that his reasoning and decision-making abilities are
>weak and flawed.

Dr. Matthew Mendel Declaration (7/18/13) at ¶ 5 (Exh. 16).  According to Dr.

Mendel, Petitioner's act was "likely an impulsive, unplanned act, consistent with

his characteristic impulsivity."  *Id*.

Instead of this evidence rebutting intent, the jury was led to believe that

Petitioner's mental state had nothing to do with the crime and that he was just

acting out of anger, or his desire for his child to stop crying.  27 RR 15, 39.

Counsel's failure is especially deficient in light of the facts known to them at

the time of trial.  The record is replete with evidence of Petitioner's severe mental

illness and impaired functioning.  Despite this compelling evidence of Petitioner's

mental state, counsel inexplicably failed to investigate, develop or present any evidence of Petitioner's mental state at the time of the crime.

Counsel had no reasonable strategic basis for this failure. Presenting this evidence would have been consistent with counsel's strategy in the guilt/innocence phase of arguing that Petitioner lacked intent. *See*, *e.g.*, 27 RR 22 ("But it's not capital murder. It wasn't his conscious objective."). Counsel successfully requested a lesser included offense instruction in the jury charge, arguing that Petitioner had not intended to kill his child. 26 RR 59-80. Even in granting this request, however, the Court noted that defense counsel had presented almost no evidence in support of this argument. *Id*. at 80. ("And I think that the position of the Defense is at best a scintilla of evidence that's been raised at best on the fringe of rationality. But out of an abundance of caution, I'm going to allow that lesser.").

Counsel's failure prejudiced Petitioner. As a result of trial counsel's failure, it was not until after the jury had convicted Petitioner that they heard any evidence whatsoever of Petitioner's severe mental illness. This failure allowed the prosecution to argue at the guilt-innocence phase, without any evidence to the contrary, that Petitioner intended to kill his child simply because he was angry or because he believed it was the only way to make his child stop crying. 27 RR 15, 39. Counsel's deficient performance prejudiced Petitioner, as it is reasonably

likely that at least one juror, if presented with the evidence discussed above, would have found Petitioner was unable to formulate the intent to kill.

Moreover, because he lacked the ability to formulate the intent to kill, Petitioner is actually innocent of capital murder.

**B.    Trial Counsel Failed to Present Evidence of Petitioner's Mental Illness to Challenge the Admission of Petitioner's Statement.**

Under Texas law, evidence of mental state or mental illness is admissible for the purpose of arguing the voluntariness, and, thus, the admissibility, of the accused's statement. *Delao v. Texas*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007); *Bizzarri v. Texas*, 492 S.W.2d 944, 946 (Tex. Crim. App. 1973).

Here, the State presented a statement Petitioner made to police in Philadelphia regarding the crime. 25 RR 241-265. Trial counsel challenged the admission of Petitioner's statement prior to trial. *See* 9 RR 1-180; 10 RR 1-114. Having failed in that effort, Petitioner's statement was admitted and the voluntariness of that statement became an issue for the jury to determine. *See* Charge of the Court, 4 CR 775. However, counsel failed to present any evidence of Petitioner's severe mental illness or mental state to challenge the statement's voluntariness.

Counsel could have no reasonable strategy for not presenting this evidence. *See Joshua v. DeWitt*, 341 F.3d 430 (6th Cir. 2003) (petitioner denied effective assistance of counsel when trial counsel limited the grounds for suppression to only the unlawful length of detention but ignored other valid grounds warranting

suppression.); *State v. Hamilton*, 320 P.3d 142 (Wash. App. 2014) (no strategic reason could exist for counsel's failure to raise additional valid grounds for suppression of evidence). Even if the jury had reached the same determination regarding the voluntariness of the statement, the evidence of Petitioner's mental illness was extremely sympathetic. Moreover, presentation of this evidence at the guilt phase would have better prepared the jury to hear the mitigation presented in the penalty phase.

Petitioner was prejudiced by counsel's failure. A reasonable investigation would have yielded evidence that Petitioner's severe and extensive mental illness rendered his statement involuntary, and therefore inadmissible. Moreover, delaying the presentation of mental health evidence until the penalty phase prejudiced the outcome of the sentencing.

## XIII. PETITIONER WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BY THE PROSECUTION'S PRESENTATION OF IMPROPER AND INFLAMMATORY EVIDENCE, THE TRIAL COURT'S ERRONEOUS EVIDENTIARY RULINGS AND BY TRIAL COUNSEL'S INEFFECTIVE FAILURES TO OBJECT TO THE ADMISSION OF CERTAIN IMPROPER EVIDENCE; DIRECT APPEAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO RAISE THIS CLAIM.

At the guilt-innocence phase of trial, a number of erroneous evidentiary rulings and failures by defense counsel allowed the jury to hear irrelevant and prejudicial information. The jury heard: an admission of a prior bad act against a child in Petitioner's incompletely-redacted statement; testimony that a pellet/B.B.

195

gun was recovered from Petitioner's car; testimony attacking Petitioner's character and implying prior criminal conduct; and the jury saw autopsy photographs depicting the deceased baby's retracted skull.  The State violated the Fifth Amendment and due process by presenting inflammatory evidence and evidence of inadmissible, implied prior bad acts.  Had trial counsel provided reasonable representation, counsel would have objected to the admission of all of this evidence, and there is a reasonable probability the trial court would have excluded it.  The trial court erred in overruling the objections that defense counsel made.

The admission of this evidence so infected the guilt and penalty phases of trial with unfairness that Petitioner was deprived of his rights to due process and a fair trial.  Because the jury at the penalty phase is instructed to consider all evidence presented at both the guilt and penalty phases of trial, the errors infected the jury's sentencing determination as well.

### A.    The Uncharged Bad Act Evidence.

Petitioner's statement about the homicide was admitted against him at trial in support of the capital murder charge.  State's Exh. 36A.  Prior to its admission, the portion of that statement which referenced Petitioner's purported attempt to sexually assault Cecelia Duarte was redacted.  The redaction, however, was incomplete: the statement, as read to the jury by Detective Hesser, included the following sentence: "I apologize to both Michele, and her daughter Cecelia, for what I asked Cecelia to do.  I felt that I betrayed their trust."  25 RR 251-52.  This

portion of the statement implied that Petitioner engaged in improper behavior with Cecelia, for which he felt the need to apologize.

This prior bad act evidence was not at all relevant to any issue before the jury. Moreover, it created extreme prejudice against Petitioner, strongly suggesting he acted sexually or otherwise improperly toward this young girl. Worse yet, it caused the jury to speculate about what that improper behavior might be. The prosecution committed misconduct in introducing this prejudicial and inflammatory evidence. The admission of this irrelevant and unduly prejudicial prior bad act evidence resulted in Petitioner being denied his due process right to a fair trial. *See Beltran v State,* No. 04-15-00410-CR, 2017 WL 943437 at *2-3 (Tex. App. Mar. 8, 2017) (evidence of extraneous offense is not admissible at the guilt phase of trial unless relevant to a fact of consequence in the case apart from its tendency to prove conduct in conformity with character, and the probative value of the evidence must not be substantially outweighed by unfair prejudice).

Trial counsel's failure to seek redaction of this additional statement, which directly acknowledged Petitioner's guilty conscience for something he asked Cecelia to do, was deficient performance under *Strickland*. Reasonable defense counsel makes all efforts to prevent the jury from hearing prejudicial and inadmissible evidence. The inference this statement created, that Petitioner attempted to assault another young child and that for some reason the details of that prior assault were being kept from the jury, was apparent. To make matters

197

worse, the jury had already heard from Michelle Duarte, Cecelia's mother, that Cecelia was only eight years old at the time. 24 RR 7. Given trial counsel's successful efforts to keep reference to this incident with Cecelia completely from the jury, there could be no strategic reason for counsel's failure to seek and obtain redaction of this incriminating portion of the statement as well.

### B.    Admission of Irrelevant and Prejudicial Evidence.

A search of Petitioner's car, which was parked in a Philadelphia parking garage near the police station, led to the discovery and confiscation of a weapon, which throughout the trial was referred to as a B.B. gun and a pellet gun. This gun had absolutely no relevance whatsoever to the murder charges in this case. The decedent did not die by gunshot or pellet shot, nor was there any testimony to suggest that this weapon was ever used at all in relation to this case. No witness, except the officers recovering the weapon, ever testified about the weapon.

Despite this total lack of relevance, two prosecution witnesses testified that this B.B. gun was found in the car Petitioner drove from Texas to Philadelphia. First, FBI Special Agent Schwartz was asked by the prosecutor, without objection from counsel: "[did] you let them [the searching officers] know that you were looking for a B.B. gun?" 23 RR188. Although the witness responded "no", the question itself telegraphed to the jury that the police were for some reason looking for a B.B. gun in relation to Petitioner and/or this case. Later Agent Schwartz testified that the search of Petitioner's vehicle did in fact lead to the discovery and

confiscation of a B.B. gun. *Id.* at 236. A second witness, Detective Scott Pena, reiterated that a pellet gun was recovered in this case. 25 RR 91.

Although defense counsel unsuccessfully sought to suppress all items that were recovered as a result of this car search, claiming the evidence was illegally obtained, counsel failed to object to the admissibility of any testimony relating to this weapon at trial. Counsel's failure was deficient performance.

Counsel's failure was prejudicial under *Strickland*. Had counsel objected to the admissibility of this evidence prior to trial, it would have been declared inadmissible and kept from the jury. *See Peters v. State*, 93 S.W.3d 347, 353-54 (Tex App. 2002) (evidence of shotgun and marijuana found in defendant's hotel room when arrested for possession of cocaine not admissible where only contested issue was whether officers had consent to search room and circumstances surrounding entry could have been described without mentioning shotgun or marijuana). Moreover, the prosecution would have been prevented from asking Agents Schwartz and Pena about it, which would have avoided creating the impression that the police were looking for this B.B. gun because it had some relevance to this case or had been used in some other criminal fashion. It would have also avoided the risk that jurors would use this evidence, as they often do prior bad act evidence, to presume Petitioner was an aggressive person with a violent past.

199

### C.    Bad Character Evidence.

In its case in chief, the State presented the testimony of Michele Duarte, the woman who allowed Petitioner to stay with her family in Texas.  24 RR 6-85.  Ms. Duarte's testimony included a complete character assault on Petitioner, which verged on suggesting his involvement in criminal conduct to support himself.  She repeatedly testified that she did not know Petitioner to ever have a job, either when he stayed with her in the apartment, when he lived with others, or when he stayed with her in the trailer.  *Id.* at 15, 21, 34.  She explained that when he stayed with her, Petitioner ate with the family but she did all the cooking and most of the cleaning.  According to Ms. Duarte, Petitioner did not contribute any money toward food, rent or other household items when he lived with her family in the apartment or the trailer.  *Id.* at 16-17, 36-37.  She also repeatedly stated that she did not know how he paid for the car he drove or bought gas for that car.  *Id.* at 16. Despite her insistence that he never had a job, she testified that Petitioner somehow always seemed to have money to buy things, like cigarettes for Caren, or necessary items for Alijah.  *Id.* at 36.

This testimony, which amounted to an improper character attack on Petitioner, had no relevance to any issue before the jury during the guilt/innocence phase of trial.  Petitioner did not testify in his own defense, nor did he in any other way put his character at issue.   Any minimal relevance this evidence could have had was substantially outweighed by the danger of unfair prejudice it created.  *See*

Texas Rules of Evidence, Rule 403.  It was misconduct for the prosecution to offer this evidence.  The admission of this evidence was so unduly prejudicial that petitioner was denied his due process right to a fair trial.

Trial counsel did not seek to preclude the admission of this evidence prior to trial, or object to or seek a curative or limiting instruction once it was elicited.  Nor did counsel request a mistrial.  Trial counsel's failures in this regard constitute ineffective assistance of counsel under *Strickland*.  This evidence served no legitimate purpose other than to effectively tarnish Petitioner's character which was not at issue and insidiously suggest his involvement in prior bad or criminal acts which allowed him to inexplicably have money at his disposal to meet his own personal needs.  There could be no strategic reason for allowing this evidence to be heard by the jury.

Had counsel sought to exclude this evidence, such a motion would have succeeded and the jury would not have heard this negative testimony about Petitioner's character.

### D.   The Trial Court Erred and Abused its Discretion in Admitting Cumulative, Irrelevant, and Inflammatory Autopsy Photographs.

Prior to the testimony of Medical Examiner Nobby Mambo, Petitioner's counsel moved to prevent the admission of two autopsy photographs, States Exhibits 111 and 112, showing the victim's retracted scull and scalp with a lot of blood and brain matter protruding through the top of the skull.  Counsel argued these photographs were "quite graphic in nature" and that their "prejudicial effect

201

will greatly outweigh any probative value that they many have." 24 RR 131.   The state countered that both photographs were necessary to show the extent of the damage to the victim's skull.  *Id.* at 132-33.   The court overruled the defense objection, finding the photographs were relevant to show the extent of the injury the decedent suffered and could be used to help explain the Medical Examiner's testimony.  *Id.* at 133.

The trial court erred and abused its discretion in admitting these irrelevant, cumulative and overly prejudicial and inflammatory photographs.  *See* Texas Rules of Evidence, Rule 403.  Ample photographs were already admitted showing the injuries to the victim's head, making these photographs cumulative in nature. During Sergeant Richard Kershaw's testimony, numerous photographs showing the injuries to back of the decedent's head were admitted and published to jury without objection from counsel.  *See* 23 RR 78-86, State's Exhibit 63(infant as originally found); State's Exhibit 64 (close up of infant's head); State's Exhibit 66 (mark on infant's head); State's Exhibit 67 (infant lying face up); State's Exhibit 68 (lividity on infant's ear).  Sergeant Kershaw described these photographs as "very graphic" and agreed they were "difficult to look at."  *Id.* at 79.  Then during FBI Special Agent Jeremy Schwartz's testimony, State's Exhibit 66 was blown up and displayed on an overhead, as he used a laser pointer to identify the injuries. *Id.* at 131-34.  Finally, during Dr. Mambo's own testimony, various other photographs of the victim, contained in State's Exhibits 104-110, were admitted

and published to the jury.  *See* 24 RR 142-45.  In light of all these other

photographs contained in State's Exhibits 63-68 and 104-110, showing the same

injuries, these two additional photographs, which also showed blood and brain

matter protruding out of the skull, were simply unnecessary.  In addition, Dr.

Mambo's testimony as to the extent of the injuries to the victim's head should have

been sufficient by itself, without inflammatory photographs to accompany it.

These two photographs were irrelevant to proving anything at issue in the

guilt phase of trial.  It was not contested that the injuries to the head were the cause

of his death, nor was it contested how those injuries occurred.  Moreover, any

minimal relevance these gruesome photographs may have had was greatly

outweighed by the risk that the passions of the jury would be inflamed and

Petitioner unduly prejudiced.

A court's ruling admitting inflammatory, cumulative photographs lacking in

evidentiary value violates due process when it renders a defendant's trial

fundamentally unfair.  *See Lisenba v. California*, 314 U.S.219, 228 (1941)

(considering whether state evidentiary ruling violated due process); *Woods v.

Johnson,* 75 F.3d 1017, 1038–39 (5th Cir.1996) (admission of photographs of

deceased's body violates Eighth Amendment when it renders the trial

fundamentally unfair).

The photographs admitted in this case, depicting horrendous bloody injuries

and oozing brain matter, were so graphic that they rendered it impossible for

Petitioner to receive a fair trial and sentencing hearing. *See Spears v. Mullin*, 343
F.3d 1215 (10th Cir. 2003) (affirming reversal of death sentence based upon
admission of gruesome photographs) (*citing Willingham v. Mullin*, 296 F.3d
917, 928-29 (10th Cir. 2000)).

      **E.**      **Trial and Appellate Counsel were Ineffective**.

As described above, trial counsel failed to meet prevailing professional
norms by failing to object to the admission of the incompletely-redacted statement
admitting a prior bad act, testimony about the B.B. gun, and testimony assailing
Petitioner's character and implying criminal activity. As a result of counsel's
deficient representation, the jury heard evidence that Petitioner admitted to prior
bad conduct with a little girl, testimony that Petitioner had in his possession, as a
fugitive, a B.B. gun, and testimony that Petitioner had no apparent means of
support, implying criminal activity. There is a reasonable probability that on the
basis of all this evidence, at least one juror assumed Petitioner had a history of
crime and violence, and that affected the juror's verdict at the guilt-innocence or
penalty phase.

Appellate counsel, who permitted Petitioner to waive his right to counsel on
appeal before the record was prepared failed to review the record and discover this
meritorious issue. Had counsel reviewed the record, counsel could have informed
Petitioner that this claim was available and could have raised this claim on appeal.
Because appellate counsel has a duty to review the record, and because there

would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

## XIV.  THE TRIAL COURT ERRED BY ADMITTING PETITIONER'S CUSTODIAL STATEMENTS WITHOUT PRETRIAL NOTICE AND IN VIOLATION OF PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY LITIGATE THIS ISSUE AND FOR FAILING TO OBJECT TO AND/OR COUNTER LAW ENFORCEMENT TESTIMONY REGARDING PETITIONER'S PURPORTED LACK OF REMORSE.

Mr. Mullis explicitly invoked his Fifth and Fourteenth Amendment rights on February 4, 2008, in the presence of attorney Daniel Stevenson.  *See* Daniel Stevenson Declaration (Exh. 22).  Mr. Mullis signed the following statement, which was addressed to all Texas Police and District Attorneys and was hand delivered to Galveston Police Sergeant Gary Jones at Mr. Mullis' waiver of extradition hearing.  *Id*. at ¶ 3.

> Please be advised that I do not wish to waive my right to remain silent. I also do not wish to speak without an attorney present.  I wish to be represented by a lawyer. Until such time as I have an opportunity to fully discuss the details of my case with my lawyer, either appointed or retained, I state the following to you: I do not wish to be questioned or have any discussion with the police; I do not wish to speak with you without my attorney present; …  I will not waive or give up any of my rights under *Miranda v. Arizona*, nor will I give up any of my Pennsylvania or Texas or Federal Constitutional rights either orally or in writing without the presence of my lawyer.

*See* Mullis Non-Waiver of Rights Form.

On February 5, 2008, at 1:30pm, Mr. Mullis was transferred from the custody of Philadelphia police to Galveston Police Sergeants Jeremy Schwartz and

Annie Almendarez.  23 RR 167-68.  Mr. Mullis was placed in a holding cell at the

Philadelphia airport as Mr. Mullis and the Galveston Police Officers waited for

their flight back to Texas.  *Id*.  Sergeants Schwartz and Almendarez provided Mr.

Mullis with civilian clothing, offered him opportunities to use the restroom,

brought him food in his cell, and kept Mr. Mullis under continual observation

while they awaited their flight.  *Id*.  At no point did the Galveston Police officers

advise Mr. Mullis of his *Miranda* rights.  *Id*.

At 7:00 pm that evening, Galveston Police Sergeant Schwartz and Detective

Scott Pena, along with two Philadelphia officers, escorted Mr. Mullis to the gate

for their flight.  *Id*.  Agent Schwartz testified that Petitioner did not at all seem

tearful.  23 RR 168.  Later he expounded on that, agreeing with the prosecutor that

Petitioner did not show any emotion, he "never cried or anything like that."  *Id*. at

242.  He went on to explain that during the entire trip Petitioner never asked about

his son or about the baby's mother Caren Kohberger.  *Id*.  According to Agent

Schwartz, right before Petitioner got onto the plane headed back to Texas, he said

something to the effect of "he was done crying and it was time to be tough."  *Id*.

Defense counsel finally objected on the grounds that this was a custodial statement

for which he was not given pretrial notice in violation of Texas Code of Criminal

Procedure, Article 38.22.  *Id*. at 242-43.  Following an off-the-record sidebar

discussion, the questioning of Agent Schwartz continued without any comment or

instruction from the court.  He testified that Petitioner's statements to him were

spontaneous and not in response to any questions he asked. *Id*. at 243. Then he testified that Petitioner told Detective Pena, who was with Schwartz at the time, that he turned himself in because "he was tired of running" and "wanted to do the right thing." *Id*. at 244.

After Agent Schwartz testified, Det. Pena testified. Det. Pena was specifically asked, "what was the Defendant's demeanor when y'all were at the airport?" 25 RR 102. He answered that Petitioner "wasn't too terribly distraught" and considering all that had happened "was in a fairly decent mood." *Id*. The prosecution then asked Detective Pena if Petitioner made any statements to him. *Id*. Pena responded that Petitioner had made statements to him, in the presence of Schwartz. *Id*. Before Pena could share the substance of these purported statements, counsel objected and requested an opportunity to voir dire the witness outside the presence of the jury. *Id*. The Court granted counsel's request. *Id*. Although this voir dire was not recorded, presumably the court sustained counsel's objection because the prosecutor did not pursue this line of questioning once Detective Pena returned to the stand. *Id*. at 103-05.

Once a defendant invokes his Fifth Amendment right to counsel, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). The State must carry a heavy burden to demonstrate that a defendant knowingly and intelligently waived his privilege against self-incrimination and his

right to counsel should the prosecution seek to use defendant's statement taken after invocation of his right to counsel, but before he was provided an attorney. *See id*. at 475-76.

At trial, the prosecution seemed to argue that Mr. Mullis' statements at the airport to Det. Pena and Agent Schwartz were voluntary and not the product of explicit police questioning.  23 RR 243.  However, constitutional "interrogation" may manifest through words or actions which are reasonably likely to elicit a response from the prisoner.  *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980); *see also Edwards v. Arizona*, 451 U.S. 477, 486 n.9 (1981) ("If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.").

Here, the record contains no indication why the trial court cut short Detective Pena's testimony into Mr. Mullis' statements and demeanor at the airport in Philadelphia.  It is clear, however, that it contains no evidence that Mr. Mullis knowingly and intelligently waived his Fifth Amendment rights at that time.  It is highly likely that the Galveston Police did or said something amounting to

208

interrogation as defined by *Innis*, during the six-plus hour detention (which included multiple conversations about bathrooms, clothing, and food), or during the long flight back to Houston from Philadelphia.

### A.   Trial Court Error for Admitting Petitioner's Custodial Statements Despite Lack of Pretrial Notice.

Agent Schwartz testified to a statement Petitioner purportedly made to Detective Pena, that Petitioner said "he was done crying and it was time to be tough," in response to the prosecutor's question "did [Petitioner] say anything about … emotion.  Did he say anything about crying … ?"  23 RR 242.  Defense counsel objected on the grounds that he was not given pretrial notice of this statement or the circumstances under which it was taken and thus was not prepared to conduct adequate cross examination.  The inquiry of Det. Pena attempted to elicit these same statements, yet after counsel's off-the-record voir dire, the record shows that the trial court sustained counsel's objection and disallowed further examination on the subject of Petitioner's custodial statements made at the airport.  Had counsel been given proper pretrial notice of these statements, he could have challenged them in his omnibus motion to suppress statements and physical evidence, and Agent Schwartz's testimony likely would not have come in either.[62]

---

[62] On September 23, 2008, defense counsel filed a motion requesting a pretrial hearing on the admissibility of "statements made by the Defendant; acts that are tantamount to statements made by Defendant; [and] statements made in the presence of the Defendant which Defendant did not deny in response; …" The trial court held a pretrial hearing on suppression of evidence on January 18-19, 2011. On January 20, 2011 the trial court denied the Defendant's Motion to Suppress. However, at the hearing only Defendant's confession of February 1, 2008 was argued,

The court's failure to sustain the objection as to Agent Schwartz's testimony was erroneous and an abuse of discretion.  This lack of pretrial notice violated Petitioner's constitutional right to confront the witnesses against him.

### B.   Trial Counsel Were Ineffective for Failing to Seek Suppression of Petitioner's Inculpatory Custodial Statements on Fifth and Fourteenth Amendment Grounds.

Counsel did not argue that admission of this custodial statement elicited from Petitioner, post-arrest and outside the presence of counsel, violated Petitioner's Fifth and Fourteenth Amendment rights.   Clearly, the unrecorded voir dire of Detective Pena lead to the suppression of this very statement, as evident from the prosecutor's failure to continue with this line of questioning.  Had counsel made the same objection when Agent Schwartz was testifying, this statement would similarly have been excluded.

Counsel would have been prepared to raise such a challenge had he spoken to extradition counsel, Daniel Stevenson, prior to trial.  Mr. Stevenson attempted to contact counsel a number of times, but never received a call back.  Stevenson Declaration at ¶ 4 (Exh. 22).  Had counsel spoken to Mr. Stevenson, they would have learned that, following Petitioner's extradition proceedings, he signed a non-waiver of rights form, which said that Petitioner did not agree to be questioned and would not waive his right to counsel or his right to remain silent.  *See* Mullis Non-

---

and there was no mention of Defendant's custodial statements made at the Philadelphia airport on February 5th; presumably, because trial counsel had no notice that these statements were made or that the prosecution intended to introduce them at trial to show a lack of remorse.

Waiver of Rights Form (Exh. 26).  Mr. Stevenson would have also explained that a copy of this form was provided to Sergeant Gary Jones of the Galveston Police Department.  Stevenson Declaration at ¶ 3 (Exh. 22).  This would have provided an additional basis for counsel to successfully preclude the admission of Petitioner's statement before it was ever elicited.  However, counsel failed to return Mr. Stevenson's calls or otherwise contact him, and thus never learned about this non-waiver of rights form.

Counsel's failure was deficient performance under *Strickland*.  Had counsel simply returned Mr. Stevenson's phone call or independently contacted him, he would have learned a wealth of information that could have helped him not only suppress this statement on Fifth and Fourteenth Amendment grounds, but also counter the insinuation made by both Detective Pena and Agent Schwartz that Petitioner was emotionless, indifferent, and lacking remorse.

Petitioner was prejudiced by counsel's inaction, which led to the admission of the prejudicial statements that Petitioner only turned himself in because he "was tired of running," and that "he was done crying and it was time to be tough."  Had these statements been excluded, in combination with the other improper lack of remorse testimony – which also amounted to an unconstitutional reference to Petitioner's post-arrest silence – there is a reasonable probability that at least on juror would have reached a different verdict.

**C.    Counsel's Ineffectiveness for Failing to Object to Irrelevant Lack of Remorse Testimony.**

The questioning of Agent Schwartz and Detective Pena was an improper attempt on the part of the prosecution to present Petitioner as a cold, emotionless, and remorseless individual.  This testimony was irrelevant and highly prejudicial and should have been objected to by counsel.

Remorse or lack of remorse is not relevant at the guilt phase of trial, as it does not tend to prove or disprove any of the elements of murder, or any other form of homicide.  Moreover, the testimony of Agent Schwartz and Detective Pena on Petitioner's purported failure to demonstrate remorse or to ask about his baby or wife (23 RR 242), violated Petitioner's Fifth Amendment privilege against self-incrimination.  *See Doyle v. Ohio*, 426 U.S. 610, 617-20 (1976) (*Miranda* warnings contain implicit assurance that silence will not be used at trial against defendant); *United States v. Shaw*, 701 F.2d 367, 382 (5th Cir. 1983) ("The standard is strict; virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a *Doyle* violation.").  Petitioner had an unqualified right to remain silent after his arrest, and this testimony put him in a position where he suffered a detriment for exercising that right.

Counsel's failure to object to this improper and unconstitutional testimony constituted ineffective assistance of counsel.  Had counsel lodged a timely objection on these grounds, it would have been sustained and this improper testimony stricken from the record and the jury ordered to disregard it.  Given the harmful impact of this testimony, counsel could have no reasonable strategy for failing to object to its admission.

Even if a timely objection had been made and was overruled, counsel could have discovered and presented readily available evidence to counter the testimony of Schwartz and Pena with regard to Petitioner's purported emotionless demeanor and lack of remorse.  Had counsel simply spoken with, or returned calls from, attorney Dan Stevenson he would have told them about his interaction with Petitioner in the cell room of the Criminal Justice Center:

> Mr. Mullis was crying when I walked in to meet with him.  He kept saying over and over again how sorry he was that he had killed his baby.  He was incredibly remorseful.  He did not want to fight extradition.  He just wanted to get back to Texas to face his punishment.  I explained the extradition process and told him how it would work if he wanted to fight it.  He kept crying and said he just wanted to agree to go back.

Stevenson Declaration at ¶ 2 (Exh. 22).  Counsel could have also learned about Mr. Stevenson from reading a Houston Chronicle article dated February 4, 2008, entitled *Police: Mullis showing remorse; Slain baby's dad to return to Texas as early as Tuesday.*  Mr. Stevenson was quoted as saying Petitioner was "crying when I spoke to him," he was "remorseful" and "seemed ready to get back to

Texas."  *Id*.  Mr. Stevenson could have testified at Petitioner's guilt phase to counter the testimony of Detective Pena and Agent Schwartz.

Petitioner suffered *Strickland* prejudice.  But for counsel's failure to preclude this prejudicial testimony from the jury, there is a reasonable probability that at least one juror would have had reasonable doubt as to Petitioner's guilt, or voted for life instead of death.

To the extent that appellate counsel could have raised any record-based aspect of this claim and failed to do so, counsel was ineffective.  Had counsel reviewed the record, counsel could have informed Petitioner that this claim was available and raised this claim on appeal.  Because appellate counsel has a duty to review the record, and because there would have been a reasonable probability of reversal on appeal on the basis of this claim, appellate counsel was ineffective.

## XV.   PETITIONER'S RIGHT TO SILENCE WAS VIOLATED WHEN THE PROSECUTOR COMMENTED ON PETITIONER'S SILENCE DURING THE PENALTY PHASE.

During the cross-examination of a witness presented by the defense in mitigation at the penalty phase, the prosecutor gratuitously commented on Petitioner's silence.  Counsel failed to object and failed to preserve this issue for appeal.  Appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness in this regard.  Petitioner's right to remain silent and his right to the effective assistance of counsel were violated.

Petitioner did not take the witness stand during either the guilt phase or the penalty phase of his trial.  The law is clear that the prosecution may not comment

on a defendant's failure to testify at trial. *See Griffin v. California*, 380 U.S. 609, 614 (1965) (Fifth Amendment violation from argument that a jury should draw a negative inference from a defendant's failure to take the stand in his own defense); *Chapman v. California*, 386 U.S. 18 (1967) (same). "The concerns which mandate the rule against negative inferences at a criminal trial apply with equal force at sentencing." *Mitchell v. United States*, 526 U.S. 314, 329 (1999). That is, "the central purpose of the privilege—to protect a defendant from being the unwilling instrument of his or her own condemnation—remains of vital importance" at sentencing. *Id.*[63]

Here, the prosecution violated Petitioner's rights by plainly pointing out to the jury that Petitioner was not testifying on his own behalf. Although "the Government retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination privilege," *Id.* at 330, the prosecution here attempted to relieve its burden for proving evidence in aggravation.

During the penalty phase, the defense called William Kelly to testify in mitigation. He testified that he was a mentor to Petitioner, through a program that would allow the mentor to be "a trusted friend" to young people in need, like Petitioner. 31 RR 15. On cross examination, the prosecution challenged whether

---

[63] The Supreme Court's decision in *White v. Woodall*, 134 S. Ct. 1697 (2014), does not alter the analysis. *Woodall* determined that a state court decision was not contrary to clearly established law under 28 U.S.C. § 2254(d)(1) when it refused to impose a no-adverse-inference instruction at the penalty phase. The Court reserved judgment on "whether the conclusion that a no-adverse-inference instruction was required would be correct in a case not reviewed through the lens of § 2254(d)(1)." *Id.* at 1703.

Petitioner trusted Mr. Kelly "during the time from age 12 to 18." 31 RR 48. Mr. Kelley responded, "[t]hat's something you will have to ask him," to which the prosecutor stated, "[w]ell, I'm not in a position to ask him that." 31 RR 48-49.

The message to the jury was clear – that the prosecution would not have the chance to ask Petitioner anything since he did not testify during the trial and was not doing so during the penalty phase. Moreover, this was an improper, gratuitous comment by the prosecution. The prosecutor is supposed to ask questions rather than make such comments in front of the jury. This comment on Petitioner's silence violated the Fifth and Fourteenth Amendments and had a substantial and injurious effect on the outcome of the sentencing phase.

This error was compounded by the prosecution's improper conduct during the guilt phase closing argument. Indeed, the prosecutor who engaged in this improper commentary before the jury is the same prosecutor who was glaring at Petitioner during her guilt phase closing argument, as if she were questioning him, implicating his silence:

| [MS. CAMERON:] | ... And then he's not browbeaten. You've listened to the tape. The questions are, "Mr. Mullis, Mr. Mullis, did you know what you were doing on January 29th, 2008?" |
|---|---|
| MR. LOPER: | Judge, I would object to Ms. Cameron looking at our client. The record won't accurately reflect this, but the jury can see that she's talking to him as though she's questioning him, somehow trying to imply to the jury that he failed to present himself as a witness in this case. We -- highly irregular and we object to it. |

216

> THE COURT:      Your objection is noted.  If you would continue
> your argument, it is sustained.

27 RR 43.  The prosecution was deliberately implying to the jury that Petitioner

did not testify and for that reason should be convicted of intentional murder.

The prosecutor's comment during the penalty phase was damaging and

violative of Petitioner's rights.  *See Gongora v. Thaler*, 710 F.3d 267, 278-83 (5th

Cir. 2013) (finding harm from prosecutor's comments on silence).  Although brief,

the dramatic impact of this scene surely remained etched in the minds of the jurors

and "str[uck] at the jugular of the defense." *Id.* at 280 (quotation marks and citation

omitted).

Trial counsel failed to object to the prosecutor's comment on Petitioner's

silence during the penalty phase.  Counsel was ineffective.  Counsel's performance

was deficient for failing to object to such a plainly improper comment on

Petitioner's silence.  Petitioner was prejudiced as there is a reasonable probability

that at least one juror would have voted for life if not for counsel's deficient

performance.

To the extent that appellate counsel could have raised any record-based

aspect of this claim and failed to do so, counsel was ineffective.  Had counsel

reviewed the record, counsel could have informed Petitioner that this claim was

available and raised this claim on appeal.  Because appellate counsel has a duty to

review the record, and because there would have been a reasonable probability of

reversal on appeal on the basis of this claim, appellate counsel was ineffective.

217

**XVI. APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO
LITIGATE PETITIONER'S APPEAL AND FOR ENABLING
PETITIONER'S WAIVER OF COUNSEL ON DIRECT APPEAL;
THE TRIAL COURT'S FAILURE TO HOLD A COMPETENCY
HEARING VIOLATED PETIONER'S RIGHT TO DUE PROCESS;
AND THE COURT OF CRIMINAL APPEALS ERRED IN DENYING
PETITIONER'S EFFORTS TO RESTORE HIS APPELLATE
RIGHTS, IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH
AND FOURTEENTH AMENDMENT RIGHTS.**

Immediately after Petitioner was sentenced to death, the trial court, on

March 23, 2011, appointed Wayne Hill, Esq. to represent Petitioner on his direct

appeal. Mr. Hill filed a timely Motion for New Trial within the thirty-day period.

On May 20, 2011, less than two months after his appointment, before the record

was available, and without a competency evaluation, Mr. Hill drafted and

presented to the court documents that enabled Petitioner to waive his right to a

counseled appeal. Appellate counsel was ineffective for failing to ensure that

Petitioner made a knowing, voluntary and intelligent waiver of his appellate rights,

for not requesting a competency hearing despite clear indications one was

necessary, and for rushing to effectuate Petitioner's stated desire to waive his right

to counsel before the record was ever available for his review.

The trial court also violated Petitioner's right to due process of law by

allowing Petitioner, who had recently been sentenced to death and had a lifelong

history of mental health problems, to waive this fundamental constitutional right

without first holding a competency hearing. The trial court was aware of

Petitioner's mental health history, but did not take any steps to appropriately

inquire into his competency. Due to his mental health problems and the

psychosocial stressors he was under at the time, Petitioner was incompetent to waive. The trial court was also aware the trial transcripts were not yet available, but allowed Petitioner to waive without inquiring into if, and how, this impacted Petitioner's decision to waive. Without this vital information, Petitioner's waiver was not knowingly and intelligently made. In fact, soon after the transcripts became available, Petitioner requested to reinstate his appeals, citing to the transcripts themselves as new evidence. Declaration of Brad D. Leveson, ¶ 13 (Exh. 60).

The Court of Criminal Appeals erred in denying Petitioner's attempt to restore his appellate rights, in violation of Petitioner's right to appeal and his right to due process.

### A.     The Legal Standard.

Under *Pate v. Robinson*, a court must *sua sponte* hold a competency hearing if there is any bona fide question as to an individual's competency. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Davis v. Alabama*, 545 F.2d 460, 464 (5th Cir. 1977). A *Pate* violation is separate and distinct from a substantive claim of incompetency to stand trial. The Petitioner need not establish that he was actually incompetent to obtain relief; rather he need only establish that the court should have ordered a hearing to determine his competency. *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980).

The waiver of the right to counsel requires a heightened standard beyond the standard for competency to stand trial; the waiver must also be knowing and

voluntary before it can be accepted. *Godinez v. Moran*, 509 U.S. 389, 401-02 (1993); *accord Indiana v. Edwards*, 554 U.S. 164, 177-78 (2008) (*Dusky v. United States*, 362 U.S. 401 (1960) held that the competency standard alone is insufficient for competency to proceed *pro se*; judges must make individualized determination of competency to conduct one's own defense).  To be knowing and voluntary, the court must determine "whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision was uncoerced."  *Godinez*, 509 U.S. at 401 n.12.

Petitioner's right to a counseled direct appeal is protected by the Constitution and by Texas statute and procedure.  The Sixth Amendment guarantee of the effective assistance of counsel includes the right to counsel on appeal; the failure to perfect an appeal is considered constructive denial of the right to counsel. *See*, *e.g. Penson v. Ohio*, 488 U.S. 75, 88-89 (1988); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).  The Fourteenth Amendment requires that Texas courts follow certain minimum safeguards of due process to make the appeal right "adequate and effective."  *Evitts*, 469 U.S. at 392.The remedy for ineffectiveness of appellate counsel is the grant of a new direct appeal.  The defendant "receives the right to an appellate proceeding, as if on direct appeal, with the assistance of counsel." *Castellanos v. United States*, 26 F.3d 717 (7th Cir. 1994).

Petitioner is entitled to a new direct appeal.

**B.     The Court Violated Petitioner's Right to Due Process by Failing to Hold a Competency Hearing and Erred in Accepting the Waiver.**

The trial court's failure to conduct a competency hearing violated Petitioner's due process rights.  *See Pate v. Robinson*, 383 U.S. at 378.  Having presided over Petitioner's trial, the court was aware that Petitioner suffered severe mental health problems and had a history of suicidal ideation and mood swings and had been diagnosed with depression, PTSD, and bipolar disorder.  Nevertheless, the court failed to conduct a hearing regarding Petitioner's competency or any other substantive inquiry into his decision to waive.  Instead, the court conducted only an extremely truncated colloquy with Mr. Mullis, never asking about his mental state.  34 RR 7-9.  Such an inquiry was insufficient to ensure Mr. Mullis was competent and violated his right to due process.  *Pate*, 383 U.S. at 378.

**C.     Petitioner Was Not Competent and His Waiver Was Not Knowing and Voluntary; Counsel Ineffectively Failed to Investigate Petitioner's Competence and the Validity of His Waiver.**

Under the circumstances, it was impossible for Petitioner to make a knowing and voluntary waiver of his appellate rights.  At the time of the waiver, appellate counsel was in no position to describe to Petitioner the available appellate issues, nor could he describe how counsel could assist in presenting those issues to the courts.  The record had not yet been prepared; thus, counsel had no familiarity with the trial transcript, exhibits, or pretrial motions.  Counsel could not provide Petitioner with competent legal advice as to the potential strength of possible appellate claims.  Petitioner expressed interest in what these record based issues

could be.  *See* Levenson Dec. at ¶ 5 (soon after this direct appeal waiver, Mr. Mullis was "focused on his legal issues and repeatedly asked if he had any good issues and was likely to win a new trial.  I was never able to properly advise him because we did not have the trial transcripts . . . and had only begun our investigation.").  Had counsel simply waited until these transcripts were available before drafting and filing a motion to waive direct appeal on his client's behalf, Mr. Mullis' decision would have at least been an intelligent one.  In assisting Petitioner to waive his appeal at that stage, with no information about the case, counsel was deficient.

Further, as described in detail in the procedural history, Mr. Hill had very little information about Petitioner's mental health at the time that he drafted and filed Petitioner's Waiver of Rights and Invocation of Right to Proceed Pro Se. Counsel knew "mitigating evidence had been presented on behalf of Mr. Mullis," Wayne Hill Declaration at ¶ 2, but did not know that Petitioner had a history of mental illness and treatment since his toddler years, and did not know that Petitioner had been diagnosed with bipolar disorder, PTSD, and depression. Counsel was aware from an interview that Petitioner had been housed in the county jail's suicide prevention unit.  Counsel did nothing to explore the issue of whether Petitioner was competent to waive his appeals and whether such a waiver was knowing and voluntary.  Counsel's failure amounted to a complete abandonment of Petitioner and thus the actual or constructive denial of direct appeal counsel. *See United States v. Cronic*, 466 U.S. 648, 659 (1984).

Had counsel waited until the record was prepared, or had counsel consulted with any of the three mental health experts–Dr. Dudley, Dr. Mendel, or Dr. Brams–who were part of the defense team at trial, counsel would have learned of Petitioner's lifelong mental health problems.  Each of these experts has stated that he or she would have advised appellate counsel to seek a competency evaluation before permitting Petitioner to waive his rights.  *See* Affidavit of Richard Dudley dated 11/14/12 at ¶¶ 7 & 8 (Original Writ of Habeas Corpus filed 11/30/12, Exhibit C); Affidavit of Matthew Mendel dated 11/16/12 at ¶¶ 5 & 6 (Original Writ of Habeas Corpus filed 11/30/12, Exhibit B); and Affidavit of Jolie S. Brams dated 11/19/12 at ¶¶ 7 & 9 (Original Writ of Habeas Corpus filed 11/30/12, Exhibit D).

Two legal experts, Professor Eric Freedman and attorney William Harris, have opined in sworn affidavits that appellate counsel's rush to assist Petitioner in waiving his rights was prejudicially deficient representation, falling far below prevailing professional norms in Texas and nationally.  *See* Affidavit of Professor Eric M. Freedman (Original Writ of Habeas Corpus, Exhibit H); Affidavit of William S. Harris (Original Writ of Habeas Corpus, Exhibit I).  As Professor Freedman states:

> As a matter of universal professional practice among competent capital defense counsel, any serious suggestion by a client that he wishes to drop his appeals is a red flag indicating a need to investigate the client's mental status scrupulously–not a direction to be routinely followed in the same way that a lawyer might, for instance, follow a client's direction to seek postponement of a trial date.

Freedman Affidavit at ¶ 29.  Mr. Harris confirmed that in Texas practice, prevailing professional norms are similar to those described by Professor Freedman.  Counsel's deficient representation was prejudicial, because it resulted in Petitioner's waiver of his right to counsel, the submission of his case on appeal without briefing, and the subsequent denial of his appeal.

Petitioner was incompetent to make a knowing and voluntary waiver, because of his mental health impairments and the psychosocial stressors he was under at the time.  Petitioner had recently been sentenced to death; he had been diagnosed with major depression, bipolar disorder, and PTSD; and he had a debilitating fear of prison, due to his history of sexual abuse.  *See* Declaration of Brad D. Levenson at ¶ 7-8 ("Based on my conversations with Travis, it is my opinion that the main thing motivating him to waive was his concern that if he won penalty phase relief he would have to move to general population where he would be a target for sexual and physical abuse by other inmates, due to the nature of his crime and his sexual orientation.  He repeatedly expressed these concerns to me and I believe to members of my staff.").

Petitioner's waiver was invalid and he is entitled to a new direct appeal.

**D.**     **The Decisions of the Court of Criminal Appeals Reinstatement.**

The Court of Criminal Appeals, as described in the procedural history above, issued a bizarre notice to Petitioner regarding filing of his appellate brief by "counsel," and subsequently decided the appeal on April 25, 2012, one month before the stated filing deadline of May 21, 2012.  The notice to Petitioner that "counsel" was directed to file his brief was not delivered to Mr. Hill or any other counsel; the only recipient was Petitioner at his prison address.  This appeal procedure did not meet the minimum due process requirements of direct appeal, and also failed to protect Petitioner's Eighth Amendment right to a meaningful review of his death sentence.  The subsequent order of the Court of Criminal Appeals denying Petitioner's motion for leave to file an original writ to restore his appellate rights similarly violated Petitioner's due process and Eighth Amendment rights to meaningful direct appeal.

**XVII. PETITIONER'S CONVICTION AND SENTENCE ARE UNCONSTITUTIONAL DUE TO THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S INADEQUATE REPRESENTATION, THE STATE'S MISCONDUCT AND THE COURT ERRORS DESCRIBED ABOVE.**

Petitioner's conviction and sentence were the product of multiple constitutional violations by the State, the trial court, and trial counsel.  As set out above, each of these violations was of such magnitude as to undermine the reliability of the verdicts and require relief.  However, even if this Court determines that Petitioner failed to meet his burden to prove the prejudice resulting from any one of these violations, it is well-established that this Court must also

examine whether the cumulative effect of these errors violated Petitioner's rights to effective assistance of counsel and to due process of law.  *See, e.g., Spence v. Johnson*, 80 F.3d 989, 1000-01 (5th Cir. 2004) (relief is warranted for cumulative error when "the constitutional errors committed in the state trial court so 'fatally infected the trial' that they violated the trial's 'fundamental fairness.'"); see also *Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different.") (emphasis added); *accord Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973).

## REQUEST FOR RELIEF

WHEREFORE, based upon the foregoing, Petitioner respectfully requests that the Court grant him the following relief:

(1)     Such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

(2)     An evidentiary hearing on all claims involving disputed issues of fact;

(3)     A Writ of Habeas Corpus to vacate Petitioner's conviction and sentence.

Respectfully submitted,

/s/ Shawn Nolan
SHAWN NOLAN
Chief, Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19016
215-928-0520
Dated:     July 19, 2017          Shawn_Nolan@fd.org

226

## <u>CERTIFICATE OF SERVICE</u>

      I, Shawn Nolan, hereby certify that on this 19th day of July, 2017, I served

the foregoing on the following person by ECF Filing and email:

                          Matthew Ottoway
                          Assistant Attorney General
                          Southern District of Texas
                          P.O. Box 12548, Capitol Station
                          Austin, TX 78711

                                        /s/ Shawn Nolan
                                        Shawn Nolan