UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

_____
                                          :
TRAVIS JAMES MULLIS,                      :
                                          :          No. 3:13-cv-121
        Petitioner,                       :
                                          :
            v.                            :
                                          :      **This is a Capital Case**
LORIE DAVIS,                              :
Director, Texas Department of             :
Criminal Justice, Correctional           :
    Institutions Division                 :
                                          :
        Respondent.                       :
_____

**CONSOLIDATED APPENDIX TO PETITION FOR WRIT OF HABEAS
CORPUS BY A PRISONER IN STATE CUSTODY
PURSUANT TO 28 U.S.C. § 2254 *et seq.***

SHAWN NOLAN
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
601 Walnut Street
Philadelphia, PA 19016
215-928-0520
Shawn_Nolan@fd.org

July 19, 2017

# Index

1)   Affidavit of Wayne Hill, November 19, 2012 . . . . . . . . . . . . . . . . . . . . . . . 1

2)   Report of Dr. Scarano . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3)   Letter from Washington County Department of Social Services,
     July 19, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

4)   Declaration of Michael Smith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

5)   Declaration of Maldina Dietz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

6)   Declaration of Richard Brokaw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

7)   Declaration of Sallyann Jennings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

8)   Declaration of Terry Pritt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

9)   Declaration of Wendy Myers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

10)  Declaration of Rebecca Pate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

11)  Declaration of Anne Mullis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

12)  Declaration of Richard Dudley, November 14, 2012 . . . . . . . . . . . . . . . . 82

13)  Declaration of Richard Dudley, July 21, 2013 . . . . . . . . . . . . . . . . . . . . . 84

14)  Johns Hopkins Treatment Records (Gary Mullis) . . . . . . . . . . . . . . . . . . 93

15)  Declaration of Matthew Mendel, November 16, 2012 . . . . . . . . . . . . . . . 571

16)  Declaration of Matthew Mendel, July 18, 2013 . . . . . . . . . . . . . . . . . . . . 573

17)  Report of Victoria Reynolds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 579

18)  Brook Lane Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 599

19)   Harford County Petition for Child in Need of Assistance  . . . . . . . . . . . . 672

20)   Declaration of Dr. Mitchell Katz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 675

21)   Police: Mullis Showing Remorse, Slain Baby's Dad to Return to Texas
      as Early as Tuesday, *The Houston Chronicle,* February 4, 2008  . . . . . . . 679

22)   Declaration of Daniel Stevenson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 681

23)   Declaration of Antoinette McGarrahan . . . . . . . . . . . . . . . . . . . . . . . . . 683

24)   *State v. Caren Kohberger*, Complaint, Feb. 1, 2008,
      Cause No. F016385 (Brazoria County)  . . . . . . . . . . . . . . . . . . . . . . . . . 685

25)   *State v. Caren Kohberger*, Cause No. F016385,
      Motion to Dismiss (Brazoria County Justice Court, Mar. 28, 2011)  . . . . 686

26)   Non-Waiver of Rights Form  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 687

27)   Juror Questionnaire, Blank  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 688

28)   Attorney's List, 02/01/11, 4:20 PM            Filed Under Seal

29)   Attorney's List, 02/01/11, 4:21 PM            Filed Under Seal

30)   Juror Questionnaire, PP                       Filed Under Seal

31)   Juror Questionnaire, BN                       Filed Under Seal

32)   Juror Questionnaire, BN                       Filed Under Seal

33)   Juror Questionnaire, DE                       Filed Under Seal

34)   Juror Questionnaire, FS                       Filed Under Seal

35)   Juror Questionnaire, DA                       Filed Under Seal

36)   Juror Questionnaire, GN                       Filed Under Seal

37) Juror Questionnaire, NC           Filed Under Seal

38) TDPS Sex Offender Registry, BW      Filed Under Seal

39) Accurint Law Enforcement Report, ND     Filed Under Seal

40) Declaration of Ruben Ornelas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 703

41) Declaration of Richard Styner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 705

42) Declaration of Robert Lundy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 709

43) Declaration of Frank G. Aubuchon . . . . . . . . . . . . . . . . . . . . . . . . . . . 714

44) Declaration of Michael Bradford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 718

45) Declaration of Sarah Oswald . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 721

46) Declaration of Hazel Cook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 723

47) Declaration of Anne Jenkins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 729

48) Declaration of Teria Pittman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 732

49) Declaration of Kim Mirch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 734

50) Declaration of Michael Brudzdzinski . . . . . . . . . . . . . . . . . . . . . . . . . 739

51) Declaration of Beverly Hibschman . . . . . . . . . . . . . . . . . . . . . . . . . . . 744

52) Declaration of Kendra Witherspoon . . . . . . . . . . . . . . . . . . . . . . . . . . 746

53) Declaration of Joanne Wallace . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749

54) Declaration of Lori Russell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 751

55) Declaration of Margaret Wallace . . . . . . . . . . . . . . . . . . . . . . . . . . . . 756

56) Declaration of Candy Reinhardt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 758

57)  Declaration of Jessica Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 761

58)  Letter from Associated Mental Health Specialists . . . . . . . . . . . . . . . . . 786

59)  Harford Memorial Hospital Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . 788

60)  Declaration of Brad Levenson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 811

61)  Maryland Department of Juvenile Services Records . . . . . . . . . . . . . . . 816

Exhibit 01

STATE OF TEXAS      §
                         §
COUNTY OF HARRIS     §

## AFFIDAVIT OF WAYNE HILL

Wayne T. Hill, an attorney licensed in the State of Texas, being duly sworn, deposes and says:

1.     "Travis James Mullis was sentenced to death on March 21, 2011, in the 122nd District Court, Galveston County, the Honorable John Ellisor presiding. The case proceeded under cause number 08-CR-0333, and was thereafter assigned cause number AP-78,525 in the Texas Court of Criminal Appeals. On March 23, 2011, I was assigned as counsel for Mr. Mullis on direct appeal to the Texas Court of Criminal Appeals.

2.     On March 23, 2011, I spoke with trial counsel concerning the facts and circumstances of the case. I was informed that mitigating evidence had been presented on behalf of Mr. Mullis. I also discussed possible appellate issues in the case, including the issue of potential juror misconduct involving premature deliberations, outside of the courtroom, and potentially without all jurors present. As I recall, the report was that this happened during the defense presentation of evidence. I also had subsequent conversations with trial counsel concerning the juror issue.

3.     On March 25, 2011, I went to the Galveston County District Clerk's office and conducted a preliminary review of court documents related to the case. I then proceeded to the Galveston County Jail to meet Mr. Mullis and review the circumstances of his case with him. I also explained the direct appeal process to him. I also informed Mr. Mullis that Brad Levenson with the Office of Capital Writs in Austin would be representing him on his habeas petition. During our March 25th meeting, Mr. Mullis expressed his desire to move from the "FSP" (Full Suicide Prevention) Unit. I contacted Kathy White - Head of Nursing at the Galveston County Jail to assist Mr. Mullis in his effort to move to a different housing unit within the Galveston County Jail. I later learned from Mr. Mullis that he was transferred as he had requested.

4.     On March 28, 2011, , I spoke with Brad Levenson, who heads the Office of Capital Writs in Austin, Texas. Mr. Levenson had been appointed to represent Mullis on his Application for Habeas Corpus under Article 11.071 of the Code of Criminal Procedure. Mr. Levenson asked if I could obtain release documents for him from Mr. Mullis on my next jail visit. I agreed and obtained the documents the next day (March 29, 2011) when I again visited Mr. Mullis at the Galveston County Jail. During my telephone conversation with Mr. Levenson, he informed me that he had investigative resources available so that the jurors could be interviewed. I subsequently interviewed the jurors myself.

5.  Under Texas Rule of Appellate Procedure 21.4, I had only thirty days from the date of Mullis's sentencing on March 21, 2011, to file the motion for a new trial. This motion, and the anticipated hearing thereon, would have allowed the Texas Court of Criminal Appeals to consider the evidence from the motion for new trial on direct appeal. On April 19, 2011, I reviewed the motion for new trial with Mr. Mullis and obtained his notarized signature on it. I then filed the motion for new trial and "presented" it to Judge Ellisor as required by the Texas Rule s of Appellate Procedure. The motion for new trial is attached hereto as "Attachment 1"

6.  On April 25, 2011, I spoke with Mr. Levenson concerning issues surrounding the client's decision to waive certain post-conviction remedies. On May 3, 2011, I had a lengthy meeting with Mr. Mullis at the Galveston County Jail during which we discussed numerous topics and issues relating to his trial and pursuing his direct appeal to the Texas Court of Criminal Appeals. Mr. Mullis executed the Defendant's Waiver of Appearance at Motion for New Trial which is attached hereto as "Attachment 2". I had a subsequent conversation with Mr. Levenson on May 16, 2011.

7.  During the course of my representation of Mr. Mullis, I met with him 6-7 times. I do not recall the precise date that Mr. Mullis first raised the issue of not wanting to pursue his direct appeal, but he did mention it at least during our April 25th meeting, if not sooner. When the topic was discussed, I likely told him it would be a "stupid thing to do" (or words to that effect) because an appeal is automatic in a death penalty case. When Mr. Mullis reiterated his desire to make decisions consistent with not seeking appellate review, he asked me to notify the Court he wanted neither an attorney nor an appeal.

8.  Based on a request made by Mr. Mullis, I prepared a document entitled Waiver of Rights and Invocation of Defendant's Right to Proceed Pro-Se ("Attachment 3") which Mullis signed. I filed this document in Court on May 20, 2011.

9.  A hearing on the motion for new trial had already been scheduled for May 20, 2011. Not knowing if the Court would allow Mullis to abandon his appeals and have me relieved as counsel, I had subpoenaed jurors to testify at the hearing on the motion for new trial.

10. When Court was called into session, I informed Judge Ellisor of Mr. Mullis's desires and the pleading I had filed on his behalf. Judge Ellisor addressed Mr. Mullis and questioned him about his decision. Based on Mullis's colloquy with Judge Ellisor (which was taken by the official court reporter) the judge granted relief to Mr. Mullis. I was relieved as court-appointed counsel on direct appeal and Mr. Mullis was allowed to proceed *pro-se*.

11. On August 22, 2012, Janice with the Galveston County District Clerk's office contacted my office and left a message that Mr. Mullis desired to reinstate his appeal. I returned Janice's call that same date and declined to undertake representation due to other pending professional commitments.

_[signature]_

WAYNE T. HILL

Sworn and subscribed to before me on this _19-th_ day of November, 2012.

_[notary seal: SYLVIA HURON REED, NOTARY PUBLIC, STATE OF TEXAS, EXPIRES JUNE 2, 2016]_

_[signature]_

Notary Public, State of Texas

# Attachment 1

Case No: 08CR0333

2011 APR 19 PM 1:01

| | |
|---|---|
| STATE OF TEXAS | IN THE DISTRICT COURT OF |
| VS. | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | 122nd JUDICIAL DISTRICT |

## MOTION FOR NEW TRIAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Travis James Mullis, Defendant in the above-styled and numbered cause, by and through the undersigned attorney, and moves this Court for an order granting him a new trial, and in support thereof would show:

### I.

Defendant was convicted of capital murder and sentenced to death.

### II.

The evidence in support of the verdict of guilt returned by the jury was insufficient as a matter of law.

### III.

The evidence in support of the verdict returned by the jury at the punishment stage of the trial was insufficient as a matter of law.

### IV.

The trial court erred when it found that the evidence used in Defendant's trial was lawfully obtained.

## V.

The court misdirected the jury about the law or committed some other material error likely to injure the defendant's rights.

## VI.

The verdict is otherwise contrary to the law and the evidence.

## VII.

The jury engaged in such misconduct (as set forth in the Affidavit of Gerald E. Bourque which is attached hereto and incorporated herein for all purposes) that the Defendant did not receive a fair and impartial trial, to wit: Juror Monica Garner made comments in the presence of other jurors which prejudiced the Defendant's right to receive a fair trial. The remedial action taken by the trial court failed to adequately take into account the impact that Ms. Garner's participation before and during guilt/innocence phase deliberations had on the remaining members of the jury. Defendant was denied his right to a fair and impartial jury of twelve individuals.

## VIII.

The State's jury argument (commenting on Defendant's sexual orientation) contravened the trial Court's Order precluding the State's use of the Defendant's sexual orientation as evidence in the trial. This argument denied Defendant of his right to due-process of law as well as his right to equal protection under the law.

## IX.

The State's selection of jurors denied Defendant of his right to a fair and impartial jury and of his right to a fair trial.

X.

The interest of justice requires the granting of relief in the form of a new trial or a new punishment trial.

XI.

Defendant would show that reasonable grounds to establish that he is entitled to relief have been set forth above.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that after reviewing the matters set forth in this Motion for New Trial, and such other evidence as may be presented this Honorable Court, he be granted a new trial and/or a new punishment trial in this cause.

Respectfully submitted,

Wayne T. Hill
09656300
4615 Southwest Freeway, Suite 600
Houston, Texas 77002
(713) 623-8312

Attorney for Defendant
Travis James Mullis

# AFFIDAVIT

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared Gerald E. Bourque, a person known to me, who after being duly sworn, upon his oath did state:

My name is Gerald E. Bourque. I am over the age of eighteen and fully competent to make this Affidavit. I have been a practicing law in the State of Texas since 1979. I am Board Certified in Criminal Law by the Texas Board of Legal Specialization. I served as appointed trial counsel in this matter.

After the conclusion of the jury selection process, but before evidence was presented to the jury, the State of Texas gave notice of its intent to produce evidence concerning the Defendant's sexual orientation under Rule 404(b) . As counsel for the Defendant, I found the State's suggestion that the Defendant's sexual orientation could be used as evidence in the trial to be untenable. I challenged the legality of the State's position regarding the admissibility of this form of evidence. The trial court sustained my objection to the notice provided to me and ordered that the State of Texas be precluded from using this type of evidence. During final summation, the State suggested that the Defendant had committed a sexual assault against another male individual. By alluding to my client's sexual orientation in this way, the State violated the Court's previous Order prohibiting evidence of sexual orientation under Rule 404(b) of the Texas Rules of Evidence.

I further believe that in light of the late Rule 404(b) notice provided by the State of Texas, it was the intended purpose of the State to seat a jury comprised exclusively of individuals who would evaluate and weigh the Defendant's sexual orientation as an aggravating, not mitigating, factor. In my opinion this also deprived Travis Mullis of a fair and impartial jury and a fair trial in this matter.

During the trial, the Court was approached by Lynette Briggs, a practicing lawyer in Galveston County, Texas. Ms. Briggs informed the Court that she observed several people outside the Galveston County Courthouse who appeared to be jurors on this case who were apparently discussing the case. It was apparent to Ms. Briggs that the jurors were not engaged in court-approved deliberations at the time. This initial concern occurred during the guilt/innocence phase of the trial. This matter came to light again during the punishment phase of the trial during the testimony of one of the defense experts (Dr. Mendel). During Dr. Mendel's testimony, juror Monica Garner made inappropriate comments in open court in the presence of the other jurors. The trial court eventually conducted an in-camera hearing with Ms. Garner to determine what she had said and to gauge the harmful effect of her comments. At the conclusion of the Court's in-camera review of this matter, Ms. Garner was removed as a juror. Ms. Garner was replaced on the jury by the first alternate, Jennifer Monroe. Mr. Mullis was not afforded a fair trial because his guilt was determined by, among others, a juror (Monica Garner) who announced her decision prior to being charged to deliberate by the trial Court. In my opinion, this misconduct on the part of Ms. Garner entitles Mr. Mullis to a complete new trial. Alternatively, I believe that Mr. Mullis is entitled to a new punishment trial or the Court's imposition of a life sentence.

Gerald E. Bourque

SUBSCRIBED AND SWORN TO BEFORE ME on this ___ day of April, 2011.


JACQUELINE S. FISCHER
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
NOV. 29, 2014

Notary Public in and for the State of Texas

# AFFIDAVIT

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared, Travis James Mullis, a person known to me, who upon his oath did state:

My name is Travis James Mullis. I am over the age of eighteen and competent to make this Affidavit. I am the Defendant in this cause. I was present throughout the trial of this matter. The allegations contained in the foregoing Motion for New Trial are within my personal knowledge and are true and correct.

_____
Travis James Mullis

SUBSCRIBED AND SWORN TO BEFORE ME, on this _19_ day of April, 2011.

_____
Notary Public in and for the State of Texas

DEBBIE OCONNOR
Notary Public, State of Texas
My Commission Expires
04-09-2011

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing Motion for New Trial has been delivered to: The Galveston County District Attorney's Office, Galveston County Courthouse - First Floor, 600 59th Street, Galveston, Texas 77551

SIGNED THIS ___14th___ day of April, 2011.

Wayne T. Hill

Case No: 08CR0333

| | |
|---|---|
| STATE OF TEXAS | IN THE DISTRICT COURT OF |
| VS. | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | 122nd JUDICIAL DISTRICT |

2011 APR 19 PM 1: 03

## PRESENTATION OF MOTION FOR NEW TRIAL TO THE COURT

On this ___19___ day of _____*April*_____, 2011, the above and

foregoing Motion for New Trial was presented to the Court in accordance with Rule 21.6

of the Texas Rules of Appellate Procedure.

Honorable John Ellisor
Judge Presiding
122nd District Court
Galveston County, Texas

I, Jason E. Murray, District Clerk and Custodian of Records for District Courts of Galveston, County, Texas do hereby certify that the foregoing is a true and correct copy of the original record, now in my lawful custody and filed in this office on the ____19____ day of ___April___ 2011 witness my official hand and seal of office this ____19____ day of ___April___ 2011
JASON E. MURRAY, DISTRICT CLERK
Galveston County, Texas

By_____ Deputy

STATE OF TEXAS                    IN THE DISTRICT COURT OF

VS.                              GALVESTON  COUNTY, TEXAS

TRAVIS JAMES MULLIS              122nd  JUDICIAL DISTRICT


### ORDER ON DEFENDANT'S MOTION FOR NEW TRIAL


On the _____ day of _____, 2011,  the foregoing Motion for New

Trial was heard by  the court.

The Court makes the  following  ORDERS on Defendant's Motion for New Trial:

Defendant is awarded a new trial in this matter

Defendant's Motion for New Trial is denied.

Defendant is awarded a new trial on punishment.

Defendant's Motion  for a New Trial on Punishment is denied.

SIGNED AND ORDERED this_____day of _____, 2011.

_____
Honorable John Ellisor
Judge Presiding
122nd District Court
Galveston County, Texas

Attachment 2

COPY

Case No: 08CR0333

2011 MAY -3 AM 11: 38

STATE OF TEXAS

VS.

TRAVIS JAMES MULLIS

IN THE DISTRICT COURT OF

GALVESTON COUNTY, TEXAS

122nd JUDICIAL DISTRICT

## DEFENDANT'S WAIVER OF APPEARANCE AT MOTION FOR NEW TRIAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Travis James Mullis, Defendant in the above-styled and numbered cause, by and through the undersigned attorney, and files his Waiver of Appearance at Motion for New Trial, and in support thereof would show:

I.

Defendant was convicted of capital murder and sentenced to death.

II.

Defendant has filed a Motion for New Trial in this matter. The Court has set a hearing date for May 20, 2011.

III.

In accordance with Article 1.14(a) of the Texas Code of Criminal Procedure, Defendant, Travis James Mullis, knowingly, intelligently, voluntarily and expressly waives his right to appearance at the Motion for New Trial hearing as required by Article 33.03 of the Texas Code of Criminal Procedure.

IV.

Defendant's signature appearing below reflects his intention and desire to waive his appearance in this matter.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Honorable Court will approve his waiver of appearance at the Motion for New Trial hearing scheduled for May 20, 2011.

Respectfully submitted,

_____

Wayne T. Hill
SBOT: 09656300
4615 Southwest Freeway, Suite 600
Houston, Texas 77002
(713) 623-8312

Attorney for Defendant
Travis James Mullis

## AFFIDAVIT / INMATE DECLARATION


I, Travis James Mullis, Booking Number 64386, being presently incarcerated in the Galveston County Jail in Galveston County, Texas, declare under penalty of perjury that I am the defendant in the above-styled and numbered cause. I was present throughout the trial of this matter. The allegations contained in the foregoing Defendant's Waiver of Appearance at Motion for New Trial Hearing are within my personal knowledge and are true and correct.

Executed this_____day of April, 2011.


_____

Travis James Mullis

**AFFIDAVIT**

My name is Travis James Mullis. I am over the age of eighteen and competent to make this Affidavit. I am the Defendant in this cause. I was present throughout the trial of this matter. The allegations contained in the foregoing  Defendant's Waiver of Appearance at Motion for New Trial hearing are within my personal knowledge and are true and correct. I knowingly, intelligently, voluntarily and expressly waive my presence at the Motion for New Trial hearing scheduled on May 20, 2011.voluntarily

_____

Travis James Mullis

SUBSCRIBED AND SWORN TO BEFORE ME, on this_____day of April, 2011.

_____

Notary Public in and for the State of Texas

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing Defendant's Waiver or Appearance at Motion for New Trial was delivered to: The Galveston County District Attorney's Office, Galveston County Courthouse - First Floor, 600 59th Street, Galveston, Texas 77551

SIGNED THIS _____ day of April, 2011.


_____
Wayne T. Hill

Case No: 08CR0333

STATE OF TEXAS

VS.

TRAVIS JAMES MULLIS

IN THE DISTRICT COURT OF

GALVESTON COUNTY, TEXAS

122nd JUDICIAL DISTRICT

## APPROVAL OF DEFENDANT'S WAIVER OF APPEARANCE

## AT MOTION FOR NEW TRIAL HEARING

This Court (GRANTS)(DENIES) Defendant's Waiver of Appearance at the Motion

for New Trial hearing scheduled for May 20, 2011.

SIGNED AND ORDERED this _____ day of April, 2011.

_____

Honorable John Ellisor
Judge Presiding
122nd District Court
Galveston County, Texas

Attachment 3

CAUSE NO: 08CR0333

| STATE OF TEXAS | § | IN THE 122nd DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| TRAVIS JAMES MULLIS | § | GALVESTON COUNTY, TEXAS |

# WAIVER OF RIGHTS AND INVOCATION OF DEFENDANT'S RIGHT TO PROCEED *PRO-SE*

TO THE HONORABLE JUDGE OF SAID COURT:

    COMES NOW, Defendant, Travis James Mullis, pursuant to the Sixth and Fourteenth Amendments to the Constitution of the United States; Article I Sections 10 and 13 of the Texas Constitution and Articles 1.14 and 37.071(j) of the Texas Code of Criminal Procedure, and files this Waiver of Rights and Invocation of Defendant's Right to Proceed *Pro-Se* and in support would show:

## I.

    Defendant was convicted of capital murder and sentenced to death.

## II.

    This Court appointed Wayne T. Hill, Attorney at Law, to represent Defendant on the direct appeal of Defendant's conviction and death sentence. This Court appointed separate counsel to represent Defendant concerning a writ of habeas corpus in this matter.

## III.

    Defendant is aware that Mr. Hill has filed a Motion for New Trial in this matter. Defendant further understands that a hearing on this Motion for New Trial is scheduled for Friday, May 20, 2011.

Waiver of Rights _____            Page 1

IV.

Defendant has instructed Mr. Hill to abandon and vacate the Motion for New Trial filed in this matter. Mr. Hill has advised against this course of action.

V.

Defendant has expressed his decision to abandon his direct appeal to the Texas Court of Criminal Appeals. Mr. Hill has explained to Defendant that the Texas Court of Criminal Appeals will review this case for constitutional error, notwithstanding Defendant's desire to waive his direct appeal. Mr. Hill has advised against this course of action.

VI.

Defendant has seriously considered and contemplated this matter for a significant period of time. Defendant is competent to make this decision. Defendant voluntarily, intelligently and knowingly, and with a full appreciation of the direct and collateral consequences of his actions, invokes his right of self-representation pursuant to the Sixth and Fourteenth Amendments to the Constitution of the United States as well as Article I Sections 10 and 13 of the Texas Constitution. Defendant wishes to waive his direct appeal to the Texas Court of Criminal Appeals set forth in Article 37.071(j) of the Texas code of Criminal Procedure.

VII.

Defendant is mentally competent to make the decisions made herein, including the abandonment of any and all challenges to his conviction and death sentence. Defendant has the mental capacity to understand the choice between life and death and to make knowing and intelligent decisions not to pursue further remedies.

Waiver of Rights _____                Page 2

# AFFIDAVIT OF TRAVIS JAMES MULLIS

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared, Travis James Mullis, a person over the age of eighteen and otherwise competent to makes this Affidavit, who after being duly sworn, upon his oath did state:

My name is Travis James Mullis. I am the Defendant in this matter. I was convicted of capital murder and sentenced to death. I executed the above and foregoing three page Waiver of Rights and Invocation of Defendant's Right to Proceed *Pro-Se* voluntarily, intelligently and knowingly, with a full understanding of the direct and collateral consequences of my decision. The allegations set forth in the Waiver of Rights and Invocation of Defendant's Right to Proceed *Pro-Se* are true and correct and within my personal knowledge.

Travis James Mullis

SUBSCRIBED AND SWORN TO BEFORE ME, on this 20th day of May, 2011.

Deputy Clerk

~~Notary Public in and for the State of Texas~~

or

Galveston County District Clerk, Jason E. Murray

Affidavit on Waiver of Rights

CAUSE NO: 08CR0333

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 122nd DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| TRAVIS JAMES MULLIS | § | GALVESTON COUNTY, TEXAS |

# COURT ORDER ON DEFENDANT'S WAIVER OF RIGHTS AND INVOCATION OF DEFENDANT'S RIGHT TO PROCEED *PRO-SE*

The Court, having considered the Defendant's Waiver of Rights and Invocation of Defendant's Right to Proceed *Pro-Se*, makes the following Findings and Orders:

The Court finds that Defendant, Travis James Mullis, is mentally competent to make the decisions made herein, including the abandonment of any and all challenges to his conviction and death sentence on direct appeal. The Court further finds that Defendant, Travis James Mullis, has the mental capacity to understand the choice between life and death and to make knowing and intelligent decisions not to pursue further remedies as set forth herein.

The Court finds that Defendant, Travis James Mullis, is competent to make the decision to represent himself in this matter, and that his decision to do so was done of his own free will. The Court further finds that Defendant, Travis James Mullis, voluntarily, intelligently and knowingly waived his right to counsel in this matter. Accordingly:

Wayne T. Hill, Attorney at Law, is hereby relieved as Defendant's counsel on direct appeal in this matter.

The Court hereby recognizes Defendant's Invocation of his Right to Proceed Pro-Se in this matter. Defendant, Travis James Mullis, is designated as representing himself in this matter.

Order on Waiver of Rights _____ Page 5

The Court finds that Defendant, Travis James Mullis, voluntarily, intelligently and knowingly waived his right to appeal his conviction and death sentence.

SIGNED AND ORDERED this _20_ day of May, 2011.

Honorable John Ellisor
Judge Presiding
122nd District Court
Galveston County, Texas

Order on Waiver of Rights

Exhibit 02



# TEXAS LAW & PSYCHIATRY, P.L.L.C.

VICTOR R. SCARANO, M.D., J.D.
DIRECTOR, FORENSIC PSYCHIATRY SERVICES

713.667.6903
FAX 713.667.6904
vscarano@txlap.com

October 6, 2011

The Honorable John Ellisor
122nd Judicial District Court
Galveston County Justice Center
600 – 59th Street, Suite 3305
Galveston, Texas 77551

      Re:    The State of Texas v. Travis James Mullis
               Cause No.: 08CR0333

Dear Judge Ellisor:

Enclosed please find my report regarding Travis James Mullis.

It is my opinion following this forensic psychiatric examination/evaluation and review of the records cited in my report that Mr. Mullis possesses sufficient present ability to knowingly, intelligently, and voluntarily waive his rights to post-conviction habeas review.

Sincerely,

Victor R. Scarano, M.D., J.D.

Encl.

cc.    Donna Cameron
       Brad Levenson

# STATEMENT OF UNDERSTANDING
## FORENSIC PSYCHIATRIC EXAMINATION/EVALUATION

I, the undersigned,

_Travis_      _James_      _Mullis_

| (PRINT) | FIRST | MIDDLE | LAST |

understand that I am seeing:

**Victor R. Scarano, M.D., J.D.**
Director, Forensic Psychiatry Services
Texas Law & Psychiatry, P.L.L.C.
P.O. Box 25371
Houston, Texas 77265

a physician, whose services have been retained by someone other than myself to perform a psychiatric examination/evaluation.

The purpose of my psychiatric examination/evaluation is legal or administrative, not treatment or treatment-related diagnosis. This means, in part, that the physician is not *my doctor*. In other words, I do not have a *doctor-patient* relationship with the physician, and this psychiatric examination/evaluation does not create one.

I understand that the things I discuss with the physician are not confidential in the same way that a *doctor-patient* psychiatric examination/evaluation might be confidential. For example, the physician may write a report for a court, an attorney, or other person, organization or insurance company entitled to information about my psychiatric examination/evaluation. The physician may also be asked to testify in court or at a deposition about the things I discuss during the psychiatric examination/evaluation. Nevertheless, I understand that I should cooperate with the interview as best I can, and be honest and straightforward in my answers. Also, I understand that the physician's report and/or testimony may either be helpful to or against my interests in this matter. Finally, unless compelled to do so by a court of law, I may refuse to cooperate with this interview.

I understand that I may ask questions of the physician at any time during the psychiatric examination evaluation. However, questions after the psychiatric examination/evaluation should be referred to those individuals or organizations who requested this psychiatric examination/evaluation, or to my attorney.

A copy of this *Statement of Understanding* has been given to me to keep.

| | |
|---|---|
| Signature of EVALUEE | 9/23/11 <br> Date |
| Signature of WITNESS | 9/23/2011 <br> Date |

Victor R. Scarano, M.D., J.D.
Revised 08/2006
Forensic.C-Statement of Understanding.doc

# COMPETENCY TO WAIVE FURTHER LEGAL CHALLENGES TO HIS CONVICTION AND SENTENCE OF DEATH
# MENTAL ILLNESS/MENTAL RETARDATION

Travis James Mullis
DOB: ███████
SSN: ███████
CAUSE No.: 08CR0333
DATE: October 6, 2011

Prepared by:

Victor R. Scarano, M.D., J.D.
Director, Forensic Psychiatry Services
Texas Law & Psychiatry, P.L.L.C.
P.O. Box 25371
Houston, Texas 77265

# TABLE OF CONTENTS

I.  IDENTIFYING INFORMATION ................................................................. 1

II.  PRESENTING PROBLEMS ................................................................... 2

    A.  INTERVIEW ..................................................................................... 2
    B.  DECISION TO WAIVE FURTHER LEGAL CHALLENGES TO HIS CONVICTION AND
        SENTENCE OF DEATH ................................................................... 5
    C.  FAMILY, SOCIAL, EDUCATIONAL HISTORY ....................................... 7
    D.  PAST PSYCHIATRIC HISTORY ........................................................ 8
    E.  MEDICATIONS ................................................................................ 9

III.  MENTAL STATUS EXAMINATION ......................................................... 9

    A.  APPEARANCE AND BEHAVIOR ...................................................... 9
        1. Dress ...................................................................................... 9
        2. Posture .................................................................................. 9
        3. Facial Expression .................................................................. 9
        4. Motor Activity ........................................................................ 9
        5. Physical Characteristics ........................................................ 9
        6. Specific Mannerisms ............................................................. 9
        7. Reactions to Interviewer ....................................................... 9
    B.  NATURE OF SPEECH ..................................................................... 9
    C.  MOOD AND AFFECT ..................................................................... 10
    D.  THOUGHT PROCESS .................................................................... 10
    E.  THOUGHT CONTENT .................................................................... 10
    F.  NATURE OF PERCEPTION ............................................................ 10
    G.  INSIGHT AND JUDGMENT ............................................................. 10

IV.  COGNITIVE FUNCTION .................................................................... 10

    A.  ORIENTATION ............................................................................... 10
    B.  FUND OF INFORMATION ............................................................... 10
    C.  ATTENTION/DIGIT SPAN ............................................................... 11
    D.  CONCENTRATION/ARITHMETIC ................................................... 11
    E.  MEMORY ...................................................................................... 11
    F.  JUDGMENT: COMPREHENSION ................................................... 11
    G.  PERCEPTION and COORDINATION ............................................... 12
    H.  ABSTRACT REASONING ............................................................... 12
    I.  MINI MENTAL EXAMINATION ......................................................... 12
    J.  TRAILS-A and TRAILS-B ............................................................... 12
    K.  SIMILARITIES ............................................................................... 13
    L.  REY FIFTEEN ITEM MEMORY TEST ............................................. 13
    M.  COMPLICATED HAND MOVEMENT TEST ...................................... 13
    N.  THE CENTER for EPIDEMIOLOGIC STUDIES DEPRESSION SCALE (CES-D) ............ 13

V.  RECORD REVIEW ........................................................................... 13

    A.  RECORDS FROM TDCJ– MEDICAL RECORDS .............................. 13
    B.  RECORDS FROM TDCJ – CLASSIFICATION FILE .......................... 15
    C.  HEARING ON PRO SE MOTION – 05/20/11 ................................... 16
    D.  VIDEO INTERVIEW – 09/21/11 ...................................................... 16
    E.  *EX PARTE BILLY GEORGE REEDY* .......................................... 17
    F.  *REES V. PEYTON* ....................................................................... 17
    G.  *RUMBAUGH V. PROCUNIER* ..................................................... 17

VI.  DISCUSSION ................................................................................. 19

VII.  DIAGNOSES ................................................................................. 19

**VIII. PSYCHOLOGICAL ISSUES: COMPETENCY TO WAIVE POST-CONVICTION HABEAS REVIEW** ...................................................................................**20**

**IX. PSYCHOLOGICAL ISSUES: MENTAL ILLNESS/MENTAL RETARDATION** .........**20**

# I.   IDENTIFYING INFORMATION

Travis James Mullis is a 25-year-old, Caucasian male who was convicted of capital murder and sentenced to death in March 2011. Mr. Mullis has been at the TDCJ Polunsky Unit since the end of May 2011. Mr. Mullis has now notified the trial court that he would like to waive all further legal challenges to his conviction and sentence of death, and have the court assign a date for his execution.

Mr. Mullis is represented by Mr. Brad Levenson, Director, Office of Capital Writs. Ms. Donna Cameron, First Assistant District Attorney, Galveston County District Attorney's Office, represents the State of Texas. Judge John Ellisor, 212th Judicial District Court, Galveston County, Texas, on September 15, 2011, appointed Victor R. Scarano, M.D., J.D., to perform a forensic psychiatric examination/evaluation to address:

1. Whether Mr. Mullis is competent to waive further legal challenges to his conviction and sentence of death;
2. Whether Mr. Mullis is suffering from a mental disease or defect;
3. If Mr. Mullis is suffering from a mental disease or defect, does the mental disease or defect prevent him from understanding his legal position and the options available to him;
4. If Mr. Mullis does understand his legal position and the options available to him, does the mental disease or defect nevertheless prevent him from making a knowing, intelligent, and voluntary choice among his options.

Mr. Mullis was interviewed by Dr. Scarano on Friday, September 23, 2011, at the Galveston County Jail, Galveston, Texas. Dr. Scarano was escorted to Mr. Mullis's jail pod by Deputy Sheriff Lemire.

The following records, reports, and court cases were obtained and reviewed:

1. A letter from Judge John Ellisor, 122nd Judicial District Court, Galveston County, Texas, to Victor R. Scarano, M.D., J.D., dated 09/15/11.
2. An Order Appointing Expert to Examine Petitioner for Competency to Waive Post-Conviction Habeas Review from Judge John Ellisor, 212th Judicial District Court, Galveston County, Texas, dated 09/15/11.
3. Materials from the Texas Department of Corrections:
   a. Medical Records.
   b. Classification File.
4. Transcript of the Hearing on Pro Se Motion, 05/20/11.
5. Video Interview of Mr. Mullis by Chris Paschenko, reporter for the Galveston County Daily News, 09/21/11.
6. Review of Texas Court of Criminal Appeals cases provided by Mr. Brad Levenson:
   a. *Ex Parte Juan Jose Reynoso*, 228 S.W.3d 163 (Tex.Crim.App. 2007).
   b. *Ex Parte Juan Jose Reynoso*, 257 S.W.3d 715 (Tex.Crim.App. 2008).

      c.  *Ex Parte Billy George Reedy*, 282 S.W.3d 492 (Tex.Crim.App. 2009).
      d.  *Rees v. Peyton*, 384 U.S. 312 (1966).
  7.  *Rumbaugh v. Procunier*, 753 F.2d 395, (5th Cir. 1985).

Tests given during the forensic psychiatric examination/evaluation process consisted of:

1. Mental Status Examination.
2. Mini Mental Examination.
3. Trails A and Trails B.
4. Similarities.
5. Rey Fifteen Item Memory Test.
6. Complicated (Luria) Hand Movement Test.
7. Center for Epidemiologic Studies Depression Scale (CES-D).

At the onset of the interview it was explained to Mr. Mullis that the purpose of this forensic psychiatric examination/evaluation is to address Mr. Mullis's competency to waive further post-conviction challenges to his conviction and sentence of death, with the result that the trial court will set a date certain for his execution. It was further explained to Mr. Mullis that as a result of this forensic psychiatric examination/ evaluation a report would be generated and sent to Judge John Ellisor; Mr. Mullis's attorney, Mr. Brad Levenson; and the State's attorney, Ms. Donna Cameron, First Assistant Criminal District Attorney for Galveston County. It was explained to Mr. Mullis that Judge Ellisor appointed Dr. Scarano to perform a forensic psychiatric examination/ evaluation. It was explained to Mr. Mullis that the information contained in the report could become public through the trial process and is, therefore, not confidential. It was explained to Mr. Mullis that the results of this forensic psychiatric examination/ evaluation could serve Mr. Mullis's legal interests, but could just as well work against those interests. Mr. Mullis was also informed that a doctor/patient relationship was not formed through this process of a forensic psychiatric examination/evaluation and that Dr. Scarano would not be providing treatment for Mr. Mullis.

Mr. Mullis, having been informed of the purpose and nature of this forensic psychiatric examination/evaluation, agreed to proceed with the interview and testing, and signed the Statement of Understanding. Deputy Sheriff Lemire witnessed Dr. Scarano's explanation of the procedure to Mr. Mullis and Mr. Mullis's signing the Statement of Understanding.

## II.  PRESENTING PROBLEMS

### A. INTERVIEW

Travis James Mullis is a 25-year-old, Caucasian male who was convicted of capital murder and sentenced to death in March 2011. Mr. Mullis has been at the TDCJ Polunsky Unit since the end of May 2011. Mr. Mullis has now notified the

trial court that he would like to waive all further legal challenges to his conviction and sentence of death, and have the court assign a date for his execution. Mr. Mullis was asked to go over the legal time line between the commission of the criminal act and his present plan to waive further legal challenges to his conviction and death sentence.

Mr. Mullis stated that the murder occurred on 01/29/08. He stated that he was arrested in Philadelphia, Pennsylvania, and brought to Galveston County. Mr. Mullis stated that he was convicted of capital murder and sentenced to death on 03/11/11.

On 05/20/11, Mr. Mullis stated that he was in Judge Ellisor's court initially for a hearing on a Motion for a New Trial, but it turned into a hearing on his motion to proceed *pro se*. Mr. Mullis stated that Judge Ellisor questioned him about his decision and whether he understood the implications of proceeding *pro se*. After the court finished questioning him, Mr. Mullis stated that Judge Ellisor granted his motion, following which he told Judge Ellisor that he wanted to waive his direct appeal and the Motion for a New Trial.

Mr. Mullis stated that Brad Levenson was the attorney appointed to represent him in the other legal challenge, i.e., Writ of Habeas Corpus. Mr. Mullis stated that Mr. Levenson was appointed to represent him on 03/23/11 by Judge Ellisor.

A few days after the 05/20/11 hearing, Mr. Mullis stated that he was transferred to the Polunsky Unit. Mr. Mullis stated that he has remained there until he was returned to the Galveston County Jail earlier this week for a psychiatric evaluation to determine whether he is competent to waive further legal challenges to his conviction and death sentence, and then to participate in a hearing before the court on that matter.

Mr. Mullis was asked to go over a 24 hour day at the Polunsky Unit starting with the morning. Mr. Mullis stated that breakfast usually comes around 3:30 to 4:30 AM. After breakfast if he is not on the roster for the 1st recreation period, Mr. Mullis stated that he would go back to sleep until 8:00 to 9:00 AM.

Mr. Mullis was asked what the recreation period entails. Mr. Mullis stated that the inmates are allowed a 2 hour recreation period, which allows them to be out of their cells and either in an outdoor or indoor hall. Mr. Mullis stated that not everyone takes their recreation time. According to Mr. Mullis, there are 10 recreation halls and though the inmates are in his separate recreation halls, they can talk to one another through the bars.

Mr. Mullis stated that the first recreation period starts at about 6:00 to 6:30 AM. When asked what he does, if he goes to the first recreation period, Mr. Mullis

stated that he would get out of recreation sometime between 8:30 to 9:00 AM, return to his cell, and take a bird bath.

When asked what he meant by a "bird bath," Mr. Mullis stated that he washes off in the sink in his cell after getting back from his recreation period. Mr. Mullis stated that he then cleans up his cell and listens to the radio or the television. When asked if he has television in his cell, Mr. Mullis stated that he has a radio and the radio can be jerry-rigged to bring in the audio portion of television stations.

When asked what happens next, Mr. Mullis stated that lunch usually comes around noon. After lunch, Mr. Mullis stated that he may take a nap. In the afternoon, Mr. Mullis stated that he reads or listens to the news. When asked what kind of books he reads, Mr. Mullis stated that he reads both fiction and non-fiction books. Mr. Mullis stated that he just finished a 900 page book about J. Edgar Hoover. Also, he said that he recently read a book on the history of Microsoft up to 1995. Mr. Mullis stated that he likes computer stuff a lot.

Mr. Mullis was asked about jerry rigging his radio to bring in television stations. Mr. Mullis stated that he had one of the other inmates jerry rig his radio, because he didn't have all the details on how to do it. When asked how, being in a separate cell, he was able to get his radio to another inmate to jerry-rig it for him, Mr. Mullis stated that the inmates throw out a line to another cell, attach the item to the line, and the other inmate hauls it in.

Mr. Mullis described making a speaker. According to Mr. Mullis, when a radio breaks down, the inmate strips out all the wires. The wires are then formed into a coil and sandwiched between two magnates, which becomes the core of the speaker. Mr. Mullis stated that the core is used to build a speaker using some cardboard and other items.

When asked about dinner, Mr. Mullis stated that dinner comes at about 6:30 to 7:30 PM. When asked about showers, Mr. Mullis stated that showers occur in shifts throughout the day. Mr. Mullis stated that the inmates are allowed 40 minutes for a shower.

When asked when lights are out at night, Mr. Mullis stated that lights go out starting at 9:00 PM and depending on what is going on it can be later. At night, Mr. Mullis stated that he reads, listens to the news on the radio and television stations. Mr. Mullis stated that he likes to listen to the Dave Letterman show and the Craig Ferguson show is on from midnight to 1:00 AM, after which he goes to sleep.

When asked if he receives any letters, Mr. Mullis stated that his brother and the younger of his two sisters write to him. Mr. Mullis stated that his mother wrote to

him for the first time in a year. He stated that he also gets letters from a friend in Houston.

## B. DECISION TO WAIVE FURTHER LEGAL CHALLENGES TO HIS CONVICTION AND SENTENCE OF DEATH

Mr. Mullis was asked to talk about his decision to waive further legal challenges by starting when he was arrested in Philadelphia. Mr. Mullis stated that he figured he was going to get the death penalty when he was arrested and returned to Galveston.

Mr. Mullis stated that his attorneys had him evaluated by a couple of mental health specialists, i.e., psychiatrist and psychologist. Mr. Mullis stated that the attorney came to see him after they received the psychiatric report outlining his childhood issues and the sexual abuse he endured. Mr. Mullis stated that his attorneys wanted his permission to go to the district attorney asking him to drop the death penalty in return for life in prison without the possibility of parole if Mr. Mullis would plead guilty to the capital murder charge. Mr. Mullis stated that after an hour of so arguing that he did not want to enter a guilty plea, he gave in and told the attorneys to go ahead and talk to the district attorney. Mr. Mullis stated that he told the attorneys that the district attorney wouldn't go for it. Mr. Mullis stated that his attorney came back and told him that the district attorney said, "No."

Mr. Mullis stated that, at the time, he felt he would be fine with whatever fate the jury decided for him. Mr. Mullis stated that he was found guilty of capital murder and was sentenced to death. Mr. Mullis stated that he went to the law library and did the best he could to educate himself on the appeals process, as he had already decided that he did not want to fight the conviction and the sentence.

Mr. Mullis stated that Mr. Wayne Hill was appointed his direct appeal attorney and he advised Mr. Hill that he wanted to waive his appeals, which resulted in the 05/20/11 hearing before Judge Ellisor.

Mr. Mullis stated that Mr. Brad Levenson was appointed his Writ attorney in late March 2011. When he was first asked about having an attorney to proceed with a writ of habeas corpus, Mr. Mullis stated that he didn't know what that meant so he said, "Yes," in order to give him some time to research what the Writ thing was all about.

When asked what happens if the court grants his motion to waive further legal challenges to his conviction and sentence, Mr. Mullis stated that the judge will set a date certain for his execution.

When asked what happens at his execution, Mr. Mullis went over the chemicals that would be introduced into his body through an intravenous line. Mr. Mullis

stated that previously the first chemical used to be sodium pentothal, but that has been replaced with phenobarbital. Once asleep, Mr. Mullis stated that the next chemical that is introduced intravenously is pancuronium bromide, which is a muscle relaxant. Mr. Mullis stated that the third chemical that is introduced through the intravenous line is potassium chloride, which is used to stop the heart.

When asked what happens when his heart stops, Mr. Mullis stated that when the heart stops he would be dead. When asked what he understands by "being dead," Mr. Mullis stated that the soul separates from the body. When asked what happens to the separated soul, Mr. Mullis stated that it either goes to Heaven or to Hell. When asked where his soul will go, Mr. Mullis stated that, as strange as it might seem to others, he believes that his soul will go to Heaven. When asked why he believes his soul will go to Heaven, Mr. Mullis stated that he has repented for what he has done, that he believes that God can forgive anything and has forgiven him, and that he has forgiven himself. Mr. Mullis stated that he has made peace with the terrible crime he had committed and is ready to accept the punishment given to him by the jury.

When asked if he grew up in a family that had a religious affiliation. Mr. Mullis stated that he grew up as a Roman Catholic, but considers himself to have a much broader religious belief. When asked what he meant, Mr. Mullis stated that he has read the Bible cover to cover, the Koran cover to cover, and read about other religious beliefs, i.e., Judaism, Buddhism. When asked about the Buddhist belief that a soul continues to return to life on Earth through many lifetimes, Mr. Mullis stated that he can see that it is a possibility. Mr. Mullis stated that his adoptive mother has been involved in "*past life transgression*" a type of hypnosis, where one experiences what they did and where there were in a past life, as a way of helping with problems in this life.

When asked why he believes that waiving further legal challenges to his conviction and sentence is a proper choice, Mr. Mullis stated that the punishment fits the crime. Mr. Mullis stated that he took a life and there is no question of his guilt.

Mr. Mullis stated further that he did not believe it would be fair to the victim, to the families, to go through years and years of fighting, when he believes that he received a just punishment, has made his peace with God and himself, and is prepared to go through with his execution, which the jury had decided was appropriate punishment for his crime.

When asked if there was any pressure brought to bear on him to waive his right to challenge the conviction and sentence, Mr. Mullis stated that it is just the opposite, i.e., others are trying to pressure him to not waive his right to challenge. Mr. Mullis stated that several of the inmates on death row tried to get him to

change his mind, but when he explained his reasons and thought process they came around to his way of thinking and understood his point of view.

Mr. Mullis stated that he has been thinking about this for the past 3 years and decided early on that whatever the jury was going to give him he was going to accept.

Mr. Mullis was asked if the thought of life in prison without the possibility of parole was a motivating factor in his decision to waive his right to challenge the conviction and sentence, Mr. Mullis stated that it was not. Mr. Mullis added that he does not believe an appeal would ever work, because of the nature of the crime he committed and the fact that there is no doubt of his guilt. Mr. Mullis stated that if it ever came about that his sentence was changed to life in prison without the possibility of parole, he would be sent to a general population prison. Mr. Mullis stated that, as a child rapist and murderer, he would be at the bottom of the food chain in prison and there would be inmates there that would want to kill him.

When asked if the thoughts of being killed in prison had prompted him in any way with forging ahead with his execution, Mr. Mullis stated that it did not, because it is really not relevant to his decision making process.

## C. FAMILY, SOCIAL, EDUCATIONAL HISTORY

Mr. Mullis stated that he was born in Charlotte, North Carolina, and raised in a town just outside of Baltimore, Maryland. Mr. Mullis stated that he never met his birth father and his birth mother died when he was 9 months old.

Mr. Mullis stated that he was adopted and that his adoptive father was a half-brother of his birth mother. Mr. Mullis stated that his adoptive father and his birth mother both had the same mother. Mr. Mullis stated that his adoptive parents lived in the Baltimore area.

Mr. Mullis stated that he was the youngest of 4 children. Mr. Mullis stated that he has an older brother and sister who are about 18 years older than him, and an older sister who is 9 years older than him.

When asked about physical or sexual abuse as a child, Mr. Mullis stated that his adoptive father sexually abused him starting when he was 3 years old to the age of 6 years old. Mr. Mullis stated that his adoptive father reported his sexual assault to Mr. Mullis's therapist and then turned himself into the police. Mr. Mullis stated that his adoptive father did not spend much time in prison. When asked about his adoptive mother's response, Mr. Mullis stated that his adoptive mother had a feeling something was going on, but didn't check it out. Mr. Mullis stated that his adoptive mother was a nurse and worked the night shift, which was the time the sexual abuse took place.

When asked about school, Mr. Mullis stated that he dropped out of school in the 11th grade on his birthday, because he was then 18 years old. Mr. Mullis stated that his adoptive mother told him that he had 3 choices, i.e., finish school, get a job, or get out of the house. Mr. Mullis stated that he contacted a friend in Texas and decided to get out of the house and go to Texas.

Mr. Mullis stated that his adoptive mother bought him a plane ticket and he flew to Houston, Texas, in 2004.

## D. PAST PSYCHIATRIC HISTORY

Mr. Mullis stated that it was thought that he had ADHD as a child and he was given the medication, Ritalin®. When he was 12 going on 13 years of age, Mr. Mullis stated that he was diagnosed with bipolar disorder. The doctors were of the opinion that the earlier diagnosis of ADHD was wrong and that he was exhibiting symptoms of bipolar disorder.

When asked what his symptoms of bipolar disorder were, Mr. Mullis stated that he would be calm one day and then become violent, destroying things the next day. When asked how many days the calm days and the violent days would alternate, Mr. Mullis stated that he cycled rapidly from day to day.

When asked if he was prescribed medication for his bipolar disorder, Mr. Mullis stated that some of the medications were Depakote®, Risperdal®, and Wellbutrin®. When asked how long he took these medications, Mr. Mullis stated that he quit taking any medications when he was 18 years old and went to Texas.

Mr. Mullis stated that he was given some medication while he was incarcerated in the Galveston County Jail, but since they didn't seem to be of any help he quit taking them. Mr. Mullis stated that he has not taken any medications since July 2010.

When asked if he had ever suffered a head injury with a period of unconsciousness, Mr. Mullis stated that in 2004 shortly after he arrived in Texas his jaw was broken and he was knocked out for a few seconds. Mr. Mullis stated that he was seen at the Memorial Hermann Hospital and told he had a broken jaw.

Mr. Mullis stated that the doctors were manipulating his jaw, which was painful, and he asked them to stop and to give him something for pain before they proceeded. Mr. Mullis stated that he got into an argument with the doctors and decided to leave. Mr. Mullis stated that he lived on ice cream and apple sauce for a couple of months after which his jaw healed and he went back to eating regular food.

### E. MEDICATIONS

Mr. Mullis stated that he has not taken any psychotropic medications since July 2010.

## III. MENTAL STATUS EXAMINATION

### A. APPEARANCE AND BEHAVIOR

1. Dress

   Mr. Mullis was dressed in jail garb. He wore glasses. He was neat, clean, and well groomed.

2. Posture

   Mr. Mullis was relaxed throughout the interview and during the testing portion of the evaluation. Rapport was readily established and conversation flowed without strain or tension.

3. Facial Expression

   Mr. Mullis's facial expressions were normal and appropriate with the subjects being discussed.

4. Motor Activity

   Mr. Mullis exhibited normal motor activity. He was neither restless nor immobile.

5. Physical Characteristics

   Mr. Mullis was a medium built man. His weight was proportionate to his height.

6. Specific Mannerisms

   Mr. Mullis did not exhibit any tics, abnormal movements, stereotypies, or bizarre posturing.

7. Reactions to Interviewer

   Mr. Mullis was cooperative during the interview. His eye contact was good. He answered questions readily and easily.

### B. NATURE OF SPEECH

Mr. Mullis's speech exhibited normal rate, volume, and tone. He was quite articulate and his grammar was good.

### C. MOOD AND AFFECT

Mr. Mullis stated that he was in a good mood. His affect was congruent with his mood.

### D. THOUGHT PROCESS

Mr. Mullis's thought processes were logical and goal directed. He did not exhibit circumstantiality, tangentiality, derailment, looseness of associations, or flight of ideas.

### E. THOUGHT CONTENT

Mr. Mullis denied current suicidal and homicidal ideation. He did not express any grandiose or delusional thoughts.

### F. NATURE OF PERCEPTION

Mr. Mullis denied having auditory or visual hallucinations. He denied paranoid thoughts.

### G. INSIGHT AND JUDGMENT

Mr. Mullis exhibited reasonably good insight and judgment.

## IV.  COGNITIVE FUNCTION

### A. ORIENTATION

Mr. Mullis was oriented to time, person, place, and situation (Mr. Mullis understood that he was undergoing a psychiatric evaluation in relation to his intention to waive further legal challenges to his conviction and death sentence).

### B. FUND OF INFORMATION

The individual's fund of information is often a good indication of his/her general level of intelligence and is useful because of its relative insensitivity to the effects of any but the most severe forms of psychopathology. It is, therefore, particularly helpful in determining the "premorbid" level of intellectual functioning when there is impairment in other functions. Mr. Mullis was asked a series of 26 questions, some easy and some hard. The average for Mr. Mullis's age group is to correctly answer 10 to 15 of the 26 questions. Mr. Mullis answered 19 of the 26 questions correctly, placing him in the above average (16 to 21 correct answers) IQ category on this test

Exhibit D - Page 15

## C. ATTENTION/DIGIT SPAN

This is not a test of memory, although individuals can improve their performance by rehearsing the digits and so introduce a memory factor. Poor performance is not, therefore, necessarily due to memory loss. Average performance requires an ability to Attend to the digits while excluding interfering thoughts, feelings, etc. Selective attention to the digits can be automatic and effortless or may involve deliberate effort as when the individual rehearses, groups the digits, etc. Anxiety and other interfering affects lower the score. Degree of impairment can be best judged against the Information Test used as a Base Line. Someone of average ability on Information should be average on digits. A below average score would suggest some impairment. Severe loss is suggestive of organic impairment, psychosis, or severe anxiety. Mr. Mullis was verbally given a list of digits to repeat. The first part of the test required Mr. Mullis to repeat the digits in the order they were given. In the second part of the test he was to repeat the digits backward. An average score in Mr. Mullis's age group is to repeat 7 digits forward and 5 digits backward. Mr. Mullis was able to repeat 8 digits forward and 6 digits backward, placing him in the above average category on this test.

## D. CONCENTRATION/ARITHMETIC

Adequate performance requires storing all the information in the question, selecting out what is relevant for the problem, and then completing the operations while not forgetting the problem. Adequate performance requires both effortless and deliberate concentration. If both Digits and Arithmetic are low one would suspect defective attention. A drop in Arithmetic compared to Digits suggests impaired concentration. A severe deficit may indicate a presence of organic impairment. Failing easy items and passing more difficult ones may suggest psychosis. Mr. Mullis was given a series of 6 arithmetic problems. Mr. Mullis answered 5 of the 6 problems correctly, placing him in the above average (5 to 6 correct answers) category on this test.

## E. MEMORY

In this test, a story with a number of facts was read to Mr. Mullis. At the completion of the story he was to recall as many of the facts as possible. The maximum score on this test is 20. The average score in Mr. Mullis's age group is 10 segments recalled. Mr. Mullis was able to recall 12 segments, placing him in the above average category on this test.

## F. JUDGMENT: COMPREHENSION

This test is to determine the extent to which an individual has been able to acquire an understanding of common modes of behavior in society, and an understanding of common social mores and conventions. The extent to which an

individual can perform well in this area may be an index of the extent to which he/she can be a socially conforming individual who responds in terms of good judgment. In this test, Mr. Mullis was given a series of 10 questions, each worth 2 points. Mr. Mullis scored 18 out of a possible 20 points, placing him in the superior (17 to 20) category on this test.

## G. PERCEPTION and COORDINATION

This is a brief examination of the individual's perceptual and visual motor functioning, which is most vulnerable to the effects of organic impairment. The individual is to read the instructions for him/herself and then perform the tasks. A performance is considered "normal" when there is an accurate copying of the six drawings and correct performance of all three instructions. Mr. Mullis correctly copied 3 of the 6 designs.

On the opposite page, Mr. Mullis was asked to draw a cube, and to draw a clock face, insert the numbers, and set the hands of the clock at 5:20. Mr. Mullis drew a cube, as directed. Mr. Mullis drew a clock face, placed the hour numbers in their correct position, and set the hands at 5:20, as directed.

## H. ABSTRACT REASONING

The individual's capacity to reason abstractly is a particularly important aspect of the individual's intellectual functioning because of its vulnerability to the effects of organic disturbances and because of its impairment in certain psychotic states, particularly schizophrenia. The capacity for abstraction can be tested through the use of proverbs. Mr. Mullis was given several proverbs to interpret. Mr. Mullis scored in the average category in interpreting proverbs.

## I. MINI MENTAL EXAMINATION

This is a short examination focusing on orientation, attention, registration, recall, and language. Mr. Mullis scored 30 out of a possible 30 points on this examination.

## J. TRAILS-A and TRAILS-B

Trails A:
In this test, Mr. Mullis was asked to connect a series of numbers in sequence from 1 to 25. Mr. Mullis performed the test without error in 30 seconds. The average time to perform this test is 30 to 45 seconds.

Trails B
This is a little harder test where Mr. Mullis is required to connect in sequence both numbers and letters, starting at the number 1, connecting it to letter A, then

to number 2, to letter B, to 3, to C, to 4, to D and so on. Mr. Mullis performed this test without error in 52 seconds. The average time to perform this test is up to 210 seconds.

## K. SIMILARITIES

Mr. Mullis was asked to provide a similarity for 20-paired dissimilar objects. Mr. Mullis scored 20 out of a possible 20 points on this test.

## L. REY FIFTEEN ITEM MEMORY TEST

Mr. Mullis was told that he was to perform a memory test. Though the test has fifteen items there are only 3 easy sequences to recall. Individuals who are attempting to exaggerate memory deficiencies or problems will tend to do poorly on this test. Mr. Mullis recalled 15 of the 15 items on this test, indicating that he was not attempting to feign memory deficits.

## M. COMPLICATED HAND MOVEMENT TEST

Mr. Mullis was asked to watch closely as Dr. Scarano performed a complicated hand movement test and then to perform the movements. Mr. Mullis was able to perform the hand movements correctly after 1 demonstration.

## N. THE CENTER for EPIDEMIOLOGIC STUDIES DEPRESSION SCALE (CES-D)

This is a self-report depression scale responding to a list of 20 questions in regards to how Mr. Mullis felt or behaved during the past week. Mr. Mullis scored a 2, indicating the absence of a clinical depression.

# V. RECORD REVIEW

## A. RECORDS FROM TDCJ– MEDICAL RECORDS

1. An Initial Mental Health Screening Interview was completed on 05/23/11. Mr. Mullis reported that he had had psychological problems in the past and received counseling at Sheppard Pratt Hospital in Baltimore, Maryland, between the ages of 12 to 17. Mr. Mullis reported that he was prescribed the medication Wellbutrin® by a psychiatrist, which he took between the ages of 13 to 17.

   Mr. Mullis reported that he experienced suicidal thoughts when he was 12 years of age and was admitted to Sheppard Pratt Hospital on 4 occasions during a 30 day time frame. Mr. Mullis reported making one suicidal attempt by overdosing on vitamins.

When asked about head injuries, Mr. Mullis reported that at the age of 11 he suffered a concussion when while playing hockey.

Mr. Mullis denied ever having auditory or visual hallucinations. Mr. Mullis denied the belief that he had any special gifts or super powers that others do not have.

When asked about prior drug abuse, Mr. Mullis reported abusing alcohol, marijuana, ecstasy, and Xanax® between the ages of 17 to 21.

When asked if he ever suffered abuse as a child, Mr. Mullis reported that he was sexually abused.

At the time of the screening interview, Mr. Mullis was noted to be cooperative with clear, spontaneous speech. He was noted to be alert and oriented to time, place, and person. His thought processes were reported as logical and goal oriented.

2. A Correctional Managed Care Mental Health Services Outpatient Intake Chain Screen was completed on 05/23/11. Mr. Mullis's behavior and mood were reported as *within normal limits* (WNL). His hygiene was reported as *good*; clothing was *clean and appropriate.* It was noted that psychometric testing was not clinically indicated.

A Mental Status Examination noted the following:
Appearance: WNL.
Orientation: X4[1].
Behavior: Cooperative.
Speech: Clear.
Thought Process: Intact; free of hallucinations or delusions.
Thought Content: WNL.
Perception: WNL.
Memory: Intact.
Intelligence: Average.
Mood: Euthymic[2].
Affect: Congruent[3].
Suicidal/Homicidal Ideations: Denied.
Impulse Control: Good.
Insight and Judgment: Fair to good.

---

[1] Oriented to time, place, person, and situation.
[2] Euthymic is considered to be normal mood.
[3] Mood is what the patient describes and affect is what is observed. Congruent mood means that the observed affect is consistent with what the patient is describing as his mood.

A Provisional Diagnostic Impression noted on Axis I was 71.09[4]. In regards to Plan and Follow-up it is noted: *no further intervention at this time*.

A Suicide Risk Assessment was completed on 05/23/11. The risk assessment reported, as follows: *In my opinion, this offender is at low imminent risk for potentially lethal suicide attempt*.

3. A Texas Uniform Health Status Update was completed on 05/23/11. Mr. Mullis was found to have no current or chronic health problems, and no special needs.

4. A Physical Examination report was completed on 05/24/11. Under the section entitled, Chief Complaint, Mr. Mullis reported that he uses an albuterol inhaler for asthma.

Past medical history indicated that Mr. Mullis had his large intestine removed during infancy due to necrotizing enterocolitis. Mr. Mullis reported that he has a history of asthma and the last time he used inhalers was 3 years ago. Mr. Mullis reported that he had been diagnosed with ADHD[5], reactive attachment disorder, and PTSD[6]. Physical examination report noted no abnormal findings.

Mr. Mullis was given a prescription for Proventil Inhaler with the following directions: 2 puffs 4 times daily, as needed.

5. TDCJ Health Summary for Classification forms were completed on 06/03/11 and 09/20/11. Both forms are identical with no changes indicating *No Restriction*.

## B.    RECORDS FROM TDCJ – CLASSIFICATION FILE

The records indicate that Mr. Mullis arrived at the Polunsky Unit on 05/23/11 and remained there until he was transported to the Galveston County Jail on 09/20/11 for a hearing on his Motion to Waive Post-Conviction Habeas Corpus Review.

The disciplinary history records indicate no disciplinary actions taken against Mr. Mullis for infractions of prison rules. The weekly Administrative Segregation Level Review indicated no restrictions.

---

[4] The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR) 2000, page 743.
V71.09: No Diagnosis or Condition on Axis I. When no Axis I diagnosis or condition is present, this should be indicated.
[5] ADHD – attention deficit hyperactivity disorder.
[6] PTSD – post traumatic stress disorder.

There are a number of documents regarding scheduled visits with his attorneys. Mr. Mullis completed a visitor's list naming individuals that should be allowed to visit him at the prison.

## C. HEARING ON PRO SE MOTION – 05/20/11

The hearing was initially set for the Motion for New Trial. Mr. Mullis, however, had decided that he wanted to remove his direct appeal attorney, Mr. Wayne Hill, and proceed *pro se*. Due to the importance of such a decision and to determine whether Mr. Mullis appreciated and understood the consequence of his decision and whether he exhibited the mental capacity to make the decision to represent himself, *pro se*, the court carefully questioned Mr. Mullis to determine whether he understood and appreciated what he was requesting.

The transcript revealed Mr. Mullis to be an articulate and knowledgeable young man who had spent time in legal research in order to learn the differences between a direct appeal and a Writ of habeas corpus. Despite being admonished by the court that self-representation was not a good idea, Mr. Mullis persisted in his request.

The court granted Mr. Mullis's request to proceed *pro se*; however, Mr. Mullis continued, at the time of the *pro se* hearing to be represented by Mr. Brad Levenson as his writ attorney.

## D. VIDEO INTERVIEW – 09/21/11

Reporter Chris Paschenko, Galveston County Daily News, conducted an interview with Mr. Mullis at the Galveston County jail.

During the interview, Mr. Mullis exhibited clear, rational, and goal directed thought processes. There was no evidence of disorganization, hallucinations, and psychotic or delusional content in Mr. Mullis's responses to Mr. Paschenko.

Mr. Mullis commented on the fact that he would be representing himself, that he won't continue any appeals, and that he will let his habeas corpus rights expire on 12/23/11. Mr. Mullis went over with Mr. Paschenko the evolving timeline, noting that the Texas Court of Criminal Appeals will review his trial transcript for constitutional errors. Once that is over, Mr. Mullis stated that the judge will set the date of execution, which would be no earlier than 90 days after the appeals process is completed.

When asked about the death sentence, Mr. Mullis stated that the punishment is justified for the crime he committed and that he has accepted the sentence the jury gave him.

### E. *EX PARTE BILLY GEORGE REEDY*[7]

Though this case involves a waiver of post-conviction remedies, it differs from Mr. Mullis's case in that the inmate in *Reedy* pled guilty to a capital murder charge as part of a plea bargain, but he did not proceed through a full jury trial. The Court was concerned when a defendant waives his rights to post-conviction as part of a plea bargain, since, not going through a full jury trial, *he could not know whether he would desire or have reason or ground for seeking a new trial*[8].

Nevertheless, this case in regards to Mr. Mullis is instructive as to the principle: (1) the post-conviction inmate can waive his right to mount challenges to his conviction and sentence, *so long as* (2) the waiver is made voluntarily, knowingly, and intelligently[9].

### F. *REES V. PEYTON*[10]

A death row inmate through his attorney filed a writ of habeas corpus in the U.S. District Court, Eastern District of Virginia. A month after the petition had been filed *Rees* directed his attorney to withdraw it and forgo any further legal proceedings. *Rees'* attorney had him evaluated by a psychiatrist who concluded that *Rees* was incompetent. *Rees* would not cooperate with the State's psychiatrist who expressed doubts that *Rees* was insane. The Court held that U.S. District Court is to hold proceeding to determine Rees' competence, i.e., *whether he has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or, on the other hand, whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises*[11].

In Rees, the U.S. Supreme Court outlines the necessity for a psychiatric evaluation of death row inmates who wish to waive their post-conviction rights to legally challenge their conviction and death sentence, since it must be known whether the desire to waive those rights is made rationally and with appreciation as to the consequences.

### G. *RUMBAUGH V. PROCUNIER*[12]

Charles Rumbaugh was convicted of capital murder and sentenced to death in Texas on 04/04/75. Mr. Rumbaugh's conviction was reversed by the Texas Court of Criminal Appeals. He was retried and again convicted of capital murder and sentenced to death. After the 2nd conviction was reaffirmed, Mr. Rumbaugh

---

[7] 282 S.W. 3d 492 (Tex.Crim.App. 2009).
[8] 282 S.W. 3d 492, 496; citing Smith v. State, 440 S.W.2d 843 (Tex.Crim.App. 1969).
[9] 282 S.W.3d 492, 494-495.
[10] 384 U.S. 312 (1966).
[11] 384 U.S. 312, 384.
[12] 753 F.2d 395 (5th Cir. 1985)

directed his attorney to take no further steps to challenge his conviction and sentence.

Mr. Rumbaugh underwent psychiatric evaluations. The court weighing all the evidence concluded that Rumbaugh was mentally competent to forego further judicial proceedings. The Court cited the Supreme Courts standard[13] to be used in deciding whether a person is mentally competent to waive further challenges to the conviction and sentence. The Court enunciated the test, as follows:

> The test is whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises. The test requires the answer to three questions:
>
> 1. Is the person suffering from a mental disease or defect?
> 2. If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
> 3. If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

The decision tree can then be constructed, as follows:

Is the person suffering from a mental disease or defect?

**NO**
No further
inquiry.

**YES**
If so, does the mental disease or defect prevent him from understanding his legal position and the options available to him?

**YES**
Person is
Incompetent

**NO**
If not, does the mental disease of defect, nevertheless prevent him from making a rational choice among his options?

**YES**
Person is
incompetent

**NO**
Person is competent.

---

[13] *Rees v. Peyton*, 384 U.S. 312 (1966).

## VI.  DISCUSSION

Travis James Mullis is a 25-year-old, Caucasian male who was convicted of capital murder and sentenced to death in March 2011.  Mr. Mullis has been at the TDCJ Polunsky Unit since the end of May 2011.  Mr. Mullis has now notified the trial court that he would like to waive all further legal challenges to his conviction and sentence of death, and have the court assign a date for his execution.

The following records demonstrate that Mr. Mullis is knowingly, intelligently, and voluntarily waiving his rights to post-conviction habeas review:

1. Mr. Mullis's testimony in the 122nd Judicial District Court for the 05/20/11 *pro se* hearing.
2. Mr. Mullis's 09/21/11 interview with the Galveston County Daily News reporter, Mr. Chris Paschenko,
3. Mr. Mullis's TDCJ medical records from 05/23/11 through 09/20/11,
4. Mr. Mullis's 09/23/11 forensic psychiatric examination/evaluation.

This forensic psychiatric evaluation/examination and testing indicates that Mr. Mullis is above average in intelligence despite not graduating from high school.  Mr. Mullis has spent time educating himself regarding the criminal justice system as it pertains to him and his situation, i.e., his conviction and death sentence.  In addition, Mr. Mullis has educated himself on the methodology that will be used to cause his death.  Mr. Mullis was able to explain what "death" meant, i.e., his life as Travis James Mullis will end, his body and soul will separate, and his soul will go to Heaven, as he believes God has forgiven him.  Mr. Mullis stated that he has come to terms with what he has done, that he has accepted the sentence of death, and he is ready for the sentence to be carried out.

Mr. Mullis was able to articulate what post-conviction challenges he could make in regards to his conviction and sentence and has decided to forego further challenges and ask the court to set a date for his execution.

No one, according to Mr. Mullis, has influenced him in making his decision.  Though he mentioned, during my interview with him, the fact that a child molester and murderer would be a target for being killed in a general population situation in prison, Mr. Mullis stated that it was not a factor in his decision to waive further challenges to his conviction and sentence.

## VII.  DIAGNOSES

**AXIS I:**   No current Axis I diagnosis.
**AXIS II:**   Features of Borderline Personality Disorder.
**AXIS III**:  Cerebral concussion at age 11.

**AXIS IV:** No current psychosocial and/or environmental issues.  Mr. Mullis claims and this forensic psychiatric examination/evaluation supports his claim that he has come to terms with the crime he committed, has accepted his death sentence and is prepared for the punishment he will receive for his crime, and has made peace with his Maker and himself in accordance with his religious beliefs.

**AXIS V:** Global Assessment of Functioning Scale – 75.

## VIII.  PSYCHOLOGICAL ISSUES: Competency to Waive Post-Conviction Habeas Review

It is my opinion following this forensic psychiatric examination/evaluation and review of the above cited records that Mr. Mullis possesses sufficient present ability to knowingly, intelligently, and voluntarily waive his rights to post-conviction habeas review.

## IX.  PSYCHOLOGICAL ISSUES: Mental Illness/Mental Retardation

During the interview, Mr. Mullis provided a past history of ADHD and bipolar disorder. According to Mr. Mullis, when he was 12 going on 13 years of age, he was told that the diagnosis of ADHD was wrong and that he actually was suffering from bipolar disorder.

Mr. Mullis's TDCJ medical records were reviewed from the time of his initial screening on 05/23/11 to his transfer back to the Galveston County Jail on 09/20/11.  Mr. Mullis reported that, between the ages of 12 to 17, he received mental health services at the Sheppard Pratt Hospital in Baltimore for ADHD, PTSD, and Bipolar disorder.  Also noted in the TDCJ medical records was Mr. Mullis's report that between the ages of 17 to 21, he used the following drugs on an experimental or a regular basis, i.e., alcohol, marijuana, ecstasy, and Xanax®.

When asked what his symptoms of bipolar disorder were, Mr. Mullis stated that he would be calm one day and then become violent, destroying things the next day.  When asked how many days the calm days and the violent days would alternate, Mr. Mullis stated that he cycled rapidly from day to day[14].

Mr. Mullis stated that he was prescribed medications, at that time, i.e., Depakote®, Risperdal®, and Wellbutrin®, which are the types of medications used to treat bipolar disorder.  Mr. Mullis stopped taking medications and from the age of 18 to the present, Mr. Mullis has not been on any psychotropic medications except for a short time during his incarceration in the Galveston County Jail during the pending criminal trial.  Mr. Mullis stated that the medications did not do much for him and, in fact, caused unacceptable side effects.

---

[14] See page 8 of this report.

Mr. Mullis's description of his symptoms does not fit either bipolar disorder or cyclothymic disorder[15]. Bipolar Disorder is categorized as either Bipolar I associated with manic episodes, and Bipolar II associated with hypomanic episodes. In Bipolar I the manic episodes last 1 week and in Bipolar II the hypomanic episodes last at least 4 days. Mr. Mullis described his mood changes occurring from day to day, which description does not meet the initial threshold time requirement for manic episodes in Bipolar I or hypomanic episodes in Bipolar II. Violent, destructive behavior is not usually seen in cyclothymic disorder.

Borderline Personality Disorder (BPD) is associated with marked shifts in mood that can occur quickly with one day and certainly from day to day. Individuals diagnosed as adults with BPD almost always report that they experienced significant abuse as a child, i.e., physical, sexual, emotional. A history of early childhood psychological trauma (beginning under the age of 6) is almost always a differentiating factor between BPD patients and other personality disorder patients. Thus, the history of childhood trauma is a very common feature in patients with BPD.

Individuals with BPD have a need to have other people with and around them, but their fear of abandonment prompts them to continually test the other person's commitment to them. Individuals with BPD display impulsivity and have significant problems in controlling their behavior, which often result in destructive behavior.

Mr. Mullis has described problems in controlling his anger. He described his mood cycles as calm one day with violent, destructive behaviors the next day.

Though a more complete and in-depth history is needed to make a firm diagnosis of borderline personality disorder, BPD appears to have a better potential for explaining Mr. Mullis's emotional and psychological makeup than bipolar disorder.

The TDCJ medical records note that between the dates of 05/23/11 through 09/20/11, Mr. Mullis did not exhibit any symptoms or signs of a mental disease or defect, received no psychotropic medications, did well on the mini-mental status examinations, and received no diagnosis on Axis I.

Mr. Mullis is not mentally retarded and does not require commitment to a facility for the mentally retarded.

Respectfully submitted,

Victor R. Scarano, M.D., J.D.

---

[15] Cyclothymic Disorder: a chronic fluctuating mood disturbance involving numerous episodes of hypomanic symptoms and numerous periods of depressive symptoms.

Exhibit 03



**Maryland's Human Services Agency**

*Department of Human Resources*      Martin O'Malley, *Governor* | Anthony G. Brown, *Lt. Governor* | Theodore Dallas, *Secretary*

July 19, 2013

Mr. Joshua Smedley
Federal Community Defender Office for the
Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
Independence Square West
Philadelphia, PA 19106

Re: summons regarding Travis J. Mullis/Gary Mullis

Dear Mr. Smedley:

The Washington County Department of Social Services, Child Welfare Division, received your summons request in the above referenced matter on this date. Just for future reference, I just wanted to inform you that per state regulations (Code of Maryland Regulations, or COMAR) we do not release Child Protective Service records or documentation without a court order [COMAR 07.02.07.19A (1) (2) & B (1)]. We do not release documentation with just a summons.

*However*, after researching your request we find that the Washington County Department of Social Services has no history on either Gary or Travis Mullis, in Child Protective Services or in any other capacity. We have no information on either of these two men to provide you. If you received information that either of them should have had some history with us in this county you may need to double check; it is possible there may be some type of history in another Maryland County, but as each county maintains a separate database we cannot access records for you in another county.

I hope this information is helpful to you.

Respectfully,

*Pam Martin*

Pam Martin
Child Protective Services

Cc: Mr. Michael Piercy, Administrator Protective Services

Pam Martin, CPS Appeals Coordinator for Western Maryland, 122 N. Potomac St., Hagerstown, MD 21741-1419
Phone #: 240-420-2367 / fax #: 240-420-2549

*Equal Opportunity Employer*

General Information 800-332-6347 | TTY 800-925-4434 | 311 West Saratoga Street | Baltimore | Maryland 21201-3500 | www.dhr.maryland.gov
Page 53

Exhibit 04

## DECLARATION OF MICHAEL SMITH
## PURSUANT TO 28 U.S.C. § 1746

I, Michael Smith, hereby depose as swear as follows:

1.      My name is Michael Smith. I am the Clinical Manager of Behavioral Health Services at Meritus Health in Hagerstown, Maryland. I am a Licensed Clinical Social Worker. In the year 2000, I was a Masters of Social Work intern at Stone Bridge Respite, a division of Brook Lane Health Services in Maryland. Stone Bridge houses children and adolescents in need of short-term therapeutic residential placement. As a part of my work there, I had therapy sessions with some of the youth. Travis Mullis was one of the clients I had individual therapy sessions with.

2.      Travis' whole case stuck out in my memory. I tried to have as many sessions as possible with Travis. He was a respectful kid who obeyed the staff, but he was reluctant to talk about his past. I remember he got upset once when we were trying to work on his issues. Talking about his past was so painful, he was often closed off. In fact, I noted in Travis' records that he was afraid I would abandon him like everyone else in his life had. I remember him feeling it didn't make sense for him to open up to me knowing I would be gone in a few weeks and he would have to start over with a new therapist. I couldn't blame him for that. I did leave before he did. However, even if I hadn't– Stone Bridge was a temporary placement and he would not be placed there with any therapist long.

3.      Travis had a lot of troubles from his past. He was abused as a child and his abuse played major role in how he ended up placed at Stone Bridge. He had flashbacks of the abuse he suffered. He felt he didn't have anyone he could talk to or trust to open up to about these issues. He was a sweet kid and a small runt of a boy. He sought out the attention and approval of staff and his peers alike. He tried hard to fit in with his peers, but he did not. He was one of the few white adolescent

clients. He had a different background than his peers who were from tougher, more urban environments. He was small and immature compared to the other clients there.

4.     Travis was very friendly, always respectful and did not have outbursts. Those are the main things I recall about Travis. I never heard anything about him being involved sexually with any of his roommates. If anyone at Stone Bridge had been aware of any incidents of sexual abuse, they would have been required to report such an incident pursuant to Maryland's mandatory reporting law.

5.     Until very recently, no one working on Travis' case came to talk to me about Travis. No one working for Travis' defense spoke with me before his trial. If they had, I would have told them all of the information above. I would have testified at Travis' trial if I had been subpoenaed to do so.


I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Michael Smith

Fax from : 248 313 9565                    07-17-13 12:54p                    Pg : 3

Exhibit 05

## DECLARATION OF _Malina Dietz_
### PURSUANT TO 28 U.S.C. § 1746

I, Maldina Dietz, hereby depose and swear as follows:

From 2000 to 2003 I worked the evening shift at The Jefferson school as a Residential Counselor. Everyone there called me Ms. Dee and I went by the name Dee Dietz.

Travis Mullis was one of the clients I knew there. I liked Travis. He looked up to me and he was respectful of me. He did what I asked him to do. I don't remember asking him to do anything and him not doing what I asked. I never had no problems with Travis. He did what he was told.

The incident that I wrote up as Travis kicking me in the head was not a big deal. I was picking up the hygiene baskets outside of each students door because they were not stored in the students room. While

I was doing this, Travis opened his door. His foot hit my head, but it didn't knock me over or anything. I told him it was a problem because I needed to set boundaries with the students. Right after it happened, Travis went back in his room and shut the door. Everyone else opened their door and he was afraid of them.

Travis was very sorry about what he did. It was no big deal, but I didn't let him know it was no big deal because I wanted him not to do it again. Travis appologized quite a few times. Travis was concerned about me. I don't remember him being concerned about me pressing charges. He was remorseful about the incident.

There was an incident at The Jefferson School where I did press charges. That was in a different side of the school. There is no comparison between the incident with Travis and the incident where I pressed charges. I never considered pressing charges against Travis.

Travis and I got along. He liked to talk to me about things, in his treatment and life. I would talk to him in the kitchen off of the unit. We weren't supposed to do that as staff for our own safety. However, I never felt threatened by Travis. I didn't have safety concerns being alone with him.

I never had problems with Travis. We would do room searches and I never found anything in Travis' room that he wasn't supposed to have. In fact, Travis was so well behaved, I let him and one other student stay up to watch the super bowl. They were the two best behaved, so I rewarded them for that.

Before today, no one has spoken with me about Travis ~~working~~ or this incident from the Jefferson School. No one working on Travis' case spoke with me before his trial. If they had, I would have told them all of the information above. I would have been willing to testify at his trial.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___7/17/2013___

Signature: _Melolura J. Dietz_

Exhibit 06

## DECLARATION OF DR. RICHARD BROKAW
## PURSUANT TO 28 U.S.C. § 1746

1. My name is Richard Brokaw. I am a licensed and certified psychologist with a doctorate from Penn State. I currently work both at Cape and Mariner Middle Schools in Milton, Delaware. I have over 16 years of experience working as a school psychologist. In addition to my work in schools, I saw clients in a private practice at Bay Counseling Services from the mid to late 1990's. Travis Mullis was one of my clients at Bay Counseling. I last saw Travis in the summer of 1998, when he was 12 years old.

2. I began treating Travis when he was ten or eleven years old. We met for fifty minutes a session, once a week, for around a year. While most of the time I met with Travis one-on-one, I consulted with his adoptive mother, or occasionally his (adoptive maternal) grandmother, for five or ten minutes before my sessions with Travis. During these consultations, I got the sense that Travis' mother felt completely overwhelmed by her son and his behavior problems. Her attitude was, "I didn't sign up for this." She had adopted Travis with her exhusband who was biologically related to Travis. With her exhusband out of her picture, her connection with Travis was tenuous. I felt that she was burnt out. When she was confronted with specific issues such as Travis' shoplifting habits, she tended to minimize them. She lacked the resources to respond adequately and productively to his problem behaviors. Travis' grandmother was not capable of compensating for Anne's exhaustion. Travis and his grandmother did not have a positive relationship. She seemed to irritate Travis.

3. Children need structure. Children need to know what is expected of them and what they can expect from others. They need routines and predictable patterns in their days to feel safe and secure. When children do not have the structure they need from trusted caretakers, they do not

have the emotional maturity to ask for it. Instead, they do their best to impose their own structure. Travis let me know, early on in our therapy sessions, that his life was chaotic and he felt insecure. He did this in a very memorable way by trying to impose structure in our therapy sessions. In our first meeting, Travis marched in, pointed at me and said "you listen to me, I've been through this therapy before, I know what's going on, just so we are clear, I'm running the show here." I kept my amusement to myself at the time, but it was funny to see such a scrawny child trying to lay down the law like that. I asked if he was finished, then I told him to sit down. I told him it was my office and I had rules he needed to abide by. Travis clearly appreciated my response and reacted positively to the limits I established. He clearly needed structure and responded well to it.

4.      Travis had serious control issues, resulting from the chaotic environment in which he was raised. He craved structure and I provided that for him. In order to give our sessions structure, we'd play board games, such as Homes and Places, to provide an element of predictability to our time together. Travis responded well to games for that reason. They organized our time and were for the most part predictable; they made him feel secure. In the space around the pattern of his turn and my turn, he was more comfortable talking about what was going on in his life.

5.      Travis had a significant history of loss, including the loss of his biological mother and his adoptive father. His adoptive father was sent to prison when Travis was a child for repeatedly sexually assaulting him. Travis had Attention Deficit Hyperactivity Disorder and was taking medication at the time. His mood and energy level were highly variable, ranging from active, energetic and euphoric to lethargic and depressed. Travis had difficulty making friends and I recall him sharing with me his impression that a lot of people hated him. He told me kids his own age didn't like him and one of our goals was to try to increase his peer relationships.

6.      Unlike adults, children grieve in a circular fashion. Their feelings and attempts to

cope occur in cycles. In contrast, adults grieve in a linear fashion. A well adjusted adult will come to terms with a loss over time and will increasingly feel a lightening of the weight of the loss. There may be some dips in feelings of the loss after, for example, the anniversary of the loss. However, the pain generally lessens over time. The way in which children cope is more complicated. The pain from a loss might lessen over time, but will then feel fresh and overwhelming again years later. Given this, the ways in which Travis' losses continued to impact him are not only unsurprising, but predictable.

7.     Travis had a habit of hoarding. This behavior was consistent with the abuse and trauma he experienced as a child and was an attempt to gain control over his basic needs. He was insecure and felt he could be on his own at any time. In order to prepare to take care of himself, Travis held on to things for what he feared might be his solitary future. This is also consistent with the abandonment and neglect to which he was subject in his formative years. I also recall Travis occasionally being extremely vulgar and oversexualized. This was also not surprising given his history.

8.     In therapy we often worked on his issues with his dad, curbing his use of vulgarity, acting appropriately in the real world, and making friends. I took Travis fishing or to the library as a reward for good behavior and to provide him with an opportunity to use the skills we were developing in the real world.

9.     Whenever I got to close to a real issue in therapy, Travis would find a way to change the subject or would even bolt out of the room. He had a clear pattern of trying to escape when something was uncomfortable.

10.    Travis was hesitant to discuss the abuse by his adoptive father. I did not press him on the topic, as I attempted to let things come out as naturally as possible. When his father's name

was even mentioned, Travis expressed extreme anger and resentment. I recall at least two occasions where Travis shared with me that he received a card from his father and ripped it up in anger, but kept the money to buy himself something. That was typical Travis, trying to gain control over a situation which was completely beyond his power to control.

11. Travis spent a significant amount of time with his cousins, the Barrys. He was quite fond of his Uncle Steve and often expressed positive feelings towards him. I understand that Uncle Steve disassociated himself completely from Travis after the incidents with his daughters. While understandable on Uncle Steve's part, this must have been devastating for Travis, who looked up to the man immensely. Steve was Travis' best approximation for a father figure in those years.

12. Travis clearly also saw me as a father figure. He would not want our therapy sessions to end and would act up when our time was nearly over for that very reason. A number of times, he expressed his hope that I would marry his mother and become his father. I recall when my twins were born in April of 1998, Travis was jealous of them.

13. When we first discussed terminating therapy, which occurred because Travis' mother felt he had sufficiently integrated the issue of his abuse, Travis became extremely agitated. Eventually he masked his agitation with bravado, stating "well that will only give me more time to do what I want to do." This was typical Travis. He suffered such extreme loss in his life that whenever he sensed an impending "abandonment," he attempted to take control by appearing as if this was something he wanted all along.

14. At the conclusion of my sessions with Travis, I let his adoptive mom know she should bring him back anytime. I also stressed that he would surely need further treatment in the future because of what he had been through. I would have advised her to remain alert for warning signs and told her not to ignore problem behaviors.

15.     I only recently learned that Travis went to trial on a murder he committed in 2008. If anyone working on Travis' legal defense had come to speak to me before now, I would have told them all of the information above.  I would have been willing to testify at Travis' trial.

I hearby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.


Richard Brokaw, Ph.D.

Exhibit 07

## DECLARATION OF SALLYANN JENNINGS
## PURSUANT TO 28 U.S.C. § 1746

I, Sallyann Jennings, hereby depose as swear as follows:

1.      My name is Sallyann Jennings. I began my career as a counselor working with children and

I later expanded my practice to counsel adolescents and adults. Travis James Mullis was one of my

clients in the early 1990's

2.      I began working with Travis when he was four years old. I immediately noted that his

parents, Anne and Gary, had issues. For instance, Anne introduced Travis as her adopted son.

Presenting him that way stressed the importance of his 'otherness' in the family unit. Anne was very

critical of Travis and everything he did. ~~She treated him like the adopted child.~~ (SJ) On the other hand,

she had nieces and a nephew that were biologically related to her. They ~~were~~ seemed SJ more important to her.

She saw Travis as someone who was just giving her grief.

3.      At the time I was seeing him, the issues Travis had were not major issues. Travis was a

likeable kid. Travis' father was the more affectionate of his parents. I would describe Travis'

mother as a prickly cactus. She was not every expressive with her feelings and seemed more

concerned with the problems Travis caused her rather than the pain he was feeling. Overall, Anne

was pessimistic, she failed to acknowledge Travis' improvement and was very critical of him at

every turn. I typically had parent conferences every ~~four~~ months SJ. From meeting with them in the

conferences and seeing them when they dropped Travis off or picked him up, I knew one of the

major issues in the situation was that Anne needed help parenting. Her need multiplied once Gary

was out of the picture.

4.      When Travis first told me that his father had been "playing with my wee wee" or something

to that effect in the bath, Anne was furious with Travis. She asked him why he would say such a

thing. She was very protective of her husband after the accusations. It wasn't until after Gary admitted to some of the abuse that she accepted it and realized she was wrong for not believing Travis.

5.     After Anne and Gary separated, Anne reported that Travis was playing sexual games with his cousins. I forget what happened exactly, but it was relatively minor acting out compared to the offense he was sent to The Jefferson School for as an adolescent. Anyway, Anne was livid about it. She accused me of failing to treat him. I recall her angrily firing me after one incident. I always felt like I was on eggshells with her.

6.     Basically, when something major– or even minor– happens in a child's life a child will imitate what happened in order to master it. For example, if a child sees his parents fight, he might fight with someone else in order to experience, understand, and feel a sense of control over what happened. There needs to be a period of time wherein their little psyches have an opportunity to understand what they see. Since children do not have the complex language to process problems verbally, they process by acting out what happened through play. Play therapy gives the child an opportunity to play through the traumatic event in order to overcome it, so the long term damage can be reduced. In play therapy, the hope is that a child with the kind of trauma Travis experienced may be less likely to act out in the extreme way he ultimately did.

7.     Anne didn't seem to hear anything I said to her about Travis' treatment. I tried to explain to Anne what was happening when Travis acted out sexually but she did not seem to understand. She went through the motions of trying to get him some help, but she wasn't engaging in the process. When Anne discontinued treatment with me for Travis, it was a crucial time for him to be in treatment. Travis needed to continue to have a space to process the sexual abuse. I told her that he didn't need to be in treatment with me, but he needed to be in treatment.

8.    A mitigation specialist from Texas named Gina Vitale contacted me about Travis' death penalty trial. We spoke on the phone a few times and I answered her questions about Travis. I never met with anyone working on Travis' defense in person. I was cooperative with the defense team and would have been willing to meet with Gina, Travis' trial lawyers, or mental health experts working on Travis' case. Gina spoke with me about the possibility of me testifying at his trial, but I never received a subpoena. If I had been served a subpoena, I would have traveled to Texas to testify. I would have testified to all of the information above.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 4904.


7|15|13                          _____
                                 Sallyann Jennings

Exhibit 08

## DECLARATION OF DR. TERRY PRITT
## PURSUANT TO 28 U.S.C. § 1746

I, Dr. Terry Pritt, hereby depose and swear as follows:

1.     My name is Dr. Terry Pritt. I am a licensed and practicing psychiatrist, board certified in child and adult psychiatry. I currently have an outpatient private practice in Maryland. In 2000, I worked at Sheppard and Enoch Pratt Hospital in Baltimore, Maryland. Sheppard Pratt is a psychiatric hospital compromised of various specialized units, including an adolescent crisis stabilization unit where Travis Mullis was a patient of mine. I reviewed selected records from Travis' Sheppard Pratt records and my recollections are based mainly on these records.

2.     Travis was admitted to Sheppard Pratt for inpatient treatment on a number of occasions in February and March of 2000, following an incident of sexual acting out with his younger cousin. Each admission was a result of suicidal ideation and/or aggressive overtures that ultimately became suicide attempts. Notably, Travis was sexually abused from the ages of three to six years of age by his adoptive father.

3.     Travis was 13 years of age when I treated him. He exhibited extreme mood lability, impulsivity, and impaired insight and judgement.   Travis suffered from intrusive thoughts, flashbacks, and nightmares about his abuse and panic attacks.

4.     Upon his final admission to Sheppard Pratt on March 14, 2000, I diagnosed Travis with Post Traumatic Stress Disorder, Chronic; Bipolar II Disorder, Hypomanic, Provisional; and Attention Deficit Hyperactivity Disorder, Combined Type. I prescribed him Seroquel, Adderall, and Depakote. These medications were intended, in combination with talk therapy, to stabilize his mood, increase his level of concentration and help to create the non-existent stimulus barrier that caused

him to act before he thought things through.

5.     For children like Travis to have a chance outside of a regimented institutional setting, medication and talk therapy would both be medically necessary. The medication regime prescribed, or something similar thereto, would have been essential to the treatment of Travis, or any person with the same history of abuse and psychiatric difficulty. Notably, Travis reported not taking his Seroquil prior to the incident that led to his final admission to Sheppard Pratt.

6.     On May 31, 2000 I recommended to the court that Travis be sent to a residential treatment facility for adolescents who have been sexually abused and have perpetrated the same abuse upon others for one to two years. In my experience, this period of time would be required to begin to work through the significant traumas this child experienced and to develop a plan for his successful adjustment back into society. Once Travis was released from any residential treatment care facility, it goes without saying that he would require intensive outpatient therapy and services, to ensure he continued to take his medication and received the psychiatric assistance he required.

7.     I understand that Travis went to Jefferson School following his release from Sheppard Pratt. I also understand that he was discharged from Jefferson within months of his involvement in sexually inappropriate behavior within the facility. I find this interesting and worthy of looking into. The transition process from residential treatment to outpatient services is vital to a patient's long term success and should never be rushed. This would be antithetical to underlying philosophy of residential treatment.

8.     Nobody from Travis' defense team ever contacted me before a lawyer and social worker from Philadelphia came to see me a few weeks ago. I would have been willing to answer any questions about Travis at the time of his trial. I would have responded in accordance with the law if I had been subpoenaed to testified at Travis' trial.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dr. Terry Pritt

Exhibit 09

## DECLARATION OF WENDY MYERS
## PURSUANT TO 28 U.S.C. § 1746

I, Wendy Myers, hereby depose as swear as follows:

1.     My name is Wendy Myers. In the early 2000's, my name was Wendy Redick. I was a

Licensed Clinical Social Worker and the Director of the Transitional Youth Program at Stone Bridge

Transitional Care Home. Stone Bridge houses children and adolescents, from age 12 to 18, in need

of short-term therapeutic residential placement. From July of 2000, until January of 2001, Travis

Mullis was one of the clients there under my care.

2.     Travis was placed at Stone Bridge following an incident where he molested his cousin. The

very first thing I would do when I heard of such a young man engaging in this kind of behavior is

to look at what he was exposed to before this incident. Upon his admission, Travis was diagnosed

with Bipolar Disorder, Chronic Type Post Traumatic Stress Disorder (PTSD), and had a Global

Assessment of Functioning (GAF) score of 40. While most people have a basic understanding of

Bipolar Disorder and PTSD, I would point out that a GAF score of 40 is low. The GAF scale is 1-

100 and a score of 40 notes impairments or serious impairments in a number of possible areas. In

comparison, a score of 50 notes serious symptoms. The designation "impairments" is more severe

than "serious symptoms."     In plain language, this means Travis had impairments or major

impairments in reality testing, communication, family relations, judgement, thinking or mood. By

way of comparison, if an adult had a score of 40, he or she would be unable to hold a job or function

in a workplace.

3.     Travis was clearly disturbed. However, he was respectful to staff. I believed him to be lower

risk than our other clients. For that reason, I placed him with an intern for therapy rather than with

a licensed social worker. Only around ten percent of our clients saw interns instead of more

experienced therapists, so it wasn't as though seeing an intern was the norm.

4.    Travis was a child who was all mouth and that was it. He tried to take a stance but all he could do was bark– he had no bite. He tried to make an impression that he was more than what he was in order to fit in with his peers, but he wasn't able to impress them. He was one of the few white students in placement. It was also certainly rare to have students from more middle class backgrounds. He was the white kid from the suburbs trying to put on a front for a bunch of city kids. On top of that, Travis was the runt of the group. He was physically very small compared with his peers. He tried extremely hard to fit in and get the acceptance of everyone. Travis had an easier time with staff members. The expectations of staff were more clear and Travis was compliant and respectful.

5.    There were times when Travis was not doing well and he would be sent to what we called the "rubber room." It was a seclusion room that students were sent to when they were escalating in order to calm them down in a place where nothing was present that they could use to hurt themselves. Being in this quiet environment seemed to help Travis.

6.    Travis' family was not involved in his treatment while he was at Stone Bridge. I do not know if there were involved after he left Stone Bridge or not. However, I would have remembered if his family had been a part of his treatment.

7.    I have no recollection of any sexual misconduct between Travis and the other patients at Stone Bridge. Maryland law requires reporting of child sexual abuse. Had such an incident happened, it would have been reported.

8.    Until very recently, no one working on Travis' case came to talk to me about Travis. No one working for Travis' defense spoke with me before his trial. If they had, I would have told them all of the information above. I would have testified at Travis' trial if I had been subpoenaed to do so.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Wendy Myers, LCSW-C
Wendy Myers

Exhibit 10

## DECLARATION OF REBECCA PATE
## PURSUANT TO 28 U.S.C. § 1746

I, Rebecca Pate, hereby depose as swear as follows:

1.      My name is Rebecca Pate. My friends and family call me Becky. In the early 2000's, I lived

in the same neighborhood in Abingdon, Maryland, as Travis Mullis and his mother. They lived near

me on Raccoon Court. I dated Travis for around one year from 2003 to 2004. Everyone called

Travis "TJ."

2.      TJ got upset and agitated very suddenly. Frustration came over his face. He'd pace back and

forth, go up and down the stairs and pull on his hair. His face turned red. That's when it all

happened. When I say, that's when it all happened, I mean that's when the craziness of Travis came

out. He'd start screaming, punching the walls and throwing things. He wouldn't throw things at me

or at anyone, he'd throw things at the walls or out of the way.  He'd leave holes in the wall where

he punched them, he'd rip doors out of their doorframes. He'd kick or punch any inanimate object

in his way. He even peed on the floor, inside of the house, when he was mad. He destroyed his

bedroom on Raccoon Court. When I first started dating him, he had a room upstairs in the house.

He ruined it. He moved down into the basement of the house and did the same thing to that room.

He ripped down the curtains. He ripped up the carpet. He'd get mad and throw his computer. He

wrote all over his dresser and he tore it apart. That was typical of TJ. One minute he was fine, the

next minute he was out of control.

3.      I knew TJ was diagnosed bipolar and I recognized these times as symptoms of his illness.

When he acted crazy, I'd leave TJ's house to go back to my own just down the street. I would tell

him to call me when he was done. I would see him act crazy and I would see the destruction he

caused after acting crazy. There were times when I was planning on going over to TJ's house and

his mom would call me to tell me not to come over because TJ was freaking out. I'd be able to hear banging and noise in the background.

4.      TJ had moments where he was fine, then some little thing would set him off. He'd start throwing things. Once, it was the day after Christmas, TJ snapped over his friend Daryl giving me a hug. Daryl and I were just friends, but TJ was jealous. We were all at TJ's mom's house and he started screaming, throwing things and he kicked us out. I went home and a few hours later, he called me and apologized. We continued to date and sometimes it was good, and sometimes bad. I knew to leave TJ alone when he got upset.

5.      I knew about TJ's history. I knew he had been raped by one of his parents and that he molested his cousin. He had flashbacks about what happened to him when he was younger. There would be times when we'd just be sitting there, watching a movie, and a flashback would start. There were times when TJ could control how badly the flashbacks hit him and other times when he couldn't. I'd see it on his face that he was upset. I tried to be someone he could talk to about the flashbacks and asked him about it sometimes, but he didn't talk to me about the specifics of what happened when he was young. It seemed like he just couldn't.

6.      I got the sense that he had a terrible childhood. The woman he lived with and called his mom wasn't his biological mother. I don't know the details of how she became his mom or anything like that. I do know that he stole money and credit cards from her. He'd take her car without permission. He never got in trouble for doing these things because she didn't call the cops or his probation officer.

7.      TJ wanted to have sex all of the time– every day, several times a day. If I didn't want to have sex with him, he'd get upset and ask me to leave.

8.      There were times with TJ that were good and times that were bad. Sometimes he was a good

boyfriend and was there for me when I needed him. He could be sweet to me, caring, loving and lovable. TJ wasn't a bad person. It was just that he had two sides. I am bipolar myself, so I understood what TJ was going through. I knew TJ was supposed to take meds for his condition, but he said they made him feel like a zombie so he didn't take them after awhile. I saw him when he was on his medication and it seemed to help him control his frustration and do away with these outbursts.

9.      When I first met TJ, he was still on probation. He had just gone from being in juvenile detention to having total freedom. He just didn't know how to deal with it and the system didn't do anything for him. He went to night school a few times a week for awhile, but then he stopped going completely. He smoked weed pretty regularly. When he was high, it calmed him down. But when it wore off, he started having problems again. To my knowledge, TJ was not seeing any sort of therapist. I wasn't in school those days either. I dropped out of high school and we spent a lot of time together. So I believe I would have known if he was seeing a counselor. I also never saw or heard about his probation officer checking up on him.

10.     I was shocked when I heard about what happened in Texas. We were in touch periodically on the phone and by MySpace messages. The last time I saw him was when he came back to Maryland once for about a week. He said he was there with his uncle and that they were going on a cruise.

11.     Until very recently, no one working on TJ's case came to talk to me about TJ. No one working for TJ's defense spoke with me before his trial. If they had, I would have told them all of the information above. I would have been willing to testify about everything I know about TJ at his trial.

I hearby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Rebecca Pate

Exhibit 11

# DECLARATION OF ANNE MULLIS
## PURSUANT TO 28 U.S.C. § 1746

I, Anne Mullis, hereby depose and swear as follows:

1.      My name is Anne Mullis. My ex-husband, Gary Mullis, and I adopted a baby who was Gary's biological nephew. Gary's sister passed away when her youngest child was an infant. His name is Travis James Wallace. We call him "TJ." After we adopted TJ, we had his last name changed from Wallace to Mullis.

2.      I did not know TJ's biological mother even though she was my sister-in-law. She and Gary had no real relationship. He was basically ashamed of her and her lifestyle. She had several children all with different men. She was also morbidly obese.

3.      After we took custody of TJ, I tried several times to connect with Gary's half siblings and family by sending cards and pictures of TJ. Gary's mother did not like me and eventually all ties were broken with that side of the family. Gary was not close with his mother either. She had walked out of the marriage when he was young, leaving him with his father, who was kind of rough around the edges. It also came out later during Gary's trial for sexually abusing TJ that Gary was sexually abused by his mother.

4.      TJ was a troubled child. When he was around three and four years old, TJ would bang his head on the headboard of our bed. He'd bang his head against other things as well, including the large bedposts. It was very solid material and no question hurt him. He'd talk about fire and wanting to burn things down. I was concerned about his behavior, so I took him to see a therapist named Sallyann Jennings. TJ did individual counseling sessions with her for about three or four years. It was not family therapy so I was not involved in the sessions.

5.      When TJ was little, I was the primary breadwinner of the household. I worked the

three to eleven shift during that time. Gary took care of TJ while I worked. Gary often worked the eleven to seven shift. His father would watch TJ for the time in between Gary leaving for work and me getting home. As I said, he was kind of rough around the edges, but you could tell he cared for TJ.

6.      Gary would sometimes take TJ to his therapy sessions. Through Ms. Jennings therapy work, it eventually came out that Gary was molesting TJ. Ms. Jennings asked Gary about it and he admitted to it. TJ had tried to tell me what was happening before. He said to me, "Daddy is kissing my pee pee." Unfortunately, I did not believe him until some time later when Gary admitted it. After that I was kicking myself for not having done something about it when TJ first told me. I have always felt bad about that.

7.      I kicked Gary out of the house after this all came out and we eventually divorced. It was tough for TJ because he had been close with Gary, but I had no choice. Gary's father also cut TJ out of the picture after the abuse came out. It was a shame, because all of the male figures in TJ's life then were gone.

8.      TJ continued to have therapy with Ms. Jennings for awhile. However, he then started acting out sexually. It was clear to me that the therapy wasn't working. I took TJ out of therapy with Ms. Jennings for that reason.

9.      After Gary was released from prison, he tried to get visitation rights with TJ. TJ was probably about nine years old then. I remember a meeting with a therapist, about whether that would be allowed. During the meeting, TJ lost it and started punching Gary and screaming. It was a strange thing to see this very small child hitting this very large man. It was like a role reversal. Then TJ bolted out of the office and locked himself in my car. Sometime later I was told that Gary would not be granted visitation.

10.     TJ started taking Ritalin in the third grade for ADHD.  It seemed to help but he always had difficulty in school.  I remember that I had to push to get the school to have him repeat fifth grade.  He was not ready for middle school.  It seemed to me that the school just wanted to get him out of there.  I kept pushing and finally they agreed to hold him back.  I had a good relationship with TJ's pediatrician and we tried to keep him off medication as long as we could.  I remember once, when TJ was in the pediatrician's office, the doctor told me he was so proud of me for ignoring TJ when he was having a tantrum.  I knew to do that and would not give in.

11.     When TJ reached puberty, the garbage really hit the fan.  Everything fell apart.  One night after TJ threatened to kill himself, we were in the emergency room.  His emotions were bouncing off the walls.  One minute he was crying, calling me "mommy," and telling me he loved me.  The next minute he was talking about wanting to blow things up.  He was like a ping pong ball. I told the crisis counselor, "this child is bipolar."  Before that, his diagnosis had not included bipolar, but ADHD.  This was when TJ was in sixth grade and he was in and out of Sheppard Pratt Psychiatric Hospital.

12.     When TJ was about thirteen, he was accused of molesting his cousin.  Her father Steven is my brother.  He and TJ had grown close since everything had happened with Gary.  Steven tried to help be a male role model for TJ.  After the abuse allegation of Steven's daughter, he cut TJ out of all of their lives completely.  TJ was eventually sent to The Jefferson School for sex offender treatment.

13.     TJ was doing better at The Jefferson School than he had in the regular school system. His grades were good and he needed the structure.  There was no question about his day-to-day activities.  He was told when to get up, when to take his meds and when to go to school.  When he would get in trouble there, the school would deal with it by putting him in an isolation room or

otherwise punishing him. This structured setting was really good for him.

14.     TJ's release from The Jefferson School was abrupt. All of a sudden, they told me that he had completed the program. I thought he had at least another year there. It was a scramble to get him enrolled in the public school because he was released right at the beginning of the school year.

15.     TJ was put in regular full time classes without treatment. I complained to the school but they said there was nothing they could do. They refused to put him into special education classes and did not even develop an individual education plan for him. It was a disaster. I thought they were just trying to get rid of him. It ultimately worked. He was truant often and eventually stopped going to school. He was supposed to be on probation at that time too. He wasn't doing what he was supposed to in terms of that as far as I could tell, but his probation officer never did anything about it. I was hoping the probation would give TJ some of that structure that he needed.

16.     TJ was at home with me for around a year before he moved to Texas. His mental illness was out of control and he would not take his medication. Once he turned 18, I basically told him he needed to take his medications or get out. I was completely overwhelmed and had no idea what to do with him. He eventually decided to leave. He told me some woman he'd met online said he could stay with her. Once I had confirmed this was true, I bought him a plane ticket.

17.     TJ would call me around once a week when he was living in Texas. I had to take everything he told me with a grain of salt because I knew he wasn't taking his medications. At one point he told me his girlfriend was pregnant. I obviously was not happy about that and told him so.

18.     The night TJ killed Alijah, he called me in the middle of the night. He told me he was trying not to get into trouble, but that he had just been somewhere with a child and attempted to fondle her. He told me he hadn't touched her. I told him he knew better than to do that. I yelled at him and asked him what the heck he was doing in that situation. He sounded bad, but there was

really nothing I could do for him then.

19.     After TJ's arrest, a mitigation specialist named Gina called me. We spoke on the phone and I emailed her, but we never met in person. I never spoke with any lawyers working on TJ's case. At the time, I remember thinking there wasn't anything I could do or say that might help TJ. I knew TJ to be a very disturbed individual. I had seen him off his meds and in manic episodes. This all seemed to be negative information. I told Gina that on the phone and nobody ever contacted me again.

20.     Recently, TJ's lawyer from Philadelphia and a social worker came to see me. Once we started talking, they explained to me that the information I was telling them was helpful. I love TJ and have always wanted to help him. If his trial lawyers had explained to me how what I knew could be helpful, I would have been willing to answer any questions and I would have testified at TJ's trial if I was asked.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746

*Anne Mullis* 7/15/13

Anne Mullis

Exhibit 12

# IN THE TEXAS COURT
## OF CRIMINAL APPEALS

Ex Parte Travis James Mullis

### CAPITAL CASE

---

### AFFIDAVIT OF RICHARD DUDLEY

Richard Dudley, being duly sworn, deposes and says:

1. I am a licensed psychiatrist, and testified as an expert in the capital trial of Travis James Mullis in Galveston County.

2. At trial, I testified that Mullis suffered from various psychiatric problems, including bipolar disorder. My testimony was based on extensive clinical interviews with Mullis as well as a review of available records.

3. Mullis was first diagnosed and treated for bipolar disorder as a teen, and the records I have reviewed are replete with references to his thoughts of suicide, suicidal gestures, as well as suicide attempts.

4. People suffering from bipolar disorder have periods of mania and periods of depression. The depression is not the typical type of "depression" lay people discuss when they say, "I'm depressed." Clinical depression involves deep-seated feelings of hopelessness, helplessness, and/or worthlessness that can result in a person becoming physically unable to get out of bed in the morning or function in the world. Such depression is often accompanied by suicidal thoughts, which can often lead to suicide attempts.

5. It is my understanding that Mullis was sentenced to death.

6. At no time did an attorney named Wayne T. Hill (or any other attorney) contact me and let me know that Mullis was considering abandoning his

direct appeal or attempting to have his appellate attorneys removed from the case.

7. If an attorney had contacted me and let me know Mullis was considering having the attorney removed so he could represent himself, and abandoning his appeal, I would have told the attorney that it would be essential to have Mullis evaluated to determine if his waiver was knowing, voluntary, and intelligent or a product of his mental illness. I would have told the attorney that Mullis's bipolar disorder and history of suicidal thoughts and gestures suggest a substantial risk that Mullis could be attempting to abandon his appeals in order to hasten his own execution. This would be a type of suicide.

8. Based on my clinical knowledge of Mullis, if I had heard from an attorney that Mullis was considering abandoning his right to appeal, or his right to an attorney to represent him on appeal, I would have suggested that further evaluation was needed to know if Mullis were competent to waive those rights.

9. As noted above, no attorney called me and made this inquiry. No one has asked me about this until now, when attorney Brian Stull contacted me, apparently after Mullis had already been permitted to waive his rights.

Sworn and subscribed to me this _____ State of New York

_14_ day of November 2012 ·ounty of New York }

NOTARY PUBLIC

MOHINDER S. GULATI
Notary Public, State of New York
No. 01GU4659357
Qualified in New York County
Commission Expires Nov. 30, 2014

RICHARD DUDLEY, M.D.

Exhibit 13

## DECLARATION OF RICHARD G. DUDLEY, JR., M.D.
### PURSUANT TO 28 U.S.C. § 1746

I, Richard G. Dudley, Jr., M.D., hereby depose and swear as follows:

1.      My name is Richard Dudley.   I am a physician, who is licensed to practice medicine in the State of New York and is board certified in psychiatry by the American Board of Psychiatry and Neurology.   I have a private practice in New York City, which has been about equally divided between a clinical practice and a forensic practice, and I have also taught at both a medical school and a law school in New York City.   I was retained to work on the Travis Mullis case in Texas and I testified at his penalty phase in 2011.

2.      It is my memory that I was retained to work on Travis' case shortly before his trial. I was in the midst of preparing to testify in another capital case with the same attorney, Mr. Bourque, when he asked me to work on this case.   I first saw Travis in December 2010, and was testifying in the penalty phase by March 2011.   Therefore I had much less time to work on this case compared to comparable cases.

3      It is also my memory that I had much less preparation time with the attorneys than I am used to having in comparable cases; I was told little-to-nothing about their overall theory or strategy for mitigation and really didn't know much about the penalty phase; and I don't believe that they really spent enough time with me to adequately understand my findings and my opinions (see below).

4.      It was my understanding at the time of trial that the referral question was whether or not Travis suffered from any major psychiatric disorder(s) and/or whether or not there were other mental health issues that could be considered for possible presentation as mitigation should his trial reach a penalty phase.   At some point it became clear that there was no plan to discuss or present his mental state at the time of the crime (even as part of mitigation); I do not remember

having much if any discussion with the attorneys about my findings and opinions about his mental state at the time of the crime. Even after the district attorney questioned me about what Travis had told me about the crime during his cross examination, without allowing for any testimony about his mental state at the time of the crime, I still was not asked about his mental state at the time of the crime during re-direct. Although I suspected that the defense didn't have much of an idea about what I might say if asked about Travis' mental state at the time of the crime, given that we hadn't fully discussed this, I was still surprised that I was not asked about this in any way during re-direct, especially given the cross examination. Additionally, upon my recent review of the closing arguments, I see that essentially, this allowed the DA to argue un-rebutted that Travis was simply upset at the time of the crime. If I had been asked about Travis' state of mind at the time of the offense, I would have testified that he was suffering from major psychiatric illnesses that seriously impaired his ability to function.

5.    Based on my psychiatric evaluation of Travis, it was my opinion that, at the time of the crime, he had suffered from and continued to suffer from multiple major psychiatric disorders. More specifically:

a.    As a child he suffered from Attention Deficit-Hyperactivity Disorder, most likely caused by a combination of genetic vulnerability and damage to him while inutero.

b.    During his early childhood years he didn't have the type of parenting that would foster the development of a healthy bond between him and a caregiver (in part due to his extended hospitalizations, but mostly due to parental neglect and abandonment), resulting in Reactive Attachment Disorder.

c.    During his early childhood years he was also repeatedly sexually abused by his adoptive father, resulting in an Anxiety Disorder with symptoms of Posttraumatic

Stress Disorder, and a lack of sexual boundaries and sexual confusion, including confusion and often considerable distress about sexual identity and pedophilic urges.

d.     The above noted traumas that he endured, in the absence of adequate parental nurture and support, also influenced the development of his personality, resulting in a Personality Disorder, Mixed Type, with Narcissistic and Borderline features.

e.     In addition, he suffered from a rapid cycling Bipolar Disorder, the onset of which was quite early; the underlying mechanism for this disorder is biochemical; and the etiology of this disorder is believed to be genetic transmission.

6.     Although I believe the attorneys knew that it was my opinion that Travis suffered from the above noted major psychiatric disorders, I believe that as a result of the very minimal preparation time, they did not have a full understanding of the impact of each of these disorders on Travis' ability to function.   They also lacked a full understanding of how these disorders interacted with each other.   More specifically, for example, many of these disorders have overlapping symptoms (such as hyper-reactivity and/or impulsivity) that cause certain of the disorders to potentiate others.   The symptoms of many of these disorders can also be exacerbated by particular psychosocial stressors, and then in turn, the enhanced symptomatology exacerbates some of the other disorders or makes them more difficult to manage.   Similarly, for example, the cycling mood states that are part of the Bipolar Disorder impact in various ways on Travis' ability to manage the other difficulties, and such cycling mood states can also exacerbate the mood instability and dysregulation that is part of some of the other disorders.

7.     This more in depth understanding of the impact of Travis' psychiatric disorders and how they interact with each other would have been helpful for several reasons.   Specifically:

a. It is really the impact of mental illness on a person's ability to function that makes the illnesses potentially mitigating

b. An understanding of Travis' mental state at the time of the crime requires this understanding of how these psychiatric disorders were exacerbated by the psychosocial stressors he was experiencing at the time, and then how these disorders interacted with and potentiated each other, resulting in the mix of behaviors that were a part of the crime.

c. Understanding the unique confluence of psychosocial stressors and the interaction of his psychiatric disorders places his mental state at the time of the crime in sharp contrast to likely mental states while incarcerated, thereby impacting one's understanding of his "future dangerousness."

d. An understanding of the impact of these disorders on Travis' ability to function, both individually and as they interact with each other, is required to understand many of the behaviors he exhibited during the course of his life that could have been otherwise easily misunderstood and/or attributed to other causes.

8. Some of the records provided to me initially also help one understand the various behaviors that Travis evidenced over the course of his life. In other words, the impact of Travis' psychiatric disorders, both individually and collectively, is very well documented in these records; this confirms the nature of his psychiatric difficulties and their chronic course; and it also helps efforts to differentiate behaviors that were/are a product of his psychiatric difficulties from behaviors that might be due to other causes. Such an understanding would have allowed the defense attorneys to challenge the prosecution's efforts to characterize Travis as simply manipulative, one who is just faking suicide, a victimizer, etc., and replace those characterizations

with a more informed understanding of his behavior and the cause(s) of his behavior.

9.      I have also recently been provided additional information about the severe sexual dysfunction in Travis' birth family, including that his mother was sexually abusing her children, that his father and step-brother were raping his step-sister and that his grandmother had sexually abused family members as well. Had I known this at the time of the trial, I could have further testified about the increased risk factors regarding the impact of such exposure at a young age and the genetic implications of these factors. These risk factors are further enhanced by additional information that I did not know about at the time of the trial regarding the true nature of the severity of the sexual abuse that Travis was subject to at the hands of his adoptive father. Gary Mullis' counseling records establish that he initially lied about the frequency and severity of the abuse. I have only recently learned that he later admitted that the abuse occurred about 12 times (rather than 6) and that he masturbated himself to ejaculation while performing fellatio on Travis. Other records indicate the likelihood that Travis was also anally raped by his father. This additional information would have allowed me to testify to the severe psychiatric implications that this abuse had on Travis' mental development.

10.      I was also not asked about "future dangerousness," including even with regard to how available psychiatric treatment might impact on future dangerousness. In that regard, it is my opinion that psychopharmacologic treatment of Travis' Bipolar Disorder, which is readily available in prison, could have brought the symptoms of his Bipolar Disorder under control. Given the dramatic impact that his Bipolar Disorder had on his ability to function, both individually and in connection with his other disorders, such control of his Bipolar Disorder would have had a significant positive impact on his ability to function. More specifically, for example, he would no longer be plagued by the extremely difficult to manage rapid cycling of his mood,

with depression and suicidal impulses at one end, and hyper-irritability and reckless impulsivity at the other. The mood instability and dysregulation associated with some of his other disorders would no longer be made worse by the cycling of his Bipolar Disorder. Increased stability of his mood would make him much more able to cope with some of his other difficulties, especially, for example, such increased stability would leave him more able to resist the pedophilic urges that he was so very conflicted about and ashamed of. Such dramatic improvement in Travis' ability to function, coupled with the fact that the psychosocial stressors to which he is most vulnerable are less likely to be present in prison, coupled with the stability and predictability of prison life versus Travis' life on the street, make the possibility of future dangerousness argued by the prosecution quite remote.

11.     I have also been asked to comment on the so called "hit list" that Travis wrote on the wall of his cell along with information about rival gangs. I have no memory of being told about the "hit list" and/or being questioned about it during the trial. If I had been told about it and asked to comment on it, I would have asked to meet with Travis again (even on the eve of my testimony) to explore this issue with him. Based on my review of the trial transcript, it appears that the prosecution presented this "hit list" as further evidence of how dangerous Travis is and will continue to be. I would have wanted to meet with Travis about this because I suspect that there are other, much more likely explanations for the "hit list." For example, given Travis' Bipolar Disorder, the behavior is much more likely part of a manic episode or a suicidal element of a depressive episode than evidence suggesting that he will be a danger to others.

12.     I have also recently been provided information about Travis' sexual relationships with older men, which it appears the prosecution characterized as evidence of how manipulative Travis is and how he has always used others. I was not provided this information by trial counsel.

It is most certainly my opinion that those relationships were much more complicated than that.

    a.    First of all, it is not at all uncommon for a late adolescent or young adult male, who was sexually abused by a paternal figure as a child, to end up repeatedly becoming sexually involved with older men.

    b.    When the young man was also neglected, abandoned or otherwise developed attachment issues during childhood years, this need to find a "father" is even more intense, as is the sense that the relationship/intimacy with that "father" can/should be expressed sexually.

    c.    These above noted elements of Travis' history are much more the driving force behind his relationships with older men than anything else.

    d.    Additionally, as a result of the above noted combination of psychiatric difficulties that Travis suffered from, his capacity to care for himself was extremely impaired; the fact that these older men took Travis in and cared for him met his needs, but also obviously met their needs. In that regard, it is more accurate to see this aspect of these relationships as one of mutual exploitation.

    e.    As further noted above, a lack of sexual boundaries and sexual identity confusion are also products of the difficulties that Travis endured along with his other various psychiatric difficulties. As a result, he doesn't really know if he is bisexual or not, and at times he hasn't even been sure to what extent his relationships with these older men were even primarily sexual.

    f.    In addition, it is also important to note that hyper and reckless sexuality is symptomatic of the more manic phases of Travis' Bipolar Disorder, so while in a manic state, his sexual behavior is much more out of his control and difficult to

manage.

g.     Finally, Travis has considerable confusion and shame about virtually all of his sexual urges and behaviors. This is quite consistent with the above noted assertion/opinion that his sexual behavior is the product of a variety of forces that Travis does not fully understand and has little to no ability to manage.

13.     I have also recently been provided with new information gathered from Travis' adoptive mother. Specifically, that she has now reported that when Travis was a child he did tell her that he was being sexually abused by her husband, Travis' adoptive father, but she didn't believe him, and she also reported that Travis called her for help on the night of the crime and she described and confirmed Travis' report to me about their interaction on the phone that night. Additionally, I have received new information that when Travis told his counselor about the abuse, she informed Anne Mullis, who responded with anger towards Travis.

14.     It has been well established that a parent's refusal to believe a child's report of being sexually abused and associated refusal to help/protect the child dramatically magnifies the damaging impact of the sexual abuse on the child's development. Given the history of Travis' relationship with his adoptive mother that he reported to me, I was surprised when he told me that he called her on the night of the crime (as he was deteriorating and did not know what to do/prior to the crime itself). When he talked to me about this it was clear that her lack of responsiveness to him that night was clearly devastating to him and clearly contributed to his continued deterioration; however now, knowing that she did not believe his childhood report to her of being sexually abused, I understand even more why he was so devastated by this repeat/re-enactment of his childhood experiences with lack of help from or protection by her. Had I known this at the time of the trial, this information would have further allowed me to explain Travis' mental state the

night of the crime.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Date:  July 21, 2013                                    s/ Dr. Richard D. Dudley, Jr., M.D.
                                                         Dr. Richard G. Dudley, Jr., M.D.

Exhibit 14



# National Institute for the Study, Prevention and Treatment of Sexual Trauma

104 E. Biddle Street
Baltimore, MD 21202
Phone: (410) 539-1661
Fax: (410) 539-1664

**Director:**
Fred S. Berlin, BS, MA, MD, PhD, PA

**Associate Director:**
Kathryn Thomas, RN, MS

**Therapists:**
Phyllis Burke, MA
Pamela Cade, MSW, LCSW
Joseph Fuhrmaneck, MA, NCC, CPC
Katherine Furr, BA, MA
Andrea Kelso, RN, MS, CS
Shelly Lurie, RN, MS, CS
Randi Miller, PhD
Mutee A. Mulazim, BS, MS
Luis Roseti, MA

**Consultant:**
H. Martin Malin, PhD, FACCS

**Research Associate:**
Greg Lehne, PhD

**Research Assistant:**
Patricia Anthony, BA

**Administrative Staff:**
Maggie Rider
Sharon Dean
Bernadine Missouri

**Chief Legal Counsel:**
Mary Ann Berlin, RN, BS, JD

**Board of Advisors:**
William Artez
Judith Becker, PhD
Gail Berendzen, BS
Richard Berendzen, PhD
Gerald Boyle, Esq.
James Breiling, PhD
H. Jerome Briscoe, III, Esq.
James L. Cavanaugh, Jr., MD
David Finklehor, PhD
A. Nicholas Groth, PhD
Roy Hazelwood, MS
Wayne P. Hunt, EdD, NCSP
Thomas Kirk
Fay Honey Knopp
Richard Lawlor, Esq.
Michael Melsheimer
Hon. Thomas J. Middleton
Jerome G. Miller, DSW, LCSW
John C. Nemish, MD
P. Gayle O'Callaghan, PsyD
Jonas Rappeport, MD
Robert L. Spitzer, MD
Gary Tidwell, Esq.
Frank L. Valcor, MD
[illegible]
[illegible]

**GARY MULLIS**

July 20, 1993

*initial Eval*

**IDENTIFYING INFORMATION & CHIEF COMPLAINT:** The patient is a 41 year old separated white male who was referred for evaluation today, July 20th, 1993 by his attorney. Mr. Mullis is accused of sexually molesting his five year old adopted son over a seven month period of time. These accusations involve genital touching and fellatio on the child. Mr. Mullis was indicted on these charges and is currently awaiting a court date. He and his wife have separated, but he has been granted temporary supervised visitations with his son.

**INFORMANTS:** The informants are the patient himself and the legal records that accompany him.

**FAMILY HISTORY:** <u>Father:</u> The patient's father is currently 70 years of age. He has diabetes that is controlled with medications and diet. The patient's father also has circulatory problems as the result of an injury years ago. The patient's father has a high school education and was employed as a steel worker for 35 years. He is currently retired. The patient described his father as "laid back". He said he is an individual who does not want to hurt anyone. He said that he and his father get along well. They are closer now than when he was younger, but he has always been closer to his father than to his mother. When he was a child, Mr. Mullis was disciplined by his mother, but not by his father. This discipline included some spankings, but generally was reprimanding or grounding.

<u>Mother:</u> The patient's mother is currently between 63 and 64 years of age. She lives in North Carolina and Mr. Mullis has not talked with her since 1986. His parents were divorced when he was 14 years of

000001

age and after that he lived with his father. He recalled that his parents fought much of the time. Immediately after the divorce, the patient's mother moved to Essex, Maryland and then to North Carolina. Mr. Mullis made a choice to stay with his father. He knows very little about his mother's education. He said that she had always been a housewife and has been married several times since the divorce between she and his father.

He described his mother as "an unusual person." He said that she is aggressive and rambunctious. He said that she does exactly what she wants to do, does not care if she hurts anyone and leads a very independent lifestyle. He said that he and his mother are not close and have never been. As a child he saw her every few years and continued to do so until 1988, when he made a decision not to have anything to do with her. This was because of some difficulties over an adoption that Mr. and Mrs. Mullis made of his sister's son.

Siblings: The patient had one sister who was 4 to 5 years older than he. She died in 1989. The patient said that his sister was quite obese, weighing probably 400 pounds and she took many medications. He said that the circumstances surrounding her death are unclear. She died when she was 40 and was found dead at her home. Mr. Mullis said that while growing up he and his sister were not very close, and that he had lost communication with her. He said that his mother would tell him that his sister was promiscuous and not someone with whom he would want to have a relationship. The patient said that he had believed this and had stayed away from her. She had one son who, subsequent to her death, was adopted by Mr. and Mrs. Mullis.

FAMILY HEALTH
HISTORY:
The family health history is positive for diabetes in the paternal grandmother and the father. The patient denied that there is any evidence of heart disease, cancer, hypertension within the family and stated that all of his grandparents died as the result of "old age". He denied any neurological, psychiatric or substance abuse problems within the family.

SOCIAL POSITION &
HOME ATMOSPHERE:
The patient said that he was the product of a middle class family. He lived for several years in Essex, then moved to Dundalk, Maryland, when he was six years old. He remained in Dundalk with his father until his own marriage at the age of 31. Until the age of 14, the patient lived with his father, sister and mother. After his parents divorced when he was 14 years old, he lived with his father and sister. His sister then left when she was 18, moving into her own place in North Carolina.

PERSONAL HISTORY:
Mr. Mullis was born on ▮▮▮▮▮▮▮▮▮ in North Carolina. He said that both of his parents were from that State. He denied knowing any details about his mother's pregnancy or his subsequent birth. However,

000002

he believes that he was healthy and that there were no medical problems. He also believes that he attained normal developmental milestones. He denied any history of enuresis, speech problems, phobias, or seizures. He said he had the usual childhood diseases and recalled having some ear infections and a strep throat on one occasion. He said that he was never hospitalized as a child. He did break his arm when he was between 12 to 14 years of age. Growing up, he lived in a neighborhood where there were other children with whom to play. He said that his interactions outside of his home were quite good and he was involved in the usual childhood activities such as ball playing and bike riding. He felt happy in these activities, but said there was a great deal of tension within his home.

EDUCATIONAL HISTORY:     The patient began school at the age of
                         six. He graduated from high school when
he was 17 years old. He said that he got satisfactory grades, but without doing very much work. He got along well with his teachers and had many friends in school. He said that he was quite accepted, though he was not active in school activities nor in sports. He said he was communications oriented and involved in audio-visuals while in school.

OCCUPATIONAL HISTORY:    The patient obtained his first jobs
                         after graduating from high school. He
said that until 1976 he moved from job to job. He had jobs such as working in burger restaurants or where ever he could find employment. In 1976 he got his first job as the head of a security department at Bon Secours Hospital, and stayed there for four years. He then went with the Baltimore City police department as a dispatcher and stayed with them for nine years. For the past four years he has worked for the Belair Police Department as a dispatcher. He was asked to resign in June as a result of the recent charges and was told that if he did not resign he would be fired. He said he had always enjoyed this type of work.

LIVING SITUATIONS:       The patient lived with his father until
                         he was 31 years of age at which time he
married. He then lived with his wife and subsequently with his adopted son, as well. Since June, Mr. Mullis has lived once again with his father.

SEXUAL INCLINATIONS      The patient reported that he learned
AND PRACTICE:            about sexuality from his peers in high
                         school. He denied ever having had sex
education and said that neither of his parents talked about sex. He believes his mother to be very judgmental and not someone he could approach. His father was far more approachable, but Mr. Mullis denied that he ever talked with him about sex. He began masturbating at the age of 13, doing so on a once a week basis. He stated that he felt no guilt about masturbation. He said that initially he did not know anything about it, but thought that

perhaps it was normal. He currently admitted to masturbating about one to two times per day.

Mr. Mullis said that he did not remember any early childhood sexual experiences. In the first grade he began to notice that he had an interest in girls and acquired a childhood sweetheart with whom he was close throughout high school. When he was 13 years old he had his first kissing experience, but does not recall any heavy petting until after high school. He said that he had difficulty getting involved with women and dated rarely during high school or afterward. He said that he has had three sexual partners including his wife, and that he had no long term relationships before meeting his wife. He could not remember when his first sexual intercourse experience was, but believed it to be while in his twenties. When he was somewhere between the ages of 12 and 14, he recalled that he and another same age boy masturbated together. This happened on one occasion. He denied any sexual experiences with adults while he was a child or adolescent, stating that he was attracted to women in their twenties to thirties. He said that he has no interest in young girls, men or young boys.

MARITAL HISTORY: The patient married his current wife, Ann, when he was 31 years old and she was 28. His wife has an Associates degree in nursing and currently works at Franklin Square Hospital. The patient said that he and his wife met through a mutual friend on a blind date. They dated for less than a year and then were married. He said that they got along quite well and had a good sexual relationship for a period of time. They developed problems with infertility and were unable to conceive a child. At one point Ann miscarried a pregnancy. The couple sought treatment at an infertility clinic and learned that one of Ann's tubes was blocked and it would be very difficult for her to conceive.

Subsequent to that diagnosis, the patient stated that his wife became less interested in sex, felt that there was no need to be sexual anymore, since reproduction was not a possibility. He said that since that time they have had infrequent sexual relations. He has found this to be very disturbing. He feels that he is unable to stimulate his wife and feels very badly about it. However, Mr. Mullis said that other aspects of their relationship remained positive until the recent difficulties.

CHILDREN: The couple have an adopted son, Travis, who is currently six years old. Travis is a natural son of Mr. Mullis's sister who died in 1989. Mr. and Mrs. Mullis adopted Travis when he was 10-1/2 months old. Travis is currently in the second grade and Mr. Mullis reports that he does well in school and seems to be well adjusted. Mr. Mullis admits to having a good relationship with his son. This is the son with whom Mr. Mullis was sexual.

000004

HABITS:                    The patient began smoking cigarettes at
                           the age of 18 and currently smokes
approximately two packs of cigarettes per day.  He said that he
drinks alcohol approximately one time per year on a social basis,
and denied that he ever became more involved in drinking, stating
that he has never been much interested in this pursuit.      He
denied the use of any street drugs.

RELIGIOUS AFFILIATION      The patient said that his parents were
AND INTEREST:              Protestant, although he was not raised
                           in any particular church.    His family
did attend a Baptist church for a period of time.  He currently
attends the Eastern Assemblies on a regular basis.

PREMORBID PERSONALITY:     The patient said that he has a few
                           friends at the current time, but that
most deserted him after learning about the sexual abuse.    Pre-
viously, he had colleagues at work with whom he got along, but
was not social.  He and his wife had made friends with neighbors
and others.  Currently Mr. Mullis has two male friends with whom
he talks and who are aware of what is going on in his life.   As
previously noted, Mr. Mullis has no current relationship with
his mother, but said that his father is quite supportive of him.
The patient's interests include communications.  He is an amateur
radio operator.  The patient described himself as a person who is
outgoing and will talk with anyone.

He said that he has always worried, but currently this tension
has exacerbated.  He said throughout his life he has had a normal
amount of depression, but is much more severely depressed at the
current time.    He said that prior to the disclosure of sexual
abuse he had met his goals. He enjoyed the work that he did and
was happy with his marriage and his son.   He currently feels
uninterested in making goals for the future.

MEDICAL HISTORY:           The patient said that he had a previous
                           history of hypertension which was treat-
ed with medications.  He has since stopped taking those medica-
tions and claims that he is no longer hypertensive.

PREVIOUS PSYCHIATRIC       There is no previous psychiatric his-
HISTORY:                   tory.

LEGAL HISTORY:             Mr. Mullis has no prior legal history.
                           He was arrested for shoplifting as a
juvenile.   He was arrested in June of 1993 on charges of child
molestation.  He was indicted on these charges last week and will
face a court hearing at some unknown date.

HISTORY OF PRESENT         The patient has been accused of and ad-
ILLNESS:                   mits to sexually molesting his five year
                           old son over an approximately seven

000005

month period. He said that these encounters first began in September of 1992. At that time his wife was working a 3 to 11 shift. Mr. Mullis was then responsible for caring for his son in the evening. He said that between the time his son returned from school and bedtime, there were many things to be done, including dinner, housework and chores. He said that to save time he and his son started taking baths together. Mr. Mullis needed to go to work at the 11 p.m. shift. During the bath time, he and his son would "fool around". He said that initially he had not intended to be sexual, and that the encounters started off being games. Many of the games they played in the bathtub involved using some of Travis's toys. The sexual pattern began when Mr. Mullis would assist Travis in washing his genitals. The patient said that he would grab one end of the washrag, and have his son grab the other end and rub it across the boy's genitals. While doing this, Mr. Mullis noticed that his son's penis became erect. This aroused Mr. Mullis and his penis also became erect.

Also in September, Mr. Mullis got into a habit of laying down with his son to help him go to sleep. He would lay with Travis for a few hours. Travis apparently came into Mr. Mullis' bed and would play around and not go to sleep. According to the patient, Travis told his father that his penis hurt and that he needed it rubbed. Mr. Mullis said he told the boy to get up and go into the bathroom, but the boy said that he did not want to do this. Mr. Mullis said that he became concerned and realized that these statements were not normal for a child of Travis's age. He said that his son kept insisting that he do something. Mr. Mullis said he told his son that he should rub his own penis. However, according to the patient, Travis insisted that his father kiss it. Mr. Mullis said he resisted this for a period of time. He felt uncomfortable doing so, and knew that it was not right. However, he eventually gave in and did kiss the boy's penis. He said that he knew that he should not do this. He got excited and aroused doing so, and admitted that he went too far. When pressed on this, Mr. Mullis said that he did perform oral sex on his son, and that while doing so he would masturbate himself until orgasm. He recalled that the oral sex encounters occurred on six to seven different occasions. Mr. Mullis said that he felt guilty about it and tried to fight it off, but was unable to do so. He said he wanted to tell someone, but could not. He reported that is son Travis promised him that he would not tell anyone, and that on several occasions he had asked Travis not to tell.

Mr. Mullis said that his son Travis was seeing a therapist, ▇▇▇▇▇▇▇▇, for other reasons during this period of time. When asked what the reasons for the therapy were, Mr. Mullis reported that it was because Travis had been born with some medical problems and that he had initially been brought up in "poor surroundings". For the first ten and a half months of his life Travis lived with his natural mother and Mr. Mullis said that at that time his sister was not working, and that the two

000006

lived in subsidized housing. Mr. and Mrs. Mullis apparently were concerned that Travis may have effects as a result of his initial upbringing and sent him to a therapist. The patient indicated that Travis had no symptoms, he seemed to be doing well in school and appeared to be well adjusted. He said they simply wanted to see whether Travis was okay as a result of his upbringing.

On April 1st of 1993, Mr. Mullis said that Travis told the therapist when he was leaving her office that he was having sex with his father. Apparently this therapist asked Mr. Mullis if this were true, and at that time the patient said no. The therapist then went on to have some sessions with Travis to verify what happened. Apparently, the boy told her details about the sexual encounters with his father. Mr. Mullis said that at that time he was having difficulty functioning because of his guilt and he eventually went to the therapist and told her what had happened. At that point she called Child Protective Services and then he was instructed to turn himself in to the police. Apparently the police came to Mr. Mullis's work to arrest him. He spent three days in jail until he could raise bail. Previous to this confession, Mr. Mullis said that he had hinted to his wife that things were going on, but was never really able to tell her. The patient said that once he turned himself in, he confessed the entire story to his wife. He said that initially she was shocked, but said she would support him. However, after he was arrested she stopped supporting him and has separated and threatened divorce. He said that he feels he has lost the support of most of his family and friends. Mr. Mullis said that he was indicted on these charges last week and that the case will be placed on the court docket.

In June, there was a hearing that allowed Mr. Mullis to visit with his son in supervised visitation two times per week. Apparently this was a temporary allowance, and Mr. Mullis said that there was a hearing coming up next week to see if this could continue. He said that he is able to visit with his son in the presence of his son's therapist,                He said that this therapist has recommended that the visitation continue and Mr. Mullis is confident that it will. Mr. Mullis said that he has recently begun to see                , a therapist in Harford County whom Mr. Mullis said is a specialist in sexual abuse. The patient also indicated that he would like to be in group therapy.

Mr. Mullis said that he does not know what led him to be sexual with his son. He said that he was very close to his son, and cared for him every night, and that there was a strong emotional bond. He said that the sexual feelings may have developed as a result. He denied that he had any previous sexual arousal to children, and felt that he was caught off guard. He also said that his wife was not getting aroused by him and that their sexual relationship had deteriorated. He found it very devastat-

ing not to have sex with his wife and did not want to seek out
other partners. He admitted that he had seen a prostitute before
he was married, but did not believe in cheating on his wife. He
said that he felt very vulnerable and that there was a strong
need for sex, and that perhaps this is where the barrier broke
down. He did not, however, seem to be projecting blame. He told
us that on many occasions he tried to control his behavior. He
would tell his son no, and tell himself the same thing. However,
he found it hard to stick to this because the sexual feelings
were so strong.

Mr. Mullis said that prior to his confession he had made up his
mind to stop. Mr. Mullis said that as a result of his actions
he has lost his job and his wife and realizes that he may lose
his freedom. He admitted that he sometimes thinks of killing
himself, but denied that he had any plan or any intention of
doing so. He is concerned that his wife will divorce him and
said that he would like to heal the marriage. Additionally, Mr.
Mullis said that he is afraid to go out of his house because he
worries about what people will think of him. He said that he was
mainly aroused to adult women. However, he said prior to his
marriage he did not date a lot because he was infrequently at-
tracted to the women, and that they were rarely attracted to him.
Initially, Mr. Mullis said that he would not be aroused if shown
pictures of naked children during plethysmography studies.
However, later he indicated that it is possible that he may show
arousal to children.

MENTAL STATUS          The patient is a 41 year old male with
EXAMINATION:           brown hair and a mustache. He was
                       casually dressed for the interview and
wore glasses. He initially expressed a great deal of anxiety,
stating that he did not know whether he could talk to a woman
about these issues. Early in the interview he would not describe
his sexual encounters with his son. Throughout the initial parts
of the interview, Mr. Mullis constantly played with his hair and
his face in an anxious manner. He later relaxed somewhat and was
open to questioning, and appeared to be honest. His speech was
generally normal in rate, rhythm and volume, but at times he
would mumble and was asked to speak up and repeat his answers.
He initially had difficulty maintaining eye contact and would
stare in another direction. However, this improved as the pa-
tient relaxed. He was frequently evasive with his answers early
in the interview, stating such things as I might have done this,
or I suspect that I did this. When pressed, he was able to admit
to the behaviors. He became much less evasive as the interview
progressed. He appeared to have an intact memory and could
recall both recent and remote events with the exception of some
of his sexual history, which may be more related to his embar-
rassment. He did not appear to be thought disordered. His mood
appeared anxious and depressed. His affect was generally flat.
He admitted to having thoughts of suicide, but denied having any
plan or any intent to do so. There was no evidence of hallucina-

000008

tions, delusions, obsessions, or compulsions. He was alert and oriented times three, and his mini-mental was 30/30.

DIAGNOSES:      Axis I      Homosexual Pedophilia of the non-exclu-
                            sive type    ego dystontc
                            Adjustment Disorder with depressed and
                            anxious mood

                Axis II     None

                Axis III    History of hypertension, successfully
                            treated with medications

FORMULATION AND             Mr. Mullis has admitted to sexual in-
RECOMMENDATIONS:            teraction with his five year old adopted
                            son over approximately a seven month
period of time. These interactions included genital touch, and fellatio of the young boy. Mr. Mullis admits to sexual arousal while performing these sexual acts with his son. He said that during the time that he orally fellated his son he would mastur-bate to orgasm. Because of the admitted arousal and period of time Mr. Mullis was involved with his son, a tentative diagnosis of homosexual pedophilia has been given. The reported events matched the diagnostic criteria for such a diagnosis. However, we would recommend a penile plethysmography study to clarify the relative degree of arousal to prepubescent males. This is a test in which Mr. Mullis would observe, pictures of boys, girls, men and women while a strain gauge around his penis records the relative degree of erotic arousal present.

Mr. Mullis presents with no evidence of psychosis. There is no substance abuse history. Thus, these do not appear to have been contributory factors in his becoming sexually involved with his son. There was apparent marital discord during this period of time, particularly in relationship to sexuality. Mr. Mullis admitted to being devastated by his wife's lack of sexual inter-est in him, and certainly this may have been a contributing factor.

Additionally, the patient is quite depressed by these events. He has lost a job that was important to him and he is unclear about the status of his marriage. The patient admitted to having little support at the current time. Mr. Mullis is currently in treatment with ▮▮▮▮▮ in Harford County. This appears to be a positive therapeutic relationship and we would recommend that it continue. However, in addition to this treatment, we would recommend that Mr. Mullis enter specialized sex offender group treatment in a facility such as ours to help him better develop insight into what led to this sexual abuse, as well as a means of providing support through these difficult times. Mr. Mullis was quite depressed about the possibility of his marriage ending,

000009

and we would suggest that this become a therapeutic issue whereby
Mr. Mullis address whether to approach his wife about the pos-
sibility of reconciliation and the need for couples counseling if
this were mutually agreed upon. The above recommendations were
discussed with Mr. Mullis and with his attorney, ███████████████
si, and we are prepared to assist the patient in following up on
the recommendations.


KATE THOMAS, M.S., R.N.
Associate Director

*Fred Berlin*

FRED S. BERLIN, M.D., Ph.D.
Associate Professor, The Johns Hopkins University,
   School of Medicine
Founder, The Johns Hopkins Sexual Disorders Clinic
Director, National Institute for the Study,
   Prevention and Treatment of Sexual Trauma

FSB\mr

000010

Progress Report - Group
Dictated by Joseph Fuhrmaneck, MA, NCC, MCPC, PsA
Dated January 4, 2000

Patient:  Gary Mullis

Patient reports general status is adequately stable, secondary to economic limitation. Patient denies experiencing inappropriate sexual urges/cognitions. By report he remains controlled behaviorally.

Patient currently continues position with ████████████, which he plans to terminate February 1, 2000.  Gary plans to relocate with his wife in North Carolina, February 4, 2000.  Patient's probationary status closes February 3, 2000.

Patient plans to continue supportive pastoral counseling with Ed Afeld once he has relocated.  Patient will have this verified for our records.  This is supported.

Patient was pleased to report that contact with spouse is going well.  Gary and wife visited during the Thanksgiving, Christmas and New Year celebration.  He plans to vacation with wife for a two-week period in the near future.

Patient is quite hopeful about his relocation and reuniting with wife.  He is actively involved in evaluating various career/employment opportunities.  This is supported.

Patient expressed concern for father who, at 77 years-of-age, is exhibiting difficulty with balance and general health.  Patient remains in constant contact with father.

No other problems were presented.  Recommend that patient be discharged with compliance, effective January 4, 2000.

Dictated but not read if not signed.

000011

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis                TODAY'S DATE:  __12-28-99__

FREQUENCY OF ATTENDANCE:  QM               START DATE:  08/10/93
OFF WEEK?        (YES)      NO

EXCUSED?         YES        NO

REASON:_____

NOTES:    (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations,  and a description of the patient's participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   joseph FuhRManeck

000012

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis                    TODAY'S DATE:  _12·21·99_

FREQUENCY OF ATTENDANCE:  QM          START DATE:   08/10/93
OFF WEEK?        YES       NO

EXCUSED?        YES      · NO

REASON:_____

NOTES:    (Include   as   applicable:     sexual   behavior   –   appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _joseph Fuhrmaneck_____

000013

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis          TODAY'S DATE:  _12·14·99_

FREQUENCY OF ATTENDANCE:  QM          START DATE:  08/10/93
OFF WEEK?          (YES)   NO

EXCUSED?          YES    ·NO

REASON:_____

NOTES:    (Include  as  applicable:    sexual  behavior  –  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status  observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _joseph Fuhrmaneck_

000014

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis                    TODAY'S DATE:  _12·7·99_

FREQUENCY OF ATTENDANCE:  QM          START DATE:  08/10/93
OFF WEEK?      (YES)       NO

EXCUSED?       YES        ·NO

REASON:_____

NOTES:    (Include  as  applicable:    sexual  behavior  –  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status  observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _joseph FuhRManeck_

000015

## PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis              TODAY'S DATE:  _11-30-99_

FREQUENCY OF ATTENDANCE:  QM              START DATE:  08/10/93
OFF WEEK?        (YES)    NO

EXCUSED?       YES       NO

REASON: _____

NOTES:   (Include  as  applicable:   sexual  behavior  –  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _joseph Fuhrmaneck_____

000016

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis          TODAY'S DATE:  _11·23·99_

FREQUENCY OF ATTENDANCE:  QM          START DATE:  08/10/93
OFF WEEK?        (YES)     NO

EXCUSED?         YES       NO

REASON:_____

NOTES:    (Include  as  applicable:    sexual  behavior  –  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   joseph Fuhrmaneck

000017

Progress Note (Group)
Dictated by Joseph Fuhrmaneck, MA, NCC, LCPC, PsA
Dated November 16, 1999

Patient: Gary Mullis

Patient reports general status is adequately stable, secondary to limited contact with spouse, continued frustration with employment situation and limited economic resources. Patient denies experiencing inappropriate sexual urges/cognitions. By report he remains controlled behaviorally.

Patient continues position with ████████████, which is going fairly well. Gary continues to find limited peer support due to staffing irregularities and inconsistent administrative policies. Patient plans to terminate position with Mars Supermarket February 2000, at which point he will relocate with spouse to North Carolina.

Patient indicated that he declined the offer to transfer probation status to North Carolina as they required him to register in the Sex Offenders Bank for a 10-year duration. Patient will conclude Maryland probation contract February 3, 2000. This can be supported.

Patient expressed concern for father who recently relocated to North Carolina residing approximately 80 miles from Gary's spouse. The parent has family who reside in the community. Gary expressed concern for father, secondary to frail health and failing memory.

Patient finds it difficult to remain separate from spouse. However, he is looking for a way to normalize relationship by February of 2000.

Patient and wife will visit during the Thanksgiving and Christmas holiday season.

Patient plans to transfer treatment to a pastoral counselor with whom he has developed a relationship in Greensboro, North Carolina, February 2000. Recommend patient verify transfer of treatment for our records.

Recommend patient close treatment with center, effective January 4, 2000, as part of normal treatment process.

No other problems were presented. Will continue to follow case.

Dictated but not read if not signed.

000018

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis            TODAY'S DATE:  _11-9-99_

FREQUENCY OF ATTENDANCE:  OM           START DATE:  08/10/93
OFF WEEK?      YES      (NO)

EXCUSED?       (YES)      NO

REASON: _____Phone consult_____

NOTES:    (Include  as  applicable:    sexual  behavior  –  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.)

Pt is excused due
to illness. Tone
in 1 w.



FOR  Joe                          DATE 11-9-99  TIME ____  A.M. P.M.
Gary mullis
OF
PHONE _____          FAX _____
MESSAGE Does not feel well.
will attend groupnext
week

☐ TELEPHONED
☐ RETURNED YOUR CALL
☐ PLEASE CALL
☐ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU

SIGNED ____        E.Adams 1154

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   joseph FuhRMANeck

Page 111

000019

## PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis          TODAY'S DATE:  _11-2-99_

FREQUENCY OF ATTENDANCE:  QM          START DATE:  08/10/93
OFF WEEK?          (YES)    NO

EXCUSED?          YES       NO

REASON:_____

NOTES:    (Include  as  applicable:    sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  _joseph Fuhrmaneck_

000020

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

## PROGRESS NOTES

PATIENT'S NAME: Gary Mullis          TODAY'S DATE: _10·26·99_

FREQUENCY OF ATTENDANCE: QM          START DATE: 08/10/93
OFF WEEK?         (YES)    NO

EXCUSED?     YES      NO

REASON:_____

NOTES:    (Include as applicable:  sexual behavior - appropriate and
inappropriate, employment status, home situation, current stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000021

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis            TODAY'S DATE: _10·19·99_

FREQUENCY OF ATTENDANCE:  QM            START DATE:   08/10/93
OFF WEEK?        (YES)     NO

EXCUSED?         YES       NO

REASON:_____

NOTES:    (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  _joseph Fuhrmaneck_

000022

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis          TODAY'S DATE:  _10·12·99_

FREQUENCY OF ATTENDANCE:  QM         START DATE:   08/10/93
OFF WEEK?        (YES)       NO

EXCUSED?         YES         NO

REASON:_____

NOTES:    (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  _joseph Fuhrmaneck_

000023

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis                TODAY'S DATE:  _10·5·99_

FREQUENCY OF ATTENDANCE:  QM          START DATE:  08/10/93
OFF WEEK?         (YES)      NO

EXCUSED?        YES        NO

REASON:_____

NOTES:   (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions,  current legal concerns,  other significant mental
status observations,  and a  description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for  the  patients  on  an  ongoing  basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _Joseph Fuhrmaneck_

000024

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis            TODAY'S DATE: _7·28·99_

FREQUENCY OF ATTENDANCE:  QM          START DATE:  08/10/93
OFF WEEK?        (YES)      NO

EXCUSED?         YES        NO

REASON: _____

NOTES:    (Include  as  applicable:    sexual  behavior  –  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status  observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  _joseph Fuhrmaneck_____

000025

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME: Gary Mullis          TODAY'S DATE:  9·21·99

FREQUENCY OF ATTENDANCE: QM          START DATE:  08/10/93
OFF WEEK?      YES        NO

EXCUSED?       YES        NO

REASON:_____

NOTES:  (Include as applicable: sexual behavior – appropriate and
inappropriate, employment status, home situation, current stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  _joseph Fuhrmaneck_____

000026

Progress Note
September 14, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, LCPC, PsA

Patient:  Gary Mullis

Patient reports general status is adequately stable secondary to economic limitation, limited physical contact with spouse and uncertainty regarding interstate compact agreement. Patient denies experiencing inappropriate sexual urges/cognitions. By report he remains controlled behaviorally.

Patient continues position with ▮▮▮▮▮▮▮▮▮▮, which is going fairly well. Patient continues to report limited staffing and disagreement with company policy.

Patient reports communication with spouse is adequate secondary to geographic distance. Gary was pleased to report that spouse is doing quite well in position. He expressed element of concern secondary to hurricane status in North Carolina, which is where spouse is currently located.

Patient continues to report minor conflict with mother-in-law, with whom he currently resides. He is hopeful that the minor disagreement can be resolved in the near future.

Patient expressed apprehension regarding interstate compact with North Carolina. Patient hopes to receive feedback regarding same September 9, 1999. This can be supported.

Mental Status Examination:

Patient's general presentation was unremarkable except for element of fatigue and minor intermittent depression with anxiety specific to above noted stressors.

No other problems were presented. Will continue to follow case. Patient will be seen on a q o month basis effective immediately as part of normal treatment process.

Dictated but not read if not signed. The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000027

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis                TODAY'S DATE:  9·7·99

FREQUENCY OF ATTENDANCE:  QM        START DATE:  08/10/93
OFF WEEK?        (YES)        NO

EXCUSED?        YES        NO

REASON:_____

NOTES:     (Include   as   applicable:    sexual   behavior   -   appropriate   and
inappropriate,    employment    status,    home    situation,    current    stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   joseph Fuhrmaneck

000028

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME: Gary Mullis          TODAY'S DATE: _8·31·99_

FREQUENCY OF ATTENDANCE: QM          START DATE:  08/10/93
OFF WEEK?        (YES)    NO

EXCUSED?         YES      NO

REASON:_____

NOTES:   (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  _joseph Fuhrmaneck_____

000029

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis          TODAY'S DATE:  **8·24·99**

FREQUENCY OF ATTENDANCE:  QM          START DATE:  08/10/93
OFF WEEK?     (YES)      NO

EXCUSED?      YES        NO

REASON: _____

NOTES:    (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  joseph Fuhrmaneck

000030

Progress Note
August 17, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, LCPC, PsA

Patient:    Gary Mullis

Patient reports general status is adequately stable secondary to current employment situation, geographic separation from spouse, current probationary status and limited financial resources. Patient denies experiencing inappropriate sexual urges/cognitions. By report he remains controlled behaviorally.

Patient continues position with ███████████ which is going fairly well. Patient continues to report difficulty with staffing pattern and company policy inconsistencies. Patient continues to seek employment in North Carolina, which is where his wife is currently residing.

Patient indicates that the North Carolina Department of Parole and Probation has received documentation for his interstate contract transfer consideration. He is anxious to receive feed back on issue.

Patient and spouse communicate daily via telephone and e-mail medium. Patient and spouse visit one to two times per month currently. Gary hopes to visit with spouse this coming week. This is certainly supported.

Patient continues to struggle with issues of loneliness and depression (mild). Patient does present with element of fatigue. Gary indicates that he is attempting to maintain proper perspective. He indicates that he is currently only "minimally stressed."

Patient discussed apprehension regarding future employment/career opportunities given his legal/criminal history. Recommend patient remain focused on improving situation whenever possible.

Recommend patient decrease treatment frequency to a q o month basis as part of normal treatment process.

No other problems were presented. Will continue to follow case.

Patient denies experiencing inappropriate sexual urges/cognitions. By report he remains controlled behaviorally.

000031

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis          TODAY'S DATE:  **8·10·99**

FREQUENCY OF ATTENDANCE:  QM          START DATE:  08/10/93
OFF WEEK?          (YES)    NO

EXCUSED?          YES       NO

REASON:_____

NOTES:    (Include  as  applicable:   sexual  behavior  –  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations,  and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  _Joseph Fuhrmaneck_____

000032

## PROGRESS NOTES

PATIENT'S NAME: Gary Mullis          TODAY'S DATE: __8·3·99__

FREQUENCY OF ATTENDANCE: QM          START DATE: 08/10/93
OFF WEEK?        (YES)        NO

EXCUSED?        YES        NO

REASON:_____

NOTES:    (Include  as  applicable:    sexual  behavior  –  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _joseph Fuhrmaneck_

000033

Progress Note
July 27, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, LCPC, PsA

Patient:    Gary Mullis

Patient reports general status is adequately stable secondary to economic limitation, geographic separation from spouse, current probationary status and career/employment area. Patient denies experiencing inappropriate sexual urges/cogitions. By report he remains controlled behaviorally.

Patient continues position with ███████████, which is going fairly well. Patient finds the position difficult secondary to staffing limitations and administrative policy/procedures. He continues to seek employment locally as well as in the North Carolina region where wife has relocated. This is supported.

Patient continues to await decision on possible interstate transfer of probation. Gary is to complete probationary status February 3, 2000. This can be supported.

Patient and spouse are having difficulty with current geographic separation. The spouse visited last week. This is supported. Gary and wife communicate q p.m. via internet medium. This is quite helpful.

Patient expressed some frustration and stress with mother-in-law (77 years of age) who he described as "very critical, meddling and judgmental).

Mental Status Evaluation:

Patient is alert, oriented and coherent. He is not currently in a state of distress. Patient reports varied depression (5-10 on a 1-10 scale). Patient reports appetite is adequate. Sleep pattern varies secondary to employment cycle (10 p.m. – 6 a.m.).

Patient is not currently receptive to initiate psychopharmacological intervention. He was not presently viewed as an absolute necessity. We will closely continue to follow case.

It is suggested that patient's symptoms on par to a significant degree or situationally triggered.

No other problems were presented. Will continue to follow case.

Dictated but not read if not signed. The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000034

## PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis          TODAY'S DATE:  **7·20·79**

FREQUENCY OF ATTENDANCE:  QM       START DATE:   08/10/93
OFF WEEK?        (YES)      NO

EXCUSED?        YES       NO

REASON:_____

NOTES:    (Include  as  applicable:   sexual  behavior  –  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   joseph FuhRMANeck

000035

PROGRESS NOTES

PATIENT'S NAME:  Gary Mullis                    TODAY'S DATE:  _7.13.99_

FREQUENCY OF ATTENDANCE:  QM            START DATE:  08/10/93
OFF WEEK?        (YES)        NO

EXCUSED?        YES        NO

REASON:_____

NOTES:    (Include   as   applicable:   sexual   behavior  –  appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _joseph Fuhrmaneck_

000036

PROGRESS NOTES

PATIENT'S NAME: GARY Mullis

FREQUENCY OF ATTENDANCE: 9w

TODAY'S DATE: 7.6.99

START DATE:

OFF WEEK?     (YES)     NO

EXCUSED?     YES     NO

REASON: _____

NOTES: (Include as applicable: sexual behavior – appropriate and inappropriate, employment status, home situation, current stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST: Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: Joseph Fuhrmaneck

000037

Progress Note
June 29, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, LCPC, PsA

Patient: Gary Mullis

Patient reports general status is adequately stable secondary to current probationary
status, geographical distance from spouse and economic limitation. Patient denies
experiencing inappropriate sexual urges/cognitions. By report he remains controlled
behaviorally.

Patient continues position with ████████████, which remains consistently
disappointing secondary to administrative policy and staffing problems. Patient
continues to evaluate possible opportunities in North Carolina, which is where his wife
relocated to continue her post.

Patient was sad and frustrated to report that the Maryland judge would not agree to close
probationary status. Patient is currently awaiting response from North Carolina regarding
possible transfer of probation to that jurisdiction.

Patient will continue treatment at this center on a q monthly frequency until August 1999,
at which point he will decrease frequency to a q o month contact until closure of
probation February 2000. At that time patient will relocate to North Carolina where he
will continue with supportive psychotherapy sessions.

Patient reports contact with spouse is supportive where the couple communicate on a q
daily frequency via e-mail format. This is most certainly supported.

Patient reports mild depression and frustration secondary to current situation and
separation from spouse, indicating "I am lonely." Fortunately patient's current separation
from spouse has not triggered inappropriate sexual material.

No other problems were presented. Will continue to follow case.

Dictated but not read if not signed. The attending physician was available and continues
to provide supervision for the patients on an ongoing basis.

000038

ME: Gary Mullis

ATTENDANCE:

TE: 6.22.99

L:    YES    (NO)

        NO

(YES)  Phase Consult

(Include as applicable: sexual behavior - appropriate and
opriate, employment status, home situation, current stresses,
aints and resolutions, current legal concerns, other significant mental
s observations, and a description of the patient's participation in
or individual therapy.):

1. is excused due
schedule confusion.
To see in IND.



PHONE CALL

DATE 6/22/99   TIME _____ AM

FOR _____ DE
M _____ Gary mullis
OF _____ ████████████████
PHONE _____ AREA CODE _____ EXTENSION
FAX # _____ He cannot att...
MESSAGE _____ grup tonight. He will
_____ call you to discuss this
_____

TELEPHONED
RETURNED YOUR CALL
PLEASE CALL
WILL CALL AGAIN
CAME TO SEE YOU
WANTS TO SEE YOU

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  Joseph Fuhrmaneck

June 22, 1999

Dr. Berlin,

Gary Mullis called. He said that he went before Judge Carr, who said that he would only release him from probation if, when he gets to North Carolina, he voluntarily registers as a sex offender. Mr. Mullis is not going to do this. He said that he is not required to do so, and if he does register, he would have to do this every year for 10 years. He only has 8 months of probation left.

His probation officer is now trying to have his probation transferred to North Carolina.

He would like to discuss this with you.

Denise

*06*

*Copy: SCE*

┌─────────────────────────────────────────┐
│                    ( PHONE CALL )        │
│ FOR  DR. BERLIN          DATE 6-22-99 TIME ____ A.M. / P.M. │
│ M  GARY Mullis                           │
│ OF _____          | TELEPHONED          │
│ PHONE _____[redacted]_____ | RETURNED YOUR CALL  │
│       AREA CODE  NUMBER  EXTENSION | PLEASE CALL  ✓ │
│ FAX # _____         | WILL CALL AGAIN     │
│ MESSAGE _____         | CAME TO SEE YOU     │
│                              | WANTS TO SEE YOU    │
└─────────────────────────────────────────┘

000040

Progress Note
May 25, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, LCPC, PsA

Patient:    Gary Mullis

Patient reports general status is at best adequately stable secondary to economic limitation, uncertainty regarding career/employment area, wife's pending location to North Carolina and unresolved probation status with the state of Maryland. Patient denies experiencing inappropriate sexual urges/cognitions. By report he remains controlled behaviorally.

Patient continues position with [redacted]. The post remains difficult secondary to company policy and staffing patterns.

Patient expressed noted anxiety as he awaits the court's decision to discontinue probation with the state of Maryland. Gary indicates that his probation officer is in favor of same. This can be supported with continued psychotherapy.

Patient is quite concerned as his wife is due to relocate to North Carolina on June 1, 1999, as requirement of her current employer [redacted] Mr. Mullis had hoped to relocate with spouse on June 1, 1999. At this time he hopes this can be accomplished by mid June 1999.

Unfortunately patient has not been able to secure employment in the North Carolina sector. This remains a very stressful situation for both Gary and his spouse. His response to same appears within acceptable perimeters.

We evaluated patient's level of insecurity and dependency within marital relationship. Patient's wife also appears to be quite insecure as this is her first marriage. This will also mark the first time that Gary and spouse have been separated since their marriage.

Should patient receive approval to discontinue probation he will relocate to North Carolina as soon as possible where he will join spouse. At that time he will continue per his agreement with this center individual psychotherapy for support and guidance. If patient's probation agreement is not rescinded he will continue treatment with this center on a q monthly frequency until such time he is able to transfer with wife.

No other problems were presented. Will continue to follow case. Patient will be seen in four weeks for routine supportive treatment contact should he not relocate to North Carolina. He will inform this center should he receive approval to discontinue probation and relocate.

Dictated but not read if not signed. The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000041

PROGRESS NOTES

PATIENT'S NAME:  Mullis, Gary          TODAY'S DATE:  __5·18·99__

FREQUENCY OF ATTENDANCE:  qm          START DATE:  08/10/93

OFF WEEK?        (YES)      NO

EXCUSED?        YES      NO

REASON:_____

NOTES:    (Include as applicable:    sexual behavior - appropriate and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations,  and a description of  the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   __Joseph Fuhrmaneck__

000042

## PROGRESS NOTES

PATIENT'S NAME:  Mullis, Gary          TODAY'S DATE:  __5·11·99__

FREQUENCY OF ATTENDANCE:  qm          START DATE:  08/10/93

OFF WEEK?     (YES)     NO

EXCUSED?     YES     NO

REASON:_____

NOTES:    (Include as applicable:    sexual behavior - appropriate and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations,  and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _Joseph Fuhrmaneck_

000043

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

## PROGRESS NOTES

PATIENT'S NAME:  Mullis, Gary          TODAY'S DATE: __5·4·99__

FREQUENCY OF ATTENDANCE:  qm          START DATE:  08/10/93

OFF WEEK?          (YES)          NO

EXCUSED?          YES          NO

REASON:_____

NOTES:     (Include as applicable:    sexual behavior  -  appropriate and inappropriate,   employment   status,   home   situation,   current   stresses, complaints and resolutions, current legal concerns, other significant mental status observations,  and a description of the patient's participation in group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   ___Joseph Fuhrmaneck___

000044

Progress Note
April 27, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, LCPC, PsA

Patient:   Gary Mullis

Patient reports general status is at best adequately stable secondary to anxiety associated with possible pending relocation to North Carolina, limited employment opportunities and economic limitation.   Patient denies experiencing inappropriate sexual urges/cognitions.   By report he remains controlled behaviorally.

Patient continues employment with ████████████████████ which is going fairly well. Patient continues to report ongoing difficulty with staffing and management policy issues.   He continues to evaluate possible alternative career/employment opportunities with focus on relocating to North Carolina.

Patient reports contact with spouse is supportive with adequate communication pattern.   The spouse has been informed that she must relocate to North Carolina in order to maintain current position June 1, 1999.   This is quite stressful for patient and spouse as he quite naturally hopes to relocate to North Carolina on or about that date.

Patient has consulted with probation officer, who is in the process of considering several options to include early termination of probationary contract or transferring case to North Carolina.   As of June 1999 Gary will have eight months remaining on current probationary period of five years. This writer could support early termination of probationary status with the stipulation patient continue supportive individual or group psychotherapy with specialist in North Carolina.

Patient expressed frustration, fearfulness and apprehension regarding current status with desire to "live an upstanding, healthy, appropriate life and begin again."   This certainly be supported.

Patient will continue current treatment with center on a q monthly frequency until relocating to North Carolina June 1999.   At that time case will be transferred to therapist for continued supportive contact.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000045

## PROGRESS NOTES

PATIENT'S NAME: Mullis, Gary               TODAY'S DATE: _4-20-99_

FREQUENCY OF ATTENDANCE: qm               START DATE: 08/10/93

OFF WEEK?        (YES)        NO

EXCUSED?        YES        NO

REASON:_____

NOTES:    (Include as applicable:    sexual behavior - appropriate and
inappropriate, employment status, home situation, current stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   _Joseph Fuhrmaneck_

000046

PROGRESS NOTES

PATIENT'S NAME:  Mullis, Gary        TODAY'S DATE: ___4.13.99___

FREQUENCY OF ATTENDANCE:  qm          START DATE:  08/10/93

OFF WEEK?     (YES)     .NO

EXCUSED?      YES      NO

REASON:_____

NOTES:    (Include as applicable:   sexual behavior - appropriate and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  ___Joseph Fuhrmaneck___

000047

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME: Mullis, Gary       TODAY'S DATE: __4·6·99__

FREQUENCY OF ATTENDANCE: qm        START DATE: 08/10/93

OFF WEEK?    (YES)    NO

EXCUSED?     YES     NO

REASON:_____

NOTES:    (Include as applicable:   sexual behavior - appropriate and
inappropriate, employment status, home situation, current stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  _Joseph Fuhrmaneck_

Page 140

000048

Progress Note
March 30, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, LCPC, PsA

Patient:    Gary Mullis

Patient reports general status is at best adequately stable secondary to economic limitation, concern for spouse's career stability and uncertainty regarding his potential career options given criminal history. Patient denies experiencing inappropriate sexual urges/cognitions. By report he remains controlled behaviorally.

Patient continues position with ████████████, which remains problematic secondary to staffing and policy inconsistencies. Patient continues to seek career/employment opportunities beyond company with nil success. This is quite frustrating and humiliating for patient. Recommend he remain focused on process.

Patient expressed concern for spouse who is in the process of relocation in career/employment area (North Carolina) effective June 1, 1999. The wife's company has been vague in formalizing her contract, which has created tension and anxiety. Both parties are concerned that patient will not receive approval to transfer probation to North Carolina and that he may continue to have difficulty securing adequate employment. Patient completes probation February 2000.

Patient and spouse have been married approximately one year. The relationship has endured several significant stressors to include wife's fragile gynecological status. Both Gary and spouse present with dependent characteristics as well as insecurity. They both remain committed relationship. However, this is quite a difficulty "honeymoon period."

Patient presents with element of depression and certainly frustration. He is goal oriented and remains focused on improving situation. This is supported.

No other problems were presented. Will continue to follow case.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000049

## PROGRESS NOTES

PATIENT'S NAME:   Mullis, Gary          TODAY'S DATE: ___3.23.99___

FREQUENCY OF ATTENDANCE:   qm          START DATE:   08/10/93

OFF WEEK?        (YES)       NO

EXCUSED?         YES         NO

REASON:_____

NOTES:    (Include as applicable:    sexual behavior - appropriate and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:   ___Joseph Fuhrmaneck___

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  Mullis, Gary            TODAY'S DATE: __3·16·99__

FREQUENCY OF ATTENDANCE:  qm            START DATE:  08/10/93

OFF WEEK?        (YES)        NO

EXCUSED?         YES          NO

REASON: _____

NOTES:    (Include as applicable:    sexual behavior - appropriate and
inappropriate, employment status, home situation, current stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE: __Joseph Fuhrmaneck__

Page 143

000051

PROGRESS NOTES

PATIENT'S NAME:  Mullis, Gary          TODAY'S DATE:  3-9-99

FREQUENCY OF ATTENDANCE:  qm          START DATE:  08/10/93

OFF WEEK?    (YES)    NO

EXCUSED?    YES    NO

REASON:_____

NOTES:    (Include as applicable:    sexual behavior - appropriate and inappropriate, employment status, home situation, current stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, LCPC, PsA

SIGNATURE:  ___Joseph Fuhrmaneck_____

000052

Progress Note
March 2, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, LCPC, PsA

Patient:    Gary Mullis

Patient reports general status is adequately stable secondary to economic limitation, career/employment stress, concern for wife's medical status and concern for his son. Patient denies experiencing inappropriate sexual urges/cognitions. By report he remains controlled behaviorally.

Patient continues position with ████████████, which is going fairly well. Patient continues to experience difficulty secondary to staffing issues and administrative policies. He continues to evaluate various career/employment opportunities, i.e., ████████████████

Contact with spouse is supportive and healthy. There is an element of anxiety as the wife's position with United Healthcare is coming to a close effective August 1, 1999. The United Healthcare group is transferring point of service to Greensboro, North Carolina. Patient's wife will most likely relocate to that area as she has invested several years in this company.

This may place Mr. Mullis in a somewhat stressful situation as he currently remains on probationary status until February 3, 2000. Patient plans to attempt transferring probationary status from Maryland to North Carolina should wife be accepted for this transfer position.

Patient also expressed concern for wife's medical status. She continues to complain of gynecological difficulties. The wife remains under doctor's care. This is supported.

Patient also expressed concern for his adopted son/victim, with whom he has no contact. This remains quite difficult for Gary.

Patient reported intermittent depression secondary to above noted issues. Medication is not seen as absolutely necessary at this time. Patient would also, "rather handle situation without relying upon medication."

No other problems were presented. Will continue to follow case.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000053

PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: __2·23·91__          START DATE: «start»

OFF WEEK?   (YES)   NO

EXCUSED?   YES   NO

REASON: _____

NOTES:   (Include  as  applicable:   sexual  behavior  –  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints  and  resolutions,  current  legal  concerns,  other  significant  mental
status  observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000054

PROGRESS NOTES

PATIENT'S NAME:   MULLIS, GARY

FREQUENCY OF ATTENDANCE:  QM

TODAY'S DATE:    _2·16·99_          START DATE:   «start»

OFF WEEK?    (YES)    NO

EXCUSED?     YES     NO

REASON: _____

NOTES:   (Include as applicable:  sexual behavior - appropriate and inappropriate, employment status, home situation, current stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   _Joseph Fuhrmaneck_

000055

PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: __2.9.99__                    START DATE: «start»

OFF WEEK?        (YES)        NO

EXCUSED?         YES          NO

REASON: _____

NOTES:    (Include   as   applicable:   sexual   behavior   -   appropriate   and inappropriate,   employment   status,   home   situation,   current   stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _Joseph Fuhrmaneck_

000056

Progress Note
February 2, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient:    Gary Mullis

Patient reports general status is adequately stable secondary to continued career/employment stress/dissatisfaction, economic limitations, concern regarding wife's medical status and concern for son's welfare.  Patient denies experiencing inappropriate sexual urges/cognitions.  By report he remains controlled behaviorally.

Patient continues position with ████████████, which remains stressful secondary to policy and staffing concerns.    Gary has not proactively evaluated possible career/employment opportunities since last seen.  AMA.  He is, however, in the process of rewriting resume.  This is supported.

Patient reports that he and wife are doing fairly well secondary to employment schedule conflicts and limited economic resources.  Patient continues to express concern for wife's medical status specific to gynecological issues.  He remains supportive.

Communication pattern within marriage is seen as adequate.    Intimacy is seen as mutually satisfactory.   The couple have not engaged in sexual relations secondary to above noted difficulties.

Patient continued to express concern for the welfare of his son.  Gary has had no word on son's status for a three month period.   This remains a very difficult and stressful situation for this individual.  Patient's concern for child appeared genuine and healthy.

Patient was pleased to report that his probation will hopefully be terminated February 2000.  This can be supported.  Patient does report mild depression with associated fatigue.  At present, patient does not feel that medication is warranted.  He appears to be functioning adequately.  Will continue to closely monitor case.

No other problems were presented.  To see patient in four weeks for routine treatment contact.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000057

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:   MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: ___1·26·99___          START DATE:   «start»

OFF WEEK?      (YES)      NO

EXCUSED?        YES       NO

REASON: _____

NOTES:   (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000058

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: ___1·19·99___          START DATE:  «start»

OFF WEEK?      (YES)      NO

EXCUSED?        YES        NO

REASON: _____

NOTES:   (Include  as  applicable:    sexual  behavior  -  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000059

## PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: ___1·12·99___          START DATE:  «start»

OFF WEEK?        (YES)        NO

EXCUSED?          YES          NO

REASON: _____

NOTES:   (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations,  and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000060

Progress Note
January 5, 1999, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient:    Gary Mullis

Patient reports general status is adequately stable secondary to economic limitation, concern for wife's medical and emotional well-being and employment disappointment.    Patient denies experiencing inappropriate sexual urges/cognitions.  By report he remains controlled behaviorally.

Patient continues position with ▮▮▮▮▮▮▮▮▮ which remains quite difficult and frustrating secondary to company policy and limited staff support.  Patient continues to evaluate various employment opportunities and will contact an employment agency to assist with same in the near future.  This is supported.

Patient expressed concern for spouse who presents with post surgery bleeding and cramping. Gary also indicates that wife "is often very moody and cries regularly."  It is patient's belief that wife may require a hysterectomy, however, fears procedure secondary to familial pattern of cancer.  Recommend patient consult ▮▮▮▮▮▮▮▮▮▮▮▮

No other problems were presented.  Will continue to follow case.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000061

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____12·29·98_____        START DATE:  «start»

OFF WEEK?    (YES)    NO

EXCUSED?    YES    NO

REASON: _____

NOTES:   (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _____Joseph Fuhrmaneck_____

000062

## PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _12·22·98_          START DATE:  «start»

OFF WEEK?     (YES)      NO

EXCUSED?      YES        NO

REASON: _____

NOTES:   (Include  as  applicable:   sexual  behavior  –  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000063

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE:  QM

TODAY'S DATE:  _8-12-15 98_          START DATE:  «start»

OFF WEEK?     (YES)     NO

EXCUSED?      YES      NO

REASON: _____

NOTES:   (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status  observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   _Joseph Fuhrmaneck_

000064

## PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____12345_____          START DATE:  «start»

OFF WEEK?        (YES)        NO

EXCUSED?         YES          NO

REASON: _____

NOTES:   (Include  as  applicable:   sexual  behavior  –  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _____Joseph Fuhrmaneck_____

000065

Progress Note
December 1, 1998, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient:  Gary Mullis

Patient reports general status is adequately stable secondary to frustration and depression associated with current career/employment situation as well as concern for wife's medical status. Patient denies experiencing inappropriate sexual urges/cognitions. He remains controlled by report behaviorally.

Patient continues employment with ▇▇▇▇▇▇▇▇, which remains far from satisfactory. The company appears to maintain less than adequate staff to man facility, which places increased demands upon current employees.

Patient indicates that he continues to forward resumes to various companies without benefit. This remains a primary focus of frustration and depression. Gary is quite pessimistic regarding his future career options secondary to prior criminal/sexual history. Recommend patient consider securing the assistance of an employment agency.

Patient indicates that he and spouse are doing "fine." By report verbal communication pattern is quite adequate as is level of physical/nurtural intimacy. This is absolutely supported.

Patient expressed concern for wife's medical status as she continues to present with excessive vaginal bleeding and cramping. She will consult with M.D. within the next week. Patient suggested that spouse may require surgical intervention (hysterectomy), which certainly may be the case. Patient remains supportive and empathic.

Recommend patient continue to monitor level of frustration and depression during the next four week period. Should depression not abate will recommend course of anti-depressant medication.

No other problems were presented. Will continue to follow case.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000066

PROGRESS NOTES

PATIENT'S NAME:   MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE:  ___11-24-98___          START DATE:   «start»

OFF WEEK?        (YES)        NO

EXCUSED?         YES          NO

REASON: _____

NOTES:   (Include   as   applicable:   sexual   behavior  -  appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   ___Joseph Fuhrmaneck___

000067

Progress Note
November 3, 1998, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient:    Gary Mullis

Patient reports general status is adequately stable secondary to recent death of parent, economic limitations and limited time with spouse. Patient denies experiencing inappropriate sexual urges/cognitions. By report, he remains controlled behaviorally.

Patient continues employment with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Gary remains dissatisfied with post in part due to administrative and company policies. He continues to seek new employment opportunities without benefit. This is quite frustrating and fatiguing for patient. Recommend he maintain proper perspective regarding issue.

Patient was sad to report that his biological mother died October 17, 1998, at 69 years of age secondary to cardiac failure. The parent was positive for a history of ETOH abuse and nicotine abuse. Gary had not had physical contact with parent since 1987. Patient did attend funeral, finding a sense of closure with process. This is supported.

Patient indicates that his father is adjusting well to the loss of prior spouse as they had been divorced some 30 years.

Patient was pleased to report that his wife is healing well post recent surgery procedure. Patient was sad to report that they have limited time together (Friday evenings) secondary to employment schedule conflicts. In addition, Gary and wife are experiencing increased stress as they are caring for mother-in-law, who has recently been ill.

No other problems were presented. Will continue to follow case.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000068

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____10/17/98_____          START DATE:  «start»

OFF WEEK?     (YES)     NO

EXCUSED?     YES     NO

REASON: _____

NOTES:   (Include as applicable:  sexual behavior — appropriate and
inappropriate, employment status, home situation, current stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _____Joseph Fuhrmaneck_____

000069

PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _10·10·98_          START DATE: «start»

OFF WEEK?      (YES)      NO

EXCUSED?       YES       NO

REASON: _____

NOTES:    (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status  observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _____Joseph Fuhrmaneck_____

000070

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____10·27·98_____          START DATE:  «start»

OFF WEEK?        (YES)        NO

EXCUSED?      · YES        NO

REASON: _____

NOTES:     (Include  as  applicable:    sexual  behavior  –  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   _Joseph Fuhrmaneck_____

000071

## PROGRESS NOTES

PATIENT'S NAME:   MULLIS, GARY

FREQUENCY OF ATTENDANCE:  QM

TODAY'S DATE: _____10/20/98_____          START DATE:  «start»

OFF WEEK?     (YES)     NO

EXCUSED?      / YES      NO

REASON: _____

NOTES:   (Include as applicable:   sexual behavior – appropriate and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   Joseph Fuhrmaneck

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____10·13·98_____          START DATE:  «start»

OFF WEEK?     (YES)        NO

EXCUSED?      · YES        NO

REASON:_____

NOTES:    (Include  as  applicable:   sexual  behavior  –  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status  observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  _Joseph Fuhrmaneck_____

000073

Progress Note
October 6, 1998, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient:   Gary Mullis

Patient reports general status is adequately stable secondary to career/employment concern, financial limitation and concern regarding son's welfare.   Patient denies experiencing inappropriate sexual urges/cognitions.  By report he remains controlled behaviorally.

Patient continues employment with ████████████ which is going fairly well.  Mr. Mullis expressed noted frustration with element of depression associated with employment search activity during the last five year period.  He continues to place, by report, applications for various positions without benefit.  Recommend patient widen scope for possible career/employment options, i.e., Baltimore County Department of Unemployment Services/Job Training Function.

Patient was pleased to report that his wife's recent gynecological surgery went well as she continues to recover from experience.  This is certainly hopeful.

Patient expressed frustration as he and spouse have extremely limited time together (Friday evenings), secondary to their respective employment schedules.  Recommend patient attempt to improve level of contact with spouse as soon as possible.

Patient expressed concern for son with whom he has had no contact for quite some time.  His last face to face contact with child was during his first and only shared treatment contact with the boy.  Gary was quite surprised that the child's mother sent his spouse a letter outlining the boy's recent accomplishments and general status, indicating "he was doing well."

No other problems were presented.  Will continue to follow case.


Dictated but not read if not signed.


The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000074

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:   MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____9·29·98_____          START DATE:   «start»

OFF WEEK?        (YES)        NO

EXCUSED?        · YES         NO

REASON: _____

NOTES:    (Include  as  applicable:   sexual  behavior  -  appropriate  and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status  observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   _Joseph Fuhrmaneck_____

000075

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:   MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____9·22·98_____        START DATE:  «start»

OFF WEEK?      (YES)      NO

EXCUSED?      · YES      NO

REASON:_____

NOTES:    (Include  as  applicable:    sexual  behavior  −  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions,  current legal concerns,  other significant mental
status observations,  and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   ___Joseph Fuhrmaneck___

Page 168

000076

## PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____9.15.98_____          START DATE:  «start»

OFF WEEK?      (YES)      NO

EXCUSED?      · YES      NO

REASON: _____

NOTES:    (Include as applicable:    sexual behavior  −  appropriate and inappropriate,  employment  status,  home  situation,  current  stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _____Joseph Fuhrmaneck_____

000077

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____9.8.98_____        START DATE: «start»

OFF WEEK?        (YES)        NO

EXCUSED?        · YES        NO

REASON:_____

NOTES:    (Include   as   applicable:   sexual   behavior   –   appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   _____Joseph Fuhrmaneck_____

000078

Progress Note
September 1, 1998, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient:   Gary Mullis

Patient reports general status is adequately stable secondary to economic and employment issues, as well as concern for wife's medical status.  Patient denies experiencing inappropriate sexual urges/cognitions.  By report he remains controlled behaviorally.

Patient continues employment with the ███████████████████, which remains demanding and frustrating secondary to staffing and policy inconsistencies.  Patient continues to evaluate various employment opportunities with little success.  Gary recently placed applications with the ██████████████████ ██ ███████.  The search for an appropriate career/employment placement has been a primary frustration during the past five year period for this individual.  Recommend he continue to evaluate employment opportunities as they arise.

Patient expressed concern for wife who will receive gynecological surgery September 18, 1998.  Patient's wife continues to present with anxiety and apprehension regarding her first surgical experience.  The wife will consult with surgeon in the near future, which is absolutely supported.

Patient reports an increase in depression during the last two week period, feeling at times "overwhelmed."  We evaluated the various situational stressors to include financial limitation which impact negatively upon patient and marital situation.  Recommend patient maintain realistic perspective and remain focused on proactively addressing concerns.  It was further recommended that patient continue to monitor level of depression during the next four week period and should situation persist we may wish to visit the possibility of prescribing an anti-depressant agent.

No other problems were presented.  Will continue to follow case.

Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000079

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____8·25·98_____       START DATE:  «start»

OFF WEEK?    (YES)      NO

EXCUSED?     YES      NO

REASON: _____

NOTES:   (Include as applicable:  sexual behavior - appropriate and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions,  current legal concerns,  other significant mental
status observations,  and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  _Joseph Fuhrmaneck_____

000080

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____8.18.98_____          START DATE:  «start»

OFF WEEK?      (YES)      NO

EXCUSED?       YES       NO

REASON: _____

NOTES:    (Include as applicable:  sexual behavior - appropriate and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   Joseph Fuhrmaneck

000081

## PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____8·11·98_____     START DATE:  «start»

OFF WEEK?     (YES)      NO

EXCUSED?      YES        NO

REASON:_____

NOTES:    (Include  as  applicable:   sexual  behavior  –  appropriate  and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions,  current legal concerns,  other significant mental
status  observations,   and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  _Joseph Fuhrmaneck_____

Progress Note
August 4, 1998, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient:   Gary Mullis

Patient reports general status is adequately stable secondary to ongoing employment demands, economic stress and concern for spouse's medical status.   Patient denies experiencing inappropriate sexual urges/cognitions.   Patient by report remains controlled and appropriate behaviorally.

Patient continues employment with ████████████, which remains quite demanding and stressful secondary to staffing problems and incompatible management styles.   Mr. Mullis continues to evaluate various employment/career opportunities with thus far limited success.   The process appears frustrating and somewhat demoralizing.   Recommend patient remain focused on proactively seeking a career transition.

Patient expressed concern for spouse who has experienced excessive vaginal bleeding secondary to piles on uterine tissue.   Patient's wife has a planned surgical date of September 18, 1998, for the removal of piles, as well as a D&C procedure.   The spouse is quite anxious and fearful regarding her first major surgery.   The medical status of spouse, as well as her exacerbated fear regarding surgery, has triggered anxiety for patient and partner.   Gary remains supportive and empathic.   Recommend spouse consult physician regarding her anxiety and fear concerning procedure.

Patient further expressed concern regarding financial stress, which he and spouse currently face.

Patient reviewed growth process secondary to involvement in psychotherapy during the last several years.   Insight is seen as improved.   Judgment viewed as intact.

No other problems were presented.   Will continue to follow case.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000083

## PROGRESS NOTES

PATIENT'S NAME:   MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: ___7·28·98___          START DATE:   «start»

OFF WEEK?      (YES)      NO

EXCUSED?       YES        NO

REASON: _____

NOTES:    (Include   as   applicable:   sexual   behavior   –   appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000084

## PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: ___7.21.98___         START DATE:  «start»

OFF WEEK?    (YES)    NO

EXCUSED?     YES     NO

REASON:_____

NOTES:    (Include   as   applicable:    sexual   behavior  -  appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations,  and  a  description  of  the  patient's  participation  in
group or individual therapy.):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  ___Joseph Fuhrmaneck___

000085

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____7.14.98_____     START DATE:  «start»

OFF WEEK?     (YES)     NO

EXCUSED?       YES      NO

REASON: _____

NOTES:    (Include   as   applicable:    sexual   behavior  -  appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000086

Progress Note
July 7, 1998, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient: Gary Mullis

Patient reports general status is adequately stable secondary to employment and economic issues as well as concern for wife's physical health. Patient denies experiencing inappropriate sexual urges/cognitions. He remains controlled behaviorally.

Patient continues employment with ██████████████, which is going fairly well. Gary continues to struggle with limited staff assistance and less than ideal administrative support. Patient indicates that he continues to evaluate various employment opportunities. This is absolutely supported.

Patient expressed noted concern for spouse who has experienced menopausal symptoms to include excessive blood loss. Patient's wife will receive D&C in the near future.

Patient is attempting to be supportive and empathic during this very difficult transition for spouse. Recommend patient monitor communication style as he has in the past tended to emotionally distance self by performing parental and/or authority role in stressful situations. Recommend patient not focus on controlling scenario, however, and to emphasize with spouse the issue of resolving situational transition as a partnership and team.

Patient was pleased to report that he and wife generally are doing quite well and that he is quite pleased with relationship. The couple do struggle economically as they begin their marital life together. Patient's wife is attempting to balance professional and personal life areas, which remains a challenge. It appears by report that she is certainly prepared for same. This is hopeful.

No other problems were presented. Will continue to follow case.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000087

Progress Note
June 30, 1998, Group Session
Dictated by Joe Fuhrmaneck, MA, NCC, CPC, PsA

Patient: Gary Mullis

Patient was not seen this session as this is his routine week for excused absence. He will be seen in one week.

Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000088

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

## PROGRESS NOTE

PATIENT'S NAME: _Gary Mullis_          TODAY'S DATE: _6/30/98_

OFF WEEK?    (YES)    NO

EXCUSED?    YES    NO

REASON: _____

NOTES:    (Include as applicable:  sexual behavior - appropriate and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations,  and a description of  the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST'S SIGNATURE: _____

000089

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: ___6 23 ·98___          START DATE:  «start»

OFF WEEK?     (YES)     NO

EXCUSED?      YES      NO

REASON:_____

NOTES:   (Include as applicable:  sexual behavior – appropriate and inappropriate, employment status, home situation, current stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000090

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____6.16.98_____          START DATE:  «start»

OFF WEEK?       (YES)       NO

EXCUSED?        YES         NO

REASON: _____

NOTES:    (Include as applicable:  sexual behavior - appropriate and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _____Joseph Fuhrmaneck_____

000091

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _6.9.98_          START DATE:  «start»

OFF WEEK?        (YES)      NO

EXCUSED?         YES        NO

REASON: _____

NOTES:    (Include as applicable:   sexual behavior - appropriate and
inappropriate, employment status, home situation, current stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000092

Progress Note
June 2, 1998, Group Session
Dictated by Joe Fuhrmaneck

Patient: Gary Mullis

Patient reports general status is adequately stable secondary to employment concern, economic stress, anxiety associated with wife's medical status, and apprehension regarding forthcoming discussion with probation officer regarding possible registration with the Maryland Sex Offender Registry. Patient denies experiencing inappropriate sexual urges/cognitions.

Patient continues employment with ███████████, which is going fair at best. Patient continues to evaluate various local dispatching possibilities beyond the law enforcement arena. This can be supported.

Patient indicates that he and wife are experiencing noted financial strain as they begin their marital life together. This is quite difficult for both parties. However, patient is concerned that his wife tends to be self-critical. Patient is attempting to be supportive and loving. This is certainly supported. Recommend patient and wife consult pastor for counseling regarding current situation.

Patient reports concern and anxiety associated with wife's medical status. She is currently consulting with OB/GYN regarding excessive bleeding and pain on a qod frequency. In addition, patient is concerned regarding his medical status as he is consulting urologist regarding prostate difficulty. There is a mild element of depression regarding above situational stressors.

No other problems were presented. Will continue to follow case.


Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000093

NATIONAL INSTITUTE
FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: ___5.26.98___         START DATE: «start»

OFF WEEK?    (YES)     NO

EXCUSED?      YES       NO

REASON: _____

NOTES:    (Include as applicable: sexual behavior — appropriate and inappropriate, employment status, home situation, current stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  ___Joseph Fuhrmaneck___

000094

PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____5.19.98_____          START DATE: «start»

OFF WEEK?     (YES)     NO

EXCUSED?      YES       NO

REASON: _____

NOTES: (Include as applicable: sexual behavior – appropriate and inappropriate, employment status, home situation, current stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST: Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: ___Joseph Fuhrmaneck___

000095

PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____5·12·98_____          START DATE: «start»

OFF WEEK?          (YES)     NO

EXCUSED?          YES     NO

REASON: _____

NOTES:     (Include   as   applicable:   sexual   behavior   –   appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status   observations,   and   a   description   of   the   patient's   participation   in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:   Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:   _Joseph Fuhrmaneck_____

000096

Progress Note
May 5, 1998, Group Session
Dictated by Joe Fuhrmaneck

Patient: Gary Mullis

Patient reports general status is adequately stable secondary to employment stress, economic demands and potential health problems. Patient denies experiencing inappropriate sexual urges/cognitions.

Patient continues employment with ███████████, reporting increased anxiety and tension secondary to a critical supervisor. Patient continues to evaluate various employment/career options, which is supported, i.e., ███████████.

Patient reports contact with spouse is positive and healthy. Gary is aware of the initial adjustments, as they begin marital relationship. He is attempting to exhibit patience, empathy and support. This is supported.

Patient expressed anxiety associated with recent diagnosis of an enlarged prostate. He will consult physician regarding issue in the near future. This is absolutely supported.

Patient's primary focus is to, "rebuild life," with emphasis on normalization process. This is supported.

No other problems were presented. Will continue to follow case.

Dictated but not read if not signed.

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

000097

Progress Note
Group Therapy Session
4/28/98
Patient:  Gary Mullis

Dictated by Joseph Fuhrmaneck, M.A., NCC, CPC. PsA.

Patient reports general status is adequately stable secondary
to economic, employment concerns, amd mild apprehension regarding
father's limited capacity to walk without discomfort.  Patient
denies experiencing inappropriate sexual urges/cognitions.

Patient continues employment with ███████████, however,
indicates that he is in the process of proactively seeking a
more appropriate position.  This is supported.

Patient indicates that he may move to North Carolina in the
next two year period as he has a strong family base of support
in the Charlotte area.  This can be supported.

Patient was quite pleased to report that he was recently married
and appears to be adjusting quite well to new life style.

This writer had the pleasure of attending the Mullis ceremony
where I met with the bride and her parents.  They were quite
pleased about the marriage and very grateful for the continued
assistance and support patient has received from this center.

Patient expressed concern for father who is having some
difficulty with mobility secondary to leg discomfort.  Patient
continues to remain empathic and supportive of parent.  This
is certainly supported.

No other problems were presented.  Will continue to follow case.

Dictated but not read if not signed.  The attending physician
was available and continues to provide supervision for the
patients on an ongoing basis.

000098

## PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _4·21·98_          START DATE: «start»

OFF WEEK?     (YES)     NO

EXCUSED?      YES      NO

REASON: _____

NOTES:    (Include as applicable:  sexual behavior - appropriate and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions,  current legal concerns,  other significant mental
status observations,  and a description of the patient's participation in
group or individual therapy.):

_Pt was married on 4·18·98 & is presently on honeymoon ._

_To see in 1 W ._

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _Joseph Fuhrmaneck_

000099

# NATIONAL INSTITUTE
## FOR THE STUDY, PREVENTION AND TREATMENT OF SEXUAL TRAUMA

### PROGRESS NOTES

PATIENT'S NAME: MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: ___4.14.98___          START DATE: «start»

OFF WEEK?        (YES)        NO

EXCUSED?        YES        NO

REASON: _____

NOTES:        (Include  as  applicable:    sexual  behavior  -  appropriate  and
inappropriate,    employment    status,    home    situation,    current    stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  ___Joseph Fuhrmaneck___

Page 192

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE:  ___4·7·98___          START DATE:  «start»

OFF WEEK?     YES        (NO)

EXCUSED?     (YES)     NO

REASON:  ___Phone Call off :___

NOTES:   (Include as applicable:  sexual behavior - appropriate and inappropriate, employment status, home situation, current stresses, complaints and resolutions, current legal concerns, other significant mental status observations, and a description of the patient's participation in group or individual therapy.):

___Pt is excused from grp. due to his wedding plan___
___demands.  Will see in 3 W.___

The attending physician was available and continues to provide supervision for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  ___Joseph Fuhrmaneck___

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____ 3·31·98 _____          START DATE: «start»

OFF WEEK?     (YES)     NO

EXCUSED?      YES       NO

REASON: _____

NOTES:     (Include as applicable:  sexual behavior - appropriate and
inappropriate,  employment  status,  home  situation,  current  stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The attending physician was available and continues to provide supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE:  _Joseph Fuhrmaneck_____

000102

PROGRESS NOTES

PATIENT'S NAME:  MULLIS, GARY

FREQUENCY OF ATTENDANCE: QM

TODAY'S DATE: _____3·24·98_____        START DATE:  «start»

OFF WEEK?        (YES)      NO

EXCUSED?         YES       NO

REASON:_____

NOTES:    (Include   as   applicable:   sexual   behavior   -   appropriate   and
inappropriate,   employment   status,   home   situation,   current   stresses,
complaints and resolutions, current legal concerns, other significant mental
status observations, and a description of the patient's participation in
group or individual therapy.):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The  attending  physician  was  available  and  continues  to  provide  supervision
for the patients on an ongoing basis.

THERAPIST:  Joseph Fuhrmaneck, MA, NCC, CPC, PsA

SIGNATURE: _____Joseph Fuhrmaneck_____

000103