**76,525**

Volume III of IV

C L E R K ' S   R E C O R D

**TRIAL COURT NO. 08CR0333**

In the 122ND District Court of Galveston County, Texas. Honorable JOHN ELLISOR, Judge Presiding

THE STATE OF TEXAS

VS.

**TRAVIS JAMES MULLIS**

**RECEIVED IN
COURT OF CRIMINAL APPEALS

JUL 05 2011

Louise Pearson, Clerk**

**Appealed to the Court of Criminal Appeals for Texas, in Austin, Texas.**

Attorney for Appellant:
Name: TRAVIS JAMES MULLIS
Address: POLUNSKY UNIT
     3872 FM 350 SOUTH
     LIVINGSTON, Texas 77351

TDCJ # 999563

Attorney for Appellee:
JACK ROADY, Criminal District Attorney
600 59TH STREET, SUITE 1001
Galveston, Texas 77551

Phone No.: (409) 766-2355
Bar No.: 24027780

**FILED IN
COURT OF CRIMINAL APPEALS

JUL 05 2011

Louise Pearson, Clerk**

Delivered to the Court of Criminal Appeals for Texas, in Austin, Texas, by mail on the ___ day of _____, 2011.

*Jason E. Murray*
JASON E. MURRAY
District Clerk
Galveston County
By: *Brandi Map*
    Deputy Clerk

**Court of Criminal Appeals Cause No. AP-76,525**

Filed in the Court of Criminal Appeals, Austin, Texas, on this the _____ day of _____, **2011**.

**LOUISE PEARSONS**, CLERK

By:_____, Deputy Clerk

**SCANNED**

DATE

CASE NUMBER 08CR0333

THE STATE OF TEXAS                          IN THE 122nd DISTRICT COURT
    VS

TRAVIS JAMES MULLIS                          GALVESTON COUNTY, TEXAS

**TRANSCRIPT**

| INDEX | PAGE |
|---|---|
| Caption . . . . . . . . . . . | 1 |
| Re-Indictment . . . . . . . . . . | 2 |
| Indictment . . . . . . . . . . | 4 |
| Docket Sheet . . . . . . . . . . | 6 |
| Paupers Oath . . . . . . . . . . | 21 |
| Statutory Magistrate's Warning . . . . . . . . | 23 |
| Request for Counsel . . . . . . . . . | 24 |
| Correspondence from District Attorney's Office . . . . . | 25 |
| Correspondence From Court . . . . . . . . | 26 |
| Order of Transfer . . . . . . . . . | 28 |
| Application for Court Order and Order . . . . . . | 29 |
| Precept and Return . . . . . . . . . | 32 |
| Notice of Seeking the Death Penalty . . . . . . | 33 |
| State's Motion for Discovery of Expert Witnesses Article 39.14(b) C.C.P. . . | 34 |
| Correspondence from Court . . . . . . . . | 36 |
| Pro Se Letter from Defendant dated 8-29-09 . . . . . | 39 |
| Pro Se Motion to Dismiss Court- Appointed Counsel . . . . | 40 |
| Pro Se Motion for Discovery and Inspection of Evidence . . . . | 43 |
| Pro Se Defendant's Motion for Exculpatory Evidence . . . . | 47 |
| Pro Se Motion for Fair and Speedy Trial . . . . . | 48 |
| Pro Se Motion for an Examining Trial . . . . . . | 49 |
| Motion to Suppress Illegally Obtained Evidence . . . . . | 51 |
| Defendant's Motion to Suppress Confession . . . . . | 55 |
| Motion for Discovery of Extraneous Offenses at Guilt and Punishment and Order . | 61 |
| Motion for Witness List (Lay and Expert) and Order . . . . | 65 |
| Motion to Reveal the Deal and Order . . . . . . | 70 |

Defendant's Motion Pursuant to Brady v. Maryland for Production of Exculpatory Evidence.   74

Defendant's Assertion of Rights   .   .   .   .   .   .   .   .   81

Motion to Discover Arrest and conviction Records of Witnesses and Order .   .   .   84

Motion for Discovery and Inspection and Order   .   .   .   .   .   .   87

Pro Se Letter from Defendant dated 10-10-08   .   .   .   .   .   .   98

Pro Se Letter from Defendant dated 9-30-08   .   .   .   .   .   .   99

Pro Se Letter from Defendant dated 10-10-08   .   .   .   .   .   .   100

Pro Se Letter from Defendant dated 11-4-08   .   .   .   .   .   .   103

Motion to Appoint Expert and to Order Examination and Testing of Case File and Lab Reports for
DNA purposes   .   .   .   .   .   .   .   .   .   .   104

Order to Appoint Expert and to Order Examination and Testing of Case File and Lab Reports for
DNA Purposes   .   .   .   .   .   .   .   .   .   .   107

Motion to Compel Disclosure of Medical Records and Order   .   .   .   .   107

Precept and Return   .   .   .   .   .   .   .   .   .   115

State's Motion for Discovery of Expert Witnesses Article 39.14(b) C.C.P. and Order .   .   116

Motion for Pre-Trial Hearing and Order .   .   .   .   .   .   .   118

Precept and Return   .   .   .   .   .   .   .   .   .   121

Notice of Seeking the Death Penalty   .   .   .   .   .   .   .   122

Notice of Filing business Records – Medical Records   .   .   .   .   .   123

Motion for Continuance and Order   .   .   .   .   .   .   .   134

Motion in Opposition to Defendant's Motion for Continuance   .   .   .   .   139

Pro Se Letter from Defendant dated 1-21-10   .   .   .   .   .   .   143

Pro Se Motion to Dismiss Court-Appointed Counsel   .   .   .   .   .   150

Order Directing Availability of Counsel   .   .   .   .   .   .   .   155

Discovery Order.   .   .   .   .   .   .   .   .   .   157

Docket Control Order   .   .   .   .   .   .   .   .   .   158

Motion for Order "In Limine" to Preserve the True and Correct Meaning of "Probability" in the
Future Dangerous Instruction and Order .   .   .   .   .   .   .   159

Election of  Jury Punishment   .   .   .   .   .   .   .   .   167

Motion in Limine to Exclude Psychiatric or Psychological Testimony Concerning Future
Dangerousness   .   .   .   .   .   .   .   .   .   .   168

Motion in Limine and Order   .   .   .   .   .   .   .   .   199

*Volume 2*

Defendant's Motion Regarding Victim Character/Impact Testimony After Mosley V. State    204

Motion Preclude the State from Offering Victim Impact Testimony and Order    209

Motion to Preserve Right to File Other Motions and Order.    217

Motion Preclude the Death Penalty as a Sentencing Option Due to Lack of Elements in the Indictment and Order    220

Motion to Declare the Death Penalty Unconstitutional Based on Texas' Lethal Injection Protocol and Order    226

Motion for Hearing on Admissibility of any Statement by Defendant Whether Written or Oral or Evidence Resulting From Same    256

Motion Preclude the Offer of Evidence of Extraneous Offenses (Ring V. Arizona) and Order    261

Motion to Prohibit Comment on the Weight to be Given or Credibility of Testimony During Trial and Order    270

Motion in Limine and Order    274

Motion in Limine    279

Motion to List Witnesses and Request for Criminal Histories    284

Motion to Hold That Tex. Code Crim. Proc. Art. 37.071 is Unconstitutional and Order    287

Motion for Complete Recordation of all Pre-Trial and Trial Proceedings and Order.    294

Defendant's Motion for a Restrictive Order Regulating News Accounts, Comments and Editorials Concerning Certain Circumstances of the Case    300

Motion to Protect the Privacy and Confidentiality of all Lawyer and Client Communications.    304

Motion Preclude the Death Penalty as a Sentencing Option and Delcare Article 37.071 Unconstitutional  (Jones V. United States; Apprendi V. New Jersey; and Ring V. Arizona) and Order 310

Motion Preclude the Death Penalty as a Sentencing Option (Unequal Funding) and Order    317

Motion to Declare Article 37.071 § 2(2) of the Texas Code of Criminal Procedure Unconstitutional on its Face and Order    322

Motion to Declare Article 37.071 § 2(b)(1) of the Texas Code of Criminal Procedure Unconstitutional on its Face and Order    322

Motion for Court to Find Art. 37.071 of the Texas Code of Criminal Procedure Unconstitutional as Applied to Travis James Mullis and Order    346

Motion to Hold Unconstitutional Tex. Code Crim. Proc. Art. 37.071 Sec. 2 (e) and  (f) – Burden of Proof and Order.    354

Motion for Equal Access to Background Information on Prospective Jurors and Order    359

Motion for Discovery, Production, and Inspection of Evidence    362

Motion for the Production of Witness Interview Notes    376

Defendant's Motion to Discover State's Extraneous and / or Unadjudicated Acts of Misconduct to be Offered at Guilt or Punishment and Order . . . . . . 380

Defendant's Motion for Discovery of Experts and Order . . . . . 384

Motion for discovery and Limiting Instructions to the Jury. . . . . 387

Defendant's Motion for Discovery and Inspection and Order . . . . 392

*Volume 3*

Motion for Discovery, Production and Rule 702/705 Hearing and Order . . . 404

Motion to Find that Tex. Code Crim, Proc. Art. 37.071 Sec. 2 (2)(b)(1) is Unconstitutional("Future Danger" Issue) . . . . . . . . . . . 412

Motion to Hold Unconstitutional Tex. Code Crim. Proc. Art. 37.071 Sec. 2(e) and (f) – Failure to Require Mitigation be Considered . . . . . . . 425

Motion to Declare Texas Death Penalty Statute to be Unconstitutional . . . 429

Motion Requesting the Court to Find Tex. Code Crim. Proc. Art. 37.071, Section 2 (f)(4) to be Unconstitutional. . . . . . . . . . 434

Motion to Declare the "10-12 Rule" Unconstitutional . . . . . 441

Motion for Preservation and Disclosure to the Defense of Grand Jury Testimony . . 463

Motion for Production of Impeachment Evidence and Order . . . . 468

Motion to List Exhibits to be Offered in Both Phases of Trial and Order . . . 474

Motion to Discover the Portions of the Defendant's Statement Which the State Intends to Use at Time of Trial . . . . . . . . . . . 477

Motion for Production of Exculpatory, Impeachment and Mitigating Evidence and Order . 480

Motion for Discovery and Inspection of All Tests Performed and Order . . . 484

Motion to Preserve Evidence and Order . . . . . . . 490

Motion for *in camera* Inspections of State's Entire File . . . . . 501

Notice of Filing Certificates / Affidavits . . . . . . . 504

Application for Subpoena . . . . . . . . 505

Application for Subpoena . . . . . . . . 506

Application for Subpoena . . . . . . . . 507

Notice . . . . . . . . . . 508

Motion for Extension of Time to Designate Expert Witnesses . . . . 518

Order Granting Extension of Time to Designate Expert Witnesses . . . . 528

Notice of Filing Certificates / Affidavits . . . . . . . 529

Defendant's Motion to Transfer All documents and Communications Pertaining to Cause No. 08-3872 to Cause No. 08CR0333 and Order . . . . . . . . 531

Notification of Defendant's Expert Witnesses . . . . . . . 534

Application for Subpoena . . . . . . . . . 538

Application for Subpoena . . . . . . . . . 539

Pro Se Letter from Defendant dated 11-2-10 . . . . . . . 540

Pro Se Letter from Defendant dated 11-8-10 . . . . . . . 546

Application for Subpoena . . . . . . . . . 552

Application for Subpoena . . . . . . . . . 553

Order on Motion for Production of Records to Children Services of Maryland . . 554

Order on Motion for Production of Records to Children Services of North Carolina . . 556

Order on Motion for Production of Records to Carolinas Medical Center-Northeast . . 558

Order on Motion for Production of Records to Carolinas Medical Center . . . 560

Order Directing Availability of Counsel . . . . . . . 562

Application for Subpoena . . . . . . . . . 564

Motion Preclude the Death Penalty as a Sentencing Option . . . . . 565

Precept and Return . . . . . . . . . 584

Memorandum of Law in Support of Defendant's Motion in Limine to Exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness . . . . 585

Motion in Limine to Exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness . . . . . . . . . . 615

Motion for Production of Records . . . . . . . . 618

Application for Subpoena . . . . . . . . . 622

Memorandum in Response to Defendant's Motion to Suppress . . . . 623

State's Request for Preliminary Ruling on Admissibility . . . . . 650

Volume 4

Defendant's Motion for Discovery of Experts Order . . . . . 655

Application for Subpoena . . . . . . . . . 658

Application for Subpoena . . . . . . . . . 659

Application for Subpoena . . . . . . . . . 660

Application for Subpoena . . . . . . . . . 661

Application for Subpoena . . . . . . . . . 662

Application for Subpoena . . . . . . . . . 663

Application for Subpoena . . . . . . . . . 664

State's Proposed Findings of Fact and Conclusions of Law . . . . . 665

Order . . . . . . . . . . . 671

Application for Subpoena . . . . . . . . . 672

First Amended Notice of Defendant's Expert Witnesses . . . . . 673

First Amended Notice of Defendant's Expert Witnesses . . . . . 676

Application for Subpoena . . . . . . . . . 679

Motion to Withdraw State's Exhibit . . . . . . . 680

Travis James Mullis' Memorandum of Law in Support of a Full, fair and Constitutional Voir Dire 681

Motion for Issuance of Certificate of Material Witness in Pending Criminal Case Under Uniform
Act to Secure Attendance of Witnesses and Order . . . . . . 717

Certificate of Material Witness in Pending Criminal Case Under Uniform Act to Secure Attendance of
Witnesses . . . . . . . . . . . 721

Media Plan . . . . . . . . . . 723

State's Motion for Release of Medical Information and Order . . . . 727

Application for Subpoena . . . . . . . . . 730

Still Camera Pool Photographer . . . . . . . . 731

Jury Strike List . . . . . . . . . . 732

Jury List . . . . . . . . . . . 754

Application for Subpoena . . . . . . . . . 755

Application for Subpoena . . . . . . . . . 756

Application for Subpoena . . . . . . . . . 757

Application for Subpoena . . . . . . . . . 758

Application for Subpoena . . . . . . . . . 759

Certificate of Material Witness in Pending Criminal Case Under Uniform Act to Secure Attendance of
Witnesses . . . . . . . . . . . 760

Certificate of Material Witness in Pending Criminal Case Under Uniform Act to Secure Attendance of
Witnesses . . . . . . . . . . . 761

Motion for Issuance of Certificate of Material Witness in Pending Criminal Case Under Uniform
Act to Secure Attendance of Witness Sally Ann Jennings and Order . . . 762

Motion for Issuance of Certificate of Material Witness in Pending Criminal Case Under Uniform
Act to Secure Attendance of Witness David Baltzer and Order . . . . 766

Letter from Court . . . . . . . . . . 770

Arraignment – Felony . . . . . . . . . . 771

Charge of the Court and Verdict . . . . . . . . . 772

Jury Communication . . . . . . . . . . 781

Jury Communication . . . . . . . . . . 782

Motion to Properly Instruct Jury at Penalty Phase as to the Use of Mental Health Evidence and
Order . . . . . . . . . . 783

Motion that the Jury be Instructed on the Consequences of the Failure to Agree on the Special Issue
And Order . . . . . . . . . . 798

Motion for Order Prohibiting Use of "No Sympathy" Instruction and Order . . 802

Motion that Jury Be Instructed on the Definition of "Criminal Acts of Violence" and Order . 807

Mr. Mullis' Proposed Jury Instructions and Order . . . . . 811

Defendant's Exhibit List . . . . . . . . . 817

Charge of the Court on Punishment and Verdict . . . . . . 820

Jury Communication . . . . . . . . . . 828

Jury Communication . . . . . . . . . . 829

Jury Communication . . . . . . . . . . 830

Jury Communication . . . . . . . . . . 831

Judgment of Conviction by Jury – Capital Murder. . . . . . 832

Abstract of Felony Conviction . . . . . . . . 834

Bill of Cost . . . . . . . . . . . 835

Notice of Appeal. . . . . . . . . . . 836

Pauper's Oath . . . . . . . . . . . 837

Motion to Withdraw and Order . . . . . . . . 838

List of Attorneys of Record for the Defendant In Capital Murder Case . . . 842

Order Appointing Writ Counsel . . . . . . . . 843

Correspondence Letter . . . . . . . . . 844

Correspondence Email from Clerk to OCA . . . . . . 845

Correspondence Email from Clerk to OCA . . . . . . 858

Correspondence Court of Criminal Appeals Letter . . . . . 859

Trial Court Certification of Defendants Right of Appeal . . . . . 861

**Pro Se Letter from Defendant dated 4-6-11** . . . . . . 862

**Post Card from Court of Criminal Appeals** . . . . . . 863

**Receipt of Correspondence Court of Criminal Appeals Letter** . . . . 864

**Correspondence Letter from Court of Criminal Appeals** . . . . . 865

**Motion for Final Payment of Attorney Fees and Order** . . . . . 866

**Motion for Final Payment of Attorney Fees and Order** . . . . . 869

**Court of Criminal Appeals Notice of Assignment** . . . . . 872

**Motion for New Trial (Sealed)** . . . . . . . 875

**Defendant's Waiver of Appearance at Motion for New Trial** . . . . 884

**Designation of Material for Inclusion in the Record on Appeal** . . . . 889

**Receipt from Court of Criminal Appeals Notice of Assignment** . . . . 891

**Application for Subpoena** . . . . . . . . 894

**Application for Subpoena** . . . . . . . . 895

**Application for Subpoena** . . . . . . . . 896

**State's Response to the Defendant's Motion for New Trial** . . . . 897

**Subpoena and Return** . . . . . . . . 900

**Subpoena and Return** . . . . . . . . 901

**Subpoena and Return** . . . . . . . . 902

**Waiver of Rights and Invocation of Defendant's Right to Proceed *Pro-Se* and Order** . . 903

**Correspondence from Board of Pardons and Paroles** . . . . . 908

**Receipt from Court of Criminal Appeals Notice of Assignment** . . . . 909

**Sheriff's Certificate** . . . . . . . . 910

**Clerk's Certificate** . . . . . . . . 911

<u>CAUSE NO. 08-3872</u>

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Vs.** | § | **GALVESTON COUNTY, TEXAS** |
| | § | |
| **TRAVIS JAMES MULLIS** | § | **122ND JUDICIAL DISTRICT** |

## <u>MOTION FOR DISCOVERY, PRODUCTION AND RULE 702/705 HEARING</u>

**COMES NOW, ROBERT K. LOPER** and **GERALD BOURQUE**, attorneys for the Defendant, **TRAVIS JAMES MULLIS**, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, sections 3, 10, 13, 15 & 19 of the Texas Constitution, and further pursuant to Tex. Code Crim. Proc. arts. 39.14 (a) and (b) and Tex. R. Evid. 104, 702, 703 and 705. In support thereof, the Defendant would show the following:

1. The Defendant has been indicted by the Harris County grand jury for the offense of capital murder;

2. The State is seeking the death penalty;

3. The Defendant anticipates that during trial of this case the State will call one or more witnesses who will offer opinions that are either scientific in nature or are based upon personal training or experience. The admissibility of such opinions are governed by Tex. R. Evid. 702, 703, 705 and *Daubert v. Merrell Dow Pharms.*, 113 S. Ct. 2786 (1993), *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167 (1999), *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) and *Jordan v. State*, 928 S.W.2d 550 (Tex. Crim. App. 1996) and *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998) (overruled in part on other grounds).

4. The proponent of scientific evidence bears the burden of demonstrating by clear and convincing evidence that the evidence is reliable. This is accomplished by showing: (1) the validity of the underlying scientific theory; (2) the validity of the technique applying the theory and (3) proper application of the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573.

Prior to the offer of scientific evidence, the trial court must conduct a hearing outside the

1

presence of the jury to determine whether the proponent has established all three criteria. This pre-admission determination is required whether the science at issue is novel or well established. *Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000).

5.  The United States Supreme Court has said:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, 113 S. Ct. at 482;

6.  This Court must find that the opinion evidence is not only reliable, but that it is relevant under Tex. R. Evid. 401, that it meets the standard set in Rule 702 and that it "assists the trier of fact [in] understanding the evidence [in] determining a fact in issue." If the trial judge finds the proposed expert testimony meets both the Rule 401 and Rule 702 requirements, then the judge must perform a Rule 403 analysis to determine whether the evidence should, in fact, be presented to the jury. *Morales v. State*, 32 S.W.3d 862 (Tex. Crim. App. 2000) at page 6;

This Court is the "gatekeeper" that must screen expert testimony for scientific reliability. Evidentiary reliability is based on scientific validity. *Jordan*, 928 S.W.2d at 6;

7.  The Texas Court of Criminal Appeals, identified the following factors that the trial judge could consider in performing its "gatekeeper function":

> (a) the extent to which the underlying scientific theory and technique are accepted, as valid, by the relevant scientific community, if such a community can be ascertained;

> (b) the qualifications of the expert(s) testifying;

> (c) the existence of literature supporting or rejecting the underlying scientific theory and technique; specifically, this Court should be provided citations to

2

empirical studies supporting the opinion and citations to articles or chapters in scientific treatises or journals supporting the opinion.

(d) the potential rate of error of the technique;

(e) the availability of other experts to test and evaluate the technique;

(f) the clarity with which the underlying scientific theory and technique can be explained to the court;

(g) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Kelly*, 824 S.W.2d at 573.

8. Should the Court determine that the testimony to be offered is in a field of science that is based upon experience and training, as opposed to a scientific method, the Court's review of the reliability of the science is even more important and the Court must find:

(a) whether the field of expertise is a legitimate one;

(b) whether the subject matter of the expert's testimony is within the scope of that field; and

(c) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field.

*Nenno*, 970 S.W.2d at 561.

9. The Court of Criminal Appeals in *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App.1998) said that not only were the criteria described in *Kelly* (peer review, rate of error, etc.) not categorically ruled out when reviewing the reliability of opinions based on "soft science" but in addition, the Court listed the following **additional** criteria for the trial court to consider:

(i) interviews conducted by the witness while in the field in which he is to express and opinion;

3

(ii) the facts of the cases in which he conducted those interviews;

(iii) statistical research performed in the field in which the witness is to express an opinion. Specifically, the witness should provide to the Court data collected by the witness or those under his or her supervision and provide the data collection instruments that were used, the data collection procedures and the statistical analysis applied to the date in forming the opinion to be proffered.

10. The United States Supreme Court has held that the reliability standard announced in *Daubert* applies to all expert testimony regardless of whether it is scientific expert testimony or clinical opinion expert testimony. *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167 (1999). All of the material that is sought by this motion is relevant to reliability of opinions based upon "soft or hard science" testimony. The Supreme Court of Texas has held that *Daubert*, and therefore *Robinson*, applies to all expert testimony–"Whether the expert would opine on economic valuation, **advertising psychology** (emphasis added), or engineering, application of the *Daubert* factors is germane to evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 725 (Tex. 1998) (affirmed in part and reversed in part).

11. So as to aid the Court in its "gatekeeping" function to determine the reliability of the offered opinion, the State should be required to provide the Court, at least 30 days prior to trial, the following:

(a) a concise and specific statement of each expert opinion the State intends to introduce at trial;

(b) the name, address and curriculum vita of each witness the State intends to qualify as an exert in order to present such testimony;

(c) all literature supporting or rejecting the underlying theory, methodology or technique used or relied upon by each State witness that will provide opinion testimony at trial. This information will allow the Court to determine if the relevant theory, methodology or technique has been subjected to review by the

4

witnesses's peers and if the purported science is generally accepted in the field.

(d) the results of any tests that have been performed on the science or methodology relied upon by each State witness that will provide opinion testimony at trial. This information will allow the Court to determine if the basis for the opinion has been or can be subjected to testing to determine its reliability;

(e) the names of each person about whom a witness to be called by the state has expressed an opinion in the past and the opinion expressed as to each by the State's witness. This information will allow the Court to determine if a known or potential rate of error exists;

(f) a listing of any standards that control the technique or methodology used to arrive at any opinion that may be expressed at trial. This will allow the Court to determine if there is an accepted protocol for gathering relevant information and interpreting that information in arriving at an opinion;

(g) the qualifications that allow the witnesses to form and express the opinions. This will allow the Court to determine if the opinion of the witness is based on scientific knowledge and training or is merely an opinion based on personal belief, bias or prejudice.

(h) a list of each interview conducted by the witness while in the field in which he is to express and opinion;

(i) the facts in each of the cases in which he conducted those interviews;

(j) statistical research performed in the field in which the witness is to express an opinion with supporting documentation as outlined in Paragraph 9 (iii) above.

12. In *Nenno* the court said:

"To the extent that a fact finder could decide that the absence of peer review casts doubt on the credibility of the testimony, such affects the weight of the evidence rather than its admissibility."

5

408

*Nenno*, 970 S.W.2d at 562. If some of the described material goes to the weight that a jury should give the testimony, as is stated in *Nenno*, then it should be provided to the Defendant as impeachment material under *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481. In addition and as provided for in Tex. C. Crim. Proc. Art. 39.14(a), counsel for the Defendant should be given the opportunity to not only examine, but to copy any documents that are provided to the Court pursuant to its Order.

**WHEREFORE, PREMISES CONSIDERED**, Counsel for the Defendant prays that upon hearing of this motion the Court:

(1) Order the State to provide to the Court those documents that have been identified in this motion as being important to the Court's "gatekeeping" function;

(2) Order that counsel for the Defendant be allowed to photocopy each of the documents, if any, produced by the State in support of the witness's opinion testimony;

(3) Order that this matter be set for a pre-trial hearing at which the State be required to establish, under the cited authority, the reliability of any opinions that are to be offered at trial;

(4) Order that this hearing be set sufficiently in advance of trial so that the accused can arrange for necessary rebuttal testimony should any of the State's opinion testimony be found to be scientifically reliable and helpful to the trier of fact; and

(5) Such other and further relief to which the Defendant, or his counsel, may show himself to be entitled.

Respectfully Submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

6

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)

## ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same on March 8 2010.

**ROBERT K. LOPER**

2010 MAR -8 AM 9:52

7

CAUSE NO. 08-3872

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## ORDER

BE IT REMEMBERED, that on the __19__ day of ____January____, 2010, came to be considered the Defendant's **MOTION FOR DISCOVERY, PRODUCTION AND RULE 702/705 HEARING**.  The court is of the opinion the motion should be in all things:

      **GRANTED**   ✓_____

      **DENIED**    _____

                          John Ellison
                          JUDGE PRESIDING

8

0333
**CAUSE NO. 08-3872**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION TO FIND THAT TEX. CODE CRIM. PROC. ART. 37.071 Sec. 2 (2)(b)(1) IS UNCONSTITUTIONAL
### ("Future Danger" Issue)

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW**, TRAVIS JAMES MULLIS, Defendant in the above cause, by and through counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution and Article 1, Sections 3, 10, 13 and 19 of the Texas Constitution and moves the Court to find that Tex. Code Crim. Proc. art. 37.071 , Sec. 2 (2)(b)(1) is unconstitutional. In support thereof, Movant would show the Court the following:

1. The Defendant has been indicted for the offense of capital murder.

2. The State is seeking the death penalty. The Eight Amendment requires a greater degree of accuracy and fact finding than would be true in a non-capital case. *Gilmore v. Taylor*, 508 U.S. 333, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

3. Tex. Code Crim. Proc. art. 37.071 Sec. 2 (b)(2)(1) provides that the jury determining the punishment for one found guilty of capital murder shall set punishment by answering two, or perhaps three, special issues. The issue that is commonly referred to as the "future danger" special issue asks the jury to determine, beyond a reasonable doubt the following:

413

> "whether there is a probability that the Defendant would
>
> commit criminal acts of violence that would constitute a
>
> continuing threat to society"

4.   Because the future dangerousness special issue increases the punishment for capital murder beyond the prescribed statutory maximum, the issue acts as the functional equivalent of a traditional element of the crime that has to be proven to a jury beyond a reasonable doubt.   Texas Penal Code § 19.03 provides that the offense of capital murder is a "capital felony."  Texas Penal Code § 12.31(a) provides that: "[a]n individual adjudged guilty of a capital felony in a case in which the state seeks the death penalty shall be punished by [life] imprisonment . . . or by death."

5.   A Texas judge can impose the death penalty only if the jury first makes statutorily required findings on one or two special issues and then returns a negative answer to the mitigation special issue.  Tex. Code Crim. Proc. requires that the jurors are charged as follows:

> (c) The state must prove each issue submitted under Subsection (b) of this article beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted under Subsection (b) of this Article.
>
> (d) The court shall charge the jury that:
>
>> . . . (2) it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously and it may not answer any issue "no" unless 10 or more jurors agree.
>
> (e)(1) The court shall instruct the jury that if the jury returns an affirmative answer to each issue submitted under Subsection (b) of this article, it shall answer the following issue:
>
>> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
>>
>> . . .

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

(1) shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree;

(g) If the jury returns an affirmative finding on each issue submitted under Subsection (b) of this article and a negative finding on an issue submitted under Subsection (e) of this article, the court shall sentence the Defendant to death. If the jury returns a negative finding on any issue submitted under Subsection (b) of this article or an affirmative finding on an issue submitted under Subsection (e) of this article or is unable to answer any issue submitted under Subsection (b) or (e) of this article, the court shall sentence the Defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life.

Tex. Code Crim. Proc. art. 37.071 § 2(b) - (g).

6.    Like the Defendant convicted of first-degree murder in *Ring v. Arizona,* 122 S. Ct. 2428 (2002), a Defendant convicted of a capital felony in Texas cannot receive a sentence of death unless a sentencing jury first makes an affirmative finding on the aggravating future dangerousness special issue (and then answers "no" to the mitigation special issue). In the absence of a finding of future dangerousness, the maximum sentence to which a Texas capital Defendant is exposed is life imprisonment, not the death penalty. As was made clear in *Blakely v. Washington,* 124 S. Ct. 2531 (2004) made clear, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely,* 124 S. Ct at 2537 (emphasis in original).

7.  The Texas Court of Criminal appeals has incorrectly said that *Apprendi v. New Jersey,* 530 U.S. 466 (2000) and *Blakely* do not apply in Texas and their rationale is unreasonably wrong.  Its

alternative holding in *Rayford v. State*, 125 S.W.3d 521, 533-34 (Tex. Crim. App. 2003) blithely dispenses with the constitutional challenge by relying on cases that predate *Apprendi*'s groundbreaking decision by many years. *See Rayford*, 125 S.W.3d at 534 (relying on *Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994)); App. 1 at 1 (relying on *Sosa v. State*, 769 S.W.2d 909, 917 (Tex. Crim. App. 1989)).

It is apparent that the Court of Criminal Appeals is unwilling to grapple with the serious constitutional implications of *Apprendi*, *Ring*, and *Blakely* on the Texas capital sentencing scheme.

8.    The Texas capital sentencing scheme's future dangerousness special issue violates the reasonable doubt standard of *Apprendi* because both *Apprendi* and *Blakely* do in fact apply in Texas. As *Blakely* made clear, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose ***without*** any additional findings." *Blakely*, 124 S. Ct at 2537 (emphasis in original). *Blakely*'s straightforward and unambiguous definition of *Apprendi*'s "prescribed statutory maximum" language leaves no doubt that *Apprendi* applies to the Texas capital sentencing scheme's future dangerousness special issue. Because the determination of future dangerousness is a fact that, if found, exposes the Defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone, the future dangerousness special issue must be found by a jury beyond a reasonable doubt. The only question for this Court, then, is whether the term "probability" found in the future dangerousness inquiry unconstitutionally lowers the reasonable doubt standard in violation of *Apprendi*.

"When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as a tail which wags the dog of the substantive offense." *Apprendi*, 530 U.S. at 495 (internal quotation marks and citation omitted). *Apprendi*'s fear of such a wag-the-dog scenario is realized here. Because the term "probability" in the future dangerousness special issue swallows the reasonable doubt standard, this aggravating factor acts as a tail that wags the dog of the substantive offense of capital murder.

*Apprendi*, *Ring*, and *Blakely* create, in effect, a new offense of aggravated capital murder in Texas. As Justice Thomas noted in his *Apprendi* concurrence, "if the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact . . . the core crime and the aggravating fact together constitute an aggravated crime . . . . The aggravating fact is an element of the aggravated crime." 530 U.S. at 501 (Thomas, J., concurring). The aggravating factor of future dangerousness found in the Texas capital sentencing scheme now attains the status of an element of the crime of <u>aggravated capital murder</u>. Together with the traditional elements of the offense of capital murder found in Texas Penal Code § 19.03, the future dangerousness aggravating factor must be found by a jury beyond a reasonable doubt before the statutory maximum punishment, death, may be imposed.

9.  The term "probability" in the future dangerousness special issue impermissibly dilutes the reasonable doubt standard. At a sentencing stage, a capital jury will have to answer the "future dangerousness" inquiry: Do you find from the evidence beyond a reasonable doubt <u>that there is a probability</u> the Defendant <u>would</u> (not "will" which further dilutes the reasonable doubt standard) commit criminal acts of violence that would constitute a continuing threat to society? *See* Tex.

Crim. Proc. Code art. 37.071 § 2(b)(1). The term "probability" wreaks havoc on the reasonable doubt standard. Its appearance in conjunction with the reasonable doubt standard relieves the State of its constitutional burden to prove every element of the offense beyond a reasonable doubt. The term eviscerates the reasonable doubt standard, rendering it a nullity or, at best, a preponderance of the evidence standard. In addition, the term undermines the vital role the reasonable doubt standard plays in reducing the risk of erroneous factual determinations.

Placing competing burdens of proof in such close proximity to each other can produce only confusion and frustration in jurors' minds as they grapple with the incomprehensible concept of proof of a probability beyond a reasonable doubt. This Court recognized in *Boyde v. California*, 494 U.S. 370 (1990), that:

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* at 380-81. The concept of "probability beyond a reasonable doubt" was described as "execrable and absurd" by Judge Roberts in *Horne v. State*, 607 S.W.2d 556, 565 (Tex. Crim. App. 1980). When average lay jurors are faced with an illogical instruction like the one mandated by Tex. Code Crim. Proc. art. 37.071 the commonsense understanding most likely to prevail in their minds would focus on the more familiar concept of "probability," to the detriment of a less familiar, legal term of art like "reasonable doubt." Jurors would quickly abandon any "technical hairsplitting" once they realized the futility of attempting to determine what quantum of evidence would constitute proof of a future event's probability beyond a reasonable doubt. Jurors will be no more successful at deciphering the "execrable and absurd" than was Judge Roberts in *Horne*.

Merely having the phrase "beyond a reasonable doubt" in the jury instructions to describe the burden of proof on the future dangerousness special issue neither adequately safeguards a Defendant's Fourteenth Amendment due process rights nor advances the vital interests served by the reasonable doubt standard. If such an incantation were sufficient to protect the reasonable doubt standard from infection by the term "probability," then *Cage* error would not exist. In *Cage v. Louisiana*, the Court held that jury instructions improperly defining the phrase "beyond a reasonable doubt" unconstitutionally diluted the reasonable doubt standard. 498 U.S. 39, 41 (1990) (*per curiam*) (overruled on other grounds). The critical inquiry is not whether the phrase "beyond a reasonable doubt" appears in the instructions. Instead, it is whether the reasonable doubt standard has been tainted by other instructions that may allow the jury to find an element of the crime based on a burden of proof that is below that required by the Due Process Clause. *Id.* It would not satisfy the Due Process Clause if the instructions on one of the elements of robbery required the jury to find "from the evidence beyond a reasonable doubt that the Defendant ***probably*** inflicted serious bodily injury or threatened another with immediate serious bodily injury." Such an instruction unconstitutionally diminishes the reasonable doubt standard. This Court should conclude no differently about an instruction that allows a jury to find the future dangerousness aggravating element of the "new" enhanced crime of death-eligible capital murder based on the same diminished burden of proof.

*Black's Law Dictionary*, 1081 (5th ed. 1979) defines the term "probability" as "likelihood; [a] condition or state created when there is more evidence in favor of the existence of a general proposition than there is against it." A lay dictionary defines the term "probability" as "the quality or state or being probable," with "probable" being defined as "supported by evidence strong enough to establish a presumption but not proof." There is, however, also another

definition of the word with a much different – but commonly understood – meaning: "the chance that a given event will occur." Merriam- Webster's Collegiate Dictionary 928 (10th ed. 1993); *see Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992) (setting out similar legal and lay definitions of the word "probability").

On first impression, a juror seeing the term "probability" in the future dangerousness special issue might equate its meaning with the legal definition or the first lay definition: a "more likely than not" burden that closely resembles the preponderance of the evidence standard. However, upon closer inspection, a juror would discard this definition in favor of the "chance" definition. The reason a juror would settle on this commonsense definition is straightforward: Read in context, the Texas special issue asks the juror to predict whether a future event will occur. The juror is being asked if there is "any" chance that the Defendant will commit criminal acts of violence that would constitute a continuing threat to society, whether that chance is 1 in 100, 51 in 100, or 80 in 100. The special issue does not ask the juror to answer "yes" to the special issue only if it is "more likely than not" that the Defendant will pose a future danger.

Because the future dangerousness special issue is not concerned with whether the odds of future danger are great or negligible, a juror would answer the issue affirmatively as long as some measurable percentage existed. Just as bookies calculate the odds of winning for each horse entered in a race, from the long-shots to the favorites, or weather forecasters predict the chance of rain, jurors use their commonsense understanding of probability to conclude that nearly every criminal Defendant – especially one recently found guilty of every traditional element of the offense of capital murder – possesses "some" chance of committing future acts of violence that would threaten society.

*Hughes v. State*, 878 S.W.2d 142, 146-48 (Tex. Crim. App. 1992), and *Robison v. State*, 888 S.W.2d 473, 481-82 (Tex. Crim. App. 1994), rejected understandings of the term "probability" based on "any percent possibility" rather than "likelihood" or "good chance." In *Hughes*, the Court of Criminal Appeals noted that "the second special issue calls for proof of more than a bare chance of future violence. Requiring more than a mere possibility that the Defendant would commit criminal acts of violence and would constitute a continuing threat to society prevents the freakish and wanton assessment of the death penalty." 878 S.W.2d at 148. In *Robison*, the Court of Criminal Appeals found the "horse race" analogy inapt:

> Appellant argues that the term "probability" could mean one in a hundred. As an analogy, he alludes to a horse race, where a horse with such odds will be wagered on, there being a "probability" the horse could win. However, appellant's analogy fails to recognize the reason the better wages is based much on the potential payout of a win when compared with the "chance" the horse will win. It is "probable" the horse will not win, however, because of the odds it is worth the gamble.

888 S.W.2d at 481.

The lower court's reasoning in these cases predating *Apprendi* cannot possibly serve as the foundation for dispensing with *Apprendi* challenges. Moreover, the lower court's rejection of the "odds or chances" definition of the term "probability" fails to consider two additional factors. First, it ignores the commonsense definition of the term that jurors will adopt when they are asked to predict whether a future event *will* occur, rather than determine whether an alleged historical event *did* occur. In the latter case, jurors will equate "probability" with the "more likely than not" understanding of the term. Compounding the problem, no statutory definition of the term exists, and the Court of Criminal Appeals has repeatedly held that the trial court does not err in refusing to instruct the jury as to the definition of the term. *See, e.g., Hughes*, 878 S.W.2d at 178; *Earhart v. State*, 823 S.W.2d 607, 632 (Tex. Crim. App. 1991); *Caldwell v. State*,

818 S.W.2d 790, 797 (Tex. Crim. App. 1991). The Court of Criminal Appeals (and prosecutors and defense attorneys in Texas) may understand that the term "probability" means more than a mere possibility, but most jurors do not.

The second factor that the lower court's definition of the term "probability" cannot account for is the incredibly high error rate by Texas capital juries in predicting future dangerousness. Even with the assistance of psychiatrists and other mental health experts, juries affirmatively answering the future dangerousness special issue get it wrong 95% of the time. *See* Texas Defender Service, *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness* (2004), at www.texasdefender.org/publication.htm. Jurors' use of an "odds or chance" definition of the term "probability" may provide one explanation for this astonishing error rate. Because nearly everyone, from Charles Manson to the Pope, has some chance, however slight, of committing future violence, juries are answering "yes" to the special issue based on a quantum of proof well below a "more likely than not" standard.

Regardless of which definition of the term "probability" that jurors in Texas are using to answer the future dangerousness special issue, there can be no question that they are employing a less onerous burden of proof than the reasonable doubt standard. Such a diluted reasonable doubt standard can no longer serve as "the prime instrument for reducing the risk of convictions resting on factual error." *In re Winship*, 397 U.S. 358, 363 (1970). When a jury's finding of future dangerousness based on a mere preponderance standard – or less – authorizes an increase in the maximum punishment for capital murder, it is appropriately characterized as "a tail which wags the dog of the substantive offense." *Apprendi*, 530 U.S. at 495 (internal quotation marks and citation omitted).

10. The jurors are further encouraged to speculate (thus reducing the state's burden) by the use of the phrase "would commit criminal acts of violence" in the instruction rather than the phrase "will commit criminal acts of violence". The jurors are then encouraged to speculate that "anyone who would commit the capital murder for which we have found this Defendant guilty, probably would commit criminal acts of violence".

11. The Texas Court of Criminal Appeals has approved this form of speculative decision making in holding that a verdict on the future dangerousness issue can be supported by the facts of the crime alone. *Kunkle v. State,* 771 S.W.2d 435, 449 (Tex. Crim. App. 1986) and *Willingham v. State*, 897 S.W.2d 351, 356 (Tex. Crim. App. 1995). The state has <u>no burden</u> to prove that the Defendant is a future danger. The Texas legislature has created the crime of aggravated capital murder for which death is a possible punishment. Through its devious use of the English language and the failure of the Court of Criminal Appeals to provide any effective appellate review of the jury's verdict, an essential element of the offense of aggravated capital murder is won by the state by default, not beyond a reasonable doubt as is required by the 8th Amendment to the United States Constitution.

Wherefore premises considered, Defendant prays that he be granted a hearing on this motion and that upon hearing this court find that:

(1) Tex. Code Crim. Proc. art. 37.071 Sec. 2 (2)(b)(1), the language that embodies the "future danger issue", fails to require that this element of the capital crime with which the Accused is charged, to be proven by the State beyond a reasonable doubt;

(2) that this, and any other portion of Tex. Code Crim. Proc. that is found to offend the provisions of the United States Constitution be found to be unconstitutional; and

(3) that as a result thereof, death must be precluded as a sentencing option in this case.

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same November 8, 2010.

**ROBERT K. LOPER**

0333
**CAUSE NO. 08-3872**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

**ORDER**

**BE IT REMEMBERED**, that on the _____day of _____, 2010,

came to be considered the Defendant's **MOTION TO FIND THAT TEX. CODE CRIM.**

**PROC. ART. 37.071 Sec. 2 (2)(b)(1) IS UNCONSTITUTIONAL** ("Future Danger" Issue).

The court is of the opinion the motion should be in all things:


GRANTED        _____

DENIED         _____


_____
**JUDGE PRESIDING**

0333
CAUSE NO. 08-~~3872~~

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION TO HOLD UNCONSTITUTIONAL TEX. CODE CRIM. PROC. ART. 37.071 SEC. 2(e) AND (f) - FAILURE TO REQUIRE MITIGATION BE CONSIDERED

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, **TRAVIS JAMES MULLIS**, the Defendant, by counsel, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Article 1, Sections 3, 10, 13, 19 and 29 and TEX. CODE CRIM. PROC. ANN. art. 1.05, 1.06 and 1.09 and by and through his attorneys of record makes this his Motion to Hold Unconstitutional TEX. CODE CRIM. PROC. art. 37.071 Sec. 2(e) and (f) - Failure to Require Mitigation be Considered, and as grounds therefore would show the Court as follows:

1. Article 37.071 Sec. 2(e) and (f), submitted to a jury upon conviction of capital murder reads as follows:

> (e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:
>
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
>
> (f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

(1)  shall answer the issue "yes" or "no";

(2)  may not answer the issue "no" unless it agrees
unanimously and may not answer the issue "yes" unless 10
or more jurors agree.

2.  This statute is unconstitutional because it fails to <u>require</u> that mitigation be

considered.  A juror is required to consider and give effect to all mitigation.  After the juror has

<u>considered</u> the mitigation, it is then up to the juror to determine what effect to give the

mitigation.  Failure to mandate consideration of mitigating evidence makes this statute

unconstitutional in violation of the Eighth Amendment.  *Penry v. Johnson*, 532 U.S. 782 (2001).

3.  Capital murder statutes that have survived constitutional scrutiny all require that the

jury be told that it must consider all mitigating evidence.  *E.g.*, *Johnson v. Texas*, 113 S. Ct. 2658

(1993); *Boyde v. California*, 494 U.S. 370 (1990); *Blystone v. Pennsylvania*, 494 U.S. 299

(1990).

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays this Court will find

Article 37.071 Sec. 2(e) and (f) unconstitutional, and for such other relief as Defendant may be

entitled.

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Texas 77380
713-862-7766(office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same _____, 2010.

**ROBERT K. LOPER**

2010 MAR -8 AM 9:52

0333

## CAUSE NO. 08-3872

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## ORDER

BE IT REMEMBERED, that on the _____ day of _____,
2010, came to be considered the Defendant's **MOTION TO HOLD UNCONSTITUTIONAL
TEX. CODE CRIM. PROC. ART. 37.071 SEC. 2(e) AND (f) - FAILURE TO REQUIRE
MITIGATION BE CONSIDERED**. The court is of the opinion the motion should be in all
things:


GRANTED   _____

DENIED    _____


                                    _____
                                    **JUDGE PRESIDING**

0333
### CAUSE NO. 08-~~3872~~

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

### MOTION TO DECLARE TEXAS DEATH
### PENALTY STATUTE TO BE UNCONSTITUTIONAL
### (Juror's inability to Predict Future Dangerousness)

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, TRAVIS JAMES MULLIS, Defendant in the above-cause, by and

through counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States

Constitution and Article 1, Sections 3, 10, 13 and 19 of the Texas Constitution and files this

Motion to Declare the Texas Death Penalty Statute to be Unconstitutional and for good and

sufficient cause would show the Court the following:

1. The Defendant has been indicted for the offense of capital murder.

2. The State is seeking the death penalty.

3. Tex. Code Crim. Proc. art. 37.071(2)(b)(1) requires a jury during the penalty phase of

a capital trial to answer the following question:

> "Whether there is a probability that the Defendant would commit
> criminal acts of violence that would constitute a continuing threat
> to society"

4. The ability to accurately predict whether or not a person would commit criminal acts

of violence is not within the ability of the lay people on the jury. The probability that a

person will commit future violence is not a prediction that even the psychiatric

community can make, particularly in the long run. The unreliability of psychiatric

predictions of long-term future dangerousness is by now an established fact within the

profession. *American Psychiatric Association Task Force on Clinical Aspects of the Violent Individual*, "Clinical Aspects of the Violent Individual" (1974) and *Amicus Brief of the American Psychiatric Association (APA) in Barefoot v. Estelle*, (1983).  The APA, in its brief, said that the primary finding of the task force was that judgments concerning the long-run potential for future violence and the dangerousness of a given individual are "fundamentally of very low reliability," adding that the state of the art regarding predictions of violence is very unsatisfactory.

5.  The unreliability of long term predictions of future dangerousness is acknowledged even today by those who take the position that there is some ability to predict dangerousness.  "Using modern assessment tools, however, there is a growing body of data to suggest that psychiatrists can, in fact, predict violence more accurately than many believe–**at least in the short term**.  Ken Hausman, "Predicting Violence Risk Possible but Complex" *Psychiatric News*, Vol 36, Number 13 (2001).  These predictions of violence, even if more accurate than in the past, come in a civil setting where a determination is made about possible civil commitment, not in the context of a capital murder case where the issue is whether someone is going to live or die, not will their civil liberties be limited for short period of time.

> "Despite the pervasiveness of violence risk assessment in mental health law, research continues to indicate that the unaided abilities of mental health professionals to perform this task are modest at best". *MacArthur Research Network on Mental Health and the Law,* "Executive Summary," at 1. ( April, 2001).

6.  The consideration for the jury must necessarily be a long-term consideration as a Defendant who is given a life sentence will not be eligible for parole for 40 calendar

years. The ability to make such long-term predictions is rendered more unreliable by the propensity of a person to commit violence to "age out" as he grows older.

7. The State will often make the argument that the Defendant is a "future danger" to prison society because he has an anti-social personality. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) states at page 648:

> Anti-social Personality Disorder has a chronic course but may become less evident or remit as the individual grows older, particularly by the fourth decade of life. Although this remission tends to be particularly evident with respect to engaging in criminal behavior, three is likely to be a decrease in the full spectrum of antisocial behaviors and substance abuse.

8. The jurors are not instructed to consider either the unreliability of long-term predictions nor the "aging-out" effect noted by the DSM-IV. This makes the application of the Texas Death Penalty statute both arbitrary and capricious. It further denies this Defendant a fair trial and due process of law.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that:

1. Art. 37.071 be found to be unconstitutional and the death penalty be precluded as a sentencing option for the jury that is sworn to decide this case;

2. In the alternative, that the jury that is empanelled to decide this case be instructed as to the unreliability of long term predictions of future dangerousness; and

3. that the jury be instructed that as a person ages, their propensity to commit violent acts remits, particularly in the 4th decade of life; and

4. That the Defendant have such other and further relief to which he may show himself to be justly entitled.

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street,
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766 (office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same March 8, 2010.

**ROBERT K. LOPER**

0333
### CAUSE NO. 08-~~3872~~

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Vs.** | § | **GALVESTON COUNTY, TEXAS** |
| | § | |
| **TRAVIS JAMES MULLIS** | § | **122ND JUDICIAL DISTRICT** |

### ORDER

**BE IT REMEMBERED**, that on the _____ day of _____,

2010, came to be considered the Defendant's **MOTION TO DECLARE TEXAS DEATH**

**PENALTY STATUTE TO BE UNCONSTITUTIONAL.** The court is of the opinion the

motion should be in all things:


**GRANTED** _____

**DENIED** _____


_____
**JUDGE PRESIDING**

CAUSE NO. 08-3872

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION REQUESTING THE COURT TO FIND TEX. CODE CRIM. PROC. ART. 37.071. SECTION 2(f)(4) TO BE UNCONSTITUTIONAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, TRAVIS JAMES MULLIS, Defendant, by and through counsel, and pursuant to the 8th and 14th Amendments to the United States Constitution and Article 1, Sections 13 and 19 of the Texas Constitution and applicable Rules of Criminal Procedure, makes this Motion in Limine. In support thereof, Defendant would show:

1. The Defendant has been indicted for capital murder.

2. The State is seeking the death penalty. The Eighth Amendment to the United States Constitution requires a "greater degree of accuracy and fact-finding than would be true in a non-capital case." Gilmore v. Taylor, 508 U.S. 333, 342 (1993); see also Woodson v. North Carolina, 428 U.S. 280, 305 (1976).

3. It is the duty of this Court and the Texas Court of Criminal Appeals to make certain that the death sentence is not "wantonly or freakishly" imposed and that the purposes of Art. 37.071 are accomplished. Ellason v. State, 815 S.W.2d 656, 660 (Tex. Crim. App. 1991).

1

4. The Supreme Court of the United States has held that "[a]ccurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a Defendant shall live or die." Gregg v. Georgia, 428 U.S. 153, 190 (1976).

5. Art. 37.071 §2(e)(1) of the Texas Code of Criminal Procedure requires the court to instruct the jury to determine:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Tex. Code Crim. Proc. art. 37.071 §2(e)(1).

6. Art. 37.071 §2(f)(4) defines mitigating evidence to be "evidence that a juror might regard as reducing the Defendant's moral blameworthiness."

7. This statutory definition violates the Eighth and Fourteenth Amendments to the United States Constitution.

8. It impermissibly instructs jurors to disregard mitigating evidence that is unrelated to a Defendant's moral blameworthiness. The instruction unconstitutionally narrows the jury's discretion in sentencing, to factors that concern only moral blameworthiness.

9. The Eighth and Fourteenth Amendments to the United States Constitution require that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a Defendant's character or record and any of the circumstances of the offense that

2

the Defendant proffers as a basis for a sentence less than death." Eddings v. Oklahoma,

455 U.S. 104, 110 (1982) (overruled in part on other grounds) (quoting Lockett v. Ohio,

438 U.S. 586, 604 (1978) (plurality opinion of BURGER, C.J.)).

10. The Supreme Court of the United States found the Texas death penalty statute

to be constitutional on the basis of guarantees that sentencing juries would be able to

consider "whatever mitigating circumstances" the Defendant might be able to show.

Lockett, 438 U.S. at 607 (referring to Jurek v. Texas, 428 U.S. 262 (1976)).

11. The Court held that these mitigating circumstances were necessary to ensure

that the death penalty was not imposed in an arbitrary or capricious manner. This belief

was based on the principle that "Defendants who commit criminal acts that are attributable

to a disadvantaged background, or to emotional and mental problems, may be less culpable

than Defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989)

(overruled on other grounds).

12. It is therefore well established that a sentencer "may not refuse to consider or

be precluded from considering 'any relevant mitigating evidence.'" Skipper v. South

Carolina, 476 U.S. 1, 4 (1986) (quoting Eddings, 455 U.S. at 114).

13. The Supreme Court of the United States has held that relevant mitigating

evidence is "evidence which tends logically to prove or disprove some fact or circumstance

which a fact-finder could reasonably deem to have mitigating value." Tennard v. Dretke,

159 L. Ed. 2d 384, 395, 124 S. Ct. 2562, 2570 (2004).

14. The Supreme Court of the United States has further ruled that once the "low

threshold for relevance is met, the Eighth Amendment requires that the jury be able to

consider and give effect to a capital Defendant's mitigating evidence." Tennard, 159 L. Ed.

2d at 396, 124 S. Ct. at 2570 (quoting Boyde v. California, 494 U.S. 370, 377-378 (1990)). It is therefore unconstitutional for a state to exclude or limit a Defendant's ability to present relevant mitigating evidence.

15. However, Art. 37.071 §2(f)(4) of the Texas Code of Criminal Procedure instructs jurors to disregard any potentially relevant mitigating evidence that does not relate to the Defendant's moral blameworthiness.

16. The instruction can only reasonably be interpreted as a limitation on the mitigating circumstances, referred to in Art. 37.071 §2(e)(1), that a jury can consider to warrant a sentence of life imprisonment rather than a death sentence. If the clause is not read as a limitation on what mitigating evidence can be considered it is rendered completely superfluous when read in conjunction with Art 37.071 §2(e)(1).

17. "It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause and word of a **statute** so that no part thereof be rendered **superfluous** or inoperative." Spence v. Fenchler, 107 Tex. 443, 457 (Tex. 1915). The only way to give effect to Art. 37.071 §2(f)(4) without rendering it superfluous is to read it as a limitation on Art 37.071 §2(e)(1).

18. Limiting the jury's consideration of mitigating evidence to factors that reduce the Defendant's moral blameworthiness creates an unacceptable risk that the death penalty would be imposed despite the existence of evidence that would infer the basis for a sentence less than death. "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." Lockett, 438 U.S. at 605 (1978).

4

19. The Supreme Court of the United States has held that "the sentencing process must permit consideration of the 'character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death' . . . in order to ensure the reliability, under Eighth Amendment standards, of the determination that 'death is the appropriate punishment in a specific case.'" Lockett, 438 U.S. at 601, (quoting Woodson v. North Carolina, 428 U.S. 280, at 304–305 (1976)).

20. A restriction on the mitigating evidence that can be considered by jurors in the sentencing phase of this trial is therefore unconstitutional, and also renders whatever, if any, sentence to be delivered unreliable since it is not certain that all relevant factors have been considered.

21. In determining whether to impose a sentence of death the jury "can do little more – and must do nothing less – than express the conscience of the community on the ultimate issue of life or death." Witherspoon v. Illinois, 391 U.S. 510, 519 (1968). The conscience of the community can only be reliably expressed by a jury that has access to all mitigating evidence to make an informed decision.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that upon hearing hereof, this court find that Art. 37.071 §2(f)(4) of the Texas Code of Criminal Procedure that defines mitigating evidence to be "evidence that a juror might regard as reducing the Defendant's moral blameworthiness" violates the 8th and 14th Amendments to the United States Constitution. Defendant prays that relief be granted by appropriate Order precluding any instruction to the jury that mitigating evidence is that which reduces the Defendant's moral blameworthiness.

5

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Texas 77008
713-880-9000 (office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Texas 77380
713-862-7766 (office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument

has been furnished to counsel for the State by hand-delivery of a copy of same on

March 8, 2010.

**ROBERT K. LOPER**

6

0333
**CAUSE NO. 08-3872**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Vs.** | § | **GALVESTON COUNTY, TEXAS** |
| | § | |
| **TRAVIS JAMES MULLIS** | § | **122ND JUDICIAL DISTRICT** |

**ORDER**

BE IT REMEMBERED, that on the _____ day of _____,

2010, came to be considered the Defendant's **MOTION REQUESTING THE COURT**

**TO FIND TEX. CODE CRIM. PROC. ART. 37.071. SECTION 2(f)(4) TO BE**

**UNCONSTITUTIONAL** . The court is of the opinion the motion should be in all things:


**GRANTED** _____

**DENIED** _____


_____
**JUDGE PRESIDING**

7

0333

**CAUSE NO. 08-3872**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION TO DECLARE THE "10-12 RULE" UNCONSTITUTIONAL

### TO THE HONORABLE JUDGE OF SAID COURT:

TRAVIS JAMES MULLIS, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article One, Sections Three, Ten, Thirteen, and Nineteen of the Texas Constitution; and other applicable law, moves this Court: (1) to declare Tex. Code Crim. Proc. article 37.071(2)(d)(2) and 37.071(2)(f)(2) unconstitutional on the ground that they create an impermissible risk of arbitrary imposition of the death penalty by placing a false dilemma before the jury; (2) to declare Article 37.071(2)(a) unconstitutional with respect to its prohibition on informing the jury that a life sentence necessarily results from an inability to answer any of the special issues; and in the alternative, (3) to provide clarifying instructions to the jury with regard to the failure of jurors to agree upon answers to special issues; and (4) to allow the attorneys to voir dire prospective jurors in order to discover their beliefs regarding the substantive outcome of deadlock at the sentencing phase.

In support of his motion, Tex. Code Crim. Proc. art. 37.071 states as follows:

### The "10-12 Rule"

Tex. Code Crim. Proc. art. 37.071(2)(d)(2) requires the Court to charge the jury that it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously, and it may not answer any issue "no" unless ten or more jurors agree.

The Court is required by Tex. Code Crim. Proc. art. 37.071(2)(f)(2) to charge the jury that it may not answer the issue submitted under Subsection (e) "no" unless it agrees unanimously and it may not answer "yes" unless ten or more jurors agree.

Under Tex. Code Crim. Proc. art. 37.071(2)(c) and 37.071(2)(f)(1) the jurors "shall" answer each interrogatory either "yes" or "no."

In the event that the jury is unable to answer any issue, either because it was unable to secure unanimity for a "yes" answer or ten votes for a "no" answer pursuant to the issues submitted under Subsection (b), or because it was unable to secure unanimity for a "no" answer or ten votes for a "yes" answer pursuant to the issue submitted under Subsection (e), Tex. Code Crim. Proc. art. 37.071(2)(g) requires the Court to sentence the Defendant to life in prison. This is substantively identical to the sentence that results if the jury is able to answer "no" to at least one issue submitted under Subsection (b) or "yes" to the issue submitted under Subsection (e).

Tex. Code Crim. Proc. art. 37.071(2)(a) prohibits the Court, either attorney, and the Defendant himself from informing the jury, or any prospective juror, that the failure to answer any of the issues presented will result in a mandatory life sentence. Jurors who ask questions regarding the consequences of such a deadlock are routinely reread the original instructions.

.Death is different not only in severity but also in kind from all other punishments. The Eighth and Fourteenth Amendments to the United States Constitution demand . additional procedural safeguards in capital trials. *See generally*, Furman v. Georgia, 408 U.S. 238 (1972); Gregg v. Georgia, 428 U.S. 153 (1976); *See* Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (holding that "death is qualitatively different"). The effect of this is that legislatures and courts are obligated to strike a difficult, but constitutionally mandated, balance between the non-arbitrary imposition of the death penalty, and the right of each Defendant to individualized sentencing.[1] The Texas death penalty statute, by providing misleading information to jurors and then prohibiting the court, the attorneys, and the Defendant from correcting that misinformation, both creates a constitutionally impermissible risk of arbitrariness, and denies Defendants their right to individualized sentencing.

---

[1] It is precisely this difficulty that caused Justice Blackmun to conclude that the entire enterprise of seeking to make the death penalty constitutionally acceptable was flawed. In his dissent from the Court's denial of a petition to grant a writ of certiorari, Blackmun declared: "From this day forward, I no longer shall tinker with the machinery of death. . . . It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies." Callins v. Collins, 510 U.S. 1141, 1145 (1994)(Blackmun, J. dissenting).

### The "10-12 Rule" Creates an Impermissible Risk of Arbitrariness

The requirement that a death sentence not be imposed arbitrarily is derived from the "Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" Caldwell v. Mississippi, 472 U.S. 320, 323 (1985)(quoting Woodson v. North Carolina, 428 U.S. at 305 (1976)). It was chiefly the concern that decisions of life and death were being arbitrarily that led the Supreme Court in 1972 to declare the death penalty in violation of the Eighth and Fourteenth Amendments to the Constitution. See generally, Furman v. Georgia, 408 U.S. 238 (1972). In capital cases, therefore, the Court is committed to ensuring that there is sufficient process to "guarantee, as much as is humanly possible, that the sentence was not imposed out of whim . . . or mistake." Eddings v. Oklahoma, 455 U.S. 104, 118 (1982)(O'Connor, J., concurring) (overruled on other grounds).

The Texas death penalty statute affirmatively creates confusion in the minds of the jurors. Jurors are first told that the jury as a whole "shall" answer "yes" or "no" to each issue presented; they are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous in order to give another. This necessarily raises the question of what happens in the event that the jury, despite being instructed that it must answer each question, is unable to get the minimum number of votes required to give either answer. The statute clearly provides that in the event of a non-answer, the Defendant is to receive a sentence that is substantively identical to that which he or she would have received had there been a verdict in favor of life, and thus the law itself exhibits no confusion with regard to the situation presented. However, not only does the statute fail to do all that is humanly possible to ensure that decisions regarding life and death are not made as a result of that manufactured confusion, but it actively prohibits any clarification of the confusion by preventing jurors from being informed at any point of the effect of a non-answer.

It is true that state legislatures are often given discretion to decide what information is relevant to a capital sentencing determination, and are thus able to exclude some information from jury instructions. See California v. Ramos, 463 U.S. 992, 1001 (1983)(holding that the Court generally "defer[s] to the State's choice of substantive

factors relevant to the penalty determination"). However, that discretion is bound by the requirements of due process. *See, e.g.*, Simmons v. South Carolina, 512 U.S. 154, 175 (1994)(O'Connor, J. concurring in judgment); Ramdass v. Angelone, 530 U.S. 156, 195 (2000)(Stevens, J. dissenting); Shafer v. South Carolina, 532 U.S. 36, 39 (2001); Kelly v. South Carolina, 534 U.S. 246, 248 (2002).

In Ramos, the Court permitted a jury instruction regarding the State Governor's commutation powers on the ground that the instruction was both accurate and relevant to a legitimate state penological interest. California v. Ramos, 463 U.S. 992, 1001-06. Despite being prompted to apply Ramos in the case of Caldwell v. Mississippi, the Court refused, holding that when the State argues that automatic appellate review is meant to determine whether the death penalty is appropriate in a given case, this information not only inaccurately depicts the role of the appellate court, but more importantly it serves an illegitimate state purpose by diminishing the ability of jurors to feel the gravity of their task. Caldwell v. Mississippi, 472 U.S. 320, 336-41 (1985).

The Texas procedural rules and corresponding jury instructions are equally inaccurate and illegitimate. When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to at least one of the three issues, this provides an incorrect picture of the state of the law. In fact, if only one juror is able to conclude that sufficient mitigation exists to warrant the imposition of a life sentence, despite that juror's inability to convince nine other jurors of his or her position, a life sentence will be imposed. This situation is unique to capital sentencing juries. During the guilt/innocence phase of a criminal trial, it is strictly correct to inform the jury that unanimity is required for either a verdict of guilt or acquittal. Although anything short of unanimity will lead to a mistrial, and thus might lead the Defendant to be released as though he were acquitted, he may still be retried and is thus unable to claim numerous basic constitutional protections such as that of double jeopardy. Under the Texas sentencing scheme, while the legislature might prefer a life sentence that derives from the agreement of ten jurors to one that arrives by default, the position of the Defendant is identical in both. *See* Padgett v. State, 717 S.W.2d 55, 58 (Tex. Crim. App. 1986) (holding that "a jury's inability to answer a punishment question in a capital murder case has the same sentencing effect as a negative answer"). Thus, instructing the jury that ten

or more of them must agree upon a "life" answer in order to sentence the Defendant to life, regardless of whether the court informs the jury of the effects of a non-answer, is an incorrect statement of the law. So long as the Texas statute equates the sentencing consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence. The false distinction between a "life" answer of ten or more jurors and a non-answer of less than ten jurors must be removed.

This was not the case prior to 1981. Under Texas's former capital sentencing statute, if a jury failed to respond to any of the three special issues the result was a complete mistrial, requiring a new trial not just on sentencing but on guilt as well. *See* Eads v. State, 598 S.W.2d 304, 308 (Tex. Crim. App. 1980). Under such a scheme, setting aside the other arguments proffered here, an instruction that ten or more jurors are required for a life sentence would be just as unobjectionable as an instruction that unanimity is required for death, a finding of guilty, or an acquittal. Presumably in response to Eads and the additional costs and difficulties that such a situation would pose, the Texas legislature in 1981 amended the death penalty statute, inserting the default sentence of life in the event of a non-answer. It was at this time that the legislature also added the infirm language that is now in Article 37.071(2)(a), prohibiting jurors from being informed of this default result. It is clear that the legislature wished to change the sentencing reality of Defendants without informing jurors of this change. In doing so, however, the legislative change made the old instructions inaccurate depictions of the law.

Not only are the instructions inaccurate, but they were intended to be inaccurate and confusing in order to serve an illegitimate state interest. Just as jurors who are informed that their decision will be reviewed for appropriateness by an appellate court are impermissibly led to deflect their awesome responsibility onto the appellate courts, Texas jurors are impermissibly led to relieve themselves of a sense of responsibility by placing it either upon the other jurors who are unwilling to join the vote in favor of life ("It is their fault that the Defendant will be killed because by not joining me they prevent us from reaching the required minimum of ten votes"), or upon the statutory scheme that purports to require ten votes, rather than merely one, in order to give life ("It is the fault of the Texas statute because unless I can get at least ten votes for life, I myself may not

vote for life"). The principle behind <u>Caldwell</u> is that courts must ensure that jurors are not invited to place their individual responsibility onto anyone else. Just as it is impermissible to lead jurors to place that responsibility upon the appellate courts, it is impermissible to lead them to place it upon their fellow jurors, or upon a restrictive sentencing statute.

Assuming *arguendo* that the Texas statute does not provide the jury with the type of inaccurate and illegitimate information prohibited by a traditional reading of <u>Caldwell</u>, new empirical data suggests that such a reading of <u>Caldwell</u> is entirely inadequate to ensure that capital jurors feel the "truly awesome responsibility" placed upon them. <u>McGautha v. California</u>, 402 U.S. 183, 208 (1971). One recent study by the Capital Jury Project concluded that "many death penalty jurors seek, and manage to find, ways to deny their personal moral responsibility for the sentencing decision." Joseph L. Hoffman, "Where's the Buck? – Juror Misperception of Sentencing Responsibility in Death Penalty Cases," 70 Ind. L.J. 1137, 1157 (Fall 1995). Given that jurors hardly need to have inaccurate information provided to them in order for them to deflect responsibility, the Caldwell rule itself should be read in light of the empirically supported premise that "death penalty jurors will take advantage of any available opportunity to *mislead themselves* about the extent of their responsibility for the sentencing decision." *Id.* If we are to give any meaning to Justice Harlan's concern that death penalty jurors be required to individually feel this terrific weight upon their shoulders, courts must inform jurors that just as each of them is required to vote for death in order for that punishment to take place, each has the power to give the Defendant life unilaterally.

The result of misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a non-answer is that they are presented with a false dilemma. Jurors are given general instructions that they must answer either "yes" or "no" to the issues before them and specific instructions that define the minimum number of votes required to give each of these answers. Because they are told that a death sentence follows from one set of answers and a life sentence follows from another, a reasonable juror might conclude that the *only* way to get either of these punishments is to answer the questions posed to them. *See* <u>California v. Brown</u>, 479 U.S. 538, 541 (1987) (quoting <u>Francis v. Franklin</u>, 471 U.S. 316 (1985)(holding that the constitutional sufficiency of

capital sentencing instructions is determined by "what a reasonable juror could have understood the charge as meaning"). This leaves jurors free to speculate as to what would occur should they be unable to provide an answer to the issues. While it is possible that jurors might correctly guess that the failure to agree will result in a life sentence, it is perhaps more likely that they will conclude that a non-answer will lead to a lesser sentence, a costly retrial or resentencing proceeding, or absolute freedom for the Defendant. Given that each of the jurors has already found the Defendant guilty of a capital offense, none of these options would look desirable to a juror who honestly believes that a life sentence in warranted. Jurors are left to deliberate with the false belief that if they are unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an altogether unacceptable third option will result.

In Simmons the Court prohibited just this sort of unfairness, holding that "The State may not create a false dilemma by advancing generalized arguments regarding the Defendant's future dangerousness while, at the same time, preventing the jury from learning that the Defendant never will be released on parole." Simmons v. South Carolina, 512 U.S. 154, 171 (1994). The Texas statute instructs jurors that at least ten of them must agree in order for a life sentence to be imposed, yet it prohibits jurors from learning that only one vote is actually required for a life sentence. It is precisely because jurors are left to speculate when capital juries are not informed of the consequences of a deadlock that several states have declared the practice to be in violation of Eight Amendment protections as found in Gregg v. Georgia, 428 U.S. 153 (1976). See, e.g., Louisiana v. Williams, 392 So.2d 619, 634-35 (1980)(holding that "by allowing the jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action"; New Jersey v. Ramseur, 106 N.J. 123, 314 (1987)(stating that "the jury must be told, in effect, that the law recognizes deadlock as a permissible result, an outcome allowed by the statute, a legal trial verdict that by law results in imprisonment rather than death").

.While this confusion might pressure voters to change their position in order to avoid the unknown third option, it might lead to an even more basic misunderstanding. Because jurors are told that each question must be answered, and voting ballots do not

include an option for non-answer, a reasonable juror following the instructions might believe that a non-answer is not only undesirable, but is in fact impermissible. Such a juror might believe that because he or she is unable to secure the ten votes required to give the answer that that juror wishes the jury to give, and because some answer either way must be given, that juror is in fact obliged to vote with the others and sentence the Defendant to death. Although the law is clear that a death sentence may never be mandatory, and individual jurors must always be free to vote for life, such a belief would reasonably follow from the instructions mandated by the Texas sentencing scheme. In fact, jurors often mistakenly believe that they are required by law to impose death.[2] One study found that when jurors asked for clarification and were simply referred back to the original instructions, rather than being disavowed of their false belief they became *more likely* to mistakenly believe that the evidence required them to vote for death.[3] This is precisely what the Texas statute would have judges do when jurors ask questions regarding the implications of a non-answer. The Texas statutory scheme creates a set of instructions that lead jurors to have false beliefs regarding their sentencing options, prohibits them from learning their true options, and then operates in a fashion that solidifies their pro-death leanings.

.It is not mere conjecture that jurors might be confused by the Texas statute in particular. A quick survey of Texas capital cases reveals numerous instances in which jurors have exhibited their confusion by asking the judge for clarification.[0] Even in the absence of such evidence of confusion, however, the Court has stated unambiguously that the "trial judge's duty is to give instructions sufficient to explain the law, an obligation that exists independently of any question from the jurors or any other indication of perplexity on their part." Kelly v. South Carolina, 534 U.S. 246, 256. The Court in Kelly held that though the jury in that case did not exhibit its confusion by inquiring about

---

2 *See generally,* Garvey, Stephen P., Sheri Lynn Johnson, and Paul Marcus, "Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases," 85 Cornell L. Rev. 627 (2000). In addition to this mistaken belief, one study also found that "[a]bout half the jurors incorrectly believe that a mitigating factor must be proved beyond a reasonable doubt. Less than a third of jurors understand that mitigating factors need only be proved to the juror's personal satisfaction. The great majority of jurors – in excess of sixty percent in both life and death cases – erroneously believe that jurors must agree unanimously for a mitigating circumstance to support a vote against death." Eisenberg, Theodore, and Martin T. Wells, "Deadly Confusion: Juror Instructions in Capital Cases," 79 Cornell L. Rev. 1 (1993).

3 85 Cornell L. Rev. 627, 639 (2000).

0

parole as the juries in <u>Simmons</u> and <u>Shafer</u> had, common sense was all that was required to know that the jurors might have been confused. *Id.* at 20. Similarly, even if empirical evidence were not available to demonstrate that the "10-12 Rule" fosters confusion among jurors, common sense is sufficient to conclude that the statute itself, and in particular its prohibition on permitting trial judges from fulfilling their duty to give sufficient instructions to explain the law, is unconstitutional.

Commenting on the prohibition on informing juries of the effect of deadlock, Judge Clinton was likely correct when he stated in his dissent in <u>Sattiewhite v. State</u> that "[i]t seems apparent to me that the purpose . . . is to act as a kind of inverted 'dynamite' charge. The Legislature did not want jurors to know that failure to reach a punishment verdict—a hung jury—would *not* result in the State incurring the additional expense of a retrial." <u>Sattiewhite v. State</u>, 786 S.W.2d 271, 292 (Tex. Crim. App. 1989)(Clinton, J. dissenting). The converse of this is that the Texas legislature did want to foster the false belief of jurors that a non-answer would require the additional expense of a retrial. Even when it is true that a hung jury will result in a costly retrial, the Constitution does not permit judges to refer to the additional expenses when they urge deadlocked juries to try to come to a verdict. *See* <u>United States v. Taylor</u>, 530 F.2d 49, 52 (5th Cir. 1976). In the event that such costs do not in fact exist, as is the case under the Texas statute, it is all the more clear that the Constitution cannot permit the legislature to benefit from that misperception by prohibiting judges and lawyers from correcting the mistaken beliefs of jurors.

The inaccurate and illegitimate instructions provided to Texas capital sentencing juries creates an unacceptable risk that decisions are being made arbitrarily or by mistake. While it is true that uncertainty about the consequences of a non-answer might lead a lone holdout for a life sentence to join the other jurors voting for death, it is equally true that this confusion might lead at least one of the three holdouts for death to join the nine other jurors voting for life. *See, e.g.,* <u>Jones v. United States</u>, 527 U.S. 373, 394 (1999)(stating that the petitioner could not demonstrate prejudice because "[i]t is just as likely that the jurors, loathe to recommend a lesser sentence, would have compromised on a sentence of life imprisonment as on a death sentence"). With regard to the Texas statute, while this point might be correct, it fails to prevent serious constitutional infirmities for two reasons.

First, because the statute provides Defendants with the exact same sentence regardless of whether they receive one vote for life or ten, the State itself is not prejudiced when votes for death are changed into votes for life for the sake of obtaining the ten vote minimum. The Defendant, however, suffers a tremendous wrong when holdouts for life switch their votes to death out of confusion or a feeling of obligation. Thus, only the Defendant, and not the State, could suffer harm from such confusion. Even if the State did have an interest in keeping life sentences that derive from a verdict distinct from life sentences that derive by default, that interest is vastly overshadowed by the Defendant's interest. *See* Lowenfield v. Phelps, 484 U.S. 231, 252 (Marshall, J. dissenting)(stating that when the substantive outcome of a deadlock is identical to that of a life verdict, "the State's interest in a verdict . . . [is] relatively weak, whereas the Defendant's interest in preserving the integrity of a dissenting vote [is] correspondingly strong"). Stated simply, while the Defendant never needs to have a voter change his or her vote out of confusion, the State, because death may only be imposed through a unanimous verdict, does. Thus, while it might be true that it would be difficult to determine whether a particular Defendant was prejudiced, it is beyond dispute that the system as a whole can only prejudice the Defendant.

Second, it is eminently clear that when confusion regarding the outcome of a deadlock leads jurors to change their votes in either direction simply for the sake of a verdict, those decisions regarding life and death are being made arbitrarily. In cases in which the jury does not quickly, and without dispute, come to agreement on the appropriate punishment, the two most important factors remaining for a decision are the general confusion of the jurors caused by misinformation, and the initial disposition of the jury regarding whether or not to impose death. If nine jurors find sufficient mitigation to warrant a life sentence, at least one of the three jurors holding out for death will be likely to switch over solely out of uncertainty regarding the consequences of a non-answer or due to a mistaken belief that an answer must be reached at all costs. If eleven jurors vote for death and one finds that the mitigating evidence warrants life, that juror might be swayed to vote for death for identical reasons. When jury instructions misinform jurors and purposefully prevent clarification, and verdicts are rendered out of such confusion, it is clear that those instructions "introduce[ ] a level of uncertainty and unreliability into the factfinding

process that cannot be tolerated in a capital case." Beck v. Alabama, 447 U.S. 625, 643
(1980) (overruled on other grounds).

### The "10-12 Rule" Denies the Defendant's Right to Individualized Sentencing

The Constitution requires that states balance the obligation to minimize the risk of
arbitrariness with the need for individualized sentencing. "[I]n capital cases the
fundamental respect for humanity underlying the Eighth Amendment requires
consideration of the character and record of the individual offender and the circumstances
of the particular offense as a constitutionally indispensable part of the process of
inflicting death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976) ( In furtherance
of this demand, the Court held in Lockett that "[T]he sentencer . . . [can] not be precluded
from considering, as a mitigating factor, any aspect of a Defendant's character or record
and any of the circumstances of the offense that the Defendant proffers as a basis for a
sentence less than death."(citation omitted). Lockett v. Ohio, 438 U.S. 586, 604 (1978).
Later cases have clarified that such mitigating evidence need only be proven by a
preponderance of the evidence. See Walton v. Arizona, 497 U.S. 639, 649-50 (1990)
(overruled on other grounds). More importantly, the Court has unequivocally held, and
the Texas statute clearly states under Article 37.071(2)(f)(3) that a single juror must be
permitted to consider and weigh mitigating evidence unilaterally, regardless of whether
any other jurors accept the evidence as mitigation. See McKoy v. North Carolina, 494
U.S. 433, 435 (1990); Mills v. Maryland, 486 U.S. 367, 374-75 (1988).

Although the capital sentencing jury resembles juries that sit in the guilt/innocence
phase of capital and non-capital trials, its role is distinct. All juries have historically been
expected "to secure unanimity by comparison of views, and by arguments among the
jurors themselves." Jones, 527 U.S. at 382 (quoting Allen v. United States, 164 U.S. 492,
501 (1896)). The capital sentencing jury, however, is charged more precisely with the
duty to "express the conscience of the community on the ultimate question of life or
death." Lowenfield, 484 U.S. at 238 (citation omitted). Because extraordinary
protections are constitutionally required to ensure against unwarranted impositions of
death, the Texas sentencing scheme, like the Louisiana statute, creates "a situation unique
to the capital trial that a single juror, by persisting in a sentencing recommendation at

variance with all of his fellow jurors, may alone cause imposition of a life sentence." State v. Loyd, 459 So. 2d 498, 503 (La. 1984). The requirement of individualized sentencing in capital trials means not simply that Defendants must be judged based upon their own character but that they must be judged as such by individual jurors charged with considering the evidence and asked to make determinations of life and death. This clearly follows from the Court's demands that each individual juror be capable of considering mitigating evidence that that juror alone finds to exist simply by a preponderance of the evidence.

Members of a capital sentencing jury sit through the court's instructions, take an oath, and pass through the extraordinary process of death qualification. More than any other jury that sits in a courtroom, we can be confident in our presumption that such jurors are unbiased, impartial, and capable of deliberation. It cannot be correct, therefore, to say that informing jurors of the effects of a deadlock would act as an "open invitation for the jury to avoid its responsibility and to disagree." Davis v. State, 782 S.W.2d 211, 221 (Tex. Crim. App. 1992)(overruled on other grounds)(quoting Justus v. Commonwealth, 266 S.E.2d 87, 92 (Va. 1980)). Rather, when a juror decides that sufficient mitigation exists to warrant a life sentence, and wishes to stick to that position despite the fact that it will prevent the jury from reaching a verdict, he does not violate some abstract duty to "secure unanimity" or to not "disagree." It is true that under the Texas sentencing statute, a juror would be abdicating his or her responsibility were he or she to not answer one of the questions. "The issues are framed in a manner which permits them to be answered either affirmatively or negatively, and it is the purpose of the deliberative process to resolve juror vacillation." Nobles v. State, 843 S.W.2d 503, 510 (Tex. Crim. App. 1992). Once deliberation has taken place, vacillation has been resolved, and each juror has settled upon his or her answer to the three special issues, however, surely the failure of those votes to meet the numerical requirements of the "10-12 Rule" cannot be considered a violation of the jury's duty. On the contrary, as the Supreme Court of New Jersey held in Ramseur, and as is equally true under Texas's statutory scheme, "A capital jury does not 'avoid its responsibility' by disagreeing – genuine disagreement is a statutorily permissible conclusion of its deliberations." Ramseur, 106 N.J. at 311.

.Indeed, McKoy and Mills together stand for the principle that setting up barriers to prevent the jury from disagreeing can itself be constitutionally prohibited. This is precisely the case with the "10-12 Rule," the substantive effect of which is that it prohibits individual jurors from having a "meaningful opportunity" to judge the Defendant on the basis of mitigation by creating the appearance that while each juror may introduce and weigh mitigating evidence unilaterally, a minimum of ten jurors are required to pass judgment on such factors.[5]  This was exactly what the Court was concerned about in McKoy when it held that "Mills requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." McKoy, 494 U.S. at 442-43.  It is not enough for Texas to inform the jury that they "need not agree on what particular evidence supports an affirmative finding on the issue [of mitigation]," Article 37.071(2)(f)(3), if the effect of the entire instruction is that ten or more jurors must agree upon an affirmative finding in order to give effect to the finding of any one juror.  Each juror must be capable of giving effect to mitigating evidence when determining the appropriate punishment, and thus only one juror, not ten, must be sufficient under Article 37.071(2)(f)(2) to answer "yes" to the mitigation issue present by 37.071(2)(e)(1).  By instructing the jury that ten jurors are required in order to give a "yes" answer, the Texas statute violates the principles underlying Mills and McKoy by preventing individual jurors from having a meaningful opportunity to consider mitigating factors.

<u>The "10-12 Rule" Denies the Defendant's Right to a Fair and Impartial Jury</u>

As discussed above, the "10-12 Rule" operates by necessarily creating confusion in the minds of the jurors, and then prohibiting them from having their confusion clarified. This was earlier discussed within the context of the additional Eighth Amendment safeguards required to reduce the risk of arbitrary and unreliable sentences.  An additional problem created by such confusion is that it permits jurors with misconceptions about the

---

5 In Roberts v. Louisiana, the Supreme Court invalidated Louisiana's mandatory death penalty scheme on the grounds that it "afford[ed] no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender." Roberts v. Louisiana, 428 U.S. 325, 333-34 (1976).  That the sentencer must have a "meaningful opportunity" to consider mitigating factors suggests that not only may legislatures not actively prohibit such consideration, but they also must also take positive steps to foster it when necessary.

law formed prior to the trial and outside of the courtroom to introduce such ideas into deliberations.

It is beyond dispute that capital juries are often dominated by misconceptions regarding the state of the law, their role as jurors, and the definition of key concepts such as mitigation. As discussed above, a reasonable juror who conscientiously attempts to understand the Texas sentencing statute might be led to believe that just as a sentence of death may not be imposed unless the jury is unanimous with regard to all three special issues, a sentence of life may not be imposed unless at least ten jurors agree with respect to at least one of the three special issues. Not only does this mistaken belief raise an Eighth Amendment problem with regard to arbitrariness and reliability, but the possibility that jurors might draw upon their preconceived notions to resolve such a situation raises Sixth Amendment concerns.

The right to an impartial jury has long been recognized as fundamental. *See, e.g.*, Lockhart v. McCree, 476 U.S. 162 (1986). This is particularly crucial in capital cases, where the Constitution demands that "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." Witherspoon v. Illinois, 391 U.S. 510, 523 n. 20 (1968) (overruled on other grounds). To protect this right, courts are obliged to take reasonable steps to ensure the impartiality of a jury. It is for this reason that voir dire is made available to both parties, the judge is equipped with the power to strike jurors for cause, each party is granted a certain number of peremptory challenges, and jury instructions are fashioned to clarify the jury's role and impress upon them the importance of their task and the oath to which they have sworn.

By manufacturing confusion in the minds of the jury and preventing the court or the attorneys from correcting it, the "10-12 Rule" creates fertile ground for jurors to draw upon their own biases and preconceived notions in coming to a verdict. This is particularly dangerous when jurors are confused about their sentencing options and the results of their sentencing decisions. The concept of a hung jury is widely understood to be a disfavored result. In most trials, a hung jury leads to a mistrial, and most people understand that a mistrial will either lead to a costly retrial or to the dropping of charges. While neither of these undesirable outcomes will result in the case of capital sentencing under the Texas statute, jurors are required to be kept in the dark with regard to that

materially relevant fact. The "10-12 Rule" effectively forces the jury to wonder what would happen were they are unable to answer the special issues, possibly leads them to believe that an unacceptable third alternative other than life and death would follow, and then leaves them to draw upon their own preconceived notions in coming to a verdict. While the concept of a mistrial might be distasteful to a holdout, and is certainly disfavored by the court, during the guilt/innocence phase of a criminal trial, it is surely all the more unacceptable to a juror in a capital sentencing proceeding who has already found the Defendant guilty of a capital offense. The risk that jurors will enter the courtroom with that misconception is too great to allow them to continue deliberating in the dark.

To ensure that capital juries do not rely upon their biases regarding hung juries during deliberations, jurors must either have their misperceptions corrected, or they must be examined for bias during voir dire. Because of the additional Eighth Amendment problems with forcing jurors to deliberate using false information, this Court should declare Article 37.071(2)(a) unconstitutional with respect to its prohibition on informing the jury of the effects of a deadlock. The Court should protect the right to a fair and impartial jury by informing the jury that if they are unable to reach the minimum number of votes required to give an answer to any one of the special issues, they are permitted to return the ballot without any answer. In the event that the jury is unable to answer any of the three special issues, the court will sentence the Defendant to life imprisonment as if he had been sentenced by the jury itself.

Should this Court not wish to protect the Defendant's right to a fair and impartial jury by invalidating Article 37.071(2)(a), the Court must permit the attorneys to voir dire potential jurors to discover what they believe would happen in the event of a non-answer. *See* Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981)(holding that voir dire "plays a critical function in assuring the criminal Defendant that his Sixth Amendment right to an impartial jury will be honored"). Not only is such questioning permitted by the Texas statute on the grounds that it would not involve informing prospective jurors of the actual consequences of a non-answer, but it is clearly in line with the central holding in Turner v. Murray that the risk of juror bias must be considered "in light of the ease with which that risk could have been minimized." Turner v. Murray, 476 U.S. 28, 36 (1986) (overruled in part on other grounds, affirmed in part). In Turner, the Court held

· ·

that because of the complete finality of the death penalty, and the risk that racial prejudice would infect jury deliberations, the trial judge failed to protect the Defendant's right to an impartial jury by not permitting the lawyers to question prospective jurors on their racial prejudice. *Id.* Similarly, because of the finality of the death penalty, and the risk that preconceived notions regarding the effects of a hung jury will improperly infiltrate jury deliberations, the right to an impartial jury must be protected at the very least by granting attorneys the right to question jurors about their beliefs. While Defendants may not have an absolute right to voir dire potential jurors regarding their beliefs about deadlocked juries, when the legislature has barred all other means of bringing such biases to light and correcting them it becomes imperative that Defendants be equipped with the tools to confront those who sit in judgment upon them.

In King v. Lynaugh, the Fifth Circuit sitting en banc reversed an earlier decision by a three judge panel which concluded that for Texas to deny a Defendant the opportunity to present information about parole eligibility is, therefore, to limit his decision to bring to the sentencer's consideration relevant information and circumstances that might cause the jury to decline capital punishment. King v. Lynaugh, 828 F.2d 257, 264 (5th Cir. 1987). In his dissent from the en banc ruling, Judge Rubin wrote: "It is precisely because Texas courts refuse to give accurate, corrective instructions that voir dire about potential jurors' understandings of parole law becomes necessary." King v. Lynaugh, 850 F.2d 1055, 1067 (5th Cir. 1988)(Rubin, Williams, Johnson, JJ. dissenting). An essential feature of the Court's holding in that case was that trial judges can use their discretion in determining how to restrict voir dire and fashion jury instructions, relying upon "immediate perceptions," Rosales-Lopez, 451 U.S. at 188-89, and the "demeanor" of the jury, Ristaino v. Ross, 424 U.S. 589, 595 (1976) (citation omitted). The present case is distinguishable from King, however, in that it is the legislature, and not the trial judge, that has decided not to issue accurate, corrective instructions to the jury regarding deadlock. Whereas the trial judge maintains the freedom to instruct the jury on parole or to allow the attorneys to voir dire the jury with regard to their beliefs on parole, the "10-12 Rule" expressly restricts the judge's discretionary powers with regard to instructing the jury on the law of deadlock. Thus, even if King is correct in instances in which it is the courts which make the decision to not give clarifying instructions, when the

legislature makes such a decision as is the case here, it is the duty of the courts to protect the right to an impartial jury by providing additional safeguards through the process of voir dire. That duty derives from the unique advantages that the trial judge has over the legislature to ensure a fair and impartial jury on a case by case basis.

<u>The "10-12 Rule" Prevents the Defendant from Receiving Effective Assistance of Counsel</u>

It is a fundamental principle in death penalty jurisprudence that "If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a Defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a Defendant shall live or die by a jury of people who may never before have made a sentencing decision." <u>Gregg v. Georgia</u>, 428 U.S. 153, 190 (Stewart, Powell, and Stevens, JJ.). This is so clear that the Fifth Circuit in <u>Burley v. Cabana</u> declared that it was ineffective assistance of counsel in violation of the Sixth Amendment for the trial lawyer to not "inform the trial court of sentencing alternatives . . . ." <u>Burley v. Cabana</u>, 818 F.2d 414, 418 (5th Cir. 1987).

If it was ineffective assistance of counsel to not inform the judge of his sentencing alternatives, it would surely be ineffective assistance of counsel to not inform a sentencing jury of its sentencing alternatives. Yet this is precisely what the "10-12 Rule" forces trial counsel to do by preventing attorneys from informing the jury of the true state of the law. A reasonable defense attorney would surely inform each juror that not only is it that juror's right, but it is in fact that juror's duty, to individually weigh the evidence presented and make a determination for life or death on the basis of that individual's conscience. Such a statement would accurately describe the role of the capital juror, and would provide the jury with information materially relevant to their sentencing responsibilities. To prevent an attorney from informing the jury of the true state of the law when such information is essential to the capital juror's role is to prevent the attorney from providing the Defendant with his right to adequate counsel. This is equally true in the event that counsel is prevented from conducting voir dire in order to intelligently

57

utilize counsel's peremptory strikes to remove prospective jurors harboring devastating misunderstandings of the consequences of deadlock under the Texas death penalty.

<u>The "10-12 Rule" Has a Coercive Effect upon the Jury</u>

"[T]he principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." <u>Jenkins v. United States</u>, 380 U.S. 445, 446 (1965)(quoting the Solicitor General's brief to the Court). In <u>Jenkins</u>, the Court declared that "in its context and under all the circumstances" the judge's statement to the jury that "'You have got to reach a decision in this case'" was coercive. <u>Id.</u> In <u>United States v. United States Gypsum Co.</u>, the Court applied <u>Jenkins</u> in holding that reversal would have been appropriate "solely because of the risk that the foreman believed the court was insisting on a dispositive verdict." <u>United States v. United States Gypsum Co.</u>, 438 U.S. 422, 462 (1978). In his concurrence with the Third Circuit's judgment in the case prior to the Supreme Court's ruling, Judge Adams concluded that when the jury foreman suggested to the trial judge that he knew the court wanted a verdict "one way or the other," the trial judge at that time "possessed the affirmative obligation to make it clear to the foreman that the jury had the option of reaching no verdict, should juror unanimity prove impossible." <u>United States v. United States Gypsum Co.</u>, 550 F.2d. 115, 133 (3d Cir. 1977)(Adams, J. concurring).

Within the context of capital sentencing, and taking into consideration the circumstances required by the Texas statute, instructing the jury that they "shall" answer "yes" or "no" to the special issues presented to them acts as undue coercion. It has already been shown above that the Texas statute necessarily creates confusion in the minds of jurors, and might affirmatively mislead jurors to believe that a third alternative to life and death exists. Within the context of the demand that each issue must be answered, setting minimum votes for each answer has the effect of coercing holdouts for life or death to feel that the need to come to a verdict takes precedent over their conscientiously held belief. While this is unacceptable in all criminal trials, it is particularly unacceptable in capital sentencing proceedings.

In <u>Lowenfield</u>, the Court in a capital case upheld the use of a supplemental charge similar to an "Allen charge" that was intended to encourage the jury to come to a verdict.

18

Lowenfield, 484 U.S. at 240-41.  The Court acknowledged that although the traditional justification for such a charge—"the avoidance of the societal costs of a retrial"—did not exist, the State still had a strong interest in having the jury "'express the conscience of the community on the ultimate question of life or death.'"  Id., at 238 (citation omitted).

Under the Texas sentencing statute the societal cost justification for pressuring juries to return a verdict is similarly absent.  Thus the only possible State interest that could balance against the strong State and private interests that jurors not be coerced, that Defendants be tried by a fair and impartial jury, and that determinations of punishment be reliable and non-arbitrary is that capital juries are meant to speak the conscience of the community.

.While it is true that capital juries are meant to represent the community, two reasons exist for why this value cannot outweigh the risk of coercion, bias, and arbitrariness that are created by not informing the jury that they have the option of not answering a question, and that the effect of a non-answer is a life sentence.  First, in order for the jury to enter a verdict of death under the Texas scheme, all twelve members of the jury must agree on all three special issues.  Thus, while the purpose of the jury is to express the collective conscience of the community, just as each community is made up of individuals each jury is made up of individuals.  What we are really looking for is not a jury that as a unit is asked to speak the singular voice of the community, but rather we are asking twelve representative individuals to each speak his or her own voice, and through that we hope to discern the collective conscience of the community.[6]  It is a mistake, therefore, to consider that the State's interest in having the jury speak the conscience of the community conflicts with the State's interests in not coercing the jury, providing a fair and impartial jury, and limiting the risk for arbitrary and unreliable decisions.  Those interests are one and the same, for if any member of the jury feels undue pressure to change his vote in order for the jury to come to a verdict, the State's interest in having the

---

[6] This statement of representativeness should not be taken to be an admission that capital juries are representative of the community.  The process of death qualification leads to the removal for cause of conscientious objectors to the death penalty despite the fact that they are no less members of the community than anyone else, as well as individuals with qualms about the death penalty who are stricken through the use of peremptory challenges.  Numerous studies have shown that those individuals who remain are more prone to support the death penalty than the average member of society, and are also more likely to convict the Defendant either because of their personal beliefs, or because the extremely time-intensive process of death qualification focuses jurors not upon the guilt or innocence of the Defendant, but rather upon what penalty he deserves once his guilt has been reached.

jury speak the conscience of the community is frustrated. It is only when each member of the jury is left entirely free to weigh the evidence presented, is permitted to unilaterally introduce and consider mitigation, and is fully informed of the individual, awesome responsibility that he or she bears in making this decision between life and death that the conscience of the community will be expressed. The Court must allow for the very real possibility that a non-verdict is itself an expression of the community's truly divided conscience with respect to the issue of whether an individual should live or die.

Secondly, even if the State's interest in a verdict does stand in opposition to the other interests that the State and the individual Defendant might hold, the entire body of capital punishment jurisprudence speaks to the overriding nature of our need to protect against unwarranted impositions of death. The State always has an interest in reaching a verdict and having the jury speak the voice of the community. That interest has not been allowed to supercede the Defendant's right to a fair and impartial jury, to not be subjected to cruel and unusual punishment, or to not receive the equal protection of the law.

**WHEREFORE, PREMISES CONSIDERED**, Mr. Mullis respectfully requests that: (1) the Court declare Tex. Code Crim. Proc. art.s 37.071(2)(d)(2), 37.071(2)(f)(2), and 37.071(2)(a) unconstitutional; (2) the Court instruct the jury that in the event that they are unable to answer any issue presented to them they are to return the ballot without said answer, and that a life sentence will be imposed upon the Defendant pursuant to state law; and in the alternative (3) the Court permit the attorneys to voir dire prospective jurors to discover whether they harbor any preconceived notions regarding the consequences of a deadlock that will prevent them from accurately and reliably weighing the evidence presented at sentencing.

Respectfully submitted,

ROBERT K. LOPER
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

GERALD BOURQUE
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)

ATTORNEYS FOR DEFENDANT


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same on _____, 2010.

ROBERT K. LOPER

0333

## CAUSE NO. 08-~~3872~~

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## ORDER

BE IT REMEMBERED, that on the _____ day of _____,

2010, came to be considered the Defendant's **MOTION TO DECLARE THE "10-12 RULE"**

**UNCONSTITUTIONAL** . The court is of the opinion the motion should be in all things:

**GRANTED** _____

**DENIED** _____ .

_____
**JUDGE PRESIDING**

22

0333

**CAUSE NO. 08-3872**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION FOR PRESERVATION AND DISCLOSURE
## TO THE DEFENSE OF GRAND JURY TESTIMONY

### TO THE HONORABLE JUDGE OF SAID COURT:

Now comes, **TRAVIS JAMES MULLIS,** by counsel, and pursuant to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, article 1 §§3, 10, 13 and 19 of the Texas Constitution, and Tex.C.Crim.P. Art. 39.14 makes this Motion For Preservation and Disclosure To The Defense of Grand Jury Testimony.

In support of this motion, counsel would show:

## 1. RECORDING AND PRESERVATION OF GRAND JURY TESTIMONY

(a)  A State District Judge has jurisdiction to order that Grand Jury proceedings be recorded and transcribed.  The District Judge has jurisdiction regarding the formation, organization, constitution and management of the Grand Jury as fully set out in Tex.C.Crim.P. Chapter 19.

(b) The District Judge gives the commissioners their instruction and duties; *see* Tex.C.Crim.P. Art. 19.04.

(c) This Court can order that grand jury testimony be recorded and after recording this testimony be preserved.

463

## 2. PROVIDING GRAND JURY TESTIOMNY OF WITNESS TO THE DEFENSE

(a)  The transcript of testimony of a witness that testified before the county grand jury that returned the indictment against **TRAVIS JAMES MULLIS** is:

> (i) a tangible thing that is not privileged;

> (ii) contains evidence that is material to any matter involved in the action against the accused;

> (iii) the transcripts are in the possession, custody or control of the state or its agencies.

(b) Upon a showing of good cause, this Court shall order the production of the tangible thing, in this case the testimony of all witnesses who testified before the grand jury that returned the indictment against **TRAVIS JAMES MULLIS**.  Tex.C.Crim.P. Art. 39.14(a).

## 3. FAILURE TO PROVIDE GRAND JURY TESTIMONY

(a)  Should this Court fail to order the preservation of grand jury testimony and/or such transcripts not be provided to the defense, the trial court cannot comply with Tex.R.Evid. 615(a) and sanctions must be imposed.  Tex.R.Evid. 615(a) provides:

### PRODUCTION OF STATEMENTS OF WITNESSES IN CRIMINAL CASES

> **(a)** After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and relates to the subject matter concerning which the witness has testified. ...

> **(d) Recess for examination of Statement**.  Upon delivery of the statement to the moving party, the court, upon application of that party, shall recess proceedings in

the trial for a reasonable examination of such statement and for preparation for its use in the trial.

**(e) Sanction for Failure to Produce Statement**. If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice.

**(f)  Definition**  As used in this rule, a "statement" of a witness means:

(3) a statement, however taken or recorded, or a transcription thereof, made by the witness to a grand jury.

(b) Counsel for **TRAVIS JAMES MULLIS** intends to comply with Tex.R.Evid. 615 and will move the court to provide the defense with a copy of each witnesses prior statements including testimony before the county grand jury.

## 4.   NEED TO PROVIDE TRANSCRIPTS PRIOR TO TRIAL

(a) Because of the likely volume of the transcript, counsel for Defendant will be required to ask for a recess after each witness has testified if delivery is delayed until after the witness has testified at trial. Such recess will have to be granted "for a reasonable examination of such statement and for the preparation for its use in trial". Tex.R.Evid. 614(d). Such recesses will be unacceptably prejudicial to defendant, inconvenience the jury and will slow the pace of the trial.

(b) The transcripts should be provided to the defense not later than 30 days after the indictment is returned by the grand jury.

**WHEREFORE, PREMISES CONSIDERED**, Counsel for **TRAVIS JAMES MULLIS** prays that upon hearing, this court:

**ORDER** the transcribing and preservation of all testimony before the Harris County grand jury;

**ORDER** the preservation of all grand jury transcripts, and;

**ORDER** that within _60_ days of the return of any indictment against **TRAVIS JAMES MULLIS** that such transcripts be provided to defense counsel.

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

2010 MAR -8 AM 9:50

CAUSE NO. 08-3872

0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## ORDER

BE IT REMEMBERED, that on _____, 2010, came to be

considered the Defendant's **MOTION FOR PRESERVATION AND DISCLOSURE TO**

**THE DEFENSE OF GRAND JURY TESTIMONY**.

The court is of the opinion the motion should be in all things:

(1) **ORDER** the transcribing and preservation of all testimony before the Harris County grand jury;

GRANTED _____

DENIED _____

(2) **ORDER** the preservation of all grand jury transcripts, and;

GRANTED _____

DENIED _____

(3) **ORDER** that within _____days of the return of any indictment against Travis James Mullis that such transcripts be provided to defense counsel.

GRANTED _____

DENIED _____

_____
**JUDGE PRESIDING**

0333
**CAUSE NO. 08-~~3872~~**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Vs.** | § | **GALVESTON COUNTY, TEXAS** |
| | § | |
| **TRAVIS JAMES MULLIS** | § | **122ND JUDICIAL DISTRICT** |

## MOTION FOR PRODUCTION OF IMPEACHMENT EVIDENCE

**TO THE HONORABLE JUDGE OF SAID COURT**:

**COMES NOW, TRAVIS JAMES MULLIS**, Defendant in the above-cause, by and

through counsel and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States

Constitution and Article 1, Sections 3, 10, 13 and 19 of the Texas Constitution and files this

Motion For Production of Witness Related Evidence, and for good and sufficient cause would

show the Court the following:

1. The Defendant has been indicted for the offense of capital murder.

2. The State is seeking the death penalty.

3. The Defendant has a Constitutional right to confront and cross-examine witnesses that

testify against him.  Impeaching as well as exculpatory evidence is favorable to the

accused under *Brady v. Maryland*, 371 U.S. 812, 83 S. Ct. 56, 9 L. Ed. 2d 54 (1962); *see*

*also, United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

4. The State, and its prosecutors, should be Ordered (with a continuing duty to disclose

newly discovered material previously and here ordered),  to furnish defense with, and

permit defense to inspect, copy and/or photograph the following information, objects or

copies relating to expert and/or medical evidence within the possession, custody, control

1

or knowledge of the prosecution or which by exercise of due diligence may become known to the State:

The identity of each expert witness the State consulted with or intends to call as a witness in the instant matter, including:

    (a) name and title;

    (b) work address and home addresses (if known);

    (d) work and home telephone numbers;

    (e) profession or occupation, and the field in which (s)he is allegedly an expert;

    (f) a copy of the witnesses' Curriculum Vitae that contains the formal education and training, including the name and address of each school where special education or training was received in this expert's field of expertise; the dates of said education and training; the name or description of each degree (s)he received, including the date when each was received and the name of the school from which received;

    (g) membership in any professional or trade association in that field of expertise including the name of each professional or trade association, dates of membership and description of office(s) held;

    (h) authorship of any books, papers or articles, including title and subject matter of book, paper or article, name and address of each item's publisher and each item's date of publication;

    (i) licenses to practice in the field of expertise, including the governmental authority by whom licensed, the general requirements that had to be met and how

2

these requirements were fulfilled; and whether any license had ever been revoked or suspended;

(j) employment, including type of practice or work in the field of expertise, names and addresses of employers and/or associates, dates of said employment, positions held and/or duty performed.

The identity of any object, sample or material tested, analyzed or examined by each expert in regard to the instant matter, including as to said test, analysis and/or examination (all three are hereinafter called "exam")

(a) the exam's date;

(b) the exam's location;

(c) the exam's purpose;

(d) the steps or methods employed in said exam;

(e) the information provided by another to the expert prior to said exam;

(f) the identity of any other person(s) assisting in said exam; and

(g) the present location of any samples or materials used in said exam.

The results or conclusions reached by each expert the State consulted or intends to call as a witness in the instant matter, including:

(a) written reports;

(b) oral opinions, including the date thereof and to whom reported.

4. The amount of compensation provided to each expert consulted or whom the State intends to call as a witness in regard to this matter.

5. In support of said motion, the Defendant respectfully states that the scientific

3

complexity of the instant case requires that full discovery of medical and scientific facts and opinions be provided. The prosecution had access and opportunity to perform scientific analysis prior to counsel's appearance in the case or in some instances, such analysis can no longer be replicated or reproduced by defense counsel. The Defendant requires a complete exposition of that information prior to the beginning of the introduction of evidence to the jury in the above case.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that relief be granted as prayed for herein.

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of on _____, 2010.

Robert K. Loper

5

0333

## CAUSE NO. 08-3872

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

JASON E. MURRAY
CLERK DISTRICT COURT
FILED
JAN 19 2011
GALVESTON COUNTY, TEXAS
BY _____ DEPUTY

### ORDER

BE IT REMEMBERED, that on the 19 day of _____Jan_____,
2010, came to be considered the Defendant's **MOTION FOR PRODUCTION OF IMPEACHMENT EVIDENCE.** . The court is of the opinion the motion should be in all things:

GRANTED ____✓____

DENIED _____

John Ellison
**JUDGE PRESIDING**

6

CAUSE NO. 08-~~3872~~  0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION TO LIST EXHIBITS TO BE OFFERED
## IN BOTH PHASES OF TRIAL

### TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW, TRAVIS JAMES MULLIS,** Defendant in the above-entitled and numbered criminal action, moves the court to order the prosecutor to provide him an exhibit list ten (10) days prior to the beginning of jury selection. In support, the Defendant will show the following.

The Defendant would respectfully request this court to instruct the district attorney to list and designate in writing all exhibits he seeks to introduce or attempt to introduce in both phases of the trial of this case ten (10) days prior to the beginning of jury selection so that defense counsel may have an opportunity to inspect and copy or photograph them prior to trial. If the court does not grant this motion, counsel's ability to provide effective assistance may be jeopardized.

Judicial economy also supports this motion. The court's failure to grant this motion may require a continuance during the trial on the merits.

**WHEREFORE, PREMISES CONSIDERED,** the Defendant prays the court will grant this motion in all respects and instruct the district attorney to list and designate in writing any an all exhibits he plans to introduce or attempt to introduce in the trial of this case at both phases and to do so at least thirty (30) days prior to the beginning of jury selection.

1

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, TX. 77380
713-862-7766(office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been hand delivered to the District Attorneys' Office, on _____, 2010.

**ROBERT K. LOPER**

2

0333

CAUSE NO. 08-3872

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

JASON E. MURRAY
CLERK DISTRICT COURT
FILED
JAN 1 9 2011
GALVESTON COUNTY, TEXAS
BY_____
DEPUTY

## ORDER

BE IT REMEMBERED, that on the __19__ day of __Jan.__,

201**0**, came to be considered the Defendant's **MOTION TO LIST EXHIBITS TO BE**

**OFFERED IN BOTH PHASES OF TRIAL**. After consideration of the motion, it is the

opinion of the court that Defendant's motion be:

GRANTED          ✓_____

DENIED           _____

_John Ellison_

**JUDGE PRESIDING**

3

CAUSE NO. 08-~~3872~~ 0333

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION TO DISCOVER THE PORTIONS OF THE DEFENDANT'S STATEMENT WHICH THE STATE INTENDS TO USE AT TIME OF TRIAL

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, TRAVIS JAMES MULLIS, Defendant, and pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Article 1, Sections 3, 10, 13, 19 and 29 of the Texas Constitution and Tex. Code Crim. Proc. art. 1.05, and Rules 1.06 and 1.07, Texas Rules of Criminal Evidence files this Motion to Discover the Portions of the Defendant's Statement Which the State Intends to Use at Time of Trial and in support thereof would show the Court:

1. The Defendant has been indicted for the offense of capital murder.

2. The State is in possession of a statement allegedly made by the Defendant.

3. At the trial of this cause, the State will seek to offer into evidence the alleged statement in order to convict the Defendant. Prior to its introduction, the State will, in all probability, seek to edit the alleged statement and redact portions of the statement.

4. In order to afford the Defendant effective assistance of counsel as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Section 10 of the Texas Constitution, defense counsel *must know*, prior to trial, what portions of the alleged statements the State will redact. Without knowing, prior to trial, the portions of

1

the statements the State will redact, defense counsel will not be able to adequately prepare his defense to the allegations in the indictment.

5.  Defense counsel should be provided with a redacted copy of the statement well in advance of trial.

**WHEREFORE, PREMISES CONSIDERED**, the Defendant requests that this Motion be sustained and relief granted as prayed for herein.

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, TX. 77380
713-862-7766(office)
832-813-0321 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same on _____ 2010.

**ROBERT K. LOPER**

2

0333

## CAUSE NO. 08-~~3872~~

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

### ORDER

BE IT REMEMBERED, that on the _____ day of _____,

2010, came to be considered the Defendant's **MOTION TO DISCOVER THE PORTIONS**

**OF THE DEFENDANT'S STATEMENT WHICH THE STATE INTENDS TO USE AT**

**TIME OF TRIAL.** The court is of the opinion the motion should be in all things:

GRANTED _____

DENIED _____

_____
**JUDGE PRESIDING**

3

**CAUSE NO. 08-3872**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION FOR PRODUCTION OF EXCULPATORY, IMPEACHMENT AND MITIGATING EVIDENCE

**TO THE HONORABLE JUDGE OF THIS COURT:**

**COMES NOW**, Travis James Mullis, Defendant in the above-entitled and numbered criminal action, files this motion for production of all exculpatory, impeachment and mitigating evidence. In support, the Defendant will show the following.

The prosecution has an obligation to produce all evidence which is exculpatory, impeaches one of their witnesses, or mitigates punishment. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley*, 514 U.S. 419 (1995). Moreover, the prosecution has an affirmative obligation not to use false testimony. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). In fact, the prosecutor has an obligation to correct the testimony of a witness when he believes that it was false even if he did not solicit or anticipate the lie. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio*, 405 U.S. at 154.

The Defendant specifically requests the court to order the State to produce any exculpatory or mitigating evidence, including, but not limited to, evidence suggesting that someone other than the Defendant inflicted the killing wound to the complainant, that the Defendant did not personally assault the complainant, other alternative suspects identified by law

1

enforcement, any evidence impeaching the statements or testimony of any witness, any evidence concerning the bad reputation for truth and veracity of any witness, any immunity agreements with any witness (both express and implied), any promises of reward or benefit (express or implied) conferred upon any witness, the history of drug abuse and mental illness of any witness, the motive of any witness to lie, the bias or prejudice of any witness against the Defendant, any evidence suggesting that the Defendant is not a future danger, and any other exculpatory or mitigating evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

**WHEREFORE, PREMISES CONSIDERED**, the Defendant prays that this motion be granted and that he be given any other relief to which he is entitled.

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)
**ATTORNEYS FOR DEFENDANT**

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been  hand delivered to the District Attorneys' Office, on ___March 8___ 2010.

**ROBERT K. LOPER**

3

0333

## CAUSE NO. 08-3872

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

PAT E. MURRAY
CLERK DISTRICT COURT
FILED

JAN 19 2011

GALVESTON COUNTY, TEXAS

BY_____
DEPUTY

### ORDER

BE IT REMEMBERED, that on the 19 day of _____Jan._____,

2011, came to be considered the above Motion For Production of Exculpatory And Mitigating

Evidence.  After consideration of the motion, it is the opinion of the court that Defendant's

motion be:

GRANTED  ✓

DENIED  _____

JUDGE PRESIDING

4

CAUSE NO. 08-3872

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## MOTION FOR DISCOVERY AND INSPECTION of All TESTS PERFORMED

The above defendant, by and through his attorneys of record, moves the Court for discovery and inspection of the following items in the possession or control of the District Attorney:

1.  The name of all tests and scientific tests or examinations conducted with regard to this case, including the following:

> (a)  Name of test.
>
> (b)  Identify the party or parties performing the test by name, rank, home address, work phone number and present assignment.
>
> (c)  Supply a clear copy of the test examination report and all the papers, work sheets and notes (including bench notes) upon which it is based.
>
> (d)  A sample of the item tested so that the same can be examined by the defense experts.

2.  Defendant demands the right to examine all physical property taken from his possession whether by warrant or otherwise.

3.  Defendant demands the right to examine all eavesdropping, recording, audiovisual or other electronic devises used in the investigation and surveillance undertaken in this case.

4.  Defendant demands an accurate and clear copy of all videotapes and sound recordings made in this case.

5. Defendant demands copies of any statements made by him, or attributed to him whether recorded or transcribed, written or oral, verbatim or summarized.

6. Defendant demands clear copies of all wiretap or eavesdropping warrants together with all documents, memorandum and affidavits upon which they are based.

7. Defendant demands the names and present addresses of all persons who would qualify as competent witnesses if called, whether or not the prosecution intends to call them as witnesses.

8. Defendant demands copies of all police memoranda, memo books, logs and any and all other reports of all investigations carried on with respect to this case.

9. Defendant demands to be informed of the name, rank, shield number, home address and work phone number and present assignments of all law enforcement personnel assigned to this case.

10. Defendant demands a copy of the personnel records of each of the above named individuals, or in the alternative that same records be turned over to the Court for examination, in camera, to determine what information contained therein would be relevant or material to the defense.

11. Defendant demands copies of the statements given to any law enforcement agents by witnesses to any of the acts set forth in the indictment.

12. Defendant demands the names of any and all experts who have been consulted in this matter by the prosecution whether or not said expert will be called as a state's witness during the trial or this matter.

13. Defendant demands the Galveston County Sheriff's Department, Galveston County District Attorney and other agency's vouchers, cash receipts, statement or any other

485

documents indicating payments to any person, officer, expert, or witness involved in this case.

14.    Defendant demands the transcript of testimony given by all witnesses before the Grand Jury during its investigation and consideration of the charges contained in the indictment returned in this cause, whether or not the state intends to call such person as a witness at the trial.

15.    Any and all evidence of whatever form, source, or motive which tends to exculpate the Defendant either through an indication of the Defendant's innocence or through the impeachment of any potential prosecution witness, and all information of whatever form, source or nature which may lead to evidence which tends to exculpate the Defendant whether by indicating his innocence or impeaching the credibility of any potential prosecution witness, and any other information which may be or become of benefit to the Defendant in preparing or presenting his defense of innocence at trial. This request includes any such evidence or information now in possession of the state, or which comes into possession of the state in the future, or which the state now has knowledge or in the future obtains knowledge.

16.    Whether the weapon set forth in the indictment was recovered, and if so, precisely where was it recovered in relation to:

　　　　a.    the location of the victim's body;

　　　　b.    place and location within the place where it was recovered; and

　　　　c.    from whom it was recovered.

17.    Specifically describe the weapon as to its size, weight, and manufacturer.

18.    Copies of all toxicological examinations conducted with regard to this case.

19.    Copies of all serological examinations conducted during the investigation of the crime charged in the indictment returned in this cause.

20.    The manner of, type of and results of all laboratory examinations conducted with regard to this case including but not limited to the results of all tests conducted on the clothing of the Defendant or of the deceased, the body of the deceased, and/or at the scene of the crime and/or upon any items found at the scene of the crime.

21.    All of the items sought are both necessary and material to the preparation of the defense of this case.  The requests are authorized by the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States,  the [State Statute or Code] [section], and *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

22.    Once the prosecution presents all of the requested items it can then be determined what will be relevant and admissible as direct evidence, or for the purposes of impeachment. The Court, prosecution, and perhaps the defense, cannot at this time decide what may be useful, relevant, or admissible.

23.    Justification for discovery and inspection stands or falls on the equitable determination of whether it makes the truth easier to determine or gives a party an advantage. Justification for discovery and inspection must be viewed from the former standpoint.

24.    A criminal trial like a civil trial is a quest for the truth.  That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined. The current tendency, and the better reasoned approach, dictates complete discovery of the facts before the trial and the elimination of surprise at the trial.   The defendant should be given all discovery to which he would be entitled if he were a civil litigant.  Any denial of discovery to this defendant on the grounds that the criminal rules of discovery are not as broad as the civil rules of discovery is a violation of the

defendant's rights under the due process and equal protection clauses of the United States Constitution.

25.     Without the requested discovery and inspection the Defendant will be deprived of his right to due process under the Fourteenth Amendment to the Constitution and the effective assistance of counsel under the Sixth Amendment to the Constitution of the United States, and his similar rights under the Texas Constitution.

**WHEREFORE**, it is respectfully requested that the relief sought herein be in all respects granted, together with such other and further relief as may be just and proper.

Respectfully submitted on this the ___ day of _____, 2010.

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the ___ day of _____, 2010.

**ROBERT K. LOPER**

0333

**CAUSE NO. 08-3872**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Vs.** | § | **GALVESTON COUNTY, TEXAS** |
| | § | |
| **TRAVIS JAMES MULLIS** | § | **122ND JUDICIAL DISTRICT** |

JASON E. MURRAY
DISTRICT COURT
FILED
By Court
JAN 9 2011
GALVESTON COUNTY, TEXAS
BY_____
DEPUTY

**ORDER**

BE IT REMEMBERED, that on the __19__ day of ___Jan___ ,

201 , came to be considered the Defendant's **MOTION FOR DISCOVERY OF ALL TESTS**

**PERFORMED**.  The court is of the opinion the motion should be in all things:

GRANTED    ✔_____

DENIED    _____

JUDGE PRESIDING

0333
**CAUSE NO. 08-~~3872~~**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Vs.** | § | **GALVESTON COUNTY, TEXAS** |
| | § | |
| **TRAVIS JAMES MULLIS** | § | **122ND JUDICIAL DISTRICT** |

## MOTION TO PRESERVE EVIDENCE

**COMES NOW**, the Accused, Travis James Mullis, by and through Counsel and pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the UNITED STATES CONSTITUTION and Article 1, Sections 10, 13 & 19 of the TEXAS CONSTITUTION and in support of his right to a full and fair hearing under both the state and federal constitutions, moves this Court to Order the State of Texas to preserve all physical evidence in this case and grant all other relief prayed for herein. In support, Mullis would show:

### I.

### FACTUAL BACKGROUND

Mullis has been indicted for the offense of capital murder and the State is seeking the death penalty. The Eighth Amendment requires a greater degree of accuracy and fact finding than would be true in a noncapital case. *Gilmore v. Taylor*, 508 U.S. 333 (1993); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

### II.

### MOTION

Mullis moves for an Order requiring the State of Texas to preserve all physical evidence related to all offenses alleged against Mullis in this case.

For purposes of this motion, the "State of Texas" is defined to include the District Attorney of Galveston County, the Galveston City Police Department, the Galveston County Sheriff's Office, the Texas Department of Public Safety, the Texas Highway Patrol, the Texas Rangers, the Federal Bureau of Investigation, the Internal Revenue Service, the Galveston County Police Crime Lab and any agents or employees of those offices, any other law enforcement officer and any other person acting in conjunction with the above named entities or on behalf of any law enforcement or other governmental agency.

For the purpose of this motion, the term "offenses" is the crime alleged in the indictment returned herein against Mullis as well as any other alleged crime or bad act which the State of Texas offered during the original trial of Mullis and which it intends to offer during any portion of the retrial of Mullis.

This motion seeks to include all items that are currently within the actual or constructive possession, custody, control or knowledge of the State of Texas and items which may become known, identified or available through the exercise of due diligence by the State of Texas.

The physical evidence for which Mullis requests preservation includes, but is not limited to, the following:

a.    Any and all forensic samples, photographs, negatives of photographs, videotapes, fingerprint samples or other material of a forensic nature, including evidence collected at the crime scene and any actual physical evidence recovered;

b.    Any other photographs, audiotapes, videotapes or electronic storage devices, made and any maps, sketches and/or diagrams made in connection with the State of Texas's investigation of the alleged crime;

c. Any and all reports, laboratory analysis requests, notes of lab personnel and/or technicians, slides, samples and any other documentation of whatever kind associated with or relating to Mullis or any other person who is a possible perpetrator of the offense described in the indictment returned herein.

d. Any notes or reports, whether handwritten, tape recorded and/or transcribed of law enforcement or other agents of the State of Texas which relate to any investigations of Mullis or anyone else suspected of having committed the same offense as that with which Mullis is charged;

e. Any notes, audiotapes, videotapes, electronic storage devices or writings known to the State of Texas, purporting to be the statement of any person having knowledge about this case;

f. Any and all videotapes, audiotapes and or handwritten statements by Mullis or which purport to be a verbatim statement of Mullis. This includes statements written by someone other than Mullis but which were acknowledged orally or in writing by Mullis;

g. Autopsy reports, preliminary or otherwise, relating to any deaths attributed to the direct or indirect actions of Mullis. This includes reports, bench notes, recordings or similar documentation made by coroners, deputy coroners and/or medical examiners;

h. Any and all Uniform Offense Reports or Supplements thereto;

i. Any reports, statements, recordings or other documentation of, by or about fellow inmates with whom the State or its agents might have discussed any matters

pertaining to Mullis;

j.     Any police logs, records, recordings and or notes of calls and reports to the State of Texas, its agents or employees or any other law enforcement agency regarding Mullis, his arrest or incidents related to the indictment or charge pending against Mullis;

k.     Finger, palm and hand print specimens, latent or otherwise and photographs thereof, taken during the course of the investigation of the offenses and any and all documents related thereto and items from which print exemplars were taken. This would include any and all requests for print comparisons made to the Automated Fingerprint Identification System (AFIS), any other state or federal comparison systems including requests for visual comparisons and reports provided as a result of such examination.

l.     Any and all items of a ballistics nature, including bullets, shells, slugs, cartridges or pieces or parts thereof, including photographs thereof, recovered and which in any way relate to the offenses. This would include written requests for examination or analysis, bench notes, reports and photographs of these items taken during the course of the investigation of the offenses and any and all documents related thereto. This designation would also include any and all requests for print comparisons made to the DRUGFIRE computer system, the National Integrated Ballistics Information Network (NIBIN) or any other state or federal comparison systems including requests for visual comparisons and resulting reports and bench notes.

m.   Any autopsy and toxicology findings, bench notes, photographs, material recording on electronic recording devices, body specimens taken by the State of Texas.

n.   Hospital and medical reports relating to the survivor of the offense for which Mullis has been indicted.

In investigating and preparing its case, the State of Texas must recover and develop physical evidence.  Depending upon motions which may be filed by the defense, and rulings by the Court, Mullis may be entitled to access to such materials and may be entitled to perform independent tests on the evidence.  If this motion to preserve evidence is not granted, Mullis will be denied due process of law, a fair trial and the effective assistance of this counsel.  He will be prevented from presenting his defense because he will be unable to effectively cross-examine the State's witnesses and will be unable to call witnesses on his behalf with regard to such evidence all in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the UNITED STATES CONSTITUTION and the Article 1, Sections 10, 13 and 19 of the TEXAS CONSTITUTION

To further protect Mullis's state and federal constitutional rights in connection with these allegations against him, he requests that none of the evidence seized in this investigation be destroyed, modified or altered without 15 days prior notice to the defense and an Order from this Court.

The defense further requests this Court to order the State of Texas to notify the defense if the State or its agents have destroyed, or consumed in testing, any materials relevant to the offenses.  If such destruction has taken place, the State should be ordered to provide to counsel

for Mullis a list of: (a) what has been destroyed or consumed; (b) by whom and upon whose

authority; (c) where and when the destruction occurred, and (d) why it occurred.

**WHEREFORE PREMISES CONSIDERED**, the Accused, Travis James Mullis,

respectfully requests that the Court order that:

1.   The State of Texas, as defined herein, shall preserve all evidence as described in this motion;

2.   The State of Texas shall not destroy, alter or modify any such evidence without a prior notice to the Accused and an Order of the Court;

3.   Mullis have such other and further relief to which he may show himself to be justly entitled in law or in equity.

Respectfully submitted,

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

**GERALD BOURQUE**
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)
**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that I gave a true and correct copy of the foregoing Motion to Preserve Evidence to the Assistant District Attorney assigned to this case on _____, 2010.

**ROBERT K. LOPER**

0333
**CAUSE NO. 08-3872**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

**JASON E. MURRAY**
CLERK DISTRICT COURT
FILED

Roy Court
JAN 9 2011

GALVESTON COUNTY, TEXAS
BY
DEPUTY

**ORDER**

On the 19 day of Jan. , 2011, came the Accused, Travis James Mullis, by and through Counsel and moved this Court to Order the State of Texas to preserve all physical evidence in this case and other relief.

The Court, after duly considering the motion, hearing the arguments of counsel and otherwise being fully advised in the premises, makes the following Order:

For purposes of this motion, the "State of Texas" is defined to include the District Attorney of Galveston County, the Galveston City Police Department, the Galveston County Sheriff's Office, the Texas Department of Public Safety, the Texas Highway Patrol, the Texas Rangers, the Federal Bureau of Investigation, the Internal Revenue Service, the Galveston County Police Crime Lab and any agents or employees of those offices, any other law enforcement officer and any other person acting in conjunction with the above named entities or on behalf of any law enforcement or other governmental agency.

For the purpose of this Order, the term "offenses" is the crime alleged in the indictment returned herein against Mullis as well as any other alleged crime or bad act which the State of Texas offered during the original trial of Mullis or which it intends to offer during any portion of the retrial of Mullis.

This Order includes all items that are currently within the actual or constructive possession, custody, control or knowledge of the State of Texas and items which may become known, identified or available through the exercise of due diligence by the State of Texas.

It is Ordered that the State of Texas shall preserve all physical evidence in its possession or over which it has control, including, but not limited to the following:

a.  Any and all forensic samples, photographs, negatives of photographs, videotapes, fingerprint samples or other material of a forensic nature, including evidence collected at the crime scene and any actual physical evidence recovered;

b.  Any other photographs, audiotapes, videotapes or electronic storage devices, made and any maps, sketches and/or diagrams made in connection with the State of Texas's investigation of the alleged crime;

c.  Any and all reports, laboratory analysis requests, notes of lab personnel and/or technicians, slides, samples and any other documentation of whatever kind associated with or relating to Mullis or any other person who is a possible perpetrator of the offense described in the indictment returned herein.

d.  Any notes or reports, whether handwritten, tape recorded and/or transcribed of law enforcement or other agents of the State of Texas which relate to any investigations of Mullis or anyone else suspected of having committed the same offense as that with which Mullis is charged;

e.  Any notes, audiotapes, videotapes, electronic storage devices or writings known to the State of Texas, purporting to be the statement of any person having knowledge about this case;

f.      Any and all videotapes, audiotapes and or handwritten statements by Mullis or

which purport to be a verbatim statement of Mullis.  This includes statements

written by someone other than Mullis, but which were acknowledged orally or in

writing by Mullis;

g.      Autopsy reports, preliminary or otherwise, relating to any deaths attributed to the

direct or indirect actions of Mullis.  This includes reports, bench notes, recordings

or similar documentation made by coroners, deputy coroners and/or medical

examiners;

h.      Any and all Uniform Offense Reports or Supplements thereto;

i.      Any reports, statements, recordings or other documentation of, by or about fellow

inmates with whom the State or its agents might have discussed any matters

pertaining to Mullis;

j.      Any police logs, records, recordings and or notes of calls and reports to the State

of Texas, its agents or employees or any other law enforcement agency regarding

Mullis, his arrest or incidents related to the indictment or charge pending against

Mullis;

k.      Finger, palm and hand print specimens, latent or otherwise and photographs

thereof, taken during the course of the investigation of the offenses and any and

all documents related thereto and items from which print exemplars were taken.

This would include any and all requests for print comparisons made to the

Automated Fingerprint Identification System (AFIS), any other state or federal

comparison systems including requests for visual comparisons and reports

provided as a result of such examination.

l.   Any and all items of a ballistics nature, including bullets, shells, slugs, cartridges or pieces or parts thereof, including photographs thereof, recovered and which in any way relate to the offenses.  This would include written requests for examination or analysis, bench notes, reports and photographs of these items taken during the course of the investigation of the offenses and any and all documents related thereto.  This designation would also include any and all requests for print comparisons made to the DRUGFIRE computer system, the National Integrated Ballistics Information Network (NIBIN) or any other state or federal comparison systems including requests for visual comparisons and resulting reports and bench notes.

m.   Any autopsy and toxicology findings, bench notes, photographs, material recording on electronic recording devices, and body specimens taken by the State of Texas.

n.   Hospital and medical reports relating to the survivor of the offense for which Mullis has been indicted.

It is further Ordered that none of the evidence seized in the investigation of the offenses be destroyed, modified or altered without 15 days prior notice to the defense and an Order from this Court.  The office of the Galveston County District Attorney is to timely notify the defense, upon discovery that the state or its agents have destroyed, or consumed in testing, any materials relevant to the offenses.  If such destruction has taken place, the State is Ordered to timely provide to counsel for Mullis a list of: (a)  what has been destroyed or consumed; (b) by whom

and upon what authority;  (c) where and when the destruction occurred, and (d) why it occurred.

ORDERED AND SIGNED on this the ___19___ day of ___Jan___, 201_.

_____
JUDGE PRESIDING

CAUSE NO. 08-3872

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Vs.** | § | **GALVESTON COUNTY, TEXAS** |
| | § | |
| **TRAVIS JAMES MULLIS** | § | **122ND JUDICIAL DISTRICT** |

## MOTION FOR *in camera* INSPECTIONS of STATE'S ENTIRE FILE

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Travis James Mullis, Defendant in the above-entitled and numbered criminal action, requests an *in camera* review by the court of the State's file in order to determine whether any exculpatory, mitigating, or impeaching evidence is included therein. In support, the Defendant will show the following.

The Defendant requests the court to make an *in camera* review of the State's entire file or files in this case in order to determine whether they include evidence which might tend to exculpate the Defendant, which might tend to impeach state's witnesses whose credibility is material to the issue of guilt, innocence or punishment, or which might tend to mitigate punishment. The Defendant further requests that such evidence be delivered to him through his counsel by the court after the court's *in camera* inspection.

Without regard to whether the court grants the motion for an *in camera* inspection, and without regard to whether the court delivered to the Defendant any of the items so requested above, the Defendant independently requests that the entire file or files of the State be copied by court personnel upon conclusion of the trial, and that the same be sealed in order to become a permanent part of the records of this trial, so that it be available for appellate review.

**WHEREFORE, PREMISES CONSIDERED**, the Defendant prays the court will grant

1

this motion in all things or in the alternative, that this court will set this matter down for a

hearing prior to trial on the merits and that at such hearing this motion will be in all things

granted, and for such other and further relief to which the defendant may be entitled, in justice or

in equity.

Respectfully submitted,

ROBERT K. LOPER
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000(office)
713-869-9912 (fax)

GERALD BOURQUE
SBN: 02716500
24 Waterway Ave., #660
The Woodlands, Tx 77380
713-862-7766(office)
832-813-0321 (fax)

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has

been hand delivered to the District Attorneys' Office, on this the March 8

2010.

ROBERT K. LOPER

2

0333
## CAUSE NO. 08-3872

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| Vs. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

## ORDER

BE IT REMEMBERED, that on the _____ day of _____,

2010, came to be considered the Defendant's **MOTION FOR IN CAMERA INSPECTIONS**

**OF STATE'S ENTIRE FILE**. The court is of the opinion the motion should be in all things:

GRANTED _____

DENIED _____

_____
**JUDGE PRESIDING**

3

NO. 08CR0333

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | § | 122nd JUDICIAL DISTRICT |

## NOTICE OF FILING CERTIFICATES/AFFIDAVITS

COMES NOW, the State of Texas by and through her Criminal District Attorney and gives notice that the State intends to introduce in evidence under the Texas Rules of Criminal Procedure at the trial of the above entitled and numbered cause the following affidavits and records, to-wit:

| RECORD | AFFIANT | EMPLOYER-ADDRESS |
| --- | --- | --- |
| CERTIFICATE OF ANALYSIS | MICHAEL PIERCE | HARRIS COUNTY, ME'S OFFICE-HOUSTON,TX |
| CHAIN OF CUSTODY AFFIDAVITS (2) | GARY JONES | GALVESTON POLICE DEPT. GALVESTON,TX |

The said affidavits and certificates of analysis were filed with the District Clerk of Galveston County among the papers of the above entitled and numbered cause on the 31st day of March, 2010 and are available for inspection at the office of the District Clerk.

Respectfully submitted,

LARRY A. DROSNES
Assistant Criminal District Attorney
Galveston County, Texas

## CERTIFICATE OF SERVICE

I, LARRY A. DROSNES, do hereby certify that I provided a copy of the foregoing notice and certificate of analysis and chain of custody affidavits listed above to Robert Loper, attorney for the said Defendant, by fax to his office, on the 31st day of March, 2010.

LARRY A. DROSNES
Assistant Criminal District Attorney
Galveston County, Texas



**APPLICATION**

| SUBPOENA ISSUED IN THE NAME OF THE STATE OF TEXAS |
|---|

*This subpoena not prepared by the office of Latonia D. Wilson, District Clerk Galveston County, Texas.*

NO. 08CR0333

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING:
**"YOU ARE HEREBY COMMANDED TO SUMMON"**

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
|---|---|
| 1 Candy Rinehart | |
| 2) Steve Barry | |
| 3) Steven Eugen Barry | |
| 4) Susan Barry | |
| 5) Caren Kohberger 6) 7) 8) | |

Upon receipt of subpoena please call: **DONNA GOODE, FIRST ASSISTANT CRIMINAL DISTRICT ATTORNEY at (409) 766-2355 TO PROVIDE HER WITH CONTACT NUMBER AND TO DISCUSS THIS MATTER PRIOR TO TRIAL.**

*If to be found in your County, to be and appear at 9:00 o'clock a.m. on the 7th day of March, 2011 ; Before the Honorable 122ND Judicial District Court of Galveston County, Texas, to be held within and for said County at the Court House thereof, in Galveston, then and there to testify as a witness on behalf of the State in a certain pending criminal (felony) action, and there to remain from day to day, and from term to term until discharged by said Court.*

**\* The witness is further commanded to deliver to a representative of the Galveston County Criminal District Attorney's Office or produce at the said time and place above set forth the following :**

**\*\*Please bring with you**

*On this day came forward* **LARRY A. DROSNES** *(applicant signature), attorney for the State/Defendant and files this application for subpoena to compel the attendance of the above named witness on this /9 day of MAR, 2008 that said witness is necessary.*

**HEREIN FAIL NOT,** *and make due return hereof, showing how you have executed the same.*
*Witness my official signature, on this _____ day of _____, _____ attested to:*

*LATONIA D. WILSON, District Clerk, Galveston County, Texas*

Subpoena instructions
____ Send to Sheriff

____ Pickup          *By:* _____ *, Deputy Clerk*

| RETURN OF SERVICE |
|---|

*Received this Subpoena on the _____ day of _____, 20____, and executed the same as shown above by delivering a copy of this subpoena to the within named witness (es) in the city of _____ and county of _____, Texas.*



| SUBPOENA ISSUED IN THE NAME OF THE STATE OF TEXAS |
|---|

*This subpoena not prepared by the office of Latonia D. Wilson, District Clerk Galveston County, Texas.*

NO. 08CR0333

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

**TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING:**
**"YOU ARE HEREBY COMMANDED TO SUMMON"**

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
|---|---|
| 1 Robert Hesser | |
| 2) Gregory Rodden | |
| 3) John McNamme | |
| 4) Andrea Smith-Wardlow | |
| 5) Michael Munroe | |
| 6) Robert Polowski | |
| 7) George Pirrone | |
| 8) | |

> Upon receipt of subpoena please call: **DONNA GOODE, FIRST ASSISTANT CRIMINAL DISTRICT ATTORNEY** at **(409) 766-2355 TO PROVIDE HER WITH CONTACT NUMBER AND TO DISCUSS THIS MATTER PRIOR TO TRIAL.**

*If to be found in your County, to be and appear at 9:00 o'clock a.m. on the 7th day of March, 2011 ; Before the Honorable 122ND Judicial District Court of Galveston County, Texas to be held within and for said County at the Court House thereof, in Galveston, then and there to testify as a witness on behalf of the **State** in a certain pending criminal (felony) action, and there to remain from day to day, and from term to term until discharged by said Court.*
**\* The witness is further commanded to deliver to a representative of the Galveston County Criminal District Attorney's Office or produce at the said time and place above set forth the following :** _____

**\*\*Please bring with you** ~~_____~~ _____, minor/s

*On this day came forward **LARRY A. DROSNES** (applicant signature), attorney for the State/Defendant and files this application for subpoena to compel the attendance of the above named witness on this ___ day of ~~V / A Y~~ , 2009, that said witness is necessary.*
2010

   *HEREIN FAIL NOT, and make due return hereof, showing how you have executed the same.*
*Witness my official signature, on this _____ day of _____ , _____ attested to*

*LATONIA D. WILSON, District Clerk, Galveston County, Texas*

Subpoena instructions
____ Send to Sheriff

____ Pickup                   *By:* _____ *Deputy Clerk*

| RETURN OF SERVICE |
|---|

*Received this Subpoena on the _____ day of _____ , 20____ . and executed the same as shown above by delivering a copy of this subpoena to the within named witness (es) in the city of _____ and county of _____ , Texas*

CAUSE NUMBER: <u>08CR0333</u>

THE STATE OF TEXAS

VS.

122nd JUDICIAL DISTRICT COURT

GALVESTON COUNTY, TEXAS

<u>TRAVIS JAMES MULLIS</u>
Defendant(s) Name

## SUBPOENA DUCES TECUM

**TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING: "YOU ARE HEREBY COMMANDED TO SUMMON"**

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
|---|---|
| CUSTODIAN OF RECORDS: Plumtree Family Health Center, L.L.C. Robert S. Knight, M.D. 104 Plumtree Road, Suite 102 Bel Air, Maryland 21015 | |

**Upon receipt of subpoena please call:   DONNA GOODE, LESTER BLIZZARD or CAROLYN ADKINS at (409)  766-2355.**

*\*\*If to be found in your County, to be and appear INSTANTER; Before the Honorable Judge John Ellisor of the 122nd Judicial District of Galveston County, Texas, to be held within and for said County at the Courthouse, thereof, in Galveston, then and there to testify as a witness on behalf of the State in the above  cause, and there to remain from day to day, and from term to term until discharged by said Court.*

- *The witness is further commanded to produce at the said time and place above set forth the following:*
  **Please provide legible copies of any and all medical records of TRAVIS JAMES MULLIS, white male, DOB: 09-20-1986 contained in your files, to include any and all records received from other providers.**

**\*\*In lieu of your personal appearance before the listed Grand Jury you may release the above requested information, <u>along with a Notarized Custodian of Records Affidavit containing number of pages</u> INSTANTER to Investigator Carolyn Adkins, 600 59th Street, Suite 1001, Galveston, Texas, Office # 409-766-2352, FAX# 409-770-6291, email: carolyn.adkins@co.galveston.tx.us.**

On this day came forward _____ Lester Blizzard, attorney for the State and files this application for subpoena to compel the attendance of the above named witness on this 2nd day of June, A.D., 2010, that said witness is necessary.

*HEREIN FAIL NOT, and make due return hereof, showing how you have executed the same.*

*Witness my official signature, on this the _____ day of _____, A.D., 2010 attested to:*

*LATONIA D. WILSON, DISTRICT CLERK, GALVESTON COUNTY, TEXAS*

*By:*   _____ *Deputy Clerk*

**This Subpoena not prepared by the office of LATONIA D. WILSON**

### RETURN OF SERVICE

*Received this Subpoena on the _____ day of _____, A.D. 20____, and executed the same as shown above by delivering a copy of this subpoena to the within named witness(es) in the city of _____ and county of _____, Texas*

*Service Fee $ _____      _____ Signature of Officer (or Qualified Person)*

Cause Number 08-0333

10 JUN 17 PM 3:10

| | |
|---|---|
| Travis Mullis | In The District Court of |
| v. | Galveston County, Texas |
| The State of Texas | 122nd Judicial District |

---

### NOTICE

---

      Comes now the State of Texas by and through her assistant district attorney provides this notice to the Court and Defendant of its intent to request this Court to take Judicial Notice of the law of the State of Pennsylvania pursuant to Rule 202 of the Texas Rules of Evidence.  Specifically the State intends to request the Court to take judicial notice of the following Pennsylvania Statutes:

      **Pennsylvania Rule of Criminal Procedure 200 and its commentaries**

      **Pennsylvania Criminal Statutes Annotated 5702, 5703, 5704 and its commentaries.**

A true and correct copy of the above statutes are attached hereto and incorporated herein for all purposes.

             Respectfully Submitted

             Lester Blizzard
             Assistant District Attorney
             Galveston County, Texas

### Certificate of Service

I certify that a true and correct copy of the above notice has been sent to counsel for the defendant by certified mail on this the _17th_ day of June, 2010.

             Lester Blizzard
             Assistant District Attorney
             Galveston County, Texas

# RULES OF CRIMINAL PROCEDURE

## PART A

### SEARCH WARRANTS

## Rule 200.  Who May Issue

A search warrant may be issued by any issuing authority within the judicial district wherein is located either the person or place to be searched.

*Comment:* This rule formally authorizes district justices, Philadelphia bail commissioners, and judges of the Municipal, Common Pleas, Commonwealth, Superior, and Supreme Courts to issue search warrants. This is not a departure from existing practice. See, e.g., Sections 1123(a)(5) and 1515(a)(4) of the Judicial Code, 42 Pa.C.S. §§ 1123(a)(5), 1515 (a)(4). Any judicial officer who is authorized to issue a search warrant and who issues a warrant is considered an "issuing authority" for purposes of this rule. The authority of a district justice to issue a search warrant outside of the judicial district but within the judicial district is recognized in *Commonwealth v. Ryan*, 400 A.2d 1264 (Pa. 1979).

Only common pleas court judges and appellate court justices and judges may issue search warrants when the supporting affidavit(s) is to be sealed under Rule 211.

This rule is not intended to affect the traditional power of appellate court judges and justices to issue search warrants anywhere within the state.

*Note:*  Prior Rules 2000 and 2001 were suspended by former Rule 18, 1973, effective February 3, 1969. Present Rule 2001 adopted March 18, 1973, effective 60 days hence; amended July 1, 1980, effective August 1, 1980.  *Comment* revised September 3, 1993, effective January 1, 1994; renumbered Rule 200 and *Comment* revised March 1, 2000, effective April 1, 2001.

### Cross References

see 42 Pa.C.S.A § 1725.1.

### Library References

C.J.S. Searches and Seizures §§ 103.1, 135.

### Law Review and Journal Commentaries

Search incident to custodial arrest for traffic violation. (1974) U.Pitt.Rev. 864.

Discretionary rule in search of a ratio-Steven R. Schlesinger and Brad-Wilson. (1980) 18 Duq.L.Rev. 225.

... surveillance and the Fourth ... ment. Alan Meisel (1973) 35 ... Rev. 53.

### Notes of Decisions

Judicial officers  2
80

---

## INVESTIGATIONS

### Service outside district  3

**In general**

Magistrate who was employee of district attorney's office, who performed many ministerial and administrative duties, and whose testimony indicated strong tendency to accept whatever police told him as true could not perform the detached judicial functions required with respect to issuance of search warrant. Com. v. Davis, 310 A.2d 334, 225 Pa.Super. 242, Super.1973.

**Judicial officers**

City of Pittsburgh police magistrates ... have jurisdiction to issue search warrants as "judicial officers" of unified judicial system subject to general supervisory and administrative authority of the Supreme Court. Com. v. Ryan, 536 A.2d 342, 370 Pa.Super. 155, Super.1987, appeal denied 546 A.2d 620, 519 Pa. 659

**Service outside district**

Although issuing police officers had jurisdiction to act as such in another township and could not serve warrant for search of premises in such other town-ship, warrant could be issued to such officers for service by other township's police and such officers could be affiants for such warrant. Com. v. Kunkel, 408 A.2d 475, 268 Pa.Super. 299, Super.1979.

District magistrate, whose office was in same county as defendant's home, had power to issue search warrant for the magistrate's magisterial district. Com. v. Young, 396 A.2d 771, 262 Pa.Super. 313, Super.1978.

Magisterial jurisdiction was county-wide and thus issuing authority was not without jurisdiction to issue search warrant for premises located outside his magisterial district, but issuing magisterial district, but outside his county. Com. v. Ryan, 391 A.2d 612, 257 Pa.Super. 538, Super.1978, affirmed 400 A.2d 1264, 484 Pa. 602.

Since neither the defendant nor his residence was in county from which justice of the peace issued search warrant, justice of the peace was without jurisdiction to issue warrant and the ensuing search of defendant's residence pursuant thereto was illegal. Com. v. Myers, 361 A.2d 884, 239 Pa.Super. 459, Super.1976.

---

## Rule 201.  Purpose of Warrant

A search warrant may be issued to search for and to seize:

(1)  contraband, the fruits of a crime, or things otherwise criminally possessed; or

(2)  property that is or has been used as the means of committing a criminal offense; or

(3)  property that constitutes evidence of the commission of a criminal offense.

*Comment:*  Concerning the provisions of paragraph (1) see *United States v. Rabinowitz*, 339 U.S. 56 (1950), overruled as to other points, *Chimel v. California*, 395 U.S. 752, 786 (1969). Also compare *Cooper v. California*, 386 U.S. 58 (1967), with *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693 (1964).

Warrants may not be issued unless the affidavit alleges a pre-existing crime. See *United States ex. rel. Campbell v. Rundle*, 327 F.2d 153, 161 (3rd Cir. 1964), followed *sub nom. Commonwealth ex rel. Ensor v. Cummings*, 207 A.2d 230 (Pa. 1965) and *Commonwealth ex rel. Campbell v. Russell*, 207 A.2d 232 (Pa. 1965). The Third Circuit's opinion cited with approval *Commonwealth v. Patrone*, 27 D & C *4 343 (Philadelphia Co. 1962); *Commonwealth v. Rehmeyer*, 29 D 2d 635 (York Co. 1962); and *Simmons v. Oklahoma*, 286 P.2d 2.., 298 (Okla. Cr. 1955)

## 18 Pa.C.S.A. § 5701
Note 2

criminal statute and wiretapping involves invasion of constitutional right of privacy, [Wiretap] Act must be strictly applied and strictly construed. (Per Friedman, J., with two Judges concurring in result, and one Judge concurring in result.) United Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

Protections of Pennsylvania Wiretapping and Electronic Surveillance Control Act apply to, and regulate conduct of, all persons, whether acting in governmental, private, or other capacity. (Per Friedman, J., with two Judges concurring and one Judge concurring in result.) United Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

Wiretapping and Electronic Surveillance Control Act is applicable to constitutional right, must be strictly construed. Electronic Surveil v. Milkleh, 633 A.2d 16, 534 Pa. 581, Sup.1993.

Wiretapping and Electronic Surveillance Control Act is in derogation of constitutional right, must be strictly construed. Electronic Surveil v. Milkleh, 633 A.2d 16, 534 Pa. 581, Sup.1993.

provisions of Wiretapping and Electronic Surveillance Control Act must be strictly applied and strictly construed. (Per Friedman, J., with two Judges concurring and one Judge concurring in result.) United Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

## § 702. Definitions

### Purpose

principal focus and purpose of Pennsylvania Wiretapping and Electronic Surveillance Control Act is protection of privacy. (Per Friedman, J., with two Judges concurring and one Judge concurring in result.) United Telephone Co. of Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

s used in this chapter, the following words and phrases shall have meanings given to them in this section unless the context clearly indicates otherwise:

"Aggrieved person." A person who was a party to any intercepted electronic or oral communication or a person against whom interception was directed.

## PUBLIC ORDER AND DECENCY

Enactment of Pennsylvania Wiretapping and Electronic Surveillance Control Act was intended to develop means of prohibition of nonconsensual interception of wire, oral, or electronic communication except where authorized by Act. (Per Friedman, J., with two Judges concurring and one Judge concurring in result.) United Telephone Co. of Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

Wiretapping and Electronic Surveillance Control Act (WESCA) did not prohibit public examination or inspection of cellular telephone interception or inspection of itemized bills submitted to county for calls made by county officials, absent proof that inspection of itemized bills would be tantamount to highly offensive act; purpose of WESCA was to protect against highly offensive publications, and itemized telephone bills were not "pen registers," within meaning of WESCA. _____ v. _____, Pub. Co. v. County of Washington, 638 A.2d 422, 162 Pa.Cmwlth. 196, Cmwlth.1994.

Focus and purpose of Wiretapping and Electronic Surveillance Control Act is protection of privacy. Com. v. Spence, 631 A.2d 666, 428 Pa.Super. 548, Super.1993.

Focus and purpose of Wiretapping and Electronic Surveillance Control Act is protection of privacy. Com. v. Parrella, 610 A.2d 1006, 416 Pa.Super. 131, Super.1992, appeal denied 644 A.2d 734, 537 Pa. 649.

### 4. Construction with federal law

By virtue of supremacy clause of United States Constitution, Federal Wiretap Act preempts state ability of state to adopt legislation that would be less restrictive in allowing interceptions. Com. v. Birdseye, 670 A.2d 1124, 543 Pa. 251, Sup.1996, certiorari denied 118 S.Ct. 2552, 518 U.S. 1019, 135 L.Ed.2d 1071.

## WIRETAPPING

### 18 Pa.C.S.A. § 5702

point between and including the point of origin and the point of reception.

"Communication common carrier." Any person engaged as a common carrier for hire, in intrastate, interstate or foreign communication by wire or radio or in intrastate, interstate or foreign radio transmission of energy; however, a person engaged in radio broadcasting shall not, while so engaged, be deemed a common carrier.

"Contents." As used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication.

"Court." The Superior Court. For the purposes of Subchapter C only, the term shall mean the court of common pleas.

"Electronic communication." Any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system, except:

(1) Deleted.

(2) Any wire or oral communication.

(3) Any communication made through a tone-only paging device.

(4) Any communication from a tracking device (as defined in this section).

"Electronic communication service." Any service which provides to users the ability to send or receive wire or electronic communications.

"Electronic communication system." Any wire, radio, electromagnetic, photo-optical or photoelectronic facilities for the transmission of electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications.

"Electronic, mechanical or other device." Any device or apparatus including, but not limited to, an induction coil or a telecommunication identification interception device, that can be used to intercept a wire, electronic or oral communication other than:

(1) Any telephone or telegraph instrument, equipment or facility, or any component thereof, furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business, or furnished by such subscriber or user for co_____ _ction to the facilities of such service and used in the ordin_ _ourse of its business, or being used by a communication common carrier in the ordinary course of its business, or by an

"Aural transfer." A transfer containing the human voice at any

**18 Pa.C.S.A. § 5702**    PUBLIC ORDER AND DECENCY

investigative or law enforcement officer in the ordinary course of his duties.

(2) A hearing aid or similar device being used to correct subnormal hearing to not better than normal.

(3) Equipment or devices used to conduct interceptions under section 5704(15) (relating to exceptions to prohibition of interception and disclosure of communications).

"Electronic storage."

(1) Any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof.

(2) Any storage of such a communication by an electronic communication service for purpose of backup protection of the communication.

"Home." The residence of a nonconsenting party to an interception, provided that access to the residence is not generally permitted to members of the public and the party has a reasonable expectation of privacy in the residence under the circumstances.

"In-progress trace." The determination of the origin of a telephonic communication to a known telephone during an interception.

"Intercept." Aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device. The term shall include the point at which the contents of the communication are monitored by investigative or law enforcement officers.

"Investigative or law enforcement officer." Any officer of the United States, of another state or political subdivision thereof, or of the Commonwealth or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter or an equivalent crime in another jurisdiction, and any attorney authorized by law to prosecute or participate in the prosecution of such offense.

"Judge." When referring to a judge authorized to receive applications for, and to enter, orders authorizing interceptions of wire, electronic or oral communications pursuant to Subchapter B (relating to wire, electronic or oral communication), any judge of the superior Court.

"One call system." A communication system established by users to provide a single telephone number for contractors or designers or by any other person to call notifying users of the caller's intent to engage in demolition or excavation work.

"Oral communication." Any oral communication uttered by a person possessing an expectation that such communication is not

---

**18 Pa.C.S.A. § 5702**    WIRETAPPING

subject to interception under circumstances justifying such expectation. The term does not include any electronic communication.

"Organized crime."

(1) The unlawful activity of an association trafficking in illegal goods or services, including but not limited to, gambling, prostitution, loan sharking, controlled substances, labor racketeering, or other unlawful activities; or

(2) any continuing criminal conspiracy or other unlawful practice which has as its objective:

(i) large economic gain through fraudulent or coercive practices; or

(ii) improper governmental influence.

"Pen register." A device which is used to capture, record or decode electronic or other impulses which identify the numbers dialed or otherwise transmitted, with respect to wire or electronic communications, on the targeted telephone. The term includes a device which is used to record or decode electronic or other impulses which identify the existence of incoming and outgoing wire or electronic communications on the targeted telephone. The term does not include a device used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communication service provided by the provider, or any device used by a provider, or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of business.

"Person." Any employee, or agent of the United States or any state or political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation.

"Readily accessible to the general public." As used with respect to a radio communication, that such communication is not:

(1) scrambled or encrypted;

(2) transmitted using modulation techniques of which the essential parameters have been withheld from the public with the intention of preserving the privacy of the communication;

(3) carried on a subscriber or other signal subsidiary to a radio transmission;

(4) transmitted over a communication system provided by a common carrier, unless the communication is a tone-only paging system communication; or

(5) transmitted on frequencies allocated under 47 CFR Parts 25, 74 ... , or 94, unless, in the case of a communication transmitted on a frequency allocated under Part 74 which is ...

allocated to broadcast auxiliary services, the communication is a two-way voice communication by radio.

"Remote computing service." The provision to the public of computer storage or processing services by means of an electronic communications system.

"State." Any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico and any territory or possession of the United States.

"Telecommunication identification interception device." Any equipment or device capable of intercepting any electronic communication which contains any electronic serial number, mobile identification number, personal identification number or other identification number assigned by a telecommunication service provider for activation or operation of a telecommunication device.

"Tracking device." An electronic or mechanical device which permits only the tracking of the movement of a person or object.

"Trap and trace device." A device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted.

"User." Any person or entity who:

(1) uses an electronic communication service; and

(2) is duly authorized by the provider of the service to engage in e use.

"Wire communication." Any aural transfer made in whole or in part through the use of facilities for the transmission of communication by wire, cable or other like connection between the point of reception and the point of reception, including the use of such a section in a switching station, furnished or operated by a tele e, telegraph or radio company for hire as a communication non carrier. The term includes any electronic storage of such munication.

Oct. 4, P.L. 831, No. 164, § 2, effective in 60 days. Amended 1981, 23, P.L. 593, No. 175, § 1, effective in 60 days; 1988, Oct. 21, P.L. No. 115, § 3, imd. effective; 1998, Feb. 18, P.L. 102, No. 19, § 5, imd. ve.

## Expiration

*This cl… r expires December 31, 2004, unless extended by …atute. S… 18 Pa.C.S.A. § 5781.*

## WIRETAPPING

### Historical and Statutory Notes

The 1998 amendment, in the definition of "Electronic, mechanical or other device", in the introductory language added … but not limited to," and "or a telecommunication identification interception device" and added par. (3); added the definition of "Home"; in the definition of "Intercept" added the second sentence; rewrote the definition of "Investigative or law enforcement officer"; in the definition of "Judge", substituted "Subchapter B (relating to wire, electronic or oral communication" for "this chapter"; re added the definitions of "Pen register"; "Telecommunication identification interception device"; and in the definition of "Wire communication" added the second sentence.

The definitions of "Investigative or law enforcement officer" and "Pen register" formerly read:

" 'Investigative or law enforcement officer.' Any officer of the United States or of the Commonwealth or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offense. The term

" 'Pen register.' A device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted, with respect to wire communications, on the telephone line to which the device is attached. The term does not include a device used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communication services provided by the provider, or any device used by a provider, or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of business."

See, now, § 5703.

### 18 Pa.C.S.A. § 5702 Note 1

shall include, but not be limited to, employees of the Pennsylvania Crime Commission, authorized to investigate crimes enumerated in section 5708 (relating to order authorizing interception of wire or oral communications).

Former § 5702, relating to breach of privacy of telephone or telegraph communications, was derived from Act 1972, Dec. 6, P.L. 1482, No. 334, § 1, as amended by Act 1973, June 27, P.L. 69, No. 29, § 1; Act 1976, April 7, P.L. 69, No. 30, § 1.

### Law Review and Journal Commentaries

Promoting the progress of science and the useful arts in the digital domain: Copyright, computer bulletin boards, and liability for infringement by others. 45 Emory L.J. 1035 (1996).

### Library References

Telecommunications ⇐402.
WESTLAW Topic No. 372.

C.J.S. Telegraphs, Telephones, Radio, and Television §§ 122, 287 to 288.

### Notes of Decisions

In general 1
Aggrieved person 2
Interception 3
Investigative or law enforcement officer 4
Oral communication 5
Pen registers 6
Persons 7
Wire communications 8

1. In ge…
Technic… ifferences between a pen register and a dialed number recorder…

Wire communications—Cont'd
which has capability of monitoring length of time targeted telephone is off the hook on ongoing calls and date and length of time targeted telephone is off the hook on incoming calls are immaterial under Wiretapping and Electronic Surveillance Control Act, as neither technically permits "aural acquisition of the contents" of any communication. Com. v. Beauford, 475 A.2d 783, 327 Pa.Super. 253, Super.1984, appeal dismissed 496 A.2d 1143 … 310.

# § Pa.C.S.A. § 5702

§ 5703 SUBCHAPTER B. WIRE, ELECTRONIC OR ORAL COMMUNICATION

## PUBLIC ORDER AND DECENCY

### Historical and Statutory Notes

Subchapter B heading of Chapter 57 as added by Act 1988, Oct. 21, P.L. 1000, No. 115, § 4, imd. effective.

## § 5703. Interception, disclosure or use of wire, electronic or oral communications

Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:

(1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;

(2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or

(3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

Oct. 4, P.L. 831, No. 164, § 2, effective in 60 days. Amended 1988, Oct. 21, P.L. 1000, No. 115, § 5, imd. effective.

### Historical and Statutory Notes

#### Expiration

*This chapter expires December 31, 2004, unless extended by statute. See 18 Pa.C.S.A. § 5781.*

Act 1972, Dec. 6, P.L. 1482, No. 334, § 1.

1957, July 16, P.L. 956, No. 411, § 1 (15 P.S. § 2443, renumbered 18 P.S. § 3742).

1939, June 24, P.L. 872, § 688 (18 P.S. § 4688).

1901, July 10, P.L. 651, §§ 1, 2. 1860, March 31, P.L. 382, § 72. 1851, April 14, P.L. 612, § 7.

Laws:

1974, Dec. 27, P.L. 1007, No. 327, now, § 5721.

mer § 5703, which related to admissibility of evidence, was derived from:

72; Dec. 6, P.L. 1482, No. 334, § 1, ended by Act 1974, Dec. 27, P.L. No. 327, §§ 2, 3.

#### Cross References

of offenses, see 18 Pa.C.S.A. § 106.

---

## WIRETAPPING

Electronic surveillance of grand jury witness. (1972) 120 U.Pa.L.Rev. 546.

Promoting the progress of science and the useful arts in the digital domain: Copyright, computer bulletin boards, and liability for infringement by others. 45 Emory L.J. 1035 (1996).

### Law Review and Journal Commentaries

Wiretapping and electronic surveillance. Donald B. King. (1961) 66 Dick. L.Rev. 17.

Wiretapping—eavesdropping without tapping telephone equipment. Burton R. Laub (1972) 43 Pa.B.A.Q. 303.

### Library References

Telecommunications ⊂493. WESTLAW Topic No. 372.

C.J.S. Telegraphs, Telephones, Radio, and Television §§ 122, 287.

### Notes of Decisions

In general   2
Admissibility of evidence   12
Civil liability   4
Expectation of privacy   7
Federal law   3
Interception   5
Oral communication   6
Persons liable   9
Presumptions and burden of proof   10
Prima facie case   11
Public officials   8
Sufficiency of evidence   13
Validity   1

**1. Validity**

Pennsylvania's Wiretapping and Electronic Surveillance Control Act is not facto violative of State Constitution; that Constitution, unaided by, and unadorned with, appropriate legislation is, by itself, incapable of preventing wiretapping, and therefore any statute authorizing and regulating wiretapping is not repugnant to the Constitution. U.S. v. Geller, E.D.Pa.1983, 560 F.Supp. 1309, affirmed 745 F.2d 49, certiorari denied 105 S.Ct. 786, 469 U.S. 1109, 83 L.Ed.2d 780.

Provisions of this section and § 5704 of this title permitting law enforcement officers to record conversations in which they are involved but depriving others of same opportunity were severable from remaining portions of the Act, and therefore even if they were constitutionally deficient, such deficiency was not fatal to the entire Act. U.S. v. Geller, E.D.Pa. 1983, 560 F.Supp. 1309, affirmed 745 F.2d 49, certiorari denied 105 S.Ct. 786, 469 U.S. 1109, 83 L.Ed.2d 780.

Surreptitious recording of unemployment compensation hearing did not

## 18 Pa.C.S.A. § 5703
Note 2

constitute interception of "oral communication" in violation of Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. § 5703, and thus, did not constitute "willful misconduct" under 43 P.S. § 802(e) that justified denial of unemployment compensation benefits, in that record of testimony given at hearing before referee was taken as matter of course for purposes of review by Unemployment Compensation Board of Review and the courts and, thus, precluded any legitimate expectation of privacy. Gunderman v. Com., Unemployment Compensation Bd. of Review, 505 A.2d 1112, 95 Pa.Cmwlth. 479, Cmwlth.1986.

**2. In general**

Pennsylvania Wiretapping and Electronic Surveillance and amended Public Utilities Commission (PUC) from directing telephone local exchange carrier (LEC) to allow staff in its Bureau of Consumer Services (BCS) to monitor carrier's customer service and collection representatives during telephone conversations with customers without requiring authorization from carrier employees, despite contention that, because a public utility was bound to respond to Commission requests for information necessary to performance of Commission's regulatory oversight duties, remaining rights under carrier's exercise carrier's exception in Act for service observing monitoring telephone quality control checks. (Per Friedman, J., with two Judges concurring and one Judge concurring in result.) United Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

This act prohibits even private individu-

## 18 Pa.C.S.A. § 5703
Note 12

PUBLIC ORDER AND DECENCY

stabbing occurred and who consented to be used by witness to refresh his memory of the substance and surrounding circumstances of the conversation. Com. v. Glover, 286 A.2d 349, 446 Pa. 492, Sup.1972.

Where induction coil device used by victim of threatening phone calls, although not physically attached to receiver, permitted conversations passing through particular telephone to be recorded on a tape recorder and simultaneously to be amplified so that they were directly audible to anyone in room, an "interception" occurred within 18 P.S. § 3742 (repealed; see this section) and without consent of both parties, no evidence concerning contents of conversations could be admitted over objection of those with whom caller spoke directly. Com. v. McCoy, 275 A.2d 28, 442 Pa. 234, Sup.1971.

In telephone conversation, both parties are alternately "senders" and "parties", but defendant was sender of that art of conversation between him, and corporate employee which indicated an offer of bribery and if there had been an interception "defendant's consent would ave been required; but employee's permission alone sufficed where witness listened on an extension, there was a violation of 18 P.S. § 3742 (repealed; aw, this section), and testimony as to conversation not admissible in evidence m. v. Murray, 223 A.2d 162, 206 .Super. 298, Super.1965, reversed 223 2d 102, 423 Pa. 37.

Where corporate employee consented witness listening to telephone conversation in which attempt was made to the corporate employee, recording of nversation did not constitute "intercep- n". within 18 P.S. § 3742 (repealed;

## 5704. Exceptions to prohibition of interception and disclosure of communications

It shall not be unlawful and no prior court approval shall be quired under this chapter for:

(1) An operator of a switchboard, or an officer, agent or employe of a    vider of wire or electronic communication service, whose fa   ies are used in the transmission of a wire communica-

now, this section), and recording could be used by witness to refresh his memory. Com. v. Murray, 213 A.2d 162, 206 Pa.Super. 298, Super.1965, reversed 223 A.2d 102, 423 Pa. 37.

In prosecution for possession and sale of heroin where evidence of telephone conversations between drug addicts and defendant obtained by wire tapping was relevant and admissible where record of evidence during the trial and defendant was tried and convicted before the date of the enactment of 18 P.S. § 3742 (repealed; now, this section) and his prosecution al by the governor outlawing wire tapping but was not sentenced until after its effective date, the conviction was not in valid. Com. v. Griffin, 149 A.2d 656, 189 Pa.Super. 59, Super.1959 certiorari denied 81 S.Ct. 750, 365 U.S. 838, 5 L.Ed.2d 747.

Where telephone calls were received by police officers during raid, in which caller asked for "Pete", the given name of defendant, and in which bets were placed, and there was no other person present in the room where the operation was conducted by such a name, there was a prohibited "interception" of communication by telephone, and in prosecution for bookmaking and pool selling, testimony of officers as to the calls was admissible. Com. v. Smith, 140 A.2d 347, 186 Pa.Super. 89, Super.1958.

### 13. Sufficiency of evidence

Evidence that defendant willfully placed wiretap on phone at his dry clean ing establishment and that its dry cleantents to authorities when disclosed con that employee was involved in series of burglaries supported convictions for unlawfully intercepting wire communication and disclosing intercepted information. Com. v. Saccol, 557 A.2d 1095, 384 Pa.Super. 161, Super.1989.

WIRETAPPING

tion, to intercept, disclose or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or of the provider of wire or electronic communication service. However, no provider of wire or electronic communication service shall utilize service observing or random monitoring except for mechanical or service quality control checks;

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:

(i) Deleted.

(ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be made, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom;

(iii) the investigative or law enforcement officer meets in person with a suspected felon and wears a concealed electronic or mechanical device capable of intercepting or recording oral communications. However, no interception under this subparagraph may be used in any criminal prosecution except for a prosecution involving harm done to the investigative or law enforcement officer. This subparagraph shall not be construed to limit the interception and disclosure authority provided for in this subchapter; or

(iv) the requirements of this subparagraph are met. If an oral inter    tion otherwise authorized under this paragraph will take plac    the home of a nonconsenting party, then, in addition to the requirements of subparagraph (ii) the inter

## 18 Pa.C.S.A. § 5704

514

§ 5704   PUBLIC ORDER AND DECENCY

3. Pa.C.S.A. § 5704

be conducted until an order is first obtained from the president judge, or his designee who shall also be a judge, of a court of common pleas, authorizing such in-home interception, based upon an affidavit by an investigative or law enforcement officer that establishes probable cause for the issuance of such an order. No such order or affidavit shall be required where probable cause and exigent circumstances exist. For the purposes of this paragraph, an oral interception shall be deemed to take place in the home of a nonconsenting party only if both the consenting and nonconsenting parties are physically present in the home at the time of the interception.

(3) Police and emergency communications systems to record telephone communications coming into and going out of the communications system of the Pennsylvania Emergency Management Agency or a police department, fire department or county emergency center, if:

(i) the telephones thereof are limited to the exclusive use of the communication system for administrative purposes and provided the communication system employs a periodic warning which indicates to the parties to the conversation that the call is being recorded;

(ii) all recordings made pursuant to this clause, all notes made therefrom, and all transcriptions thereof may be destroyed at any time, unless required with regard to a pending matter; and

(iii) at least one nonrecorded telephone line is made available for public use at the Pennsylvania Emergency Management Agency and at each police department, fire department or county emergency center.

(4) A person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception.

(5) Any investigative or law enforcement officer, or communication common carrier acting at the direction of an investigative or law enforcement officer or in the normal course of its business, to use a pen register, trap and trace device, or telecommunication identification interception device as provided in Subchapter E (relating to pen registers, trap and trace devices and telecommunication identification interception devices).

(5) Personnel of any public utility to record telephone conversations with utility customers or the general public relating to receiving and dispatching of emergency and service calls provided there is . . . recording, a periodic warning which indicates to during . . . ' the conversation that the call is being recorded.

104

WIRETAPPING

18 Pa.C.S.A. § 5704

(7) A user, or any officer, employee or agent of such user, to record telephone communications between himself and a contractor or designer, or any officer, employee or agent of such contractor or other related matters, if the user or its agent indicates to the other parties to the conversation that the call will be or is being recorded. As used in this paragraph, the terms "user," "contractor," "demolition work," "designer" and "excavation work" shall have the meanings given to them in the act of December 10, 1974 (P.L. 852, No. 287), referred to as the Underground Utility Line Protection Law," and a one call system shall be considered for this purpose to be an agent of any user which is a member thereof.

(8) A provider of electronic communication service to record the fact that a wire or electronic communication was initiated or completed in order to protect the provider, another provider furnishing service toward the completion of the wire or electronic communication, or a user of that service, from fraudulent, unlawful or abusive use of the service.

(9) A person or entity providing electronic communication service to the public to divulge the contents of any such communication:

(i) as otherwise authorized in this section or section 5717 (relating to investigative disclosure or use of contents of wire, electronic or oral communications or derivative evidence);

(ii) with the lawful consent of the originator or any addressee or intended recipient of the communication;

(iii) to a person employed or authorized, or whose facilities are used, to forward the communication to its destination; or

(iv) which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

A person or entity providing electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one directed to the person or entity, or an agent thereof) while in transmission of that service to any person or entity other than an addressee or intended recipient of the communication or an agent of the addressee or intended recipient.

(10) Any person:

(i) to intercept or access an electronic communication made through an electronic communication system configured so that the el nic communication is readily accessible to the general public;

ted:

(ii) to intercept any radio communication which is transmitted:

(A) by a station for the use of the general public, or which relates to ships, aircraft, vehicles or persons in distress;

(B) by any governmental, law enforcement, civil defense, private land mobile or public safety communication system, including police and fire systems, readily accessible to the general public;

(C) by a station operating on an authorized frequency within the bands allocated to the amateur, citizens band or general mobile radio services; or

(D) by any marine or aeronautical communication system;

(iii) to engage in any conduct which:

(a) is prohibited by section 633 of the Communications Act of 1934 (48 Stat. 1105, 47 U.S.C. § 553); or

(b) is excepted from the application of section 705(a) of the Communications Act of 1934 (47 U.S.C. § 605(a)) by section 705(b) of that act (47 U.S.C. § 605(b)); or

(iv) to intercept any wire or electronic communication the transmission of which is causing harmful interference to any lawfully operating station, to the extent necessary to identify the source of the interference.

(11) Other users of the same frequency to intercept any radio communication made through a system which utilizes frequencies monitored by individuals engaged in the provisions or use of the system, if the communication is not scrambled or encrypted.

(12) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforce-ment officer to intercept a wire or oral communication involving suspected criminal activities where the officer or the person is a party to the communication and there is reasonable cause to believe that:

(11) the other party to the communication is either:

(A) holding a hostage; or

(B) has barricaded himself and taken a position of confine-ment to avoid apprehension; and

(ii) that party:

(A) will resist with the use of weapons; or

(B) is threatening suicide or harm to others.

(13) An investigative officer, a law enforcement officer or em-ployees of the Department of Corrections for State correctional facilitie- intercept, record, monitor or divulge any telephone

196

calls from or to an inmate in a facility under the following conditions:

(i) The Department of Corrections shall adhere to the follow-ing procedures and restrictions when intercepting, recording, monitoring or divulging any telephone calls from or to an inmate in a State correctional facility as provided for by this paragraph:

(A) Before the implementation of this paragraph, all inmates of the facility shall be notified in writing that, as of the effective date of this paragraph, their telephone conversations may be intercepted, recorded, monitored or divulged.

(B) Unless otherwise provided for in this paragraph, after intercepting or recording a telephone conversation, only the superintendent, warden or a designee of the superintendent or warden or other chief administrative official or his or her designee shall have access to that recording.

(C) The contents of an intercepted and recorded telephone conversation shall be divulged only as is necessary to safe-guard the orderly operation of the facility, in response to a court order or in the prosecution or investigation of any crime.

(ii) So as to safeguard the attorney-client privilege, the Depart-ment of Corrections shall not intercept, record, monitor or divulge any conversation between an inmate and an attorney.

(iii) Persons who are calling in to a facility to speak to an inmate shall be notified that the call may be recorded or moni-tored.

(iv) The Department of Corrections shall promulgate guide-lines to implement the provisions of this paragraph for State correctional facilities.

(14) An investigative officer, a law enforcement officer or em-ployees of a county correctional facility to intercept, record, moni-tor or divulge any telephone calls from or to an inmate in a facility under the following conditions:

(i) The county correctional facility shall adhere to the follow-ing procedures and restrictions when intercepting, recording, monitoring or divulging any telephone calls from or to an inmate in a county correctional facility as provided for by this para-graph:

(A) Before the implementation of this paragraph, all inmates of the facility shall be notified in writing that, as of the effective date of this paragraph, their telephone conversations may be intercepted, recorded, monitored or divulged.

(B) Unless otherwise provided for in this paragraph, after -rcepting or recording a telephone conversation, only the --perintendent, warden or a designee of the superintendent or

**18 Pa.C.S.A. § 5704**   PUBLIC ORDER AND DECENCY

warden or other chief administrative official or his or her designee shall have access to that recording.

(C) The contents of an intercepted and recorded telephone conversation shall be divulged only as is necessary to safeguard the orderly operation of the facility, in response to a court order or in the prosecution or investigation of any crime.

(ii) So as to safeguard the attorney-client privilege, the county correctional facility shall not intercept, record, monitor or divulge any conversation between an inmate and an attorney.

(iii) Persons who are calling into a facility to speak to an inmate shall be notified that the call may be recorded or monitored.

(iv) The superintendent, warden or a designee of the superintendent or warden or other chief administrative official of the county correctional system shall promulgate guidelines to implement the provisions of this paragraph for county correctional facilities.

(15) The personnel of a business engaged in telephone marketing or telephone customer service by means of wire, oral or electronic communications to intercept such marketing or customer service communications where such interception is made for the sole purpose of training, quality control or monitoring by the business, provided that one party involved in the communications has consented to such intercept. Any communications recorded pursuant to this paragraph may only be used by the business for the purpose of training or quality control. Unless otherwise required by Federal or state law, communications recorded pursuant to this paragraph shall be destroyed within one year from the date of recording.

8, Oct. 4, P.L. 831, No. 164, § 2, effective in 60 days. Amended / 10, P.L. 227, No. 72, § 1, effective in 60 days; 1981, Dec. 23, P.L. 591, , 175, § 2, effective in 60 days; 1988, Oct. 21, P.L. 1000, No. 115, § 5, 1, effective 1995, Sept. 26, P.L. 1056, No. 20 (Spec. Sess. No. 1), § 2, ctive in 60 days; 1996, Dec. 19, P.L. 1458, No. 186, § 1, effective in 60 s; 1998, Feb. 18, P.L. 102, No. 19, § 6, imd. effective.

**Expiration**

This chapter expires December 31, 2004, unless extended by statute. See 18 Pa.C.S.A. § 5781.

**Historical and Statutory Notes**

The 1998 amendment, in the introductory language added "and no prior court approval shall be required"; in par. (2), added even ii... ; including... but not limited to...

3 P.S. § 176 et seq.

2 1995 amendment added par. (13).

: 1996 amendment, in cl. (2), added ment, in cl. (2), added iii); and ..., cl. (14).

WIRETAPPING

Promoting the progress of science and the useful arts in the digital domain: Copy-right, computer bulletin boards.

**Law Review and Journal Commentaries**

and liability for infringement by others. 45 Emory L.J. 1035 (1996).

**Library References**

Evidence beyond the scope of discovery, attorney-client privilege, confidentiality, use of cellular and cordless telephones. See Gibbons, 5 Pennsylvania Practice § 2.8.

Telecommunications ⚫493. WESTLAW Topic No. 372. C.J.S. Telegraphs, Telephones, Radio, and Television §§ 122, 287.

**Notes of Decisions**

In general 2
Admissibility 15
Approval 3
Consent 4
Correctional facilities 3
Correctional rights 3
Court order or prior approval 7
Disclosure 10
Interception 12
Memorandum of approval 6
Participation 6
enforcement officer 13
Quality control checks by common carrier 9
Search and seizure 11
Suspected criminal activities 8
Validity 1

**1. Validity**

Provisions of this section and § 5703 of this title permitting law enforcement officers to record conversations in which they are involved but depriving others of same opportunity were severable from remaining p... of the Act, and there... even i... if were constitutionally de...

**18 Pa.C.S.A. § 5704**
**Note 1**

"such officer or person is a party to communications;" ...

Former § 5704, which related to civil damages, was derived from Act 1972, Dec. 6, P.L. 1482, No. 334, § 1, as amended by Act 1974, Dec. 27, P.L. 1007, No. 327, § 2.

**Prior Laws:**

Act 1974, Dec. 27, P.L. 1007, No. 327, § 4; Act 1972, Dec. 6, P.L. 1482, No. 334, § 1.

See, now, § 5725.

**Notes of Decisions**

the entire Act. U.S. v. Geller, E.D.Pa. 1983, 560 F.Supp. 1309, affirmed 745 F.2d 49, certiorari denied 105 S.Ct. 786, 469 U.S. 1109, 83 L.Ed.2d 780.

Pennsylvania's Wiretapping and Electronic Surveillance Control Act is not ipso facto violative of State Constitution, that constitution, unaided by, and una-domed with, inappropriate legislation is, by itself, incapable of preventing wiretapping, and therefore any statute authorizing and regulating wiretapping is not per se repugnant to the Constitution. U.S. v. Geller, E.D.Pa.1983, 560 F.Supp. 1309, affirmed 745 F.2d 49, certiorari denied 105 S.Ct. 786, 469 U.S. 1109, 83 L.Ed.2d 780.

This section permitting police to intercept oral communication with one party's consent and approval of authorized prosecuting attorney did not authorize eavesdropping without a warrant, and thus was not unconstitutional. Com. v. Schaeffer, 536 A.2d 354, 370 Pa.Super. A.2d 251, 520 Pa. 596, affirmed 688 A.2d 1143, 547 Pa. 51.

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | GALVESTONCOUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122nd JUDICIAL DISTRICT |

## MOTION FOR EXTENSION OF TIME TO DESIGNATE
## EXPERT WITNESSES

**TO THE HONORABLE JUDGE OF SAID COURT:**

Comes now, **TRAVIS MULLIS,** Defendant in the above-entitled and numbered criminal action, by and through his counsel of record, Gerald E. Bourque and Robert K. Loper, and moves this Honorable Court for an extension of time to Designate Expert Witnesses and in support thereof would show the following:

I.

Gerald E. Bourque, one of Defendant's attorneys, has only recently completed an eight-week federal death penalty case in the Eastern District of Texas. Immediately upon completion of that case was set for trial in another death penalty case in Burleson County. That case has only recently concluded.

Robert K. Loper, Defendant's lead counsel, has also been involved in a lengthy felony murder trial in Harris County, Texas, which was just recently completed. He is also set for a capital murder trial in Harris County on July 16, 2010, as well as another capital murder case in Harris County on July 29, 2010.

These trials have caused counsel to file this motion to request additional time to designate expert witnesses.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that the court extend the deadline for disclosure of expert witnesses.

Respectfully submitted,

GERALD E. BOURQUE
STATE BAR NO.  02716500
24 Waterway Ave., Suite 660
The Woodlands, TX  77380
Telephone:     (713) 862-7766
Telecopier:    (832) 813-0321

ROBERT K. LOPER            by Gerald E.
State Bar No. 12562300            Bourque
111 W. 15th St.
Houston, Texas  77008
(713) 880-9000
(713) 869-9912 (fax)

ATTORNEY FOR DEFENDANT
TRAVIS JAMES MULLIS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to the Court and the District Attorney of Galveston County, Texas via fax on this 1st day of July, 2010.

GERALD E. BOURQUE

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | GALVESTONCOUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122nd JUDICIAL DISTRICT |

**ORDER GRANTING MOTION FOR EXTENSION OF TIME
TO DESIGNATE EXPERT WITNESSES**

On this _____ day of _____, 2010, came on for consideration Defendant's

Motion for Extension of Time to Designate Expert Witnesses and the Court, after due consideration,

is of the opinion that said motion is hereby:

_____ Granted

_____ Denied

Signed this _____ day of _____, 2010.


_____

JUDGE ELLISOR

# GERALD E. BOURQUE
### ATTORNEY AT LAW

24 WATERWAY AVENUE, SUITE 660, THE WOODLANDS, TEXAS 77380
Office (713) 862-7766
Facsimile (832) 813-0321

July 1, 2010

Ms. Latonia D. Wilson
District Clerk
Galveston County Courthouse
600 59th St., Room 4001
Galveston, TX  77551-2388

RE:   **The State of Texas vs. Travis James Mullis**
       **Case No. 07-CR-0333**

Dear Ms. Wilson:

Please find enclosed Defendant's Motion for Extension of Time to Designate Expert Witnesses to be filed in the above-referenced cause.

Please return the file-stamped copies to this office in the enclosed stamped, self-addressed envelope.

Thank you for your assistance.

Sincerely,

Gerald E. Bourque

GEB/me
Encl.
cc: Mr. Larry A. Drosnes,
       Assistant District Attorney

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | GALVESTONCOUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122nd JUDICIAL DISTRICT |

## MOTION FOR EXTENSION OF TIME TO DESIGNATE EXPERT WITNESSES

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now, **TRAVIS MULLIS**, Defendant in the above-entitled and numbered criminal action, by and through his counsel of record, Gerald E. Bourque and Robert K. Loper, and moves this Honorable Court for an extension of time to Designate Expert Witnesses and in support thereof would show the following:

I.

Gerald E. Bourque, one of Defendant's attorneys, has only recently completed an eight-week federal death penalty case in the Eastern District of Texas. Immediately upon completion of that case was set for trial in another death penalty case in Burleson County. That case has only recently concluded.

Robert K. Loper, Defendant's lead counsel, has also been involved in a lengthy felony murder trial in Harris County, Texas, which was just recently completed. He is also set for a capital murder trial in Harris County on July 16, 2010, as well as another capital murder case in Harris County on July 29, 2010.

These trials have caused counsel to file this motion to request additional time to designate expert witnesses.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that the court extend the deadline for disclosure of expert witnesses.

Respectfully submitted,

GERALD E. BOURQUE
STATE BAR NO. 02716500
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Telephone:    (713) 862-7766
Telecopier:   (832) 813-0321

ROBERT K. LOPER
State Bar No. 12562300
111 W. 15th St.
Houston, Texas 77008
(713) 880-9000
(713) 869-9912 (fax)

by Gerald E. Bourque

ATTORNEY FOR DEFENDANT
TRAVIS JAMES MULLIS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to the Court and the District Attorney of Galveston County, Texas via fax on this 1st day of July, 2010.

GERALD E. BOURQUE

# GERALD E. BOURQUE
### ATTORNEY AT LAW

24 WATERWAY AVENUE, SUITE 660, THE WOODLANDS, TEXAS 77380
Office: (713) 862-7766
Facsimile: (832) 813-0321

July 1, 2010

Ms. Latonia D. Wilson
District Clerk
Galveston County Courthouse
600 59th St., Room 4001
Galveston, TX 77551-2388

RE:  The State of Texas vs. Travis James Mullis
Case No. 07-CR-0333

Dear Ms. Wilson:

Please find enclosed Defendant's Motion for Extension of Time to Designate Expert Witnesses to be filed in the above-referenced cause.

Please return the file-stamped copies to this office in the enclosed stamped, self-addressed envelope.

Thank you for your assistance.

Sincerely,

Gerald E. Bourque

GEB/me
Encl.
cc: Mr. Larry A. Drosnes,
    Assistant District Attorney

# GERALD E. BOURQUE

### ATTORNEY AT LAW

24 WATERWAY AVENUE, SUITE 660, THE WOODLANDS, TEXAS 77380
Office (713) 862-7766
Facsimile (832) 813-0321
www.geraldebourque.com

## FACSIMILE COVER SHEET

TO: _Judge Ellison_

FROM: Gerald E. Bourque

FAX NO: 409-770-6265

DATE: 7-1-10

RE: St. of Tx. v. Travis Mullis

No. of Pages: 5

## MESSAGE

If any of the pages are missing or illegible, please contact our office at 713-862-7766.

CAUSE NO. 08CR0333

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| V. | § | GALVESTONCOUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122nd JUDICIAL DISTRICT |

**ORDER GRANTING MOTION FOR EXTENSION OF TIME
TO DESIGNATE EXPERT WITNESSES**

On this _____ day of _____, 2010, came on for consideration Defendant's

Motion for Extension of Time to Designate Expert Witnesses and the Court, after due consideration,

is of the opinion that said motion is hereby:

_____ Granted

_____ Denied

Signed this _____ day of _____, 2010.

_____
JUDGE ELLISOR

**Neumann, Janice**

| | |
|---|---|
| From: | Drosnes, Larry |
| Sent: | Friday, July 02, 2010 3:50 PM |
| To: | 'Robert K. Loper'; 'gerald@geraldebourque.com' |
| Cc: | Goode, Donna; Blizzard, Lester; Neumann, Janice |

**Mr. Loper:**

**We oppose your motion for extension of time to designate expert witnesses. A hearing on you motion is set in the 122nd for July 8th at 1:30 p.m.**

**Larry A. Drosnes**
**Assistant Criminal District Attorney**
**Galveston County, Texas**
**409- 766-2374 Office**
**409-765-3205 Fax**
**409-943-6494 Pager**
**larry.drosnes@co.galveston.tx.us**

This e-mail is the work product of the Galveston County Criminal District Attorney's Office prepared in anticipation of or in the course of preparing for criminal litigation. This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of Texas or his staff. This e-mail is not subject to public disclosure without the express permission of the Galveston County Criminal District Attorney or his designated representative.

NO. 08CR0333

| | |
|---|---|
| THE STATE OF TEXAS | IN THE DISTRICT COURT |
| | OF |
| VS. | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | 122ND JUDICIAL DISTRICT |

## ORDER GRANTING EXTENSION OF TIME
## TO DESIGNATE EXPERT WITNESSES

On this the 8th day of July, 2010, came on to be heard the Defendant's Motion for Extension of Time to Disclose Expert Witnesses.

On the 8th day of March, 2010, the Court ordered the parties herein to designate and disclose to opposing counsel expert witnesses' names and addresses and areas of expertise by July 1, 2010.

On July 1, 2010 the Defendant by and through his attorneys of record filed Defendant's Motion for Extension of Time to Disclose Expert Witnesses to the State asking for additional time to comply with the court's order.

The Court finds that said request for extension should be granted.

IT IS THEREFORE ORDERED that the parties herein designate and disclose to opposing counsel expert witnesses' names and addresses and areas of expertise by the 2nd day of August, 2010.

Signed this the 8 day of July, 2010.

_____
Judge Presiding

Approved and Agreed to:

_____
Robert K. Loper
Attorney for Defendant Travis James Mullis

_____
~~Donna Goode~~ LARRY DISGNEC
First Assistant Criminal District Attorney
Galveston County, Texas

NO. 08CR0333

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | § | 122nd JUDICIAL DISTRICT |

## NOTICE OF FILING CERTIFICATES/AFFIDAVITS

COMES NOW, the State of Texas by and through her Criminal District Attorney and gives notice that the State intends to introduce in evidence under the Texas Rules of Criminal Procedure at the trial of the above entitled and numbered cause the following affidavits and records, to-wit:

| **RECORD** | **AFFIANT** | **EMPLOYER-ADDRESS** |
| CHAIN OF CUSTODY AFFIDAVIT | RICK MCCULLOR | GALVESTON POLICE DEPT. GALVESTON,TX |

The said affidavits was filed with the District Clerk of Galveston County among the papers of the above entitled and numbered cause on the 8th day of July, 2010 and are available for inspection at the office of the District Clerk.

Respectfully submitted,

LARRY A. DROSNES
Assistant Criminal District Attorney
Galveston County, Texas

## CERTIFICATE OF SERVICE

I, LARRY A. DROSNES, do hereby certify that I provided a copy of the foregoing notice and chain of custody affidavit listed above to Robert Loper, attorney for the said Defendant, by mail and fax to his office, on the 8th day of July, 2010.

LARRY A. DROSNES
Assistant Criminal District Attorney
Galveston County, Texas

## CHAIN OF CUSTODY AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared RICK MCCULLOR, who being by me duly sworn, sated as follows:

My name is RICK MCCULLOR. I am of sound mind, over the age of 18 years, capable of making this affidavit, and am personally acquainted with the facts stated in this affidavit.

My address is: 601 54th Street Galveston, Texas.

On the March 26, 2009 I was employed as a peace officer with the City of Galveston, Texas.

On that date, I came into possession of the physical evidence described as Blood Stain Card of Alijah Mullis(374-58 A).

I received the physical evidence from the City of Galveston Police Department property room on said date and said evidence was sealed.

I transferred the sealed physical evidence to the Texas Department of Public Safety Regional Crime Laboratory in Houston Texas under the Laboratory Case Number, L2H 182325 on March 26, 2009.

During the time that the physical evidence was in my custody, I did not make any changes or alterations to the condition of the physical evidence and the physical evidence was transferred in the same condition as received.

**AFFIANT**

SWORN TO AND SUBSCRIBED before me on the ___8___ day of __July__ , 2010.

**Notary Public, State of Texas**

CISSI STALLINGS
MY COMMISSION EXPIRES
January 18, 2014

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 122ND DISTRICT COURT |
| | § | |
| V. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | |

## DEFENDANT'S MOTION TO TRANSFER
## ALL DOCUMENTS AND COMMUNICATIONS PERTAINING
## TO CAUSE NO. 08-3872 TO CAUSE NO, 08CR0333

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant, TRAVIS JAMES MULLIS, in the above-entitled and numbered cause, by and through Defendant's Attorneys of Record, and moves the Court to authorize that all documents and communications pertaining to Cause No. 08-3872 be transferred to Cause No. 08CR0333.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court authorize the transfer of documents and communications pertaining to Cause No. 08-3872 be transferred to Cause No. 08CR0333.

Respectfully submitted,

GERALD E. BOURQUE
State Bar No. 02716500
24 Waterway Ave., Suite 660
The Woodlands, TX   77380
Telephone: 713-862-7766
Telecopier: 832-813-0321


ROBERT K. LOPER
State Bar No. 12562300
111 West 15th Street
Houston, TX   77008
Telephone: 713-880-9000
Telecopier: 713-869-9912

ATTORNEYS FOR DEFENDANT


## CERTIFICATE OF SERVICE

I, the undersigned, certify that a copy of the foregoing Motion to Transfer all Documents and Communications Pertaining to Cause No. 08-3872 to Cause No. 08CR0333 has been served upon each attorney of record on this 30th day of July, 2010.

GERALD E. BOURQUE

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 122ND DISTRICT COURT |
| V. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | |

JASON E. MURRAY
122ND District Court
FILED
By Court
JAN 19 2011
GALVESTON COUNTY, TEXAS
BY_____
DEPUTY

**ORDER**

On this the 19 day of _Jan_, 2010, came to be heard Defendant's,

TRAVIS JAMES MULLIS, Motion to Transfer all Documents and Communications

Pertaining to Cause No. 08-3872 to Cause No. 08CR0333. After due consideration of

same the Court finds that the Motion should in all things be

☑    GRANTED          ☐    DENIED

IT IS THEREFORE ORDERED, that Defendant's Motion is granted and that

Documents and Communications Pertaining to Cause 08-3872 be transferred to Cause

No. 08CR0333.

SIGNED this 19 day of _Jan,_ 2010.

John Ellis
JUDGE PRESIDING

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 122ND DISTRICT COURT |
| | § | |
| V. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | |

## NOTIFICATION OF DEFENDANT'S EXPERT WITNESSES

Notice is hereby made of the following expert witnesses that may potentially be called by the Defendant:

Dr. Jolie S. Brams
Psychologist
Brams & Associates Inc.
985-B Bethel Road
Columbus, Ohio, 43214

Dr. Antoinette R. McGarrahan
Neuropsychologist
12820 Hillcrest Road
Suite C-125, Dallas, Texas, 75230

Dr. Matthew Mendel
Psychologist
3727 Benson Drive
Raleigh, North Carolina, 27587

Dr. Debbara Monroe
Psychologist
5625 College Avenue
Suite 212
Oakland, California, 94618

Dr. Mary E. Pelz
Criminal Justice (Prisons) Expert
College of Public Service
One Main Street, C400
Houston, Texas, 77002

Dr. Reuben Matalon
Professor of Pediatrics and Human Biological Chemistry and Genetics
University of Texas Medical Branch
Department of Pediatrics
3,350H Children's Hospital Route 0359
301 University Boulevard, Galveston, Texas, 77059

Dr. James Owens
Neurologist
Baylor College of Medicine
Houston, Texas

Mitchell H. Katz. MD
Neonatologist
Division of Pediatric Gastroenterology/Nutrition
Children's Hospital of Orange County
455 S. Main Street
Orange, California, 92868

Mr. Nick Cushing
Attorney at Family Law
Krusch & Sellers
5950 Fairview Road, Suite 808
Charlotte, North Carolina, 28210

Mr. Daniel S. Hellwig
Forensic DNA Technical Leader
Sorenson Forensics
2495 South West Temple
Salt Lake City
Utah, 84115

Neonatal Care Specialist (to be designated)

Adoption Expert (to be designated)

Development Pediatrician (to be designated)

Respectfully submitted,

GERALD E. BOURQUE
State Bar No. 02716500
24 Waterway Ave., Suite 660
The Woodlands, TX  77380
Telephone: 713-862-7766
Telecopier: 832-813-0321


ROBERT K. LOPER
State Bar No. 12562300
111 West 15th Street
Houston, TX  77008
Telephone: 713-880-9000
Telecopier: 713-869-9912

ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I, the undersigned, certify that a copy of the foregoing Notification of Defendant's Expert Witnesses has been served upon each attorney of record on this 30th day of July, 2010.

GERALD E. BOURQUE



---

### SUBPOENA ISSUED IN THE NAME OF THE STATE OF TEXAS

*This subpoena not prepared by the office of Latonia D. Wilson, District Clerk Galveston County, Texas.*

NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

**TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING:**
**"YOU ARE HEREBY COMMANDED TO SUMMON"**

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
|---|---|
| 1) Michele Duarte aka Michele Nichols** | |
| 2) Julio Hernandez | |
| | |
| | |
| | |
| | |

Upon receipt of subpoena please call: DONNA GOODE, FIRST ASSISTANT CRIMINAL DISTRICT ATTORNEY at (409) 766-2355. TO PROVIDE A CONTACT NUMBER AND TO DISCUSS THIS MATTER PRIOR TO TRIAL.

*If to be found in your County, to be and appear at 9:00 o'clock a.m. on the 4TH DAY OF FEBRUARY, 2011 ; Before the Honorable 122ND Judicial District Court of Galveston County, Texas, to be held within and for said County at the Court House thereof, in Galveston, then and there to testify as a witness on behalf of the State in a certain pending criminal (felony) action, and there to remain from day to day, and from term to term until discharged by said Court.*

**\* The witness is further commanded to deliver to a representative of the Galveston County Criminal District Attorney's Office or produce at the said time and place above set forth the following :**

\*\***Please bring with you** _Michael Durate, A MINOR_ _____
_____, minor/s
*On this day came forward LARRY A. DROSNES (applicant signature), attorney for the State/Defendant and files this application for subpoena to compel the attendance of the above named witness on this 24 day of August 2010, that said witness is necessary.*

**HEREIN FAIL NOT**, *and make due return hereof, showing how you have executed the same.*
*Witness my official signature, on this _____ day of _____, _____ attested to:*

Subpoena instructions              *LATONIA D. WILSON, District Clerk, Galveston County, Texas*
_____ Send to Sheriff

_____ Pickup                        By: _____ Deputy Clerk

---

### RETURN OF SERVICE

*Received this Subpoena on the _____ day of _____, 20____, and executed the same as shown above by delivering a copy of this subpoena to the within named witness (es) in the city of _____ and county of_____
Texas*

~~rvice Fee $ _____  _____.

*Signature of Officer (or Qualified Person)*



**SUBPOENA ISSUED IN THE NAME OF THE STATE OF TEXAS**

*Enforcement of Subpoena. Contempt failure by any person without adequate excuse to obey a subpoena
served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court
in the county in which the subpoena is served, and may be punished by fine or confinement, or both.*

This subpoena not prepared by the Office of Latonia D. Wilson, District Clerk Galveston County, Texas

| | | |
|---|---|---|
| CAUSE NO.08CR0333 | **THE STATE OF TEXAS** | IN THE DISTRICT COURT OF |
| PRESENT TERM, 2010 | **VS.** | GALVESTON COUNTY, TEXAS |
| | **TRAVIS JAMES MULLIS**<br>Defendant/s Name | 122ND JUDICIAL DISTRICT COURT |

TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING:
"YOU ARE HEREBY COMMANDED TO SUMMON"

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
|---|---|
| 1)   MIGUEL DUARTE | |

Upon receipt of subpoena please call: **DONNA GOODE, FIRST ASSISTANT CRIMINAL DISTRICT
ATTORNEY** at 409-766-2360 TO PROVIDE HER WITH CONTACT NUMBER AND TO DISCUSS
THIS MATTER PRIOR TO TRIAL.

*If to be found in your County, to be and appear at 9:00 a.m. on the 7th day of March, 2011; Before the Honorable Judge John Ellisor
of the 122nd Judicial District Court of Galveston County, Texas, to be held within and for said County at the Court House thereof, in
Galveston, then and there to testify as a witness on behalf of the State in a certain pending criminal (felony) action, and there to remain
from day to day, and from term to term until discharged by said Court.*

**\*The witness is further commanded to produce at the said time and place above set forth the following:**
**\*\*Please bring with you** Antonio Duarte and Cecilia Duarte, minor/s

On this day came forward _____ Lester Blizzard  (applicant signature), attorney for the State/Defendant
and files this application for subpoena to compel the attendance of the above named witness on this _____ day of
October _____, 2010, that said witness is necessary.

   **HEREIN FAIL NOT,** and make due return hereof, showing how you have executed the same.
*Witness my official signature, on this _____ day of _____, A.D., 20____ attested to:*

   *LATONIA D. WILSON, District Clerk, Galveston County, Texas*

   By: _____ , Deputy Clerk

| RETURN OF SERVICE |
|---|
| *Received this Subpoena on the _____ day of _____, 20____, and executed the same as shown above by delivering a copy of this subpoena to the within<br>named witness(es) in the city of _____ and county of _____, Texas<br>Service Fee $ _____  _____ Signature of Officer (or Qualified Person)* |

OCT - 8 PM 3: 23

10/8/10 - 155 - Sub - glu - DA

10 NOV -2 AM 9:03

Oct. 31, 2010

DISTRICT CLERK

GALVESTON COUNTY, TX

,MS. Wilson,

I am writing to formally request that the following motions be withdrawn Immediately and Prior to The Pre-Trial hearings Scheduled to begin on Nov. 18th, 2010 in relation to Cause 08CR0333:

1) Motion to Preclude the death Penalty as a Sentencing option and declare Article 37.071 Unconstitutional (Jones V. United States; Apprendi V. New Jersey; And Ring V. Arizona)

2) Motion to Preclude death Penalty as a Sentencing option (unequal Finding)

3) Motion to Declare Article 37.071 Section 2 (a) of the Texas Code of Criminal Procedure Unconstitutional on its Face.

4) Motion to Declare Article 37.071 Section 2 (b)(1) of The Texas Code of Criminal Procedure Unconstitutional on its face

5) Motion for Court to find Art. 37.071 of the Texas Code of Criminal Procedure Unconstitutional as applied to Travis James Mullis;

6) Motion to hold Unconstitutional Tex. Code Crim. Proc. Art. 37.071 Section 2 (c) and (f) - Burden of Proof

540

7). Motion to Find that Code Crim. Proc. Art. 37.071. Sec. 2(A)(b)(1). is Unconstitutional ("Future Danger Issue")

8) Motion to Hold Unconstitutional Tex. Code Crim. Proc. Art. 37.071. Section 2(e) and (F) – Failure to require Mitigation be Considered

9) Motion to declare Texas Death Penalty Statute Unconstitutional (Jurors inability to Predict Future Dangerousness)

10) Motion requesting The court to Find Tex. Code Crim. Proc. Art. 37.071 Section 2(F)(4) To be Unconstitutional

11) Motion to declare the "10-12 Rule" Unconstitutional

12) Motion in Limine to exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness

13) Motion for order in Limine to Preserve The True and Correct Meaning of "Probability" in Future dangerousness instruction

14) Motion in Limine (Preclude Testimony about violent acts by others)

15) Defendants Motion regarding Victim Character/Impact Testimony After Mosley V. State

16) Motion Preclude the State from offering Victim impact Testimony

.7)  Motion to Preclude the death Penalty as a Sentencing option due to Lack of elements in the indictment

18)  Motion to declare the death Penalty unconstitutional based on Texas Lethal injection Protocol

19)  Motion Preclude The offer of evidence of extraneous offenses (Ring V. Arizona)

20)  Motion to Prohibit comment on The weight to be given of Credibility of Testimony during Trial

21)  Motion in Limine  (Guarantee of No Violence)

22)  Motion in Limine  (Victim Impact Type Evidence)

23)  Motion to hold that Tex. Code of Crim. Proc. Art. 37.071 is unconstitutional.

Copys of this Letter/Request to withdraw motions have been Sent Simultaniously to Judge John Ellisor, Latonia D Wilson, Robert K. Loeb, and Gerald Bourane as These Parties Represent the Judge, County District Clerk, and Defense Attorneys in this Case, The Said attorneys have been notified of My intent and desire to withdraw the above Said motions. I now hereby formally (request in writing).

542

I have done considerable research into the said motions, including review of State and Federal Law, Precedent and Caselaw relating to each. I am aware of the "Pro's + Con's" of each motion and have intensely scrutinized each. I am highly informed in my decision to Withdraw said Motions and the effects of doing So. My Lawyers and I do NOT Agree on this Matter however I have hereby requested this Action.

I am aware of my Rights to withdraw my motion at my time for any reason regardless of my lawyers having filed it either then I, I am aware of my Right to Participation and overall rights to make Decisions on actions My Lawyers may or may not take on my behalf.

If there is any question as to my Seriousness or as to the risk of appeals related to my decision to withdraw these motions, I have no Problem going on record and making this request as well as on record Staying any waiver to my Right to appeal on grounds of the withdraw of these 23 said Motions. If the Court denies this request I wish for my objection to go on record.

I have Consulted with this issue with a Pro-Bono Civil Rights Attorney and have instructed him on how To Proceed Should this be denied.

If the 23 Said Motions are not withdrawn as requested the Attorney has been instructed on how To handle this situation.

Upon denial of this request to withdraw these motions if They are not withdrawn as requested Complaints with the Following Agencies including but not limited to:

1) Texas State BAR
2) U.S. Dept. of Justice
3) State Commission on Judicial Conduct
4) Texas Civil Rights Project
5) American Civil Liberties Union

In addition Copies of this letter as well as Copies sent to Gerald Bourque, Robert Loper, Latonia Wilson, and Judge John Ellisor as well as Copies of all Complaints sent to Above stated Agencies will be sent along with a Press release To The Following Parties including but not limited to:

1) Prison Legal News
2) KPRC-2  (NBC)
3) KHou-11 (CBS)
4) KTRK-13 (ABC)
5) KRIV - Fox 26
6) KIAH - TV 39
7) Cable News Network (CNN)
8) MSNBC
9) Court TV

Finally, Civil Rights Lawsuits will be filed against all parties involved
Including but not Limited to:

1) Judge John Ellisor
2) Robert K Lopez
3) Gerald Bourque
4) Leonia D. Wilson

As well as all other Parties related to This issue.

Copies of Said lawsuits will also be Sent to The above said
Media outlets. Preparations for Those Actions have already been made
and all Complaints, Lawsuits, Press Releases, etc. Will be Sent by my
Civil Rights Attorney upon his notification of the denial and failure
to grant and Acknowledge this request.

I hope it does not come to This but my future is
at stake as is and I have every right to direct my attorneys
Not to file certain motions, & I do have Legal say in how my
Case is handled. I am well educated on my Rights and will
Continue to do what is required to Protect Them.

I hereby Pray the Above 23 Motions are Withdrawn

10 NOV -2 AM 9:04

District Clerk

Thank You,

Travis James Mills
#F 64386

545

RECEIVED

NOV 0 2 2010

2010 NOV -8 PM 2: 37

Oct 31, 2010

Judge Ellisor,

I am writing to formally request that the following motions be withdrawn Immediatney and Prior to The Pretrial hearings Scheduled to begin on November 18th, 2010; in Relation to Cause 08CR0333:

1) Motion to Preclude the Death Penalty As A Sentencing Option And Declare Article 37.071 Unconstitutional (Jones V. United States ; Apprendi V. New Jersey ; And Ring V. Arizona)

2) Motion to Preclude Death Penalty as a Sentencing Option (unequal Funding)

3) Motion to Declare Article 37.071 Section 2(a) of the Texas Code of Criminal Procedure Unconstitutional on its face

4) Motion to Declare Article 37.071 Section 2(b)(1) of the Texas Code of Criminal Procedure Unconstitutional on its face

5) Motion for Court to find Art. 37.071 of the Texas Code of Criminal Procedure Unconstitutional As applied to Travis James Mullis

6) Motion to Hold Unconstitutional Tex. Code Crim. Proc. Art. 37.071 Section 2 (e) And (F) ~ Burden of Proof

7) Motion to find that Code Crim. Proc. AA. 37.071 Sec. 2(2)(b)(1) is Unconstitutional ("Future Danger Issue")

8) Motion to Hold Unconstitutional Tex. Code Crim. Proc. Art. 37.071 Section 2(e) and (f) - Failure to require Mitigation Be Considered.

9) Motion to Declare Texas Death Penalty Statute to be Unconstitutional (Juror's inability to Predict Future Dangerousness)

10) Motion Requesting the Court to Find Tex. Code Crim. Proc. Art. 37.071 Section 2(F)(4) to be Unconstitutional

11) Motion to Declare the "10-12" Rule Unconstitutional

12) Motion inLimine to Exclude Psychiatric or Psychological Testimony Concerning Future Dangerousness

13) Motion for order in Limine to Preserve The True and Correct Meaning of "Probability" in the future Dangerousness instruction

14) Motion In Limine (Preclude Testimony About Violent acts by others)

15) Defendant's Motion Regarding Victim Character/Impact Testimony After Mosley V. State

16) Motion Preclude The State from offering Victim Impact Testimony

17) Motion Preclude the death Penalty As a Sentencing option due to Lack of elements in the Indictment

18) Motion to declare the Death Penalty Unconstitutional based on Texas Lethal InJection Protocol

19) Motion Preclude the offer of Evidence of Extraneous offenses (Ring V. Arizona)

20) Motion to Prohibit Comment on the weight to be given of Credibility of Testimony During Trial

21) Motion In Limine (Guarantee of No Violence)

22) Motion In Limine (Victim Impact Type Evidence)

23) Motion to hold that Tex. Code of Crim. Proc. Art. 37.071 Is Unconstitutional.

Copys of this Letter / Request to withdraw Motions have been Sent Simultaniously to Judge Ellisor, Lutonia D. Wilson, Robert K. Loper, And Gerald Bourque. These Parties represent the Judge, County District Clerk and Defense Attorneys in this Case. The Said Attorneys have been notified of My intent & Desire to withdraw Above Said Motions. I now hereby Formally state my request in writing.

548

I have done Considerable research into the said motions including review of State & Federal Laws, Precedent & Case law relating to each. I am aware of the "Pro's & Con's" of each Motion and have intensley Scrutinized each. I am Highly informed in my decision to Withdraw said motions and the effects of doing so. My Lawyers & I do NOT Agree on this matter however I have hereby requested this Action.

I am aware of My Rights to withdraw any Motion at any Time for any reason regardless of My layers having filed it Cather than I. I am aware of my right to Participation and overall rights to make Decisions on Actions My Lawyers may or may not Take on My Behalf.

If there is any Question as to my Seriousness or as to The risk of Appeals related to my decision to withdraw these motions. I have no Problem going on record And making this request as well as Go Record Stating my waiver to My Right to Appeal on grounds of the withdraw of these 23 said motions. If the Court denies this request I Wish for my objection to go On record.

I have Consulted about this issue with a Pro-Bono Civil Rights Attorneys and have instructed him on how to Proceed Should this be denied.

If the 23 Said Motions Are not Withdrawn as requested the Attorney has been instructed on how to handle this Situation

Upon Denial of this request to withdraw these motions, If they are not withdrawn as requested Complaints will be Filed With the Following Agencies including But not Limited to:

    1) Texas State BAR

    2) U.S. Dept of Justice

    3) State Commission on Judicial Conduct

    4) Texas Civil Rights Project

    5) American Civil Liberties Union

In addition, Copies of this letter as well as all Copies Sent to Gerald Bourque, Robert Loper, Latania Wilson, and Judge John Ellisor, as well as Copies of all Complaints Sent to Above Stated Agencies Will be Sent Along With a Press Release to The Following Parties Including but not Limited to:

    1) Prison Legal News

    2) KPRC - 2 (NBC)

    3) KHOU - 11 (CBS)

    4) KTRK - 13 (ABC)

    5) KRIV - Fox 26

    6) KIAH - TV39

    7) Cable News Network (CNN)

    8) MSNBC

    9) Court TV

Finally, Civil Rights lawsuits will be filed against all parties involved Including but not Limited to:

1) Judge John Ellisor
2) Robert K. Loper
3) Gerald Bourque
4) Latonia D. Wilson

As well as all other parties related to this issue.

Copies of said Lawsuits will also be sent to the above said Media outlets. Preparations for these actions have already been made and all above Complaints, Lawsuits, & Press releases will be Sent by my Civil Rights Attorney upon his notification of the Denial and failure to grant & acknowledge this request.

I hope it does not come to this but my future is at Stake as is and I have every right to direct my attorneys not to file certain motions & I do have Legal Say in how my case is handled. I am well educated on my rights and will Continue to do what is required to Protect them.

I hereby Pray the above 23 motions Are withdrawn.

Thank You,

Travis James Mullis

# 64386



## SUBPOENA ISSUED IN THE NAME OF THE STATE OF TEXAS

*This subpoena not prepared by the office of Latonia D. Wilson, District Clerk Galveston County, Texas.*

NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING:
**"YOU ARE HEREBY COMMANDED TO SUMMON"**

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
|---|---|
| 1 Scott Pena | |
| **Upon receipt of subpoena please call: LESTER BLIZZARD, ASSISTANT DISTRICT ATTORNEY at** **(409) 770-5183 or (409) 766-2355 Main.** | |

*If to be found in your County, to be and appear at 9:00 o'clock a.m. on the 18th day of January  2011 ; Before the Honorable 122ND Judicial District Court of Galveston County, Texas, to be held within and for said County at the Court House thereof, in Galveston, then and there to testify as a witness on behalf of the **State** in a certain pending criminal (felony) action, and there to remain from day to day, and from term to term until discharged by said Court.*

*On this day came forward* _____, **LESTER BLIZZARD**, *attorney for the State/Defendant and files this application for subpoena to compel the attendance of the above named witness on this _____ day of_____, 2010, that said witness is necessary.*

**HEREIN FAIL NOT**, *and make due return hereof, showing how you have executed the same.*
*Witness my official signature, on this* __14__ *day of* __Dec_____, 201 (Attested to:)

*LATONIA D. WILSON, District Clerk, Galveston County, Texas*

Subpoena instructions
_____ Send to Sheriff

_____ Pickup                    By:_____ , *Deputy Clerk*

## RETURN OF SERVICE

*Received this Subpoena on the _____ day of_____, 20____, and executed the same as shown above by delivering a copy of this subpoena to the within named witness (es) in the city of _____ and county of _____, Texas*
*Service Fee $ _____    _____ Signature of Officer (or Qualified Person)*

DISTRICT CLERK
GALVESTON COUNTY, TX.
2010 DEC 14  PM 2:59

 

---

### SUBPOENA ISSUED IN THE NAME OF THE STATE OF TEXAS

*This subpoena not prepared by the office of Latonia D. Wilson, District Clerk Galveston County, Texas.*

NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING:
**"YOU ARE HEREBY COMMANDED TO SUMMON"**

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
|---|---|
| 1) Robert Hesser | |
| 2) Gregory Rodden | |
| 3) John McNamee | |
| 4) George Pirrone | |
| 5) Michael Munroe | |
| 6) Andrea Smith Wardlow | |
| Upon receipt of subpoena please call: LESTER BLIZZARD, ASSISTANT DISTRICT ATTORNEY at (409) 770-5183 or (409) 766-2355 Main. | |

*If to be found in your County, to be and appear at 9:00 o'clock a.m. on the 18th day of January 2011 ; Before the Honorable 122ND Judicial District Court of Galveston County, Texas, to be held within and for said County at the Court House thereof, in Galveston, then and there to testify as a witness on behalf of the **State** in a certain pending criminal (felony) action, and there to remain from day to day, and from term to term until discharged by said Court.*

*On this day came forward _____, **LESTER BLIZZARD**, attorney for the State/Defendant and files this application for subpoena to compel the attendance of the above named witness on this _____ day of _____, 2010, that said witness is necessary.*

   ***HEREIN FAIL NOT**, and make due return hereof, showing how you have executed the same.*
*Witness my official signature, on this 14 day of Dec, 2010 attested to:*

LATONIA D. WILSON, *District Clerk,* Galveston County, Texas

Subpoena instructions
____ Send to Sheriff

____ Pickup                    By: _____ , *Deputy Clerk*

---

### RETURN OF SERVICE

*Received this Subpoena on the _____ day of _____, 20___, and executed the same as shown above by delivering a copy of this subpoena to the within named witness (es) in the city of _____ and county of _____, Texas*
*Service Fee $ _____ _____ Signature of Officer (or Qualified Person)*

553

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 122ND JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| TRAVIS JAMES MULLIS | § | GALVESTON COUNTY, TEXAS |

ORDER ON
MOTION FOR PRODUCTION OF RECORDS
TO CHILDREN SERVICES OF MARYLAND

On this 15th day of December, 2010, came on to be considered the Defendant's

Motion for Production of Records. After receiving same and consulting with counsel

for both parties, it is hereby

ORDERED that Children Services of Maryland produce to Gerald E. Bourque,

Attorney at Law, 24 Waterway Ave., Suite 660, The Woodlands, TX 77380, certified

copies of all records in their possession regarding the adoption of Travis J. Wallace

(Mullis) by his adoptive parents, Gary Lynn Mullis (DOB: 6/26/52), and Anne Marie

Barry Mullis (DOB: 1/12/55). Travis J. Wallace (Mullis) was born September 20, 1986

and it is believed the adoption occurred some date before his fifth birthday in 1991. It

is further

ORDERED that all records be produced, including but not limited to, court

records, medical records, social study records, or records pertaining to any act/s of child

abuse and/or sexual assault perpetrated on Travis J. Wallace (Mullis) (DOB: 9/20/86) by

his adoptive father, Gary Lynn Mullis, (DOB: 6/26/52) or by anyone else on Travis J.

Wallace/Mullis (DOB: 9/20/86).

SIGNED this the _15_ day of ___December__, 2010.

JUDGE JOHN ELLISOR,
PRESIDING JUDGE OF THE
122nd JUDICIAL DISTRICT COURT,
GALVESTON COUNTY, TEXAS

555

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 122ND JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| TRAVIS JAMES MULLIS | § | GALVESTON COUNTY, TEXAS |

## ORDER ON
## MOTION FOR PRODUCTION OF RECORDS
## TO CHILDREN SERVICES OF NORTH CAROLINA

On this 15th day of December, 2010, came on to be considered the Defendant's Motion for Production of Records.  After receiving same and consulting with counsel for both parties, it is hereby

ORDERED that Children Services of North Carolina produce to Gerald E. Bourque, Attorney at Law, 24 Waterway Ave., Suite 660, The Woodlands, TX 77380, certified copies of all records in their possession regarding the adoption of Travis J. Wallace (Mullis) by his adoptive parents, Gary Lynn Mullis (DOB: 6/26/52), and Anne Marie Barry Mullis (DOB: 1/12/55).  Travis J. Wallace (Mullis) was born September 20, 1986 and it is believed the adoption occurred some date before his fifth birthday in 1991. It is further

ORDERED that all records be produced, including but not limited to, court records, medical records, social study records, or records pertaining to any act/s of child abuse and/or sexual assault perpetrated on Travis J. Wallace (Mullis) (DOB: 9/20/86) by his adoptive father, Gary Lynn Mullis, (DOB: 6/26/52) or by anyone else on Travis J.

556

Wallace/Mullis (DOB: 9/20/86).

SIGNED this the ⟨15⟩ day of ⟨December⟩, 2010.

JUDGE JOHN ELLISOR,
PRESIDING JUDGE OF THE
122nd JUDICIAL DISTRICT COURT,
GALVESTON COUNTY, TEXAS

557

CAUSE NO. 08CR0333          2010 DEC 15  AM 10: 31

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 122ND JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| TRAVIS JAMES MULLIS | § | GALVESTON COUNTY, TEXAS |

## ORDER ON
## MOTION FOR PRODUCTION OF RECORDS
## TO CAROLINAS MEDICAL CENTER-NORTHEAST

On this 15th day of December, 2010, came on to be considered the Defendant's

Motion for Production of Records.   After receiving same and consulting with counsel

for both parties, it is hereby

ORDERED that Ms. Geraldine Auton, Director of Medical Records for Carolinas

Medical Center - Northeast (formerly Cabarrus Memorial) produce copies of any and all

records to Gerald E. Bourque, Attorney at Law, 24 Waterway Ave., Suite 660, The

Woodlands, TX  77380, relative to the treatment of Travis J. Wallace or Travis J. Mullis,

whose date of birth is September 20, 1986.    It is further

ORDERED that these records should cover a period of time beginning in January

1, 1986 through to August 1, 1987, for Sheila Lee Wallace, Sheila Lee Goodson, Sheila

Lee Moore, or Sheila Lee Devlin, whose date of birth is May 31, 1949 and whose date of

death is July 12, 1987.   It is further

ORDERED that the medical records for Travis J. Wallace or Travis J. Mullis,

558

whose date of birth is September 20, 1986, shall cover the timeframe beginning with his

date of birth (9/20/86) through January 1, 1997.

SIGNED this the 15 day of December, 2010.

JUDGE JOHN ELLISOR,
PRESIDING JUDGE OF THE
122nd JUDICIAL DISTRICT COURT,
GALVESTON COUNTY, TEXAS

559

CAUSE NO. 08CR0333

2010 DEC 15   AH 10: 31

| THE STATE OF TEXAS | § | IN THE 122ND JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| TRAVIS JAMES MULLIS | § | GALVESTON COUNTY, TEXAS |

ORDER ON
MOTION FOR PRODUCTION OF RECORDS
TO CAROLINAS MEDICAL CENTER

On this 15th day of December, 2010, came on to be considered the Defendant's

Motion for Production of Records. After receiving same and consulting with counsel

for both parties, it is hereby

ORDERED that Ms. Keitha Eddins, Director of Medical Records for Carolinas

Medical Center (formerly Charlotte Memorial) produce copies of any and all records to

Gerald E. Bourque, Attorney at Law, 24 Waterway Ave., Suite 660, The Woodlands, TX

77380, relative to the treatment of Travis J. Wallace or Travis J. Mullis, whose date of

birth is September 20, 1986.    It is further

ORDERED that these records should cover a period of time beginning in January

1, 1986 through to August 1, 1987, for Sheila Lee Wallace, Sheila Lee Goodson, Sheila

Lee Moore, or Sheila Lee Devlin, whose date of birth is May 31, 1949 and whose date of

death is July 12, 1987.  It is further

ORDERED that the medical records for Travis J. Wallace or Travis J. Mullis,

560

whose date of birth is September 20, 1986, shall cover the timeframe beginning with his

date of birth (9/20/86) through January 1, 1997.

SIGNED this the 15 day of December, 2010.

_____
JUDGE JOHN ELLISOR,
PRESIDING JUDGE OF THE
122nd JUDICIAL DISTRICT COURT,
GALVESTON COUNTY, TEXAS

561

FILED
BuCourt
DEC 21 2010
GALVESTON COUNTY, TEXAS
BY CLERK
Deputy

CAUSE NO. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | GALVESTON COUNTY, TEXAS |
| | § | |
| TRAVIS JAMES MULLIS | § | 122nd JUDICIAL DISTRICT |

## ORDER DIRECTING AVAILABILITY OF COUNSEL

This Court scheduled the trial of this cause to begin February 1, 2011, after a previous continuance. This Court intends to proceed with the trial as scheduled without delay. An evidentiary hearing is scheduled to begin on January 18, 2011 and continue through the end of that week.

As result of the trial setting in a case of this magnitude, the lawyers herein must be prepared to go forward as scheduled. To that end, this Court enters this Order directing the availability of defense counsel, Robert K. Loper and Gerald E. Bourque, beginning January 4, 2011 and continuing through March 31, 2011. The Court is aware of the necessity of completing all matters necessary for the effective assistance of counsel in the months prior to the trial of a capital murder case where the death penalty is sought by the government. The Court is also aware of the demands placed upon experienced trial counsel with a pending caseload of criminal actions. Defense counsel are directed to make every reasonable effort not to begin the trial of any other case or contested matter during this time of pretrial preparation and the beginning of trial herein and are directed to seek any reasonable continuance of other contested matters to comply with this directive. Defense counsel shall not be prohibited from making court appearances or attending to other matters in court, such as docket calls, appearances, pleas, sentencings, or other matters that could be immediately postponed upon notice

562

from this Court, if pretrial matters arise herein.

Counsel herein are directed to bring this Order to the attention of any Court before which counsel is scheduled to appear for any trial or contested matter during the pendency of this trial. Any Court to which this Order is presented is respectfully requested to take notice hereof and to accord deference to the trial of this cause for the orderly administration of justice. This Order is effective from the date of the entry hereof.

SIGNED this __21__ day of __Dec.__, 2010.

_John Ellison_
JUDGE PRESIDING

APPROVED:

_Robert K Loper w/p_
Robert K. Loper
Attorney for Defendant

_Gerald E Bourque_
Gerald E. Bourque
Attorney for Defendant

LATONIA D. WILSON
CLERK DISTRICT COURT
FILED
By Court
DEC 2 1 2010
GALVESTON COUNTY, TEXAS
BY
Deputy

563

APPLICATION

---

### SUBPOENA ISSUED IN THE NAME OF THE STATE OF TEXAS

*This subpoena not prepared by the office of Latonia D. Wilson, District Clerk Galveston County, Texas.*

NO. 08CR0333

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS JAMES MULLIS | § | 122ND JUDICIAL DISTRICT |

TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING:
**"YOU ARE HEREBY COMMANDED TO SUMMON"**

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
| --- | --- |
| 1 Custodian of Record, ATTN: Royston Patterson Standard Parking 1200 McKinney Street, Suite 541, Houston, Texas 77010 | |
| Upon receipt of subpoena please call: LESTER BLIZZARD, ASSISTANT DISTRICT ATTORNEY at (409) 770-5183 or (409) 766-2355 Main. | |

*If to be found in your County, to be and appear at 9:00 o'clock a.m. on the 18th day of January 2011 ; Before the Honorable 122ND Judicial District Court of Galveston County, Texas, to be held within and for said County at the Court House thereof, in Galveston, then and there to testify as a witness on behalf of the State in a certain pending criminal (felony) action, and there to remain from day to day, and from term to term until discharged by said Court.*

***The witness is further commanded to produce at the said time and place above set forth the following:***
\ny and all employee records in regard to Travis James Mullis, DOB: 09-20-1986, SS# 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 , to include but not limited to application, time cards, schedules, background investigations, correspondence, and reason(s) for termination,

***In lieu of appearance the requested documents may deliver the requested information, along with a Custodian of Record Affidavit to the Galveston County Criminal District Attorney's Office, 600 59th Street, Suite 1001, Galveston, Texas 77551.***

*On this day came forward _____, LESTER BLIZZARD, attorney for the State/Defendant and files this application for subpoena to compel the attendance of the above named witness on this 29th day of December, 2010, that said witness is necessary.*

*HEREIN FAIL NOT, and make due return hereof, showing how you have executed the same.*

*Witness my official signature, on this _____ day of _____, _____ attested to:*

*LATONIA D. WILSON, District Clerk, Galveston County, Texas*

Subpoena instructions
_____ Send to Sheriff

_____ Pickup                    *By:* _____ *Deputy Clerk*

---

### RETURN OF SERVICE

*Received this Subpoena on the _____ day of _____, 20____, and executed the same as shown above by delivering a copy of this subpoena to the within named witness (es) in the city of _____ and county of _____ Texas*

*Service Fee $ _____   _____ Signature of Officer (or Qualified Person)*

564

CAUSE NO. 08-CR-0333

THE STATE OF TEXAS      }      IN THE DISTRICT COURT OF

vs.      }      GALVESTON COUNTY, TEXAS

TRAVIS MULLIS      }      122nd JUDICIAL DISTRICT

## MOTION PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION
### (Reduced Capacity Due to Mental Illness)

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW** Travis Mullis, by and through counsel and pursuant to the Fifth, Sixth,

Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Sections

3,10, 13 & 19 of the Texas Constitution and Texas Code of Criminal Procedure, articles 1.05,

1.051, 15.17, 16.01, 20.17, 26.04 26.052, and moves to preclude the death penalty as a

sentencing option in this case due to his longstanding mental illness. In support, he would show

the court the following:

1.      Travis Mullis has been indicted for the offense of capital murder.

2.      The State is seeking the death penalty. The Eighth Amendment requires a greater

degree of accuracy and fact finding than would be true in a noncapital case. Gilmore v. Taylor,

508 U.S. 333 (1993); Woodson v. North Carolina, 428 U.S. 280, 305 (1976). This Court and the

Court of Criminal Appeals are bound by the law to make certain that a sentence of death is not

wantonly or freakishly imposed and that the purposes of Art. 37.071 are accomplished in a

constitutional manner. Ellason v. State, 815 S.W. 2d 6565 (Tex.Crim.App. 1991).

3.      Those prohibitions embodied within the Eighth Amendment to the United States

Constitution include the prohibition against the infliction of a cruel and unusual punishment.

1

Article 1, Section 13 of the Texas Constitution provides even greater protection in that this section bars the infliction of a "cruel *or* unusual punishment" (emphasis added).

4.    The State of Texas has charged that it was the *conscious* objective or desire of Travis Mullis cause the death of Alijah Mullis and/or that he was *aware* that his conduct was reasonably certain to cause the death of Alijah Mullis.

5.    The capacity of Travis Mullis to form a conscious objective or desire is reduced by impairments in his cognitive ability.   His cognitive ability has been reduced by his longstanding mental illness, which is Bipolar Disorder, and is exacerbated by Attention Deficit Hyperactivity Disorder and the trauma he suffered as a six-year-old, when his father sexually abused him and was subsequently imprisoned.

### A. TRAVIS MULLIS HAS A SIGNIFICANT HISTORY OF MENTAL ILLNESS

6.    Travis Mullis' history of mental illness began young.  According to medical records, he was seven years old when ADHD was first suspected.  He was placed on daily doses of Ritalin when he was eight years old and, when he was nine, the Harford County (Maryland) Public Schools formally diagnosed him with ADHD and Separation Anxiety.  He continued to take Ritalin for his attentional problems, which have been regularly observed and repeatedly diagnosed as ADD and, much more frequently, ADHD.

In February 2000, at the age of 13, Mr. Mullis was admitted to Sheppard Pratt hospital as a result of contemplating suicide by decapitation or drowning.  Upon admission, he was diagnosed with Mood Disorder NOS and discharged with a prescription for Paxil and Ritalin. Two weeks later, he was hospitalized a second time and diagnosed with Major Depression, Recurrent, Severe. He was prescribed the powerful antipsychotic drug, Seroquel, and discharged.

2

566

Almost 10 days later, he was admitted again for attempting suicide. The medical notes report that he was taking Paxil, Ritalin and Seroquel. Over the next several months, his medications would include Depakote – which is used to control mood disorders -- Seroquel and Wellbutrin.

At age 14, according to Jefferson School Records, Mr. Mullis was diagnosed with Bipolar Disorder, Post Traumatic Stress Disorder and ADHD. His Global Assessment of Functioning was placed at 40, which in a juvenile is indicative of major impairment in functioning.

Mr. Mullis continued to take Depakote, Wellbutrin and Risperdal (which is used to treat the symptoms of mania) while 16 and 17. He was diagnosed again as a 16-year-old with Bipolar I Disorder, PTSD and ADHD.

Shortly after Mr. Mullis turned age 17, the Harford County Public Schools administered the WAIS III IQ test. Mr. Mulls' his full-scale IQ score was reported to be in the low-average range and his scores indicated difficulties with reasoning.

7. By any standard, Bipolar I Disorder is a lifelong brain disorder that is the most serious form of the disease known to the public as "manic depression." The National Institute of Mental Health states that Bipolar I Disorder is marked by "manic or mixed episodes that last at least seven days, or by manic symptoms that are so severe that the person needs immediate hospital care. Usually, the person also has depressive episodes, typically lasting at least two weeks. The symptoms of mania or depression must be a major change from the person's normal behavior." National Institute of Mental Health, Bipolar Disorder web page, at http://vvww.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml (last visited Jan. 4, 2010).

3

567

Lest there be any question about how Bipolar Disorder manifests itself, the NIMH states, "Symptoms of bipolar disorder are severe. They are different from the normal ups and downs that everyone goes through from time to time." *Id.*

Moreover, emerging research strongly suggests that Bipolar Disorder affects brain growth and development. A recent study using MRI found that the pattern of brain development in children with bipolar disorder was similar to that in children with "multi-dimensional impairment," a disorder that causes symptoms that overlap somewhat with bipolar disorder and schizophrenia. This suggests that the common pattern of brain development may be linked to general risk for unstable moods. N. Gogtay, et al., "Dynamic mapping of cortical development before and after the onset of pediatric bipolar illness," 48(9) *J Child Psychol Psychiatry* 852 (Sept. 2007).

8.      Further, in addition to Bipolar I Disorder, Mr. Mullis also suffers from lifelong ADHD and PTSD. These illnesses, in combination, cannot be viewed as trifling. They have had far far-reaching impact on Mr. Mullis' ability to exist in the world, as his medical and life history indicates. Indeed, Mr. Mullis' Bipolar I Disorder, ADHD and PTSD have clearly impaired cognitive abilities in the following ways:

> a. They have impaired his ability to receive information;
>
> b. They have impaired his ability to process that information;
>
> c. They have impaired his ability to rationally react to that information.

Accordingly, the death penalty should be precluded as a sentencing option in this case due to Travis Mullis's mental illness, which reduces his capacity and his personal culpability. To allow the State to seek the death penalty against Travis Mullis violates the Eighth

4

**568**

Amendment and Article 1, Section 13 of the Texas Constitution by subjecting him to the ultimate punishment despite his reduced capacity due to mental illness, from which he suffers through no fault of his own. Because of his impairment, Travis Mullis's capacity and personal responsibility are as diminished as those offenders with mental retardation, and he is no less entitled than those offenders to be exempted from the ultimate punishment.

## B.   THE RATIONALE OF *ATKINS* PROTECTS THOSE WITH REDUCED CAPACITY FROM THE DEATH PENALTY

9.   There are definite correlations between impairments suffered by the mentally ill and those people who are impaired by mental retardation. Persons who are mentally retarded and commit crimes have a reduced capacity, which diminishes their personal culpability, and execution of the mentally retarded violates the Eighth Amendment's prohibition on the infliction of cruel and unusual punishment. Atkins v. Virginia, 536 U.S. 304 (2002). The offender with mental retardation suffers from sub-average intellectual functioning and has significant limitations in adaptive skills, they frequently know the difference between right and wrong, are competent to stand trial, but "by definition" they have diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses and to understand other's reactions. Their deficiencies do not warrant an exemption from criminal sanctions but diminish their personal culpability. Id. at 317-318. In other words, mentally ill offenders "like those with mental retardation or who were juveniles at the time of the offense, have diminished responsibility for their actions. All merit punishment, but not the extreme penalty."[1] Moreover, "when severe

---

[1] Winick, B. J. (2008) The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, University of Miami School of Law, available at http://ssrn.com/abstract=1291781, page 37.

mental illness imposes impairments comparable to mental retardation and juvenile status on judgment, rationality, and the ability to foresee consequences and control behavior, it would appear similarly less justifiable to impose the death penalty as retribution for past crimes or as a deterrent to future ones. To the extent that mental illness produces effects that reduce volitional control and blameworthiness to the same degree as mental retardation and juvenile status, the imposition of the death penalty would seem insufficiently related to the purposes of capital punishment to allow its application consistent with the Eighth Amendment."[2]

The Supreme Court has found that the death penalty serves the social purposes of retribution and deterrence. Gregg v. Georgia, 428 U.S. 153, 183 (1976). Retribution "necessarily depends on the culpability of the offender." Atkins, 536 U.S. at 319. Capital punishment must be limited to a narrow category of offenders whose "extreme culpability makes them 'the most deserving of execution.'" Id., quoted in Roper v. Simmons, 125 S.Ct. 1183, 1194 (2005).

Offenders, whose reasoning capacities render them less than fully culpable for their crimes, are not eligible for the death penalty[3] because "they do not act with the level of moral culpability that characterizes the most serious adult conduct." Atkins, 536 U.S. at 306. As a result, the Court found that the diminished mental capacity of the mentally retarded, including their disabilities in "areas of reasoning, judgment, and control of impulses," does not merit the death penalty as appropriate retribution. Id.

---

[2] Ibid p. 30.

[3] See e.g., Roper v. Simmons, 125 S.Ct. 1183, 1196 (2005) (finding that "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity"); see also Thompson v. Oklahoma, 487 U.S. 815 (1988).

6

570

Additionally, the social purpose of deterrence is not served by executing the mentally retarded. Since the mentally retarded suffer from impairments in their cognitive functioning, they are less likely to be able to process the information that the death penalty is a possible punishment. As a result, the person with mental retardation cannot examine their behavior, evaluate the possible punishments, and "control their conduct based upon that information" in the same manner as other adults in society. Atkins, 536 U.S. at 320. This inability to conform conduct undermines the identified social purposes of deterrence and makes the execution of persons with mental retardation nothing more than "the purposeless and needless imposition of pain and suffering." Enmund v. Florida, 458 U.S. 782, 798 (1982) (quoting Coker v. Georgia, 433 U.S. 584, 592 (1977)).

## B. *ATKINS'* RATIONALE SHOULD PREVENT THE MENTALLY ILL FROM ELIGIBILITY FOR EXECUTION

10.     The mental illness of Travis Mullis has reduced his mental capacity in a way that is as profound (if not more so) than one who is impaired by retardation, and therefore, the rationale in Atkins is equally applicable to those individuals suffering from severe mental illness.

Many scholars, lawyers, and mental health experts have already noted this connection between mental retardation and mental illness. For example, Doctors Victor Scarano and Bryan Liang believe "Atkins opens the door for the same arguments to be brought forward in death penalty cases involving the mentally ill." Victor R. Scarano & Bryan A. Liang, Mental Retardation and Criminal Justice: *Atkins*, the Mentally Retarded, and Psychiatric Methods for the Criminal Defense Attorney, 4 HOUS. J. HEALTH L. & POL'Y 285, 310 (2004). After all, the mentally ill suffer from the same diminished

7

capacities, including the inability to control impulses, as those cited by the Court in Atkins. John H. Blume & Sherry L. Johnson, Killing the Non-Willing: *Atkins*, The Volitionally Incapacitated, and the Death Penalty, 55 S.C. L. REV. 93, 126-27 (2003); and Scarano & Liang, supra.

Likewise, Christopher Slobogin argues that "there may not be any plausible reasons for differentiating between the execution of people with mental illness and execution of people with mental retardation." Christopher Slobogin, What *Atkins* Could Mean For People With Mental Illness, 33 N.M.L. Review 293, 293 (2003). Slobogin takes this argument a step further, noting that the "the delusions, command hallucinations, and disoriented thought process[es] of those who are mentally ill represent greater dysfunction than that experienced by most 'mildly' retarded individuals (the only retarded people likely to commit crime)". Christopher Slobogin, Mental Illness and the Death Penalty, 1 Cal. Crim. L. Rev. 3 (2000), *available at* http://www.boalt.org/CCLR/v1/v1sloboginfr.htm. As a result of these similarities, imposing the death penalty on the mentally ill does not further the social goals of retribution and deterrence as is also violates the Eighth Amendment to the United States Constitution.

All offenders are culpable, but there are varying degrees of culpability. Our legal system, and our society, deal with these differences in culpability by meeting out different punishments for different individuals, ensuring that "only the most deserving of execution are put to death," Atkins, 536 U.S. at 319. As a result, the societal value of retribution "necessarily depends on the culpability of the offender, "Id.

8

572

In <u>Atkins</u>, the Supreme Court concluded that mentally retarded offenders are categorically lacking in moral blameworthiness because of their cognitive limitations and inability to control impulses. These characterizations of diminished culpability are also applicable to those who suffer from mental illness because the mentally ill exhibit disabilities in reason and impulse control. Blume & Johnson, <u>supra</u>, at 126-27. Indeed, "[f]or those with mental illness, the activities and vagaries of life are often difficult and may lead to unacceptable social behaviors, resulting in the commission of illegal acts." Scarano & Liang, <u>supra</u>, at 311. Therefore, a mentally ill person is not as mentally culpable as the average-minded murderer because of his dysfunction. And, as per the analysis in <u>Atkins</u>, if the mental culpability of an "average murderer" is insufficient to impose the death penalty, then such a punishment imposed on a less mentally culpable person is not merited, particularly when that person suffers from the same disabilities as the categorically-excluded mentally retarded offenders. <u>Atkins</u>, 536 U.S. at 319.

The issue of culpability of the mentally ill has also been addressed in the recent case of <u>Panetti v.Quarterman</u>[4], which involved "a different but related legal test"[5], the standard for competency to be executed. In this case, the Court stated that the execution of a severely mentally ill prisoner "serves no retributive purpose"[6] and thus violates the Eighth Amendment. As Winick summarizes, "in other words 'the objective of community vindication' by execution of a condemned prisoner whose 'mental state is so

---

[4] 127 S. Ct. 2842 (2007).

[5] Winick, B. J. (2008) The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, University of Miami School of Law, available at http://ssrn.com/abstract=1291781, page 48.

[6] <u>Panetti</u>, 127 S. Ct. at 2861 (citing <u>Ford v. Wainwright</u>, 477 U.S. 399, 408).

9

573

distorted by a mental illness' that he is prevented from recognizing the severity of his offense is 'called in question' since 'his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole'[7,8] Furthermore, the Court observed that "gross delusions stemming from severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose."[9] Thus "Panetti's language suggests that when such illness produces gross delusions or other cognitive effects, significantly distorting the offender's understanding and appreciation of his conduct and of its wrongfulness, capital punishment will serve no retributivist purpose, and therefore would be cruel and unusual."[10]

This conclusion is shown into even harsher relief when one analyses the offender in clinical terms. The mentally ill "may experience such distortions of reality that their ability to appreciate the wrongfulness of their conduct or to understand its consequences may be significantly reduced, such as when their psychosis causes them to mistakenly believe that their victims are attacking them or involves hallucinations commanding them to kill them. Similarly, their symptomatology may create such gross irrationality that it

---

[7] Ibid.

[8] Winick, B. J. (2008) The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, University of Miami School of Law, available at http://ssrn.com/abstract=1291781, page 48.

[9] Panetti at 2862.

[10] Winick, B. J. (2008) The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, University of Miami School of Law, available at http://ssrn.com/abstract=1291781, page 49.

10

significantly impairs their judgment at the time of the crime."[11] This has been recognized by the Texas courts, for example in Yates v. State, whereby Andrea Yates was found not guilty by reason of insanity for the bathtub drownings of her five young children. Ms Yates' delusional state was so severe that she believed that Satan was inside her and thus killed her children to try to save them from hell. In this case Ms Yates had reduced culpability and deterability as a result of her mental illness even though she understood her conduct to be illegal."[12]

Likewise, the execution of the mentally ill does not serve the societal goal of deterrence. The mentally ill are unlikely to control their behavior based upon the knowledge that the death penalty is a possible punishment for their behavior because they have "great difficulty in communicating with and understanding others, engaging in logical cost-benefit analysis, and evaluating the consequences of and controlling their behavior. Slobogin, What Atkins Could Mean For People With Mental Illness, supra, at 304. Therefore, much like adolescents, who are categorically exempt from the death penalty, persons with mental illness are not likely to make the "kind of cost-benefit analysis that attaches any weight to the possibility of execution." Thompson v. Okalahoma, 487 U.S.815, 837 (1988). Furthermore, "just as it is for mentally retarded offenders, the 'cold calculus' of cost and benefit is 'at the opposite end of the spectrum from behavior'" for offenders with mental illness. Atkins, 536 U.S. at 319-20 citing Gregg, 428 U.S. at 186 quoted in Blume & Johnson, supra, at 129. Thus, both logic and

---

[11] Ibid p. 52.

[12] Yates v. State, 171 S.W.3d 215 (Tex. App. Houston 1st Dist. 2005).

11

575

Supreme Court precedent dictate the conclusion that the death penalty cannot serve a deterrent purpose when applied to offenders with mental illness.

In Lockett v. Ohio, 438 U.S. 586, 605 (1978), the Supreme Court acknowledged the impossibility of creating a perfect procedure for imposing the death penalty. Nevertheless, the Court determined that mitigating circumstances, which may call for a less severe punishment, must be considered by the jury in order to satisfy the requirements of the Eighth and Fourteenth Amendments. In Atkins, the court considered the fact that "mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes," Atkins, 536 U.S. at 320-21.

Mentally ill offenders face similar obstacles. Severe mental illness, like significant cognitive impairments, sharply constricts a defendant's ability to "give meaningful assistance to counsel." Blume & Johnson, supra, at 130. Mentally ill offenders often do not trust counsel and therefore, refuse to help them prepare the case. Id. Likewise, the mentally ill offender is not helpful regarding facts of the crime. And, perhaps most importantly, mentally ill defendants are often unable to conform their conduct to the "requirements of courtroom decorum and procedure." Id. Thus, they are "typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." Atkins, 536 U.S. 304, 320-21 (2002) quoted in Blume & Johnson, supra, at 130. Furthermore, there is much stigma against the mentally ill as "values are largely shaped by often sensational media portrayals of mental illness and by

12

576

stereotypes and irrational prejudice against those with mental illness"[13]. This precludes seeing mental illnesses as medical illnesses, which are illnesses "producing effects that are symptoms of illness outside the individual's control, rather than being due to moral depravity."[14]

This is reflected in <u>Atkins</u>, which also illustrates that mental retardation as a mitigating fact may actually be used as an aggravating factor of future dangerousness, which may make the defendant more likely to receive a death sentence.  Mentally ill defendants face the exact same risks.  Mental illness, like youth and mental retardation, is universally considered a mitigating fact for sentencing.  Slobogin, <u>What Atkins Could Mean For People With Mental Illness</u>, supra, at 312.  "[I]mpaired intellectual functioning" is inherently mitigating and, therefore, meets the definition of 'constitutionally relevant' mitigating evidence.  <u>Tennard v. Dretke</u>, 124 S.Ct. 2562, 2569-72 (2004), cited in <u>Perry v. State</u>, 158 S.W.3d 438 (Tex. Crim. App. (2004).

However, similarly to mental retardation, mental illness may actually be used as an aggravating fact in order to show future dangerousness.  Slobogin, <u>What Atkins Could Mean For People With Mental Illness</u>, supra, at 313. For example, research shows that "despite the fact that offenders with serious disorders are not more likely to re-offend than the general offender population, the public tends to equate mental disorder with dangerousness." Christopher Slobogin, <u>Is *Atkins* the Antithesis or Apotheosis of Anti-Discrimination Principles?: Sorting out the Groupwide Effects of Exempting People with</u>

---

[13] Winick, B. J. (2008) The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, University of Miami School of Law, available at http://ssrn.com/abstract=1291781, page 60.

[14] Ibid.

Mental Retardation from the Death Penalty, 55 ALA. L. REV. 1101, 1107. In this way, mental illness can be a "two-edged sword," engendering greater fear of future violence. Atkins, 536 U.S. at 321, quoted in Blume & Johnson, supra, at 131. Indeed, "juries also may misunderstand clinical evidence concerning the offender's mental illness and its impact on his functioning at the time of the offense, may incorrectly equate mental illness with dangerousness, and may incorrectly think that the death penalty is the only way to protect the community from the defendant's future violence"[15]. This unfairly biases the jury during the penalty phase of a capital trial against a mentally ill defendant, making him more susceptible to receive the death penalty. This would directly contradict Eighth Amendment values against awarding disproportionate punishments to crimes committed. Consequently, since the Supreme Court has deemed this risk too great for the mentally retarded, then it must be as great for the mentally ill, who share numerous characteristics with the mentally retarded.

11.    A punishment is excessive and therefore prohibited by the Eighth Amendment if it is not graduated and proportioned to the offense. Weems v. United States, 217 U.S. 349, 367 (1910). A claim that punishment is excessive is judged by currently prevailing standards of decency. Trop v. Dulles, 356 U.S. 86, 100-101 (1958).   The proportionality review should be informed by objective factors to the maximum possible extent. Harmelin v. Michigan, 501 U.S. 957, 1000 (1991). Objective factors that were considered by the Supreme Court in Atkins include the "broader social and professional consensus" Atkins, 536 U.S. at 316 n.21. as indicated by briefs and positions of the American Psychological Association and positions of religious communities of all faiths. Also to be considered are the views of "respected

---

[15] Ibid p. 64.

14

**578**

professional organizations and other nations that share our Anglo-American heritage and by leading members of the Western European Community. Thompson v. Oklahoma, 487 U.S. at 830-831 cited in Atkins, 536 U.S. at 316 n.21.

The positions of those groups to whom the United States Supreme Court has mandated this Court to consider are:

a.   The American Psychological Association:  It has asked that each jurisdiction that imposes the death penalty to stop until current deficiencies such as death penalty prosecutions involving persons with serious mental illnesses are ameliorated.  See http://www.apa.org/pi/deathpenalty.html.

b.  The American Bar Association:  The ABA has called for a temporary moratorium of the death penalty "unless and until states could ensure the fair and impartial administration of the death penalty."  The ABA also opposes the execution of the mentally retarded and of juveniles in all circumstances.  See http://www.abanet.org/media/deathpenaltyqa.html.

c.  The American Psychiatric Association:  Opposes the imposition of the death penalty "if at the time of the offense, [the defendant] had a severe mental disorder or disability that specifically impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to their conduct, or (c) to conform their conduct to the requirements of the law."  See http://www.psych.org/edu/other_res/lib_archives/archives/200406.pdf.

d. The Western European Community and other members of the International Community.  For example, The European Union opposed the death penalty in all circumstances. See http://www.eurunion.org/legislat/DeathPenalty/deathpenhome.htm. It has been stated that "international human rights norms condemn the death penalty for defendants with severe mental illness"[16]. According to a Resolution adopted by the United Nations Commission on Human Rights, all countries that still maintain capital punishment are urged "[n]ot to impose the death penalty on a person suffering from any form of mental disorder...."[17] This is especially pertinent as the courts in both Atkins and Roper considered "as further evidence of contemporary standards *the general consensus in the law of other countries and in international human rights law* that

---

[16] Winick, B. J. (2008) The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, University of Miami School of Law, available at http://ssrn.com/abstract=1291781, page 35.

[17] United Nations Commission on Human Rights Res 2001/68, ¶ 4(e) (April 25, 2001).

15

579

rejected imposition of capital punishment for those with mental retardation and who were juveniles at the time of the offense"[18] (emphasis added).

In addition to these organizations, almost every mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and "all of those organization advocate either an outright ban on executing all mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented." Blume & Johnson, supra, at 121.

12.     The determination of what is "excessive" is made by viewing the standards of today, "not those at the time of the Bloody Assizes or when the Bill of Rights was adopted.  The basic concept underlying the 8th Amendment is nothing less than the dignity of man – The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."  Atkins 536 U.S. at 311.

13     Exempting the mentally ill from execution also is required by principles of equal protection: "Equal protection requires that like cases be considered alike, and to the extent that severe mental illness imposes parallel deficits in culpability and deterability as mental retardation and juvenile status, offenders suffering these effects also should be exempt from capital punishment."[19]

14.     The execution of one who is mentally ill violates the dignity of man generally and this Court, specifically.  The execution of one whose personal culpability is diminished by

---

[18] Winick, B. J. (2008) The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, University of Miami School of Law, available at http://ssrn.com/abstract=1291781, page 34.

[19] Winick, B. J. (2008) The Supreme Court's Emerging Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier, University of Miami School of Law, available at http://ssrn.com/abstract=1291781, page 38.

16

mental illness is just as excessive and offensive as executing one whose personal culpability is reduced by mental retardation.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that this Court preclude the death penalty as a sentencing option in this case.

Dated: January 6, 2011

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000 (office)
713-869-9912 (fax)

**GERALD E. BOURQUE**
SBN.02716500
24 Waterway Ave., Suite 660
The Woodlands, Texas 77380
(713) 862-7766 (office)
(832) 813-0321 (fax)

*Counsel to Defendant Travis Mullis*

17

581

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 6th day of January 2011.

Robert K. Loper

18

582

## CAUSE NO. 08-CR-0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | } | **IN THE DISTRICT COURT OF** |
| | } | |
| vs. | } | **GALVESTON COUNTY, TEXAS** |
| | } | |
| TRAVIS MULLIS | } | **122nd JUDICIAL DISTRICT** |

### ORDER

On this, the ____ day of _____ 2011, came on to be heard the Defendant Travis Mullis' Motion to Preclude the Death Penalty as a Sentencing Option due to Mr. Mullis' longstanding Bipolar I Disorder, ADHD and PTSD. The Court has reviewed this motion and considered the arguments of the parties and is of the opinion that it should, in all things, be granted. It is therefore

ORDERED that the State not seek the death penalty as a sentencing option in this case due to Mr. Mullis' longstanding mental illness because it has reduced his capacity and diminished his personal culpability such that exposing him to execution would violate the Eighth Amendment's prohibition on the infliction of cruel and unusual punishment.

_____
**Hon. John Ellisor**
**122nd Judicial District Court**

19

583

PRECEPT TO SERVE JURY POOL-SELECTION LIST

CAUSE NO. 08CR0333 – 122ND

THE STATE OF TEXAS

VS.

TRAVIS JAMES MULLIS

JASON E. MURRAY
CLERK DISTRICT COURT
FILED
10:09AM
JAN 07 2011
GALVESTON COUNTY, TEXAS
BY_____
DEPUTY

TO THE SHERIFF OF GALVESTON COUNTY, SAID STATE, GREETING:

YOU ARE HEREBY COMMANDED to forthwith deliver to TRAVIS JAMES MULLIS, a prisoner in your custody, the accompanying Copy of JURY POOL SELECTION LIST.

HEREIN FAIL NOT, and due return make hereof, without delay.

WITNESS my signature and seal of office, on this the 20TH day of December, A. D., 2010.

ATTEST:

LATONIA D. WILSON, Clerk,
District Court, Galveston County, Texas

By _R. Lopez_____, Deputy
R. LOPEZ

================================================================
SHERIFF'S RETURN

Came to hand on the 20 day of December, A. D., 2010, at 4:18 o'clock P. M., and executed on the same day, by delivering to the within named TRAVIS JAMES MULLIS, a prisoner in my custody, in person, a copy of JURY POOL SELECTION LIST mentioned within, and delivered to me with this writ.

Returned on the 23 day of December, A. D., 2010.

FREDDIE POOR
SHERIFF, GALVESTON COUNTY, TEXAS

BY _B. Pham_____, DEPUTY

_____
DEFENDANT

584

**CAUSE NO. 08-CR-0333**

| | | |
|---|---|---|
| THE STATE OF TEXAS | } | IN THE DISTRICT COURT |
| | } | |
| vs. | } | GALVESTON COUNTY, TEXAS |
| | } | |
| TRAVIS MULLIS | } | 122nd JUDICIAL DISTRICT |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE
### PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY CONCERNING
### FUTURE DANGEROUSNESS

Pursuant to the 5th, 6th, 8th, and 14th Amendments to the United States Constitution, Art.

I, §§ 10, 13, 15, and 19 of the Texas Constitution, Tex.C. Crim. P. 28.01 and Tex. R. Evid. 401,

403, 702, 703 and 705, Defendant requests that this Court exclude all psychiatric or

psychological expert opinion testimony offered by the State as to the probability that Defendant

will commit future "criminal acts of violence that would constitute a continuing threat to society"

under Tex. C. Crim. P. Art. 37.071 § (2)(b)(1)(Vernon Supp. 2001). Travis Mullis respectfully

submits that such testimony does not meet the requirements of Tex. R. Evid. 702 nor Tex. R.

Evid. 403.

1

585

## INTRODUCTION

For expert testimony to be admitted as evidence under Tex.R.Evid. 702, the trial court must determine whether such testimony is reliable and relevant. Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 720 (Tex. 1998). The trial court functions in a "gatekeeping role" for the admission of such evidence; the reliability of expert testimony is a question of admissibility, not of weight. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). See Kuhmo Tire Co. v. Carmichael, 526 U.S. 137 (1999); Kelly v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992); E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549 (Tex. 1995); Nenno v. State, 970 S.W.2d 549 (Tex. Crim. App. 1998). The proponent of expert testimony bears the strict burden of proving both the reliability and relevance of such testimony before it may be admitted into evidence. Robinson, 923 S.W. 2d at 557.

Additionally, expert testimony deemed reliable and relevant is still subject to Tex. R. Evid. 403. Such testimony must be excluded if "its probative value is substantially outweighed by the danger of prejudice, confusion of the issues, or misleading the jury, by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403.

In the penalty phase of a capital trial, the court must evaluate psychiatric or psychological testimony that predicts a defendant's continuing threat to society under Art. 37.071 § (2)(b)(1), or "future dangerousness," using these reliability, relevance, and prejudice considerations. Nenno, 970 S.W.2d 549 (performing a reliability, relevance, and prejudice inquiry for psychiatric testimony in penalty phase of capital murder trial); Joiner v. State, 825 S.W.2d 701 (Tex. Crim. App. 1992) (same). The gross impropriety and inadmissibility of psychiatric and psychological predictions of future dangerousness is clear when such predictions

2

586

are evaluated for reliability, relevance, and prejudice, The admission of testimony that incorporates these predictions violates the rules of evidence, the constitutional rights of the accused, and the common law.

## ARGUMENT

**I.    PSYCHIATRIC OR PSYCHOLOGICAL PREDICTIONS OF A DEFENDANT'S FUTURE DANGEROUSNESS ARE UNRELIABLE, AND MUST BE EXCLUDED UNDER TEX. R. EVID. 702.**

The reliability of expert testimony rests on a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and may properly be applied to the facts in issue. Daubert, 509 U.S. at 593-94. A preliminary assessment of reliability is guided by (a) the validity of the underlying scientific theory (b) the validity of the technique applying the theory and (c) the proper application of the technique on the occasion in question. Kelly, 824 S.W.2d at 573; Nenno, 970 S.W.2d at 561. Questions of validity and proper application are to be guided by certain factors, which include, but are not limited to:

(a) The qualifications, experience, and skill of the person testifying;

(b) The extent to which the reasoning or methodology can be and has been tested;

(c) The extent to which the reasoning or methodology relies upon the subjective interpretation of the person testifying;

(d) Whether the reasoning or methodology has been subjected to peer review and/or publication, and whether the theory or technique has been rejected in such literature;

(e) The availability of other experts to test and evaluate the technique;

3

587

(f) The potential or known rate of error of the reasoning or methodology;

(g) Whether the reasoning or methodology has been generally accepted as valid by the relevant scientific community;

(h) The non-judicial uses which have been made of the reasoning or methodology;

(i) The clarity with which the underlying theory and technique can be explained to the court.

Daubert, 509 U.S. at 593; Kelly, 824 S.W.2d at 573; Robinson, 923 S.W. 2d at 557.

The above-listed factors [Daubert/Kelly/Robinson factors] are germane to evaluating the reliability of both scientific and non-scientific expert testimony, "[w]hether the expert would opine on economic valuation, advertising psychology, or engineering...." Gammill, 972 S.W.2d at 725. See also Moore v. Ashland Chemical, Inc. 151 F.3d 269 (5th Cir. 1998) (holding that clinical medical expert's testimony was not admissible because it did not fulfill the Daubert factors); Perez v. State, 25 S.W.3d 830 (Tex. App.- Houston [1st Dist.] 2000) (applying Daubert analysis to non-scientific expert); American Tourmaline Fields v. International Paper Co., No. CIV.A.3:96CV3363D, 1999 WL 242690 at *4 (N.D. Tex. April 19, 1999)(same). As such, the above listed principles govern the admissibility of psychiatric and psychological testimony, which is based on a combination of training, experience, and scientific inquiry. Nenno, 970 S.W.2d at 560-62. See also Muhammad v. State, 46 S.W.3d 493, 506-507 (Tex. App. – El Paso [8th Dist.] 2001) (using the Kelly factors to determine whether psychological evidence should be admitted); Green v. State, 55 S.W.3d 633, 639-41 (Tex. App. – Tyler [12th Dist.] 2001)(same). In evaluating "fields of study aside from the hard sciences," courts should tailor the above analysis

4

588

to examine closely the data collection procedures, such as personal interviews, document review, or statistical analysis, conducted by the witness in question. Nenno, 970 S.W.2d at 562.

### A. The Proponent of the Expert Testimony Bears the Burden of Proving the Reliability of the Expert's Testimony.

The proponent of psychiatric or psychological predictions of a defendant's future dangerousness bears the burden of proving the reliability of such predictions. Robinson, 923 S.W. 2d at 557. The reliability of such predictions must be proven by the proponent in each individual case. Coble v. State, , ___ S.W. 3d ___ (Tex. Crim. App. Oct. 13, 2010). In order to satisfy this burden the proponent must demonstrate his experience and skill in a sub-specialty of forensic psychology or psychiatry that addresses the prediction of future dangerousness of criminal defendants in capital cases. A general degree in psychiatry or psychology is not sufficient to establish expertise in the predictions of future dangerousness in capital cases. See Broders v. Heise, 924 S.W.2d 148, 153 (Tex. 1996)(holding that a testifying expert must have expertise on the very matter about which he is to give an opinion and that a medical degree is not sufficient to establish this expertise). The proffered expert also bears the burden of proving his skill in predicting the future dangerousness of criminals. Experience testifying as an expert witness on the issue at hand is not sufficient to establish reliability. In fact, absent a showing of the reliability of the proffered testimony, the Texas Supreme Court has squarely rejected the testimony of those who have had long histories of testifying by noting that "'the only review the plaintiffs' experts' work has received has been by judges and juries, and the only place their theories and studies have been published is in the pages of the federal and state reporters.'" Merrell Dow Pharmaceuticals v. Havner, 953 S.W.2d 706, 726 (Tex. 1997)(quoting Daubert v. Merrell Dow Pharamceuticals, Inc., 43 F.3d 1311, 1318 (9th Cir. 1995)). Furthermore,

5

589

experience in the field is not sufficient to establish expertise if such experience is not skillful. See Sosa v. State, 841 S.W.2d 912, 916 (Tex. App. - Houston [1st Dist.] 1992) (rejecting testimony of proffered "graphonalaysis" expert who had been a graphoanalyst for fifteen years and had reviewed thousands of handwriting samples because testimony otherwise not proved reliable).

In order to demonstrate this skill, the expert should be asked to proffer specific publications on the reliability and acceptability of the methodologies employed in predicting future dangerousness. See Castellow v. Chevron, 97 F.Supp.2d 780, 794-95 (S.D. Tex. 2000)(rejecting experts' testimony who did not point to medical or scientific literature supporting their conclusions); Green, 55 S.W.3d at 640 (rejecting expert's testimony who did not provide the trial court with any actual authorities and authorities supporting his analysis); American Tourmaline Fields, 1999 WL 242690 at *3 (rejecting testimony of proffered expert who has not provided court with copies of articles upon which he purported to rely and could not recall the name or citation for any articles that have discussed his technique).

Further, the methodologies that the proffered expert employs in predicting future dangerousness must be consistent with the methodologies and principles of predicting future dangerousness that are detailed in those publications the expert brings to the court's attention. See Green, 55 S.W.3d at 640 (rejecting expert's testimony when expert did not indicate that he had followed the methodologies of the "authorities" that he cited); Bennett v. PRC Public Sector, Inc., 931 F.Supp. 484, 494 (S.D. Tex. 1996) (rejecting expert's testimony noting that the methodology he employed was not consistent with the methodologies described by experts and literature in the field that he had named).

6

590

**B.**   **The State Cannot Meet Its Burden of Proving the Reliability of Psychiatric or Psychological Predictions of a Defendant's Future Dangerousness.**

Psychiatric or psychological predictions of a defendant's future dangerousness fail many of the foregoing Daubert/Kelly/Robinson factors for evaluating the reliability of expert testimony. The state's proffered expert is unable to produce adequate authority supporting his opinions as scientific knowledge, nor has any other expert ever done so: "On the basis of any evidence thus far presented to a court, it appears that the use of psychiatric evidence to predict a murderer's 'future dangerousness' fails all five Daubert factors." Flores v. Johnson, 210 F.3d 456, 464 (Garza, J., specially concurring) (2000).

**(1)   Psychiatric or Psychological Predictions of a Defendant's Future Dangerousness Are Not Reliable Because They Are Strictly Subjective.**

Psychiatric or psychological predictions of a defendant's future dangerousness, particularly ad-hoc determinations based on hypothetical fact patterns prepared and presented by the State, are unreliable because they are "simply subjective testimony without any scientific validity." Id. at 458. Each psychiatric or psychological prediction of future dangerousness is determined in a different manner. There is no established and consistent methodology applied or required for psychiatric or psychological analyses of future dangerousness, and "standards controlling the operation of the technique are nonexistent." Id at 465-66. See also Kenneth B. Dekleva, Psychiatric Expertise in the Sentencing Phase of Capital Murder Cases, 29 J. Am. Acad. Psych. & L. 58, 60 (2001) ("'specific'... guidelines for making dangerousness predictions in forensic populations do not currently exist.").

An ad-hoc determination of dangerousness is not externally verifiable by other experts. There has been no "testing" of the methodologies used in the predictions of each expert. The

7

factors an expert uses in determining dangerousness are not weighted and do not correspond to any graded scale of factors that would contribute to or predict dangerousness. Other experts looking at the same data are unable to determine whether the testifying expert's particular weighting of such factors is accurate. Thus, peer review of predictions of future dangerousness is rare, and "peer review of making such predictions has been uniformly negative." Flores, 210 F.3d at 465-66 (Garza, J., specially concurring) (citing G. Morris, Defining Dangerousness: Risking a Dangerousness Definition, 10 J. Contemp. Legal Issues 61, 85-86 (1999)). See also, William M. Grove & Paul E. Meehl, Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures: The Clinical-Statistical Controversy, 2 Psych. Pub. Pol'y & L. 293, 320 (1996) (noting that clinical experiences cannot resolve disputes among psychologists because each can appeal to his own unique clinical experiences which lack an objective referent). Testimony such as this that is "subjective and 'not readily re-produceable [sic]'" by others in the field should not be admissible. Green, 55 S.W.3d at 638.

Key terms and concepts of the witness' testimony are amorphous and inexact. The scope of dangerousness and the length of time at issue are not defined. Concepts such as "conscience," "malice," and "evil," upon which determinations of dangerousness rely, are not adequately defined by the testifying witness. The imprecise nature of the methodology disqualifies it for admission in a capital proceeding; "[s]uch testimony lacking objective scientific testing or personal examination defies scientific rigor and cannot be described as expert testimony. It is simply subjective testimony without any scientific validity by one who holds a medical degree." Flores, 210 F.3d at 458 (Garza, J., specially concurring).

8

592

The foregoing features of subjectivity in psychiatric or psychological predictions of a defendant's future dangerousness are precisely the "subjective interpretation[s] of the expert" that the Texas Supreme Court warned against in Robinson, 923 S.W. 2d at 557. This subjectivity makes such predictions unreliable and inadmissible under Tex. R. Evid. 702.

> (2)   **Psychiatric or Psychological Predictions of a Defendant's Future Dangerousness Are Not Reliable Because They Are Subject to an Overwhelming Rate of Error.**

In Coble, before finding that admission of a prediction of future dangerousness was an error, the Court of Criminal Appeals asked: "have the predictions . . . been verified as accurate over time?" Coble v State, _ _ _ S.W. 3d _ _ _ at *55. The answer is no. It is generally accepted by the scientific community that psychiatrists and psychologists are more often incorrect in their assessments of future dangerousness than they are correct. The American Psychiatric Association [APA], has consistently maintained that "[t]he unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession." Barefoot v. Estelle, 463 U.S. 880, 920 (1983) (Blackmun, J., dissenting) (quoting Brief Amicus Curiae for the American Psychiatric Association, Barefoot v. Estelle, 463 U.S. 880 (1983) (No. 82-6080) [hereinafter APA Brief]. See also Flores v. Johnson, 210 F.3d 456, 463 (5th Cir. 2000) (Garza, J., specially concurring) (noting that the scientific community's rejection of the reliability of predictions of future dangerousness is "as true today as it was in 1983.") Predictions that a person will be dangerous in the future are wrong two out of three times. Barefoot, 463 U.S. at 920 (citing APA Brief at 9, 13); J. Monahan, The Clinical Prediction of Violent Behavior 47-49 (1981); C. Slobogin, Dangerousness and Expertise, 133 U. Pa. L. Rev. 97, 111-17 (1984) (citing results of the major studies: Baxstrom study: 20% accuracy; Thornberry Study: 20% accuracy;

9

593

New York study: 14% accuracy: Kozol study: 34.7% accuracy; Paxtuxent study: 41.3% accuracy; Wenk study: 8% accuracy). As such, a jury member could more accurately predict dangerousness by flipping a coin rather than relying on an expert psychologist or psychiatrist's testimony. Because the conclusions drawn from ad-hoc psychiatric or psychological predictions of future dangerousness are more often wrong than right, the amorphous and undefined methodologies they employ should be deemed unreliable. See General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (holding that "conclusions and methodology are not entirely distinct from one another" and that erroneous conclusions may indicate a faulty underlying methodology).

Several studies have been conducted on the prison conduct of former death row inmates in Texas. One study by Marquart, Ekland-Olson, and Sorensen (1989) examined the accuracy of jurors' determinations of future dangerousness by comparing the institutional behavior of 92 former death row inmates who had their sentences commuted or reversed with a control group of 107 capital murderers sentenced to life imprisonment. In the case of the former group, juries had determined there was a probability of future dangerousness whereas in the case of the latter group the juries had determined the group to not constitute such a risk. Moreover, these groups were compared to the entire Texas state prison population in 1986 and a population of inmates housed in a single high-security prison. Overall, the former death row inmates' total rate of assaultive institutional misconduct in the general population was lower than the rates for the comparison groups. More specifically, the rate of violent prison rule violations was 1/5 and 1/10 the rate of the general population and a non-capital, high-security prison comparison sample, respectively. The annual base rates of violent rule infractions (were 1.6 for commutees, 2.6 for

10

594

life-sentenced murderers, 11.7 for the general population, and 19.3 for the high-security prison population.

Marquart and Sorensen (1989) followed a national sample of 558 Furman commuted inmates from 30 jurisdictions over a 15-year period. In total, 6 murders and 59 serious acts of violence were perpetrated in the prisons by the former death row inmates after they had been commuted and were no longer on death row. With respect to the serious rule violations, a small group (7.4%) of chronic offenders committed more than half of the total number of infractions. Of the 30% who committed any institutional infractions, half committed only one infraction over the 15-year period, and many served out their sentences without incident. These rates are comparable to those reported by Marquart, Elkland-Olson, and Sorensen (1994) on the 421 death row inmates who passed through death row in Texas between 1974 and 1988. Specifically, 63 assaultive acts-including 37 involving a weapon on other inmates and 24 involving a weapon on guards- were committed by just over 10% of the inmates (n=45).

Reidy, Cunningham, and Sorensen (2001) summarized the extant research on the incidence of violent prison misconduct in the general prison population of former death row inmates. Over varying follow-up periods (ranging from 2 to 53 years) across several jurisdictions, the rates of assault in the institution by death row, former death row, capital life, LWOP, and LWP inmates were relatively low, ranging from 0% to 31%. Aside from their literature review, Reidy et al. (2001) also reported a cumulative institutional violence rate at 35.9%, of which 20.5% occurred in the general population, in a sample of 39 former death row inmates in Indiana over an average of 16 years. Although indicating a rate somewhat higher than

11

595

prior studies, of the 24 violent acts (committed by a total of 14 different inmates), only 7 were judged to be "serious."

Even the more generous studies, done under the most controlled settings, indicate that predictions of future dangerousness will be accurate only one-half of the time. As such, these predictions are no better than chance determinations of who will be dangerous in the future. Randy Otto, On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature, 18 Law & Psych. Rev. 43, 64 & n.65 (1994); See also Melvin Goldzband, Dangerousness: A Mutating Concept Passes Through the Literature, 26 J. Am Acad. Psych. & L. 649, 651 (1998)(noting that predictions of dangerousness are increasingly demanded by courts but because of their unreliability such predictions are "inherently fruitless" and "possibly dangerous."); George B. Palermo, et al. On the Predictability of Violent Behavior, 36 J. Forensic Sci. 1435, 1442 (1991) (noting that supportive scientific studies for the accuracy of long-term predictions of violence are lacking); David Freedman, Flase Prediction of Future Dangerousness: Error Rates and the Psychopathy Checklist-Revised, 29 J. Am. Acad. Psych. & L. 89, 92 (2001)("The prediction of complex behaviors such as violence remains exceedingly difficult and uncertain, and the plethora of new instruments fails to reach a scientifically reliable or valid standard of performance to be used to make decisions about a person's life or liberty in any setting.").

The reliability of psychiatric and psychological predictions of future dangerousness is tenuous when one considers how Texas courts have treated the admissibility of polygraph evidence. The Texas Court of Criminal Appeals has erected a "policy-based barrier to the admission of the existence and results of polygraph tests." Reed v. State, 48 S.W.3d 856, 860-61

12

596

(Tex. App. – Texarkana [6[th] Dist.] 2001). The court has held polygraph testimony categorically inadmissible "because it is not objective, but rather subjective, unreliable, and unduly persuasive." Reed, 48 S.W.3d at 863. The polygraph technique accurately predicts truth or deception "between seventy and ninety percent of the time." United States v. Posada, 57 F.3d 428, 434 (5th Cir. 1995). The most favorable estimates of the accuracy of future dangerousness predictions indicate that they are correct merely fifty percent of the time. Psychiatric and psychological predictions of future dangerousness, which are both less reliable and more subjective than polygraph tests, should similarly be deemed inadmissible.

Research and literature that may indicate a more accurate prediction rate of future dangerousness is based on methods of prediction that are very different from those used in capital trials. More accurate prediction rates are garnered from studies in which clinicians have the opportunity to observe behavior in a mental health facility over an extended period of time. The procedure used in this trial instead has been an ad-hoc determination of dangerousness based upon a hypothetical scenario provided by the State. A report prepared by Texas Defender Service in 2004 examined the incidents of violence of 155 Texas state inmates who a psychiatrist had said would be a future danger. The report found that the mental health "experts" were wrong an astonishing 95% of the time. Texas Defender Service, "Deadly Speculation — Misleading Texas Capital Juries with False Predictions of Future Dangerousness", (2004).

The United States Supreme Court has cautioned against the reliability of methodologies with high rates of error. Daubert, 509 U.S. at 593. The error rate for psychiatric or psychological predictions of a defendant's future dangerousness makes it patent that such predictions are unreliable.

13

597

(2) **Psychiatric or Psychological Predictions of a Defendant's Future Dangerousness Are Not Reliable, As Evidenced by Lack of General Acceptance in the Relevant Scientific Community.**

The American Psychiatric Association [APA] has insisted that psychiatrists are not qualified to make determinations of long-term future dangerousness and has consistently urged that expert psychiatric expert testimony on future dangerousness be deemed inadmissible. The APA has urged that "[a]bsent an in-depth psychiatric examination and evaluation, the psychiatrist cannot exclude alternative diagnoses; nor can he assure that the necessary criteria for making the diagnosis in question are met. As a result, he is unable to render a medical opinion with a reasonable degree of certainty." Flores, 210 F.3d at 467 (Garza, J., specially concurring) (quoting APA Brief). "The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness, is to put it bluntly, unreliable and unscientific." Id. at 463. As an indication of the strength of the scientific community's rejection of this sort of ad-hoc psychiatric and psychological determinations, the APA expelled Dr. James Grigson because he consistently testified as to a defendant's future dangerousness without personal examination. Bruce Vincent, A Dearth of Work for 'Doctor Death': the Once Ubiquitous James Grigson Now Finds Little Demand for his Testimony in Texas Capital Murder Sentencings, Texas Lawyer, Dec. 4, 1995, at 4.

A testifying expert cannot establish that his methodologies are accepted in the relevant scientific community through "mere assurances as to the accuracy of his own methods and results, in the absence of other credible supporting evidence." Castellow, 97 F.Supp.2d at 792 (citations omitted). See Robinson, 923 S.W.2d at 559 (holding that an expert's "self-serving statements that his methodology was generally accepted and reasonably relied upon by other

14

598

experts in the field are not sufficient to establish the reliability of the technique and theory underlying his opinion."). Thus, the proffered expert's assertion that the scientific community accepts his methodologies is not sufficient in light of the overwhelming rejection of this testimony by the scientific community. As the Court of Criminal Appeals wrote, there must be "objective source material in [the] record to substantiate [the witness's] methodology as one that is appropriate in the practice of forensic psychiatry." Coble, __ __ at *52. The state cannot produce such material to satisfy their burden. The lack of general acceptance indicates that the proffered predictions are not reliable, scientific knowledge and cannot be admitted under Tex. R. Evid. 702.

### (3) Psychiatric or Psychological Predictions of a Defendant's Future Dangerousness Are Not Reliable, As Evidenced by Lack of Use Outside a Judicial Context.

The Texas Supreme Court has asked of experts whether the methodology or study they employ "was prepared only for litigation" and whether it has "been used or relied upon outside the courtroom." Havner, 953 S.W.2d at 726. The expert testimony in this case is decidedly prepared only in the context of litigation and, given its lack of acceptance within the scientific community, would never be relied upon outside of the courtroom. While determinations of future dangerousness are used in involuntary civil commitment of individuals, psychotherapists' liability for their patients' actions, and post-jail detention of sexual predators, there is no non-judicial context for their use. Furthermore, the predictions of future dangerousness in these contexts are predictions of dangerousness in the short term, whereas future dangerousness predictions in capital cases are predictions of behavior in the long term. There is no procedure in Texas for reevaluating determinations of future dangerousness during the span of the defendant's

15

599

sentence. Thus, the prediction of future dangerousness may concern behavior that extends for decades into the future. Even if short-term predictions may be made with some degree of accuracy, long-term predictions cannot be made accurately or reliably. See Grant H. Morris, Defining Dangerousness: Risking a Dangerous Definintion 10 J.Contemp. L. Issues 61, 78 (1999); Douglas Mossman, Dangerous Decisions: An Essay on the Mathematics of Involuntary Hospitalization 2 U. Chi. L. School Round Table 95, 97 (1995). As the Texas Supreme Court noted in Robinson, the lack of any non-judicial use for proffered expert opinions—like predictions of future dangerousness—indicates that such opinions are unreliable. See 923 S.W.2d at 557.

> ### (4) Ad-Hoc Psychiatric or Psychological Predictions of a Defendant's Future Dangerousness Are Not Reliable Because They Are Not Based on a Reliable Data Source.

As an essential component of assessing the reliability of the proffered testimony, "the underlying data should be independently evaluated in determining if the opinion itself is reliable." Havner, 953 S.W.2d at 713. The data set upon which the testifying expert here rests is not reliable and the expert's opinion should therefore not be admissible. The data set upon which the testifying expert relies has been prepared by the prosecution, and the testifying witness has not verified the data provided. The Court of Criminal Appeals found that the trial judge had abused his discretion where he admitted a prediction of future dangerousness that "relied entirely upon the documentary materials given to [the witness] by the prosecution." Coble, ___ ___ at *57. The proffered prediction in this case has the same flaw. Furthermore, the data upon which this determination is based have not been compiled objectively, and the data have been specifically compiled to prove dangerousness. Compilation of data in this manner has been held to "give

16

600

rise[] to a 'common-sense skepticism' regarding the expert's evaluation" which has proved fatal to the reliability of such testimony. Munoz v. Orr, 200 F.3d 291, 301 (5th Circ. 2000)(citations omitted). See also Castellow, 97 F.Supp.2d at 797 (rejecting reliability of proffered expert noting that the "detailed investigation" upon which the witness relied was prepared by Plaintiff's investigator); Green, 55 S.W.3d at 638 (rejecting reliability of proffered expert noting that witness had not independently investigated data provided him).

Ad-hoc determinations based on a hypothetical fact pattern prepared and presented by the State are unreliable because they do not incorporate any personal interviewing, investigation, or background examination. Testimony which relies only on a hypothetical provided by the State decidedly lacks any of the investigation, examination, or interviewing that courts have stipulated as the bedrock of a testifying mental health professional and proper clinical opinion provider. Testifying experts "whose convictions about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests [may] properly be viewed by the district court as lacking the objectivity" that is required to assure the reliability of the testimony. Castellow, 97 F.Supp.2d at 792 (quoting Claar v. Burlington Northern Railway Co., 29 F.3d 499, 503 (9th Cir.1994)).

The Texas Criminal Court of Appeals has acknowledged "the pivotal role that psychiatry has come to play in criminal proceedings" and has characterized that role as one in which "psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury." Jackson v. State, 992 S.W.2d 469, 473 (Tex. Crim. App. 1999) (quoting Ake v. Oklahoma, 470 U.S. 68, 79 (1985)). The Supreme Court in Ake v. Oklahoma stipulated that a "competent psychiatrist" is one "who will conduct an appropriate

17

601

examination." Ake, 470 U.S. at 83. Finally, the Texas Court of Criminal Appeals has held that psychiatrists assist the jury by "laying out their investigative and analytic process to the jury." Jackson, 992 S.W.2d at 473. It is thus clearly recognized that an essential role of a mental health professional in court is to conduct an "investigative process" which includes examinations and interviews of the defendant.

The lack of investigation makes this method particularly unreliable because, without more information the testifying expert is unable to rule out other diagnoses and hypotheses with regard to the defendant. See Paul S. Appelbaum, Hypotheticals, Psychiatric Testimony, and the Death Sentence, 12 Bull. Am. Acad. Psych. & L. 169 (1984). The expert is unable to ascertain all the facts that might make these alternate hypotheses or diagnoses more plausible for the defendant's situation. See Mata v. State, 46 S.W.3d 902, 915 (Tex. Crim. App. 2001)(rejecting expert's testimony that did not take into account facts that the court found salient to the analysis). An expert's inability or failure to rule out other hypotheses for the question at issue has proved fatal to the reliability of his proffered testimony. See Bennett v. PRC Public Sector, Inc., 931 F. Supp. 484, 492 (S.D. Tex. 1996) (limited fact collection impeded expert's ability to rule out other causes of Plaintiff's injury and indicated that expert's testimony was unreliable).

For the reasons articulated above, psychiatric or psychological predictions of future dangerousness are not reliable. Any expert testimony incorporating such predictions is inadmissible under Tex. R. Evid. 702.

**II.     PSYCHIATRIC OR PSYCHOLOGICAL PREDICTIONS OF A DEFENDANT'S FUTURE DANGEROUSNESS ARE IRRELEVANT, AND MUST BE EXCLUDED UNDER TX. R. EVID. 402 AND 702.**

602

Even if found to be reliable, expert testimony must be shown to be relevant to a factual issue in question. In determining relevance, expert testimony should be admitted only when it will aid the jury in making inferences regarding fact issues more effectively. United Blood Servs. v. Longoria, 938 S.W.2d 29, 30 (Tex. 1997) (affirming trial court's exclusion of expert testimony on blood-banking procedure and industry); Glasscock v. Income Prop. Servs., 888 S.W.2d 176, 180 (Tex. App.-Houston [1st Dist.] 1994) (reversing trial court exclusion of expert testimony regarding security procedures in commercial office buildings because not an area of expertise within knowledge of reasonable juror). Psychiatric and psychological predictions of future dangerousness do not aid the jury in determining questions of fact, and are therefore inadmissible due to irrelevance under Tex. R. Evid. 702.

When the jury is equally competent to form an opinion regarding ultimate fact issues, the expert's testimony as to these issues should be excluded. K-Mart Corp. v. Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000) ("That a witness has knowledge, skill, expertise, or training does not necessarily mean that the witness can assist the trier-of-fact."); Williams v. State, 895 S.W.2d 363, 366 (Tex. Crim. App. 1994) (same). If a purported expert testifies to an analysis based on factors that an average layperson juror would generally be aware of and utilize absent the expert testimony, such testimony is irrelevant. Douglas v. State, No. 01-98-01151-CR, 2001 WL 1048533, at *7 (Tex. App.-Houston [1st Dist.] Aug. 31, 2001) (affirming exclusion of expert testimony regarding the voluntariness of defendant's confession). Testimony that might be "of some benefit" to the jury is not admissible unless the jury would not be qualified to answer the question without the benefit of the expert's specialized knowledge. Speer v. State, 890 S.W.2d

19

603

87, 96-97 (Tex. App. - Houston [1st Dist.] 1994) (affirming exclusion of expert testimony regarding defendant's "dependent personality disorder").

Psychiatric predictions of future dangerousness are not offered in every capital case. There are many instances in which juries decide the special question of future dangerousness without consideration of psychiatric testimony. See, e.g., Jasper v. State, No. 73,817, 2001 WL 1504674, at *1-2 (Tex. Crim. App. Nov. 28, 2001) (affirming jury finding of future dangerousness based on facts of crime, evidence of escalating criminal activity, and lack of remorse); Conner v. State, No. 73,591, 2001 WL 1043248, at *4 (Tex. Crim. App. Sep 12, 2001) (affirming jury finding of future dangerousness based on defendant's prior criminal history); Trevino v. State, 991 S.W.2d 849, 854 (Tex. Crim. App. 1999) (same); Salazar v. State, 38 S.W.2d 141, 146 (Tex. Crim. App. 2001) (affirming jury finding of future dangerousness based on facts of offense alone). As such, it is clear that jurors are qualified to answer the future dangerousness question, and unreliable psychiatric testimony regarding the same point must be excluded.

In cases where the State offers psychiatric expert testimony regarding future dangerousness, as described in Section IA, above, predictions are ad-hoc determinations solicited by a hypothetical fact pattern presented orally to the witness by the State. This hypothetical fact pattern is generally limited to the facts of the specific crime for which the defendant has been convicted, although occasionally incorporates supplemental evidence, such as extraneous offenses, uncharged prior misconduct, and limited character evidence. As described above in Section IA(v), the proffered "expert" rarely has interviewed or investigated the defendant personally. The factors used in constructing the hypothetical are sufficient, independent of any

psychiatric or psychological analysis, to form the basis of a jury determination. Jasper, 2001 WL 1502674 at *1-2; Conner, 2001 WL1043248 at *4; Trevino, 991 S.W.2d at 854; Salazar, 38 S.W.2d at 146.

Further, a psychiatric or psychological "spin" or interpretation of these same facts is unreliable, as described in Section I. Because psychiatric and psychological predictions of dangerousness have been shown to be grossly unreliable, they have no relevance to a jury's determination of the factual question. Unreliable information cannot be considered helpful, and therefore relevant, to a jury. See Morales v. State, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000) ("Naturally, testimony which is unreliable or irrelevant would not assist a juror in understanding the evidence or determining a fact in issue as is required by Rule 702."); Griffith v. State, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998) ("Evidence that is not reliable is not helpful to the jury because it frustrates rather than promotes intelligent evaluation of the facts."); Bennett, 931 F.Supp. at 500 (finding testimony unreliable where "completely lacks specificity" and "borders on sheer speculation," and therefore irrelevant).

Psychiatric or psychological predictions of future dangerousness rely exclusively on matters within the average juror's common knowledge, and thus should be excluded. K-Mart Corp, 24 S.W.3d at 361. Whereas relevant scientific or expert testimony assists a juror by introducing new facts or expertise, psychiatric predictions of future dangerousness merely "tell the jury how they should view the facts." Id. This is not sufficient to meet the necessary criteria for relevance. See also Flores v. State, 871 S.W.2d 714, 724 (Tex. Crim. App. 1993) (Clinton, J., dissenting) (noting that expert psychiatric testimony regarding future dangerousness does not "add anything of substance to whatever inference of future dangerousness may be gleaned from

21

605

the facts themselves."); Speer, 890 S.W.2d at 97 (finding that psychiatric testimony regarding defendant's dependent personality disorder could be found within the range of a layperson's knowledge).

For the reasons articulated above, psychiatric or psychological predictions of future dangerousness are irrelevant. Any expert testimony incorporating such predictions is inadmissible under Tex. R. Evid. 402 and 702.

**III.   PSYCHIATRIC OR PSYCHOLOGICAL PREDICTIONS OF A DEFENDANT'S FUTURE DANGEROUSNESS ARE PREJUDICIAL, MISLEADING, AND CUMULATIVE, REQUIRING EXCLUSION UNDER TX. R. EVID. 403.**

Psychiatric or psychological predictions of a defendant's future dangerousness, because of unreliability and lack of relevance alone, as described in Sections I and II, above, create an unacceptable danger for unfair prejudice. The flawed underlying methodology and high potential rate of error render psychiatric or psychological future dangerousness predictions insignificant as to whether future danger is any more or less probable. See Morales, 32 S.W.3d at 865 ("Naturally, testimony which is unreliable or irrelevant would not assist a juror in understanding the evidence or determining a fact in issue…"); Griffith, 983 S.W.2d at 288 ("Evidence that is not reliable is not helpful to the jury because it frustrates rather than promotes intelligent evaluation of the facts.")

**A.   Psychiatric or Psychological Predictions of a Defendant's Future Dangerousness Prejudice the Jury in an Inappropriate, Irrational, and Indelible Way, Outweighing the Predictions' Probative Value.**

Expert testimony is placed under additional evidentiary constraints because courts have reasoned that jurors are unable to evaluate such testimony thoroughly and, therefore, give it excessive weight regardless of its reliability and veracity. Gammill, 972 S.W.2d at 722 (citing

**606**

Robinson, 923 S.W.2d at 553). See also Kelly, 824 S.W.2d at 573. In capital sentencing proceedings, there are four preexisting juror biases that compound the general tendency of unchecked acceptance of expert testimony. These biases affect jurors' perceptions of the likelihood of violent recidivism, the opportunities for recidivism, the accuracy of clinical expert testimony in general and the accuracy of expert predictions of future dangerousness specifically. Such biases reduce the effectiveness of traditional methods of adversarial testing in capital sentencing proceedings. The result is unfair prejudice that might not arise in other legal contexts.

Jurors in capital cases have a predisposed tendency to overestimate the likelihood of violent recidivism. Capital jurors estimate the probability that a defendant charged with capital murder, and given a life sentence, will commit another homicide between 25 and 50%, whereas studies show the likelihood to be approximately 0.2% over a forty-year term. J.R. Sorenson & R. Pilgrim, Criminology: An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants, 90 J. Crim. L. & Criminology 1251, 1269 (2000). Jurors estimate the probability that a criminal defendant convicted of a violent crime will continue to engage in assaultive behavior between 50 and 85%. Again, studies show this sense to be greatly exaggerated; the risk of additional violent crimes in general is approximately 16%. Sorenson & Pilgrim, supra at 1269. Jurors in capital cases also have a predisposed tendency to overestimate the opportunity defendants will have to commit acts of violence in the outside community. Studies in Texas indicate that, on average, jurors believe a defendant sentenced to life in prison will be paroled after fifteen years, whereas under Texas law, defendants given a life sentence after conviction for a capital crime must serve forty years before becoming eligible for parole. V.T.C.A., Gov't Code § 508.145(b) (2001); Sorenson & Pilgrim, supra at 1255.

23

607

Furthermore, jurors also believe clinicians to be capable of predicting future dangerousness at a far more accurate rate than empirical studies have suggested. D.A. Krauss & B.D. Sales, The Effects of Clinical and Scientific Expert Testimony on Juror Decision Making in Capital Sentencing, 7 Psych. Pub. Pol'y & L. 267, 276, 301 (2001). Finally, jurors have an extreme predisposition toward acceptance of "clinical" opinion expert testimony, which is based on a subjective, personal assessment of the evaluee. Krauss & Sales, supra at 305. Psychiatric or psychological predictions of a defendant's future dangerousness, particularly those based on an expert's ad-hoc analysis of a hypothetical fact pattern prepared and presented by the State, are presented as clinical determinations. Id. Jurors weigh clinical opinion testimony heavily in final decisions and often fail to distinguish between more and less accurate clinical opinion testimony. Id.

In general, jurors do not scrutinize expert testimony as intensely as lay testimony and the presumption of credibility for expert witnesses is falsely enhanced. "Consequently a jury more readily accepts the opinion of an expert witness as true simply because of his or her designation as an expert." Gammill, 972 S.W.2d at 722 (citing Robinson, 923 S.W.2d 549); See also Flores v. Johnson, 210 F.3d 456, 465-6 (5th Cir. 2000) (Garza, J., specially concurring)("the problem here is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education (not to mention designation as an 'expert') gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact."); Krauss & Sales, supra at 273; C. Haney, Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death, 49 Stan. L. Rev. 1447, 1469-70 & n.113 (1997) ("In this light, capital penalty trials sometimes

become forums in which grossly prejudicial and unreliable predictions of future dangerousness are presented with the imprimatur of state authority.") (citations omitted).

The preexisting tendencies of jurors in capital cases to overestimate the likelihood of violent recidivism, the opportunities criminal defendants have for recidivism, as well as the accuracy of clinical predictions of future dangerousness and the veracity and reliability of clinical predictions in general, reinforce the disproportionate credence jurors generally give expert testimony. These tendencies combined create a dangerous and unacceptable risk of prejudice in capital sentencing proceedings.

Adversarial testing is not a sufficient safeguard against the prejudicial effect of psychiatric or psychological predictions of future dangerousness. Faulty presuppositions and disproportionate acceptance of expert testimony may cause jurors to discredit expert testimony and cross-examination offered to counter a psychiatric or psychological determination of future dangerousness. Krauss & Sales, supra at 276; E.H. Mantell, A Modest Proposal to Dress the Emperor: Psychiatric & Psychological Opinion in the Courts, 4 Widener J. Pub. L. 53, 65-66 (1994) ("Given a choice between an expert who says that he can predict with certainty that the defendant, whether confined in prison or free in society, will kill again, and an expert who says merely that no such prediction can be made, members of the jury charged by law with making the prediction surely will be tempted to opt for the expert who claims he can help them in performing their duty, and who predicts dire consequences if the defendant is not put to death."). The "apparent endorsement" of a medical or scientific community can be extremely detrimental to a defendant's substantive rights. Perez v. State, 25 S.W. 3d 830, 841 (Tex. App.- Houston [1st

25

609

Dist.] 2000) (finding trial court erred in allowing state's expert witness testimony as to "child abuse accommodation syndrome").

Adversarial procedures are generally insufficient to remove the prejudice caused by psychiatric or psychological predictions of a defendant's future dangerousness. Krauss & Sales, supra at 305. The ability to impeach, or discredit, expert witnesses through cross-examination is limited. Opposing counsel is allowed to question the expert using statements contained in treatises and authoritative scientific materials, however, such cross-examination is limited to publications that the witness recognizes as authoritative or publications upon which the expert has relied. Reynolds v. Warthan, 896 S.W.2d 823, 827 (Tex. App. - Tyler [12th Dist.] 1995) (citing Carter v. Steere Tank Lines, Inc., 835 S.W.2d 176, 182 (Tex. App. - Amarillo [7th Dist.] 1992, writ denied). See also Bowles v. Bourdon, 219 S.W.2d 779, 783. (Tex. 1949). This detracts from the ability to legitimately subject the testimony to the rigors of adversarial testing.

Unreliable psychiatric opinion testimony creates a risk that the jury will be impressed in an irrational and indelible way. The prejudicial potential of such testimony is great and parties confronted with such testimony have limited, if any, means to rebut or remove the prejudicial impact.

**B.      The Limited Probative Value of Psychiatric or Psychological Predictions of a Defendant's Future Dangerousness Are Outweighed by Their Cumulative Nature.**

The State has no pressing "need" for the admission of psychiatric or psychological predictions of future dangerousness, because it has a variety of other means available to prove the Art. 37.071 § (2)(b)(1) special question. The predictions, are generally ad-hoc determinations solicited by a hypothetical fact pattern generally limited to the facts of the specific crime for

26

610

which the defendant has been convicted, occasionally incorporating supplemental evidence, such as extraneous offenses, uncharged prior misconduct, and limited character evidence. The hypothetical fact pattern, with or without the supplemental evidence, and resulting psychiatric or psychological prediction of future dangerousness, needlessly present cumulative evidence, specifically prohibited by Rule 403.

Such predictions are needless because they lack validity or reliability and thus, offer nothing to the jury in addition to the mere repeat recitation of the facts of the crime, or other evidence, that has already been presented and made a part of the record. Merely cumulative evidence that serves no additional purpose must be excluded. Sims v. Brackett, 885 S.W.2d 450, 454 (Tex. App. – Corpus Christi [13th Dist.] 1994) (reversing trial court exclusion of expert medical witness testimony as to cause of patient's intestinal leak because not "*merely cumulative*") (emphasis added). See also Pace v. Sadler, 966 S.W.2d 685 (Tex. App. – San Antonio [4th Dist.] 1998) (excluding personal narrative describing facts already on the record in medical malpractice case because cumulative and would have only served to prejudice defendants).

The admission of unreliable psychiatric predictions of a defendant's future dangerousness sheds no credible scientific, medical, or other light on the individual circumstances of the defendant at issue. The potential rate of error of such predictions, described in Section I (A)(ii), above, shows that a witness providing the opinion is no more qualified to accurately do so than any of the members of the jury panel might be. Because the jurors otherwise have access to the underlying evidence presented to the opinion witness in the hypothetical fact pattern, and have the authority to base their determination of future dangerousness on this data alone, the opinion

27

**611**

testimony itself is useless except for its prejudicial potential. See, e.g., Long v. State, 823 S.W.2d 259 (Tex. Crim. App. 1991) (excluding autopsy photographs in murder case, even though relevant and probative, because of prejudicial nature and cumulative effect where less gruesome photographs were already in the record); Penry v. Johnson, 215 F.3d 504, 513   (5th Cir. 2000)(Dennis, J., dissenting) (expressing concern regarding the "cumulative effect and reinforcement" of the "erroneous" admission of psychiatric testimony regarding future dangerousness); See also Jasper, 2001 WL 1502674 at *1-2; Conner, 2001 WL1043248 at *4; Trevino, 991 S.W.2d at 854; Salazar, 38 S.W.2d at 146 (juries may find future dangerousness based on the facts of the offense alone or some combination of the facts of the offense, the defendant's prior criminal history, and juror interpretation of remorse or other character evidence).

Psychiatric testimony offering a prediction of a defendant's future dangerousness is cumulative to other testimony or evidence already presented to the jury. As a result, such testimony, especially given its overwhelming potential for unfair prejudice, indelible and irrational impression on the jury, and consumption of judicial resources and time, must be excluded under Rule 403.

Because psychiatric and psychological predictions of future dangerousness impress the jury in an irrational and indelible manner, do not serve to make the fact of a defendant's future dangerousness any more or less probable, and do not fill a need of the proponent of such predictions that would not be met otherwise, the predictions consume an unnecessary amount of time in the sentencing phase of a capital trial.

For the reasons articulated above, the minimal, if any, probative value of psychiatric or psychological predictions of future dangerousness is outweighed by the danger of unfair prejudice such predictions cause. Any expert testimony incorporating such predictions is inadmissible under Tex. R. Evid. 403.

## CONCLUSION

For the foregoing reasons, Travis Mullis requests that this Court exclude any and all psychiatric or psychological expert testimony offered by the State that incorporates a prediction as to whether he would constitute a continuing threat to society, or his future dangerousness.

Respectfully submitted, this ____ day of January, 2011.

ROBERT K. LOPER
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000 (office)
713-869-9912 (fax

GERALD E. BOURQUE
SBN.02716500
24 Waterway Ave., Suite 660
The Woodlands, Texas 77380
(713) 862-7766 (office)
(832) 813-0321 (fax)

*Counsel to Defendant Travis Mullis*

29

613

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the ⁀ day of January 2011.

Robert K. Loper

30

614

CAUSE NO. 08-CR-0333

THE STATE OF TEXAS                     }        IN THE DISTRICT COURT OF

                                       }

vs.                                    }        GALVESTON COUNTY, TEXAS

                                       }

TRAVIS MULLIS                          }        122nd JUDICIAL DISTRICT

## MOTION *IN LIMINE* TO EXCLUDE
## PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY
## CONCERNING FUTURE DANGEROUSNESS

Pursuant to the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution, Art. I, §§ 10, 13, 15, and 19 of the Texas Constitution, Tex. R. Crim. Pro. 28.01

and Tex. R. Evid. 401, 403, 702, 703 and 705, and for the reasons set forth below and in the

attached *Memorandum of Law*, Travis Mullis respectfully moves this Court to exclude all

psychiatric or psychological expert opinion testimony offered by the State as to the probability

that he will commit future "criminal acts of violence that would constitute a continuing threat to

society" under Tex. Code Crim. Proc. Ann. Art. 37.071 § (2)(b)(1)(Vernon Supp. 2001).

　　　　1.  Travis Mullis has been indicted by the Galveston County Grand Jury for the

　　　　offense of capital murder;

　　　　2.  The State is seeking the death penalty;

　　　　3.  The State seeks to call one or more witnesses to offer psychiatric or psychological

　　　　expert opinions or predictions as to Travis Mullis' eligibility for the death penalty

　　　　under Tex. Code Crim. Proc. Ann. Art. 37.071 § (2)(b)(1)(Vernon Supp. 2001).

　　　　4.  The opinions proffered will be either scientific in nature or based on personal

　　　　training and experience.

　　　　5.  The admissibility of these opinions is governed by Tex. R. Evid. 401, 403, 702,

　　　　703, and 705 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579

615

(1993); Kuhmo Tire Co. v. Carmichael, 526 U.S. 137 (1999); Kelly v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992); E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d 549 (Tex. 1995); Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713 (Tex. 1998); Nenno v. State, 970 S.W.2d 549 (Tex. Crim. App. 1998).

6.  Psychiatric or psychological predictions as to a whether a defendant will constitute a continuing threat to society, or a defendant's "future dangerousness," are inadmissible because they do not meet the standards for reliability articulated in the rules of evidence and the common law. Such predictions are unreliable due to: (a) their overwhelming rate of error; (b) their lack of acceptance in the relevant scientific community; (c) the subjective, inconsistent, ad-hoc, and standardless manner in which they are formed; (d) the absence of a proper and adequately reliable data source upon which to base them.  Any testimony the State seeks to admit incorporating such predictions does not satisfy the reliability requirement of Tex. R. Evid. 702, and must be excluded.

7.  Psychiatric or psychological predictions of a defendant's future dangerousness are further inadmissible because they (1) do not meet the standards for relevance articulated in the rules of evidence and the common law; (2) they do not assist jurors in determining a question of fact as they are ad-hoc determinations solicited by hypothetical fact patterns (3) any probative value is substantially outweighed by the danger of unfair prejudice pursuant to Tex. R. Evid. 403.

2

616

**WHEREFORE, PREMISES CONSIDERED**, Travis Mullis respectfully requests that the Court exclude any and all psychiatric or psychological expert testimony offered by the State that incorporates a prediction as to whether he is a future danger or would constitute a continuing threat to society.

Dated: January 11, 2011

**ROBERT K. LOPER**
SBN: 12562300
111 West 15th Street
Houston, Tx 77008
713-880-9000 (office)
713-869-9912 (fax

**GERALD E. BOURQUE**
SBN.02716500
24 Waterway Ave., Suite 660
The Woodlands, Texas 77380
(713) 862-7766 (office)
(832) 813-0321 (fax)

*Counsel to Defendant Travis Mullis*

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to counsel for the State by hand-delivery of a copy of same this the 11th day of January 2011.

Robert K. Loper

3

**617**

CAUSE NO. 08CR0333

JASON E. MURRAY
CLERK DISTRICT COURT
FILED
JAN 14 2011
GALVESTON COUNTY, TEXAS
BY
DEPUTY

THE STATE OF TEXAS § IN THE 122ND JUDICIAL

§

V. § DISTRICT COURT OF

§

TRAVIS JAMES MULLIS § GALVESTON COUNTY, TEXAS

## MOTION FOR PRODUCTION
## OF RECORDS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, TRAVIS JAMES MULLIS, Defendant in the above styled and numbered cause, by and through his counsel of record, and files this Motion for Production of Records.  For good cause the Defendant would show the following; to-wit:

1. TRAVIS JAMES MULLIS is charged by indictment with Capital Murder.  The State of Texas is seeking the death penalty.

2. The Defendant's background, including all mitigating factors, are relevant to the due administration of justice in a capital murder case.

3. Defense counsel are charged with the duty of seeking a full and complete history of the Defendant's life; beginning with all possible birth factors.

4. The Defendant's birth records, including these medical records of his birth mother are relevant to the due administration of justice.

5. The Defendant's birth mother, Sheila Lee Wallace, had serious health

618

problems that ultimately caused her death within weeks of the Defendant's birth.

6. Carolinas Medical Center, formerly Charlotte Memorial, and Carolinas Medical Center Northeast, formerly Cabarrus Memorial, possess medical records for Sheila Lee Wallace, and the Defendant, Travis Wallace/Mullis.

7. After the death of the Defendant's birth mother he was adopted.   The records regarding the adoption are likewise material to the due administration of justice.   The Defendant's adoption occurred in either North Carolina or Maryland.   Defendant seeks records of his adoption from the proper authorities in either North Carolina or Maryland.

8. The Defendant may be known as Travis J. Mullis or Travis J. Wallace and his date of birth is September 20, 1986.

9. The Defendant's biological mother may be known as Sheila Lee Wallace, Sheila Lee Goodson, Sheila Lee Moore and Sheila Lee Devlin, with a date of birth listed as May 31, 1949.

10. The Defendant's biological father is known as Bobby Ray Wallace or Bobby Ray Dancy, with a date of birth listed as February 7, 1944.

11. The Defendant's mother and father, by way of adoption, are Anne Marie Barry Mullis (DOB: 1/12/55) and Gary Lynn Mullis (DOB: 6/26/52).

12. The Custodian of Records for Carolinas Medical Center is Ms. Keitha Eddins.

619

Ms. Eddins is the Director of Medical Records and she can be found at 1000 Blythe Boulevard, Charlotte, NC, 28203.  The telephone number is 704-355-2000.

13. The Custodian of Records for Carolinas Medical Center-Northeast is Ms. Geraldine Auton.  Ms. Auton is the Director of Medical Records and she can be fround at 920 Church Street N., Concord, NC 28025.   Ms. Auton's telephone number is 704-403-3593.

14. The Director of Children Services for North Carolina and/or Maryland is not known at this time and should be referred to as the Custodian of Record for Children Services of North Carolina and Custodian of Records for Children Services of Maryland.

WHEREFORE, PREMISES CONSIDERED, Defendant prays the Custodians of Records for Children Services of North Carolina and Maryland, Ms. Keitha Eddins of Carolinas Medical Center and Ms. Geraldine Auton of Carolinas Medical Center-Northeast be ordered to produce all medical records and adoption records in their possession (regarding Sheila Lee Wallace, Bobby Ray Wallace, Travis J. Wallace/Mullis, Anne Marie Barry Mullis and Gary Lynn Mullis) by January 10, 2011, by delivering the same with an attached business records affidavit to Gerald E. Bourque, Attorney at Law, 24 Waterway Ave., Suite 660, The Woodlands, TX  77380.

Respectfully submitted,

GERALD E. BOURQUE
State Bar No. 02716500
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Telephone: 713-862-7766
Telecopier: 832-813-0321


ROBERT K. LOPER
State Bar No. 12562300
111 West 15th Street
Houston, TX 77008
Telephone: (713) 880-9000
Telecopier: (832) 869-9912


ATTORNEYS FOR DEFENDANT
TRAVIS JAMES MULLIS


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been furnished to the District Attorney on this 15th day of December 2010, by hand delivery.

GERALD E. BOURQUE

JASON E. MURRAY
CLERK DISTRICT COURT
FILED
JAN 14 2011
GALVESTON COUNTY, TEXAS
BY_____
DEPUTY

621

APPLICATION 

CLERK DISTRICT COURT
FILED
8 : 0 8 a . m
JAN 1 8 2011
GALVESTON COUNTY, TEXAS
DEPUTY

**SUBPOENA ISSUED IN THE NAME OF THE STATE OF TEXAS**

*This subpoena not prepared by the office of Jason E. Murray, District Clerk Galveston County, Texas.*

CAUSE NO. 08CR0333
**Present Term 2011**

**THE STATE OF TEXAS**
VS.
**TRAVIS JAMES MULLIS**
Defendant/s Name

122nd JUDICIAL DISTRICT COURT
**Galveston County, Texas**

TO ANY PEACE OFFICER OR BY ANY OTHER PERSON WHO IS OTHERWISE QUALIFIED OF THE STATE OF TEXAS, GREETING:
**"YOU ARE HEREBY COMMANDED TO SUMMON"**

| WITNESS NAMES/ADDRESS/VOCATION | DATE/TIME SERVED |
|---|---|
| 1)Officer A. Wardlow-Smith #6998- P.P.D. | |
| 2) Officer M. Munroe #9894- P.P.D. | |
| 3) Detective R. Hesser- P.P.D. | |
| 4) Detective McNamee- P.P.D. | |
| 5) Detective Pironne- P.P.D. | |
| GPD POLICE OFFENSE REPORT NO.2008-00003872 | |
| Upon receipt of subpoena please call Kayla M. Allen at (409)766.2488 **OR** email me at Kayla.allen@co.galveston.tx.us. PLEASE BE ON STANDBY FOR _____ and PROVIDE ME WITH AN IMMEDIATE CONTACT NUMBER | |

*If to be found in your County, to be and appear at 8:30 o'clock A. M., on the 7th day of March, 2011;*
*Before the Honorable JOHN ELLISOR in the 122nd District Court of Galveston County, Texas, to be held within and for said County at the Court House thereof, in Galveston, then and there to testify as a witness on behalf of the State in a certain pending criminal (felony) action, and there to remain from day to day, and from term to term until discharged by said Court.*
*\*The witness is further commanded to produce at the said time and place above set forth the following:*

*\*\*Please bring with you _____, minor/s*

*On this day came forward* K. Allen *(applicant signature), attorney for the State and files this application for subpoena to compel the attendance of the above named witness on this 18th day of January, 2011, that said witness is necessary.*

*HEREIN FAIL NOT, and make due return hereof, showing how you have executed the same.*

*Witness my official signature, on this 18th day of January, A.D., 2011 attested to:*

*JASON E. MURRAY, District Clerk, Galveston County, Texas*

Subpoena instructions
_____ Send to Sheriff

X___ Pickup            By: _____ , Deputy Clerk

**RETURN OF SERVICE**

*Received this Subpoena on the _____ day of _____, 20____, and executed the same as shown above by delivering a copy of this subpoena to the within named witness(es) in the city of _____ and county of _____, Texas*
Service Fee $ _____    _____ Signature of Officer (or Qualified Person)

622

CLERK DISTRICT COURT
FILED
ᴧ.Oᶠᴏ.ᴍ
JAN 18 2011
GALVESTON COUNTY, TEXAS
BY_____
DEPUTY

Cause No. 08CR0333

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | GALVESTON COUNTY, TEXAS |
| TRAVIS MULLIS | § | 122TH JUDICIAL DISTRICT |

## MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

TO THE HONORABLE JUDGE OF SAID COURT:

Comes NOW, THE STATE OF TEXAS, by and through her Criminal District Attorney Jack Roady, and files this Memorandum in Response to Defendant's Motion to Suppress Evidence, namely statements and physical items:

### I.

### DEFENDANT'S ALLEGATIONS

The Defendant alleges that his confession was involuntary and was the result of promises and coercive action by law enforcement officers. He further alleges that the he was not warned of his statutory and constitutional rights. Additionally, the Defendant alleges that he invoked his right to remain silent and was repeatedly interrogated by the officers after doing so. The Defendant further states that he was denied access to counsel after a timely request and was not immediately taken before a magistrate for his statutory warnings. Finally, the Defendant

623

alleges he was arrested without a valid warrant and without any statutory exception.

## II.

### SUMMARY OF FACTS

Travis Mullis stands charged with the Capital Murder of his infant son, Alijah Mullis. The Defendant is alleged to have intentionally and knowingly caused the death of Alijah, a child under the age of six on the 29th of January 2008 in Galveston County, Texas.

After a deceased infant was found by civilians at approximately 9:00 a.m. CST at Seawall Boulevard east of Condo Road, Galveston Police officers were dispatched to the scene. They later interviewed Caren Kohberger at her residence at 1100 Fox Meadow #212, Alvin, Brazoria County, Texas. She positively identified a photograph of the deceased infant as her son, Alijah Mullis. She stated that the defendant had left with their infant son at 4:30 a.m. on that same day and had not returned. By 1/31/08 12.10 a.m. CST, the Galveston County District Attorney caused an alert to be entered into TCIC/NCIC for a special investigative hold to be placed on the defendant for a possible

624

homicide of an infant and also placed a hold on a vehicle that may be associated with the crime namely, a 2002 Hyundai with Texas license plates 067RJP.

Galveston Police Sergeant A. Almandarez informed Alvin Police Detective Patrick Moore that there had been an "out- cry" of an attempted sexual assault of a child by the defendant alleged to have occurred 1-29-08.  The child, Cecilia Duarte, resided at the same Fox Meadow address along with her mother, her mother's boyfriend, her brothers, Caren Kohberger, the Defendant, and baby Alijah.

Based upon interviews and a police investigation, on January 31st 2008 at 4:55 p.m.CST, a sworn complaint was filed alleging Travis Mullis committed the Felony Offense of Enticing a Child on 1-29-08.  That information was also entered into TCIC/NCIC at 5:32 p.m. CST on 1/31/08.

On 2-1-08 at approximately 1:50 EST in Philadelphia, Pennsylvania, the Defendant turned himself in to the Philadelphia Police Department. He was greeted initially by two Philadelphia Police officers, Andrea Wardlow-Smith and Michael Munroe.  He made spontaneous and voluntary oral statements that he was wanted

625

in Texas for kidnapping, murder, and a stolen auto. He voluntarily provided identifying information so that the officers could check NCIC to confirm any outstanding arrest warrants from Texas. After the defendant made the admission of being wanted, and with an NCIC confirmation, he was placed in handcuffs and patted down. He voluntarily made the statement to Officer Munroe "I stomped his head, I just kept stomping his head". He said it was "a baby, my son". The defendant also stated that he had a vehicle that he had parked in a nearby lot. He also showed them his parking ticket.

A Corporal Robert Pawlowski with the Philadelphia Police Department checked the computer and at approximately 2:00 p.m. EST provided the officers with a copy of the NCIC confirmation showing that the Defendant was wanted in Texas. The NCIC shows both the Enticement of a Minor from Brazoria County and the investigative hold for the Defendant and for Caren Kohberger's vehicle out of Galveston County. Based upon the confirmation, Homicide Detective Robert Hesser was contacted by Officer Smith and he came down and took custody of the Defendant.

Detectives Pirrone and McNamme of the Philadelphia Police Department obtained the parking ticket and keys from the

**626**

Defendant and located the vehicle.   According to police departmental policy, the Detectives inspected it prior to releasing it to a civilian wrecker.   At approximately 3:30 p.m. EST, they located a Powerline Daisy BB pistol within plain view in the vehicle.

At 3:55 p.m. EST, the Defendant was given his Constitutional Miranda warnings in compliance with Pennsylvania law by Detective Hesser and Rodden.   He affirmatively waived all of his rights and agreed to give a written and audio recorded statement.   Then at 5:04 and 5:07 p.m. EST the Defendant signed his written Texas statutory written warnings and he affirmatively waived those. The written statement then began at 5:12 p.m. EST and concluded at 8:10 p.m. and was signed by the Defendant at 8:42 p.m. EST. After the Defendant's confession was communicated to members of the Galveston County District Attorney's Office, at 9:15 p.m. on 2-1-08, Judge Lonnie Cox of the 56th Judicial District Court signed a capital murder warrant on the Defendant.

At 9:55 p.m. EST, the videotaped statement was begun after he was given the Pennsylvania warnings.   The video statement concluded at 10:37 p.m. EST. After the defendant's confession, a search incident to arrest was conducted and the defendant's shoes

**627**

and clothing was taken from him at approximately 11:15 p.m. EST on 2-1-08. The Defendant confessed that the clothing and shoes he had on were the same he wore when he stomped the child's head causing his death.

The Defendant never invoked his right to counsel or to remain silent. He never requested that the interview be terminated. The Defendant initialed and signed his warnings and was allowed to make any changes he wished to his written statement. He was never threatened, coerced, or promised anything.

On 2-2-08 at 6:30 p.m. EST the Defendant was given his magistrate warnings and arraigned on a Felony Fugitive from Justice Complaint that had been executed that same day in Philadelphia.

On 2-4-08 at 9:16 a.m. EST the Bail Commissioner signed the evidentiary search warrant for the Hyundai vehicle in compliance with Pennsylvania law. At 11:15 p.m. EST with the assistance of Galveston Police Department, the vehicle was search and items of clothing, paperwork, and baby items were recovered. An inventory of the property was done.

## III.

### SUMMARY OF APPLICABLE LAW

The Defendant was arrested in Philadelphia, Pennsylvania. A Court upon its own motion may, or upon the motion of a party shall, take judicial notice of the constitutions, public statutes, rules, regulations, ordinances, court decisions, and common law of every other state, territory, or jurisdiction of the United States. A party requesting that judicial notice be taken of such matter shall furnish the court sufficient information to enable it properly to comply with the request, and shall give all parties such notice, if any, as the court may deem necessary, to enable all parties fairly to prepare to meet the request. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken. Judicial notice of such matters may be taken at any stage of the proceeding. The court's determination shall be subject to review as a ruling on a question of law. **Texas Rules of Evidence, Rule 202, Nonn v. State,** 117 S.W. 3d 874 (Tex. Crim. App. 203). The State would urge this Court to take judicial

**629**

knowledge of the **Pennsylvania Rules of Criminal Procedure, Rule 200** and **18 Pa.C.S.A § 5702-5704.** See **"Exhibit A".**

Texas law states that a written, oral, or sign language statement of an accused made as a result of a custodial interrogation is admissible against the accused in a criminal proceeding in this state if: (1) the statement was obtained in another state and was obtained in compliance with the laws of that state or this state. **Texas Code of Criminal Procedure, Art. 38.22 Sec. 8.** The State has provided a sworn affidavit of Pennsylvania law expert, Ann Ponterio, see **"Exhibit B"** swearing that the defendant's statements are in compliance with Pennsylvania law.

## IV.

### ARREST OF THE DEFENDANT

The Defendant turned himself in at a time when a Felony warrant was filed out of Brazoria County, Texas. Additionally, there was an investigative hold for the Defendant and Caren Kohberger's vehicle out of Galveston County, Texas. After confirming these "hits" on NCIC, Det. Hesser took custody of the Defendant. The Defendant was given his **Miranda** warnings during custodial interrogation both in compliance with **Miranda v. Arizona,** 384 U.S. 436 (1966), Texas law, **Texas Code of Criminal Procedure** Art. 38.22 and Pennsylvania law.

**630**

**V.**

## ORAL STATEMENTS BY THE DEFENDANT

The Defendant made several statements to law enforcement personnel at the time he surrendered and was booked. Spontaneous statements by a defendant do not implicate **Texas Code of Criminal Procedure, Art. 38.21, 38.22, 38.23, Sosa v. State** 769 s.w.2d. 909 (Tex. Crim. App 1989). Neither does routine booking questions. **Pennsylvania v. Muniz** 496 U.S. 582, 1990.

Additionally, the Defendant's custodial oral statements were videotaped with warnings that were knowingly, intelligently, and voluntarily waived, and all voices on the recording were identified. Furthermore, the Defendant was given a timely copy of the statement. **Texas Code of Criminal Procedure Art. 38.22 Sec. 3.** Additionally, **38.22 sec. 3** shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed. After the Defendant's confession, he identified a location on a Google map where he had committed the offense and where the baby and other evidence were found. He also stated

**631**

that he committed the offense in the clothing he was wearing. The officers took custody of the clothing which included his shoes. The pattern of the tread on the bottom of his shoe was consistent with the indentation that was left on the child's head. Additionally, DNA of the child was also found on the shoe.

The videotaped statement was also in compliance with Pennsylvania wire tapping laws where "it shall not be unlawful and no prior court approval shall be required under this chapter for: A person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception." **18 Pa.C.S.A. Purdon's Pennsylvania Statutes and Consolidated Statutes sec. 5704.** The defendant consented to the videotaping of his statement to Detectives Hesser and Rodden and completed their necessary written forms.

### VI.

### WRITTEN CUSTODIAL STATEMENTS

Additionally the Defendant gave a written statement to the police. He was given his **Miranda** warnings and **Texas Code of Criminal Procedure Art. 38.22** warnings, namely:

(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this

**632**

code or **received from the person to whom the statement is made** a
warning that (emphasis added):

(1) he has the right to remain silent and not make any statement
at all and that any statement he makes may be used against him at
his trial;

(2) any statement he makes may be used as evidence against him in
court;

(3) he has the right to have a lawyer present to advise him prior
to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have
a lawyer appointed to advise him prior to and during any
questioning; and

(5) he has the right to terminate the interview at any time. The
Defendant knowingly, intelligently, and voluntarily waived all of
his rights and gave both a written and oral statement.

## VII.

### MAGISTRATE WARNINGS

The Defendant was taken before a Magistrate within 48 hours
on 2-2-08. He received his warnings in Philadelphia by means of
an electronic broadcast system and was also appointed an attorney
to represent him for his extradition process. "An officer or
person executing a warrant of arrest shall without unnecessary
delay take the person or have him taken before the magistrate who

**633**

issued the warrant or before the magistrate named in the warrant, if the magistrate is in the same county where the person is arrested." If the issuing or named magistrate is in another county, the person arrested shall without unnecessary delay be taken before some magistrate in the county in which he was arrested. **Texas Code of Criminal Procedure, Art. 15.16.** The person making the arrest or the person having custody of the person arrested shall without unnecessary delay, but not later than 48 hours after the person is arrested, take the person arrested or have him taken before some magistrate of the county where the accused was arrested or, to provide more expeditiously to the person arrested the warnings described by this article, before a magistrate in any other county of this state. The arrested person may be taken before the magistrate in person or the image of the arrested person may be presented to the magistrate by means of an electronic broadcast system. **Texas Code of Criminal Procedure, Art. 15.17..** If the magistrate determines that the arrest was lawful, the person arrested is considered a fugitive from justice for the purposes of Article 51.13 of this code, and the disposition of the person is controlled by that article. Additionally, the Defendant was Magistrated when he arrived in Galveston County, Texas.

## VIII.

## FUGITIVE FROM JUSTICE

The NCIC that was run in Philadelphia before the Defendant was taken into custody stated that there was a felony complaint for which Texas would extradite. "When a complaint is made to a magistrate that any person within his jurisdiction is a fugitive from justice from another State, he shall issue a warrant of arrest directing a peace officer to apprehend and bring the accused before him. **Texas Code of Criminal Procedure, Art. 51.03.**". The complaint shall be sufficient if it recites:

1. The name of the person accused;

2. The State from which he has fled;

3. The offense committed by the accused;

4. That he has fled to this State from the State where the offense was committed; and

5. That the act alleged to have been committed by the accused is a violation of the penal law of the State from which he fled. **Texas Code of Criminal Procedure, Art. 51.04.** A person in any other State of the United States charged with treason or any felony who shall flee from justice and be found in this State,

**635**

shall on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime. **Texas Code of Criminal Procedure, Art. 51.01.** All peace officers of the State shall give aid in the arrest and detention of a fugitive from any other State that he may be held subject to a requisition by the Governor of the State from which he fled. **Texas Code of Criminal Procedure, Art. 51.02.** Pennsylvania also filed a Fugitive from Justice Complaint after the Defendant's arrest.

## IX.

### SEARCH OF VEHICLE

The Defendant does not have standing to contest the search of Caren Kohberger's vehicle that he took without her permission out of state. Additionally, he consented by providing the Philadelphia officers with the keys, parking ticket and location of the vehicle after stating that he was wanted for auto theft. A Daisy BB pistol was found by Detectives Pirrone and McNamme when they did their initial check of the vehicle before releasing it to a civilian tow truck. Then, on 2-4-08, after a Bail Commissioner signed a search warrant, the vehicle was searched.

**Pennsylvania Rules of Criminal Procedure and Investigations, Rule 200.**

WHEREFORE, PREMISES CONSIDERED, the State prays that Defendant's Motion to Suppress evidence be denied.

Respectfully submitted,

JACK ROADY

Criminal District Attorney

Donna W. Cameron, First Assistant

Criminal District Attorney

600 59TH Street, Suite 1001

Galveston, Texas 77551

(409) 766-2360

FAX:   (409) 765-2914

SBOT # 03675050

637

Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been served on Robert K. Loper, attorney for Robert Stevens, by hand delivery on this the 18th day of January, 2011.

Donna W. Cameron

Donna W. Cameron

RULES OF CRIMINAL PROCEDURE

Rule 201

PART A

SEARCH WARRANTS

## Rule 200.  Who May Issue

A search warrant may be issued by any issuing authority within the judicial district wherein is located either the person or place to be searched.

*Comment:* This rule formally authorizes district justices, Philadelphia bail commissioners, and judges of the Municipal Court, Common Pleas, Commonwealth, Superior, and Supreme Courts to issue search warrants. This is not a departure from existing practice. See, e.g., Sections 1123(a)(5) and 1515(a)(4) of the Judicial Code, 42 Pa.C.S. §§ 1123(a)(5) and 1515(a)(4). Any judicial officer who is authorized to issue a search warrant and who issues a warrant is considered an "issuing authority" for purposes of this rule. The authority of a district justice to issue a search warrant outside of the magisterial district but within the judicial district is recognized in *Commonwealth v. Ryan,* 400 A.2d 1264 (Pa. 1979).

Only common pleas court judges and appellate court justices and judges may issue search warrants when the supporting affidavit(s) is to be sealed under Rule 211.

This rule is not intended to affect the traditional power of appellate court judges and justices to issue search warrants anywhere within the state.

*Note:*  Prior Rules 2000 and 2001 were suspended by former Rule 28, 1973, effective February 3, 1969. Present Rule 2001 adopted March 323, effective 60 days hence; amended July 1, 1980, effective August 1, 1980; *Comment* revised September 3, 1993, effective January 1, 1994; renumbered Rule 200 and *Comment* revised March 1, 2000, effective April 1, 2001.

, see 42 Pa.C.S.A. § 1725.1.

### Cross References

### Law Review and Journal Commentaries

Jusionary rule in search of a rationale. Steven R. Schlesinger and BradWilson, (1980) 18 Duq.L.Rev. 225.

Search incident to custodial arrest for traffic violation. (1974) U.Pitt.Rev. 864.

tical surveillance and the Fourth lment. Alan Meisel (1973) 35 .L.Rev. 53.

### Library References

rches and Seizures ⚖103.1. TLAW Topic No. 349.

C.J.S. Searches and Seizures §§ 135.

### Notes of Decisions

Judicial officers   2
80

rel   1

In general
Magistrate who was employee of dis... attorney's office, who performed ... ministerial and administrative ... ties, and whose testimony indicated ... rong tendency to accept whatever po... ce told him as true could not perform ... e detached judicial functions required ... th respect to issuance of search war... nt. Com. v. Davis, 310 A.2d 334, 225 ... Super. 242, Super.1973.

Judicial officers
City of Pittsburgh police magistrates ... we jurisdiction to issue search warrants ... "judicial officers" of unified judicial ... ystem subject to general supervisory and ... ministrative authority of the Supreme ... ourt. Com. v. Dumont, 536 A.2d 342, ... 70 Pa.Super. 155, Super.1987, appeal ... lied 546 A.2d 620, 519 Pa. 659.

Service outside district
Although township police officers had ... power to act as such in another town... hip and could not serve warrant for ... search of premises in such other town-

## Rule 201.  Purpose of Warrant

A search warrant may be issued to search for and to seize:

(1)  contraband, the fruits of a crime, or things otherwise criminally possessed; or

(2)  property that is or has been used as the means of committing a criminal offense; or

(3)  property that constitutes evidence of the commission of a criminal offense.

*Comment:*  Concerning the provisions of paragraph (1) see *United States v. Rabinowitz,* 339 U.S. 56 (1950), overruled as to other points, *Chimel v. California,* 395 U.S. 752, 786 (1969). *Also compare Cooper v. California,* 386 U.S. 58 (1967), with *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693 (1964).

Warrants may not be issued unless the affidavit alleges a preexisting crime. *See United States ex. rel. Campbell v. Rundle,* 327 F.2d 151, 161 (3rd Cir. 1964), followed *sub nom. Commonwealth ex rel. Ensor v. Cummings,* 207 A.2d 230 (Pa. 1965) and *Commonwealth ex rel. Campbell v. Russell,* 207 A.2d 232 (Pa. 1965). The Third Circuit's opinion cited with approval *Commonwealth v. Patrone,* 27 D & C 2d 343 (Philadelphia Co. 1962); *Commonwealth v. Rehmeyer,* 27 ... & C 2d 635 (York Co. 1962); and *Simmons v. Oklahoma,* 286 ...296, 298 (Okla. Cr. 1955).

ship, warrant could be issued to such officers for service by other township's police and such officers could be affiants for such warrant. Com. v. Kunkel, 408 A.2d 475, 268 Pa.Super.299, Super.1979.

District magistrate, whose office was in same county as defendant's home, had power to issue search warrant for the home, though it was located outside of magistrate's magisterial district. Com. v. Young, 396 A.2d 771, 262 Pa.Super. 313, Super.1978.

Magisterial jurisdiction was countywide and thus issuing authority was not without jurisdiction to issue search warrant for premises located outside his magisterial district, but within same county. Com. v. Ryan, 391 A.2d 612, 257 Pa.Super. 538, Super.1978, affirmed 400 A.2d 1264, 484 Pa. 602.

Since neither the defendant nor his residence was in county from which justice of the peace issued search warrant, justice of the peace was without jurisdiction to issue warrant and the ensuing search of defendant's residence pursuant thereto was illegal. Com. v. Myers, 361 A.2d 884, 239 Pa.Super. 459, Super.1976.

## 18 Pa.C.S.A. § 5701
### Note 2

criminal statute and wiretapping involves invasion of constitutional right of privacy, Act must be strictly applied and strictly construed. (Per Friedman, J., with two Judges concurring and one Judge concurring in result.) United Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

Protections of Pennsylvania Wiretapping and Electronic Surveillance Control Act apply to, and regulate conduct of, all persons, whether acting in governmental, private, or other capacity. (Per Friedman, J., with two Judges concurring and one Judge concurring and one Judge concurring in result.) United Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

Wiretapping and Electronic Surveillance Control Act is applicable state statute authorizing interceptions in Pennsylvania, for purpose of Federal Wire Interception Act. Com. v. Bird-song, 670 A.2d 1124, 543 Pa. 251, Sup. 996, certiorari denied 116 S.Ct. 2552, 18 U.S. 1019, 135 L.Ed.2d 1071.

Wiretapping and Electronics Surveillance Control Act, which is in derogation constitutional right, must be strictly nstrued. Boettger v. Miklich, 633 A.2d 46, 534 Pa. 581, Sup.1993.

Provisions of Wiretapping and Electronic Surveillance Control Act must be tictly applied and strictly construed. etger v. Miklich, 599 A.2d 713, 142 Cmwlth. 136, Cmwlth.1991, appeal nted 606 A.2d 903, 530 Pa. 634, re-sed 633 A.2d 1146, 534 Pa. 581.

### §702.  Definitions

s used in this chapter, the following words and phrases shall have meanings given to them in this section unless the context clear cates otherwise:

**"aggrieved person."** A person who was a party to any intercepted, electronic or oral communication or a person against whom ntercep        was directed.

## PUBLIC ORDER AND DECENC

Enactment of Pennsylvania Wiretap-ping and Electronic Surveillance Con Act was intended to develop means f prohibition of nonconsensual intercep-tion except where electronic communi-tion except where electronic communi-(Per Friedman, J., with two Judges co curring and one J    with two Judges co Util.) United Telephone Co. of Penn vania   v.   Pennsylvania   Public   Utili Com'n, 676 A.2d 1244, Cmwlth.1996.

Wiretapping and Electronic Surve lance Control Act (WESCA) did not p hibit public examination or inspection cellular telephone itemized bills subm to county for calls made by coun officials, absent proof that inspection itemized bills would be tantamoun highly offensive act; purpose of WES was to protect against highly offens publications, and itemized bills were not "pen registers," within mean of WESCA.  PG Pub. Co. v. Coun Washington, 638 A.2d 422, 162 P. Cmwlth. 196, Cmwlth.1994.

Focus and purpose of Wiretapping a Electronic Surveillance Control Act protection of privacy. Com. v. Spenc 631 A.2d 666, 428 Pa.Super. 548, Su per.1993.

**4.   Construction with federal law**
By virtue of supremacy clause of Un ed States Constitution, Federal Wire terception Act preempts ability of sta to adopt legislation that would be le restrictive   in   allowing   interception Com. v. Birdseye, 670 A.2d 1124, 543 251, Sup.1996, certiorari denied 1 S.Ct. 2552, 518 U.S. 1019, 135 L.Ed 1071.

## RETAPPING

## 18 Pa.C.S.A. § 5702

**"aural transfer."** A transfer containing the human voice at any nt between and including the point of origin and the point of eption.

**"Communication common carrier."** Any person engaged as a common carrier for hire, in intrastate, interstate or foreign commu-cation by wire or radio or in intrastate, interstate or foreign radio nsmission of energy; however, a person engaged in radio broad-sting shall not, while so engaged, be deemed a common carrier.

**"Contents."** As used with respect to any wire, electronic or oral communication, is any information concerning the substance, pur-  t, or meaning of that communication.

**"Court."** The Superior Court. For the purposes of Subchapter C ly, the term shall mean the court of common pleas.

**"Electronic communication."** Any transfer of signs, signals, writ- images, sounds, data or intelligence of any nature transmitted in ole or in part by a wire, radio, electromagnetic, photoelectronic or hoto-optical system, except:

(1) Deleted.

(2) Any wire or oral communication.

(3) Any communication made through a tone-only paging device.

(4) Any communication from a tracking device (as defined in
(this section).

**"Electronic communication service."** Any service which provides o users the ability to send or receive wire or electronic communica-ons.

**"Electronic communication system."** Any wire, radio, electromag-tic, photo-optical or photoelectronic facilities for the transmission electronic communications, and any computer facilities or related ectronic equipment for the electronic storage of such communica-tion.

**"Electronic, mechanical or other device."** Any device or appara-s, including, but not limited to, an induction coil or a telecommuni-tion identification interception device, that can be used to intercept wire, electronic or oral communication other than:

(1) Any telephone or telegraph instrument, equipment or facility, or any component thereof, furnished to the subscriber or user by a provider of wire or electronic communication service in the ordi-nary course of its business, or furnished by such subscriber or user — connection to the facilities of such service and used in the ordinary course of its business, or being used by a communication

investigative or law enforcement officer in the ordinary course of his duties.

(2) A hearing aid or similar device being used to correct subnormal hearing to not better than normal.

(3) Equipment or devices used to conduct interceptions under section 5704(15) (relating to exceptions to prohibition of interception and disclosure of communications).

"Electronic storage."

(1) Any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof.

(2) Any storage of such a communication by an electronic communication service for purpose of backup protection of the communication.

"Home." The residence of a nonconsenting party to an interception, provided that access to the residence is not generally permitted to members of the public and the party has a reasonable expectation of privacy in the residence under the circumstances.

"In-progress trace." The determination of the origin of a telephonic communication to a known telephone during an interception.

"Intercept." Aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device. The term shall include the point at which the contents of the communication are monitored by investigative or law enforcement officers.

"Investigative or law enforcement officer." Any officer of the United States, of another state or political subdivision thereof, or of the Commonwealth or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter or an equivalent crime in another jurisdiction, and any attorney authorized by law to prosecute or participate in the prosecution of such offense.

"Judge." When referring to a judge authorized to receive applications for, and to enter, orders authorizing interceptions of wire, electronic or oral communications pursuant to Subchapter B (relating to wire, electronic or oral communication), any judge of the superior Court.

"One call system." A communication system established by users to provide a single telephone number for contractors or designers or any other person to call notifying users of the caller's intent to engage in demolition or excavation work.

"Oral c          munication." Any oral communication uttered by a 'son pos...ssing an expectation that such communica...

subject to interception under circumstances justifying such expectation. The term does not include any electronic communication.

"Organized crime."

(1) The unlawful activity of an association trafficking in illegal goods or services, including but not limited to, loan sharking, prostitution, loan sharking, controlled substances, labor racketeering, or other unlawful activities; or

(2) any continuing criminal conspiracy or other unlawful practice which has as its objective:

(i) large economic gain through fraudulent or coercive practices; or

(ii) improper governmental influence.

"Pen register." A device which is used to capture, record or decode electronic or other impulses which identify the numbers dialed or otherwise transmitted, with respect to wire or electronic communications, on the targeted telephone. The term includes a device which is used to record or decode electronic or other impulses which identify the existence of incoming and outgoing wire or electronic communications on the targeted telephone. The term does not include a device used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communication service provided by the provider, or any device used by a provider, or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of business.

"Person." Any employee, or agent of the United States or any state or political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation.

"Readily accessible to the general public." As used with respect to a radio communication, that such communication is not:

(1) scrambled or encrypted;

(2) transmitted using modulation techniques of which the essential parameters have been withheld from the public with the intention of preserving the privacy of the communication;

(3) carried on a subscriber or other signal subsidiary to a radio transmission;

(4) transmitted over a communication system provided by a common carrier, unless the communication is a tone-only paging system communication; or

(5) transmitted on frequencies allocated under 47 CFR Parts 25, .D, E, F or 94, unless, in the case of ...

allocated to broadcast auxiliary services, the communication is a two-way voice communication by radio.

"Remote computing service." The provision to the public of computer storage or processing services by means of an electronic communications system.

"State." Any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico and any territory or possession of the United States.

"Telecommunication identification interception device." Any equipment or device capable of intercepting any electronic communication which contains any electronic serial number, mobile identification number, personal identification number or other identification number assigned by a telecommunication service provider for activation or operation of a telecommunication device.

"Tracking device." An electronic or mechanical device which permits only the tracking of the movement of a person or object.

"Trap and trace device." A device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted.

"User." Any person or entity who:

(1) uses an electronic communication service; and

(2) is duly authorized by the provider of the service to engage in such use.

"Wire communication." Any aural transfer made in whole or in part through the use of facilities for the transmission of communications by wire, cable or other like connection between the point of origin and the point of reception, including the use of such a connection in a switching station, furnished or operated by a telephone, telegraph or radio company for hire as a communication common carrier. The term includes any electronic storage of such communication.

### Expiration

This chapter expires December 31, 2004, unless extended by statute. 8 Pa.C.S.A. § 5781.

Oct. 4, P.L. 831, No. 164, § 2, effective in 60 days. Amended 1981, Oct. 21, P.L. 23, P.L. 593, No. 175, § 1, effective in 60 days; 1988, Oct. 21, P.L. No. 115, § 3, imd. effective; 1998, Feb. 18, P.L. 102, No. 19, § 5, imd. ve.

## Historical and Statutory Notes

The 1998 amendment, in the definition of "Electronic, mechanical or other device", in the introductory language added "but not limited to," and "or a telecommunication identification interception device" and added par. (3); added the definition of "Home"; in the definition of "Intercept" added the second sentence; in the definition of "Investigative or law enforcement officer", in the definition of "Judge", substituted "Subchapter B (relating to wire, electronic or oral communication," for "this chapter"; rewrote the definition of "Pen register"; added the definitions of "State" and "Telecommunication identification interception device"; and in the definition of "Wire communication" added the second sentence.

The definitions of "Investigative or law enforcement officer" and "Pen register" formerly read:

"Investigative or law enforcement officer." Any officer of the Commonwealth of Pennsylvania or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offense.

"Pen register." A device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted, with respect to wire communications, on the telephone line to which the device is attached. The term does not include a device used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communication service provided by the provider, or any device used by a provider, or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of business.

Former § 5702, relating to breach of privacy of telephone or telegraph communications, was derived from Act 1972, Dec., P.L. 1482, No. 334, § 1, as amended by Act 1973, June 27, P.L. 69, No. 29, § 1; Act 1976, April 7, P.L. 69, No. 30, § 1.

See, now, § 5703.

### Law Review and Journal Commentaries

Promoting the progress of science and the useful arts in the digital Copyright, computer bulletin boards.

Telecommunications ⬤=492, WESTLAW Topic No. 372.

and liability for infringement by others. 45 Emory L.J. 1035 (1996).

### Library References

C.J.S. Telegraphs, Telephones, Radio, and Television §§ 122, 287 to 288.

### Notes of Decisions

In general 1
Aggrieved person 2
Interception 3
Investigative or law enforcement officer 4
Oral communications 5
Pen registers 6
Persons 7
Wire communications 8

Wire communications—Cont'd which has capability of monitoring length of time targeted telephone is off the hook on ongoing calls and date and length of time targeted telephone is off the hook on incoming calls are immaterial under Wiretapping and Electronic Surveillance Control Act, as neither technically permits "aural acquisition of the contents of any communication." Com. v. Beauford, 475 A.2d 783, 327 Pa.Super. 253, Super.1984, appeal dismissed 496 A.2d

**18 Pa.C.S.A. § 5702**
Note 8

PUBLIC ORDER AND DECENCY

SUBCHAPTER B.  WIRE, ELECTRONIC OR ORAL COMMUNICATION

Historical and Statutory Notes

Subchapter B heading of Chapter 57 was added by Act 1988, Oct. 21, P.L. 1000, No. 115, § 4, imd. effective.

**§ 5703.  Interception, disclosure or use of wire, electronic or oral communications**

Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:

(1)  intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;

(2)  intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or

(3)  intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

1988, Oct. 4, P.L. 831, No. 164, § 2, effective in 60 days.  Amended 1988, Oct. 21, P.L. 1000, No. 115, § 5, imd. effective.

**Expiration**

*This chapter expires December 31, 2004, unless extended by statute.  See 18 Pa.C.S.A. § 5781.*

**Historical and Statutory Notes**

mer § 5703, which related to admissibility of evidence, was derived from 1972, Dec. 6, P.L. 1482, No. 334, § 1, ended by Act 1974, Dec. 27, P.L. No. 327, §§ 2, 3.

now, § 5721.

:aws:

.974, Dec. 27, P.L. 1007, No. 327, 1.

Act 1972, Dec. 6, P.L. 1482, No. 334, § 1.
1957, July 16, P.L. 956, No. 411, § 1 (15 P.S. § 2443, renumbered 18 P.S. § 3742).
1939, June 24, P.L. 872, § 688 (18 P.S. § 4688).
1901, July 10, P.L. 651, §§ 1, 2.
1860, March 31, P.L. 382, § 72.
1851, April 14, P.L. 612, § 7.

**Cross References**

of offenses, .ee 18 Pa.C.S.A. § 106.

WIRETAPPING

**18 Pa.C.S.A. § 5703**
Note 2

**Law Review and Journal Commentaries**

Electronic surveillance of grand jury witness. (1972) 120 U.Pa.L.Rev. 546.

Promoting the progress of science and the useful arts in the digital domain: Copyright, computer bulletin boards, and liability for infringement by others. 45 Emory L.J. 1035 (1996).

Wiretapping and electronic surveillance.  Donald B. King, (1961) 66 Dick. L.Rev. 17.

Wiretapping—eavesdropping without tapping telephone equipment.  Burton R. Laub (1972) 43 Pa.B.A.Q. 303.

**Library References**

Telecommunications �köm 493.
WESTLAW Topic No. 372.

C.J.S. Telegraphs, Telephones, Radio, and Television §§ 122, 287.

**Notes of Decisions**

In general  2
Admissibility of evidence  12
Civil liability  4
Expectation of privacy  3
Federal law  9
Interception  5
Oral communication  6
Persons liable  4
Presumption and burden of proof  10
Prima facie case  11
Public officials  8
Sufficiency of evidence  13
Validity  1

**1.  Validity**

Pennsylvania's Wiretapping and Electronic Surveillance Control Act is not ipso facto violative of State Constitution; that Constitution, unaided by, and unadorned with, appropriate legislation is, by itself, incapable of preventing wiretapping, and therefore any statute authorizing and regulating wiretapping is not per se repugnant to the Constitution.  U.S. v. Geller, E.D.Pa.1983, 560 F.Supp. 1309, affirmed 745 F.2d 49, certiorari denied 105 S.Ct. 786, 469 U.S. 1109, 83 L.Ed.2d 780.

Provisions of this section and § 5704 of this title permitting law enforcement officers to record conversations in which they are involved but depriving others of same opportunity were severable from remaining portions of the Act, and therefore even if they were constitutionally deficient, such deficiency was not fatal to the entire Act.  U.S. v. Geller, E.D.Pa. 1983, 560 F.Supp. 1309, affirmed 745 F.2d 49, certiorari denied 105 S.Ct. 786, 469 U.S. 1109, 83 L.Ed.2d 780.

Surreptitious recording of prosecu-

constitute interception of "oral communication," in violation of Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. § 5703, and, thus, did not constitute "willful misconduct" under 43 P.S. § 802(e) that justified denial of unemployment compensation benefits, in that record of testimony given at hearing before referee was taken as matter of course for purposes of review by Unemployment Compensation Board of Review and the commission thus, precluded any legitimate expectation of privacy.  Guardsmark v. Com., Unemployment Compensation Bd. of Review, 505 A.2d 1112, 95 Pa.Cmwlth. 479, Cmwlth.1986.

**2.  In general**

Pennsylvania Wiretapping and Electronic Surveillance Control Act prohibited Public Utility Commission (PUC) from directing telephone exchange carrier (LEC) to allow local exchange carrier (LEC) to provide for interexchange carrier services (BCS) to Bureau of Consumer Services (BCS) to monitor carrier's customer service and collection representatives during telephone conversations with customers without requiring authorization from carrier employees, despite contention that, because a public utility was bound to respond to Commission requests for information necessary to performance of Commission's regulatory oversight duties, Commission could exercise carrier's monitoring rights under carrier's exception in Act for service quality control checks.  (Per Friedman, J., with two Judges concurring and one Judge concurring in result.)  United Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Com'n, 676 A.2d 1244, Cmwlth.1996.

## PUBLIC ORDER AND DECENCY

**Note 12**

stabbing occurred and who consented to detective's listening in on conversation phone, any error in admitting into evidence the detective's testimony about the conversation was harmless, where the girlfriend had previously testified as to the substance and surrounding circumstances of the conversation. Com. v. Glover, 286 A.2d 349, 446 Pa. 492, Sup.1972.

Where induction coil device used by victim of threatening phone calls, although not physically attached to receiver, permitted conversations passing through particular telephone to be recorded on a tape recorder and simultaneously to be amplified so that they were directly audible to anyone in room, an "interception" occurred within 18 P.S. § 3742 (repealed; now, this section) and, without consent of both parties, no evidence concerning contents of conversations could be admitted except by testimony of those with whom caller spoke directly. Com. v. McCoy, 275 A.2d 28, 442 Pa. 234, Sup.1971.

In telephone conversation, both parties are alternately "senders" and "receivers", but defendant was sender of that part of conversation between him and corporate employee which indicated an offer of bribery and if there had been an "interception" defendant's consent would have been required; but employee's permission alone sufficed where witness merely listened on extension, there was no violation of 18 P.S. § 3742 (repealed; now, this section), and testimony as to conversation was admissible in evidence. Com. v. Murray, 213 A.2d 162, 206 Pa.Super. 298, Super.1965, reversed 223 .2d 102, 423 Pa. 37.

Where corporate employee consented witness' listening to telephone conversation in which attempt was made to the corporate employee, recording of .the conversation did not constitute "interception", within 18 P.S. § 3742 (repealed).

---

### 5704. Exceptions to prohibition of interception and disclosure of communications

It shall not be unlawful and no prior court approval shall be required under this chapter for:

(1) An operator of a switchboard, or an officer, agent or employee of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire communica-

now, this section), and recording could be used by witness to refresh his memory. Com. v. Murray, 213 A.2d 162, 206 Pa.Super. 298, Super.1965, reversed 223 A.2d 102, 423 Pa. 37.

In prosecution for possession and sale of heroin where evidence of telephone conversations between drug addicts and defendant obtained by wire tapping were relevant and admissible when received in evidence during the trial and defendant was tried and convicted before the date of the enactment of 18 P.S. § 3742 (repealed; now, this section) and its approval by the governor outlawing wire tapping but was not sentenced until after the effective date, the conviction was not invalid. Com. v. Griffin, 149 A.2d 656, 189 Pa.Super. 59, Super.1959, certiorari denied 81 S.Ct. 750, 365 U.S. 838, 5 L.Ed.2d 747.

Where telephone calls were received by police officers during raid, in which caller asked for "Pete", the given name of defendant, and in which bets were placed, and there was no other person present in the room where the telephone was conducted by such a name, there was not a prohibited "interception" of communication by telephone, and in prosecution for bookmaking and pool selling, testimony of the officers as to the calls was admissible. Com. v. Smith, 140 A.2d 347, 186 Pa.Super. 89, Super.1958.

**13. Sufficiency of evidence**

Evidence that defendant willfully placed wiretap on phone at his dry cleaning establishment and then disclosed contents to authorities when he discovered that employee was involved in series of burglaries supported convictions for unlawfully intercepting wire communications and disclosing intercepted information. Com. v. Saccol, 557 A.2d 1095, 384 Pa.Super. 161, Super.1989.

### WIRETAPPING

## 18 Pa.C.S.A. § 5704

tion, to intercept, disclose or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of wire or electronic communication service. However, no provider of wire or electronic communication service shall utilize service observing or random monitoring except for mechanical or service quality control checks.

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:

(i) Deleted.

(ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be made, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom;

(iii) the investigative or law enforcement officer meets in person with a suspected felon and wears a concealed electronic or mechanical device capable of intercepting or recording oral communications. However, no interception under this subparagraph may be used in any criminal prosecution except for a prosecution involving harm done to the investigative or law enforcement officer. This subparagraph shall not be construed to limit the interception and disclosure authority provided for in this subchapter; or

(iv) the requirements of this subparagraph are met. If an oral interception otherwise authorized under this paragraph will take place in the home of a nonconsenting party, then, in addition to the requirements of subparagraph (ii), the

107

be conducted until an order is first obtained from the president judge, or his designee who shall also be a judge, of a court of common pleas, authorizing such in-home interception, based upon an affidavit by an investigative or law enforcement officer that establishes probable cause for the issuance of such an order. No such order or affidavit shall be required where probable cause and exigent circumstances exist. For the purposes of this paragraph, an oral interception shall be deemed to take place in the home of a nonconsenting party only if both the consenting and nonconsenting parties are physically present in the home at the time of the interception.

(3) Police and emergency communications systems to record telephone communications coming into and going out of the communications system of the Pennsylvania Emergency Management Agency or a police department, fire department or county emergency center, if:

(i) the telephones thereof are limited to the exclusive use of the communication system for administrative purposes and provided the communication system employs a periodic warning which indicates to the parties to the conversation that the call is being recorded;

(ii) all recordings made pursuant to this clause, all notes made therefrom, and all transcriptions thereof may be destroyed at any time, unless required with regard to a pending matter; and

(iii) at least one nonrecorded telephone line is made available for public use at the Pennsylvania Emergency Management Agency and at each police department, fire department or county emergency center.

(4) A person, to intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception.

(5) Any investigative or law enforcement officer, or communication common carrier acting at the direction of an investigative or law enforcement officer or in the normal course of its business, to use a pen register, trap and trace device, or telecommunication identification interception device as provided in Subchapter E (relating to pen registers, trap and trace devices and telecommunication identification interception devices).

(5) Personnel of any public utility to record telephone conversation is with utility customers or the general public relating to receiving and dispatching of emergency and service calls provided there is ... recording, a periodic warning which indicates to ... parties the conversation, that the call is being recorded.

(7) A user, or any officer, employee or agent of such user, to record telephone communications between himself and a contractor or designer, or any officer, employee or agent of such contractor or designer, pertaining to excavation or demolition work or other related matters, if the user or its agent indicates to the parties to the conversation that the call will be or is being recorded. As used in this paragraph, the terms "user," "contractor," "demolition work," "designer" and "excavation work" shall have the meanings given to them in the act of December 10, 1974 (P.L. 852, No. 287), referred to as the Underground Utility Line Protection Law,[1] and a one call system shall be considered for the purpose to be an agent of any user which is a member thereof.

(8) A provider of electronic communication service to record the fact that a wire or electronic communication was initiated or completed in order to protect the provider, another provider furnishing service toward the completion of the wire or electronic communication, or a user of that service, from fraudulent, unlawful or abusive use of the service.

(9) A person or entity providing electronic communication service to the public to divulge the contents of any such communication:

(i) as otherwise authorized in this section or section 5717 (relating to investigative disclosure or use of contents of wire, electronic or oral communications or derivative evidence);

(ii) with the lawful consent of the originator or any addressee or intended recipient of the communication;

(iii) to a person employed or authorized, or whose facilities are used, to forward the communication to its destination; or

(iv) which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

(10) Any person:

(i) to intercept or access an electronic communication made through an electronic communication system configured so that ... electronic communication is readily accessible to ... public:

A person or entity providing electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one directed to the person or entity, or an agent thereof) while in transmission of that service to any person or entity other than an addressee or intended recipient of the communication or an agent of the addressee or intended recipient.

ted:

(ii) to intercept any radio communication which is transmitted:

(A) by a station for the use of the general public, or which relates to ships, aircraft, vehicles or persons in distress;

(B) by any governmental, law enforcement, civil defense, private land mobile or public safety communication system, including police and fire systems, readily accessible to the general public;

(C) by a station operating on an authorized frequency within the bands allocated to the amateur, citizens band or general mobile radio services; or

(D) by any marine or aeronautical communication system;

(iii) to engage in any conduct which:

(a) is prohibited by section 633 of the Communications Act of 1934 (48 Stat. 1105, 47 U.S.C. § 553); or

(b) is excepted from the application of section 705(a) of the Communications Act of 1934 (47 U.S.C. § 605(b)) by section 705(b) of that act (47 U.S.C. § 605(a)) by section

(iv) to intercept any wire or electronic communication the transmission of which is causing harmful interference to any lawfully operating station, to the extent necessary to identify the source of the interference.

(11) Other users of the same frequency to intercept any radio communication made through a system which utilizes frequencies monitored by individuals engaged in the provisions or use of the system, if the communication is not scrambled or encrypted.

(12) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire or oral communication involving suspected criminal activities where the officer or the person is a party to the communication and there is reasonable cause to believe that:

(i) the other party to the communication is either:

(A) holding a hostage; or

(B) has barricaded himself and taken a position of confinement to avoid apprehension; and

(ii) that party:

(A) will resist with the use of weapons; or

(B) is threatening suicide or harm to others.

(13) An investigative officer, a law enforcement officer or employees of the Department of Corrections for State correctional facilities ̄ intercept, record, monitor or divulge any telephone

calls from or to an inmate in a facility under the following conditions:

(i) The Department of Corrections shall adhere to the following procedures and restrictions when intercepting, recording, monitoring or divulging any telephone calls from or to an inmate in a State correctional facility as provided for by this paragraph:

(A) Before the implementation of this paragraph, all inmates of the facility shall be notified in writing that, as of the effective date of this paragraph, their telephone conversations may be intercepted, recorded, monitored or divulged.

(B) Unless otherwise provided for in this paragraph, after intercepting or recording a telephone conversation, only the superintendent, warden or a designee of the superintendent or warden or other chief administrative official or his or her designee shall have access to that recording.

(C) The contents of an intercepted and recorded telephone conversation shall be divulged only as is necessary to safeguard the orderly operation of the facility, in response to a court order or in the prosecution or investigation of any crime.

(ii) So as to safeguard the attorney-client privilege, the Department of Corrections shall not intercept, record, monitor or divulge any conversation between an inmate and an attorney.

(iii) Persons who are calling in to a facility to speak to an inmate shall be notified that the call may be recorded or monitored.

(iv) The Department of Corrections shall promulgate guidelines to implement the provisions of this paragraph for State correctional facilities.

(14) An investigative officer, a law enforcement officer or employees of a county correctional facility to intercept, record, monitor or divulge any telephone calls from or to an inmate in a county correctional facility as provided for by this paragraph:

(i) The county correctional facility shall adhere to the following procedures and restrictions when intercepting, recording, monitoring or divulging any telephone calls from or to an inmate in a county correctional facility as provided for by this paragraph:

(A) Before the implementation of this paragraph, all inmates of the facility shall be notified in writing that, as of the effective date of this paragraph, their telephone conversations may be intercepted, recorded, monitored or divulged.

(B) Unless otherwise provided for in this paragraph, af-intercepting or recording a telephone conversation, only the superintendent, warden or a designee of a...

warden or other chief administrative official or his or her designee shall have access to that recording.

(C) The contents of an intercepted and recorded telephone conversation shall be divulged only as is necessary to safeguard the orderly operation of the facility, in response to a court order or in the prosecution or investigation of any crime.

(ii) So as to safeguard the attorney-client privilege, the county correctional facility shall not intercept, record, monitor or divulge any conversation between an inmate and an attorney.

(iii) Persons who are calling into a facility to speak to an inmate shall be notified that the call may be recorded or monitored.

(iv) The superintendent, warden or a designee of the superintendent or warden or other chief administrative official of the county correctional system shall promulgate guidelines to implement the provisions of this paragraph for county correctional facilities.

(15) The personnel of a business engaged in telephone marketing or telephone customer service by means of wire, oral or electronic communication to intercept such marketing or customer service communications where such interception is made for the sole purpose of training, quality control or monitoring by the business, provided that one party involved in the communications has consented to such intercept. Any communications recorded pursuant to this paragraph may only be used by the business for the purpose of training or quality control. Unless otherwise required by Federal or State law, communications recorded pursuant to this paragraph shall be destroyed within one year from the date of recording.

78, Oct. 4, P.L. 831, No. 164, § 2, effective in 60 days. Amended 1981, July 10, P.L. 227, No. 72, § 1, effective in 60 days; 1988, Dec. 23, P.L. 1593, No. 175, § 2, effective in 60 days; 1988, Oct. 21, P.L. 1000, No. 115, § 5, effective in 60 days; 1995, Sept. 26, P.L. 1056, No. 20 (Spec. Sess. No. 1), § 2, effective in 60 days; 1996, Dec. 19, P.L. 1458, No. 186, § 1, effective in 60 days; 1998, Feb. 18, P.L. 102, No. 19, § 6, imd. effective.

73 P.S. § 176 et seq.

### Expiration

*This chapter expires December 31, 2004, unless extended by statute.  See 18 Pa.C.S.A. § 5781.*

### Historical and Statutory Notes

The 1998 amendment, in the introductory language added par. (13).

: 1995 amendment added par. (13).
i); 1996 amend-ment in cl. (2), added approval language added "and no prior court approval shall be required"; in par. (2), added "; including ", but not limited to

198

---

the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications)."... deleted subpar. (i), substituted "this subchapter" for "subparagraph (i)" and added subpar. (iv); in par. (5) substituted "or" for ... and added subpar. ... substituted "... or telecommunication identification device as provided in Subchapter B (relating to pen registers, trap and trace devices and telecommunication identification interception device)" ... "for as provided in this chapter"; in subpar. (9) of par. ... insert "investigative"; and added par. (15).

Subpar. (i) of par. (2) formerly read:

"such officer or person is a party to the communication."

Former § 5704, which related to civil damages, was derived from Act 1972, No. 2, P.L. 1482, No. 334, § 1, as amended by Act 1974, Dec. 27, P.L. 1007, No. 327, §§ 2, 3.

See, now, § 5725.

**Prior Laws:**

Act 1974, Dec. 27, P.L. 1007, No. 327, § 4.

Act 1972, Dec. 6, P.L. 1482, No. 334, § 1.

### Law Review and Journal Commentaries

Promoting the progress of science and the useful arts in the digital domain. Copy-right, computer bulletin boards. 45 Emory L.J. 1035 (1996).

... and liability for infringement by others.

### Library References

Telecommunications ⟜493.
WESTLAW Topic No. 372.
C.J.S. Telegraphs, Telephones, and Television §§ 122, 287.

Evidence beyond the scope of discovery, attorney-client privilege, confidentiality; use of cellular and cordless telephones, see Gibbons, 5 Pennsylvania Practice § 2.8.

### Notes of Decisions

In general 2
Admissibility 15
Approval 3
Consent 4
Constitutional rights 5
Correctional facilities 10
Court order or prior approval 7
Disclosure 14
Interception 12
Memorandum of approval 6
Participation of law enforcement officer 13
Quality control checks by common carrier 9
Search and seizure 11
Suspected criminal activities 8
Validity 1

**Validity 1**

Provisions of this section and § 5703 constitute the permitting law enforcement officers to record conversations in which they are involved but depriving others of opportunity were severable from remaining portions of the Act, and therefore even if they were ...

... the entire Act. U.S. v. Geller, E.D.Pa. 1983, 560 F.Supp. 1309, affirmed 745 F.2d 49, certiorari denied 105 S.Ct. 786, 469 U.S. 1109, 83 L.Ed.2d 780.

Pennsylvania's Wiretapping and Electronic Surveillance Control Act is not ipso facto violative of State Constitution; that Constitution, unaided by and unadorned with appropriate legislation, is by itself, incapable of preventing wiretapping, and therefore any statute authorizing and regulating wiretapping is not per se repugnant to the Constitution. U.S. v. Geller, E.D.Pa.1983, 560 F.Supp. 1309, affirmed 745 F.2d 49, certiorari denied 105 S.Ct. 786, 469 U.S. 1109, 83 L.Ed.2d 780.

This section permitting police to intercept oral communication with one party's consent and assuring attorney did not authorize prosecuting attorney did not authorize such eavesdropping without a warrant, and thus was not unconstitutional. Com. v. Schaeffer, 536 A.2d 354, 370 Pa.Super. 179, Super.1987, appeal granted 545 A.2d 251 ...

## AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF PHILADELPHIA

Before me the undersigned authority, in and for the State of Pennsylvania on this day personally appeared Ann Ponterio, who, after being duly sworn, deposed and said:

My name is Ann Ponterio. I am of sound mind, over 18 years of age, and competent to give this affidavit.

In 1981, I graduated from St. Bonaventure University, Allegany, New York, with a B.A. in Mass Communications and a minor in Business. In 1984, I graduated from New England School of Law, Boston, Massachusetts, with a Doctor of Jurisprudence Degree. In 1994, I graduated from the University of Pennsylvania's Fels School of Government, with Masters in Government Administration. I have been licensed to practice law in the State of Pennsylvania since 1984.

I am an Assistant District Attorney in the Philadelphia District Attorney's Office and currently the Assistant Chief of the Homicide Unit. I have been a prosecutor since 1984 and have been a trial attorney from 1984 to 2003, when I became the Assistant Chief of the Homicide Unit. I worked as a prosecutor in the Municipal Court Unit, Juvenile Court Unit, Rape Unit, and Major Trials Unit prior to being assigned to the Homicide Unit in 1990. I have tried over 100 homicide trials, 25 rape jury trials and 100 major case trials (waiver and jury trials). My duties as Assistant Chief are to manage and supervise 19 attorneys, assist them in their preparation and trials, and give them advice on legal issues. I train all the attorneys I supervise through monthly training sessions that are open to the entire unit and through individual training per Assistant District Attorney, per trial. I also approve search warrants and affidavits of probable cause for arrest warrants for homicide detectives in the Philadelphia Police Department.

I have reviewed the statements given by Travis James Mullis (d.o.b. 9-20-86) to officers of the Philadelphia Police Department on February 1, 2008, which statements are attached hereto and incorporated herein for all purposes as Exhibit "A", Exhibit "B", and Exhibit "C".

It is my legal opinion, based on the information and documents provided me and based on my training and experience, that all of said statements as contained in Exhibit "A" (written statement of Travis James Mullis), Exhibit "B", and Exhibit "C" (audio- video statement of Travis James Mullis) were obtained in compliance with the laws of the State of Pennsylvania and would be admissible in Pennsylvania against Mr. Mullis in a criminal trial.

648

I understand that this affidavit is to be used as evidence in the case of the <u>State of Texas v. James Mullis</u>, No.08CR0333, District Court of Galveston County, Texas, 122nd Judicial District, in which Mr. Mullis is charged with Capital Murder.

I have read the above statement, which is based on documents and information provided to me and my personal experience, and it is true and correct.

Ann Ponterio
Assistant Chief, Homicide Unit
Philadelphia District Attorney's Office

Sworn and subscribed before me
this 20th day of July 2009.

NOTARY PUBLIC
STATE OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
COLLEEN E. BAUER, Notary Public
City of Philadelphia, Phila. County
My Commission Expires December 20, 2010

649

CLERK DISTRICT COURT
FILED
1:14PM

**JAN 1 9 2011**

Cause No. 08CR0333

THE STATE OF TEXAS    §    IN THE DISTRICT COURT, TEXAS GALVESTON COUNTY, TEXAS

VS.    §    GALVESTON COUNTY, TEXAS

     BY_____ DEPUTY

TRAVIS MULLIS    §    122TH JUDICIAL DISTRICT

## STATE'S REQUEST FOR PRELIMINARY RULING ON ADMISSIBILITY

TO THE HONORABLE JUDGE OF SAID COURT:

Comes NOW, THE STATE OF TEXAS, by and through her Criminal District Attorney Jack Roady, and files this Memorandum in Response to Defendant's Motion to For Preliminary Ruling on Admissibility under **The Texas Rules of Evidence, Rule 104** and would show this Honorable Court:

### I.

### SUMMARY OF FACTS

Travis Mullis stands charged with the Capital Murder of his infant son, Alijah Mullis. The Defendant is alleged to have intentionally and knowingly caused the death of Alijah, a child under the age of six on the 29th of January 2008 in Galveston County, Texas.

After a deceased infant was 'found by civilians at approximately 9:00 a.m. at Seawall Boulevard east of Condo Road,

650

Galveston Police officers were dispatched to the scene. They later interviewed Caren Kohberger at her residence at 1100 Fox Meadow #212, Alvin, Brazoria County, Texas. She positively identified a photograph of the deceased infant as her son, Alijah Mullis. She stated that the defendant had left with their infant son at 4:30 a.m. on that same day and had not returned. By 1/31/08 12.10 a.m. CST, the Galveston County District Attorney caused an alert to be entered into TCIC/NCIC for a special investigative hold to be placed on the defendant for a possible homicide of an infant and also placed a hold on a vehicle that may be associated with the crime namely, a 2002 Hyundai with Texas license plates 067RJP.

Galveston Police Sergeant A. Almandarez informed Alvin Police Detective Patrick Moore that there had been an "out- cry" of an attempted sexual assault of a child by the defendant alleged to have occurred 1-29-08. The child, Cecilia Duarte, resided at the same Fox Meadow address along with her mother, her mother's boyfriend, her brothers, Caren Kohberger, the Defendant, and baby Alijah.

At 3:55 p.m. EST, the Defendant was given his Constitutional Miranda warnings in compliance with Pennsylvania law by Detective Hesser and Rodden.  He affirmatively waived all of his rights and agreed to give a written and audio recorded statement.  Then at 5:04 and 5:07 p.m. EST the Defendant signed his written Texas statutory written warnings and Pennsylvania warnings and affirmatively waived those.  The Defendant confessed that he had attempted to sexually assault Cecelia Duarte early that morning. He became afraid that she would tell her mother, Michele, and the Defendant would get in trouble.  He tried to leave the house that day and Caren Kohberger urged that he take Alijah with him.  He shortly thereafter committed the Capital Murder of Alijah and then fled to Maryland and eventually Pennsylvania.  In his confession he discusses his actions with Cecelia and asks for forgiveness.

### III.

### SUMMARY OF APPLICABLE LAW

"Same transaction contextual evidence" is evidence reflecting the context in which a criminal act occurred, recognizing that events do not occur in a vacuum, and a jury has a right to hear what occurred immediately before and after the

offense in order to realistically evaluate the evidence. **Rules of Evidence, Rule 404 (b)**. To be admissible under rule prohibiting evidence of other crimes, wrongs, or acts to prove character of a defendant to show action in conformity therewith, same transaction contextual evidence must be necessary to the jury's understanding of the offense. Necessity required for same transaction contextual evidence to be admissible under rule prohibiting evidence of other crimes, wrongs, or acts to prove character of a defendant to show action in conformity therewith can exist either because (1) several offenses are so intermixed or connected as to form a single, indivisible criminal transaction, such that in narrating the one, it is impracticable to avoid describing the other, or (2) the same transaction contextual evidence tends to establish some evidentiary fact, such as motive or intent. **Rules of Evidence, Rule 404 (b)**. **McDonald v. State**, 148 S.W.3d 598 **(Tex.App.-Houston [14 Dist.],2004)**.

WHEREFORE,PREMISES CONSIDERED, the State prays that Defendant's Motion to Suppress evidence be denied.

Respectfully submitted,

JACK ROADY

Criminal District Attorney

**653**

*Donna W. Cameron*

Donna W. Cameron, First Assistant

Criminal District Attorney

600 59TH Street, Suite 1001

Galveston, Texas 77551

(409) 766-2360

FAX:  (409) 765-2914

SBOT # 03675050


Certificate of Service


I hereby certify that a true and correct copy of the foregoing has been served on Robert K. Loper, attorney for Robert Stevens, by hand delivery on this the 19th day of January, 2011.

*D W C*

Donna W. Cameron

654