1

1       REPORTER'S RECORD
        VOLUME 23 OF 59 VOLUMES
2       TRIAL COURT CAUSE NO. 08CR0333
    COURT OF CRIMINAL APPEALS CAUSE NO. AP-78,525

3

4

5

6    TRAVIS JAMES MULLIS,        )   IN THE DISTRICT COURT OF
                                 )
7           Appellant,           )
                                 )
8    VS.                         )   GALVESTON COUNTY, TEXAS
                                 )
9    THE STATE OF TEXAS,         )
                                 )
10          Appellee.            )   122ND JUDICIAL DISTRICT

11

12                                          FILED IN
                                   COURT OF CRIMINAL APPEALS
13

14       GUILT/INNOCENCE PROCEEDINGS         OCT 27 2011

15

16                                      Louise Pearson, Clerk

17

18   On the 7th day of March, 2011, the following proceedings
     came on to be heard in the above-entitled and numbered
19   cause before the Honorable John Ellisor, Judge
     presiding, held in Galveston, Galveston County, Texas:

20   Proceedings reported by machine shorthand.

21

22

23

24

25

# ORIGINAL

- October 12, 2011

2

```
 1                    A P P E A R A N C E S

 2      FOR THE STATE OF TEXAS

 3           Mr. B. Lyn McClellan
             Special Prosecutor
 4           SBOT NO:  13396100
             Ms. Donna W. Cameron
 5           First Assistant District Attorney
             SBOT NO:  03675050
 6           Ms. Kayla M. Allen
             Assistant District Attorney
 7           SBOT NO:  24043530
             Galveston County District Attorney's Office
 8           Galveston County Justice Center
             600 59th Street
 9           Galveston, Texas  77551
             Phone:  409.766.2355
10           Fax:    409.766.2290

11

12      FOR THE DEFENDANT

13           Mr. Robert K. Loper,
             SBOT NO:  12562300
14           LOPER LAW
             111 W. 15th Street
15           Houston, Texas  77008
             Phone:  713.880.9000
16           Fax:    713.869.9912

17             - AND -

18           Mr. Gerald E. Bourque
             SBOT NO:  02716500
19           ATTORNEY AT LAW
             24 Waterway Ave. Suite 600
20           The Woodlands, Texas  77380
             Phone:  713.862.7766
21           Fax:    713.813.0321

22

23

24

25
```

- October 12, 2011

3

VOLUME 23
CHRONOLOGICAL INDEX

MARCH 7, 2011                                    Page

Arraignment                                      7

Opening Statement by Ms. Cameron                 16

Opening Statement by Mr. Loper                   31

| STATE'S WITNESSES | Direct | Cross |
| JESSE ZARO | 44 | 57 |

| | Direct | Cross |
| RICHARD KERSHAW | 66, 121 | 93 |

| | Direct | Cross |
| JEREMY SCHWARTZ | 124, 232 | 168, 248 |

Adjournment for the Day                          259

C.S.R.                                           260


ALPHABETICAL INDEX

| | Direct | Cross | Vol. |
| RICHARD KERSHAW | 66, 121 | 93 | 23 |

| | Direct | Cross | |
| JEREMY SCHWARTZ | 124, 232 | 168, 248 | 23 |

| | Direct | Cross | |
| JESSE ZARO | 44 | 57 | 23 |


EXHIBIT INDEX

| STATE'S NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
| 55, | Photo | 54 | 54 | 23 |
| 56, | CD of 9-1-1 Call | 54 | 54 | 23 |
| 57, | Scene Video | 78 | 79 | 23 |
| 58, | Photo | 78 | 79 | 23 |
| 59, | Photo | 78 | 79 | 23 |

FIRM NAME

- October 12, 2011

4

EXHIBIT INDEX (Continued)

| STATE'S NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 60, | Photo | 78 | 79 | 23 |
| 61, | Photo | 78 | 79 | 23 |
| 62, | Photo | 78 | 79 | 23 |
| 63, | Photo | 78 | 79 | 23 |
| 64, | Photo | 78 | 79 | 23 |
| 65, | Photo | 78 | 79 | 23 |
| 66, | Photo | 78 | 79 | 23 |
| 67, | Photo | 78 | 79 | 23 |
| 68, | Photo | 78 | 79 | 23 |
| 69, | Photo | 78 | 79 | 23 |
| 70, | Photo | 78 | 79 | 23 |
| 71, | Photo | 78 | 79 | 23 |
| 72, | Photo | 78 | 79 | 23 |
| 73, | Photo | 78 | 79 | 23 |
| 74, | Photo | 78 | 79 | 23 |
| 75, | Business Records From Galveston Area Ambulance Authority | 121 | 122 | 23 |
| 76, | Google Map | 146 | 146 | 23 |
| 77, | Consent to Search | 146 | 146 | 23 |
| 78, | Photo | 146 | 146 | 23 |
| 79, | Photo | 146 | 146 | 23 |
| 80, | Photo | 146 | 146 | 23 |
| 81, | Photo | 146 | 146 | 23 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FIRM NAME

- October 12, 2011

5

EXHIBIT INDEX (Continued)

| STATE'S NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 82, | Photo | 146 | 146 | 23 |
| 83, | Photo | 146 | 146 | 23 |
| 84, | Photo | 146 | 146 | 23 |
| 85, | Photo | 146 | 146 | 23 |
| 86, | Photo | 146 | 146 | 23 |
| 87, | Photo | 146 | 146 | 23 |
| 88, | Photo | 146 | 146 | 23 |
| 89, | Photo | 146 | 146 | 23 |
| 90, | Photo | 146 | 146 | 23 |
| 91, | Photo | 146 | 146 | 23 |
| 92, | Photo | 146 | 146 | 23 |
| 93, | Photo | 146 | 146 | 23 |
| 94, | Photo | 146 | 146 | 23 |
| 95, | Photo | 146 | 146 | 23 |
| 96, | Photo | 146 | 146 | 23 |

6

1  MARCH 7, 2011

2       (Open court, Defendant present, no jury)

3       THE COURT:  Thank you.  Please be seated.

4  Good morning.  Welcome to the 122nd

5  District Court.  It is March the 7th, 2011.  We're here

6  on Cause No. 08CR0333, The State of Texas versus Travis

7  James Mullis.

8       Is the State ready to proceed?

9       MS. CAMERON:  We are, Your Honor.

10      THE COURT:  Is the Defense ready to

11  proceed?

12      MR. LOPER:  The Defense is ready, Your

13  Honor.

14      THE COURT:  Procedurally what I think

15  we'll do is go ahead and take Mr. Mullis' plea to the

16  indictment.  We will then call in the jury who, by the

17  way, are all here now.  We'll have them sworn in.  I'll

18  read instructions to them and then we'll arraign him

19  before the jury.

20      Does the State have any estimate of how

21  long they want to take for their opening statement?

22      MS. CAMERON:  I would say, Your Honor,

23  approximately 15 minutes.

24      THE COURT:  And is the Defense going to

25  want to make an opening statement at this time or do

7

1  they want to reserve?

2       MR. LOPER:  We're probably going to follow

3  the State immediately.

4       THE COURT:  So, 15 minutes or less, you

5  think?

6       MR. LOPER:  It would be less than that,

7  Judge.

8       THE COURT:  Okay.  Anything else we need

9  to talk about before we get started here, Counsel?

10      MS. CAMERON:  We do have on the record

11  that we are abandoning the second paragraph of the

12  re-indictment.

13      MR. LOPER:  So, that won't be read

14  obviously before the jury?

15      THE COURT:  Correct.

16      MS. CAMERON:  Yes, Your Honor.

17      THE COURT:  Okay.  At this time then if

18  someone from the State will come forward and read the

19  indictment, we'll take Mr. Mullis' plea.

20      MS. CAMERON:  Thank you, Your Honor.

21      "In the name and by authority of the State

22  of Texas:  The Grand Jurors for the County of Galveston,

23  State aforesaid, duly organized as such at the July

24  Term, A.D., 2009, of the District Court of said county,

25  122nd Judicial District of Texas, upon their oaths in

8

1  said Court present that Travis James Mullis, on or about

2  the 29th day of January, A.D., 2008, and anterior to the

3  presentment of this indictment in the County of

4  Galveston and the State of Texas, did then and there

5  intentionally or knowingly cause the death of an

6  individual, namely, Alijah Mullis, by stomping or

7  kicking the said Alijah Mullis with the leg or the foot

8  of the said Travis James Mullis, and the said Alijah

9  Mullis was then and there an individual younger than six

10  years of age.

11      "Against the peace and dignity of the

12  State."

13      And signed by the Foreperson of the Grand

14  Jury.

15      THE COURT:  To the charge against you

16  alleged in this indictment, what is your plea?

17      THE DEFENDANT:  Not guilty of capital

18  murder.

19      THE COURT:  Thank you.  You may be seated.

20      All right.  If everybody is ready, we'll

21  ask Mr. Kelly to bring out the jury.

22      MS. CAMERON:  May I approach, Your Honor?

23      THE COURT:  Yes.

24      MS. CAMERON:  This is the arraignment,

25  felony form.

9

1       THE COURT:  Thank you very much.

2       Does either side want to invoke the Rule

3  before opening statement?

4       MR. LOPER:  We would, Your Honor.

5       (Open court, Defendant and jury present)

6       THE COURT:  Good morning, ladies and

7  gentlemen.  Please be seated.

8       Now that we've got you all seated, I'm

9  going to have to ask you to stand and raise your right

10  hand.  Brandi Maples with the District Clerk's Office

11  will administer your oath as jurors.

12      (Jury sworn)

13      THE COURT:  Please be seated.  All right.

14  For the record, it's March the 7th, 2011, at about

15  9:20 a.m.  The jury is present as well as the parties.

16      At this time, ladies and gentlemen, I'm

17  going to read to you the instructions to a criminal

18  jury.  You may have copies of those if you like to read

19  along.  You should have a copy to refer to throughout

20  the trial.

21      Do not mingle with nor talk to the

22  lawyers, the witnesses, the parties or any other person

23  who might be connected with or interested in this case

24  except for casual greetings.  They have to follow these

25  same instructions and you will understand it when they

- October 12, 2011

10

1  do.

2      Do not accept from nor give to any of

3  those persons any favors, however slight, such as rides,

4  food or refreshments.

5      Do not discuss anything about this case or

6  even mention it to anyone whomsoever, including your

7  wife or husband, nor permit anyone to mention it in your

8  hearing until you are discharged as jurors or excused

9  from this case. If anyone attempts to discuss the case,

10  report it to me at once. Do not even discuss this case

11  among yourselves until you have heard all the evidence,

12  the Court's charge, the attorneys' arguments and until I

13  have sent you to the jury room to consider your verdict.

14      Do not make any investigation about the

15  facts of this case. Occasionally we have a juror who

16  privately seeks out information about a case on trial.

17  This is improper. All evidence must be presented in

18  open court so that each side may question the witnesses

19  and make proper objection. This avoids a trial based

20  upon secret evidence.

21      These rules apply to the jurors the same

22  as they apply to the parties and to me. If you know of

23  or learn anything about this case except from the

24  evidence admitted during the course of this trial, you

25  should tell me about it at once.

11

1      You have just taken an oath that you will

2  render a verdict on the evidence submitted to you under

3  my rulings. Do not make personal inspections,

4  observations, investigations or experiments, nor

5  personally view premises, things or articles not

6  produced in Court. Do not let anyone else do any of

7  these things for you.

8      Do not tell other jurors your own personal

9  experiences or those of other persons nor relate any

10  special information. A juror may have special knowledge

11  of matters such as business, technical or professional

12  matters. Or he or she may have expert knowledge or

13  opinions or he or she may know what happened in this or

14  some other lawsuit. To tell the jurors any of this

15  information is a violation of these instructions.

16      All right. Let's flip over to the --

17  what's called the addendum to the criminal jury

18  instructions and I'll read those to you at this time.

19      Do not post or read about the case or

20  subject matter of the case or persons in the case on

21  blogs, internet news sites or social media including but

22  not limited to Wikipedia, MySpace, Twitter or Facebook.

23  You can post that you were on jury duty and how long you

24  expect to be on jury duty. That is all you're allowed

25  to write or text about in relation to your jury service.

12

1      You cannot post anything about whether a

2  verdict has or will be reached or when a verdict has or

3  will be reached or announced in Court. Do not read or

4  send text messages in the courtroom. Do not have cell

5  phones, BlackBerries or any other device you may use to

6  communicate with others on while you are in the

7  courtroom.

8      While you're deliberating, your cell

9  phones, BlackBerries and any other device used to

10  communicate with others will be removed from the jury

11  room.

12      Do not seek information contained in law

13  books, dictionaries, public or private records, the

14  internet, television, newspapers, blogs, social media or

15  elsewhere which is not admitted into evidence. Do not

16  research anything about this case, the parties, the

17  attorneys or any subject matter connected with the case.

18      All right. The Texas law permits proof of

19  any violation of the rules of proper jury conduct. By

20  this I mean that jurors and others may be called upon to

21  testify in open court about acts of jury misconduct. I

22  instruct you, therefore, to follow carefully all

23  instructions which I have given you, as well as others

24  which you will later receive while this case is on

25  trial.

13

1      You may keep these instructions and review

2  them as the case proceeds. A violation of these

3  instructions should be reported to me.

4      Ladies and gentlemen of the jury, any

5  questions about the instructions I just read?

6      (No response)

7      THE COURT: I will ask then for the record

8  with the jury present, is the State ready?

9      MS. CAMERON: State's ready, Your Honor.

10      THE COURT: Is the Defense ready?

11      MR. LOPER: Defense is ready, Your Honor.

12      THE COURT: Ladies and gentlemen, we're

13  going to do a thing now that's called an arraignment.

14  Basically that means I'm going to ask the attorney for

15  the State to come forward and read the indictment. And

16  at that time I'll call for the Defendant's plea.

17  Ms. Cameron?

18      THE COURT: Thank you, Your Honor.

19      "In the name and by authority of the State

20  of Texas: The Grand Jurors for the County of Galveston,

21  State aforesaid, duly organized as such at the July

22  Term, A.D., 2009, of the District Court of said county,

23  the 122nd District Court of Texas, upon their oaths in

24  said Court present that Travis James Mullis, on or about

25  the 29th day of January, A.D., 2008, and anterior to the

FIRM NAME

- October 12, 2011

14

1   presentment of this indictment in the County of

2   Galveston and the State of Texas did then and there

3   intentionally and knowingly cause the death of an

4   individual, namely, Alijah Mullis, by stomping or

5   kicking the said Alijah Mullis with the leg or foot of

6   the said Travis James Mullis, and the said Alijah Mullis

7   was then and there an individual younger than six years

8   of age.

9         "Against the peace and dignity of the

10  State."

11        And signed by the Foreperson of the Grand

12  Jury.

13        THE COURT:  Thank you, Ms. Cameron.

14  Mr. Mullis, to the offense alleged against

15  you in this indictment, i.e., capital murder, what is

16  your plea?

17        THE DEFENDANT:  Not guilty of capital

18  murder.

19        THE COURT:  Thank you.  You may be seated.

20  All right.  Ladies and gentlemen, I'm

21  going to read one more set of instructions about how the

22  case will go forward.  And at that time, we will get

23  started.

24        This trial will proceed as follows:  The

25  prosecutor may make an opening statement if they choose.

15

1   The Defense may do so as well or may reserve to a later

2   time.  The prosecutor then will offer evidence through

3   witnesses.  The Defense may cross-examine each witness

4   presented.

5         When the prosecutor has finished

6   presenting the State's case, the Defense may or may not

7   present evidence.  As a reminder, the Defendant is never

8   required to prove his innocence.  The prosecutor may

9   cross-examine each Defense witness, if any.

10        When the Defense is finished presenting

11  its witnesses, the prosecutor may put on rebuttal

12  witnesses and the Defense may then do the same.

13        At the conclusion of the presentation of

14  all the evidence, I will prepare and read to you the

15  Court's charge and each side will present closing

16  arguments.  At that time you will then be permitted to

17  retire and deliberate.

18        All right.  Are there witnesses present

19  who may be testifying in this case?

20        MS. CAMERON:  I don't believe there are,

21  Your Honor.

22        THE COURT:  Okay.  At this time then I'll

23  recognize the State of Texas for an opening statement.

24        MS. CAMERON:  Thank you, Your Honor.

25

16

1         OPENING STATEMENT OF THE STATE

2   BY MS. CAMERON:

3         May it please the Court, opposing counsel,

4   co-counsel.  Ladies and gentlemen of the jury, this is

5   our opportunity to give you an overview of what we

6   anticipate the evidence will show.

7         The story starts on January 29th, 2008.

8   You will hear from a Mr. Jesse Zaro.  Jesse Zaro and his

9   wife, Emmy (phn), on January 29th, they had a day off.

10  They took their children to school, dropped them off and

11  they decided they would do what they had often enjoyed

12  doing, which was going down to the far east end of

13  Galveston Island to a place called Cherry Hill.

14        You will hear from Mr. Zaro that he loved

15  to look and watch for the wildlife, especially the

16  coyotes, the packs of coyotes that they would see down

17  there.  So, he and his wife sometime around 9:00 o'clock

18  in the morning on January 29th, they're driving along in

19  this kind of desolate area.  There's not much traffic at

20  this time, but it's daylight.  They decide to drive up

21  on the concrete embankment to get away from any other

22  cars that might be traveling that way.

23        As they're driving along and trying to

24  enjoy their day off, you will hear Mr. Zaro say, "Stop.

25  I think I see -- I see something, a baby doll."

17

1         He thinks in this area, and you'll hear

2   that Cherry Hill, it's fairly desolate.  You go all the

3   way to the end of the seawall.  And at the right, there

4   are condominiums on the beach, the Gulf side.  And to

5   the left is an open field that goes towards the

6   harborside.  So, he decides because he sees something

7   and he knows that there's often discarded trash and

8   things that are left behind, he decides to stop his car.

9         He gets out of his vehicle with his wife

10  there and he says, "Oh, my God.  It's a baby.  I think

11  it's a baby.  I can't believe it.  The baby's dead."

12  The baby looked dead.  He was horrified.

13        You will hear the 9-1-1 tape that he

14  called and talks to EMS and then the Galveston Police

15  Department.  And you'll hear this grown man crying, so

16  upset.  "I can't believe it.  Who would do this to a

17  baby?"  And so, his wife, you know, makes certain he

18  doesn't touch the baby, he doesn't do anything.

19        You will hear that 9-1-1 call.  And it's

20  chilling.  It's traumatizing.  You will hear that this

21  grown man was left crying there at the scene as he's

22  physically observing who we come to know as little

23  Alijah Mullis.

24        You will hear from an Officer Kershaw with

25  the Galveston Police Department who is one of the first

FIRM NAME

- October 12, 2011

---

**18**

1  officers that makes the scene. And at the time that he
2  gets there, EMS and the Galveston -- the fire
3  department's already been there. The baby is covered
4  with a sheet. But he looks around and he notices that
5  some 20 to 25 feet from the infant is what appears to be
6  a car seat.
7       So, he looks around and he -- you know, he
8  knows that this location is desolate. He knows that
9  this location is known to have coyotes. But he waits
10  before he does anything with the baby until the crime
11  scene officer, Scott Pena, comes.
12       When Scott Pena comes, they wanted to make
13  certain because the media were coming, people were
14  hearing about an infant being found. So, they lift the
15  sheet in order for them to view the infant that's there.
16  And Officer Kershaw will tell you that when he looked at
17  the infant, he looked like he was about three to six
18  months old. That when he looked at him that he could
19  tell that part of his head was caved in. That he saw on
20  the back of the infant what looked like an imprint or a
21  distinct marking that looked like a rectangular shape.
22  And with the assistance of putting on gloves and helping
23  Scott Pena, what they do is they decide to turn the baby
24  over. The baby's clad only in a diaper. The head with
25  trauma, with the imprint, and at that time he discovered

---

**19**

1  that it was an infant boy. Nothing to tell them who
2  this child was or who left that child there along with
3  the trash that was around this area.
4       So, at this point the next person on the
5  scene is Detective Sergeant Jeremy Schwartz, now a
6  special agent with the FBI. When the call came in, he
7  decided to go to the scene. He, along with another
8  sergeant, an Annie Almendarez, also with the Galveston
9  Police Department assigned to the Juvenile Division,
10  arrive at the scene to look at the child and to cordon
11  off the crime scene to make certain that nothing and
12  nobody interfered with them collecting any kind of
13  evidence that would tell them who committed this
14  horrendous crime and to perhaps identify who that infant
15  was.
16       So, decisions were made to make certain
17  that they got statements from anybody who would have any
18  personal knowledge. The Zaros were taken to the
19  Galveston Police Department for statements. And when he
20  looked at the infant, he saw abrasions on the child's
21  face.
22       The baby, it looked like he had been
23  flung, thrown approximately 20 to 25 feet from the
24  curbside of the concrete of this embankment. And then
25  some 20 to 25 feet past that, there was an infant car

---

**20**

1  seat. And he'll tell you that after he examined the
2  baby and what looked like a crushed skull or a caved-in
3  skull that he also examined what was around the baby;
4  one blue sock. Then he went to the car seat. He noted
5  that the car seat was Evenflo, that it had a distinct
6  pattern on it. And his partner, or Annie Almendarez,
7  noted that the baby was in a Blue's Clues diaper from a
8  popular TV show for children that was on the diaper
9  itself.
10       At this point the child was soon taken to
11  the Medical Examiner's Office in order for them to do
12  the autopsy. Jeremy Schwartz will tell you he stayed at
13  the scene for some two hours trying to process
14  everything and trying to assist with the investigation.
15  At this point he knew that they had an infant that had
16  basically been discarded with no identifying marks, no
17  way to tell who this child was. So, a decision was made
18  that they would try to get some digital photographs that
19  they would try to somehow get the word out through the
20  media who this child was and what the child looked like.
21  But in order to do that, they would have to create a
22  digital image of the child so that the child's face
23  could be shown to the public not as it was, but as it
24  should be using the digital camera.
25       You will next hear that Jeremy Schwartz

---

**21**

1  went about his investigation. And next significant
2  thing that occurs is he receives a call from a John
3  Florence who is an investigator with the Medical
4  Examiner's Office. At that time Jeremy Schwartz
5  believes that they've identified a possible mother and a
6  possible name that would go to the child. So, they then
7  go to that location. It's a trailer park in Alvin,
8  Texas. He goes with the intent to try to figure out is
9  this the same child that he observed, that he looked at.
10       When he and Annie Almendarez get to that
11  trailer, a trailer that was owned by a Michele Duarte,
12  who you will hear from, also, one of the first things
13  that strikes him as he walks into the trailer is he sees
14  that same Evenflo pattern, that same distinctive
15  stroller, the pattern, the same -- the same one that he
16  had seen out at the scene with that car seat. And so,
17  he's putting two and two together.
18       The next thing he sees is he gets
19  permission and he gets consent from both Caren Kohberger
20  who believes she's the mother of the infant and also
21  Michele Duarte. They go through this small trailer.
22       You'll hear from Michele Duarte that she
23  had taken the Defendant in periods of time. And that at
24  the time of Alijah Mullis' death, that living in the
25  home was Ms. Duarte; her boyfriend, Mr. Nichols;

---

- October 12, 2011

22

1   Ms. Duarte's four children, two boys, two girls; the
2   Defendant, Travis Mullis; Caren Kohberger, the mother of
3   Alijah Mullis.
4           At that time they don't show her any
5   pictures. But what they do is they see from her one of
6   the many pictures that she had of her infant son that
7   was three months old at the time of his death. And
8   Jeremy Schwartz will tell you that when he looked at
9   that digital image of her son, Alijah Mullis, that in
10  his mind he knew that that was the infant that had been
11  left at Cherry Hill at the far end of Galveston Island.
12          So, a decision was made to have them come
13  and give statements. They both cooperated. They both
14  gave videotaped statements. They were interviewed and
15  then a photograph was eventually shown, the digital
16  reimaging of Alijah Mullis was shown to Caren Kohberger
17  and she positively identified him.
18          After they gave their statements, there
19  was an interview. You'll also hear from Michele Duarte.
20  Michele Duarte will say that she met the Defendant
21  online maybe in 2005. She knew him online for a couple
22  of years. He was living up in Maryland. And at some
23  point Michele Duarte agreed to let Travis Mullis come
24  down and live with her and her family. He came from
25  Maryland sometime around 2006 and lived on and off with

23

1   her and her family.
2           She'll tell you that at the time of
3   Alijah's birth and around the time of Alijah's death
4   that the Defendant would get very frustrated anytime the
5   baby would cry. It's difficult for him to deal with it.
6   She'll tell you that he was unemployed and that he had
7   somewhat of a volatile, unstable relationship with the
8   baby's mother, Caren Kohberger.
9           You'll additionally hear from Jeremy
10  Schwartz as he's working the investigation that when he
11  gets the information about Alijah Mullis, when he gets
12  the name Travis James Mullis, he also finds out that
13  Caren Kohberger had a 2002 Hyundai and that that would
14  be the vehicle that the Defendant left in.
15          So, having this information, it was then
16  entered into a national computer so that if any police
17  officer, if any agency was able to stop that car, was
18  able to locate Travis Mullis, there would be an
19  investigative hold so questions could be asked and he
20  could be interviewed.
21          The next thing that you'll hear about is
22  as they're working the case and they're trying to
23  determine where is Travis Mullis, you'll hear from
24  Detective Schwartz that he received a call from a
25  Detective Hesser. Detective Hesser has been with the

24

1   Philadelphia Police Department in the Homicide Division
2   for years. And based on receiving that information,
3   Sergeant Schwartz told Detective Hesser -- this is about
4   February 1st, two days later -- he said, "If he's
5   willing to talk, talk to him. Give him his Texas
6   Miranda warnings. Give him all of his Constitutional
7   warnings and see if he will talk to you."
8           Sometime later, a few hours later at about
9   8:45 that evening, Detective Hesser then faxes to
10  Sergeant -- to Detective Schwartz a written statement
11  made by the Defendant waiving his rights and stating in
12  that written statement that he intentionally, that he
13  was upset with the baby, that the baby was crying and
14  that he took the baby and stomped on his head three or
15  four times until he could tell that his skull had
16  collapsed.
17          When that information was transferred to
18  the local detectives that were working it, they then put
19  together an affidavit for an arrest warrant, an arrest
20  warrant charging the Defendant with capital murder for
21  the intentional and knowing killing of Alijah Mullis, a
22  child under the age of six years, then only three months
23  old.
24          Detective Schwartz then went to a District
25  Court Judge, presented the affidavit for the arrest

25

1   warrant and the Judge signed it and put a bond on it so
2   there was now in the system an arrest warrant for the
3   Defendant for capital murder. That was again entered
4   into the national system so that it would be pulled up
5   and used by the people and the detectives in
6   Philadelphia, Pennsylvania.
7           You'll also hear from Carolyn Entriken.
8   Carolyn Entriken is the maternal grandmother of Baby
9   Alijah. She will tell you that her daughter, Caren
10  Kohberger, had lived -- was born and raised up in New
11  Jersey. Lived most of her life up there. Sometime
12  around 2006 when she was about 25 years old or 26 years
13  old, she was living and working in Connecticut. She'll
14  tell you that her daughter was emotionally immature,
15  that she hadn't had many boyfriends, that she had low
16  self-esteem, that she and her ex-husband had tried to
17  provide some financial and emotional support for their
18  daughter. But in 2006, Caren Kohberger wanted to come
19  to Texas. Ms. Entriken doesn't know all the details of
20  why she was coming or who she was coming to meet. And
21  then sometime in May of 2007, Carolyn Entriken receives
22  an e-mail and realizes that Caren Kohberger is pregnant,
23  pregnant with Alijah.
24          She provided an apartment for them. She
25  purchased that 2002 Hyundai. She did what she could to

**26**

1  try to get her daughter stabilized in this new family
2  situation. You'll also hear that this was her first
3  grandchild. So, when the baby was one month old, she
4  came down here. She came down to Houston with her then
5  husband. And she'll tell you that, "When I came here,
6  Alijah was my baby. I picked him up. I held him. I
7  diapered him. I fed him." And that he was a good baby.
8  He wasn't a fussy baby. That you could console him.
9  That he wasn't difficult.
10        She'll tell you then is the first time she
11  met the Defendant, Travis Mullis. There weren't any red
12  flags going up other than she knew that Travis Mullis
13  was a young man, that he appeared to be in his early
14  20s, that he talked a lot about himself, but he didn't
15  seem to have a job. But she didn't observe anything
16  that caused her concern. The next thing in her plan is
17  I'm going to come back in three months and see my
18  grandbaby again. But what she'll tell you is that
19  within two months, she finds out that her grandbaby had
20  been murdered.
21        At that time, she comes down to plan a
22  memorial, to be here to do what she can for her
23  daughter. And she ends up taking her daughter back to
24  New York where she's briefly hospitalized for issues of
25  depression. She'll also tell you that her daughter

**27**

1  became the focus of an investigation with the Alvin
2  Police Department in Brazoria County and was charged
3  with child endangerment and is still under indictment
4  and has an attorney for that.
5        So when you go back to, you know, what the
6  officers are learning here, you'll learn that Dr. Nobby
7  Mambo, the Medical Examiner, did the autopsy on this
8  little three-month-old child. And what he'll tell you
9  is that that child died from blunt force trauma, that
10  just like an egg shell, the skull shattered. That he'll
11  use a medical term, emacerated, which means his brain
12  was destroyed, that the child maybe died instantly
13  because of the devastating nature of these injuries.
14        You'll hear that once they got the signed
15  warrant, Detective Schwartz, from the Judge here, they
16  made plans to immediately go up to Philadelphia,
17  Pennsylvania. And when they got there, you know, they
18  divided up responsibilities. Scott Pena, who is the
19  crime scene investigator, he along with another
20  detective up there, McNamee, they got a search warrant
21  for the vehicle, the 2002 Hyundai. They processed it.
22  They received the evidence from the detective, anything
23  that was relevant.
24        Sergeant Schwartz will tell you that he
25  and Annie Almendarez went to Maryland where the

**28**

1  Defendant was raised to see whether or not on his trip
2  as he left the infant, as he traveled up to Maryland and
3  eventually ended in Philadelphia, whether or not he had
4  made any admissions or who he had talked to.
5        You'll hear from a couple of officers that
6  worked the front of the Philadelphia Police Department,
7  an Officer Munroe and an Officer Smith-Wardlow (sic),
8  and they'll say that the Defendant kind of casually
9  walked up to the entrance of the Philadelphia Police
10  Department and said, "I'm wanted for murder, a
11  kidnapping and auto theft and I'd like to turn myself
12  in."
13        Well, they're thinking, you know, there's
14  a young man here and we've got to confirm this. So,
15  they get his identifiers, they get his information, they
16  check it in the computer. And within the computer is
17  that hold for him for his vehicle. They then take him
18  in.
19        As he's taken in, he's not asked any
20  questions. And then he volunteers to Officer Munroe, "I
21  stomped his head. I just kept stomping his head."
22        At this point they're saying, "We're not
23  trying to interview you. Just wait. Just sit down."
24  They wanted to make sure they didn't violate any of his
25  rights. They contacted Detective Hesser who worked in

**29**

1  Homicide. He came down, took custody of the Defendant.
2  The Defendant was then taken up to an
3  interview room. Detective Hesser is thinking, well,
4  I'll just maintain him until our fugitive unit can come
5  and then take him into custody and send him back to
6  Galveston where they're wanting him. So, he puts him in
7  this room and he says -- Detective Hesser tells the
8  Defendant, "Well, I'm going to need your belt, anything
9  sharp. I'm going to need your shoelaces." And he gets
10  the keys. And the Defendant just kind of looks down at
11  his shoes, looks down at the shoelaces.
12        Then he tells Detective Hesser, "Suicide's
13  not an issue."
14        And then he says, "Well, I'm going to need
15  them any way."
16        And he looks down at his shoes again and
17  he says, "Well, these are the shoes that I used to stomp
18  my son's head in with."
19        And then he says, "I'm going to need them
20  any way."
21        That's when the Defendant kind of matter
22  of factly says to Detective Hesser, "Well, there's not
23  going to be any DNA on my shoes because the body wasn't
24  bleeding when I left it." The body wasn't bleeding when
25  I left it, but they take his shoes. They take the

30

1  evidence. And then later they give it back to him to
2  give him his level of comfort so he's, you know,
3  comfortable when he's being interviewed.
4       They did the written interview first.
5  Then they got consent to do an oral, a video interview
6  of him second. You'll hear from both of those. And
7  you'll see the Defendant on the video matter of fact,
8  like he's describing a road trip, talking about every
9  detail, where he went, where he stopped, where he got
10  money, who he was looking for. And then when he's
11  talking about his child, what he says is going to be
12  telling because he's asked, "Did you know you were going
13  to kill your baby?"
14       "Yes."
15       "Did you intend to kill your baby?"
16       "Yes."
17       "Why did you just throw your baby?"
18       "I wanted to get it as far away from me as
19  I could because I knew that it was my link to the crime.
20  It scared me."
21       You'll also see that there's bruises on
22  the child where it looks like the infant was just
23  thrown, just tossed into that field. And luckily found
24  when that baby was maybe deceased for less than two
25  hours.

31

1       I'm confident that after you hear all of
2  the evidence from all of the witnesses that you will be
3  convinced beyond a reasonable doubt, beyond all doubt
4  that this Defendant on January 29th, 2008, took his
5  infant son and stomped him to death and threw him like
6  trash into that field. Thank you.
7       THE COURT: That concluded the State's
8  opening statement.
9       Does the Defense desire to make an opening
10  statement at this time?
11       MR. LOPER: We do, Your Honor.
12       THE COURT: You may proceed, Mr. Loper.
13       MR. LOPER: Thank you.
14       OPENING STATEMENT OF THE DEFENSE
15  BY MR. LOPER:
16       Good morning. May it please the Court.
17       You've just received a not-so-brief
18  summary of what the State's evidence may be in this
19  case. And I don't think there's any hiding the fact as
20  we talked to each and every one of you individually in a
21  hypothetical way during jury selection that these were
22  not going to be pleasant facts. I think we all but told
23  you that. I think you anticipated that. You expected
24  that. And there's nothing about these facts that are
25  going to be pleasant. And that's why we spent some time

32

1  talking about how difficult an objective decision may be
2  in this case.
3       Opening statements are designed -- excuse
4  me. The law allows opening statements to be presented
5  to a jury to give the jury an idea of what we think the
6  evidence may present to you. Sometimes they evolve into
7  a little bit of jury argument, although they're not
8  really supposed to. They're supposed to just tell you
9  what they think the evidence will show.
10       The evidence from the Defense's
11  perspective in this case starts a little bit earlier
12  than the State's version January 29th of 2008. We think
13  the story starts when Travis Mullis and Caren Kohberger
14  get together. They get together and are boyfriend and
15  girlfriend. They're living together and they are a
16  young couple. Unmarried, but they are a couple.
17       Caren gets pregnant. And like any young
18  couple without any real meaningful support other than
19  help from others, but no meaningful support of their own
20  and no real job to talk about, they struggle a little
21  bit. Struggle a little bit financially. And as you've
22  already heard a little bit from the State, they
23  struggled a little bit in a relationship type of a way.
24       But there they are living in a trailer in
25  Alvin, Texas, with another family. Probably very

33

1  cramped. Probably -- a lot of that too many mice in the
2  box type attitude probably going on.
3       Alijah Mullis is born in the fall of 2007.
4  And they're all living in this trailer when on January
5  the 29th of 2008 -- and I think the evidence will show
6  to you that there's not any particular reason why it was
7  January the 29th versus January 28th or January the
8  30th -- but on that particular night in the middle of
9  the night Travis Mullis and Caren Kohberger are both up
10  in the middle of the night. Travis Mullis goes to the
11  store. He comes back from the store. He is upset. He
12  and Caren are arguing. There's acrimony going on
13  between the two of them. The place is probably becoming
14  too small for the both of them to stay. And Travis
15  Mullis decides that it's a good idea that he should
16  leave to get some separation as he says in a statement
17  that the State's alluded to on several occasions to try
18  to do some thinking, have some time to think.
19       So, this is all going on and he's made
20  this decision that he should leave. And he doesn't ask
21  if he can take Alijah with him. In fact, he's ready to
22  leave. But it is Caren Kohberger who insists that he
23  take Alijah. Caren knows that he's -- Travis will not
24  want to care for Alijah for very long. And after a few
25  hours because he won't want to care for Alijah for very

- October 12, 2011

34

1  long, that he will bring him back.
2      Because you see in the past when Travis
3  has left the trailer, he's been gone for a few days.
4  Caren Kohberger does not want that to happen again. So,
5  she makes it a habit of insisting that when he leaves
6  the house no matter the time of the day -- this is
7  certainly the oddest time of the day to leave at 3:00 or
8  4:00 a.m., he must take the baby with him. So, she
9  basically uses her child as a homing beacon to bring
10  Travis back again.
11      Now, you've heard from the State that when
12  Travis leaves with Alijah that morning, that's when the
13  worst thing that could happen to Alijah occurred. It
14  was because of that. But at 3:00 or 4:00 a.m. in the
15  morning at his girlfriend's insistence Baby Alijah is
16  taken sleeping and placed in that car seat to ensure
17  that Travis returns home again and off he goes.
18      He drives to the seawall here in
19  Galveston. You've heard a very good description about
20  where it was. And he's sitting there trying to decide
21  what to do. He's thinking about it. He's probably not
22  in a very good state of mind. In fact I would think
23  he's probably in the worst state of mind.
24      As he's sitting there contemplating this,
25  the baby begins to cry as three-month-old babies tend to

35

1  do. Their diapers are wet. They're hungry. They have
2  been awakened from a sleep. Maybe they don't have a
3  good sleep pattern, but the baby begins to cry. And
4  Travis Mullis does what he knows -- what little he knows
5  about trying to comfort the child.
6      From all appearances, it obviously does
7  not work. Again, you will hear from the statement that
8  he reaches a breaking point. And he does what he does
9  to stop the baby from crying. It's not pleasant and
10  it's not nice.
11      And for what he has done, I think the
12  evidence will bring you to the conclusion that he should
13  be held accountable for it. But there are reasons why
14  the evidence shouldn't lead you to find him guilty of
15  capital murder. But he does what he does to stop the
16  baby from crying.
17      And then he realized what he had done. He
18  throws the baby to the ground and he leaves. A second
19  really bad decision. And he takes off in sort of a
20  vague flight across America in a way, an attempt to try
21  to find his father not really knowing where to look or
22  not really knowing how he's going to get there. And as
23  Ms. Cameron has alluded, you'll hear some information
24  about some help that he got along the way to get there.
25  And after this indirect flight across the country, not

36

1  knowing where he's going really, he finally decides that
2  he's gone far enough and he decides to go into the
3  Philadelphia police station and tell his side of the
4  story.
5      He's not -- despite the many good efforts
6  of the Galveston Police Department to try to find him,
7  he is not captured on a road. He's not arrested upon a
8  warrant. He's not brought into the Philadelphia police
9  station by Philadelphia police officers. He turns
10  himself in.
11      I anticipate there will be some evidence
12  to show you that before he makes that final decision
13  there in the city of Philadelphia that he paces outside
14  the police station trying to decide what he should do.
15  I submit to you that he's probably deciding whether
16  should I go ahead and do this or should I continue on my
17  flight, wherever that might take me.
18      The bottom line is and the evidence will
19  show you that he does eventually walk in and tell them
20  that he's wanted. He goes to them and says that. And
21  at that point in time I would suspect having decided
22  that he's ready to come in and give himself up, so to
23  speak, he's ready to talk about what has occurred. He
24  was probably also very, very ready to tell his side of
25  the story.

37

1      My point on that is that I think the
2  evidence will show you that he was very primed for an
3  interview. You hear the -- in the State's opening about
4  the Miranda warnings and how you've got to give a person
5  his warnings before he or she gives a statement while
6  they're in police custody. And I think you'll find that
7  in this particular case because of his demeanor and
8  because of the way he surrendered himself, he was very
9  ready to give that statement. Almost pliable, if you
10  will.
11      When he came in, he told one of the first
12  officers at the desk, "I kept stomping on his head. I
13  kept stomping on his head." And that's very good
14  evidence there of exactly what he did and exactly what
15  the Medical Examiner in his opinion will be that caused
16  the blunt force trauma that caused Alijah Mullis' death.
17      And when the first detective from the
18  Philadelphia Police Department come in contact with him,
19  sat him down, he told him that he was stomping on his
20  son's head. Philadelphia officer's going to tell you he
21  almost had to stop him. "Wait until we get everything
22  in place before we can finally take your statement."
23      You will learn that they ultimately do do
24  that, that they do give him the warnings. It does
25  appear that he waives them. And if you believe that he

38

1   did so voluntarily in waiving those rights, you will be
2   asked by the Court based upon some written instructions
3   given to you that you may consider that statement for
4   what you will in making a decision in this case.
5       But the reason it's important to talk
6   about this and to talk about what the statement says is
7   because when it comes time for deliberation, you folks
8   are going to be called upon to make the decision about
9   whether you should decide what Travis Mullis said or you
10  should decide about what Travis Mullis meant when he
11  said what he said.
12      And going into the police station and
13  saying, "I kept stomping my baby's head," he's telling
14  the police what he did. He's not telling them what he
15  meant to do. In the statement that you hear and the
16  State's underlining that for you in their opening, they
17  said that he said in response to questions, "Did you
18  mean to do this?"
19      "Yes."
20      "Did you intentionally kill your son?"
21      "Yes."
22      I don't know because I wasn't there. And
23  the important thing because you folks are making a
24  decision that you weren't there, but I suspect that what
25  occurred from the time that he went into the

39

1   Philadelphia Police Department -- by the way, I'm sorry.
2   I didn't really give you some time periods on that. He
3   walked into the station at about 1:50 in the afternoon.
4   By the time the videotaped statement, which as you now
5   know was taken second after the written statement, it's
6   almost 11:00 o'clock at night. It's about nine hours
7   that the police officers have him.
8       Not everything is recorded obviously. Not
9   everything is recorded in any type of offense report
10  you'll find obviously. I don't know, but I suspect that
11  as the police in Philadelphia were on the phone with the
12  police and the District Attorneys in Galveston, Texas,
13  they were learning a little something about the case
14  because, gosh, they've got to be able to ask intelligent
15  questions. They've got to learn about where the body
16  was found. They've got to learn a little bit about what
17  the Galveston Police and District Attorney's Office.
18  They've got to learn about the types of warnings that
19  you give in Texas so that they can give the right
20  warnings and that statement will be admissible.
21      They're doing their job and there's
22  nothing wrong with that. But when Travis Mullis walked
23  into that police station and said as you will hear to
24  one of the officers, "Am I doing the right thing," as in
25  giving myself up, they assure him, "Sure you are." They

40

1   assure him that he's doing the right thing. And that
2   goes along with the idea he was very pliable and very
3   amenable to what the police might want him to say in
4   this statement.
5       The long and the short of it is as the
6   police are on the phone with the folks in Galveston, I
7   assume the Philadelphia cops don't know all the laws in
8   the State of Texas. Some of us lawyers in Texas don't
9   know all of the laws in Texas. I suspect they're being
10  told about how to give the proper Texas warnings so that
11  statement is admissible in a Texas state court. What is
12  the offense of capital murder as it relates to the
13  killing of a child in the State of Texas? And what does
14  it take in order to get the death penalty for a case in
15  the State of Texas? And I suspect that they were
16  tutored about finding out that you need to show that the
17  person --
18          MS. CAMERON: Your Honor, I'm going to
19  object to any speculation about what was going on and
20  any argument in this case.
21          THE COURT: Sustained.
22          MR. LOPER: The evidence will show you
23  that these officers obtained statements from Travis
24  Mullis that were identical to the type of statements
25  that are necessary for you folks to find the facts in

41

1   this indictment to be true.
2       But as you go back, the evidence will
3   present to you that he states that he's stomping his
4   baby's head to stop him from crying. It is the
5   Philadelphia police officers who convince him with the
6   logic, well, if you're stomping his head and it caused
7   his death, you caused his death. And these two
8   Philadelphia officers that you'll hear from which might
9   have 50 or 60 years of experience who had this
10  21-year-old young man in the state of mind that he's in
11  were able to -- you can't really argue and he couldn't
12  really argue with their logic that if I did it, I must
13  have meant to do it.
14      And the reason why that's important is
15  this: It is not just hearing him repeating or parroting
16  what the Philadelphia officer instructed to ask him to
17  say. It's delving behind that and making the difficult
18  decision, is that really what he meant? And because of
19  that, the evidence will show you, we think, at the
20  conclusion of this case when it's all been delivered to
21  you that if he meant to stop his child from crying but
22  he didn't intentionally cause his death, that that calls
23  for a verdict of not guilty of capital murder.
24      Now, I'm not saying -- and I said earlier,
25  briefly earlier that that doesn't mean that you're not

- October 12, 2011

42

1  going to hold him accountable for his actions. But when

2  you look at the evidence as it is going to be presented

3  to you, the evidence is going to create a reasonable

4  doubt in your mind about what he meant to do when he did

5  what he did on the seawall. And that will result in you

6  folks coming back with a verdict for Travis Mullis of

7  not guilty of capital murder. Thank you.

8         THE COURT: All right. Ladies and

9  gentlemen, we're going to be preparing to start the case

10  as far as evidence is concerned. We'll go ahead and

11  give you a ten-minute comfort break while we do that.

12  So, you will be excused to the jury room and we will

13  call you back in in ten or 15 minutes.

14         (Break held)

15         (Open court, Defendant present, no jury)

16         THE COURT: Thank you. Please be seated.

17  If you'll bring your witnesses.

18  If you'll give your name to the court

19  reporter to start with.

20         THE WITNESS: Jesse Zaro.

21         THE WITNESS: Jeremy Schwartz.

22         THE WITNESS: Richard Kershaw.

23         THE COURT: Thank you. If you would each

24  raise your right hand.

25         (Witnesses sworn in)

43

1         THE COURT: Thank you. Let me tell you

2  that the Witness Exclusion Rule is in effect. Basically

3  that means that only one witness can be in the courtroom

4  at a time while testifying. When you're outside the

5  courtroom, please do not discuss your testimony with

6  other witnesses. You are permitted to speak to the

7  attorneys. Any questions about the Witness Exclusion

8  Rule?

9         THE WITNESSES: No, sir.

10         THE COURT: If y'all don't mind, wait

11  outside until you're called.

12  Is the State ready?

13         MS. CAMERON: State's ready. And

14  Ms. Allen will be calling the first witness which will

15  be Mr. Zaro.

16         THE COURT: And the Defense, are y'all

17  ready to proceed?

18         MR. LOPER: Yes, sir.

19         THE COURT: Mr. Kelly, bring in the jury,

20  please.

21         (Open court, Defendant and jury present)

22         THE COURT: Ms. Allen, if you'll call your

23  first witness.

24         MS. ALLEN: The State would call Jesse

25  Zaro.

44

1         THE COURT: Sir, if you would come here to

2  my right and have a seat in the witness box.

3         Ladies and gentlemen of the jury, let me

4  tell you that this witness along with several others has

5  already been sworn. They are under oath to tell the

6  truth in this matter.

7         Ms. Allen, you may proceed.

8         MS. ALLEN: Thank you, Your Honor.

9

10         JESSE ZARO,

11  having first been duly sworn, testified as follows:

12         DIRECT EXAMINATION

13  BY MS. ALLEN:

14  Q. Mr. Zaro, would you introduce yourself to the

15  jury?

16  A. I'm Jesse Zaro.

17  Q. And, Mr. Zaro, where do you live?

18  A. I live in League City.

19  Q. And are you married?

20  A. Yes, ma'am.

21  Q. And what's your wife's name?

22  A. Esmeralda Zaro.

23  Q. And do y'all have children?

24  A. Yes, ma'am.

25  Q. And how many children do you have?

45

1  A. I have two children.

2  Q. And what are their ages?

3  A. Seventeen, my son's 17. My daughter is 10.

4  Q. And where do they go to school?

5  A. They go to school in League City, Clear Creek

6  High. My son's in Clear Creek High School and my

7  daughter's in Goforth Elementary.

8  Q. Let me direct your attention back to January

9  29th, 2008. Where did your children go to school on

10  that day?

11  A. They went to school here on the Island. We

12  lived here. My son was at Weis, eighth grade. My

13  daughter was second grade in Oppe Elementary.

14  Q. And where did you live in Galveston back on

15  January 29th, 2008?

16  A. I don't know the address. It was Cove View

17  Boulevard. It was Lakeside Apartments.

18  Q. But you did live in Galveston?

19  A. Yes, ma'am, I did.

20  Q. Okay. Let's talk about that morning, January

21  29th, 2008. Do you remember about what time you woke

22  up?

23  A. Not really. I don't really remember. I think

24  it was like 6:00 o'clock.

25  Q. And what is your -- what was your normal

46

1  routine in the morning?
2      A.  I'd get up about -- when I worked, it was about
3  5:00 a.m.
4      Q.  And on January 29th, 2008, were you working
5  that day?
6      A.  No.  I was off.
7      Q.  When you were off, what do you do in the
8  morning or what did you do that morning?
9      A.  Well, we get out.  We get up, get the kids up
10  for school.  And I was off on a Tuesday and Wednesday.
11  Get the kids ready for school.  Take them to school.
12  And we'd go out.  We'd go places, you know, mostly the
13  beaches.  The Island is beautiful and we'd just get out
14  and go places, you know, just to the beach or whatever.
15      Q.  What would you do when you were on the beach?
16      A.  We'd collect -- sometimes collect seashells or
17  watch the birds.  Just -- it was relaxing.  The kids
18  were in school.  Just go out and see the sites.  You
19  know, it was beautiful and wildlife and whatever and,
20  you know, sometimes we'd watch the ships roll in and
21  out.  We'd talk, you know, about things.
22      Q.  Is that -- are those the activities you would
23  do with your wife?
24      A.  Yes, ma'am.
25      Q.  Now, on January 29th, 2008, after you and your

47

1  wife had dropped the children off at school, where did
2  y'all go?
3      A.  We -- after I dropped them off at school, we
4  went down riding -- I think it was the seawall.  And we
5  went to -- down to the piers.  We like to watch the
6  shrimp boats and hear ships sometimes go in and out of
7  there.  It's just a walk area.  We like to walk.  It's
8  more of a tourist area.  And it was just somewhere to
9  go.  You know, not a whole lot to do, not a lot of money
10  to do anything with.  So, we'd always go down there
11  sometimes and, you know, we'd just walk and hear the
12  birds, talk about things and stuff like that and --
13      Q.  Did you go anywhere after --
14      A.  Yes, we did.
15      Q.  Where did you go?
16      A.  We got in the car and we went down.  We like
17  sweets.  We stopped at the doughnut shop there on 23rd
18  Street and got our doughnuts.  So, we started riding
19  toward the east end, you know.  Got on Broadway and
20  headed down toward the east end.  And we were just
21  talking.
22      Q.  Okay.  And where did you end up?
23      A.  I got on the seawall heading down that way.
24  And there was just -- I don't remember a whole lot.  We
25  were talking about just some regular routine talk that

48

1  morning.  And I started heading toward the east end, the
2  very east end of it, toward Apffel Park, I believe it's
3  called.
4      Q.  Okay.  And did you end up around Cherry Hill?
5      A.  Yes.
6      Q.  And describe what that area is like to the
7  jury.
8      A.  The hill itself?
9      Q.  Yes, that area.
10      A.  It's just like a levee, a hurricane levee.
11  You go up there and just -- it's like a hill that goes
12  down.  And I believe it was the Army Corps of Engineers
13  that own it.  It's an isolated area.  Really nothing out
14  there.  Just isolated.
15      Q.  And on this particular day did you see any type
16  of vehicles coming and going?
17      A.  Well, when we got up on -- I got up on the wall
18  up on there because the dump trucks were speeding.  So, I
19  got up there to get away from that.  We got up on the
20  levee and that's -- oh, I seen a guy cutting grass up
21  there.
22      Q.  And what was your reason for going to Cherry
23  Hill?  What were you looking for?
24      A.  We normally come back that way but -- to escape
25  the dump trucks.  And there's coyotes up there once in a

49

1  while.  I'm not really sure, but they might have been
2  mating.  And sometimes we just like to watch them, you
3  know.  They're very scary animals or whatever, but that
4  was just something we like to see.  It was something to
5  do.
6      Q.  So, you've been up there before and watched the
7  coyotes?
8      A.  Right.
9      Q.  Did you see any coyotes this day?
10      A.  No.
11      Q.  And about how long would you say you were in
12  that area?
13      A.  We were cruising real slow, you know, and just
14  talking.  And I saw an oncoming car.  My wife was
15  telling me about that.
16      Q.  Okay.  Was there anything that you noticed
17  about this oncoming vehicle?
18      A.  It's kind of -- I don't remember too well, but
19  they were leaving kind of fast or whatever.  And my wife
20  was telling me -- and if I remember right she's saying,
21  "There's a vehicle coming," or something like that.  And
22  I kind of like, you know, would turn my head that way to
23  look for coyotes and all that.  And I was looking at all
24  the trash on the ground, too.  A lot was going through
25  my head, you know, like that guy's going to cut all the

- October 12, 2011

50

1  trash up and stuff, you know. Just thinking about

2  things, listening to her.

3     Q. When you say, "that guy," you're referring to

4  that person you saw on the mower?

5     A. Yes, ma'am.

6     Q. That morning while you were out there, did

7  something strike you to make you stop your vehicle?

8     A. Yes, ma'am.

9     Q. Okay. And what was that?

10    A. I was -- I was coming down this levee. And I

11 was looking, you know, to my left and I spotted

12 something. And it looked like a doll. I came up on it.

13 You know, I was driving slow anyway. We were just

14 taking our time like I said. I spotted this doll.

15    Q. What did you do when you spotted what you felt

16 was a doll?

17    A. Sometimes I like to pick things up, like

18 scavenger hunt, or whatever. You know, just collect

19 stuff. I just looked at it and I thought someone

20 disregarded one of those expensive kind of dolls. I

21 looked at it and I just -- you know, everything just --

22 things started popping in my head. I was like, wow, you

23 know. What is this, you know?

24    Q. Well, did you stop your vehicle?

25    A. Well, I was going to pass it. And I slowed

51

1  down and looked. And I said, "I better take a look at

2  this." Something just popped in me. It just didn't

3  seem right, you know. I told my wife to stay in the

4  car. And I got out of the car and I walked over to it.

5     Q. And describe to the jury when you walked over

6  to what you felt was a baby doll what you saw.

7     A. It looked -- it was laying there. And it hurts

8  my heart talking about this. It was -- I walked up to

9  it and I was like, oh, God, 3 or 4 feet from it.

10 I looked down and something hit my heart. It was like

11 all the wind just left me. God, it's the horror. It

12 was the horror, man, you know.

13    Q. Was the child face up or face down?

14    A. It was on its stomach and its head was turned.

15 But that's the thing I noticed was its head.

16    Q. What did you notice about the baby's head?

17    A. It was smashed in or something. It was just

18 like caved in.

19    Q. Did you see anything on the baby's face?

20    A. I don't remember. I think it's like something

21 red, too, that I saw, like a dot or something. That's

22 all I remember. I don't remember a whole lot now, but

23 that's what I do kind of remember.

24    Q. And did you ever touch the baby?

25    A. No, ma'am.

52

1     Q. And once you saw the baby, did you still feel

2  that it was a doll?

3     A. As soon as I saw it, it hit my heart. And I

4  jumped up. I lost my wind and I turned and ran toward

5  the car, you know. I wasn't really sure, but I had to

6  be on the safe side as a citizen and responsible. I

7  waved at a passing dump truck, I remember. I just -- I

8  forgot we had a cell phone. It was like -- everything

9  was going in slow motion.

10       MR. LOPER: Objection, nonresponsive.

11       THE COURT: Can you ask another question,

12 please?

13       MS. ALLEN: Yes, Your Honor.

14    Q. (BY MS. ALLEN) Did the dump truck stop when

15 you tried to wave it down?

16    A. No, ma'am.

17    Q. At some point did you call 9-1-1?

18    A. Yes, ma'am.

19    Q. From whose cell phone did you call 9-1-1?

20    A. It was from my wife's cell phone.

21    Q. And when you called 9-1-1, what did you tell

22 9-1-1?

23    A. I told them that I was out there riding and we

24 saw -- we found a doll. I thought it was a doll or a

25 baby out there. And that's what I had told them. I

53

1  don't remember a whole lot of everything I had told

2  them.

3        MS. ALLEN: Your Honor, may I approach?

4        THE COURT: You may.

5     Q. (BY MS. ALLEN) I'm going to show you what's

6  been marked as State's Exhibit No. 55. If you will take

7  a moment and look at State's Exhibit No. 55.

8     A. Okay.

9     Q. Do you recognize State's Exhibit No. 55?

10    A. Yes, ma'am.

11    Q. Okay. And does this fairly and accurately

12 depict what Cherry Hill, your vehicle and yourself

13 looked like on January 29th, 2008?

14    A. Yes, ma'am.

15    Q. Has it been altered or changed in any way?

16    A. No, ma'am.

17    Q. Let me show you what's been marked as State's

18 Exhibit No. 56. Do you recognize State's Exhibit

19 No. 56?

20    A. Yes, ma'am.

21    Q. And how do you recognize State's Exhibit

22 No. 56?

23    A. It has my initials on it and the date.

24    Q. And did you review State's Exhibit No. 56

25 before coming to Court today?

54

1    A. Yes, ma'am.

2    Q. And on what date did you review it?

3    A. On the date there. On the date that's on the

4  CD.

5    Q. And could you tell what date it is?

6    A. It's January the 25th, 2011.

7    Q. Is that an accurate conversation that you and

8  your wife had with dispatch on January 29th, 2008?

9    A. Yes, ma'am.

10   Q. Has it been altered or changed in any way?

11   A. No, ma'am.

12   Q. Did you recognize your wife's voice on the

13  9-1-1 call?

14   A. Yes, ma'am.

15   Q. And were you standing beside her when she

16  called 9-1-1?

17   A. Yes, ma'am.

18        MS. ALLEN: I'd like to offer State's

19  Exhibit No. 55 and State's Exhibit No. 56.

20        MR. LOPER: No objection, Your Honor.

21        THE COURT: State's 55 and 56 are

22  admitted.

23        (State's Exhibit Nos. 55 and 56 admitted)

24        MS. ALLEN: May I publish them?

25        THE COURT: You may.

55

1        Ladies and gentlemen, let me -- if you've

2  figured this out, when the lawyers talk about wanting to

3  publish something, that basically means they want to

4  show it to you. I'm going to allow that to happen.

5        You may proceed.

6        MS. ALLEN: Thank you, Your Honor.

7    Q. (BY MS. ALLEN) Mr. Zaro, looking at State's

8  Exhibit No. 55, could you describe what State's Exhibit

9  No. 55 is for the jury?

10   A. It's my car. And my wife's standing beside the

11  car.

12   Q. When you say your car, is that overlooking to

13  the right of -- what color is your vehicle?

14   A. It's blue.

15   Q. What make and model is it?

16   A. It was a Mercedes Benz.

17   Q. Do you see where you and your wife are?

18   A. Yes, ma'am.

19   Q. Okay. And is that where you stopped your

20  vehicle when you noticed what you thought was a doll?

21   A. Yes, ma'am.

22   Q. Okay. Were you driving the vehicle?

23   A. Yes, ma'am.

24   Q. And when you got out, where did you walk?

25   A. When I got out, I walked toward where the area

56

1  is, where the -- looks like the sheet is or somewhere

2  right in there. Somewhere right in there. Let me point

3  it out. I got out of the car here. I came down here,

4  somewhere right in here. Then I ran back up this way.

5        (State's Exhibit No. 56 played for Jury)

6    Q. (BY MS. ALLEN) Now, Mr. Zaro, did you ever

7  touch the baby?

8    A. No, ma'am.

9    Q. Did your wife ever touch the baby?

10   A. No, ma'am.

11   Q. Did you see the car seat in that area?

12   A. I'm not really sure. I'm not really sure.

13   Q. And when the police officers got there,

14  what -- did you then go somewhere with them?

15   A. Yes, ma'am.

16   Q. Where did you go?

17   A. They told me to follow them down to the

18  station.

19   Q. And did you follow them to the station?

20   A. Yes, ma'am.

21   Q. And who went to the station?

22   A. Me and my wife.

23   Q. And what did you do when you got to the

24  station?

25   A. We were interviewed.

57

1    Q. And have you been back to that area?

2    A. No, ma'am.

3    Q. Why not?

4        MR. LOPER: Objection. Immaterial,

5  irrelevant.

6        THE COURT: Sustained.

7        MS. ALLEN: Pass the witness, Your Honor.

8        THE COURT: Counsel?

9        MR. LOPER: If it please the Court.

10        CROSS-EXAMINATION

11  BY MR. LOPER:

12   Q. Mr. Zaro, how are you doing this morning? Are

13  you okay?

14   A. Yes, sir.

15   Q. Who was the woman's voice that we heard on the

16  9-1-1 tape?

17   A. My wife.

18   Q. All right. And her name is?

19   A. Esmeralda Zaro.

20   Q. Esmeralda. Okay. Now, you were working in the

21  Sheriff's Department at that time as a jailer; is that

22  right?

23   A. Yes, sir.

24   Q. You were living here on the Island?

25   A. Yes, ma'am.

- October 12, 2011

---

**58**

1   Q.  Now you're living in League City?

2   A.  Yes, sir.

3   Q.  What do you do now?

4   A.  I'm a truck driver.

5   Q.  When you were talking about your -- the events

6  of that morning, obviously you don't know anyone by the

7  name of Caren Kohberger, right?

8   A.  No, sir.

9   Q.  That name doesn't mean anything to you.  Fair

10  statement?

11   A.  No, sir.

12   Q.  Okay.  And you didn't know Travis James Mullis

13  before that day?

14   A.  No, sir.

15   Q.  You didn't see a car pull away from that area

16  as you came -- was it called Cherry Hill?

17   A.  Cherry -- that's known -- that's what I've

18  always known it to be.

19   Q.  Okay.  Is that a fair statement as well?

20   A.  I don't understand what you're talking about.

21   Q.  Well, when you're coming down --

22   A.  Oh, okay.  Yes, sir.

23   Q.  -- toward Apffel Park?

24   A.  The only car mentioned was what my wife had

25  said.

---

**59**

1   Q.  Okay.  You didn't really see that car.  She

2  just said, "There's a car coming" or something?

3   A.  It was like an SUV.  I kind of glanced when it

4  passed by.

5   Q.  Then there was some dump trucks?

6   A.  It was dump trunks up and down the seawall.

7   Q.  Is that normal up and down that area since

8  you're there that often?

9   A.  I'm not really sure, sir.  They were just going

10  up and down that morning and they were hauling dirt from

11  somewhere or dumping dirt.

12   Q.  Okay.  I've been warned to talk through this

13  microphone.  I apologize to you if you were having a

14  hard time hearing me.

15      When we saw the photograph a few minutes ago,

16  I think that's State's Exhibit No. 55, do you recall

17  that picture we had up on the screen?

18   A.  Yes, sir.

19   Q.  Looked like there was a blue car parked on the

20  street.  That would have been your car?

21   A.  Right.

22   Q.  Your automobile?

23   A.  Yes, sir.

24   Q.  Was that you and your wife depicted in the

25  photograph?

---

**60**

1   A.  That is.

2   Q.  And I think we saw some yellow tape strung out

3  as well?

4   A.  Yes, sir.

5   Q.  So, that photograph would have been taken

6  clearly after law enforcement arrived?

7   A.  Yes, sir.

8   Q.  Okay.  And then obviously they've done a little

9  bit of work because there was already -- it appears --

10  well, I don't know that, but there's a sheet on the

11  ground?

12   A.  Yes, sir.

13   Q.  Did you see that?

14   A.  Yes, sir.

15   Q.  Hold it.  I'm even messing that up.  There's a

16  white spot on the ground someplace?

17   A.  Yes, sir.

18   Q.  All right.  And what was that?

19   A.  A white sheet.

20   Q.  Okay.  And why -- what was it covering, if

21  anything?

22   A.  There was a baby I found.

23   Q.  Okay.  And did you see in that photograph --

24      MR. LOPER:  Maybe we can pop that up

25  again, if possible?

---

**61**

1   Q.  (BY MR. LOPER)  Did you see in the

2  photograph -- generally speaking, they don't let me

3  around the technology.

4      So, can you see where it's marked State's

5  Exhibit No. 55 --

6   A.  Yes, sir.

7   Q.  Did you have a screen up there for you?  Can

8  you see it on there?

9   A.  Yes.

10   Q.  Okay.  When -- there's been some discussion of

11  there being a car seat or a baby seat or something in

12  this area.  Do you know -- I think you testified a few

13  minutes ago that you don't remember seeing one or

14  something?

15   A.  Yes, sir.

16   Q.  Okay.  Had -- when this photograph is being

17  taken, State's Exhibit No. 55, had that car seat already

18  been removed from that levee area?

19   A.  I don't remember, sir.  It was there when I

20  drove up.  It's a while back.  It was just so much going

21  on that morning.

22   Q.  It was clearly a stressful situation?

23   A.  Very scary, sir.

24   Q.  Okay.  Did you see any additional injuries to

25  the child like knife marks or anything like that?

---

FIRM NAME

- October 12, 2011

---

**62**

1   A.   No, sir.

2   Q.   Who is -- is this -- who is this standing?

3   A.   That's me, sir.

4   Q.   That's you.  And these would be Galveston law

5   enforcement?

6   A.   Yes, sir.

7   Q.   Okay.  And this is -- what vehicle is that?

8   A.   I don't know.

9   Q.   Did it have any -- did this vehicle that I'm

10  circling here which is sort of facing your car but an

11  additional, looks like 75 yards down the road, do you

12  know if it had any involvement in what we're seeing here

13  at the crime scene?

14  A.   I don't know.

15  Q.   Okay.  When you're talking about the tractor

16  that's cutting the grass, where is it in relation to

17  this photograph being taken?  Is it down by that car or

18  is it behind you?

19  A.   It was back behind me.

20  Q.   Do you know whether that tractor -- I mean, was

21  it one of those tractors that has the Bush Hog on the

22  back or under it?

23  A.   I think it was a -- I don't remember, sir.

24  Q.   Okay.  Did you as you were coming towards the

25  Cherry Hill location -- and again, I'm using Cherry

---

**63**

1   Hill; is that right?

2   A.   Yes, sir.

3   Q.   Okay.  As you're coming towards this Cherry

4   Hill location and you're watching the tractor, do you

5   know if the tractor had made a pass through this area?

6   A.   No, sir.  I don't know.

7   Q.   Okay.  We see various debris down here on the

8   ground.  Do you know whether this debris that we're

9   looking at here has anything to do with the incident

10  which makes the basis of this indictment, what's

11  happening now?  Do you know?

12  A.   No, sir.

13  Q.   How long did you stay at the scene that's

14  depicted here on State's Exhibit No. 55 before you left

15  and followed the officers back to the station?

16  A.   I had just gotten there, sir.  I think it was

17  probably like 15 minutes, 20 minutes when I got there

18  and made the call immediately.

19  Q.   Okay.  And I understand that.  But it looks

20  like law enforcement came out and it looks like you may

21  have given -- talked to them a little bit about what you

22  found when they arrived.  Fair statement?

23  A.   Yes, sir.

24  Q.   Okay.  So, you talked to them a little bit

25  about what's happened.  And they rope it off.  Looks

---

**64**

1   like we've got some yellow tape.  It looks like they

2   roped it off as a crime scene, right?

3   A.   Yes, sir.

4   Q.   What I'm really asking is from the time that

5   law enforcement arrived up here on Cherry Hill so that

6   you can direct them to what you had seen, how long --

7   how much longer did you stay at that scene before

8   leaving and going back to the station?

9   A.   Maybe -- I'm not sure, sir.  I -- maybe 15

10  minutes and -- I'm not really sure, sir.

11  Q.   That's okay.  That's okay.  That's fine.  What

12  time of the morning is it, best you can tell us, that

13  you get out of your car and see the infant?

14  A.   I think, sir, it's somewhere close to 9:00.

15  Q.   Would have been right around 9:00, maybe 8:00?

16  A.   I'm not really sure, sir.

17  Q.   Could have been 8:30, 9:00 o'clock, anytime in

18  that window?

19  A.   Probably about close to 9:00 o'clock.  It was

20  like probably right at 9:00.  I'm not really sure.  It's

21  been a while.

22  Q.   And then you followed them back to the station.

23  And you and your wife have an opportunity to talk about

24  what happened?

25  A.   Right, yes, sir.

---

**65**

1   Q.   You did that.  Do you recall giving them a

2   written statement about what happened, what you saw and

3   what you did?

4   A.   I don't remember, sir.

5   Q.   Just verbally talked to them about what

6   happened, how you felt about it, those sorts of things?

7   A.   I do remember talking to them, yes, sir.

8   Q.   And it's still kind of -- it's still in your

9   memory bank today.  Fair statement?

10  A.   Yes, sir.

11  Q.   It's still kind of tough on you?

12  A.   It's remembering back that far, yes, sir.

13          MR. LOPER:  We pass the witness.

14          THE COURT:  Ms. Allen?

15          MS. ALLEN:  Nothing further, Your Honor.

16          THE COURT:  May this witness be excused?

17          MS. ALLEN:  Yes, Your Honor, from the

18  State.

19          MR. LOPER:  Yes, sir.

20          THE COURT:  Thank you, Mr. Zaro.  You may

21  step down.

22          THE WITNESS:  Thank you.

23          THE COURT:  Ms. Cameron, who is the

24  State's next witness?

25          MS. CAMERON:  The State would call

---

- October 12, 2011

66

1   Sergeant Richard Kershaw.

2           THE COURT:  If you would please have a

3   seat in the witness box.

4           You may proceed.

5           MS. CAMERON:  Thank you, Your Honor.

6

7       RICHARD KERSHAW,

8   having first been duly sworn, testified as follows:

9       DIRECT EXAMINATION

10  BY MS. CAMERON:

11      Q.  Please introduce yourself to the ladies and

12  gentlemen of the jury.

13      A.  My name is Richard Kershaw.

14      Q.  And how are you employed?

15      A.  I'm employed with The State of Texas Attorney

16  General's Office presently.

17      Q.  And what are your duties in your position there

18  with the Attorney General's Office?

19      A.  I'm a fraud investigator.  I do Medicaid fraud,

20  drug diversions and elderly abuse cases.

21      Q.  Now, can you give them the benefit of your

22  background in law enforcement?

23      A.  Yeah.  Back in the early Eighties I was with

24  the Sheriff's Department for a while.  Did some

25  investigation work there.  Galveston Police Department

67

1   for 21 years.  Retired from there.

2       Q.  All right.  Let me direct your attention back

3   to January, January 29th, 2008.  What was the position

4   assignment that you held at the Galveston Police

5   Department at that time?

6       A.  I was a patrol supervisor at that time.

7       Q.  And what were your responsibilities as a patrol

8   supervisor?

9       A.  Supervised patrol officers in certain

10  districts.  Do lineup, things like that.

11      Q.  Did you have a particular district within

12  Galveston Island at that time?

13      A.  Yes.  It changed.  Depending on the day and who

14  did lineup, we changed, yes.

15      Q.  All right.  I want to direct your attention to

16  around 9:00 o'clock in the morning.  Did you receive any

17  information regarding a possible crime scene at the far

18  east end of the Island?

19      A.  Yes, I did.

20      Q.  And how did you first become aware of it?

21      A.  I heard it on the radio, on my police radio.

22      Q.  And where were you at that time?

23      A.  I was at the police station.

24      Q.  What, if any, action did you take after hearing

25  that?

68

1       A.  I notified my lieutenant who was standing next

2   to me that I was going to the scene.

3       Q.  And how long did it take you approximately to

4   get from the Galveston Police Department to the scene?

5       A.  Ten, 15 minutes maybe.  Fifteen minutes

6   probably.

7       Q.  Were you by yourself at that time?

8       A.  Yes, I was.

9       Q.  So, approximately what time did you get to the

10  crime scene location?

11      A.  Probably just a few minutes after 9:00 a.m.

12      Q.  What was to be your responsibility once you got

13  to the crime scene?

14      A.  Actually as a patrol supervisor to assist our

15  identification division or they call it CSI in some

16  places are in charge of the scene.  We were just there

17  to assist.

18      Q.  When you arrived there, do you know whether or

19  not the EMS or the fire department were still there at

20  that time?

21      A.  I don't believe they were.  No, I don't believe

22  so.

23      Q.  Do you recall who was there when you arrived?

24      A.  Yes.  There was -- one of our detectives was

25  there.

69

1       Q.  Do you recall which detective that would be?

2       A.  Yeah.  Sergeant Schwartz.

3       Q.  And do you know what his responsibility was to

4   be at the crime scene?

5       A.  At first, I didn't.  I did afterwards.  But

6   when I first pulled up, he was actually rolling out

7   crime scene tape around the area.  I assisted with that.

8       Q.  Were there any other officers there?  Do you

9   recall?

10      A.  Yes.  There were a couple of patrol officers

11  there and then the crime scene investigators were there.

12      Q.  So, would that be Officer Pena?

13      A.  Yes, it was.  Scott Pena was there.

14      Q.  And also Officer Jones?

15      A.  I don't think he was there when I showed up,

16  no.  I think he hadn't gotten there yet.

17      Q.  So, what action did you take when you arrived

18  and you saw Sergeant Schwartz putting out the crime

19  scene tape?

20      A.  I assisted with that because it was a fairly

21  big area.  I assisted with pulling the tape and tying it

22  off to the cars and posts and things we had to tie the

23  tape off to to secure the area.

24      Q.  Now, are you personally familiar with this area

25  of town?

FIRM NAME

- October 12, 2011

70

1    A. Yes, I am.

2    Q. And had you been there for crime scenes before,

3  if you recall?

4    A. Yes.

5    Q. And are you aware of whether or not there's

6  actually coyotes that go in that field location at that

7  Cherry Hill spot?

8    A. Yes. I worked nights before this before I was

9  a detective but before that particular duty as a patrol

10  supervisor. I was a supervisor on nights at one time

11  and they're all over that area out there. Especially at

12  night, you see them all over the place.

13    Q. So, when you got to the scene, and I think you

14  said you assisted with the crime scene tape, what other

15  actions did you take?

16    A. I remained outside the tape until Officer Pena

17  asked me to step inside and assist him, which I did so.

18  He was trying to take the sheet off the victim and he

19  needed some assistance. So, he asked me to step inside

20  the tape and help him.

21    Q. And did you actually observe the infant?

22    A. Yes. Yes, I did.

23    Q. And can you describe the infant that you

24  observed when you removed the sheet?

25    A. Very small child, infant, face down. All he

71

1  had on was a diaper at the time. Face down, head

2  pointing up towards the seawall itself, facing to the

3  south.

4    Q. With his head being face down, were you able to

5  observe any type of trauma to the infant?

6    A. Not at that time, no, ma'am.

7    Q. And what was the next thing that you-all did?

8    A. First I assisted holding the sheet up, which

9  were blocking for any spectators or media or anything,

10  holding the sheet up so Officer Pena could examine the

11  body. I was holding one corner. Officer Blackwell was

12  there, too. He was holding the other corner. He had

13  showed up sometime, too. He might have been there

14  before I got there.

15    Q. At any time did you offer any kind of

16  assistance as far as checking the infant in any way?

17    A. Yes, I did.

18    Q. Can you tell us how you went about doing this?

19    A. Officer Pena had checked the infant. And all

20  of his photos, I guess, were done before that because he

21  was actually there at that point to check the infant.

22  When he'd asked me, he rolled the infant over on its

23  back and then checked the extremities and made a comment

24  to me that he didn't think rigor mortis had set in at

25  that time.

72

1    Q. Did you actually touch or do anything to see

2  for yourself whether or not any rigor mortis had set in?

3    A. Yes, I did.

4    Q. And by "rigor mortis," would you explain to the

5  jury what we're talking about?

6    A. Rigor mortis sets in after death on everyone,

7  no matter how old. And it's a certain length of time it

8  sets in. And it's stiffening of the muscles and the

9  extremities. And certain lengths of time it does it. I

10  was a detective for a long time. So, I knew about the

11  rigor, what it did.

12    Q. Did you put on gloves before you had any

13  contact with the infant?

14    A. Yes. What had happened was Officer Pena had

15  checked the infant, had actually felt the infant with --

16  he had gloves on. And he made a comment as to possible

17  extremities being slightly different temperature. And

18  he asked me if I would check. So, I asked him to hand

19  me a set of gloves out of his bag that he had there.

20    I put gloves on and examined the infant. I

21  felt the torso and then the extremities, the feet and

22  the hands, and told him that he was correct, that I felt

23  that the torso was slightly warmer, not that the infant

24  was warm, but they were slightly warmer temperature than

25  the extremities.

73

1    Q. Did you at any time check anything else as it

2  related to the infant?

3    A. Yes, I did.

4    Q. Can you tell the jury what it is that you

5  checked?

6    A. After I had checked for the heat differences, I

7  put my thumb on the infants jaw and wiggled it because

8  rigor mortis sets in the jaw normally first of all.

9  That's where it sets. And I put my thumb on the

10  infant's jaw and wiggled it a little bit and saw that

11  there was not rigor in his jaw. And I was -- as I was

12  doing that, I had the opportunity to look in the

13  infant's mouth. And I didn't see any obstructions or

14  any teeth at that time. And I made those comments to

15  Officer Pena as I was doing that.

16    Q. Now, are you actually putting your hand or your

17  gloved hand inside the infant's mouth or are you just

18  doing this from the outside manipulation?

19    A. No. Never touched the infant inside the mouth.

20  I simply had my thumb on the jaw or on the chin, pushing

21  it down and looking inside. I never put anything inside

22  the infant's mouth.

23    Q. Were you able to determine whether or not this

24  was a male or a female infant?

25    A. Yes. I had asked him was he aware of the

- October 12, 2011

**74**

1  infant's sex. And he made the statement to me that he
2  didn't know that. So, since we had the infant on the
3  back, I picked up the diaper slightly and looked. And I
4  told him it was it -- it's definitely a male. And that's
5  how we knew the sex of the child.
6      Q. Could you estimate how old the child appeared
7  to you?
8      A. Yes. From seeing that there was not teeth and
9  from the size of the infant and just what I had seen, it
10  appeared to me three to six months old.
11     Q. Was there anything there that you saw that told
12  you who the infant was?
13     A. No.
14     Q. And you said that when the child was --
15  originally when you saw the child, he was laying face
16  down with his head turned. When the child was turned
17  over, can you tell the jury whether or not you were able
18  to observe any injuries to the infant?
19     A. Yes.
20     Q. Tell the jury what you observed and where.
21     A. The first thing I had noticed, there was some
22  type of specks, some type of -- they weren't really
23  puncture wounds. They were just puncture marks. Not
24  necessarily through the skin. There was severe damage
25  to the top of the infant's head. You could see the

**75**

1  concave in the top of the head. And, of course, I could
2  see some lividity in the -- post-mortem lividity in the
3  ear. I think it was the infant's right ear, if I'm not
4  mistaken.
5      Q. Now, when you say lividity, tell the jury what
6  you're talking about and what it is that you're
7  observing that makes you think you've seen lividity.
8      A. Yes. Post-mortem lividity is when a body lays
9  in a certain position. Immediately after death,
10  lividity starts. And that's blood settling to that
11  certain portion of the body. And it happens
12  immediately. It tends to get worse as time goes on.
13  Lividity settles. So, it's a good way of telling if a
14  body has been in that position or if it had been moved
15  after death, things like that.
16     Q. All right. Now, when you were out there, were
17  there photographs taken of the scene and the infant?
18     A. Yes. I don't know how many before I got there.
19  Pena was taking photographs as I was helping with the
20  crime scene tape that when he had gotten through with
21  his photos, he had asked me to step in. So I -- and he
22  did take more photos as I was standing there because I
23  don't think he had turned the infant over yet.
24     Q. Were you present when the video was taken --
25  was done?

**76**

1      A. Yes, I was.
2      Q. Do you know whether or not Officer Pena with
3  the crime scene unit, is he capable of doing an accurate
4  recording of a crime scene?
5      A. Yes, he is. He's trained.
6      Q. Do you know whether or not he uses a camera
7  that is capable of making an accurate recording?
8      A. Yes. Sure he is.
9      Q. And did you review at my request the crime
10  scene video to determine whether or not it fairly and
11  accurately shows the crime scene that you observed out
12  there on January 29th, 2008?
13     A. Yes, I did. And it was accurate.
14     Q. And with the exception of any kind of
15  narration, has that been removed so that there's no
16  sound?
17     A. Yes.
18     Q. Now, when you were out there, did you -- were
19  you able to observe anything else other than the infant?
20     A. Yes.
21     Q. Can you tell the jury what, if anything else,
22  you saw out there appeared to be related to this crime
23  scene?
24     A. It's a fairly open area and the grass is very
25  short in that location. And it's hilly. At the top of

**77**

1  the hill you can see pretty much everything from there
2  until it gets to the bottom of the hill where there's
3  some high grass. The infant was up towards the top of
4  the hill, say three-quarters up, I'm guessing. And down
5  to the bottom of the hill kind of a straight line from
6  the sidewalk or from the parking curb up there there was
7  an infant seat down at the bottom next to the high
8  grass. And there was another part of the foam it looked
9  like from that seat just above the infant's head, upper
10  part of the hill.
11     Q. So, if somebody is driving by this location at
12  Cherry Hill, can you tell the jury whether or not the
13  car seat would have been visible to anybody driving by?
14  Because you said I think it was down towards the bottom
15  of the hill. Would it be visible from just driving by?
16     A. Possibly, but it might be a little tough.
17  It's at the bottom of the hill. You would have to be
18  looking for it.
19     Q. Could you tell approximately how many feet from
20  the curb and the concrete the infant would have been?
21  Just guesstimate.
22     A. Yeah. I didn't do any measurements. That
23  wasn't my job. I think it's probably in my estimation
24  would have been probably 25, 30 feet, maybe.
25     Q. Then can you estimate for the jury

FIRM NAME

78

1   approximately how far from the infant's body would the
2   car seat have been?
3       A.   Probably another 30 feet or so.
4           MS. CAMERON:   If I may approach the
5   witness, Your Honor?
6           THE COURT:   You may.
7       Q.   (BY MS. CAMERON)   Sir, I'm going to show you
8   what's been marked for identification purposes as
9   State's Exhibit No. 57.   And do you recognize that as
10  the crime scene video that you have your initials on?
11      A.   Yes, I do.
12      Q.   And can you tell the Court and the jury, did
13  you have an opportunity to review this and -- before you
14  placed your initials on it to decide whether or not you
15  recognized it as fairly and accurately showing the crime
16  scene?
17      A.   Yes, I did.
18      Q.   Now I'm going to also show you what's been
19  marked for identification purposes as State's Exhibit
20  Nos. 58 through 74.   And if you could look those over?
21      Do these photos, State's Exhibit Nos. 59
22  through 74, do they fairly and accurately show the scene
23  as you recall it on January 29th, 2008?
24      A.   Yes, they do.
25          MS. CAMERON:   Your Honor, at this time I'm

79

1   going to tender to opposing counsel 58 through 74 and
2   State's Exhibit No. 57 and offer the same into evidence.
3           MR. LOPER:   State's Exhibit No. 57 and
4   then 58 through 74, we have no objections.
5           THE COURT:   All right.   Those exhibits are
6   admitted.
7       (State's Exhibit Nos. 57 through 74 admitted)
8           MS. CAMERON:   Thank you, Your Honor.
9   If I may approach, Your Honor?
10          THE COURT:   You may.
11      Q.   (BY MS. CAMERON)   Officer Kershaw, are some of
12  these photographs difficult to look at?   Are they fairly
13  graphic in showing the infant as the baby was found on
14  that day?
15      A.   I would say they're very graphic, yes.
16      Q.   And in addition to the child's skull and some
17  red marks that you saw, can you tell the jury whether or
18  not there was any noticeable mark or imprint that you
19  saw in the back of the child's head?
20      A.   Yes.
21      Q.   Can you describe that for the jury?
22      A.   What had occurred was once we had covered the
23  child back up and he had done the video and all that,
24  the Medical Examiner arrived on the scene and after a
25  while wanted to examine the body itself.   I assisted in

80

1   that as well.   And we hadn't turned the child back over.
2   It was laying face up.
3       When he got there, he wanted the child placed
4   back in its original position.   When we turned the child
5   over, I noticed two distinct red marks on the back of
6   the child's head.   And I described them as being
7   rectangle shaped.   One full perfect rectangle, the
8   other one just above it as about half of the same type
9   of rectangle.
10          MS. CAMERON:   Your Honor, if I may publish
11  now the photographs, State's Exhibit Nos. 58 through 74?
12          THE COURT:   You may.
13      Q.   (BY MS. CAMERON)   Now, Officer Kershaw, we're
14  now looking at State's Exhibit No. 58.   If you can
15  explain to the jury what it is that they're seeing from
16  this perspective?
17      A.   Yeah.   This view is facing the south like
18  you're facing those condos out there in the south to the
19  beach.   The seawall, what they -- commonly known as
20  Cherry Hill, is that hill where the cars are being
21  shown.   The white sheet is where --
22      Q.   You can use the pointer.
23      A.   Okay.   The white sheet is where the body of the
24  infant is.
25      Q.   So, when you talked about the 20 to 25 feet

81

1   difference, where those vehicles are, is that on that
2   concrete embankment where you're kind of giving your
3   guesstimation where the infant is from the road?
4       A.   Yes.   The sidewalk and the curb is actually
5   right there.   And then that's what my estimation was
6   from there to there.
7       Q.   State's Exhibit No. 59 appears that there's
8   some crime scene tape.   And are these all various police
9   vehicles that are out there in the investigation?
10      A.   Yes, ma'am.   The actual -- that's my car the
11  way I pulled up.   That's Sergeant Schwartz's unmarked
12  car.   Of course, another patrol car.   And that little
13  truck is Officer Blackwell's truck.
14      Q.   And do you know where approximately the infant
15  would have been or where Mr. Zaro's vehicle would have
16  been if we're looking at this photograph -- is this the
17  perimeter back here?
18      A.   Yeah.   This is actually a hill going down to
19  the roadway.   That's a flat section of it where you can
20  see my car's parked.   The infant is just on the other
21  side of that telephone pole, just on the east side.
22  You're facing east.   The photo is facing east at this
23  point.
24      Q.   State's Exhibit No. 60, if you could explain
25  what way the jury is looking at.   What way are they facing

82

1   at this point? Is this west?
2       A.  Yes, ma'am. This is facing west. That's
3   actually my patrol unit right there. That wasn't there.
4   Of course, when I got there, that's Sergeant Jones' van.
5   There's another ID unit. And that's Sergeant Schwartz's
6   car and that's Sergeant Schwartz.
7       Q.  State's Exhibit No. 61, if you can explain what
8   the jury is looking at in this photograph?
9       A.  That was taken primarily right about where my
10  unit was looking to the -- it would be the northeast,
11  looking -- that's a ship channel out there and to the
12  north. Of course there's the telephone pole.
13      Q.  Do you know of your own personal knowledge
14  whether or not this field, this area would be where the
15  coyotes are?
16      A.  Yes. There's where they live out in there and
17  also between -- on the other side, on the south side of
18  the seawall itself, there's some marshy land out there.
19  We've seen them all over out there. They're everywhere.
20      Q.  Now, it appears that the white sheet is there
21  to the right next to the pole. And then if you look to
22  the left, is the car seat visible from this photograph?
23      A.  Yes, it is. That's it right there.
24      Q.  And did you actually approach that and look at
25  it?

83

1       A.  Yes, I did.
2       Q.  State's Exhibit No. 62, do you recognize the
3   people that are in this photograph?
4       A.  Yes, I do.
5       Q.  And would this be Sergeant Almendarez that is
6   next to Schwartz?
7       A.  Yes. Sergeant Almendarez, Sergeant Schwartz,
8   there's Pena. That, of course, is me, Blackwell,
9   Lieutenant Trevino.
10      Q.  Now, there appears to be some kind of an infant
11  headrest here. Do you know whether or not that was part
12  of crime scene that was collected?
13      A.  Yes, it was. The headrest is what I described
14  earlier as being just above the head area above the
15  child. And then the material at least matched -- that I
16  checked matched the material on the seat.
17      Q.  Can you also see in this photograph the
18  perspective of where the car seat is from where the
19  infant is?
20      A.  Yes, you can. It's sort of in a northwesterly
21  direction, I would say.
22      Q.  Now, at that point is it difficult to tell, is
23  the infant face up or face down?
24      A.  The infant's face up at that point.
25      Q.  State's Exhibit No. 63, is this the way you

84

1   found the infant initially?
2       A.  Yes. The first time I lifted the sheet when
3   Officer Pena asked me to, that's the way I saw the
4   infant. Exactly like that.
5       Q.  Wearing only a diaper?
6       A.  Yes, ma'am.
7       Q.  State's Exhibit No. 64, and this is a close-up
8   of the infant. And tell the jury what it is that they
9   are seeing with the child's head.
10      A.  The superficial puncture things I was talking
11  about it appeared to me were on the facial area. That's
12  an indention to the skull that I had talked about.
13      Q.  State's Exhibit No. 65, can you explain to the
14  jury what they're looking at at this time?
15      A.  Yeah. This would be after the -- we had done
16  all the examining of the child and after the Medical --
17  after the Medical Examiner had gotten there, I noticed
18  that Officer Pena had put that -- it's like some PVC
19  things. It outlined certain pieces of evidence, I
20  guess. It's an evidence outlining kit, I guess you
21  would call it. That's around the child right there.
22      Q.  And at this point had anything been moved from
23  the locations that they were found so that you could see
24  the perspective of where the car seat is from the
25  infant?

85

1       A.  Yes. To my knowledge there was nothing moved
2   at that particular time.
3       Q.  State's Exhibit No. 66, there appears to be
4   some kind of an indentation or a mark. Can you explain
5   to the jury what it is that you saw and observed when
6   you looked at the back of the infant's head?
7       A.  Yes. Those rectangle markings, indentions is
8   what I described earlier. One was pretty identifiable
9   in a rectangle and the other one was -- looked like it
10  was the same type, but about half of it you could see at
11  that point.
12      Q.  State's Exhibit No. 67, is this the infant face
13  up?
14      A.  Yes, it is.
15      Q.  And not the way that the child was found,
16  correct?
17      A.  No. That was after we had turned him over.
18      Q.  And it appears that there's some redness around
19  the ear. I'm going to show you what's in evidence as
20  State's Exhibit No. 68. Now, as far as -- I think you
21  had shared with the jury that you thought that this
22  might be some lividity. Would that have been where the
23  child was laying? Would the head have been down on that
24  ear?
25      A.  Yes. When I first saw the child laying down,

86

1 the head was turned to the left which would have placed
2 the right ear on the ground. And that's why I thought
3 that that would be the beginning of lividity.
4     Q. As far as what it could be, were you present at
5 the time of the autopsy?
6     A. No, I was not.
7     Q. Do you know whether or not this could have been
8 from trauma or lividity?
9     A. I do not.
10     Q. Thank you, sir. State's Exhibit No. 69, tell
11 the jury what they're looking at on that photograph.
12 Let me back it up to -- what is the jury looking at at
13 this time?
14     A. That's the car seat that I described. It's
15 actually laying on one of the top corners. You're
16 seeing the bottom of it. At this point the head area is
17 up here.
18     Q. State's Exhibit No. 70, can you see that to be
19 an Evenflo design or the brand that has a distinctive
20 pattern on it?
21     A. Yes. It's two separate patterns of material,
22 but it's all sewn the same thing. You can tell it was
23 made that way. The headrest that I said a while ago
24 matched this part and material.
25     Q. Now, did you make any attempt -- when you saw

87

1 this baby seat, did you look to see whether or not there
2 might be anything on there that might be an identifying
3 mark that would show who this infant was?
4     A. Yes, I did.
5     Q. And tell the jury what was going through your
6 mind and what you looked for.
7     A. When I examined -- there was a couple of things
8 I was actually looking at when I went to look at it.
9 The first thing I wanted to do was try to see if there
10 was maybe a name written on it, a last name. A lot of
11 parents will do that if they drop a child off at a day
12 care or something. They have to write the name on it so
13 that they could come back and pick the child up and they
14 don't get the wrong seat. I examined that and could not
15 find any identifiable names or anything like that on it.
16     Q. Show you State's Exhibit No. 71. And what do
17 you recognize that to be?
18     A. That's the -- appeared to be the headrest
19 portion that had detached from the car seat.
20     Q. State's Exhibit No. 72, did you see a blue
21 infant sock at the location?
22     A. Yes, I did.
23     Q. Did you see the matching sock anywhere at that
24 location?
25     A. I do not recall, no. I don't think so.

88

1     Q. And State's Exhibit No. 73 appears to be some
2 kind of divot. And did you actually observe that bit of
3 a -- almost like a chunk of the ground removed?
4     A. Yes, I did. That area right there we had
5 noticed was uphill from the infant and looked like a
6 fresh indention that someone -- something had hit there
7 or something had struck the ground at that point, we
8 thought.
9     Q. And State's Exhibit No. 71, does that also show
10 that same kind of indention or divot in the ground?
11     A. Yes, it does. That appears to be the same one
12 after they marked it with a measuring stick.
13     Q. You talked about the difference from -- the
14 infant's body being some 20 or 25 feet away and then
15 this car seat being maybe 40 or 45 feet away. Do you
16 have an opinion as to whether or not that that might be
17 consistent with maybe an initial throw of the car seat
18 maybe having landed at that location and then it would
19 have been thrown a second time to get it to the distance
20 it was?
21     MR. LOPER: Judge, I have to object. I
22 think that's calling for speculation.
23     THE COURT: Sustained.
24     Q. (BY MS. CAMERON) Do you remember noting
25 whether or not there was any dirt mark on a portion of

89

1 the car seat when it was observed?
2     A. I observed the dirt mark on the seat. You
3 could see it when you walked up to it.
4     Q. And do you know where that dirt mark came from?
5     A. Don't know. But at that particular time I
6 thought it could have come from that indention in the
7 ground.
8     MS. CAMERON: Your Honor, at this time I
9 would like to publish for the jury the crime scene
10 video, which is State's Exhibit No. 57.
11     THE COURT: You may proceed.
12     Q. (BY MS. CAMERON) Again, this is somewhat
13 difficult to watch because of showing the infant?
14     A. Yes, ma'am, it is.
15     (State's Exhibit No. 57 played for Jury)
16     Q. (BY MS. CAMERON) I wanted to ask you a couple
17 of questions. I know I've been calling you Sergeant
18 Kershaw. What's your title now with the office of the
19 Attorney General?
20     A. I'm a sergeant as well. I was a sergeant in
21 Galveston. I was promoted to sergeant with the Attorney
22 General's Office.
23     Q. All right. Now, I noticed on the crime scene
24 video when we focused in on the infant, the baby is face
25 up. Was the infant found that way or was the infant

90

1  found initially face down?

2      A.  When I first saw the infant, it was face down.

3      Q.  All right.  Now, when the camera was panning in

4  on the car seat, it looked like they were -- it was

5  focusing in on what looked like some dirt on the end of

6  the car seat.  Did you see that?

7      A.  Yes, I did.  That's why I described earlier as

8  possibly maybe being in contact with that indention in

9  the ground.

10      Q.  All right, sir.  And after you were out there

11  at the crime scene, did you have any further involvement

12  and follow-up with this particular case?

13      A.  I did not.

14      Q.  And who did you understand to be the sergeant

15  or the detective in charge of the case from there on?

16      A.  To my particular knowledge, I thought it was

17  Sergeant Schwartz had the case as detective.

18      MS. CAMERON:  Okay.  Thank you, sir.

19  And I'll pass the witness.

20      THE COURT:  If I could see the attorneys

21  for just a moment, please.

22      (Discussion at the bench, off the record)

23      (Open court, Defendant and jury present)

24      THE COURT:  Ladies and gentlemen, I

25  understand that there will be more questions of Sergeant

91

1  Kershaw.  It's noon.  We're going to go ahead and take

2  our lunch break.  Please remember the instructions that

3  you're under.  I'm going to give you about an hour and

4  20 minutes for lunch.  So, if you will be back at 1:20,

5  ready to proceed.  Thank you.

6      (Open court, Defendant present, no jury)

7      THE COURT:  Thank you.  We'll stand in

8  recess until 1:20.

9      (Lunch break held)

10      (Open court, Defendant present, no jury)

11      THE COURT:  It is 1:25.  We're about to

12  get started.  I understand there may be a witness

13  present who needs to be sworn.

14      MS. CAMERON:  Yes, Your Honor.  Present in

15  the courtroom is a gentleman by the name of Royston

16  Patterson who was interviewed by the Galveston Police

17  Department who gave a lengthy statement.  He may

18  potentially be a witness in this case.

19      THE COURT:  Mr. Patterson, will you please

20  come forward, sir?  Sir, if you will come here before

21  the court reporter, please.  Thank you, sir.  What is

22  your name?

23      THE WITNESS:  Royston Patterson.

24      THE COURT:  Spell that for me, please.

25      THE WITNESS:  R-o-y-s-t-o-n

92

1  P-a-t-t-e-r-s-o-n.

2      THE COURT:  All right.  Mr. Patterson, you

3  have been identified as a potential witness in this

4  case.  If I can get you to raise your right hand.

5      (Witness sworn)

6      THE COURT:  Thank you, Mr. Patterson.  Let

7  me tell you that the Witness Exclusion Rule is in

8  effect.  In Texas law that basically means that only a

9  witness who is testifying can be present in the

10  courtroom.  So, when you're waiting to testify, you will

11  have to wait outside the courtroom.  Please do not

12  discuss your testimony with any other witnesses.  You

13  are permitted to speak to the attorneys if they choose

14  to talk to you.  Okay?

15      THE WITNESS:  Okay.

16      THE COURT:  Any questions about that Rule?

17      THE WITNESS:  Is that today?

18      THE COURT:  That's effective from this

19  point to the end of the trial.

20      THE WITNESS:  Yes, sir.  But do I stay --

21  I mean, am I going to be called today?

22      THE COURT:  I do not know.  If you want to

23  give a cell number or some contact information, e-mail,

24  that type of thing to the attorneys, you're welcome to

25  do that.  But I don't know what their trial schedule is

93

1  and when they might call you.  Okay?

2      THE WITNESS:  Okay.

3      THE COURT:  Thank you, sir.

4      Let me also remind the participants and

5  those who are in attendance as visitors viewing the

6  trial, when the jury is present and there are witnesses

7  testifying, as much as possible if you will remain in

8  your seats and only leave during breaks, that kind of

9  helps the jury stay focused on the witnesses.  If you

10  don't feel like you can stay through the testimony of a

11  witness, please leave before they begin testifying.

12      Let's go ahead and bring out the jury.

13      (Open court, Defendant and jury present)

14      THE COURT:  Please be seated.

15      Mr. Loper, you may cross-examine the

16  witness.

17      MR. LOPER:  Thank you, Judge.

18      CROSS-EXAMINATION

19  BY MR. LOPER:

20      Q.  Sergeant Kershaw, how are you?

21      A.  I'm good, sir.  Thank you.

22      Q.  I'm Bob Loper.  I'm one of the lawyers in this

23  case for Mr. Mullis.  You and I have never talked about

24  this case, have we?

25      A.  We have not.

94

1    Q.   When did you retire from the Galveston Police

2   Department?

3    A.   October of 2008.  Right after Hurricane Ike.

4    Q.   Okay.  Later in the year after January of '08

5   when this incident occurred, correct?

6    A.   Yes, correct.

7    Q.   Okay.  Now you work for the Attorney General's

8   Office?

9    A.   Yes, I do.

10   Q.   You do Medicaid fraud type investigations?

11   Among other things probably?

12   A.   Yes.

13   Q.   I guess from time to time since October of

14  2008, you've been called back to testify about cases

15  that you have been involved in when you were employed by

16  the Galveston Police Department, correct?

17   A.   Yes, that's correct.

18   Q.   And this happens to be one of them?

19   A.   Yes, sir.

20   Q.   And of all the things you told the jury about

21  this morning about what you did on January 29th of 2008,

22  you certainly recorded that in some type of offense

23  report, didn't you?

24   A.   I did.

25   Q.   And I would imagine since that was almost three

95

1   years ago, you certainly had a chance to look at that

2   prior to testifying today, haven't you?

3    A.   Yes, I have.

4    Q.   And the Galveston Police Department or the

5   Galveston County District Attorney's Office made that

6   available to you for your review, didn't they?

7    A.   They did, but I kept a copy of my report.

8    Q.   You had also kept a copy?

9    A.   Yes, I did.

10   Q.   Okay.  Was that pretty much a one-page

11  statement or summary of a report?

12   A.   Yes, it was.

13       MR. LOPER:  May I approach the witness,

14  Judge?

15       THE COURT:  You may.

16   Q.   (BY MR. LOPER)  Let me show you a copy that had

17  been provided to us.  I just want to make sure that I'm

18  asking about the same page that you're talking about.

19   A.   That's my report.

20   Q.   Okay.  Any part of what you did in this case

21  that you may have recorded in an offense report anywhere

22  else in this case other than this one page?

23   A.   No.

24   Q.   And I think you told us this morning that at

25  the time that this occurred in January of 2008, your job

96

1   at that time was a patrol supervisor, correct?

2    A.   That's correct.

3    Q.   How many officers did you supervise?

4    A.   Shift-wise, probably 30.  Day-to-day basis,

5   probably 15 to 18, something like that.

6    Q.   This happened while you were on duty and

7   working on January 29th of 2008, correct?

8    A.   Correct.

9    Q.   You were at the police station when this call

10  came in, correct?

11   A.   Yes, I was.

12   Q.   Was this sort of a police department

13  office-wide dispatch that you heard that brought you to

14  this scene or was this something that was exclusively

15  for your ears only that day?

16   A.   It wasn't for me.  It was a broadcast that I

17  heard.

18   Q.   I recall that you told the jury this morning

19  that you informed your lieutenant that you were going to

20  go to the scene, correct?

21   A.   That's correct.

22   Q.   Is that because you were the patrol supervisor

23  that you made that decision or is it part of your

24  supervisory authority that you would go to a scene like

25  this?

97

1    A.   Both of those and something else as well.

2    Q.   Okay.  You were not, were you, assigned to any

3   type of Homicide unit in the Galveston Police

4   Department, were you?

5    A.   At that time, no.

6    Q.   And was there any way for you to know at the

7   time that you heard this dispatch whether any other

8   officers had arrived at the scene before you?

9    A.   Only the ones I heard on the radio from talking

10  to each other.

11   Q.   I know that you told us that when you got there

12  that Detective Schwartz and that Officer Scott Pena were

13  already present, correct?

14   A.   Yes.

15   Q.   You were able to tell by radio traffic and

16  having a radio with you that they had been dispatched as

17  well and that they were on their way to the scene also,

18  correct?

19   A.   Not necessarily.  I didn't know exactly who was

20  there.  I knew there was radio traffic about the scene

21  about being there and what the scene was about

22  basically.

23   Q.   And you also said that sort of your general

24  responsibility, as you understood it, when you got there

25  was to assist in whatever capacity there at the scene,

98

1  correct?

2  A. Correct.

3  Q. And the person that would have requested your

4  help in certain areas or directed you in certain areas,

5  that would have been Detective Schwartz; is that right?

6  A. Not necessarily.

7  Q. Okay. It could have been anyone that was there

8  that could have asked for your help?

9  A. No. The crime scene technicians handled the

10  scenes. Even though you might be a supervisor they have

11  their own supervisors as well.

12  Q. And in this particular case I guess that would

13  have been Scott Pena?

14  A. Yes. He was the crime scene technician there

15  at the scene.

16  Q. Were there any other crime scene technicians

17  there other than Officer Pena?

18  A. I didn't see them, not when I got there --

19  first got there, no.

20  Q. Okay. And one of the things that you did was

21  that you assisted in putting out the crime scene tape,

22  correct?

23  A. That's correct.

24  Q. When you arrived on the scene do you recall

25  whether you were brought to where the baby was found

99

1  before you began assisting with the crime scene tape or

2  did you immediately begin helping with the crime scene

3  tape?

4  A. First thing I did was assist Sergeant Schwartz

5  rolling out the crime scene tape. He had it about half

6  done. I just assisted helping him finish.

7  Q. So, you helped finish laying out the crime

8  scene tape before you ever approached the body; is that

9  right?

10  A. That's correct.

11  Q. Okay. And I'm sure that there was some

12  conversation that went on between you and the officers

13  that were already present about who had found the baby;

14  is that right?

15  A. Yes, somewheres in there. I can't say whether

16  it was at that particular time or later on while I was

17  there. But, yes, I was briefed.

18  Q. What they knew because they beat you there,

19  they were able to communicate to you; is that right?

20  A. That's correct.

21  Q. Okay. You were not involved in interviewing

22  Mr. Or Ms. Zaro at all, were you?

23  A. I was not.

24  Q. You didn't do any interviews of any potential

25  witnesses there at the scene, did you?

100

1  A. I did not.

2  Q. After you had helped with laying out the crime

3  scene tape, is that when you approached the infant on

4  the ground?

5  A. Yes. Once Officer Pena asked me to come inside

6  the tape, I did so.

7  Q. Right. At his request you came in to help him

8  out. I believe you also said that you assisted him in

9  taking the sheet off of the baby; is that right?

10  A. That's why he called me over, yes.

11  Q. When you arrived at the scene, the sheet had

12  already been placed over the infant; is that correct?

13  A. Correct.

14  Q. And other than them telling you what was there,

15  you didn't really see for yourself what was there until

16  the sheet was removed, correct?

17  A. Correct.

18  Q. You were not aware of your own personal

19  knowledge how long the baby had been there, were you?

20  A. No.

21  Q. And you were not aware of your own personal

22  knowledge whether the baby had been moved in that

23  location to any extent, were you?

24  A. No.

25  Q. You just know that when you arrived and there

101

1  was a sheet over where the infant was laying, that's

2  where the infant was when you saw him, correct?

3  A. That's the location where I saw him, yes, when

4  I first picked up the sheet.

5  Q. And when you were helping Officer Pena to take

6  the sheet off of the baby, it was just you and he; is

7  that correct?

8  A. No.

9  Q. Who else was helping?

10  A. Officer Blackwell. He was on one corner. I

11  was on the other.

12  Q. Is that the image that is captured in one of

13  the photographs that we had up there this morning, do

14  you remember?

15  A. I don't remember which one you might be talking

16  about. It possibly is. I don't know.

17  Q. Okay. It's also my understanding --

18  MR. LOPER: Judge, is there a switch you

19  click to make that work?

20  THE COURT: Yes.

21  MR. LOPER: Thank you.

22  THE COURT: That's assuming, of course, it

23  works. Is the Elmo on?

24  Q. (BY MR. LOPER) Sergeant, let me see if I can

25  find the photo I'm talking about. I tell you what. I

- October 12, 2011

---

102

1    want to ask you about this one first. This is State's
2    Exhibit No. 59 which is already in evidence. And you've
3    even seen this previously in front of the jury, correct?
4         A. Yes.
5         Q. And you've told the jury who all these vehicles
6    belong to, correct?
7         A. Yes, I did.
8         Q. Now, in this photograph it appears that
9    Mr. Zaro's car is not present, right?
10        A. I don't know. I don't know his car. I never
11   remembered seeing it.
12        Q. Okay. Did you ever remember seeing a blue
13   Mercedes?
14        A. Possibly when I first got there. But I didn't
15   really pay that much attention to it.
16        Q. Let me show you now State's Exhibit No. 55.
17   And that is also in evidence. Do you see the blue
18   vehicle, the only vehicle that's in this photograph?
19        A. Yes, I do.
20        Q. Okay. Do you see where it is in relation to
21   the windmill-looking object back here to the left?
22        A. Yeah. That tower to the left? Yes, sir.
23        Q. Excuse me. It is a tower.
24            And now I've pulled that up and now this is
25   State's Exhibit No. 59 again. Do you see that it

---

103

1    doesn't appear that there's a blue vehicle there
2    anymore?
3         A. Correct.
4         Q. In fact, where it was sitting now looks like
5    there's several officers standing and talking?
6         A. Yes.
7         Q. Can we assume by the fact that in State's
8    Exhibit No. 59, that Mr. Zaro's vehicle is gone, that
9    Mr. Zaro was also gone or do you remember?
10        A. I don't -- I never met the man. I don't know.
11        Q. Now, the photo that I had originally come up
12   here meaning to ask you about is State's Exhibit No. 62.
13   And a minute ago when it was up here, you were able to
14   identify the folks that were represented in that
15   photograph, right?
16        A. Correct.
17        Q. And the man that's in sort of the khaki vest
18   with a dark brown shirt, that's Officer Pena, correct?
19        A. That is Officer Pena.
20        Q. So, who would have been taking this photograph,
21   if you know?
22        A. I don't know. This was later after several
23   other people had gotten there. This was not at the
24   beginning when I got there. So, I don't know who was --
25   who else had shown up.

---

104

1         Q. Okay. Because earlier in your direct testimony
2    you were talking about how Officer Pena was taking
3    photographs before you arrived as far as you know and
4    also at the time that you arrived, correct?
5         A. What my testimony was about his photos was when
6    he asked me to come in, he had already taken his photos,
7    he said. Now, as far as watching him take the photos, I
8    did not.
9         Q. Okay. But then getting back to the obviously
10   if he's in this, he didn't take it. But you don't have
11   any recollection of who it would be that would have done
12   this?
13        A. No. This was later on after several other
14   people got there. I pointed out that they were present
15   in the photo. They weren't there at the beginning.
16        Q. With your years of experience with the
17   Galveston Police Department and the way you know that
18   scenes are normally run, would it have been a crime
19   scene investigator that would have taken a photograph
20   like this or could it have been any patrol officer with
21   a camera or do you know if there's any such policy?
22        A. More than likely in a crime scene, it would
23   have been one of the crime scene technicians.
24        Q. So, there was another crime scene technician
25   out there other than Scott Pena, it appears?

---

105

1         A. That's correct. I saw him later, yes.
2         Q. Okay. And now getting back to the original
3    question I was trying to ask you about, when the sheet
4    was -- is this a photograph you were trying the first
5    time the sheet was removed when you were there?
6         A. It is not.
7         Q. This is a later representation, correct?
8         A. Yes, it is.
9         Q. When it was first removed when you were telling
10   us after you helped with the crime scene tape and Scott
11   Pena and Officer Blackwell --
12        A. Yes.
13        Q. -- was assisting?
14        A. Correct.
15        Q. It was just the three of you?
16        A. From what I remember, it was only three of us
17   standing there when I first got -- when they first
18   called me in to the tape, it was Officer Blackwell on
19   the right corner; my cell phone, left corner and only
20   Officer Pena there at that -- right around the child,
21   yes.
22        Q. And apparently there doesn't seem to be a
23   photograph that would represent the three of you pulling
24   up the sheet on that very first occasion? Or if there
25   is, it's not amongst what we have right now?

---

FIRM NAME

**106**

1    A.  I didn't observe one, no.

2    Q.  Do you remember whether anybody took a

3  photograph of the first time you lifted the sheet when

4  it was you and Pena and Blackwell?

5    A.  I don't know that.  No, I don't.

6    Q.  When you on that first occasion lifted the

7  sheet, that was your first occasion to see the infant on

8  the ground, correct?

9    A.  Yes.

10    Q.  And that's when you made the observations that

11  you told the jury about as far as the injuries -- excuse

12  me -- the fact that you could see the child was dressed

13  only in a diaper, correct?

14    A.  That's correct.

15    Q.  You told the jury that at that time you really

16  weren't in a position to be able to determine whether

17  the child had any trauma or not, correct?

18    A.  I don't think I testified exactly to that, but

19  I did see the indentions on the left side because the

20  baby's head was turned.

21    Q.  Okay.  Do you know whether anybody on the very

22  first occasion you raised the sheet, you said that you

23  first saw the baby with its stomach -- or face down on

24  the ground, correct?

25    A.  Yes.

**107**

1    Q.  Head turned to the left?

2    A.  Yes.

3    Q.  Do you recall whether anybody did take a

4  photograph of that initial showing to show the baby in

5  that position?

6    A.  I personally have no knowledge of that, no.

7    Q.  Okay.  I know that later upon request you

8  helped to turn the baby over; is that right?

9    A.  Officer Pena turned the child over while I was

10  holding the sheet.

11    Q.  While you were standing there?

12    A.  Yes.  While I was standing right there at it,

13  yes.

14    Q.  All right.  And then sometime later than that,

15  the baby was turned back to the original position

16  because the Medical Examiner's Office representative

17  wanted to see the child in the original condition; is

18  that right?

19    A.  Correct.

20    Q.  And who would have been the person that

21  reversed the baby's position back to face down again?

22    A.  I think it was myself and Officer Pena both.

23    Q.  Okay.  And how did you decide to put the baby

24  back in the place that you had seen him before?  Was it

25  just your recollection of how he had been laying or had

**108**

1  someone been taking notes of exactly how he was laying?

2    A.  I just helped roll him over exactly where we

3  had rolled him before, just back the opposite way.

4    Q.  But in terms of where his arms were and his

5  hands were, was it just sort of this is the way we

6  recollect that he was sitting or had someone actually

7  taken some notes as to where the hands and the arms were

8  positioned?

9    A.  I didn't take any notes and we didn't put his

10  arms in certain positions, no.

11    Q.  When you were standing out there and looking at

12  the child on the very first occasion when you lifted the

13  shirt (sic), was there anyone who was taking any type of

14  notes about here's what we found and the position that

15  the baby is in?

16    A.  No one told me anything like that, no.  I

17  didn't observe anything.

18    Q.  Would that type of thing, taking notes about

19  position, distance from the tower, distance from the

20  pole, would that have been something that would have

21  been your responsibility or Scott Pena's or someone

22  else's?

23    A.  That would have been the crime scene tech's

24  before I got there.

25    Q.  Okay.  And that would have been Pena and

**109**

1  whoever else was helping?

2    A.  Right.

3    Q.  I'm going to jump ahead a little bit, but you

4  were asked to estimate how far the infant was found from

5  the street.  And I believe that you said it was about

6  25 -- you said it was an estimate on your part, but it

7  was about 25 to 30 feet, correct?

8    A.  My best estimate, yes.  I didn't step it off or

9  measure it.

10    Q.  I understand that's just your estimate.  And I

11  guess that's just kind of looking back on it and also

12  assisted by looking at the photograph, correct?

13    A.  Somewhat, yes.

14    Q.  Do you know if anyone did do any type of

15  measurement to determine the exact distance the child

16  was from the street?

17    A.  My particular knowledge, I hadn't seen that.

18    Q.  But traditionally and normally that would be

19  the job of the crime scene technician?

20    A.  Correct, before you move anything.

21    Q.  And the same thing about the car seat.  Your

22  best estimate was it was another 30 feet beyond that,

23  which I guess that means would make it 55 to 65 -- the

24  car seat, 55 to 65, estimate, from the street, correct?

25    A.  Yes.  I believe I said something to the tune of

- October 12, 2011

110

1  30 feet or so or more.
2  Q.  Right.
3  A.  So, you're probably right, 65, 70 feet.
4  Q.  I'm adding that 30 to the other 25 to 30.
5  A.  Correct.
6  Q.  But again, you didn't do measurements.  And if
7  anyone did, that would have been someone else, correct?
8  A.  Correct.
9  Q.  Now, you were talking about determining that
10  the child was a little boy, correct?
11  A.  Yes.  I remember that.
12  Q.  You were able to do that by not picking up his
13  entire body, but just picking up a corner of the diaper;
14  is that correct?
15  A.  Not the corner.  I didn't testify to that.
16  Q.  I'm sorry.  How did you do it?
17  A.  My two fingers in the front.  He was on his
18  back.  I just picked it up and looked in.  Could see it
19  was a male.
20  Q.  Okay.  You were able to do that --
21  A.  I lifted away from his skin.
22  Q.  After he had already been flipped over on his
23  back?
24  A.  Correct.
25  Q.  Right.  Okay.

111

1  Is it your understanding that to that time, no
2  one had yet determined the sex of the baby, gender of
3  the baby?
4  A.  That, I'm not sure.  I did make a comment to
5  Officer Pena at that time that it was a male.
6  Q.  Do you know whether there were any photographs
7  taken of that time when the gender of the baby was
8  discussed?
9  A.  I'm not sure.
10  Q.  Let me ask you this in sort of a general sense.
11  During the time that you and Officer Pena were picking
12  up the sheet, when you were there to pick up the sheet
13  for the very first time, do you remember him or anyone
14  taking any photographs?
15  A.  Yes.
16  Q.  And who did that person have been?
17  A.  That would have been Pena.
18  Q.  Okay.  The other photograph that I had a minute
19  ago was a later time when the sheet was removed,
20  correct?
21  A.  Yeah.  And obviously someone else was taking
22  it.
23  Q.  You were telling the jury about checking the
24  infant for any rigor mortis.  And obviously in your
25  training and experience you have some experience in that

112

1  area, don't you?
2  A.  Yes, I did.
3  Q.  Any type of determination of the exact time of
4  death or how long the child had been out there in the
5  field would probably be done by someone with more
6  experience in that area, wouldn't they?
7  A.  It would be.
8  Q.  Probably a doctor perhaps?
9  A.  Yes.  Medical Examiner, someone like that.
10  Q.  Exactly, the Medical Examiner.  But over the
11  years you've learned enough to -- you kind of look at
12  the signs to look for, correct?
13  A.  Correct.
14  Q.  When you were looking inside of the -- excuse
15  me -- checking the baby's chin and jaw for any rigor
16  mortis, you said that you were able to look inside of
17  his mouth, correct?
18  A.  Correct.
19  Q.  Did you use any type of artificial aid to help
20  you get a better view, like a flashlight or penlight or
21  anything like that?
22  A.  No.  It was daylight.  I just, like I say,
23  pushed the chin down with my thumb to where I could see
24  in there.  There could have been even teeth.  I just
25  didn't see any.

113

1  Q.  Do you recall or do you know whether anyone
2  recorded that -- Officer Pena or any other crime scene
3  technician photographed you doing that?
4  A.  No.
5  Q.  And the lividity that you told this jury about,
6  I believe after you were shown a photograph by Ms.
7  Cameron you agreed that this possible lividity that was
8  present in the ear may have come from lividity, but it
9  may have also come from some other trauma and you just
10  weren't able to tell; is that right?
11  A.  Correct, at that time.
12  Q.  At that time?
13  A.  Yes.
14  Q.  Do you recall whether the scene photographs,
15  the still scene photographs that are in evidence that
16  we've talked about, whether those were taken before or
17  after the scene videotape was taken?
18  A.  I wasn't -- I was present with part of the
19  video and I know it was after I had gone into the scene.
20  Q.  Do you remember who took the scene videotape?
21  A.  I don't, no.  I believe it was Pena, but it
22  could have been Sergeant Jones.  I don't really recall.
23  Q.  You spent some time talking about some dirt
24  that was found on the car seat.  And you were hazarding
25  a guess as to whether that dirt on the seat may have

- October 12, 2011

114

1  come from when it was left there on the ground, correct?

2  A.  I'm not sure what you mean by "hazard."  I

3  wasn't trying to compare the dirt with the ground.  Just

4  the position of where the dirt was located on the seat

5  on the corner there and the mark in the ground.  That's

6  kind of what I was looking at.

7  Q.  But you didn't do any type of testing and do

8  you know whether anybody did any type of testing to

9  determine whether a specific amount of dirt that was on

10  the corner of that chair had been there for two hours or

11  two days or two weeks, did you?

12  A.  I did not do any testing, no.

13  Q.  No type of soil composition testing was done to

14  determine whether it came from right there at the scene,

15  did you?

16  A.  Not me, no.

17  Q.  Right.  Do you know whether any of that was

18  done?

19  A.  I do not know.

20  Q.  In the photograph of this -- this is State's

21  Exhibit No. 73.  I think this is the divot that you were

22  talking about, wasn't it?

23  A.  Correct.

24  Q.  Okay.  Do you remember where this, call it a

25  divot, indentation was found in relation to the body?

115

1  A.  Yes.

2  Q.  Where was that?

3  A.  Slightly above -- up the hill, let me say.

4  Q.  What do you think the distance was between the

5  body and the indentation?

6  A.  I didn't measure it, like I say.  But I could

7  give you a guess on my opinion.  Probably 5 to 7 feet,

8  maybe 8 feet, something like that, 5 feet.

9  Q.  You know what evidence markers are, don't you?

10  A.  Yes, I do.

11  Q.  Sometimes those are used in crime scenes to

12  locate spent casings and spent cartridges and things

13  like that, right?

14  A.  Correct.

15  Q.  Did anybody have any type of evidence markers

16  out at this scene that day?

17  A.  Yes.

18  Q.  Were they used to show the location of certain

19  items of interest?

20  A.  Yes.  At certain times during that crime scene

21  investigation, yes.

22  Q.  I'm showing you now State's Exhibit No. 62.

23  And would that photo reflect where the indentation was

24  located that you told us about?

25  A.  That photo wouldn't be showing that, no.

116

1  Q.  When you're saying it's up the hill, you mean

2  back to the left that's off the photograph, right?

3  A.  Correct.  Probably just left of where you can

4  see the officer's leg.  The left and maybe behind him a

5  little bit.

6  Q.  Was there any way -- does that help at all?

7  A.  Don't know.

8  Q.  Okay.  Was there any way --

9  A.  I'm sorry.  I can't tell from that photo.

10  Q.  Was there any way for you to determine how long

11  that divot or indentation had been there?

12  A.  Just per speculation, I thought it was fresh.

13  Q.  How did you determine that it was fresh?

14  A.  There's other indentations in the ground that

15  just appeared to be fresher than, you know, the ground's

16  damp, things like that.  I didn't examine it or get down

17  close to it and feel it or anything like that.

18  Q.  I mean, the grass appears to be dead, doesn't

19  it, around the indentation?

20  A.  Yes.

21  Q.  Did it look any more fresh or less fresh than

22  any other holes that were out there on the ground?

23  A.  Down between all that on the ground part, it

24  did.  It appeared to be fairly fresh to me.

25  Q.  Do you know whether that could have been

117

1  someone's footprint as they approached the scene or not?

2  A.  I have no idea.

3  Q.  You really don't know whether it's connected to

4  the scene or not, do you?

5  A.  I do not, no.

6  Q.  But to be careful in the crime scene, you did

7  note it?

8  A.  It was noted to me, actually.

9  Q.  And at that point in time, and I'm kind of

10  talking about all the Galveston Police Department, but

11  you also, but at that time there was no knowledge as to

12  the identity of this child, correct?

13  A.  At the time I was there?

14  Q.  Yes, sir.

15  A.  No, there was no identity.

16  Q.  And there was no real information at that time

17  as to how the child had gotten there; is that right?

18  A.  Correct.

19  Q.  About the only thing that you would be able to

20  tell, and this really was going to be probably the

21  Medical Examiner, was to have that person, him or her,

22  have an opinion as to how long the baby had been there.

23  And that would be later based on probably some medical

24  opinion that they might have, correct?

25  A.  To an exact time of death, you're saying?

FIRM NAME

118

1    Q. Yes, sir.
2    A. That would come from the Medical Examiner's
3  Office.
4    Q. How long do you think that you were at the
5  scene, Sergeant Kershaw?
6    A. Hour and a half or so, I guess. Hour, hour and
7  a half. I didn't really keep track.
8    Q. And your report doesn't indicate an actual time
9  that you were there, does it?
10    A. Yes. It indicates what time I received the
11  call and soon after I got there -- or heard the call
12  over the radio and left.
13    Q. Okay. I'm sorry. It doesn't indicate when you
14  would have departed the scene, does it?
15    A. No, it doesn't. I don't think it does.
16    Q. But your recollection is that it was about an
17  hour or two or hour and a half?
18    A. Something like that, I guess.
19    Q. And the things that I've told this jury about
20  both during direct and during my cross as well are all
21  the things that you did in this case, correct? In other
22  words, you were not involved in interviewing any
23  witnesses, were you?
24    A. No, I was not.
25    Q. And that includes when you got back to the

119

1  police station, which presumably you went back to
2  eventually that day, correct?
3    A. Yes.
4    Q. And although there was other work being done on
5  this case, you weren't involved in terms of
6  investigations or computer research or traveling to any
7  other scenes; is that correct?
8    A. No, I was not.
9    Q. Okay. The time that you were out there in the
10  hour to hour and a half that you were there, and you
11  listed for us the names of some of the officers that
12  were there and we've had photographs to identify them,
13  but were there other officers there present around the
14  crime scene other than the ones you told us about?
15    A. Yes. I can remember several on the outside of
16  the tape. Don't -- I can't remember exactly what time
17  they may have gotten there, though. But there were
18  other officers and personnel that arrived.
19    Q. Were these patrol officers? Were they
20  investigators, detectives?
21    A. I think both. One was another patrol
22  supervisor that I remember that arrived.
23    Q. Was that Lieutenant Trevino?
24    A. No. He -- well, he was a supervisor, but
25  that's not who I was talking about. He's actually in

120

1  one of the photos. On the outside of the tape I
2  remember seeing another sergeant.
3    Q. How many total officers -- again, this is an
4  estimate, do you think were present?
5    A. I'm not sure. Probably half dozen or so.
6  Including supervisors, not just officers.
7    Q. A half a dozen in addition to the five or six
8  we saw in that one paragraph?
9    A. Probably a couple more than that. Some of
10  those aren't -- in other words, some are ID and all
11  that. It depends on what you're -- I thought you meant
12  uniformed officers when you asked the question.
13    Q. I was going to ask about uniformed officers,
14  but I didn't mean to ask for any officers that may have
15  been present, uniformed or otherwise. What number would
16  that have been?
17    A. I didn't count them. I can just guess if you
18  want me to.
19    Q. What's your best recollection?
20    A. Best recollection is probably less than ten.
21       MR. LOPER: That's all that I have, Judge.
22       THE COURT: Ms. Cameron?
23       MS. CAMERON: Just briefly, Your Honor.
24
25

121

1       FURTHER DIRECT EXAMINATION
2  BY MS. CAMERON:
3    Q. Sergeant Kershaw, you were talking about
4  lividity and rigor mortis. Is there anything in your
5  experience that we didn't bring out in front of the
6  jury, any of your experience as a police officer that
7  you have in addition to being on patrol?
8    A. Yes, there is.
9    Q. Can you share that with the jury?
10    A. Prior to being a day watch supervisor, I spent
11  nine and a half years as a Homicide, Bank Robbery, Major
12  Crimes for the City of Galveston.
13    Q. Can you approximate how many homicide
14  investigations you might have been involved in?
15    A. Involved in, probably a dozen or more.
16  Assigned to me, probably four or five maybe. But I was
17  involved in others that I wasn't assigned to.
18       MS. CAMERON: That's all I have, Your
19  Honor.
20       MR. LOPER: Nothing further, Judge.
21       THE COURT: May this witness be excused?
22       MS. CAMERON: Yes, Your Honor.
23       THE COURT: Thank you, Sergeant.
24       MS. CAMERON: Prior to calling my next
25  witness, I would like to tender to opposing counsel

122

1   State's Exhibit No. 75, offer it into evidence and

2   publish portions of it.

3            MR. LOPER:  No objections.

4            THE COURT:  State's Exhibit No. 75 is

5   admitted.

6        (State's Exhibit No. 75 admitted)

7            MS. CAMERON:  If I may publish portions of

8   this?

9            THE COURT:  You may.

10            MS. CAMERON:  State's Exhibit No. 75,

11   which are business records from the Galveston Area

12   Ambulance Authority.  Provider, Galveston EMS.  Pick up

13   location, Cherry Hill.  Address, 100 Seawall.  Receive,

14   9:01.  Dispatch, 9:01.  In route, 9:02.  At scene, 9:05.

15   9:06, vital signs assessed.  Blood pressure, zero.

16   Pulse, zero.  Respiratory, zero.  Level of

17   consciousness, unresponsive.  9:06, head to toe

18   assessment.

19            Narrative:  GEMS Medic No. 1 arrived for a

20   possible DOS.  Fire department first responders reported

21   that a child was found and that no one had touched the

22   body or interfered with the scene.  Examination of the

23   scene found an approximately three- to six-month-old

24   child laying prone on ground wearing only a diaper.  The

25   child was found laying approximately 15 to 20 feet off

123

1   of the sidewalk on the grass area close to a telephone

2   pole.  A 2- to 3-inch diameter depression that was

3   almost approximately 1 inch in depth was noted to the

4   left parietal region of the skull.

5            The patient's face was turned to the left

6   with partial view of left side of face.  There were

7   abrasions to the left side of face with no signs of

8   heavy breathing -- heavy bleeding.  The patient had a

9   pale ashen appearance in color and had ants covering the

10   body.  Closer examination by only paramedic David Smith

11   found the patient to be cold to the touch when checking

12   the pulse on the bronchial side of the left arm.  He

13   also noted that the patient was rigored with full muscle

14   rigidity.

15            No further examination was performed.

16   Fire department first responders covered the body with a

17   white sheet and the scene was turned over to the

18   Galveston PD.  GEMS Medic 1 returned to service without

19   incident.  We were later informed by GPD that the child

20   was male and no identification was available as of yet.

21            Your Honor, at this time the State would

22   call Special Agent Jeremy Schwartz.

23            THE COURT:  Thank you.  If you will have a

24   seat and give your full name to the court reporter.

25            THE WITNESS:  Jeremy Schwartz,

124

1   S-c-h-w-a-r-t-z.

2            THE COURT:  You may proceed.

3            MS. CAMERON:  Thank you, Your Honor.

4

5        JEREMY SCHWARTZ,

6   having been previously duly sworn, testified as follows:

7            DIRECT EXAMINATION

8   BY MS. CAMERON:

9        Q.  Please introduce yourself to the ladies and

10   gentlemen of the jury.

11        A.  Good afternoon.  My name is Jeremy Schwartz.

12   I'm a Special Agent with the FBI.

13        Q.  Can you give the jury the benefit of your

14   training and experience as a police officer and now as a

15   special agent?

16        A.  Yes, ma'am.  I began my career in 2008.  I was

17   hired with the Galveston Police Department in May of

18   2008.  Prior to that, I attended Alvin Community

19   College.  Got my peace officers license and was accepted

20   here with the Galveston Police Department.  I began my

21   career as most of us do, as a patrol officer and moved

22   my way up to the bicycle patrol division, which sounds

23   silly, but it's actually a step up.  From there I became

24   a member of the canine division for several years.  And

25   after about five years in my career here at the police

125

1   department, I was promoted to Sergeant.  I ran the

2   evening watch patrol division for several years until I

3   was promoted up to detective with the Galveston Police

4   Department.

5        Q.  Unless I heard you wrong, which is quite

6   possible, I think you started with GPD, the Galveston

7   Police Department, in May, 2008.  Would it have been ten

8   years before that or --

9        A.  I'm sorry.  Did I say 2008?  That's when I

10   left, May, 2008.  I apologize.  May of 1998 is

11   when I started my career.  May of 2008 is when I

12   resigned to take the position with the FBI.

13        Q.  All right.  So, in 1998 when you started with

14   the Galveston Police Department, did you go to any kind

15   of academy or schooling to become a certified peace

16   officer?

17        A.  Yes, ma'am.

18        Q.  And can you describe that to the jury?

19        A.  Sure.  The basic school is through Alvin

20   Community College.  A lot of officers at the time we

21   would pay our own way to go through schooling.

22   Basically do several months worth of night watch

23   schooling where you learn all the basic ideas of being a

24   police officer, investigations and such.  Once you get

25   hired on by a police department, you continue your

126

1  education by doing in-service courses and stuff like
2  that, learn more and more detailed stuff about being a
3  police officer.
4      Q.  And aside from your academy training, can you
5  share with the jury what your formal education is?
6      A.  Sure. I became a master peace officer right
7  before I left, which you have to have so many certain
8  hours with your training as well as years in service. I
9  also attended college while I was a police officer. And
10  just prior to leaving the police department, I actually
11  got my Master's Degree in strategic leadership and
12  business.
13      Q.  And your undergraduate degree was --
14      A.  It's an organizational leadership, which is
15  also in business as well.
16      Q.  And you said that you started with the FBI.
17  Would that be in May of 2008?
18      A.  I left in May of 2008. I took one week off and
19  began my 21-week academy with the FBI in June of 2008.
20      Q.  Can you share with them just briefly, I guess,
21  that would be in Quantico?
22      A.  That's correct.
23      Q.  Can you tell them a little bit about what
24  training is involved in being an FBI agent?
25      A.  Sure. With the FBI it's similar to police work

127

1  only our investigations change from State crimes to
2  Federal laws. The academy in Quantico is 21 very long
3  weeks where we learn everything from how to write a
4  report to working crime scenes to turning in evidence
5  and basically learning how to work long-term
6  investigations.
7      Q.  And currently where are you assigned?
8      A.  I'm assigned in Lake Havasu City, Arizona,
9  which is a very small patch of Arizona in the northwest
10  corner of Arizona, about two hours south of Las Vegas.
11      Q.  And your duties and responsibilities as an FBI
12  agent, what do they consist of?
13      A.  I'm assigned to what's called a VCMO, a squad
14  which stands for Violent Crimes and Major Offenders. We
15  generally work crimes that occur on the Indian
16  reservations. I'm located -- there's several Indian
17  reservations around us. And any major crimes that
18  happen out there, whether it's assaults or homicides,
19  the FBI comes in and works with the tribal police and
20  actually prosecutes those cases Federally because it's
21  all Federal land.
22      Q.  I want to direct your attention back to January
23  29th of 2008. Can you share with the jury what your
24  assignment was at that time?
25      A.  I was a detective sergeant with the Galveston

128

1  Police Department back then.
2      Q.  And what were your duties and assignments as a
3  detective sergeant with the Galveston Police Department?
4      A.  My assignment was -- as a detective I was
5  assigned to major cases which involves anything from
6  homicides to major assaults and robberies.
7      Q.  At that time do you know approximately how many
8  homicides you would have been involved in either
9  assisting with or investigating?
10      A.  In my ten-year career, I couldn't tell you.
11  There was many because I was a patrol sergeant. One of
12  our first responsibilities are to go out to the scene
13  and help organize everything out there, also. So, I
14  probably -- I mean, I couldn't tell you. A couple dozen
15  maybe in my ten years.
16      Q.  So, on January 29th, 2008, can you tell the
17  jury what initially got your attention to the
18  investigation of an infant that had been found at the
19  Cherry Hill location?
20      A.  Sure. On that date I was working. We worked
21  normal business hours, 8:00 to 4:00, that kind of thing.
22  And I actually heard a broadcast over the radio of a
23  call out on the east end that involved the possible
24  deceased child. Since it was normal business hours and
25  not nighttime where we would have somebody on call, I

129

1  just volunteered to go out there to assist to determine
2  what was going on.
3      Q.  Do you recall approximately what time you got
4  to the location?
5      A.  Right around 9:15, 9:20 I believe is when I
6  heard the call and I was there shortly after that.
7      Q.  When you got to the location, who was present
8  at the scene?
9      A.  There were a few officers there including
10  Sergeant Luck, Sergeant Kershaw, I believe Lieutenant
11  Alvarez was there and also Lieutenant Trevino who was
12  our -- my supervisor for CID actually arrived at the
13  same time I did.
14      Q.  And what actions did you take when you arrived
15  there?
16      A.  Initially what I did was just kind of assess
17  the scene and talk to some of the officers that were out
18  there just to determine what we had. During my drive
19  out there is when I heard over the radio also that EMS
20  had already been to the scene and had confirmed that
21  there was a child that was dead out there.
22      Q.  When you say, "assess the scene," explain to
23  the jury if you walk the perimeter or if you saw the
24  child or what it is that you did to assess the scene.
25      A.  Initially what I did was make sure that

130

1  everybody that was out there belonged out there. You
2  know, a lot of times when you see -- when people see a
3  bunch of police cars, you get people that want to stop
4  and see what's going on. So, once I made sure that
5  everybody out there belonged there, I set up crime scene
6  tape about as far around as I could get. When I had
7  gotten there, there was just a sheet that was covering
8  the baby. So, I couldn't actually see him at first.
9         Initially my job is to make sure that the
10  pieces are moving in order, that we're getting our
11  identification officers out there in order to process
12  the scene, interviews are being conducted that need to
13  be conducted and just generally making sure that the
14  scene is secure out there.
15         Q. Were you familiar with that particular location
16  at Cherry Hill?
17         A. Yes, ma'am.
18         Q. Had you ever worked crime scene investigations
19  at that location?
20         A. I have, correct.
21         Q. And in the early morning hours, say,
22  approximately from 4:00 in the morning until 6:00 in the
23  morning, can you describe to the jury, is there a lot of
24  traffic out there? Would you describe it as desolate or
25  high traffic?

131

1         A. It depends on the day of the week. Obviously
2  Cherry Hill got its name for a reason. People like to
3  park out there in the middle of the night, whether
4  they're young kids getting away from their parents doing
5  whatever in their cars. Sometimes you may have several
6  cars out there.
7         When I first started with the department, it
8  was a big car racing extravaganza out there until
9  somebody drove off the seawall and died and we were very
10  strenuous about making sure that people weren't racing
11  out there anymore. So, it depends on the day of the
12  week. Sometimes there's absolutely nobody out there and
13  sometimes, you know, 2:00 or 3:00 in the morning, you go
14  by and see a couple cars parked up on the hill up there.
15         Q. Now, at the time that you're assessing the
16  scene and you're putting the crime scene tape up, can
17  you tell the jury, is Officer Pena there from the crime
18  scene unit?
19         A. When I first arrived, Officer Pena was not
20  there. I stood back on the scene. He arrived there
21  pretty shortly after. I have the time noted in my
22  report if you need me to look back at what time it was.
23  But Officer Pena wasn't there at the very beginning.
24  So, I waited until he got there before I went further
25  into the scene.

132

1         Q. So, at the time you arrived there, was the
2  infant visible?
3         A. No, ma'am.
4         Q. And describe what it is that you were able to
5  see before Officer Pena got there.
6         A. Sure. Before I -- before Officer Pena got
7  there, I stood up on the concrete part before going onto
8  the grass. From there you could see a white sheet. And
9  again, the officers that were there told me that the
10  baby was laying under the sheet. And further beyond
11  that you could see a baby carrier down at the bottom of
12  the hill.
13         Q. And when Officer Pena got there, were you able
14  to then view the child?
15         A. Yes, ma'am.
16         Q. Can you describe for the jury what it is that
17  you saw when you were able to view the infant?
18         A. Of course. Once Officer Pena arrived there, we
19  had the sheet lifted up so that we could, you know, view
20  the child. The baby was laying on his stomach, but he
21  wasn't exactly face down. He was laying on his stomach
22  but his head was turned to the side so you could
23  actually see his face. Originally, at that point you
24  can't really tell whether it's a male or a female. You
25  could see -- I mean, blatantly obvious you could see

133

1  that there was some trauma to the child's head, which
2  was noted by all of us out there. You could also see
3  some small abrasions and small little cuts and stuff on
4  the side of his face as well.
5         Q. Now, were you touching the infant in any way?
6  Were you handling the child?
7         A. No, ma'am.
8         Q. And why is that?
9         A. That's the job for my identification officers
10  to do. The fewer people we can have actually touching
11  the child, the better. My job is to just view what's
12  going on and pay attention and note whatever
13  observations I can make on there as well.
14         Q. In your report I think there was something
15  noted about abrasions. Can you describe for the jury
16  what it is that you saw and where that was on the
17  infant's face?
18         A. It was on the side of his face. They said he
19  was laying on his stomach, but his head was turned
20  facing to the left. So, you could see the left side of
21  his face. And they just looked like little tiny
22  individual red abrasions on there almost. Almost like a
23  scuff mark if you fell on concrete and injured your
24  knee, you would get little -- individual little marks on
25  there. That's what you could see on his face in

- October 12, 2011

**134**

1  addition to the indentation on his head.

2     Q.  What, if anything, did you note about the

3  infant's skull?

4     A.  The indentation was one of the first things I

5  noticed. It was, I guess -- it was very obvious that it

6  was disformed on the top of his head. Also I noted on

7  the back of his head which was visible because he's

8  facing to the left and you can see the whole side on the

9  back, I noticed that there was a very distinct mark on

10  the back of his head. Almost looked like a little

11  square on the back of his head. I'd say probably a

12  half-inch-by-half-inch square red mark on the back of

13  his head.

14     MS. CAMERON:  If I may approach the

15  witness, Your Honor?

16     THE COURT:  You may.

17     MS. CAMERON:  If I may show, Your Honor,

18  what's in evidence as State's Exhibit No. 66?

19     THE COURT:  You may.

20     Q.  (BY MS. CAMERON)  Now, Special Agent, I'm

21  showing you what's in evidence now as State's Exhibit

22  No. 66. And you should have a laser pointer up there.

23  If you can show the jury what, if anything, that you

24  noted that you just described to the jury.

25     A.  Yes, ma'am. If you look up at the top here,

**135**

1  this is -- from this angle, I mean, it's still pretty

2  obvious, but you can see that the -- there's misshapen

3  to his head here as opposed to being round. This side

4  of the head you can see how the head is still round over

5  here and this side has an indentation. The red markings

6  that I was referring to are these little squares back

7  here which are very visible, I mean, even in this

8  picture. And in person it was even more vibrant. These

9  little square marks really stood out.

10     Q.  Thank you, sir.

11     Now, as far as your responsibilities at the

12  scene as the detective sergeant, can you tell the jury

13  if this was to be your case from beginning to end? Were

14  you the supervisor at the scene, so to speak?

15     A.  Well, we would call it the lead detective.

16  The case was assigned to me. As I said, Lieutenant

17  Trevino came out there and I believe Captain Benavidez

18  was out there as well. They're in charge of the

19  Detective Division. So, they make the decision on who

20  gets assigned cases. As I said earlier, I had gone out

21  there just in case they needed a detective out there

22  before we even knew there was actually a deceased baby

23  out there. And they assigned me to handle the case as

24  the lead detective.

25     Q.  So, at the time that you're out at the scene,

**136**

1  do you have any idea who this infant is, what the

2  child's name is?

3     A.  No, ma'am.

4     Q.  Do you have any suspects at this point?

5     A.  No, ma'am, not at all.

6     Q.  Do you have any vehicles that would have been

7  associated with the crime from anybody that you could

8  have talked to out at that area?

9     A.  No, ma'am, not when we were first out there,

10  no.

11     Q.  So, after Officer Pena gets out there, are you

12  able to walk around and see anything in addition to the

13  infant's body? Did you see a car seat out there?

14     A.  I did. And again, I was able to see the car

15  seat from the roadway before Officer Pena got out there.

16     Q.  Did you get up close enough to see what the

17  brand name was on the car seat and what kind of pattern

18  it had on it?

19     A.  Yes, ma'am.

20     Q.  What was it?

21     A.  It was an Evenflo brand car seat.

22     Q.  And in addition to that, was the infant -- what

23  was the infant wearing?

24     A.  The only thing he had on was a diaper. He had

25  no shirt, no pants.

**137**

1     Q.  Were you able to determine what particular type

2  of diaper it was and if there was any kind of pattern on

3  there?

4     A.  Yes, ma'am. They turned out to be Blue's Clues

5  patterned diapers.

6     Q.  So, other than making a note of the type of

7  diaper and this Evenflo, the car seat that was out

8  there, did you have any other clues to the child's

9  identity?

10     A.  To his identity, no, ma'am.

11     Q.  Did you also see a little blue sock out there?

12     A.  Yes, ma'am, I did.

13     Q.  How long approximately were you out at the

14  scene?

15     A.  It was a couple of hours, I would say. I got

16  out there just shortly after -- I guess -- I believe the

17  call was about 9:20. I was out there for a few hours,

18  maybe two hours.

19     Q.  So, in addition to Mr. And Ms. Jesse Zaro, was

20  there anyone else that you-all had to get statements

21  from at this time?

22     A.  No, ma'am.

23     Q.  So, tell the jury, when you left the scene,

24  where is it that you went or what did you do next in

25  your investigation.

138

1    A.  Originally we had gone to the station but we

2   planned to go to the Medical Examiner's Office in order

3   to view an autopsy.  At that time, you know, part of our

4   goal is -- the first thing we want to do is identify the

5   child.  So, I did things like call our dispatch to see

6   if we had any missing children reports and such just in

7   an effort to try to determine who the child was.

8    Q.  Tell the jury, did you have any conversations

9   with Officer Pena or Renee Ochoa about how you-all might

10  develop a photograph that would be suitable to perhaps

11  give out to the media so that you could maybe put it on

12  TV or do something to try to identify who that child

13  was?

14   A.  Yes, ma'am.  Those conversations started pretty

15  early because, again, our number one goal is to get the

16  child identified.  That's where our investigation has to

17  start.  Because of the injuries to his face and the

18  indentation on his head, we wanted to do things as

19  easily for the public as we could so that we didn't --

20  the last thing we want to do is post that picture on the

21  news and say, "Is this your child," because it obviously

22  -- I mean, it's not very kind to do.  So --

23       MR. BOURQUE:  Objection, nonresponsive.

24       THE COURT:  Ask another question, please.

25   Q.  (BY MS. CAMERON)  So, did you-all try to

139

1   produce a digital photo of the infant perhaps using the

2   mirror image of the side that wasn't damaged in order to

3   have a suitable photograph to put -- to give to the

4   media?

5    A.  Yes, ma'am.  We discussed that with Officer

6   Pena who's our ID officer.  Our plan was to take a

7   digital photograph of the child's face.  And Pena said

8   he would be able to basically do a mirror image of the

9   half of his face that didn't have any injuries to it.

10  And that way the picture would look a little bit --

11   Q.  Now, after you left the Medical Examiner's

12  Office, did you get any clues or get any calls that

13  might give you a tip to what the identity of this infant

14  might be?

15   A.  I received a call from the Medical Examiner's

16  Office regarding a Ms. Caren Kohberger who had called

17  the Medical Examiner's Office and stated that she --

18       MR. BOURQUE:  Objection, hearsay.

19       MS. CAMERON:  Let me rephrase that.

20   Q.  (BY MS. CAMERON)  Without going into anything

21  that -- would it have been an Investigator Florence from

22  the ME's Office?

23   A.  Yes, ma'am.

24   Q.  Without going into anything that he said, after

25  you had that conversation with him, can you tell the

140

1   jury what it is that you did?

2    A.  Sure.  We contacted Caren Kohberger by

3   telephone.  Identified ourselves -- myself and Sergeant

4   Almendarez as investigators with the police department

5   down here and asked her to remain at her home so we

6   could come speak to her.

7    Q.  Now, Sergeant Almendarez, would that be

8   Sergeant Annie Almendarez?

9    A.  Yes, ma'am.

10   Q.  And where was she assigned at that time?

11   A.  At that time she was the sergeant in charge of

12  the Juvenile Division.

13   Q.  And what was to be her responsibilities in this

14  investigation?

15   A.  She was basically a cold case agent -- a

16  co-detective.  So, basically we have more than one

17  person that attempts to work on major cases like this in

18  case, you know, two heads are better than one.

19   Q.  Do you recall approximately when it was that

20  you got that call from Florence, the investigator from

21  the ME's Office?

22   A.  The exact time?  No, I do not recall that,

23  ma'am.

24   Q.  Do you recall approximately when it was that

25  you went to a location in Alvin, Texas, in order to meet

141

1   with Caren Kohberger?

2    A.  It was daylight hours.  It was in the

3   afternoon.  I'll have to review my notes --

4    Q.  Do you have your report with you?

5    A.  Yes, ma'am, I do.

6    Q.  Okay.  Feel free to review it.

7    A.  Okay.

8       THE COURT:  Ladies and gentlemen, while

9   he's doing that, why don't you stand up and stretch.

10      Let us know when you're ready, Officer.

11      THE WITNESS:  I am ready.

12      THE COURT:  Okay.  Thank you.  Please be

13  seated.

14      And, Ms. Cameron, you may continue.

15      MS. CAMERON:  Thank you, Your Honor.

16   Q.  (BY MS. CAMERON)  Now, first of all, does your

17  report indicate approximately what time it is that you

18  received a call from Investigator Florence from the ME's

19  Office?

20   A.  Yes, ma'am.  6:16 p.m -- 16 -- sorry.

21  Military time.  4:16 p.m.  I apologize.

22   Q.  All right.  So, is this then still January

23  29th?

24   A.  I believe so, yes, ma'am.  I'm sorry.  Yes,

25  that's correct.

142

1  Q. And then approximately what time was it that
2  you arrived at the location in Alvin, Texas?
3      A. Forty-five minutes from then.
4      Q. When you got there, I'm assuming that you and
5  Annie Almendarez -- was there anybody else going with
6  you?
7      A. No, ma'am.
8      Q. And what's the physical address of the location
9  you went to?
10     A. The address is No. 212 at the -- 1100 Fox
11 Meadow Drive in Alvin, Texas.
12     Q. Is this a trailer park?
13     A. Yes, ma'am, it is.
14     Q. And who were you greeted by?
15     A. Michele Duarte was in the home as well as Caren
16 Kohberger.
17     Q. And do you know whose trailer that was?
18     A. Michele's.
19     Q. And do you know who all was living at that
20 trailer?
21     A. Yes, ma'am. The people that lived there was
22 Michele and her boyfriend, Darrell Nichols. And they
23 have four children. Along with Travis Mullis, Caren
24 Kohberger and their child, Alijah.
25     Q. And did you take the digital photograph with

143

1  you or did you have the intent to show them the infant
2  for identification there at the trailer?
3      A. Originally I believe that we actually had the
4  artist's rendition of the -- of Alijah. But the intent
5  was not to actually show her the photograph there. Our
6  plan was to bring her and Michele back to the station
7  and actually do a thorough interview.
8      Q. Describe Caren Kohberger for the members of the
9  jury. How did she appear when you met with her?
10     A. She was very calm. She didn't -- never got
11 upset or inquired as to why we were there. I mean, she
12 knew that we were there to discuss her child missing
13 but, very calm, relaxed.
14     Q. Was she cooperative?
15     A. Yes, ma'am.
16     Q. Describe Michele Duarte.
17     A. The same. Michele was -- Michele had a little
18 bit of concern as to why we were there. Obviously was
19 aware that Alijah and Travis Mullis had been missing for
20 several hours. But, again, very cooperative and willing
21 to come to the station and speak with us.
22     Q. What was it that you were actually saying to
23 them as you come to the trailer?
24     A. Originally we just discussed with them that,
25 you know, we understand that you haven't seen your child

144

1  or the father of the baby in a long time. Got some
2  basic information and explained to them that we'd like
3  to talk to them about the father and the child being
4  missing.
5      Q. Did you obtain consent to search from Michele
6  Duarte?
7      A. Yes, ma'am, I did.
8      Q. And were you allowed at that time to walk
9  through the entire trailer?
10     A. Yes, ma'am.
11         MS. CAMERON: If I may approach the
12 witness, Your Honor?
13         THE COURT: You may.
14     Q. (BY MS. CAMERON) I'm going to show you what's
15 been marked for identification purposes as State's
16 Exhibit No. 76. And this is a Google map that shows a
17 location at 1100 Fox Meadow Drive, Alvin, Texas. And
18 then there's a, I guess a pin at a location that's
19 called "Cherry" for Cherry Hill. Can you tell whether
20 or not this fairly and accurately shows the location of
21 both where you went to the trailer and also the crime
22 scene location?
23     A. Yes, ma'am.
24     Q. And I'm going to show you also what's been
25 marked for identification purposes as State's Exhibit

145

1  No. 78 through State's Exhibit No. 96. And if you could
2  look at those and tell the jury and the Court whether or
3  not those fairly and accurately show the location of the
4  trailer park in Alvin, Texas, when you went there with
5  Annie Almendarez.
6      A. Yes, ma'am. They all appear to be the trailer,
7  No. 212.
8      Q. And who was taking these photographs?
9      A. These were taken by the ID officer, Scott Pena.
10     Q. So, you told the jury that you had gone out
11 there that afternoon with Annie Almendarez. Did you end
12 up going out there a second time after consents to
13 search were obtained?
14     A. Yes, ma'am, that's correct.
15     Q. And would this be the second time that you-all
16 went to the trailer?
17     A. Yes, ma'am. Those all appear to be from
18 No. 212.
19     Q. And they fairly and accurately show the trailer
20 as you saw it that afternoon?
21     A. Yes, ma'am.
22     Q. And State's Exhibit No. 77, do you recognize
23 that as the consent to search that was obtained from the
24 owner of the trailer, Michele Duarte?
25     A. Yes, ma'am.

146

1    Q.   And is that your signature down there under
2    "Witness"?
3    A.   It is.
4         MS. CAMERON:   Your Honor, at this time I'm
5    going to tender to opposing counsel State's Exhibit
6    Nos. 76, 77 and 78 through 96 and offer the same into
7    evidence.
8         MR. BOURQUE:   No objections to State's
9    Exhibit Nos. 76 through 96; is that right?
10        THE COURT:   All right.  Those exhibits
11   will be admitted.
12        (State's Exhibit Nos. 76 through 96 admitted)
13        MS. CAMERON:   Thank you, Your Honor.  If I
14   may publish these?
15        THE COURT:   You may.
16   Q.   (BY MS. CAMERON)   Now, Special Agent Schwartz,
17   I'm going to show to the jury State's Exhibit No. 76.
18   And there appear to be two drop pins on this.  One at
19   1100 Fox Meadow.  Would that be the location that you
20   went to that afternoon to the trailer that was owned by
21   Michele Duarte?
22   A.   Yes, ma'am.
23   Q.   And there appear to be different routes that
24   you could take.  Are you familiar with the different
25   ways that one could go from that trailer location to get

147

1    to Galveston Island?
2    A.   I'm familiar with the fastest route.
3    Q.   Okay.  What would the fastest route --
4    A.   That would be taking --
5         MR. BOURQUE:   Objection.  It's immaterial
6    and irrelevant.  The route he took would be the only
7    relevant --
8         MS. CAMERON:   We'll move on.
9    Q.   (BY MS. CAMERON)   But within this map does it
10   show I-45?
11   A.   Yes, ma'am.
12   Q.   And what is this blue --
13   A.   That should be Highway 6.
14   Q.   Now, can you show the jury from the drop pin at
15   1100 Fox Meadow, where is it that you would reference to
16   Cherry Hill or the location of the crime scene?
17   A.   That would be down at the right-hand corner
18   here where the other yellow pin is.
19   Q.   Thank you, sir.
20        State's Exhibit No. 77, a consent to search,
21   if you had not been able to get a consent to search from
22   Caren Kohberger and also from Michele Duarte, can you
23   tell the jury what you would have had to have done in
24   order to search that trailer?
25        MR. BOURQUE:   Objection.  It's immaterial

148

1    and irrelevant.
2    Q.   (BY MS. CAMERON)   Would you have had to have
3    gotten a search warrant if you hadn't gotten consent
4    from Caren Kohberger and also Michele Duarte?
5         MR. BOURQUE:   Same objection, Judge.
6         THE COURT:   Well, this is the State's
7    case.  I'm going to overrule the objection.
8         You may ask the question.
9    Q.   (BY MS. CAMERON)   What was the purpose for
10   obtaining consent from the people that lived at that
11   location?
12   A.   If you can't obtain consent from the owner of
13   the home, you have to file for a search warrant to get
14   into the residence.
15   Q.   Did you need or get a search warrant after you
16   got consent from Caren Kohberger and Michele Duarte?
17   A.   No, ma'am.
18   Q.   And down here at the bottom, would that be your
19   signature?
20   A.   Yes, ma'am, second from the bottom.
21   Q.   State's Exhibit No. 78, if you can explain to
22   the jury what we're looking at here.
23   A.   That would be the front door entrance to
24   No. 212.
25   Q.   State's Exhibit No. 79?

149

1    A.   That's a photograph just including the address
2    of the trailer.
3    Q.   Now, when you first went into the trailer, did
4    you notice anything that caught your eye as far as a
5    stroller?
6    A.   Yes, ma'am.  That was located right there in
7    the front, basically the living room, the partition
8    between the kitchen and living room.
9    Q.   If you could use the pointer and show the jury
10   what it is that you're referencing and whether or not --
11   A.   This here is a stroller.  And maybe you can
12   tell in this picture, but the pattern on that stroller
13   was very similar to the pattern of the carrier that we
14   saw out there where Alijah was found.
15   Q.   Was it an Evenflo brand?
16   A.   Yes, ma'am.
17   Q.   So, are you at all factoring that in as you're
18   seeing that when you come into the trailer?
19   A.   Yes, ma'am.
20   Q.   State's Exhibit No. 81, is this a close-up of
21   that stroller?
22   A.   Yes, ma'am.
23   Q.   And looking at it this way --
24        MS. CAMERON:   Your Honor, if I may?
25   Q.   (BY MS. CAMERON)   I'd like to put State's

- October 12, 2011

---

150

1  Exhibit No. 70 next to State's Exhibit No. 81. Can you
2  tell the jury whether or not you were seeing the
3  similarities of the two Evenflo, one being a stroller
4  and one being the discarded baby seat that was found at
5  Cherry Hill?
6      A.  Yes, ma'am. Just looking at this area here,
7  you could see that they have the same pattern on them
8  and they are the same brand.
9      Q.  State's Exhibit No. 82, is this, again, part of
10  the trailer?
11     A.  Yes, ma'am, it is.
12     Q.  And do you recognize who this gentleman is?
13     A.  I do. That's Sergeant Jones.
14     Q.  And who is this lady that we see in the
15  background?
16     A.  I believe that's Michele Duarte, the owner of
17  the residence.
18     Q.  You believe that is Michele Duarte?
19     A.  Yes, ma'am.
20     Q.  State's Exhibit No. 83, is this the living room
21  area?
22     A.  Yes, ma'am, it is.
23     Q.  State's Exhibit No. 84, is this kind of the
24  kitchen and -- that goes from the living room area?
25     A.  Correct. Kitchen, dining room-type area.

---

151

1      Q.  State's Exhibit No. 85, who is the young woman
2  that we're seeing in State's Exhibit No. 85?
3      A.  That's Alijah's mother, Caren Kohberger.
4      Q.  State's Exhibit No. 86?
5      A.  That would be just inside the front entry door
6  and looking back towards the back bedrooms.
7      Q.  State's Exhibit No. 87?
8      A.  That's taken from the bedroom at the far end
9  which is where Caren explained to us that she sleeps
10  with Alijah and Travis Mullis.
11             MR. BOURQUE:  Objection, hearsay.
12             THE COURT:  Sustained.
13     Q.  (BY MS. CAMERON)  Without going into anything
14  that you came to learn by conversations, can you tell
15  the jury, did there appear to be two beds in that
16  bedroom?
17     A.  Yes, ma'am.
18     Q.  And did you also find baby items -- State's
19  Exhibit No. 88, does this show the two beds, one here
20  and then one there?
21     A.  Yes, ma'am, there's two beds in that picture.
22     Q.  And State's Exhibit No. 89, is this in the same
23  bedroom and showing a lot of child clothing?
24     A.  Yes, ma'am.
25     Q.  State's Exhibit No. 90, is that a close-up of

---

152

1  what we just looked at of the child clothing?
2      A.  Yes, ma'am.
3      Q.  State's Exhibit No. 92, can you tell the jury
4  whether or not there's a small blue sock in that
5  picture?
6      A.  Down there on the bottom right-hand corner is a
7  -- it's a blue sock.
8      Q.  When you were out at the crime scene, had you
9  seen a single blue sock?
10     A.  Yes, ma'am.
11     Q.  State's Exhibit No. 93, what are we looking at
12  here?
13     A.  Those would be the Luvs diapers with the Blue's
14  Clues brand pattern.
15     Q.  Where had you last seen the Blue's Clues
16  diaper?
17     A.  On Baby Alijah.
18     Q.  At this point you've seen the Evenflo stroller
19  with that pattern. You're seeing the Blue's Clues
20  diapers. What's going through your mind at this point?
21  Do you believe that Caren Kohberger is the mother of the
22  child that you had found?
23     A.  Yes, ma'am.
24     Q.  State's Exhibit No. 94, State's Exhibit
25  No. 95, does that appear to be a child bath in there?

---

153

1      A.  Yes, ma'am.
2      Q.  Do you know offhand what the ages were of
3  Michele Duarte's children? Were any of them infants?
4      A.  I don't believe any of them were infants, no,
5  ma'am.
6      Q.  State's Exhibit No. 96, did there appear to be
7  some paperwork that was located in that bedroom?
8      A.  Yes, ma'am.
9      Q.  Now, was it your responsibility to go through
10  and collect evidence and to gather any paperwork or to
11  take into your possession any possible evidence?
12     A.  No, ma'am. I used the identification officers
13  to do that.
14     Q.  So, that would be for Officer Pena?
15     A.  Yes, ma'am.
16     Q.  State's Exhibit No. 91, did there appear to be
17  a little girl's bedroom with some pink curtains or --
18     A.  Yes, ma'am.
19     Q.  Now, while you're out there, approximately how
20  much time did you spend at that location before you left
21  to go back to the station?
22     A.  It was a couple of hours that we were up there.
23     Q.  And during the time that you were there, did
24  you see any photographs of Baby Alijah Mullis?
25     A.  Yes, ma'am. That was during -- I believe that

---

Page 150 to 153 of 260

154

1    was during the first time we first -- before we took

2    Caren for her interview.

3         Q.  Let's talk about that initial time that you're

4    there that you see the place, you see the stroller, you

5    see the Blue's Clues diaper.  You said you didn't show

6    any pictures of Alijah, correct?

7         A.  Correct.

8         Q.  Tell the jury what, if any, pictures you saw of

9    Caren Kohberger's infant.

10        A.  Caren Kohberger showed me a photograph that she

11   said was a pretty recent picture of her child.

12   Based on the photograph that she showed me, I believed

13   that her child was the same one that we had found on

14   Cherry Hill.

15        Q.  Now, was there anything distinctive about the

16   way he looked?

17        A.  Yes, ma'am.  He had a really cool Mohawk.

18   Just -- it was a natural cowlick or something, but his

19   hair stood straight up in the front.  I recall that

20   being very distinctive from out there on the scene.

21        Q.  So, when you're putting that together and

22   you're seeing the picture of her infant, are you saying

23   anything to her?

24        A.  Not there at the house, no, ma'am.

25        Q.  Did you request for them to come back to the

155

1    station to give a statement?

2         A.  Yes, ma'am, we did.

3         Q.  And did they agree to do so?

4         A.  Yes, ma'am.

5         Q.  Did they go back with you or how did they get

6    to the station?

7         A.  Correct.  They did not have their own car.

8    So, they rode back with Sergeant Almendarez and I to the

9    police station down here.

10        Q.  Now, at this point did you ask her the name of

11   the child?

12        A.  Yes, ma'am.

13        Q.  Did you ask her the name of the father of the

14   child?

15        A.  Yes, ma'am, I did.

16        Q.  And who did you believe was the father of that

17   infant?

18              MR. BOURQUE:  Objection.  It's based on

19   hearsay.

20              THE COURT:  Sustained.

21        Q.  (BY MS. CAMERON)  Well, let me ask you this:

22   Did you get information about Caren Kohberger's vehicle?

23        A.  Yes, ma'am, I did.

24        Q.  And what was your purpose for getting

25   information about her car?

156

1         A.  In an effort to locate the car we needed

2    descriptors so we could try to find the car if he was

3    out driving around.

4         Q.  Tell the jury, what is TCIC-NCIC?

5         A.  Sure.  TCIC and NCIC here in Texas, they kind

6    of go to the same thing.  National Crime Information

7    Center, which is the NCIC part of it.  And you have the

8    Texas part of it.  Entries are put into that computer

9    for a myriad of things.  For people that have warrants

10   or stolen cars, we enter that information through our

11   dispatchers into the computer system.  And that way if

12   those cars or people are located in another city or even

13   another state, it warns the officers who stop them that

14   either the car's been stolen or the person has a

15   warrant.

16        Q.  So, without going into anything that Caren

17   Kohberger said to you or anything that was said to you

18   by Michele Duarte what, if anything, did you cause to be

19   placed into TCIC-NCIC regarding that vehicle and a

20   person of interest?

21        A.  We had both the vehicle entered, which was a

22   2002 Hyundai, as well as Travis, AKA T.J. Mullis entered

23   into the TCIC-NCIC computer.

24        Q.  Did you have identifiers on him?  Did you have

25   a photograph or were you strictly putting a name into

157

1    TCIC-NCIC?

2         A.  Name and date of birth.

3         Q.  Additionally, did you have a license plate for

4    the vehicle?

5         A.  Yes, ma'am.

6         Q.  And who did you believe that vehicle or did you

7    check to see who that vehicle was registered to?

8         A.  Both Caren and T.J.

9         Q.  That's your understanding?

10        A.  Yes, ma'am.

11        Q.  Now, did you actually get a certificate of

12   title to know whether or not Travis Mullis was even on

13   the title?

14        A.  No, ma'am.

15        Q.  Now, after that was entered into the system,

16   did you then attend the autopsy?

17        A.  Yes, ma'am, I did.

18        Q.  Is that routine for a detective to go to an

19   autopsy on a deceased person in a case that you're

20   working?

21        A.  Yes, ma'am, it is.

22        Q.  And what day do you recall going to the

23   autopsy?

24        A.  I believe the autopsy was done on the --

25   January 30th.

Page 154 to 157 of 260

FIRM NAME

158

1    Q. So, this is now the second day?

2    A. Correct.

3    Q. And what is it that you learned or -- well,

4 don't go into what would have been told to you by Mambo,

5 by Dr. Nobby Mambo, but did you observe for yourself

6 whether or not there was any other trauma to this infant

7 besides the child's head?

8    A. I observed the injury to the head.

9    Q. Can you tell the jury whether or not it was

10 massive, severe --

11    A. I would use the word "severe" trauma to the

12 head.

13    Q. Did it appear to be the cause of death, if you

14 know?

15    A. Yes, ma'am.

16    Q. Now, I want to direct your attention to after

17 the autopsy and you've now got a name and a car entered

18 into the system. Did there come a time when you

19 received notice that the Defendant had turned himself in

20 at a location?

21    A. Yes, ma'am, I did.

22    Q. Tell the jury what day and approximately when

23 it would have been that you were aware that Travis

24 Mullis was located.

25    A. That's going to be February 1st. Sometime in

159

1 the afternoon I learned that Travis Mullis had turned

2 himself in in Philadelphia.

3    Q. So, who did you actually communicate with?

4    A. Detective Hesser with the Philadelphia Police

5 Department Homicide Unit.

6    Q. Now, are there times when you might say, "Hold

7 off on interviewing a suspect. We'll be right there and

8 we'll do the interviewing"?

9    A. Yes, ma'am. Those times would be if the person

10 is caught somewhere locally where I as the lead

11 detective can actually go conduct the interview, I would

12 do that myself. This being all the way up in

13 Philadelphia, it's a little difficult to get a plane

14 ride up there immediately. I learned if he wanted to

15 talk, I would prefer the interview be done immediately.

16    Q. So, what, if any, instructions did you give to

17 Detective Hesser with the Homicide Division of the

18 Philadelphia Police Department?

19    A. I requested that he give Travis Mullis a Texas

20 Miranda warning as well as the Miranda warning that's

21 utilized there in Philadelphia.

22    Q. How were you able to give him the Miranda

23 warning -- the Texas warnings to the gentleman up in

24 Philadelphia?

25    A. We had it faxed to his office there.

160

1    Q. And did you have ongoing conversations with

2 Detective Hesser? Did you end up giving him whatever

3 information you had down here?

4    A. Yes, ma'am.

5    Q. Did you let him know where the body was found?

6    A. Yes, ma'am, I did.

7    Q. Do you recall what, if any, other information

8 you gave to Detective Hesser?

9    A. Basically the date and location and who we

10 believed the suspect was.

11    Q. Well, going back to the location, that location

12 where the infant was found, is that a location in

13 Galveston County, Texas?

14    A. Yes, ma'am, it is.

15    Q. So, did you give him any maps or anything or

16 have those sent or just a general location?

17    A. Just a general location.

18    Q. Now, at some point did you believe that they

19 were able to obtain a written statement from the

20 Defendant?

21    A. Yes, ma'am, that same day.

22    Q. So, was there a period of time after you said,

23 "Talk to him," that it was a matter of then waiting to

24 find out what they were going to get from the Defendant?

25    A. That's correct.

161

1    Q. Did you end up getting a fax from Detective

2 Hesser that was essentially the Defendant's written

3 statement?

4    A. Yes, ma'am, I did.

5    Q. And do you know how long it took in order for

6 you to get this?

7    A. I recall the time that I received it, which was

8 around 8:40, 8:45, I believe.

9    Q. So, do you know approximately how many hours

10 had gone by from when you said, "Go ahead and try to

11 talk to him. Here are the Texas warnings," and when you

12 received a copy of the written statement?

13    A. Yes, ma'am. Give me one moment, please. It's

14 around 1:50 in the afternoon is when I received a call

15 from Detective Hesser. I received the fax, I believe,

16 again, it was 8:50 that afternoon.

17    Q. And did you review that written statement?

18    A. Yes, ma'am, I did.

19    Q. Did Annie Almendarez review that, also?

20    A. Yes, ma'am.

21    MS. CAMERON: If I may approach the

22 witness, Your Honor?

23    THE COURT: You may.

24    Q. (BY MS. CAMERON) Special Agent, I'm going to

25 show you what's been marked for identification purposes

- October 12, 2011

162

1  as State's Exhibit No. 47. And do you recognize what
2  that is?
3     A.  Yes, ma'am.
4     Q.  And can you tell the jury, after you got the
5  statement, what is it that you-all did in order to try
6  to make certain that there was a warrant in place for
7  the Defendant?
8     A.  After reading the written statement, we filed
9  for a warrant which included this affidavit for the
10  arrest of Travis Mullis.
11     Q.  Were you present when that was signed by a
12  magistrate, District Court Judge Lonnie Cox of the 56th
13  District Court for Galveston County, Texas?
14     A.  Yes, ma'am.
15     Q.  And, so, in order for this to be done, was
16  there a sworn affidavit by Annie Almendarez that was
17  presented to the Judge?
18     A.  That's correct.
19     Q.  And did you observe the Judge review that?
20     A.  Yes, ma'am.
21     Q.  And did he sign that?
22     A.  Yes, ma'am, he did.
23     Q.  And at this point did you believe that you-all
24  then had an arrest warrant for the Defendant, Travis
25  James Mullis, for the offense of capital murder?

163

1     A.  Yes, ma'am.
2     Q.  And approximately what time was that signed by
3  the Judge?
4     A.  9:15 p.m.
5     Q.  And tell the jury what it was, what action did
6  you take after that arrest warrant was signed?
7     A.  After the arrest warrant was signed, I returned
8  back down here to the station and met with our dispatch
9  supervisor in order to have the TCIC-NCIC information
10  updated to include a capital murder warrant for Travis
11  Mullis.
12     Q.  So, initially there was a hold. Now there was
13  a capital murder warrant for him in the system?
14     A.  That's correct.
15     Q.  Now, what is your understanding about what is
16  now going on with the Defendant in Philadelphia?
17     A.  After the written statement was done, they were
18  going to do a videotaped statement as well.
19     Q.  Did you have any further communication that
20  evening or after you got the capital murder warrant
21  signed with Detective Hesser?
22     A.  Yes, ma'am, after the interview was concluded.
23     Q.  When you say, "the interview," would that be
24  the second interview that was videotaped?
25     A.  Correct, yes, ma'am.

164

1     Q.  Did you receive information about what was in
2  the contents of that?
3     A.  Yes, ma'am, I did.
4     Q.  Now, what was your plan at this point? Did
5  you-all have any plans to go up to Philadelphia to
6  process the vehicle?
7     A.  Yes, ma'am.
8     Q.  Did you understand that they had located that
9  2002 Hyundai?
10     A.  Yes, ma'am. I learned that the same time after
11  they -- after Travis had turned himself in to the police
12  department. Detective Hesser also said that they had
13  located the vehicle.
14     Q.  How soon after he had made his statement did
15  you and other Galveston police officers go up to
16  Philadelphia, Pennsylvania?
17     A.  I believe we went up the following day.
18     Q.  And when you went, who all went?
19     A.  Myself, Sergeant Almendarez, Scott Pena and
20  Sergeant Jones.
21     Q.  And did you-all have divided responsibilities
22  as far as who would be responsible for processing the
23  vehicle and what you and Annie Almendarez would be
24  responsible to do?
25     A.  Yes, ma'am. Again, my -- I was assigned -- I

165

1  assigned Detective Pena and Sergeant Jones to conduct
2  the identification work on the vehicle. And myself and
3  Sergeant Almendarez would be able to -- would be free to
4  do interviews.
5     Q.  When you say, "interviews," did you come to
6  know whether or not the Maryland area was an area of
7  interest or something that -- there might be people in
8  that area that you needed to interview?
9     A.  Yes, ma'am.
10     Q.  And did you and Annie Almendarez go to
11  Maryland?
12     A.  Yes, ma'am, we did.
13     Q.  And what was your purpose for going anywhere
14  that the Defendant might have traveled?
15     A.  The purpose was to meet with people that he may
16  have spoken to during his drive from Texas up to
17  Philadelphia.
18     Q.  Now, after you did your interviews, did you go
19  back to Philadelphia to the police department?
20     A.  Yes, ma'am.
21     Q.  And what is your understanding of what evidence
22  was taken possession of?
23     A.  At the time I recall there was part of a car
24  seat that was located in the trunk. Another baby
25  blanket was found in the vehicle as well as a B.B. gun

FIRM NAME

Page 162 to 165 of 260

- October 12, 2011

166

1    that was found in the car.

2         Q.  Did you-all get the shoes of the Defendant?

3         A.  Yes, ma'am.

4         Q.  Did you also get his sweater and the clothing

5    that he had on when he was there?

6         A.  Everything that he was wearing was taken.

7         Q.  Now, how were you to transport the Defendant

8    back?

9         A.  We had to transport him on a plane.

10        Q.  And who took custody of the Defendant?

11        A.  I did, ma'am.

12        Q.  Can you describe -- first of all, do you see

13   the Defendant present in Court today?

14        A.  Yes, ma'am, I do.

15        Q.  Can you point to him and describe him by some

16   article of clothing that he's wearing?

17        A.  He's sitting at that table right there in the

18   blue tie.

19             MS. CAMERON:  May the record reflect that

20   the witness has identified the Defendant?

21             THE COURT:  It will.

22        Q.  (BY MS. CAMERON)  Now, when you went up there,

23   was this your first time to deal with him, the first

24   time to meet him?

25        A.  Yes, ma'am.

167

1         Q.  And when was it that you actually first saw and

2    got custody of the Defendant?

3         A.  That would be at the actual airport, at the

4    Philadelphia airport substation.

5         Q.  Now, his clothing was taken into police

6    custody.  What, if anything, was the Defendant given to

7    wear on his way back?

8         A.  Myself and Almendarez actually went to Wal-Mart

9    and purchased a sweatshirt and sweat pants that matched

10   as well as some slippers.

11        Q.  How would you describe his demeanor?

12        A.  Talkative, chatty, calm, I guess you could say.

13        Q.  Well, was your intent to reinterview him?

14        A.  No, ma'am.  Not at all.

15        Q.  And tell the jury why you weren't going to

16   reinterview him.

17        A.  Once he had been to Philadelphia, he had gone

18   to his initial appearance.  And after that time you're

19   provided with your Miranda warning.  Philadelphia

20   actually advised him not to talk to us.  So, we had no

21   intentions of reinterviewing him.

22        Q.  So, did he spontaneously speak to you-all?

23        A.  Yes, ma'am, several times.

24        Q.  As far as his demeanor, did he seem tearful,

25   upset, crying?

168

1         A.  Was the first word "tearful"?

2         Q.  Tearful.

3         A.  No, ma'am, not at all.

4         Q.  Well, how would you describe his demeanor?

5         A.  It was very casual.  He spoke to me like he'd

6    known me for years like a friend, very casual.

7             MS. CAMERON:  I'll pass the witness.

8         Thank you, sir.

9             THE COURT:  Ladies and gentlemen, we're

10   going to go ahead and take a comfort break.  I'll call

11   you back out in about 15 minutes.  Thank you.

12             (Break held)

13             (Open court, Defendant and jury present)

14             THE COURT:  Thank you.  You may be seated.

15        The Defense may cross-examine the witness

16   at this time.

17             MR. BOURQUE:  Thank you, Your Honor.

18             CROSS-EXAMINATION

19   BY MR. BOURQUE:

20        Q.  Agent Schwartz, how are you doing this

21   afternoon?

22        A.  Very well, sir.  Yourself?

23        Q.  All right.  Very well.  Thank you for asking.

24        We just talked a little bit outside the

25   presence of the jury about State's Exhibit No. 75, which

169

1    is that report --

2             MR. BOURQUE:  If I may approach, Judge?

3             THE COURT:  You may.

4         Q.  (BY MR. BOURQUE)  I talked about it and then

5    took it away from you.

6         A.  Yes, sir.

7         Q.  That's State's Exhibit No. 75.  And in State's

8    Exhibit No. 75, that's the document where EMS is

9    reflecting some of their evaluations when they --

10             THE COURT REPORTER:  When they what?

11        Q.  (BY MR. BOURQUE)  Got to the scene.  Do you

12   remember that?

13        A.  Yes.

14        Q.  That's the court reporter's way of telling me

15   to slow down.

16        A.  I get that a lot, sir.

17        Q.  So, in State's Exhibit No. 75, it reflects that

18   EMS, when they got to the scene and they checked on the

19   baby, they found -- I don't know the exact -- seems like

20   the phrase was full-scale muscle rigidity.  You see that

21   in there?

22        A.  Yes, sir, I do.  Do you want me to read it?

23        Q.  Yes, sir.  That would be great.

24        A.  "The pt." -- which I'm assuming is patient --

25   "was rigored with full muscle rigidity."

- October 12, 2011

---

170

Q. Okay. Full muscle rigidity. And just so we're
clear on this, you didn't actually touch the baby to
determine whether there was full-scale rigidity or rigor
mortis or anything else, correct?

A. That's correct.

Q. Someone else touched the baby?

A. Yes, sir.

Q. And does what's reflected in State's Exhibit
No. 75 concur with what you observed when -- was it
Kershaw that touched the baby?

A. I know Pena did for sure.

Q. Pena did?

A. Yes, sir.

Q. Does it support what you saw when Pena touched
the baby or is it different?

A. Based on what this report is saying, I'm going
to say it's different. I'm assuming, but I'm not going
to make assumptions. Being rigored sounds different
than not having rigor mortis.

Q. I mean, those of us who are in the line of work
that we are, although I'm not an expert in what is and
is not rigor mortis, it's certainly something that you
would identify if you saw it?

A. Yes, sir.

Q. Okay. And it's not something -- I mean, if you

---

171

know what rigor mortis is, then when you see it, you'd
certainly identify it and you'd know that's what it is.
Fair statement?

A. Correct, yes, sir.

Q. And, of course, this is an infant. We know now
the child was roughly three months old, right?

A. Yes, sir.

Q. You know also from the work that we do that the
onset of all sorts of things for children and infants is
different than it would be for adults?

A. I believe so, yes, sir.

Q. So, although the explanation appears to be
different, we'll leave that up to the ME's Office to
explain to us, if they can, how that happened. Fair
statement?

A. Yes, sir.

Q. Okay. If you can, tell the jury -- and you may
not be able to. But if you can, can you tell the jury
about what time it was that morning when you saw Pena
touch the baby?

A. Between 9:30 and 10:00 a.m.

Q. Close enough. That's fine. All right. Now,
thank you for that -- you can set that aside. That's
the only thing I wanted to cover on 75.

A. Yes, sir.

---

172

Q. When we're taking -- it appears that you guys
are notified somewhere around 1:50 p.m. on February 1st
that Mr. Mullis has, for lack of a better word,
surrendered to the Philadelphia Police Department. Does
that sound accurate?

A. Yes.

Q. All right. So, that's roughly, give or take
ten minutes, about 2:00 o'clock in the afternoon?

A. Correct.

Q. Okay. And at 2:00 o'clock in the afternoon,
you guys are notified. And then things begin to happen.
You begin to do the things that you need to do.
Sergeant Almen --

A. Almendarez.

Q. Almendarez begins to do the things that she
needs to do to assist you so that you can get the wheels
moving in the right direction, correct?

A. Correct.

Q. You know as a detective -- and how long had you
been a police officer as of 2008?

A. Nine -- over nine and a half years, almost ten.

Q. Let's just use ten.

A. Sure.

Q. Basically fair to say that up -- about the time
of the incident which makes the basis of this

---

173

indictment, you had been in law enforcement about ten
years?

A. Yes, sir.

Q. Okay. And Sergeant --

A. Almendarez.

Q. Almendarez. I'll get it before the trial's
over. Sergeant Almendarez had been in law enforcement
for how long? Best you know.

A. Longer than me. Thirteen, 15, something like
that.

Q. Okay. So, somewhere in the neighborhood of 20
to 25 years of law enforcement experience between you
and Sergeant --

A. Almendarez. You can call her Annie.

Q. Thank you.

All right. So, basically at that time you're
also in a position where you're in contact with the DA's
Office in Galveston County --

Okay. So, somewhere starting around 2:00
o'clock in the afternoon of February the 1st, you get
this notice from Philadelphia that something's on the
horizon regarding the Alijah Mullis investigation?

A. Yes, sir.

Q. All right. And you come back. You make a
phone call or there's a phone call received from

---

FIRM NAME

174

1   Philadelphia's Homicide Division?
2       A.   That's correct.
3       Q.   And when is it that you notify the DA's Office
4   here in Galveston that there's something on the horizon?
5       A.   Moments after that.  I don't have an exact
6   time.  But the phone calls between Detective Hesser and
7   the DA's Office were in and out.  So, around the same
8   time.
9       Q.   Okay.  So, fair to say that you hear something
10  from Philadelphia PD around 2:00.  Without hesitation
11  you get the DA's Office involved because you know this
12  is an interstate issue?
13      A.   Correct.
14      Q.   You know that there's issues about -- because
15  you've been in law enforcement for this long, you know
16  that there's issues about extradition?
17      A.   Yes, sir.
18      Q.   And whether or not someone's going to be
19  forcibly extradited or whether it's going to be through
20  cooperation, there's all kinds of legal issues involved
21  in this case, right?
22      A.   Yes, sir.
23      Q.   Because it's an interstate --
24      A.   Yes, sir.
25      Q.   -- matter.  So, without stressing the point,

175

1   everybody's antennas are up in law enforcement?
2       A.   That's fair to say.
3       Q.   All right.  Because we want to get it right,
4   correct?
5       A.   Correct.
6       Q.   It's imperative that whatever it is that's done
7   in this case, it's done correctly?
8       A.   Yes, sir.
9       Q.   We get the correct information from the correct
10  person, right?
11      A.   Correct, yes, sir.
12      Q.   And so, would it be fair to say -- is it
13  Bennett -- is there in the District Attorney's Office an
14  Assistant DA by the name of Bennett?
15      A.   Yes, sir.  Joel Bennett.
16      Q.   Joel Bennett?
17      A.   Yes, sir.
18      Q.   So, Joel Bennett begins -- is that who you
19  talked to first or did you talk to Mr. Sistrunk first?
20      A.   Joel Bennett first.
21      Q.   Okay.  At what point did Mr. Sistrunk get
22  involved?
23      A.   I don't recall seeing Mr. Sistrunk that day.
24      Q.   So, if you got a call at 2:00, would it be fair
25  to say that Mr. Joel Bennett was involved by

176

1   2:00 p.m. to 2:05?
2       A.   I'd say it's fair to say.  I can't be exact,
3   but somewhere around the same time.
4       Q.   All right.  So -- and how long had Mr. Bennett
5   been in the DA's Office at the time of this, if you
6   know?
7       A.   I do not know.
8       Q.   It was clear to you he was an experienced
9   prosecutor?
10      A.   Yes, sir.
11      Q.   Wasn't a brand new baby lawyer?
12      A.   That's correct.
13      Q.   Now, let's -- let's jump forward.  There's a
14  warrant that's executed -- not executed.  There's an
15  arrest warrant that's signed by Judge Cox at about 9:15;
16  is that right?
17      A.   Yes, sir.
18      Q.   Okay.  Now, where was the affidavit typed that
19  was attached to the warrant that was then produced for
20  Judge Cox?
21      A.   Here in the District Attorney's Office.
22      Q.   And who was it that typed that warrant, if you
23  know?
24      A.   Joel Bennett.
25      Q.   Okay.  So, Mr. Bennett was on the scene while

177

1   this questioning was going on back and forth, right?
2       A.   I'm sorry.  On the scene?
3       Q.   At the DA's Office in Galveston County.
4       A.   Correct, yes, sir.
5       Q.   All right.  So -- yes.  And there's two scenes.
6   There's the scene up in the Philadelphia Homicide
7   Division, right?
8       A.   Sure.
9       Q.   And then there's the scene back in Galveston
10  County, correct?
11      A.   Yes, sir.
12      Q.   All right.  So, would it be fair to say that
13  there were communications by telephone going back and
14  forth for that six-hour period between 2:00 and -- well,
15  seven-hour period between 2:00 and roughly 9:00 p.m.?
16      A.   I'm sorry.  But there were phone calls going
17  back and forth?
18      Q.   From Galveston to Philadelphia and Philadelphia
19  to Galveston?
20          MS. CAMERON:   Your Honor, can we be
21  specific as to who is talking to who?
22          MR. BOURQUE:   I'll get to that -- I'm
23  going there.  But I first have to establish if there
24  were phone calls.
25          THE COURT:   Can you answer the question?

178

1    THE WITNESS: Yes, sir, I can.

2    A.  If you're asking if there's phone calls being

3    made between 2:00 o'clock and the time we got the

4    statement faxed to us, that would not be accurate.

5    Q.  (BY MR. BOURQUE)  Tell me what would be

6    accurate.

7    A.  After he explained to us that they were going

8    to go in to conduct an interview, he told me he'd call

9    me later when they were done.  And we weren't going to

10   interrupt them by making phone calls until they were

11   finished.

12   Q.  So, at some point it looks like the warrant

13   is -- there's an affidavit that's prepared; is that

14   correct?

15   A.  Correct.

16   Q.  And it appears that the affidavit is about two

17   full single-spaced pages?

18   A.  Yes, sir.

19   Q.  And those aren't typed until we know what the

20   facts are.  Fair to say?

21   A.  Correct.

22   Q.  You can't know the facts until after you get

23   them, right?

24   A.  Yes, sir.

25   Q.  Is, like, Mr. Bennett, is he like the world's

179

1    fastest typist?

2    MS. CAMERON:  Your Honor, I'm going to

3    object.  That's argumentative.

4    THE COURT:  This is cross-examination and

5    I'll overrule the objection.

6    MR. BOURQUE:  And I'll rephrase it, Judge.

7    It was an improper question.  I apologize.

8    Q.  (BY MR. BOURQUE)  It would be fair to say that

9    it took at least 45 minutes to type that single-spaced

10   affidavit?

11   A.  I don't recall how long it took to type the

12   affidavit.

13   Q.  Well, I mean, you can type?

14   A.  Yes, sir.

15   Q.  All right.  And Mr. Bennett obviously can type

16   because he's the one that typed it, correct?

17   A.  Yes, sir.

18   Q.  All right.  But -- you would agree with me it's

19   probably about -- well, you would agree it's not typed

20   until you have the information, right?

21   MS. CAMERON:  I object to the form of that

22   question when he says "the information."  There's a lot

23   of information and then there's what the Defendant said

24   in his statement.

25   MR. BOURQUE:  I'll rephrase.

180

1    Q.  (BY MR. BOURQUE)  You don't type the affidavit

2    until you get the statement, correct?

3    A.  Not necessarily.

4    Q.  I don't want speculation.  When was it typed?

5    A.  Some could have been typed while we were

6    waiting --

7    MR. BOURQUE:  Objection to speculation.

8    MS. CAMERON:  Your Honor, I'm going to

9    object.  He's not letting the witness answer the

10   question.

11   MR. BOURQUE:  If I may, he just did in a

12   speculative manner.  If he knows, he can testify.  If he

13   doesn't know, he can't testify.  That's ultimately --

14   THE COURT:  The objection's overruled.

15   Q.  (BY MR. BOURQUE)  So, you understand.  Don't

16   speculate.  Only testify to what you understand and what

17   you know.

18   A.  Correct.

19   Q.  Okay?

20   A.  Yes, sir.

21   Q.  So, I guess what I'm hearing you tell me is you

22   don't know when the affidavit was typed, correct?

23   You only know that Mr. Bennett typed it?

24   A.  I can tell you when it was finished.

25   Q.  You can tell me when it was finished?

181

1    A.  Yes, sir.

2    Q.  Okay.  It was finished at?

3    A.  After we got the statement, sir.

4    Q.  Okay.  So, it was typed after you got the

5    statement.  And then what happens?  Are you the person

6    who gets it signed?

7    A.  Signing the affidavit or getting it signed in

8    front of the Judge.

9    Q.  Getting it signed by the Judge.

10   A.  Yes, sir.  I was with Sergeant Almendarez when

11   we went to get it signed.

12   Q.  So, you guys are here in Galveston?

13   A.  Correct.

14   Q.  At the courthouse?

15   A.  Yes, sir.

16   Q.  You get the statement at 8:50.  It's typed and

17   completed at sometime after that.  Fair statement?

18   A.  Yes, sir.

19   Q.  And then do you walk it downstairs, upstairs,

20   get the -- what do you do?  I mean, how do you get it

21   signed?

22   A.  It was late at night.  So, we actually had to

23   go to Judge Cox's home and have him sign it there.

24   Q.  And where does Judge Cox live?

25   A.  I really don't recall.  I didn't drive, sir.

Page 178 to 181 of 260

FIRM NAME

- October 12, 2011

182

1    I apologize.

2       Q.   That's okay.  Was it League City, Texas City,

3    La Marque?

4       A.   I don't remember to be honest.  But not on

5    Galveston Island.

6       Q.   Fair to say it took you at least 15 minutes to

7    get there?

8       A.   Fair to say, yes, sir.

9       Q.   So, if we have a two-page single-spaced

10   affidavit, then some of it had to be typed before you

11   actually had all the evidence.  Fair statement?

12      A.   It's possible.

13      Q.   You don't know?

14      A.   I do not know.

15      Q.   What do you do -- it shows it was -- that the

16   warrant is signed at 9:15?

17      A.   Yes, sir.

18      Q.   So, do you drive back here to Galveston or do

19   you fax it to those guys from the Judge's home?

20      A.   No.  Came back down here, sir.

21      Q.   Came back down here.  So, what time was it that

22   you faxed it to the folks in Philadelphia, if you did?

23   Did you fax it to them?

24      A.   I don't recall what time we did that, if we

25   did.  We may have just told them over the phone.  Once

183

1    it's entered into NCIC, then we wouldn't need to fax it.

2    We could just run a person's name.

3       Q.   Did you talk to -- did you talk to Detective

4    Rodden or Detective Hesser or Detective McNamee or any

5    of the other detectives that were involved in the

6    investigation surrounding the indictment which makes the

7    basis of this case?

8       A.   Yes, sir.

9       Q.   Which ones did you talk to on February 1st,

10   2008?

11      A.   I spoke to Detective Hesser the majority of the

12   time.  I know I spoke to McNamee on the phone as well.

13      Q.   Okay.  Now, when you say, "majority of the

14   time," that would indicate that there's at least three

15   phone calls that you have with Hesser?

16      A.   There was quite a few at the beginning

17   regarding the waiver of rights and stuff like that.

18      Q.   Regarding the waiver of rights and the ground

19   rules?

20      A.   Correct, yes, sir.

21      Q.   Because it was important that -- they weren't

22   just calling you to tell you they had him in custody.

23   They were calling for instructions.  Fair statement?

24      A.   I don't know if that's a fair statement.  They

25   were calling and explaining that the person was willing

184

1    to talk and give a statement.

2       Q.   And who was that said to?

3       A.   Detective Hesser.

4       Q.   Who did he say that to?

5       A.   Me.

6       Q.   He spoke directly to you?

7       A.   Correct.

8       Q.   Okay.  Then did you say to him:  "Get the

9    statement"?

10      A.   Yes, sir.

11      Q.   Don't let any time pass on this, right?

12      A.   That's correct.

13      Q.   Because you know in ten years of experience in

14   law enforcement that you've got to strike when the

15   iron's hot when the person is there willing to bare his

16   soul and ready to surrender, then you have -- you need

17   to move quickly?

18      A.   That's a fair statement.

19      Q.   And if you don't, things can go south pretty

20   quickly, right?

21      A.   Correct.

22      Q.   For example, when you guys go down to pick him

23   up, that's only a day later, right?

24      A.   Yes, sir.

25      Q.   And you're going down there to pick him up.

185

1    And you already know at that point that you're not going

2    to be able to talk to him because he's got a lawyer and

3    already been in the process of getting to a hearing?

4       A.   Right.

5       Q.   So, things do change quickly?

6       A.   Yes, sir.

7       Q.   Okay.  So, it was good law enforcement for you

8    guys to get all your -- and help me if I'm right on

9    this -- get all your ducks in a row before the statement

10   is taken?

11      A.   Correct.

12      Q.   And get all your ducks in a row while the

13   statement is being taken?

14      A.   Yes, sir.

15      Q.   Everybody needs to understand what the ground

16   rules are.  When I say everybody, I'm talking about law

17   enforcement from both states, right?

18      A.   Yes, sir.

19      Q.   Because if they're in the process of taking the

20   statement and they don't get the right statement, they

21   don't get all that they need to get, it could be

22   detrimental to your case.  Fair statement?

23      A.   That's possible, yes, sir.

24      Q.   So, they're wanting to have -- you're in the

25   process of giving them information that tells them some

FIRM NAME

- October 12, 2011

186

1    of the facts that you know and you want them to know.

2    Fair statement?

3        A.  Yes, sir.

4        Q.  Okay.  You talk to them.  They knew when they

5    sat down to talk to him after -- those officers were

6    told by you that the baby had been stomped on, right?

7        A.  That's correct.

8        Q.  Or blunt force trauma?

9        A.  Yes, sir.

10       Q.  We didn't know at that point, but we knew there

11   was blunt force trauma --

12       A.  Correct.

13       Q.  -- on the child, correct?

14       A.  Yes, sir.

15       Q.  Okay.  So, you wanted that information to be

16   known to them.  And you knew that there was blunt force

17   trauma to the child's head?

18       A.  Yes, sir.

19       Q.  And you let them know about that, correct?

20       A.  Correct.

21       Q.  You let them know roughly what part of the town

22   the incident occurred in.  When I say, "incident,"

23   that's where the baby's found?

24       A.  I believe so, but I don't recall going over the

25   details of the exact location with Hesser.

187

1        Q.  That's okay.  You know that you -- you sent

2    them a Google map at some point?

3        A.  I didn't send Detective Hesser a Google map.

4        Q.  You know one was sent?

5        A.  I did not know that.

6        Q.  Okay.  All right.  So -- and when we looked at

7    one of the exhibits earlier that had the map on it and

8    it had some bright line from Cherry Hill out to --

9    looked like Caren Kohberger's house; is that right?

10       A.  Yes, sir.

11       Q.  Okay.  Is that the route that you took out to

12   the house, that bright line?

13       A.  I took Highway 6, correct.

14       Q.  And that's that bright line that we saw on the

15   exhibit?

16       A.  Yes, sir.

17       Q.  How long did it take you to get to Caren

18   Kohberger's house that day?

19       A.  Thirty minutes, 40.

20       Q.  Does Judge Cox live out in that part of the

21   city?

22       A.  I really don't recall.

23       Q.  Bad question.  I meant that sort of -- that

24   part of the county is what I meant to ask.  The answer's

25   the same.  You don't know?

188

1        A.  Yes, sir.  I really don't know.

2        Q.  Now, you learned -- as you were talking to

3    these homicide investigators, you learned that there was

4    a car that was important to the investigation, that --

5    you knew that there was a car up in the Philadelphia

6    area, correct?

7        A.  Correct, yes, sir.

8        Q.  You explained that to McNamee?

9        A.  Correct.

10       Q.  And you were interested in getting the car

11   because you were looking for certain information out of

12   it, correct?

13       A.  Evidence, yes, sir.

14       Q.  And you had let the officers know what it was

15   you were looking for out of the car?

16       A.  No, sir.

17       Q.  You let them know you were looking for a B.B.

18   gun and a --

19       A.  Oh, no, sir.

20       Q.  You didn't?

21       A.  No, sir.

22       Q.  Okay.  Are you -- did Sergeant Almendarez?

23       A.  Yes, sir.

24       Q.  Okay.  Was she on the phone back and forth or

25   was she ever on the phone with Hesser or Rodden or

189

1    McNamee or was it just you?

2        A.  I believe it was just me.  I don't recall her

3    speaking to them.

4        Q.  So, if one of those were to come in and say,

5    "Look, we knew we were looking for a B.B. gun," that

6    would just be something that slipped your mind telling

7    them?  Not that you're lying or trying to hide anything.

8    That would be just something that slipped your mind?

9        A.  That one of our officers said we were looking

10   for a B.B. gun?

11       Q.  No.  That if Rodden or McNamee or Hesser or one

12   of those guys comes and testifies they were told to look

13   for a B.B. gun --

14           MS. CAMERON:  Your Honor, I'm going to

15   object to the form of that question, what somebody else

16   said.

17           MR. BOURQUE:  I'll withdraw the question,

18   Judge.

19           THE COURT:  Thank you.

20       Q.  (BY MR. BOURQUE)  Now, you knew from talking to

21   these guys that -- these homicide investigators from

22   Philadelphia, that they were experienced.  Whether they

23   had 30 years experience apiece or ten, you knew you were

24   talking to experienced homicide investigators.  Fair

25   statement?

FIRM NAME

- October 12, 2011

190

1   A. Yes, sir.

2   Q. And you could tell from talking to people over

3   the phone whether you're visiting with people who have

4   experience?

5   A. For the most part, yes, sir.

6   Q. And that's important because you didn't want

7   some rookie messing up an investigation. Fair

8   statement?

9   A. Fair statement.

10  Q. It would be -- it would have been appropriate

11  for you if it had been some patrol officer calling, you

12  would have been concerned and wanted someone -- wanted

13  to talk to some supervisors about getting this right.

14  Fair statement?

15  A. Yes, sir.

16  Q. Let's go back to the scene a little bit on

17  January the -- 28th?

18  A. 29th.

19  Q. 29th, that morning. There's roughly about a

20  dozen officers out there when you also include the fire

21  fighters that had been present, correct? You got two

22  fire fighters, you, Kershaw, Alvarez, Trevino, Powers

23  Blackwell, Pena, Luck, Benavidez and Captain Braun --

24  Brown?

25  A. Braun.

191

1   Q. Braun?

2   A. Yes, sir.

3   Q. And Sergeant Jones. So, about 13. Does that

4   sound about right?

5   A. That sounds about right.

6   Q. Okay. Is there -- and it's important -- and

7   these are people that you just listed in your report as

8   having been at the scene --

9   A. Yes, sir.

10  Q. -- correct? And it's important. Scene

11  integrity is everything, isn't it?

12  A. Yes, sir.

13  Q. That's why you put out the yellow markers,

14  correct?

15  A. Correct.

16  Q. All right. But it's not in the best interest

17  of anyone to have 13 officers trampling inside a crime

18  scene. Fair statement?

19  A. It depends on their job description.

20  Q. Well, weren't you kind of the scene supervisor?

21  A. Yes, sir.

22  Q. Okay. And, you know, you know as a trained

23  detective at the time and even more so now as a Special

24  Agent with the FBI that scene integrity is everything?

25  A. Yes, sir.

192

1   Q. You can't have people trampling around and

2   stepping all around just because they want to help.

3   Fair statement?

4   A. Yes, sir.

5   Q. Some of the problem we had, whether it was a

6   problem or not, some of the phenomenon here is that

7   people were showing up, officers were showing up at the

8   scene to volunteer their time to assist and they weren't

9   invited by you. They just appeared. Fair statement?

10  A. Possibly. I'm not sure.

11  Q. Let's put it this way: When you go back to

12  search the house, the trailer?

13  A. Yes, sir.

14  Q. The trailer that belonged to Ms. Duarte?

15  A. Yes, sir.

16  Q. How many of you go back there?

17  A. Four.

18  Q. Okay. So, there's four officers. You --

19  A. Sergeant Almendarez, Scott Pena and Sergeant

20  Jones.

21  Q. Okay. There are four of you. And four of you

22  have specific obligations, correct?

23  A. That's correct.

24  Q. All right. And what was your obligation at the

25  time?

193

1   A. Scene management again and interviews,

2   et cetera.

3   Q. Scene management and interviews?

4   A. Yes, sir.

5   Q. Okay. And what was Almendarez?

6   A. Almendarez?

7   Q. Almendarez. Almendarez.

8   A. Theirs was the same thing, for interview

9   purposes.

10  Q. Okay. The third one, Pena, what was his duty?

11  A. He's our crime scene officer.

12  Q. And the fourth one?

13  A. Same thing. Crime scene.

14  Q. So, you're kind of the supervisor of the scene.

15  And these three detectives have assignments as you go in

16  there. Okay. Right?

17  A. Yes, sir.

18  Q. And you don't know what you're looking for, but

19  you know that you have four experienced detectives,

20  homicide detectives who know how to protect a scene and

21  how to gather evidence, right?

22  A. Yes, sir.

23  Q. Okay. Now, is four more or less than 13?

24  A. That would be less, sir.

25  Q. And we have a photograph out at the scene where

194

1   there's some divot or something. You don't
2   know -- do you even know what I'm talking about, a divot
3   at the scene?
4       A.   The photograph of the divot?  Yes, sir, I'm
5   familiar with it.
6       Q.   You don't know what caused that?
7       A.   No, sir.
8       Q.   You didn't locate it.  Someone else did?
9       A.   Correct.
10      Q.   And when you're at the scene, you're not the
11  person who bends down to check the child for rigor
12  mortis.  One of those persons was Pena?
13      A.   Correct.
14      Q.   Okay.  Which is appropriate because he's
15  working with you --
16      A.   Yes, sir.
17      Q.   -- correct?  The other one is Kershaw.
18  Kershaw is not assigned to this case that morning, is
19  he?
20      A.   No, sir.  He was the first supervisor on the
21  scene.
22      Q.   First supervisor on the scene.  Are you aware
23  of the fact that he also touched the baby?
24      A.   Yes, sir.
25      Q.   Do you know who else touched the baby or if

195

1   anyone touched the baby before you got there?
2       A.   EMS personnel.
3       Q.   Okay.  Did you observe Kershaw touch the baby?
4       A.   No, sir, I did not.  I don't recall that.
5       Q.   So, that had happened before you got there?
6       A.   Yes, sir.
7       Q.   And then he had to be the one to tell you that
8   he had touched the baby?
9       A.   Yes, sir, correct.
10      Q.   You couldn't have been happy with that?
11      A.   That he touched the child?
12      Q.   Yes.
13      A.   It depends on how he did it, the purpose of
14  doing it.
15      Q.   Well, I understand that.  We already know EMS
16  has come.  They're gone even before he gets there, that
17  being Kershaw.  We know that, right?
18      A.   Yes, sir.
19      Q.   So, they're obviously gone before you get
20  there, correct?
21      A.   EMS personnel?
22      Q.   Yes.
23      A.   Yes, sir.
24      Q.   And you know that Kershaw has touched the baby?
25      A.   Yes, sir.

196

1       Q.   Okay.  Without asking you or any other
2   detective on the scene with CSU or CSI -- what's your
3   unit called, CSU?
4       A.   I don't know what they call it here anymore,
5   sir.
6       Q.   Okay.  We'll call it the CSU guys.
7       A.   There you go.
8       Q.   All right.  So, you know that when the CSU guys
9   get there that the scene had already been disturbed?
10      A.   Yes, sir.
11      Q.   I mean, that cannot be welcome news to you,
12  correct?
13      A.   Correct, unless you want me to explain it.
14      Q.   Well, we know that the baby's been touched by
15  fire fighters, right?
16           MS. CAMERON:  Your Honor, can the witness
17  be allowed to explain?
18           THE COURT:  This is cross-examination.
19  You may have the opportunity to redirect if you like.
20           You may proceed, Mr. Bourque.
21           MR. BOURQUE:  Thank you, Judge.
22      Q.   (BY MR. BOURQUE)  We know that there's been a
23  sheet placed over the baby?
24      A.   Yes, sir.
25      Q.   Do we know who placed that sheet there?

197

1       A.   I believe it was the EMS personnel or the fire
2   department.  I'm not sure.
3       Q.   But we don't know that?
4       A.   Correct.
5       Q.   So, we don't know -- was the sheet ever
6   returned to whoever it belonged to originally?
7       A.   I believe the sheet was recovered as evidence
8   by Scott Pena.  I believe so.
9       Q.   There are other things that we see scattered on
10  the ground, you know, to the untrained eye, me, looks
11  like litter?
12      A.   Yes, sir.
13      Q.   Were you able to differentiate whether it
14  really was litter or whether it had anything to do with
15  the case?  Do you know what I'm talking about?
16      A.   Yes, sir.  Yeah.  But I'm not sure at the time
17  if we're able to tell which things are which.  So, I
18  know some things you collected that turned out to not
19  be -- have any evidentiary value at all.
20      Q.   All right.
21           MR. BOURQUE:  May I, Judge?
22           THE COURT:  You may.
23      Q.   (BY MR. BOURQUE)  Let's see if we can kind of
24  go through some of them.
25      A.   Sure.

198

1    Q.  We could see by looking at State's Exhibit

2  No. 55 --

3          MR. BOURQUE:  May I stand up here and do

4  it, Judge?

5          THE COURT:  You may.  Keep your voice up,

6  please.

7    Q.  (BY MR. BOURQUE)  We can see little white

8  flakes all over this.  And I'm just going to call it a

9  crime scene area, the area that's roped off.

10   A.  Yes, sir.

11   Q.  Is that okay?

12   A.  Yes, sir.

13   Q.  All right.  Now, how do you differentiate

14  between these things that are laid out here and whether

15  or not they may be important, if they are, to the

16  investigation?

17   A.  You start by looking at it and making a

18  decision based on that.

19   Q.  What -- did you make any notes about what --

20  you see this little circle looks like, kind of a folded

21  piece of paper right here?

22   A.  I'm not even sure what that is.  I see it in

23  the photograph, yes, sir.

24   Q.  Do you know if you even looked at it?

25   A.  I don't recall.  I can't tell what it is in the

199

1  photograph.

2    Q.  Outside -- try to keep these in order.  It will

3  take me a minute.  Let me look at State's Exhibit No.

4  60.  And bear with me here in case I break this,

5  but -- I'm not going to touch it.  Over here in this

6  area -- I can't get the zoom to work.  I apologize.

7          MR. BOURQUE:  It's okay.  Yeah, if you

8  would.

9    Q.  (BY MR. BOURQUE)  Okay.  Do you see what we're

10  talking about here?  We've got these additional papers

11  over here.  Did you send anybody of your 13 guys that

12  were out to help you, did you ask them to go pick this

13  stuff up and let's find out if this is related to our

14  case?

15   A.  Scott Pena would have been the only person I

16  discussed picking up evidence with.

17   Q.  When you say that, what do you mean you would

18  have discussed it with -- you would have talked to Scott

19  Pena about whether to retrieve any of this information?

20   A.  Correct.

21   Q.  So then, you'd agree with me there's -- for

22  lack of a better word, there's a lot of litter in this

23  crime scene --

24   A.  I would agree with that.

25   Q.  -- area?

200

1    A.  Yes, sir.

2    Q.  Right?  And to do an appropriate investigation,

3  you may have found information there, but you don't know

4  if you looked, right?

5    A.  Yes, sir, because I don't recall.  I can't tell

6  what it is in that photograph.  I'm not sure if that was

7  something collected or not.

8    Q.  If we look down in this brushy area here, see

9  where my finger is?

10   A.  Yes, sir.

11   Q.  What is that, if you know?

12   A.  I can't tell from that picture.  May be the

13  headrest from the car seat.  I'm not certain.

14   Q.  But it looks like it's inside the roped-off

15  area, doesn't it?

16   A.  Yes, sir.

17   Q.  Okay.  Here we have State's Exhibit No. 62.

18  This looks like the headrest right here?

19   A.  Yes, sir.

20   Q.  Can you see that?

21   A.  Yes, sir.

22   Q.  Okay.  So, we know if we look back at State's

23  Exhibit No. 61 and we're looking at this large piece

24  of -- we know that's not the headrest?

25   A.  That's correct, yes, sir.

201

1    Q.  But as you sit here right now, you can't tell

2  me whether it does or does not have anything to do with

3  the incident that's made the basis of this indictment?

4    A.  Yes, sir.  I'm not sure.

5    Q.  Correct?

6    A.  Correct.

7    Q.  Now, did you guys have any crime scene tags?

8  You know, like a lot of times you'll see these little --

9  you know, like you go to Whataburger, you get those

10  little numbers.  And a lot of times you'll see pictures

11  at a crime scene with those kind of numbers laid on the

12  ground to spot certain things.  I don't see any of that

13  at this crime scene.

14   A.  In those photographs you probably won't.

15   Q.  There will be others?

16   A.  Correct.

17   Q.  Okay.  The sock you found at the house -- let

18  me ask you this when we look at 73.  Let me talk about

19  the socks for a minute.  Did you match it to the one

20  that was found in the field at the scene?

21   A.  Personally I was able to match it by color and

22  approximate size.

23   Q.  That's about it?

24   A.  Yes, sir.

25   Q.  Okay.  So, it appeared they were matches, but

- October 12, 2011

202

1  you didn't really do any comparison side by side. Your
2  recollection looks like the same one?
3      A.  Correct.
4      Q.  When we look at this State's Exhibit No. 73,
5  would it be fair to say that when a person walks, they
6  have a heel and a toe on the shoe?
7      A.  Yes, sir.
8      Q.  Like, if I were to step right here and I had
9  water on the bottom of my shoe maybe on the carpet or
10  something, you would expect when I lifted my foot for it
11  to leave a heel and a toe area where I just stepped.
12  Fair statement?
13     A.  Fair statement, yes, sir.
14     Q.  And really even more so, you know, if I were
15  barefoot and stepped on an area, like if I stepped in
16  some water and then stepped on a sack or something, a
17  paper sack, you could easily see the heel and the toe
18  impression of where I just stepped.  Fair statement?
19     A.  Yes, sir.
20     Q.  Doesn't this look like -- 73, doesn't that
21  really look like a heel and a foot impression?
22     A.  Possible.
23         MS. CAMERON:  Your Honor, I'm going to
24  object to any speculation of this witness as being a
25  heel and a toe.

203

1         MR. BOURQUE:  Well, one guy gets to
2  speculate, it's a bouncing chair --
3         MS. CAMERON:  Your Honor, I'm going to --
4         THE COURT:  I overrule the objection.
5  You may answer the question if you can.
6      A.  I can't tell based on pictures.  I'm sorry.
7      Q.  (BY MR. BOURQUE)  It's not dissimilar from what
8  you might expect from a foot impression, is it?
9      A.  Besides the size of it, I would say it would
10  not be dissimilar.
11     Q.  Let me show you State's Exhibit No. 63.  And
12  what's covered here is the infant child.  Okay?
13     A.  Yes, sir.
14     Q.  What's left uncovered are two -- what are those
15  two things?
16     A.  The thing on the -- let me use my pointer.
17  That I believe is a bottle.  And the thing next to it, I
18  am not certain what that is on that picture.  I believe
19  that is a glass bottle there on the left.  And that
20  item, I cannot tell based on the picture.
21     Q.  What might we expect to find from a glass
22  bottle?
23     A.  Evidence.  It's part of this case.
24     Q.  Was this bottle taken as physical evidence in
25  this case and examined for any reason?

204

1      A.  I believe it was taken, yes, sir.
2      Q.  Do you know if it was examined for any reason
3  in this case?
4      A.  That, I do not know.
5      Q.  Fingerprints, DNA or anything else?
6      A.  I'm uncertain.
7      Q.  What about this piece right here?
8      A.  I can't tell what that is, sir.
9      Q.  Were you able in your investigation to
10  determine whether that bottle had anything to do with
11  that incident which makes the basis of this indictment?
12     A.  The bottle's not used for the indictment
13  purposes, no, sir.
14         MR. BOURQUE:  Judge, maybe it will help
15  him if he can see closer.  May I approach?
16         THE COURT:  You may.
17     Q.  (BY MR. BOURQUE)  It doesn't help me, but maybe
18  it will help you if you can look at 63 in person and see
19  if that helps you identify what that second piece is
20  laying on the ground.
21     A.  Unless you have a close-up one, I'm not certain
22  what that is.  I can speculate but --
23     Q.  Don't speculate.
24     A.  -- I'm not supposed to speculate.  I'm not
25  certain what that is.

205

1      Q.  Okay.  Do you know if he even collected it?
2      A.  I couldn't tell based on that picture.  I would
3  have to see the other ones.
4      Q.  Well, no -- let me for the record just state
5  that I've lost 73 and 74.  Got them.
6      A.  Okay.
7      Q.  Best of your recollection, how old were
8  Ms. Duarte's children?
9      A.  I have a range in my report if you want me to
10  look at it real quick.  Two to 12 or something like
11  that, sir.
12     Q.  If that will refresh your recollection, go
13  ahead.
14     A.  Two to 11.
15     Q.  So, ages 2 to 11?
16     A.  Yes, sir.
17     Q.  So -- and sometimes 2-year-olds can still be in
18  those little -- what do they call those?
19     A.  A stroller.
20     Q.  Strollers.  Thank you.  And we see a stroller
21  in some of the pictures they have inside the trailer
22  that's marked as 212 -- actually, it's State's Exhibit
23  No. 79.  We see that the address on the outside of the
24  trailer is 212?
25     A.  Yes, sir.

- October 12, 2011

### 206

1   Q. That's Ms. Duarte's trailer, right?
2   A. Correct.
3   Q. It looks like you guys got a consent to search
4   from Ms. Kohberger -- not Ms. Kohberger, but from
5   Ms. Duarte; is that correct?
6   A. Yes, sir.
7   Q. On the 29th?
8   A. That's correct.
9   Q. And if I understand this basically -- you guys
10  are basically wanting to search the house, anything, the
11  barn outside or whatever, you're basically -- it's a
12  carte blanche right to search, correct? You weren't
13  limited as to what you might be searching for?
14  A. She gave us full consent, correct, yes, sir.
15  Q. Of course, that's important also in the
16  investigation or in any search. What you're searching
17  for can be important. If you're limited in your search,
18  you're limited in your search. That's not what you have
19  here, correct?
20  A. Correct.
21  Q. Through State's Exhibit No. 77, you got carte
22  blanche to search my house, take whatever you want?
23  A. Yes, sir.
24  Q. So, you weren't just limited in looking for
25  items that might fit the incident which makes the basis

### 207

1   of the indictment. But if you had come across illicit
2   drugs or marijuana or anything like that, you would have
3   taken it?
4   A. Correct.
5   Q. You didn't find any of those things in the
6   search?
7   A. No, sir.
8   Q. So that we're clear on that, right?
9   A. Yes, sir.
10  Q. We didn't find any -- I don't know, black
11  mollies -- I bet they don't have that anymore. Xanax --
12  A. I'm not sure what a black molly is.
13  Q. That's how young you are. But there are no
14  drugs or anything found, no cocaine, no heroin, there's
15  no illicit drugs of any type?
16  A. Not that I recall, yes, sir.
17  Q. What's the other big one? There's no meth.
18  There's no crystal meth there?
19  A. No, sir.
20  Q. I can't believe I thought of black mollies.
21  Where did that come from?
22      Okay. What time of day or night are you
23  executing your search?
24  A. At 212?
25  Q. Okay. 2:12 in the morning --

### 208

1   A. No, sir. I'm saying -- you're asking at the
2   house, No. 212?
3   Q. Yes.
4   A. It was nighttime. I don't recall off the top
5   of my head.
6   Q. It wouldn't have been 3:00 o'clock in the
7   morning?
8   A. No, sir. 8:00, 9:00, something like that. I
9   could check for you.
10  Q. When we look at State's Exhibit No. 88 -- back
11  this up.
12      Look at State's Exhibit No. 78. It appears
13  that -- would it be fair to say there's, like, two beds
14  in here?
15  A. Yes, sir.
16  Q. There's one down here in the corner and then
17  this one with the sheet on it. Did you see a baby bed
18  in the house?
19  A. No, sir.
20  Q. Did you see a bassinet?
21  A. I don't -- not in that room, no, sir.
22  Q. Do you recall having seen a bassinet?
23  A. I do not. Do not. Definitely not in that
24  room.
25  Q. And it's been a while since I've had kids, but

### 209

1   wouldn't three months, you would still be in a bassinet?
2   A. Not according to Caren.
3   Q. Definitely would have been in a baby bed?
4   A. No, sir.
5   Q. So, the baby didn't have a baby bed?
6   A. They let Alijah sleep in the carrier, in the
7   car seat.
8   Q. In the car seat?
9   A. Yes, sir.
10  Q. This looks like -- 89 looks like the same
11  bedroom, different angle. Would you agree with me?
12  A. Yes, sir.
13  Q. Did you learn from your investigation where --
14  when Alijah was put down for the night, where the baby
15  was allowed to sleep? Was it in this room?
16  A. Yes, sir.
17  Q. How many people slept in this room?
18  A. Five.
19  Q. Five people in this room?
20  A. Yes, sir.
21  Q. How many bedrooms were in this trailer?
22  A. Three, I believe.
23  Q. Nine people living in the house is what it
24  sounds like?
25  A. Michele Duarte's two older sons lived in the

- October 12, 2011

210

1 room with the Defendant and Caren and Alijah.

2     Q.  Two older -- how old are they?

3     A.  Eleven and 7 -- 8, I believe.  Not sure.

4     Q.  Who was the smoker in the family?

5     A.  I know Ms. Kohberger smoked.  I'm not sure who

6 else in that room smoked.

7     Q.  Is that a cigarette pack right there?

8     A.  I believe so, yes, sir.

9     Q.  This next one, State's Exhibit No. 91, looks

10 like a different bedroom.  Is that an accurate

11 assessment?

12     A.  Yes, sir.

13     Q.  Do you know who -- from your investigation who

14 slept in here?

15     A.  One of the daughters of Ms. Duarte or maybe

16 both of them.  I don't know for sure.  I know one for

17 sure.

18     Q.  I don't want to split hairs with you about some

19 of this stuff.  But really, Luvs, these diapers here,

20 that's a pretty common brand, right?  I mean, if I went

21 to the grocery store --

22     A.  Luvs?  Yes, sir.

23     Q.  If I went to the store today to buy some Luvs

24 diapers, it wouldn't be hard to find?

25     A.  I don't believe so.

211

1     Q.  Would you say Evenflo is a pretty big

2 manufacturer of baby stuff?  Wouldn't be surprised if at

3 my home with my grandchildren, I have Evenflo push carts

4 and all that?

5     A.  Fair to say, yes, sir.

6     Q.  Do we know whose blanket it is that's depicted

7 in State's Exhibit No. 94?

8     A.  Is that the blue one?

9     Q.  Yeah.

10     A.  I believe that was the blanket that belonged to

11 Baby Alijah.

12     Q.  Was it posed for this picture or is this how

13 you found it?

14     A.  I believe that was posed for the picture.

15     Q.  For the effect?  Then we see State's Exhibit

16 No. 96 here.  And this looks like a different bedroom or

17 not?  I don't know.

18     A.  No, sir.  That should be the same bedroom.

19     Q.  As the first one we saw?

20     A.  Yes, sir, with the two beds.

21     Q.  Okay.  Do you know what those documents are

22 that are on the bed?

23     A.  I do not know what those are, sir.

24     Q.  Do you know if they were seized as a part of

25 your investigation?

212

1     A.  I believe they were, yes, sir.

2     Q.  And are there any photographs of the third

3 bedroom?

4     A.  I'm not certain.  I don't know, sir.

5     Q.  Do you know how these items wound up on the

6 bed?  Did y'all just pose those?

7     A.  Correct.  I believe that they were found in a

8 different spot and put there to have the picture taken.

9     Q.  When we look at Defendant's (sic) Exhibit

10 No. 78, can you tell us what this little swing set --

11 what is that all around it?

12     A.  What is around the swing set?

13     Q.  Well, what is the swing set?  Is that what that

14 is, a swing set?

15     A.  I guess -- it appears to be one of those --

16 like a rocking seat or something.

17     Q.  And these other things that are scattered

18 around the outside?

19     A.  Plants and some -- looks like kids toy or

20 something leaning up against the wall there.  I believe

21 that's a trash can.  I'm not sure.

22     Q.  Looked like it might be a grill?

23     A.  Yes, sir.

24     Q.  Talking about this piece right here.  Looks

25 kind of like a grill.

213

1         Now, when was it that you went to

2 Philadelphia?

3     A.  I thought it was February 2nd, but maybe it was

4 the 3rd.

5     Q.  Check and see.  Looks like the 3rd.

6     A.  That sounds more accurate.

7     Q.  Look at page 11 and see if that refreshes your

8 recollection.

9     A.  Yes, sir.  February the 3rd, 7:45.

10     Q.  Okay.  So, when you arrived there on the 3rd,

11 there's really -- it's late in the day.  So, you really

12 don't have a chance to get started to do anything until

13 the next morning.  Is that a fair statement?

14     A.  I believe so.  We left pretty early, but that's

15 correct.

16     Q.  It's a long flight?

17     A.  Yes, sir.

18     Q.  When you arrived in Philadelphia or when you go

19 by the Homicide Department the next day for whatever

20 official business you have to conduct, it's at or about

21 that time when Mr. Mullis who is seated to my right is

22 going before a magistrate.  Does that sound about right?

23     A.  I believe that was that same day, but that may

24 have been on the morning of the 3rd.  I'm not sure if he

25 went on the 3rd or 4th.

- October 12, 2011

---

**214**

1    Q.  Were you present when he went before the
2   magistrate?
3    A.  No, sir.
4    Q.  You just know by the time you got there and
5   things got squared away, he had waived extradition and
6   was going to be ready for you to take him and bring him
7   back to Galveston?
8    A.  Yes, sir, correct.
9    Q.  Did you know that by the time you -- by the
10  time you left here to go to Philadelphia?
11   A.  No, sir.
12   Q.  Now, you know, you indicated that when he
13  talked to you, it was sort of like he had known you your
14  whole life?
15   A.  Yes, sir.
16   Q.  Well, I mean, you're an investigator, correct?
17   A.  Yes, sir.
18   Q.  You're a detective, right?
19   A.  Yes, sir.
20   Q.  With the FBI?
21   A.  Yes, sir.
22   Q.  Special Agent with the Federal Bureau of
23  Investigation?
24   A.  Correct, yes, sir.
25   Q.  You know by the time you get there and you meet

---

**215**

1   these guys from Philadelphia, you know that each one of
2   them probably has 25 to 30 years worth of law
3   enforcement behind them.  Fair statement?
4    A.  Yes, sir.
5    Q.  You're trained in law enforcement, you know.
6   When you -- you're trained on how to speak to these
7   suspects and things, especially when you've got a
8   suspect that is interested in baring his soul, right?
9    A.  Yes, sir.
10   Q.  You don't want to aggravate them and make them
11  mad, right?
12   A.  Correct.
13   Q.  You get them coffee if they want it.  You can
14  get them a pizza if they want it.  If they need
15  something, y'all be happy to provide it for them, right?
16   A.  Yes, sir.
17   Q.  As long as they're giving, you're willing to
18  give?
19   A.  Fair statement.
20   Q.  And you got -- whether you're in Philadelphia,
21  whether you're in Wisconsin, whether you're in Florida,
22  investigators know that be nice to the suspect when he's
23  talking to you and he'll be nice in return, right?
24   A.  For the most part, yes, sir.
25   Q.  For the most part.  So, you guys kind of talk

---

**216**

1   to them in a pleasant way, don't you?
2    A.  To the Defendant or just in general?
3    Q.  Any Defendant who's willing to talk to you and
4   it's an important case, you want to build a rapport with
5   that person?
6    A.  Correct, yes, sir.
7    Q.  Part of building a rapport is learning how to
8   talk to the person as if you're really not angry with
9   what's happened, right?
10   A.  Yes, sir.
11   Q.  Because you can't afford to let them know that
12  you're angry, right?
13   A.  Yes, sir.
14   Q.  If you do, it might turn the investigation off,
15  right?
16   A.  Correct.
17   Q.  So, you're trying to build a rapport with that
18  person?
19   A.  Yes, sir.
20   Q.  So that you can get information from that
21  person, right?
22   A.  That's correct.
23   Q.  Okay.  And you've been trained if you can get
24  it done right, you refer to that person by his first
25  name.  You talk to him in a cordial and kind of an

---

**217**

1   honorable way as if he is your friend, right?
2    A.  Yes, sir.
3    Q.  So, you know that these officers in
4   Philadelphia, if they're doing their job, they're
5   befriending this person as well, this person being
6   Mr. Mullis?
7    A.  Yes, sir.
8    Q.  You didn't want to do anything when you got
9   there to disrupt that rapport or that relationship,
10  right?
11   A.  That's correct.
12   Q.  So, you were kind and gentle and polite to
13  Mr. Mullis?
14   A.  I believe so.
15   Q.  Right?
16   A.  Yes, sir.
17   Q.  And it would be fair to say that Mr. Mullis
18  didn't curse you?
19   A.  That's correct.
20   Q.  And you didn't curse him?
21   A.  No, sir.
22   Q.  And he wasn't disrespectful to you?
23   A.  No, sir.
24   Q.  He was kind, talkative?
25   A.  Yes, sir.

---

FIRM NAME

- October 12, 2011

## 218

1  Q. And treated you basically with the same respect
2  that you treated him with?
3  A. Yes, sir.
4  Q. Okay. So I can get back to State's Exhibit No.
5  47 for a minute, you know, you don't really even type
6  State's Exhibit -- you don't complete State's Exhibit
7  No. 47 until you've actually read the statement that was
8  given by Mr. Mullis in Philadelphia, correct?
9  A. Again, I don't think that that's entirely
10  accurate.
11  Q. Well, I think -- did you testify previously
12  that we read the Defendant's statement and then got a
13  warrant?
14  A. Yes, sir.
15  Q. Okay. And again, I want to make sure that you
16  don't -- that you understand I'm not talking about the
17  whole statement. I'm just talking about completing this
18  statement. You don't complete the statement until after
19  you've read the entire statement that you had faxed
20  to --
21  A. Yes, sir, that's correct.
22  Q. So, around 8:50 or so, you got the statement
23  faxed to you from Philadelphia. Fair statement?
24  A. Yes, sir.
25  Q. It would also be fair, you looked at the

## 219

1  statement. Now you know it's about six pages roughly?
2  A. Yes, sir.
3  Q. Okay. Single-spaced, right?
4  A. I believe so.
5  Q. Okay. So, it's fair to say it took ten or 15
6  minutes to read through the statement, make sure you had
7  everything you needed, right?
8  A. Yes, sir.
9  Q. Okay. Because you wanted to make sure that you
10  had everything that you needed before you told them,
11  "It's okay. Good statement," right?
12  A. Before I told who?
13  Q. Before you told Philadelphia.
14  A. Yes, sir.
15  Q. Statement's ready. Okay. Now, here's my
16  question: If they're sending the statement to you,
17  faxing it to you, are they faxing it to you before he
18  had signed it so that you can look at it or do they send
19  it to you only after it's executed; that is, signed by
20  him?
21  A. I'd have to look. I believe it was already
22  signed, sir.
23  Q. Take a look and see.
24  THE COURT: While he's doing that, ladies
25  and gentlemen, lets stand up for a moment, move around a

## 220

1  little bit.
2  All right. You may answer the question.
3  A. The one that I have was signed prior to being
4  faxed. So the copy that I have was signed.
5  Q. (BY MR. BOURQUE) But you read the statement,
6  correct?
7  A. Yes, sir.
8  Q. Is that right?
9  A. Correct.
10  Q. You make sure that it has everything in there
11  that you need?
12  A. Yes, sir.
13  Q. Okay. Do you let Philadelphia know, okay,
14  we're -- we've got it. Good statement?
15  A. I believe at that time they just explained to
16  me that they were going to move on to a videotaped
17  interview.
18  Q. Okay. So, you get the written statement. And
19  you've got the written statement. They informed you
20  they're going to move on to do a videotaped statement?
21  A. Yes, sir.
22  Q. So they've indicated to you that not only has
23  he surrendered himself --
24  A. Correct.
25  Q. -- he has given them a written statement that

## 221

1  you know took about six hours to take, seven?
2  A. Yes, sir.
3  Q. I'm going to use 2:00 to 9:00 instead of 1:50
4  to 8:00. Is that okay, 2:00 o'clock in the afternoon?
5  A. Oh, yes, sir.
6  Q. To 9:00. It's just simpler that way for me.
7  A. Understood.
8  Q. So, basically we're talking about seven hours
9  to get this written statement?
10  A. Yes, sir.
11  Q. And -- so, you read it. They tell you they're
12  moving on to do a videotaped statement. And you say,
13  "Thanks, guys. I appreciate it," and off you go?
14  A. Yes, sir.
15  Q. Do you know if you talked to them again that
16  evening?
17  A. I believe I spoke to them after the interview,
18  the videotaped interview was done, correct.
19  Q. Okay. You take the information that you've
20  gotten -- that you have received by fax. You prepared
21  an affidavit. And to be fair, the affidavit has about
22  one paragraph that's added to it from the information
23  you gathered from Philadelphia?
24  A. Correct, yes, sir.
25  Q. You add that paragraph to it, to the affidavit

FIRM NAME
Page 218 to 221 of 260

- October 12, 2011

222

1  after reading the statement given by Mr. Mullis in
2  Philadelphia. You add that one paragraph. Then you --
3  and Detective --
4      A. Almendarez.
5      Q. -- Detective Almendarez can go find Judge Cox.
6  Judge Cox swears here to the affidavit and then signs
7  the warrant at approximately 9:15 p.m. that night?
8      A. Yes, sir.
9      Q. You guys come back to the Galveston courthouse?
10     A. I believe I went straight to the station at
11  that point.
12     Q. Okay. You go to the station and -- you're
13  talking about the Galveston police station?
14     A. Yes, sir.
15     Q. And is that in the same complex as we're in
16  right now?
17     A. No, sir. It's one block over. It's at the
18  other -- actually I guess they're all attached. I
19  apologize. The other -- far end. I think y'all can
20  walk through from one to the other with prisoners. I'm
21  not sure. The other end. Not here.
22     Q. So, but basically that's what I'm trying to
23  make sure I understand. You leave. You get Judge Cox
24  to sign the warrant. You come back to the overall
25  justice complex?

223

1      A. Yes, sir.
2      Q. Which includes the courthouse on the one end
3  and the DA's Office and then on the other end has the
4  Galveston PD?
5      A. Yes, sir.
6      Q. So, you come back to the facility. Would it be
7  fair to say you get back by about 9:45?
8      A. Fair to say.
9      Q. When I say that, it might be 9:30, might be
10  10:00 o'clock. But somewhere in that range you get back
11  to -- you get back to this Galveston Justice Center?
12     A. Correct.
13     Q. Do you know at what time you have your next
14  communication with the detectives in Philadelphia?
15     A. I'm going to have to check. I don't recall.
16  I believe that the phone conversation was done sometime
17  in the road. And they explained to me they were going
18  to send me the videotaped interview later on, but I'm
19  not certain.
20     Q. It's okay. I forget about the new-fangled cell
21  phone concept.
22     A. Yes, sir.
23     Q. So, you're actually in communication on the
24  road --
25     A. I believe so, after the interview was

224

1  completed.
2      Q. That's fair. Thank you.
3      Okay. Are they calling you while they're
4  doing the videotaped statement?
5      A. No, sir.
6      Q. All right. When they complete the videotaped
7  statement, do you have a communication or a conversation
8  with them after they complete the video statement?
9      A. Yes, sir.
10     Q. Tell the jury about that.
11     A. About the conversation after? He explained to
12  me that they have an older --
13     Q. "He" being?
14     A. Detective Hesser. I apologize. That they have
15  an older videotaped system and they were not going to be
16  able to immediately e-mail me a copy of the videotaped
17  statement. It would have to be transferred from VHS
18  tape onto a disk and that he would Fed-Ex it to me
19  overnight when he was done with that.
20     Q. You found that a little surprising, I guess?
21     A. A little.
22     Q. I mean, it's Philadelphia.
23     A. Yes, sir.
24     Q. You -- this is not Philadelphia, this is
25  Galveston. And we have the capabilities to download it

225

1  and e-mail it and the other side --
2      A. That's correct. Wasn't that shocking, to be
3  honest.
4      Q. Of course, when you're transporting him back,
5  he doesn't have any clothes?
6      A. I'm sorry?
7      Q. When you're transporting him back -- and you
8  guys take the time to go buy him some clothes?
9      A. Clothed him, yes, sir.
10     Q. Yes, because otherwise basically he's coming
11  home naked because you've got the -- you've seized his
12  clothing that he wore into the station, right?
13     A. Well, no, sir. He had been provided the
14  jailhouse clothing. But I didn't want to take that from
15  Philadelphia PD.
16     Q. I mean, you went above and you were trying to
17  be as nice to him as possible, not just because he's an
18  inmate or the target or the suspect in a terrible crime.
19  You just didn't want to have to transport the guy in
20  jail clothes. I mean, you went and bought the guy some
21  clothes?
22     A. Correct.
23     Q. That's kind of a nice gesture, don't you think?
24     A. I suppose so.
25     Q. Okay. I wrote this down and I'm not sure I

226

1   understood it based on what you testified.  Did you
2   testify earlier, "I gave him locales and they took a
3   statement"?
4        I wrote that down.  I wrote down in quotes, "I
5   gave them locales," like you were talking to the
6   Philadelphia PD and you were giving them like locales --
7        A.  Referring to locations?
8        Q.  Could be.
9        A.  Possibly.  Again, I think I clarified that a
10  little bit.  I recall saying that the incident happened
11  in Galveston, but not giving them specifics as to the
12  exact location that Alijah was found.
13       Q.  Okay.  Did you also testify previously that we
14  had ongoing talks with the homicide investigators in
15  Philadelphia?
16       A.  In the beginning, yes, sir.
17       Q.  How did Luck get assigned to this case?
18       A.  Luck was -- at the time I believe Sergeant Luck
19  was the actual east end supervisor.
20       Q.  Okay.  And what does that mean to me, "east end
21  supervisor"?
22       A.  The patrol officers have supervisors that cover
23  different areas and have -- back when I was here, we had
24  an east end supervisor, a central supervisor and a west
25  end supervisor.  And your supervisors were in charge of

227

1   those respective areas.  If a major call came out, then
2   those supervisors would go down there.
3        Q.  Okay.  So, what was Kershaw's?  He wasn't the
4   east end --
5        A.  He was close to the area and had been in the
6   department for a long time and was pretty experienced.
7   So, he went by.
8        Q.  I mean, but isn't he the same person as Luck?
9   I mean, aren't they equal in position at that time?
10       A.  In equal position, yes, sir, correct.  They
11  were both patrol sergeants, yes, sir.
12       Q.  So, Luck was over the east end which might, for
13  lack of a better word, give him jurisdiction, sort of,
14  or authority to be out there, right?
15       A.  Correct.
16       Q.  Okay.  But you didn't assign Luck to this case?
17       A.  I didn't assign anybody to the case, sir.
18       Q.  Correct.  You didn't assign anybody.  Just 13
19  people showed up?
20       A.  Correct.
21       Q.  If Luck was over the east end back in '08,
22  where was Kershaw?  What was his involvement?
23       A.  He could have been at the station at the time
24  of the call.  He could have been closer.  I'm not sure
25  where he was when the actual call came out.  There's

228

1   no -- supervisors are allowed to overlap and assist in
2   other areas.  If one supervisor is busy in an area, then
3   other supervisors can come out to assist.  It's not
4   uncommon for a supervisor to help with a case like this.
5        Q.  I wouldn't disagree with you, but who do these
6   two guys answer to?
7        A.  Whoever the patrol lieutenant is at the time.
8        Q.  So, would it be in -- you know, law
9   enforcement, like fire fighting, is sort of -- it's sort
10  of a quasi-military operation?  It's a chain of command,
11  correct?
12       A.  Yes, sir.
13       Q.  Somebody's got to be at the top of the food
14  chain and authority moves down from there, right?
15       A.  That's correct.
16       Q.  And the way things are supposed to work is that
17  there's a reason that there's a lieutenant, right?
18       A.  Yes, sir.
19       Q.  Because the lieutenant knows things that
20  sergeants don't know about what's going on in and around
21  the district, various districts?
22       A.  Maybe, maybe not.
23       Q.  Well --
24       A.  Not to say the lieutenant would know more about
25  what's going on in the district than the sergeant.  The

229

1   sergeant probably has more knowledge about what's
2   actually going on in the district.  But the lieutenant
3   would still be his supervisor.
4        Q.  Correct.  And when we're in supervisory
5   positions, the whole purpose of being in a supervisory
6   position or being the person at the greater authority is
7   to have greater authority, right?
8        A.  Yes, sir.
9        Q.  I mean, somebody's got to be in control --
10       A.  Correct.
11       Q.  -- right?  We can't have the tail wagging the
12  dog, right?
13       A.  Yes, sir.
14       Q.  As we see in some operations, right?
15       A.  Correct.
16       Q.  Okay.  It's got to be the other way around?
17       A.  Yes, sir.
18       Q.  Right?  So, it wouldn't have been -- I mean,
19  shouldn't the lieutenant have said -- it's hypothetical.
20  In a quasi-military organization such as the Galveston
21  Police Department or the Houston Police Department or
22  the Sheriff's Department, there's a chain of command
23  where people give other people assignments?
24       A.  That's correct.
25       Q.  Okay.  And in this case, do you know whether or

230

1  not the lieutenant, the supervising lieutenant gave
2  authority to Kershaw to be at the scene or whether
3  Kershaw just took it and made it his own authority?
4     A.  I'm not certain if the lieutenant kind of told
5  him or not to.  I guess it all depends on the location
6  of where people are and if they're close, they'll come
7  by and assist with something like this.
8     Q.  You work for the FBI?
9     A.  Yes, sir.
10    Q.  Who do you answer to?
11          MS. CAMERON:  Your Honor, I object on the
12  grounds of relevance.
13          THE COURT:  Mr. Bourque?
14          MR. BOURQUE:  Judge, it has to do with 13
15  people contaminating an area built for four.
16          MS. CAMERON:  Your Honor, I'm going to
17  object to the sidebar.
18          THE COURT:  That's sustained, but I will
19  allow some questioning in this area.  You may proceed.
20          MR. BOURQUE:  Thank you, Judge.
21    Q.  (BY MR. BOURQUE)  You work for the Federal
22  Bureau of Investigation?
23    A.  Yes, sir.
24    Q.  Who do you answer to there?
25    A.  I answer to a supervisor that was down in

231

1  Houma.
2     Q.  Okay.  And he's got a supervisor, also?
3     A.  Correct.
4     Q.  Okay?  And so, you don't just go off on your
5  own doing the things that you want to, right?
6     A.  We're pretty much on our own out there, sir.
7     Q.  If you get into a situation that is
8  supposed -- you're answering to a supervisor, if you've
9  gone outside what you know your realm of responsibility
10  to be, there's trouble, isn't there?
11    A.  Like I said, we -- in the office that I'm at,
12  we handle things on our own out there, sir.
13    Q.  All right.  I think one of the things that you
14  testified to previously on direct is that your job was
15  to check and make sure that only the people present were
16  people that belonged there?
17    A.  I believe I said that, yes, sir.
18    Q.  What -- I mean, what doesn't belong there?  If
19  there's 13 people on a crime scene like this, how -- did
20  you tell some people, "You're not welcome inside the
21  ropes"?
22    A.  Yes, sir.
23    Q.  So, there had been more than 13 present?
24    A.  No, sir.  I listed everybody who's out there,
25  whether they're stepping in the crime scene tape or not.

232

1          MR. BOURQUE:  I'll pass the witness, Your
2  Honor.
3          THE COURT:  Ms. Cameron?
4          MS. CAMERON:  Thank you, Your Honor.  May
5  I approach the witness?
6          THE COURT:  You may.
7     FURTHER DIRECT EXAMINATION
8  BY MS. CAMERON:
9     Q.  Special Agent, I'd like to start with seeing if
10  we can clarify a little bit about State's Exhibit
11  No. 47, which is the arrest warrant, correct?
12    A.  Correct.
13    Q.  And it was signed at 9:15 p.m., is that
14  correct, on February 1st, 2008?
15    A.  Yes, ma'am, that's correct.
16    Q.  And do you know whether or not the affidavit
17  was begun earlier than when you received the final
18  information from the Defendant's statement?
19    A.  I believe it was, yes, ma'am.
20    Q.  And if you can look at -- I believe it's a
21  two-page affidavit, can you just state how much of that
22  two pages was information that was received from
23  Philadelphia, Pennsylvania?
24    A.  The entire first page is not.  That was stuff
25  that we had knowledge of prior to that.  And the

233

1  majority of the second page was not received either or
2  was information we had prior to Philadelphia contacting
3  us.  It would be just this final paragraph that was
4  information we got from Philadelphia.
5     Q.  All right.  So, you don't know of your own
6  personal knowledge when Joel Bennett may have started to
7  work on this affidavit?
8     A.  That's correct.  I'm not certain, but I can say
9  that I believe that we started earlier than actually
10  waiting on the statement to be turned in.
11    Q.  Now, I want to direct your attention to the
12  fax.  Does this document show the fax that you received
13  from Detective Hesser?
14    A.  Yes, ma'am.
15    Q.  And what is that, sir?  Is that the statement
16  of the Defendant that you were waiting for that you then
17  added to that arrest warrant affidavit?
18    A.  That's correct.
19    Q.  And can you tell the jury when it is -- what is
20  the time that's up at the top?
21    A.  Shows to be 8:45 p.m. on February 1st.
22    Q.  And you've traveled from here to Philadelphia,
23  correct?
24    A.  Yes, ma'am.
25    Q.  And can you tell the jury what the time

234

1  difference is?  Is it an hour later?

2  A.  I believe there are -- I'm in Arizona.  And we

3  don't do time zone changes.  Are they an hour ahead of

4  us?

5  Q.  We can get the Court to take judicial notice

6  and we will provide that.  But do you know whether or

7  not when you received this, even though it says

8  8:45 p.m., do you know whether or not it was 7:45 p.m.

9  Houston time?

10  A.  Yeah.  I do not unless I have that in my notes.

11  Q.  Okay.  Well, can you check and see if by chance

12  you have in your notes when you received it from

13  Philadelphia, because I think the Defense is trying

14  to --

15          MR. BOURQUE:  Let's not have sidebar about

16  what the Defense is trying to do.

17          THE COURT:  Sustained.

18          MR. BOURQUE:  Ask the jury to be

19  instructed to disregard the sidebar of counsel.

20          THE COURT:  Please disregard the last

21  statement made by counsel.

22          You may ask another question.

23  Q.  (BY MS. CAMERON)  Was there some questioning

24  by opposing counsel as to how quickly you were able to

25  get the information, receive it from Philadelphia, type

235

1  it into an affidavit, get in your car, go to meet the

2  Judge, get the Judge to sign it and then to come back?

3  A.  Was there questioning?  Yes, ma'am.

4  Q.  All right.  So, do you know from looking at

5  your records or from your offense report whether or not

6  you would have received it at a different time which

7  would have been Houston time?

8  A.  I have that at 8:45 I received a fax from

9  Philadelphia.

10  Q.  All right.  So, when you've got -- you've got

11  8:45.  And do you know whether or not that is the time

12  here or the time that it was received on the document?

13  A.  That would be the time here.

14  Q.  All right.  But again, there's one paragraph

15  that appears to be added?

16  A.  On the affidavit, yes, ma'am.

17  Q.  Now I'd like to talk to you a little bit about

18  the information that you're conveying to Philadelphia.

19  A.  Yes, ma'am.

20  Q.  And at the time that you're talking to

21  Detective Hesser when he is going to be interviewing the

22  Defendant, do you know of your own personal knowledge

23  that Alijah Mullis has had his head stomped on?

24  A.  No, ma'am.

25  Q.  Is that anything that you communicated to

236

1  Detective Hesser?

2  A.  No, ma'am.

3  Q.  And -- so, you didn't know anything about the

4  manner and means, just what you had seen at the autopsy?

5  A.  That's correct.

6  Q.  And let's talk about the search of the vehicle.

7  Did you know what would be in that vehicle?

8  A.  I had no idea.

9  Q.  Were you at any time directing Detective

10  McNamee as to what to look for other than to make

11  certain that it's preserved so it can be processed?

12  A.  No, ma'am.  We just simply wanted the car to be

13  held so that we could do it ourselves.  And the B.B. gun

14  incident came up because Detective -- I believe that was

15  McNamee, I apologize, called me and said there's a B.B.

16  gun in the car.  Our policy says we have to take it out.

17  So, I told him to take it out and don't touch anything

18  else and hold it for us.

19  Q.  And let's talk about the crime scene.  Whose

20  responsibility was it out there to actually collect the

21  evidence?

22  A.  From the vehicle?

23  Q.  Yes -- no, no.  I'm sorry.  Now I'm to the

24  crime scene here in Galveston.

25  A.  Yes, ma'am.  That would be Scott Pena, the ID

237

1  officer.

2          MS. CAMERON:  If I may approach, Your

3  Honor?

4          THE COURT:  You may.

5  Q.  (BY MS. CAMERON)  And I'm going to show you

6  State's Exhibit No. 55 just as kind of an example of

7  what the Defense attorney was showing you when he said,

8  "Did you take this?  Did you pick this up?  What was the

9  significance of different pieces of items that were

10  found at the location?"  Do you remember those

11  questions?

12  A.  Yes, ma'am.

13  Q.  Based on your knowledge of this location,

14  Cherry Hill --

15  A.  Yes, ma'am.

16  Q.  -- would it be fair to say that it's kind of a

17  trash dumping ground, that there's lot of trash out

18  there?

19  A.  There was a lot of debris out there at the

20  time, yes.

21  Q.  So, would it be fair to say that there was a

22  lot of trash out there?  Did you think it all was

23  associated with this crime or just people dumping stuff

24  out there?

25  A.  Not all of it was associated with the crime.

- October 12, 2011

238

1    Q. And whose responsibility was it to collect the

2    evidence?

3    A. Scott Pena.

4    Q. And did you have confidence that Scott Pena

5    could do a professional job of assessing the crime

6    scene?

7    A. Yes, ma'am.

8              MR. BOURQUE: Objection. It's irrelevant.

9              THE COURT: Overruled.

10   Q. (BY MS. CAMERON) Now, the Defense attorney was

11   saying essentially, I think he was questioning you and

12   saying that this was -- this crime scene of yours was

13   contaminated by 13 officers. Do you recall being asked

14   that?

15   A. Yes, ma'am.

16   Q. Can you tell the jury with the officers that

17   were out there and what you maintained with the crime

18   scene tape, was it -- did you consider this scene to be

19   contaminated?

20   A. No, ma'am, I did not.

21   Q. And tell the jury why, if you've got all these

22   officers out there, including two crime scene officers

23   and several sergeants, why you didn't consider it to be

24   contaminated or disturbed or compromised?

25   A. Everybody that's out there is out there for

239

1    purposes of solving the case. So, people are given

2    different roles and people handle different parts of the

3    investigation. Not all 13 people that are listed on

4    there necessarily even stepped foot across the crime

5    scene. Some of them just stand there and are there

6    for -- pick their brains if we have any questions or if

7    we come up with something or other -- if other things

8    happen.

9        So, assignments are given no matter how many

10   people are out there. I don't turn help away if I can

11   get help. Sergeant Kershaw is out there. Sergeant Luck

12   was out there. We utilized the resources that we had

13   out there at the time.

14   Q. So, as the detective out there in control of

15   the scene or the lead detective, if you had seen

16   something go on, if you had seen something that you in

17   your professional opinion felt was a compromise to the

18   scene, what would you have done?

19   A. I would have kicked them out of the scene for

20   starters and at least noted what they had done, what

21   they had touched. And that's why I initially when I got

22   out there put up the crime scene tape.

23   Q. Now, you were asked about the actions of

24   Sergeant Kershaw touching the baby?

25   A. Yes, ma'am.

240

1    Q. Do you know of your own personal knowledge

2    whether or not he did what he was directed to do by

3    Officer Pena?

4    A. I do not know if he did it as directed by Pena

5    or if he did it on his own. But what I recall the

6    purpose of it being was to determine the sex of Alijah.

7    At the time we didn't know whether we had a male or a

8    female that was -- that had died out there. That's

9    important for us to know as soon as we can.

10   Q. Now, let's talk about the Defendant's demeanor

11   and how he was with you.

12   A. Yes, ma'am.

13   Q. Did you have an occasion to review the audio

14   videotape that the Defendant did with Detectives Rodden

15   and Hesser?

16   A. Yes, ma'am, I did.

17   Q. Did you observe the Defendant's demeanor during

18   that entire interview?

19   A. I did.

20   Q. Can you tell the jury, you know, basically how

21   he was treated by those detectives?

22   A. He was treated kindly. I mean, there was a

23   rapport that was built and they were communicating back

24   and forth very professionally.

25   Q. And even though when you took custody of him,

241

1    did you make it clear to him that you weren't there to

2    interview him?

3    A. Yes, ma'am.

4    Q. And did he continue to be talkative?

5    A. Yes, ma'am, he did.

6    Q. And was there any difference at all in the

7    demeanor that he had with the detectives in the

8    interview versus the demeanor that he had with you-all

9    as you took him back to Houston?

10   A. Yes, ma'am, his demeanor was different.

11   Q. And can you kind of just describe a little bit

12   of how his demeanor was different?

13   A. Sure. What I observed in the interview was his

14   demeanor was he was using a lot of big words and things

15   that you would use if you were actually a police officer

16   using words like "departed." And when he was with me,

17   it was -- he was using a lot of slang words and talking

18   -- you know, I mean, just talking like he was born and

19   raised on the streets, using a lot of slang and it was

20   just a complete difference than what he was doing when

21   he was in the interview with the Philadelphia

22   detectives.

23   Q. So, it seemed to be -- you could notice a

24   difference?

25   A. Yes, ma'am.

242

1   Q.  Let's talk about -- do you recall him saying
2   anything -- I think you stated that you didn't observe
3   any emotion by him, did you?
4   A.  No, ma'am.  He never cried or anything like
5   that.
6   Q.  Was he talkative, though?
7   A.  Yes, ma'am.
8   Q.  You know, when you say he didn't cry, did he
9   show any emotion that you observed?
10  A.  No.  I mean, like I said, he was just talking
11  and I couldn't -- not that I tried, but he just
12  continued to talk using a lot of slang and acting
13  completely different than what I had seen on the video.
14  Q.  Did he ask about his son, Alijah, at all?
15  A.  No, ma'am.
16  Q.  Did he ask about Caren Kohberger?
17  A.  No, he did not.
18  Q.  Did he say anything to you -- you talk about
19  emotion.  Did he say anything about crying or --
20  A.  He had made a statement before -- right before
21  we got on the flight that he was done crying and it was
22  time to be tough.
23  Q.  Had he made any other --
24       MR. BOURQUE:  Excuse me.
25       I'm going to have to object to that under

243

1   38.22.  This guy's clearly in custody at this point.
2   And we don't have any contextual nature for that and
3   I've never seen that in a report.  So, I've got to
4   object under 38.22.
5       MS. CAMERON:  May I ask a question?
6       THE COURT:  Counsel, approach for just a
7   moment, please.
8       (Discussion at the bench, off the record)
9       (Open court, Defendant and jury present)
10      THE COURT:  Ladies and gentlemen, I've
11  talked to the attorneys.  It looks like they probably
12  have about 25 more minutes with this witness.  It is now
13  seven minutes after 5:00.  Let me get a feel from y'all
14  how you're doing.  Are you willing to keep on going for
15  a while or do we need to come back in the morning?
16  Everybody ready to press on?  Okay.  Thank you.
17      You may continue.
18      MS. CAMERON:  Thank you, Your Honor.
19  Q.  (BY MS. CAMERON)  I want to go back to the
20  statement that you just shared with the jury.
21  A.  Yes, ma'am.
22  Q.  Were you questioning him when he made that
23  statement?
24  A.  No, ma'am.  I know that -- that in my report
25  that he was not being asked any questions.  He just

244

1   continued to talk.
2   Q.  And when you say you weren't questioning him,
3   who was the other officer that was accompanying you and
4   that was with him at the time?
5   A.  Officer Pena and I did the actual escort, but
6   the whole group was there; myself, Sergeant Almendarez
7   and Sergeant Jones and Scott Pena.
8   Q.  Was anybody else asking him questions?  Was
9   that in response to any law enforcement questioning?
10  A.  No, ma'am.
11  Q.  Did he make any other spontaneous statements?
12  A.  Yes, ma'am, he did.
13  Q.  And would that be a statement that he made to
14  Officer Pena?
15  A.  Yes, ma'am, in my presence.
16  Q.  And what is it that you remember him saying?
17  A.  I note in my report with quote marks on it that
18  he turned himself in because he was tired of running.
19  And the quote was that he wanted to do the right thing.
20  Q.  And what was the context of him saying that?
21  A.  With regards to his arrest for capital murder.
22      MS. CAMERON:  If I may have a moment, Your
23  Honor?
24      THE COURT:  You may.
25      MS. CAMERON:  If I may approach the

245

1   witness, Your Honor?
2       THE COURT:  You may.
3   Q.  (BY MS. CAMERON)  If you could refer to your
4   offense report at your notations starting with 1920?
5   A.  Yes, ma'am.
6   Q.  And can you tell the jury, 1920, that would be
7   military time and that would be what time?
8   A.  7:20 p.m.
9   Q.  Did you make a notation if you can refresh your
10  memory as to whether or not you knew at that time at
11  7:20, which would be, I believe, Central Standard Time
12  for us --
13      MR. BOURQUE:  I apologize for
14  interrupting.  I've got the offense report.  Can you
15  tell me what page that is on?
16      MS. CAMERON:  That is page 11 of 21.
17      MR. BOURQUE:  Thank you.
18  Q.  (BY MS. CAMERON)  That would be 7:20, correct?
19  A.  Yes, ma'am.
20  Q.  And are you making a notation at that time, if
21  you need to refresh your memory, that the statement was
22  almost completed?
23  A.  That's correct.
24  Q.  And I'm going to refer you to the fax that you
25  received from Eastern Standard Time?

246

1   A. Yes, ma'am.

2   Q. And do you know whether or not Philadelphia,

3   Pennsylvania, is Eastern Standard Time?

4   A. It is.

5   Q. All right. And you're receiving it at 8:45,

6   correct?

7   A. I believe so, yes, ma'am.

8   Q. Well --

9   A. 8:45 their time.

10   Q. Their time. This is coming from Homicide

11   Division Fax No. 21 --

12       MR. BOURQUE: Can we have him testify as

13   opposed to the State?

14       THE COURT: Sustained.

15   Q. (BY MS. CAMERON) Can you tell the jury where

16   this is coming from?

17   A. From the Homicide Division from the

18   Philadelphia Police Department.

19   Q. And that fax number, is that a fax number from

20   Philadelphia, Pennsylvania?

21   A. It appears to be.

22   Q. And would the time denoted on that be from

23   Philadelphia, Pennsylvania?

24       MR. BOURQUE: Objection. It's asked and

25   answered. He already testified he received it at 8:45

247

1   Galveston time.

2       THE COURT: I'm going to overrule the

3   objection.

4       Because the issue has been raised, if you

5   can answer the question, you may.

6       THE WITNESS: Yes, sir.

7   Q. (BY MS. CAMERON) So, do you know whether or

8   not we are in the same time zone as Philadelphia,

9   Pennsylvania, in Eastern Standard Time?

10   A. We are not.

11   Q. Okay. So, does it refresh your memory that

12   you're going from the statement almost being completed

13   at 7:20 --

14   A. Yes, ma'am.

15   Q. -- your time --

16   A. Correct.

17   Q. -- to then saying now at 8:45 you're receiving

18   the fax?

19   A. It is very possible that I wrote 2045 on my

20   notes there to reflect the time that's up here as

21   opposed to the actual time zone difference, which would

22   have been 7:45 here in Texas.

23       MS. CAMERON: Thank you, sir.

24       I'll pass the witness.

25       THE COURT: Mr. Bourque?

248

1       MR. BOURQUE: If it please the Court. May

2   I approach the witness, Judge?

3       THE COURT: Yes, sir.

4       FURTHER CROSS-EXAMINATION

5   BY MR. BOURQUE:

6   Q. How are you doing?

7   A. I'm doing swell. Yourself?

8   Q. I think I'm okay. Look. Let me direct your

9   attention to page 19 of your report.

10   A. Yes, sir.

11   Q. It starts on -- that's February 1st, 2008,

12   right?

13   A. Yes, sir.

14   Q. Now, when you write down 1100 hours, are you

15   writing your time or are you writing Philadelphia's

16   time?

17   A. My time, sir.

18   Q. When you write 1145, is that your time or is

19   that Philadelphia's time?

20   A. That would be my time.

21   Q. Okay. When you write 1350, is that your time

22   or is that Philadelphia's time?

23   A. My time.

24   Q. When you write 1626, is that your time or is

25   that Philadelphia's time?

249

1   A. That would be our time.

2   Q. If you write 1900, are you writing

3   Philadelphia's time or are you writing your time?

4   A. That's our time.

5   Q. So, it makes perfectly good sense when you

6   write 1920, you're talking about your time, not

7   Philadelphia's time?

8   A. Correct.

9   Q. When you write 2045, you're talking about your

10   time, not Philadelphia's time, correct?

11   A. I may have been talking about Philadelphia's

12   time --

13   Q. Well, when you testified on direct --

14       MS. CAMERON: Your Honor, can the witness

15   be allowed to finish his answer?

16       THE COURT: Were you finished?

17       THE WITNESS: I was just saying, I may

18   have been writing Philadelphia's time on that one based

19   on what was on the top of the fax.

20   Q. (BY MR. BOURQUE) Okay. Well, let's go to

21   February 3rd, 2008, when you write 74 -- 07:45, you

22   writing Philadelphia time, are you writing Texas time?

23   A. That would be Texas time, sir.

24   Q. When you're writing 8:30 on February the 4th,

25   are you writing Philadelphia time or are you writing

250

1  Texas time?

2  A.  Texas time, sir.

3  Q.  Do you want to go through the whole offense

4  report and write whose time you're writing on it?

5  MS. CAMERON:  Your Honor, I'm going to

6  object.  This is argumentative.

7  THE COURT:  Overruled.

8  Q.  (BY MR. BOURQUE)  Do you want to go through the

9  whole offense report?

10  A.  Not necessarily.

11  Q.  You'd agree with me that when you testified on

12  cross-examination just a few minutes ago when I asked

13  you what time you received it, you said you received it

14  at 8:45 Galveston time, correct?

15  A.  I -- possibly.

16  Q.  Did you say that?

17  A.  I don't recall if I said Galveston time.  I did

18  say 8:45 though, sir.

19  Q.  You said 8:45 Galveston time, didn't you?

20  A.  I believe so.

21  Q.  Yes?

22  A.  Yes, sir.

23  Q.  It's not until cross-examination when the

24  Government help -- needs help over here, you decided

25  maybe it was the wrong time?

251

1  MS. CAMERON:  I object.  That's

2  argumentative and sidebar.

3  THE COURT:  Sustained.

4  MS. CAMERON:  Can I ask that the jury be

5  told to disregard that last statement by opposing

6  counsel?

7  THE COURT:  If you will ask me.

8  MS. CAMERON:  Yes.  I'm asking you, Judge.

9  THE COURT:  That will be granted.

10  Please disregard that last statement.

11  MR. BOURQUE:  I apologize to the Court and

12  to counsel.

13  THE COURT:  Accepted.

14  Q.  (BY MR. BOURQUE)  Basically what we have here

15  is well over 100 different time assignments to your

16  offense report of about 22 pages, right?  If you had

17  four --

18  A.  I would have to count them.

19  Q.  Let me help you a little bit.

20  A.  Yes, sir.

21  Q.  If you had four -- or let's see.  If you had

22  four assignments per page, you would be somewhere around

23  80-something pages, 80-something time zones?

24  A.  Yes, sir.

25  Q.  Okay?  So, in each one of those, you put down

252

1  Galveston County time.  Fair statement?

2  A.  That's correct.

3  Q.  Now, just so we're clear, on this notation

4  that's on this fax line, you don't even know if that is

5  Philadelphia time or whether that's Houston time, do

6  you?

7  A.  That's correct.

8  Q.  I mean, you put down 2045.  You've been in law

9  enforcement ten years at the time that you're

10  involved in this investigation, right?

11  A.  Yes, sir.

12  Q.  And you know that what time you put things down

13  is important?

14  A.  Correct.

15  Q.  Right?

16  A.  Yes, sir.

17  Q.  Okay.  So, as we testified a few minutes ago on

18  cross-examination, it appears that you received the

19  report at 8:45.  You finished the affidavit.  You get it

20  signed.  You take it to Judge Cox within a 30-minute

21  period and you have it signed -- the warrant signed by

22  Judge Cox, right?

23  A.  That I had the warrant signed?

24  Q.  From the time that you received it from the

25  time that you received the statement from Philadelphia

253

1  to the time you got the Judge to sign it was about 30

2  minutes?

3  A.  Correct, yes, sir.

4  Q.  Okay.  Thank you.

5  So, when -- if you get it signed at 9:15, the

6  warrant --

7  A.  Yes, sir.

8  Q.  -- then you must have had -- you must have

9  received it, the statement from Philadelphia at 8:45

10  because that's a 30-minute time slot.  Fair statement?

11  A.  I believe so.

12  Q.  Okay.  That's fine.

13  Now, so that we're clear on this, it wasn't

14  just the detective from the Homicide Division in

15  Galveston talking to the detective in the Homicide

16  Division in Philadelphia, was it?

17  A.  I'm sorry?

18  Q.  Those aren't the only two parties involved in

19  communicating with one another.  We had the DA's Office

20  involved in this investigation?

21  A.  Yes, sir, that's correct.

22  Q.  And in taking this statement, right?

23  A.  In taking the statement?

24  A.  Yeah.  Assisting in taking the statement?

25  A.  Yes, sir.

254

1    Q. Because you know you get a phone call at 1:50
2    and I want to use the number 2:00 o'clock because it's
3    easier for me that way.
4    A. Yes, sir.
5    Q. But if you get the statement that -- you're
6    notified at 2:00 o'clock that there's something going
7    on, you've testified previously that you got Mr. Bennett
8    involved by 2:05 or 2:10?
9    A. Yes, sir.
10   Q. Okay. Some five or ten minutes later, right?
11   A. Yes, sir.
12   Q. You know that Bennett is typing the affidavit
13   that's going to be attached to the warrant at
14   9:00 o'clock, right?
15   A. Yes, sir.
16   Q. So, Bennett is typing the affidavit. That's
17   seven hours that Bennett's involved in the case on a
18   hands-on basis, right?
19   A. That's correct.
20   Q. And that's before you guys get in the car and
21   drive to find Judge Cox, right?
22   A. Yes, sir.
23   Q. Now, Judge Cox knew y'all were coming, I
24   assume?
25   A. Correct.

255

1    Q. I mean y'all called and said, "We're on our
2    way, Judge"?
3    A. Yes, sir.
4    Q. So, he knew you guys were coming?
5    A. Correct.
6    Q. You didn't wake him up in his nightgown?
7    A. No, sir.
8    Q. Okay. So, you guys go -- when we're talking
9    about you guys, we're not just talking about you and
10   Detective Almendarez, not just the two of you, but also
11   you had Joel Bennett in the car, Joel Bennett, the First
12   Assistant District Attorney for the Galveston County
13   DA's Office?
14   A. Correct.
15   Q. He's in the car?
16   A. Yes, sir.
17   Q. Is he driving?
18   A. I don't recall. I don't know why I'm foggy on
19   that. I really don't recall where Judge Cox lives or
20   who drove. I don't think I drove.
21   Q. Well, in all fairness, it's been three years?
22   A. Yes, sir.
23   Q. Okay. So, don't beat yourself up over that.
24       Basically what we do know is that during that
25   period in excess of seven hours we have the DA's Office

256

1    closely monitoring everything. They've got their hands
2    on everything that's happening. Fair statement?
3    A. Everything that's happening in Texas.
4    Q. Yes.
5    A. Yes, sir, correct.
6       MR. BOURQUE: Okay. Just one moment,
7    Judge.
8    Q. (BY MR. BOURQUE) Okay. What were the three
9    statements that he just volunteered?
10   A. I'm sorry? I believe he only gave two.
11   Q. Okay. What was the first one?
12   A. Wanted to do the right thing.
13   Q. That's it. And then --
14   A. And the other one was he was done crying. It
15   was time to be tough.
16   Q. Can you show that to me in your 21 pages
17   that --
18   A. I do not have that in my report, sir.
19   Q. Well, you have the one about he wanted to do
20   the right thing?
21   A. That's correct.
22   Q. You would agree with me a 21-page offense
23   report, that took some time, right?
24   A. It's an ongoing report. So, you add to it each
25   time you do something. It's not all typed up at one

257

1    time.
2    Q. Right. But the statement that you put in there
3    is -- the only statement that I can see in your report
4    is that he wanted to do the right thing?
5    A. Yes, sir.
6    Q. And when I say "wanted to do the right thing,"
7    I'm talking about Mr. Mullis seated to my right?
8    A. Yes, sir.
9    Q. Okay. And then this other part about -- it was
10   -- what was it?
11   A. That he was done crying. It was time to be
12   tough.
13   Q. Done crying and time to be tough?
14   A. Yes, sir.
15   Q. That's really not in your report?
16   A. That's correct. I do not have that in my
17   report.
18   Q. Okay. And you would agree with me that a few
19   minutes ago as you apologized to the jury about being a
20   little foggy on what you do recall and that sort of
21   thing, it's been three years?
22   A. Yes, sir.
23   Q. Don't you think if it was really said, that
24   would have been something you would haveput in your
25   report?

FIRM NAME

258

1    A.  That was going to stick in my head no matter
2    what.  But I thought Officer Pena was going to put that
3    in his report.
4    Q.  Well, did you read Officer Pena's report before
5    you testified?
6    A.  Yes, sir.
7    Q.  And --
8    A.  I don't think it's in there.
9              MR. BOURQUE:  Thank you.  I pass the
10   witness?
11             MS. CAMERON:  Nothing further from this
12   witness.
13             THE COURT:  May this witness be excused?
14             MS. CAMERON:  Yes, Your Honor.
15             MR. BOURQUE:  Yes, sir.
16             THE COURT:  Thank you.  You may step down.
17             THE WITNESS:  Thank you.
18             THE COURT:  All right.  Ladies and
19   gentlemen, we're going to go ahead and break for the
20   day.  I'll ask you to be back here tomorrow morning
21   ready to go at 9:00 a.m.  Get here just a little before
22   9:00, that would be helpful.
23             Please remember the instructions that you
24   are under.  There may well be reports in the newspaper,
25   on TV, on the radio or internet certainly.  Please

259

1    refrain from reviewing any of those reports.  Any
2    questions before I release you?  All right.  See y'all
3    tomorrow morning at 9:00.
4              (Proceedings adjourned)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FIRM NAME

260

1              REPORTER'S CERTIFICATE
2    THE STATE OF TEXAS    *
3    COUNTY OF GALVESTON   *
4
5         I, Judy Hansen, Official Court Reporter in and for
6    the 122nd District Court of Galveston County, State of
7    Texas, do hereby certify that the above and foregoing
8    contains a true and correct transcription of all
9    portions of evidence and other proceedings requested in
10   writing by counsel for the parties to be included in
11   this volume of the Reporter's Record, in the
12   above-styled and numbered cause, all of which occurred
13   in open court or in chambers and were reported by me.
14        I further certify that this Reporter's Record of the
15   proceedings truly and correctly reflects the exhibits,
16   if any, admitted by the respective parties.
17        WITNESS MY OFFICIAL HAND this the 14th day of
18   October, 2011.
19
20
21        /s/ Judy Hansen
22
             Judy Hansen, Texas CSR 4979
23           Expiration Date: 12/31/2012
                Official Court Reporter
24           122nd District Court
                Galveston County, Texas
25           Galveston, Texas  77551