- March 16, 2011

1

REPORTER'S RECORD
VOLUME 30 OF 59 VOLUMES
TRIAL COURT CAUSE NO. 08CR0333
COURT OF CRIMINAL APPEALS CAUSE NO. AP-78,525

TRAVIS JAMES MULLIS,        *  IN THE DISTRICT COURT
                            *
        APPELLANT           *
                            *
VS.                         *  GALVESTON COUNTY, TEXAS
                            *
THE STATE OF TEXAS,         *
                            *
        APPELLEE.           *  122ND JUDICIAL DISTRICT

FILED IN
COURT OF CRIMINAL APPEALS

OCT 27 2011

PUNISHMENT PHASE

Louise Pearson, Clerk

On the 16th day of March, 2011, the following
proceedings came on to be heard in the above-entitled
and numbered cause before the Honorable John Ellisor,
Judge presiding, held in Galveston County, Texas;
    Proceedings reported by machine shorthand.

# ORIGINAL

FIRM NAME

- March 16, 2011

2

```
 1                A P P E A R A N C E S

 2   FOR THE STATE OF TEXAS:

 3        Mr. B. Lyn McClellan
          Special Prosecutor
 4        SBOT:  13396100
          Ms. Donna W. Cameron
 5        First Assistant District Attorney
          SBOT:  03675050
 6        Ms. Kayla M. Allen
          Assistant District Attorney
 7        SBOT:  24043530
          Galveston County District Attorney's Office
 8        Galveston County Justice Center
          600 59th Street
 9        Galveston, Texas  77551
          Phone:  409.766.2355
10        Fax:    409.766.2290

11

12   FOR THE DEFENDANT:

13        Mr. Robert K. Loper
          SBOT:  12562300
14        LOPER LAW
          111 W. 15th Street
15        Houston, Texas 77008
          Phone:  713.880.9000
16        Fax:    713.869.9912

17        - AND -

18        Mr. Gerald E. Bourque
          SBOT:  02716500
19        ATTORNEY AT LAW
          24 Waterway Ave. Suite 660
20        The Woodlands, Texas  77380
          Phone:  713.862.7766
21        Fax:    713.813.0321

22

23

24

25
```

- March 16, 2011

3

```
 1                    CHRONOLOGICAL INDEX

 2                       VOLUME 30

 3
                                                    VOIR
 4      DEFENSE WITNESS          DIRECT   CROSS      DIRE

 5      Gina Vitale                6       170       32,71
 6                                                   116

 7      REPORTER'S CERTIFICATE........................  212
 8

 9

10

11

12              ALPHABETICAL WITNESS INDEX

13
                                                    VOIR
14      WITNESS                 DIRECT   CROSS      DIRE

15      Gina Vitale                6       170       32,71
16                                                   116

17

18

19

20

21

22

23

24

25
```

- March 16, 2011

4

1                        VOLUME 30

2                    EXHIBIT INDEX

3  DEFENSE
   EX. NO.    DESCRIPTION          OFF.      ADM.
4
   9-11       Photos               18        18
5
   12-14      Photos               22        22
6
   19         Photo                22        22
7
   23         Adoption Records     25        25
8
   23A-B      Excerpted pages      25        25
9
   24         Sheila Wallace       29        29
10            autopsy

11 24A        Excerpted pages      29        29

12 25         Bay Area Counseling  33        33
              records
13
   25A-G      Excerpted pages      33        33
14
   26         Birth, marriage,     36        37
15            death certificates

16 27         Carolinas Medical    39        39
              Center records
17
   27A-Z      Excerpted pages      39        39
18
   27AA-EE    Excerpted pages      39        39
19
   28         ER report            50        50
20
   29         Sheila Wallace       51        53
21            medical records

22 29A-T      Excerpted pages      51        53

23 30         Edgewood H.S.        70        70
              records
24
   31         Feldman Records      71        71
25

6

1                        VOLUME 30

2                   EXHIBIT INDEX (Cont'd.)

3  DEFENSE
   EX. NO.   DESCRIPTION              OFF.      ADM.
4

5  41A       Excerpted pages          109       109

6  42        Memorial Hermann         112       113
             records
7
   42A       Excerpted pages          112       113
8

9  43        Kohberger medical        112       113
             records
10
   44        Plumtree records         115       116
11
   45A       Binder of excerpted      119       119
12           pages

13 46        Content Summary          117       117

14

15

16

17

18

19

20

21

22

23

24

25

7

MARCH 16, 2011

(Open court, Defendant present, Jury present)

THE COURT: It is March the 16th, 2011 at 9:00 a.m. Is the Defense and the State ready to go forward?

MR. BOURQUE: Yes, sir.

MS. CAMERON: State's ready, Your Honor.

THE COURT: All right. Mr. Bourque.

MR. BOURQUE: Thank you, Judge. We'd call Gina Vitale.

THE COURT: All right.

(Witness sworn)

GINA VITALE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BOURQUE:

Q. Ms. Vitale, would you state your full name for the record, please?

A. My name is Gina Vitale.

Q. If you would, would you just tell the jury a little bit about who you are and how you're involved in this case.

A. I'm the mitigation specialist working on

8

Travis' case.

Q. And do you work independently?

A. I do. I'm appointed -- I work independently but I'm appointed by various State and Federal Courts to assist the Defense in representation of clients.

Q. Are you a lawyer?

A. No, I'm not.

Q. Tell us a little bit about your educational and work experience.

A. I have a Bachelor's Degree from Tulane University in Psychology and a Master's Degree in Social Work from the University of Houston. I've worked as a social worker in both hospitals and residential treatment facilities and also I did work -- quite a bit of work before that as a residential counselor and psychiatric technician.

Q. All right. Now, how long have you known me?

A. I've probably known you almost ten years.

Q. Okay. And would you say -- how many capital murders have you worked on?

A. I've probably been appointed in upwards of 40. Not all of those go to trial. There's a variety of different results in those case but I've probably been appointed on about that many.

Q. Do you know in the ten years we've known one

9

another about how many times you've worked for me on capital murder defense cases?

A. I don't know.

Q. Okay.

A. I don't think we've ever worked on a case that's gone to trial before.

Q. Yeah, okay. That sounds about right.

In the field of mitigation can you tell the jury kind of what you do in the field of mitigation in capital defense cases?

A. The role of a mitigation specialist is to put together a comprehensive biopsychosocial history of the client so it's looking at every aspect of the client and his family's history, the genetics, the psychology, the living arrangements, the education, sort of you name it. And that involves everything from interviewing the client and their family to interviewing any professionals that may have been in contact with the family over their life span, whether it be social workers, medical doctors, neighbors, teachers. It's my job to be nosy and I'll talk to anybody that will talk to me.

Q. Would it be fair to say that it would be fair to title you sort of as a mitigation investigator?

A. Yes.

10

Q. They're all kind of investigators. You hear about private eyes and things like that. You don't tote a gun and go look for witnesses at crime scenes.

A. No, I certainly don't.

Q. Your job is to find a history, what happened, who is this boy sort of thing.

A. Correct.

Q. Or who is this woman.

A. Exactly.

Q. And can you tell when was it that you became involved in this case if you can track it to a date certain?

A. Not a specific date but I believe it was sometime in 2009.

Q. Okay. And you recall that you replaced someone else?

A. That's correct.

Q. So, you came in sometime in 2009. What's the first thing you began to do?

A. The first thing I did review the file of the other investigator -- mitigation specialist since that was in existence and then the next thing to do was to go interview the client and start gathering information from him.

Q. Now, to be a mitigation investigator do you

11

1   have to be on some approved list?
2       A.  No.
3       Q.  But it has to be something that you're
4   interested in?
5       A.  Absolutely.
6       Q.  Do you find it rewarding?
7       A.  I do.
8       Q.  Do you find it challenging?
9       A.  I do.
10      Q.  Do you find it difficult?
11      A.  Yes.
12      Q.  Did you find all three of those in this case?
13      A.  Very much so.
14      Q.  When -- you're aware that there were a number
15  of records that we began to look for.
16      A.  Correct.
17      Q.  You're familiar -- are you familiar with the
18  Sheppard Pratt-Jefferson School?
19      A.  Yes.
20      Q.  Can you tell the ladies and gentlemen of the
21  jury how many pages of documents we had out of Sheppard
22  Pratt?
23      A.  From the Sheppard Pratt-Jefferson School we
24  received somewhere between 3- and 4,000 pages of
25  records.

12

1       Q.  And, of course, that only sounds like a lot
2   until you actually have to go through them, correct?
3       A.  Right.
4       Q.  And, of course, some pages like in anything
5   where there's documentation some's relevant, some's not
6   relevant, some's important, some's not.
7       A.  Yes.
8       Q.  Is that a fair assessment of the Sheppard Pratt
9   records?
10      A.  It is.
11      Q.  You know that we have these 3,000 pages down on
12  the third floor and we brought those up here and they
13  got locked in a room without a key to get them out.
14      A.  That's correct.
15      Q.  We'll get that later in the day.  But what you
16  did is you have gone through all of those pages.
17      A.  That's true.
18      Q.  Would it be fair to say that probably the two
19  hardest working people in this case are you and my
20  secretary?
21      A.  Absolutely.
22      Q.  As we -- before we talk about some of the
23  records, would you say that Sheppard Pratt -- how would
24  you say -- how hard was it to get the Sheppard Pratt
25  records?

13

1           MR. MCCLELLAN:  I object to relevance.  We
2   have the records.  I object to relevance.
3           MR. BOURQUE:  I'll help, Judge.
4           THE COURT:  Okay.
5       Q.  (BY MR. BOURQUE) Some of the records are easier
6   to find than others, right?
7       A.  Yes.
8       Q.  Some people are more cooperative than others?
9       A.  Yes.
10      Q.  Sheppard Pratt was cooperative.
11      A.  Yes.  I believe those actually came prior to me
12  being appointed on the case.
13      Q.  You started looking for additional records.
14      A.  Correct.
15      Q.  And eventually you started trying to find
16  family members.
17      A.  Yes.
18      Q.  Trying to find --
19          MR. MCCLELLAN:  Your Honor, I would object
20  to the leading.  I have no problem with some leeway,
21  but --
22          MR. BOURQUE:  That's fine, Judge.  I agree
23  with him.
24          THE COURT:  Okay.
25      Q.  (BY MR. BOURQUE) At what point were you able to

14

1   find the family members?
2       A.  Family members, biological family members, were
3   only located very recently, within the last couple of
4   months.
5       Q.  How is it that you found them in the last
6   couple of months?
7       A.  After months of searching and hours of genetic
8   research, I was able to locate who I believed was a
9   biological half-sister of Mr. Mullis.
10      Q.  What made you think as you're looking through
11  -- kind of take the jury through how hard it was for
12  you to find this family.
13      A.  I started with very little information.  Mr.
14  Mullis wasn't able to give me a lot of information on
15  his biological family because he didn't know it.  I
16  believed I knew his mother's maiden name.
17  Unfortunately, I was incorrect.
18          But after quite a bit of searching I was
19  able to find a death certificate for her.  I requested
20  those records.  Once those records came in, there was
21  some information on her death certificate that led me
22  to some other last names and her parents' names.  Once
23  I had those names, I was able to do some more research
24  and ultimately tracked back -- tracked his biological
25  mother back to a marriage to a Mr. Goodson.

15

1    I did have a possible first name for one
2  of his half-sisters and it wasn't until I was able to
3  start searching for her with the new last names that I
4  was learning that I was able to locate her.  So, it was
5  a lot of trial and error.
6    Q.  What state was she located in?
7    A.  North Carolina.
8    Q.  How close is North Carolina to Maryland, for
9  example?
10   A.  Not very.
11   Q.  Just next door, fair statement?
12   A.  Oh, North Carolina and Maryland, yes, sir.
13   Q.  But quite a distance from the State of Texas.
14   A.  Yes.
15   Q.  And were you required -- what assistance did
16 you try to get from other investigators or mitigation
17 investigators from the North Carolina or Maryland area?
18   A.  We were working with an attorney in the North
19 Carolina area to try and locate individuals and obtain
20 records and I ultimately traveled both to North
21 Carolina and to Maryland in order to interview folks
22 and try and locate individuals.
23   Q.  Who was the first biological family member that
24 you found?
25   A.  The first was Kendra Goodson.

16

1    Q.  And Kendra Goodson is who as to Travis James
2  Mullis?
3    A.  Kendra is his older half-sister.
4    Q.  And without telling us what she said to you,
5  were you able to locate other family members and
6  friends as a result of that?
7    A.  Yes, I was.
8    Q.  That led you to who -- did you get to meet as a
9  result of opening the door to Kendra?  What's Kendra's
10 last name?
11   A.  Goodson.
12   Q.  So --
13   A.  Actually she's now married.  It's Witherspoon.
14   Q.  After meeting with Kendra Witherspoon, what
15 other family members and friends were you able to
16 locate?
17   A.  After speaking to Kendra, I spoke to another
18 half-sibling, an older half-brother whose name is
19 Michael Nicholson.  And after speaking to him, was
20 referred on to other individuals and spoke with some
21 family friends, the Kelly family.  I spoke with Sophia
22 Kelly, Bridgette Kelly and Michelle Kelly who is now
23 Michelle Kelly Black.  Ultimately I also spoke with
24 Michelle Nicholson who is the older half-sister of
25 Travis and the twin sister of Michael Nicholson.

17

1    Q.  So, when you -- by getting to Kendra
2  Witherspoon and being able to visit with her, you were
3  able to open the door to other people to visit with?
4    A.  Yes.
5    Q.  Were you able to --
6      MR. BOURQUE:  Judge, may I approach the
7  witness?
8      THE COURT:  You may.
9    Q.  (BY MR. BOURQUE)  Were you able to locate any
10 photographs of Travis Mullis in his infancy?
11   A.  Yes.
12   Q.  Show you what's marked as Defendant's 9, 10,
13 and 11 and take a moment to review those.
14   A.  (Reviewing documents)
15   Q.  Have you had an opportunity?
16   A.  Yes.
17   Q.  Do these photographs fairly and accurately
18 depict -- although you didn't know Travis at that age,
19 fair statement?
20   A.  Correct.
21   Q.  These are the photographs that you obtained as
22 a result of meeting family members and friends of the
23 family?
24   A.  That's correct.
25   Q.  Is that correct?

18

1    A.  Yes.
2    Q.  Are these photographs -- can you tell the
3  ladies and gentlemen of the jury what these are
4  photographs of?
5    A.  They're --
6    Q.  Exhibit No. 9.
7    A.  No. 9 is a photograph of Travis, his older
8  sister, Kendra, and his mother.
9    Q.  Okay.  Now, from the moment you obtained these
10 photographs, did you alter them or change them or make
11 any deletions or additions?
12   A.  No, I did not.
13     MR. BOURQUE:  Judge, we'd offer 9, 10 and
14 11 at this time.
15     MR. MCCLELLAN:  Could I have a moment to
16 confer with counsel?
17     THE COURT:  You may.
18     (Counsel conferring privately)
19     MR. MCCLELLAN:  No objection.
20     THE COURT:  Defendant's 9, 10, 11 are
21 admitted.
22     MR. BOURQUE:  May I publish these?
23     THE COURT:  You may.
24   Q.  (BY MR. BOURQUE)  You've got Defendant's
25 Exhibit 9.  Who did you get Defendant's Exhibits No. 9,

19

1  10 and 11 from?

2     A.  I believe 9 and 10 came from Michelle Black and

3  11 I think came from a maternal aunt, Denise Devlin.

4     Q.  And those people are here to testify to their

5  authenticity?

6     A.  They are.

7     Q.  As a result of these photographs, can you tell

8  the ladies and gentlemen of the jury who these people

9  are that are depicted on the screen?

10    A.  The infant is Travis Mullis, the young girl

11 with the blond hair is Kendra and the woman holding the

12 baby is Sheila Wallace.

13    Q.  You have a pointer up there that is sort of a

14 laser and you may be able to activate that.

15        Can you tell us which one is Kendra?

16    A.  This is Travis here and the infant and this is

17 his mother, Sheila, holding him and this is Kendra

18 hugging her from the side.

19    Q.  So, that's Travis with his mom and Travis with

20 his --

21    A.  Older sister.

22    Q.  He has also an additional sister?

23    A.  That's correct.

24    Q.  And that's Defendant's Exhibit No. 9.

25 Defendant's Exhibit No. 10.  And can you tell us -- at

20

1  least now you know why they don't let me work on these.

2  But on Defendant's Exhibit No. 10, can you tell us

3  what's depicted in Defendant's Exhibit No. 10?

4     A.  The infant in the photograph is Travis and the

5  man holding him is his biological father, Bobby Ray

6  Wallace.

7     Q.  What's occurring right here?

8     A.  Bobby Ray Wallace is holding what I believe is

9  a bulb and there's a tube you can see here going to

10 Travis' abdomen.  As a young infant when he was

11 hospitalized, that was how he was fed.

12    Q.  So, that's what's commonly referred to as a

13 G-tube?

14    A.  That's correct.

15    Q.  As far as I know.

16    A.  Correct, a gavage feeding.

17    Q.  He was -- looks like this is indicating about

18 six weeks old at that time?

19    A.  Yes.  I believe that actually may be in the

20 hospital.

21    Q.  Then this is Defendant's Exhibit 11 which had

22 been introduced into evidence.  Can you tell us who

23 that is?

24    A.  The infant in the picture again is Travis and

25 he's in a car seat there and you can see the tube

21

1  coming -- peeking out of the onesie there, that is the

2  tube that would have been used for feeding.

3     Q.  So, that's 9, 10 and 11 -- are the earliest

4  known pictures we have of Travis James Mullis?

5     A.  Yes.

6     Q.  Then were a series of pictures.  Let me

7  show you Defendant's 12, Defendant's 13, Defendant's

8  14, Defendant's 15, 16, 17, Defendant's 18, Defendant's

9  19, Defendant's 20, Defendant's 21 and Defendant's 22.

10        Now, you have seen Travis with his shirt

11 off.  Is that accurate?

12    A.  Yes, I have.

13    Q.  Of course you know now I took those pictures,

14 correct?

15    A.  Correct.

16    Q.  Do they fairly and accurately depict Travis

17 Mullis' abdomen the way that it appears today?

18    A.  They do.

19        MR. BOURQUE:  And, Judge, at this time we

20 would offer -- it's 12 through 22?

21    A.  That's correct.

22        MR. MCCLELLAN:  May I approach her and see

23 those?

24        THE COURT:  Yes.

25        MR. MCCLELLAN:  Can I approach counsel?

22

1        THE COURT:  You may.

2        (Counsel conferring privately)

3        MR. BOURQUE:  Let me reoffer these.

4  Instead of offering 12 through 22, we'll offer 12, 13,

5  14, and 19.

6        THE COURT:  Any objection?

7        MR. MCCLELLAN:  No, Your Honor.

8        THE COURT:  12, 13, 14 and 19 are

9  admitted.

10        MR. BOURQUE:  Thank you.  May I publish

11 for the jury?

12        THE COURT:  You may.

13    Q.  (BY MR. BOURQUE)  We're looking now at

14 Defendant's Exhibit 12.  I think the jury can see that

15 here.  And who is depicted in this photograph?

16    A.  Travis.

17    Q.  Whose abdomen is that?

18    A.  Travis Mullis'.

19    Q.  We're looking at Defendant's Exhibit 13.

20 Again, this is maybe a closer up and so one side.  And

21 whose stomach is that?

22    A.  Travis Mullis'.

23    Q.  And that's as it appears today?

24    A.  It is.

25    Q.  Defendant's Exhibit 14.  I know some of the

23

1  jury won't be able to see with the light reflecting on
2  it. That's okay for now. They'll have it in the back.
3  This is Defendant's Exhibit 14. Again, this is a
4  close-up on a different side of the abdomen. Fair
5  statement?
6      A. Yes, it is.
7      Q. Then it looks like we have Defendant's Exhibit
8  19 and it looks as if we've got a scarred area on his
9  body and this is on his chest; is that correct?
10     A. That's correct.
11     Q. And, of course, Dr. Mendel will speak to these.
12     A. Dr. Katz.
13     Q. That's what I meant, Dr. Katz will talk about
14  it. So, that takes us to some of the records that
15  we're going to be talking about. Is that a fair
16  statement?
17     A. Yes.
18         MR. BOURQUE: Judge, is it okay if I kind
19  of -- I'm kind of in need of these up here. Is that
20  okay?
21         THE COURT: That's fine.
22     Q. (BY MR. BOURQUE) As part of your records
23  collection in this case, what did you find important as
24  you're going through it?
25     A. There were a number of different records that

24

1  were collected from a number of different agencies and
2  with any set of records some bits of those are
3  important and some are less so.
4      Q. And how did you decide what was going to be
5  important and what wasn't going to be important?
6      A. Well, what I tried to pick out were the records
7  from the larger set that would give someone a clearer
8  picture of Travis and his life in context of what
9  circumstances he was in at various times during his
10  life.
11     Q. All right. Let me show you Defendant's Exhibit
12  No. 23. Do you recognize that as a certified copy of
13  the court records that were received from Harford
14  County Circuit Court?
15     A. Yes.
16     Q. And why did you see -- why did you feel that
17  the adoption records were important, if they were?
18     A. These records are the documentation of the
19  beginning of Travis' life with his adoptive family and
20  there's some background information in here I think is
21  important.
22     Q. What was required for us to find these records,
23  if you can tell the ladies and gentlemen?
24     A. These records were only accessible with some
25  intervention from the Court, I believe the Court here

25

1  as well as the Court in Harford County and an
2  additional attorney there.
3      Q. How hard was it to just find these the easy
4  way?
5      A. It was impossible. I was not able to locate
6  and obtain these records myself through the normal
7  chain.
8      Q. Was there anything you found in the records you
9  wanted to point out to the jury?
10     A. Yes.
11     Q. Let me show you what's marked as Defendant's
12  Exhibit No. 23A and 23B. Do you recognize those?
13     A. I do.
14     Q. Okay. Now, these are just parts -- they're
15  parts of these records?
16     A. That's correct.
17         MR. BOURQUE: Judge, I would offer at this
18  time 23, 23A and 23B and tender those to the State for
19  them to review.
20         MR. MCCLELLAN: No objection.
21         THE COURT: Defendant's Exhibit No. 23,
22  23A and 23B are admitted.
23     Q. (BY MR. BOURQUE) What did you find out in the
24  adoption records, generally speaking? Like when was
25  the adoption?

26

1      A. The adoption was initiated immediately after
2  the death of Sheila Wallace which was in July of 1987
3  and then, if memory serves, it wasn't officially
4  granted until December in 1989 which would have been
5  two years later.
6      Q. All right. In our search were we able to find
7  where there was ever a social study that was done
8  before Travis was adopted by the Mullis family?
9      A. No. In fact it's what's missing from these
10  records or what isn't in these records that is the most
11  significance which is that lack of any sort of
12  investigation into the adoptive family.
13     Q. Is there any indication, which is standard --
14  is there any indication that Travis Mullis had a lawyer
15  assigned to him in his infancy to protect his rights
16  before the adoption took place?
17     A. There's no indication of that.
18     Q. So, he didn't have an ad litem for him?
19     A. Not that I can see in these records, no.
20     Q. Now, when we look at 23A, I see where you've
21  highlighted a paragraph if I can pull that up or back
22  -- there's a location down here -- you have highlighted
23  something for the jury and would you read that to the
24  jury?
25     A. "The natural father of the child is Bobby Ray

---

27

1  Wallace whose present whereabouts are unknown to the
2  petitioner. The natural father of the child has
3  willfully neglected and refused to supply adequate
4  support, maintenance and medical care for the child and
5  has made no effort of any sort to communicate with the
6  minor child or provide for the well-being of the child
7  since it was born."
8      Q. Do you know the date of this document?
9      A. The date of this document is January 20th,
10 1989.
11     Q. Now -- and then that last sentence on the first
12 page?
13     A. "The child resided exclusively with Sheila D.
14 Goodson until her death in July of 1987."
15     Q. These are judicial findings that are made by a
16 court at the time of the adoption.
17     A. That's correct.
18     Q. And what is it on the second page of this
19 document that you want to point out to the jury?
20     A. It reads: "That upon the minor child being
21 placed in the custody of the Plaintiffs herein, the
22 child was severely anemic and required medical
23 attention which the child had not previously received."
24     Q. Then out of 23B there's a notation, first of
25 all -- Defendant's Exhibit No. 23B there's a cost slip

---

28

1  that you have highlighted for the jury that indicates
2  what?
3      A. I believe that's the filing cost that the
4  Mullis' paid.
5      Q. That's $90?
6      A. Correct.
7      Q. You have Defendant's Exhibit No. 23 --
8      A. Yes.
9      Q. -- folder and we're going to place 23A and 23B
10 in the 23 folder. Okay?
11     A. Okay.
12     Q. So -- but so the jury's clear, all those
13 records in Defendant's Exhibit No. 23 are going to
14 include 23A and 23B, just not the highlighted portions
15 on Defendant's 23?
16     A. Correct.
17     Q. And then 23A is just a highlighted portion that
18 you wanted to point to the jury?
19     A. Yes, that's right.
20     Q. And the same with 23B?
21     A. Yes.
22     Q. Okay. And can you identify Defendant's Exhibit
23 No. 24?
24     A. These are the autopsy records which were
25 obtained from North Carolina Vital Records for Sheila

---

29

1  Lee Wallace.
2      Q. Okay. And it includes a toxicology report?
3      A. It does.
4      Q. You gathered that as part of your workup in
5  preparing for this case?
6      A. I did.
7      Q. And a copy has been provided to the State
8  previously?
9      A. Yes, it has.
10         MR. BOURQUE: I'm offering 24A as well,
11 Judge.
12         MR. MCCLELLAN: No objection.
13         THE COURT: Defendant's Exhibit 24 and 24A
14 are admitted.
15     Q. (BY MR. BOURQUE) Okay. We're talking about
16 the autopsy report of who?
17     A. Of Sheila Wallace.
18     Q. Who is Sheila Wallace?
19     A. She is Travis' biological mother, the woman in
20 the picture we saw over there.
21     Q. And in the autopsy report that we have, you
22 found something that you wanted to show to the jury; is
23 that correct?
24     A. Yes.
25         MR. BOURQUE: May I approach the ELMO,

---

30

1  Judge.
2          THE COURT: You may.
3      Q. (BY MR. BOURQUE) Now, you're not a physician
4  and you're not telling me what any of this means.
5      A. No, I'm not a physician.
6      Q. And in 24A it looks like you have found some
7  information there you wanted to share with the jury.
8      A. Yes. This is a narrative summary of the
9  autopsy and it states: "Physical examination shows
10 marked obesity, peripheral edema and marks of bed
11 springs on her right side. There are numerous apparent
12 cigarette burns in her nightgown."
13     Q. And this is from her autopsy?
14     A. Yes.
15     Q. And, again, 24A would be included in the folder
16 of Defendant's Exhibit No. 24?
17     A. Correct. It's the last page.
18     Q. Okay. If you would, would you just read the
19 first paragraph for the jury which talks about external
20 descriptions; scars, tattooing, clothing, property and
21 jewelry?
22     A. "This is the body of a morbidly obese woman
23 dressed in a pink nylon gown and nylon panties. The
24 gown has numerous holes in it. The skin is without
25 scars. Several ulcerations are present under the left

---

- March 16, 2011

**31**

1 breast and on the right arm and leg. There are
2 impressions resembling chicken wire on the right
3 shoulder, hip and thigh. The abdomen is distended with
4 multiple stria and induration of skin. The left breast
5 and inner thigh are also indurated with stria. The
6 skin of the face and chest contain multiple small scars
7 consistent with acne. The skin of the feet is dry with
8 thick calluses on the heels. The fingertips are
9 discolored. The external genitalia are those of a
10 normally developed female. There is a sanitary napkin
11 present; however, no discharge is noted. There is no
12 evidence of trauma. There is diffuse edema of the face
13 with marked paraorbital and conjunctival edema. No
14 teeth are present."
15    Q. Let me show you what is marked as Defendant's
16 Exhibit -- before we do that, on Defendant's Exhibit 24
17 what efforts -- how hard or tough was it to find those
18 records?
19        MR. MCCLELLAN: Your Honor --
20        MR. BOURQUE: I'll rephrase it.
21    Q. (BY MR. BOURQUE) What did you do to try to get
22 those records?
23    A. I contacted the North Carolina Vital Records
24 Office to obtain the death certificate of Sheila
25 Wallace. Once I obtained the death certificate it was

**32**

1 noted that an autopsy had been completed and I was able
2 to contact the North Carolina Vital Records Office,
3 submit some paperwork and a fee and receive those
4 records.
5    Q. Now, let's look at Defendant's Exhibit 25. Can
6 you identify Defendant's Exhibit 25?
7    A. Yes.
8    Q. What is Defendant's Exhibit 25?
9    A. They are written therapy notes from the Bay
10 Counseling Center.
11    Q. Okay. And are these records that you gathered
12 as a result of your mitigation work?
13    A. They are.
14    Q. And copies were provided to the state in
15 preparation --
16    A. Yes, they were.
17    Q. -- for your testimony?
18    A. Yes.
19    Q. Did you find things in there that you thought
20 were important for the jury to see?
21    A. I did.
22    Q. Would it be fair to say some of the writing was
23 obviously done by a doctor because you can't read it?
24    A. Yes.
25        MR. BOURQUE: Judge, let me offer Bay Area

**33**

1 Counseling Exhibit No. 25. With those I'll offer 25A,
2 25B, 25C, D, E, F and G.
3        MR. MCCLELLAN: Can I take the witness on
4 voir dire briefly concerning the subset exhibits?
5        THE COURT: You may.
6        MR. MCCLELLAN: May I approach the
7 witness?
8        THE COURT: You may.
9        VOIR DIRE EXAMINATION
10 BY MR. MCCLELLAN:
11    Q. Defendant's Exhibits 25A through 25F. Now,
12 these are counseling records of whom?
13    A. Travis Mullis.
14    Q. Okay. Doesn't have anything to do with his
15 parents?
16    A. They're mentioned.
17    Q. But these are -- are these notes made by the
18 person who was doing the counseling?
19    A. Yes. Travis Mullis was the patient and those
20 records were made by his therapist.
21        MR. MCCLELLAN: I have no objection, Your
22 Honor.
23        THE COURT: All right. Defendant's
24 Exhibit 25 and 25A through G are admitted.
25    Q. (BY MR. BOURQUE) Did you find some documents

**34**

1 -- obviously you found some documents you want to share
2 with the jury?
3    A. Yes.
4    Q. If we look at 25A, let's talk about that top
5 line. What's being reflected there, if you can tell?
6    A. It reads: "Some talk of father/angry."
7    Q. Next one?
8    A. "Dad" -- either got or sent. It's hard for me
9 to read from here -- "a $25 money order. Tore up
10 card."
11    Q. Next line, the third line?
12    A. "Use it to get bike. Need" -- I believe it's
13 "$44."
14    Q. Next line.
15    A. "I hate him."
16        MR. BOURQUE: May I approach?
17        THE COURT: Yes.
18    Q. (BY MR. BOURQUE) So, he says in quotations
19 what?
20    A. "I hate him. Asshole lives in Dundalk.
21 Dundalk is a city in North Carolina."
22    Q. Then the next quotation is what?
23    A. "Why do people get adopted?"
24    Q. Then under that?
25    A. "Be a lot of abortions if they didn't."

35

1    Q. Those are just notations from the doctor --
2    A. Correct.
3    Q. -- then about his interview. Then on 25B.
4    A. Travis says to his therapist, "I wish you were
5  my dad."
6    Q. Then 25C?
7    A. It documents that he's resistant to talking
8  about his dad.
9    Q. 25D?
10   A. Travis tells his therapist, "A lot of people
11  hate me."
12   Q. Then 25E?
13   A. Travis discusses feelings associated with Dad.
14  "I hate him. I would like to kill him if I could. I
15  will always hate him."
16   Q. This would have been in July of 1998?
17   A. Correct.
18   Q. How old would Travis have been at that time?
19   A. You're going to make me do the math? He would
20  have been 11 or 12.
21   Q. Almost 12?
22   A. Yes.
23   Q. I'm sorry. 25F.
24   A. It documents that he has negative feelings
25  associated with his dad and then also he's expressed to

36

1  the therapist, "I wish I had a dad."
2    Q. So, this would have been five years -- would
3  have been 19 --
4    A. 1998.
5    Q. Defendant's Exhibit 25G. You highlighted --
6    A. This is actually at the beginning of his
7  therapy. We've sort of gone in reverse order. It
8  says, "Travis stated he only needs to be here because
9  he hates his dad."
10   Q. Again those are the Exhibits 25A through G that
11  will be included amongst the folder -- in the folder
12  which is Defendant's Exhibit 25?
13   A. Yes.
14   Q. Is that correct? Okay. Then we show you
15  what's marked as Defendant's Exhibit 26. Where did you
16  get those records?
17   A. These came from the North Carolina Department
18  of Health and Human Services.
19   Q. These are just documents which corroborated
20  information you gathered over time; is that correct?
21   A. That's correct.
22   Q. Did we pull anything out of there that we
23  wanted to highlight for the jury?
24   A. No, they're self explanatory.
25        MR. MCCLELLAN: No objection.

37

1        THE COURT: Defendant's Exhibit 26 is
2  admitted.
3    Q. (BY MR. BOURQUE) Now, in Defendant's Exhibit
4  26 you can tell the jury what documents you actually
5  have here. What's the one on the top page?
6    A. This is the death certificate for Sheila
7  Wallace.
8    Q. It's a two-page document?
9    A. It is. It was double-sided.
10   Q. It indicates she died of what?
11   A. Congestive heart failure and cardiomegaly.
12   Q. You have an additional document on -- which is
13  the third page of this exhibit and what is that?
14   A. That's the application for a marriage license
15  for Bobby Ray Wallace and Sheila.
16   Q. Okay. And, again, certified copy of that
17  document -- a certification stamp?
18   A. Yes.
19   Q. Then the certificate of live birth of Travis
20  Mullis?
21   A. It is the certificate of live birth documenting
22  the Mullis -- Ann and Gary Mullis as his parents.
23   Q. He wasn't born as Travis James Mullis?
24   A. No. He was born Travis James Wallace.
25   Q. After an adoption what goes on with a birth

38

1  certificate of a child who's been adopted?
2    A. They can have a certificate of birth re-issued
3  under the name of the adoptive parents.
4    Q. But you have to make an application and the
5  Judge has to sign the order?
6    A. That's correct.
7    Q. Let me take you to Defendant's Exhibit 27. Can
8  you tell the ladies and gentlemen of the jury what
9  Defendant's Exhibit 27 is?
10   A. 27 are the medical records from what at the
11  time was Charlotte Memorial Hospital and they're the
12  records from after the birth of Travis James Wallace.
13   Q. They're NICU records?
14   A. They are.
15   Q. They're regarding the birth of Travis James
16  Wallace?
17   A. The birth and then the hospital course for
18  several months after.
19   Q. Of course, we know that Travis James Wallace
20  is --
21   A. Travis Mullis, yes.
22   Q. Let me offer those and we've given a copy to
23  the State for them to see these business records; is
24  that correct?
25   A. That's correct.

39

1       MR. BOURQUE:  That's Defendant's Exhibit
2   No. 27 and 27 through -- Defendant's Exhibits 27A
3   through 27EE.
4       MR. MCLELLAN:  I have no objection, Your
5   Honor.
6       THE COURT:  Defendant's Exhibits 27 and
7   27A through 2EE are admitted.
8       Q.  (BY MR. BOURQUE)  As to Defendant's Exhibit No.
9   27, you did pull a number of those that you would like
10  the jury to see?
11      A.  Yes.
12      Q.  Now, you've highlighted some and you know that
13  Dr. Katz is coming later?
14      A.  That's correct.
15      Q.  You highlighted some that you want the jury to
16  see.  Some of those they can see back in the presence
17  of the jury room?
18      A.  Yes.
19      Q.  And some they can view today?
20      A.  Yes.
21      Q.  Now, let's go -- let's look at Defendant's
22  Exhibit No. 27A.  Did you pull that up on your copy?
23      A.  Yes.
24      Q.  And if you will read to the ladies and
25  gentlemen of the jury what we're finding in Defendant's

40

1   Exhibit 27A?
2       A.  This is a discharge summary; so, it gives a
3   history of his hospitalization and it reads:  "The
4   child was brought to NICU initially for glucose
5   monitoring and was transferred to the NRU after two
6   days.  He developed grossly bloody stools while in the
7   NRU and X ray was compatible with NEC."
8       Q.  Do you know what the initials "NEC" stand for?
9       A.  Yes.
10      Q.  What does it stand for?
11      A.  Necrotizing enterocolitis.
12      Q.  Okay.  All right.  Next.
13      A.  "He was returned to the NICU for further birth
14  history.  See Dr. Skidmore's NICU transfer summary."
15      Q.  Go down to No. 3?
16      A.  No. 3 says:  "Necrotizing enterocolitis.
17  Patient was originally operated on 9/22/86 with an
18  exploratory lap and required a subtotal colectomy
19  ileostomy, gastrostomy for removal of necrotic bowel."
20      Q.  And right under that you highlighted -- start
21  at "take down."
22      A.  "A take down ileostomy performed on 11/13/86."
23      Q.  So, it appeared the child was born on what day?
24      A.  9/20/86.
25      Q.  So, it looks like two days later we're having

41

1   NEC problems?
2       A.  Correct.
3       Q.  And it looks like there's a surgery on the
4   22nd?
5       A.  Yes.
6       Q.  And then another one on November 13th?
7       A.  Yes.
8       Q.  What about the socials on Line 6?
9       A.  "Mother lives in Kannapolis and visits and
10  calls as frequently as possible.  Her medical history
11  is complicated including advanced maternal age, morbid
12  obesity, gestational diabetes, pregnancy induced
13  hypertension, COPD with PO264 and recurrent UTIs."
14      Q.  What is UTI?
15      A.  Urinary tract infection.
16      Q.  Okay.  All right.  I'm sorry.  "She appeared."
17      A.  "She appeared appropriate and very desirous of
18  caring for the child at home."
19      Q.  All right.  And that's the social history
20  through 27A or Item 6 of 27A.
21          Now, tell me how many surgeries does it
22  appear he's had according to this first page on 27A.
23      A.  27A reflects two surgeries.
24      Q.  Then on 27B -- read that aloud.
25      A.  There's one additional procedure that's

42

1   indicated.
2       Q.  And that's -- what's that called?
3       A.  "Hyperalimentation line in the right internal
4   jugular vein is placed."
5       Q.  Something's done in his neck?
6       A.  I believe so.
7       Q.  On 27E?
8       A.  I believe that's 27C.
9       Q.  27C, what does that say?  Read the highlighted
10  portion.
11      A.  "Pregnancy complicated by, one, advanced
12  maternal age; two, morbid obesity" -- parenthesis --
13  "(360 pounds); three, gestational diabetes; four,
14  pregnancy induced HTN; five, COPD with borderline
15  hypoxia."
16      Q.  Do you know what pregnancy induced HTN is?
17      A.  Yes.  That's pregnancy induced hypertension or
18  high blood pressure.
19          "Five, COPD with borderline hypoxia
20  (PO264) secondary to tobacco use of four packs per day
21  times many years; six, diffuse pitting edema and rapid
22  weight gain; seven, several treated UTIs."
23      Q.  Going to skip 27D as in dog.  Read to me what
24  you find on the first page of 27E as in Edward?
25      A.  There's a nursing diagnosis given of delay in

43

1  parent/infant bonding due to prolonged hospitalization
2  of TJ and mom's inability to visit frequently" --
3  parenthesis -- "(out of town)."
4      Q.  Next.
5      A.  A nursing goal is given. It states: "During
6  visits mom will show appropriate bonding behavior by
7  holding TJ close, talking to him, attempting eye to eye
8  contact and by participating in his care. If unable to
9  visit will call frequently to inquire about condition."
10     Q.  Next.
11     A.  "Interventions: One, encourage mom to visit as
12  frequently as possible; two, encourage mom to call if
13  unable to visit for condition update; three, call mom,
14  as requested, daily at" -- I believe that's 10:00
15  o'clock. "Four, during visits provide time alone with
16  TJ to promote bonding; five, encourage questions re:
17  TJ's care and answer them; six, encourage mom to bring
18  several of TJ's toys, clothes, et cetera, from home."
19     Q.  Now, as you were going through these records,
20  were you making notes as best you could or following
21  the timelines to determine when visits were made and
22  when calls were made?
23     A.  Yes.
24     Q.  Did you kind of put together a calendar of
25  events that reflects phone calls made by the mother or

44

1  by the hospital to the mother and also visits made by
2  the mother?
3      A.  I did.
4      Q.  Now, tell the ladies and gentlemen of the jury,
5  according to these records, how many days he was in the
6  hospital after his birth?
7      A.  He was hospitalized for 71 days.
8      Q.  In those 71 days from his birth, how many
9  actual visits did Mom make to the hospital?
10     A.  Ten.
11     Q.  Out of the ten visits -- that's ten visits to
12  the hospital, right?
13     A.  Correct. That does include while she was in
14  the hospital as well.
15     Q.  While she's in the hospital, she's visiting the
16  child?
17     A.  Yes.
18     Q.  If she's in the hospital for three days, that
19  takes up three of the ten visits. Is that what you're
20  telling me?
21     A.  She did not visit even every day when she was
22  hospitalized.
23     Q.  Okay. All right. Now, when we get to the
24  phone calls, tell the ladies and gentlemen of the jury
25  how you documented phone calls.

45

1      A.  I documented any time a call was made, whether
2  it was a call made from the neonatal intensive care
3  unit to mom or a call received from mom in the neonatal
4  intensive care unit, and every call was documented
5  whether or not there was a response on the other end.
6  So, when the NICU called mom to give an update, even if
7  mom didn't answer, that call is documented in the
8  record.
9      Q.  So, how many phone calls are made?
10     A.  We have phone calls made on 28 of the days.
11     Q.  So, phone calls are being made one way or the
12  other. Some were connected, some weren't?
13     A.  Correct.
14     Q.  When -- is the child old enough to talk on the
15  phone at that point?
16     A.  No.
17     Q.  Would you please set that aside and just remind
18  me before we get through the day that we want to do
19  something with this?
20     A.  Okay.
21     Q.  And these are the records, 27F -- this is 27F
22  and it's reflecting no visits by -- no parental visits,
23  no parental contact, etc. That's what 27F reflects; is
24  that right?
25     A.  That's correct.

46

1      Q.  Again, we've got 27G. You highlighted now, no
2  personal contact. Looks like some Cs and some Bs
3  attached in that third column from the right?
4      A.  Yes. That's the form that the nursing staff
5  was using to document any calls or visits by the
6  parents.
7      Q.  So, basically when we look at 27F, G, H, those
8  are the nursing notes about visits?
9      A.  Yes.
10     Q.  Some of the nursing notes about visits.
11     A.  Correct.
12     Q.  Now, 27I looks like you've got a notation you
13  wanted to share here. What is this saying at 12/1/86.
14     A.  This is documentation, I believe, by the
15  physical therapist on the day of discharge. It says:
16  "He's becoming very social with much smiling and some
17  cooing. He's appropriate for age in terms of motor
18  development. Today he lifted his head while in prone."
19         Then it's "Instructed nurse in what to
20  tell Mom when she comes this evening in terms of
21  developmental activities."
22     Q.  Then in 27J, just tell the ladies and gentlemen
23  of the jury what is 27J documenting?
24     A.  Documents any teaching that was done with mom
25  and also the skills that mom demonstrated when she's

47

1   taking the baby home.
2       Q.  Now, up here we've got marked DNA.  What does
3   that mean?  It obviously doesn't mean the DNA that we
4   talked about in court?
5       A.  I have three columns.  Yes, No and DNA which
6   means does not apply.
7       Q.  So, what do we have about demonstrating
8   diapering?
9       A.  When asked if mom was able to demonstrate
10  diapering, it was checked that it does not apply.
11      Q.  So, basically what we're seeing here is that
12  there was an explanation of a disease process given to
13  somebody; is that right?  See No. 2?
14      A.  Yes.
15      Q.  Okay.  Then demonstrates bathing the infant so
16  she could demonstrate she could bathe the infant.
17      A.  Yes.
18      Q.  Then No. 12 she demonstrated -- she verbalizes
19  an understanding of the frequency, type and amount of
20  feeding?
21      A.  Yes.
22      Q.  Then she documents frequency, type and amount
23  in the comment section.  Then the last thing, 14, she
24  verbalizes the knowledge of formula preparation.
25      A.  Yes.

48

1       Q.  All the other things we've got highlighted are
2   do not apply?
3       A.  Yes.
4       Q.  Then 27K, dated -- there's one dated 10/16/86
5   and another one 10/17/86.  What's being documented
6   there?
7       A.  Again, these are the nursing notes that
8   document the lack of parental contact.
9       Q.  So, on December the 16th -- I'm sorry -- on
10  October the 16th, whatever shift that is at 2000 hours,
11  which would be?
12      A.  10:00 o'clock -- 8:00 o'clock.
13      Q.  I can live with either.  No parental contact.
14      A.  Correct.
15      Q.  And then at -- on 10/17 it looks like 0600
16  hours?
17      A.  Yes.
18      Q.  You've got no parental contact this shift as
19  well.
20      A.  Yes.
21      Q.  Then there are other notations and these are
22  the places where you pulled your summary together.
23      A.  Yes, from that chart we saw earlier as well as
24  these written records.
25      Q.  So, that's reflected in 27L as in Larry; is

49

1   that right?
2       A.  Yes.
3       Q.  All the way through EE?
4       A.  It's actually K.  27K through 27EE.
5       Q.  So, when we say through 27EE if we start at
6   27K, that's 27K, 27 -- whenever the alphabet ends, it
7   starts over again.
8       A.  Correct.
9       Q.  I can complicate things for myself sometimes.
10  And those are the notes that you used to document when
11  the phone calls were made or when the visits were made?
12      A.  Yes.
13      Q.  Again, as it reflects we've done previously,
14  we're going to take 27A through 27EE and this time
15  we're going to clip them and we're going to include
16  those in the folder which has been admitted as 27.
17      A.  Correct.
18      Q.  All right.  And then if you can, can you tell
19  us what 27A is?
20      A.  28?
21      Q.  I'm sorry.  28.
22      A.  28 is a one-page emergency room report from the
23  Carolinas Medical Center.
24      Q.  And who is that in reference to?
25      A.  Travis Wallace.

50

1           MR. BOURQUE:  Judge, may I offer 28?
2       Q.  (BY MR. BOURQUE)  Let me see.  Was there
3   anything in 28 you wanted to include?
4       A.  It's a one-page document.
5           MR. MCCLELLAN:  I have no objection.
6           THE COURT:  Defendant's Exhibit 28 is
7   admitted.
8       Q.  (BY MR. BOURQUE)  Why was Carolinas Medical
9   Center ER report important to add to the documents in
10  this case or why did you see it as important?
11      A.  Again, it documents his fragile medical
12  condition and also he is less than a year old at the
13  time yet consent for treatment from the mother is only
14  obtained by telephone it records.  Unfortunately it
15  doesn't state who brought the child to the ER.
16  Apparently not the mother.
17      Q.  Can you read what it is instead of commenting
18  on it?  That's my fault.
19      A.  It says: "I, the undersigned, do hereby
20  voluntarily consent to emergency treatment deemed
21  necessary in my physician's judgment" and then there's
22  a section for the patient dash parent or guardian's
23  signature.  It's documented by the two nurses that it
24  was phone consent received.
25      Q.  Phone consent would be some kind of consent

- March 16, 2011

51

1   received by phone by some responsible party?

2       A.   Correct.

3       Q.   Is there any indication of who took the baby to

4   the hospital?

5       A.   There's not.

6       Q.   Is there any indication there was even an adult

7   member of the family present when he was at the ER

8   according to that?

9       A.   According to that, no.

10      Q.   Let me show you, if I may, Defendant's Exhibit

11  29.  And can you tell me what Defendant's Exhibit 29

12  is?

13      A.   These are the records from the Carolinas

14  Medical Center regarding the treatment of Sheila

15  Wallace prior to the birth of Travis Wallace.

16      Q.   And why did we gather these records?

17      A.   To determine what the prenatal course was for

18  Ms. Wallace.

19      Q.   Do you remember who all we supplied these

20  records to?

21      A.   I believe we supplied them to our experts as

22  well as the State.

23          MR. BOURQUE:  Judge, we would offer at

24  this time Defendant's Exhibit 29 and Defendant's

25  Exhibit 29A through 29T.

52

1       Q.   (BY MR. BOURQUE)  And this is documenting

2   Sheila Wallace's condition at the time that -- just

3   prior to Travis' birth?

4       A.   Correct.

5       Q.   So, this is the birth mother?

6       A.   Yes.

7       Q.   While he's looking at those, we have the

8   Carolinas Medical Center records we just introduced?

9       A.   Yes.

10      Q.   There is another set we got from them.

11      A.   Correct.

12      Q.   Did they just volunteer these or what happened

13  for us to get these?

14      A.   We were required -- I initially submitted a

15  request along with an authorization from Mr. Mullis

16  allowing me to have -- to obtain these records and I

17  was told the records didn't exist.  We were forced to

18  go back to the hospital --

19      Q.   Hold up.  You asked several times for these

20  records?

21      A.   Correct.

22      Q.   You submitted the documentation that they asked

23  for?

24      A.   Correct.

25      Q.   And this went on for months?

53

1       A.   Months, yes.

2       Q.   Finally there was a court order signed not only

3   by this Judge but by a Judge in that state?

4       A.   Yes.

5       Q.   The Judge in this court and a Judge in that

6   state.

7       A.   In North Carolina, yes.

8       Q.   And magically they appeared?

9       A.   Yes.

10      Q.   When did you get these records?

11      A.   Just within the last month.

12      Q.   We were actually in voir dire when these showed

13  up.

14      A.   Yes.

15          (Counsel conferring privately)

16          MR. MCCLELLAN:  I have no objection.

17          THE COURT:  All right.  Defendant's

18  Exhibits 29 and 29A through 29T are admitted.

19      Q.   (BY MR. BOURQUE)  As we look at Defendant's

20  exhibit documents that you pulled out of Defendant's

21  Exhibit 29, again we pulled some that go through the

22  alphabet to T?

23      A.   Correct.

24      Q.   So, it's 29A through 29T?

25      A.   Correct.

54

1       Q.   And what did you find in 29A that you wanted to

2   read to the jury?  I think it was 1 through 11, I

3   believe.

4       A.   Yes.  It's a list of final diagnoses for Sheila

5   Wallace.

6       Q.   Okay.  Go ahead.  What do you mean a list of

7   final diagnoses, if you know what that means?

8       A.   This is her discharge summary and this is a

9   list of all diagnoses that she had at the time of her

10  discharge, all of the medical issues.

11      Q.   This is like after Travis is born and she's

12  released?  Is that what you're telling me?

13      A.   This list was given at the time of this

14  discharge which was 8/6 of '86; so, Travis had not yet

15  been born.  He was still in utero at this time.

16      Q.   Okay.  Go ahead and tell the ladies and

17  gentlemen what you find there.

18      A.   "Final diagnosis:  1, intrauterine pregnancy

19  approximately 30 weeks gestational age; 2, advanced

20  maternal age; 3, morbid obesity; 4, poor obstetrical

21  history including history of twin gestation

22  pregnancy-induced hypertension and premature labor."

23      Q.   Hypertension, is that like high blood pressure?

24      A.   Yes.

25      Q.   No. 5.

**55**

1    A.   "5, gestational diabetes requiring insulin; 6,
2  hypertension, probably chronic versus pregnancy
3  induced; 7, diffuse pitting edema; 8, rubella negative;
4  9, trichomonas vaginitis."
5    Q.   Do you know what trichomonas is?
6    A.   That's a sexually transmitted disease.
7    Q.   This is at 30 weeks?
8    A.   Correct.
9    Q.   Where is Travis at this particular moment?
10    A.   He's still in utero.
11    Q.   Okay.  No. 10?
12    A.   "No. 10, history of urinary tract infections
13  this pregnancy; 11, polyhydramnios probably secondary
14  to No. 5."
15    Q.   No. 5 being gestational diabetes?
16    A.   Correct.
17    Q.   29B?
18    A.   Gives the history of her illness, Sheila's
19  illness to this date and, again, this is still while
20  Travis is in utero.
21    Q.   Okay.
22    A.   "36-year-old white female --"
23    Q.   How about we start with the social history and
24  then we'll go back up there?
25    A.   Okay.  "The patient lives at home with her

**56**

1  husband and three children.  Smokes two packs of
2  cigarettes per day and drinks 15 to 20 cups of coffee
3  per day."
4    Q.   Okay.  Now go back up.
5    A.   "36-year-old white female transferred from
6  Cabarrus County for multiple medical problems including
7  advanced maternal age, morbid obesity, poor obstetrical
8  history including history of pre-term labor times two
9  with twin gestation.  The first set of twins was
10  remarkable for preterm labor at 35 weeks and pregnancy
11  induced hypertension with delivery of live infants of 3
12  pounds, 12 ounces and 4 pounds, 3 ounces in 1967."
13    Q.   This report is being written in 1986; is that
14  right?
15    A.   That's correct.
16    Q.   This is July 30th, 19 --
17    A.   '86.
18    Q.   So, they're referring back to evidently twins
19  that were born in 1967?
20    A.   Yes.
21    Q.   Now this second set of twins?
22    A.   "This second set of twins remarkable for
23  pre-term labor at approximately 32 to 34 weeks and
24  spontaneous vaginal delivery of two live infants,
25  weight less than 3 pounds on both with neonatal death

**57**

1  of one twin secondary to meningitis on the second day
2  of life in 1977."
3    Q.   So, there appears there's a second -- there's
4  two sets of twins?
5    A.   Correct.
6    Q.   The first set was born in '67?
7    A.   Yes.
8    Q.   The second set was born in '77?
9    A.   Yes.
10    Q.   How old was Travis when he had his necrotizing
11  enterocolitis diagnosis?
12    A.   Two days old.
13    Q.   And this birth in 1977 the child dies on the
14  second day?
15    A.   That's correct.
16    Q.   Of meningitis?
17    A.   Yes.
18    Q.   Or secondary to meningitis.  Okay.  And then
19  the last sentence, "In 1985."
20    A.   "In 1985 the patient has spontaneous second
21  trimester abortion at approximately 20 weeks."
22    Q.   Now, on 29C this looks like August of '96?
23    A.   That's correct.
24    Q.   August of '86.
25    A.   '86, yes.

**58**

1    Q.   And we're basically about five weeks from
2  delivery; is that correct?
3    A.   That's correct.
4    Q.   He's born September 20th; so, these are notes
5  here from August the 5th, 1986.
6    A.   Yes.
7    Q.   Can you read this to the jury?
8    A.   "Patient states she had some difficulty with
9  measuring insulin correctly and seeing air bubbles due
10  to very poor eyesight.  States she thinks she can rely
11  on daughter and neighbor to help with this.
12    Q.   Do you know which daughter -- never mind.  You
13  don't know that.  That's from some other witness,
14  correct?
15    A.   Correct.
16    Q.   What is 29D?
17    A.   This is a doctor's order asking them to notify
18  social services that patient is being discharged so
19  that "HHN can visit today."
20    Q.   Would that be some sort of human health
21  services organization?
22    A.   Home health nurse.
23    Q.   Then 29C?
24    A.   Again, a similar order is written, "Social
25  services consult, REHH nurse."

59

1    Q.  29F just reflects that she has no dentures and
2  she gums her food?
3    A.  Yes.
4    Q.  Eye does not focus?
5    A.  Yes.
6    Q.  So, the second page is reflecting she has
7  eyesight problems?
8    A.  That's correct.
9    Q.  What does that mean?  What does that say?
10    A.  "Left eye does not focus.  Seems to look to the
11  left periphery at all times."
12    Q.  And this is about the birth mother?
13    A.  Correct.
14    Q.  And 29G.  This looks like July 30th, 1986?
15    A.  Yes.
16    Q.  1200 being about noon?
17    A.  Yes.
18    Q.  Are these nurse notes?
19    A.  These are -- yes, nurse's notes reflecting
20  Sheila's condition.
21    Q.  Can you read these to the jury?
22    A.  "There's a thin, milky looking vaginal
23  secretions" -- parenthesis -- "(copious).  Large amount
24  of encrusted old cells on heels.  Feet need cleaning.
25  Very jovial and cooperative.  Fan at bedside for

60

1  patient's comfort.  Environmental services called and,"
2  quote, "big bed ordered."
3    Q.  Big bed ordered?
4    A.  Yes.
5    Q.  I thought that said big red.
6        All right.  29H?
7    A.  Again, this is nursing notes documenting
8  Sheila's interaction.  It states she's eager to learn
9  but gets confused easily.
10    Q.  This is August 1st of 1986; is that right?
11    A.  Yes.
12    Q.  August 1st of 1986.  Where is Travis James
13  Mullis -- or Wallace?
14    A.  Still in utero.
15    Q.  This is 29A.  What are these?  I'm so sorry.
16  It's 29I.  What is this?
17    A.  These are physician notes from the
18  pulmonologist and it documents -- he states:  "He
19  wonders, though, if it is a good idea to deliver over
20  the weekend when there's less staff available all
21  around."
22    Q.  What is COPD?
23    A.  Chronic obstructive pulmonary disease.
24    Q.  When we're looking at 29A, was that reflected
25  in there on that 12 -- those 11 items, COPD?

61

1    A.  It is not documented in those 12 items that I
2  see.
3    Q.  Okay.  But we have records of them clearly in
4  the record?
5    A.  It is documented elsewhere, yes.
6    Q.  29J?
7    A.  Again, this is a note from the staff
8  pulmonologist.  It documents Sheila's history and
9  condition.  It states:  "She reports a remote history
10  of asthma but was never treated or seen by a doctor for
11  this problem.  She wakes up wheezing at night although
12  this is not a significant problem.  Friends remark that
13  she sounds like a quote, unquote 'bear' when she is
14  walking down the hall.  And she has dyspnea at
15  approximately 25 to 50 feet or several stairs."
16    Q.  What's dyspnea?
17    A.  Difficulty breathing.
18    Q.  All right.
19    A.  "She smokes approximately four packs per day
20  for many years."
21    Q.  So, this would have been September 10th and how
22  many days away from birth are we at this point?
23    A.  Ten days.  And you can see the diagnosis of
24  COPD at the bottom there under:  "Impressions.  Resting
25  borderline hypoxia secondary to COPD, obesity."

62

1    Q.  Be all right if I highlighted that?
2    A.  Certainly.
3    Q.  (Marking)  Then 29K, what does it appear is
4  happening here at 29K?
5    A.  The nurse is requesting a social service
6  consult.  The nurse states:  "Social service consult
7  regarding home situation, Hazel Smith."
8    Q.  That's -- I'm sorry.
9    A.  Presumably that's the name of the social
10  worker.
11    Q.  Then 29L is pretty much the same, just another
12  set of documents reflecting basically what we have in
13  29K.
14    A.  29K lists exactly why.
15    Q.  Then 29M, 29N, those appear to be care plan
16  summaries.
17    A.  29M is the nursing order for the social service
18  consult.  It states:  "Morbid obesity and prolonged
19  sleeping habits, decreased activity level.
20  Questionable safe environment for child."
21    Q.  Which one are you reading from?
22    A.  It's on 29M and 29K.  29K is the highlighted
23  handwritten version.
24    Q.  Anything else on 29M?
25    A.  Yes.

63

1    Q.  All right.  It may be easier to see on 29K.
2  Will you pull 29M and N back and let's look at 29K.
3    A.  Says: "Morbid obesity and prolonged sleeping
4  habits, decreased activity level.  Questionable safe
5  environment for child."  Parentheses "(Cannot perform
6  routine ADL independently)."
7    Q.  What's an ADL?
8    A.  Activity of daily living.
9    Q.  Okay.
10    A.  "2: 18-year-old daughter refuses to continue
11  to, quote, 'be a slave for mom' and has run away,'"
12  parentheses, "(per patient's mom, Gladys Devlin)."
13    Q.  Who is Gladys Devlin?
14    A.  Travis Mullis' biological maternal grandmother,
15  Sheila Wallace's mother.
16    Q.  But she -- at this point she's about to be the
17  maternal grandmother.
18    A.  She has been the maternal grandmother it looks
19  like for about 24 hours at this point.
20    Q.  But then at some point she becomes the adoptive
21  paternal grandmother; is that right?
22    A.  Yes.
23    Q.  But originally she is the biological maternal
24  grandmother?
25    A.  Yes.

64

1    Q.  Sheila Wallace's mother?
2    A.  Yes.  And No. 3 reports: "Patient's mom has
3  hostile, angry attitude and shares her views with
4  Sheila, nurse and nurses on OHRU and NICU."
5    Q.  Does that mean -- when they say patient's mom,
6  is that Gladys Devlin?
7    A.  Yes.
8    Q.  No. 4.
9    A.  No. 4: "9-year-old daughter will likely --
10  will probably have the bulk of child rearing
11  responsibility."
12    Q.  His 9-year-old sister?
13    A.  Yes, Kendra.
14    Q.  Kendra's here to testify?
15    A.  She is.
16    Q.  Then this is one dated -- 29-O.
17    A.  Yes.
18    Q.  Can you tell me about 29-O?
19    A.  This is back a few days, again, prior to the
20  time that Travis was delivered and again these are
21  nursing notes documenting Sheila's condition and her
22  interaction with the nurses.  It states: "There's no
23  evidence of smoking by patient but she's begging for
24  cigarettes."
25    Q.  Okay.

65

1    A.  "Sleeping, lying on left side, copious amounts
2  of thick, white sputum oozing from mouth."
3    Q.  So, not from her vagina but from her mouth?
4    A.  Yes.  "Awakened and repositioned.  Mouth wiped
5  with damp cloth."
6    Q.  This is within 12, 13 days of Travis James
7  Wallace Mullis' birth?
8    A.  Yes.
9    Q.  29P?
10    A.  Also a nurse's note reflecting Sheila's
11  condition.  States: "She was asleep at intervals
12  during the assessment.  Thermometer fell out of mouth
13  times 4 while taking vital signs due to patient's
14  somnolence.  02 at" -- and I'm not sure what that
15  abbreviation is "via nasal cannula.  Prongs discolored
16  with nicotine stains."
17    Q.  What are they -- what does that mean?
18    A.  Nasal cannula is the plastic tubing that takes
19  oxygen from an oxygen tank to the body and it's a thin
20  tube with two prongs that fits over your face and the
21  two prongs go up your nose.  So, that's how the air's
22  delivered and that's the nasal cannula.
23    Q.  It's discolored from what?
24    A.  Nicotine stains.
25    Q.  Go on.

66

1    A.  It documents she's refusing coffee.  She's
2  usually constantly demanding coffee.  At the bottom it
3  states: "She was smoking four to five packs a day at
4  home and now goes into the bathroom to have only about
5  four per day."  In parenthesis it documents: "(There
6  are 29 packs of cigarettes in her closet.)"
7    Q.  At the hospital?
8    A.  At the hospital.
9    Q.  Do you know how much cigarettes cost back then?
10    MR. MCCLELLAN:  I object to the relevance,
11  Your Honor.
12    MR. BOURQUE:  I withdraw the question,
13  Judge.  I'm sorry.
14    Q.  (BY MR. BOURQUE)  29Q.
15    A.  Again a nursing note regarding Sheila's
16  interaction with the nurses about eight or nine days
17  before Travis is born: "She refuses to do fetal
18  movement count today as yesterday."  States: 'It would
19  take me all day and I can't stay awake long at a time.'"
20    Q.  What's she refusing to do, fetal movement?
21    A.  Fetal movement count.
22    Q.  So, this before the birth?
23    A.  Correct, as a means of monitoring the fetal
24  activity.
25    Q.  She's saying she can't stay awake long enough

67

1  to do that?

2  A. That's correct.

3  Q. 29R.

4  A. Again, the nurses describe her condition and

5  the condition of her room at the hospital five days

6  before Travis was born: "Room has foul odor.

7  Encouraged patient to let me help her wash her hair.

8  She voices acquiescence. Soft stool on bathroom floor

9  questionably due to patient unable to wipe properly and

10  questioned if it fell out of gluteal fold when she got

11  in shower."

12         It says something is stained. The first

13  word I can't read.

14  Q. Looks like linens?

15  A. Looks like linens but I don't know why they

16  would be stained.

17         "Crumbs and trash all over floor. Patient

18  is totally dependent on staff for hygiene of

19  environment and for assist with hair, feet and perianal

20  area. She cannot reach these areas due to obesity."

21  Q. So, 29S, although it's 29 pages, you have one

22  page you wanted to read to the jury; is that right?

23  A. Yes.

24  Q. If you could read that, please?

25  A. "Patient's mother is at bedside and seems to be

68

1  hostile/angry at Sheila. Sheila is crying. Encouraged

2  verbalization of feelings of both Sheila and her mom.

3  Will write a social services consult due to home

4  situation and lack of emotional support for Sheila.

5  Encouraged mom to support Sheila in her attempt to rear

6  child. Lose weight instead of making fun of her.

7  Sheila's mom has definite feelings and knowingly and

8  unknowingly seems to enjoy baiting, nagging and using

9  cruel, digging remarks to Sheila, to me about Sheila,

10  and to NICU nurses that are caring for baby."

11  Q. So, is this -- we're talking about Gladys

12  Devlin?

13  A. Gladys Devlin, yes. "Talked at length with

14  Sheila about family problems. Will pass on information

15  to social services. Sheila agrees to walk in hall with

16  me at 2130 after visiting hours are over so that,

17  quote, 'no males will be around' to see her ambulate."

18  Q. 29-T.

19  A. This is the day of Travis' first surgery and

20  this reports the interaction with mom when she's told

21  about his illness.

22         It states: "Patient asked questions and

23  related that baby boy twins had died 9 years ago in the

24  same unit. Ventilated and cried." Then that was

25  continued.

69

1         Second page of 29-T. It states: "OOB to

2  NICU to visit baby. Sat and cried on and off when baby

3  cried. Stated: 'I don't want to touch him. I had a

4  twin once that I touched and he died.' She sat with

5  the baby looking at him for 15 minutes, then returned

6  to the room stating; 'I feel better now. He's so

7  cute.'"

8  Q. Is that the mother's discharge summary and the

9  notes therefrom?

10  A. Yes.

11  Q. Leading up to the birth of this child?

12  A. That's correct.

13  Q. That the jury knows as Travis Mullis.

14  A. Yes.

15  Q. And, again, we'll clip 29A through 29T, include

16  them among the folder and the papers of Defendant's

17  Exhibit 29.

18         THE COURT: Mr. Bourque, this will

19  probably be a good time for a morning break so we can

20  catch a breath here. Ladies and gentlemen, we'll call

21  you back out in 15, 20 minutes. Thank you.

22         (Recess taken)

23         (Open court, Defendant present, Jury

24  present)

25         THE COURT: Mr. Bourque, you may continue.

70

1         MR. BOURQUE: Thank you very much, Judge.

2  Q. (BY MR. BOURQUE) Ms. Vitale, Defendant's No.

3  30, are those business records from -- what are those

4  business records from?

5  A. I believe that's the Edgewood High School

6  records.

7  Q. Who's that about?

8  A. Travis Mullis.

9  Q. And you brought those records for what reason?

10  A. They reflect his performance at the Edgewood

11  High School I believe after his release from the

12  Jefferson School.

13         MR. BOURQUE: We're offering Defendant's

14  Exhibit No. 30.

15         MR. McCLELLAN: No objection, Your Honor.

16         THE COURT: Defendant's Exhibit 30 is

17  admitted.

18  Q. (BY MR. BOURQUE) Was there anything really

19  you wanted to show the jury as to Defendant's Exhibit

20  No. 30 or you just wanted them to have it?

21  A. I just wanted them to have it in case they

22  wished to review his educational records.

23  Q. Defendant's Exhibit No. 31?

24  A. These are the medical records from Dr. Stephen

25  Feldman.

71

1   Q.   And out of those records you pulled Defendant's
2   Exhibit No. 31 and 31A; is that correct?
3   A.   31A and 31B.
4   Q.   What did I say?  31, 31A.  So, out of 31 you
5   pulled 31A and 31B?
6   A.   Correct.
7   Q.   Whose doctor was Dr. Feldman?
8   A.   Doctor Feldman was Travis Mullis' pediatrician.
9           MR. BOURQUE:  Judge, we'd offer
10  Defendant's Exhibits 31, 31A and 31B.
11          MR. MCCLELLAN:  If I may take the witness
12  on voir dire?
13          THE COURT:  You may.
14          VOIR DIRE EXAMINATION
15  BY MR. MCCLELLAN:
16  Q.   Concerning Dr. Feldman's records, was there
17  also a Dr. Feldman at Sheppard Pratt or is that a
18  different doctor?
19  A.   That's a different doctor.
20          MR. MCCLELLAN:  No objection, Your Honor.
21          THE COURT:  Defendant's Exhibit No. 31,
22  31A and 31B are admitted.
23          MR. BOURQUE:  Thank you.
24  Judge, may I publish?
25          THE COURT:  You may.

72

1           DIRECT EXAMINATION (CONT'D.)
2   BY MR. BOURQUE:
3   Q.   As to 31A, what was it that you wanted to read
4   to the jury?
5   A.   Dr. Feldman writes a letter on May 27th of
6   1994: "Travis James Mullis is a 7-year-old boy with a
7   history of behavior and attention problems.  He has
8   also had a very complex medical history.  He is in
9   immediate need of a complete psychological evaluation."
10  Q.   Now, if I'm -- this is reflecting that he's
11  seven years old?
12  A.   Correct.
13  Q.   And Dr. Stephen Feldman is saying he is in
14  immediate need?
15  A.   Yes.
16  Q.   Of a complete psychological assessment?
17  A.   Yes.
18  Q.   Then out of 31 being Dr. Feldman's records, you
19  found 31B; is that correct?
20  A.   That's correct.
21  Q.   Can you read only the highlighted sections of
22  31B?
23  A.   "Travis in the last year has been very
24  confused, angry, and depressed.  He has gone through
25  stages of being enraged at the Judge", quote, "'for

73

1   putting his daddy in jail'; at Ms. Jennings for
2   reporting the abuse; and as of late, anger at his
3   grandmother which I suspect is anger at his mother for
4   not being with him more.  There have been many losses
5   for Travis in the last year and he is trying to adjust
6   to the situation."
7   Q.   So, this would have been in May of 1994?
8   A.   Correct.
9   Q.   And that's -- looks like it's four days after
10  31A.
11  A.   Yes.
12  Q.   Go ahead.
13  A.   "Most of his aggression is verbal which shows
14  control.  Before the sentencing of his father there
15  were statements about the electric chair and jail which
16  at times were expressed with tears and frustration at
17  his inability to save his father.
18  Q.   Whose inability to save his father?
19  A.   Travis'.
20  Q.   Travis is frustrated with the inability to save
21  his father?
22  A.   Yes.
23  Q.   The records we saw previously he hated his
24  father.
25  A.   That's correct.

74

1   Q.   Okay.
2   A.   "Socially he is very immature and he has
3   behavioral problems with other kids.  However, until
4   his formal education began, his exposure to other
5   children was minimal as father and grandfather
6   baby-sat.  There was no preschool experience.  I
7   support testing for Travis.  The person I recommend is
8   Dr. Richard Loeff," spelled L-o-e-f-f.
9   Q.   That's what you just read to the jury.
10  A.   Correct.
11  Q.   Okay.  And who is she sending this letter to?
12  A.   This is a letter that's sent to Dr. Feldman.
13  Q.   Now, did you make an effort to find Sally
14  Jennings?
15  A.   I did.
16  Q.   What efforts did you make to find Sally
17  Jennings?
18  A.   I contacted her by telephone and spoke with her
19  early on.  I was later unable to contact her at those
20  same numbers.  They were disconnected.  When I traveled
21  to Maryland, I went to her office and spoke with her
22  former office mate.
23  Q.   Do not indicate what anyone said to you.
24  A.   Right.  Spoke with her former office mate and
25  also went to her home in Baltimore.

FIRM NAME

75

1    Q.  Is she willing to come and testify in this
2  case?
3    A.  I have not been able to recontact her.
4    Q.  And you know that we presently are trying to
5  get her subpoenaed even today?
6    A.  Yes.
7    Q.  In what state?
8    A.  In Maryland.
9    Q.  Defendant's Exhibit No. 32.  Do you recognize
10  Defendant's Exhibit No. 32?
11    A.  I do.
12    Q.  What is Defendant's Exhibit No. 32?
13    A.  Medical records from the Galveston County Jail.
14    Q.  Did you also pull a couple of sheets out of
15  that that you wanted to highlight for the jury.
16    A.  I did.
17    Q.  And that was marked as Defendant's Exhibits 32A
18  and 32B?
19    A.  Correct.
20         MR. BOURQUE:  Judge, we would offer the
21  business records which are 32, the Galveston County
22  Jail medical records, and 32A and 32B.
23         MR. MCCLELLAN:  No objection, Your Honor.
24         THE COURT:  All right.  Defendant's 32,
25  32A and 32B are admitted.

76

1         MR. BOURQUE:  May I publish, Your Honor?
2         THE COURT:  You may.
3    Q.  (BY MR. BOURQUE)  When we look at 32A, what was
4  it you wanted to point to the jury?
5    A.  The diagnosis and medications for Travis while
6  he was in the Galveston County Jail.
7    Q.  Do you know the date of these?
8    A.  The date is 6/8/2010.
9    Q.  Okay.
10    A.  The Axis I diagnosis is impulse control
11  disorder.  There's no diagnosis on Axis II, no
12  diagnosis on Axis III, and the medicines renewed are
13  Haldol, Cogentin, and Sertraline."
14    Q.  For 90 days or 90 times?
15    A.  For 90 days, renewed for 90 days.
16    Q.  Then 92B?
17         THE COURT:  32.
18         MR. BOURQUE:  Yes, sir.  Thank you.  32B.
19  I'm sorry.
20    A.  32B reflects that on January 26th, 2010,
21  Travis voiced suicidal ideation to the staff at the
22  county jail.
23    Q.  (BY MR. BOURQUE)  So, roughly a year ago?
24    A.  Correct.
25    Q.  Like we did with the other exhibits, we're

77

1  going to put 32A and 32B into the packet which is
2  marked Defendant's Exhibit 32.
3    A.  Correct.
4    Q.  At this time let me show you what's marked as
5  Defendant's Exhibit No. 33 and see if you can identify
6  these records and the authenticity of --
7    A.  Yes.
8    Q.  Authenticity affidavit.  What is 33?
9    A.  33 are records from the Harford County
10  Department of Social Services.
11    Q.  Okay.  And let me at this time offer -- you
12  didn't pull anything out of 33; is that correct?
13    A.  That's correct.
14    Q.  But tell the ladies and gentlemen of the
15  jury -- I'm sorry.
16         MR. BOURQUE:  I'll offer No. 33 at this
17  time.
18         MR. MCCLELLAN:  No objection.
19         THE COURT:  Defendant's Exhibit No. 33 is
20  admitted.
21    Q.  (BY MR. BOURQUE)  Tell the ladies and gentlemen
22  of the jury what Defendant's Exhibit No. 33 is.
23    A.  Those are the Department of Social Services
24  records of the investigation into the sexual abuse of
25  Susan Barry.

78

1    Q.  Who is the perpetrator in this case?
2    A.  Travis Mullis.
3    Q.  These are the records that we were able to find
4  that reflect official documents about the episode
5  involving Travis Mullis and Susan Barry, his little
6  cousin?
7    A.  Correct.
8    Q.  So, that's Harford County records?
9    A.  Yes.
10    Q.  What is Defendant's Exhibit No. 34?
11    A.  These are also Harford County Department of
12  Social Services records.  These reflect the
13  investigation of the sexual abuse of Travis Mullis by
14  Gary Mullis.
15    Q.  So, this would be Gary Mullis -- this would be
16  Travis as the victim?
17    A.  That's correct.
18    Q.  Would this have been before the Susan Barry
19  episode?
20    A.  Yes.
21    Q.  You pulled Defendant's Exhibit -- you pulled
22  several pages out that we've marked as Defendant's
23  Exhibit Nos. 34A through 34F.
24    A.  That's correct.
25    Q.  Is that correct?

79

1    A. Yes.

2        MR. BOURQUE: Judge, at this point we

3    would offer Defendant's Exhibit No. 34, which is the

4    Harford County CPS records where Travis was the victim

5    of Gary Lynn Mullis.

6        MR. MCCLELLAN: No objection, Your Honor.

7        THE COURT: Defendant's Exhibits 34, 34A

8    through 34F are admitted.

9    Q. (BY MR. BOURQUE) Now, that's Defendant's 34

10   and 34A through F. We also have Defendant's Exhibit

11   No. 35; is that correct?

12   A. That's correct.

13   Q. And these are Harford County juvenile

14   conviction records?

15   A. Correct.

16   Q. And you pulled out of that 35A through 35B; is

17   that correct?

18   A. That's correct.

19   Q. Then we also have Defendant's Exhibit No. 36,

20   Harford County public school records?

21   A. That's correct.

22   Q. Psych report. Out of Defendant's Exhibit No.

23   36 you pulled Exhibits 36A through 36D; is that

24   correct?

25   A. That's correct.

80

1        MR. BOURQUE: Judge, at this time I offer

2    Defendant's Exhibits 35, 35A and 35B and tender same to

3    counsel and then Defendant's Exhibit 36 and that would

4    include 36A through 36D as in dog.

5        MR. MCCLELLAN: No objection to 35 and 35A

6    and B.

7        THE COURT: They will be admitted.

8        MR. MCCLELLAN: No objection to 36 or 36A

9    through D.

10       THE COURT: Those exhibits will be

11   admitted.

12   Q. (BY MR. BOURQUE) Ms. Vitale, we've basically

13   got 45 exhibits, correct?

14   A. That's correct.

15   Q. As you look at 34A, looks likes you had a lot

16   on -- what did you want to point out to the jury?

17   What is this about?

18   A. This is the initial assessment done of the

19   Mullis family after the abuse of Travis was disclosed.

20   Q. All right. So, this is -- we're pulling this

21   out of the Harford County records, CPS records

22   reflecting Travis as the victim?

23   A. That's correct.

24   Q. Read that to the jury, please.

25   A. "The conditions surrounding maltreatment are

81

1    significant which means maltreatment is justified by

2    caretaker or caretaker denies that any maltreatment

3    occurred. Although information indicates otherwise or

4    caretakers explanation does not fit with the other

5    information given, including denial or blaming others.

6    Deliberate long-term with detrimental results,

7    substance abuse which contributes to abuse or neglect,

8    multiple victims, history of child's death, use of

9    instruments, threats, history of abuse."

10   Q. So, that's the list of what could qualify as a

11   significant incident?

12   A. That's correct. Then the summation of the

13   assessment reads: "On 6/3/93 Mr. Mullis called DSS."

14   Q. Now, who is DSS, if you know?

15   A. The Department of Social Services.

16   Q. In --

17   A. In Harford County, Maryland.

18   Q. Is that what I call CPS here?

19   A. Yes, CPS. Children's Protective Service.

20   Q. Go ahead.

21   A. "Mr. Mullis called DSS to report his

22   inappropriate behavior with his son. The therapist,

23   Sally Jennings, who had been seeing Travis for about

24   three years told Mr. Mullis to report his behavior,

25   fondling his son's penis when son takes baths.

82

1        "Travis talked of dad touching his private

2    area. They slept in same bed. Dad helped bathe him.

3    Travis told his dad he hated what his dad was doing and

4    told him to stop but dad didn't stop. Abuse began

5    around 9/92 and stopped about 4/93."

6    Q. So, what we're seeing here in this report is

7    that his dad was only a pedophile for only a few

8    months?

9    A. That's what it would indicate.

10   Q. That's what the records indicate.

11   A. Correct.

12   Q. Go ahead.

13   A. That's what he admitted to.

14   Q. Yes.

15   A. "Abuse involved him bathing with his son, son

16   coming into his bed and Mr. Mullis being sexually

17   aroused and Mr. Mullis taking his son's penis into his

18   mouth."

19   Q. Now, is that known as fellatio?

20   A. Yes.

21   Q. So, what's happening here? What's he

22   describing?

23   A. Mr. Mullis is describing performing fellatio on

24   his own son -- or his adoptive son.

25   Q. On his little boy.

- March 16, 2011

83

1    A. Yes.

2    Q. This little boy.

3    A. Yes.

4         MR. MCCLELLAN: I object to leading, Your

5    Honor.

6         THE COURT: Sustained.

7    A. "Mr. Mullis said his son asked him to take care

8    of his penis because it hurt. Mr. Mullis at first

9    refused and then succumbed." That's the end of that

10   first page.

11        "Mrs. Mullis was unaware of the abuse. It

12   occurred while she was working. Initially, Mrs. Mullis

13   was in much conflict over the abuse report and wanted

14   to be supportive of son and husband. Worker took out

15   ex parte to remove Mr. Mullis from the home."

16   Q. (BY MR. BOURQUE) Now, what does that mean,

17   "worker took out ex parte to remove Mr. Mullis from the

18   home"?

19   A. I believe there were some legal proceedings

20   which compelled Mr. Mullis to move out of the house.

21   Q. So, the Court had to come in and order him away

22   from his son?

23   A. That's correct.

24   Q. Okay.

25   A. "In the process Mr. Mullis was fired from his

84

1    job and Mr. and Mrs. Mullis were upset with worker over

2    this."

3    Q. So, who's upset with the worker?

4    A. Both parents, Mr. and Mrs. Mullis.

5    Q. So, they're upset that the Court ordered him

6    out of the house.

7         MR. MCCLELLAN: I object to leading, Your

8    Honor.

9         THE COURT: Sustained.

10   Q. (BY MR. BOURQUE) All right. Go ahead.

11   A. "Over the next few days Mrs. Mullis' anger grew

12   and at present time she has put house up for sale,

13   started procedures for separation and divorce and is

14   upset over visits between Travis and dad."

15   Q. And in parenthesis.

16   A. "Ms. Jennings supports continued visitation of

17   Travis with dad, feeling it is therapeutically helpful

18   for Travis."

19   Q. Next.

20   A. "Travis began therapy with Ms. Jennings about

21   three years ago to deal with separation and loss.

22   Ms. Jennings started seeing Mr. Mullis sometime in 4/93

23   after Travis revealed to her that he and Dad had a

24   secret, couldn't tell or daddy would get in trouble.

25   Travis revealed that daddy kissed his worm. When

85

1    Ms. Jennings confronted Mr. Mullis, he said son likes

2    kisses and he blew on son's stomach.

3         "In the next session Travis denied abuse.

4    Said it was an April Fool's joke. Travis said he was

5    afraid he'd be taken away and put in another home. Mr.

6    Mullis told Ms. Jennings that when after taking baths,

7    TJ crawls into bed with him and that is what stimulated

8    him. Ms. Jennings told Mr. Mullis the behavior had to

9    stop. Ms. Jennings spoke to Mrs. Mullis about

10   husband's behavior and Mrs. Mullis said husband

11   wouldn't do anything out of the way. Ms. Jennings told

12   Mrs. Mullis that she needed to be home at night. Mr.

13   Mullis was stressed out. Ms. Jennings told worker that

14   she and Mr. Mullis decided he should report his

15   behavior to DSS."

16   Q. Okay.

17   A. "Mr. Mullis, when talking to worker in initial

18   report, said he was very remorseful and disgusted with

19   what he had done. Worker had concern over Mr. Mullis'

20   mental condition and expressed it to wife,

21   Ms. Jennings, and Detective Wheeler. Mr. Mullis denied

22   any thoughts of suicide but continually wanted worker

23   to assure him that everything would be okay and he

24   would not be charged and arrested. Worker continually

25   throughout day of 6/3/93 told Mr. Mullis that she

86

1    couldn't give him that assurance he was seeking."

2    Q. Now, do we have any records that we have for

3    the jury regarding Gary Lynn Mullis, birth or death

4    certificate or anything?

5    A. We do have a -- did obtain a death certificate.

6    Q. That's in some other things to come?

7    A. Yes.

8    Q. Out of 34 it looks like you have two pages on

9    34B?

10   A. Yes.

11   Q. If you can read that to the jury.

12   A. This is a summary of contacts with the family.

13   Says: "TJ is confused, misses his dad. Mrs. Mullis

14   tries to discontinue visits with Mr. Mullis. Travis at

15   times uncontrollable, throws self on floor."

16   Q. So, this would be -- this is about '93?

17   A. Yes. June of '93.

18   Q. This will be June of '93?

19   A. Yes.

20   Q. So, he's almost 7?

21   A. 7, yes.

22   Q. So, he's throwing himself on the floor?

23   A. Correct.

24   Q. Next.

25   A. "Travis when saw worker said he wanted his dad

87

1  to come home. Later in visit Mr. Mullis hugged his son
2  and Travis responded to his hug, prolonged hug."
3      Q.  Is this before or after -- this little notation
4  here, is this before or after Mr. Mullis has
5  acknowledged his pedophilia?
6      A.  This is after.
7      Q.  And performing fellatio on his son?
8      A.  After.
9      Q.  On 34C it looks like you have some notations
10  like a four-page document?
11      A.  Correct.
12      Q.  Two pages you lighted some things you wanted to
13  show the jury.
14      A.  States: "Mrs. Mullis reported that Travis had
15  been seeing a therapist for behavioral problems since
16  age 3 but that Mr. Mullis states he started sexually
17  abusing Travis one and a half years ago."
18      Q.  So, if Travis is almost 7, am I correct in
19  understanding that Mr. Mullis is saying it only started
20  since he was 5 and a half?
21      A.  That's correct.
22      Q.  But really it goes back four years.
23      A.  Correct.
24      Q.  As far as is documented; is that correct?
25      A.  That's correct.

88

1      Q.  Next?
2      A.  "Mr. Mullis reported he felt terrible about
3  what he did to his son but was afraid of going to jail.
4  Mr. Mullis was requesting joint custody of Travis."
5      Q.  Is Mr. Mullis at this point in the home or out
6  of the home?
7      A.  Out of the home.
8      Q.  He's out of the home by court order?
9      A.  Correct.
10      Q.  And he's requesting joint custody of his son?
11      A.  Yes.
12      Q.  After doing what to his son?
13          MR. MCCLELLAN:  Your Honor, I object to --
14  she's already testified to what he had done.
15  Repetitious.
16          THE COURT:  Please continue.
17      Q.  (BY MR. BOURQUE)  And the last sentence on that
18  page?
19      A.  "Travis expressed that he wanted his family
20  back together; i.e., his father in the new home with
21  his mother and him.  He stated this was his plan."
22      Q.  Does that sound like some confusion?
23      A.  Yes.
24          MR. MCCLELLAN:  I object to leading.
25      Q.  (BY MR. BOURQUE)  Now, as to 35D.  What was it

89

1  you wanted the jury to see out of 35D?
2      A.  There's some --
3          MR. MCCLELLAN:  Your Honor, I don't
4  believe there is a 35D.
5          MR. LOPER:  There may not be.
6          THE WITNESS:  34D.
7          MR. MCCLELLAN:  Okay.
8          THE COURT:  Thank you.
9          MR. BOURQUE:  I need all the help I can
10  get, Judge.
11      Q.  (BY MR. BOURQUE)  I'm sorry.  Thank you.  34D?
12      A.  34D discusses Travis' progress in therapy.
13  States:  "Mrs. Mullis has expressed considerable
14  concern about Travis' behavior which is sometimes
15  uncontrollable.  Travis has threatened to hurt himself
16  by throwing himself on the floor.  Mrs. Mullis believes
17  her son may not be ready to relate to his father on a
18  one-on-one basis."
19      Q.  Now, what time is this?  This is still 1993?
20  Looks like July of '93?
21      A.  Correct.  He's not quite 7.
22      Q.  Go ahead.  "During."
23      A.  "During the therapeutic sessions time is set
24  aside for Mr. Mullis to visit with Travis.  During
25  these visits in therapy, Mr. Mullis has been tense and

90

1  not really able to enjoy being with his son.  During
2  the first therapeutic visit, Travis ran into his
3  father's arms.  Mr. Mullis apologized to his son for
4  what had occurred, abuse.  And Travis told his dad that
5  he was mad and he did not like it, abuse, one bit.
6      Q.  Next?
7      A.  "Travis' anger and guilt could be the result of
8  the abuse coupled with the fact that Travis' world had
9  been turned upside down."
10      Q.  That was all out of 34D?
11      A.  Correct.
12      Q.  Then 34E looks like you had three pages there
13  with a couple paragraphs you wanted to point out?
14      A.  Yes, this discusses the abuse:  "The abuse
15  began around September, 1992, and occurred over a
16  period of time, six to seven times, and stopped about
17  two months ago.  The abuse involved bathing with his
18  son, his son coming into his bed, and Mr. Mullis
19  becoming sexually aroused.  Mr. Mullis took his son's
20  penis into his mouth.
21          "Mr. Mullis denied putting anything into
22  his son's rectum and denied ever abusing any other
23  children.  Mr. Mullis stated his son asked him to take
24  care of his penis because it hurt.  Mr. Mullis said he
25  at first refused, then succumbed.  He said that the

- March 16, 2011

91

1   touching stopped around St. Patrick's Day.

2           "Travis also spoke of his bottom hurting

3   him to the point where it was hard for him to sit down

4   at school.  He would have gooey gunk put on his bottom

5   by his parents.  He believed it hurt him after a bowel

6   movement.

7           "Travis told his therapist, Sally

8   Jennings, that he had a secret and could not tell

9   anybody or his daddy would get in trouble.  His daddy

10  kisses his worm.  Travis told Ms. Jennings that he

11  hated his daddy doing this and had told him to stop but

12  he still did it.  Ms. Jennings confronted Mr. Mullis

13  about the child's revelations and Mr. Mullis said his

14  son likes kisses and he blows on his son's stomach."

15      Q.  Go ahead.

16      A.  I believe this is just a repeat of something

17  that's already been read.

18      Q.  Okay.  34F as in Frank, what is this?

19      A.  This is a letter to the Court from Sally

20  Jennings.  Says: "I have seen Travis Mullis in weekly

21  psychotherapy since 1993.  His visits will be increased

22  to twice weekly.  At present I'm supervising weekly

23  30-minute visitations with Travis and his father in my

24  Austin office.  I'm asking to be removed from this duty

25  as the therapeutic boundaries are being tarnished.  I

92

1   am recommending that the father continue on the

2   established visitation schedule."

3       Q.  So, apparently --

4           MR. MCCLELLAN:  I object to what he thinks

5   is apparent, Your Honor.

6       Q.  (BY MR. BOURQUE)  So, what's happening here?

7       A.  Sally Jennings will no longer be -- did not

8   wish to any longer supervise these visitations but

9   recommends that the visitations do continue.

10      Q.  Let's go to, finally, 35.  What is it on 35A

11  you saw that you felt you wanted to inform the jury of?

12      A.  It's a summary of what brings him to the

13  Jefferson School and then also of his family therapy

14  there.

15          States: "Travis was referred to TJSPTS

16  program for his involvement in a second degree sexual

17  offense against his 8-year-old cousin.  Travis admits

18  to his involvement in this offense; however, he does

19  have a tendency to minimize his behaviors and their

20  damaging consequences.

21          "Travis does have a fairly longstanding

22  history of participation in outpatient therapy to

23  address the various issues that have surfaced within

24  the family such as lack of bonding between Travis and

25  his adoptive parents, the sexual abuse perpetrated on

93

1   Travis by his adoptive father, the death of his

2   biological mother and, finally, his involvement in the

3   current legal charges.  Travis presents as ready and

4   willing to engage in treatment for his sexually abusive

5   behaviors and appears committed to learning coping

6   skills and aimed towards making healthier choices in

7   the future."

8       Q.  35B?

9       A.  35B is a note -- it's addressed to "Whom it may

10  concern."  I believe it's addressed to the Court from

11  the attending psychiatrist.  It states:  It is my

12  recommendation that Travis Mullis not be present for

13  his upcoming court hearing.  It is my medical opinion

14  that his presence at this Court hearing would impose

15  significant anxiety in this child which may endanger

16  his safety."

17      Q.  Now to Defendant's Exhibit 36.  Looks like 36A

18  is multiple pages.

19      A.  It's a psychological report from the public

20  schools that just summarizes the various psychological

21  evaluations, diagnoses, and recommendations throughout

22  his childhood.

23      Q.  How old is he when this referral is made?

24      A.  This is actually completed in March of 2004 but

25  reflects all evaluations going back to the first when

94

1   he was 7.

2       Q.  If you will go ahead.

3       A.  Okay.  "He had been placed at the Jefferson

4   School on January 19th, 2001, by the Department of

5   Juvenile Justice for a second degree sex offense and

6   not for educational reasons.  Records that were

7   received from the Jefferson School indicated that

8   Travis had been documented as having the educational

9   disability of multiple disabilities.  However, the

10  records did not indicate which two or more educational

11  disabilities were included in this coding.  Phone calls

12  by Edgewood High School staff members to the Jefferson

13  School could not elicit this information."

14          "He was currently receiving four hours of

15  special education services per week.  Mrs. Mullis

16  reported that Travis is currently taking Risperdal,

17  Depakote and Wellbutrin.  Travis' first psychological

18  assessment 9/8/94, N. Williams, Ph.D." --

19      Q.  Let me cut you off there.  How old would he

20  have been on 9/8/94".  Let's make it 9/20/94.

21      A.  He would have been 7 -- 8.  He would have just

22  turned 8.  He was completed when he was 7 years of age

23  and in the third grade.

24      Q.  There's another page I think you --

25      A.  There's several more pages and it's a summary

95

1   of all the various assessments that he had.

2      Q.   Are any of the summaries -- have we covered

3   them yet?

4      A.   No, not the educational assessment.

5      Q.   Okay.  Go ahead.

6      A.   It says:  "He was described as a frustrated

7   young boy who was having to deal with the sexual abuse

8   by his father and with feelings of guilt about his

9   father's presence in jail and absence from home and who

10  feels very close to his mother and at times worries

11  about her absence which results in separation anxiety."

12      "The diagnoses made included separation

13  anxiety disorder and attention deficit hyperactivity

14  disorder.  An outdated instrument was utilized to test

15  Travis' intellectual ability; thus, his true

16  intellectual ability would be lower than what was

17  reported by Dr. Williams and would probably have been

18  in the high average range had the valid instrument been

19  utilized."

20      Q.   Okay.

21      A.   "A psychological consultation report, 1/27/95,

22  R. Lesser, Harford County Public Schools, was completed

23  when Travis was 8 and in the third grade.  He was

24  referred by the people services team due to behavior

25  concerns.  After Travis began taking medication for

96

1   attentional concerns, it was reported that his poor

2   attentional skills were greatly reduced.  An

3   educational assessment report 10/10/95, V. Stephens,

4   Harford County Public Schools, was completed when

5   Travis was in the fourth grade.  He was referred to the

6   IEP team by his mother due to concerns about academic

7   performance.

8      "Another psychological assessment,

9   12/16/96, R. Brokaw, Bay Counseling Services, was

10  completed when Travis was 10 and in the fifth grade.

11  During the assessment he was defiant, hostile, highly

12  resistant to the testing situation, restless and

13  agitated.  He became less hostile and guarded across

14  the five hourly testing sessions.  Attentional concerns

15  and a number of problematic, especially aggressive

16  behaviors were reported my Mrs. Mullis.

17      "The diagnoses made included attention

18  deficit hyperactivity disorder, predominately

19  inattentive type, disorder of written expression and

20  optional defiant disorder.  A review of this report,

21  3/27/97, R. Lesser, Harford County Public Schools,

22  suggested the consideration of the educational

23  disability of multiple disabilities based on the

24  educational disabilities," quote, 'other health

25  impairment,' end quote, specific learning disability.

97

1      "On February 13th" -- and I believe it's

2   1997 but the year is difficult to read on this copy --

3   "Travis was documented as having the educational

4   disability of specific learning disability by the

5   Abbington Elementary IPE team.

6      "On April 15th, 1999, the Bellaire Middle

7   IEP team redocumented Travis' educational disability as

8   multiple disabilities based on a re-evaluation of

9   available information.

10      Q.   What page are you on?  Because I lost you.

11      A.   I'm on Page 3.

12      MR. MCCLELLAN:   You've got to keep turning

13  the pages.

14      MR. BOURQUE:   I'm easily distracted, okay.

15      A.   "The educational disability of specific

16  learning disability was re-documented based solely on

17  classroom performance, IEP progress and unit

18  assessments rather than academic achievement scores.

19      "On August 26th, 1999, an SE13 was

20  submitted from Dr. Robert S. Knight which diagnosed

21  ADHD and dysgraphia.  Dr. Knight did not report any

22  symptoms or supportive evidence for the diagnosis of

23  these conditions.

24      "A psychiatric discharge summary,

25  2/18/2000 by M. Vimalananda, MD, Sheppard Pratt,

98

1   indicated that Travis had been hospitalized for

2   suicidal and homicidal ideation.  Travis reportedly had

3   been in outpatient treatment on and off since the age

4   of 4.

5      Q.   (BY MR. BOURQUE)  So, how old is he in February

6   of 2000?  13, 14?

7      A.   13, I believe.

8      Q.   How many years would that be from 4 until

9   February the 18th, 9 years?

10      A.   Sorry.

11      Q.   So, if he's in treatment from the age of 4 to

12  the age of 13 how many years is that?

13      A.   9.  "The diagnosis made at discharge included

14  mood disorder not otherwise specified, attention

15  deficit disorder by history, and impulse control

16  disorder.  Another private psychological assessment,

17  6/30/2000 by M. Stein, completed when Travis was 13

18  years old and in seventh grade:  At that time Travis

19  had recently been admitted to the Sheppard Pratt

20  Hospital due to suicidal and homicidal behavior.

21      "He reportedly had three previous

22  admissions since molesting his 8-year-old cousin in

23  February 2000.  He was reported to have a history of

24  sexual abuse by his adoptive father for three years.

25  He reportedly demonstrated flashbacks, panic attacks,

## 99

1 and nightmares regarding his abuse. He reportedly had
2 been diagnosed as having the diagnoses of
3 post-traumatic stress disorder, chronic; Bipolar II;
4 hypomanic, provisional; attention deficit hyperactivity
5 disorder, combined type. At that time he was receiving
6 Seroquel and Depakote.
7      "Travis was reported to be a depressed,
8 anxious, and impulsive youngster with low self-esteem
9 who displays mood instability and variable reality
10 testing and appears to be easily overwhelmed and
11 disorganized within interpersonal relationships. He
12 appeared at risk for self-destructive and destructive
13 behavior."
14     Q. How old is he when this report is made that he
15 appeared at risk for self-destructive and destructive
16 behavior?
17     A. 13 years old
18     Q. What is self-destructive?
19     A. Would be suicidal behavior or self-mutilation.
20     Q. Next paragraph.
21     A. "Another educational assessment 7/10/2000,
22 D. Phipps at Sheppard Pratt when Travis was 13 years of
23 age. At that time he had been out of school for five
24 months and had been hospitalized at Sheppard Pratt
25 since March of 2000. Prior to that time he had been

## 100

1 hospitalized at Shepherd Pratt four times in a span of
2 six weeks. He was admitted for suicidal and homicidal
3 ideation. Although test scores were based on grade
4 norms rather than age norms, Travis demonstrated low
5 average to very superior. The validity of this report
6 is judged to be highly questionable and the information
7 should not be used in making educational decisions."
8     "Travis was placed at the Jefferson Day
9 School in Frederick County by the Department of
10 Juvenile Justice, January 19th, 2001. Travis' current
11 diagnoses were reported to include Bipolar I disorder,
12 most recent episode mixed, unspecified; post-traumatic
13 stress disorder and attention deficit hyperactivity
14 disorder NOS."
15     Q. At this point up until now has there been any
16 diagnosis of reactive attachment disorder?
17     A. No.
18     Q. Next page.
19     A. These are conditions and observations
20 psychological testing that was done at this time which
21 would have been in 2004.
22     It states: "At times he would not attempt
23 the difficult items saying instead, 'You can just skip
24 those.' He tended to be rude, assaulted the examiner
25 about being old, made a number of inappropriate

## 101

1 comments and frequently used fowl language. He did not
2 give any indication that he thought his behavior was
3 inappropriate."
4     Q. Page 6 of that report.
5     A. "Travis performs better on the more concrete
6 row "Learned tasks" which do not require much problem
7 solving or abstract reasoning skill. It would appear
8 that based on the current test results in comparison
9 with the previous test results, Travis' abstract
10 reasoning skills have not kept pace with his advancing
11 chronological age."
12     "He performed below average in practical
13 social reasoning and judgment. He performed well below
14 age level in active working memory; however, this is
15 the last subtest administered and when most of the
16 items were presented, he did not even attempt them."
17     "He performed below average in abstract
18 non-verbal reasoning. Generally, Travis' visual
19 perceptional organizational skills were adequate for
20 his age level but his non-verbal reasoning and problem
21 solving were weaker. He tended to use trial and error
22 problem solving strategies which would be considered
23 immature strategies for his chronological age."
24     Q. That's off of 36A?
25     A. That's correct.

## 102

1     Q. 36B?
2     A. B, C, and D are all similar documents that
3 document his mother's -- that document his mother's not
4 present for any of these special education IEPs or
5 individual education planned meetings at the school
6 system.
7     Q. And when you say B, C, and D, you're talking
8 about --
9     A. 36B, 36C and 36D. The 36C documents not only
10 that she's not present but that -- "she will be
11 dismissed from services as of 4/22/04. Several
12 attempts were made to contact parent."
13     Q. Okay. Then we have Defendant's Exhibit No. 37
14 which appears to be the Harford County school records
15 from '01 through '03; is that correct?
16     A. Yes, that's correct.
17     Q. And 38, Harford County Sheriff's Office records
18 regarding the abuse of Susan Barry?
19     A. Correct.
20     Q. And Defendant's Exhibit No. 39, classification
21 -- jail records classification and inmate records from
22 Galveston County?
23     A. From Galveston County, yes.
24     Q. Is that correct?
25     A. That's correct.

103

1    Q.  Did you pull anything out of 37 or 38 and
2    wanted to show the jury?
3    A.  I did not.
4         MR. BOURQUE:  Judge, at this time I would
5    offer Defendant's Exhibit No. 37, Defendant's Exhibit
6    No. 38, Defendant's Exhibit No. 39 and 39A through 39L
7    and tender the same to counsel for their review.
8         MR. MCCLELLAN:  No objection to
9    Defendant's Exhibit 37.
10        THE COURT:  Admitted.
11        MR. MCCLELLAN:  No objection the
12   Defendant's Exhibit 38.
13        THE COURT:  It's admitted.
14        MR. BOURQUE:  Thank you.
15        MR. MCCLELLAN:  No objection to
16   Defendant's Exhibit 39, 39A through 39L.
17        THE COURT:  Those exhibits will be
18   admitted.
19        MR. BOURQUE:  May I publish, Judge?
20        THE COURT:  You may.
21   Q.  (BY MR. BOURQUE)  Again, so I'm clear, there
22   wasn't anything out of 38 or 39 you wanted to show to
23   the jury or point out?
24   A.  That's correct.
25   Q.  Although they are into evidence for the jury's

104

1    review?
2    A.  Yes.  38 is duplicated in several other files,
3    other places.
4    Q.  Now, what was it in 39A you wanted to show the
5    jury?
6    A.  39A is a report on one of the two infractions
7    that Mr. Mullis committed while he was incarcerated.
8    It states: "Inmate Mullis, Travis J., No. 64386,
9    interfered with the taking of count of the H100 pod by
10   hiding in his cell and not answering this deputy when
11   called."
12   Q.  And in 39B?
13   A.  It is the second of the two infractions by
14   Mr. Mullis and it reports:  "The guard noticed a
15   massive amount of graffiti.  Some of the graffiti
16   consisted of gang signs and an extensive amount of
17   initials.  Other graffiti marks consisted of white
18   power, swastikas.  Also there were black gang signs
19   that included PIRU and CK all day."
20   Q.  39C.
21   A.  It's a security level reassessment that they do
22   every so often over at the jail and states that the
23   recommended security designation is medium.
24   Q.  Now, what are the different choices?  How many
25   different choices do you have?

105

1    A.  There are three different choices.
2    Q.  And what's the No. 1 choice?
3    A.  High.
4    Q.  No. 2 choice?
5    A.  Closed custody.
6    Q.  No. 3?
7    A.  Medium assaultive-escape.
8    Q.  4?
9    A.  Medium.
10   Q.  5A?
11   A.  Medium presentenced.
12   Q.  5B?
13   A.  Minimum presentenced.
14   Q.  6?
15   A.  Minimum.
16   Q.  7?
17   A.  Low minimum.
18   Q.  8?
19   A.  Very low.
20   Q.  So, he's not listed here as a high security
21   risk; is that right?
22   A.  That's correct.
23   Q.  Now, did you do the circle there or was that in
24   the records?
25   A.  The circle was in the records.

106

1    Q.  And then that is 39C.  And again we have 39D, a
2    39E, a 39F, 39G, 39H, 39I, and a 39J and 39K and a 39L?
3    A.  That's correct.
4    Q.  Now, up until we get to 39I -- I guess that
5    would be all the way to 39H -- we got him listed at
6    medium; is that correct?  And then at 39I on September
7    the -- looks like March the 25th of 2010.
8    A.  Correct.
9    Q.  That's 39I, J, K, and L we've got medium.  He
10   goes to a Level 3; is that correct?
11   A.  That's correct.
12   Q.  In any of the records that you had, did you
13   ever see him go to a 1 or a 2?
14   A.  Never.
15   Q.  Now, Defendant's Exhibit 40.  Do you recognize
16   Defendant's Exhibit 40?
17   A.  I do.
18   Q.  What is Defendant's Exhibit 40?
19   A.  These are jail records from the Galveston
20   County Jail.
21   Q.  All right.  And were there any records out of
22   Defendant's Exhibit 40 that you wish to show the jury?
23   A.  Yes.
24   Q.  And that would be 40A through 40D?
25   A.  That's correct.

- March 16, 2011

107

1   MR. BOURQUE: Judge, I'll offer
2   Defendant's Exhibits 40 and 40A through 40D.
3   (Counsel conferring privately)
4   MR. MCCLELLAN: I have no objection to 40
5   or 40A, 40B or C. 40D is already in evidence.
6   THE COURT: Defendant's 40, 40A through C
7   is admitted. D is a duplication, already admitted.
8   Q. (BY MR. BOURQUE) These are the jail records it
9   appears; is that correct?
10   A. That's correct.
11   Q. From the Galveston County Sheriff's Department?
12   A. Correct.
13   Q. What is it you wanted to reflect to the jury?
14   A. There was a diagnosis by the UT Medical Branch
15   Hospital of an overdose and a recommendation to seek
16   further medical attention for depression.
17   Q. 40B?
18   A. This is a note by a social worker in the jail
19   which quotes Travis as stating: "I guess I'm doing
20   okay considering what I've done and where I am." She
21   reports that "the inmate appears childlike, laughs and
22   smiles at inappropriate times and that inmate does
23   report multiple instances of acting on impulse without
24   knowing what he is doing."
25   Q. How old is he when this is happening, February

108

1   7th, 2008?
2   A. 22, 21.
3   Q. 40C?
4   A. This is another report. This is a masters
5   level individual, I believe a psychologist, and states
6   -- reports that Travis states: "I'm all right. No,
7   I'm not suicidal. I want to find a way to make amends
8   if I can. I'm proud of myself for turning myself in.
9   I'm scared, too. And I'm pissed that I had the mental
10   capacity to do it. (Crying)"
11   Q. And then Defendant's Exhibit 41 is the Maryland
12   Police Department record regarding Gary Mullis?
13   A. Yes, it is.
14   Q. And Defendant's Exhibit 42 is -- we'll do it
15   later.
16   A. Okay.
17   Q. Are these records that you pulled in your
18   investigation into this case?
19   A. Yes.
20   Q. Did you pull some exhibits out of Defendant's
21   Exhibit 41 that you wanted to highlight for the jury,
22   specifically 41A?
23   A. Yes, that's a narrative regarding the crime.
24   MR. BOURQUE: Judge, we would offer
25   Defendant's Exhibit 41 and Defendant's Exhibit 41A and

109

1   tender it to the State for their review.
2   MR. MCCLELLAN: I have no objection to 41
3   or 41A.
4   THE COURT: They are admitted.
5   Q. (BY MR. BOURQUE) As you look at Defendant's
6   Exhibit 41A, it looks to be about a four-page document.
7   Is that accurate?
8   A. Yes.
9   Q. What is it you wanted to share with the jury?
10   A. It's a narrative of the report of abuse against
11   Travis by Gary. A lot of it has been in other
12   documents that we've seen but some of it is either
13   additional or is contrary to what we've seen before.
14   He states: "Ms. Bloxham related their office had
15   received a phone call from the victim's father at the
16   request of his therapist who admitted to some
17   inappropriate behavior with his son while taking baths
18   together. He admitted to fondling his son's penis but
19   did not remember how many times.
20   "Ms. Bloxham interviewed the victim who
21   stated, 'My dad kisses my tummy' pointing to his penis
22   and said 'the kissing makes his penis tickle.' The
23   victim stated daddy can only kiss him on the lips now.
24   The victim stated he had a secret and the last time his
25   father had kissed his tummy was before St. Patrick's

110

1   Day."
2   Q. What year is this?
3   A. This report is done on 6/17/93. Looks like
4   there's a date down in the lower right-hand corner of
5   the first page.
6   "Mr. Mullis stated he wanted to turn
7   himself in for the things he had done to his son. He
8   responded, 'When I started bathing him for time --
9   first time when the victim was four or five years old
10   he related that he worked a 12:00 to 8:00 shift and
11   that due to his limited amount of time and the child's
12   inability to properly wash himself, he would take baths
13   with the victim. He stated that he would wash the
14   victim's private parts.
15   "Mr. Mullis stated that this caused both
16   of them to become sexually stimulated. He then said he
17   began having his son sleep with him until he realized
18   these actions were wrong and he stopped them. He said
19   that his son would come to him saying he had problems
20   with his penis and he needed someone to help him. When
21   asked what type of problems the victim had with his
22   penis, he said it hurt.
23   'Mr. Mullis stated his son wanted him to
24   kiss his worm, his son's words for his penis, but he
25   refused. He stated that after a while he gave in and

111

1 kissed the victim's penis. He stated he knew it was

2 wrong but the victim came looking for it and he did not

3 want to disappoint his son. He stated he knew these

4 actions were wrong and was afraid of the ramifications

5 of these acts. Mr. Mullis stated that after awhile he

6 just could not stop and his son said he would not tell.

7 He stated he knew this was not right and he said he's

8 bothered by the sexual abuse but could not refuse

9 anymore. He stated about two months ago he said it had

10 to stop."

11         "Mr. Mullis stated that he would take his

12 son's penis into his mouth and that they would both

13 become sexually aroused. He stated that the victim did

14 not realize that what he was asking for was wrong and

15 he finally had to tell him. He stated he did not place

16 his son's penis in his mouth every time the child asked

17 him but only six or seven times from September, 1992

18 until May of 1993. When questioned, he stated he had

19 never placed anything in the child's rectum and only

20 one time had he asked his son to take his penis in his

21 mouth. But then he changed his mind about having his

22 son do this."

23         "He stated that his sexual activities with

24 his wife changed in September of 1992. Before that

25 time they were normal. He stated these acts always

112

1 occurred in the family's home and the wife was never at

2 home during those acts. Mr. Mullis stated he has never

3 had any problems with other children. He continued by

4 saying he knew he had a problem and needed help.

5 That's why he went to Ms. Jennings."

6         "Based on that report charges were filed

7 against Gary Mullis for child abuse, second degree sex

8 offense, third degree sex offense, perverted practice,

9 and battery."

10     Q.   Defendant's Exhibit No. 42 and 43. Did you

11 identify 42?

12     A.   42 are the medical records for Alijah Mullis

13 from Memorial Hermann, the Texas Medical Center. These

14 are the records from his birth.

15     Q.   Defendant's Exhibit 43.

16     A.   These are also medical records from Memorial

17 Hermann Medical Center. These are the records for

18 Caren Kohberger.

19     Q.   And also out of Defendant's Exhibit 42, did you

20 pull one exhibit marked as 42A?

21     A.   Yes.

22         MR. BOURQUE: Judge, we would offer 42,

23 42A and Defendant's Exhibit 43.

24         MR. MCCLELLAN: May we approach, Your

25 Honor?

113

1         THE COURT: Ladies and gentlemen, let's be

2 at ease while they're conferring about these documents.

3         (Counsel conferring privately)

4         MR. MCCLELLAN: I have no objection to 42,

5 43, or 42A.

6         THE COURT: All right. 42, 42A, and 43

7 are admitted.

8         MR. BOURQUE: May I publish 42A, Your

9 Honor?

10         THE COURT: You may.

11     Q.   (BY MR. BOURQUE) Again, Defendant's Exhibit 42

12 are records regarding Memorial Hermann records at the

13 Texas Medical Center on Alijah Mullis; is that correct?

14     A.   That's correct. And the same document is in

15 both files from Alijah and Caren.

16     Q.   All right. Go ahead.

17     A.   "SW received a phone call from patient's MGM,

18 Carolyn, who was calling from New Jersey to share her

19 concerns about patient's parent. Patient's MGM stated

20 that she is the primary financial support for patient's

21 parents as neither of them are employed and have no

22 other source of income. Patient's MGM also expressed

23 concern about Ms. Kohberger's stability as she states

24 that patient's parents are lacking many of the basic

25 resources they will need in carrying for the patient.

114

1         "Ms. Kohberger stated that patient's

2 maternal aunt is a psychiatrist and she has concerns of

3 Ms. Kohberger's emotional stability after visiting her

4 earlier this week. Patient's parents need additional

5 resources and support. Dr. Su agreed that she did not have

6 any concerns. However, he agreed that I could speak to

7 the patient's parents to evaluate while providing

8 appropriate resources and support. They stated they

9 have future plans to move to Alvin where FOB's mother

10 figure can assist with the child care

11 responsibilities."

12     Q.   Is there anything else out of 42, second page?

13     A.   "Patient's mother stated she found out she was

14 pregnant at about five weeks. She stated that she did

15 not have Medicaid until her sixth month and she was not

16 receiving regular prenatal care. At 19 weeks she got

17 nervous because she didn't feel the baby moving. She

18 stated that FOB called EMS and was transported to Ben

19 Taub. She stated that she had tests run but that she

20 left the hospital before receiving the test results

21 because she was unhappy with her care. It appears that

22 they have good family support from the maternal side of

23 the family but it is unsure if this support will

24 continue for much longer. Patient's family would

25 benefit greatly from additional resources and

115

1    supportive services."

2    Q. I believe that takes us to the Defendant's

3    Exhibit 44; is that right?

4    A. Yes.

5    Q. Can you identify Defendant's Exhibit 44 for us

6    at this time?

7    A. Yes. These are medical records received from

8    Dr. Knight and the Plumtree Family Health Center.

9    Q. Okay. Was there anything -- what is Plumtree

10   Family Health Center?

11   A. It's a medical clinic in Maryland where Travis

12   Mullis received medical care as an adolescent.

13   Q. That's what these records are for?

14   A. Yes.

15   Q. You brought these for the jury to have access

16   to?

17   A. Yes.

18   MR. BOURQUE:  Offer Defendant's Exhibit

19   44.

20   Q. (BY MR. BOURQUE) Also, to clarify, you didn't

21   pull anything out of Defendant's Exhibit 44 to mark as

22   44A or anything else, did you?

23   A. I did not.

24   MR. MCCLELLAN:  May I take the witness on

25   voir dire, Your Honor?

116

1    THE COURT:  You may.

2    VOIR DIRE EXAMINATION

3    BY MR. MCCLELLAN:

4    Q. Do these only deal with physical medical issues

5    as opposed to psychological medical treatment?

6    A. No. I believe there are also some

7    psychological diagnoses in there.

8    MR. MCCLELLAN:  No objection.

9    THE COURT:  Defendant's Exhibit 44 is

10   admitted.

11   MR. BOURQUE:  Before we get to Defendant's

12   Exhibit 45A, we have another exhibit marked, 46. This

13   might be a good time to break for lunch if the Court

14   concedes.

15   THE COURT:  All right. We'll do that.

16   Ladies and gentlemen, it's about 11 minutes after

17   12:00. If y'all can be back ready to go at 1:30.

18   (Lunch recess taken)

19   (Open court, Defendant present, Jury

20   present)

21   THE COURT:  You may be seated.

22   Mr. Bourque, you may continue.

23   MR. BOURQUE:  May I approach the witness,

24   Your Honor?

25   THE COURT:  Yes, sir.

117

1    DIRECT EXAMINATION (Cont'd.)

2    BY MR. BOURQUE:

3    Q. Ms. Vitale, do you have what's marked as

4    Defendant's Exhibit 46?

5    A. Yes.

6    Q. Is this what we talked about earlier in terms

7    of phone calls?

8    A. Yes.

9    Q. And this fairly and accurately depicts after

10   you've been through all the numbers and the records,

11   phone calls and visits regarding that 71 days that

12   Travis Mullis or Travis Wallace was in the hospital

13   immediately after his birth?

14   A. Yes.

15   MR. BOURQUE:  Judge, I tender -- offer

16   Defendant's Exhibit 46 and tender to counsel for their

17   review.

18   MR. MCCLELLAN:  No objection.

19   THE COURT:  Defense Exhibit 46 is

20   admitted.

21   Q. (BY MR. BOURQUE) Let me direct your attention

22   to Defendant's Exhibit 45 which are these volumes

23   marked down on the floor. Can you tell the ladies and

24   gentlemen of the jury what those exhibits are?

25   A. That is the entire record for Travis Mullis

118

1    from Sheppard Pratt and the Jefferson School.

2    Q. That includes seven volumes of three-ring

3    binders?

4    A. Correct.

5    Q. Now, from that, Defendant's Exhibit 45, what

6    did you pull together?

7    A. I culled through those records and pulled 277

8    pages that I felt would give a good representation of

9    what was going on during the time Travis was at the

10   Jefferson School, discussing anything from his behavior

11   on shifts, his behavior and interactions in therapy,

12   medical notes, psychiatric notes, a variety of all

13   different kinds of records.

14   MR. BOURQUE:  Judge, may I have just a

15   second?

16   THE COURT:  You may.

17   Q. (BY MR. BOURQUE) And we've marked that as

18   Defendant's Exhibit 45A?

19   A. That's correct.

20   Q. And those are records that we pulled from

21   Defendant's Exhibit 45 which is this two or three

22   thousand pages of paperwork?

23   A. I think almost 4,000, yeah.

24   MR. BOURQUE:  Judge, at this time I'll

25   offer 45A into evidence.

119

1      MR. MCCLELLAN: To which we have no
2  objection.
3      THE COURT: So, at this time, just to be
4  clear, 45A is being offered and not 45 at this point.
5      MR. BOURQUE: 45 will not be offered by
6  us.
7      THE COURT: All right. 45A is admitted.
8      Q. (BY MR. BOURQUE) Now, for example, you talked
9  about some of the things that you pulled out of these
10  -- out of 45 to compile what is 45A. Did you also
11  create an index? Is there an index there?
12     A. There is.
13     Q. How many different sections or how many
14  different things did you pull to place into 45A?
15     A. There are 277 sections in the binder and 277
16  labels on the index. There are some that contain more
17  than one record and those are reflected on the index.
18     Q. And why did you do an index to this 45A?
19     A. Hopefully to facilitate anyone who's looking at
20  these records and being able to find specific things
21  and to know what they're looking at.
22     Q. Okay. Now, when we're talking about 45A, are
23  these going to be records that are separate and apart
24  from all these other exhibits we've talked about so
25  far?

120

1      A. Almost all of these are different. I think
2  maybe one -- I believe it was a transfer summary that
3  was contained in the Jefferson School Records that we
4  discussed earlier because it was also contained in
5  another set of records that we've gone through.
6      Q. For example, if the jury wanted to find out
7  when Travis Mullis was potty trained, where would they
8  go to find that?
9      A. That's something that would be in the social
10  assessment from Stone Bridge Transitional Care Program
11  and they could look at the index here and that would be
12  Tab 2 and it should be fairly easy to find the document
13  from there.
14     Q. What about records that might reflect when he
15  was first initially diagnosed with rapid mood swings,
16  it was first noted anywhere?
17     A. I believe that would be Tab 3 in the Initial
18  Review and Screening form from the Jefferson School.
19     Q. And his height and weight records that you
20  might see?
21     A. They are on the health assessment form Part 1,
22  which is Tab 4.
23     Q. Vision and hearing testing section?
24     A. That's another health screening form which is
25  Tab 6.

121

1      Q. Now, before we go to Tab 7 there were two
2  doctors, Dr. Feldman?
3      A. There is -- the Dr. Feldman that I'm familiar
4  with is Stephen Feldman who was the pediatrician whose
5  records we talked about earlier.
6      Q. Is that the doctor that diagnosed him with
7  scarlet fever?
8      A. That's correct.
9      Q. Now, when we go to the ARD meetings and
10  information about him when he's in the second grade,
11  where would that be?
12     A. That would be under Tab 7 and that is
13  information that was in the Jefferson School records
14  but that came to them from Harford County Public
15  Schools in the form of an educational assessment
16  report.
17     Q. And what about Tab 7, I think, in June of '95
18  some record that exists relative to when Gary Mullis
19  was released from prison?
20     A. That's in the child and adolescent psychosocial
21  assessment.
22     Q. In Tab 7?
23     A. Correct.
24     Q. When he had his second testing psychological
25  assessment they found him with separation anxiety and

122

1  ADHD?
2      A. That actually comes from the Harford County
3  psychological report that we discussed earlier and that
4  is in this binder under Tab 10.
5      Q. What about -- did he have the Hepatitus B
6  vaccine or was he diagnosed with Hepatitis B?
7      A. He was given the vaccine.
8      Q. What about the evidence of the concussion when
9  he was playing hockey or roller hockey?
10     A. There's documentation of the concussion and the
11  symptoms that he suffered after that and that is again
12  back in Tab 7 which is in the school performance data
13  summary and as well also the child and adolescent
14  psychosocial assessment.
15     Q. What's in Tab 12?
16     A. Tab 12 is the psychosocial assessment and
17  social work intervention plan from Sheppard Pratt.
18     Q. What's in Tab 13?
19     A. It's another school performance data summary.
20     Q. What about Tab 14?
21     A. It's a pre-admission evaluation from the
22  Jefferson School.
23     Q. Any indications in that Tab 14 that are
24  relative to suicidal ideations?
25     A. Yes, I believe there are. It reports that

123

1  there have been multiple suicide attempts.
2      Q.  Okay.  What's in Tab 15?
3      A.  Tab 15 is the standardized test information
4  form and it gives scores that Travis received on
5  writing tests as well as functional reading tests and
6  it just documents that he passed both of those.
7      Q.  Okay.  Now what about Tab 16?
8      A.  Tab 16 is a discharge summary from his, I
9  believe, first placement at Sheppard Pratt.  He was
10  there from the 14th of February in 2000 to the 18th of
11  February in 2000.
12      Q.  What assessments are being made there or what
13  are we finding out in that tab?
14      A.  The assessment discusses why he was
15  hospitalized which was because of suicidal ideation.
16  He had considered cutting his head off or drowning
17  himself.  They determined that his insight and judgment
18  were impaired and that he was restless.  He described
19  himself during that assessment as being in a deep hole
20  and they discussed anger that he felt at his adopted
21  father over the sexual abuse as well as guilt over his
22  own abuse of his cousin.
23          There is documentation in that summary
24  also about medication that he's been administered which
25  are Ritalin, Citracal and Proventil.  And there is a

124

1  discharge note which indicates at the time of discharge
2  on the 18th there were no aggressive or
3  self-destructive behaviors and that Travis and his
4  mother participated in therapy.
5      Q.  Any indications of any mood disorder diagnosis,
6  ADD or impulse control disorders in that tab?
7      A.  Yes.  He's diagnosed with all three; mood
8  disorder NOS, ADD by history and an impulse control
9  disorder.
10      Q.  How old would he have been at that point?
11      A.  I'll do the math again.
12      Q.  13 and a half?
13      A.  13 years old.  And he was discharged on an
14  additional medication of Paxil.
15      Q.  Then what do we have on 17.  We have some
16  additional --
17      A.  Tab 17 is also a discharge summary from his
18  next hospitalization at Sheppard Pratt.  It also
19  documents that he is impulsive, labile and easily
20  agitated.  It documents that his medications are
21  Ritalin, Paxil, and that they've also added Seroquel.
22  It discusses his education which is that he's in the
23  7th grade and special education.  It states that he
24  remained safe while he was on the unit and did not
25  exhibit any aggression towards peers or staff.  He

125

1  expressed sadness again over the abuse and at one point
2  during a family meeting he punched the wall and
3  threatened to kill himself.
4      Q.  This would have been in March the 2nd of 2000
5  through March the 6th?
6      A.  That's correct.  He was discharged on the 18th
7  of February and was back in the hospital within two
8  weeks almost.
9      Q.  What do we have in Tab 18?
10      A.  Tab 18 is rather than a discharge summary, it's
11  an admission note from the attending physician at
12  Sheppard Pratt.  This is from -- an admission note from
13  his third admission there.
14      Q.  This is -- tell the jury what this is about,
15  this March 14th?
16      A.  He had been rehospitalized due to an incident
17  of acting out while his grandmother is watching him.
18  He reports that he had been drinking alcohol, that he
19  had stopped taking his Seroquel and apparently he tried
20  to set -- talked about setting fire to a gasoline drum
21  and then expressed a desire to strangle his grandmother
22  and himself.
23      Q.  Do we know which grandmother he's talking
24  about?
25      A.  Yes.  I believe it's Francis Barry, his

126

1  adoptive mother's mother.
2      Q.  In Section 18 what impressions -- I'm sorry --
3  19.  What do we find in Section 19 -- Tab 19?
4      A.  Tab 19 is a psychiatric update and Tab 19 is a
5  report by Dr. Lyon.  And Dr. Lyon reports -- his
6  impressions are that Travis is immature and impulsive
7  and that further evaluation of sexual preoccupation is
8  necessary as well as psychometric assessment.
9      Q.  And also they're concerned about what else?
10      A.  He also suggests an evaluation to determine
11  organic brain impairment.
12      Q.  What else were they concerned about there?
13      A.  It states that Travis seems to be psychopathic
14  and that there are antisocial traits with the
15  possibility of a mood disorder.
16      Q.  And that's 13 years, 6 months?
17      A.  Correct.
18      Q.  Let's go to Tab 20.
19      A.  Another psychological evaluation this time by a
20  Ph.D., Melinda Stein.  And she again documents that he
21  appears depressed, anxious and impulsive with low
22  self-esteem.  He displays mood instability and variable
23  testing.  He's easily overwhelmed and disorganized with
24  interpersonal relationships and requires a highly
25  structured environment for success.  Finally her

127

1  recommendation is that a trauma consult be obtained.
2      Q.  Do you know what a trauma consult is?
3      A.  I believe that's due to the sexual abuse in
4  order to determine a possible diagnosis of
5  post-traumatic stress disorder.
6      Q.  Okay.  Let's go to -- Tab 21 has some
7  information.  What about Tab 22?
8      A.  Tab 22 is documentation of a request that was
9  made to -- it's by the Harford County Local
10  Coordinating Council.  It's the Interagency Admission
11  Review Dismissal Committee and I believe that's an
12  agency that's associated with the Harford County School
13  District.
14          There was a request made for Ann Mullis,
15  his adoptive mother, to come in and complete a social
16  history so that they can make the appropriate placement
17  for him and this form documents that she refuses to do
18  that.
19      Q.  And what references are made, if any, in Tab
20  24?
21      A.  Tab 24 is a nursing assessment and it documents
22  that there is history of suicidal ideation times 5.  On
23  one of those occasions he had developed an actual plan
24  and on one of those occasions he had gone through with
25  the attempt at suicide.

128

1      Q.  What else do you have in Tab 24?
2      A.  The nursing assessment notes that there are
3  mild tremors present in Travis, that his emotional
4  response pattern is childlike and that he doesn't
5  really like himself because he has impulse control
6  problems.
7      Q.  When would this -- what period of time is this
8  that Tab 24 deals with?
9      A.  This is also while he's at Sheppard Pratt in
10  the Jefferson School and this was in January of 2001.
11      Q.  Then Tab 25?
12      A.  This is a psychiatric progress note which
13  indicates that he's settling down on the unit in
14  residential treatment and that he seems to be making
15  progress and that they're not having any adults with
16  him at that time.
17      Q.  That is on February 2nd, 2001?
18      A.  Yes.
19      Q.  Also immediately following Tab 25 is Tab 26 on
20  or about the same day?
21      A.  Right.  He then begins to argue a bit with the
22  staff regarding the unit rules.
23      Q.  So, on February 2nd, 2001, there are notes that
24  he's making progress settling down and then in Tab 26
25  on the very same day he's beginning to argue unit rules

129

1  with the staff.
2      A.  That's correct.
3      Q.  Tab 27 and Tab 28 deal with issues.  What's
4  happening in Tab 29?
5      A.  Tab 29 is a nursing progress note and it
6  documents that he's experiencing some drainage from an
7  old stoma site.  So, one of his -- one of the scars
8  from the injuries or illnesses that he had as a young
9  infant is still continuing to cause him problems.
10      Q.  Now, let me jump back to Tab 7 for just a
11  minute.  Did you -- was there any indication in Tab 7
12  as to the amount of drugs that he was on and what kind
13  of drugs he was on?
14      A.  By drugs do you mean --
15      Q.  Medication.  I'm sorry.
16      A.  That's okay.
17      Q.  If you look on your time sheet on 1/19/01.
18      A.  Okay.  Yes.  At that time he is on Depakote.
19  He's taking 250 milligrams in the morning and 500
20  milligrams later in the day and also Seroquel, 100
21  milligrams, two tablets twice a day.  And then also
22  some other medications, a multivitamin, Tylenol and
23  Benadryl.
24      Q.  Also what kind of indications are there, if
25  there are any, about -- out at Tab 7 that talk about

130

1  him initiating contact with his father, slash, abuser?
2      A.  It does indicate he has attempted contact with
3  his father.
4      Q.  Did you find anything in the records that you
5  were able to pull from Sheppard Pratt that talked about
6  -- what kinds of records were you able to determine
7  that even at this age he's having problems with this --
8  his stoma site?  What is that?
9      A.  I believe that's the site of where either he
10  had the G-tube before or something -- one of the lines
11  that was placed either for feeding or something.  I'll
12  leave that to Dr. Katz who can probably address that
13  better than I can.  But that would be a site that was
14  created when he was an infant during his multiple
15  surgeries.
16      Q.  What time frame are we talking about in terms
17  of Tab 29?
18      A.  We're talking 2001; so, this is -- he's 13, 14.
19      Q.  Okay.  Tab 31 that you pulled, what's the
20  content of 30 and 31?
21      A.  30 and 31 are both evening shift notes and any
22  time someone's in residential treatment there will be
23  documentation from every shift, hence the 3,000-plus
24  pages.  These particular notes report that he's
25  discussing with staff feelings about sexualized

131

1  behavior by other residents and that's making him
2  uncomfortable and he's fearful he will be victimized
3  again while he's there at the facility and staff is
4  reassuring him and saying he'll be safe and he won't be
5  re-victimized.
6      Q.  That would be in Tab 30.  Then what happens
7  over in 31?
8      A.  In 31 Travis discusses that he's been having
9  nightmares and confesses that he's abused his cousin
10  and -- this is a different cousin that I believe we
11  talked about previously.  I believe this is Stephanie
12  Barry and he states that she approached him to perform
13  a sex act and that they had developed a code so that
14  they could discuss what they were doing without anyone
15  knowing what they were talking about.
16      Q.  Then that takes us down to 35.  What's going on
17  in 35?
18      A.  Travis is confronted by staff with some
19  feelings and he's having a difficult time expressing
20  those feelings.  Rather than being able to discuss them
21  calmly with the therapist, he gets so upset that he
22  throws his glasses and begins banging his head on the
23  bleachers.
24      Q.  Then what about 37?
25      A.  Travis discusses having auditory hallucinations

132

1  with his counselor.  He states that sometimes he hears
2  voices but he doesn't like to talk about it.  He told
3  his 6th grade teacher about it once and she laughed at
4  him.
5      Q.  Okay.  Go down to 41.  What do you find in 41?
6      A.  In 41 there's a visit from his mother and
7  grandmother and the records document that they arrive
8  for a visit with bags full of junk food, candy, soda,
9  chips and fast food.
10      Q.  What's the time frame there?
11      A.  This is also in -- also in 2001 in April.
12      Q.  And then Tab 43?
13      A.  In Tab 43 Travis is also having behavioral
14  difficulties and instead of acting out, he goes to
15  staff and asks them if he can remove himself from the
16  group to go to the quiet room for a self-imposed time
17  out.
18      Q.  Let's go to Tab 46.  What's in there?
19      A.  Tab 46, he makes a confession in the evening
20  group that he had been abusing his victim for three
21  months rather than the weeks that he previously
22  described.
23      Q.  47.  What do we find in 47?
24      A.  In 47 he discusses family therapy and
25  apparently it's brought up, his relationship with his

133

1  father, and Travis breaks down in family therapy and
2  cries over missing his father.  He also admits to
3  sneaking phone calls to his father in the recent past.
4      Q.  Tab 48?
5      A.  He reports that he's still hearing voices.
6      Q.  What do we find in 49?
7      A.  He's asked to take a time out in his room
8  because his behavior is upsetting a peer and causing
9  that peer's behavior to then escalate
10      Q.  Tab 50, what do we find there?
11      A.  Travis is found to have excessive hygiene
12  issues.  He's not brushing his teeth and when
13  confronted about it, becomes disproportionately
14  reactive and distraught.
15      Q.  Over brushing his teeth?
16      A.  Yes.
17      Q.  What do we find in 51?
18      A.  The psychiatric note in 51 describes that
19  Travis continues to be a tough challenge for staff and
20  that he's not showing major progress in behavior,
21  though he seems to be making some effort.
22      Q.  What does it indicate about his social
23  maturity?
24      A.  He tends to minimize and behaves in a socially
25  immature way.

134

1      Q.  In Tab 55 that the jury will have in their
2  presence, what are they learning from that?
3      A.  Discusses his medications at that time which is
4  June of '01.  He's taking Depakote twice a day,
5  Seroquel and Wellbutrin.
6      Q.  Are there any in that same tab -- what kind of
7  diagnoses are being done, if any?
8      A.  He's given the diagnosis of bipolar disorder,
9  post-traumatic stress disorder and ADHD NOS.
10      Q.  What does NOS mean?
11      A.  Not otherwise specified.  He's also documented
12  as having problems related to social environment,
13  educational problems and problems related to
14  interactions with the legal system.
15      Q.  What's his GAF score in Tab 55?
16      A.  40.
17      Q.  What do we pull out of Tab 56?
18      A.  It's a discussion in family therapy, a note
19  about Travis and his mother's relationship.  Travis and
20  Ann Mullis discuss Travis' recent relationship with his
21  father.  The therapist notes that Travis' affect was
22  extremely flat and unemotional.  Travis appears to be
23  very well defended in discussing his father and he does
24  not want anyone to tell him how he should react to his
25  father or to limit their contact.

135

1    Q.  Do we know which father we're talking about
2    here?
3    A.  Gary Mullis, his adoptive father.
4    Q.  Let's go to Tab 58.  What is the jury going to
5    learn in Tab 58?
6    A.  The nursing progress note documents that he's
7    having difficulty this shift and threatens to burn
8    himself in the shower or hang himself with his
9    clothing.  He tells the nurse that he threatens when
10   he's anxious but only -- but he needs to be somewhere
11   he can feel safe.  They won't lock him up.
12   Q.  What do we find in Tab 61?
13   A.  This is a psychiatric note and the psychiatrist
14   documents that Travis is trying to be involved in the
15   program and he feels that the medications are beginning
16   to help, that Travis is working on his trust issues and
17   making progress, focusing in on treatment issues and
18   that he's making some headway in his sex offender
19   treatment program.  His mood is less volatile and his
20   information processing is much better.
21   Q.  This would have been when?
22   A.  This was in July of '01.
23   Q.  What happens in Tab 62?
24   A.  This is an evening shift note from one of the
25   residential counselors.  In group he presented his work

136

1    in Step 1 and Step 2 of his sex offender treatment and
2    he was able to show some insight into his behaviors.
3    After group he gets upset and acts out by throwing a
4    ball at a staff member and this is after he's told that
5    one of the staff members will be leaving the unit which
6    upset him.  He has difficulty processing his feelings
7    and, instead, provokes his peers, bangs his head on the
8    wall, threatens peers and has difficulty following
9    directions.  He ultimately asks staff if he can remove
10   himself to the quiet room to regroup.
11   Q.  Tab 64, what do we find?
12   A.  Travis discusses in family therapy his loss and
13   his sadness at several of the staff members on the unit
14   having left for other jobs and he also is reporting
15   that he's upset by an increased amount of flashbacks to
16   the abuse.
17   Q.  What about Tab 66?
18   A.  There's apparently stress and conflict going on
19   in the house in which he's living and he discusses with
20   the evening shift staff that he's feeling sad and
21   depressed because of this conflict.
22   Q.  Let's go to Tab 73.  What do we find in Tab 73?
23   A.  It's again an evening shift note which
24   describes Travis tantruming at bedtime, refusing to
25   soak his foot and kicking the basin down the hallway.

137

1    I believe he had an injury to his foot and that's the
2    reason he was -- it had been prescribed an evening foot
3    soak.  But eventually he's been able to regroup his
4    behavior, discuss his behavior with staff and then go
5    to bed.
6    Q.  What about Tab 75?
7        MR. MCCLELLAN:  What was the previous one?
8        MR. BOURQUE:  73.
9    A.  I'm sorry.  75?
10   Q.  (BY MR. BOURQUE)  Yes, ma'am.
11   A.  Says that Travis has a difficult shift.  He's
12   calling staff names, saying things like "I can get
13   anything I want" and "You have no idea what I'm up to."
14   Q.  What was that quote about "I'm so covert"?
15   A.  "I'm so covert I can get anything I want.  You
16   all have no idea what I'm up to."
17   Q.  Tab 76?
18   A.  It's reported that that's a difficult shift for
19   Travis.  He's off task, telling staff to shut up, not
20   transitioning well between activities and is talking
21   about things like making bombs and blowing up windows.
22   Q.  Tab 78, what do we find there?
23   A.  Again this is a group note, actually, and it
24   says that he was unable to attend the group because he
25   was placed in the quiet room because of an emotional

138

1    mobility and anxiety.  He's fearful over upcoming
2    family therapy session.
3    Q.  What's happened in Tab 81?
4    A.  When one of his peers begins to escalate and
5    act out during the evening shift, that upsets Travis
6    who then begins banging his head against the door and
7    eventually asks staff again if he could remove himself
8    to the quiet room where he can be safe and regroup and
9    not hurt himself.
10   Q.  That would have been when?
11   A.  August of 2001.
12   Q.  August 17th?
13   A.  '01, yes.
14   Q.  Then in Tab 86 which would be around August
15   30th, 2001, what do you find there?
16   A.  The note by the pharmacist, he seems to be
17   doing very well behaviorally.
18   Q.  So, this is nine days after -- 13 days after
19   banging his head against the closet door and the wall?
20   A.  Yes.
21   Q.  Now, in Tab 86 he's doing well?
22   A.  Yes.
23   Q.  Tab 87?
24   A.  The psychiatric progress note shows that he's
25   still dealing with issues of depression but there's a

139

1  distinct behavior change, that he's more interested in
2  treatment and appears more positive about the outcome
3  of his treatment but that he's still having some
4  attentional problems.
5      Q.  Tab 88, he would be almost 15; is that correct?
6      A.  Yes.
7      Q.  What do we find there?
8      A.  He's very emotional at bedtime.  States that
9  he's having flashbacks and sees himself at 3 years old
10  performing fellatio on his father.  He also sees his
11  victims performing fellatio on him.  He is so upset
12  he's not able to agree that he won't hurt himself.  He
13  has to spend -- the entire evening is spent in the
14  quiet room where they can monitor him.
15      Q.  Looks like Tabs 90, 91, 92 deal with flashback
16  issues.  Does that sound about right?
17      A.  Yes.
18      Q.  Tab 95.  What happens in Tab 95?
19      A.  He's consequence for being disrespectful and
20  loses points.  He gets into a staff conversation when
21  it's not appropriate.
22      Q.  Let's go to Tab 98.
23      A.  Again it's documented that he's banging his
24  head this time on the armoire and refusing to discuss
25  with staff what's upset him.  He again asks for time

140

1  aside in the quiet room where he's unable to regroup
2  and continues to bang the door and becomes more
3  aggressive with staff cursing and threatening.  After
4  this continues for a short time he's eventually able to
5  process his behavior and feelings about the flashbacks
6  he's having and his concerns that the Jefferson School
7  will not be able to help him.
8      Q.  And this is roughly seven weeks after the
9  August 17th banging of the head?
10      A.  Yes.
11      Q.  How old is he on, let's say, November 20th,
12  2001?
13      A.  November 20th, 2001, he would be 14, 15.
14      Q.  Okay.  14, 15.
15      A.  I guess that's his birthday.  He's turning 15.
16      Q.  So, in Tab 102 what are we finding?
17      A.  He expresses in a conversation with the evening
18  shift that he's upset and concerned that he won't be
19  able to succeed in the program at the Jefferson School
20  and that his flashbacks are continuous.
21      Q.  Let's go to 106.  What's happening in 106?
22      A.  He becomes upset again during evening shift and
23  becomes verbally abusive towards the staff and refuses
24  to process his feelings.  When staff pushes him further
25  he admits -- he begins discussing his plans for a pass

141

1  for the Christmas holiday and becomes very emotional
2  and begins to cry.
3      Q.  This would be -- what period of time are we
4  talking about here?
5      A.  This is probably right around Thanksgiving time
6  of the year that he turned 15.
7      Q.  About a month before Christmas?
8      A.  Uh-huh.
9      Q.  Let's go to Tab 108.  What's going on in Tab
10  108?
11      A.  This is an update in the note from the
12  psychiatrist saying that Travis had been holding
13  feelings in and that he is now having difficulty
14  following directions, that lately in his treatment he
15  seems to have shut down, that there's not much change
16  in school and, in fact, there's possibly some
17  deterioration in his school behavior and that he
18  remains distractible in class.
19      Q.  Then in 110?
20      A.  Again these are nursing and evening shift notes
21  which document an episode of disruptive behavior which
22  requires him to get some PRN or as needed medication
23  and be taken to the quiet room.
24          He is eventually able to process this
25  behavior with staff but then again his behavior

142

1  deteriorates.  And he's again sent to the quiet room
2  and more PRN medications are offered and eventually he
3  is able to agree to take those medications orally and
4  go on about the evening routine.
5          He ultimately discusses with staff his
6  desire to talk to his physician and states that the
7  reason he becomes so upset was that he heard voices
8  telling him "I'm going to kill you."
9      Q.  What evidence -- was he ever put in any kind of
10  therapy like horseback riding or where is that?
11      A.  He did.  That's Tab No. 112 which is an
12  individual therapy note and that discusses his
13  participation in the therapeutic horseback riding
14  program.  It reports that he spontaneously stroked the
15  horse's nose and kissed the horse, thanking it for
16  following directions.  Travis commented he felt safer
17  and more in control working with a horse who was less
18  argumentative.  He quickly acknowledged the parallels
19  in his relationship with staff.
20      Q.  What's that date?
21      A.  12/13/01.
22      Q.  And then four days later what do we have?
23      A.  Four days later he requires physical restraints
24  because he becomes out of control and his behavior
25  results in a female staff member actually getting

143

1  injured.
2      Q.  That's in Tab 113?
3      A.  That's correct.
4      Q.  Tab 115, what do we see?
5      A.  Again he's having difficulty with directions.
6  He's talking about things -- talking with a peer about
7  rioting on the unit, talking to a peer who's on
8  restriction and is not allowed to be talking.  He uses
9  inappropriate language and refuses to go to the quiet
10 room.  Eventually he's able to accept the consequences
11 and goes to the quiet room for 15 minutes and it says
12 "has a good remainder of the shift."
13     Q.  What about what's in 120?
14     A.  Travis is expressing to the evening staff that
15 he's feeling unsafe after threats are made by a peer
16 and inappropriate sexual comments are made by one of
17 his peers.  He becomes agitated by these comments and
18 takes his anger out on staff by throwing a shampoo
19 bottle at them.  And then when staff bends down to pick
20 up either the shampoo or the basket it was in, Travis
21 comes out of the bathroom and actually kicks the staff
22 in the head.
23     Q.  What's in Tab 126?
24     A.  Again, this is an evening shift note and in
25 response to his behavior several -- six days earlier:

144

1  "Travis continues to express remorse over kicking staff
2  and continues to ask if she is all right.  Travis
3  apologizes and states he will not do it again."
4      Q.  What about Tab 130?
5      A.  Travis in the general group therapy session
6  reports that he doesn't have any friends and everyone
7  calls him a dork.  He continues to isolate himself from
8  the group and instead seeks out staff to interact with.
9      Q.  What about Tab 133?
10     A.  There's a phone call initiated with his aunt
11 and uncle at that time but the aunt hangs up almost
12 immediately after the phone call.  Travis claims that
13 it doesn't bother him but later tells evening shift
14 staff that he really jokes about things to cover up how
15 he feels.
16     Q.  Now, what uncle are we talking about in Tab
17 133, if you know?
18     A.  This would be Stephen Barry and the aunt is
19 Candy.
20     Q.  What about Tab 136?
21     A.  Nursing progress note.  Again Travis is having
22 flashbacks.  He's trying to use the coping skills he's
23 learned but is still frightened and angry.  Staff notes
24 a difference in his behavior this shift.  He becomes
25 agitated and visually distressed, crying, holding his

145

1  head and breaks his glasses.  He reports having a
2  flashback from when his father abused him and spoke of
3  not feeling safe.  He informed staff that he was
4  thinking of hurting himself but was able to contract
5  with them not to do any self harm.
6      Q.  What about Tab 142?
7      A.  He discusses with the evening shift there are
8  three additional victims than he has previously
9  reported and while he's discussing this with the staff,
10 he's visually upset and crying.
11     Q.  There's additional references to that in Tab
12 144 as well, correct?
13     A.  Yes and 143.
14     Q.  In Tab 143 did you make any additional notation
15 -- did you see anything else in Tab 143 that you
16 thought the jury might want to know about?
17     A.  Tab 143 is the follow-up note by his
18 psychiatrist in which the psychiatrist states that he's
19 not sure of the truthfulness of the disclosure of the
20 new victims.
21     Q.  You're talking about the professional who's
22 doing the counseling who's making those notations?
23     A.  That's correct, his treating psychiatrist.
24     Q.  About 145, Tab 145?
25     A.  Travis is speaking to the evening shift staff

146

1  about the confusion over his sexuality.
2      Q.  Was that about the first place that you saw
3  that come into play?  The first time would be my
4  question.
5      A.  The first time, I believe, yes.
6      Q.  That would have been April the 2nd of '02?
7      A.  Yes, that's correct.
8      Q.  148.  What do we see in 148?
9      A.  Staff documents that Travis is caught
10 repeatedly lying about jobs and cars that his mother
11 has.  When he's confronted, he makes up additional
12 stories to cover up those lies and this is a pattern in
13 his behavior that's documented as far back as
14 elementary school.
15     Q.  How about 149?
16     A.  Travis becomes upset with family therapy and
17 storms out of the room and ends up going to the quiet
18 room in order to regroup.
19     Q.  What's in 153 now?
20     A.  This is another follow-up note by the treating
21 psychiatrist and this is with regards to the three
22 victims that he had disclosed previously.  A report was
23 made to CPS by Jefferson School about those victims and
24 it would have been apparently the Washington County
25 Child Protective Services or Department of Social

- March 16, 2011

147

1  Services and they agreed to conduct an investigation.
2      Q.  When we're talking about the report on the
3  previous -- previous report where the --
4      A.  On 3/28/02 where he discloses there were three
5  more victims.
6      Q.  Now, this doesn't mean six now.
7      A.  No.
8      Q.  What's in Tab 154?
9      A.  Again he's discussing confusion over his
10  sexuality but is not comfortable -- he discusses this
11  with one of the staff members but reports that he's not
12  comfortable talking to his therapist about it.
13      Q.  That's in 154?
14      A.  Yes.
15      Q.  So, this would be the second notation you're
16  seeing?
17      A.  Correct.
18      Q.  On that --
19      A.  On that specific subject.
20      Q.  Then 156, what do we find in 156?
21      A.  He's being moved from one therapeutic residence
22  to another and at this point he discusses with staff --
23  expresses his displeasure over moving to the new house
24  because of his existing relationship with staff and
25  peers at his current residence.

148

1      Q.  And this would be in May 2002?
2      A.  That's correct.
3      Q.  Roughly 15 years, eight months or something
4  like that?
5      A.  Yes.
6      Q.  What do we have in 162?
7      A.  Nursing progress notes indicate that he's
8  treated in the clinic for a red pustular area 8
9  millimeters in diameter anterior -- I'm sorry -- 8
10  millimeters anterior to the rectum.
11      Q.  163, what do we see here?
12      A.  Travis having difficulty in the program and
13  continues to be manipulative with staff.  The
14  psychiatrist documents that they're trying to help his
15  mother set better boundaries for him and that he's not
16  reported any flashbacks in the last few days.
17      Q.  What sort of theme are we seeing with these
18  flashbacks?  How long a period are these flashbacks
19  going to go according to these Sheppard Pratt records.
20      A.  They're discussed throughout the three or four
21  years he's there.
22      Q.  Then in Tab 166?
23      A.  This is a family therapy note where Ann and
24  Travis discuss her brother, Steven's, withdrawal of
25  consent to have Travis telephone him.

149

1      Q.  When you say Steven, are you talking about
2  Steven Barry?
3      A.  Yes.
4      Q.  And this would be in June of 2002?
5      A.  Yes.  They're surprised at his sudden
6  withdrawal and Ann reports that in the past Steven had
7  expresses his desire to support Travis.
8      Q.  In 167 he just continued to be compliant with
9  his meds?
10      A.  That's correct.
11      Q.  What about 169?
12      A.  This is again a family therapy note and this
13  time Ann Mullis is discussing her anger with her
14  brother for withdrawing the telephone consent.  She
15  feels confused and betrayed by her brother who had
16  previously stated his intention to be supportive of
17  Travis' recovery.
18      Q.  Again what uncle or what brother?
19      A.  Steven Barry.
20      Q.  Let's go to 176.
21      A.  Another family therapy note.  This time Travis
22  expresses to Ann a desire to learn more about his
23  biological family and obtaining some medical records in
24  regards to them.  Only Ann's response is described as
25  terse and without much of her standard warmth.  She

150

1  would only agree to think about the request.
2      Q.  Let's go to 180.  What do we see there?
3      A.  This is an evening shift note where Travis'
4  behavior is described as noticeably different.  He's
5  upset by a statement made by Dr. Kahn who stated that
6  he wasn't sure that he was having real flashbacks.
7      Q.  When Dr. Kahn -- or when this notation is made,
8  clearly what's Dr. Kahn's saying?  Who is it that may
9  not be having real flashbacks?
10      A.  Travis.
11      Q.  Did we try to find Dr. Kahn or did we not have
12  enough information?
13      A.  We never had enough information.
14      Q.  What about 181?
15      A.  It states that Travis tells staff that he
16  admits he's isolating in his room and he's feeling
17  unsafe with his peers and he describes one of the peers
18  put a plastic knife to his throat.
19      Q.  Let's look at 187 and 188 together and tell the
20  jury what we find there.
21      A.  Again he's describing confusion over his
22  sexuality because of the abuse that was perpetrated on
23  him and the genders of his victims and that he's again
24  feeling unsafe on the unit due to peers that are
25  behaving inappropriately.

151

1   Q. 189, what do we find in 189 that was
2   interesting to you?
3   A. TJ is advanced to the silver level and is
4   reportedly doing well. Although he still is described
5   as having some anxiety, his GAF or Global Assessment of
6   Functioning has been raised from a 40 to a 55 and he
7   seems to be progressing.
8   Q. So, previously we had seen a GAF score of 40?
9   A. Correct.
10  Q. And this is sometime later and now it's raised
11  15 points to a 55?
12  A. Correct.
13  Q. What's happening in 196?
14  A. Travis received a letter from his biological --
15  I'm sorry -- from his adoptive father, Gary Mullis, and
16  he becomes upset by this and rips up the letter and
17  throws it in the trash can and spits on it.
18  Q. Spits in the trash?
19  A. Yes.
20  Q. What about Tab 200?
21  A. Travis is discussing the letter from his father
22  in individual therapy. He reports -- Travis reports
23  that he feels like his father is trying to be
24  manipulative when he makes affectionate statements and
25  that this, in turn, makes Travis feel guilty. Travis

152

1   admits feeling nothing for his father at times and then
2   feeling extremely angry towards him at other times.
3   Q. What about Tab 208?
4   A. In this evening shift note it reports that
5   Travis hits the staff with a ball in rec on purpose but
6   that he is able to discuss the incident and doesn't
7   lose that silver level he's earned because he's able to
8   process it appropriately.
9   Q. What happens in Tab 213?
10  A. Travis is upset and agitated that he has caused
11  problems between his mother and her boyfriend even
12  though the mother's boyfriend was going through a
13  personal crisis at the time. Travis admitted that his
14  mother's relationships were her responsibility and it
15  was not his job to make sure it was healthy and that
16  both of the adults were being respectful to one
17  another. He admitted that it was like his parents'
18  relationship and that he felt he caused their divorce
19  because his father abused him.
20  Q. Tab 216.
21  A. This is a note from the psychiatrist reporting
22  that Travis is doing well in school. He's doing his
23  homework, that his interaction with peers remains up
24  and down and he is trying hard to work on his behavior.
25  He's continuing to talk to staff and not shut down.

153

1   His depression is better, he's working on goals, has
2   made the silver level, is not complaining of flashbacks
3   and is showing improvement in oppositional defiant
4   behaviors and he's approved for a therapeutic overnight
5   pass with his family."
6   Q. Are you seeing some cycling in and out where
7   he's okay at one time? What are you seeing?
8   A. Travis appears to be successful in the program
9   and then alternates that with periods where he's
10  decompensating, not participating as well and having
11  difficulties.
12  Q. So, let's go to January 13, 2003 in Tab 218.
13  A. This is a family therapy note and after a
14  weekend pass Travis comes back and states that he was
15  upset after a weekend ice skating activity. Travis
16  stated when the rink became crowded with young
17  children, he became uncomfortable and asked his mentor
18  to take him home. Instead of agreeing, his mentor said
19  he was, quote, "going to have to deal with it."
20  Eventually the mentor did agree to return him home.
21  Q. Do we know who the mentor was?
22  A. William Kelly.
23  Q. Then in Tab 219.
24  A. The psychiatrist reports that Travis is
25  continuing to make improvement and his grades in school

154

1   are improving, he's a positive role model for his peers
2   and that he's complying with his medication. He is
3   verbalizing his feelings well and seems to be more
4   involved in his treatment. He needs to get more
5   positive as far as his self-esteem goes.
6   Q. Tab 225 takes us to February 12th, 2003.
7   What's happened there?
8   A. The psychiatrist reports that he's been doing
9   very well in school. Travis has made the honor roll,
10  he's working on issues and is making good progress. He
11  remains compliant with meds and expressed no suicidal
12  or homicidal ideation.
13  Q. Now, give us an idea of what happens now in 226
14  which is a period around February 24th, 2003?
15  A. Travis again begins acting out and having some
16  problems on the unit and because of that he receives
17  consequences. In further discussing that behavior he
18  says that he's upset over teachers and staff who are
19  leaving the program for other jobs and this has caused
20  him to have feelings which have caused him to act out.
21  Q. 227. What is happening in 227?
22  A. During family therapy Travis expresses
23  frustration over his mother's boyfriend acting as his
24  father. He shows disrespect and a bad attitude towards
25  his mom's boyfriend in therapy and ultimately walks

155

1   out. Mom is oblivious to his actions and can't
2   understand why he leaves. She refuses to confront
3   Travis about his behavior despite prompting from the
4   therapist.
5       Q. Now, before we go any further, what level is he
6   in the program as of this particular date, which is
7   March 10th, 2003?
8       A. I believe he's still in the silver level.
9   Although he did receive consequences on the 24th, I
10  don't believe he lost his level as a result of his
11  behavior.
12      Q. Now take us to March 11th, 2003, in Tab 228.
13  What happens there?
14      A. On the 11th his level is actually suspended.
15  He makes sexual remarks and gestures towards female
16  staff and his level is dropped.
17      Q. And then three days later on March 14th, 2003,
18  what's going on in Tab 229?
19      A. The psychiatrist reports that he continues to
20  make progress slowly but steadily. He continues to do
21  well in school. His grades are improving. His move
22  remains stable. His affect is brighter. He sometimes
23  had difficulty expressing frustration appropriately.
24  He remains engaged in therapy. Mother is following
25  better limits and not allowing herself to be taken

156

1   advantage of. Travis is compliant with his meds.
2       THE COURT: We're going to take a break.
3       (Recess taken)
4       (Open court, Defendant present, Jury
5   present)
6       THE COURT: Ladies and gentlemen, I'll
7   remind you that I'm not the only one that can call
8   timeout. If you need a break, give me the high sign
9   and I'll give you one. There we go.
10      Mr. Bourque, you may continue.
11      MR. BOURQUE: Thank you, Judge.
12      Q. (BY MR. BOURQUE) Before we push on to 230,
13  what was it about 183, Tab 183, that you wanted to talk
14  about?
15      A. 183 is the documentation that Travis tells the
16  group his restrictions have been lifted because the CPS
17  investigation yielded no results.
18      Q. All right. So, now let's move on to Tab 230
19  just briefly. What do we find in 230?
20      A. The evening staff document that Travis had
21  shown marked improvement with not making inappropriate
22  jokes and comments.
23      Q. All right. And in 233 what do we see about
24  suicidal or homicidal?
25      A. Travis is not expressing suicidal or homicidal

157

1   ideation which he has in the past when confronted with
2   his behavior.
3       Q. This is what time frame?
4       A. This is in March of 2003, the end of March.
5       Q. March 28th?
6       A. Yes.
7       Q. Then what do we find in Tab 234 that is
8   complimentary about Travis Mullis?
9       A. States that he's working on treatment
10  assignment almost every day, has been a positive roll
11  model for his peers, trying to help when they are
12  having difficulty and that he's sharing treatment work
13  with staff more often.
14      Q. And again would you characterize that as
15  positive or negative?
16      A. That's a positive note.
17      Q. Go back to 233. How are his grades doing in
18  Tab 233?
19      A. He's made the honor roll.
20      Q. Again?
21      A. Yes.
22      Q. Are you seeing -- would you say that's a
23  positive action by him or --
24      A. Yes. 233 and 234 are both indicating he's
25  doing well in the program.

158

1       Q. And that's on March 28th?
2       A. Correct.
3       Q. So, those are the things happening on March
4   28th of 2003.
5       A. Correct.
6       Q. Then on April the 9th, basically ten days later
7   in Tab 235, what do we see?
8       A. This would be -- he becomes overwhelmed with
9   emotion and runs from the therapy room sobbing when he
10  attempts to express to his mother how fearful he is of
11  Michael hurting one or both of them.
12      Q. Now, who is Michael at this point?
13      A. At this point Michael is Ann's fiance.
14      Q. Okay. So, it's who his mother's engaged to.
15      A. Correct.
16      Q. And that's -- even if you back up to Tab 232
17  when we're talking about Michael's daughters, that's
18  the Michael we're talking about?
19      A. Yes.
20      Q. So now that we know that, then tell the jury
21  what's in Tab 232.
22      A. In Tab 232 during a family therapy session
23  Travis presents a list of requests to his mother and
24  including that he never be left alone with Michael's
25  daughter and that he have some time to himself once he

159

1  has earned her trust back. Travis is pleasantly
2  surprised when Ann agrees and they agree to continue
3  communication in this manner.
4      Q.  And how is TJ handling his work program in Tab
5  237?
6      A.  He's working the program. The psychiatrist
7  states that he's been having passes with his mother and
8  utilizing them very well. Both in school and home
9  behavior has stabilized considerably. He's handling
10  the news of his therapist leaving fairly well and he's
11  compliant with his meds.
12     Q.  Now, in Tab 233 on March 28th, 2003, we see
13  what in terms of suicidal ideations again?
14     A.  He's not expressing any suicidal or homicidal
15  ideations.
16     Q.  Now, go to April the 17th, 2003. In Tab 239
17  what are we seeing?
18     A.  Travis expresses suicidal thoughts to staff but
19  states that he won't act on them.
20     Q.  Basically that's two and a half weeks later?
21     A.  Correct.
22     Q.  So, what -- are we seeing positive action on
23  March the 28th?
24     A.  Yes.
25     Q.  By Travis?

160

1      A.  Yes.
2      Q.  Then by April the 17th what are we seeing?
3      A.  By April 17th after his therapist has moved to
4  another unit he's expressing suicidal ideation again.
5      Q.  Four days, Tab 240, what are we seeing?
6      A.  Travis made suicidal gestures and noises, was
7  involved in negative talk and when speaking with staff
8  talked about hearing voices which told him to have
9  consensual sex and then since that couldn't happen, he
10  should kill himself.
11     Q.  And then as little as a week later in Tab 242,
12  what are we seeing?
13     A.  Travis continues to shine and is making good
14  progress. Showing insight in treatment.
15     Q.  Let's go to 245. What do we see in 245 on May
16  the 1st, 2003?
17     A.  Travis has one-on-one talk with staff and
18  confides that he hears voices tell him to do sexual
19  things like masturbate. He states he has discussed
20  this with his therapist and is aware that these things
21  are not good for his progress in the program.
22     Q.  Now, what's happening in May of 2003? Where
23  are we in the program? Where is Travis in the program
24  as of May of 2003?
25     A.  He's approaching the end of his term there at

161

1  the Jefferson School. He's been having more and more
2  therapeutic passes approved with his family and is
3  getting ultimately closer to discharge.
4      Q.  Okay. Ultimately closer to discharge from the
5  Sheppard Pratt school?
6      A.  Yes. Actually the Jefferson School.
7      Q.  Jefferson School. I'm sorry. Then in 246 what
8  are we learning?
9      A.  In individual therapy Travis requested to meet
10  and discuss his last home visit. He reported that he
11  and his mother discussed some of his triggers. He's
12  not ready to discuss the voices he's hearing but states
13  he understands there's a correlation between the voices
14  and talking to his father again. He reports these are
15  the same voices he heard while he was offending.
16     Q.  Now, in 248 we see he's tested for an STD?
17     A.  That's correct.
18     Q.  Did we have records of that that we talked
19  about in these other exhibits?
20     A.  No, I don't believe we did.
21     Q.  Can you tell in 248 or 249 whether he's working
22  the program still?
23     A.  In 248 the reason he's tested for the STD is
24  that he had sexual contact with another peer in the
25  unit. He allowed that peer to fondle him. So you

162

1  would have to say that that's not working the program.
2      But then in 249 his psychiatrist responds
3  that "He has done well and is concentrating well and is
4  working on his treatment issues and remains compliant
5  with meds. He did engage in inappropriate sexual
6  contact with another resident but he was able to
7  process it and was very forthcoming of his behavior."
8      Q.  So, that would be May the 30th of 2003?
9      A.  Correct.
10     Q.  Yet 22 days earlier on May -- on April the
11  28th, 2003 in Tab 242 they're making references to
12  "he's shining"?
13     A.  Yes.
14     Q.  Then what happens on June 4th, 2003, in the
15  Jefferson School, Tab 250?
16     A.  In family therapy he is encouraged to write a
17  letter to his father in order to process the anger that
18  he feels toward him. Travis talked about his desire to
19  be a nurse and he admits that he's happy his discharge
20  has been postponed.
21     Q.  Further in 251 what do we learn about this
22  discharge being postponed?
23     A.  He admits to his individual therapist that he
24  sabotaged his discharge because he did not feel he was
25  ready. He also realized that he needed to become more

163

1  aware of his feelings in situations -- more aware of
2  his feelings in situations which may become a problem
3  for him.
4      Q. So, what does that mean? If you put the June
5  4th together with June 13th, what are we learning here?
6      A. Travis is saying he has more work to do before
7  he's ready to be living at home with his mother again.
8      Q. And that he's afraid to go home.
9      A. Yes.
10     Q. Then on July the 1st of 2003 in Tab 256 what do
11 we learn?
12     A. Travis again was involved in sexual activity
13 with another peer. The peer fondled Travis while he
14 was in the dining room and Travis admits that this
15 behavior was to sabotage his discharge.
16     Q. So, he's continuing on July the 1st what he's
17 doing on June the 4th and the 13th? He's sabotaging
18 his release.
19     A. It is possible because the milieu notes are not
20 written every day, that this milieu note on July 1st
21 refers to that same incident with the peer that was
22 discussed earlier. But I can't be certain.
23     Q. Okay. Then on July the 14th in Tab 258 -- and
24 that's just two weeks after this July 1st tab of 256.
25 And what's happening on July the 14th?

164

1      A. It states that "He has done well all around.
2  His psychiatrist reports that he's completed discussing
3  his abuse but work was added to deal with some of the
4  emergent issues after the incident on the unit where he
5  was involved in inappropriate contact with another peer
6  a few weeks ago. Academically he's making good
7  progress."
8      Q. That's on the 14th of July?
9      A. Yes.
10     Q. Two days later on 259, Tab 259, what do we
11 learn?
12     A. "In individual and family therapy as well as
13 during the evening shift Travis discussed his decision
14 to leave a public swimming pool while on break, on
15 leave, due to becoming uncomfortable around females.
16 He discussed anger at learning his father wanted to
17 initiate regular contact. He expressed desire to see
18 his father but only during supervised visits and
19 expressed desire for father to register as a sex
20 offender. Travis processed fear over saying he wanted
21 to see his father would make his mother upset. He
22 stated he wanted to see father to ask questions that
23 were never answered. Travis would only agree to see
24 father if supervised and wants to do it while in
25 treatment so that the treatment team and peers can

165

1  support him before and after the visit."
2      Q. Then on July the 30th, 2003, what does Tab 262
3  say about his process in therapy?
4      A. "The psychiatrist reports that Travis is
5  engaged in his treatment and is able to process in
6  therapy. His mother remains very involved in his
7  treatment and attend individual treatment plan meetings
8  regularly."
9      Q. What's his mood?
10     A. "His mood stable. His affect is brighter and
11 he's cheerful."
12     Q. That's July 30th in Tab 262?
13     A. Correct.
14     Q. Then on the very same day in 263 after the
15 psychiatrist makes the note that he is engaged in his
16 treatment and he is able to process in therapy, what's
17 going on in Tab 263 on the very same day?
18     A. "Travis is caught colluding with peers to watch
19 an inappropriate video on the unit. Travis provided
20 the computer to watch the video."
21     Q. Tab 265. What happens when Mr. Mullis doesn't
22 get his way in Tab 265?
23     A. "He has been refusing his meds. He becomes
24 argumentative and abusive."
25     Q. What's reported in 269?

166

1      A. "Travis reports that he does not find young
2  children attractive. He's attracted to female peers
3  and is uncomfortable around younger females only
4  because his victims were younger females."
5      Q. Then this is late August, 2003; is that right?
6      A. That's correct.
7      Q. When is it when he first goes to the Jefferson
8  School?
9      A. He goes to Sheppard Pratt in 2000 and then has
10 several admissions there and then goes into the
11 Jefferson School shortly -- or he goes into facilities
12 that are affiliated with the Jefferson School shortly
13 thereafter. From his first admission to Sheppard Pratt
14 in 2000, he's home for less than a few weeks at a time,
15 I believe.
16     Q. Basically what we're learning is for about
17 three years ---
18     A. Correct.
19     Q. It's a pretty intense program -- environment.
20     A. Yes.
21     Q. Then August 28th, 2003, in Tab 269, what do we
22 learn?
23     A. He does not find young children attractive.
24 He's attracted to female peers and is uncomfortable
25 around younger females only because his victims were

167

1  younger females.

2  Q. You have not talked to Dr. Mendel, have you?

3  A. Briefly, I have.

4  Q. All right. What are we seeing at 228? Whose

5  notes are they and what are they based on, if you know?

6  A. These are the notes from his individual

7  therapist.

8  Q. Do you know who that therapist was?

9  A. I would have to look at the actual note.

10  Q. And that's a finding that he's -- someone's

11  making a finding or someone's making a statement that

12  Travis Mullis does not find young children attractive?

13  A. That's correct.

14  Q. Then also in 269 what do we see?

15  A. That he is attracted to female peers and is

16  uncomfortable around young female peers because his

17  victims were young females.

18  Q. Does that seem to be somewhat contradictory to

19  the first notes you just read that he does not find

20  young children attractive?

21  A. That he's -- that his victims were young

22  females.

23  Q. Uh-huh.

24  A. They're somewhat contradictory.

25  Q. All right. Tab 273?

168

1  A. His individual therapist reports that Travis

2  has come a long way in terms of working on treatment

3  issues but in some ways remains superficial. At this

4  point in his life, it appears that he may lack the

5  depth of expression required to more completely express

6  his feelings.

7  Q. He's basically 17 at this point?

8  A. Yes.

9  Q. What do we learn in 273 about their opinions as

10  to whether or not he can transition into the community?

11  A. They believe he should transition smoothly into

12  the community.

13  Q. In Tab 275 what do we learn about September

14  15th, 2003.

15  A. September the 15th, 2003, he's discharged home

16  to his mother's care. The Court has decided to let him

17  go home. His individual education plan was revised,

18  sending him back to public school. Travis has done

19  well in the treatment. No suicidal or homicidal

20  ideation is noted and his mood is stable and his affect

21  is a lot brighter. He's sent home on Wellbutrin,

22  Depakote and Risperdal with diagnoses of Bipolar 1

23  disorder, most recent episode mixed unspecified PTSD

24  ADHD NOS. On Axis II the diagnosis has been deferred

25  and on Axis III his diagnoses are IBS and seasonal

169

1  allergies.

2  His Axis IV problems are related to

3  school, to social environment and interaction with the

4  legal system/crime and educational problems. His

5  current GAF at the time of discharge is a 55.

6  Q. This is on what day?

7  A. This is on 9/15/03, the same day a letter is --

8  which is under Tab 276 -- a letter is received from the

9  Maryland Health Partners which is the insurance company

10  that states they've decided they will no longer pay for

11  residential treatment.

12  Q. So, on September 15th, 2003, there's a letter

13  saying we ain't paying for this anymore?

14  A. That's correct.

15  Q. And what happens at that point?

16  A. They send him home.

17  Q. Then there's Tab 277. Explain to the jury what

18  you find in 277 as he's being released.

19  A. That's the discharge summary and at that time

20  Travis fears expressing the depths of his depression

21  and he doesn't want additional medications.

22  "He continues to work from the Pathways

23  book and has expressed surprise that his mother

24  continues to support him despite his admissions. He

25  expresses a desire to meet with his father in therapy

170

1  in the future. He requires continued individual family

2  and group therapy with medication follow-up. Provided

3  these community services are in place, Travis should

4  experience minimal problems in the community."

5  But there's no evidence that he receives

6  any of that followup.

7  Q. Would it be fair to say that as Travis is being

8  released he has some fears about --

9  A. Absolutely. In Tab 272 on the 8th of September

10  so that's before his discharge about a week: "Travis

11  tells the group that he's scared about his upcoming

12  discharge because he feels safe at the Jefferson School

13  and he admits that he's been pretending in front of his

14  peers not to be afraid."

15  Q. Do you find it at least ironic that he's

16  released the day his insurance terminates on him?

17  A. Absolutely.

18  MR. BOURQUE: Pass the witness.

19  THE COURT: Mr. McClellan.

20  MR. MCCLELLAN: Thank you, Your Honor.

21  May I proceed?

22  THE COURT: You may.

23  CROSS-EXAMINATION

24  BY MR. MCCLELLAN:

25  Q. Ms. Vitale, I hate to go back to where we

171

1 started at 9:00 o'clock but I want to ask you about
2 some of the connections you made or maybe failed to
3 make behind your testimony.
4          MR. MCCLELLAN:  May I approach the
5 witness, Your Honor?
6          THE COURT:  You may.
7     Q.  (BY MR. MCCLELLAN)  Remember during the
8 testimony what you identified and was admitted into
9 evidence as Defense Exhibit No. 28?
10    A.  Yes.
11    Q.  Which is basically an emergency services record
12 for Travis Mullis?
13    A.  Yes.
14    Q.  Whenever -- he was born on September 20th of
15 '86 --
16    A.  That's correct.
17    Q.  And the date of this treatment was June of '87;
18 so, he was about 8 months old?
19    A.  That sounds right.
20    Q.  And there's a note here that phone consent,
21 which I assume is about consent from a parent --
22 received phone consent.  And I guess the situation is
23 that the mother gave phone consent that they could
24 treat her child who was 8 months of age.
25    A.  That's my understanding.

172

1     Q.  Did you see some issue with the fact that,
2 well, the mother didn't even take time to go to the
3 hospital with the kid?
4     A.  To me that's concerning.
5     Q.  Okay.  Now, that was on June the 11th of 1987?
6     A.  Correct.
7     Q.  Now, in State's Exhibit 26 the death
8 certificate for Ms. Wallace was on July the 11th, 1987?
9     A.  Yes.
10    Q.  About 30 days later?
11    A.  That's correct.
12    Q.  So, 30 days after your concern that she didn't
13 take her child to the emergency room she died?
14    A.  Yes.
15    Q.  Do you know what her condition was on the day
16 that she did not go?
17    A.  I only have what was reported to me by family
18 members.
19    Q.  So, all you have is what somebody else told
20 you, hearsay.
21    A.  That's right.
22    Q.  And it still concerns you the fact she didn't
23 take the child there when she died 30 days later?
24    A.  Yes.
25    Q.  Okay.  And while we're on Ms. Wallace since --

173

1 seem to spend a lot of time on her.  Defendant's
2 Exhibit No. 27, which I believe are the birth and ICU
3 records concerning the birth of Travis Mullis and a
4 discharge summary, I assume, for Travis Mullis or Baby
5 Boy Wallace as referred here?
6     A.  Correct.
7     Q.  And there is that you've testified about on 27J
8 there is a --
9          MR. MCCLELLAN:  May I approach?
10         THE COURT:  You may.
11    Q.  (BY MR. MCCLELLAN)  -- a document titled
12 Teaching Criteria.
13    A.  You said that's 27J?
14    Q.  27J.  See that down at the bottom?
15    A.  Yes.
16    Q.  Up here at the top, "Teaching Criteria"?
17    A.  Yes.
18    Q.  There are columns for Yes, No and DNA which, as
19 we said, probably does not apply?
20    A.  Yes.
21    Q.  And was the impression you wanted to leave
22 that where -- I guess "Demonstrates Diapering" says,
23 "Does not apply"?
24    A.  That's how I read that.
25    Q.  Right.  And "Demonstrates taking infant's

174

1 temperature" says "Does not apply"?
2     A.  Yes.
3     Q.  And "Demonstrates reading thermometer
4 correctly" says "Does not apply"?
5     A.  Yes.
6     Q.  And "Demonstrates how to feed infant bottle or
7 breast" says "Does not apply"?
8     A.  That's how that's marked.
9     Q.  You thought that was because she couldn't do
10 that?
11    A.  I don't know why it was marked "Does not
12 apply."  I don't know whether that means that nurse
13 didn't see her do it or whether that skill doesn't
14 apply to this infant.  I don't know.  We just don't
15 have that answer.
16    Q.  So, why was it important to highlight it if you
17 don't know what it meant?
18    A.  Well, I believe any person taking an infant
19 home it's certainly applicable whether they know how to
20 diaper an infant, take their temperature, read a
21 thermometer correctly and certainly in the case of
22 Travis Mullis understand how to feed him because he had
23 complicated feeding issues.
24    Q.  I understand.  And part of the complicated
25 feeding issue would be that -- you tell me -- bottle

175

1   and breasts, since he was being fed by a tube, maybe
2   that does not apply?
3       A.   Perhaps that one doesn't.
4       Q.   Okay.  But you want to ascribe negative things
5   towards Ms. Wallace because somebody checked "Does not
6   apply" and they could have checked "No," right?  They
7   had the option of checking "No"?
8       A.   Yes.
9       Q.   But she can't do it.  Wouldn't that be the
10  column you would check if she doesn't demonstrate
11  diapering?  That answer would be "No".
12      A.   I can't answer that.  I don't know exactly who
13  filled this out or exactly what they mean so I can't
14  answer whether they should have or could have.
15  Obviously they could have checked "No."
16      Q.   None of us are going to know that, are we?
17      A.   Not unless we can read that handwriting and get
18  in touch with that nurse.
19      Q.   But you want to imply to the jury a negative
20  effect on Mrs. Wallace to say she didn't even know how
21  to diaper the kid, she didn't know how to take a
22  temperature or read a thermometer and she doesn't know
23  how to breast feed him -- even though he's not going to
24  be breast feeding?
25      A.   What I'm suggesting is we don't know whether

176

1   she can or not.
2       Q.   There's lots of things we don't know that you
3   didn't highlight; is that correct?
4       A.   I'm sorry?
5       Q.   There's lots of things in the records we don't
6   know but you don't highlight them throughout the entire
7   records.
8       A.   There's certainly a number of things that
9   aren't highlighted, absolutely.
10      Q.   I mean, the record on her death doesn't show
11  obviously on the record that she didn't take the child
12  to the hospital but that is somewhat relevant, is it
13  not, that she died 30 days later?
14      A.   I don't know if it's relevant or not.  My
15  understanding is that her health was so poor during all
16  that time that it hadn't changed dramatically up until
17  the time of her death.  Her health was as poor the day
18  she went home from the hospital as it was the day
19  before she died.
20      Q.   Let me go where we can actually start talking
21  about Travis Mullis.
22      A.   Okay.
23      Q.   On State's Exhibit No. 32 -- these, I believe,
24  are the jail -- is that what they are?
25      A.   Yes.

177

1       Q.   Jail records?
2       A.   Yes.
3       Q.   And the jail records, I believe you testified
4   that there is a -- State's Exhibit 32B out of 32?
5               MR. BOURQUE:  Is that Defendant's Exhibit
6   32B?
7       Q.   (BY MR. MCCLELLAN) I apologize.  Defense
8   Exhibit 32B.
9       A.   Right.
10      Q.   And it says "Travis Mullis, patient boy:
11  Suicidal ideation on January 26th, 2010."
12      A.   Yes.
13      Q.   And that came out of 32?
14      A.   Yes.
15      Q.   Did you overlook this entry in the Correctional
16  Medical Services and Disciplinary Progress Notes on the
17  27th of 2010 in the same records where it quotes Travis
18  Mullis as saying, "I was not --
19      A.   I believe it says, "I was just playing."
20      Q.   "I was just playing."  You read better than I
21  do.  Go ahead.
22      A.   "I was just playing.  I wasn't going to hurt
23  myself."
24      Q.   Okay.  Now, you thought the note saying "Voiced
25  suicidal ideation" was important?

178

1       A.   Yes.
2       Q.   But not the highlight that I was just playing,
3   "I wasn't planning on hurting myself."
4       A.   That could be just as relevant.  I think that's
5   consistent with the ups and downs of Travis' --
6       Q.   We have -- so, would you like to make a 32C?
7       A.   You certainly could.  I wouldn't object to
8   that.
9       Q.   Okay.  I don't think you get to object.
10      A.   (Laughter)
11      Q.   Now, Defendant's Exhibit No. 31 and out of this
12  which are Dr. Stephen Feldman's records, there is a
13  letter, 31B --
14      A.   Correct.
15      Q.   -- of which from Ms. Jennings to Dr. Feldman in
16  May of 1994?
17      A.   Yes.
18              MR. MCCLELLAN:  May I show this to the
19  jury here?
20              THE COURT:  You may.
21      Q.   (BY MR. MCCLELLAN) Again, you highlighted in
22  this letter Dr. Feldman from Susan Jennings?
23      A.   Sally Ann Jennings.
24      Q.   Okay.  Whatever.  I'm sorry.  Mrs. Jennings.
25  Not whatever.

179

1    (Laughter)
2    Q. (BY MR. MCCLELLAN) I didn't know how to
3  pronounce her name and I wasn't about to try. Okay.
4  So, you highlighted things like "Travis in the last
5  year had been very confused, angry, depressed." I
6  won't read the rest of that. But this little section
7  here didn't get highlighted. "When he's angry, he
8  expresses his anger in statements involving knives or
9  cutting people up or killing them."
10   A. Yes.
11   Q. That wasn't important? You highlighted the
12 things you thought were important.
13   A. The information in this record that I felt was
14 important was in relation to his feelings with his
15 father; so, I was highlighting specifically the
16 portions that dealt with his relationship with his
17 father.
18   Q. Isn't it more important about what his
19 relationship might be with other people who might be
20 alive than it is with his father who now is deceased?
21   A. Well, no. When I was -- my point in reviewing
22 this record was to discuss his relationship with his
23 father. That's the same reason I didn't highlight
24 Travis is a very bright and verbally advanced child.
25 It just wasn't relevant to the information I was

180

1  pulling from this.
2    Q. Why?
3    A. Because I was specifically focused on his
4  relationship with his father within this record.
5    Q. The truth, in fact, Travis is a very bright and
6  intelligent person, is he not?
7    A. The records seem to reflect that, yes.
8    Q. Right. So, he's not a special ed student. He
9  may have been --
10   A. He was a special education student throughout
11 school.
12   Q. I'm a 2.5 undergraduate GPA, kind of proud of
13 it, you know. But he's now -- the age where he is
14 today he is an intelligent person, no intellectual
15 problems as far as academics, et cetera, in that
16 regard?
17   A. I haven't assessed his current academic status;
18 so, I couldn't speak to that. I'm sure the
19 psychologists and psychiatrists that are going to
20 testify can.
21   Q. Have I put this all back together?
22   A. I believe so.
23   Q. Whoops! Is there a B?
24   A. There's a B, yeah.
25   Q. In fact, in the Harford County Public School

181

1  records there are records, are there not, concerning
2  his educational level and even at that time which would
3  be at age 17 1/2, he shows -- put it this way -- yeah,
4  17 1/2, grade 11. There's this chart. I know you're
5  familiar with it, the Woodcock Johnson test of
6  achievement.
7    A. Yes.
8    Q. And there's different scores for different
9  things. Math he's not very good at but everything
10 else --
11   A. Neither am I.
12   Q. Me either. I don't want to tell you the other
13 things I've flunked.
14     They fall in the average range, all of
15 these -- most of the things other than math fall in the
16 average range?
17   A. From low average all the way up to superior.
18   Q. Right. Okay. 11 out of the 22 fall into the
19 average range. Would that be correct?
20   A. I haven't counted. I'll take your word for it.
21   Q. Then they list here the grades that he has and
22 so he was functioning -- well, here's -- is part of the
23 problem Travis Mullis had academically is he didn't
24 care, he wasn't interested in a lot of the stuff they
25 were doing?

182

1    A. I think that was definitely a problem.
2    Q. There's a strong history of him being truant
3  until he went to some place where he had to go to
4  school?
5    A. I believe especially after he was released from
6  Jefferson School, truancy was an issue for him.
7    Q. Right. In fact, one of the schools, they
8  kicked him out because he was truant?
9    A. He was suspended and placed in alternative
10 education, yeah.
11   Q. If you don't apply yourself, if you don't study
12 and do your homework which he has a history of not
13 doing even at Sheppard Pratt, right? He didn't do a
14 lot of the homework stuff. There's a lot of stuff in
15 there about hasn't caught up with the deal. He
16 completed one deal that was supposed to take -- it took
17 him four months and it was a four hour --
18   A. I don't remember it specifically but I
19 certainly take your word for it.
20   Q. All right. But his school performance is,
21 quite frankly, when we check it all out, it is more
22 than adequate?
23   A. His intellectual capacity is, absolutely.
24   Q. He does not have any organic brain defect, does
25 he?

183

1    A.  There's a recommendation that an assessment for
2  that be done.  I don't recall ever seeing any results
3  of any assessment for that.
4    Q.  Are you not familiar with the fact that there
5  may have been a test to determine whether or not
6  there's an organic brain injury to Mr. Mullis as he
7  sits here today?
8    A.  I don't recall seeing anything in the records
9  about him receiving --
10    Q.  I'm not talking about those records.
11    A.  I'm sorry.
12    Q.  I'm not talking about -- I would assume, can we
13  agree, if he had organic brain damage at any time, he
14  would have it now?
15    A.  Yes, absolutely.
16    Q.  It doesn't repair.
17    A.  It doesn't go away, yes.
18    Q.  And there's no record anywhere, anyplace, any
19  time about having anything about organic brain damage,
20  any tests, any report, any doctor diagnosis or
21  anything?
22    A.  I don't know that an evaluation was ever done;
23  so, no, it's not documented that he does but I don't
24  recall that it's documented that he doesn't.
25    Q.  You would consider him to be -- just to

184

1  summarize all the records.  There's lots of records.
2    A.  Lots of records.
3    Q.  You would consider him to be intelligent.
4    A.  Yes.
5    Q.  Maybe a very poor effort, though, in academics
6  as far as the effort he put in?
7    A.  Yes.
8    Q.  He's been consistently, when he's had the
9  opportunity to be, truant?
10    A.  Yes.
11    Q.  Didn't always do his homework or gave a poor
12  effort at doing homework?
13    A.  Yes.
14    Q.  Basically he could be described as lazy.
15    A.  Could be.
16    Q.  Never really had a job.
17    A.  Not to my knowledge.
18    Q.  Kind of irresponsible in relationship to work
19  behavior.  Would that be a fair assessment?
20    A.  I haven't seen any employment records; so, I
21  just don't know.
22    Q.  That kind of indicates there's not any
23  employment, right?
24    A.  And if there's no employment, I can't say
25  whether he's responsible or irresponsible.

185

1    Q.  You spent a lot of time doing a social history
2  on Travis Mullis.
3    A.  Yes.
4    Q.  You're going to find everything there is out
5  there to find.
6    A.  I'm going to certainly try.
7    Q.  And you don't have any records -- I think he
8  was employed for a period of time.
9    A.  My understanding is that he was but I haven't
10  seen any records of that.
11    Q.  I think the testimony -- well, did you look?
12  Did you check with Walgreens?
13    A.  I believe that was done by the mitigation
14  specialist that was on the case before me and I don't
15  recall ever seeing any records in her file.
16    Q.  That may be why you're here.
17    A.  That may be.
18    Q.  There was testimony that you may not know about
19  in the guilt/innocence stage of trial that may be -- I
20  guess it's the punishment stage of trial.
21    A.  I haven't seen any of the testimony.
22    Q.  That he had a job at Walgreens and that he just
23  left a note saying: I'm out of here.  Bye.
24    A.  Then, yes, that would be irresponsible.
25    Q.  Basically he could be described as selfish?

186

1    A.  Probably.
2    Q.  All about me?
3    A.  Probably.
4    Q.  Would it be fair to describe him, based upon
5  the records and information you gathered, sexually
6  obsessed?
7    A.  Yes.
8    Q.  Now, is it fair to report that his mother,
9  meaning Ms. Mullis, Ann Mullis, was very supportive of
10  Travis Mullis?
11    A.  If you mean by attending therapy and
12  participating in therapy, yes.
13    Q.  And now, do you -- I don't know if you have a
14  female or anything else but do you believe that if a
15  person has a child and that child is in need of help
16  that it's an easy decision to put them in a psychiatric
17  type facility?
18        MR. BOURQUE:  Objection.  Calls for
19  speculation.  She's not in a position to answer that.
20        MR. MCCLELLAN:  Well, I'm just asking her
21  if she believes it's an easy decision for a parent to
22  place their child into psychiatric therapy.
23        THE COURT:  I'm going to sustain the
24  objection.
25        MR. MCCLELLAN:  Okay.

187

1    Q.   (BY MR. MCCLELLAN)  Now, she was supportive --
2  well, we know from the records, do we not, on the
3  Sheppard Pratt that there were reasons each time he was
4  checked into Sheppard Pratt?
5    A.   Absolutely.
6    Q.   And the fact that he would verbally say, "I'm
7  going to kill myself" and the parent needs to respond
8  to that, do they not?
9    A.   Yes.
10   Q.   And, now, he had multiple admissions but, of
11  course, they only -- some of them only lasted a week.
12   A.   That's correct.
13   Q.   I mean, as I understand it, he was in from
14  February the 14th, 2000 to February the 18th which is
15  probably a week.
16   A.   Four days -- five days.
17   Q.   I see records from February 24th to February
18  28th of 2000.
19   A.   Okay.
20   Q.   Another, I suggest, five-day period of time.
21  March the 2nd to March the 6th.
22   A.   Yes.
23   Q.   And then March the 14th, which I don't know
24  when the date was he was discharged from that.
25   A.   I believe it was the 21st.

188

1    Q.   The 21st?
2    A.   I believe.
3    Q.   So, he would act out, he would do something, he
4  would go berserk, he would throw a temper tantrum or
5  whatever, he would say he's going to hurt himself or
6  hurt others and they would take him and take him to
7  Sheppard Pratt and he would stay there for a few days.
8    A.   That's correct.
9    Q.   And they did that each time he acted out until
10  -- the reason he's at Sheppard Pratt beginning in 2000
11  for the extended stay to 2003 is because of the sexual
12  assault that occurred on the 8-year-old girl and as a
13  juvenile the Court under juvenile delinquent
14  proceedings sent him there?
15   A.   That's correct.
16   Q.   And he got out because he's getting ready to be
17  18.
18   A.   I believe it was a combination of his impending
19  birthday and the decision by the insurance not to pay
20  anymore.
21   Q.   Do you know whether or not Ms. Mullis made
22  monetary payments to Sheppard Pratt over and above what
23  insurance paid?
24   A.   I don't know.  I believe there were some
25  financial records in the 3,000-plus pages.  I don't

189

1  recall specific amounts or dates.
2    Q.   And we don't see any insurance records in
3  there, though, do we?
4    A.   There was some, obviously, because that's where
5  that letter came from.  And I was under the impression
6  that was insurance.
7    Q.   But, I mean, there's no records about, okay,
8  whatever the insurance company was, paid them "X"
9  number of dollars and it's like an account receivable
10  or --
11   A.   No EOB's or anything like that, no.
12   Q.   Now, so, would you agree with me that Travis
13  Mullis -- Ann Mullis was supportive of Travis Mullis?
14   A.   To an extent, yes.
15   Q.   And, of course, she found herself at one point
16  in time being a single parent not by choice but by the
17  fact that the husband sexually assaulted Travis Mullis.
18   A.   I think it was probably choice and it was a
19  good choice.
20   Q.   Would you agree, then, also that the Defendant
21  can easily be documented as very manipulative?
22   A.   Yes, that word is used in the records, yes.
23   Q.   Well, even if it wasn't used in the records,
24  you can see by the things he's done and describe that
25  terminology just by what he's done, right?

190

1    A.   I believe it's used accurately in the record,
2  yes.
3    Q.   Well, he manipulated the staff?
4    A.   Yes.
5    Q.   He manipulated his mother?
6    A.   Yes.
7    Q.   He manipulated even fellow patients -- I don't
8  know what terminology you used.
9    A.   Peers, yes.
10   Q.   And, quite frankly, he used others for his
11  pleasure.
12   A.   Yes.
13   Q.   Both female victims, male victims, and his
14  mother by manipulating her to bring all kinds of food
15  and all kind of CDs and maybe it was her effort to make
16  up for maybe something, but she provided him with
17  almost anything he wanted.
18   A.   His mother did, yes.
19   Q.   Now, would you agree with me that the records
20  are replete with issues about he has an anger problem?
21   A.   Yes.
22   Q.   He exhibits aggressive behavior?
23   A.   Yes.
24   Q.   He not only has an anger problem that he acts
25  out but he has an anger problem with emotions that come

191

1  in and he has thoughts that are anger even sometimes
2  when he doesn't act on them.
3       A.  Yes.
4       Q.  Now, you mentioned, I guess, on Tab 30 in your
5  whatever report -- State's Exhibit -- I don't know what
6  State's exhibit number it is.
7            THE COURT:  Defense exhibit.
8            MR. MCCLELLAN:  Defendant's Exhibit.  I
9  apologize.
10      Q.  (BY MR. MCCLELLAN)  Tab 30 in the binder, you
11 made note that he feared being a victim.
12      A.  Correct.
13      Q.  But really the reverse was the problem, was it
14 not, him victimizing others?
15      A.  I believe you had the record previously.  I
16 would have to familiarize myself again with it, that
17 whole note, in order to speak to it.
18      Q.  Well, the 30 about him fearing being a victim
19 is already up there.
20      A.  It's in the binder.  Let's see.
21      Q.  I'll get it for you.
22      A.  Thank you.
23            MR. BOURQUE:  Just for the record
24 clarification, that's Exhibit 45A, Tab 30.
25            MR. MCCLELLAN:  Thank you.

192

1            THE COURT:  Correct.  Defendant's 45A.
2       Q.  (BY MR. MCCLELLAN)  The only question I had was
3  you made reference from that that he feared being a
4  victim.
5       A.  Yes, right.
6       Q.  Okay.  Are you familiar with reports in these
7  records where Travis disclosed that basically he had
8  additional victims to report to them that he had made
9  victims up?
10      A.  Yes.  This specific record talks about a
11 certain peer who he is fearful of victimizing.  There
12 are other records where he talks about himself having
13 victims.  Those were unfounded by CPS.
14      Q.  Well, let's talk about that.
15      A.  Okay.
16      Q.  Now, CPS, the fact they did not pursue charges
17 or reported to the police doesn't mean it's unfounded,
18 does it?
19      A.  I know CPS here you can have reports or --
20      Q.  I have a specific question.
21      A.  It is possible that they were not reported to
22 the police but were not found to be untrue.
23      Q.  Right.  They're looking at it to see whether
24 they're going to take some action.
25      A.  Correct.

193

1       Q.  And here's the setting that they're looking at:
2  They're looking at Sheppard Pratt.  They're looking at
3  treatment for people who are sex offenders.  They're
4  looking at persons who have been sent and declared
5  juvenile delinquent -- and maybe all of them have.  I
6  don't know.  Declared juvenile delinquent, sent them
7  for sex offender treatment and for whatever other
8  treatment the Court thought necessary as a juvenile.
9  He is -- this is being reported in 2001.  He's been
10 there about a year.  They don't know necessarily how
11 long he's going to be there but obviously he's not
12 going to be let go until the Court says he is, right?
13      A.  Right.
14      Q.  And the fact that they either look at it -- you
15 don't know if they had all the names of the people that
16 were involved.
17      A.  No, I don't know anything about their
18 investigation.
19      Q.  Right.  They'd have to go out and interview
20 maybe the person who's the, quote, "victim" says "I'm
21 not interested in doing anything"?
22      A.  That's certainly a possibility.
23      Q.  There's all kinds of situations that get
24 reported to police or CPS or whatever.  Not taking
25 action doesn't mean it didn't happen.

194

1       A.  Correct.
2       Q.  And you're not trying to leave that impression
3  with this jury, are you?
4       A.  No.
5       Q.  Because I noticed that Mr. Bourque asked that
6  -- wanted to go back to his Tab 183.
7       A.  Correct.
8       Q.  Where the CPS investigation said there were no
9  results, they didn't take any action.
10      A.  Correct.
11      Q.  And prior to that it had been reported because
12 Sheppard Pratt, having knowledge now from Travis Mullis
13 that he's reported having victimized people, are under
14 a legal obligation, are they not, to report that to
15 Child Protective Services, the police, whatever?
16      A.  And the licensing board, yes, they are.
17      Q.  So, they fulfilled their function?
18      A.  To my knowledge, yes.
19      Q.  Then when CPS decides to prosecute or not by
20 talking to the people, what they decide doesn't have
21 anything to do with whether it happened or not, does
22 it?
23            MR. BOURQUE:  I object.  It may not but I
24 object to calling for speculation of this witness.
25            THE COURT:  Sustained.

195

1    Q.  (BY MR. MCCLELLAN)  You cannot draw that
2    conclusion, can you?  Because CPS didn't go to the
3    police to file additional charges, that does not mean,
4    does it, that there were no -- that they were not
5    justified charges?
6        A.  Correct.
7        Q.  Because, otherwise, I guess -- you had
8    mentioned that the doctor thought, well, maybe some of
9    these reports, the victims, may not be true.
10       A.  That was what the psychiatrist wrote in his
11   report, yes.
12       Q.  And you don't know whether, you know, we know
13   what Travis Mullis maybe -- there's lots of things he
14   might have reported that are not true, right?
15       A.  I'm certain.
16       Q.  We can't pick and choose which ones are, can
17   we?  But in here in the report they document in 2001,
18   March 1st of 2001, that Travis disclosed that he indeed
19   had another victim that no one knew about.  I can show
20   you.
21       A.  That's correct.
22       Q.  And that he discussed in great detail his
23   latest victim including her relation to him, previous
24   suspicions about his offenses with her, his behaviors,
25   and why he had not disclosed his victim until now.

196

1        So, this is probably something he did
2    outside of Sheppard Pratt.
3        A.  That's how I would read that note, yes.
4        Q.  Males are kept with males and females are kept
5    in another area, I would some.
6        A.  I don't know.  There are certainly hospitals
7    where males and females interact.  In a sexual offender
8    treatment program, it would likely be different.  I
9    just couldn't say because I'm not familiar with their
10   program.
11       Q.  In fact, this may refer to where he's alleging
12   that -- he's admitting that he had sexual relations
13   with Stephanie who is the other older sister of Susan
14   Barry?
15       A.  That's what I believe that to be in reference
16   to.
17       Q.  But then further he basically made a disclosure
18   of four additional -- or three additional people who he
19   had -- men or boys who he had encountered at another
20   facility who are now in this facility where he's in,
21   right?
22       A.  Yes.
23       Q.  And he disclosed that, in fact, up to and
24   including disclosing that in July of 2003 within two
25   months of being released that he was involved in sexual

197

1    activity with another peer on the house.
2        A.  Yes.
3        Q.  So, there are -- in fact, there's not any
4    record of him being a victim, is there, while in this
5    treatment facility but of him victimizing others?
6        A.  That's correct.
7        Q.  There's a fear of being a victim but never it
8    was --
9        A.  Yes.
10       Q.  You agree that the records show that he makes
11   poor choices?
12       A.  Yes.
13       Q.  Do you agree that the records indicate that he
14   really doesn't love anyone?
15       A.  I think he's extremely conflicted about what
16   his emotions are.
17       Q.  Would you agree that he reacts
18   disproportionately to threats that, whether real or
19   perceived, his reactions to what he perceives to be
20   threats or what actually may be threats is
21   disproportionate, more severe than what the threat may
22   be?
23       A.  I think his reactions also vary fairly
24   dramatically from situation to situation and perhaps
25   unpredictable.

198

1        Q.  Would you agree that the records indicate he
2    lacks moral development?  He's not developed a moral
3    system?
4        A.  I don't know if they reflect that he hadn't
5    developed a moral system.
6        Q.  Okay.  Now, you wouldn't call immoral being a
7    moral system, though, would you?  I mean, if I acted
8    immorally, that wouldn't be my moral system.  That
9    would be different.
10       A.  I don't know that the records reflect that he
11   only acts immorally, either.
12       Q.  He has continual verbal threats and verbal
13   abuse.  In other words, he -- the records show, do they
14   not, that he engaged in taunting other peers?
15       A.  Yes.
16       Q.  Just like some of the peers engaged in taunting
17   him?
18       A.  Yes.
19       Q.  And that he would threaten verbally to hurt
20   himself, to hurt others, to "if I see my dad, I'll kill
21   him," to all kinds of verbal type threats?
22       A.  Yes.
23       Q.  Will you agree that he has recurring
24   difficulties with the law?
25       A.  Yes.

199

1  Q. Would you agree that he's a persistent liar?

2  A. Yes.

3  Q. Would you agree that he lacks remorse?

4  A. No, I don't know that I would.

5  Q. So, whenever he says, I won't -- "I've learned

6  from this" and "I won't do this" and "I'm sorry I did

7  this" and then he goes right back out and does it

8  again, you think that remorse that he verbalizes using

9  the word might be, in fact, real?

10  A. I think it's certainly possible.

11  Q. Would you agree that he's deceitful?

12  A. Yes.

13  Q. That he cons others?

14  A. Yes.

15  Q. In fact, there's some note in here in the

16  records where he tells them, "I've conned y'all on so

17  many things you wouldn't even know how many there are"?

18  A. Yes.

19  Q. Would you agree that he rationalizes his

20  conduct? Conduct that's inappropriate, he tries to

21  rationalize that conduct?

22  A. I don't know if he tries to rationalize it or

23  if he doesn't understand what appropriate conduct is.

24  Q. Okay. Now, when he talked about relating that

25  he was involved sexually with Stephanie, the older --

200

1  other than until we hear this, we had never heard

2  anything about that, okay?

3  A. Okay.

4  Q. He basically says it was her idea and she asked

5  for it and they had a code and they speak code words so

6  the parents wouldn't know what was going on and do

7  those kind of things?

8  A. That was the report, yes.

9  Q. And would you agree that he also blames others

10  for why he acted as he did?

11  A. Yes.

12  Q. And is there demonstrated in the record a

13  pattern of a lack of concern for the feelings of

14  others?

15  A. No, I don't think there is.

16  Q. Okay. Well, doesn't he basically say: I don't

17  care what anybody thinks; I don't care what anybody

18  thinks I should or shouldn't do; I'm going to do this

19  anyway.

20  A. Yes. And he also expresses remorse and

21  feelings of regret at some of his more negative

22  behaviors.

23  Q. And those are usually ones that he's caught

24  doing?

25  A. Yes. I don't think he's talking to the staff

201

1  about things he hasn't been caught doing except for the

2  abuse of Stephanie.

3  Q. Would you agree he basically has shown a total

4  disregard for rules and responsibilities while he's at

5  Sheppard Pratt and other places?

6  A. I would disagree. He works his way -- he

7  certainly doesn't follow every rule every day but he

8  works his way up the level system to silver level and I

9  believe he was nominated for some position by peers.

10  So, I think he is able to follow rules and work within

11  -- I believe it mentioned in the records a very

12  structured system. I think he can follow those rules

13  and be successful and has.

14  Q. When he wants to?

15  A. He has to put some effort forth, certainly.

16  Q. Well, he sure didn't follow the rules of

17  school. He's supposed to come to school?

18  A. He did not follow that rule, no.

19  Q. I'm supposed to do my homework. I won't do it.

20  A. He did not.

21  Q. I'm supposed to complete this one part of their

22  pathway to recovery, whatever it's called, a book, and

23  it's supposed to be in a one-hour session and it would

24  take him four months to do it. And it's not because he

25  took him -- you get the impression it wasn't because he

202

1  spent four months working on it. He just didn't do it

2  until he got ready to.

3  A. Yeah, that's exactly the impression I have.

4  Q. He uses others to get what he wants?

5  A. Yes.

6  Q. Do you recall that in the family therapy

7  session back on June the 5th, 2001, there's a notation

8  that he said he had no memories of early life?

9  A. June 5th of 2001.

10  Q. Right. I don't know if that's one of your --

11  A. It's not one that I believe I have here.

12  Q. Yeah, it's probably not one that you picked

13  out. I don't know that I have that or not. But do you

14  recall that he said he has no memories of his early

15  life?

16  A. I do know he said that, yes.

17  Q. But then at a later time he gives -- he says he

18  has a vivid memory of performing fellatio on his dad at

19  the age of 3?

20  A. He describes it, I think, as a flashback to

21  that.

22  Q. Let's talk about flashback. Well, so, he can

23  -- he recalls what he was doing or was happening to him

24  at age 3?

25  A. In the flashback.

203

1    Q.  Well, just in any memory.

2    A.  He certainly describes difficulty with early

3  memories.  I have no argument with that.

4    Q.  I don't know that anybody can remember what

5  happened at age 3.

6        Now, the flashbacks, there are two kinds

7  of flashbacks, are there not?  I mean there's

8  flashbacks where he's talking about flashbacks about my

9  interaction with my dad, fellatio, him performing on

10  me, me performing on him.  Everybody says 3 to 6, 3 to

11  6.  So, that's kind -- it was the adoptive time.  So,

12  there's flashbacks about that?

13    A.  Yes.

14    Q.  But he also talks about flashbacks about when

15  he was victimizing others?

16    A.  Yes.

17    Q.  Flashbacks with Susan Barry?

18    A.  Yes.

19    Q.  Flashbacks with other people in the Sheppard

20  Pratt community who he had victimized?

21    A.  I don't remember there being any flashbacks to

22  that but --

23    Q.  But flashbacks don't always mean in his

24  terminology that it's a flashback about what my father

25  did to me.  It may be a flashback about what I did to

204

1  someone else.

2    A.  Yes, absolutely.

3        MR. MCCLELLAN:  Could I have just a

4  moment, Your Honor?

5        THE COURT:  You may.

6    Q.  (BY MR. MCCLELLAN)  There's a notation on a

7  psychological group note back in April of 2001.  Do you

8  recall this where the peers provided feedback -- this

9  may be one of the ones y'all picked out -- that "Travis

10  Mullis consistently presents with high risk behavior,

11  lies to staff and peers and puts forth an attitude of

12  'I don't care'"?

13    A.  Yes, I do remember reading that.

14    Q.  That during a family therapy session back in

15  April of 2002 that the session focused on a recent

16  disclosure made by Travis regarding three additional

17  victims offended when he was placed in Stone Bridge

18  that as an exploration of Ann's reaction began, Travis

19  became extremely verbally abusive, stormed out of the

20  session stating that Ann could fuck it and just never

21  come back and refused to re-engage in the session.  Do

22  you recall that?

23    A.  Yes.

24    Q.  Remember a situation wherein, again, family

25  therapy, April 26th, 2001, where Travis was disclosing

205

1  to his mother that he's unsure of her affection and is

2  afraid she might leave him and she told him that she

3  had been through the worst and that she's still there

4  and still loves him and regardless of what he did, she

5  would be there for him.

6        Do you remember that?

7    A.  Yes.

8    Q.  Part of the therapy was Travis was supposed to

9  -- whenever he kept reporting flashbacks to the staff,

10  they said, okay, let's give you a journal and have you

11  write down what the flashbacks are, what's happening,

12  what are you doing when it happened to kind of journal

13  what's going on so they could better address the

14  flashbacks and what may be the trigger, et cetera, that

15  kind of stuff?

16    A.  That's correct.

17    Q.  Remember that?

18    A.  Yes.

19    Q.  And Travis never did that journal, did he?

20    A.  I don't recall.

21    Q.  Isn't there a note in there someplace -- and

22  don't ask me to find it -- that he did not prepare that

23  journal?

24    A.  If you say so.  I don't specifically remember

25  seeing any notes about any entries; so, that's

206

1  certainly possible.

2    Q.  There's a note in 2002 about Travis stated that

3  there was two of the three additional victims are in

4  attendance at the Jefferson School in some program

5  reportedly in the Howell House and the other one's

6  enrolled in the day school.  Travis stated he

7  victimized the three males while he was in the Stone

8  Bridge respite program and while all three of the boys

9  were his roommates.  And he related that he began

10  grooming each of these victims by being nice to them

11  and allowing them to play with his toys, repeatedly

12  asking them to play sexual games.  Then he reported

13  that he performed fellatio on all the boys on

14  approximately eight or nine occasions.  Do you recall

15  that entry?

16    A.  Yes, I actually believe that's in our binder.

17    Q.  Do you recall him being upset when he found out

18  information or believed that Dr. Kahn, K-a-h-n, who had

19  been one of the doctors treating him -- is that right?

20    A.  Yes.

21    Q.  He expressed that Travis' report of flashbacks

22  were manufactured and Travis agreed to speak with

23  Dr. Kahn about the comments in his struggle to maintain

24  a positive outlook considering his belief and

25  experiences of the flashbacks.

207

1    So, he was upset that Dr. Kahn believed
2  that the flashbacks were manufactured.
3    A.  Yes.
4    Q.  And back in October, 2002, he was upset during,
5  I guess, some crisis on the unit and asked to be
6  removed from the situation.  He was taken into the
7  hall.  He told staff that he felt like breaking his
8  peers' necks but he was able to process and go to bed
9  directly after this.  Remember that?
10    A.  Yes.
11    Q.  Do you remember him back in April of 2003 just
12  about six -- less than six, five months before being he
13  was released or discharged from Sheppard Pratt that he
14  was so upset about, I guess the fiance, the boyfriend
15  of Ann Mullis, that he began drawing destructive
16  pictures in art class and he was very afraid that his
17  mother would break up with her boyfriend.  If this
18  happened he would shoot her boyfriend.  Remember that
19  entry?
20    A.  Yes.
21    Q.  I think you've already may have referenced this
22  where he reported that he knows -- this is May of 2003,
23  about four months before release of being discharged --
24  Travis reported again he knows he will never offend
25  again.  The reasons he gave are that he does not want

208

1  to be sent back into placement or go to prison; is that
2  right?
3    A.  Yes.
4    MR. MCCLELLAN:  Could I have a moment,
5  Your Honor?
6    THE COURT:  You may.
7    Q.  (BY MR. MCCLELLAN)  Now, not only was Ms.
8  Mullis active at Sheppard Pratt in coming, I guess,
9  weekly to the family therapy sessions -- she was that,
10  right?
11    A.  Yes.
12    Q.  Also there were a large number of times he
13  would get weekend passes to go out over a weekend with
14  his mother?
15    A.  Yes.
16    Q.  He would leave on Friday, come back on a
17  Sunday, I guess.  I don't know.  But he would have
18  weekend passes.
19    A.  He did.
20    Q.  Additionally he would even have weekday passes
21  where they may pick him up, go out to eat, see a movie
22  and come back that night, right?
23    A.  I believe so.
24    Q.  So, he -- Ann Mullis was very involved
25  throughout this entire three-year process, supportive

209

1  of Travis Mullis?
2    A.  Yes.
3    Q.  In fact, the exhibits, those seven binders
4  basically document the efforts made by Sheppard Pratt.
5  And would you agree that Sheppard Pratt is a
6  respectable institution for doing the type of work that
7  they purport to do?
8    A.  My understanding is they're well respected,
9  yes.
10    Q.  Spent three years working with Travis Mullis
11  over all of this period of time and did their best
12  efforts to try to change his thought processes and the
13  way he reacts to certain things.
14    MR. LOPER:  Judge, I object to that as a
15  multifarious question and also is calling for a
16  conjecture from her.
17    THE COURT:  Can you restate?
18    MR. MCCLELLAN:  Yes.
19    Q.  (BY MR. MCCLELLAN)  Those seven volumes
20  document the efforts of Sheppard Pratt to treat Travis
21  Mullis for the problems that he had.
22    A.  To treat him in sex offender treatment, yes.
23    Q.  Right.  Okay.  Well, and he had group therapy
24  through Sheppard Pratt?
25    A.  Yes.

210

1    Q.  Individual therapy?
2    A.  Yes.
3    Q.  I don't even know what this is.  What's milieu
4  therapy?
5    A.  I don't know that it's milieu therapy.
6  Typically a milieu note is just a note as to how he's
7  doing on the unit daily.  The unit itself and the day
8  to day goings on is generally referred to as the milieu
9  in a residential treatment setting.
10    Q.  Okay.  Family therapy?
11    A.  Yes.
12    Q.  Sex offender therapy?
13    A.  Yes.
14    Q.  It's already been mentioned the horse riding or
15  dealing with horses therapy?
16    A.  Yes.
17    Q.  All for a three-year period of time they went
18  through all of this.
19    Now, did you talk to -- as part of your
20  preparation I think you testified -- correct me if I'm
21  wrong -- that you interviewed Travis Mullis for a
22  period of time prior to beginning all your --
23    A.  Yes, I did.
24    Q.  During the time that you interviewed Travis
25  Mullis, did you ask him about his actions and the

- March 16, 2011

211

1  offense which makes the basis for the indictment in

2  this case?

3      A.  No.  We didn't discuss the facts of this case.

4      Q.  You just talked to him about family and

5  schooling and him but not about the crime that he's

6  been found guilty of?

7      A.  Correct.

8              MR. MCCLELLAN:  I pass the witness, Your

9  Honor.

10             MR. BOURQUE:  Judge, I'll have some

11  substantial redirect.

12             THE COURT:  All right.  Ladies and

13  gentlemen, I have another commitment; so, we're going

14  to go ahead and break for the day.  Please remember to

15  be under the instructions we've discussed.  See you

16  tomorrow morning a little before 9:00.  Thank you.

17             (Adjourned for the day)

18

19

20

21

22

23

24

25

212

1              REPORTER'S CERTIFICATE

2  THE STATE OF TEXAS  *

3  COUNTY OF GALVESTON *

4

5      I, Judy Hansen, Official Court Reporter in and for

6  the 122nd District Court of Galveston County, State of

7  Texas, do hereby certify that the above and foregoing

8  contains a true and correct transcription of all

9  portions of evidence and other proceedings requested in

10  writing by counsel for the parties to be included in

11  this volume of the Reporter's Record, in the

12  above-styled and numbered cause, all of which occurred

13  in open court or in chambers and were reported by me.

14      I further certify that this Reporter's Record of

15  the proceedings truly and correctly reflects the

16  exhibits, if any, admitted by the respective parties.

17      WITNESS MY OFFICIAL HAND this the 14th day of

18  October, 2011.

19

20      /s/Judy Hansen

21      _Judy Hansen_

22      Judy Hansen, Texas CSR 4979

        Expiration Date: 12/31/2012

23      Official Court Reporter

        122nd District Court

24      Galveston County, Texas

        Galveston, Texas

25

FIRM NAME