- March 21, 2011

1

| | |
|---|---|
| TRAVIS JAMES MULLIS, | * IN THE DISTRICT COURT |
| APPELLANT | * |
| VS. | * GALVESTON COUNTY, TEXAS |
| THE STATE OF TEXAS, | * |
| APPELLEE. | * 122ND JUDICIAL DISTRICT |

FILED IN
COURT OF CRIMINAL APPEALS

OCT 27 2011

PUNISHMENT PHASE

Louise Pearson, Clerk

    On the 21st day of March, 2011, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable John Ellisor,

Judge presiding, held in Galveston County, Texas;

    Proceedings reported by machine shorthand.

ORIGINAL

- March 21, 2011

2

1                 A P P E A R A N C E S

2   FOR THE STATE OF TEXAS:

3       Mr. B. Lyn McClellan
        Special Prosecutor
4       SBOT:  13396100
        Ms. Donna W. Cameron
5       First Assistant District Attorney
        SBOT:  03675050
6       Ms. Kayla M. Allen
        Assistant District Attorney
7       SBOT:  24043530
        Galveston County District Attorney's Office
8       Galveston County Justice Center
        600 59th Street, Suite 3305
9       Galveston, Texas  77551
        Phone:  409.766.2355
10      Fax:    409.766.2290

11

12  FOR THE DEFENDANT:

13      Mr. Robert K. Loper
        SBOT:  12562300
14      LOPER LAW
        111 W. 15th Street
15      Houston, Texas 77008
        Phone:  713.880.9000
16      Fax:    713.869.9912

17      - AND -

18      Mr. Gerald E. Bourque
        SBOT:  02716500
19      ATTORNEY AT LAW
        24 Waterway Ave. Suite 660
20      The Woodlands, Texas  77380
        Phone:  713.862.7766
21      Fax:    713.813.0321

22

23

24

25

FIRM NAME

- March 21, 2011

3

1                    VOLUME 33

2              CHRONOLOGICAL INDEX

3

4    JURY CHARGE CONFERENCE...........................  4

5    MOTION FOR MISTRIAL..............................  9

6    HEARING ON JUROR MISCONDUCT..................... 10

7    CLOSING ARGUMENT BY THE STATE................... 19

8    CLOSING ARGUMENT BY THE DEFENSE................. 26

9    FINAL CLOSING ARGUMENT BY THE STATE............. 51

10   JURY RETIRES TO DELIBERATE...................... 72

11   VERDICT......................................... 75

12   JUDGMENT........................................ 80

13   REPORTER'S CERTIFICATE.......................... 81

14

15

16

17

18

19

20

21

22

23

24

25

4

1  MARCH 21, 2011

2         (Open court, Defendant present, Jury not

3  present)

4         THE COURT: I've been handed several

5  proposed jury instructions by the Defense. Has the

6  State had the opportunity to review these?

7         MR. MCCLELLAN: Yes, Your Honor.

8         THE COURT: Okay. Assuming the Defense

9  position is stated in their motions, what is the

10  State's response? First is Mr. Mullis's proposed jury

11  instructions.

12         MR. MCCLELLAN: The State would ask that

13  that be declined, that the things they're asking for --

14  that they're entitled to are already included in the

15  jurors' charge.

16         THE COURT: Okay. And the motion that the

17  jury be instructed on the definition of criminal acts

18  and violence.

19         MR. MCCLELLAN: We'd ask that the motion

20  for the definition of criminal acts and violence, we'd

21  ask that that be denied -- it's not been defined by the

22  Courts -- and be given the everyday interpretation of

23  that definition. We ask that that be denied.

24         THE COURT: The motion for order

25  prohibiting the use of, quote, "no sympathy," close

5

1  quote, instruction.

2         MR. MCCLELLAN: We ask that that be

3  denied. I'm pretty confident that the no sympathy

4  instruction was put in there initially to keep the

5  State from trying to seek sympathy for the deceased --

6  the instructions were put in there by the Courts or the

7  Legislature to keep the State from trying to seek

8  sympathy for the deceased as an answer to the verdict.

9  Now the Defense continually asks for it not to be in

10  there because they want to be able to ask for sympathy

11  for the Defendant. We'd ask that the instruction be

12  denied.

13         THE COURT: All right. Motion for the

14  jury to be instructed on the consequences of the

15  failure to agree on the special issues.

16         MR. MCCLELLAN: We would ask that that

17  also be denied. The Court's instructed them as to what

18  they're to do, how they're to answer the questions

19  based upon the law and the evidence and not -- they

20  don't need to be told what the result will be --

21  they're told all they need to be told concerning the

22  results that tend to answer against the State and

23  unanimous would be the position for death to occur.

24         THE COURT: And the motion to properly

25  instruct jury at the penalty phase as to the use of

6

1  mental health evidence.

2         MR. MCCLELLAN: Sure this is not a jury

3  instruction but I assume it's just setting out the

4  reasons why they're asking for the things they're

5  asking for. If it is a jury instruction, then we ask

6  that it be denied.

7         THE COURT: I have signed orders denying

8  each of the proposed jury additions from the Defense.

9  Have each of you had an opportunity to review the

10  proposed Charge of the Court on punishment that was

11  circulated late Friday?

12         MR. MCCLELLAN: The State has, Your Honor.

13         MR. LOPER: We have, Your Honor.

14         THE COURT: Okay. Other than the things I

15  just denied, do you have any further objections to the

16  charge, Mr. Loper?

17         MR. LOPER: We don't, Your Honor.

18         THE COURT: From the State?

19         MR. MCCLELLAN: We have none, Your Honor.

20         THE COURT: All right.

21         The next issue to talk about: As you

22  will, recall Friday we had a juror that I interviewed

23  privately in chambers that admitted to me she had been

24  talking about the case with her fellow jurors before

25  the time and in direct violation of previously given

7

1  instructions. That being Ms. Monica Garner.

2         I did at the Defense's request dismiss her

3  as a juror and will be moving up the first alternate

4  which is Juror No. 13 which is Ms. Monroe.

5         And I guess I would like some input from

6  the lawyers on exactly how to inform the jury of this

7  sequence, whether I should bring them out and tell them

8  that in open court or inform them through the bailiff.

9  Any thoughts from the State or Defense on that issue?

10         MR. MCCLELLAN: Just thinking off the top

11  of my head, Your Honor, I would think that it would be

12  proper to instruct them in open court and tell

13  Ms. Monroe she's now part of the jury and no longer an

14  alternate, assuming she knows she's been an alternate.

15  I don't know.

16         THE COURT: I assume they've figured that

17  out. They know that from the guilt/innocence phase.

18         MR. MCCLELLAN: You're right.

19         THE COURT: So, I'm certain she does know.

20         MR. MCCLELLAN: And I -- you know, it's

21  kind of a moot point, I guess, at this juncture to tell

22  them not to discuss it outside and only when they're

23  deliberating because the next time they go back,

24  they're going to be deliberating. But they also need

25  -- and I'm sure the Court will instruct on that -- if

**8**

1   they go to lunch or wherever they go, on bathroom
2   breaks or something like that, but they can't
3   deliberate two or three. They have to wait until
4   everybody's together to do any kind of deliberation.
5        THE COURT: I think that's appropriate. I
6   think it's further appropriate that I instruct the
7   panel that anything that Ms. Garner may have said to
8   them regarding her opinions, testimony during
9   punishment should be disregarded.
10       MR. MCCLELLAN: I'm thinking that maybe
11  the Court should inquire if anybody on the jury thinks
12  they have been so influenced by her they cannot
13  disregard what statement she may or may not have said,
14  that they inform the Court.
15       THE COURT: I'm willing to ask that.
16  What's the Defense's position on these issues?
17       MR. BOURQUE: I want to try to put it in
18  stages here. My first objection is going to be that
19  the first alternate being added was not allowed to be a
20  part of deliberations at Phase 1 and so she's coming in
21  as an alternate in Phase 2 after having not
22  participated in any way, shape, form or fashion in the
23  deliberations in Phase 1. We believe that's a denial
24  of the Defendant's Constitutional rights to due process
25  under the Fifth -- due process violation under the

**9**

1   Fifth and Fourteenth Amendments to the United States
2   Constitution and a denial of the Defendant's right to
3   effective assistance of counsel under the Sixth
4   Amendment of the U.S. Constitution. And finally an 8th
5   Amendment violation for cruel and unusual punishment.
6   That's that part. Now moving to the second problem.
7        We would request, Judge, I don't mean to
8   be leaning down as a sign of disrespect --
9        THE COURT: None taken. And if you want
10  me to take this in three components, I'm going --
11       MR. BOURQUE: Could we do one first?
12       THE COURT: Yes.
13       MR. BOURQUE: Therefore, we'd ask for a
14  mistrial for adding the 13th juror to become the new
15  12.
16       THE COURT: That motion for mistrial is
17  denied. The objection is overruled. We're dealing
18  with a statutory scheme that allows alternates to be
19  available throughout the whole trial and can come in at
20  any phase; during guilt/innocence, during punishment.
21  That juror has participated in the whole process
22  listening to the evidence at every stage and the
23  Legislature has provided that if for some reason a
24  juror becomes incapacitated and has to be removed, the
25  alternates are there to help even during deliberation.

**10**

1   So, that objection is overruled.
2        MR. BOURQUE: Then the next thing that we
3   would request, Judge, if we could kind of put it in
4   chronological order.
5        We recall that on either the first day of
6   evidence or the second day of evidence there was a lady
7   that approached the Bench, Lynette Briggs, indicated
8   that she had walked past a group of smokers and
9   couldn't really identify any individual person. She
10  said something vague like: They looked like they were
11  talking about a case. I didn't hear. I didn't listen
12  but I wanted to bring it to the Court's attention.
13       Then we find out Thursday and Friday that
14  we have several smokers on our jury and we have one of
15  the smokers who's made some comments about how she
16  evaluated the case and she indicates to the Court that
17  she's having these conversations during smoke breaks.
18  And, so, we're in a situation where I think
19  realistically we can really assume going all the way
20  back to that Lynette Briggs' statement that we've got a
21  group of jurors who smoke and they would gather out to
22  smoke during breaks of the court and it was during that
23  period that at least one juror, Ms. Garner, was sharing
24  her thoughts, concepts and evaluations of the facts
25  throughout the case.

**11**

1        What I would ask the Court to do is to
2   bring each one of the individual smokers in our group,
3   identify who the smokers are, take them in chambers and
4   ask them specifically did you listen, did you tell her
5   to stop, and what did you say in addition? And if you
6   didn't say anything, did anybody else in the smoker's
7   group say anything to her. Because it can't -- this
8   thing couldn't have gone on for seven days without
9   somebody in that group either participating or lending
10  an ear and it's not simply talking about it that's not
11  the end of juror misconduct. That's the beginning.
12       If we're in a situation where we had
13  jurors smoking every day listening to Ms. Garner and
14  not telling her, one, be quiet; two, listening to her
15  and, three, not bringing it to the Court's attention,
16  those are all juror misconduct activities. And we
17  believe they're such egregious in manner that it led to
18  all of the violations, the due process violations, the
19  effective assistance of counsel violations, the cruel
20  and unusual punishment violations.
21       What they've done if they've all gone down
22  and talked about this case is they virtually did
23  survivors island. They all went downstairs, colluded
24  and conspired so they had their teamwork together so
25  that when they went back in the jury room -- and if you

12

1  remember, it's specifically important, they were given
2  a smoke break before they began deliberations. They
3  went out, they had their smoke break, and in about 15
4  minutes after they come back from the smoke break, they
5  got a verdict. Although it looks like an hour, it's
6  really about 15 minutes. And so it's just a horrible,
7  horrible impact on this client, Travis James Mullis.
8          So, what I would ask the Court to do is to
9  evaluate those smokers to find out what we have and
10 then if they have violated the rules, if they have
11 engaged in jury misconduct, the first thing I'd ask for
12 is a mistrial back to the beginning. Second request is
13 that you declare a mistrial in the punishment phase and
14 impose a life sentence without parole.
15         MR. MCCLELLAN: I oppose those sanctions.
16 If the Court sees the need to talk to each of the
17 jurors, I think the inquiry is this: Has what
18 happened, whatever it is that happened, affected their
19 ability to be fair and impartial and judge the evidence
20 on their own and reach their own verdict, individual
21 verdict? To try to bootstrap somebody talking to me
22 and me not saying shut up, call the Judge, do all these
23 things, which would be an unnatural reaction to do,
24 that means I have now done something wrong because
25 somebody came to me and said something or I felt, you

13

1  know, okay, I hear what you're saying, that would not
2  be jury misconduct.
3          The inquiry that needs to be made, I would
4  suggest, is has every juror left, do they feel that
5  their ability to reach a fair and impartial verdict on
6  their own without the influence from anybody else would
7  be compromised by anything that's occurred. You have
8  to realize that 11 of the now 12 left have deliberated
9  on guilt and innocence, have talked about the case,
10 have done all these other things. And now to say at
11 this other stage to say that if they did something
12 wrong, they're now disqualified from all stages is just
13 way overreaching in the State's opinion.
14         THE COURT: Okay.
15         MR. BOURQUE: May I add one other thing?
16         THE COURT: You may.
17         MR. BOURQUE: Just in closing, yes, it is
18 unnatural to do a tattletale activity. However, the
19 Judge has instructed them if you see -- if you see
20 people violating these rules, you're to bring it to the
21 Court's attention.
22         So, if this has been going on for five
23 days or two days or even 45 minutes and it's not
24 brought to the Court's attention -- and it wasn't
25 brought to the Court's attention by any juror -- that's

14

1  jury misconduct. They were participating in it if they
2  listened to it, if they participated in any way by not
3  saying you can't do this, this is a violation of the
4  Court's instructions, then they have engaged in juror
5  misconduct.
6          Yes, I agree, tattle telling is not easy
7  to do. But when you've been told here are the rules,
8  don't violate them, if anyone does violate them you
9  have to bring it to the Court's attention, that's juror
10 misconduct.
11         THE COURT: What we're going to do, I'm
12 going to go ahead and interview the identified
13 potential jurors that may have spoken to Ms. Garner,
14 see if there's anything there and, if so, we'll bring
15 that to the attention of the attorneys and get that on
16 the record.
17         I'll inform Ms. Monroe that she is now
18 Juror No. 8. And once those issues have been crossed,
19 then we'll reconvene and go forward with where we are
20 at that point. So, if y'all will bear with us, we'll
21 be in recess for probably 15, 20 minutes. Thank you.
22         (Recess taken)
23         (In chambers, Defendant not present)
24         THE COURT: As we discussed out in open
25 court, I called in four jurors and discussed the

15

1  matters with them. I spoke with Ms. Proehl, Mr. Holly,
2  Ms. Monroe and Ms. Lewis. The first three were
3  identified in the smokers group who had been going down
4  smoking with Monica Garner. Ms. Proehl said that she
5  had heard the witness (sic) make statements in the jury
6  room and in the smoker's area, that she had been asked
7  to stop, that she personally asked her to stop talking
8  about it in the smokers area. And then I learned from
9  another juror that others had been saying -- if anyone
10 started to bring up something, wait a minute. We can't
11 talk about that. So, those instructions have been
12 followed.
13         I then went through the questions and
14 asked her, "Did anything you hear, has it influenced
15 you to the point that would affect your verdict that
16 we're about to be considering" and she said, "Oh, no.
17 I've invested too much time and energy and effort into
18 this case and I've kept an open mind. I would not let
19 anything she said influence me."
20         I then spoke to Mr. Holly. He said that
21 he was the sole male down there and the women tended to
22 congregate and talk and he got kind of left out of the
23 conversations. But he's the one that said if anything
24 started to come up at any point in the jury room,
25 someone would always ask them to stop, the Judge has

**16**

1 told us not to do that. So, he was asked those same
2 questions: Did anything that started to be said or you
3 did hear, would that influence you in your verdict in
4 any way" and he said, "No."
5 The next person I spoke to was Ms. Munroe,
6 who was Juror No. 13, our first alternate. She said
7 that Ms. Garner had made those statements, that she had
8 told them she already made up her mind, that she
9 appeared very opinionated and jaded and that they,
10 again, would tell her to stop and she had not been
11 influenced. So, nothing had been said that would
12 influence her, that she has not made up her mind and
13 she is willing to continue to evaluate the evidence and
14 make a fair judgment.
15 I called in Ms. Lewis and the reason I did
16 is because Ms. Proehl identified the person she thought
17 was in the smokers area was Dolores. Dolores Lewis is
18 not one of the smokers. So, I think she is mistaken.
19 I think that was really Monica Garner she was talking
20 about.
21 But I did call Ms. Lewis and she was
22 clueless. She did not hear anybody talk about it and
23 has not made up her mind. She said, "I haven't heard
24 anything but even if I had, I'm committed to this
25 process and keeping an open mind."

**17**

1 MR. MCCLELLAN: When you first started,
2 you said "the witness." I'm assuming you're referring
3 to the juror.
4 THE COURT: I meant "the jurors," if I
5 said witness. I talked to four jurors who were not
6 under oath. They were not witnesses, but I did
7 interview them here.
8 I did ask them to keep their conversations
9 with me confidential and not to share that with the
10 other jurors. I did inform Ms. Munroe that she was now
11 going to be Panel Member No. 8, moving up to take Ms.
12 Garner's place. All right.
13 MR. BOURQUE: So -- I'm sorry.
14 THE COURT: Go ahead.
15 MR. BOURQUE: I was just going to ask you
16 if the motions for mistrial we asked for are overruled.
17 THE COURT: They are at this point. I am
18 confident that the jury instructions, say, for
19 Ms. Garner were followed, that the other jurors when
20 they heard her speaking of it or others that might have
21 started to say something were asked to stop in
22 compliance with the instructions, that these jurors
23 appear to be compliant with the instructions, that they
24 appear to be open-minded to both sides and that they're
25 going to try to render a true and just verdict just

**18**

1 based on the evidence they've heard in court and not
2 from any other source. Okay?
3 MR. LOPER: Thank you, Judge.
4 MS. CAMERON: Very good.
5 THE COURT: All right. Well, we'll go
6 back out and reconvene. In a couple of minutes I'll
7 call the jury out, read the charge and we'll get
8 started. We're still looking at about an hour per
9 side. If you get to the end of that time and if
10 there's still something you need to say, let me know.
11 (Open court, Defendant present, jury
12 present)
13 THE COURT: All right. Ladies and
14 gentlemen, are you ready to proceed?
15 MS. CAMERON: We are, Your Honor.
16 MR. LOPER: Yes, sir.
17 THE COURT: Carl, bring them out, please.
18 (Open court, Defendant present, Jury
19 present)
20 THE COURT: Please be seated. Good
21 morning, ladies and gentlemen. All right. For the
22 record, it is March 21st, 2011, at 9:44 a.m. I
23 appreciate your patience in getting the process started
24 this morning.
25 As we discussed earlier, I'm about to read

**19**

1 the Charge of the Court on punishment. Once that's
2 done both the State and Defense will have the
3 opportunity to present their closing summation and
4 arguments.
5 Is the State ready to go forward at this
6 time?
7 MS. CAMERON: We are, Your Honor.
8 THE COURT: Is the Defense?
9 MR. LOPER: Defense is ready, Your Honor.
10 (The Court reads the Charge of the Court
11 on punishment in Cause No. 08CR0833)
12 THE COURT: All right. Ladies and
13 gentlemen, that is the Charge of the Court on
14 punishment. At this time I'll recognize the attorneys
15 for the State of Texas for a closing argument.
16 MS. CAMERON: Thank you, Your Honor.
17 STATE'S CLOSING ARGUMENT
18 May it please the Court, opposing counsel,
19 ladies and gentlemen of the jury.
20 A trial, any criminal trial, should be a
21 search for the truth. And how is it that you know what
22 the truth is? It's because the witnesses and the
23 evidence are tested by both sides. Because only when
24 you know the truth is the answer to these special
25 issues easy. You've heard from a lot of witnesses and

20

1  you've heard from the facts of the case the horrendous,
2  the horrific facts of the case. And what does that
3  tell you? That tells you all you need to know about
4  answering these special issues.
5          What kind of person -- what kind of person
6  commits this kind of horrific crime? What kind of
7  person gratifies his own sexual needs with his own
8  3-month-old son and then stomps on his head to death?
9  Listen to the testimony of Carolyn Entreken as she
10  spoke to you about the impact this crime has had on her
11  and her family.
12          She said to you, "It is hard to believe
13  that there is such evil that exists" and maybe it's
14  just as simple as that, that the monster in this case
15  is not Grandma Gladys, that evil does exist, that the
16  monster is sitting right here in this courtroom and his
17  name is Travis Mullis.
18          Everything that you have heard about
19  Travis Mullis should lead you to be able to answer
20  these special issues. I want to talk to you briefly
21  about Special Issue No. 1. And remember on voir dire
22  when we talked about what is society. Is society just
23  prison society? It's not defined that way in the
24  charge. Society means all of society.
25          And, so, you have to look at what you know

21

1  about Travis Mullis in order to answer the question:
2  Do you believe beyond a reasonable doubt that he will
3  commit continuing acts of violence that will constitute
4  a continuing threat to society?
5          And think about the evidence that you've
6  heard. The Defendant, Travis Mullis, has had homicidal
7  thoughts since he was 11 years old. Everyone that has
8  tried to reach out and give him some kind of support,
9  take him in, be a family to him, he has victimized.
10  Even Steven Barry, an adult man, is afraid of the
11  Defendant and he fears for his whole family because he
12  knows Travis Mullis assaulted his own grandmother,
13  Steven Barry's mother, a frail lady, Francis Barry; .
14  sexually molested his daughter, the Defendant's own
15  cousin. What does he know about the Defendant?
16          And you saw how brutally cross-examined he
17  was as if somehow he's not a loving uncle, not a
18  supportive uncle but at some point he said: Travis
19  Mullis is destroying people. Travis Mullis is violent.
20  Travis Mullis manipulates people. He's deceitful. He
21  uses people for his own gratification.
22          And what do we know about all the efforts
23  that went into trying to fix the monster? He had a
24  mentor. He had a family that adopted him. He had an
25  adoptive mother that never gave up on him. He had the

22

1  best medical and psychiatric care that anyone could
2  ever have. And what does that do?
3          I would suggest to you that you-all know
4  more about Travis Mullis than any of the Defense
5  experts that spent their hours with him. You've seen
6  the real Travis Mullis. Travis Mullis sees people as
7  something to be used for his own needs, for his own
8  gratification, without caring about the consequences
9  and without accepting any responsibility. Everyone
10  else is to blame.
11          So, in terms of thinking about the future
12  dangerousness of the Defendant, think about what we
13  know about Sheppard Pratt. Shepherd Pratt was a
14  structured lockdown facility much like a jail would be,
15  only it was very therapeutic trying to meet his needs.
16  They even gave him therapeutic horseback riding,
17  individual therapy, family therapy, group therapy. His
18  mother came every weekend.
19 .        What does he do in that structured
20  environment? He assaults a female. He assaults a
21  female staff member, kicks her. He grooms and sexually
22  molests other residents. So, that's what he's like in
23  a controlled setting because he'll feign some kind of,
24  oh, I'm going to commit suicide. I'm the victim. And
25  then once he lures you in, he'll take advantage of you.

23

1          What do we also know about the Defendant
2  as far as when he's in the jail, when he's here in
3  Harris -- in Galveston County? What do we know about
4  him? He's creating a hit list of all the people that
5  have tried to reach out to him. Michele Duarte took
6  him in, gave him a place to live. Ann Mullis adopted
7  him and never abandoned him. His mentor, everybody
8  becomes on his hit list. And I would suggest to you
9  that he's sending a message when he puts up there
10  "Watch your back." Maybe that would have been some
11  good advice for Julio Hernandez, watch your back.
12          And even the Defense's own expert witness,
13  when Dr. Katz was up here testifying -- and, you know,
14  I don't know if these experts have an agenda. I don't
15  know if they are just not seeing something important.
16  But, as he says, all of his things that are to benefit
17  Travis Mullis on cross-examination, what does he say?
18  Travis Mullis does not belong in society. You can't
19  fix him. You can't medicate him. There is no
20  medication. There is no treatment. There is nothing
21  you can do about the evil that he is. Call it an
22  anti-social personality, narcissistic, grandiose. He
23  can't be fixed.
24          So, think about all of the evidence that
25  you've heard. And the facts alone of this case could

24

1    tell you all you need to know about what kind of person
2    Travis Mullis is, just to create in everybody's mind
3    the most horrific crime that could be committed.  So
4    horrific that if it wasn't an agenda when you heard
5    their psychiatrist testify from New York who spent
6    hours with him -- what did the Defendant do?  What did
7    he tell you he did to Alijah?
8              Well, he said that he got angry and upset
9    and the baby woke up and the baby started crying and he
10   went back and Travis Mullis was trying to console the
11   baby but he wouldn't stop crying; so, he lost it and he
12   killed him.  I don't know if that doctor had an agenda
13   to hide or to keep something from you-all or it was
14   just too horrific, just too disgusting that only on
15   cross-examination from Mr. McClellan does he say, oh,
16   yeah, by the way -- and then you hear the truth because
17   it shocks the conscience.  And I trust that when you go
18   back and you consider all of the evidence that you will
19   find unanimously beyond a reasonable doubt, beyond any
20   doubt that the Defendant constitutes a continuing
21   threat to society.
22             I want to talk to you briefly about
23   Special Issue No. 2.  What is militate or mitigate?
24   Militate means that it works for, that it should
25   influence you for the death sentence, that it's not

25

1    mitigation.  And what do we know about the Defendant?
2    We know that the Defendant had a background that wasn't
3    perfect.
4              How many people in our society have
5    perfect childhoods?  How many people are out there that
6    have suffered abuse, physical abuse, emotional abuse,
7    whether or not it's Kendra Witherspoon or somebody that
8    you knew, someone that you grew up with, a family
9    member?  But the Defendant made choices and the choices
10   that the Defendant made were always for Travis Mullis.
11   What does Travis Mullis want?  So, he manipulates
12   people.  Is there anything that you've heard that
13   lessens his moral blameworthiness with every choice
14   that he made with every benefit that was given to him
15   to try to institute some kind of morality to him, some
16   sense of responsibility?
17             Travis Mullis is a user.  He would use his
18   sister, he would use his brother, he would use anybody
19   to come in to manipulate you but you know better
20   because you know the facts.  You know the truth about
21   Travis Mullis.
22             What I'm going to ask you to do is to do
23   justice.  There can't be justice without the proper
24   punishment, and the truth is all you need to make those
25   decisions.  And I would ask you to say that unanimously

26

1    there is not sufficient mitigation to warrant life
2    without parole.  The Defendant deserves the death
3    penalty for everything he's done, for every victim in
4    his life, for the grandchild that Carolyn Entreken will
5    never know, for a beautiful baby that was helpless at
6    the hands of a monster.
7              Thank you.
8              THE COURT:  Mr. Loper, you may proceed.
9              DEFENSE CLOSING ARGUMENT
10             MR. LOPER:  I don't know that I disagree
11   so much with the State's assertion that this young man
12   right here that you-all get a good look at is a
13   monster.  I don't know that I disagree much with that.
14   But he's not much of a monster.  And in the prison
15   society that you're going to send him to someday soon,
16   he's not a dangerous monster.  He's not a dangerous
17   monster that should lead you to answer this first issue
18   "Yes."  You found Travis Mullis guilty of this crime.
19   And for that he gets the death penalty.  All you have
20   to decide now is whether this case and the evidence
21   that you've heard should lead you to the conclusion
22   that the Government should remove him from the earth.
23             The State has won this lawsuit.  Friday a
24   week ago they won the lawsuit and you now know and he
25   knows and everyone knows that the evidence that's been

27

1    presented to you the last three days of last week were
2    not designed to excuse his conduct.  It was not a
3    defense as the State would have you look at.
4              Prosecutors always confuse mitigation with
5    excuses but it's not.  It's to put it in perspective.
6    It's to give you an idea as the what's the appropriate
7    answer to these questions.  It's what happened, how it
8    happened, how he came to be, what formed him, what
9    molded him, what you know about him and, frankly,
10   especially as to Issue No. 1, what he's done in the
11   last three years of his life, just not very dangerous,
12   leads you to make the decision as to what should be
13   done with him from this point forward.  And I submit to
14   you if you look at all those things in a big picture
15   scheme, you will think that a life sentence is both
16   just and proper.
17             As you know -- just a quick reference to
18   the jury charge which you will take back with you as
19   you did last time.  You don't just go back and write
20   the word "life" or write the word "death" on a piece of
21   paper and bring it back to the courtroom.  We spent a
22   lot of time talking with each one of you talking about
23   these questions.  It has to be all 12 jurors be
24   unanimous for a "Yes" answer on Issue No. 1.  And if
25   ten of you decide that the answer to No. 1 should be

28

1 "No," that's sufficient to answer that question.

2 I submit to you that from the evidence

3 that you heard, all 12 of you should vote "No" as to

4 Issue No. 1. The Court's Charge also tells you that if

5 that happens, your service is done. You may return to

6 the courtroom and hand that verdict to the bailiff.

7 It tells you that if you do get to

8 Question 2, the mitigation question, again all 12

9 jurors must answer "No" in order for that to be

10 correctly answered. Or if 10 of you decide that, yes,

11 that is sufficient mitigating evidence to warrant a

12 life sentence, that that's sufficient to answer that

13 question.

14 And as it's said and as we've all

15 discussed, it makes no difference what part of the

16 mitigating evidence convinces you. It could be his

17 prenatal days, gestation days, birthdays, surgery days,

18 abandonment days, sexual abuse days and anything else

19 that you might decide is appropriate.

20 You know, to be -- and we talked about

21 this: A fair and impartial juror in a case in order to

22 be able to sit on a capital murder jury and consider

23 these questions, a juror has to be able to give full

24 consideration to mitigating evidence. Talked to every

25 one of you. Every one of you said that you could.

29

1 It's interesting to me that to be a

2 prosecutor and ask a jury to sentence one of our fellow

3 citizens to death, you don't need to be because the

4 State of Texas in this case has chosen to attack Travis

5 Mullis in order to seek a death penalty for him on two

6 bases. Either, one, most of what happened to him

7 really didn't. You really didn't have as bad a mom as

8 you think. He didn't really have as bad an adopted dad

9 as you think he did. But if he did, it didn't really

10 affect him. Again, they look at it as an excuse and

11 it's not and that's not what the law is.

12 It's interesting to me that when we were

13 picking this jury -- not for every one of you and I

14 know it was several of you and I think you'll remember

15 this -- but the State was giving examples to you to

16 think about in deciding what's this mitigating stuff.

17 I assume that this was something that was brand new to

18 most of you. One of the examples they gave was you

19 could decide that the Defendant on trial in a

20 hypothetical case is young and that could be

21 mitigating. And that's true. Jurors have returned

22 life sentences in this State --

23 MR. MCCLELLAN: I object to him telling

24 what other jurors may have done in this State on the

25 basis of some piece of evidence.

30

1 THE COURT: Ladies and gentlemen, I remind

2 you, as the charge says, you're only to consider the

3 evidence admitted in this case. Thank you. You may

4 continue.

5 MR. LOPER: Thank you, Judge.

6 Juries have made the decision on

7 mitigating evidence based on what they thought it was.

8 The State tendered that up to you, some of you, at voir

9 dire because they wanted you to think, well, yeah, that

10 it's one thing. And it is accurate. It can be one

11 thing. But it's funny that they use that as an example

12 to try to get you to understand that those are the

13 kinds of things that can be considered and now that

14 we're in trial and now that you've learned of the abuse

15 of Travis Mullis at the hands of his adoptive father,

16 Gary Mullis, that they want you to think, well, it

17 doesn't really matter who sexually abused the child as

18 long as they're too young enough to know that it

19 happened. That's kind of what they said.

20 You will recall that Dr. Mendel was

21 talking about the fact that a baby can recognize smell

22 and can recognize the sound of their mother or father

23 or their caretaker's voice at the age of three months.

24 Don't think for a minute what Gary Mullis did to Travis

25 did not affect him because, of course, it did.

31

1 Or I think the other tactic they might

2 have tried and may try is that, well, even if you have

3 one parent who's sexually abusing you, if you have

4 another parent who isn't, then it's okay. In this case

5 it would have been Ann Mullis. That's not enough to

6 make up.

7 And here's another thing: If it had

8 turned out that Travis Mullis, when he walked into the

9 Philadelphia Police Department, admitted what he did,

10 talked about the sexual abuse at the hands of his

11 father and it turned out that Gary Mullis really was a

12 police officer and that Gary Mullis denied that this

13 had ever happened and it was never reported throughout

14 all those years and even to this moment you didn't hear

15 it until you heard it in the courtroom, someone on the

16 jury might say that's a little bit of a late reporting

17 of being a victim and I'm suspicious that that's

18 something that would affect someone. But that's not

19 what you have here.

20 The records were replete. The records are

21 all here, hundreds of exhibits, they're all available

22 to you to show that he really was sexually abused by

23 his father and it really did happen and it really did

24 affect him. That's not offered to you as an excuse.

25 It's by way of understanding.

32

1    And we don't know how many years it went
2  on. We really don't know. We know what Gary Mullis
3  said. But if you remember when we were talking to
4  Dr. Mendel on the stand about why would a sex offender
5  minimize how many times he offends, the State stood up
6  and stipulated that a sex offender is going to minimize
7  their conduct. I don't think he needed to because I
8  think you-all understood that but at least we're all in
9  agreement that that's what a sex offender's going to
10  do.
11    Now, Travis Mullis in his statement to the
12  Philadelphia Police Department did a Gary Mullis. He
13  didn't admit what he did to his son. That doesn't take
14  away from the fact that he did it. And it was
15  horrifying. There's no question. Sickening.
16  Disgusting. Nobody is not affected by that. But over
17  the last three days of last week when you learned his
18  history and you learned about what he had done and what
19  he had been through, did it really surprise you? I
20  don't think it should.
21    The other thing about him walking into the
22  Philadelphia Police Department, the Philadelphia police
23  station peacefully, turned himself in, confessed to the
24  crime, that should not go unmentioned here because
25  guess what? That's also mitigating. I think it shows

33

1  remorse. I think it does. Dr. Mendel agreed with that
2  as well.
3    What happens in trial sometimes is jurors
4  sit there, especially if there's no evidence from the
5  Defendant himself. You can't take that into
6  consideration. You can't. The Court's Charge tells
7  you that. And sometime later when they're back there
8  deliberating they think, well, all he did was sit there
9  and write notes. Do we really know how he felt about
10  this? Well, in this case based on the evidence that
11  you've heard, I submit to you that you did because
12  before he came back to Texas, before he had lawyers,
13  before he started his hi-jinx in his cell -- and I'll
14  get to that in a minute -- he walked into the
15  Philadelphia Police Department on his own when he could
16  have ran and confessed to the crime when he didn't have
17  to. He didn't do it fully. And now I know now that
18  all the lawyers agree that that's kind of a normal
19  thing to do.
20    I don't mean to say it's right. It
21  doesn't mean that we like it. None of us would ever do
22  it. But we're not talking about excusing behavior.
23  We're talking about the difference between living out
24  your life in prison, which is why I tell you the
25  evidence should make you decide he should be, or

34

1  deciding he is so dangerous and none of what happened
2  in his life is sufficiently mitigating that he ought to
3  be removed from the earth. And that's not what should
4  happen, not based on the evidence.
5    So, Gary Mullis does that to Travis and
6  Travis does that to Alijah at almost about the same
7  age. Gary Mullis does it to Travis for we don't know
8  how many years and we don't know how many times. The
9  State would ask you to skip over that because somebody
10  somewhere, maybe in the state of Iowa had that happen
11  to them and they didn't go out and become a capital
12  murderer. That's not even the law. That's not even
13  relevant.
14    I don't care if you cured cancer and you
15  were a sexual assault survivor. Hopefully there's
16  someone who will some day. It doesn't matter because
17  we're not talking about what someone else could do.
18  We're talking about how it affected him. He's the guy
19  on trial and that's why the evidence is presented to
20  you. If it's not presented to you, how do you know to
21  make that decision?
22    So, Travis does it to his son one time and
23  the State would ask you because he did it and because
24  he didn't admit it up front, that you could use that to
25  kill him. Well, they might say Gary never killed

35

1  Travis. No, he didn't. That's true. He put him on
2  the path for where he is. And also remember this: A
3  life sentence, as you all agree, is not getting off
4  easy. That's punishment for what he did.
5    Okay. One thing on his background I
6  wanted to mention and that is Sheila Wallace and also
7  Ann Mullis, his birth mother, his adopted mother. The
8  State usually argues in death penalty cases that the
9  Defense comes in here and beats up on the mom. After
10  all, it's got to be her fault that made him commit that
11  crime. I will tell you that is not necessarily so and
12  that was not the desire we were trying to do. But if
13  we didn't present background of his upbringing and
14  background of his health and background of his prenatal
15  care and all the other things, how would you be able to
16  base a decision? So, that's why it's presented to you.
17    Apparently, Sheila Wallace and Ann Mullis
18  were not the worst mothers. Apparently for different
19  reasons, various and different reasons, they probably
20  weren't the best mothers either. But there was love in
21  the Wallace home. You could tell that from her
22  children who came in here and testified. It may not
23  have been the most healthy environment. She didn't
24  take care of herself as well as she should have. Those
25  things definitely affected Travis as Dr. Katz has told

36

1  you. But I bet there was love in that home, I think.
2  I think you can tell that by the fact that her children
3  came in and although they want to support someone that
4  they haven't even laid eyes on for 23 years, they still
5  had a difficult time criticizing their mom and
6  criticizing the home that they lived in.
7  But I get the sense and I think maybe you
8  do, too, that Sheila Wallace for the decisions she made
9  about her health and the decisions she made about her
10  lifestyle, if she could have I have this sense that
11  when Travis Mullis went to trial in this case, she
12  would have been front row to watch what was going on to
13  be able to support her son. I think she'd be the first
14  person to ask you to spare her son's life in spite of
15  what he may have done.
16  That's not Ann Mullis. Ann Mullis,
17  according to her brother, said that she decided to
18  distance herself from this situation. And that's not
19  beating up on someone, but that's just stating it like
20  it is. As a matter of fact, we heard from Steven that
21  he, his mother, Francis Barry, would take legal action
22  if the Defense even tried to contact them. I suspect
23  that's Ann Mullis, too.
24  And one more thing, even if Ann Mullis
25  was, as the State's probably going to argue, a great

37

1  and wonderful mother, what does it tell you -- because
2  I don't think a 3 or a 4 or a 5-year-old or a
3  6-year-old or a 7-year-old could ever possibly answer
4  questions in such a way that they would know that
5  someday they would be prosecuted for a horrible crime
6  and their words would be used against them -- so I
7  submit to you what Travis said in those days was true.
8  But even if she had been the attentive
9  mother that the State wants you to believe that she
10  was, doesn't the fact that she was more attached to the
11  child molester tell you something? It should tell all
12  of you mothers something and it tells all of us fathers
13  something, too, I think.
14  Now, the Court's Charge tells you that if
15  you answer Special Issue No. 1 "no," then you don't
16  even move on to Special Issue No. 2.
17  I think Special Issue No. 2 has gotten so
18  much mitigating evidence in it that you folks could
19  practically do a show of hands in the jury box. I know
20  you won't because you need to go back and deliberate.
21  But bear in mind that you don't even get there unless
22  you get there on Issue No. 1. And now I kind of wanted
23  to talk to you about that.
24  You look at his three years in custody
25  here in the Galveston County Jail. You look at his

38

1  poor impulse control that Dr. Mendel talked about. Do
2  you really think he could sit there and hold his breath
3  for that long and not anything occur, not anything at
4  all?
5  Don't you know that if there was anything
6  more than jumping out and saying boo when they do a
7  head count, if it was assault, if it was extortion, if
8  it was leading the gang on the cell block or whatever
9  it might be, don't you know if there was any evidence
10  of that that you would have heard about it in three
11  years time?
12  They trumped up this initial thing on the
13  cell wall as a reason for you to kill him. They
14  trumped up this suicide attempt as a reason for you to
15  kill him. Is he a future danger? Have they proven to
16  you beyond a reasonable doubt that he's a future
17  danger?
18  Is it because he repeated this cycle of
19  abuse to his cousin that he acted out and did what he
20  was taught? Is it because he held something to his
21  friend's neck? May have been a knife. May not have
22  been a knife. He doesn't know. Didn't get hurt.
23  Didn't call the police. Didn't go to the doctor.
24  Later helped him get a job and took him in for a night
25  and apparently slept peacefully and without concern.

39

1  Is that a reason for the State to ask you answer Issue
2  No. 1 "Yes"?
3  Is it because he wrote this silly
4  62-person hit list in permanent marker on his cell wall
5  along with inaccurate gang graffiti that pits one gang
6  against another? And they're at odds with each other,
7  all of which the deputy agreed puts him in more danger
8  than anything else. That's not very subtle.
9  And we had a little fun with the initials
10  and you now know that his lawyers' names are on that
11  list along with part of the Defense team and apparently
12  some other people, too. There's some initials that
13  seem to match, although no one can say for sure but
14  they seem to match some other people that were
15  witnesses in this case, police officers in the case
16  perhaps, things like that.
17  If you will remember and trying to put
18  that in perspective, he had just received news that his
19  -- he had been in jail for a long time and his trial
20  wasn't going to happen for an even longer period again.
21  It led to this suicide attempt and it led to these
22  things on the wall. Both those events are a month
23  apart. The records are here. You can take a look at
24  them if you like.
25  Was he just showing frustration at the

**40**

1  system? Was that really the kind of thing, that subtly
2  putting in permanent marker that hit list on the wall
3  something that would make you folks go back there and
4  say this guy deserves to die? That thinking is so
5  messed up that you shouldn't hate him. You should pity
6  him. If it was a real threat and if he was really
7  going to carry this out from beyond the jail walls, and
8  if someone was really in threat and if it was really a
9  reason to kill someone, wouldn't there be other
10  initials on that wall as well? That was what was going
11  on in his mind, his frustrated little confused mind,
12  back in that year.
13       That's not something for you to hang your
14  hat on and go back there and look at each other and
15  say, well, we'd better answer Issue No. 1, "Yes."
16  We're sure convinced that's going to happen. Because
17  it's not. When he was told to wash it off, he did.
18  When he was told not to do it again, he didn't. He
19  follows the rules in confinement.
20       Mr. Kelly told you that. He went to see
21  him at Sheppard Pratt. He said he's comfortable there.
22  He seems safe there. Dr. Mendel used the word
23  "institutionalized." He's not a danger. He's not a
24  danger to that prison society. Society's not defined.
25  The word "prison" is not in there but don't -- and I

**41**

1  don't think you are -- be confused by the fact that you
2  know what the question leads to. He doesn't move down
3  the block. We used that example during voir dire as
4  well. He goes to prison for life and all of his life.
5       Real quick on that suicide attempt. The
6  State may argue, well, gee, he might do that again.
7  Again, think about what he had just heard. He told
8  them that it was a suicide attempt. At some time later
9  after the threat had passed and he is in full suicide
10  procedure, that rubber room they talked about, he tells
11  the doctor who came in here for the State that "That's
12  not really what I meant to do. I was just bored." Was
13  he? Did he think that or was he just trying to get out
14  of that FSP that they talked about? It doesn't make
15  him a future danger. It doesn't make him Lex Luthor.
16  That's what the State's going to want you to believe.
17       There are no children in prison. There
18  are no adolescents in prison. You all agreed to that,
19  too, when we talked earlier last month. The State's
20  going to argue that because he had sex with other
21  juveniles at Sheppard Pratt, that that makes him a
22  danger. So, I guess the implication there is that he's
23  going to have sex with men in prison and that makes him
24  a danger.
25       Take a look at him. Do you think if he's

**42**

1  going to have sex in prison -- and he might. Probably
2  will, most would say. Do any of you take a look at him
3  and think that it's going to be non-consensual? I
4  doubt it. I don't see him forcing himself on anyone in
5  prison.
6       And if the State's trying to tell you that
7  because he might have sex in prison some day and that's
8  the reason to kill him, that's not only improper and
9  illegal but I would think it would be offensive to ask
10  you to decide the factors in this case on that basis.
11       We talked about -- witnesses talked about
12  where he would be on the totem pole there in prison
13  when he goes. He's going to be more in danger than
14  anybody else. If the State were to argue, well, if
15  he's going to go up there and going to be in such
16  danger that he might even be harmed. He might even be
17  killed. Let's save everybody some time and answer
18  these questions the way we want you to. I would think
19  that would equally be illegal and I would also thienk
20  probably offensive to you, as well.
21       If you follow the law and I think you will
22  -- if you follow the evidence that the State has
23  presented to you, the explanations and the evidence
24  that have been presented to you by the Defense, this
25  total picture and package of Travis Mullis, I think

**43**

1  that you will find that you have not been convinced
2  beyond a reasonable doubt that he's a future danger.
3  The facts don't support it. A couple of little minor
4  incidents don't support it, and your answer to
5  Issue No. 1 is "No."
6       Your work is over, the trial is finished,
7  you've given Travis a fair trial, he gets what he has
8  coming and you will have done the right thing and
9  giving him a life sentence is the right thing because
10  his life does have value. The evidence is there to
11  show you that his life has value. The evidence is not
12  there to show you that he is a future threat. Thank
13  you.
14       THE COURT: Mr. Bourque.
15       MR. BOURQUE: What do you say? We'll
16  start with this: "I don't want to touch him because
17  the last boy child I touched died."
18       I told you in voir dire that there are two
19  things. Remember that? Two things. The "Hall of
20  Justice" is lined with two things. On the one wall is
21  plastered "hate, vengeance, anger, vitriol." The other
22  wall is draped with a fabric composed of love,
23  compassion, and understanding. You will not have to
24  guess next week what motivates you. You will know.
25  You will never have to wonder again what really

44

1   motivates you.  You will know.
2        This is the saddest of sad.  The only
3   backdrop I have for this is what my faith tells me
4   about Alijah.  That's it.  So, now we look and we say
5   what do we do about this?  I will take you first to Dr.
6   Katz who says he was already set up for significant
7   neuropsychiatric damage in utero through no fault of
8   his own.
9        Is there no level of compassion where we
10  look up one day and we say but for the grace of God
11  there go I?  Maybe your mom and dad weren't perfect.
12  I'm sure I wasn't perfect.  But through no fault of her
13  own you might say she was a physical disaster, a
14  medical disaster.  If Travis James Mullis were here
15  today laying on a gurney as a quadriplegic on life
16  support systems would it make a difference to you in
17  determining what you're going to do?
18        And I submit to you he's an emotional
19  mental health quadriplegic.  It's not that he's
20  unwilling, he's unable.  And the question is not since
21  he's like that, then is there a blank we can fill out
22  to just kill him and be done with it?  I don't know
23  what to tell you, what magic word to give you but
24  compassion has its place in this case.  Love has its
25  place in this case.  You can love Alijah and you can

45

1   love Travis James Mullis.  They are not mutually
2   exclusive.  You can have compassion for Alijah Mullis
3   and you can have compassion for Travis James Mullis.
4   They are not mutually exclusive.
5        Where do we drift as a society if we say,
6   well, you tried.  You tried to work the program.  You
7   just couldn't get there.  We're tired, we're old, you
8   die.  This is the saddest of sad to not be able to
9   understand how you can take a child and do this
10  (demonstrating) and roll on the ground with the child
11  and hold him and hug him and love him, to not know
12  that, to not know the value of that feeling.  There's
13  nothing like it and you know what I'm talking about.
14  There is no greater feeling than to have a child right
15  here and really not want to let go.  You know what I'm
16  talking about.  He doesn't know that.  He doesn't know
17  that.  He's going to live whatever life -- he doesn't
18  know that feeling.  It's not Sheppard Pratt's fault.
19  It's not his fault.  It just is.
20        And so do we say because you don't know,
21  because you can't come to where we come, you can't feel
22  because you don't know the love that God has in your
23  heart for you, that we just throw you out and we kill
24  you?  I don't know.  No one should have to live the
25  life that Travis Mullis has lived.  Listen to me.  No

46

1   one should have to live the life that Travis Mullis has
2   lived and then die and go to hell for it.  I don't
3   know.  But I know this.  He should not die because he
4   does not know love.
5        You go to weddings all the time and they
6   read the saying from Paul where Paul talks about the
7   greatest of these is love.  You know the only person
8   that Christ ever rebuked was the rich man.  He never
9   rebuked anyone else.  And he told us love, love, love
10  and even in Matthew when he speaks before he gets to
11  543 where he talks about loving your enemies, he talks
12  about -- he goes into -- you have heard an eye for an
13  eye but truly I tell you.  And then he says, "Love even
14  your enemies."  I'm not telling you that Travis is an
15  enemy but he doesn't have our capacity to understand,
16  our capacity to even develop a moral compass.  Maybe
17  given time God can reach him.  Maybe.  Got to give him
18  that chance, though.  Because we're all valuable.
19  Every one of us.
20        Dr. Katz says he doesn't belong in our
21  society.  He doesn't.  That's already fixed.  He's not
22  coming out of our society -- into our society.  He will
23  die in prison.  I ask you to let him die by whatever
24  other cause.  I'm asking you not to have to carry his
25  blood on your hands.  I'm asking you not to do that.

47

1   Emotional quadriplegic.
2        Hit list, that's the stupidest thing I've
3   ever seen in my life.  A narcissistic goofball writes
4   that list.  Please.  That's some kind of threat?
5   Really?  Come on.  Julio Hernandez, who even knows what
6   happened?  Who even knows if it really did happen?  If
7   Travis is a threat to do anything in prison, if he's a
8   threat to do anything in prison, it's to perform
9   fellatio.  That's it.  You can kill him for that?
10        Reactive attachment disorder layered upon
11  top of post-traumatic stress disorder layered upon top
12  of bipolar disorder, chronic, not otherwise specified;
13  borderline personality disorder; separation anxiety.
14  Narcissim disorder; sexual identity confusion; and then
15  the necrotizing enterocolitis.  His life was set up in
16  such a way that his life was destroyed.
17        I hope that you understand what the State
18  of Texas is asking out of each one of you, each one of
19  you.  It's not a team verdict.  Each one of you, each
20  one of you has it in your hands to spare his life.
21  Each one of you has it in your hands to spare his life,
22  each one.  Any one.
23        Psychobabble.  Really?  That's where we're
24  going to go with this?  Really?  Really?  I think there
25  were eight or nine of you that I sat in the chair right

- March 21, 2011

---

48

1  here and talked to directly and asked each one of you
2  directly, "Will you give meaningful consideration to
3  our mitigation on evidence?" Psychobabble? Really?
4          I know for sure eight of you are better
5  than that because that's eight or nine that I talked
6  with. We hired experts to throw them up there to just
7  say whatever we want to so we can look good on paper?
8  Really?
9          The value of an expert's testimony is
10  somehow judged by who calls him? Really?
11          Because the State -- great State of Texas
12  wears the white hats, had they called these men to
13  testify, they would have some value? Because the
14  Defense calls them, they have no value? They're not to
15  be trusted? Really?
16          The State of Texas wants to defend Gary
17  Lynn Mullis. Really? Are you buying that? Really?
18          The great State of Texas wants to defend
19  Ann Mullis. Really?
20          Doesn't her absence speak volumes? You
21  know a mother, you had a mother, you are a mother.
22  Doesn't come to ask you to spare her son's life and
23  they defend that? Really?
24          Where would you be as a father or a
25  mother? Where do you think Sheila Wallace would be

---

49

1  today? She'd be here. You might have to wheel her in
2  if she were alive. She'd be here. You know she would
3  be here. She thought in her limited way that it was
4  better for her not to touch Travis for fear that it
5  might kill him, but she was willing to do that to save
6  his life.
7          This kid never caught a break. Ann Mullis
8  was not a break. When the going got tough for Ann
9  Mullis, she did what everyone else did. She dipped her
10  hands in the water and she said not my problem. So,
11  literally every single solitary person, his biological
12  mother through no fault of her own was already at the
13  end of her life when she got pregnant and then she
14  died. The biological father, as many useless fathers
15  do, had already hit the road before birth. Came back
16  to see if Travis was worth loving and determined he
17  wasn't and off he went and he never heard from him
18  again.
19          The adopted father is dead and Ann Mullis
20  is nowhere to be found. What kind of message was being
21  sent to Travis Mullis when every single solitary person
22  that could have taught him the value of this feeling
23  just turned and gave him the finger.
24          Does he have a sexual identity crisis or
25  problem? Yes.

---

50

1          Is that a threat to our society? No.
2          He's locked up. He's in prison. He's
3  never coming home. He's a threat to no one. You know
4  exactly what will happen to him when he gets in the
5  general population, don't you? He's not a threat to
6  anyone.
7          The question is: Do you find from the
8  evidence beyond a reasonable doubt that there's a
9  probability the Defendant would commit criminal acts of
10  violence? Criminal acts of violence first. No. That
11  would constitute a continuing threat. Given his -- he
12  won't become -- not TJ Mullis. By the time he hits the
13  general population, he will be BJ Mullis. "Hey, BJ,
14  get over here." By the time he hits the general
15  population, he'll be BJ Mullis and he'll go. Because
16  not to go is his death warrant.
17          Threat to our society? No.
18          Special Issue No. 2, we all talked about
19  it. Everyone that I talked to about the value of
20  trying to understand what we're saying in Special Issue
21  No. 2, is his life compass broken through no fault of
22  his own? There is no other viable answer to that. It
23  is broken through no fault of his own. And you should
24  answer Special Issue No. 2 in a way that a life
25  sentence should be imposed. You should answer Special

---

51

1  Issue No. 2 in a way that a life sentence is imposed.
2          I cannot tell you how proud I am of the 12
3  of you. I'm exhausted. You're exhausted. There is no
4  stress level in the history of jurisprudence like this
5  stress. I ask you to take a deep breath, go inside
6  yourself and ask yourself a quiet question and then
7  spare his life because as a society you've got to be
8  better than this. You've got to be better than this.
9  I cannot imagine, I cannot imagine living your life
10  without that. I can't imagine that. What must that be
11  like? And doesn't the person who can't identify with
12  this deserve our mercy?
13          This is such a wonderful feeling,
14  (demonstrating) I even use it on other people's
15  grandchildren. It feels so good to the heart. It
16  rejuvenates you and it strengthens you and it empowers
17  you. What must it be like not to know this? Even if I
18  just didn't have any of that other stuff, this is it.
19  This is it. This is enough. Thank you.
20          THE COURT: Mr. McClellan.
21          STATE'S FINAL CLOSING ARGUMENT
22          MR. MCCLELLAN: May it please the Court,
23  ladies and gentlemen of the jury, counsel for the
24  Defense, counsel for the State.
25          Now, I guess it's your fault. How many

---

FIRM NAME

- March 21, 2011

---

**52**

1  times -- I love it when the Defense gets up here and
2  tells you what I'm going to say. I'm going to ask you
3  to kill because of graffiti. Look at the word they
4  used. "Kill." I'm going to ask you to kill because of
5  this. I'm going to ask you to kill because of this. I
6  don't know how many of you but the vast majority of you
7  I did voir dire and I had one phrase that I suggested
8  was going to last through voir dire through this trial
9  until today to the time you go back in that room: I
10  will a true verdict render based on the law and the
11  evidence. Period. End of story. Wherever that takes
12  you, that's where you go.
13  You've heard nothing but telling you what
14  you have to do, telling you to have sympathy for Travis
15  Mullis, telling you what you have to think, telling you
16  what the State is going to say. Stay true to the thing
17  that we talked about, true verdict render based on the
18  law and the evidence and you will be well served by
19  following that guideline.
20  I find it amazing that the Defense says --
21  Mr. Loper says, you know, Issue No. 2, we can probably
22  just take a show of hands right now and we don't even
23  need to discuss it. Well, if they're so confident you
24  can find that there is mitigation he's going to get a
25  life sentence, why do they spend all their time on

---

**53**

1  Issue No. 1? Because it doesn't make any difference
2  what you answer on Issue No. 1 if on Issue No. 2 you
3  say there is mitigation, which they think is a slam
4  dunk. Something's wrong here. Somebody's trying to
5  lead somebody down somewhere.
6  Issue No. 1, they spend all their time,
7  he's not a continuing threat. Now, follow the logic.
8  He's not a continuing threat to commit acts of violence
9  that will be a continuing threat to society because
10  he's going to be in the penitentiary.
11  Let me just guess, I'm taking a wild shot
12  here, everybody convicted of capital murder is in the
13  penitentiary. Everybody on death row is in the
14  penitentiary. That's where they are. The issue is not
15  what will he do in the penitentiary. The issue is
16  this: Is penitentiary a part of society? You bet it
17  is.
18  Does it say while confined in the
19  penitentiary? No, it doesn't. But they want you to
20  think that's the only thing. Here's the issue. Some
21  of you mentioned this. As you sit here this day and
22  as Mr. Mullis sits here this day, do you believe beyond
23  a reasonable doubt there's a probability that he would
24  commit continuing criminal acts of violence that would
25  be a continuing threat to society? Is he the type of

---

**54**

1  person that fits that answer? Not what is he going to
2  do, how is he going to do it, whatever.
3  I would suggest to you that when we
4  brought you in and said take a look at Mr. Mullis, is
5  he the type of person -- by looking. That's what
6  they're talking about. Is he the type of person that
7  would take out his 3-month-old son, stomp on his head
8  after sexually assaulting his son? No, he doesn't look
9  like that. You can't judge a book by its cover but you
10  can judge a person by what he's done and they want to
11  minimize everything he's ever done.
12  Well, he was -- quite frankly all those
13  records, the things that -- volumes and volumes of
14  records that weren't introduced, that is society's
15  attempt to make him be a person that should be in
16  society. And after all those attempts, after all that
17  effort, after everything that's been done after years
18  and years, here is what we have as a result. Here's
19  what we have as a result, why we are here today.
20  Now, while he was locked up at Sheppard
21  Pratt -- I think the Defense said, well, he was
22  comfortable there. Oh, yeah, I'm comfortable at
23  Sheppard Pratt. I've been there three years. Let me
24  see, I've victimized four, five, maybe eight guys.
25  Good deal. I'm thinking: All right, I'm doing okay.

---

**55**

1  But you know while at Sheppard Pratt while
2  he's creating more victims, he's also any time, any
3  time he doesn't get his way he strikes out, he gets
4  angry, he explodes. He does whatever. He goes to the
5  quiet room so much they ought to call it the Mullis
6  room.
7  Now, you have records in there that
8  indicate -- and they were put in there as State's
9  Exhibit No. 204 -- that during one of the times he
10  assaulted one of the people that was the staff there at
11  Sheppard Pratt. Now, stay with me for a minute because
12  I've got a point to make.
13  It said, "He took his anger out on the
14  staff and began throwing sample bottles at the staff.
15  Ms. Dee bent down to pick up a hygiene basket after he
16  went to the bathroom. He came out of the bathroom and
17  kicked Ms. Dee in the head." Okay. Fast forward two
18  or three days.
19  "He had a one-on-one with Ms. Dee. He was
20  very concerned if he had hurt her" -- or she says "me"
21  because she's the one that wrote this -- "hurt me when
22  he kicked me. Travis said he was sorry about five
23  times." Now the punch line: "He asked if I was going
24  to press charges."
25  That's his concern. Not remorse for

---

56

1  having done what he's done. Are you going to press
2  charges? It goes on to say "Travis felt so much better
3  after our talk." No kidding. Travis while he's there
4  did what he wanted to do when he wanted to do it.
5  That's his life. It's all about me. People are
6  objects to be used. People -- and once in the record
7  there was a notation where they said, "Are you trying
8  to manipulate us?"
9       He said, "I manipulate y'all so many times
10  you don't even know it." That's what he's dangerous
11  for, manipulation. That's what he does. He
12  manipulates people. Even while locked up, he continued
13  to offend. Even while being treated for the sexual
14  crimes he committed and for the mental issues, he
15  continued to offend.
16       They said, well, he made a hit list and
17  that's just a big joke. I don't know if it's a joke or
18  not. That's what went through his mind, here's the
19  people I hate. And we're going to talk about this in a
20  minute but he is who he is. He's the same person that
21  back on January 29th as he is here today. He doesn't
22  look harmful. He doesn't look like he'd be a problem.
23  He doesn't look this part but the records show that he
24  is dangerous, that he does commit criminal acts of
25  violence that is a threat to society.

57

1       They say, well, wouldn't he have done
2  something wrong in the last three years, if he had been
3  here in the Galveston County Jail for the last three
4  years? Let me think my way through that. Let me see,
5  I've been charged with capital murder. They're trying
6  to seek the death penalty. If I start acting out too
7  much, it's probably a bad thing, probably not going to
8  be to my benefit. I suggest defense counsel probably
9  told him that. So, the fact he can behave for a period
10  of time, sure.
11       My mind just wants to jump ahead so fast
12  and go to something else. I'm going to try to take it
13  to where it makes sense because there's going to come a
14  time where we're going to look at why didn't he do it
15  before. Okay. And that's going to be the question.
16       The crime itself, that tells you, doesn't
17  it, that this guy's a continuing threat to society,
18  probably the most disgusting, despicable crime you
19  could think of. You'd be hard pressed to come up with
20  a worse set of facts.
21       Mr. Bourque -- I didn't forget this -- Mr.
22  Bourque said throughout the trial for those of you that
23  had his voir dire, you know, it's all about Travis'
24  life compass. His compass is broken. It's either none
25  of his fault, some of his fault or all of his fault.

58

1  Travis Mullis didn't have a life compass. He doesn't
2  have a life compass. He doesn't have a conscience. He
3  doesn't know right from wrong. He knows it's all about
4  me. He sees people as things to be used, not as people
5  to be used, as objects to be used. He has no life
6  compass.
7       He doesn't have a conscience. It's what
8  we called cold-blooded killer. We didn't need a DSM-IV
9  to know what we're talking about, cold-blooded killer.
10  Doesn't look like a cold-blooded killer, but now you
11  know that he is. So, he has no conscience. He
12  manipulates others for his own purposes.
13       This idea about the fake suicide, it was
14  just a fake. I don't know about the suicide part. Let
15  me see, if I put a sock in my mouth, get a potato chip
16  bag to go over my head. I don't know if -- I'm dying.
17  No. He was manipulating and he was manipulating to get
18  out and go someplace else. He knows how to manipulate
19  people. That's what he's learned. He sees, as we
20  said, other people as objects. It's all about
21  fulfilling and satisfying his needs.
22       We know that he's impulsive and has anger
23  and can't control his anger at the time like when he
24  kicked Mrs. Dee, when he throws the shampoo and when he
25  gets all kind of outrage. Luckily he didn't have at

59

1  Sheppard Pratt things to use around that might cause
2  other injuries because we know this is how he works.
3       His anger is out of control and he reacts
4  with violence to what he doesn't like but more
5  important, he acts out of violence for things he can't
6  control. As long as he can control you, you're okay.
7  As long as he can control what's going on, it's okay.
8  As long as I can manipulate you, you're fine. But when
9  I can't, things are out of control.
10       He has no remorse. He's not upset about
11  this. And let's just look and, you know -- remorse, to
12  me, is my God, what have I done? How could I have done
13  this? Do you see one -- anybody, anywhere, anyplace
14  where that's what he said? No. Let's look in the
15  statement.
16       This is the statement he gave on the first
17  part of February, two maybe three days at the outside
18  from committing this crime. Here's the man who
19  committed the crime and here he is turning himself in
20  and now giving a statement to the police. And here's
21  what's utmost in his mind. He gives the statement and
22  he's given a chance to correct it. He corrects the
23  fact that there's not a space between forms and the
24  No. 75-331B. That's pretty important, in his mind.
25       They asked, "Do you have any children?"

**60**

1    He says, "Yes, I had a son and he was
2  3 months old." Doesn't indicate any remorse there. He
3  goes through and makes other grammatical changes. He
4  spells Reuters for them because they've got that
5  spelled wrong. That's pretty important.
6    And, of course, he says when he's
7  talking about what's going on with Alijah, "the only
8  way I could stop him from crying was to kill him."
9    But then he says after he had -- "I picked
10  up Alijah by the legs and threw him away like trash."
11  He said, "I just started crying and was thinking what
12  was I going to do."
13    Give me a break. I killed my 3-month-old
14  son. What am I going to do?
15    Not what have I done, how could I have
16  done this. It's all about me.
17    He said, you know, of course, "I decided
18  not to kill myself." He makes choices. All of his
19  choices are self-preservation choices. What helps him
20  choices. Not about empathy, remorse or anybody else.
21    Then he says -- I was thinking about when
22  he goes around and stops at these different places and
23  he asks for help and they send him to a social services
24  outreach place. "Well, I can't go there because I
25  don't want them to know all that information because I

**61**

1  was afraid I was going to get caught." There again,
2  it's all about Travis.
3    He said, "I was thinking about going back
4  to Mr. Kelly's house." He was talking about being
5  there. "I explained to him about the real situation"
6  because he hadn't been truthful with Mr. Kelly "but I
7  decided not to." Again a choice, help him.
8    Then, of course, they tried to give him
9  credit for the fact he went into the police station and
10  gave -- told them what happened. Not so fast. Not so
11  fast. He didn't tell them what happened. He told them
12  what he wanted them to know. Obviously he left out a
13  big part of what occurred.
14    They asked him did you ever -- talk about
15  Alijah. "Did you ever think about taking your son to
16  the hospital in hopes they might be able to resuscitate
17  him?" His response was "No. By that time I knew I was
18  in trouble and didn't want to get caught and I drove
19  away." Choice. See, that's the deal. He had the
20  ability to make choices. Whatever mental issues he has
21  or doesn't have, he has the ability to make choices.
22  The choices he makes are all about him and never about
23  the goodwill or health of somebody else.
24    He's upset. He said he was upset that he
25  killed his son but he was totally logical whenever he

**62**

1  tells about all these things in the statement. He had
2  a plan to get away. He couldn't take Alijah to get --
3  seek help because that was going to get him caught. He
4  had no problem thinking, though, about and making
5  decisions about self-preservation. And in the result
6  of Alijah being in the way, he just threw him away.
7    They asked you, they said, "Does he look
8  like a threat to somebody in prison?" Like, if you
9  didn't know him before and you didn't know what you do
10  now, does he look like he would go out and kill a
11  3-month-old son? But here's the problem. He looks
12  harmless, but he's a con man. He's a manipulator. And
13  the biggest manipulation, the biggest con he hopes to
14  pull off is to con you into believing he's not a
15  continuing threat. That will be his biggest con.
16    I told you he doesn't have a life compass,
17  he has no remorse, he doesn't have a conscience; but if
18  he did have a life compass, it would always point to
19  it's not my fault. Now, this doesn't have a whole lot
20  to do with anything. Of course, I love the fact they
21  said, well, they're asking you to kill him because of
22  this, they're asking you to kill him because of this.
23    We're asking you to answer these questions
24  based on the evidence, a true verdict render based on
25  the law and the evidence. We're not asking you to kill

**63**

1  anybody. I've done this a lot of years and I've never
2  asked a jury to kill somebody. I've asked them to
3  truthfully answer the questions and whatever the
4  answers are, so be it. Okay.
5    But if they weren't -- if they put on
6  evidence about Sheila Wallace for background
7  information, Lord help me if they ever want background
8  information. They assassinated Sheila Wallace. I
9  wanted to ask for an attorney ad litem to represent her
10  posthumously. They did everything -- because all of
11  this is relevant, right? Her weight, four packs of
12  cigarettes a day, 15 cups of coffee, even her vaginal
13  secretions. They even had testimony about that. And
14  feces on the bathroom floor because she couldn't either
15  reach to wipe herself or it got caught in the creases
16  or folds of her flesh. Now, what in the world does
17  that have to do with anything?
18    That's just trying to make Sheila Wallace
19  because she's horrible and it's her fault and she
20  didn't -- oh, I love it -- she was afraid to touch him
21  because her last son that she touched died. Said that
22  one time, if she said it, and then obviously she did
23  cradle him, she did hold him. You even see pictures of
24  that. But Sheila, if you were here, I would apologize
25  to you for the assassination that's been done on your

64

1   character.

2          Here's what I remember about Sheila

3   Wallace: I'm sure she was morbidly obese, smoked

4   cigarettes and did all that other stuff. I'm sure she

5   did. But on the day that Sheila Wallace knew she

6   wasn't going to live the night, she gave Travis to

7   Ms. Devlin, a 15, 16, 17-year-old. Take him home.

8   Take him home with you. She delivered him to someone

9   who cared. And for that, we would be so lucky if

10  Travis Mullis had what Sheila Wallace had. Take care

11  of Alijah. Take care of him. I can't take care of

12  him. Hand him over to somebody else as opposed to use

13  him for his physical pleasure and then kill him.

14         Special Issue No. 2 says can you find from

15  the -- take into consideration all the evidence

16  including the facts of the crime itself, the character

17  and background and the personal moral culpability of

18  the Defendant and are there sufficient mitigating

19  circumstance or circumstances that warrant a life

20  sentence rather than a death sentence.

21         "That warrant." What does that mean?

22  That means that justify, that explain. That is that

23  the type of thing that is a proper response? And you

24  read in the charge also that it says you consider

25  mitigation is that evidence that reduces the

65

1   Defendant's moral blameworthiness on the bottom of Page

2   3. Reduces the Defendant's moral blameworthiness.

3   What's his moral blameworthiness? What about his

4   actions caused the death of Alijah Mullis? His moral

5   -- which he doesn't have any morals -- activity that

6   caused the death of Alijah Mullis. Mitigation is what

7   reduces that. Okay?

8          And what you have is that after years of

9   treatment for his being a sex offender, for mental

10  health issues, being treated by psychiatrists and

11  psychologists, receiving medication, not receiving

12  medication, the Defendant does this crime. When he

13  does this crime after all the attempts have been made,

14  after all the efforts have been made to change the

15  person he was, we have received this kind of a case

16  where Alijah Mullis, 3 months old, was stomped to death

17  by his father.

18         Now, we don't make light of sexual abuse

19  and we don't make light of the sexual abuse Travis

20  Mullis had to undergo. But Travis Mullis is a sexual

21  abuse survivor. His sister from the same mother, a

22  sexual abuse survivor. Most sexual abuse survivors are

23  not re-offenders. Travis Mullis not only is a

24  re-offender, he also killed his son.

25         I thought it was ironic the fact that

66

1   Dr. Mendel specializes in the area sexual abuse

2   survivors and the only something than other? Abuse

3   survivor that didn't survive is Alijah Mullis. He was

4   not a survivor. He was sexually abused but he was not

5   a survivor and that's done based on the acts and

6   desires and the choices of the Defendant, Travis

7   Mullis.

8          You know he had the ability to make

9   choices but the kind of choices he made are

10  self-centered choices. And here's that dichotomy I

11  think that you can see. Travis -- I mean, Alijah

12  Mullis, he had choices and his choices were to use him

13  for his own sexual pleasure, kill him, stomp his head

14  in and throw him away like garbage.

15         But then I'll never forget about the

16  moment that he was in Philadelphia and they asked for

17  his shoes and his clothes and he looked down -- and he

18  was told we have to take your shoes because of suicide

19  precaution and he goes "suicide's not an option."

20  Because that means he would have to hurt himself. It's

21  a real easy choice to kill my son but for me, suicide's

22  not an option.

23         He had choices with Alijah. There were so

24  many things he could have done. He supposedly reaches

25  this crescendo of anger and everything that's going on

67

1   and, okay, take Alijah and drop him off at a police

2   station. Take him off and drop him off at a library or

3   a public park or a McDonald's or places where he could

4   be found to do whatever -- do something other than

5   stomp his head in and kill him because now we know, if

6   we didn't know before, he sexually assaulted his son.

7          Now, either Mendel or Dudley said he had

8   no control over the difficulties that affected him. He

9   had no control over the difficulties that affected him?

10  He said that night he had been overcome by all the

11  issues that he had. He was at a breaking point,

12  banging his head on the steering wheel, dashboard,

13  wherever, so overcome by these difficulties that he had

14  that he was sexually aroused and had sex and then

15  placed his penis is Alijah's mouth and ejaculated?

16         These issues that we've been dealing with

17  for years result in this I don't know what to do. Oh,

18  I got an idea. You got to be kidding me. You have to

19  be kidding me. That he was so overcome by all of this

20  that he decided to have sex with Alijah.

21         Here's the elephant in the room. It's not

22  me. Why two hours before when he took Cecelia -- you

23  didn't know about that in the beginning until we get to

24  punishment. He took Cecelia. He took her to the

25  store, got candy and cigarettes and stopped at the

68

1  school. Told her to take her pants down. She didn't.
2  Why didn't he kill her? Wasn't he overcome by the same
3  emotions that he was two hours later? Nothing in his
4  life had changed much, had it? Still didn't have a
5  job, still didn't have any way of income. Makes the
6  choices he makes not to work, choices he makes not to
7  do things, choices he makes to live off of others and
8  not off himself.
9          And did you see Cecelia when she took that
10  stand? Can you envision her on the stand, this big
11  lock of bangs? I don't know if you noticed. She's
12  sitting there and the lock of bangs was covering this
13  eye and she could see Travis and she moved her hair
14  over to block that view to see this view. You could
15  tell by Cecelia that she felt she was in the presence
16  of evil even though she's in a courtroom well lit,
17  bailiffs, jury, you could tell she felt the threat and
18  that's the kind of threat that he is. The same issues
19  were affecting him with Cecelia but for some reason he
20  did not choose to kill her.
21          Now, this kind of sums up, I think, one of
22  the points. It's in State's Exhibit 204 and it's back
23  on September of 2003. They write: "Travis is
24  justifying his sexual offenses by indicating that his
25  cousin gave her consent as well as denying that he is

69

1  an offender, preferring to see himself as a victim who
2  victimized someone else in reaction to a flashback."
3          "Who prefers to see himself as a victim,"
4  boy, does he. Everybody but Travis is responsible.
5  Everybody but Travis is responsible.
6          Mr. Bourque said during voir dire and
7  carried it on through the final argument that through
8  this mythical hall he sees the two walls in the "Hall
9  of Justice" that he sees hate, vengeance and anger on
10  one side; love, compassion and understanding on the
11  other. And where are you going to be? Well, that's a
12  great choice.
13          How about being in the middle and charged
14  and seeing justice. That's not one of the options he
15  gave you. How about justice? How about responsibility
16  for the actions that you take? And then, of course,
17  they -- he says something to the effect that blood will
18  be on your hands. Ridiculous. Justice. That's not
19  what -- people don't want justice. People want mercy.
20  And he said "God loves Travis Mullis" and God does love
21  Travis Mullis. But God is also a God of judgment. And
22  God will not be mocked.
23          It's up to Travis, his relationship with
24  the Lord. It's not anything we can do. We're here to
25  make a decision that God has put us here to do. God is

70

1  in control of everything. Sometimes we don't
2  understand it. I don't understand it. But God put us
3  here to do what we're here to do.
4          And it says love your neighbor and love
5  your enemy. Well, as a Christian I love Travis Mullis.
6  I hope he finds his Saviour. But it has nothing to do
7  with the decision that's going to be made here today
8  because that's a personal decision. That's a personal
9  relationship everybody has to establish or just not
10  even worry about and for many, many, many, many years I
11  didn't worry about it. It wasn't important. Now it's
12  important. But whatever it is, it's going to be up to
13  his individual decision. It has nothing to do with you
14  and don't let people put you on a guilt trip about
15  that.
16          Special Issue No. 1, is he a continuing
17  threat, probably commit criminal acts of violence,
18  threat to society. Is he that type of person? Sure he
19  is. That's what the evidence shows.
20          Is there mitigating circumstances that
21  warrant, that justify, that call for life as opposed to
22  death? No, there's not. There's lots of mitigating --
23  we talked about the fact if it's sufficient mitigating
24  circumstances. There are all kinds of things. I
25  suggest to you you may be sitting through here like I

71

1  do through these trials and kind of go, well, I wonder
2  what my DM-4 diagnosis is. I've got this and I do this
3  and I don't do this and everybody, I suggest, has
4  things that we don't do that are -- because we're not
5  perfect. Okay. But that's not an excuse. That's not
6  the reason he did what he did. I don't know that we'll
7  ever know the reason that he did exactly what he did
8  other than we know that he did it, he's not remorseful
9  about it, and he doesn't care because he did what he
10  wanted to do and he did that and it's all about him.
11          Now, Alijah James Mullis was put to death.
12  On January 29th, 2008. He had none of the safeguards
13  of trial by jury. He had the inability to defend
14  himself. No one came and gave passionate arguments on
15  his behalf. He had no jury to deliberate the evidence
16  and decide his punishment. Travis James Mullis has
17  always. Travis James Mullis, though, for Alijah Mullis
18  was the Judge, the jury, and executioner. I ask you,
19  based on the law and the evidence, where that leads
20  you, to answer Issue No. 1 "Yes" and Issue No. 2 "No."
21  Thank you.
22          THE COURT: Counsel, thank you for your
23  closing arguments.
24          Ladies and gentlemen, you've heard the
25  Charge of the Court, you've heard the arguments of

**72**

1  counsel. At this time I'm about to hand the Charge of
2  the Court to Mr. Kelly. He will conduct you to the
3  jury room to conduct your deliberations. We will await
4  further word from you. Let me advise you it's 25
5  minutes until 12:00. We will be making arrangements
6  for you for lunch here in a little while. We will
7  await further written word from you. Thank you.
8          (Jury retires to the jury room)
9          (Open court, Defendant present, Jury not
10  present)
11          THE COURT: I'm going to be separating out
12  the alternate and keeping him separate from the jury.
13  Mr. Kelly is accomplishing that right now. I have him
14  taken to my chambers and I'll ask him to remain
15  separate and apart from them. I think I told him last
16  week to bring a book if he needs to. I'm also going to
17  arrange through the Sheriff's Department to have a
18  deputy accompany them to a lunch place to have lunch.
19  They are under the instructions not to discuss the case
20  while they're doing that. When they come back, we'll
21  await further word.
22          Anything from either side before I go
23  accomplish those things?
24          MR. BOURQUE: The only thing I would say
25  is when you decide where they're going to go for lunch,

**73**

1  tell us so we don't go there.
2          THE COURT: I will.
3          MS. CAMERON: Nothing.
4          THE COURT: Should y'all decide to be
5  apart from us for any significant period of time, make
6  sure we have a pager or cell number. Thank you,
7  Counsel.
8          (Recess taken)
9          (Open court, Defendant present, Jury not
10  present)
11          THE COURT: Counsel, I've already received
12  a communication from the foreman. It says: We want
13  the written statement that Travis gave. We want the
14  exhibit list for both the State and Defense and we want
15  photos of the cell."
16          The written statement's easy, the photos
17  are easy but the clean exhibit lists that don't have
18  references to non-admitted evidence may be problematic
19  at this point. Do y'all have -- were y'all thinking
20  ahead and --
21          MR. MCCLELLAN: We have.
22          THE COURT: -- have exhibit lists that
23  don't have --
24          MS. ALLEN: I can probably clean it up in
25  10, 15 minutes.

**74**

1          THE COURT: I think you can probably do it
2  during the lunch hour. They're going to the Golden
3  Corral, by the way. Don't go to the Golden Corral.
4          MS. CAMERON: Not a problem.
5          THE COURT: They'll be leaving in the next
6  10 minutes. So, let's work on seeing if we can come up
7  with clean exhibit lists and what the numbers are and
8  that will help them throughout the day and throughout
9  the proceedings as they need to see specific exhibits.
10          MR. LOPER: Judge, you may have said it
11  and I didn't catch it. You said all exhibit lists or
12  just the State exhibit list?
13          THE COURT: No, they want both. They want
14  the exhibit lists from both the State and Defense.
15  Okay. So, you guys are charged with coming up with a
16  clean admitted list of Defense exhibits and you guys
17  for the State. Okay. We've got at least an hour to
18  get that done while they go to lunch.
19          (Recess taken)
20          (Open court, Defendant present, Jury not
21  present)
22          THE COURT: I'm having to do a little
23  interpreting of their note here. It lists Defense
24  items that they would like. Defense 33, 34, 34A, 34B,
25  35, 35A, 35B, 38, 40, 41, 41A, 42, 42A, 45A, 47, 48.

**75**

1  Now I guess as an afterthought, 30 and 31A. Okay.
2          Any objection to us finding that evidence
3  and sending it back, from the State or Defense?
4          MR. MCCLELLAN: No.
5          MR. LOPER: No, sir.
6          THE COURT: Okay. Well, let's locate it
7  and send it back. Thank you.
8          (Requested evidence sent to the jury
9  room).
10          (Open court, Defendant present, Jury not
11  present)
12          THE COURT: We've received a note that the
13  jury has received a verdict. We're trying to locate
14  the alternate for him to also receive the verdict. If
15  you will bear with us for a couple minutes.
16          Thank you.
17          Are the parties ready to receive the
18  verdict?
19          MS. CAMERON: Yes, we are, Your Honor.
20          MR. LOPER: Yes, Your Honor.
21          THE COURT: Ladies and gentlemen of the
22  audience, we're going to be having the jury come out in
23  just a moment. I'm going to read their verdict. This
24  is a very serious case. I don't know what the verdict
25  will be. I'm asking that there be no outcries or

76

1  outbursts of any kind. I'm asking that you give this
2  jury and this verdict the respect and deference that
3  they deserve for their decision, whatever that may be.
4       If you feel like you cannot comply with
5  those instructions, I'd ask you to please leave the
6  courtroom. Thank you.
7       (Open court, Defendant present, Jury
8  present)
9       THE COURT:  Thank you.  Please be seated
10  Mr. Nystrom, I've received your note saying that a
11  verdict has been reached; is that correct?
12       FOREPERSON:  Yes, sir.
13       THE COURT:  If you would, please, hand the
14  Charge and verdict form to Mr. Kelly.
15       (Complies).
16       THE COURT:  Thank you.
17       All right.  Counsel, the verdict appears
18  to be in proper form.  Cause No. 08CR0333, the State of
19  Texas versus Travis James Mullis.
20       "Special Issue No. 1.  Answer:  We the
21  jury unanimously find from the evidence beyond a
22  reasonable doubt that the answer to Special Issue No. 1
23  is Yes."  Signed by the foreperson of the jury.
24       "Special Issue No. 2:  We, the jury,
25  unanimously find that the answer to Special Issue No. 2

77

1  is No." Signed by the foreperson of the jury.
2       "We, the jury, return in open court the
3  above answers to the special issues submitted to us and
4  the same is our verdict in this case."
5       Signed by the foreperson of the jury.
6       Does either side desire to have the jury
7  polled as to their answers to these special issues?
8       MS. CAMERON:  We do not, Your Honor.
9       MR. LOPER:  We would, Your Honor.
10       THE COURT:  Ladies and gentlemen of the
11  jury, the Code of Criminal Procedure requires that when
12  a party asks that the jury be polled as to their
13  verdict, that I call each of your names individually
14  and you answer "Yes" or "No" to the question: Is this
15  your verdict?
16       So, we'll begin with Juror 1, Joann
17  Hunter, is this your verdict?
18       JUROR HUNTER:  Yes, sir.
19       THE COURT:  Juror No. 2, Charles Jenkins,
20  is this your verdict?
21       JUROR JENKINS:  Yes, Your Honor.
22       THE COURT:  Juror No. 3, Donna Boswell, is
23  this your verdict?
24       JUROR BOSWELL:  Yes, sir.
25       THE COURT:  Juror No. 4, Bonnie Neiu, is

78

1  this your verdict?
2       JUROR NEIU:  Yes, sir.
3       THE COURT:  Juror No. 5, Dolores Lewis, is
4  this your verdict?
5       JUROR LEWIS:  Yes, sir.
6       THE COURT:  Juror No. 6, Kyle Reiss, is
7  this your verdict?
8       JUROR REISS:  Yes, sir, it is, Your Honor.
9       THE COURT:  Juror No. 7, James Ebbs, is
10  this your verdict?
11       JUROR EBBS:  Yes, sir.
12       THE COURT:  Juror No. 8, Jennifer Munroe,
13  is this your verdict?
14       JUROR MUNROE:  Yes, sir.
15       THE COURT:  Juror No. 9, Shannon Polk, is
16  this your verdict?
17       JUROR POLK:  Yes, sir, it is.
18       THE COURT:  Juror No. 10, Stacy Holly, is
19  this your verdict?
20       JUROR HOLLY:  Yes, sir.
21       THE COURT:  Juror No. 11, Bruce Nystrom,
22  is this your verdict?
23       JUROR NYSTROM:  Yes, sir.
24       THE COURT:  And Juror No. 12, Patricia
25  Proehl, is this your verdict?

79

1       JUROR PROEHL:  Yes, it is.
2       THE COURT:  Thank you.  The jurors have
3  been polled and it's 12 answers of "Yes."
4       Ladies and gentlemen, at the beginning of
5  this trial I gave you certain instructions about not
6  discussing this case, not looking into any evidence
7  about this case, any news reports.  I'm about to
8  release you from those instructions with the thanks of
9  this Court.  And you are free to look at any articles
10  about the case, discuss the case with anyone you
11  choose.  The other side of that coin is you're free not
12  to discuss the case with anyone if that is your choice.
13       Generally at this time I would ask the
14  State and Defense if they have a brief statement they'd
15  like to make to the jury and I'll afford you that
16  opportunity at this time, if you would like.
17       MS. CAMERON:  Thank you, Your Honor.
18       On behalf of the Galveston County District
19  Attorney's Office, all of the citizens of Galveston
20  County with whom you all represent and the memory of
21  Alijah Kohberger, I thank you for your verdict.
22       THE COURT:  Thank you.  Does the Defense
23  desire to make any statement?
24       MR. LOPER:  We don't have a statement,
25  Your Honor.

80

1    THE COURT: Thank you.

2    All right. Ladies and gentlemen, I'm

3    about to send you back to the jury room. I will be

4    meeting with you for a few minutes before you are

5    released. At this time you are excused.

6    (Recess taken)

7    (Open court, Defendant present)

8    THE COURT: Cause No. 08CR0333, the State

9    of Texas versus Travis James Mullis. I'm about to sign

10    a conviction, a judgment of conviction by a jury,

11    capital murder. Date entered March 21st, 2011. The

12    offense for which the Defendant is convicted is capital

13    murder. The jury has answered the special issues in a

14    way that will result in the death penalty being

15    imposed.

16    Mr. Mullis is present with his attorneys

17    and I'll ask the question of you at this time,

18    Mr. Mullis. Do you know of any legal reason why this

19    judgment should not be signed and carried out at this

20    time?

21    THE DEFENDANT: No, sir.

22    THE COURT: That is the order of the

23    Court. You're remanded to the custody of the Sheriff

24    to complete this sentence. I notice and will note for

25    the record that a pauper's oath for the appeal and a

81

1    notice of appeal have been signed by Mr. Mullis; is

2    that correct?

3    MR. LOPER: Yes, Your Honor. We'll also

4    give oral notice of appeal on his behalf.

5    THE COURT: Okay. Anything further from

6    the State or Defense at this time?

7    MS. CAMERON: Nothing further from the

8    State.

9    MR. LOPER: Judge, we just had a question.

10    We don't know if that form that is prepared will show

11    this or we need to make some oral request of the Court

12    that our services would be terminated so he can be

13    appointed qualified certified appellate counsel.

14    THE COURT: I will certainly grant that

15    motion. I think because of the gravity of the case, it

16    would be wise to put that in writing and I'll sign it

17    and this information will be forwarded to the Court of

18    Criminal Appeals for appointment of appellate counsel

19    as soon as that can physically be done.

20    MR. LOPER: We'll get that taken care of,

21    Judge.

22    THE COURT: All right. This Court will

23    stand in recess. Thank you.

24    (Conclusion of the proceedings)

25

82

1    REPORTER'S CERTIFICATE

2    THE STATE OF TEXAS *

3    COUNTY OF GALVESTON *

4

5    I, Judy Hansen, Official Court Reporter in and for

6    the 122nd District Court of Galveston County, State of

7    Texas, do hereby certify that the above and foregoing

8    contains a true and correct transcription of all

9    portions of evidence and other proceedings requested in

10    writing by counsel for the parties to be included in

11    this volume of the Reporter's Record, in the

12    above-styled and numbered cause, all of which occurred

13    in open court or in chambers and were reported by me.

14    I further certify that this Reporter's Record of

15    the proceedings truly and correctly reflects the

16    exhibits, if any, admitted by the respective parties.

17    WITNESS MY OFFICIAL HAND this the 14th day of

18    October, 2011.

19

20    /s/Judy Hansen

21

22    Judy Hansen, Texas CSR 4979

Expiration Date: 12/31/2012

23    Official Court Reporter

122nd District Court

24    Galveston County, Texas

Galveston, Texas

25