# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

|  |  |  |
|---|---|---|
| TRAVIS JAMES MULLIS, | : | |
| | : | |
| Petitioner, | : | |
| | : | No. 3:13-cv-121 |
| v. | : | |
| | : | |
| LORIE DAVIS,, | : | **This is a Capital Case** |
| Director, Texas Department of | : | |
| Criminal Justice, Correctional | : | |
| Institutions Division | : | |
| | : | |
| Respondent. | : | |

## REPLY IN SUPPORT OF CONSOLIDATED
## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PRISONER IN STATE CUSTODY
## PURSUANT TO 28 U.S.C. § 2254 *et seq.*

SHAWN NOLAN
PA Bar No. 53565
PETER WALKER
TX Bar No. 24075445
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
shawn_nolan@fd.org
peter_walker@fd.org

Dated: December 21, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... vi

PRELIMINARY STATEMENT .............................................................................................. 1

WAIVER AND PROCEDURAL DEFAULT ........................................................................... 2

   A.    Law of Procedural Default ................................................................................ 2

   B.    Texas's Application of Article 11.071 § 4 Here Is Inadequate to Foreclose Review by This Court. .............................................................................................. 5

       1.    Texas's relaxed approach to untimely applications under Section 4A ................... 7

       2.    Enforcing Section 4A's time limits where the State never filed a direct appeal brief, was not a clear, firmly established, regularly followed or independent rule at the time of Mullis's alleged default. .................................................................10

   C.    State Habeas Counsel's Abandonment and Ineffective Representation of Mr. Mullis Provide Cause and Prejudice for any State Court Default. ....................... 12

       1.    Counsel performed ineffectively in the months following their appointment. ...... 13

       2.    State habeas counsel abandoned their role as advocate for Mr. Mullis in competency proceedings; at minimum, they were ineffective in failing to investigate or challenge Mr. Mullis's competency to waive. ............................... 15

       3.    Counsel's Ineffectiveness Continued after the October 11 Hearing. .................... 27

       4.    State habeas counsel's abandonment and failures prejudiced Mr. Mullis. ........... 36

       5.    Counsel's failure to correctly calculate the filing deadline frustrated Mr. Mullis's ability to file an application and deprived him of the ability to knowingly waive. ................................................................................................................. 37

       6.    Counsel knowingly failed to disclose a conflict of interest in representing Petitioner in his attempt to file an untimely habeas application. .......................... 40

   D.    Mr. Mullis's Purported Waiver Was Involuntary and There Is a Reasonable Probability that the Court Would Have Found Mr. Mullis Incompetent and his Waiver Involuntary Had It Learned of the Confluence of Mr. Mullis's History of Sexual Abuse and Trauma, Diagnosis of PTSD, and Fear of Being Sexually Assaulted in General Population......................................................................... 41

   E.    28 U.S.C. Section 2254(E)(2) Neither Bars Petitioner From Introducing New Evidence Nor Precludes This Court From Holding An Evidentiary Hearing On His Claims.......................................................................................................... 45

CLAIMS FOR RELIEF ....................................................................................................... 48

I.    In Support Of A Death Sentence, The State Knowingly Presented False Allegations Of Extraneous Offenses By Petitioner As A Juvenile; Defense Counsel Was Ineffective For Failing To Rebut These And Other Allegations That Petitioner Was A Future Danger And Make Appropriate Objections; Appellate Counsel Was Ineffective For Failing To Raise This Record-Based Claim. ..................................... 48

    A.    Respondent Does Not Apply the Correct Standard Pursuant to *Napue* and *Agurs* ............................................................................................................... 50

    B.    Unfounded or Ruled Out Allegations of Sexual Assaults ................................... 52

      1.    *Napue* violation ................................................................................52

      2.    Counsel's Ineffectiveness .................................................................53

      3.    Altercation with Staff Member at Jefferson .........................................55

      4.    Altercation with Grandmother ...........................................................58

      5.    Behavior in Prison ............................................................................59

      6.    Improper and Unrebutted Comparison Between Jefferson School and Prison ......62

II.   Petitioner Was Denied His Sixth Amendment Right to the Effective Assistance of Counsel at Capital Sentencing, Because Counsel Failed to Investigate, Develop, and Present Compelling Mitigating Evidence. .................................................................. 67

    A.    The Legal Standard for Claims of Ineffective Assistance of Counsel. ................. 67

    B.    Deficient Performance. ....................................................................................... 68

    C.    Prejudice. ........................................................................................................... 73

III.  The State Denied Petitioner his Constitutional Rights to Due Process and a Fair Trial by Withholding Evidence; Trial Counsel was Ineffective for Failure to Request this Evidence ....................................................................................................................... 78

    A.    The State Violated *Brady*. ................................................................................. 79

    B.    Counsel Was Ineffective. ................................................................................... 80

IV.   The Excusal of One Hundred Venirepersons by Agreement Between the Parties, Without Individual Voir Dire, Denied Petitioner his Right to an Impartial Capital Sentencing Jury Protected by the Sixth, Eighth and Fourteenth Amendments; the Trial Court Erred in Permitting this Practice; Trial Counsel was Ineffective for Failing to Object to this Practice; the Statute Permitting Excusals upon Agreement is Unconstitutional; Appellate Counsel was Ineffective for Failing to Raise this Claim. ............................................................................................................................ 82

    A.    Petitioner's Claim is Supported by Supreme Court Case Law. ........................... 83

    B.    *Teague* Does Not Prevent This Court from Considering Petitioner's Claim ........ 86

    C.    Petitioner Has Pled Sufficient Facts to Prove Counsel's Ineffectiveness. ............ 87

V.      The Trial Court Erred in Failing to Instruct Petitioner's Capital Sentencing Jury that Mitigating Circumstances Do Not Need to Be Proven Beyond a Reasonable Doubt, Violating Petitioner's Eighth and Fourteenth Amendment Rights; Trial Counsel was Ineffective for Failing to Move for a Proper Instruction or Object to the Instruction as Given; Appellate Counsel was Ineffective for Failing to Raise This Issue. ............... 89

VI.     Trial Counsel Was Ineffective For Failing To Move For Change Of Venue Or Venire Despite The Fact That The Community And Jury Poool Had Been Saturated With Highly Prejudicial Publicity. As A Result, Petitioner Was Denied His Rights To An Impartial Jury And Due Process. .................................................................................... 91

    A.    Texas Law Governing Motions for Change of Venue ........................................... 92

    B.    Trial Counsel Was Ineffective ............................................................................. 93

VII.    Voir Dire Was Constitutionally Defective.................................................................. 95

    A.    Inadequate Voir Dire About Prospective Jurors' Ability to Consider Mitigating Evidence...................................................................................................... 96

    B.    Counsel's Failure to Request Voir Dire of Jurors as to Whether or Not They Could Consider a Life Sentence for Someone Who Killed an Infant................... 98

VIII.   Improper Victim Impact Evidence Was Presented To The Jury At The Guilt/Innocence Phase Of The Trial And Trial Counsel Were Ineffective In Failing To Properly Litigate This Issue.................................................................................... 99

IX.     Trial Counsel Was Ineffective For Failing To Investigate, Develop And Present Evidence Of Petitioner's Mental State To Rebut The State's Evidence Of Mens Rea. ................................................................................................................................ 101

    A.    Evidence of Petitioner's Mental State was Relevant and Admissible. ............... 102

    B.    Respondent Mischaracterizes Petitioner's Claim. ............................................. 103

    C.    Trial Counsel Was Ineffective. .......................................................................... 104

X.      Petitioner Was Denied His Rights Under The Fifth, Sixth, Eighth And Fourteenth Amendments By The Prosecution's Presentation Of Improper And Inflammatory Evidence, By The Trial Court's Erroneous Evidentiary Rulings And By Trial Counsel's Ineffective Failures To Object To The Admission Of Improper Evidence; Direct Appeal Counsel Was Ineffective For Failure To Raise This Claim ............. 106

XI.     The Trial Court Erred By Admitting Petitioner's Custodial Statements Without Pretrial Notice And In Violation Of Petitioner's Fifth And Fourteenth Amendment Rights; Trial Counsel Was Ineffective For Failing To Properly Litigate This Issue And For Failing To Object To And/Or Counter Law Enforcement Testimony Regarding Petitioner's Purported Lack Of Remorse ................................................ 109

    A.    Violation of Petitioner's Fifth and Fourteenth Amendment Rights................... 109

    B.    Trial Counsel's Ineffectiveness.......................................................................... 111

XII.    Petitioner's Right To Silence Was Violated When The Prosecutor Commented On Petitioner's Silence During The Penalty Phase ....................................................... 112

iv

A.  Petitioner's Constitutional Right to Silence Was Violated ............................... 113

B.  Trial Counsel Was Ineffective ............................................................ 115

XIII.  Petitioner Was Incompetent When He Waived His Appellate Rights; Trial Counsel Were Ineffective For Failing To Protect Those Rights; Trial Court Erred In Not Holding A Full Competency Hearing. .................................................... 117

XIV.  Petitioner's Conviction And Sentence Are Unconstitutional Due To The Cumulative Effect Of Trial Counsel's Inadequate Representation, The State's Misconduct And The Court Errors Described Above. ....................................................... 124

REQUEST FOR RELIEF ...................................................................... 126

# TABLE OF AUTHORITIES

**Federal Cases**

*Adams v. Texas*,
  448 U.S. 38 (1980) ......................................................................................... 83

*Agan v. Singletary*,
  12 F.3d 1012 (11th Cir. 1994) ....................................................................... 23

*Andrus v. Texas*,
  140 S. Ct. 1875 (2020)..................................................................................... 57

*Appel v. Horn*,
  250 F.3d 203 (3rd Cir. 2001) .................................................................... 15, 23

*Austin v. Davis*,
  876 F.3d 757 (5th Cir. 2017) ......................................................................... 121

*Banks v. Dretke*,
  540 U.S. 668 (2004) ......................................................................................... 81

*Barrientes v. Johnson*,
  221 F.3d 741 (5th Cir. 2000) ........................................................................... 48

*Berger v. United States*,
  55 S. Ct. 629 (1935) ....................................................................................... 115

*Boone v. Paderick*,
  541 F.3d 447 (4th Cir. 1976) ........................................................................... 79

*Bouchillon v. Collins*,
  907 F.2d 589 (5th Cir. 1990) ................................................... 16, 19, 20, 22, 23

*Boyde v. California*,
  494 U.S. 370 (1990) .................................................................................... 89-90

*Bradshaw v. Richey*,
  546 U.S. 74 (2005) ........................................................................................... 46

*Brady v. United States*,
  397 U.S. 742 (1970) ....................................................................... 41, 42, 43, 44, 45

*Brown v. Thaler*,
  455 F. App'x 401 (5th Cir. 2011) ............................................................... 32, 33

*Canales v. Stephens*,
  765 F.3d 551 (5th Cir. 2014) ............................................................................. 3

*Caro v. Calderon*,
   165 F.3d 1223 (9th Cir. 1999) ................................................................ 25

*Caswell v. Ryan*,
   953 F.2d 853 (3d Cir. 1992) .................................................................. 23

*Chambers v. Mississippi*,
   410 U.S. 284 (1973) ............................................................................ 124

*Coleman v. Thompson*,
   501 U.S. 722 (1991) .................................................................... 5, 7, 11

*Couch v. Booker*,
   632 F.3d 241 (6th Cir. 2011) ................................................................ 25

*Cullen v. Pinholster*,
   563 U.S. 170 (2011) .............................................................................. 45

*Davis v. Alaska*,
   415 U.S. 308 (1974) .............................................................................. 79

*Demothenes v. Baal*,
   495 U.S. 731 (1990) ............................................................................ 121

*Dowthitt v. Johnson*,
   230 F.3d 733 (5th Cir. 2000) .......................................................... 25, 26

*Doyle v. Ohio*,
   426 U.S. 610 (1976) .................................................................... 110, 111

*Draughon v. Dretke*,
   427 F.3d 286 (5th Cir. 2005) .............................................................. 105

*Eddings v. Oklahoma*,
   455 U.S. 104 (1982) .............................................................................. 97

*Ford v. Wainwright*,
   477 U.S. 399 (1986) ............................................................................ 121

*Jurek v. Texas*,
   428 U.S. 262 (1976) ............................................................................ 123

*Evitts v. Lucy*,
   469 U.S. 387 (1985) ............................................................................ 123

*Faretta v. California*,
   422 U.S. 806 (1975) ............................................................................ 122

*Giglio v. United States*,
     405 U.S. 150 (1972) ................................................................. 50

*Gongora v. Thaler*,
     710 F.3d 267 (5th Cir. 2013) .................................................. 116

*Gonzalez v. State*,
     924 F.3d 236 (5th Cir. 2019) ................................................. 4, 5

*Gregory v. Thaler*,
     601 F. 3d 347 (5th Cir. 2010) ................................................. 68

*Griffin v. California*,
     380 U.S. 609 (1965) ............................................................... 113

*Griffin v. Warden*,
     970 F.2d 1355 (4th Cir. 1992) ................................................ 57

*Hale v. United States*,
     710 F.3d 711 (7th Cir. 2011) ................................................. 122

*Harrington v. Richter*,
     562 U.S. 86 (2011) .................................................................. 65

*Hendricks v. Calderon*,
     70 F.3d 1032 (9th Cir. 1995) ................................................. 26

*Holland v. Jackson*,
     542 U.S. 649 (2004) ................................................................ 46

*Hooks v. Workman*,
     689 F3d 1148 (10th Cir. 2012) .............................................. 49

*Hull v. Freeman*,
     932 F.2d 159 (3d Cir. 1991) ................................................... 23

*Jackson v. Johnson*,
     194 F.3d 641 (5th Cir. 1999) ................................................ 114

*James v. Kentucky*,
     466 U.S. 341 (1984) .................................................................. 5

*Kansas v. Carr*,
     577 U.S. 108 (2016) ................................................................ 90

*Keeney v. Tamayo-Reyes*,
     504 U.S. 1 (1992) .................................................................... 47

*Kyles v. Whitley*,
   514 U.S. 441 (1995) ............................................................. 58, 64, 124

*Lee v. Kemna*,
   534 U.S. 362 (2002) ............................................................. 5

*Lewis v. Connecticut Com'r of Correction*,
   790 F.3d 109 (2d Cir. 2015) ............................................................. 81

*Maples v. Thomas*,
   132 S. Ct. 912 (2012) ............................................................. 2, 3, 4, 27, 46

*Martinez v. Ryan*,
   132 S. Ct 1309 (2012) ............................................................. 2, 3

*Martinez v. Ryan*,
   566 U.S. 1 (2012) ............................................................. 2, 3, 46, 47

*Mata v. Johnson*,
   210 F.3d 324 (5th Cir. 2000) ............................................................. 24

*Matsuda v. Wada*,
   101 F.Supp. 1315 (D. Haw., 1999) ............................................................. 61, 66

*McClain v. Hall*,
   552 F.3d 1245 (11th Cir. 2008) ............................................................. 25

*McGruder v. Metropolitan Government of Nashville and Davidson County, Tennessee*,
   2020 WL 4586171 (MD. Tenn. August 10, 2020) ............................................................. 62

*Mills v. Maryland*,
   486 U.S. 367 (1988) ............................................................. 89, 90

*Morgan v. Illinois*,
   504 U.S. 719 (1992) ............................................................. 83, 95, 97, 98

*Napue v. Illinois*,
   360 U.S. 264 (1959) ............................................................. 50

*Newbury v. Stephens*,
   756 F.3d 850 (5th Cir. 2014) ............................................................. 46

*Nissho-Iwai Am. Corp. v. Kline*,
   845 F.2d 1300 (5th Cir. 1988) ............................................................. 66

*Old Chief v. United States*,
   519 U.S. 172 (1997) ............................................................. 106

*Padilla v Kentucky*,
    559 U.S. 356 (2010) ........................................................... 11

*Pamplin v. Mason*,
    364 F.2d 1 (5th Cir. 1966) ............................................... 92

*Payne v. Tennessee*,
    501 U.S. 808 (1991) ......................................................... 99

*Penry v. Johnson*,
    532 U.S. 782 (2001) ......................................................... 90

*Penry v. Lynaugh*,
    492 U.S. 302 (1989) ..................................................... 90, 95

*Porter v. McCollum*,
    558 U.S. 30 (2009) ....................................................... 57, 71

*Ramey v Davis*,
    314 F.Supp.3d 785 (S.D. Tex. 2018) ........................... 87, 88

*Raymond v. Weber*,
    552 F.3d 680 (8th Cir. 2009) ........................................... 15

*Bonds v. Cox*,
    20 F.3d 697 (6th Cir. 1994) ............................................. 62

*Richey v. Bradshaw*,
    498 F.3d 344 (6th Cir. 2007) ........................................... 25

*Rompilla v. Beard*,
    545 U.S. 374 (2005) ........................................... 55, 56, 71, 72

*Ross v. Oklahoma*,
    487 U.S. 81 (1988) ........................................................... 96

*Saffle v. Parks*,
    494 U.S. 484 (1990) ......................................................... 86

*Schriro v. Landrigan*,
    550 U.S. 465 (2007) ......................................................... 36

*Segundo v Davis*,
    831 F.3d 345 (5th Cir. 2016) ........................................... 26

*Seidel v. Merkle*,
    146 F.3d 750 (9th Cir. 1998) ......................................... 102

x

*Sims v. Brown*,
    425 F.3d 560 (9th Cir. 2005) ........................................................................ 25, 26

*Smith v. Dretke*,
    417 F.3d 438 (5th Cir. 2005) ........................................................................ 105

*Soria v. Johnson*,
    207 F.3d 232 (5th Cir. 2000) ........................................................................ 97

*Speights v. Frank*,
    361 F.3d 962 (7th Cir. 2004) ........................................................... 117-118, 118

*Strickland and Lafler v. Cooper*,
    566 U.S. 156 (2012) ........................................................................ 33

*Strickland v. Washington*,
    466 U.S. 668 (1984) ............................................. 3, 51, 73, 104, 108, 112, 124

*Sturgis v. Goldsmith*,
    796 F.2d 1103 (9th Cir. 1986) ........................................................................ 15

*Taylor v. Kentucky*,
    436 U.S. 478 (1978) ........................................................................ 124

*Teague v. Lane*,
    489 U.S. 288 (1989) ........................................................................ 63, 86

*Tennard v. Dretke*,
    542 U.S. 274 (2004) ........................................................................ 90

*Tenny v. Dretke*,
    416 F.3d 404 (5th Cir. 2005) ........................................................................ 105

*Thompson v. Wainwright*,
    787 F.2d 1447 (11th Cir. 1986) ........................................................................ 118

*Three Rivers Confections, LLC v. Warman*,
    660 Fed.Appx. 103 (3d Cir. 2016) ........................................................................ 66

*Trevino v. Thaler*,
    569 U.S. 413 (2013) ............................................................ 3, 14, 46, 47

*Turner v. Murray*
    476 U.S. 28 (1986) ........................................................................ 87

*U.S. v. Medina-Carrasco*,
    815 F.3d 457 (9th Cir. 2015) ........................................................................ 122

*Ulster County Ct. v. Allen*,
    442 U.S. 140 (1979) ............................................................................................ 5

*United States v. Agurs*
    427 U.S. 97 (1976) ............................................................................................ 50

*United States v. Bagley*,
    473 US. 667 (1985) ............................................................................................ 79

*United States v. Barfield*,
    969 F.2d 1554 (4th Cir. 1992) ............................................................................ 15

*United States v. Boigegrain*,
    155 F.3d 1181 (10th Cir. 1998) .......................................................................... 23

*United States v. Collins*,
    430 F.3d 1260 (10th Cir. 2005) .......................................................................... 15

*United States v. Dula*,
    989 F.2d 772 (5th Cir. 1993) ............................................................................ 114

*United States v. Grosz*,
    76 F.3d 1318 (5th Cir. 1996) ............................................................................ 114

*United States v. Klat*,
    156 F.3d 1258 (D.C. Cir. 1998) .......................................................................... 15

*United States v. Martinez*,
    143 F.3d 1266 (9th Cir.1998) ........................................................................... 122

*United States v. Shaw*,
    701 F.2d 367 (5th Cir. 1983) ............................................................................ 110

*United States v. Tavera*,
    719 F.3d 705 (6th Cir. 2013) .............................................................................. 81

*Wainwright v. Witt*,
    469 U.S. 412 (1985) ............................................................................... 83, 84, 96

*Walbey v. Quarterman*,
    2009 WL 113778 (5th Cir. 2009) ............................................................... 50-51, 73

*Wiggins v. Smith*,
    539 U.S. 510 (2003) .................................................................................... *passim*

*Williams v. Taylor*,
    529 U.S. 362 (2000) .......................................................................................... 68

*Williams v. Taylor*,
    529 U.S. 420 (2000) ....................................................... 46, 47

*Witherspoon v. Illinois*,
    391 U.S. 510 (1968) ....................................................... 82-83

*Wood v. Quarterman*,
    491 F.3d 196 (5th Cir. 2007) ............................... 36, 119-120

*Wood v. Quarterman*,
    503 F.3d 408 (5th Cir. 2007) ..................................... 106

## Federal Statutes

28 U.S.C. § 2254 .......................................................... 45-48

28 U.S.C. §1746 ............................................................. 66

28 U.S.C. § 2254 ............................................................ i, 45

28 U.S.C. § 4904 .......................................................... 62, 63

## State Cases

*Allridge v. State*,
    850 S.W.2d 471 (Tex. Crim. App. 1991) .......................... 96

*Bell v. State*,
    938 S.W.2d 35 (Tex. Crim. App. 1996) ........................... 92

*Bryant v. State*,
    75 S.W.3d 628 (Tex. App.—Ft. Worth 2002) ................. 30

*Burgess v. State*,
    816 S.W.2d 424 (Tex. Crim. App. 1991) ..................... 31, 32

*Butler v. State*,
    716 S.W.2d 48 (Tex. Crim. App. 1986) .......................... 105

*Dinkins v. State*,
    894 S.W.2d 330 (Tex. Crim. App. 1995) ...................... 110

*Druery v. State*,
    225 S.W.3d 491 (Tex. Crim. App. 2007) ........................ 65

*Ex parte Bigby*,
    2008 WL 5245356 (Tex. Crim. App. Dec. 17, 2008) ............ 8

*Ex parte Brown*,
    2008 WL 152724 (Tex. Crim. App. Jan. 16, 2008) ............. 8

*Ex parte Carter,*
    2009 WL 190161 (Tex. Crim. App. Jan. 28, 2009) ............................................ 8

*Ex parte Cortez,*
    2013 WL 458197 (Tex. Crim. App. Feb. 6, 2013) .......................................... 8-9

*Ex parte Gobert,*
    2012 WL 479689 (Tex. Crim. App. Feb. 15, 2012) ........................................... 8

*Ex parte Gongora,*
    2006 WL 173106 (Tex. Crim. App. Jan. 25, 2006) ..................................... 8, 39

*Ex parte Kerr*,
    64 S.W.3d 414 (Tex. Crim. App. 2002) ......................................................... 7

*Ex parte Medina,*
    361 S.W.3d 633 (Tex. Crim. App. 2011) ....................................................... 8

*Ex parte Medrano,*
    2012 WL 5452694 (Tex. Crim. App. Nov. 7, 2012) ........................................ 9

*Ex parte Norman,*
    2010 WL 4978807 (Tex. Crim. App. Dec. 8, 2010) ....................................... 9

*Ex parte Reynoso*,
    228 S.W.3d 163 (Tex. Crim. App. 2007) ............................................. 7, 8, 35

*Ex parte Reynoso*,
    257 S.W.3d 715 (Tex. Crim. App. 2008) ...................................... 7, 28, 35, 36

*Ex parte Segundo,*
    2009 WL 190162 (Tex. Crim. App. Jan. 28, 2009) ......................................... 8

*Fields v. State*,
    627 S.W.2d 714 (Tex. Crim. App. 1982) ...................................................... 92

*Gonzalez v. State*,
    222 S.W.3d 446 (Tex. Crim. App. 2007) ...................................................... 93

*Hallman v. State*,
    603 S.W.3d 178 (Tex. App. 2020) ............................................................... 51

*Henley v. State*,
    576 S.W.2d 66 (Tex. Crim. App. 1978) .................................................. 92, 93

*Jackson v. State*,
    160 S.W.3d 568 (Tex. Crim. App. 2005) ................................................ 102, 103

*Kniatt v. State*,
　206 S.W.3d 657 (Tex. Crim. App. 2006) .............................................................. 41

*Mayes v. State*,
　816 S.W.2d 79 (Tex. Crim. App. 1991) ............................................................. 107

*Miller-El v. State*,
　782 S.W.2d 892 (Tex. Crim. App. 1990) ...................................................... 99, 101

*Owen v. State*,
　656 S.W.2d 458 (Tex. Crim. App. 1983) ........................................................... 113

*Roberson v. State*,
　2002 WL 34217382 (Tex. Crim. App. June 20, 2007) ................................. 102, 103

*Ruffin v. State*,
　270 S.W.3d 586 (Tex. Crim. App. 2008) ................................................... 102, 103

*Rumbaugh v. State*,
　629 S.W.2d 747 (Tex. Crim. App., 1982) ............................................................ 65

*Schindley v. State*,
　326 S.W.3d 227 (Tex. App. 2010) ............................................................ 118, 119

*Standefer v. State*,
　59 S.W.3d 177 (Tex. Crim. App. 2001) .............................................................. 96

*Wheeler v. State*,
　353 S.W. 3d (Tex. Crim. App. 1962) ................................................................. 79

## State Statutes

Tex. Code Crim. Proc. art. 11.071 § 2 ............................................................ 5, 37

Tex. Code Crim. Proc. art. 11.071 § 3 ............................................ 14, 15, 33, 34, 35

Tex. Code Crim. Proc. art. 11.071 § 4 ........................................................ *passim*

Tex. Code Crim. Proc. art. 38.36 ..................................................................... 101

Tex. Code Crim. Proc. art. 11.071 § 4 ............................................................ 5, 37

Tex. Code. Crim. Proc. Art. 35.05 ..................................................... 82, 83, 86, 88

Tex. Penal Code § 6.03 .................................................................................. 103

Tex. Penal Code § 19.02 ......................................................................... 102, 103

## PRELIMINARY STATEMENT

Petitioner Travis Mullis will be referred to by name or as "Petitioner." Transcripts of state court trial proceedings in the Reporter's Record will be cited as [Volume number] RR [page number].  Pleadings and orders that are part of the Clerk's Record in the 122nd District Court of Galveston County will be referred to as named in the record, with reference to CR followed by page number, when available.

Petitioner's Consolidated Petition for a Writ of Habeas Corpus (ECF No. 94) will be cited as "Petition," and Respondent Davis's Answer and Motion for Summary Judgement (ECF No. 147) will be cited as "Answer." All page citations to these pleadings will be to page number of the document.

Petitioner filed two appendixes, one with the initial Petition (ECF No. 10) and another with the Supplement (ECF No. 28). On July 19, 2017, Petitioner filed a consolidated habeas petition (ECF 94) and a consolidated appendix (ECF Nos. 95, 95-1, 95-2, 95-3 7 95-4), containing all of the exhibits with their initial numbering (the numbering continued seriatim in the second appendix). In this pleading, Petitioner will cite to the exhibit numbers in the consolidated appendix when referencing documents filed therein.  There are thirteen additional exhibits attached to this filing cited as Exhibits A through Exhibit M.

All other citations are either self-explanatory or will be explained.  All emphasis in this Reply is supplied unless otherwise indicated; parallel citations are omitted.

Petitioner provides a reply only to assertions in Respondent's Answer not sufficiently addressed in the Petition.  For those claims and issues not addressed in this Reply, Petitioner relies on the factual and legal arguments made in the Petition.  Claim XVI addresses the invalidity of Petitioner's waiver of direct appeal counsel and process and is relevant to, and

incorporated into, each of Petitioner's claims containing assertions of appellate counsel's ineffectiveness.

## WAIVER AND PROCEDURAL DEFAULT

Respondent argues that Mr. Mullis's claims are procedurally defaulted, rendering this Court unable to review them, because the claims were not exhausted in state court and would be barred from future review in state court. *See* Answer at 46-50.

Mr. Mullis is entitled to merits review of his claims for three reasons. First, Texas's application of Article 11.071 § 4 here is inadequate to foreclose review by this Court. Second, state habeas counsel's abandonment of Mr. Mullis and ineffectiveness during state habeas proceedings caused Petitioner to fail to exhaust his claims in the state courts, excusing any default. *See Martinez v. Ryan*, 132 S. Ct 1309 (2012); *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012). These failures undermined the reliability of the competency proceedings and prevented Mr. Mullis from making a knowing, intelligent, and voluntary waiver. Third, Mr. Mullis's purported waiver was not voluntary, but instead was driven by his traumatic sexual history and his fear of being sexually assaulted in prison.

### A.      Law of Procedural Default

The doctrine of procedural default is judge-made law designed "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez*, 132 S. Ct. at 1316. The doctrine imposes a bar on federal review of claims that "a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Id.* This bar does not apply, however, unless certain prerequisites are satisfied. The bar may be applied only if "the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Id.* (citations omitted). Finally, a state prisoner may

2

overcome default in federal court by showing "cause" for the default and "prejudice" from the violation of federal law. *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Under Supreme Court precedent, post-conviction counsel's ineffective assistance can constitute "cause" to overcome a default. In *Martinez*, the Court held that when an initial-review collateral proceeding is the first time a petitioner can raise a claim for ineffective assistance of trial counsel, state habeas counsel's ineffective assistance at that stage could supply "cause" for the default of the trial ineffectiveness claim. 132 S. Ct. at 1320. The next Term, the Court clarified that this rule applied to Texas, because the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013).

To establish cause, *Martinez* requires Petitioner to show that (1) state habeas counsel's performance at an initial collateral-review proceeding was deficient as defined in *Strickland v. Washington*, 466 U.S. 668 (1984), and (2) an ineffective-assistance-of-trial-counsel claim that state habeas counsel failed to raise has "some merit." *Canales v. Stephens*, 765 F.3d 551, 567-68 (5th Cir. 2014). Petitioner makes these showings in Parts I.C-G. In addition, Petitioner must demonstrate prejudice, which "requires a showing that there is 'a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 568 (quoting *Strickland,* 466 U.S. at 694) (alteration in original). The meritorious claims outlined in this pleading prove prejudice.

The Supreme Court has carved out another exception to the general rule that mere "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as 'cause.'" *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012) (citing *Coleman*, 501 U.S. at 753). In *Maples*, the

Court held that an attorney's abandonment of her client without notice in post-conviction proceedings could provide cause for the resulting default. *Id*. *Maples* reasoned that such actions by counsel could not be imputed to her client because the principal-agent relationship had been "severed." *Id.* at 922-23 (citing *Jamison v. Lockhart,* 975 F.2d 1377, 1380 (8th Cir. 1992) (attorney conduct may provide cause to excuse a state procedural default where, as a result of a conflict of interest, the attorney "ceased to be [petitioner's] agent")). Mr. Mullis shows below that counsel abandoned him leading up to, during, and after the October 11, 2011 competency hearing, establishing "cause" under *Maples*.

Respondent's misapplication of *Gonzalez v. State*, 924 F.3d 236 (5th Cir. 2019), premised on a distortion of the record before this Court, is utterly specious. *See* Answer at 60-62. In *Gonzalez*, the Fifth Circuit held that a petitioner's federal habeas claims were procedurally barred where his failure to seek state habeas relief was caused "by his refusal to *accept* [state] habeas counsel," in the first place, and subsequent failure to timely file a pro se petition. *Gonzalez*, 924 F.3d at 244 (emphasis added). The court specifically noted that the petitioner was unable to avail himself of the *Martinez/Trevino* exception to establish cause and prejudice because he failed to "*accept*" state habeas counsel. *Id*. fn. 3 (emphasis added). In order to render *Gonzalez* relevant, Respondent inaccurately asserts that Petitioner also "refused to accept state habeas counsel" and therefore cannot point to an external cause to excuse his procedural default. Answer at 60. But unlike the petitioner in *Gonzalez*, Petitioner initially accepted state habeas counsel; it was only by accepting counsel that Petitioner could have later made a "decision to discharge" that counsel. *Id*. at 62. Here, the facts of Petitioner's case fall squarely into the *Martinez/Trevino* exception because state habeas counsel's ineffectiveness during the period they

4

represented Petitioner—i.e. state habeas counsel's "failings," *Gonzalez*, 924 F.3d at 244 fn. 3—caused any procedural default.

### B.     Texas's Application of Article 11.071 § 4 Here Is Inadequate to Foreclose Review by This Court.

Under the doctrine of procedural default, in order to preclude review of a claim by this Court, a state court's procedural rule must be "independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be "adequate" to preclude federal merits review, the state court bar must have been "clear" and "firmly established and regularly followed" at the time of the alleged default. *See James v. Kentucky*, 466 U.S. 341, 348 (1984) (state rule must be "clear," "firmly established and regularly followed"); *Ulster County Ct. v. Allen*, 442 U.S. 140, 150-51 & nn.8-9 (1979) (state rule must be "clear"). And "adequacy is itself a federal question" that this Court has sole responsibility to decide. *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quotation omitted). Here, Texas's denial of Mr. Mullis's request to reinstate his state habeas proceedings as untimely under Article 11.071 § 4 was inadequate because the bar was neither "clear" nor "firmly established and regularly followed" when applied in these novel circumstances.

Section 4 of Article 11.071 governs the timing of filing of a state habeas application in capital cases and states that an application:

> must be filed in the convicting court not later than the 180th day after the date the convicting court appoints counsel under Section 2 or not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later.

Tex. Code Crim. Proc.art. 11.071 § 4(a).

After vacillation by Mr. Mullis over whether to pursue state habeas proceedings, and much confusion over the deadline to file, *see infra*, the Texas Court of Criminal Appeals ruled that Mr. Mullis had failed to file and thus defaulted a state habeas application by July 2, 2012,

which they calculated to be Mr. Mullis's deadline "[u]nder the best possible scenario." Order, *Ex parte Mullis*, No. WR-76,632-01 (Tex. Crim. App. Sept. 12, 2012) at 2. The Court instructed that any untimely application or motion for a new filing date would have to be accompanied by a showing of good cause why it was not filed before the deadline.[1] *Id.*

On November 20, 2012, state habeas counsel filed on Mr. Mullis's behalf a motion seeking to establish a new due date for a habeas application, which would have effectively reinstated state habeas corpus proceedings. *See* Motion to Appoint Counsel and Establish a New Habeas Corpus Application Due Date (hereinafter "4A motion"). As discussed *infra*, in support of this motion, state habeas counsel argued that new evidence of Mr. Mullis's mental illness constituted good cause, a basis for establishing a new filing date under Article 11.071 § 4A.

On December 12, 2012, the CCA found that state habeas counsel had failed to show good cause under Section 4A "[i]n light of [Mullis's] most recent letter, his consistent and persistent efforts to forego habeas review, and our review of the record." As Respondent acknowledges, the application of this procedural bar terminated Mr. Mullis's state habeas proceedings and prevented him from filing a state habeas application. Answer at 43.

---

[1] Section 4A provides:

> On command of the court of criminal appeals, a counsel who files an untimely application or fails to file an application before the filing date applicable under Section 4(a) or (b) shall show cause as to why the application was untimely filed or not filed before the filing date. . . . At the conclusion of the counsel's presentation to the court of criminal appeals, the court may . . . appoint new counsel to represent the applicant and establish a new filing date for the application, which may be not more than 270 days after the date the court appoints new counsel.

Tex. Code Crim. Proc. art. 11.071 § 4A.

However, this state procedural bar does not foreclose review of Mr. Mullis's claims, because it was inadequate under *Coleman,* 501 U.S. at 729. First, Section 4A was not firmly established or regularly followed due to the CCA's relaxed approach to untimely applications. And second, when applied to Mr. Mullis, there was no clear, firmly established, regularly followed, independent rule with respect to cases like this one, in which the State never filed an appellate brief to trigger the state habeas deadline under Article 11.071 § 4(a).

### 1.  Texas's relaxed approach to untimely applications under Section 4A

Texas's capital habeas statute is "built upon the premise that a death row inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute." *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002). When an applicant's counsel makes mistakes that are not attributable to the applicant, the Court of Criminal Appeals has given the applicant the chance to have a single "bite at the apple" by finding "good cause" under Article 11.071, Section 4A.

The Texas Court of Criminal Appeals has interpreted "good cause" leniently and typically granted petitioners the opportunity to file otherwise untimely applications under 4A when counsel has made some mistake. The case of Juan Reynoso is instructive. In that case, the applicant waffled in his decision to waive, repeatedly invoking waiver and removing counsel and then seeking to revoke waiver and have counsel reappointed. *Ex parte Reynoso*, 257 S.W.3d 715, 716 (Tex. Crim. App. 2008). Reynoso eventually permitted his counsel to file an application on his behalf, but the application was ruled untimely. *Id.* Initially, "[g]iven the timing and applicant's repeated claims that he did not want to pursue his appeals, [the Court] held that, although his application was filed during an interval in which he chose to pursue his appeals, applicant could not show good cause for the untimely filing." *Id.* (citing *Ex parte Reynoso,* 228 S.W.3d 163 (Tex. Crim. App. 2007)). But the Court of Criminal Appeals reconsidered its decision, vacating its earlier finding of no good

7

cause. *Id.* at 717. The Court determined there was "good cause" where Reynoso's "tardiness in filing was due to [counsel's] mistaken, but not totally implausible, interpretation of the law," notwithstanding Reynoso's own waffling on his decision to waive. *Id.* at 723. Therefore, technical mistakes of law can provide "good cause" even where the applicant's conduct partially contributes to the untimely filing.

Time and again, the Court has found "good cause" for technical errors, honest mistakes, and sundry equitable reasons. *See, e.g.*, *Ex parte Bigby*, WR-34,970-02, 2008 WL 5245356 (Tex. Crim. App. Dec. 17, 2008) (good cause found for "a simple miscalculation of the dates"); *Ex parte Murphy*, WR-70,832-01 (Tex. Crim. App. Mar. 25, 2009) (good cause found where motion for extension of time filed after deadline due to counsel's misreading of statute). The Court has found good cause where "the State fail[ed] to challenge [counsel's honest] mistake." *Ex parte Brown*, WR-68,876-01, 2008 WL 152724 (Tex. Crim. App. Jan. 16, 2008). The Court has also found good cause when the applicant's counsel has "intentional[ly] refus[ed] to plead specific facts that might support habeas-corpus relief." *Ex parte Medina*, 361 S.W.3d 633, 642 (Tex. Crim. App. 2011).

It has found good cause where counsel missed *two* habeas deadlines and stated that he was hospitalized for a mere four days over two months before the application was due. *Ex parte Segundo*, WR-70,963-01, 2009 WL 190162 (Tex. Crim. App. Jan. 28, 2009); *Ex parte Carter*, WR-70,722-01, 2009 WL 190161 (Tex. Crim. App. Jan. 28, 2009). It has found good cause for unstated reasons in a case where the application was filed over six months late. *Ex parte Gongora*, WR-60115-02, 2006 WL 173106 (Tex. Crim. App. Jan. 25, 2006). It has found good cause where counsel had not even moved to show good cause and the circumstances causing the untimely filing were "primarily" beyond counsel's control. *Ex parte Gobert*, WR-77,090-01, 2012 WL 479689 (Tex. Crim. App. Feb. 15, 2012); *see also Ex parte Cortez*, WR-78,666-01, 2013 WL 458197 (Tex.

Crim. App. Feb. 6, 2013) (waiving requirement of showing of good cause and addresses merits of application signed on due date but not field until five days later).

The Court is so committed to the principle that an applicant will have one full and fair opportunity to present his claims that it has ensured even applicants who fail to show good cause can receive the benefit of a 4A remedy—i.e., appointment of new counsel and the opportunity to file a new application. *See Ex parte Medrano*, WR-78,123-01, 2012 WL 5452694 (Tex. Crim. App. Nov. 7, 2012) (good cause not found where original counsel's filing was four years overdue, but still appointing new counsel to prepare a new application); *see also Ex parte Castillo*, WR-70,510-01 (Tex. Crim. App. April 22, 2009) (after determining original counsel had failed to show good cause for failing to file timely application, Court appointed new counsel and granted 270 days to file application); *Ex parte Luna*, WR-70,511-01 (Tex. Crim. App. Oct. 1, 2008) (same); *Ex parte Neal*, WR-70,512-01 (Tex. Crim. App. Oct. 1, 2008); *Ex parte Young*, WR-70,513-01 (Tex. Crim. App. Oct. 1, 2008) (same); *Ex parte Ramirez*, AP-75,167 (Tex. Crim. App. July 7, 2008) (appointing new counsel and granting 270 days to file petition after original counsel failed to timely file application and "ha[d] not even attempted to show good cause.").[2]

---

[2] The Court has also found good cause in *Ex parte Norman*, WR-74,743-01, 2010 WL 4978807 (Tex. Crim. App. Dec. 8, 2010) (application considered timely after counsel for applicant filed application in wrong county, which then forwarded application to correct county after deadline.); *Ex parte Rubio*, WR-65,784-02 (Tex. Crim. App. Sept. 11, 2013) (good cause found in light of difficulty obtaining timely rulings from trial court, and upon applicant's third request, counsel failed to show good cause, but Court still granted additional 30 days to file application.); *Ex parte Smith*, WR-70,593-01 (Tex. Crim. App. Oct. 1, 2008) (good cause found where originally appointed counsel withdrew due to health condition and subsequent counsel diligently pursued case); *Ex parte Blanton*, WR-61,443-01 (Tex. Crim. App., June 22, 2005) (good cause found for reasons not stated); *Ex parte Ramirez*, WR-71,401-01 (Tex. Crim. App. Feb. 11, 2009) (good cause found where originally appointed counsel was removed for failing to file timely application, and subsequent counsel had difficulty obtaining full record); *Ex parte Brewer*, WR-46,587-02, (Tex. Crim. App. Jan. 20, 2012) (good cause found where filing deadline was unclear due to complicated history of case).

In sum, Texas has construed "good cause" broadly in order to ensure that an applicant receives "one bite at the apple." *Medina*, 361 S.W.3d at 642. In fact, Mr. Mullis was only the third applicant to be denied the opportunity to file an initial state habeas application in the 15 years since Section 4A was amended to allow untimely applications upon a showing of good cause. *See Ex parte Tabler*, WR-72,350-01 (Tex. Crim. App. Sept. 16, 2009); *Ex parte Austin*, WR-59,527-01 (Tex. Crim. App. July 6, 2004). In light of Texas's relaxed approach to untimely applications like Mr. Mullis's, Section 4A is not an adequate state ground.

> **2.      Enforcing Section 4A's time limits where the State never filed a direct appeal brief, was not a clear, firmly established, regularly followed or independent rule at the time of Mullis's alleged default.**

At the time the CCA applied Section 4(a) to Mr. Mullis's case, there was no clear, regularly followed, clearly established or independent rule with respect to cases in which no appellate brief was filed to trigger the deadline set by Article 11.071 § 4(a). Quite the opposite, the state court had never imposed the deadline under these circumstances.

Section 4A requires a state habeas application be filed within 180 days of the appointment of state habeas counsel, or within 45 days of the State filing their direct appeal brief, whichever is later. The statute is silent as to the deadline if the State does not file a direct appeal brief, as occurred here, and there was no judicial precedent clearly governing this situation at the time of Mr. Mullis's purported default on July 2, 2012. Indeed, the parties' and courts' longstanding confusion and inconsistency about the filing deadline itself demonstrates the lack of a clear, firmly established rule.

As set forth *infra*, state habeas counsel attempted and failed several times to calculate and advise Mr. Mullis regarding his filing deadline. *See* Sec IC3. However, state habeas counsel were not alone in their confusion. In moving the trial court to notify the CCA that no timely

10

application had been filed, the State asserted that Mr. Mullis's application was due on or before

May 21, 2012. Exhibit A, State's Motion for Trial Court to Notify the Court of Criminal Appeals

of the Lack of Filing of Habeas Writ, at *4. However, the motion does not explain how the State

determined that date. *Id*.

The CCA's order on this matter further demonstrated the ambiguity of the statute in

scenarios such as this one. The CCA offered a peculiar, open-ended interpretation of the deadline

for filing that Mullis had apparently surpassed: "*Under the best possible scenario*, applicant's

application would have been due to be filed in the trial court on or before July 2, 2012." CCA

9/12/12 Order at 2 (emphasis added). The Court's order provided no reasoning for this

determination, did nothing to clarify how to calculate a deadline when no appellate brief is filed,

and cited no statute or cases in support of its "best possible" July 2, 2012 date.  The uncertainty

in the court's order is understandable, however; neither the language of the statute nor existing

precedent addressed the circumstance presented here. The condition precedent to trigger the

application deadline – the filing of the State's original brief on direct appeal – never took place.

Likewise, in defending state habeas counsel's difficulty in calculating when Mr. Mullis's

application would be due, Respondent acknowledged this scenario as "an unusual situation," and

one "'[w]here the law is not succinct and straightforward.'" Answer at 76 (quoting *Padilla v*

*Kentucky*, 559 U.S. 356, 369 (2010)).  In sum, Texas's novel application of Article 11.071 § 4

where the conditions precedent had not occurred, and which prevented Mr. Mullis from filing a

state habeas application and terminated his state habeas corpus proceedings, is not an adequate

state ground and does not foreclose review by this Court of Mr. Mullis's claims.

Nor was the state court's ruling "independent of the federal question" presented here.

*Coleman*, 501 U.S. at 729. Petitioner's competency to proceed and to represent himself in state

capital habeas proceedings as protected under the Eighth and Fourteenth Amendments, and his Sixth Amendment right to have counsel represent him effectively at such a critical stage, are implicated by and intertwined with the state court's untimeliness finding and its finding that good cause was not shown, as explained in detail below.

### C.   State Habeas Counsel's Abandonment and Ineffective Representation of Mr. Mullis Provide Cause and Prejudice for any State Court Default.

Even assuming that the State can establish procedural default, Petitioner can show cause and prejudice to overcome it. In March 2011, the state district court appointed the Office of Capital Writs (OCW) to serve as Petitioner's state habeas counsel. By October 2011, state habeas counsel abandoned Mr. Mullis, abdicating their principal duties to investigate and develop his habeas claims. State habeas counsel did so even though the state court never removed or discharged them as counsel, even as their client urged them to investigate his claims, and even though they told the court that they would continue representing Mr. Mullis.

Even before abandoning Mr. Mullis outright, OCW had already abdicated their role as counsel during the proceedings on Mr. Mullis's competency to waive his state habeas application. Counsel had justified concerns about Mr. Mullis's competency. But when the court appointed an expert to evaluate Mr. Mullis, state habeas counsel failed to turn over thousands of pages of mental health records that would have informed the competency expert's evaluation. Counsel then failed to alert the court to these omissions. Moreover, counsel failed to inform the court of the true reason driving Mr. Mullis's desire to waive—that, due to his history of sexual abuse and mental illness, he would rather die than face the possibility of being raped in the prison system's general population. By state habeas counsel's own admission, they abdicated their role as advocates in the competency proceedings and affirmatively chose not to challenge the expert's report or bring this information to light.

After abandoning their investigation and litigation of Mr. Mullis's claims, state habeas counsel still took actions that prevented Petitioner from presenting his claims in state court. OCW continued to hold themselves out as counsel for Mr. Mullis, filing motions on his behalf. In the one task state habeas counsel chose to perform—providing Mr. Mullis with a deadline to file his habeas application—counsel repeatedly failed to determine a deadline. Finally, when Mr. Mullis—even without the benefit of counsel's investigation—contacted OCW and expressed a desire to reinstate his habeas proceedings, counsel undermined their client's attempt. As counsel, OCW were aware they would be conflicted in arguing that their own poor representation provided grounds for reinstating the habeas proceedings. Nevertheless, state habeas counsel represented Mr. Mullis in his proceedings to file an untimely habeas application, but failed to disclose their conflict to the court. In seeking to reinstate Mr. Mullis's habeas proceedings, state habeas counsel failed to address their own numerous failures that resulted in no application being filed, including their failure to disclose Mr. Mullis's true motivation for waiving, and failed to disclose this conflict to the court.

It is because of these failures by state habeas counsel that Petitioner failed to file a habeas application. These failures also undermined the reliability of the competency proceedings and prevented Mr. Mullis from making a knowing, intelligent, and voluntary waiver.

### 1. Counsel performed ineffectively in the months following their appointment.

OCW was appointed on March 23, 2011.[3] In the six months that followed, before filing a motion to waive Mr. Mullis's habeas application, counsel did little to develop the case. As

---

[3] Respondent repeatedly incorrectly asserts that Mr. Mullis failed or refused to accept counsel. *See, e.g.*, Answer at 60, 61. As set forth below, Mr. Mullis accepted OCW's appointment, then repeatedly sought their legal assistance in his case, both before and after his competency hearing.

counsel informed the trial court, "[s]ubstantial Investigation ha[d] yet to be done in this case." 4A Motion at 13, 2.SHCR-01 at 18.

Respondent argues that OCW could not have investigated because they did not have the trial record yet. Answer at 63. But this argument misconceives post-conviction counsel's most basic role, which by definition concerns matters *outside* the trial record. *Trevino v. Thaler*, 569 U.S. 413, 422 (2013), citing *Martinez v Ryan*, 566 U.S. 1, 13 (2012); *see also* Texas Bar Association, *Guidelines and Standards for Texas Capital Counsel* 12.2(B)(1) (2006) (hereinafter "State Bar Guidelines"). Indeed, Article 11.071 § 3(a) requires counsel to "investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus." Tex. Code Crim. Proc. art. 11.071 § 3(a). And because Texas habeas counsel are typically appointed immediately following the trial, it is prevailing and proper practice for counsel to undertake investigation when the record takes months to prepare.

Moreover, OCW did have all of trial counsel's files, which contained a wealth of information and leads. But after nearly six months, OCW had taken only "initial steps" to even review those records. 4A Motion at 12. They had made only preliminary contacts with Mr. Mullis's family, and had not spoken with any of Mr. Mullis's "extended relatives, friends . . . former employers, and other witnesses who may have insight into Mullis's life history and background." *Id*. at 13. OCW acknowledged that doing this work would take "many months" to complete. *Id*. As Petitioner would prove at a hearing, counsel had no justification for failing to use the many months they had—from their March appointment until the October competency hearing—to perform any investigation on Mr. Mullis's behalf.

14

In any event, the government's argument that OCW cannot be faulted for failing to investigate the case before receiving the trial transcripts proves too much. If counsel's role in the case was so preliminary as to preclude meaningful investigation, *see* Answer at 63, then counsel could not meaningfully advise their client about waiving either. *See* State Bar Guidelines at 35 ("[C]ounsel cannot responsibly advise a client about the merit of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation."). Nonetheless, on September 15, 2011, counsel acquiesced in Mr. Mullis's demand to file a motion to "waive post-conviction habeas review" application. *See* Pet'r's Mot. to Waive Post Conviction Habeas Review ("Motion to Waive"). 1 SHCR-01 at 4-11. Upon learning of Mr. Mullis's desire to waive, state habeas counsel ceased investigation, "suspend[ing]" an investigative trip to North Carolina to interview Mr. Mullis's family "when it looked like Mr. Mullis was going to affirmatively waive." Transcript of Hearing on Motion to Waive Post-Conviction Hearing Review, 10/11/11 at 8. Counsel then told the court: "What we have done so far is we have *started* the investigative process . . . . It takes about a year and a half . . . . we've had about six months." *Id.* (emphasis added).

> **2.    State habeas counsel abandoned their role as advocate for Mr. Mullis in competency proceedings; at minimum, they were ineffective in failing to investigate or challenge Mr. Mullis's competency to waive.**

Courts have consistently recognized that competency hearings are crucial stages in which counsel plays a vital role.  *See, e.g.*, *Raymond v. Weber*, 552 F.3d 680, 684 (8th Cir. 2009) (citing cases); *United States v. Collins,* 430 F.3d 1260, 1264 (10th Cir. 2005); *Appel v. Horn,* 250 F.3d 203, 215 (3rd Cir. 2001); *United States v. Klat,* 156 F.3d 1258, 1262 (D.C. Cir. 1998); *United States v. Barfield,* 969 F.2d 1554, 1556 (4th Cir. 1992); *Sturgis v. Goldsmith,* 796 F.2d 1103, 1108–09 (9th Cir. 1986). Counsel must perform adversarial testing of a competency

determination in order for the court to make a reliable and accurate judgment. *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) (where challenging client's competency and raising insanity defense is client's "sole hope," an attorney aware of his client's history of mental problems and institutionalizations could have no reasonable strategy for failing to investigate). Here, however, state habeas counsel abandoned their role as advocate for Mr. Mullis, undermining the reliability of the competency proceedings. *See infra*.

Counsel's inadequate representation continued before, during, and after the competency hearing, further contributing to Mr. Mullis's failure to exhaust his claims. Counsel's failure to advocate on Mr. Mullis's behalf resulted in a competency determination by a court-appointed psychiatrist, Dr. Victor Scarano, made without the benefit of Mr. Mullis's long and highly relevant history of severe mental illness. Dr. Scarano never received documentation that Mr. Mullis had been repeatedly diagnosed with Bipolar Disorder, or that he had been placed in a psychiatric hospital three times in the course of a month for suicidal ideation, or that doctors had diagnosed him with severe, recurrent depression and Post-Traumatic Stress Disorder (PTSD). Unaware of this crucial information, Dr. Scarano produced a report wholly inconsistent with Mr. Mullis's mental health history. Dr. Scarano was the first and only mental health professional in 25 years to evaluate Mr. Mullis and conclude that he does not suffer from severe mental disorders.

In the Motion to Waive, counsel requested appointment of a mental health expert to evaluate whether Mullis was competent and a subsequent hearing. Counsel also stated that Mullis sought to remove OCW as his attorneys. That same day, the court appointed Dr. Victor Scarano to examine Mullis "for the purpose of determining whether [he] has sufficient present ability to consult with his attorney . . . and whether [he] has a rational as well as factual

understanding of the proceedings against him to knowingly and intelligently waive his post-conviction habeas review." *See* Order Appointing Expert to Examine Petitioner for Competency to Waive Post-Conviction Habeas Review, 1.SHCR-01, at 13.

Counsel knew of Mr. Mullis's well-documented lifelong history of mental illness, including Bipolar Disorder, PTSD and Major Depression. Counsel possessed hundreds of pages of—yet still woefully incomplete, *see* Claim 2 infra—childhood medical records, substantiating Mullis's repeated diagnoses for mental disorders.[4] Those records show, for example, that Mullis carried a diagnosis for Attention Deficit Hyperactivity Disorder and Separation Anxiety from the age of seven; at age thirteen, Mullis was placed in a psychiatric hospital three times in the course of a month for suicidal ideation where doctors diagnosed him with severe, recurrent depression and PTSD; and that Mullis was repeatedly diagnosed with Bipolar Disorder and other severe psychiatric problems.

There was ample additional information in trial counsel's file that, if investigated, would have provided key insights into Mr. Mullis's psychiatric impairments. For example, counsel had extensive files and notes for psychiatrist Dr. Richard Dudley and psychologist Dr. Matthew Mendel, the experts who testified at trial regarding Mr. Mullis's mental health disorders. Yet OCW failed to consult with those experts regarding Mr. Mullis's desire to waive.

Even though OCW had such childhood and pre-trial mental health records for Mr. Mullis, and knew that the court-appointed psychiatrist would review records submitted by the parties, counsel failed to provide any of these records to Dr. Scarano. *See* Exhibit B, March 16, 2015

---

[4] "At the time Mullis was granted pro se status on his post-conviction habeas proceedings, the OCW had collected the files of Mullis's trial counsel, as well as the files from the expert witnesses who testified at Mullis's trial (although there may still be other experts consulted by trial counsel who did not testify that the OCW has not yet contacted.)." 4A Motion at 12.

Declaration of Jessica Johnson ¶6. The State's effective representation itself shows how deficiently OCW performed. The State did not hesitate in giving Dr. Scarano material it thought would support a finding of competency. For example, the State gave Dr. Scarano a news report in which Mullis had spoken to the press about his case. On October 5, 2011, the State also submitted certain medical records from jail and prison authorities. Counsel knew the State was providing Dr. Scarano this material, and yet still failed to provide any records that would shed a light on Mr. Mullis's mental impairments. *See* Competency Report by Dr. Vincent R. Scarano, ("Scarano Report"). Rather, OCW provided him with only four Texas Court of Criminal Appeals opinions. As a result, Dr. Scarano necessarily lacked highly relevant evidence crucial to his competency finding.

Respondent argues that, despite not being provided these mental health records, Dr. Scarano was aware of Mr. Mullis's mental health history. Answer at 70. In doing so, Respondent both overstates the weight Dr. Scarano gave Mr. Mullis's *self-reported* mental health history and overlooks the obvious importance of mental health records in mental health evaluations. Although Scarano recounted that Mr. Mullis self-reported prior diagnoses of ADHD, PTSD and bipolar disorder, Dr. Scarano did not accept these diagnoses as valid or correct. Quite the opposite, Dr. Scarano did not consider Mr. Mullis's PTSD at all and expressly discounted the self-report of bipolar disorder as invalid. Scarano Report at 26. Due to the inherently unreliable nature of self-reporting major psychiatric illnesses, the lack of corroborating records hamstrung Dr. Scarano's review and made it impossible for him to consider the effects of Mr. Mullis's mental illness, particularly his PTSD, on his decision to waive. Such records are highly relevant to any competency determination or other mental health evaluation. *See* Dudley Addendum, November 8, 2016 at 4.

When counsel Levenson received Dr. Scarano's report on October 6, 2011, he identified a number of statements in the report that conflicted with his personal knowledge of Mr. Mullis and his history, but did nothing to alert the court to these discrepancies. Levenson spoke to Dr. Scarano about the contrast between his finding that Mullis did not have any Axis I or Axis II diagnoses and Petitioner's long-standing mental health diagnoses detailed above. Johnson Dec. ¶ 3. He also pointed out that the report did not mention or consider Mr. Mullis's fear of being sexually assaulted in general population. Levenson told Dr. Scarano that, contrary to Dr. Scarano's report, Mullis had repeatedly told Levenson that his waiver was motivated by his fear of being sexually assaulted in general population. *Id.* ¶ 6. When Dr. Scarano told Mr. Levenson "his findings were based upon his observations of Travis alone," state habeas counsel did nothing further to inform or challenge Dr. Scarano's conclusions. *Id.* ¶ 8.

Raising these issues would have created grave doubts about Mullis's competency and the voluntariness of the waiver. For example, had OCW consulted trial experts Dr. Dudley and Dr. Mendel, counsel would have learned that their opinions sharply contradicted Dr. Scarano's. As Dr. Dudley explained:

> If an attorney had contacted me and let me know Mullis was considering having the attorney removed so he could represent himself, and abandoning his appeal, I would have told the attorney . . . that Mullis's bipolar disorder and history of suicidal thoughts and gestures suggest a substantial risk that Mullis could be attempting to abandon his appeals in order to hasten his own execution.  This would be a type of suicide.

Exhibit 12, Affidavit of Richard Dudley, 11/14/2012.

Indeed, in later seeking to reinstate Mr. Mullis's state habeas proceedings, OCW retained psychiatrist Dr. Michael Fuller to evaluate Mr. Mullis. Dr. Fuller's report demonstrates that a psychiatrist confronted with a full account of Mr. Mullis's medical records would have found severe mental impairments:

> Mr. Mullis, in my professional opinion has manifested symptoms of significant psychiatric illness throughout his lifetime. He has been diagnosed by qualified physicians with several disabling conditions and many have attempted a variety of treatment modalities. It remains unclear if there is a single unifying diagnosis underlying his mood volatility, depressive periods, impulsivity, sexual aberrations, lack of empathy, and general instability. Without a reasonable doubt many of his behaviors and thought processes can be attributed to a disorder of personality. He was subjected, it appears, to a highly traumatic sequence of violations early in life and clearly manifests. Many persons presenting with a history such as his accumulate numerous Axis I psychiatric disorder diagnoses as they pass through childhood, adolescence, and adulthood. Bipolar Disorder, ADHD, Impulse Control Disorder, Major Depression, Substance Abuse Disorders, Paraphilias, Post Traumatic Stress Disorder, and others are commonly "collected" during the development and maturation of these individuals.

Exhibit C, Report of Psychiatric Examination by Dr. Michael Fuller at 11.

Upon receiving Dr. Scarano's report, OCW should have also noticed a number of other issues. Dr. Scarano dismissed life imprisonment as a motivating factor for Mullis's decision to waive, but Mr. Mullis had told counsel Levenson repeatedly that his waiver was motivated by his fear of being sexually assaulted in general population.

In addition, Dr. Scarano's report contained important but underdeveloped details counsel could have used to both give context to and challenge Mr. Mullis's waiver. Take for example the report's conclusion that Mullis had features of Borderline Personality Disorder. As Dr. Scarano recounted, features of that mental disorder include "fear of abandonment" and the need "to continually test the . . . commitment" of those around the individual. Scarano Report at 21. Individuals with Borderline Personality Disorder are also marked by "impulsivity"—calm one day, destructive the next. *Id.* A reasonable lawyer would find this characterization highly relevant and insightful regarding Mr. Mullis's waiver: was Mullis "test[ing] the commitment" of his lawyers by threatening waiver of his legal rights and removal of counsel? Mullis's impulsive behavior, motivated by a need to test those around him, made him incapable of consulting effectively with his counsel and undermined the "voluntariness" of his waiver. Counsel must

have seen these red flags and these opportunities to challenge the validity of the competency evaluation, and yet counsel did nothing to challenge Dr. Scarano's competency finding at the October 11 hearing.

Reasonable counsel would have seized any of these numerous options for challenging Dr. Scarano's competency determination. For example, state habeas counsel could have introduced evidence on Mullis's extensive history of mental illness, alerting the court to the striking discrepancies between this history and Dr Scarano's report. They could have requested that Dr. Scarano prepare a new report based on review of all the relevant records. They could have hired a different expert to help interpret Dr. Scarano's findings or alternatively challenge those findings. Or counsel could have simply submitted the report to rigorous adversarial testing by requesting Dr. Scarano appear and examining him.

But counsel did nothing. Instead, at the October 11 hearing, Mr. Levenson attested that he had read the report "thoroughly" and had no objection to the report "as a whole" and "certainly ha[d] no problems putting it into evidence." 10/11/11 transcript at 7. Dr. Scarano was not even called to testify regarding his findings. Counsel did nothing to assist the court in making a reliable determination of Mr. Mullis's competency.

No reasonable attorney would succumb so readily to a finding of competency based on information the attorney knew to be incomplete and inaccurate, including his client's lengthy history of severe mental illness. The law says as much: competency hearings are crucial stages at which counsel needs to be present.[5] When counsel abandon their role as advocates for their client's interests, they are as good as no counsel at all. Thus, when Levenson represented to the court that he had no objection to Dr. Scarano's report, in reality he failed to provide any

representation at all. By failing to disclose their client's history of mental illness, conducting *no* investigation into obvious leads to challenge Dr. Scarano's evaluation, and performing no adversarial testing at the competency hearing, counsel abdicated their client's "sole hope." *Bouchillon*, 907 F.2d at 597. Counsel abdicated their duties not only to Mr. Mullis, but also to the court. Counsel's failure to alert the court to Mr. Mullis's documented and highly relevant history of psychological problems, and its striking inconsistencies with Dr. Scarano's report, constituted a breakdown in the adversarial process and rendered the result unreliable.[6]

State habeas counsel's failures and abandonment prejudiced Mr. Mullis.  As discussed *infra*, there is a reasonable probability that the court would have found Mr. Mullis incompetent and his waiver involuntary had it learned that the decision to waive derived from Mr. Mullis's history of sexual abuse and trauma, diagnosis of PTSD, and fear of being sexually assaulted in general population. Moreover, counsel's abandonment and failures undermined the reliability of the competency proceedings, rendering the purported waiver inadequate to bar review of Mr. Mullis's claims by this Court.

>    a.    **State habeas counsel has a duty to provide relevant information to a competency expert and provide adversarial testing of the competency evaluation.**

Respondent misunderstands counsel's role with regard to a client who wishes to waive his habeas proceedings. Respondent makes two interrelated errors in this regard. First, Respondent argues that due to the client's right to self-representation, counsel owes no duty to challenge his client's competency through adversarial testing. Answer at 65. Second, Respondent claims that counsel has no duty to provide a competency expert with material necessary to inform that expert's competency determination. *Id.* at 68-69.

---

[6] *See Burdine*, 262 F.3d at 349.

### i. Counsel has a duty to challenge a client's decision to waive and may not acquiesce in an incompetent client's desire to be found competent.

Respondent recites the general principle that counsel must "*usually* obey a client's directives." Answer at 66 n.13. Competency proceedings are not the usual circumstance, however. Instead, courts recognize that counsel must perform adversarial testing of the competency determination in order for a court to make a reliable and accurate judgment; adopting Respondent's approach would allow an incompetent client to block a court's inquiry into this crucial legal question.

In *Bouchillon*, the Fifth Circuit stressed the duty counsel has in raising challenges to a client's mental status. 907 F.2d at 597. Central to the court's reasoning was the fact that "the trial court . . . relies on counsel to bring these matters to his or her attention. . . .  If counsel fails here to alert the court to the defendant's mental status the fault is unlikely to be made up." *Id*. This echoes the position of other circuits. "[W]e think it axiomatic that the desire of a defendant whose mental faculties are in doubt to be found competent does not absolve counsel of his or her professional responsibility to put the government to its proof at a competency hearing when the case for competency is in serious question." *Hull v. Freeman*, 932 F.2d 159, 169 (3d Cir. 1991), *overruled on other grounds as stated in as stated in Caswell v. Ryan*, 953 F.2d 853, 859 (3d Cir.1992); *see also Appel v. Horn*, 250 F.3d 203, 215 (3d Cir. 2001) ("[The attorneys] had the obligation to act as counsel at Appel's competency hearing by subjecting the state's evidence of competency to meaningful adversarial testing."); *United States v. Boigegrain*, 155 F.3d 1181, 1188 (10th Cir. 1998) ("[D]efendant's lawyer is not only allowed to raise the competency issue, but . . . she has a professional duty to do so when appropriate."); *Agan v. Singletary*, 12 F.3d 1012, 1018 (11th Cir. 1994) ("[C]ounsel has a duty to investigate a client's competency to stand

trial or plead guilty.  An attorney cannot blindly follow a client's demand that his competency not be challenged.").

In setting out procedural standards for competency to waive federal habeas proceedings, the Fifth Circuit has also recognized the necessity of counsel's adversarial testing. In *Mata v. Johnson*, 210 F.3d 324 (5th Cir. 2000), the court held that an "opportunity for the parties to present testimony or documentary evidence" was a necessary part of an adequate competency process. *Id.* at 333. But Respondent's approach would defeat this procedural safeguard in every case. If, as Respondent proposes, counsel must obey a client's wish to be found competent, no defense counsel could avail herself of the opportunity to present evidence to challenge her client's competency. There would be no opportunity for "the parties" to present evidence, and, thus, no adversarial testing.

Additionally, Texas ethical rules make clear that state habeas counsel has a duty to challenge a client's decision to waive. "It is a dereliction of habeas corpus counsel's duty to simply acquiesce to a capital client's insistence that he or she wishes to be executed." State Bar Guidelines 12.2(B)(2)(c). As the evidence at a hearing would show, OCW's lack of adversarial testing in this case fell below prevailing standards of practice in a variety of ways.

> **ii.    Defense counsel can reasonably rely on an expert's opinion only after counsel has provided relevant information to that expert.**

Respondent provides a page of citations for the assertion that "OCW was . . . entitled to rely on Scarano's expert opinion," Answer at 68—even though OCW withheld records that would have shown  Dr. Scarano's opinions to be ill-informed and inaccurate. In fact, these citations support Petitioner's position that defense counsel can reasonably rely on the defense expert's opinion *only after counsel has provided relevant information to the expert.*

Respondent quotes a single sentence from *Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011), but the court's full discussion supports Petitioner. In full, *Couch* states (with Respondent's quoted portion italicized):

> An attorney cannot hire an expert, give him whatever evidence he happens to have on hand (but not the evidence the client pointed to) and accept the report without further discussion. *Trial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating a trial strategy.* But this common-sense principle does not give trial counsel a free ride when it comes to the obligation to undertake a thorough investigation of law and facts relevant to plausible options for a defense.

*Id.* at 246-47 (quotation marks and citations omitted). The Sixth Circuit found trial counsel's performance so unreasonable that it also held the state court's decision denying the claim unreasonable. *Id.* at 248.

*Sims v. Brown*, 425 F.3d 560 (9th Cir. 2005), also cited by Respondent, reinforces *Couch*: "Counsel has 'an obligation to conduct an investigation which will allow a determination of what sort of experts to consult. Once that determination has been made, *counsel must present those experts with information relevant to the conclusion of the expert.*'" *Sims*, 425 F.3d at 585 (quoting *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999)) (emphasis added). *See also Richey v. Bradshaw,* 498 F.3d 344, 362 (6th Cir. 2007) ("[T]he mere hiring of an expert is meaningless if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable.").[7]

---

[7] Two other cases that Respondent cites are distinguishable on their facts.  In *McClain v. Hall*, McClain's claim failed because his counsel's failure to inform his defense expert was harmless: "McClain blames Dr. Maish's failure to diagnose the frontal lobe disorder on his counsel's failure to inform Dr. Maish of McClain's history of childhood abuse and substance abuse, but that argument fails. As McClain acknowledges, Dr. Maish was aware of both McClain's substance abuse and childhood abuse." *McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008). *Dowthitt*—Respondent's only Fifth Circuit citation—similarly concerns a defense expert whom counsel had adequately prepared. *See Dowthitt v. Johnson*, 230 F.3d 733, 747 (5th Cir. 2000)

More broadly, state habeas counsel was not entitled to rely solely on Dr. Scarano's expert opinion because Dr. Scarano was an expert to the court, not a defense expert retained by OCW.[8] Respondent overlooks and misconstrues this distinction. Indeed, all of the cases cited by Respondent address reliance on *defense* experts. *See* Answer at 69. Rather, these cases hold that counsel was not ineffective after retaining, consulting with, and receiving the opinions of their *own* experts, something OCW failed to do here. *See, eg., Segundo v Davis*, 831 F.3d 345, 352 (5th Cir. 2016) ("The record makes clear that Segundo's trial counsel obtained the services of a mitigation specialist, fact investigator, and two mental-health experts."); *Sims*, 425 F.3d 560 at 582 (counsel "retained the services of two experts…so that he could have the benefit of opinions from experts in both disciplines."); *Dowthitt v Johnson*, 230 F.3d 733, 747 (5th Cir. 2000) ("Counsel retained Dr. Fason, a psychiatrist, to examine Dowthitt on several issues regarding Dowthitt's mental state.").

Defense experts "are valuable to an attorney's investigation . . . not only because they have special abilities to process the information gathered by the attorney, but because they also are able to guide the attorney's efforts toward collecting relevant evidence." *Hendricks v. Calderon*, 70 F.3d 1032, 1038-39 (9th Cir. 1995). Defense counsel cannot similarly cooperate or consult with and therefore rely on a non-defense expert. Because Dr. Scarano was not a defense expert, state habeas counsel could not rely on him as though he were the expert OCW vetted, consulted with, prepared, and hired.

---

(rejecting claim that defense counsel did not adequately prepare defense expert).  These cases do not address the situation in this case.

[8] Contrary to OCW's assertion, Dr. Scarano was an expert to the court, and not retained by OCW.  *See* Answer at 62 ("A psychiatrist retained by OCW determined he was competent.").

### 3.    Counsel's Ineffectiveness Continued after the October 11 Hearing.

The day after the October 11 hearing, the district court issued an order that did *not* remove OCW as counsel. Instead, the order explicitly authorized OCW to "continue to investigate and prosecute a post-conviction writ of habeas corpus on behalf of Mr. Mullis until the deadline for filing," while conditionally permitting Mr. Mullis to act *pro se* only as to the ultimate question of whether to "file the writ" that counsel prepared. October 12, 2011 Order. Nonetheless, from that date forward, OCW abandoned Mr. Mullis and failed to act or investigate as counsel on his behalf. *See Maples v. Thomas*, 132 S. Ct. 912, 922.

Respondent misinterprets the October 12 order as merely permitting, but not requiring, OCW to investigate Mr. Mullis's post-conviction remedies, and reasons that the order thus excused OCW's subsequent abandonment of Mr. Mullis. Answer at 73. Respondent concludes that the order removed OCW as Mr. Mullis's counsel and "placed [OCW] in a familiar role— standby counsel." Answer at 73. The record refutes these assertions and instead shows that OCW successfully urged the court not to remove them as counsel or relegate them to standby counsel; the parties and the court understood that OCW remained Mr. Mullis's counsel; and OCW nonetheless failed to perform the basic duties of post-conviction counsel on Mr. Mullis's behalf.

Despite their failure to perform effectively on the issue of Mr. Mullis's mental competency, counsel did accomplish one thing at the hearing: they persuaded the court not to remove OCW as counsel. Counsel explained that investigation was needed before OCW could advise Mr. Mullis of what claims could be raised on his behalf. 10/11/11 transcript at 9; *see also id.* at 10. Mr. Levenson also expressed concern that the court not permit waiver too soon. Levenson suspected that Mr. Mullis might later change his mind about waiving post-conviction proceedings, just like other capital litigants who later regretted their decisions to waive. *Id.* at 10.

27

Levenson also observed that permitting waiver would be premature as a matter of legal

procedure:

> [T]he main point is that Mr. Mullis can't really waive his habeas until the time it's
> due and that would be another reason to for keeping us on the case during this
> time.  He's going to be sitting either here or at Polunsky and we certainly have the
> time and energy and the desire to work on Mr. Mullis's case on his behalf.

10/11/11 transcript at 17; *see also Ex parte Reynoso,* 257 S.W.3d 715, 720 n.2 (Tex. Crim. App.

2008) (waiver of habeas review not truly effective until after filing deadline has passed). Thus,

Levenson requested that the court allow OCW to remain as counsel on the case and defer any

decision regarding Mullis's request to waive and remove counsel:

> I would actually ask you to look beyond [Dr. Scarano's] report and to look at the
> age of Mr. Mullis and where we are in our investigation at this point and to
> perhaps kick this can down the road a little bit farther so we can have more time
> to work on Mr. Mullis's case and he can make a more informed decision about
> what this office can do for him.  I just don't think he can make that decision right
> now.

*Id*. at 11; *see also id.* at 17. The State did not object to such an arrangement.

The court shared Levenson's concerns and stressed to Mr. Mullis the importance of

allowing OCW to continue to investigate and develop his application. *Id*. at 19. The court made

clear to all parties that OCW's removal as counsel would be inconsistent with their continued

involvement and would require OCW to stop investigating on Mr. Mullis's behalf.

> And if you waive this, they stop doing that.  That's the point.  Waive means to
> give up. . . . That they would stop the whole process of working on your behalf,
> trying to find something that might change the ultimate outcome.

*Id*. at 15.

At the conclusion of the October 11 hearing, the court had three discrete decisions to

make on the motion before it: (1) Was Mullis competent to waive? If so, (2) would the court

grant the waiver at this juncture? (3) Would the court remove OCW as counsel?  The next day, the court entered an order seeming to adopt exactly OCW's position at the hearing.

Though the court found Mr. Mullis competent for the purpose of waiving his rights to post-conviction habeas review, the court deferred any decision regarding the waiver itself and allowed OCW to remain on the case as counsel. The relevant portion of the order states:

> Mr. Mullis is permitted to act *pro se* regarding any decisions concerning waiver and/or filing a post-conviction writ of habeas corpus.  The Office of Capital Writs may continue to investigate and prosecute a post-conviction writ of habeas corpus on behalf of Mr. Mullis until the deadline for filing, but must not file the writ if Mr. Mullis persists in electing to waive filing.

October 12, 2011 Order.

The court did not *discharge* or *remove* counsel and did not *grant* the motion. Instead, the court used mandatory language sparingly: Mullis was *permitted* and OCW *may*. The only phrase that mandated anything implied that the court did not remove counsel and did not grant waiver. By permitting counsel to act and "continue to investigate . . . *on behalf of*  Mr. Mullis," the court plainly envisioned a continuing attorney-client relationship. Indeed, the court had previously admonished all parties that OCW's removal from the case would require a termination of OCW's investigation on Mr. Mullis's behalf. *See* 10/11/11 transcript at 15 ("[To waive means] they would stop the whole process of working on your behalf."). By allowing OCW to continue investigating, the order thus did *not* remove OCW as counsel. Further, the phrase "*persists in electing to waive* filing" reflects that the waiver decision was unresolved and had not yet been decided. Particularly in light of the previous day's hearing, the message was clear: the court's order did not grant waiver and did not remove OCW from the case. Rather, the court denied Mr. Mullis's request to do so, and "allow[ed] the office of capital writs to continue working" as counsel. 10/11/11 Transcript at 19.

Texas law confirms this understanding. A court must affirmatively grant a motion to remove appointed counsel. *See* Tex. Disciplinary R. Prof'l Conduct 1.15, *Bryant v. State*, 75 S.W.3d 628, 631 (Tex. App.—Ft. Worth 2002) ("[I]t is well-established that when counsel appears on behalf of a criminal defendant as his attorney of record, that lawyer, whether appointed or retained, is obligated to represent the client until the trial court actually grants a motion to withdraw or a motion to substitute counsel."). Because the court did not order counsel removed and in fact permitted counsel to continue with their duties, the order maintained the *status quo ante* of the attorney-client relationship, and counsel had no basis for abandoning their client.

Legal ethicist Robert Schuwerk, co-author of the Handbook of Texas Lawyer and Judicial Ethics, longtime member of the committee on Texas Disciplinary Rules of Professional Conduct ("TDRPC"), and Professor Emeritus at the University of Houston Law Center shares this view. Exhibit E, Decl. of Robert P. Schuwerk at ¶ 6 ("Schuwerk Declaration").  Although the court found Mr. Mullis was "permitted to act *pro se* regarding any decisions concerning waiver and/or filing a post-conviction writ of habeas corpus," this language was not inconsistent with OCW's continued representation of Mr. Mullis. Under TDRPC 1.02(a)(1), a lawyer is obligated to defer to a client concerning the "objectives and general methods of representation." TDRPC Rule 1.02(a)(1); *see also* Schuwerk Declaration at ¶ 8.  Therefore, even absent the court's order, this rule would dictate that the decision whether to file a habeas corpus application was ultimately up to Mr. Mullis, not OCW. *Id*. "[T]his was not a substantially greater limitation on the OCW's freedom of action than would ordinarily govern a lawyer." *Id*. The court was merely affirming a right Mr. Mullis, and all clients, always have.

Following the court's order, OCW continued to hold itself out as counsel for Mullis. For example, on February 14, 2012, OCW filed a motion for extension of time to file a habeas petition on Mr. Mullis's behalf, describing OCW as "counsel for Mr. Mullis." *See* Unopposed Motion for an Extension of Time to File Initial State Habeas Application, Feb. 14, 2012, attached as Exhibit 10. For its part, any time the State communicated with the court or Mr. Mullis, it served a copy of the letter or pleading on the OCW. *See, e.g.*, State's Motion for Trial Court to Notify the Court of Criminal Appeals of the Lack of Filing of Habeas Writ, Pursuant to Art. 11.071, June 27, 2012, at 5, attached as Exhibit 11 (Certificate of Service reads "The undersigned attorney for the State certifies that a copy of the above motion was mailed to Brad Levenson, habeas counsel."). Mr. Mullis shared this understanding too. Following the hearing, on October 13, 2011, Mr. Mullis wrote to OCW and unequivocally instructed them to continue investigation. "Per Judge Ellisor's order ***you may continue to investigate on my behalf*** 'but must not file the Writ if Mr. Mullis persists in electing to waive filing.'" Exhibit D, Letter from Travis Mullis to Brad Levenson, October 13, 2020 (emphasis added). Such contemporaneous evidence provides strong corroboration that OCW remained counsel, albeit while failing to fulfill counsel's duties, after the October 12 order.

Respondent nonetheless insists that the October 12 order "placed [OCW] in a familiar role—standby counsel." Answer at 73. The order did no such thing.  If the court had meant for OCW to be standby counsel, it would have said so. Texas trial courts have discretion whether to even recognize the role of standby counsel. Because a Texas criminal defendant has no right to standby counsel at trial, a court "should inform him whether in its discretion the court intends to allow it." *Burgess v. State*, 816 S.W.2d 424, 428 n.1 (Tex. Crim. App. 1991). Here, the court did not even mention a possible role for standby counsel, let alone require OCW to fulfill it.

Respondent's conjecture about "standby counsel" is not supported by the record, the language of the order, or Texas law.

The court's order was clear, both on its face and in the context of the hearing one day earlier. If state habeas counsel nonetheless thought the order was ambiguous, it was still inappropriate to *assume* that they had been removed from the case and to abandon all further representation. *See* Tex Disciplinary R. Prof'l Conduct 1.15; *Bryant*, 75 S.W.3d at 631. Not only did counsel fail to seek clarification of the order; counsel's subsequent actions—which, again, Respondent does not discuss or dispute—prevented the court or the prosecution from noticing OCW's abandonment of its client.

Finally, Respondent places undue weight on the Court of Criminal Appeals' imprecise dicta that "applicant waived the appointment of habeas counsel," *Ex parte Mullis*, No. WR-76,632-01, at *2 (Tex. Crim. App. Sept. 12, 2012), as meaning that OCW was never even appointed in the first place. *See* Answer at 72. Such a ruling would have been far afield of the narrow question before the court—whether a writ had been filed—and thus was not, as Respondent's contends "a definitive interpretation" of state law. *See id.* The court merely referenced to the case's procedural history without mentioning OCW's abortive role. But Respondent's expansive interpretation of this phrase is refuted elsewhere in the opinion when the CCA order noted that OCW had been appointed. *Ex parte Mullis*, No. WR-76,632-01, at *2. Even if the state court had ruled that Mr. Mullis's waiver of habeas counsel retroactively excused OCW of its professional duties to Mr. Mullis, such a ruling would have been an unreasonable determination of historical fact and an unreasonable application of *Strickland* and its progeny.

*Brown v. Thaler*, 455 F. App'x 401 (5th Cir. 2011), is instructive. There, the circuit held that the state court unreasonably determined a procedural history "fact" where the finding "was

belied by" state court records and inconsistent with state law. *Id*. at 405-06. As here, the

purported finding was terse and in passing, and the circuit rejected the State's contention that the

finding was exempt as a pure question of state procedural law:

> We conclude that the state district court's finding that a PDR was denied . . . was
> not an interpretation of the operation of state procedural rules. There is no
> analysis or explanation that would allow that single statement, in what otherwise
> is a listing of procedural history, to be considered as anything other than a bare
> statement of a fact.

*Brown*, 455 F. at 405. The same considerations apply equally here, and any factual finding that

OCW did not represent and owed no duties to Mr. Mullis would be patently unreasonable.

Further, such a determination would unreasonably apply *Strickland* and *Lafler v. Cooper*,

566 U.S. 156, 165 (2012). *Lafler* recognized that "[t]he Sixth Amendment requires effective

assistance of counsel at critical stages of a criminal proceeding," including pretrial and post-trial

stages. *Id*. Because competency proceedings are a critical stage, and the record plainly

establishes that OCW represented Mr. Mullis during the competency proceedings here, any state

court ruling that OCW had no Sixth Amendment duty to Mr. Mullis at that stage would be an

unreasonable application of clearly established federal law.

Because the trial court did not remove OCW from the case, their statutory and ethical

duties to investigate and develop claims on Mr. Mullis's behalf still applied. TDRPC 1.02, cmt. 6

("Unless the representation is terminated as provided in Rule 1.15, a lawyer should carry through

to conclusion all matters undertaken for a client."). Article 11.071 § 3(a) requires counsel to

"investigate expeditiously, before and after the appellate record is filed in the court of criminal

appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus."

Tex. Code Crim. Proc. art. 11.071 § 3(a). Additionally, the ABA guidelines mandate that "[a]t

every stage of the proceedings counsel has a duty to investigate the case thoroughly." ABA

GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES Guideline 10.7 *Investigation* (2003); *see also id.* Guideline 10.15.1(e)(4) (requiring post-conviction counsel to "continue an aggressive investigation of the case").

Counsel's colloquy with the court regarding the work OCW needed to do to advise Mr. Mullis concerning his habeas application created the expectation, on the part of both Mr. Mullis and the court, that OCW would:

> "(i) review the trial transcript once it was generated; (ii) follow up with any promising information that transcript revealed; (iii) complete other aspects of its investigation alluded to in the October 11 hearing that were not directly dependent on that transcript; (iv) develop an overall strategy, if not an actual completed draft, of what it viewed as the optimal approach to any habeas petition it might file on his behalf, and (v) complete all of that work sufficiently before the deadline for waiving the filing of the writ to permit them to consult with Mr. Mullis about it beforehand."

Exhibit E, Robert Schuwerk Declaration at ¶ 7.

OCW's 4A Motion filed on November 20, 2012 confirms the lack of any substantial investigation or claim development after the October 2011 hearing. In the thirteen months after the hearing, counsel did no meaningful work on Mr. Mullis's behalf. In the 4A Motion, counsel put it bluntly: "Because Mullis waived his post-conviction habeas litigation, the OCW has not fully investigated or prepared an application on his behalf." 4A Motion at 12. Elsewhere, OCW admitted that, "substantial investigation ha[d] yet to be done in this case." *Id.* at 13. Just as before the 2011 hearing, OCW had collected the files of trial counsel and expert witnesses, but had still taken only "initial steps to review those records." 4A Motion at 12.

The Reporter's Record became available on October 27, 2011, shortly after the trial Court's October 12, 2011 order. Although Mr. Levenson had stressed to the Court the importance of the trial transcript in determining what issues should be pursued, *see* 10/11/11 transcript at 9, OCW did not even review the transcript upon receiving it, *see* 4A Motion at 12-

13.  In fact, a year later, OCW still had not reviewed the trial transcript. 4A Motion at 12-13.

Counsel's account of the investigation completed makes no mention of additional records being

collected or meaningful interviews conducted in that span of time. *Id*. In short, despite remaining

as counsel for Mr. Mullis, and holding themselves out as such, OCW abandoned all investigation

and claim development on his behalf.

In *Ex parte Reynoso ("Reynoso II")*, the Court of Criminal Appeals laid out the only two

appropriate courses of action for counsel to take when confronted with a client who seeks to

waive post-conviction review and remove appointed counsel. 257 S.W.3d 715, 720 n.2 (Tex.

Crim. App. 2008). Article 11.071, § 3(a) requires counsel to "investigate the case to the best of

his ability despite the defendant's wishes." *Id*. "Thus, counsel faced with an uncooperative client

should either (1) move to withdraw from the case, or (2) diligently pursue the investigation

despite his client's protests." *Id*. Despite these two mutually exclusive options, counsel did

neither here. Instead, OCW held itself out as counsel for Mr. Mullis while performing none of

the duties required of counsel. Independent of counsel's other failures detailed in the Petition,

OCW's abandonment of its investigation after the October 2011 hearing alone constitutes cause

to overcome any default.

Respondent nonetheless asserts that "any attorney would be reasonable in declining to

work on a habeas application" of a client who desires to waive. *See* Answer at 75 (quoting *Ex

parte Reynoso* (*Reynoso I*), 228 S.W.3d 163, 166 (Tex. Crim. App. 2007)). This is inaccurate and

premised on *Reynoso I*, which is no longer good law. In *Reynoso II*, 257 S.W.3d at 720 n.2, the

Court of Criminal Appeals reconsidered *Reynoso I*, vacated it, and reversed its earlier decision

because *Reynoso I*'s rule conflicted with the statutory duties imposed on state habeas counsel.

As the court explained *Reynoso II*:

> Our statement in [*Reynoso I*] that "any attorney would be reasonable in declining to work on a habeas application under the circumstances [of this case]" may have painted with too broad a brush given the statutory duty of Article 11.071 § 3(a) that appointed counsel "shall investigate" the case before and after the appellate record is filed. Thus, counsel faced with an uncooperative client should either (1) move to withdraw from the case, or (2) diligently pursue the investigation despite his client's protests.

257 S.W.3d at 720 n.2. OCW flouted those clear directions by neither moving to withdraw nor investigating.

Respondent also points to unconnected case law on trial counsel ineffectiveness claims in which a defendant's instructions not to present mitigation evidence absolved trial counsel of their constitutional duties. *See* Answer at 75 (citing *Schriro v. Landrigan*, 550 U.S. 465 (2007) and *Wood v. Quarterman*, 491 F.3d 196 (5th Cir. 2007)). These cases are readily distinguished legally and factually. Legally, in *Schriro* and *Wood*, there was no equivalent state-law duty that required counsel to investigate as in Article 11.071 § 3(a) here. Factually, as discussed above, Petitioner did not block the investigation and presentation of evidence. He instructed his attorneys to investigate further and remained open to reconsidering his desire to waive filing.

### 4. State habeas counsel's abandonment and failures prejudiced Mr. Mullis.

Mr. Mullis sought investigation of his claims both before and after the court's October 12, 2011 order and there is a reasonable probability he would have changed his desire to waive had counsel performed adequately.

Mr. Mullis was interested in investigation of his guilt-phase claims from the very beginning of counsel's appointment. Johnson 2015 Decl. ¶ 3. Mr. Mullis wanted OCW to develop and investigate any potential guilt-phase-related claims. *Id.* Although Mr. Mullis instructed OCW not to discuss his desire to waive with his family, he *never* instructed OCW not to investigate potential claims and placed no limitation on their investigation. *Id.* at ¶ 4.

As noted above, Mr. Mullis continued seeking investigation following the court's October 12, 2011 order. *See* Exhibit D, Letter from Travis Mullis to Brad Levenson, October 13, 2020 at *2. Petitioner's August 20, 2012 letter announcing his desire to pursue his habeas proceeding further underscores that his decision whether to waive depended on the investigation and development of his claims. Mullis's interest in new evidence shows his interest in litigating viable claims that an investigation might uncover.

Given the repeated instructions and the fact that Mullis attempted to revoke his purported waiver based on his discovery of new evidence, Respondent's contention that "[a]ny assertion that Mullis would have changed his mind had he seen the fruits of this hypothetical investigation is speculative and self-serving" is unpersuasive. Answer at 75. In any event, this is yet another factual dispute that should be settled at an evidentiary hearing.

### 5. Counsel's failure to correctly calculate the filing deadline frustrated Mr. Mullis's ability to file an application and deprived him of the ability to knowingly waive.

Section 4 of Article 11.071 of the Texas Code of Criminal Procedure states that an application for a writ of habeas corpus:

> must be filed in the convicting court not later than the 180th day after the date the convicting court appoints counsel under Section 2 or not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later.

Tex. Code Crim. Proc.art. 11.071 § 4(a). OCW repeatedly flubbed the deadline, failed to advise Mullis as necessary to protect his rights, and thus deprived Mullis of his ability to file a timely habeas application or to waive that right knowingly. Had counsel advised Mr. Mullis reasonably. he would have been able to file a timely petition.

As set forth in Mr. Mullis's Motion to Stay and Abey the Federal Habeas Proceeding, counsel's performance was deficient in several respects. *See* DE 31, *18-26. First, OCW filed a

series of extension motions without being certain of the habeas deadline and without

meaningfully working on Mr. Mullis's case in the interim. For example, OCW did not seek an

extension of the habeas deadline until, according to its own incorrect calculations, the deadline

had already passed. *See* Exhibit F, Petitioner's Motion for Extension of Time to File Initial State

Habeas Application. When that extension was granted, OCW permitted the new deadline to pass,

then continued to repeat such errors. *See, e.g.,* Exhibit G, February 14, 2012 Motion for

Extension of Time. Second, counsel failed to advise Mr. Mullis of the potential worst-case

scenarios regarding the deadline or of the pitfalls of missing the deadline. Mr. Mullis was

prejudiced by these failures.

In their February 14, 2012 motion for extension, counsel concluded that Mullis required a

90-day extension from what they now believed was the correct due date, February 21 2012.

Counsel based this supposed deadline on the idea that the triggering event, the date the State's

original brief was supposedly due, had passed on January 7. *See* 2/14/12 Motion for Extension of

Time. Counsel did not support this date with any evidence or argument. January 7, 2012 was a

Saturday, and thus could not have been the deadline for the State's original brief.

In truth, up to that point, no event that could have plausibly triggered the Article 11.071 §

4 deadline: the State had filed nothing in the direct appeal, and the appeal was still under review

by the Court of Criminal Appeals. Yet the court, acquiescing in counsel's incorrect assumptions,

assigned Mullis a deadline of May 21. On April 25, Levenson reiterated this arbitrary and

incorrect deadline to his client, "Remember, your deadline to file the petition is May 21."[9]

---

[9] At the very least, counsel should have realized that he had miscalculated the date on February
17 when the Court of Criminal Appeals informed OCW that Mullis's direct appeal was "set for
submis[sion]" without oral argument on March 7, 2012.

The trial court also independently violated its obligations under the state capital habeas statute. Article 11.071 § 4(d) states:

> If the convicting court . . . determines that after the filing [deadline] no application has been filed, the convicting court *immediately, but in any event within 10 days*, shall send to the court of criminal appeals and to the attorney representing the state:
>> (1) . . . a statement of the convicting court that no application has been filed within the time periods required . . . and
>> (2) Any order the judge of the convicting court determines should be attached . . . .

Tex. Code Crim. Proc. art. 11.071 § 4(d) (emphasis added). The court should have notified the Court of Criminal Appeals by May 31 (and, for that matter, by December 29) that no application had been filed. By waiting until late June to notify the Court of Criminal Appeals, the court violated its obligation under Article 11.071. *See Ex parte Gongora*, WR-60115-02, 2006 WL 173106 (Tex. Crim. App. Jan. 25, 2006) (finding "good cause" for 4A motion where court failed to notify CCA pursuant to § 4(d)). This violation further added to the confusion regarding Mr. Mullis's deadline.

When the case finally arrived before the Court of Criminal Appeals, Texas's highest criminal court was likewise flummoxed by the deadline issue. In its September 9, 2012 order, the Court of Criminal Appeals offered a peculiar open-ended interpretation of the deadline for filing that Mullis had apparently surpassed: "*Under the best possible scenario*, applicant's application would have been due to be filed in the trial court on or before July 2, 2012." CCA 9/12/12 Order at 2. Generally speaking, the idea of a deadline is that there can only be one time to file; if there are many scenarios that can produce different times in which to file, there is no deadline. The uncertainty in the Court of Criminal Appeals's statement is understandable, however; the language of the statute did not address what Mullis's deadline to file his habeas application was.

The event that should have triggered the application deadline under the statute was the filing of the State's original brief on direct appeal, and that event never took place.

At no point did Petitioner know what the real deadline was, and this uncertainty deprived him of the ability to make a final, knowing decision about litigating his issues or waiving his rights. Because waiver was only effective upon passage of a deadline, and that deadline was ever-shifting based on counsel's mistakes and the absence of an well-established rule, Petitioner was never able to reassess his desire to waive or knowingly effectuate a waiver. All the while, OCW did no further investigation or development of habeas claims. These mishaps— independently and taken together—provide good cause for petitioner's failure to exhaust and render his purported waiver unknowing.

> **6.** **Counsel knowingly failed to disclose a conflict of interest in representing Petitioner in his attempt to file an untimely habeas application.**

On August 20, 2012, Mr. Mullis contacted OCW and expressed a desire to pursue his habeas proceedings. OCW then represented Mr. Mullis in his motion to file an untimely habeas application under Section 4A, Article 11.071 of the Texas Code of Criminal Procedure. *See* 4A Motion 1. Yet OCW undermined Mr. Mullis's best chance to have his claims heard by failing to report a known conflict of interest to the court and suppressing any argument based on their failings as state habeas counsel.

State habeas counsel was aware of the conflict. OCW received advice from legal ethics expert and law professor Monroe Freedman regarding representation of Mr. Mullis in his effort to reopen his habeas proceedings. Johnson 2015 Decl. ¶ 11. Professor Freedman advised OCW that representation of Mr. Mullis in proceedings to reinstate his right to state habeas review presented a conflict of interest, as OCW would be conflicted in arguing that their own mistakes

and poor representation provided grounds for reinstating the habeas proceedings. Professor Freedman further advised that OCW could represent Mullis as a last resort if no other unconflicted counsel could be found.

OCW then claimed an inability to secure unconflicted counsel and represented Mr. Mullis in his proceedings to file an untimely habeas application. But counsel failed to disclose their conflict to the court. *See* 4A Motion at *1 n.1 ("OCW no longer represents Mullis in his habeas corpus proceedings, but is instead acting as pro bono counsel for the purpose of this Motion."). Counsel's arguments further proved that OCW was acting based on the conflict. Counsel now offered a self-serving reading of the October 12 order, which they labeled an "Order Removing Habeas Counsel." *Id.* at *3. Counsel's motion failed to mention that Mr. Mullis had sought investigation after the order. *Id.* at *3 n.3. And counsel failed to disclose that they were aware Mr. Mullis's waiver was involuntary, driven by his fear that he would be raped in general population, but failed to alert the court. Instead, counsel opted to attack the competency finding on the grounds that their own client had misled them and Dr. Scarano.

Acting under this conflict, OCW provided an incomplete and inaccurate account of why no state habeas application had been filed, and undermined Mr. Mullis's last opportunity to have his claims heard in state court.

> **D.    Mr. Mullis's Purported Waiver Was Involuntary and There Is a Reasonable Probability that the Court Would Have Found Mr. Mullis Incompetent and his Waiver Involuntary Had It Learned of the Confluence of Mr. Mullis's History of Sexual Abuse and Trauma, Diagnosis of PTSD, and Fear of Being Sexually Assaulted in General Population.**

To be "voluntary," a waiver must be "the expression of the defendant's own free will and must not be induced by threats, misrepresentations, or improper promises." *Kniatt v. State*, 206 S.W.3d 657 (Tex. Crim. App. 2006) (*citing Brady v. United States*, 397 U.S. 742, 755 (1970)). Voluntariness of a waiver "can be determined only by considering all the relevant circumstances

surrounding it." *Brady*, 397 U.S. at 749. Here, Mr. Mullis can demonstrate with clear and convincing evidence that his purported waiver was not an expression of his own free will; rather, it was the manifestation of his traumatic history of sexual abuse, his fear of revictimization, and his mental illness. As Dr. Victoria Reynolds has concluded, Mr. Mullis's fear of being sexually assaulted in general population was so great he would have rather died than face even the risk of this occurring. However, because of state habeas counsel's failures, Dr. Scarano did not consider how Mr. Mullis's mental illness and history of trauma impacted his decision to waive. Although Dr. Scarano declined to meet substantively with Mr. Mullis's current counsel, current counsel obtained the opinions of Dr. Victoria Reynolds.[10] According to Dr. Reynolds, a full account of Mr. Mullis's history of sexual abuse, combined with his prior diagnosis for PTSD, and concerns expressed to his state habeas counsel, could have alerted Dr. Scarano and the court that Mr. Mullis was not acting voluntarily in his desire to waive.

According to Dr. Reynolds, given Mullis's long-standing diagnosis of PTSD combined with his severe history of trauma—"including abandonment and neglect before adoption, maternal neglect post-adoption, and his prolonged history of sexual abuse by his adoptive father"—Mr. Mullis's fear of re-victimization played an "influential" role on the voluntariness of his waiver. Exhibit H, Reynolds Add. at 2-3. She concluded that "the specific terror of enduring another rape is often the driving force" behind "self-defeating, destructive, and suicidal behaviors," such as Mr. Mullis's desire to waive. *Id.* at 5. Mullis's fear of being sexually

---

[10] Dr. Reynolds was asked to review Dr. Scarano's report and other documents pertinent to Mr. Mullis's waiver, provide a critical assessment of Dr. Scarano's evaluation, and opine on how Mr. Mullis's history of trauma impacted his decision to waive his right to post conviction habeas review. She identified a number of vital issues that counsel failed to bring to the attention of Dr. Scarano, that would have impacted his ultimate finding that Mullis was competent and could voluntarily waive his right to post-conviction habeas review. Exhibit H, Dr. Victoria Reynolds's report, entitled Addendum to Psychological Report of Trauma (04/29/15) ("Reynolds Add.").

assaulted in general population could have triggered the re-experiencing aspect of his PTSD, which would create extreme anxiety, panic, and irrational avoidance behavior on Mr. Mullis's part. *Id.* at 4. As Dr. Reynold explained, for victims of sexual abuse, "the pain and loss of control engendered in this form of victimization is so distressing to them that they will die before they will 'allow' such a thing to happen to them again." *Id.* This was the case for Mr. Mullis, where his "fear of being raped again in his lifetime trump[ed] his fear of death." *Id.* at 5.

The available medical records would have informed Dr. Scarano of the details and severity of the sexual abuse Mr. Mullis suffered and allowed Dr. Scarano to consider how this history of trauma impacted Mr. Mullis's decision making. Dr. Reynolds found that Scarano's report lacked a full assessment of the scope and severity of Mr. Mullis's history of trauma. Dr. Victoria Reynolds Addendum to Psychological Report of Trauma (4/29/15) at 2 (hereinafter "Reynolds Add."). Although Dr. Scarano's report notes sexual abuse, Dr. Scarano's reliance on only TDCJ records and Mr. Mullis's self-reporting "may have led him to believe that Travis's history of sexual abuse was not as severe or its impact as severe as pervasive as other documentation available at that time." Reynolds Add. at 2. Indeed, Dr. Scarano's report gives the topic of sexual abuse cursory treatment, noting only that "…Mr. Mullis stated that his adoptive father sexually abused him starting when he was 3 years old to the age of 6 years old." Competency Report by Dr. Vincent R. Scarano, Pet'r Ex. 5. The nature and severity of the sexual abuse are omitted, as is any discussion of whether this history of trauma impacted Mr. Mullis's decision to waive.

Dr. Reynolds's addendum addresses the dangers and limitations of relying on self-reporting by victims of sexual abuse. Reynolds Add. at 2. Dr. Reynolds explained that sexually abused males like Mr. Mullis carry a significant amount of shame and thus tend to avoid

recalling their abuse or minimize it when they do recount it. "Without significant prompting

from Dr. Scarano, and sensitivity to Travis's shame and avoidance of these memories, Travis

himself was not likely to volunteer the details of his sexual abuse." *Id*. For that reason, Dr.

Reynolds critiqued Dr. Scarano's exclusive reliance on Mr. Mullis's self-reporting,

characterizing it as "necessarily limiting." *Id.* Thus, "records or other corroborating evidence can

be vital in determining the severity and details of the sexual abuse." *Id.* Ultimately, Dr. Reynolds

concluded that "Dr. Scarano's failure to fully evaluate the impact of Travis's sexual abuse

history on his thinking and behavior over his lifetime appears to have resulted in a critical

oversight: an evaluation of how influential Travis's history of sexual abuse was on his decision

to waive his appeals." *Id.* at 2.

Dr. Reynolds also concluded that Dr. Scarano's diagnosis of Borderline Personality

Disorder, read in conjunction with Mr. Mullis's historical diagnosis of PTSD, drove Mr. Mullis's

attempt to waive his appeals.

> PTSD is characterized by over-generalized fear networks that alter not only the
> neurobiology of the person with PTSD, but affect their beliefs and the flexibility
> of those beliefs.  When Travis anticipates being put in the general population
> where he cannot control other males' access to him, this triggers a cascade of
> memories and associations to his father's sexual violations in which he was
> helpless, trapped and had no choice but to accommodate his father's abuse.

*Id*. at 4. Dr. Reynolds summarized the severity of Mr. Mullis's fear of revictimization in stark

terms: "Simply put: Travis's fear of being raped again in his lifetime trumps his fear of death."

*Id*. at 5.

Independent of whatever additional information the records may have provided, Dr.

Reynolds criticized Dr. Scarano's report for failing to consider how the features of borderline

personality disorder, which Dr. Scarano himself saw as a likely diagnosis, impacted Mr. Mullis's

decision. *Id*. at 3. Prominent features of borderline personality disorder include frequent and

marked changes in mood, impulsivity, destructive behavior and chronic suicidality. *Id.* Given these traits and their readily apparent potential influence on Mr. Mullis's decision to waive, Dr. Reynolds found it difficult to understand Dr. Scarano's "confidence in the stability and reliability of Travis's state of mind during the assessment, as well as his acceptance of Travis's formulation that his decision to waive his appeals had nothing to do with his history either of suicidality or sexual abuse." *Id.* According to Reynolds, "[t]hese conclusions were nether responsive to his BPD diagnosis nor Travis's actual behavior history." *Id.*

"A more coherent picture of Travis's decision-making capabilities would have been informed by an explanation of how his observations of Travis's trauma history, his BPD, and his lack of insight influenced his capacities in this regard." *Id.* at 3. This Court should conclude, as Dr. Reynolds did, that Mr. Mullis's mental illness and fear of being revictimized drove his desire to waive.

### E.    28 U.S.C. Section 2254(E)(2) Neither Bars Petitioner From Introducing New Evidence Nor Precludes This Court From Holding An Evidentiary Hearing On His Claims

As explained throughout this reply and Petitioner's prior submissions, the parties raise factual disputes that require a hearing to resolve. This is true both as to the threshold procedural arguments set forth above and the substance of Petitioner's claims. Respondent argues that this Court is barred from considering new evidence or holding an evidentiary hearing on Petitioner's claims under 28 U.S.C. § 2254(e)(2) and *Cullen v. Pinholster*, 563 U.S. 170 (2011). *See* Answer at 90-93. This argument, which is directly refuted by Supreme Court and Fifth Circuit precedents, is meritless. The opening clause of § 2254(e)(2) precludes an evidentiary hearing in federal habeas proceedings where the petitioner has failed to develop the factual basis of a claim in state court. 28 U.S.C. § 2254(e)(2). Respondent correctly notes that this provision is only

triggered if a petitioner is "at fault" for the failure to develop in state proceedings. *Bradshaw v. Richey*, 546 U.S. 74, 79 (2005). However, Respondent errs when it asserts that a petitioner is "at fault" where, as is the case here, the failure to develop a record in state proceedings is the result of state habeas counsel's abandonment and ineffectiveness.

Respondent cites *Holland v. Jackson,* 542 U.S. 649 (2004), and *Williams v. Taylor,* 529 U.S. 420 (2000), for the proposition that state post-conviction counsel's lack of diligence is attributed to the petitioner for § 2254(e)(2) purposes. *See* Answer at 91. The Respondent's reliance on *Holland*, *Williams*, and attribution doctrine generally is misplaced. Neither case involved a petitioner who alleged ineffective assistance of state habeas counsel. *See Holland*, 542 U.S. at 650-51; *Williams*, 529 U.S. at 427. More importantly, both cases predate *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), which held that habeas counsel's ineffectiveness in failing to properly exhaust a claim provides cause and prejudice to excuse any default. 566 U.S. at 17; 569 U.S. at 428–29. Both cases also predate *Maples v. Thomas*, 132 S. Ct. 912 (2012), in which the Court held that an attorney's abandonment in post-conviction proceedings could not be imputed to the client and could provide cause for the resulting default. 132 S. Ct. at 922-23. Under *Martinez/Trevino*, a court may consider new evidence presented for the first time in federal court where a petitioner shows that (1) his state habeas counsel was ineffective for failing to present that evidence, and (2) his claims are "substantial," meaning that his claims have "some merit." *Newbury v. Stephens*, 756 F.3d 850, 871–72 (5th Cir. 2014) (citing *Martinez*, 566 U.S. at 871). Thus, this Court can and should hold an evidentiary hearing on the issue of state habeas counsel's ineffectiveness, and, in doing so, should consider the substantiality of Petitioner's underlying claims and the evidence in support of those claims.

46

*Pinholster*'s limitation of federal habeas review to the state court record is premised on the assumption that a diligent petitioner would be afforded the means to fully and fairly develop the record in state court, and is, consequently, inapplicable where ineffective assistance of state habeas counsel denies the petitioner the opportunity to develop that record. Respondent's contrary interpretation of § 2254(e)(2) would effectively nullify *Martinez* and *Trevino*. *Martinez*, designed to protect the fundamental right to counsel, reflects a concern that prisoners deprived of adequate state post-conviction counsel would be "in no position to *develop the evidentiary basis* for [their] claim[s]. . . which often turns on evidence outside the trial record." 566 U.S. at 12 (emphasis added). *Trevino* also recognized that the central task of much federal ineffective assistance of trial counsel litigation is to "investigate [a claimant's] background, determine whether trial counsel had adequately done so, and then *develop evidence* about additional mitigating background circumstances." *Trevino*, 569 U.S. at 425 (emphasis added). A procedural rule that permits a petitioner to assert a claim, but denies him the ability to support it, undermines the principles underlying these decisions and endangers the constitutional right to counsel at trial.

The history of § 2254(e)(2) corroborates Petitioner's interpretation of the statute. Section 2254(e)(2)'s "free from fault" standard codified the Supreme Court's decision in *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). *See Williams*, 529 U.S. at 434. In *Keeney,* the Supreme Court held that the same standard for determining cause and prejudice should be used to determine whether a federal evidentiary hearing may be held in a habeas proceeding. 504 U.S. at 8. The Court held that petitioner was entitled to an evidentiary hearing if he can "show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure." *Id.* at 11. *Kenney* adopted a rule that tied restrictions on evidentiary hearings to the general principles of cause and prejudice and Congress codified that rule. This is the proper

standard to apply here. *Martinez*'s and *Maples*'s narrow extensions of cause and prejudice do not

take them outside *Kenney* and, consequently, does not violate § 2254(e)(2). Because a prisoner

with *Martinez*-or *Maples*- postured claims is no longer considered to be *at fault* for forfeiting the

claim, he has not "failed to develop" the claims under § 2254(e)(2). Moreover, the Fifth Circuit

adheres to the rule that procedural default law and § 2254(e)(2) must use symmetric definitions

of fault. *See Barrientes v. Johnson*, 221 F.3d 741, 771 (5th Cir. 2000).

Respondent's protracted discussion of the two statutory exceptions in § 2254(e)(2) and

Petitioner's purported inattention to those exceptions is irrelevant. Petitioner need not prove that

his claims could not have been discovered with due diligence or that new, retroactive

constitutional rules apply, because Petitioner's claims fall squarely into the *Martinez/Trevino*

exception—an exception that attends to § 2254(e)'s opening clause. In short, Petitioner satisfies

§ 2254(e)(2)'s "free from fault" standard and removes any bar to the consideration of new

evidence and an evidentiary hearing because the abandonment and ineffectiveness of his state

habeas counsel establishes cause and prejudice.

## CLAIMS FOR RELIEF

**I.   IN SUPPORT OF A DEATH SENTENCE, THE STATE KNOWINGLY PRESENTED FALSE ALLEGATIONS OF EXTRANEOUS OFFENSES BY PETITIONER AS A JUVENILE; DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO REBUT THESE AND OTHER ALLEGATIONS THAT PETITIONER WAS A FUTURE DANGER AND MAKE APPROPRIATE OBJECTIONS; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS RECORD-BASED CLAIM.**

At the penalty phase, the State presented testimony and argument of extraneous offenses

Petitioner committed as a juvenile, many of which occurred while he was in a juvenile placement

facility being treated for sexual abuse perpetrated by his adoptive father and for Petitioner's

resulting sexual misbehavior. The State used this evidence, in combination with testimony from

a "prison classification expert," to argue for Special Issue 1—that Petitioner was a future danger —and against Special Issue 2—that circumstances mitigated against a sentence of death.

Despite being on notice that the State planned to present this evidence and argument, counsel failed to investigate, uncover and present available evidence to refute these allegations. Counsel did not contact individuals involved in, or possessing information relevant to, these extraneous offenses. Counsel did not utilize readily available records to impeach or recast these incidents so the jury could properly assess their relevance to the life or death decision they were making. Counsel did not utilize expert services to counter the State's expert testimony—which provided a vital and necessary stepping stone in their argument that Petitioner would be a future danger in prison. Counsel's deficient performance in failing to investigate and counter this vital portion of the State's case for death, in combination with his failure to present positive prison adjustment evidence, violated Petitioner's Sixth and Eighth Amendment rights and undermines confidence in the jury's ultimate verdict. *See Hooks v. Workman*, 689 F3d 1148 (10th Cir. 2012) (counsel ineffective for among many reasons, his failure to rebut the state's aggravating evidence); The State Bar of Texas Guidelines and Standards for Texas Capital Counsel (2006), Guideline 11.7(A) (stating defense counsel's "continuing duty to investigate issues bearing upon penalty and to seek information that . . . rebuts the prosecution's case in aggravation").

When it came to these extraneous offenses, the State was not forthcoming with the jury. The State exaggerated the scope of Petitioner's alleged misconduct and failed to present evidence in their possession that diminished the seriousness of these incidents. The State's presentation of dishonest, exaggerated, and/or false evidence violated Petitioner's Eighth Amendment right to reliable capital sentencing and Fourteenth Amendment right to due process.

## A.        Respondent Does Not Apply the Correct Standard Pursuant to *Napue* and *Agurs*

Throughout their Answer, Respondent applies an incorrect legal standard under *Napue v. Illinois*, 360 U.S. 264 (1959). Respondent repeatedly asserts that Petitioner failed to prove that prosecutors "knew of any falsity." *See, e.g.,* Answer at 97, 99 100. As the Court in *United States v. Agurs*, 427 U.S. 97 (1976) recognized, however, the *Napue* standard encompasses not only evidence the prosecutor *knows* to be false, but also evidence the prosecutor *should have known was false*. 427 U.S. at 103 (noting that the grant of a new trial in *Mooney v. Holohan*, 394 U.S. 103 (1935), involved perjured testimony and evidence such that "the prosecution knew, or *should have known*, of the perjury"). While the Fifth Circuit Court of Appeals appears to require knowledge of the falsity, there is a split in the Circuits on this issue in any event *Agurs* controls.[11]

Respondent also applies an improper materiality standard, repeatedly arguing that any false evidence was "minor" and that this evidence was "vastly outweighed" by and "pales in comparison to" the remaining evidence in aggravation, including the nature of the underlying crime. *See e.g.* Answer at 97, 99-100, 121. This is not the standard under *Napue*, which requires Petitioner to show a *reasonable probability* that the false or misleading evidence *could* have affected the judgement of the jury. 360 U.S. at 271; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972). Respondent's repeated argument that the horrendous nature of Petitioner's crime overwhelms any other consideration "is a non-starter."  *Walbey v. Quarterman*, 2009 WL 113778, *8, 309 Fed. Appx. 795 (5th Cir. 2009) (unpublished) ("Texas's next argument – that

---

[11] *See* Aron E. Goldschneider, *Edict v. Dicta: Rolling Back Rights in the Second Circuit under the Clearly Established Clause of the AEDPA Amended Habeas Statute*, 26 N. Ill. U. L. Rev. 1, 49 (2005) (finding that the First, Second, Third, Fourth, Eighth, and Ninth Circuits have recognized the "should have known" standard, while the Fifth, Sixth, Seventh, Eleventh Circuits require actual knowledge).

Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence – is a non-starter. . . .   To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge. . . .   Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts.  But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief . . . would virtually never be available, so testing for it would amount to a hollow judicial act.").

Finally, Respondent improperly addresses the materiality of each allegation of ineffectiveness and prosecutorial misconduct individually, rather than cumulatively. *See* Answer at 97, 99-100, 106, 109-110, 111, 116, 121. This individualized approach conflicts with and unreasonably applies clearly established federal law mandating that the prejudicial impact of counsel's failures and the materiality of various instances of prosecutorial misconduct be considered cumulatively. *See Strickland*, 466 U.S. 688 (defining deficient performance and prejudice by reference to counsel's "errors" in the plural); *Hallman v. State*, 603 S.W.3d 178, 193 (Tex. App. 2020), petition for discretionary review granted (Sept. 30, 2020), (*citing Kyles v. Whitley*, 514 U.S. 419, 441 (1995)) ("A cumulative evaluation of the materiality of wrongfully withheld evidence is required rather than considering each piece of withheld evidence in isolation."). While each of Petitioner's allegations has independent merit, the cumulative impact of the State's misconduct was material, and the cumulative impact of counsel's deficient performance prejudiced Petitioner, thus undermining confidence in the jury's finding for death. This misconduct and ineffectiveness impacted the four extraneous incidents addressed in Sections B through F infra.

### B.        Unfounded or Ruled Out Allegations of Sexual Assaults

The extraneous bad act evidence related to allegations that Petitioner, at the age of 13 or 14, was involved in sexual misconduct with three roommates at Stone Bridge Respite Program, a residential therapeutic facility for sexual offenders where Petitioner was sent following his own sexual abuse and acting out. The State's evidence in support of these extraneous offenses consisted of notations in Jefferson School Records that: 1) Petitioner told staff he had "three more victims than previously reported," 2) Petitioner described those incidents as involving oral sex, 3) Petitioner's counselor questioned the "truthfulness" of Petitioner's disclosures, and 4) Petitioner told the group that his restrictions were "lifted due to the lack of results in a CPS investigation [that was initiated based on his disclosures]." 58 RR Def. Exh. 45-142, -143, 183.

With this evidence in hand, the prosecutor cross examined three defense witnesses about the incident, creating a picture of Petitioner as a manipulative person who "victimizes," "violates" and "uses" other people. *See* Petition at 23-24; 30 RR 206, 31 RR 208; 32 RR 135-36. In closing argument, the prosecutor exaggerated and overstated these incidents, telling the jury that while at Sheppard Pratt, Petitioner "victimized four, five, maybe eight guys." 33 RR 54. The prosecutor argued that these incidents showed Petitioner was selfish, manipulative, and remorseless, 33 RR 22, and were proof positive that Petitioner was a future danger. 33 RR 22 ("in terms of thinking about future dangerousness . . . think about . . . Sheppard Pratt . . . a structured lockdown facility much like a jail . . . . He grooms and sexually molests other residents. So that's what he's like in a controlled setting.").

### 1.        *Napue* violation

Respondent asserts that Petitioner did not prove this evidence was false, that prosecutors "knew of any falsity", or that that any falsity was material. According to Respondent, the jury already heard evidence raising doubts about whether or not these incidents occurred, and the

prosecutor's mention of these assaults during closing was insignificant and "vastly outweighed" by other aggravating evidence. Answer at 96-98.

The Jefferson School records show that Petitioner's disclosure was limited to three boys, not 4 or 8 as the prosecutor falsely asserted in closing argument. Moreover, the evidence shows that CPS ruled out or found Petitioner's disclosed improprieties to be unsubstantiated. *See* Petition at 28-29. Applying the correct *Napue* standard, this evidence shows the State knew or should have known that their arguments, which doubled the number of purported victims and presumed these assaults actually occurred, were false.

While Respondent is correct that some evidence questioning these incidents was before the jury— including two entries in a 277-page binder of Jefferson School records submitted to the jury as one of more than two hundred other exhibits and the testimony of a defense mitigation specialist reading these entries—this does not defeat a showing of materiality. As noted above, the prosecutor repeatedly highlighted these "sexual assaults" while cross examining defense witnesses and in closing argument, all while operating on a clear presumption that these assaults did in fact occur. Given the prosecutor's wide-ranging use of this evidence to show future dangerousness and to recast and counter Petitioner's mitigation, there is a reasonable probability that, had the untruthfulness of the extraneous act evidence been uncovered, at least one juror would have voted for life.

### 2.    Counsel's Ineffectiveness

Respondent argues that counsel was not deficient in failing to counter these allegations and Petitioner was not prejudiced because counsel introduced and published Jefferson School records showing that "the psychiatrist doubted Mullis' self-report" and "the CPS investigation yielded no results." Answer at 107. Respondent does not address the prosecutor's overstatement regarding the number of victims, which counsel failed to object to or correct. Respondent also

does not address counsel's failure to speak with, or present testimony from, counselors at Stone Bridge who did not recount any sexual misconduct involving Petitioner. *See* Exhibit 9, Declaration of Wendy Myers; Exhibit 4, Declaration of Michael Smith. One of those counselors even described Petitioner as someone likely to fabricate such a story: Travis as a small kid with a big mouth; "the runt of the group" who tried to "take a stance" and "make an impression that he was more than what he was." Exhibit 9, Declaration of Myers at ¶ 4. Finally, Respondent does not address trial counsel's misguided concession in closing that Petitioner "had sex with other juveniles at Sheppard Pratt." 33 RR 41.

Respondent argues that Petitioner was not prejudiced by counsel's failure to uncover and present evidence that the CPS records from this incident were destroyed, and thus that these allegations of misconduct were ruled out and/or unfounded under Maryland law. *See* Answer at 107. Contrary to Respondent's assertions otherwise, the term "ruled out" means that CPS found the abuse did not occur and the term "unfounded" means there was insufficient evidence to support a finding of abuse. *See* COMAR .07.02.07.11(B) & (C). Such evidence would have given credence to *Petitioner's statement*, documented in the Jefferson School records, that the CPS investigation yielded no results.

Petitioner does not contest that Jefferson School records pertaining to this incident were introduced and published in part to the jury— along with voluminous other records and exhibits. *See* 36 RR 6-22 (index of State and Defendant's trial exhibits). Petitioner instead faults counsel for not looking beyond these records, for not adequately investigating these alleged incidents, for failing to object to the prosecutor's overstatements, and for conceding in closing argument that these incidents occurred, when credible evidence showed otherwise. Had counsel conducted a constitutionally adequate investigation, he would have uncovered and been able to present

evidence confirming that Petitioner's disclosures were nothing but puffery and there was no

basis to conclude that these incidents actually occurred. Armed with this information, competent

counsel would have objected to the prosecutor's overstatement and would not have made such a

damaging and inaccurate concession in closing argument. Counsel's failure to investigate this

extraneous offense evidence, evidence counsel knew the State planned to use, amounts to

deficient performance. *See Rompilla v. Beard*, 545 U.S. 374, 389 (2005) (finding deficient

performance when counsel failed to investigate aggravating evidence).

### 3.     Altercation with Staff Member at Jefferson

This prior bad act evidence pertains to a notation in the Jefferson School records stating

that Petitioner threw shampoo bottles at staff and that, when a counselor came to pick up his

hygiene basket outside his door, he kicked her. Counsel did not investigate this incident, speak to

the counselor involved, Maldina Dietz ("Ms. Dee"), and did not present any evidence to counter

or contextualize the statement in the records.

The prosecutor mentioned this incident in closing argument on three separate occasions,

using it to argue that Petitioner was manipulative, selfish, remorseless, impulsive, prone to angry

outbursts and as proof that Petitioner would be a future danger in the structured environment of

prison, which the prosecutor equated to the conditions of confinement as Jefferson School. 33

RR 22, 55, 58. Specifically, the prosecutor argued, while purportedly reading from the record:

> "He had a one-on-one with Ms. Dee. He was very concerned if he had hurt her" --
> or she says "me" because she's the one that wrote this – "hurt me when he kicked
> me. Travis said he was sorry about five times." Now the punch line: "He asked if
> I was going to press charges."  That's his concern. Not remorse for having done
> what he's done. Are you going to press charges? It goes on to say "Travis felt so
> much better after our talk." No kidding. Travis while he's there did what he
> wanted to do when he wanted to do it. That's his life. It's all about me. People are
> objects to be used.

*Id*. at 55.

What the State argued was exaggerated and the prosecutor's "punch line" was false and unsupported by the record. The prosecutor was not "reading from the record" as Respondent asserts, *see* Answer at 99, but rather was providing the jury with a false, ad-libbed account of what occurred. The actual record shows that Petitioner did apologize and expressed remorse to the counselor, but never once asked her if she was going to press charges, never expressed concern about her reporting him to law enforcement, and never said he "felt so much better" after they talked. *See* 58 RR 120, 122 (record of incident on January 5, 2002 and Petitioner's apology on January 11, 2002). In a disingenuous effort to support the trial prosecutor's false argument, Respondent cites to a notation in the Jefferson Records from *ten months prior* to this incident. *See* Answer at 98-99 citing to 39 RR SX 204 (record dated March 5, 2001).

The State should have known and counsel should have investigated and uncovered evidence showing this incident was far less serious than portrayed by the State. The records themselves show the incident and Petitioner's frustration were precipitated by "threats" and "inappropriate sexual comments" from a peer that made Petitioner "feel unsafe," but the jury never heard this. *See* 58 RR 120. In addition, unpresented evidence from the counselor involved shows that the incident was "not a big deal," that she was not injured in any way, and that she did not even report the incident to police—which she had done following other incidents. *See* Exhibit 5, Declaration of Maldina Dietz. If called to testify, this counselor would have explained the inaccuracy of the account in the records and clarified she "never considered pressing charges" and only discussed the incident with Petitioner because she felt the need "to set boundaries with students." *Id.*

Respondent speculates that counsel might not have wanted "to expend significant investigative resources" to locate and speak with Ms. Dee and may not have wanted to present

her as a witness for fear of drawing more attention to the incident. *See* Answer at 110-11.

Respondent's argument about insufficient funds is unavailing given that this was a capital case

and counsel had a clear duty to investigate the State's case in aggravation. Respondent also

ignores that counsel's "decision" could not have been strategic or reasonable, as it was based on

no investigation. Strategic choices made after an incomplete investigation are reasonable only to

the extent that reasonable professional judgments support the limitations of counsel's

investigation. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Counsel cannot reasonably abandon

his or her investigation after having "acquired only rudimentary knowledge of his [client's]

history from a narrow set of sources," *Andrus v. Texas,* 140 S. Ct. 1875, 1882 (2020) (quoting

*Wiggins*, 539 U.S at 524), or "ignor[ing] pertinent avenues for investigation for which he should

have been aware." *Porter*, 55 U.S. at 40. Yet, that is exactly what counsel did here, relying on

records containing "rudimentary" information, without reaching out to the actual witnesses

referenced in those records. Such extra-record speculation as to counsel's rationale, which

Respondent engaged in here, is improper. *See Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir.

1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly

did not"). An evidentiary hearing is required to resolve these material issues of disputed fact.

Respondent asserts that Petitioner cannot prove materiality and/or prejudice where only

"limited" references to this incident were made in closing argument and, for instance "simply

reading from the record made by the staff member." Answer at 99-100, 111. This assertion is

disingenuous and contradicted by the record. As noted above, the prosecutor was not reading

from the record, nor was his use of this evidence "limited." Ultimately, this evidence was used to

support the prosecutor's argument that Petitioner would be a future danger: "So, in terms of

thinking about the future dangerousness of the Defendant, think about what we know about

Sheppard Pratt. . . .What does he do in that structured environment? He assaults a female. He assaults a female staff member, kicks her." 33 RR 22. In determining the effect of a constitutional violation at trial, "[t]he likely damage is best understood by taking the word of the prosecutor, who contended during closing arguments" that the evidence at issue was important. *Kyles,* 514 U.S. at 444.

Counsel's failure to interview the purported "victim" of this assault, object to the prosecutor's false argument, and present an accurate version of what actually occurred was objectively unreasonable. Had counsel done these things, he could have prevented, or at the very least diminished the impact of, the prosecutor's closing argument. Had counsel adequately rebutted this prior bad act evidence, along with other prior bad act evidence discussed herein, there is a reasonable probability that at least one juror would not have voted for death.

### 4.     Altercation with Grandmother

The prosecutor falsely argued that Petitioner assaulted his grandmother Francis Barry, "a frail lady", 33 RR 21, despite a pretrial interview of her where she unequivocally denied Petitioner ever assaulted her. *See* Petition at 29. Counsel, who was provided with a copy of the interview prior to trial, was ineffective for failing to investigate and rebut this argument. *Id.* at 35.

Respondent faults Petitioner for not providing this Court "with proof that there is a pretrial interview with Frances wherein she denies Mullis ever assaulted her." Answer at 109. Although *Respondent does not ever deny such a recording exists or is in their possession*, Respondent asks this Court to dismiss Petitioner's assertion of ineffectiveness as "conclusory" and insufficient to warrant habeas relief. *Id.* As would be proven at a hearing, Petitioner is in possession of an audio copy of this interview, which was located on a CD in trial counsel's files. Although Petitioner did not have an official transcription of this audio interview to attach to his

Petition, Petitioner is willing to work with Respondent to obtain an official transcription to provide to this Court.

Respondent further argues that, "even if such a recording existed," Petitioner could never have presented it at trial because it would have been inadmissible hearsay. *Id*. In support of this assertion Respondent says that "Frances directed her son [Stephen Barry] to tell trial counsel that she did not want to speak with them and asked them to cease their attempts to contact her" and "at the direction of her physician, she did not attend Mullis' trial." *Id*. (citing to 28 RR 132-33 & 72). Respondent's argument is not persuasive. Steven Barry wrote an email to the defense investigator "about [his] mother, Francis," stating: "leave my family alone or I'm going to take legal action," and making it clear that *he* did not want anyone from the defense to contact "[his] family" as he thought Petitioner "deserved death." 28 RR 132-33. While Stephen testified that he wrote that email at his mother's request, it is ironic that Respondent's hearsay argument itself relies on these hearsay assertions.

Moreover, contrary to Respondent's insinuation otherwise, counsel had numerous avenues by which to get Ms. Barry's statement into the record. Counsel could have requested the Court's assistance in getting her testimony before the jury, including by requesting permission to depose her in advance of trial. Counsel could also have sought to stipulate to the admission of her pretrial statement. Such a stipulation would have been appropriate given the State's obligations to seek justice, not just a conviction and death sentence; to ensure the presentation of their case for death was complete and accurate; and to ensure Petitioner received a fair and reliable sentencing hearing as mandated by the United States Constitution.

### 5.    Behavior in Prison

The State presented two deputy sheriffs employed by the prison and a more than a dozen photographs of graffiti, including gang symbols and a hit list, found on the walls of Petitioner's

cell. 29 RR 7-22, 44-59. The State argued in closing that this graffiti was evidence Petitioner was a future danger, even when incarcerated. 33 RR 23. Counsel did not present any evidence regarding this graffiti incident or Petitioner's overall behavior in prison.

Counsel was ineffective for failing to show the insignificance of this graffiti incident with the testimony from four deputy sheriffs, each of whom recount that they did not take this incident seriously and characterize it as an attention-seeking act of boredom rather than a threatening act. *See* Petition at 38. These same deputy sheriffs could have provided evidence of Petitioner's positive adjustment to jail while awaiting trial.

Respondent argues that, because counsel was able to "extract concessions of non-dangerousness" during his cross examination of the State's witnesses, testimony from four additional "jailers" was unnecessary and would have been cumulative. Answer at 115-16. For this reason, Respondent speculates that counsel "knew they could get such information out of the State's jailer witnesses," and thus they acted tactically in failing to interview other prison employees. *Id.* at 116. Respondent is incorrect. The deputy sheriffs that counsel failed to interview and present could have provided much more detail about Petitioner's good behavior in prison, details far beyond the "non-dangerousness" concession the State's witnesses provided on cross examination. *See* Petition at 36-38. These deputy sheriffs characterize Petitioner as being helpful (having taught one of the deputy sheriff's how to understand the inmates' sign language so he could keep himself out of harm's way), "more like an assistant deputy than an inmate," someone who "wanted the jail to be safe for everyone and [  ] contributed to making it safe," "respectful," compliant, an "overall good guy," and a "damn near perfect inmate." *See* Exhibit 41, Declaration of Richard Styner at ¶ 3; Exhibit 42, Declaration of Robert Lundy at ¶ 2; Exhibit 44, Declaration of Michael Bradford at ¶ 4. For these reasons, Respondent's speculation as to

counsel's purported strategy in failing to present these witnesses is unpersuasive and, in any event, raises a question of disputed fact. Moreover, given that counsel never investigated or spoke to any of these deputy sheriffs, counsel's decision could not be characterized as strategic or reasonable under *Strickland*.

Finally, Respondent argues that one jailer's declaration (Exhibit 44, Declaration of Michael Bradford) is not competent evidence as it contains defects— citing to "a non-existent federal statute to give it sworn force" and failing to provide an "executed-on date." *Id.* at 116 (citing to *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994)." Respondent puts form over substance. The language of 28 U.S.C. §1746 only requires that a statement of verification be in "substantially" the same form as the statement set forth therein. As such, to be in compliance with § 1746, an unsworn declaration "need not be identical to the language in the statute." *United States v. 8 Gilcrease Lane, Quincy Fla. 32351*, 587 F.Supp.2d 133, 139 (D.C. 2008). As the Fifth Circuit has stated, there are two statements that are essential to a proper verification under 28 U.S.C. § 1746:  (i) an assertion that the facts are true and correct; and (ii) an averment that the first assertion is made under penalty of perjury. *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) (declaration invalid because it never declared statement to be true and correct); *see also Matsuda v. Wada*, 101 F.Supp. 1315 (D. Haw., 1999) (focusing on substantial compliance with the statute and finding that an unsworn declaration which states 'I declare under penalty of perjury that the foregoing is true and correct' complies with the statute, and is therefore valid"). Mr. Bradford's declaration complies with those two requirements; in any event, the allegations in the Petition are themselves sufficient to warrant a hearing on Mr. Bradford and the other deputies' accounts.

Although the Sixth Circuit case cited by Respondent, *Bond v. Cox*, 20 F.3d 697, suggests in dicta that an undated affidavit cannot be considered by the court in addressing a summary judgment motion, this holding is contrary to the language of § 1746, which only requires substantial compliance with the statute. Moreover, this "suggestion" made in *Cox* has been explicitly rejected by at least one court. *See McGruder v. Metropolitan Government of Nashville and Dividson County, Tennessee*, 2020 WL 4586171 *8 (MD. Tenn. August 10, 2020) ("the court rejects the suggestion [made in *Bonds v. Cox*, 20 F.3d 697] that the Declaration must be stricken because it is undated"). The fact that Mr. Bradford's declaration is undated and cites to the wrong perjury statute is simply immaterial at this stage of these proceedings.[12] Ultimately, if this Court shares Respondent's stated concerns about the validity of the information in the declaration, this concern weighs in favor of holding an evidentiary hearing where the witnesses may be presented and heard.

### 6.     Improper and Unrebutted Comparison Between Jefferson School and Prison

The State "misleadingly compared the conditions at Jefferson School to the conditions of confinement Petitioner would face if he were sentenced to life in prison and argued that his previous misbehavior [at Jefferson School] was predictive of how he would act in prison." *See* Petition at 32. As a result of counsel's deficient performance, the State presented inaccurate testimony from an employee of the TDCJ-CID Classification and Records Department regarding the conditions of confinement faced by prisoners sentenced to life without parole and this

---

[12] For purposes of explanation, the perjury statute in Pennsylvania, where counsel does much of their work, is 18 Pa. C.S. § 4904, so Petitioner's mistaken citation to 28 U.S.C. § 4904 at the bottom of this and several other declarations appears to have stemmed from a clerical error. The correct statute is cited at the top of each of the declarations containing this error at the end of the declaration.

inaccurate testimony went unrebutted. *See id.* The prosecutor then used this false testimony as a springboard from which to make the speculative argument that the conditions at Jefferson School were similar to conditions in prison and Petitioner's prior bad acts at Jefferson School thus showed he would be a future danger in prison. *Id.*, citing 33 RR 22.

Counsel was ineffective for failing to hire a corrections expert to counter the State's expert and explain that the secure conditions Petitioner would face if sentenced to life imprisonment were very different from the conditions at Jefferson School. Such expert testimony, as proffered in the declaration of Frank Aubuchon, would have shown that the State's expert testimony was inaccurate in several material respects. *See* Exhibit 43, Declaration of Frank Aubuchon.  Moreover, such testimony would have shown that the prosecutor's argument was improper, as the "level of security" at Jefferson School/Shepherd Pratt was "much less than that of a lockdown jail." *Id.* at ¶ 6. Petitioner's expert highlights the following differences between Jefferson School and a structured prison: unlike Jefferson School, a structured prison houses offenders in single, locked cells for up to 23 hours a day; does not utilize common living areas; utilizes mechanical restraints when individuals are outside their cells; utilizes "much more than a wooden privacy fence" to guard the perimeter; and is authorized to use deadly force to prevent escape. *Id.* at ¶¶ 5-6.

Respondent argues that Petitioner's allegations do not amount to a *Napue* violation because Petitioner failed to show that prosecutors elicited false testimony on this topic. Answer at 100. Respondent also argues that Petitioner is really asking the Court to extend *Napue/Giglio* to prosecutorial argument and that the adoption of such a new constitutional rule is precluded by *Teague v. Lane*, 489 U.S. 288 (1989). Answer at 100-102.

Respondent is incorrect. Petitioner has shown that the State's expert testimony regarding prison conditions was inaccurate and that evidence regarding Petitioner's prior bad acts at Jefferson School was overstated and false. While Respondent contests the falsity of this underlying evidence, it does not dispute Petitioner's assertion that the prosecutor's future dangerousness argument necessarily relied on this evidence. As the Court in *Kyles* noted, "[t]he likely damage [from a constitutional violation] is best understood by taking the word of the prosecutor, who contended during closing arguments" that the evidence at issue was important. 514 U.S. at 444. For this reason, it is not necessary for this Court to adopt a new constitutional rule in order to address Petitioner's *Napue* claim.

With regard to Petitioner's ineffectiveness claim, Respondent asserts it is really a claim of an "uncalled witness" because in a pretrial court filing counsel designated Dr. Mary E. Plez as a "criminal justice (prisons) expert", did not present her testimony at trial, and hence must have had a strategic reason for not doing so. Answer at 117-18. Respondent's argument rests on false presumptions, including that Dr. Pelz was qualified to discuss classification of prisoners in the TDCJ and that counsel hired her for that purpose. *Id.* at 177 N.33. To the contrary, counsel hired Dr. Pelz with the intent of using her as a "prison lifestyles expert"—as was written on the top of her CV found in counsel's file—to explain to the jury what life would be like for Petitioner if convicted and sentenced to life in prison without parole for having killed and sexually abused a child. Exhibit I, Trial Counsel's Copy of Dr. Pelz's C.V. Her CV confirms this area of expertise but reflects no experience at all with classification of prisoners and corresponding restrictions. All of her publications, her grants and her professional presentations focus on gang life and culture in prison. Although Dr. Pelz was briefly employed as a corrections *counselor* at a prison in Rasharon Texas from 1986 to 1988, that was her only experience working inside the Texas

prison system. *Id.* Given her background, if Dr. Pelz had attempted to testify about offender classification at TDCJ, the State likely would have objected and had her testimony excluded.

Next, Respondent argues that counsel had no reason to think he would need to present testimony showing the differences between the Jefferson School and a TDCJ prison, because the issue only first arose during the prosecutor's closing argument. Hence, Respondent asserts—citing to *Harrington v. Richter*, 562 U.S. 86, 107 (2011)—"it was far from a necessary conclusion that this [would be a critical issue] at the time of the trial." Answer at 118. This is an absurd argument in a state where future dangerousness "in prison"—the only place Petitioner could possibly end up following his capital murder convictions—is one of *two* critical issues before the jury in deciding between life or death. *Druery v. State*, 225 S.W.3d 491, 506-07 (Tex. Crim. App. 2007) (future dangerousness to society includes prison); *Rumbaugh v. State*, 629 S.W.2d 747 (Tex. Crim. App., 1982) (unadjudicated extraneous offenses are admissible to show future dangerousness). Why else would the State have presented testimony from a classifications expert, if not to set up this exact future dangerousness argument?

Finally, Respondent asserts Petitioner cannot prove prejudice because his corrections expert's declaration contains deficiencies which "strip it of evidentiary force" and make it "not competent evidence" for this Court to consider. Answer at 120. Respondent alleges these deficiencies include reference to a nonexistent federal statute and use of "a conditional, 'to the best of my personal knowledge, information and belief.'" Answer at 120. In support of this assertion, Respondent ignores controlling law from the Fifth Circuit and cites instead to

dictacontained in a footnote in an unpublished, factually distinguishable Third Circuit case,

*Three Rivers Confections, LLC v. Warman*, 660 Fed.Appx. 103, 108 n.10 (3d Cir. 2016).[13]

Again, Respondent puts form over substance and the language of 28 U.S.C. §1746 only requires that a statement of verification be in "substantially" the same form as the statement set forth therein. As such, to be in compliance with § 1746, an unsworn declaration "need not be identical to the language in the statute." *8 Gilcrease Lane, Quincy Fla. 32351*, 587 F.Supp.2d 133. Under Fifth Circuit precedent, there are two statements that are essential to a proper verification under 28 U.S.C. § 1746: (i) an assertion that the facts are true and correct; and (ii) an averment that the first assertion is made under penalty of perjury. *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988); *see also Matsuda*, 101 F.Supp. 1315 (finding that an unsworn declaration which states 'I declare under penalty of perjury that the foregoing is true and correct' complies with the statute). Mr. Aubuchon's declaration complies with these two requirements and thus is properly verified. Mr. Aubuchon's declaration "affirm[s] and swear[s]" in the header that the statements in his declaration are, as noted in the footer: "true and correct" . . . "subject to the penalty of perjury." Exhibit 43 at ¶ 12. This is sufficient to substantially comply with 28 U.S.C. § 1746. In any event, as set forth above, if this Court has concerns as to the truth or accuracy of the information in Mr. Aubuchon's declaration, granting Petitioner an evidentiary hearing would be the appropriate way to resolve that issue.

---

[13] Three Rivers is factually distinguishable. First, it involving a trademark infringement lawsuit, not a capital death penalty case. Second, unlike the affidavit at issue here, the affidavit in Three Rivers did not contain the required "under penalty of perjury" language. *Compare* 660 Fed. Appx. at 108 n.10 *with* App. Ex. 43 at 717 (ECF No. 95-3 at 122). Third, the language contained in this footnote is mere dicta and irrelevant to the court's determination that plaintiff's averment was *substantively* insufficient to withstand summary judgement. *See id.* at 108 (plaintiff's claim "generally that he 'used the mark for many years' prior to 2006, at which point he and [another] created a corporate entity . . . which used the mark" was "vague, "undermines his claim that he alone had ownership of the [mark]," and is "undermined by the record evidence").

**II.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT CAPITAL SENTENCING, BECAUSE COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT COMPELLING MITIGATING EVIDENCE.**

Trial counsel were ineffective for failing to conduct a complete and comprehensive life history mitigation investigation, for failing to prepare a social history report, for relying solely on expert witnesses who had never treated Petitioner, and for relying on records alone to portray his life after the age of nine months. Ultimately, counsel failed to present to the jury a cohesive narrative of Petitioner's lifetime of abuse, abandonment and despair, a narrative that would have changed the outcome of the penalty phase and would have resulted in a sentence less than death. Respondent spends more than eighty pages in its answer resisting this claim, going to great lengths to challenge each specific proffer made by Petitioner. The Court need not engaged in the speculation and mental gymnastics necessary to resolve this claim on the pleadings; the Court instead should hold an evidentiary hearing to assess the weight and credibility of the proffered evidence. Over and over in its answer, Respondent tees up questions of fact and offers speculation as to why trial counsel may have made certain determinations during the trial regarding the presentation of evidence. As set forth in the introductory section of this Reply, disputes of fact at this stage should be resolved by the Court following evidentiary proceedings. *See* pp. 45-48, *supra*.  Accordingly, Petitioner primarily relies on the arguments set forth in the habeas petition and supplement, and here replies to a few of Respondent's points, as set forth below.

**A.    The Legal Standard for Claims of Ineffective Assistance of Counsel.**

Petitioner has clearly laid out the standards established by the United States Supreme Court for the analysis of this claim. *See* Petition at 43-45. In its Answer, Respondent attempts to portray this entire claim as one in which Petitioner is merely faulting counsel for failure to call

certain witnesses. Answer at 130. Relying on *Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009), Respondent argues that failure-to-call-witness claims are frowned upon and for that reason, Petitioner cannot prevail.

Respondent specifically argues that Petitioner has not fulfilled the four requirements outlined in *Gregory v. Thaler*, 601 F. 3d 347 (5th Cir. 2010), regarding claims for failure to call witnesses. *See* Answer at 130, *quoting Gregory* at 352 (To prevail on such a complaint, "an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable."). Respondent is incorrect, because for each proffered witness here, Petitioner has identified the witness, established that the witness would have testified, has proffered the testimony and has submitted clear arguments to the Court as to why the evidence would have been favorable.

Respondent's attempt to shoehorn Petitioner's entire claim of ineffectiveness during the penalty phase into a claim for failure to call witnesses is unavailing. Petitioner has proffered a great deal of evidence that the jury should have heard before making its sentencing determination. This evidence should not be assessed on the basis of failure to call witnesses but rather as a cumulative analysis of the deficiency in counsel's overall investigation and presentation, and its impact on the sentencing decision. *Williams v. Taylor*, 529 U.S. 362 (2000).

**B.      Deficient Performance.**

Respondent repeatedly conjures up reasons why counsel may have made certain decisions during the trial to not present certain evidence. This pure speculation should not be accepted by the Court. Instead, Petitioner should be entitled to present all of the evidence proffered to the Court at an evidentiary hearing, at which the Court can assess whether there were actual strategy decisions made, rather than basing its ruling on the State's conjecture.

Moreover, if counsel did make strategy decisions, the Court should determine whether those decisions were reasonable, and whether those decisions were made after a thorough investigation. "Strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003), *quoting Strickland v. Washington*, 466 U.S. 668, 690-691 (1984). Here, trial counsel failed to conduct an adequate investigation, so any strategic decisions actually made by counsel were unreasonable. Ultimately, this analysis can only be undertaken after a presentation of the evidence at a hearing.

Repeatedly, Respondent speculates as to strategy decisions that may have been made by trial counsel during the penalty phase. One of the most important witnesses counsel failed to present to the jury was Petitioner's adoptive mother. She raised him, knew everything about his incredibly difficult life, his severe mental illness and the struggles he encountered throughout his childhood. Yet, counsel did not present her to the jury. In responding to Petitioner's claim that failure to present Petitioner's mother amounted to deficient performance, Respondent suggests that counsel "could have reasonably concluded that a parent who did not want to support their child while on trial for his life was not a good witness, or that [she] had little to offer beyond what counsel introduced through…records, which provided extensive detail about [Petitioner's] life." Answer at 138. What "counsel could have reasonably concluded" is mere guesswork.

Respondent similarly argues with respect to Petitioner's mother that "signing a declaration is a far less daunting prospect than testifying in open court." Answer at 140. Respondent appears to be suggesting that she would sign something but that she would have refused to testify. That is not the case, as her Declaration makes clear. She *never* spoke with Petitioner's trial counsel, and spoke with counsel's mitigation investigator a single time. As she

stated, if the "trial lawyers had explained to me how what I knew could be helpful, I would have been willing to answer any questions and I would have testified at TJ's trial if I was asked." Exhibit 11, Declaration of Ann Mullis at ¶20. She was not called during the penalty phase because counsel's performance was deficient. Again, an evidentiary hearing should be held to resolve this factual dispute.

With respect to the failure to call additional witnesses, including mental health professionals who treated Petitioner during his lifetime, Respondent again engages in conjecture, suggesting that trial counsel "might have thought the better course was to present this information via written material rather than through the witnesses who authored it." Answer at 142. Even if counsel made a strategy decision— of which there is currently no evidence—such a decision would necessarily have been made in a vacuum because counsel, for the most part, did not speak to these witnesses. *See* Exhibit 4, Declaration of Michael Smith; Exhibit 5, Declaration of Maldina Dietz; Exhibit 6, Declaration of Richard Brokaw; Exhibit 8, Declaration of Terry Pritt; Exhibit 9, Declaration of Wendy Myers; Exhibit 45, Declaration of Sarah Oswalt; Exhibit 46, Declaration of Hazel T. Cook; Exhibit 49, Declaration of Kim Murch. The law is clear that strategy decisions that are made without a complete investigation, are not considered reasonable. *See Wiggins*, *supra*.

Respondent suggests that defense counsel may have spoken to some of these witnesses. *See* Answer at 143-44. The State's continued speculation as to why trial counsel proceeded in various ways itself establishes the need for a hearing. *See e.g.* Answer at 145 ("As to the Stone Bridge employees, Smith and Myers, counsel could have reasonably believed that interviewing such witnesses was less important given that they had significantly less contact with Mullis than the Jefferson School employees"); *id.* at 146 ("attorneys could have reasonably presumed that, to

the extent it was diagnostically relevant, Pritt would have included any important information about Mullis in his records and would not have had independent recollection of a limited event occurring a decade earlier"); *id.* ("review of those records could have led counsel to believe that they were relatively unimportant in the grand scheme of Mullis's background").

With respect to some of the witnesses, Respondent attempts to shift blame to Petitioner. *See e.g.* Answer at 154 ("Petitioner now fails to prove that his attorneys were deficient by not elucidating what he told them about these witnesses"). It is not Petitioner's responsibility to prove what he told his trial attorneys, nor is it a capital defendant's responsibility to understand what may or may not be mitigating. Rather, it is capital counsel's duty to conduct a complete investigation and then make strategic decisions based on the results of that investigation. There is no indication anywhere in this record that Petitioner was anything but cooperative with his attorneys. And even if he had not been, counsel still has the duty to investigate. *See Porter v. McCollum,* 558 U.S. 30. 40 (2009) (despite counsel's testimony that defendant was "fatalistic and uncooperative" and instructed counsel not to contact his ex-wife or son, "that d[id] not obviate the need for defense counsel to conduct some sort of mitigation investigation"); *Rompilla v. Beard*, 545 U.S. 374, 381-82 (2005) (finding that although defendant was "uninterested in helping" develop mitigating evidence, provided answers to suggest that his childhood and schooling were "normal," and at times was "actively obstructionist," counsel still had a duty to conduct a mitigation investigation). This factual dispute is yet another reason for the Court to hold an evidentiary hearing.

Regarding failure to obtain certain vital records, Respondent continues its speculation regarding counsel's actions and suggests that the "intermingling" of some of these records resolves the issue. Answer at 158-59. In other words, Respondent argues that, since a small

amount of some of the missing records were included in records that trial counsel did secure, there is no deficiency here. However, neither the records of Gary Mullis—Petitioner's step father who repeatedly raped and sexually assaulted him—nor the Brook Lane records, both of which are incredibly important to understanding the overall mitigation picture, were gathered by trial counsel. *See* Exhibit 14, John Hopkins Treatment Records (Gary Mullis); Exhibit 18, Brook Lane Records. Yet, Dr. Mendel, who testified for the defense at the penalty phase, did not have these records. *See* Exhibit 15, Declaration of Matthew Mendel at ¶ 8. The Brook Lane records show that Petitioner was treated for anal fissures. The Gary Mullis treatment records provide significantly more detail regarding Petitioner's repeated sexual molestation than Dr. Mendel possessed at the time of his testimony. *Id.* ("This information of physical injuries consistent with anal rape and evidence that Gary Mullis previously lied about the extent of the abuse, lead me to believe that the sexual abuse was far worse than I had thought at the time of my testimony").

Dr. Dudley, the psychiatrist who testified at the penalty phase, came to the same conclusions once he had the opportunity to review these records.

> These risk factors are further enhanced by additional information that I did not know about at the time of the trial regarding the true nature of the severity of the sexual abuse that Travis was subject to at the hands of his adoptive father. Gary Mullis' counseling records establish that he initially lied about the frequency and severity of the abuse. I have only recently learned that he later admitted that the abuse occurred about 12 times (rather than 6) and that he masturbated himself to ejaculation while performing fellatio on Travis. Other records indicate the likelihood that Travis was also anally raped by his father. This additional information would have allowed me to testify to the severe psychiatric implications that this abuse had on Travis' mental development.

Exhibit 13, Declaration of Richard Dudley at ¶ 10. Had counsel collected these records and provided them to his experts, Petitioner's mitigation presentation would have been far more compelling. Counsel was deficient for failing to collect all of the available records relevant to Petitioner's life history.

### C.      Prejudice.

Petitioner has proffered a great deal of evidence that should have been presented to the jury, but was not presented due to trial counsel's deficient performance. Counsel failed to conduct all of the necessary records collection, investigation and expert consultation required by the Sixth Amendment in a capital case. As a result, the jury did not hear the compelling narratives of life history and mental health mitigation that have now been presented to this Court. Petitioner was prejudiced as there is a reasonable likelihood that the jury would not have sentenced Petitioner to death if it had heard a complete mitigation presentation.

In its Answer, Respondent parses out each individually proffered piece of evidence and argues that, because of the facts of the crime, the presentation of that piece of evidence would not have changed the sentencing verdict. In doing so, Respondent makes two errors. First, the prejudice analysis that must be conducted here is not a piece by piece consideration of the proffered evidence but a cumulative one. *See* discussion of *Strickland, supra.* Secondly, Respondent engages in a balancing of each individual fact proffered by Petitioner against the details of the crime itself. Again, that is not the proper analysis. Respondent essentially argues that, due to the egregious nature of the details of the crime, no amount of mitigation could have resulted in a sentence of less than death. This argument is precluded by Supreme Court and Fifth Circuit precedent. *See Walbey v. Quarterman*, 2009 WL 113778, *8, 309 Fed. Appx. 795; *see also* Russell Stetler, *The Past, Present and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases*, 42 Hofstra L. Rev. 1161, 1227-47 (2018) (appendices listing over two hundred cases with highly aggravated factors in which defendants were sentenced to less than death).

Indeed, this is not the standard to be applied in determining prejudice. The standard is clear: prejudice is established where there a "reasonable probability" that the evidence not

presented to the jury due to counsel's deficient performance would have led at least one juror to vote for a life sentence. *Wiggins*, 539 U.S. at 537. Here, when applying the proper analysis, it is reasonably likely that at least one juror would have "struck a different balance" and Petitioner would not have been sentenced to death. *Id*.

Regarding Petitioner's evidence that his adoptive mother disbelieved him when he told her that her husband was sexually abusing him, Petitioner proffers testimony from the trial experts regarding how they could have explained this compelling evidence to the jury. Petition at 45-48. Here, again, Respondent simply argues in a piecemeal fashion that the egregious nature of the crime would overcome any value to this evidence. Answer at 169. Respondent also suggests that Petitioner has not proven that either Ann Mullis or Sally Ann Jennings would have testified at trial if called by the defense. Answer at 167. But that is not the case.  In each of their declarations, they clearly state that they would have testified. *See* Exhibit 11, Declaration of Anne Mullis at ¶ 10; Exhibit 7, Declaration of Sally Ann Jennings at ¶ 8. Respondent asks the Court to simply disbelieve these assertions without the benefit of an evidentiary hearing. This is yet another reason that a hearing is essential here.

Respondent also posits that this evidence was presented to the jury though the admission of the Harford Memorial Hospital Records (Exhibit 59). Answer at 168. Respondent misses the point. Prejudice is established by showing the severe impact his mother's response had on Petitioner. Indeed, had a complete investigation been conducted and had Dr. Dudley been informed of this evidence, he would have explained the psychological impact it had on Petitioner:

> It has been well established that a parent's refusal to believe a child's report of being sexually abused and associated refusal to help/protect the child dramatically magnifies the damaging impact of the sexual abuse on the child's development. Given the history of Travis' relationship with his adoptive mother that he reported

to me, I was surprised when he told me that he called her on the night of the crime
(as he was deteriorating and did not know what to do/prior to the crime itself).
When he talked to me about this it was clear that her lack of responsiveness to
him that night was clearly devastating to him and clearly contributed to his
continued deterioration; however now, knowing that she did not believe his
childhood report to her of being sexually abused, I understand even more why he
was so devastated by this repeat/re-enactment of his childhood experiences with
lack of help from or protection by her. Had I known this at the time of the trial,
this information would have further allowed me to explain Travis' mental state
the night of the crime."

Exhibit 13, Declaration of Richard Dudley at ¶ 14. *See also* Exhibit 16, Declaration of Matthew
Mendel at ¶ 4 ("The failure to protect Travis by his mother had a profound negative impact on
his overall mental development").

Because counsel failed to do a complete collection of records prior to the trial, their
experts were not provided with at least two essential sets of records, Petitioner's Brook Lane
treatment records (Exhibit 18), and Gary Mullis's treatment records following his conviction for
sexually assaulting Petitioner (Exhibit 14). These records prove both the extent and the nature of
the abuse inflicted on Petitioner, including details that were not presented to the jury: that
Petitioner was anally raped by his step-father, that the abuse occurred far more times than the
jury was led to believe, and that the step-father would masturbate while performing felatio on
four- and five-year-old Petitioner. This is the most compelling of mitigating evidence, and its
absence from the trial presentation establishes prejudice.

Respondent suggests that this evidence was before the jury, and is merely cumulative
because Dr. Mendel testified that sexual abusers can underreport the extent and nature of sexual
abuse. Answer at 170. That concept alluded to by Dr. Mendel was far different from the evidence
that has been proffered before this Court. The declarations of Drs. Dudley and Mendel lay this
out clearly.

> Gary Mullis' counseling records establish that he initially lied about the frequency and severity of the abuse. I have only recently learned that he later admitted that the abuse occurred about 12 times (rather than 6) and that he masturbated himself to ejaculation while performing fellatio on Travis. Other records indicate the likelihood that Travis was also anally raped by his father. This additional information would have allowed me to testify to the severe psychiatric implications that this abuse had on Travis' mental development.

Exhibit 13, Declaration of Richard Dudley at ¶ 9. *See also* Exhibit 16, Declaration of Matthew Mendel Declaration at ¶ 9 ("Simply put, I think it likely would have had a much more powerful impact on the jury to hear from me that Travis' adoptive father, Gary Mullis, anally raped him, probably repeatedly, from infancy or toddler years until about age 6. That, I think, would have come across, as much more enormous and egregious and harmful, than does oral sex."). When considering this evidence in conjunction with all of the other evidence that was missed by trial counsel, there is the reasonable likelihood of a different sentencing verdict.

 In dealing with the remainder of the proffered evidence and Petitioner's arguments that he has established prejudice, Respondent asserts, wrongly, that the evidence is cumulative, that the declarations are technically flawed and that no amount of mitigation could have overcome the egregious nature of Petitioner's crime. For each piece of evidence proffered, Respondent has scoured the record in search of anything similar to argue to this Court that the evidence was already presented. For example, the State argues this with respect to the new evidence of sexual assault based on the Brook Lane and the Gary Mullis treatment records as described above. The evidence that was alluded to was far different than that which is now proffered based upon Dr. Mendel's consideration of these records. While Respondent does so, Petitioner has not engaged in a protracted effort here to delve into the details of every specific piece of evidence to discuss whether it is cumulative of the evidence presented at trial. Rather, this is another reason that the Court should hold a hearing to evaluate the evidence firsthand.

Respondent argues with respect to every proffered declaration that there is some flaw, e.g. that the declaration cites to an incorrect statute, that it uses "best of" language, or that it is undated. *See e.g.* Answer at 190 (Teria Pittman's declaration using language "'to the best of my personal knowledge, information, and belief' does not comply"); *id.* at 192 ("At the outset, Bruzdzinski's 'declaration' lacks three requirements to give it evidentiary weight—it relies on a non-existent statute, it uses incorrect language, and it is not dated"); *id.* at 198 ("Ann [Mullis's] declaration loses its evidentiary force because it uses 'best of' language in the jurat"); *id.* at 201 ("As noted above, none of the experts' 'declarations' or reports have evidentiary weight"). Respondent makes these or similar arguments with respect to *every witness* proffered in the Petition. Petitioner has earlier explained the error in the statute number that appears in some of the declarations. Such protestations of form over substance are unavailing and should simply amplify for this Court the need for an evidentiary hearing.

Finally, as noted above, Respondent continues to argue that there is no mitigation that could overcome the facts of Petitioner's crime and establish prejudice. If this were, indeed, the standard in evaluating evidence in capital cases, there would be no need for trials. Surely, that is not what Respondent is suggesting, though it is the logical conclusion of Respondent's line of reasoning. In virtually every section or subsection of the Answer, Respondent relies on this untenable argument. *See e.g.* Answer at 201 ("And that one piece of mitigating evidence is undoubtedly minimally impactful when weighed against the State's overwhelming punishment case"); *id.* at 202-03 ("And even if this evidence were viewed in the light Mullis presents it, it would not have made a different result reasonably probable given the horrific nature of his crime"); *id* at 206 ("Mullis's apologies would have had little effect on the jury"); *id.* at 208 ("Assuming the truth of all his evidence, it still does not overcome the overwhelming

punishment case advanced by the State"). As noted above, the fact that a case may be highly aggravated does not mean that death is automatic, nor would such a concept comport with the requirements of the Constitution.

Finally, Respondent fails to engage in any cumulative prejudice analysis as required by the Constitution. Instead, as described above, Respondent individually compares each fact to the nature of the crime to conclude there is no prejudice. This Court should hold an evidentiary hearing to allow Petitioner to present the proffered evidence at which time the Court can properly determine whether Petitioner has established deficient performance and prejudice.

## III.   THE STATE DENIED PETITIONER HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY WITHHOLDING EVIDENCE; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO REQUEST THIS EVIDENCE.

The State violated Petitioner's constitutional rights by failing to disclose, prior to trial, exculpatory and impeachment evidence of consideration received by key prosecution witness Carolyn Entriken and by failing to correct false and misleading testimony. In the alternative, counsel was ineffective for not uncovering and presenting this evidence.[14]

Petitioner has proffered strong circumstantial evidence that Mrs. Entriken testified in exchange for dropping child endangerment charges against her daughter Caren Kohberger based on facts that arose from the investigation of this case—i.e., Ms. Kohberger's recklessness in encouraging Petitioner, in his very unstable state of mind, to take the baby with him. *See* Petition at 111. The State did not disclose this evidence, nor did counsel uncover and present it when Mrs. Entriken testified at both the guilt and penalty phases of trial.

---

[14] Petitioner withdraws the portion of this claim related to Michele Duarte and the State's failure to disclose information on computer hard drives seized from the residence Petitioner shared with his girlfriend and the Duarte family. Petitioner initially raised these claims in an abundance of caution at a time when relevant discovery was still outstanding.

A.      **The State Violated *Brady*.**

Respondent argues that Petitioner cannot show anything more than suspicion of a deal and there is "good reason to suspect there was no deal" because there was not "a pending charge" against Mrs. Entriken's daughter, nor did the State have leverage over her, because when, as here, an information is the charging instrument, a person cannot be charged with a felony absent their "consent." Answer at 84-85, 209. Respondent further argues that the prosecutors had no duty to turn over evidence of charges pending in another county, "where [Petitioner's] prosecutors had no authority," and that this evidence would not have been material given the limited nature of Ms. Entriken's testimony. *Id.* at 209-210.

Respondent is incorrect, both legally and factually. Legally, impeachment evidence extends to any information showing a witness's motive, bias, or interest in testifying. *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974) ("A defendant has the constitutional right to impeach a witness by showing bias."). Agreements between the government and a witness, whether they are formal written agreements, or "tacit" assurances, or "implied understandings," have the potential to bias a witness and thus are fodder for impeachment and subject to disclosure under *Brady. See United States v. Bagley*, 473 US. 667, 683 (1985) ("This possibility of a reward gave [the witness] a direct, personal stake in respondent's conviction."); *see also Boone v. Paderick*, 541 F.3d 447, 451 (4th Cir. 1976) ("[t]he more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor").

Factually, whether there was a pending "charge" against Ms. Kohlberger is not dispositive. A complaint had been filed against her, she had been arrested, and she was awaiting the State's decision to formally file charges against her through the filing of an information. *See Wheeler v. State*, 353 S.W. 3d (Tex. Crim. App. 1962) (a valid complaint is a prerequisite to a valid information). At the heart of the matter, the State, contrary to their assertion otherwise, had

leverage over Ms. Entriken. They had the power to prosecute, or decline to prosecute, her daughter. Exercising that leverage, they chose the latter option not to file an information and to dismiss the complaint against her.

Moreover, Respondent's assertion that Galveston prosecutors had no leverage over Ms. Entriken because Brazoria County had sole "authority" over her daughter's prosecution is belied by the facts before this Court. The complaint against Ms. Kohlberger was dismissed in Brazoria County for reasons that pertained solely to a Galveston County prosecution and conviction. *See* Exhibit 25, *State v. Caren Kohberger*, Cause No. F016385, Motion to Dismiss (Brazoria County Justice Court, Mar. 28, 2011) ("Travis Mullis tried for Capital Murder in Galveston County in death of baby and received death penalty."). In light of this stated rationale, which did not in any way diminish Mr. Kohberger's responsibility for her criminally negligent/reckless behavior, Respondent's suggestion that Petitioner's prosecutors did not have "authority" over these charges falls flat.

At the very least, had this impeachment evidence showing Ms. Entriken's bias or motivation in testifying been disclosed, there is a reasonable probability it would have diminished the impact of her emotional, and largely improper, testimony on the jury's verdicts at both the guilt-innocence phase and the penalty phase of Petitioner's trial. *See* Claims V, XI.

**B.      Counsel Was Ineffective.**

Respondent makes the circular argument that, because Ms. Entriken testified at trial to the pending charges, even providing the name of her daughter's attorney, counsel could have uncovered and presented evidence of this deal by exercising due diligence. Answer at 210. Respondent unreasonably presumes the victim's grandmother would have spoken with counsel *prior to her testimony at trial*, an assertion that is unsupported by the record and highly unlikely, but in any event should be considered at a hearing.

Further, counsel's action or inaction does not excuse the State from its *Brady* obligations. *Brady* and its progeny squarely put the onus on the State to turn over exculpatory evidence, rather than on counsel to play hide and seek to uncover it. *See Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."); *see also United States v. Tavera*, 719 F.3d 705, 712 (6th Cir. 2013) (rejecting argument that lawyer could have discovered undisclosed statements by interviewing the person before trial, noting that *Banks* makes it clear that the client does not lose the benefit of *Brady* when the lawyer fails to detect the favorable information); *Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109 (2d Cir. 2015) (stating that Court has never required a defendant to exercise due diligence to obtain *Brady* material, and there is no duty for a defendant, who was reasonably unaware of exculpatory information, to take affirmative steps to seek out and uncover such information in the possession of the prosecution in order to prevail under *Brady*; state court's imposition of such a requirement violated clearly established federal law).

Also relevant to this claim and not addressed by Respondent, Respondent has three bankers boxes of "work product"—labeled "AA–Investigator," "BB–Voir Dire Work Product," and "CC–Work Product"—that federal habeas counsel was not permitted to review during open file review. Petitioner hereby renews his previous request for an order permitting his counsel to review the contents of those boxes, or an order for in camera review, to determine whether they contain any exculpatory or impeachment evidence that the State is constitutionally obligated to disclose. *See* Petition at 112.

**IV.    THE EXCUSAL OF ONE HUNDRED VENIREPERSONS BY AGREEMENT BETWEEN THE PARTIES, WITHOUT INDIVIDUAL VOIR DIRE, DENIED PETITIONER HIS RIGHT TO AN IMPARTIAL CAPITAL SENTENCING JURY PROTECTED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS; THE TRIAL COURT ERRED IN PERMITTING THIS PRACTICE; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THIS PRACTICE; THE STATUTE PERMITTING EXCUSALS UPON AGREEMENT IS UNCONSTITUTIONAL; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM.**

Tex. Code. Crim. Proc. Art. 35.05, which permits the excusal of venirepersons from jury service by agreement between the parties solely on the basis of their answers on a written questionnaire, was unconstitutional as it was applied in this case, resulting in the excusal of one hundred venirepersons without individual voir dire and the excusal of numerous venirepersons who would not have otherwise been disqualified for cause, in violation of Petitioner's right to individual voir dire and amounting to an improper excusal of jurors in violation of his Sixth, Eight and Fourteenth Amendment rights. *See* Petition at 116-127. Trial counsel was ineffective for failing to ensure an adequate voir dire and protect Petitioner's right to an impartial jury, and appellate counsel was ineffective for failing to raise these meritorious claims. *Id.* at 128.

Respondent asserts that Petitioner does not cite to any case holding that excusal of jurors by agreement, based on their questionnaire and without individual questioning, violates the Constitution, Answer at 212; that no such rule exists, *id.* at 213-214; and that, to the extent Petitioner is arguing for an extension of *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and its progeny, *Teague* obstructs his ability to do so. *Id.* at 214. With regard to Petitioner's ineffective assistance of trial counsel claim, Respondent argues that Petitioner failed to prove that counsel was deficient when he agreed to excuse one hundred venirepersons based solely on their questionnaire responses and that Petitioner cannot prove prejudice, which, according to Respondent, Petitioner must do because any error that may have occurred was not structural. *Id.*

at 214-15, 217-18. Respondent's arguments, which are largely based on the false and inaccurate premise that *Witherspoon* and its progeny are not controlling on this issue, are unavailing.

### A.    Petitioner's Claim is Supported by Supreme Court Case Law.

Contrary to Respondent's assertion otherwise, Petitioner explicitly cites to *Witherspoon; Morgan v. Illinois*, 504 U.S. 719 (1992); *Wainwright v. Witt*, 469 U.S. 412 (1985); and *Adams v. Texas*, 448 U.S. 38 (1980) in support of his assertion that Tex. Code. Crim. Proc. Art. 35.05 is unconstitutional as applied in this case. *See* Petition at 113-114. Although Respondent argues these cases are factually distinguishable and thus inapplicable, these arguments are misguided and unpersuasive. Respondent argues that *Witherspoon* and *Morgan* do not apply here, as those cases only addressed, and their holdings are limited to, assertions of trial court error for improperly granting challenges for cause and improperly denying a defendant his right to challenge jurors for cause. Answer at p. 214. To the contrary, *Witherspoon* and *Morgan*, as well as *Witt* and *Adams* are directly implicated by counsel's agreement to strike one hundred jurors for cause based solely on their questionnaires under the circumstances of this case, where their answers did not demonstrably show they were partial—i.e. that their answers did not show that their views would "prevent or substantially impair" their ability to follow the law and perform their duties in a capital case. *See Adams*, 448 U.S. at 45. The State was not held to their burden of proving partiality, and Petitioner was not afforded the opportunity to rehabilitate and assess the demeanor of these prospective jurors through individual voir dire.

*Morgan* held that capital defendants are entitled to an impartial jury, and, in furtherance of that right, "an adequate voir dire to identify unqualified jurors." 504 U.S. at 730. *Morgan* further found that exclusion of prospective jurors "hesitant in their ability to sentence a defendant to death" violates the Sixth and Fourteenth Amendments. 504 U.S. at 732. *Witherspoon* found

83

the same, establishing that a jury is impartial when it is "uncommonly willing to condemn a man to die"—a standard that is not met when jurors are excluded merely because of general moral or philosophical reservations about the death penalty. 501 U.S. at 521-22. *Witt* clarified that the key issue is "whether the juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath." 469 U.S. at 424 (internal quotations omitted). *Witt* also found that the burden of proving partiality rests with the party seeking to excuse a prospective juror for cause and noted that partiality is traditionally assessed through voir dire and determinations of demeanor and credibility. *Id.* at 423-24, 428.

Taken together, these cases stand for the proposition that counsel has a duty to ensure an impartial jury is empaneled through the exercise of adequate individual voir dire which holds the State to its burden of proving adequate grounds exist to excuse jurors, and ensures jurors are not excused simply based upon their general reservations about the death penalty. None of this occurred when counsel agreed to excuse one hundred prospective jurors without subjecting them to any voir dire; without assessing their demeanor, credibility, and partiality in advance; without determining the basis for their reservations, if any, about the death penalty; and without even assessing their understanding or misunderstanding of the questions posed to them in the questionnaire.[15]

As detailed in the Petition, counsel's actions resulted in the excusal by agreement of at least fifteen prospective jurors who were clearly not challengeable for cause based on any of their answers to the questionnaire, and multiple jurors who expressed general moral or

---

[15] Voir dire was particularly essential in this case because the written questions pertaining to the death penalty were complicated and compound, and as a number of prospective jurors candidly admitted, confusing. *See* Petition at 118 fn.33.

philosophical reservations about the death penalty but were not demonstrably "partial" under *Witt*. *See* Petition at 116-17 n.31. Many of the jurors that counsel agreed to strike for cause did not provide answers that indicated they would automatically vote for or against the death penalty, such that they should be automatically excluded under *Witherspoon.*

For example,[16] with regard to question 73,[17] while responses 1 ("I cannot vote to assess the death penalty under any circumstances") and 5 ("I would vote to assess the death penalty in every case that I could") are the only views that would arguably "prevent or substantially impair" a juror's ability to follow the law on a capital jury, counsel agreed to excuse all prospective jurors who chose anything other than response 3 ("My decision on whether to assess the death penalty would depend upon the facts and circumstances of a particular case."). Excusing jurors solely for choosing responses 2 ("I am opposed to the death penalty but could vote to assess it in a proper case") or 4 ("I would usually vote for the death penalty in a case where the law allows me to do so"), by agreement or otherwise, is a clear violation of *Witherspoon*. Counsel failed to hold the State to its burden of proving partiality under *Witt* before jurors were excused based on the unsupported presumption, never tested through individual voir dire, that they would unequivocally support or oppose the death penalty. In this case, 13 venirepersons who chose answers 2 and 4 were excluded from the jury, although according to their answers they could not have been properly challenged for cause nor (based on their questionnaires alone) were they exempt from service on any other ground.

---

[16] For other examples, *see* Petition at 121-22.

[17] The question asked prospective jurors to assume they were on a jury to determine punishment for a defendant who had already been convicted of capital murder, for whom the law would allow the jury to choose sentences of "death, life imprisonment, or some other penalty," and then to choose one of five possible responses.

As Petitioner's juror comparison reveals, the result of this statutorily sanctioned process of striking jurors by agreement, as utilized by counsel in this case, resulted in the excusal of jurors who did not hold any identifiable disqualifying beliefs. Whether by agreement to strike or otherwise, the result is the same and the central holdings of *Witherspoon, Witt*, *Adams,* and *Morgan* were violated.

### B.   *Teague* Does Not Prevent This Court from Considering Petitioner's Claim.

Since Petitioner is arguing for a straight-forward application of *Witherspoon* and *Morgan* through a *Strickland* lens, *Teague* does not prevent this Court from addressing Petitioner's meritorious claim. Granting relief on Petitioner's claim does not require this Court to fashion a new constitutional rule of law and retroactively apply that rule here, and thus *Teague* is inapposite. In *Teague*, counsel argued for the adoption of a new rule (that the Sixth Amendment's fair cross section requirement should apply to the petit jury), which would have explicitly overruled existing Supreme Court precedent, and the Court declined to address this contention holding that the new constitutional rule urged by Petitioner should not be applied retroactively to cases on collateral review. 489 U.S. at 301. Unlike in *Teague*, Petitioner is not asking this Court to adopt a new constitutional rule, rather he is simply asking this Court to apply principles underlying existing Supreme Court precedent to the Tex. Code. Crim. Proc. Art. 35.05. *See Saffle v. Parks,* 494 U.S. 484 (1990) ("A new rule is defined as a rule that breaks new ground, imposes a new obligation on the states or federal government, or is not dictated by precedent existing at the time the defendant's conviction became final. The explicit overruling of an earlier holding no doubt creates a new rule. It is more difficult, however, to determine whether a new rule is announced when a decision extends the reasoning of prior cases.").

Petitioner's request does not require this Court to break new ground or impose new obligations on the State of Texas. Petitioner requests that this Court find that the particular agreement reached by the parties in this case was unconstitutional because it resulted in the dismissal of prospective capital jurors who, under *Witherspoon* and its progeny, should not have been excused. In other words, Art. 35.05 as applied, resulted in the dismissal of jurors whose responses indicated only minor reservations about the death penalty, without any showing that these reservations would prevent or substantially impair their ability to follow the law.

## C.      Petitioner Has Pled Sufficient Facts to Prove Counsel's Ineffectiveness.

Petitioner has presented sufficient facts to show counsel's lack of strategy. Respondent speculates that counsel's agreement to excuse jurors was likely strategic because he "had finite time and resources, and certainly could have made a strategic decision to excuse pro-death penalty venirepersons at the outset instead of after a long and laborious process of questioning such disqualified venirepersons." Answer at 214. But such speculation is not supported by the records and sharply contrasts with the Supreme Court's mandate that the examination of prospective jurors in capital cases is especially crucial. *See, e.g. Turner v. Murray* 476 U.S. 28, 35-36 (1986). Such speculation also highlights the need for an evidentiary hearing.

Moreover, Respondent's assertion that an identical claim was denied in *Ramey v Davis,* 314 F. Supp. 3d 785 (S.D. Tex. 2018), is incorrect. Ramey, unlike Petitioner, provided no factual support for his assertions.[18] *Id.* at 812. The court highlighted this failing, noting in its denial of Ramey's claim that he failed to "specify which potential jurors were removed by consent, but

---

[18] Ramey baldly asserted that his constitutional rights were violated when prospective jurors were excused by agreement on the basis of their questionnaires alone and some of those individuals were not challengeable for cause. *Ramey v. Davis*, No. 6:13-cv-00043 (Doc. No. 30), p. 74-76.  Ramey never identified who those potential jurors were or his basis for concluding that they were not otherwise challengeable for cause.

could have been rehabilitated with additional questioning." *Id.* Unlike in *Ramey*, Petitioner has provided a detailed factual proffer in support of his assertions: specifically identifying the number of each and every prospective juror excused by agreement, the number of each and every prospective juror excused by agreement who could have been rehabilitated, and the number of each and every prospective juror who provided no answers showed partiality for or against the death penalty. *See* Petition at 116-17 & ns. 30 & 31. Moreover, Petitioner attached, under seal, actual juror questionnaires in his Appendix and conducted a detailed analysis of the questions on the questionnaire concerning the death penalty and the answers provided to those questions, in determining the method counsel utilized in making the decision to agree to excusal.  *See* Petition at 117, n.30. It is that method—that application of Tex. Code. Crim. Proc. Art. 35.05 in his case—that was unconstitutional.

Although the court in *Ramey* did state, in dicta, that "*even if* trial counsel agreed to remove all jurors *unequivocally* opposed to or in favor of a death sentence, such an approach falls within an areas reserved traditionally for strategic decision making," this does not resolve Petitioner's claim. Counsel here was ineffective for agreeing to remove, not only jurors who were "unequivocally" opposed to or in favor of a death sentence (i.e. those who gave responses 1 or 5 to question), but also those jurors whose responses suggested they had slight reservations or were merely inclined one way or the other.

Respondent's prejudice analysis is equally as unpersuasive. Because *Witherspoon* applies to the facts alleged herein and a *Witherspoon* violation is structural error, it is per se prejudicial. Even if it were not, Petitioner has made a sufficient proffer, including based on the disparate treatment of venirepersons 321 and 553, *see* Petition at 123-28, to show he was prejudiced by counsel's deficient performance in agreeing to excuse objectively impartial jurors.

**V.    THE TRIAL COURT ERRED IN FAILING TO INSTRUCT PETITIONER'S CAPITAL SENTENCING JURY THAT MITIGATING CIRCUMSTANCES DO NOT NEED TO BE PROVEN BEYOND A REASONABLE DOUBT, VIOLATING PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR A PROPER INSTRUCTION OR OBJECT TO THE INSTRUCTION AS GIVEN; APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE.**

Petitioner's jury was instructed that they had to make a "finding" with regard to both special issues and repeatedly instructed that their findings had to be made "beyond a reasonable doubt," without any further clarification that mitigating circumstances were not subject to this high standard. *See* CR 772-80 (using the phrase "beyond a reasonable doubt" ten times during guilt phase instructions); CR 820 (instructing the jury that the burden of proof for the first special issue was beyond a reasonable doubt); CR 823 (describing the answers to both Special Issues as a "finding" and instructing the jury that the burden of proof for extraneous crimes or bad acts was beyond a reasonable doubt); CR 825 (verdict sheet setting forth standard for the first Special Issue as "beyond a reasonable doubt").

The charge of the court and verdict sheets in this case, taken as a whole, would lead a reasonable juror to believe that all *findings*, including findings of mitigating circumstances, were required to be made beyond a reasonable doubt. *See Mills v. Maryland*, 486 U.S. 367, 375-76 ("The critical question, then, is whether petitioner's interpretation of the sentencing process is one a reasonable jury could have drawn from the instructions given by the trial judge and from the verdict form employed in [the] case").  By suggesting a higher burden of proof than the law requires, there is a "reasonable likelihood" that the jury interpreted and applied these instructions in a way that prevented them from giving full consideration and effect to Petitioner's mitigating evidence and prevented them from making an individualized sentencing determination as required by the Eighth and Fourteenth Amendments. *See Boyde v. California*, 494 U.S. 370, 380 (1990) ("Ambiguity in capital-sentencing instructions give rise to constitutional error if there is a

reasonable likelihood that the jury has applied the challenged instructions in a way that prevents the consideration of constitutionally relevant evidence."); *see also Penry v. Lynaugh*, 492 U.S. 302, 327-328 (1989) ("full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a reasoned moral response to the defendant's background, character, and crime"); *Mills*, 486 U.S. at 384 (finding "substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed" which prevented full consideration of mitigating evidence and required death sentence to be vacated); *Tennard v. Dretke*, 542 U.S. 274, 285 (2004); *Penry v. Johnson*, 532 U.S. 782, 797 (2001).

Respondent argues that *Kansas v. Carr*, 577 U.S. 108 (2016), is dispositive of this issue. Answer at 227-28. According to Respondent, *Carr* rejected the contention that, without instruction, jurors were left to speculate on the correct burden of proof for mitigating circumstances. Respondent recounts the holding of *Carr* as follows: "no juror would reasonably have speculated that mitigating circumstances must be proven by any particular standard, let alone beyond a reasonable doubt." Answer at 229. Respondent errs. Given the factual differences between *Carr* and Petitioner's case, *Carr* is not dispositive of the issue before this Court. First, as Respondent concedes, *Carr* was decided after Petitioner's trial and thus is not applicable here. *See* Answer at 229. Second, Respondent's interpretation of *Carr* is overly broad. The holding of *Carr* is based on reasons particular to Kansas's capital sentencing scheme and jury instructions that quoted directly from that scheme. 577 U.S. at 643 ("*For the reasons we have described*, no juror would reasonably have speculate that mitigating circumstances must be proved by any particular standard, let alone beyond a reasonable doubt.") (emphasis added). The reasons

underlying the decision in *Carr*, as set forth by the Court, include: 1) the instructions at issue stated "any mitigating circumstances found to exist" and the Court reasoned that "'found to exist' certainly does not suggest proof beyond a reasonable doubt," and 2) one of the mitigating circumstances under Kansas law is "mercy" and requiring a burden of proof for a mitigating circumstance like "mercy", which is "not a factual determination" that could be subjected to any kind of standard of proof, does not "make much sense." *Id.* at 120-21.

Unlike in *Carr*, the instructions and verdict sheet at issue in Petitioner's case do not contain the language "found to exist" or any similar language. *See* CR 820-826. Nor was the jury in Petitioner's case told that mercy was one of the mitigating factors it could consider in making this life or death decision. *Id.* To the contrary, Petitioner's jury was told to make "findings" with regard to both special issues and were repeatedly told their "findings" had to be made beyond a reasonable doubt. As a result of these differences between the instructions in *Carr* and those at issue here, *Carr* is not dispositive of the issue currently before this Court.

## VI.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR CHANGE OF VENUE OR VENIRE DESPITE THE FACT THAT THE COMMUNITY AND JURY POOOL HAD BEEN SATURATED WITH HIGHLY PREJUDICIAL PUBLICITY. AS A RESULT, PETITIONER WAS DENIED HIS RIGHTS TO AN IMPARTIAL JURY AND DUE PROCESS.

Petitioner's Sixth Amendment right to an impartial jury was violated by the selection of his jury from a constitutionally infirm jury pool. Extensive coverage in local media discussed Petitioner's confession, expressly linked Petitioner's crime to other recent instances of violence against babies in Galveston County, described Petitioner's capital murder charge as an opportunity denied in those other cases to express the community's outrage, and, perhaps most prejudicially, strongly suggested that Petitioner wanted a death sentence if he were found guilty. *See* Petition at 169-72; *see also* Paschenko, C., *Accused baby killer wants to keep death penalty option*, Galveston Daily News, https://youtu.be/e_YcxPzMtGM?t=230, (Dec. 31, 2010) (during

recorded interview published online, interviewing reporter states: "I mean it's almost like, if you were convicted, that you would want the death penalty"). Despite trial counsel's awareness of this widespread and prejudicial publicity, *see* Petition at 172-73, counsel unreasonably failed to request a change of venue—a request that, contrary to Respondent's representations otherwise, was reasonably likely to have been granted.

### A.     Texas Law Governing Motions for Change of Venue

The crux of Respondent's response to Petitioner's claim is a strawman. Respondent asserts that Petitioner's failure to identify seated jurors whose impartiality was polluted by news coverage "dooms the claim." Answer at 262. This is a misstatement of the law governing motions for change of venue. The measure of the Sixth Amendment violation at issue here is not whether prejudice demonstrably "found its way into the jury box," but whether "outside influences affecting the community's climate of opinion as to a defendant are inherently suspect." *Pamplin v. Mason*, 364 F.2d 1, 5 (5th Cir. 1966); *accord Henley v. State*, 576 S.W.2d 66, 72 (Tex. Crim. App. 1978).

In *Henley*, a trial court refused to hold an evidentiary hearing on the defendant's motion for change of venue because it successfully empaneled a jury. *See* 576 S.W.2d at 70. The Texas Court of Criminal Appeals reversed, holding that, even if it were possible to empanel an apparently unbiased jury, the defendant was entitled to a change of venue if he could show the existence of "influences in the community which could affect the answers on voir dire." *Id.* at 72; *see also Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996) (recapitulating *Henley* principle)*; Fields v. State*, 627 S.W.2d 714, 719 (Tex. Crim. App. 1982) (noting that selection of unbiased jury is insufficient to satisfy State's burden in opposition to motion for change of venue). According to the court, the "primary factor" for a Texas trial court's consideration in ruling on a venue change is whether widespread, inflammatory news coverage "has raised

substantial doubts about *the effectiveness of voir dire*" for testing the venire's impartiality. *Henley*, 576 S.W.2d at 71 (emphasis added). Thus, Petitioner's inability to "prove that a biased juror served" on the basis of the record imposes no bar on relief.

### B.     Trial Counsel Was Ineffective

To justify a change of venue, Petitioner needed only to show that the publicity surrounding his case was "pervasive, inflammatory and prejudicial." *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007).

First, Petitioner cited a total of 46 news articles in his Petition—26 published in the Galveston Daily News, the newspaper of record for Galveston County, and 20 published in the Houston Chronicle, the most widely distributed newspaper in Texas, concerning Petitioner's case. *See* Petition at 169-71. The intensity of this coverage in print media greatly exceeds that in *Gonzalez v. State*, the *only* Texas case cited by Respondent. *See* Answer at 257-64; *see Gonzalez*, 222 S.W.3d at 450 (finding lack of pervasiveness where, in addition to some evidence of newscasts and testimony from two witnesses, appellant introduced three newspaper articles).

The relevant time period, between Petitioner's arrest and his trial, spans 2008 through early 2011. The Texas Press Association began publishing directories of Texas daily newspapers with circulation data for the Galveston Daily News and Houston Chronicle in 2009. Between 2009 and 2011, the Galveston Daily News had an average circulation of 24,068.[19] Based upon information gathered by the Texas Press Association, approximately 4.5% of the Houston Chronicle's total circulation is attributable to Galveston County, which would result in an

---

[19] *See* Texas Daily Newspaper Association, *2009 Directory of Texas Newspapers*, 38 (2009) (total circulation of 27,898); Texas Press Association, *2010 Texas Newspaper Directory* 9 (2010) (total circulation of 22,855); Texas Press Association, 2011 Texas Newspaper Directory, 8 (2011) (total circulation of 21,450).

average circulation of 19,197 in Galveston County during the same period.[20] Census data shows

that there were approximately 106, 617 households in Galveston County in the relevant time

period (the margin of error for this figure is 1,157).[21] It would therefore be conservative to

conclude that at least 25% of Galveston households received physical copies of the local

newspapers intensely scrutinizing Petitioner's case—in reality, the percentage of households

receiving one of these newspapers was likely closer to 40%. In addition to this print media,

Petitioner's case was extensively covered by local television news outlets. *See* Petition at 172.

Second, Respondent has offered little response to Petitioner's arguments concerning the

inflammatory and prejudicial nature of the publicity. *See* Petition at 169-72. Instead, Respondent

erroneously asserts that Petitioner is required to show that specific jurors were biased and

suggests that any prejudicial effect of the publicity was blunted by Galveston County's proximity

to Houston, where several hundred murders are committed each year. *See* Answer at 261. The

former argument is meritless, as set forth above, and the latter argument cannot be squared with

Respondent's own characterizations of Petitioner's crime as singularly "inhuman" and

"deprav[ed]." Answer at 9. Indeed, the extensive news coverage surrounding Petitioner's case is

inconsistent with the notion that his crime was analogous to other murders in the Houston

metropolitan area. Respondent also argues that the risk of prejudice was reduced by a gap of time

between the publication of the articles linking Petitioner's crime to other infanticides in

---

[20] *See* Texas Daily Newspaper Association, *2009 Directory of Texas Newspapers*, 44 (2009) (total circulation of 448,273); Texas Press Association, *2010 Texas Newspaper Directory* 10 (2010) (total circulation of 443,789); Texas Press Association, 2011 Texas Newspaper Directory, 9 (2011) (total circulation of 387,732).

[21] *See* United States Census Bureau, *Households and Families Subject Table for Galveston County, Texas*, 2010: American Community Survey 5-Year Estimates https://data.census.gov/cedsci/table?q=children%20&g=0500000US48167&tid=ACSST5Y2010. S1101&hidePreview=true (last visited Dec. 17, 2020).

Galveston County and the beginning of Petitioner's trial. *See* Answer at 259-60. However, Respondent ignores the fact that *all* of the coverage discussing the back and forth between Petitioner and his attorneys concerning their challenges to Texas's capital sentencing statute, and suggesting that Petitioner wanted a death sentence if he were found guilty, took place in 2011—mere weeks before Petitioner's trial. *See* Petition at 169-71.

Given the pervasive, inflammatory and prejudicial nature of the news coverage surrounding Petitioner's case, a motion for change of venue was reasonably likely to have been granted. Trial counsel was deficient for failing to move for a change of venue under these circumstances. And, had Petitioner's jury been drawn from a pool that was not tainted by pervasive and inflammatory news coverage—including suggestions that Petitioner wanted the death penalty—there is a reasonable probability that Petitioner would have been found not guilty or that at least one juror would have voted for life.

## VII. VOIR DIRE WAS CONSTITUTIONALLY DEFECTIVE.

The guarantee of a defendant's right to an impartial jury includes an adequate voir dire to identify unqualified jurors. *Morgan v. Illinois*, 504 U.S. 719, 729-731, (1992).

Petitioner was prevented from making two appropriate voir dire inquiries due to trial court error and counsel's ineffectiveness: 1) whether or not a juror was able to consider mitigating evidence that did not relate directly to the crime, and 2) whether or not a juror was able to consider mitigation, as opposed to automatically voting for death, when the facts of the case are highly inflammatory, i.e. the killing of an infant. The law is clear that if a juror refused to consider mitigating evidence unrelated to the crime or would automatically vote for death, they would be subject to dismissal for cause. *Penry v. Lynaugh*, 492 U.S. 302, 219 (1989) ("[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence.");

accord *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *see also*, *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (holding that failure to remove a juror who indicates they will vote to impose death automatically if the jury found the defendant guilty is constitutional error.).

### A.   Inadequate Voir Dire About Prospective Jurors' Ability to Consider Mitigating Evidence.

Respondent misconstrues Petitioner's claim. Petitioner does not argue, as Respondent asserts, that he is constitutionally entitled to jurors who treat certain circumstances as per se mitigating. *See* Answer at 266. Nowhere does Petitioner make such an assertion. Respondent confuses the difference between improper *mitigation commitment* questions, and proper voir dire of prospective jurors querying bias. *Id*. A mitigation commitment question seeks to bind a juror to an outcome when a condition precedent is present, despite other evidence. *See Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001); *see also*, *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991) ("An attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts."). Here, Petitioner sought to query the potential jurors about whether they would consider proffered mitigation evidence that was unrelated to the crime in their sentencing determination. 4 CR 681-716. Hence, the cases cited by Respondent are inapposite.

Respondent cites to *Dorsey v. Quarterman* for the proposition that a capital defendant is not entitled to challenge "prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation of a death sentence as aggravating rather than as a mitigating factor." 494 F. 3d 527, 533 (5th Cir. 2007).[22] Answer at 266. Surely, it is the

---

[22] A prospective juror's views on capital punishment do not provide a basis for removal for cause *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.* *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007) (citing *Wainwright v. Witt,* 469 U.S. 412, 424, (1985)).

sentencer's prerogative to determine the *weight given* to mitigating evidence.  *See Eddings v. Oklahoma,* 455 U.S. 104, 102 (1982). However, a sentencer "may not give mitigating evidence *no weight* by excluding such evidence from his consideration." *Id.* The Supreme Court has made clear that a sentencer may not "refuse to consider, as a matter of law*, any relevant mitigating evidence." *Id.* If a prospective juror indicates that he cannot consider proffered evidence in mitigation of the death penalty, that juror should be excused for cause. *Soria v. Johnson*, 207 F.3d 232, 245 (5th Cir. 2000).

Respondent further suggests that, regardless of the inquiries made at voir dire, the seated jurors received a sufficient colloquy on the law and agreed they could follow the law, and that is all a criminal defendant is afforded under the Constitution. Answer at 267-69. However, *Morgan* makes clear that 'general fairness' and 'follow the law' inquiries are insufficient to detect biased jurors. *Morgan*, 504 U.S. at 734-35. A defendant on trial for his life must be permitted the opportunity to inquire about a prospective juror's ability to consider evidence proffered in mitigation of a death sentence. *Id*. at 736. The empaneling of just one biased juror disentitles the State to execute a death sentence. *Id*. at 729. Moreover, the voir dire the State cites to, questions posed by the State to the first juror Joann Hunter,[23] supports, rather than contradicts, Petitioner's point. The description of mitigating evidence provided by the State repeatedly suggested, through hypothetical examples, that mitigation need not be considered unless it was tied to, or excused, the offense in question. Answer at 267-69. Petitioner asserts that following this misleading and improper description, counsel should have, but failed to make the follow up inquiry necessary to determine if these jurors were capable of finding mitigation as required by

---

[23] According to Respondent, this same mitigation colloquy was made of numerous other venirepersons. *See* Answer at 269 -70.

the law. *Compare* Answer at 268 (citing to and analyzing voir dire excerpt at 13 RR 51-55) *with* Petition at 178-79 (citing to and analyzing the same voir dire excerpt).

### B.   Counsel's Failure to Request Voir Dire of Jurors as to Whether or Not They Could Consider a Life Sentence for Someone Who Killed an Infant.

Respondent argues that "because the trial court did not preclude inquiry into [whether or not jurors would automatically vote for death based on the victim's actual age], [Petitioner] fails to prove constitutional error." Answer at 272. Respondent errs. Counsel's failure to request voir dire on this issue, which Respondent concedes could not have been denied had it been requested, *id.*, constitutes ineffective assistance of counsel. *See* Petition at 180-81.

Next, Respondent argues that since jurors were told the victim was younger than six years of age, they knew about the special issues, and because many were told by the prosecutor that they had to determine mitigation separately from all other issues, they knew[24] that there could be no automatic answer to the special issues. Answer at 272-73. This is not the claim Petitioner raised. Rather, Petitioner asserted that counsel was ineffective for failing to request the opportunity to voir dire jurors as to whether they would automatically vote for death after learning the victim was merely three months old. *See* Petition at 180-81. Respondent argues that Petitioner failed to prove that jurors would have answered this inquiry differently. Answer at 273. As common sense and ample precedent establish, however, when the victim is of a very young age, this is an important inquiry. *See* Petition at 180. For the reasons set forth in the Petition and above, Petitioner's claim has merit and counsel were ineffective for failing to ensure that Petitioner's right to an impartial jury were protected.

---

[24] Citing to one example, 13 RR 64, Respondent asserts that some prospective jurors were explicitly asked about whether or not he would automatically vote for death based solely on the crime. Answer at 273.

**VIII.   IMPROPER VICTIM IMPACT EVIDENCE WAS PRESENTED TO THE JURY AT THE GUILT/INNOCENCE PHASE OF THE TRIAL AND TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO PROPERLY LITIGATE THIS ISSUE.**

Victim impact evidence is not admissible at the guilt phase of a criminal trial. *See Payne v. Tennessee*, 501 U.S. 808, 821 (1991) (victim impact legislation was enacted "to enable the *sentencing authority* to consider information about the harm caused by the defendant") (emphasis added); *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (victim impact evidence does not make more or less probable any fact that is of consequence during the guilt/innocence phase of the trial). Despite the clarity of the law, the State presented voluminous testimony from two witnesses, Mr. Zaro and Mrs. Entriken, which extended well beyond any issue relevant to the guilt phase of trial and qualified as inadmissible victim impact evidence. *See* Petition at 184-86.

From the outset, Respondent misapprehends Petitioner's claim. Petitioner does not fault the trial court for failing to "sua sponte" exclude this evidence, *see* Answer at 275, rather Petitioner faults the court for not granting Petitioner's pretrial motion to exclude this evidence and faults counsel for failing to object or adequately seek to exclude it. S*ee* Petition at 183, 188-89. After admitting that it is "questionable" whether the testimony Petitioner highlights was improperly admitted victim impact evidence, Respondent goes on to assert that this evidence was proper "contextual" evidence. Answer at 276.

Respondent baldly asserts that Mr. Zaro's testimony "was directed to the circumstances of finding a murdered baby" and hence was "more accurately construed as contextual evidence [than improperly admitted victim impact evidence]." *Id*. This statement is not supported by any argument, but even so, it is unavailing. While the circumstances surrounding Mr. Zaro finding the baby were relevant contextual evidence, Respondent fails to explain how Mr. Zaro's

"chilling" and "traumatizing" testimony[25] describing the impact this had on him personally was necessary to convey to the jury an understanding of those circumstances. *See* 33 RR 51 (repeatedly describing it as "a horror" that took "the wind" out of him, and "hurts my heart to talk about"). This testimony served no purpose other than to evoke emotion and create sympathy for the victim and prejudice against Petitioner, yet counsel failed to object to it.

Respondent makes a similar cursory assertion with regard to Mrs. Entriken. Respondent argues that her "testimony and identification of three photographs was likewise contextual"; dismisses her description of Alijah's life and temperament and the memorial created for him as "cursory"; and dismisses her testimony about her daughter's grief as a "brief" and "relevant to rebut any potential argument that [her daughter] was involved in the killing." Answer at 276. Mrs. Entriken's testimony was not as limited as Respondent suggests, nor was it "brief" or "cursory." Ms. Entriken testified about the baby's birth; his steely blue eyes and reddish hair and how he favored her daughter as three pictures of her daughter, her and her husband with the baby were published to the jury; she complained about not being able to see his body at the funeral home and about the delayed release of his body; she described her involvement in planning his memorial, and her daughter's resulting emotional issues, depression and psychiatric hospitalization. *See* Petition at 184-86. As for Respondent's argument that Mrs. Entriken's daughter's grief was relevant to rebut any potential argument her daughter was involved in the killing, counsel had not, and did not ever, make such an argument. There was nothing to rebut.

Finally, Respondent argues that because Petitioner killed his own son, this was a case about domestic violence and in such cases testimony about a victim's family is proper. *See*

---

[25] The trial prosecutor characterized Mr. Zaro's anticipated testimony as "chilling" and "traumatizing."  23 RR 17.

Answer at 276-77. According to Respondent, "that baby's life and the circumstances of his murder are necessarily intertwined with the baby's relationships with family members" and hence the testimony Petitioner complains of was admissible under Texas Code of Criminal Procedure article 38.36(a). *Id.* at 77. Respondent is wrong. There is no domestic violence exception to the general rule that victim impact evidence is inadmissible at the guilt phase of a criminal trial. Article 38.36(a) simply provides that "[i]n all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to . . . the previous relationship existing between the accused and the deceased, together with all *relevant* facts and circumstances going to show the *condition of the mind of the accused* at the time of the offense." Tex. Code Crim. Proc. art. 38.36 (emphasis added). Mrs. Entriken's testimony, as summarized above, in no way related to Petitioner's prior treatment of, or relationship with, his son, nor did it provide any insight into Petitioner's state of mind at the time of the offense. It was inadmissible and counsel should have objected.

Respondent asserts that because the testimony Petitioner complains of was properly admitted at the guilt phase of trial, counsel could not be found ineffective for failing to object.[26] Answer at 277-78. For the reasons set forth in the Petition and above, Petitioner's claim that has merit and counsel was ineffective for failing to object to this evidence, particularly given his pretrial efforts to exclude exactly such unfairly prejudicial testimony.

## IX. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP AND PRESENT EVIDENCE OF PETITIONER'S MENTAL STATE TO REBUT THE STATE'S EVIDENCE OF MENS REA.

Despite the well-established duty to investigate, develop, and present evidence of

---

[26] Counsel did object, unsuccessfully, to Mr. Entriken's testimony that the baby shared similarities with her daughter, but not to any of the other objectionable testimony summarized herein or described in the Petition. *See* 24 RR 107.

mental health defenses in capital cases, trial counsel unjustifiably failed to present evidence of Petitioner's mental state at the time of the crime that would have squarely rebutted the state's evidence of mens rea. *See*, *e.g.*, *Seidel v. Merkle*, 146 F.3d 750, 756 (9th Cir. 1998); *United States v. Kauffman*, 109 F.3d 186, 191 (3d. Cir. 1997). Respondent offers three arguments in response to this claim: (1) Petitioner cannot establish prejudice because evidence regarding Petitioner's mental state at the time of the crime would have been irrelevant during the guilt phase of his trial; (2) Petitioner cannot establish prejudice because his experts do not now offer evidence that negates the requisite mens rea; and (3) Petitioner fails to establish that trial counsel neglected the topic of his mental state at the time of crime i.e. fails to show deficient performance. Each of these arguments is meritless.

### A.    Evidence of Petitioner's Mental State was Relevant and Admissible.

Texas's murder statute requires proof of either intent or knowledge. *See* Tex. Penal Code § 19.02(b)(1). Respondent misapprehends Texas law when they argue that the inclusion of the latter mental state—knowing—rendered evidence of Petitioner' mental state at the time of the crime irrelevant. Answer at 281. On the contrary, the Texas Court of Criminal Appeals has long held that evidence of a defendant's mental state and mental illness may be presented to a jury and considered to negate the mens rea element of a crime. *See Jackson v. State*, 160 S.W.3d 568, 573-74 (Tex. Crim. App. 2005). In *Jackson*, the court differentiated between the affirmative defense of "diminished capacity"—which is not recognized in Texas—and the presentation of mental-health evidence for the purpose of negating mens rea. *Id*.; *see also Roberson v. State*, 2002 WL 34217382, at *7 (Tex. Crim. App. June 20, 2007). The Court of Criminal Appeals later clarified that both lay and expert testimony of a "mental disease or defect" that rebuts mens rea will be relevant and admissible unless excluded by a specific evidentiary rule. *Ruffin v. State*, 270 S.W.3d 586, 588 (Tex. Crim. App. 2008). In doing so, it acknowledged that "mental

diseases or defects may affect a person's perception of the world just as much as they may affect his rational understanding of his conduct or his capacity to make moral judgments." *Id*. at 593. Respondent does not dispute that a defendant's ability to perceive the world accurately impacts his awareness of the "nature of his conduct" or the probable result of that conduct. *See* Tex. Penal Code § 6.03 (definition of culpable mental states). Indeed, both *Jackson* and *Roberson* involved murder charges under § 19.02(b)(1). *Jackson*, 160 S.W.3d at 569; *Roberson*, 2002 WL 34217382 at *1. Respondent cites no authority for the proposition that Texas courts analyze the admissibility of mental state evidence differently in capital murder cases. Nor does the State identify a specific evidentiary rule under which evidence of Petitioner' mental state at the time of the crime would have been excluded.

### B.   Respondent Mischaracterizes Petitioner's Claim.

Respondent mischaracterizes the nature of Petitioner's ineffective assistance of counsel claim. Recapitulating new affidavits from experts retained by trial counsel and presented during the penalty phase of trial, Respondent inaccurately suggests that Petitioner' experts now "appear to be addressing premeditation"—which is unquestionably irrelevant under § 19.02(b)(1)—or a "diminished mental-state defense"—an affirmative defense that does not exist in Texas. Answer at 281. To the contrary, the experts discuss Petitioner's severe mental illness and specific psychosocial stressors that impacted his mental state at the time of the crime without reference to a legal framework of any kind. *See* Petition at 191-92. Yet, based on its false premise, Respondent argues that Petitioner fails to establish prejudice because Petitioner's experts, in their new affidavits, do not reach the ultimate issue and expressly conclude that Petitioner lacked the relevant mens rea at the time of the crime. *See* Answer at 281.

Petitioner's claim is simply that trial counsel failed to "investigate, develop, *and* present" evidence of Petitioner' mental state, which counsel could then have used to argue that Petitioner

103

lacked the requisite mens rea to be convicted of capital murder. *See* Petition at 190. (emphasis

added). As a result of counsel's inaction, the State was given the sole opportunity to characterize

Petitioner's mental state at the time of the crime, which they did by arguing, without opposition

from counsel, that Petitioner acted solely out of anger or annoyance, to stop his child from

crying. *See* Petition at 193. Had trial counsel performed effectively and asked his experts to

opine on Petitioner's mental state at the time of the crime, the jury would have had a more

complete picture of the severity of Petitioner's mental illness and the psychosocial stressors

impacting his mental state at the time of the crime. Had the jury heard such evidence there is a

reasonable probability that at least one juror would have found that the prosecution failed to meet

its burden to prove the mens rea element of murder. *See Strickland*, 466 U.S. at 694.

### C.      Trial Counsel Was Ineffective.

Trial counsel's failure to ask his mental health experts to opine on Petitioner's mental

state at the time of the crime was particularly inexplicable given trial counsel's apparent

awareness of this exact issue. Counsel argued during the guilt-innocence phase of trial that

Petitioner lacked intent—a strategy that, standing alone, could not have disproven mens rea

because Texas's murder statute only requires proof of a knowing mental state. *See* Petition at

193. Counsel also successfully obtained a lesser-included offense jury instruction based on his

argument that Petitioner had not intended to kill his child. *See* Petition at 193. Respondent does

not offer an explanation for the disjuncture between trial counsel's apparent strategy and their

failure to investigate and develop evidence of Petitioner's mental state at the time of the crime—

because there is no reasonable explanation. Despite the facts that none of trial counsel's mental

health experts recollect discussing Petitioner's mental state at the time of the crime with trial

counsel, that trial counsel presented no such mental state evidence, and that Texas law

specifically permits such evidence to negate mens rea, Respondent asserts that "silence on this topic does not prove deficient performance." Answer at 280. These facts do not amount to silence and, at minimum, present a dispute of material fact that should be addressed at a hearing. Moreover, as the trial court noted when it hesitantly agreed to provide the requested lesser included offense instruction, counsel presented almost no evidence showing that Petitioner lacked intent. *See* Petition at 193.

Contrary to Respondent's suggestion, Petitioner has established that trial counsel failed to ask *any* mental health expert to evaluate Petitioner's mental state at the time of the crime, and that this evidence was readily available and could have been presented through the same mental health experts that trial counsel had already retained. Under these circumstances, trial counsel's abdication of their duty to hold the state to its burden of proof on an element of the crime—an element that trial counsel themselves identified as the crux of Petitioner's sole defense theory during the guilt-innocence phase—fell below an objective standard of reasonableness. *See Tenny v. Dretke*, 416 F.3d 404, 408–09 (5th Cir. 2005) (counsel found ineffective where self-defense was sole defense theory at trial, and counsel failed to adequately investigate, call available witnesses, and elicit critical testimony that would have supported the theory); *see also Smith v. Dretke*, 417 F.3d 438, 441–43 (5th Cir. 2005) (counsel found ineffective for failing to call available defense witnesses due to misapprehension of Texas law); *Draughon v. Dretke*, 427 F.3d 286, 296–97 (5th Cir. 2005) (counsel found ineffective where counsel failed to retain an expert witness to analyze and present forensic evidence that would have countered prosecution's theory of the case); *Butler v. State*, 716 S.W.2d 48, 55–56 (Tex. Crim. App. 1986) (counsel found ineffective where sole defense theory at trial was misidentification, but counsel failed to call an available alibi witness and failed to interview eyewitnesses).

**X.** **PETITIONER WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BY THE PROSECUTION'S PRESENTATION OF IMPROPER AND INFLAMMATORY EVIDENCE, BY THE TRIAL COURT'S ERRONEOUS EVIDENTIARY RULINGS AND BY TRIAL COUNSEL'S INEFFECTIVE FAILURES TO OBJECT TO THE ADMISSION OF IMPROPER EVIDENCE; DIRECT APPEAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO RAISE THIS CLAIM**

Admission of any extraneous conduct during a trial "risk[s] that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment." *Old Chief v. United States*, 519 U.S. 172, 181 (1997). Three clear evidentiary errors here—reading a redacted portion of Petitioner' confession that made an allusion to a specific extraneous offense involving a child, testimony concerning a B.B. or pellet gun seized from Petitioner's car after he was arrested, and testimony suggesting that Petitioner was involved in unspecified criminal conduct to support himself—were neither isolated nor harmless. Collectively, the erroneous admission of this improper and inflammatory evidence was so unduly prejudicial as to render Petitioner's trial fundamentally unfair. *See Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007).

With respect to the redacted portion of Petitioner's confession, Respondent argues that no extraneous offense was admitted into evidence because the statement "I want to apologize to both [Nichols] and her daughter [C.D.] for what I asked [C.D.] to do" was open to an innocuous interpretation absent additional context. *See* Answer at 286. But Respondent's premise—that this allusion was devoid of context—is not persuasive. In his confession to one child's murder, Petitioner professed remorse towards a second child for an extraneous event. It strains belief that a juror would construe that remorse in a neutral light. Moreover, such an allusion to extraneous conduct is *more* likely to trigger adverse speculation, rather than less, when the allusion remains unexplained at the end of trial. The inference that this statement created—that Petitioner

attempted to assault a second child victim and that for some reason the details of this extraneous conduct were being kept from the jury—was apparent and unduly prejudicial.

Respondent next argues that testimony concerning a BB or pellet gun seized from Petitioner's car following his arrest was admissible "contextual evidence" of the murder investigation. Answer at 291. Respondent likewise argues that Nichols's testimony—which implied that Petitioner was involved in unspecified criminal conduct to support himself—was admissible "contextual evidence" because Petitioner mentioned his housing instability in his confession. Answer at 293. Respondent's reliance on a notion of "contextual evidence" is misplaced. The Texas Court of Criminal Appeals recognizes that evidence of a defendant's "bad character traits possesses such a devastating impact on a jury's rational disposition towards other evidence, and is such poor evidence of guilt, that [Rule 404] was created expressly for its exclusion." *Mayes v. State*, 816 S.W.2d 79, 86 (Tex. Crim. App. 1991). In *Mayes*, the court held that providing "context" to an instant offense is not one of the "alternative" purposes under which character evidence may be admissible under Texas Rule of Evidence 404(b). *Id.* at 88; *see also id.* at 87 (noting federal courts which have addressed the admissibility of purported contextual evidence demonstrate "a reluctance to admit character evidence on contextual grounds"). Respondent drastically downplays the significance of these three evidentiary errors.

The admission of testimony concerning a weapon seized from Petitioner's car—which Respondent characterizes as a "kid's toy," Answer at 291—and Ms. Nichols' testimony—which Respondent characterizes as commentary on Petitioner's "impoverishment and idleness," Answer at 294—severely compounded the prejudicial effect of the allusion to an extraneous offense in the confession. First, at least 24 states regulate non-powder guns to some degree, partly in recognition of the fact that B.B. or pellet guns can be and often are mistaken for actual

firearms. *See* Giffords Law Center, *Non-power and Toy Guns*, https://giffords.org/lawcenter/gun-laws/policy-areas/child-consumer-safety/non-powder-toy-guns/ (last visited Dec. 2, 2020) (surveying state regulations of non-powder guns); *see also* Ferris, S., *Fatal Texas Shooting Highlights Struggle to Regulate Replica Guns*, Center for Public Integrity, https://publicintegrity.org/education/fatal-texas-shooting-highlights-struggle-to-regulate-replica-guns/ (Jan. 13, 2020) ("[One] reason cities have adopted restrictions is the growth in people using real-looking fake weapons…to commit serious crimes"). Second, the problem with Ms. Nichols' testimony was not that it was merely disparaging, but rather the manner in which Ms. Nichols' insisted that Petitioner always seemed to have money despite never working. The obvious implication of Ms. Nichols' testimony was that Petitioner had an illicit source for his money. Collectively, these three evidentiary errors engendered the impression that Petitioner was habitually engaged in criminal, even violent conduct, and that the child victim in the instant case was not the only child that Petitioner had victimized.

This erroneously admitted evidence had no relevance at the guilt-innocence phase of Petitioner's trial, and trial counsel's performance with respect to these evidentiary errors fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 694. Counsel failed to seek to preclude this evidence prior to trial, failed to object to the evidence when it was elicited at trial, and failed to seek a curative or limiting instruction, or request a mistrial, after the jury heard it. In light of the unduly prejudicial nature of such evidence, there could be no excuse for counsel's inaction. There is a reasonable probability that on the basis of this evidence, at least one juror assumed Petitioner had a history of crime and violence, and that their assumption affected the juror's verdict at the guilt-innocence or penalty phase of Petitioner's trial.

**XI.   THE TRIAL COURT ERRED BY ADMITTING PETITIONER'S CUSTODIAL STATEMENTS WITHOUT PRETRIAL NOTICE AND IN VIOLATION OF PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY LITIGATE THIS ISSUE AND FOR FAILING TO OBJECT TO AND/OR COUNTER LAW ENFORCEMENT TESTIMONY REGARDING PETITIONER'S PURPORTED LACK OF REMORSE**

During the guilt-innocence phase of Petitioner's trial, Petitioner's Fifth and Fourteenth Amendment rights were violated by the testimony of Galveston Police Sergeant Schwartz and Detective Pena, the officers who escorted Petitioner from Pennsylvania to Texas. These officers offered their opinions, based upon Petitioner's custodial statements, about what Petitioner *did not* say during his extradition, and made other observations that Petitioner was remorseless. This testimony was irrelevant and improper at the guilt-innocence phase of Petitioner's trial. Respondent, in framing its response to this claim, misrepresents the caution with which Petitioner invoked his Fifth and Fourteenth Amendment rights the day before Petitioner was extradited. *See* Answer 297 ("after being informed of his [*Miranda* rights]…[Sergeant Schwartz and Detective Pena]…escorted [Petitioner] to the gate for their flight"). In fact, Petitioner specifically invoked his Fifth and Fourteenth Amendment rights in the presence of counsel and signed a written "Non-Waiver of Rights Form" that was hand-delivered to Galveston law enforcement personnel prior to his extradition. *See* Petition 205.

**A.   Violation of Petitioner's Fifth and Fourteenth Amendment Rights**

As detailed in his Petition, *see* Petition 205-09, the admission of Petitioner's custodial statements through Sergeant Schwartz's testimony constituted a violation of Petitioner's Fifth Amendment and *Miranda* rights. Petitioner's Fifth Amendment right against self-incrimination was also implicated by both Sergeant Schwartz's and Detective Pena's testimony. For example, Sergeant Schwartz explained that Petitioner seemed emotionless, and that Petitioner never asked

109

about his son or the baby's mother. *See* Petition 207. Respondent argues that a relevance objection to this lack of remorse testimony would have been futile because, had Petitioner accidentally killed his son, "he might have apologized profusely for it" and therefore the "absence of apology reflect[ed] the opposite." Answer at p. 306. This argument is both illogical and meritless.

According to Respondent, Petitioner's custodial statements were relevant because of what Petitioner *did not say* after invoking his right to remain silent. Respondent's line of reasoning, far from supporting its position, demonstrates why the challenged testimony violated Petitioner's Fifth Amendment rights. *See United States v. Shaw*, 701 F.2d 367, 382 (5th Cir. 1983) ("The standard is strict; virtually any description of a defendant's silence following arrest and a Miranda warning will constitute a *Doyle* violation"); *accord Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995) ("the prohibition against commenting on post-arrest silence includes testimony regarding a defendant's contrition or remorse"). Moreover, Respondent's position is clearly rejected by controlling state precedent. In *Dinkins*, a State's witness testified that the defendant lacked remorse and failed to protest his innocence following his arrest. 894 S.W.2d at 355–56. The Texas Court of Criminal Appeals held that both elements of the challenged testimony constituted impermissible comment on the defendant's silence in violation of the Fifth Amendment. *Id*. at 356. Under this precedent, Sergeant Schwartz and Detective Pena's testimony impermissibly punished Petitioner for exercising his Fifth Amendment rights. *See Doyle v. Ohio*, 426 U.S. 610, 617-20 (1976) (*Miranda* warnings contain implicit assurance that silence will not be used at trial against defendant).

### B.        Trial Counsel's Ineffectiveness

Respondent's response to Petitioner's ineffective assistance of counsel claim is equally unpersuasive. Trial counsel's performance with respect to Sergeant Schwartz and Detective Pena's testimony—failing to suppress Petitioner's custodial statements prior to trial, failing to object to the testimony during trial, and failing to rebut the thrust of the testimony that Petitioner purportedly lacked remorse—was unquestionably deficient. *See* Petition at 210-14. To the extent Respondent argues that Petitioner was not prejudiced because it would have been futile for trial counsel to make objections to the challenged testimony, Respondent's position is meritless for the reasons set forth above.

Respondent's obfuscations concerning Petitioner's extradition counsel, Daniel Stevenson, bear closer scrutiny. The day before Petitioner was extradited, Mr. Stevenson met with Petitioner and was struck by Petitioner's expressions of remorse. *See* Petition at p. 213 ("[Petitioner] was crying…He was incredibly remorseful"). Mr. Stevenson was available and willing to testify as a defense witness—in fact, Mr. Stevenson repeatedly attempted to contact trial counsel, but trial counsel never returned his calls. *Id.*; *see also* Exhibit 22, Declaration of Daniel Stevenson. Mr. Stevenson's testimony, Respondent argues, "would not have countered what the officers observed…[but] shown only that [Petitioner's] demeanor was different on a prior occasion." Answer at pp. 303-04. Respondent hides the ball: *without* Mr. Stevenson's testimony, the *only* testimony heard by the jury concerning Petitioner's remorse or lack thereof was the adverse testimony provided by Sergeant Schwartz and Detective Pena.

Respondent then complains that it is inconsistent for Petitioner to protest trial counsel's failure to object to the officers' testimony on the one hand, and trial counsel's failure to call Mr. Stevenson in rebuttal on the other. *See* Answer 306. In this, Respondent only highlights the

compounding layers of trial counsel's deficient performance. Even had counsel failed in

excluding their testimony, trial counsel could have effectively rebutted Sergeant Schwartz's and

Detective Pena's testimony simply by returning Mr. Stevenson's numerous calls. There is no

reasonable strategic basis for trial counsel's failure to call Mr. Stevenson as a witness *after* the

challenged testimony heard by the jury. *See Strickland*, 466 U.S. at 690–91 ("strategic choices

made after less than complete investigation are reasonable precisely to the extent that reasonable

professional judgments support the limitations on investigation"). Trial counsel's deficient

performance with respect to Mr. Stevenson alone establishes prejudice. There is a reasonable

probability that, but for the fact that Sergeant Schwartz and Detective Pena's improper lack of

remorse testimony went uncontradicted throughout the guilt-innocence phase *and* the penalty

phase of Petitioner's trial, at least one juror would have voted for life.

## XII.   PETITIONER'S RIGHT TO SILENCE WAS VIOLATED WHEN THE PROSECUTOR COMMENTED ON PETITIONER'S SILENCE DURING THE PENALTY PHASE

Petitioner's Fifth Amendment right to remain silent and his right to effective assistance of

counsel were violated during the penalty phase of trial. On cross-examination of a defense

witness—Petitioner's childhood mentor—the prosecutor asked the witness whether Petitioner

trusted him. 31 RR 48. The witness answered: "That's something you will have to ask him." *Id*.

Immediately thereafter, the prosecutor interjected, "Well, I'm not in a position to ask him that."

31 RR 48-49. The message the jury heard, a message previously telegraphed to the jury during

the guilt phase of trial,[27] was loud and clear: Petitioner's failure to testify made it impossible for

---

[27] While glaring directly at Mr. Mullis, this same prosecutor commented during closing: "Mr. Mullis, Mr. Mullis, did you know what you were doing on January 29th, 2008?" *See* 27 RR 43. Counsel objected on the ground that the prosecutor was improperly drawing attention to Petitioner's failure to testify and provide an answer to this question, and his objection was sustained. *Id*.

the prosecution to get answers to questions they wanted answers to. The inference to be drawn

by the jury, that it should hold Petitioner's failure to testify against Petitioner, was unmistakable.

### A.  Petitioner's Constitutional Right to Silence Was Violated

Respondent's attempt to evade the obvious—that the prosecutor made a gratuitous,

improper comment on Petitioner's failure to testify—is unavailing. As a preliminary matter, the

prosecutor's entire line of questioning was objectionable. The prosecutor's initial question was

objectionable on the grounds that it was patently beyond the scope of the witness's personal

knowledge, it called for an opinion, and it called for speculation. The ensuing interjection was

not even in the proper form for cross-examination because it was clearly phrased not as a

question but as a statement. Even if this interjection was construed as a question, it too would be

objectionable as argumentative. *See* Argumentative, Federal Trial Objections § A10 (7th ed.)

("Argumentative questions are… not intended to elicit new information…Typically, such a

question states a conclusion and asks the witness to agree with it"). A question is argumentative

"if it is merely an effort by counsel…[to] draw inferences from, or to comment on evidence." *See*

2A Tex. Prac., Handbook on Texas Evidence OBJ 2. Drawing attention to and inferences from

purported 'missing evidence'—Petitioner's failure to testify—is exactly what the prosecutor

sought to do with her interjection. Insinuating that a defendant's failure to testify is probative of

their culpability is precisely the argument proscribed by the Fifth Amendment. *See Griffin v.*

*California*, 380 U.S. 609, 615 (1965); *accord Owen v. State*, 656 S.W.2d 458, 459 (Tex. Crim.

App. 1983) ("If the remark complained of called the jury's attention to the absence of evidence

that only the [defendant's] testimony…could supply, the conviction must be reversed").

To violate a defendant's Fifth Amendment rights through a remark, either the

prosecutor's "manifest intent" in making the remark must have been to comment on the

defendant's silence, or the character of the remark must have been such that the jury would

"naturally and necessarily construe it" as such a comment. *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999). Respondent argues that neither condition was met in the instant case because an "equally plausible" interpretation of the prosecutor's remark was that he was "reminding the witness he was [Petitioner's] proxy." Answer at 310. Although it is unclear in what sense this lay witness could be viewed as a "proxy" for Petitioner, in support of its position Respondent cites to *United States v. Dula*, where the Fifth Circuit observed that it is not error "to comment on the defendant's failure to produce evidence on a phase of the defense upon which he seeks to rely." F.2d 772 (5th Cir. 1993); *see* Answer at 310.

Putting aside the paradoxical nature of Respondent's reasoning on its face—i.e. the prosecutor did not comment on Petitioner's silence, only Petitioner's failure to produce his own testimony—*Dula* is entirely distinguishable. *Dula* involved a prosecutor's summation, in closing argument, that *no* witness had taken the stand and offered *any* testimony in support of one of the defenses set forth by the defendant. *United States v. Dula*, 989 F.2d 772, 776–77 (5th Cir. 1993); *accord United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996) (in closing argument, the government is not prohibited "from commenting on the defense's failure to counter or explain the evidence"). Those are not the facts before this Court. Here, a gratuitous comment was improperly made during cross-examination of a defense witness. The comment was objectionable from the outset and could not be excused as mere oratorical flare. Also unlike the closing arguments in *Dula* and *Grosz*, which made no specific reference to the defendant or the defendant's failure to provide any specific testimony, the prosecutor's comment singled out Petitioner and specifically drew attention to *his* failure to testify. It is this distinction that makes the prosecutor's comment here a *Griffin* violation, whereas the closing arguments in *Dula* and *Grosz* were appropriate.

114

Respondent also attempts to defend this improper comment on the basis that it was the witness who first "threw the proverbial skunk in the jury box." Answer at 310. Respondent cites to no authority, and no authority exists, for the proposition that a lay witness can open the door to a violation of Fifth Amendment rights. Whether this witness, a non-attorney, made an inapt choice of words is immaterial. It was the professional and ethical duty of the prosecutor to ensure that Petitioner's constitutional rights were honored. *See* TX ST RPC Rule 3.09 (special professional responsibilities of a prosecutor); *see also Berger v. United States*, 55 S. Ct. 629, 633 (1935) ("while [the prosecution] may strike hard blows, [it] is not at liberty to strike foul ones").

### B.     Trial Counsel Was Ineffective

Respondent suggests that trial counsel was not ineffective for failing to object because the prosecutor's comment was not an improper comment on Petitioner's silence and because the witness, not the prosecutor, was to blame. *See* Answer at 312. This argument fails for the reasons set forth above, which elucidate why the prosecutor's interjection was improper, and how it violated Petitioner's Fifth Amendment rights. Respondent further speculates that even if the prosecutor's comment was objectionable, counsel might have chosen not to object to avoid calling attention to Petitioner's failure to testify. *See id*. Respondent's argument on this point is noteworthy for its concession that the prosecutor's interjection was in fact a comment on Petitioner's silence. Petitioner agrees, but Respondent cannot have it both ways. Had counsel objected to the prosecutor's initial line of questioning, the witness's answer would never have been elicited in the first instance and, presumably, the prosecutor's caustic interjection would not have ensued. Counsel's failure to object to this entire line of questioning was objectively unreasonable.

Finally, Respondent argues that the prosecutor's improper comment on Petitioner's silence was harmless under *Brecht*. *See* Answer at 311. To the contrary, this improper comment

was both violative of Petitioner's Fifth Amendment rights and highly damaging to Petitioner's penalty phase defense. The Fifth Circuit has recognized that improper comment on a defendant's silence may overcome the harmless error standard. *See Gongora v. Thaler*, 710 F.3d 267, 278-83 (5th Cir. 2013). Here, numerous factors—the prosecutor's earlier implication Petitioner's silence was a basis for conviction during guilt-innocence phase closing argument, trial counsel's failure to object and obtain a curative instruction, and the existence of compelling mitigation evidence during the penalty phase of Petitioner's trial— militate in favor of a finding that this error was both substantial and injurious. *Id*. at 278. Moreover, during the penalty phase Petitioner presented evidence of his significant childhood abuse, trauma and severe mental illness. Petitioner's diagnoses included reactive attachment disorder, a disorder characterized by an inability to attach and connect with other human beings. *See* 31 R.R. 142. The prosecutor's interjection did not occur in a vacuum, it followed a lay witness's statement that they were unable to speculate or offer an opinion as to whether Petitioner trusted—i.e. formed an intimate attachment—with the witness. The prosecutor's improper comment insinuated that Petitioner's claimed disabilities would never be fully tested because Petitioner had exercised his right to silence. Thus, the prosecution leveraged a violation of Petitioner's Fifth Amendment rights to "strike at the jugular" of Petitioner's penalty phase mitigation defense. *Gongora*, 710 F.3d at 280.

For the reasons set forth above and in the Petition, Petitioner's Fifth Amendment rights were violated and Petitioner was prejudiced as a result. *See* Petition at 214-17. But for trial counsel's deficient performance, there is a reasonable probability that at least one juror may have struck a difference balance and voted for life.

## XIII.   PETITIONER WAS INCOMPETENT WHEN HE WAIVED HIS APPELLATE RIGHTS; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PROTECT THOSE RIGHTS; TRIAL COURT ERRED IN NOT HOLDING A FULL COMPETENCY HEARING.

Less than two months after his appointment, before the trial record was even available, without speaking to trial counsel, without any knowledge of Petitioner's extensive mental health history yet knowing that he was on suicide watch, without having his client evaluated by a mental health expert, and without requesting that the court hold a competency hearing, direct appeal counsel drafted and filed documents summarily stating that his client was mentally competent, wished to proceed pro se for purposes of waiving his direct appeal, and was making this decision voluntarily, intelligently and knowingly. *See* Petition at 218-24; 4 CR 904. Counsel's words, which were unsupported by any information or investigation, were meaningless. Likewise, counsel's decision to file these waiver documents was uninformed and inherently unreasonable. *See* Petition at 221.

In response, the trial court conducted a surface level colloquy of Petitioner—which did not even include an inquiry into what motivated Petitioner's decision to waive—and then granted Petitioner's request to proceed pro se. 34 RR 6-26. The trial court granted Petitioner's request despite its awareness of Petitioner's mental health history, its awareness that the trial transcripts were not yet available, and without ordering a competency evaluation or holding a competency hearing. Faced with bona fide questions as to Petitioner's competency, as evident from his mental health history elicited at trial, the court's response to this request was inadequate and unconstitutional. *See* Petition at 219.

Respondent argues that the trial court had no constitutional obligation to hold a hearing on whether Petitioner, who has a lifelong history of severe mental illness, was competent to fire his attorney and proceed pro se to waive his appellate rights. Respondent relies on *Speights v.*

*Frank*, 361 F.3d 962, 965 (7th Cir. 2004), for the proposition that simple assent is all that is constitutionally required for a mentally ill defendant to waive appellate rights. However, Respondent's reliance on *Speights* is inapt. Competency was not an issue in *Speights*, where the defendant was "not afflicted by any mental disease." *Id*. *Speights* is not relevant to Petitioner's argument that his incompetency at the time of waiver created a due process issue.

Respondent misconstrues the thrust of Petitioner's argument. Petitioner argues that— given everything that the trial court knew about Petitioner's history of mental health problems— the court should have endeavored to hold a hearing to determine whether Petitioner was in fact competent to do so. *See* Petition at 221. Likewise, appellate counsel had a duty to investigate his client's mental illness before acquiescing to his wish to rush to the death chamber. An attorney has expanded duties when representing a client whose condition prevents him from exercising proper judgment. *See Thompson v. Wainwright*, 787 F.2d 1447, 1451–52 (11th Cir. 1986).[28]

The State also attempts to frame the trial court's severely limited waiver colloquy as sufficient to protect Petitioner's constitutional rights. Answer at 314. However, the trial court asked Petitioner only eight questions about his mental health history—and only when prompted by the prosecutor. 34 RR 14-16. The colloquy was limited to whether he had been diagnosed, whether he was on any medications, whether he thought he had a rational understanding of the

---

[28] If the client is mentally incompetent, the client may lack the legal capacity to discharge the lawyer, and in any event the discharge may be seriously adverse to the client's interests. The lawyer should make special effort to help the incompetent client consider the consequences and in some situations may initiate proceedings for a conservatorship or similar protection of the client. *See* TX ST RPC Rule 1.15, comment 6. "[T]he function of an attorney to the legal system is to act as the expert advocate representing his or her client. An attorney is to abide by a client's decisions in a criminal case, after consultation, about the plea to be entered, whether to waive jury trial, and whether the client will testify. In all other respects, *it is the duty of counsel to analyze the case* and to determine and present what nonfrivolous issues may exist on appeal." *Schindley v. State*, 326 S.W.3d 227, 230 (Tex. App. 2010) (citing Tex. Disciplinary R. Prof'l Conduct 1.02) (emphasis added).

118

proceedings that were occurring. *Id*. Such a limited colloquy was patently unreasonable given what the trial court already knew about Petitioner's mental health history. *See* Petition at 55-91, 101-03 (describing Petitioner's history of mental illness).

Respondent next argues that appellate counsel Wayne Hill was not ineffective for assisting Petitioner in his waiver of appellate rights, because Mr. Hill was merely following his client's orders. *See* Answer at 314. Respondent cites to *Wood v. Quarterman* for the proposition that "[n]either the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions *to not present evidence* [at the punishment phase of a capital trial]." 491 F.3d 196, 203 (2007). But *Wood* has nothing to do with the issues presented here. The defendant in *Wood* had two competency hearings prior to trial and the trial court had an opportunity to consider and whether the defendant was, in fact, competent. *Id*. at 198. Petitioner had no competency hearing at all prior to or upon his decision to waive his appellate rights.

Respondent refers back to Petitioner's waiver of state habeas procedures. Answer at 314. The contrast between what state habeas counsel undertook to perform highlights precisely what Mr. Hill failed to perform:

> OCW began a prompt investigation of Mullis's case. They met with Mullis shortly after appointment and on numerous occasions thereafter, they talked with trial counsel and collected their files, they spoke with Mullis's trial experts and certain family members, and they began reviewing the State's files.

Answer at 63. While Mr. Hill did meet with Petitioner, he failed to perform any of the other functions of defense counsel. Moreover, Respondent admits that access to the trial transcript is one of the most important pieces of evidence for appellate counsel to have access to – which Attorney Hill never obtained. *Id*. at 64 ("without knowing precisely what was before the jury—without having the benefit of a trial transcript—it is impossible to know exactly what to search for."

(discussing the challenge of investigating post-conviction cases without the benefit of a trial transcript)).

Petitioner's arguments in his November 30, 2012, Motion for Leave to File Petition for Original Writ of Habeas Corpus filed with the Texas Court of Criminal Appeals (seeking reinstatement of his direct appeal rights) demonstrate attorney Hill's ineffectiveness and the prejudice Petitioner suffered. *See* Exhibit J.[29] Appellate counsel never learned, prior to filing the waiver, about Travis's history of mental illness, only that "mitigating evidence had been presented on behalf of Mr. Mullis." Exhibit 1, Affidavit of Wayne T. Hill at ¶ 2. The defense exhibits containing Petitioner's extensive medical, mental health, and social service records amply describe Petitioner's extensive mental health issues—and would have been available to appellate counsel, had he waited for the record on appeal to be completed, or requested them from trial counsel.

Also readily available to appellate counsel were the three mental health experts who worked on this case at trial: Richard Dudley, M.D., Matthew Mendel, Ph.D., and Jolie Brams, Ph.D. Dr. Mendel, a psychologist, testified as to the effect of abandonment, loss, and sexual abuse Travis suffered. *See* Exhibit 15, Affidavit of Dr. Matthew Mendel. Dr. Dudley testified to Travis's psychiatric diagnoses and history of mental illness (bipolar disorder and post-traumatic stress disorder) and suicidal tendency. *See* Exhibit 12, Affidavit of Dr. Richard Dudley. Dr. Brams, a psychologist, did not testify, but served as a consulting expert. *See* Exhibit K, Affidavit of Dr. Jolie Brams. Each expert was available to appellate counsel if counsel had called them and explained that Petitioner had proposed to waive counsel and abandon his appeal. All three experts would

---

[29] This motion was denied on December 12, 2012. *Ex parte Mullis*, No. WR-76, 632-01, Order (Tex. Crim. App. Dec. 12, 2012).

have advised appellate counsel that Petitioner should be evaluated for competence to waive his

appellate rights. *See* Petition at 222-23; Exhibits K.[30]

   Respondent next argues that Petitioner has not rebutted the finding that he was competent

to waive his right to appellate counsel with clear and convincing evidence. *See* Answer at 314

(citing to *Demothenes v. Baal*, 495 U.S. 731, 735 (1990), and *Austin v. Davis*, 876 F.3d 757,

780–81 (5th Cir. 2017)). Petitioner can and will make such a showing at a hearing. The

defendants in both *Baal* and *Austin* were subject to multiple competency hearings and both trial

courts went to great lengths to support those court's findings of competency. *See Baal* at 732-33;

*Austin* at 779-80. Petitioner has yet to be afforded any of the constitutional protections the

defendants in those two cases were provided.[31]

---

[30] For example, as Professor Eric Freedman and attorney William Harris detail in their expert affidavits, counsel fell far short of meeting these standards. *See* Exhibit L, Affidavit of Professor Eric Freedman, with attachment; Exhibit M, Affidavit of Attorney William Harris. First, the ABA Guidelines require counsel to "be familiar enough with the client's mental condition to make a *reasoned* decision - fully documented, for the benefit of actors at later stages of the case - *whether to assert the position that the client is not competent to waive further proceedings."* Commentary to Guideline 10.5 (Relationship with the Client), 31 Hofstra L. Rev. at 1010 (emphasis added). The Guidelines also require counsel to "continually monitor the client's mental, physical and emotional condition for effects on the client's legal position." Guideline 10.15.1 (Duties of Post-Conviction Counsel), 31 Hofstra L. Rev. at 1080. As evident from Mr. Hill's affidavit, including his mere awareness that "mitigating evidence had been presented," and as evident from the available experts whom he never contacted, counsel did none of what the ABA Guidelines require. He fell short of prevailing standards. The Commentary to the ABA Guidelines also state that counsel whose client desires to abort any defense against the death penalty should "initially try to identify the source of the client's hopelessness," should attempt to obtain treatment for the client's mental or emotional problems, and to enlist people to speak with the client about the value of living. ABA Guidelines, 31 Hofstra L. Rev. at 1010. Counsel did not do this either." *Id.*

[31] "In *Baal*, the state court's conclusion that Baal was competent to waive his right to further proceedings was "fairly supported by the record." Three psychiatrists who examined Baal had determined he was competent; a psychiatrist who had the opportunity to observe and talk to Baal testified that Baal was competent at the hearing; and the trial court concluded that Baal was competent after both observing Baal and questioning him extensively on the record." *Baal*, 495 U.S. at 735. A state psychiatrist testified that Baal was competent; a state prison official who had observed Baal also testified as to Baal's competence. The court also reviewed the reports of three

Respondent next argues that, "where a petitioner has chosen to proceed pro se, he cannot claim ineffectiveness of counsel," citing *Faretta v. California*, 422 U.S. 806, n. 46 (1975), and *Hale v. United States*, 710 F.3d 711, 714 (7th Cir. 2011). Answer at 314. Respondent's reliance on these cases is inapt. The cited footnote in *Faretta* discusses the concept that a pro se litigant cannot later claim that he provided himself ineffective assistance. The court in *Hale* is simply making the same point—a claim of ineffective assistance of counsel cannot be brought against oneself. Petitioner's claim, by contrast, is that his direct appeal attorney was ineffective for failing to represent Petitioner fully and robustly during the time he was representing Petitioner. Counsel failed to speak with Petitioner's family, failed to request a full competency hearing, failed to talk to trial experts or investigate why Petitioner was motivated to waive.

Respondent next argues that not realizing the strength of one's appellate claims at the time of waiver "does not permit him to invalidate his knowing and voluntary waiver of appellate rights." Answer at 315 (citing *U.S. v. Medina-Carrasco*, 815 F.3d 457, 462 (9th Cir. 2015)). *Medina-Carrasco* involved waiver of appellate rights in a bargained-for plea agreement. There were no competency issues present in that case, in stark contrast to Petitioner's case.[32]

_____

psychiatrists who had examined Baal and concluded that he was competent to stand trial. Based on this evidence, the court held that Baal was aware of his impending execution and of the reason for it, and thus was sane under the test set forth in *Ford v. Wainwright,* 477 U.S. 399 (1986). The court further held that Baal was in control of his faculties, was competent to choose to decline to pursue an appeal, and had made an intelligent waiver of his right to pursue postconviction relief. *Id.* at 736.

[32] "Each one of those courts, however, has done so with the proviso that such waivers must be rigorously assessed to assure that they have been entered knowingly, intelligently, and voluntarily. Furthermore, the courts have made clear that the question is not one of form but of substance: Did the defendant *in fact* knowingly, intelligently, and voluntarily waive the right to appeal or to collaterally attack a conviction or sentence—a determination which must be based upon the specific facts and circumstances presented by the particular case, including the defendant's "background, experience, and conduct." *United States v. Martinez,* 143 F.3d 1266, 1269 (9th Cir.1998). And, as with waivers of constitutional rights, "a heavy burden" rests on the government to demonstrate by a preponderance of the evidence that the waiver was voluntary

Respondent argues that Petitioner's request to file an original habeas application was not sufficient to exhaust this claim and hence it is procedurally defaulted. Answer at 48-50. Respondent reasons that "a challenge to a conviction or sentence, not otherwise presented on direct review, must be brought under Article 11.071" and that "[Petitioner] was required to present his ineffective assistance of appellate counsel claim via Article 11.071, and his attempt to raise it through an original writ was procedurally improper." Answer at 49.

Petitioner's failure to raise this claim in an Article 11.071 writ was a direct result of state habeas counsel's ineffectiveness and abandonment of Petitioner. Hence, for the reasons set forth in the initial portion of this brief entitled Waiver and Default, this procedural default can be overcome and Petitioner is entitled to merits review of this claim. At the very least this Court should hold an evidentiary hearing on the issue of default.

Finally, Respondent argues that the federal constitution does not mandate an appellate process for criminal convictions. Answer at 315-16. True enough, but where a state provides for an appellate process, that process must comport with constitutional requirements. *See Evitts v. Lucy*, 469 U.S. 387 (1985) (holding that due process and equal protection require effective advocacy in a criminal defendant's direct appeal.). Moreover, the right to direct appeal for a death-sentenced prisoner finds its foundation in the Eighth Amendment. *Jurek* v. *Texas,* 428 U.S. 262, 276 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (relying in part on Texas's provision of direct appeal to this Court in finding Texas's capital-sentencing system satisfies Eighth Amendment). What happened in Petitioner's case fell far short of the heightened protection the Eighth Amendment requires when the State seeks to execute.

---

and that the defendant knowingly and intelligently waived these important statutory rights. *United States v. Medina-Carrasco*, 815 F.3d 457, 464 (9th Cir. 2015) (Friedman, J., dissenting).

The bottom line is that Petitioner has suffered from mental illness for his entire life. The trial court was aware of Petitioner's mental disabilities, and failed to protect his constitutional rights by conducting a full and proper competency hearing before allowing a mentally ill defendant to represent himself in a capital appeal. Mr. Hill failed to learn or understand the mental handicaps his client suffered from, and was ineffective for failing to robustly protect the interests of his client.

Petitioner was not competent at the time of the waiver of his direct appeal rights, and the Court should order a hearing according to the procedures outlined in *Pate*.

## XIV.   PETITIONER'S CONVICTION AND SENTENCE ARE UNCONSTITUTIONAL DUE TO THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S INADEQUATE REPRESENTATION, THE STATE'S MISCONDUCT AND THE COURT ERRORS DESCRIBED ABOVE.

Respondent asserts that Petitioner's cumulative error claims fails because Petitioner "has not proven constitutional errors, so he has nothing to cumulate," his claims are procedurally defaulted, and "the Supreme Court has not "directly spoken to the issue of cumulative error and thus this claim is *Teague* barred." Answer at 316-17.

Respondent is incorrect in each of these assertions. First, for all the reasons set forth *supra*, Petitioner's has proven constitutional errors resulting from counsel's ineffectiveness and the State's misconduct and Petitioner can overcome any procedural default. Second, contrary to Respondent's assertion otherwise, the Supreme Court has spoken on this issue repeatedly. *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different.") (emphasis added); *accord Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973); *see also Kyles v. Whitley*, 514 U.S. 419, 441 (1995)

("A cumulative evaluation of the materiality of wrongfully withheld evidence is required rather than considering each piece of withheld evidence in isolation.").

## REQUEST FOR RELIEF

Wherefore, based on the foregoing and on Petitioner's Consolidated Petition for Writ of

Habeas Corpus, Petitioner respectfully requests that the Court grant him the following relief:

(1)     Such discovery as is necessary for full and fair resolution of the claims contained in his Petition, as Petitioner will request by separate motion;

(2)     An evidentiary hearing on all claims involving disputed issues of fact, including factual disputes relevant to Petitioner's ability to overcome any procedural bars;

(3)     Oral argument on all claims; and

(4)     Issuance of a Writ of Habeas Corpus granting relief from Petitioner's convictions and sentences.

Respectfully submitted,

/s/ Peter Walker
Shawn Nolan
Peter Walker
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

Date:   December 21, 2020

126

## CERTIFICATE OF SERVICE

I, Shawn Nolan, hereby certify that on this date, I served the foregoing on the following person by ECF filing and email:

Matthew Ottoway
Assistant Attorney General
Southern District of Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711


/s/ Shawn Nolan
Shawn Nolan


Date: December 21, 2020

127