# UNITED STATES DISTRICT
## FOR THE SOUTHERN DISTRICT OF TEXAS

## GALVESTON DIVISION

| | | |
|---|---|---|
| **TRAVIS JAMES MULLIS,** | : | |
| **Petitioner,** | : | |
| **v.** | : | No. 3:13-cv-00121 |
| | : | **THIS IS A CAPITAL CASE** |
| **BOBBY LUMPKIN,** | : | |
| **Director, Texas Department of** | | |
| **Criminal Justice, Correctional** | : | |
| **Institutions Division,** | | |
| | : | |
| Respondent. | : | |

## PETITIONER'S SUPPLEMENTAL BRIEF

Shawn Nolan
Peter Walker
Federal Community Defender for the
Eastern District of Pennsylvania
Curtis Center – Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
shawn_nolan@fd.org
peter_walker@fd.org

COUNSEL FOR PETITIONER

Dated: May 3, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................iii

ARGUMENT..............................................................................................1

I.   Procedural Default and Procedural Law ......................................................1

II.  Abandonment or Ineffective Representation by Habeas Counsel ..........3

   A.   OCW Abandoned Mr. Mullis by Failing to Protect His Interests in
      Competency Proceedings, which Ultimately Precluded Mr. Mullis
      from Filing a Timely Writ Petition. .......................................................4

      1.   OCW prematurely drafted and filed a waiver on Petitioner's
         behalf. ......................................................................................7

      2.    OCW prematurely suspended all investigation of Mr. Mullis's case
         simply because it appeared that he might waive. ...........................11

      3.   OCW agreed with Mr. Mullis not to challenge the findings of the
         court-appointed expert, without any way of knowing whether the
         expert's conclusion would be reliable, and without taking all
         necessary steps to ensure reliability.................................................14

      4.   OCW abided by their improper agreement not to challenge Dr.
         Scarano's findings, despite knowing that his report inaccurately
         assessed Mr. Mullis's mental health background and omitted
         information critical to his competence to waive.............................16

      5.    .OCW was conflicted from representing Mr. Mullis in his efforts to
         revive his state habeas review on grounds of incompetency to
         waive. .........................................................................................18

      6.   At the very least, OCW ineffectively represented Mr. Mullis in
         relation to his competency to waive state habeas review. ..............20

   B.   OCW Abandoned Mr. Mullis by Continuing to Hold Themselves Out
      as State Habeas Counsel after October 12, 2011, while Taking No
      Steps toward Preparing a Writ Application. .......................................21

   C.   Dr. Fuller's Report Does Not Negate any Abandonment or
      Ineffectiveness by Counsel................................................................23

III.  Mr. Mullis's Competency and the Voluntariness of his Waiver ..........24

   A.   Due to Their Conflict of Interest, OCW Improperly Constrained Dr.
      Fuller's Evaluation............................................................................25

1.   Lack of information about extent of sexual abuse and the role it played in Mr. Mullis's waiver decision ..........................................26

2.   Lack of information from trial mental health experts ...................28

3.   Lack of information about Mr. Mullis's recent fluctuations towards waiver and the unnecessarily confined scope of competency evaluation .........................................................................................28

4.   Failure to consider whether waiver was voluntary ........................30

5.   Legal insufficiency of Dr. Fuller's report ......................................31

B.   The CCA Was Not Justified in Relying on Mr. Mullis's September 13, 2012 Letter When It Denied His Efforts to Reinvigorate Habeas Review. ....................................................................................................32

IV.   Need For Further Fact Finding ............................................................34

# TABLE OF AUTHORITIES

**Federal Cases**

*Bouchillon v. Collins,*
   907 F.2d 589 (5th Cir. 1990) ............................................................ 14

*Bundy v. Dugger,*
   816 F.2d 564 (11th Cir. 1987) .......................................................... 13

*Coleman v. Thompson,*
   501 U.S. 722 (1991) ...................................................................... 1, 2

*Day v. McDonough,*
   547 U.S. 198 (2006) ......................................................................... 2

*Dretke v. Haley,*
   541 U.S. 386 (2004) ....................................................................... 35

*Edwards v. Carpenter,*
   529 U.S. 446 (2000) ......................................................................... 5

*Godinez v. Moran,*
   509 U.S. 389 (1993) ....................................................................... 31

*Hatten v. Quarterman,*
   570 F.3d 595 (5th Cir. 2009) ............................................................. 4

*Indiana v. Edwards,*
   554 U.S. 164 (2008) ....................................................................... 33

*Jenkins v. Anderson,*
   447 US. 231 (1980) ........................................................................ 34

*Manning v. Foster,*
   224 F.3d 1129 (9th Cir. 2000) ........................................................ 4-5

*Maples v. Thomas,*
   565 U.S. 266 (2012) ........................................................ 4, 5, 6, 22-23

*Martinez v. Ryan*,
    566 U.S. 1 (2012) ............................................................................... 4

*Mata v. Johnson*,
    210 F.3d 324 328 (5th Cir. 2000) .................................................... 32

*Profitt v. Waldron*,
    831 F.2d 1245–49 (5th Cir. 1987) ...................................... 15, 17, 18

*Roberts v. Dretke*,
    381 F.3d 491 (5th Cir. 2004) ............................................................ 15

*Thomas v. Attorney General, Florida*,
    795 F.3d 1286–94 (11th Cir. 2015) ............................................... 6-7

*Thompson v. Wainwright*,
    787 F.2d 1447 (11th Cir. 1986) ....................................................... 13

*United States v. Boigegrain*,
    155 F.3d 1181 (10th Cir. 1998) ....................................................... 13

*United States v. Ives*,
    574 F.2d 1002–07 (9th Cir. 1978) ............................................... 33-34

*United States v. Ruston*,
    565 F.3d 892 (5th Cir. 2009) ........................................................... 34

*United States v. Taylor*,
    437 F.2d 371 (4th Cir. 1971) ........................................................... 34

*Wilkins v. Stephens*,
    560 Fed. Appx. 299 (5th Cir. 2014) .................................................. 6

*Young v. Westbrooks*,
    702 Fed. Appx. 255 (6th Cir. 2017) .................................................. 6

**State Cases**

*Kniatt v. State*,
    206 S.W.3d 657 (Tex. Crim. App. 2006) ......................................... 31

**State Statutes**

Art. 11.071 § 4 ................................................................................... 1, 3

Art. 11.071 § 4A ............................................................... 2, 18, 19, 34

Art. 11.071 § 5 ...................................................................................... 1

Petitioner Travis James Mullis, through undersigned counsel, hereby submits this Supplemental Brief pursuant to this Court's Order dated March 16, 2021. ECF No. 163 (Order).

## ARGUMENT

## I.     PROCEDURAL DEFAULT AND PROCEDURAL LAW

The first issue on which the Court requested supplemental briefing is identifying the relevant "event" that "results in a federal procedural bar of the specific claims in Mullis's federal habeas petition." *Id.* at 11.

As the Court summarized, the Respondent argues that "Texas' bar on successive habeas applications is the procedural law that bars federal review." *Id.* (referencing Texas Code of Criminal Procedure Article 11.071 § 5). But Mr. Mullis never filed a successive habeas application in state court, meaning that there is no decision from the Texas courts relying on Article 11.071 § 5 to bar Mr. Mullis from obtaining relief. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (federal habeas review is barred when state court denied relief "*pursuant to an independent and adequate state procedural rule* . . . unless the prisoner can demonstrate cause for the default and actual prejudice. . . [or] a fundamental miscarriage of justice"). Rather, the CCA denied relief based on: (i) "applicant's failure to timely file an application" under Art. 11.071 § 4, *see see* TM-041 (9/12/12 Opinion at 3); and (ii) his failure "to establish good cause for failing to

1

file a habeas application on or before the statutorily applicable due date" under Article 11.071 § 4A, *see* TM-063 (12/12/12 Opinion at 4).

To the extent the Respondent is arguing that Mr. Mullis cannot avail himself of the equitable exceptions to procedural default because the CCA barred his *application*, rather than any specific *claims*, the Respondent is mistaken. Although state prisoners are generally required to exhaust their constitutional claims in state court before obtaining federal habeas review of those claims, exhaustion is not a jurisdictional requirement, but rather a rule of comity. *See, e.g.*, *Day v. McDonough*, 547 U.S. 198, 205 (2006). As the *Coleman* Court explained: "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." 501 U.S. at 731. Accordingly, it is irrelevant whether the state court's procedural bar precluded state court review of a particular claim or of any and all claims. Either way, the state court was denied the "first opportunity" to address the claim(s), and federal habeas review is precluded absent a showing of inadequacy or cause and prejudice. Mr. Mullis shows both here.

First, the CCA's September 12, 2012 and December 12, 2012 decisions relied upon rules inadequate to foreclose review by this Court because the rules were neither "clear" nor "firmly established and regularly followed" when applied to the circumstances of this case. *See* Reply Brief at 7–12. The September 12

2

decision was inadequate because the Article 11.071 § 4(a) filing deadline was neither "clear" nor "firmly established and regularly followed" as applied here. *Id*. at 10-12. The State concedes as much, arguing that confusion in determining the state habeas filing was reasonable given the "difficult and novel" and "unusual" situation" presented "where the law is not succinct and straightforward;" and there was "uncertainty with respect to the appropriate litigation timelines." Answer at 76–77, 81.  The December 12 decision was inadequate because Mr. Mullis's case was one of only three capital cases in which the CCA has refused to find "good cause" to excuse an untimely application, meaning the CCA enforced a deadline against Mr. Mullis that it does not "regularly follow" in similar cases. *See* Reply Brief at 7–10.  Second, as detailed in Petitioner's prior pleadings and below, Mr. Mullis can overcome procedural default on the basis of state habeas counsel's abandonment and/or ineffective assistance. *See, e.g.*, *id.* at 12–41; *see also infra*.

## II.   ABANDONMENT OR INEFFECTIVE REPRESENTATION BY HABEAS COUNSEL

The second issue on which the Court requested supplemental briefing is whether state habeas counsel's[1] representation "would be classified as

---

[1] In its Order, this Court observes that "Mullis does not extensively challenge his decision not to file a direct appeal." Order at 14 n.8. Petitioner does not include any additional briefing on direct appeal counsel's ineffective failure to challenge waiver in this pleading because it is not relevant to whether Mr. Mullis may obtain federal review of his defaulted claims. However, Petitioner fully briefs the issue in Claim XVI of his § 2254 Petition. *See* ECF No. 94 at 218–25.

abandonment or negligence." Order at 13. As this Court noted, "[u]nder Supreme Court precedent, the representation provided by a state habeas attorney may provide for federal review of otherwise-barred claims in two circumstances"—a showing of deficient habeas representation under *Martinez v. Ryan*, 566 U.S. 1 (2012) or attorney abandonment under *Maples v. Thomas*, 565 U.S. 266 (2012). Although to establish cause Petitioner need only prove either ineffectiveness or abandonment, Mr. Mullis can prove both.

Because Mr. Mullis extensively briefed his arguments under *Martinez* in his Reply, he focuses primarily on counsel's abandonment here.

> **A.    OCW Abandoned Mr. Mullis by Failing to Protect His Interests in Competency Proceedings, which Ultimately Precluded Mr. Mullis from Filing a Timely Writ Petition.**

Ordinarily, "the attorney is the prisoner's agent, and under 'well-settled principles of agency law,' the principal bears the risk of negligent conduct on the part of his agent." *Maples*, 565 U.S. at 280. However, the Supreme Court has explained that "[a] markedly different situation is presented[ ] . . . when an attorney abandons his client without notice, and thereby occasions the default" or "as a result of a conflict of interest, the attorney 'cease[s] to be [petitioner's] agent.'" *Id.* at 281–82 & n.7 (citing *Holland v. Florida*, 560 U.S. 631, 649 (2010) and *Jamison v. Lockhart*, 975 F.2d 1377, 1380 (8th Cir. 1992)); *see also Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009); *Manning v. Foster*, 224 F.3d 1129, 1134 (9th

Cir. 2000); *Edwards v. Carpenter*, 529 U.S. 446, 458 (2000) (Breyer, J.,

concurring) (recognizing "cause" independent of a claim of ineffective assistance).

As the Court in *Maples* noted: "the authority of an agent terminates if, without

knowledge of the principal, he acquires adverse interests or if he is otherwise

guilty of a serious breach of loyalty to the principal," such as when the principal

"act[s] for another in an undertaking which has a substantial tendency to cause him

to disregard his duty to serve his principal with only his principal's purposes in

mind." 565 U.S. at 284 (citing to Restatement (Second) of Agency § 112 and §

394, Comment a 2 (1957)).

     "Having severed the principal-agent relationship, an attorney [who is

conflicted or abandons his client] no longer acts, or fails to act, as the client's

representative." *Maples*, 565 U.S. at 281. "Common sense dictates that a litigant

cannot be held constructively responsible for the conduct of an attorney who is not

operating as his agent in any meaningful sense of that word." *Id.* at 282 (quoting

*Holland*, 560 U.S. 631, 659 (Alito, J., concurring)). Therefore, "[u]nder agency

principles, a client cannot be charged with the acts or omissions of an attorney who

has abandoned him. Nor can a client be faulted for failing to act on his own behalf

when he lacks reason to believe his attorneys of record, in fact, are not representing

him." *Id*. at 283; *see also id.* at 284.

     Here, state habeas counsel—the Office of Capital Writs, or "OCW"—

abandoned their role as Mr. Mullis's adversarial representative or agent with

respect to competency by:

- encouraging him in his efforts to waive state habeas review, despite being on notice that any decision to waive was likely the result of irrational thinking;

- prematurely suspending all investigation of his case simply because it appeared that he might waive;

- agreeing with Mr. Mullis not to challenge the findings of the court-appointed competency expert, Dr. Victor Scarano, without any way of knowing whether Dr. Scarano's conclusions would be reliable;

- failing to take measures necessary to ensure that Dr. Scarano's conclusions would be accurate;

- abiding by their agreement not to challenge Dr. Scarano's findings, despite knowing that his report inaccurately assessed Mr. Mullis's mental health background and omitted information critical to his competence to waive; and

- continued representing Mr. Mullis in his effort to reinstate his state habeas proceedings on the ground that he had not been competent to waive, even though OCW had been informed by an ethics expert that such representation constituted a conflict of interest.

Together, these acts and omissions were far more egregious than those

typically seen in cases in which courts have refused to find abandonment—such as

where counsel simply miscalculated a filing deadline or failed to raise all of the

issues a petitioner wished to argue. *Cf. Wilkins v. Stephens*, 560 Fed. Appx. 299

(5th Cir. 2014); *Young v. Westbrooks*, 702 Fed. Appx. 255 (6th Cir. 2017). Here,

counsel's conduct amounted to "a serious breach of loyalty to the principal," and

thus constitutes abandonment. *Maples*, 565 U.S. at 284; *see also Thomas v.*

6

*Attorney General, Florida*, 795 F.3d 1286, 1291–94 (11th Cir. 2015) (finding abandonment in the context of equitable tolling and noting that "divide loyalty" could fall under "the umbrella of abandonment, or instead amount to independent reasons that equitable tolling may be appropriate in this particular case").

1. *OCW prematurely drafted and filed a waiver on Petitioner's behalf.*

State habeas counsel affirmatively assisted Mr. Mullis in waiving state habeas review despite his fluctuating and inconsistent desire to do so. Less than six months after their appointment on March 23, 2011, and with full knowledge of Mr. Mullis's inconsistent stance on whether he wanted to waive, state habeas counsel drafted, had Mr. Mullis sign (in the presence of a notary), and immediately filed a motion and affidavit seeking to waive state habeas review. *See* TM-001-008 (Motion to Waive Post-Conviction Habeas Review with attached affidavit, filed 9/15/11).

Mr. Mullis had repeatedly gone back and forth with regard to waiving— right up until this waiver was signed and filed. In the weeks following counsel's appointment, Mr. Mullis was "cooperative" and "enthusiastic about the litigation [OCW] was pursuing." *See* TM-138 (Declaration of Brad D. Levenson dated 1/10/17 at ¶ 3). Indeed, although Mr. Mullis explained to state habeas counsel that he was unable to predict the dysfunctional cycles of his Bipolar Disorder and hinted at his concern that he might be subject to assault in general population, he

7

explicitly expressed a willingness to assist counsel in investigating and presenting

his case. *See* TM-065 (Mullis letter to Levenson 4/12/11)  ("I will do everything in

my power to help assist you and your office in helping me. I won't give up on

myself or ya'll.").

One week later, on April 19, 2011, Mr. Mullis first stated his desire to waive

post-conviction review, based on his fear of being violently attacked in general

population. Even then, Mr. Mullis requested a visit from counsel before May 8,

2011, to discuss his options. *See* TM-066 (Mullis letter to Levenson dated

4/19/11). That attorney visit took place on May 4, 2011, and after that visit Mr.

Mullis backed off his decision to waive, stating "I will give you a chance to work it

and see where we can get." TM-070 (Mullis letter to Levenson, 5/4/11).

The following week, Mr. Mullis wrote to counsel expressing his concern that

an appeal would just draw attention to his case, making him even more of a target

for assault in general population (TM-072, Mullis letter to Levenson, 5/11/11), and

instructing counsel he wanted to waive (TM-074, Mullis letter to Levenson,

5/12/11). One week later, after the trial court permitted Mr. Mullis to proceed pro

se on his direct appeal, he backed off the immediacy of his desire to waive state

post-conviction review, writing to counsel that he would give them two weeks to

continue working on his case before he made a final decision. TM-075 (Mullis

letter to Levenson, 5/20/11). As OCW attorney Brad Levenson recounts, Mr.

8

Mullis was "focused on his legal claims and repeatedly asked if he had any good issues" and "told OCW he might even file his own direct appeal brief." TM-138-139 (Levenson Dec. ¶ 5).

From May 20, 2011 until September 14, 2011, when state habeas counsel physically presented Mr. Mullis with the waiver motion and affidavit they had drafted, he remained on the fence about waiving. In fact, during that time period Mr. Mullis acted like a person who did *not* want to waive. According to OCW attorney Robert Romig, Mr. Mullis expressed an interest in his case, requested to read the reporter's record, inquired about the clerk's record and various motions he had filed that were part of that record, and suggested that he might file a pro se direct appeal brief. Although Mr. Mullis continued to threaten that he "may pull the plug," he also told various OCW employees, including Mr. Romig and investigator Elizabeth Garza, that he was happy for them to still investigate and appreciated them working on his case.

Even on August 24, 2011, in his final communication with counsel before being presented with the motion to waive, Mr. Mullis remained indecisive. In that letter, he complained that he had not seen counsel in a month, requested a visit, and stated that he had questions before making any final decision. TM-076 (Mullis letter to Levenson, 8/24/11). On September 14, 2011, Mr. Levenson accommodated Mr. Mullis's request. It is unclear what, if any, questions Mr.

Mullis asked counsel that day, but is it clear that counsel presented Mullis with the motion to waive state habeas review and a supporting affidavit that counsel had drafted, and had Mr. Mullis sign those documents in the presence of a notary. According to Mr. Levenson, Mr. Mullis proclaimed that he was sure he wanted to waive and asked that the waiver motion be filed by the following week. Wasting no time, state habeas counsel filed the signed motion and accompanying affidavit the very next day, September 15, 2011.

State habeas counsel's conduct violated prevailing professional guidelines and practices for competent capital defense counsel at that time. Those guidelines require that counsel not simply "acquiesce" to his death-sentenced client's wishes to relinquish available appeals given this "usually reflect[s] the distorting effects of overwhelming feelings of guilt and despair rather than a rational decision in favor of a state-assisted suicide." *See* American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Commentary to Guideline 10.5, 31 Hofstra L. Rev. 913, 1009–10 (2003); *see also* State Bar of Texas, Guidelines and Standards for Texas Capital Counsel, at 32 (Apr. 21, 2006) (establishing nearly identical standards). As explained by Professor Eric Freedman and Texas attorney William Han, "[a]s a matter of universal professional practice among competent capital defense counsel, any serious suggestion by a client that he wishes to drop his appeals is a red flag indicating a

10

need to investigate the client's mental status scrupulously—not a direction to be routinely followed in the same way that a lawyer might, for example follow a client's direction to seek postponement of a trial date." TM-099 (Affidavit of Professor Eric M. Freedman dated 11/28/12 at ¶ 29; (Exhibit H to Original Writ)); *see also* TM-110, (Affidavit of William S. Harris at ¶¶ 6-7 (similar) (Exhibit I to Original Writ)).

In affirmatively drafting and presenting Mr. Mullis with a motion to waive state habeas review, thereby facilitating and encouraging their client's intermittently-expressed desire to waive, state habeas counsel abandoned their role as Mr. Mullis's advocate and violated their duties and obligations as capital counsel. State habeas counsel's actions are particularly concerning because during a four-month period prior to September 2011, Mr. Mullis was far from certain that he wanted to waive and in fact had repeatedly vacillated on the question.

    2.  *OCW prematurely suspended all investigation of Mr. Mullis's case simply because it appeared that he might waive.*

Mr. Levenson has admitted that Mr. Mullis was always interested in pursuing investigation pertaining to his case and never placed any limitations on OCW's investigation of the guilt or penalty phase of his case. TM-112 (Declaration of Jessica Johnson dated 3/16/15 at ¶¶ 3–4). Nevertheless, as Mr. Levenson later told the trial court, OCW consciously curtailed their investigation of his case, "suspend[ing]" an important investigative trip, "when it looked like

11

Mr. Mullis was affirmatively going to waive." TM-016 (Transcript of Hearing on Motion to Waive Post-Conviction Hearing Review, 10/11/11 at 8). Moreover, although not clearly tied to Mr. Mullis's overtures at waiving, OCW only took "initial steps" to review trial counsel's files (which were in their possession) and conducted nothing more than preliminary interviews of a handful of Mullis' family members. TM-055 (4A Motion at 12).

After September 15, 2011, when OCW filed the motion to waive on Mr. Mullis's behalf, they ceased investigating his case entirely, even though the trial court did not rule on the motion until nearly one month later, and despite OCW's recognition that Mr. Mullis's competency was "questionable." *See* TM-055-056 (4A Motion at 12–13) (acknowledging cessation of investigation, despite "substantial" work remaining); TM-140 (Levenson Decl. ¶ 10) (Mr. Levenson admitting that he had real concerns about Mr. Mullis's competency, that he "felt [Mullis's] competency was questionable," and believed "[his] thinking was obscured by his fear of general population and possibly depression"). Notably, it does not appear that OCW ever informed Mr. Mullis that they had curtailed or ceased investigating his case, even though he had repeatedly requested that they continue with their investigative efforts.

The Respondent argues that OCW's cessation of investigation was reasonable given Mr. Mullis persistent waiver. Answer at 75. However as noted

*supra*, at this point in time, Mr. Mullis was neither consistent nor persistent in his desire to waive. In any event, defense counsel cannot "blindly follow" defendant's instructions concerning his defense, especially where counsel suspects defendant's judgment is impaired by "mental difficulties." *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986); *see also United States v. Boigegrain*, 155 F.3d 1181, 1187 (10th Cir. 1998) ("While the Sixth Amendment demands that counsel to criminal defendants act as their advocates, the rule is not absolute in any sense. . . . Requiring a lawyer to argue at the direction of one who may be mentally incompetent . . . serves neither the individual client nor the truth-seeking process."); *Bundy v. Dugger*, 816 F.2d 564, 567 (11th Cir. 1987) ("If defense counsel suspects that the defendant is unable to consult with him 'with a reasonable degree of rational understanding,' he cannot blindly accept his client's demand that his competency not be challenged.") (internal citation omitted).

If anything, the client's expression of a potential desire to waive heightened the need for counsel to undertake a thorough investigation into his mental health. *See, e.g.*, ABA Guidelines Commentary to Guideline 10.5 (Relationship with the Client), 31 Hofstra L. Rev. at 1010 (requiring counsel to "be familiar enough with the client's mental condition to make a reasoned decision—fully documented, for the benefit of actors at later stages of the case—whether to assert the position that the client is not competent to waive further proceedings"); Guideline 10.15.1

13

(Duties of Post-Conviction Counsel), 31 Hofstra L. Rev. at 1080 (requiring that counsel to "continually monitor the client's mental, physical and emotional condition for effects on the client's legal position"). Counsel had no excuse for failing to comply with these directives.

> 3. *OCW agreed with Mr. Mullis not to challenge the findings of the court-appointed expert, without any way of knowing whether the expert's conclusion would be reliable, and without taking all necessary steps to ensure reliability.*

As noted above, Mr. Levenson believed that Mr. Mullis's competency was "questionable," and Mr. Mullis had warned OCW during a period of rational thought that he may try to resist assistance of counsel due to his mental health issues. *See supra*. Nevertheless, after encouraging Mr. Mullis to file a motion to waive habeas review, OCW agreed with him that if he was "able to convince" the court-appointed expert that he was competent, OCW would not challenge the expert's conclusions. *See* TM-113 (Johnson Decl. ¶ 5).

Agreeing to such an arrangement before counsel could have any knowledge of the content or findings of the court-appointed expert's report was improper. A criminal defendant has a right to counsel in competency proceedings, and counsel has a duty to perform adversarial testing of a competency determination in order for the court to make a reliable and accurate judgment. *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990); *see also* ABA STANDARD 7-4.2(c) (defense counsel has a duty to "make known to the court and to the prosecutor those facts

14

known to counsel which raise the good faith doubt of competence"). And although courts often find in retrospect that a defense attorney was entitled to rely upon the opinion of a court-appointed expert, these cases do not establish *a priori* that every court-appointed expert will render a reliable opinion. *See, e.g.*, *Roberts v. Dretke*, 381 F.3d 491, 499 (5th Cir. 2004) ("[S]eeking the aid of a court-appointed psychiatrist, in some circumstances, does not excuse the absence of further investigation."); *Profitt v. Waldron*, 831 F.2d 1245, 1248–49 (5th Cir. 1987) (counsel deficient for relying on opinion of court-appointed psychiatrist to forgo insanity defense when counsel knew defendant had escaped from a mental institution).

Furthermore, even after having bound themselves to the court-appointed expert's opinion, OCW did nothing to ensure that evaluation was adequately informed, subject to adversarial testing, or accurate. As discussed in Petitioner's Reply, counsel failed to undertake any investigation into Mr. Mullis's mental health in advance of the hearing. Additionally, counsel failed to even provide the court-appointed expert, Dr. Scarano, with relevant documents OCW had received from trial counsel. Among these records were hundreds of pages of Mr. Mullis's childhood medical records documenting his repeated diagnoses for various mental disorders (including Post-Traumatic Stress Disorder, Bipolar Disorder, and Major Depression); his three psychiatric hospitalizations for suicidal ideation; and the

15

files and notes of trial psychiatrist Dr. Richard Dudley and trial psychologist Dr.

Matthew Mendel. *See* TM-055 (4A Motion at 12); *see also* TM-113 (Johnson

Decl. ¶ 6).

> 4. *OCW abided by their improper agreement not to challenge Dr.*
>    *Scarano's findings, despite knowing that his report inaccurately*
>    *assessed Mr. Mullis's mental health background and omitted*
>    *information critical to his competence to waive.*

Upon receiving Dr. Scarano's report, Mr. Levenson noticed various areas of

concern to him, including Dr. Scarano's failure to diagnose Mr. Mullis with any

Axis I or II disorders, in sharp contrast with his well-documented mental health

history, and Dr. Scarano's failure to consider how Mr. Mullis's very real fear of

being raped in general population might impact his competency to waive. TM-140

(Levenson Decl. ¶ 11); *see also* TM-113 (Johnson Decl. ¶¶ 7-8). Mr. Levenson

was so concerned about these discrepancies and omissions that he called Dr.

Scarano to discuss. However, Dr. Scarano dismissed Levenson's concerns, stating

that his findings were supported based solely on his observations of Mr. Mullis.

TM-140 (Levenson Decl. ¶ 11_; TM- 113 (Johnson Decl. ¶ 8). The Respondent's

assertion that Dr. Scarano was aware of all the relevant information (but simply

found Mr. Mullis's prior diagnoses to be incorrect, not substantial enough to

impact his decision, or not then-present), conflicts with what Dr. Scarano

reportedly told Levenson and is unsupported by the record. *See* Answer at 70.

In spite of counsel's concerns about Mr. Mullis's competency to waive and

the validity of Dr. Scarano's report—particularly given Scarano's admission that he discounted or ignored Mullis's extensive prior mental health history—counsel did not in any way challenge Dr. Scarano's conclusions or bring his concerns to the attention of the trial court. Instead, at the competency hearing, Mr. Levenson stipulated to the admissibility of Dr. Scarano's report, waived any cross examination of him, and made no argument concerning Scarano's evaluation or finding that Mr. Mullis was competent. TM-014-015, TM-018-019 (Transcript of Hearing on Motion to Waive Post-Conviction Hearing Review, 10/11/11 at 6–7, 10–11).

Counsel later explained these failures by reference to their pre-arranged deal with Mr. Mullis not to challenge the court-appointed expert if Mullis was able to "convince" the expert he was competent. *See* TM-113 (Johnson Decl. ¶ 9) (Levenson stated that once Mr. Mullis passed the evaluation, he believed it was his turn to uphold his end of the bargain and not fight him on competency); *Id.* ¶ 10 (attorney Romig said "OCW was not advocating in the competency proceedings"). However, as explained above, this agreement was itself a breach of counsel's duties to Mr. Mullis and in no way excuses their failure to notify the court of vital background information conflicting with, or omitted from, Dr. Scarano's report, which was highly relevant to the court's ultimate determination.

In defending OCW's conduct at the competency hearing, the Respondent

17

argues that OCW was "entitled to rely on Scarano's expert opinion, like any attorney may rely on an expert's opinion." Answer at 68. But the Fifth Circuit has expressly rejected the argument that "obtaining the opinion of a court-appointed psychiatrist excuses" counsel from any further duties, regardless of the circumstances. *Profitt*, 831 F.2d at 1249. Rather, the court held that counsel's reasonableness must be assessed under the circumstances of a given case. Here, the circumstances included: OCW having prior knowledge of Mr. Mullis's mental health issues, failing to provide Dr. Scarano with relevant documents, and harboring specific concerns about the accuracy of Dr. Scarano's report.

> 5. *OCW was conflicted from representing Mr. Mullis in his efforts to revive his state habeas review on grounds of incompetency to waive.*

On August 20, 2012, Petitioner sent letters to OCW counsel, the trial court, and the District Attorney requesting that his direct appeal and state habeas proceedings be reinstated and that the trial court appoint counsel. A few weeks later, Mr. Levenson visited Mr. Mullis and told him that OCW would file a motion under Article 11.071 § 4A ("4A Motion"), which allows for the filing of an untimely writ upon a showing of "good cause."

Given that he was sentenced to death, Mr. Mullis was likely to succeed on a properly pled and supported motion under § 4A. *See* Reply Brief at 7-10 (explaining that the CCA regularly grants such motions in capital cases and

providing numerous examples). But, as advised by legal ethics expert Monroe Freedman, OCW was in no position to raise issues that provided the most likely avenue for relief under § 4A, all of which involved OCW's own ineffectiveness. TM-114 (Johnson Decl. ¶ 11); *see also* Reply Brief at 7-10.

OCW suggests that despite this conflict, they complied with their ethical obligations by attempting to secure unconflicted counsel before they decided to file the 4A Motion themselves, as the expert they consulted advised them to do. TM-114 (Johnson Decl. ¶ 11). However, what actual efforts OCW made to obtain unconflicted counsel are unclear from the existing record. Moreover, there is no indication from the record that OCW told Mr. Mullis about this conflict or sought his waiver of any conflict, when they informed him that they would file a 4A Motion on his behalf. *See* TM-141 (Levenson Decl. ¶ 15) (recounting his conversation with Mullis about OCW filing a 4A Motion and making no mention of OCW's conflict).

Non-conflicted counsel could have filed a motion pointing to all of the factors described in Petitioner's prior pleadings and above to show that OCW was deficient in failing to protect Mr. Mullis's right to state habeas review. Instead, OCW attempted to show good cause by placing the blame squarely on Mr. Mullis, rather than on themselves. Specifically, they argued that good cause was satisfied based entirely on the allegation that *Mr. Mullis* concealed his depression, suicidal

19

ideation, and fear of violence in general population from Dr. Scarano in October 2011, thereby leading to an erroneous finding of competency. OCW makes no mention of *their own* failure to communicate this information to Dr. Scarano or the court, despite being well aware of Mr. Mullis's motivation for waiving at the time of the evaluation. *See supra.*

Despite the leniency typically granted in capital cases, the CCA denied OCW's motion.

### 6. *At the very least, OCW ineffectively represented Mr. Mullis in relation to his competency to waive state habeas review.*

Counsel's acts and omissions left Mr. Mullis, for all intents and purposes, without counsel for these vital competency proceedings and forced the court to make a ruling based on a finding of competence without access to relevant and accurate information. As such, their conduct is properly characterized as abandonment. At the very least, however, Petitioner has established that OCW was ineffective at the competency stage. *See* Reply Brief at 15–26. Additionally, through the reports of mental health experts filed in these federal proceedings, Petitioner has established that, had counsel performed effectively, there is a reasonable probability that Mr. Mullis would have been found incompetent to waive state habeas review and OCW would have had no excuse not to proceed with investigating his case and filing a timely writ application. *See id.* at 41–45.

20

**B.** **OCW Abandoned Mr. Mullis by Continuing to Hold Themselves Out as State Habeas Counsel after October 12, 2011, while Taking No Steps toward Preparing a Writ Application.**

As discussed in Petitioner's Reply, the trial court's October 12, 2011 order stated that OCW would remain counsel for all purposes except whether or not to file a state habeas application. Contrary to the Respondent's assertion otherwise, the court's order did not grant Mr. Mullis permission to proceed pro se, grant Mullis's motion to remove counsel, or somehow transform appointed state habeas counsel into standby counsel. Rather, the order explicitly authorized OCW to "continue to investigate and prosecute a post-conviction writ of habeas corpus on behalf of Mr. Mullis until the deadline for filing," while conditionally permitting Mr. Mullis to act pro se only as to the ultimate question of whether to "file the writ" that counsel prepared. October 12, 2011 Order; *see also* Reply Brief at 27–33. Professor Robert Schuwerk[2] agrees with Petitioner's interpretation of the court's order, explaining:

> [W]hile finding Mr. Mullis competent to waive his habeas rights and permitting him to proceed *pro se*, unlike the order it entered earlier with respect to appellate counsel, . . . did not explicitly discharge the OCW from its representation of Mr. Mullis. Instead, it permitted the OCW to proceed with a range of activities . . . Such activities were inconsistent with the OCW ceasing to be Mr. Mullis's habeas counsel. In my professional opinion therefore, the Court's order did not discharge OCW as counsel for Mr. Mullis.

---

[2] Robert Shuwerk is a Professor Emeritus at the University of Houston Law Center, co-author of the Handbook on Texas Lawyer and Judicial Ethics, and a long-time member of the committee on Texas Disciplinary Rules of Professional Conduct.

TM-153 (Declaration of Robert P. Schuwerk at 6). Professor Schuwerk concluded

that given the exchange between counsel and the court, which occurred in Mr.

Mullis's presence:

> [I]t seems clear that he would have believed that OCW would (i) review
> the trial transcripts once it was generated; (ii) follow up with any
> promising information that transcript revealed; (iii) complete other
> aspects of its investigation . . . not directly dependent on [the] transcript;
> (iv) develop and overall strategy, if not an actual completed draft of
> what it viewed as the optimal approach to any habeas petition it might
> file on his behalf; and (v) complete all of that work sufficiently before
> the deadline for waiving the filing of that writ to permit it to consult
> with Mr. Mullis about it beforehand.

TM-154.

In any event, OCW continued to refer to themselves as "counsel for Mr.

Mullis" in a February 14, 2012 filing to the court. *See* TM-033-038 (Unopposed

Motion for an Extension of Time to File Initial State Habeas Application, Feb. 14,

2012). Furthermore, although Mr. Mullis wrote letters to counsel directing them

not to file anything on his behalf absent instructions otherwise, he never indicated

that he wanted them to stop investigating his case or working up a writ application

that might be filed should he change his mind. OCW therefore had an obligation to

either investigate Mr. Mullis's case in preparation to file a state habeas petition or

make clear to Mr. Mullis that they were performing no work on his behalf. The

record does not reflect that they did either, which amounted to abandonment, just

as it did in *Maples*. *See Maples,* 565 U.S. 288–89 (petitioner abandoned where

22

counsel stopped working on his case, but petitioner received no "warning that he had better fend for himself" and had "no reason to suspect that he lacked counsel able and willing to represent him").

### C. Dr. Fuller's Report Does Not Negate any Abandonment or Ineffectiveness by Counsel.

In addition to seeking additional briefing on OCW's abandonment and ineffectiveness, the Court's Order asks whether Mr. Mullis's "waivers, particularly after Dr. [Michael] Fuller's report finding him competent, negate[] any abandonment or negligence by counsel." Order at 13.

As an initial matter, to the extent the Court is under the impression that Mr. Mullis executed a waiver *after* Dr. Fuller found him to be competent, Petitioner respectfully suggests that the Court has misapprehended the timing of events. The last communication in which Mr. Mullis asserted a desire to waive state habeas review is dated September 13, 2012. *See* TM-078-079 (Mullis letter to CCA dated 9/13/12 (forwarded by CCA to Judge Ellisor on 9/21/12)).  Dr. Fuller evaluated Mr. Mullis on November 1, 2012, and issued his report on November 8, 2012. *See* TM-080-091 (Dr. Fuller Report).

Furthermore, because of OCW's conflict when it came to filing a 4A Motion on Petitioner's behalf, Dr. Fuller—who was hired solely to provide a report in support of that 4A Motion—was provided with limited information and never told about Mr. Mullis's September 13, 2012 letter. *See* TM-157-159 (Declaration of Dr.

23

Michael A. Fuller ¶¶ 4, 9). Moreover, OCW unnecessarily restricted the scope of Dr. Fuller's evaluation, precluding him from presenting an accurate assessment of Mr. Mullis's fluctuating position toward waiver. *See infra*. Had Dr. Fuller been given all of the relevant information and been asked to conduct a more comprehensive evaluation of competency, he would have made clear that, due to his multiple psychiatric illnesses and traumatic background, Mr. Mullis's waivers—whether on September 13, 2012 or any other time—could not be deemed the product of a rational choice. *See infra*.

## III. MR. MULLIS'S COMPETENCY AND THE VOLUNTARINESS OF HIS WAIVER

The last issue on which the Court requested supplemental briefing relates to the report authored by Dr. Fuller on November 8, 2012 in support of OCW's 4A Motion. Petitioner did not include any substantive discussion of Dr. Fuller's report in his prior briefing because the CCA did not make any findings as to the legal sufficiency of Dr. Fuller's opinion in denying the 4A Motion. Rather, the CCA denied relief because "neither counsel s motion nor Fuller's report show that applicant was incompetent on August 22, 2012, when he tried to reinstate his appeals or on September 13, 2012, when be again re-urged his desire to waive review of his conviction." TM-063 (12/12/12 Order at 4).

Furthermore, although this Court suggests otherwise, *see* Order at 15, Petitioner has never relied on Dr. Fuller's report to establish in these proceedings

24

that Mr. Mullis was incompetent to waive state habeas review. Rather, Petitioner relies on the report of Dr. Victoria Reynolds, supported by the report of Dr. Richard Dudley, for this purpose. *See*, *e.g.*, Reply at 41-45. In fact, Petitioner finds Dr. Fuller's report defective in several respects, as detailed below. The report in no way establishes that Mr. Mullis was in fact competent to waive his state habeas proceedings at any given time, or that his waiver was voluntary. Likewise, neither Dr. Fuller's report nor the surrounding circumstances justified the CCA's reliance on Mr. Mullis's September 13, 2012 letter in dismissing the 4A Motion.

### A. Due to Their Conflict of Interest, OCW Improperly Constrained Dr. Fuller's Evaluation.

Dr. Fuller was retained by OCW after Mr. Mullis contacted counsel in August 2012 expressing a desire to reinstate his habeas proceedings, and the report obtained from Dr. Fuller was limited to supporting OCW's contrived excuse for their own failures in the 2011 competency proceedings. *See supra*. As a result, OCW largely limited Dr. Fuller to the same inadequate records reviewed by Dr. Scarano and did not ask him to consider any shortcomings in Dr. Scarano's evaluation or findings, which OCW had fully endorsed to the trial court in 2011. *See* TM-159, Fuller Dec. ¶ 7; Reply at 40-41. Furthermore, to the best of his recollection, Dr. Fuller was never told that that Mr. Mullis had again asserted his desire to waive as recently as September 13, 2012—just weeks before Dr. Fuller's evaluation. TM-157 (Fuller Dec. ¶ 4). And Dr. Fuller is certain that he was only

asked to opine on Mr. Mullis's competence to waive on two precise dates: (i) September 23, 2011, the date of Dr. Scarano's examination; and (ii) November 1, 2012, the date of Dr. Fuller's examination. Finally, counsel limited Dr. Fuller's opinion to competency, without asking him to consider whether Mr. Mullis's mental illness precluded him from voluntarily waiving habeas review.

Under these circumstances, it is unsurprising that Dr. Fuller's report contains no reference to factors in Mr. Mullis's history that were highly relevant to his ability to rationally and voluntarily choose to waive state habeas review.

### i.   *Lack of information about extent of sexual abuse and the role it played in Mr. Mullis's waiver decision*

Because OCW never investigated Mr. Mullis's mental health background and limited Dr. Fuller to a narrow universe of information, Dr. Fuller was forced to rely primarily on the client's self-reporting as the basis for his opinions. Due to this limitation, Dr. Fuller failed to grasp the extensive and brutal nature of the sexual abuse Mr. Mullis suffered as a child, or the lifelong trauma he has experienced from that abuse. *See* TM-083 (Fuller Report at 4) (summarizing the abuse in a single sentence, which reads: "His adoptive father was convicted of sexually abusing him and sent to prison when Mr. Mullis was six years of age."). As a result, Dr. Fuller, like Dr. Scarano, failed to account for the powerful influence that Mr. Mullis's history of sexual abuse had on his decision to waive his appeals. *See* TM-116 (Addendum to Psychological Report of Trauma (4/29/15) at 2)

("Reynolds Add."). Indeed, Dr. Fuller did not make *any* mention of Mr. Mullis's fear of being sexually assaulted in general population, even though Mr. Mullis had repeatedly explained to Mr. Levenson that this was his primary motivation for waiving his appeals. *See* TM-139 (Levenson Decl. ¶ 7).

By contrast, Dr. Reynolds—who reviewed extensive records and conducted a thorough examination of Mr. Mullis—explained that "the specific terror of enduring another rape is often the driving force" behind Mr. Mullis's "self-defeating, destructive, and suicidal behaviors," including his desire to waive. TM-119 (Reynolds Add. at 5). She also opined that Mr. Mullis's fear of being sexually assaulted in general population could have triggered the re-experiencing aspect of his PTSD, which would create extreme anxiety, panic, and irrational avoidance behavior on Mr. Mullis's part. *Id.* at 4. As Dr. Reynold explained, for victims of sexual abuse, "the pain and loss of control engendered in this form of victimization is so distressing to them that they will die before they will 'allow' such a thing to happen to them again." *Id.* This was the case for Mr. Mullis, where his "fear of being raped again in his lifetime trump[ed] his fear of death." *Id.* at 5.

Dr. Reynolds concluded based on her record review and evaluation that Mr. Mullis's "dysregulated behavior and state of mind related to his appeals" are manifestations of his "trauma-related adaptations and symptoms." TM-133 (Addendum to Psychological Report of Trauma (11/8/16) ¶ 8). Dr. Fuller may well

have come to these same conclusions had he been given all relevant documentation and information.

### 1. *Lack of information from trial mental health experts*

Dr. Fuller was also denied the opinions of other mental health experts who had met with Mr. Mullis on multiple occasions prior to his trial, and later offered perspectives that shed important light on how Mr. Mullis's major psychiatric illnesses affected his competency. Had OCW interviewed and obtained an opinion from trial psychologist Dr. Michael Mendel, for example, Dr. Fuller could have learned that Mr. Mullis's reactive attachment disorder—which stemmed from his history of trauma, abuse and abandonment—substantially impaired his ability to trust counsel, and thus impacted his capacity to make a rational choice with respect to continuing his appeals. TM-092-093 (11/16/12 Mendel Aff. ¶¶ 5-6).  Similarly, psychiatrist Dr. Dudley would have told OCW that Mr. Mullis's rapid cycling bi-polar disorder and other major psychiatric difficulties, each of which interacts with and exacerbates the others, "result in impaired decisionmaking that is the result of his broad-based instability and severe mood reactivity." TM-123 (Dudley Report ¶¶ 24-25).

### 2. *Lack of information about Mr. Mullis's recent fluctuations towards waiver and the unnecessarily confined scope of competency evaluation*

In their 4A Motion, OCW mischaracterized Mr. Mullis as having unswervingly expressed a desire to waive between March 2011 and August 2012,

and then suddenly having an unqualified "change of heart." *See* TM-045 (4A Motion at 2) ("From the beginning of [OCW's] representation, Mullis . . . communicated to OCW his desire to waive his habeas corpus rights."); *id.* at 3 (describing Mr. Mullis's August 20, 2012 letters to the courts requesting that his appeals be reinstated as a "sharp contrast to the position he had taken since the beginning of OCW's representation to his case"). In fact, as Mr. Levenson later acknowledged, "[t]hroughout [OCW's] representation," Mr. Mullis "went back and forth between being hopeful and enthusiastic about his litigation and wanting to waive." TM-142 (Levenson Decl. ¶ 17); *see also id.* ("It was a roller coaster ride that went up and down with his mental state. His emotionally instability was apparent.").

Despite being well aware of Mr. Mullis's volatile attitude toward waiver, counsel asked Dr. Fuller to limit his evaluation to Mr. Mullis's competency to waive on the two dates on which he was examined by Dr. Scarano and Dr. Fuller. *See* TM-158 (Fuller Decl. ¶¶ 5-6). And critically, OCW did not make Dr. Fuller aware of the fact that Mr. Mullis had again expressed a desire to waive habeas review just weeks prior to Dr. Fuller's examination.

As a result of this myopic review, Dr. Fuller concluded that, although his mental health issues rendered Mr. Mullis incompetent as of his October 2011 waiver, he had since "learned to cope effectively with being on death row" and "is

presently well adapted to his environment." TM-088-089 (Fuller Report at 9-10).

Dr. Fuller thus concluded that Mr. Mullis was competent as of November 1, 2012,

with no indication that this condition was subject to change due to the nature of

Mullis's complex mental impairments. *Id.*

However, Dr. Fuller recently told undersigned counsel that, had he been

aware of Mr. Mullis's September 13, 2012 renewed waiver, he would have

addressed that in his report, along with the reasons why it was to be expected that

Mr. Mullis's position on waiver would fluctuate. TM-157-158 (Fuller Decl. ¶ 4).

As Dr. Fuller explains in his declaration:

> Competency is a moving target, not a steady state. As I wrote in my November 8, 2012 report, my opinion that Mr. Mullis was "presently" competent was based on my finding that, during my evaluation on November 1, his multiple psychiatric illness were quiescent and therefore not affecting his decisional abilities. However, given his traumatic past and numerous psychiatric conditions, Mr. Mullis is very fragile and vulnerable psychologically and emotionally. There are any number of variables in the environment that could trigger a sudden and dramatic change in his decision-making capacity, and I would not have been at all surprised if two days after my evaluation, Mr. Mullis decompensated and was once again unable to make rational choices. I would have attested to this opinion in 2012 and included it in my report if I had been asked.

*Id.* ¶ 6. This paints a radically different portrait of Mr. Mullis's competency than

OCW presented to the CCA with the 4A Motion.

### 3. *Failure to consider whether waiver was voluntary*

OCW also failed to ask Dr. Fuller to consider whether, regardless of his

competency, Mr. Mullis's mental illness rendered him incapable of voluntarily

waiving state habeas review. As discussed in Petitioner's earlier pleadings, a finding of competency to waive "is not all that is necessary before [a defendant] may be permitted to" forgo his appeals; the trial court "must satisfy itself that the waiver . . . is knowing and voluntary." *Godinez v. Moran*, 509 U.S. 389, 400 (1993); *see also* Reply Brief at 41–45.

The purpose of the "voluntary" inquiry in the context of waiver is to determine whether the decision to waive is "uncoerced." *Godinez*, 509 U.S. at 401 n.12 (citation omitted). Thus, to be voluntary, a waiver must be "the expression of the defendant's own free will." *Kniatt v. State*, 206 S.W.3d 657 (Tex. Crim. App. 2006) (citing *Brady v. United States*, 397 U.S. 742, 755 (1970)). OCW argued in its 4A Motion that "depression and severe mental illness presented him with only a 'Hobson's choice'—to commit suicide—which was not a choice at all." TM-053 (4A Motion at 10). Yet, Dr. Fuller's report provides no support for this argument.

By contrast, Dr. Reynolds—who was specifically asked to consider the impact of Mr. Mullis's mental illness and history of trauma on the voluntariness of his waiver—concluded that the purported waiver was not an expression of his own free will. *See* Reynolds Add. at 2–3.

### 4. *Legal insufficiency of Dr. Fuller's report*

Ultimately, because Dr. Fuller had to explain how he reached a different conclusion from Dr. Scarano entirely on the basis of Mr. Mullis's failure to

disclose to Dr. Scarano his depression, fear of a life sentence, and suicidal ideation at a particular point in time, Dr. Fuller's opinion is expressed in legally insufficient terms. Although Dr. Fuller acknowledged that Mr. Mullis had manifested symptoms of significant psychiatric illness throughout his lifetime, *see* TM-089 (Fuller Report at 10), he did not consider how Mr. Mullis's mental impairments— individually and in combination—rendered him unable to "mak[e] a rational choice among his options." *Mata v. Johnson*, 210 F.3d 324 328 (5th Cir. 2000). Rather, as this Court observed, Dr. Fuller's report simply assumes that "depression and suicidal intent render a defendant incompetent without linking those factors to the inquiry required by the law." ECF No. 163 at 16.

Had Dr. Fuller had access to all relevant information and been asked to consider the impact of Mr. Mullis's mental illnesses on his decision-making ability more broadly, Dr. Fuller could have reached the types of conclusions seen in the expert reports submitted in these federal habeas proceedings. *See* TM-159 *(*Fuller Decl. ¶ 9) (expressing a willingness to review relevant records not provided to him in 2012 and author a supplemental report addressing the ways Mr. Mullis's mental health issues affect his competency to waive, and whether any such waiver was likely to be voluntary).

**B.   The CCA Was Not Justified in Relying on Mr. Mullis's September 13, 2012 Letter When It Denied His Efforts to Reinvigorate Habeas Review.**

Given the forgoing, it is clear that, had OCW not limited Dr. Fuller's evaluation to two specific points in time, and had they told him about the September 13, 2012 letter to the CCA, he would have explained that Mr. Mullis was not competent when he wrote the letter.

However, even setting aside Dr. Fuller's report, the CCA was not justified in relying on the letter to deny Mr. Mullis's 4A Motion. By the time the CCA reviewed Mr. Mullis's motion, the court was aware that he had vacillated on the subject of waiver at least four times. First, Mr. Mullis waived habeas review in October 2011. He then expressed a desire to reinstate his proceedings on August 22, 2012. Just a few weeks later, he again declared that he wanted to waive review. And finally, in November 2012, Mr. Mullis agreed to be evaluated by Dr. Fuller and permitted OCW to file the 4A Motion, clearly indicating that he had changed his mind yet again.

As the Supreme Court has recognized, "mental illness is not a unitary concept," but rather something that "varies in degree," "can vary over time," and "interferes with an individual's function at different times and different ways." *Indiana v. Edwards*, 554 U.S. 164, 175 (2008). And courts have specifically acknowledged that there may be "frequent fluctuations" in a defendant's competency, even within a period of months. *United States v. Ives*, 574 F.2d 1002, 1006–07 (9th Cir. 1978) (trial court violated due process by refusing to "consider

evidence of a possible change in [defendant's] ability to stand trial during the five months since his last psychiatric examination, when there had been four alternating determinations of competency and incompetency in less than a year"); *see also United States v. Ruston*, 565 F.3d 892, 903 (5th Cir. 2009) (refusing to rely on six-month-old competency evaluation); *United States v. Taylor*, 437 F.2d 371, 382 (4th Cir. 1971) (Sobeloff, C.J., concurring in part and dissenting in part) (same).

In light of this jurisprudence, and given the leniency that the CCA has traditionally granted capital petitioners seeking to file an untimely writ, it was unreasonable for the court to rely strictly on the September 13, 2012 letter to deny relief under Article 11.071 § 4A. *See* Reply Brief at 7-10.

## IV.   NEED FOR FURTHER FACT FINDING

As this Court is surely aware based on all of the briefing up to this point, there are serious factual disputes between the parties. These disputes can only appropriately be resolved at an evidentiary hearing. *See Jenkins v. Anderson*, 447 US. 231, 234 n.1 (1980) (application of cause and prejudice may require district court fact finding). Further fact finding is necessary to establish the extent of state habeas counsel's abandonment of Mr. Mullis, or at least their ineffective representation of him, in state habeas review.

This Court should hear from the witnesses Petitioner has proffered.  This testimony would help resolve disputed issues of material fact, including:

- the extent to which OCW curtailed or ceased their investigation of Mr. Mullis's case based on their impression he would ultimately waive and following the October 11, 2011 competency hearing;

- the content of discussions between OCW and Dr. Scarano after counsel received his reports and identified areas of concern;

- why OCW, if unclear as to their role pursuant to the trial court's October 12, 2011 order, did not request clarification from the court;

- the extent of OCW's conflict of interest in presenting the 4A Motion on Petitioner's behalf and whether or not Mr. Mullis was informed of their conflict; and

- what efforts, if any, OCW undertook to locate unconflicted counsel to prepare and present Mullis's 4A Motion.

## CONCLUSION

While "[t]he cause and prejudice requirement shows due regard for States' finality and comity interests," it also "ensur[es] that 'fundamental fairness [remains] the central concern of the writ of habeas corpus.'" *Dretke v. Haley*, 541 U.S. 386, 393 (2004). In the unusual circumstances of this case, which Petitioner will further elucidate at an evidentiary hearing, concerns for fundamental fairness should lead this Court to conclude that OCW's abandonment of Mr. Mullis, as well as their ineffectiveness in representing him, excuses any procedural default.

/s/ Peter Walker
Shawn Nolan
Peter Walker
Federal Community Defender for the
Eastern District of Pennsylvania
Curtis Center – Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
shawn_nolan@fd.org
peter_walker@fd.org

COUNSEL FOR PETITIONER

Dated: May 3, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused the foregoing to be served on the following person by ECF filing:

Matthew Ottoway
Assistant Attorney General
Office of the Attorney General of Texas
Post Office Box 12548
Austin, Texas 78711-2548


/s/ Peter Walker
Peter Walker


Dated: May 3, 2021